**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to All Cases

**<u>PLAINTIFFS' MASTER COMPLAINT</u>**

1.      Plaintiffs, by the undersigned counsel, hereby submit this Master
Complaint against Defendants BAYER CORPORATION, BAYER HEALTHCARE
PHARMACEUTICALS INC., and BAYER HEALTHCARE A.G. (hereinafter
collectively "Defendants" or "Bayer") for equitable relief, monetary restitution, and/or
compensatory and punitive damages. Plaintiffs make the following allegations based
upon their personal knowledge, and upon information and belief, as well as upon their
attorneys' investigative efforts, regarding the drug product Trasylol®.

2.      This Master Complaint is submitted pursuant to Pretrial Order No. 4 (Case
Management Order No. 1) of this Multidistrict Litigation ("MDL") Transferee Court, to
serve only the administrative functions of efficiency and economy of presenting certain
common claims and common questions of fact and law for consideration by this Court in
the context of this multidistrict proceeding. This Master Complaint does not necessarily
include all claims asserted in all of the actions that have been transferred to this Court
under 28 U.S.C. § 1407, nor is it intended to consolidate for any purposes the separate
claims of the plaintiffs herein. Those matters are set forth in the individual actions filed
by each of the respective Plaintiffs. This Master Complaint does not constitute a waiver

or dismissal of any actions or claims asserted in those individual actions, nor by it do any Plaintiffs relinquish the right to add or assert or seek leave to add or assert any additional claims or predicates for claims depending upon further information that they may uncover.

## The Parties

3.      Plaintiffs are individuals, or the duly authorized representatives of individuals and/or the estates of deceased individuals who, at all times relevant to the allegations in the complaint, resided in the United States of America.  Primary Plaintiffs bring these civil actions for equitable relief, monetary restitution, and/or compensatory and punitive damages for injuries and/or wrongful deaths suffered as a direct result of their exposure to Trasylol during major surgery.  In addition, Secondary Plaintiffs assert derivative claims including, but not limited to, loss of consortium and survivorship.  Not all claims asserted in this Master Complaint will necessarily be held by, nor asserted by, all Plaintiffs, and not all claims in this Master Complaint are asserted by each Plaintiff against every Defendant.

4.      Defendant BAYER CORPORATION is a corporation formed in the State of Indiana with its principal place of business located in Pittsburgh, Pennsylvania.  Bayer Corporation is a wholly owned subsidiary of Defendant BAYER HEALTHCARE A.G. At all times material to this lawsuit, Bayer was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce, either directly or indirectly, the drug product Trasylol.

5.      Defendant BAYER HEALTHCARE PHARMACEUTICALS INC., as successor in interest of BAYER PHARMACEUTICALS CORPORATION, is a wholly

Draft of June 5, 2008 – Confidential Attorney Work Product

owned subsidiary of Defendant Bayer Corporation, incorporated in the state of Delaware, with its principal place of business located in Wayne, New Jersey.   Prior to January 1, 2008, Bayer Pharmaceuticals Corporation was a wholly owned subsidiary of Defendant Bayer Corporation.  Bayer Pharmaceuticals Corporation's principal place of business was located in West Haven, Connecticut.  The development of Trasylol for sale in the United States, the conduct of clinical studies, the preparation of regulatory applications, the maintenance of regulatory records, the labeling and promotional activities regarding Trasylol, the decision to suspend marketing of Trasylol, and other actions central to the allegations of this lawsuit, were undertaken by Defendant Bayer Pharmaceuticals Corporation in the State of Connecticut and elsewhere.

6.     Pursuant to Pretrial Order No. 4 (Case Management Order No. 1) in this multidistrict litigation, service of process of any abbreviated complaints ("Short Form Complaints") upon Defendants BAYER CORPORATION and BAYER HEALTHCARE PHARMACEUTICALS INC. shall be effective when sent by registered U.S. mail, return receipt requested, to Douglas A. Pearson, Esq., 100 Bayer Road, Building 14, Pittsburgh, PA 15205-9741, or, upon amended order of the Court, his successor.  In addition, a copy of each notice transmitted to the Defendants in the foregoing manner shall be provided to Lead and Liaison Counsel for Defendants.  Service will be effective ten (10) days after mailing.

7.     Defendant BAYER HEALTHCARE A.G., a healthcare and medical products company, is a German corporation with its principal place of business in Leverkusen, Germany.  Bayer HealthCare A.G. is a wholly owned subsidiary of the managing holding company Defendant BAYER A.G.  Bayer A.G. is also a German

corporation with its principal place of business in Leverkusen, Germany.  At all times relevant herein, Bayer HealthCare A.G., and its predecessor Bayer A.G., was in the business of designing, testing, manufacturing, distributing and promoting certain pharmaceutical products, including Trasylol.

8.      Pursuant to Pretrial Order No. 4 (Case Management Order No. 1) in this multidistrict litigation, service of process of any abbreviated complaints ("Short Form Complaints") upon Defendant BAYER HEALTHCARE A.G. shall be effective when sent by registered U.S. mail, return receipt requested, to Alexander Bey, Esq., General Counsel, Bayer HealthCare AG, Law and Patents Department, 51368 Leverkusen, GERMANY, or, upon amended order of the Court, his successor.  In addition, a copy of each notice transmitted to the Defendant in the foregoing manner shall be provided to Lead and Liaison Counsel for Defendants.  Service will be effective ten (10) days after mailing.

## Jurisdiction and Venue

9.      The federal District Courts have jurisdiction over these civil actions pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy in each individual action exceeds $75,000.00 and the Plaintiffs are citizens of different states than the Defendants.  This allegation is made without prejudice to those Plaintiffs, who may, by motion, seek remand of their civil action(s) to state court.

10.     Venue in this district for pretrial proceedings in these civil actions is proper pursuant to 28 U.S.C. § 1407 and the April 7, 2008 Transfer Order of the United States Judicial Panel on Multidistrict Litigation and/or subsequent Transfer Orders. Plaintiffs pray that each action so transferred shall be remanded by the panel or by the

Draft of June 5, 2008 – Confidential Attorney Work Product

Court at or before the conclusion of such pretrial proceedings to the judicial district from which it was transferred, or, in the case of civil actions filed directly into the docket of this Multidistrict Litigation, to a judicial district where venue is proper under 28 U.S.C. § 1391, unless it shall have been previously concluded.

**<u>Allegations of Fact</u>**

11.     Trasylol® is the brand name of a drug product known generically as "aprotinin for injection" which is available for medical use only by prescription.   It is a member of a class of prescription drug products known as Antifibrinolytics, which are used as a means of controlling or reducing bleeding and limiting or avoiding blood transfusions in current medical practice.   Since the early 1990's, Antifibironlytic therapies have been widely accepted by the medical community for use during cardiac and other types of surgery to reduce the number of patients requiring blood transfusion and to reduce total blood loss.

12.     The aprotinin protein, which is the active pharmaceutical ingredient in Trasylol, is a naturally occurring proteolytic enzyme inhibitor derived from bovine lung tissue.   Aprotinin consists of 58 amino acid residues in a single-chain polypeptide, consisting of 6512 daltons and is cross-linked by three disulfide bridges.   The reactive bond site for Aprotinin is lysine – 15 – alanine – 16, and it forms reversible stoichiometric complexes.

13.     Aprotinin was first discovered in or about 1930 in Germany.   Since the 1950's, Aprotinin was sold outside the United States as a treatment for acute pancreatitis and for several other indications.   Trasylol is manufactured in Germany by Bayer Healthcare A.G.

14. From 1994 to 2007, Bayer sold Trasylol in the United States in 100 and 200 milliliter vials. When used during surgery, Trasylol was generally delivered to the patient intravenously in the operating room by a health care professional and without the specific knowledge of the patient.

15. Amicar® (epsilon-aminocaproic acid or "EACA") and Cyklokapron® (tranexamic acid or "TEA") are additional drug products in the Antifibrinolytic class. EACA was first sold in the United States in or about 1964, and TEA was first sold in the United States in or about 1986.

16. In 1987, a study was published by Dr. David Royston *et al.* in *The Lancet* suggesting that the use of aprotinin in repeat coronary artery bypass graft (also known as "CABG") surgery would reduce blood loss and the need for transfusions in patients undergoing CABG surgery.

17. In December 1993, the U.S. Food and Drug Administration (the "FDA") approved Trasylol for sale in interstate commerce in the United States as a prescription drug product and approved Trasylol's principal label, known as the "Package Insert," based on the criteria employed by the federal agency pursuant to the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.* In that Package Insert, Trasylol was indicated "for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of repeat coronary artery bypass graft surgery [and] in selected cases of primary coronary artery bypass graft surgery where the risk of bleeding is especially high . . . or where transfusion is unavailable or unacceptable."

18.     According to the FDA, the risk of renal toxicity associated with exposure to Trasylol was known to Bayer in 1993.  According to Dr. Dennis Mangano, M.D., Ph.D., of the Ischemia Research and Education Foundation, despite pre-existing clinical and animal evidence, only a minority of 45 clinical studies conducted on aprotinin exposure during surgery prior to FDA's approval in 1993 commented on renal function and, of those, none had an adequate number of patients to determine, with statistical significance, whether Trasylol exposure increased the risk of renal failure.

19.     In October 1994, the FDA approved amendments to the Trasylol Package Insert to provide an optional, lower dosage regimen of aprotinin.

20.     In August 1997, the FDA approved amendments to the Trasylol Package Insert to highlight information about the risk of anaphylactic shock and certain other adverse effects associated with exposure to aprotinin.

21.     In August 1998, the FDA approved amendments to the Trasylol Package Insert.  In that Package Insert, Trasylol was indicated for use during both primary and repeat CABG surgeries.

22.     Between August 1998 and December 2006, no material safety information was reviewed and approved or deemed not approvable by the FDA for inclusion in the Trasylol Package Insert.

23.     The FDA required Bayer to conduct certain post-approval clinical studies and/or evaluations and analyses as conditions of its approval of the revised Package Insert in 1998.  Bayer did not fulfill those obligations and/or did not conduct those clinical studies and/or evaluations and analyses so as to generate clinically meaningful information about the safety of Trasylol.

24.     Further, Bayer failed to conduct any clinical studies comparing the safety and efficacy of Trasylol with EACA and/or TEA and failed to conduct any epidemiological studies to assess extent and nature of the risk of renal failure and/or death.

25.     Bayer aggressively promoted Trasylol to physicians through medical journal advertisements, mass mailings, and direct communications from the Bayer sales force, among other methods.  Bayer sponsored continuing medical education ("CME") seminars and paid physicians to advocate the use of Trasylol, orally and in writing, over the use of other Antifibrinolytics and in various types of surgery, and to downplay the significance of the adverse effects of Trasylol and in particular the risk of renal injury.

26.     Bayer regularly represented in its advertising and promotional messages that the risk of renal and certain other injuries including death, associated with exposure to Trasylol were "comparable to placebo," "had no adverse effect on renal function" and other similar false and misleading messages.  These messages represented to physicians that Trasylol did not cause renal injuries and/or did not cause more injuries than the number of injuries resulting from surgery without the use of Trasylol.   In other advertising and promotional messages, Bayer overstated the benefits of Trasylol.

27.     According to Bayer, an estimated 4.3 million patients were given Trasylol. Bayer estimated that Trasylol sales generated about $293 million in 2005 alone, making it the company's 11th largest-selling drug.  In late 2005, Bayer forecast that Trasylol would someday generate upwards of $600 million annually.

28.     On January 26, 2006, *The New England Journal of Medicine* ("NEJM") published an article by Dr. Mangano *et al.* reporting an association of Trasylol (aprotinin

injection) with renal toxicity and renal failure and ischemic events (myocardial infarction and stroke) in patients undergoing coronary artery bypass grafting surgery.  This study was an observational study of patients who received either Trasylol, EACA or TEA, or no specific drug treatment.  A graph presented by Dr. Mangano illustrates the increased risk of renal injuries associated with exposure to aprotinin versus EACA, TEA, or no Antifibrinolytic drug:



29.     Overall, Dr. Mangano found more than a doubling in the risk of renal injury in patients exposed to aprotinin compared to those patients not exposed (odds ratio of 2.52 (1.66-3.82)) as well as an increased risk of cardiovascular and cerebrovascular adverse events and death.

30.     On January 20, 2006, in the medical journal *Transfusion*, Dr. Karkouti *et al*. also showed an association between the use of aprotinin and renal toxicity among patients undergoing cardiac surgery with cardiopulmonary bypass.

31.     In February 2006, the FDA issued a public health advisory regarding the results of the Mangano and Karkouti studies and expressing a desire to hold an advisory committee meeting to discuss the safety of Trasylol.

32.     Upon receiving the Mangano study, Bayer established a "Trasylol Steering Committee" ("TSC") that included numerous highly ranked Bayer employees, both from Bayer's United States offices, but also from the Bayer home offices in Germany, to oversee Bayer's total response to the studies and any regulatory responses.  Bayer's TSC began a coordinated response to the Mangano and Karkouti studies intended to call their science and findings into question and hopefully lay the groundwork for a favorable result from the FDA's proposed advisory committee meeting.   As part of this assault on the studies, Bayer wrote to the FDA to allege "serious methodological and statistical flaws" in the studies.

33.     On February 1, 2006, Bayer contacted Dr. Alex Walker, a highly respected Harvard-trained physician and pharmacoepidemiologist and the Senior Vice President for Epidemiology at a company named "i3," regarding the possibility of conducting its own retrospective study to compare Trasylol with EACA and TEA, in order to rebut the conclusions of Drs. Mangano and Karkouti.

34.     After independent reviewers approved of the i3's protocol and design, Bayer endorsed the study's commencement.  On June 19, 2006, Bayer official Dr. Ernst Weidmann signed an agreement with i3 to begin the study. The appendix to that

Draft of June 5, 2008 – Confidential Attorney Work Product

agreement required i3 to deliver the preliminary results of the study within 3 months, just in time for the FDA's September 21, 2006 advisory committee meeting.

35.     In May 2006, the FDA announced that it would convene a meeting of its Cardiovascular and Renal Drugs Advisory Committee on September 21, 2006, to evaluate the data regarding Trasylol.  The FDA asked Bayer to submit information relative to Trasylol and, specifically, the issues raised by the Mangano and Karkouti studies.  Bayer submitted voluminous information to the FDA and had numerous contacts with the agency about Trasylol and the meeting, but did not ever inform the FDA about the work being conducted by Dr. Walker and i3.

36.     The i3 study confirmed the findings of Drs. Karkouti and Mangano. The i3 study examined the medical records of approximately 67,000 patients, of whom 30,000 had received Trasylol.  The study showed that patients who received Trasylol were at an increased risk for death, kidney failure, congestive heart failure, and stroke. By September 14, 2006, Bayer's Trasylol response team were in possession and aware of the preliminary results of the i3 study and were aware that it confirmed the findings of the earlier published studies of Trasylol.  Bayer did not inform the FDA about the work being conducted by Dr. Walker or existence of the preliminary report until after the September 21, 2006 advisory committee meeting.

37.     Bayer continued to prepare for the September 21, 2006 advisory committee meeting.  Despite learning of the study's results a week earlier, Bayer failed to inform the advisory committee that the results of the i3 study confirmed the results of the Trasylol studies being discussed at the hearing. In fact, at no point did Bayer even

Draft of June 5, 2008 – Confidential Attorney Work Product

mention that it had commissioned such a study to create "independent data" by which to compare the Mangano and Karkouti studies.

38.     At the September 21, 2006 meeting, the FDA's advisory committee invested a great deal of time in questioning the science of Mangano and Karkouti's studies and questioned whether it made sense to act without additional studies confirming the risks of Trasylol.

39.     The FDA advisory committee ultimately voted 18-0 to recommend that there should be no change to the safety labeling of Trasylol.

40.     Days later, the FDA first learned of the work being conducted by Dr. Alexander Walker, including the 67,000 patient-study his company, i3, conducted for Bayer.

41.     A Bayer "investigation" of how or why the i3 study was not presented to the FDA's advisory committee found it the result of "regrettable human error."  Bayer, of course, also continued to publicly question the science and results of its own study. Bayer continued to sell Trasylol despite these studies proving the danger of the drug.

42.     On September 29, 2006, the FDA issued a second Public Health Advisory related to Trasylol which noted the i3 study and that the FDA did not have access to this study at the September 21, 2006 advisory committee meeting. Essentially, the FDA reiterated its February 2, 2006 Public Health Advisory, noting that studies questioning the safety of Trasylol existed.

43.     As a result of the recommendations of the FDA's advisory committee, the articles authored by Mangano *et al.* and Karkouti *et al.,* along with other reports and data known to and/or in the possession of the Defendants, the FDA required that the Package

Insert for Trasylol include additional Warnings and Precautions, beginning in December 2006. The Warnings and Precautions included the risks of renal injury and renal failure associated with the use of aprotinin, and recommended that aprotinin be reserved for patients who are at an increased risk of blood loss and blood transfusion.

44. On December 15, 2006, the FDA sent an Alert to healthcare professionals advising of a change in the product label for Trasylol:

> The new labeling for Trasylol (December 2006) has a more focused indication for use, a new Warning about renal dysfunction, a revised Warning about anaphylactic reactions, and a new Contraindication. Trasylol is now indicated only for prophylactic use to reduce peri-operative blood loss and the need for blood transfusion in patients who are at *an increased risk for blood loss and blood transfusion* undergoing cardiopulmonary bypass in the course of coronary artery bypass grafting (CABG) surgery. Trasylol should be administered only in the operative setting where cardiopulmonary bypass can be started quickly. Trasylol should not be administered to any patient with a known or suspected exposure to Aprotinin within the past 12 months.
>
> FDA is evaluating additional recently submitted epidemiological safety study data (discussed below), in the context of all other safety and efficacy information available on Aprotinin. This review may result in other actions, including additional changes to the full prescribing information (product labeling).

45. On January 25, 2007, Bayer announced it was discontinuing three clinical studies of Trasylol. The studies were to investigate the safety and efficacy of Trasylol with regard to transfusion requirements and blood loss in adults undergoing spinal fusion surgery, pneumonectomy or esophagectomy for cancer, and total cystectomy in bladder cancer.

46.     On September 12, 2007, a joint meeting of the FDA's Cardiovascular and Renal Drugs Advisory Committee and Drug Safety and Risk Management Advisory Committee was held.  The purpose of the meeting was to follow up on the September 2006 meeting, as well as to discuss the findings of additional studies showing an increased mortality rate in Trasylol-treated patients.  At that meeting, the advisory committee voted 16-1 to recommend that Bayer be allowed to continue selling Trasylol with the label revisions instituted in December 2006.

47.     In October 2007, Bayer was notified that the Executive Committee of a Canadian-based clinical study of Trasylol in high-risk cardiac surgery patients had halted the study.   A planned periodic data analysis in this clinical trial, the *Blood conservation using antifibrinolytics: A randomized trial in a cardiac surgery population* ("BART") study conducted by the Ottawa Health Research Institute, indicated an increase in all-cause mortality (that almost reached conventional statistical significance for 30-day mortality) for patients in the Trasylol treatment arm compared to patients who received the alternative drug products EACA or TEA.

48.     On or about November 5, 2007, Defendants discontinued the sale of Trasylol.  The FDA stated at that time:  "[I]t is not possible to determine and identify a population of patients undergoing cardiac surgery for which the benefits of Trasylol outweigh the risks."

49.     In May 2008, the New England Journal of Medicine published an article by Hebert, et al. finding an association of Trasylol with increased mortality when compared with other antifibrinolytic agents.  Sadly, the lead author, Paul Hebert,

concluded, "This study could have been done by the company [Bayer] five to ten years ago."

50.     Following publication of the BART study, on May 14, 2008 Bayer notified the FDA of its intent to remove all remaining supplies of Trasylol from hospital pharmacies and warehouses. The following day, Trasylol production and marketing was terminated worldwide.

51.     Primary Plaintiffs are individuals (or the representatives of individuals) who were exposed to Trasylol during surgery and who experienced renal insufficiency, renal failure, and/or other related adverse experiences, including death, as a direct and proximate result of their exposure to Trasylol.  Said injuries further caused extensive anxiety, distress, fear, pain, suffering, and depression, while they substantially reduced the ability to enjoy life.

52.     Secondary Plaintiffs are spouses and survivors who experienced injuries as a direct and proximate result of Primary Plaintiffs' exposure to and injury from Trasylol.

## **Claims for Relief**

### COUNT I - STRICT LIABILITY - FAILURE–TO–WARN

53.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

54.     Defendants are liable to Plaintiffs under state common law and/or state Product Liability Acts for innocent, negligent and/or willful failure to provide adequate warnings and other clinically relevant information and data regarding the appropriate use

of Trasylol to Plaintiffs and to the health care providers that prescribed and administered Trasylol to them.

55.     Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of renal and other injuries and death associated with the use of Trasylol, either compared to the use of other drug products in the class of Antifibrinolytics and/or compared to the use of no Antifibrinolytics, were inadequate.

56.     Plaintiffs did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to them or to their physicians.

57.     Defendants had a continuing duty to provide consumers, including Plaintiffs, and their physicians with warnings and other clinically relevant information and data regarding the risks and dangers associated with Trasylol, as it became or could have become available to Defendants.

58.     Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Trasylol, to health care providers empowered to prescribe and dispense Trasylol to consumers, including Plaintiffs, without adequate warnings and other clinically relevant information and data.  Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Trasylol, which resulted in injury to Plaintiffs.

59.     Despite the fact that Defendants knew or should have known that Trasylol caused unreasonable and dangerous side effects when either compared to the use of other

drug products in the class of Antifibrinolytics, and/or compared to the use of no Antifibrinolytic, which many users would be unable to avoid by any means, they continued to promote and market Trasylol without stating that there existed safer and more or equally effective alternative drug products and/or providing adequate clinically relevant information and data.

60.     Defendants knew or should have known that consumers, and Plaintiffs specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

61.     Defendants failed to provide timely and adequate warnings to physicians, distributors, and consumers, including Plaintiffs and to their intermediary physicians, in the following ways:

(1) Defendants failed to include adequate warnings and/or providing adequate clinically relevant information and data that would alert Plaintiffs and their physicians to the dangerous risks of Trasylol including, among other things, kidney failure and death;

(2) Defendants failed to provide adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, kidney failure and death;

(3) Defendants continued to aggressively promote Trasylol, even after they knew or should have known of the unreasonable risks of kidney injury and death from this drug.

62.     Defendants had a constitutionally-protected right to provide Plaintiffs and their physicians with adequate clinically relevant information and data and warnings

regarding the adverse health risks associated with exposure to Trasylol, and/or that there existed safer and more or equally effective alternative drug products.

63.     By failing to provide Plaintiffs and their physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Trasylol, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

64.     Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiffs and the public.

65.     Defendants' actions described above violated the federal and state Food, Drug and Cosmetic Acts and rendered Trasylol misbranded.

66.     As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiffs were exposed to Trasylol and suffered and continue to suffer the injuries and damages set forth with greater specificity in their individual Complaints.

<u>COUNT II - STRICT LIABILITY – DESIGN DEFECT</u>

67.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

68.     Defendants are liable to Plaintiffs for the injuries and damages sustained by Plaintiffs pursuant to state common law and/or state Product Liability Acts due to the defective design and/or formulation of Trasylol.

69.     At all times material to these allegations, Defendants manufactured, distributed, and sold Trasylol, which was administered to Plaintiffs during surgery, as alleged in their individual Complaints.

70.     Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field.

71.     The Trasylol administered to Plaintiffs was defective in design or formulation in the following respects:

(1) When it left the hands of the Defendants, this drug was unreasonably dangerous to the extent beyond that which could reasonably be contemplated by Plaintiffs or their physicians;

(2) Any benefit of this drug was outweighed by the serious and undisclosed risks of its use when prescribed and used as the Defendants intended;

(3) The dosages and/or formulation of Trasylol sold by the Defendants were unreasonably dangerous;

(4) There are no patients for whom the benefits of Trasylol outweighed the risks; and/or

(5) There are no patients for whom Trasylol is a safer and more efficacious drug than other drug products in its class.

72.     The Trasylol administered to Plaintiffs was defective at the time it was distributed by the Defendants or left their control.

73.     The Trasylol administered to Plaintiffs was expected to reach the user without substantial change in the condition in which it was sold.

Draft of June 5, 2008 – Confidential Attorney Work Product

74. The Trasylol administered to Plaintiffs reached them without substantial change in the condition in which it was sold.

75. Plaintiffs were patients whom the Defendant reasonably expected would be administered Trasylol.

76. Defendants were entitled to withdraw Trasylol from the market at any time, but failed to do so in a timely and responsible manner.

77. The defects in the Trasylol administered to Plaintiffs were a direct and proximate cause of the injuries, damages, and death sustained by Plaintiffs as set forth in their individual Complaints.

## COUNT III – NEGLIGENCE

78. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

79. Defendants are liable to Plaintiffs pursuant to state common law and/or state Product Liability Acts due to their negligent development, study, manufacture, distribution and sale of Trasylol.

80. At all times relevant to this lawsuit, Defendants owed a duty to consumers, like Plaintiffs and their health care providers, to assess, manage, and communicate the risks, dangers, and adverse effects of Trasylol and to suspend distribution and sale of Trasylol when Defendants discovered it to be unreasonably dangerous.

Draft of June 5, 2008 – Confidential Attorney Work Product

81.     Defendants' duties included, but were not limited to, carefully and properly designing, testing, studying, manufacturing, promoting, selling, and/or distributing Trasylol into the stream of commerce, and providing adequate information regarding the appropriate use of this drug product.

82.     Defendants negligently and carelessly breached the above-described duties to Plaintiffs by committing negligent acts and/or omissions including, but not limited to, the following:

(1) Defendants failed to use ordinary care in designing, testing, and manufacturing Trasylol so as to reveal and communicate the high risk to users of unreasonable, dangerous side-effects, some of which are fatal, such as renal failure, when compared to the use of alternative drug products in its class or compared to the use of no drug products;

(2) Defendants failed to accompany Trasylol with adequate information that would alert doctors, consumers, and other users to the potential adverse side effects associated with the use of these drugs and the nature, severity and duration of such adverse effects either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(3) Defendants failed to conduct adequate post-marketing studies, non-clinical and clinical testing and post-marketing surveillance and analyses to determine and communicate the safety profile and side effects of Trasylol either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(4) Defendants failed to warn Plaintiffs or their physicians prior to actively encouraging the sale of Trasylol, either directly or indirectly, orally or in writing, about the possibility of renal failure, injury and death as a result of the use of this drug, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(5) Defendants continued to promote the safety and effectiveness of Trasylol, while downplaying its risks, even after Defendants knew or should have known of the risks of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(6) Defendants knew or should have known that the use of Trasylol involved a risk of kidney failure, renal injury, and death and/or that Trasylol was unreasonably dangerous either compared to the use of alternative drug products in its class or compared to the use of no drug products, and failed to communicate that information to Plaintiffs and their physicians;

(7) At the time of Plaintiffs' surgeries, Defendants had or should have had scientific data which indicated the true association between the use of Trasylol and the risk of kidney failure, renal injury, and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products, and could have distributed that information to Plaintiffs and their physicians even if that information was not included in the FDA-approved product labeling;

Draft of June 5, 2008 – Confidential Attorney Work Product

(8) Defendants failed to provide consumers, like Plaintiffs and their health care providers, with scientific data which indicated that Trasylol was unreasonably dangerous either compared to the use of alternative drug products in its class or compared to the use of no drug products, that there were no patients in whom the benefits of Trasylol outweighed the risks, and failed to promptly withdraw Trasylol from the market;

(9) Defendants affirmatively represented to physicians and the public that "Trasylol had no adverse effect on renal function" when pre-approval clinical data confirmed the risk of renal impairment and Defendants had never performed any post-approval epidemiological studies to assess the risk of Trasylol on renal function; and

(10)    Defendants were otherwise careless or negligent.

83.    Although Defendants knew or should have known that Trasylol caused unreasonably dangerous side effects, either compared to the use of alternative drug products in its class or compared to the use of no drug products, which many users would be unable to remedy by any means, Defendants continued to market this drug for use in surgeries, when there were safer and less expensive alternatives available.

84.    Defendants knew or should have known that consumers, like Plaintiffs, would suffer injury as a result of Defendants' failure to exercise ordinary care, as described above.  Defendants, as manufacturers of drug products, are held to the level of knowledge of an expert in the field.

Draft of June 5, 2008 – Confidential Attorney Work Product

85.     As a direct and proximate cause of Defendants' negligent acts and/or omissions, Plaintiffs suffered injuries and damages, as set forth in their individual Complaints.

## COUNT IV - NEGLIGENCE *PER SE*

86.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

87.     Defendants have an obligation not to violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the drug products it sells.

88.     Defendants' acts constitute an adulteration, misbranding, or both, as defined by the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.* and parallel state Food, Drug and Cosmetic Acts and state common law.  Said acts constitute a breach of duty subjecting Defendants to civil liability for the damages arising there from inasmuch as such acts constitute negligence *per se*.

89.     Plaintiffs, as patients and purchasers exposed to Trasylol, are within the class of persons the statutes and regulations described above are designed to protect, and Plaintiffs' injuries are the type of harm these statutes and regulations are intended to prevent.

90.     As a direct and proximate cause of Defendants' negligent acts and/or omissions, Plaintiffs suffered injuries and damages, as set forth in their individual Complaints.

Draft of June 5, 2008 – Confidential Attorney Work Product

<u>COUNT V – FRAUD, MISREPRESNTATION, AND SUPPRESSION</u>

91.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

92.     Defendants are liable to Plaintiffs under the state common law and/or state Product Liability Acts for innocent, negligent and/or willful misrepresentations regarding the safety, efficacy, and risk/benefit ratio of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products, to Plaintiffs and to the health care providers that prescribed, recommended, ordered, and administered Trasylol to them.

93.     Through their actions and omissions in advertising, promoting, and otherwise, Defendants fraudulently, intentionally and/or negligently made public misrepresentations of material facts to, and/or concealed material facts from physicians and consumers like Plaintiffs, concerning the character and safety of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products.

Draft of June 5, 2008 – Confidential Attorney Work Product

94.     Defendants were entitled to provide consumers, like Plaintiffs and their health care providers, with scientific data which indicated an association between the use of Trasylol and the risk of kidney failure, renal injury, other injuries, and death. Defendants were able and entitled to compare Trasylol to alternative drug products in its class or to the use of no drug products, and were able to distribute such data to Plaintiffs and their physicians even if that information was not included in the Package Insert. Defendants were entitled to provide consumers, like Plaintiffs and their health care providers, with bona fide scientific data which indicated that Trasylol was unreasonably dangerous compared to alternative drug products in its class or to the use of no drug products, that there were no patients in whom the benefits of Trasylol outweighed the risks, and could have withdrawn Trasylol from the market at any time.

95.     Those public misrepresentations and omissions include, but are not limited to, those set forth in the general allegations section of this Complaint.   Those misrepresentations and omissions further include, but are not limited to, the following:

(1) Defendants failed to disclose that their pre-clinical and clinical testing and post-marketing surveillance were inadequate to determine the safety and side effects of Trasylol, compared to alternative drug products in its class or compared to the use of no drug products;

(2) Defendants failed to timely disclose, and/or intentionally concealed, data showing that Trasylol use dramatically increased the risk for renal failure and other injuries and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

Draft of June 5, 2008 – Confidential Attorney Work Product

(3) Defendants failed to include adequate warnings with Trasylol about the potential and actual risks, and nature, scope, severity, and duration of any serious side effects of this drug, including without limitation, the risk of renal failure, other injuries and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(4) Defendants concealed and continue to conceal past and present facts – including that, as early as the mid-1990's, Defendants were aware of and concealed their knowledge of an association between the use of Trasylol and dangerous side effects, including renal failure and death – from the consuming public, including Plaintiffs;

(5) Defendants affirmatively represented to physicians and the public that "Trasylol had no adverse effect on renal function" when pre-approval clinical data confirmed the risk of renal impairment and Defendants had never performed any post-approval epidemiological studies to assess the risk of Trasylol on renal function.

96.     Defendants' above-described acts and/or omissions were performed willfully, intentionally, and with reckless disregard for Plaintiffs and the public.

Draft of June 5, 2008 – Confidential Attorney Work Product

97.     Defendants knew or should have known that these representations were false and that Plaintiffs and their physicians would rely on them.  Defendants were obligated to disclose the foregoing risks, but failed to adequately and timely do so even after they were in possession of information concerning those risks.  Defendants' representations that Trasylol was safe for its intended use, either compared to the use of alternative drug products in its class or compared to the use of no drug products, were false.  Trasylol was, in fact, unreasonably dangerous to the health of Plaintiffs when used during surgery, and there were alternative products in the same class of drug products available that were less expensive, equally or more effective, and posed less risks.

98.     In the alternative, Defendants failed to exercise reasonable care in ascertaining the accuracy of the information they provided regarding the safe use of Trasylol and communicating that information to Plaintiffs and their physicians.

99.     At the time of Defendants' fraudulent misrepresentations and active concealment, Plaintiffs and their physicians were not aware of the falsity of the foregoing representations, nor were they aware that material facts concerning Trasylol had been concealed or omitted.  In reliance upon Defendants' misrepresentations, Plaintiffs physicians were induced and did administer Trasylol to Plaintiffs before, during, and/or after surgery.

100.    Defendants are obligated to provide consumers like Plaintiffs and their health care providers with scientific information and data regarding the association between exposure to Trasylol and the a risk of kidney failure, renal injury, other injuries, and death and could have distributed that information to Plaintiffs and their physicians even if that information was not included in the Package Insert.   Defendants were obligated to provide consumers, like Plaintiffs and their health care providers, with scientific information and data which indicated that Trasylol was unreasonably dangerous, that there were no patients in whom the benefits of Trasylol outweighed the risks, either compared to the use of alternative drug products in its class or compared to the use of no drug products.

101.    If Plaintiffs and their physicians had known the true facts concerning the risks of the use of Trasylol, in particular the risk of renal failure, other injuries and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products, they would not have used Trasylol and would have used one of the alternatives in that class of drug products.

Draft of June 5, 2008 – Confidential Attorney Work Product

102.    The reliance of Plaintiffs and their physicians upon Defendants' misrepresentations was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Trasylol, while Plaintiffs and their physicians were not in a position to know the true facts.  Defendants overstated the benefits and safety of Trasylol and concomitantly downplayed the risks in its use, compared to the use of alternative drug products in its class or to the use of no drug products, thereby inducing Plaintiffs' physicians to use Trasylol in lieu of other, safer alternatives.  At all times relevant hereto, Defendants' corporate officers, directors and/or managing agents knew or should have known of, and ratified the acts of Defendants, as alleged herein.

103.    Defendants' misrepresentations, concealment, suppression and omissions were made willfully, wantonly, uniformly, deliberately or recklessly, in order to induce Plaintiffs to be administered Trasylol.  Plaintiffs and their physicians did reasonably and justifiably rely upon the material misrepresentations and omissions made by the Defendants when agreeing to utilize Trasylol.

104.    As a direct and proximate result of the reliance of Plaintiffs and their physicians on Defendants' misrepresentations and concealment concerning the risks and benefits of Trasylol, Plaintiffs suffered injuries and damages, as set forth in their individuals Complaints.

## COUNT VI – CONSTRUCTIVE FRAUD

105.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

Draft of June 5, 2008 – Confidential Attorney Work Product

106.    At the time Trasylol was manufactured, distributed, and sold by Defendants to Plaintiffs, Defendants were in a unique position of knowledge concerning the safety and effectiveness of the drug product, which knowledge was not possessed by Plaintiffs or their physicians, and Defendants thereby held a position of superiority over Plaintiffs.

107.    Through their unique knowledge and expertise regarding the defective nature of Trasylol, and through their marketing statements to physicians and patients in advertisements, promotional materials, and other communications, Defendants professed to Plaintiffs' physicians that they were in possession of facts demonstrating that Trasylol was safe and effective for its intended use and was not defective.

108.    Defendants' representations to Plaintiffs' physicians were made to induce the purchase of Trasylol, and Plaintiffs and their physicians relied upon those statements when purchasing and administering Trasylol.

109.    Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiffs and their physicians and engaged in constructive fraud in their relationship.

110.    Plaintiffs and their physicians reasonably relied on Defendants' representations.

111.    As a direct and proximate result of Defendants' constructive fraud, Plaintiffs have suffered injuries and damages, as set forth in their individual Complaints.

## COUNT VII – BREACH OF IMPLIED WARRANTIES

Draft of June 5, 2008 – Confidential Attorney Work Product

112.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

113.   Trasylol was designed, tested, manufactured, distributed, promoted and sold by the Defendants; and was expected to, and did, reach Plaintiffs without a substantial change in its condition.

114.   Defendants, through advertising and promotional materials and the statements of sales representatives and paid endorsers, impliedly warranted that Trasylol was safe for the use for which it was intended.

115.   Defendants breached said implied warranties in that Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, renal failure, other injuries, and death.

116.   Plaintiffs and their physicians relied to their detriment on Defendants' implied warranties.

117.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs suffered injuries and damages, as set forth in their individual Complaints.


COUNT VIII - UNFAIR AND DECEPTIVE TRADE PRACTICES

118.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

119.   Under state laws, Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of the drug products.

Draft of June 5, 2008 – Confidential Attorney Work Product

120.   Defendants financed, assisted, supported and participated in the promotion and use of Trasylol in order to create consumer demand for the drug.

121.   Defendants deliberately misrepresented the safety of Trasylol and intentionally concealed the risks attendant to use of the drug.   Through their misrepresentations, Defendants intentionally affected the decisions of consumers and their health care providers to purchase, prescribe and use Trasylol, and to exclude the options of not using a drug product or using a substantially cheaper alternative drug from the same class.

122.   Defendants, while engaged in the conduct and practices identified above, committed one or more violations of state laws, including, but not limited to, the following:

(1) Defendants made false and misleading representations and omissions of material facts regarding Trasylol;

(2) Defendants concealed and otherwise failed to publicize the risks and injuries associated with Trasylol in order to promote sales of the drug and maximize profits; and

(3) Defendants engaged in advertising and promotion of Trasylol without conducting sufficient pre-clinical, clinical and post-approval testing and adequate post-marketing surveillance and analyses of Trasylol.

Draft of June 5, 2008 – Confidential Attorney Work Product

123.     Defendants thereby intended to and did affect the price of Trasylol, unfairly and deceptively maintained the price of Trasylol at an inflated level not otherwise obtainable and caused Plaintiffs and the consuming public generally to pay more for the drug than was warranted or than they would otherwise have paid in the absence of Defendants' misrepresentations and concealment.

124.     The above-described conduct, practices, acts and omissions were immoral, oppressive, unethical and/or unscrupulous, in violation of international treaty and law, and/or offend public policy.

125.     The above-described conduct, practices, acts and omissions caused consumers permanent and substantial financial loss, which loss could not reasonably have been avoided, and which was not outweighed by any countervailing benefit to the consuming public.   Consumers in general, and Plaintiffs in particular, incurred unnecessary expenses for a product that was purchased only because of the unfair, unscrupulous, oppressive and/or deceptive acts or practices of the Defendants.

126.     As a consequence of Defendants' wrongful conduct, Plaintiffs suffered an ascertainable financial loss: the difference between the price paid for Trasylol as a result of the Defendants' unfair trade practices and the cost of any of the substantially cheaper, and safer, drug alternatives.


## COUNT IX - UNJUST ENRICHMENT

127.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

Draft of June 5, 2008 – Confidential Attorney Work Product

128.    As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and use of Trasylol by Plaintiffs.

129.    Defendants have voluntarily accepted and retained these profits and benefits derived from Plaintiffs with full knowledge and awareness that, as a result of Defendants' wrongdoing, Plaintiffs were not receiving a product of the quality, nature or fitness that had been represented by Defendants, or that Plaintiffs, as reasonable consumers, expected to receive.

130.    By virtue of the conscious wrongdoing alleged above, Defendants have been unjustly enriched at the expense of Plaintiffs, who are entitled to in equity, and hereby seek, the disgorgement and restitution of Defendants' wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## COUNT X - LOSS OF CONSORTIUM

131.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

132.    At all times relevant hereto, the Plaintiffs' spouses (hereinafter referred to as "Spouse Plaintiffs") and/or family members (hereinafter referred to as "Family Member Plaintiffs") suffered injuries and losses as a result of Plaintiffs' injuries

Draft of June 5, 2008 – Confidential Attorney Work Product

133.     Spouse Plaintiffs and/or Family Member Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' conduct.

134.     Spouse Plaintiffs and/or Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love, and affection.

135.     For all Spouse Plaintiffs, Plaintiffs allege his/her marital relationship has been impaired and depreciated, and the marital association between husband and wife has been altered.

136.     Spouse Plaintiffs and/or Family Member Plaintiffs have suffered great emotional pain and mental anguish.

137.     As a direct and proximate result of Defendants' wrongful conduct, Spouse Plaintiffs and/or Family Member Plaintiffs have sustained and will continue to sustain severe injuries, severe emotional distress, economic losses, and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

138.     Defendants are liable to Spouse Plaintiffs and/or Family Member Plaintiffs jointly and/or severally for all general, special and equitable relief to which Spouse Plaintiffs and/or Family Member Plaintiffs are entitled by law.

<u>COUNT XI - WRONGFUL DEATH</u>

139.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

140.     Decedent Plaintiffs died as a result of their exposure to Trasylol and the Defendants' conduct and are survived by various family members, named and unnamed.

141.     The representatives of Decedent Plaintiffs' estates bring these claims on behalf of the Decedent Plaintiffs' lawful heirs.

142.     Defendants' wrongful conduct has proximately caused Decedent Plaintiffs' heirs to suffer the loss of Decedents' companionship, services, society, marital association, love and consortium.

143.     Decedent Plaintiffs' estate representatives bring these claims on behalf of Decedent Plaintiffs' lawful heirs for these damages and for all pecuniary losses sustained by the heirs.

144.     Decedent Plaintiffs' estate representatives further plead all wrongful death damages allowed by statute in the state or states in which the causes of action accrued.

<u>COUNT XII - SURVIVAL ACTION</u>

145.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

Draft of June 5, 2008 – Confidential Attorney Work Product

146.    As a direct and proximate result of their exposure to Trasylol and the conduct of Defendants outlined above, Decedent Plaintiffs suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses of hospitalization, medical and nursing care and treatment, and loss of earnings as well as loss of ability to earn money prior to Decedent Plaintiffs' deaths.

147.    The representatives/administrators of Decedent Plaintiffs' estates bring this claim on behalf of Decedent Plaintiffs' estates and Decedent Plaintiffs' beneficiaries for damages.

148.    The representatives/administrators of Decedent Plaintiffs' estates further plead all survival damages allowed by statute in the state or states in which the causes of action accrued.

## COUNT XIII - GROSS NEGLIGENCE/MALICE

149.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

150.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and reckless disregard for the rights of others, the public, and Plaintiffs for which the law would allow, and which Plaintiffs will seek at the appropriate time under governing law for the imposition of exemplary damages, in that Defendants' conduct:

(1) When viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or

(2) included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiffs. Plaintiffs relied on the representation and suffered injury as a proximate result of this reliance.

151.     Plaintiffs therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount within the jurisdictional limits of the Court.

152.     Plaintiffs also allege that the acts and omissions of Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiffs. In that regard, Plaintiffs will, as noted, seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.


COUNT XIV – PUNITIVE DAMAGES

153.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

154.    Plaintiffs are entitled to punitive damages because Defendants' actions were reckless and without regard for the public's safety and welfare.  Defendants misled both the medical community and the public at large, including Plaintiffs and their physicians, by making false representations about and concealing pertinent information regarding Trasylol.  Defendants downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the use of Trasylol, including renal failure and death, despite information demonstrating the product was unreasonably dangerous.

155.    The conduct of the Defendants in designing, testing, manufacturing, promoting, advertising, selling, marketing, and distributing Trasylol, and in failing to warn Plaintiff's Decedent and other members of the public of the dangers inherent in the use of Trasylol, which were known to the Defendants, was attended by circumstances of fraud, malice, or willful and wanton conduct, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, including Plaintiff's Decedent.

156.    At all times material hereto, Defendants had a duty to exercise reasonable care in the design, manufacture, testing, research and development, processing, advertising, marketing, labeling, packaging, distribution, promotion and sale of Trasylol.

157.    Defendants breached their duty and were wanton and reckless in their actions, misrepresentations, and omissions toward the public generally, and Plaintiff specifically, in the following ways:

Draft of June 5, 2008 – Confidential Attorney Work Product

(1) Defendants actually knew of Trasylol's defective nature, as set forth herein, but continued to design, manufacture, market, and sell Trasylol so as to maximize sales and profits at the expense of the health and safety of the consuming public, including Plaintiff's Decedent, and in conscious disregard of the foreseeable harm caused by Trasylol;

(2) Defendants spent millions of dollars a year researching and developing medicines and aggressively marketing Trasylol, but devoted far less attention to conducting sufficient pre-clinical testing, clinical testing, comparison testing, and adequate post-marketing surveillance of this drug;

(3) Defendants violated state and/or federal laws by selling and distributing a drug product that was misbranded and/or adulterated under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.* and parallel state Food, Drug and Cosmetic Acts and state common law; and

(4) Defendants continued to promote the safety of Trasylol, while providing no warnings at all about the unreasonable risk to consumers of death, kidney failure, congestive heart failure, and stroke associated with it, even after Defendants knew of that risk from multiple studies.

158.    Defendants knew that Trasylol had unreasonably dangerous risks and caused serious side effects of which Plaintiffs and their physicians would not be aware. Defendants nevertheless advertised, marketed, distributed, and sold the medicine knowing that there were safer methods and products available.

159.    Defendants' above-described actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiffs and the public.

Draft of June 5, 2008 – Confidential Attorney Work Product

160.    One or more of the aforementioned violations of law by the Defendants were committed with reckless disregard for the safety of the public and of Plaintiffs as a product user.

161.    One or more of the aforementioned violations of law by Defendants were committed willfully and deliberately, and caused substantial financial injury to the consuming public and Plaintiffs.

162.    As a direct and proximate result of the wanton and reckless actions and inactions of the Defendants as set forth above, Plaintiffs are entitled to punitive damages.

**WHEREFORE**, Plaintiffs request trial by jury and that the Court grant them the following relief against Defendants, Bayer Corporation, Bayer Healthcare Pharmaceuticals Inc., and Bayer Healthcare AG, and Bayer AG, jointly and severally, on all counts of this Complaint, including:

(A)    Money Damages representing fair, just and reasonable compensation for their respective common law and statutory claims;

(B)    Punitive and/or Treble Damages pursuant to state law;

(C)    Disgorgement of profits and restitution of all costs;

(D)    Attorneys' fees pursuant to state law;

(E)    Pre-judgment and post-judgment interests as authorized by law on the judgments which enter on Plaintiffs' behalf;

(F)    Costs of suit; and

(G)    Such other relief as is deemed just and appropriate.

THE PLAINTIFFS,

Draft of June 5, 2008 – Confidential Attorney Work Product