UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-1928-MD-MIDDLEBROOKS/JOHNSON

SOUTHEAST LABORERS
HEALTH AND WELFARE FUND,
On behalf of itself and all others
similarly situated,

       Plaintiffs,

vs.

BAYER CORPORATION, BAYER
HEALTHCARE PHARMACEUTICAL,
INC., BAYER HEALTHCARE, LLC,
BAYER HEALTHCARE, A.G.,

       Defendants.

       This Order relates to Case No.  08-80873
_____/

## ORDER ON MOTION TO DISMISS

THIS CAUSE comes before the Court upon the Defendants' (hereinafter, collectively,

"Bayer's") Motion to Dismiss Plaintiff's First Amended Class Action Complaint.  The Court has

reviewed the Motion and is otherwise fully informed of the premises.

Plaintiff, Southeast Laborers Health and Welfare Fund, brings this purported class action

alleging violations of: (1) RICO, 18 U.S.C. §1962(c); (2) New Jersey Consumer Fraud Act, N.J.

STAT. ANN. §§56:8, *et seq.;* (3) common law fraud; (4) negligent misrepresentation; and (5)

unjust enrichment.  The class that Plaintiff purports to represent are all private, non-

governmental entities in the United States that purchased, reimbursed and/or paid all or part of

the cost for Trasylol for purposes other than resale from January 1, 1999, through November,

2007.

## Background

The following facts are derived from the Plaintiff's First Amended Complaint (the "Complaint"). Trasylol is the trade name for the drug aprotinin. Aprotinin, developed some time in the 1950s, is derived from bovine lungs, and was originally used to treat pancreatitis. The drug assists the body in preventing excessive bleeding during surgical procedures. As such, it is ordinarily administered to patients during surgery. Bayer began researching Trasylol in the early 1980s, and early animal drug trials revealed severe kidney damage as a side effect of the drug, but despite these early indications of severe adverse reactions, Bayer sought, and was granted, approval for the use of Trasylol in Coronary Artery Bypass Graft Surgery ("CABG")in the early 1990s.

During a period of more than twenty-plus years, Bayer, utilizing scores of doctors and scientists, whom the Plaintiff terms "Key Opinion Leaders" or "KOL," embarked on an aggressive marketing campaign which consistently espoused the effectiveness and safety of Trasylol for its approved CABG use as well as for various non-approved, or "off-label," uses. Trasylol costs in excess of $1,000.00 per dose, and ordinarily, multiple doses are required during the course of one surgery. Aminocaprioc acid and tranexamic acid are alternative drugs that similarly reduce the risk of excessive bleeding during surgery. They are considerably less expensive than Trasylol, and both are available in generic formulas.

The allegations relating to Bayer's knowledge are as follows: (1) "studies in the 1990s found a very high risk of renal failure associated with the use of aprotinin;" (2) a 1992 study not funded by Bayer revealed renal dysfunction in 13 out of 20 patients who had been administered

2

aprotinin; (3) unspecified evidence indicates that Bayer routinely received reports of adverse incidents; (4) Bayer was so aware of the renal risks Trasylol presented that the company purposely declined to undertake a clinical study to evaluate renal risks because such studies would have "confirm[ed] its worst suspicions" about the drug; and (5) in 2006, two independent studies revealed a relationship between the use of Trasylol and increased risks of renal damage and other serious adverse reactions (the "2006 Studies" or the "Studies").

According to the Complaint, the 2006 Studies indicated that patients receiving aprotinin experienced much higher rates of renal failure or dysfunction than those receiving tranexamic acid, and also that discontinuing the use of the drug would: (1) prevent numerous deaths; and (2) save more than a billion dollars in dialysis costs, not to mention the exorbitant expense of the inflated cost of the drug. After the Studies, the FDA issued a public health advisory in February of 2006 and set an advisory committee meeting for September 21, 2006. Plaintiff claims that, despite the Studies and public health advisory, Bayer continued to aggressively market Trasylol and mislead everyone about the dangers associated with the drug. Bayer also then contacted Dr. Alexander Walker of i3 Drug Safety ("i3"), an independent medical research company, to commission him to undertake an independent, Bayer-funded, study to assess the veracity of the 2006 Studies. Bayer requested that the i3 study be completed in time for the September 21, 2006 advisory meeting.

The i3 study confirmed the 2006 Studies' findings that Trasylol users experienced a higher level of serious, adverse reactions than patients using either no drug or alternative drugs. The results of the i3 study were available to Bayer by September 14, 2006. Bayer did not bring up the results of, nor mention the existence of, the i3 study at the September 21, 2006 advisory

3

committee hearing.  According to Plaintiff, Dr. Walker, upon being informed that Bayer had not reported the i3 study results to the FDA during the September 21 meeting, phoned Bayer and inquired why Bayer had not presented the results of the study to the FDA.  Bayer responded that it had concerns regarding the science of the study and the preliminary nature of the findings.

Plaintiff is a health and welfare fund responsible for paying a portion of or the entire purchase price of prescribed medications, including Trasylol, for health plan participants.  It brings this suit on its behalf, and on the behalf of other similarly situated insurance funds, and alleges, that due to Bayer's fraudulent conduct – its failure to disclose that Trasylol was more dangerous than comparable drugs available in the market – it was forced to pay hundreds of millions of dollars for unnecessary and exorbitantly expensive doses of Trasylol.  This is because "[p]roperly informed third party payers [sic] would never have agreed to pay for Trasylol had they known the true risk of the drug . . . [and] would have insisted on the use of far cheaper and safer alternative drugs." (Comp. at ¶¶ 33 -34).

<u>Legal Standard</u>

It is well settled  that in ruling on a motion to dismiss, a federal court must view the complaint in the light most favorable to the plaintiff and take its well-pled factual allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (citation omitted); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984); *Watts v. Fla. Int'l Univ.,* 495 F. 3d 1289, 1295 (11th Cir. 2007); *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002).   In considering a motion to dismiss, it is necessary to assess the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8: "a short and plain statement of the claim showing that the pleader is

4

entitled to relief," but one must also keep in mind that such short and plain statement "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted); *Watts*, 495 F. 3d at 1295.

Under the *Twombly* standard, factual allegations in a complaint need not be overly detailed but "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact). *Id.* at 1964-65 (citations omitted). "The Supreme Court's most recent formulation of the pleading specificity standard is that 'stating such a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." *Watts*, 495 F.3d at 1295 (quoting *Twombly*, 550 U.S. at 556). This does not mean to say that a plaintiff must establish a probability of prevailing on a particular claim, but rather, the standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of a required element. *Id.* "It is sufficient if the complaint succeeds in 'identifying facts that are suggestive enough to render [an element] plausible.'" *Id.* at 1296 (quoting *Twombly*, 550 U.S. at 556). A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcrof v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).

Additionally, when a claim for fraud is raised, "a party must state with particularity the circumstances constituting fraud . . .[while] [m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." *See* FED. R. CIV. P. 9(b). However, Rule 9 "must not be read to abrogate Rule 8," and a court, in "considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of Rule 9(b) with

5

the broader policy of notice pleading." *Friedlander v. Nims,* 755 F.2d 810, 813 n.3 (11th Cir. 1985)(citations omitted).  With these standards in mind, I turn to the instant Motion.

The Motion to Dismiss

Bayer, in its Motion, asserts that the Plaintiff's Complaint must be dismissed because: (1) it fails to allege a viable claim under the Federal RICO Statute; (2) the Plaintiff may not maintain a consumer fraud claim under New Jersey's Consumer Fraud Act; (3) Plaintiff fails to meet its burden of establishing proximate cause and reliance to support its claims for fraud or negligent misrepresentation; and (4) the failure of Plaintiff's other claims bars its recovery for unjust enrichment.

The RICO Claim

Plaintiff, in Count I, alleges that it is entitled to relief under RICO, 18 U.S.C. §1962(c), because: (1) Bayer and KOLs engaged in a pattern of racketeering activity, including numerous acts of mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343; and (2) Plaintiff and Members of the Class were injured in their business or property by such racketeering activity because they paid monies for the drug Trasylol, which they would not have done absent Bayer's wrongful conduct.

In the Motion, Bayer asserts that Plaintiff's RICO claim fails because Plaintiff: (1) fails to adequately allege a "pattern" of racketeering activity; (2) fails to establish causation; and (3) fails to allege a cognizable RICO enterprise.  Specifically, Bayer asserts that Plaintiff's Complaint merely alleges conclusory allegations that Bayer defrauded healthcare providers, plan participants and Southeast.  Bayer also asserts that the Plaintiff's RICO claim must fail because it does not plead the circumstances constituting fraud with particularity as required by FED.R.CIV.P. 9(b).

6

In response, the Plaintiff asserts that the following allegations in the Complaint adequately allege a RICO claim pursuant to §18 U.S.C. 1962(c): (1) Bayer, working together with its KOL, undertook a scheme to defraud the medical community, third party payers, and the general public by concealing the dangers associated with Trasylol for a period of time spanning ten or more years; (2) Bayer disseminated false and misleading information via the mail and wires during this extended period of time despite its long-term knowledge of the dangers associated with Trasylol; and (3) the information that Bayer disseminated was designed to induce physicians to prescribe the use of Trasylol during surgical procedures, instead of using less costly and readily available alternative drugs.  Plaintiff also asserts that, because the Complaint alleges that Bayer's fraud spanned more than ten (10) years, Rule 9's pleading requirements should be relaxed.

The Federal RICO laws provide civil and criminal liability for persons engaged in a pattern of racketeering activity.  *See* 18 U.S.C. §1962(a-d).  An individual injured in his or her business or property by any such racketeering activity has a civil cause of action and may recover treble damages and attorneys fees.  *See* 18 U.S.C. §1964(c).  To make out a civil RICO claim, a plaintiff must establish the following elements: (1) a violation of Section 1962 [of the RICO laws]; (2) injury to his or her business or property; and (3) a causal connection between the racketeering activity and the injury.  *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).  The instant Motion attacks the first and third elements.

In order to properly allege the first element, a violation of Section 1962(c), a plaintiff must adequately plead: (1) the conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity which is (5) the proximate cause of the injury to plaintiff's business or

person.[1] *See, Williams v. Mohawk Indus., Inc.,* 465 F.3d 1277, 1282-83 (11th Cir. 2006) (citations omitted). As stated above, the Complaint alleges that Bayer engaged in mail and wire fraud by disseminating false materials designed to mislead physicians to utilize Trasylol. Mail fraud and wire fraud are forms of "racketeering activity" for the purposes of RICO. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454, 126 S.Ct 1991,1995, 164 L.Ed.2d 720 (2006) (citing §1961(1)(B)). At first glance then, it might appear then that Plaintiff alleges the first element, a violation of the RICO laws, sufficiently to withstand this motion to dismiss.

However, Bayer asserts that such is not the case because the Plaintiff has not sufficiently pled a "pattern of racketeering activity." "To successfully allege a pattern of racketeering activity, plaintiff must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004)(emphasis in original)(citations omitted). Because RICO targets ongoing criminal activity, it is not enough to simply establish two isolated predicate acts. *See id.*

With these concepts in mind, I turn to a review of the Complaint and first find that Plaintiff fails to allege the requisite two predicate acts of racketeering activity. The only sufficiently specific factual allegations relate to Bayer's responses and actions after the two Studies were published in early 2006. Specifically, the Complaint alleges that Bayer continued

---

[1] I note that Section 1962(c)'s fifth element- which requires a plaintiff to establish proximate causation is identical to the third element of 1964. *See, Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 456-57 (2006)(citations omitted); *Williams,* 465 F.3d 1277(11th Cir. 2006). The causation discussion that follows *infra* therefore applies to both.

to aggressively market Trasylol after the Studies were published and after the FDA issued its public health advisory.   It further alleges that the fact that Bayer commissioned the 2006 i3 study, but did not disclose the results of that study to the FDA at the September 21, 2006 advisory meeting, demonstrates Bayer's pattern of racketeering activity.

As for earlier predicate acts, the Plaintiff relies on generalized statements that Bayer and KOL, made up of prominent scientists and physicians, schemed to conceal the risks of Trasylol and to expand the drug's off-label usage.  Plaintiff proffers general assertions that Bayer and KOL knew of the dangers presented by Trasylol, but Plaintiff does not provide "enough facts to raise a reasonable expectation that discovery will reveal evidence" of the required element of an agreement between Bayer and KOL to hide or misrepresent such knowledge with the intent to mislead the medical community.  *See, Watts,* 495 F.3d at 1296.  Nor are the allegations successful "in 'identifying facts that are suggestive enough to render [such an agreement] plausible.'" *Watts*, 495 F.3d at 1296 (quoting *Twombly,* 550 U.S. at 556). The complaint makes generalized conclusory allegations about the existence of such information, Bayer's suppression of it, and Bayer's marketing of Trasylol for off-label uses, such as orthopaedic surgery.

Plaintiff asserts that the generalized statements satisfy its burden because the predicate acts occurred over a long period of time, and so Rule 9(b)'s specificity requirement is somewhat relaxed pursuant to *Hill v. Morehouse Med. Assoc., Inc.*, 2003 WL 22019936 (11th Cir. 2003). *Hill*, an unpublished Eleventh Circuit opinion predating *Twombly*, dealt with alleged violations of the False Claims Act. In that case, the plaintiff had sufficient firsthand information regarding the defendant's fraudulent actions, but the actual tangible evidence of the fraud was predominantly in the defendant's possession.

9

Plaintiff's reliance on *Hill* is misplaced. In the non-binding *Hill* decision,[2] the Eleventh

Circuit, stated in a footnote that:

> Rule 9(b)'s heightened pleading requirement may be applied less stringently when
> the 'fraud allegedly occurred over a period of time. . . . In that instance, the
> plaintiff is not required to provide a 'detailed allegation of all facts supporting
> each and every instance of [the alleged fraudulent acts] . . . , but the complaint
> must set forth a representative sample 'detail[ing] . . . the defendants' allegedly
> fraudulent acts, when they occurred, and who engaged in them.

*Hill* at *5 (internal citations omitted).

Although *Hill* is not determinative, it is instructive, and it leads me to find that the

Complaint fails to satisfy even a relaxed application of Rule 9(b). Other than the alleged 2006

conduct regarding Bayers' failure to include the results of the i3 study in the materials it

presented to the FDA at the September 21 advisory meeting, the Complaint alleges only general

claims that Bayer schemed with KOLs. Such factual allegations are not sufficient to constitute "a

representative sample of the defendants' allegedly fraudulent <u>acts, when they occurred and who</u>

<u>engaged in them</u>." *Id.* (emphasis in original). Additionally, as I noted previously, the Complaint

also fails to adequately allege any facts which would indicate the existence of a common purpose

to commit racketeering acts of mail or wire fraud between Bayer and the KOLs. Accordingly, I

find that Plaintiff has failed to allege sufficient factual allegations to establish that any

racketeering activity occurred, let alone a pattern of racketeering activity occurring within a ten-

year period.

Assuming that Plaintiff had adequately pled a pattern of racketeering activity, the

---

[2] Unpublished Opinions of the Eleventh Circuit are non-binding precedent. *See United States v. Mejia*, 154 F.3d 1297, 1297 n.1 (11th Cir. 1998).

Complaint as it stands still would require dismissal because, under established RICO principles,

the factual allegations do not sufficiently allege that the behavior complained of proximately

caused the Plaintiff an injury. It is well established that under both Section 1964 and 1962(c), the

Complaint must satisfactorily tie the alleged racketeering activity to the Plaintiff's injury. *See,*

*Williams,* 465 F.3d 1277 (11th Cir. 2006). In other words, the Plaintiff must set forth how

Bayer's wrongful action caused the Plaintiff the injury it claims to have suffered.[3]

The Supreme Court has set forth the principles upon which resolution of the RICO

causation issues presented herein rely. *See, e.g. Holmes v. Sec. Investor Prot. Corp.,* 503 U.S.

258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Anza v. Ideal Steel Supply Corp.,* 547 U.S.

451, 453, 126 S.Ct 1991,1994, 164 L.Ed.2d 720 (2006); and *Bridge v. Phoenix Bond & Indem.*

*Co.,* 128 S. Ct. 2131, 170 L.Ed.2d 1012 (2008).

In *Holmes,* the plaintiff was a private corporation that had a duty to reimburse customers

of certain broker-dealers if the broker-dealer became unable to meet its financial obligations.

The defendant, according to the *Holmes* plaintiff, had conspired to manipulate stock prices which

in turn had caused two brokerage firms to liquidate. This in turn had triggered the plaintiff's duty

to reimburse the brokerage firms' clients, thereby causing plaintiff a direct financial injury.

The *Holmes* Court found that the plaintiff had not stated a valid RICO claim because

under RICO, it is not enough to allege that a defendant's acts were the "but for" cause of a

plaintiff's injuries. Rather, in order to state a valid RICO claim, the Court held that a RICO

---

[3] Because I find that Plaintiff's RICO claim fails for lack of causation, it is unnecessary
to address whether or not the Complaint satisfactorily alleges a RICO enterprise. I therefore
decline to do so. I note that *Boyle v. United States,* 129 S.Ct. 2237(2009) appears to run contrary
to Bayer's asserted arguments in this regard.

plaintiff must also adequately allege that the defendant's acts were the proximate cause of their injuries as well.   *Holmes,* 503 U.S. 258 at 268, 112 S.Ct. at 1317.   The Court explained that the link was "too remote, between the stock manipulation alleged and the customer's harm, being purely contingent on the harm suffered by the broker dealers."   *Id.* at 271, 112 S.Ct. at 1319.

In *Anza*, two competing corporations operated nearly identical businesses within the same geographical area in New York.   The plaintiff in *Anza* alleged that the other corporation was not charging required sales tax to all customers and was therefore submitting false and fraudulent sales tax returns to the State.   This wrongful activity allegedly gave the defendants an unfair competitive advantage, thereby harming the plaintiff.   The complaint alleged: (1) that by submitting fraudulent tax returns, the defendants had committed mail and wire fraud; and (2) that the defendants had used the profits of an unlawful racketeering activity to establish "an enterprise engaged in or affecting interstate . . . commerce."   *Anza,* 547 U.S. at 454-55, 126 S.Ct. at 1995.

The *Anza* Court held that the alleged RICO violations under Section 1962(c) were not viable because the cause of the asserted harm - the defendants' lowering of prices - was entirely distinct from the alleged RICO violation - defrauding the State.   *Id.* at 458, 126 S.Ct. at 1997. Although distinguishable from *Holmes*, the Supreme Court found "the absence of proximate causation[] equally clear in both cases."   *Anza,* 547 U.S. at 458, 126 S.Ct. at 1997.   Specifically, the *Anza* Court indicated that because factors, unconnected to the asserted fraud could have played a part in the competitor's lower prices, and because the plaintiff's lost sales also could have resulted from factors other than the alleged fraud, there was "discontinuity between the RICO violation and the asserted injury."   *Id.*   The Court stated that it was reluctant to allow such attenuated claims to go forward for policy reasons because determining the resultant harm would

12

be inordinately complex and speculative.  For example, in the *Anza* context:

> A court considering the claim would need to begin by calculating the portion of
> [the defendant's] price drop attributable to the alleged pattern of racketeering
> activity.  It next would have to calculate the portion of [the plaintiff's] lost sales
> attributable to the relevant part of the price drop.  The element of proximate
> causation . . . is meant to prevent these types of intricate, uncertain inquiries from
> overrunning RICO litigation. . . .
>
> The requirement of a direct causal connection is especially warranted where the
> immediate victims of an alleged RICO can be expected to vindicate the laws by
> pursuing their own claims.  'Directly injured victims can generally be counted on
> to vindicate the law as private attorneys general, without any of the problems
> attendant upon suits by plaintiffs injured more remotely'. . . .  There is no need to
> broaden the universe of actionable harms to permit RICO suits by parties who
> have been injured only indirectly.

*Id.* at 459-460, 126 S.Ct. at 1997-98 (internal citations omitted).

*Bridge* expounded on these principles.  In *Bridge*, 128 S.Ct 2131 (2008), the plaintiffs

were individuals who sought to purchase tax liens at public auction.  The rules of the auction

required each buyer to submit bids under his/her name only, and specifically prohibited bidders

from using agents in order to submit simultaneous bids and fraudulently obtain a

disproportionate share of the auctioned liens. *See id.* at 2135.  To ensure the integrity of the

process, the governmental agency required all bidders to submit affidavits of compliance with the

single, simultaneous bidder rules. The defendants in the case filed fraudulent affidavits, and

therefore were able to acquire a disproportionate number of auctioned liens. *See id.*

The plaintiffs sued under RICO alleging that but for defendants' wrongful conduct, they

would have had the opportunity to obtain more tax liens. *See id.* at 2138.  The defendants

asserted, *inter alia*, that the plaintiffs were unable to establish proximate cause under *Holmes*,

because, if anything, they were only indirectly harmed by defendants' conduct. *See id.*  The

13

*Bridge* Court found that the "plaintiffs' alleged injury -- the loss of valuable liens -- [was] the direct result of [the defendants'] fraud." *Id.* at 2144. The *Bridge* Court also found that a RICO claim alleging mail fraud as a predicate act is not required to allege first party reliance in order to withstand a motion to dismiss.[4]

The Eleventh Circuit has followed the approach set forth in these cases. *See, e.g., Williams v. Mohawk Indus., Inc.*, (11th Cir. 2006); *United Food & Commercial Workers Unions, Employers Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271 (11th Cir. 2000). However, it has not as yet had the opportunity to determine the issue of proximate causation presented here. I note that a case presenting these identical issues and arguments is currently pending before the Eleventh Circuit. *See Ironworkers Local Union No. 68 & Participating Employers Health & Welfare Funds v. Astrazeneca Pharma., LP*, No. 08-16851-CC discussed *infra.*

Plaintiffs asserts that its RICO claim should not be dismissed because their injury is direct. Specifically, it asserts that, absent Bayer's deceptive marketing, physicians would not have used Trasylol, and therefore Plaintiff would not have had to pay for Trasylol as cheaper alternative drugs were available. At first blush, this might appear to sufficiently state a direct injury. However, in the RICO context, a plaintiff must establish that a defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well. *See Bridge*, 128 S.Ct. at 2141 (citing *Holmes*, 503 U.S. at 265-66, 268). If a plaintiff cannot do so, then it is an

---

[4] My findings as to proximate cause for Plaintiff's RICO claim do not rely on any finding as to first party reliance, but I note that *Bridge* left open the question as to whether a plaintiff bringing a mail fraud based RICO claim must allege that somebody relied on the misstatements at issue.

14

indirect victim of the injurious conduct alleged.

The proximate cause prong is an attempt "to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes*, 503 U.S. at 268. This means that the central question to be determined is whether or not the alleged violation led directly to the plaintiff's injuries and the answer lies within the plaintiff's ability to establish proximate cause. *See, e.g., Anza*, 547 U.S. at 461; *Ironworkers Local Union No. 68 v. Astrazeneca Pharma., Inc.*, 585 F.Supp.2d 1339, 1344 (M.D. Fla. 2008).

Whether or not a plaintiff can establish proximate cause requires a court to consider the policy formulated by the Supreme Court cases requiring a direct injury:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes,* 503 U.S. at 269 - 70.

Applying these policy factors to the case herein, I find that they weigh heavily against a finding of proximate cause. Calculation of Plaintiff's losses would be purely speculative. There are many factors that a doctor may consider in determining what medication to administer to a given patient. Doctors are presumed to go beyond advertising medium and use their independent knowledge in making medical decisions. Loss calculation necessarily would require an analysis of whether or not a particular physician ever received or relied on Bayer's allegedly fraudulent

15

statements, and whether or not a physician, knowing the risk vs. benefit of Trasylol, would still have used it during an operation. It would require a determination as to how many doses a patient received, and whether or not the number of doses was tied into any fraudulent marketing. It would also require speculation as to what alternative medications a particular physician would have ordered in a particular surgery, and how much that medication would have cost. A cost calculation would be problematic, as costs clearly would have fluctuated over the ten year period. Lastly, it would entail determining those patients who received Trasylol who did not suffer any adverse reactions, and who might have been helped by the use of the drug.

My conclusion -- that proximate cause is absent in the Complaint at bar -- is supported by the court's reasoning in *Ironworkers Local Union No. 68, supra*. In that case, plaintiffs, various union health and welfare benefits funds, sued the manufacturer of an anti-psychotic medication, asserting claims under RICO, and state consumer protection acts, as well as common law claims for fraud, negligent misrepresentation and unjust enrichment. *See id.* at 1342. The plaintiffs alleged, as does the Plaintiff here, that the manufacturer had "illegally marketed and promoted [the drug]" by "misrepresent[ing] the comparative safety efficacy and superiority of [the drug] over other" drugs of the same type. *Id.* at 1341. As in this case, the plaintiffs further alleged that: (1) the manufacturer had provided physicians with financial incentives to attend their educational seminars and speak positively about the medication to their peers, and (2) that the manufacturer had engaged in an aggressive marketing and promotional campaign which directly targeted physicians by providing them with information which concealed or misrepresented information about the drugs safety and effectiveness. *See id.* at 1341-42. The district judge held, *inter alia*, that "allowing the [p]laintiffs to move forward on their civil RICO claims would

16

present precisely the types of problems the *Holmes* Court sought to avoid." *Id.* at 1344. That is equally true here.

At the hearing on this Motion, the Plaintiff asserted that the arguments it is making regarding causation are different than the one present in *Ironworkers Local Union 68* because: (1) it is alleging that Bayer concealed information, and so, it cannot specifically allege when statements were never made; and (2) it is alleging that absent Bayer's illegal conduct, neither it- nor anyone else- would have "paid for [Trasylol]  period," Thus Plaintiff concludes that their injury was directly caused the Bayer's actions, and that, because they claim they would not have paid for the drug at all, the calculation of damages is not speculative. Plaintiff cite *In re Zyprexa Prod. Liab.. Litig.*, 493 F.Supp.2d 571 (E.D.N.Y. 2007) as support for a finding that it has adequately established proximate cause.

*In re Zyprexa* involved a virtually identical claim by insurance payers against the manufacturer of the prescription schizophrenia medication, Zyprexa.  The insurers sued the manufacturer for violations of RICO, various state consumer fraud statutes, common law fraud and unjust enrichment. *See id.* at 574.  The complaint alleged an ongoing overpricing scheme wherein, during an eleven year period, the manufacturer had fraudulently "disseminated misinformation, about the safety and efficacy of Zyprexa, and promoted and marketed it for uses for which it was not indicated, and for patients who would have been better served by less expensive medication." *Id.*  Unlike the drug involved herein, however, Zyprexa, had not been withdrawn from the market. *See id.*

The *Zyprexa* court allowed statistical evidence to be presented which established that the defendant's marketing campaign and failure to disclose relevant medical data had resulted in a

17

disproportional increase in both sales and price. The court allowed the plaintiffs' RICO and

consumer fraud claims to proceed, determining that "[a]s purchasers of Zyprexa - i.e., those who

paid for the product in whole or in part out of their personal funds - plaintiffs [had alleged] a

direct injury to themselves that [was] not dependent on any physician's decision or injury

suffered by those who ultimately ingested Zyprexa." *Id.* at 577.

The *Zyprexa* court found that the plaintiffs' claim was one for overpricing. It further

found that the alleged injury, plaintiffs' overpayment, was a direct result of the defendant's

fraudulent marketing scheme. *See id.* at 576-77. The court distinguished the facts from those

presented in *Laborers Local 17 Health & Benefit Fund v. Philip Morris*, 191 F.3d 229 (2d Cir.

1999).

*Laborers Local 17*, and several similar cases, involved suits by insurance providers

against cigarette manufacturers for the increased cost of medical care required by their insured

due to complications resulting from years of smoking. This line of cases has consistently held

that, for RICO purposes, the increased cost of medical care caused by years of smoking was too

far attenuated from the cigarette manufacturers' alleged fraud of failing to disclose the dangers

inherent in smoking to establish proximate causation under *Holmes* and its progeny. *See, e.g.,*

*United Food & Commercial Workers Unions, Employers Health & Welfare Fund v. Philip*

*Morris, Inc.*, 223 F.3d 1271 (11th Cir. 2000); *Lyons v. Philip Morris, Inc.*, 225 F.3d 909 (8th Cir.

2000); *Tex. Carpenters Health Benefit Fund v. Philip Morris, Inc.*, 199 F.3d 788 (5th Cir. 2000);

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d

818 (7th Cir. 1999).

Plaintiff attempts to utilize *Zyprexa* by claiming that, unlike the tobacco cases (where the

18

injuries alleged payment for treatment of smoking-related illnesses which were solely contingent on the harm to other parties), its injury is a direct and foreseeable result of Bayer's fraudulent marketing strategy. Specifically, it asserts that the injury is not that it paid more for medical claims by its beneficiaries because patients were harmed by Trasylol, but rather, that it paid for Trasylol at all and at an exorbitant price because Bayer's concealment of the dangers and fraudulent touting of the benefits of the drug over other drugs on the market directly drove up the price and market share of Trasylol. This argument is simply a question of semantics and does not affect my determination as to proximate cause. There is no substantive difference between the question of whether Plaintiff would have paid for Trasylol at all instead of a lower-priced alternative versus whether Plaintiff paid too much for Trasylol because of the actual value of the drug. Both questions present the same proximate cause policy concerns noted above.[5]

When closely analyzed, I find that the *Zyprexa* court relied on a fraud-on-the-market theory in allowing the plaintiffs' claims to proceed. The fraud-on-the-market doctrine, however, is a creature of limited securities fraud actions, whereby a rebuttable presumption is created that the "market" as a whole relied on a company's misrepresentations, and so, therefore, individuals within the "market" are excused from establishing that they specifically relied on a particular

---

[5] To the extent that Plaintiffs are asserting that their damage calculations are not speculative because all that will be needed is an assessment of how many doses of Trasylol it paid for at what cost, I discount such assertion because the fact that Plaintiff would not have paid for Trasylol does not mean that physicians would not have chosen another blood-loss prevention medication or technique. Clearly the Plaintiff would have still needed to pay for that, and so factoring in the costs of what the Plaintiff might have had to pay for versus what it did pay for retains a finding of speculativeness. I also find that the policy reasons relating to the proper party to vindicate the specified violations of law, discussed *infra*, still weigh in favor of a finding that the Plaintiffs are indirect victims who fail to establish proximate cause.

misrepresentation.  In the mail or wire fraud context, where plaintiffs are not required to plead reliance, the theory serves to establish damage causation by determining a price impact on the market caused by a parties allegedly fraudulent activity.

I find that the *Zyprexa* court's reliance on this type of fraud on the market theory of damages and/or causation is simply misplaced.  This is because the fraud on the market theory relies on an efficient market theory.  "[A]n efficient market as that in which "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3rd Cir. 1997); .  The Supreme Court has stated that "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed."  *Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 991, 99 L.Ed.2d (1988).

The fraud-on-the-market doctrine in both the Eleventh and Third Circuits has been held to be limited strictly to securities cases and inappropriate in claims alleging deceptive advertising such as the ones presented herein.  *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir. 1997) ("the fraud on the market theory of securities law . . . is based on concepts and policies that simply do not apply in a products liability case."); *N.J. Citizens Action v. Schering-Plough Corp.*, 842 A.2d 174, 178 (N.J. 2003).  The premise of *Zyprexa* necessarily applies the fraud-on-the-market doctrine to find that the injury claimed is direct, a premise which I find to be contrary to the law of this Circuit, and so, I decline to apply its reasoning to this case.

The Plaintiff seems to argue, alternatively, that the fact that Bayer's conduct was done with the specific purpose of driving up the price and increasing the price of Trasylol must

20

somehow change my determination as to the sufficiency of its proximate cause allegations. I do not agree. Cases where there is specific intent to drive a market up or down are not exempt from RICO's proximate cause analysis - nor do they escape the policy considerations inherent in such proximate cause analysis. *See, e.g., Associated Gen. Contractors, Inc. v. Carpenters*, 459 U.S. 519, 532 n.25, 103 S. Ct. 897, 74. L.Ed.2d 723 (1983).

The third *Holmes* consideration -- whether directly injured victims can generally be counted on to vindicate the law as private attorneys general, without the problems attendant upon suits by plaintiffs injured more remotely -- further supports my determination as to proximate causation. The existence of this MDL demonstrates that the direct victims of Bayer's alleged wrongful activity, those patients who suffered physical injury, are able to "vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely. . . . There is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Id.*   The FDA is charged with supervising the safety of drugs so as to avoid injuries to people. If indeed, Bayer deceived the FDA as to the safety of Trasylol as alleged, then the proper parties to vindicate the law would be those persons physically injured by the deception.

I note that while it is well established that the individual plaintiffs in the MDL action cannot bring a cause of action under RICO, as their alleged damages are personal in nature and not the injury to their "business or property" protected by RICO, such fact does not require a different finding as to the Plaintiff's RICO standing.[6] Protecting individuals from personal harm

---

[6] If, as Plaintiff alleges, the individual plaintiffs succeed in their individual personal injury suits, almost all of which allege the same fraudulent activity, although not in the RICO

is the goal of the FDA's comprehensive testing, labeling and approval requirements.  The individual plaintiffs are exactly those that the FDA regulations are intended to protect, and as such, they have sufficient independent incentive to pursue their own causes of action for types of injuries such as pain and suffering.  Although these will not be RICO claims, they will remedy the harm done by Bayer's alleged misconduct.  Moreover, these actions will promote "the general interest in deterring injurious conduct," which *Holmes* cited as the objective of this policy factor. 503 U.S. at 269, 112 S.Ct. 1311.  The fact that the individual plaintiffs have alternative remedies for their direct personal injuries also weighs against finding RICO standing for Plaintiff. Conversely, Bayer's alleged misconduct did not proximately cause Plaintiff's injury so the Plaintiff lacks standing to bring a RICO claim against Bayer.

In summary then, I find that the Plaintiff has failed to adequately allege with specificity the requisite two predicate RICO acts or common purpose between alleged conspirators.  These are pleading factors for which an ability to amend is appropriate.  I additionally find that Plaintiff has failed to establish proximate cause.  I note that my finding as to Plaintiff's proximate cause deficiency appears to be fatal to its RICO claim, and while I question its ability to remedy this deficiency, in an abundance of caution, I will grant leave to amend the Complaint in an attempt to establish a different premise of proximate causation in the unlikely event that can be accomplished.

<u>New Jersey Consumer Fraud Act</u>

Bayer next attacks the Plaintiff's claim for relief under the New Jersey Consumer Fraud

---

context, Plaintiff may still be able to file for subrogation to recover the costs paid for the administration of Trasylol to the individual patients.

Act ("NJCFA"), N.J. STAT. ANN.§§ 56:8-1, *et seq.* The NJCFA makes unlawful

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby

*Id.*

A claim under New Jersey's Consumer Fraud Act has three elements: (1) unlawful conduct; (2) and ascertainable loss; and (3) a causal connection between the unlawful conduct and an individual plaintiff's ascertainable loss. *Id.* at § 56:8-2; *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007).

Plaintiff asserts that it has properly pled all three of these elements. Specifically, the Complaint alleges that Bayer's actions and failures to act, including the false and misleading representations and omissions of material facts regarding the safety of Trasylol: (1) constitute "unconscionable business practices, deception, fraud, false pretenses, misrepresentations [and] the knowing concealment, suppression or omission of material facts about the safety of Trasylol with the intent that others rely upon such concealment, suppression or omission [of material facts] in connection with the sale" of merchandise in violation of the NJCFA; (2) which resulted Plaintiff ascertainable direct losses; and (3) such losses were caused by Bayer's encouraging use of Trasylol over less expensive and safer treatment alternatives.

Bayer, in its Motion asserts that dismissal of Plaintiff's NJCFA claim is warranted because: (1) Plaintiff is not a consumer as contemplated by the NJCFA; and (2) Plaintiff's

23

allegations fail to establish that Bayer's sales and marketing proximately caused it any ascertainable loss. According to Bayer, only consumers can bring claims under the NJCFA. The question of whether a party is a "consumer" is determined by the character of a particular transaction.

Because I find that the NJCFA claim fails due to lack of causation, the issue of whether the Fund is a "consumer" as contemplated by the NJCFA is unnecessary to decide, and so I decline to do so. I note that there are New Jersey cases which have presumed that insurance payers are "consumers" under the NJCFA, but that the issue has specifically be left to be determined at a later date. *See, e.g. Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d. 1076 (N.J. 2007); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 2004 WL 3767338 (N.J. Super. Ct. Law. Div. 2004).

Being a state-created statute, the NJCFA is subject to interpretation under the law of the State of New Jersey. This makes analysis of Bayer's Motion as to proximate causation under the NJCFA more problematic, because most courts considering actions under NJCFA applied a less stringent definition of proximate cause than the one those same courts have applied in RICO claims for actions that were virtually identical to the one presented herein. *See, e.g., In re: Warfarin Sodium Antitrust Litig.*, 391 F.3d. 516, 531 (3d Cir. 2004); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2nd Cir. 2003); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105 (D.N.J. Dec. 23, 2008). *Cf. Ironworkers Local Union No. 68 v. Astrazeneca Pharm., Inc.*, 585 F.Supp.2d 1339 (M.D. Fla 2008) (finding that the proximate cause requirement under the NJCFA was the same as that applied in RICO cases and dismissing plaintiffs' NJCFA claims).

In *Desiano*, the Second Circuit had an opportunity to address claims that were substantially similar to those present in this MDL proceeding, and specifically, the issue of whether the NJFCA permitted an insurance company to bring a claim for "inflated" costs against a drug manufacturer. *See* 326 F.3d 339.  The *Desiano* plaintiffs were a group of individual health insurers asserting a cause of action under the NJCFA.  They alleged that the defendant drug manufacturer had fraudulently and aggressively promoted its diabetes drug, Rezulin, as safe and more effective than existing alternative medications when the manufacturer actually had known for a substantial period of time that Rezulin was neither safer nor more effective.  In fact, the drug was ultimately pulled from the market because, as stated by the FDA, "continued use of [the drug] now poses an unacceptable risk [of liver damage] to patients." *Id.* at 344.

As in this case, the *Desiano* plaintiffs alleged that the drug manufacturer had paid two influential physicians to promote the drug.  Unlike this case, however, the *Desiano* plaintiffs pled detailed and specific allegations and facts supporting their claims.  For example, they alleged that one influential physician held a prominent position in the National Institute of Health (NIH), and the other was the NIH's senior diabetes researcher who had the overall responsibility for a $150 million clinical study designed to test Rezulin's effectiveness.  Both physicians had strong financial ties to the success of Rezulin.[7]

The *Desiano* plaintiffs claimed that after the initial studies, the lead researcher had found "very worrisome liver toxicity" and he recommended that Rezulin not be approved.  They further

---

[7] Dr. Olefsky was an inventor or co-inventor of three patents regarding Rezulin's use. He also was co-chair of a Warner-Lambert-created group that promoted the drug.  Dr. Eastman was a board member of two organizations financed by Warner-Lambert and Rezulin's developer. *Desiano*, 326 F.3d at 341.

25

claimed that after this researcher's report, the defendant drug manufacturer met with the head of

the FDA and the researcher was removed from the Rezulin clinical study.  He was replaced with

another researcher who, in his medical review of the study, noted that the clinical trials had

identified "significant safety issues" and suggested unpredictable damage associated with the

drug.  However, the new researcher did not present his findings in the FDA advisory committee

meeting, and the drug was approved unanimously.[8]

The *Desiano* plaintiffs referenced numerous instances where the drug manufacturer had

touted Rezulin as a pioneering and revolutionary treatment against diabetes.  Suffice it to say that

the plaintiffs alleged several specific instances of clinical review indicating patient safety risk

while setting forth specific advertisements and public information which, in the face of those

clinical reviews, were misleading.  Eventually, some four years after the introduction of Rezulin,

the product was withdrawn from the market, and the lawsuits ensued.  The *Desiano* plaintiffs

sought class relief under the NJCFA on behalf of all private insurance payers that paid for the

drug during the four year time period.  The district court, in considering the defendant's motion

to dismiss, held that under the proximate cause analysis outlined in *Holmes* and *Anza*, the

plaintiffs could not establish that the defendant's actions were the proximate cause of their

damages.

---

[8] I note the level of specificity of the *Desiano* allegations, as the facts constituting the defendants' allegedly wrongful conduct, like those involved here, were alleged to have occurred over an extended period of time.  This did not seem to prevent the plaintiffs from satisfactorily alleging the particular circumstances constituting fraud for the purposes of Rule 9(b).

26

The Second Circuit reviewed *Holmes*[9] and *Laborer's Local 17*,[10] the cases upon which the district court had relied in making its determination that plaintiffs would not be able to establish proximate causation. The *Desiano* Court first noted that "the legal standard of proximate cause that [was] relevant to [a case under the NJCFA] *is not the law of RICO.*" 326 F.3d at 348 (emphasis added). The Court found that the crux of the plaintiff insurance company's claim was the allegation that it would not have purchased Rezulin but for the Defendant's fraudulent marketing and failure to disclose the dangers inherent in the drug's use. As discussed above, this injury was too remote under RICO principles, but the law of New Jersey did not require the application of the stricter RICO proximate cause.

In reversing the trial judge's decision, the *Desiano* Court discussed how the standard of causation in RICO, being created under a federal statute, was different–i.e. more stringent – than that under the NJCFA, a state statute subject to New Jersey's law and common law principles of causation. Being unable to certify the question of causation to the New Jersey Supreme Court,[11] the *Desiano* Court was required to assess what "New Jersey's common law of proximate causation requires." *Id.* at 349. I note, therefore, that the Second Circuit's determination on how the New Jersey courts would stand on the issue of causation under the NJCFA is not binding.

The Third Circuit, in *In re: Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir.

---

[9] *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

[10] *Laborer's Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999).

[11] The Supreme Court of New Jersey allows certification only from the Third Circuit. *See* N.J. Court Rules, R.2:12A-3 (2002).

2004), adopted the *Desiano* court's rationale that plaintiff insurance payers have standing to sue drug manufacturers for their misrepresentations when it results in the insurance company's payment of supracompetitive prices for a drug where low-price generic alternatives are available. I find this case problematic but distinguishable, as it does not deal with the question of causation under the NJCFA and as it preceded contrary binding New Jersey precedent discussed *infra*.

In *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co. Inc.,*[12] the Supreme Court of New Jersey considered an action alleging the same type of injury under the NJCFA. However, the *Merck* case did not involve a motion to dismiss. Rather, after assuming without deciding that the third-party payers were "consumer[s] as that term is intended in [the NJCFA], the court considered the sole issue of whether certification of a nationwide class of third-party payers under the NJCFA was appropriate.[13]

The *Merck* court did lend some guidance, however, on whether or not Plaintiff herein adequately alleges a claim under the NJCFA. Specifically, the court stated:

> Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover. In place of the traditional reliance element of fraud and misrepresentation, we have required that plaintiffs demonstrate that they have sustained an ascertainable loss.
>
> Fraud on the market is essentially a creature of federal securities litigation. . . . In that context, plaintiffs who purchased securities are permitted to demonstrate that they were damaged simply because the defendant engaged in behavior otherwise prohibited

---

[12]  929 A.2d 1076 (N.J. 2007).

[13]  The Court notes for future reference that New Jersey's Supreme Court held that certification of a class was improper under the NJCFA. This fact may provide the Plaintiff difficulty in any future motion to certify a class.

28

and there was a change in the price. The theory presumes reliance.

We have rejected the fraud on the market theory as being inappropriate in any context other than federal securities fraud litigation. Therefore, to the extent that plaintiff seeks to prove only that the price charged for [a drug] was higher than it should have been as a result of defendant's fraudulent marketing campaign, and seeks thereby to be relieved of the usual requirement that plaintiff prove an ascertainable loss, the theory must fail.

*Merck*, 929 A.2d 1076 (internal citations omitted).

The *Merck* Court, in the quoted language above, adopted the reasoning of the New Jersey appellate court in *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003). The *N.J. Citizen Action* Court determined that allowing a fraud on the market theory to satisfy the mandatory element of an ascertainable loss would "virtually eliminate the requirement that there be a connection between the misdeed complained of and the loss suffered [which would] . . . fundamentally alter the concept of causation in the CFA context." *Id.* at 178. I find that the Plaintiff's assertion herein - that it has established an ascertainable loss due to Bayer's conduct - relies on such a fraud-on-the-market analysis. As such, I find that it is due to be dismissed under the State of New Jersey's interpretation of the NJCFA. I note that *Desiano* preceded both *Merck* and *Citizens Action*, and so, to the extent that it conflicts with the rulings contained therein, I discount it as inconsistent with binding state precedent.

Again I find that it is unlikely that Plaintiff will be able to replead so as to cure the proximate cause deficiencies addressed herein, but as I did in the RICO claim, I will grant leave to amend the Complaint as to establish a different premise of proximate causation distinguishable from that addressed herein.

29

<u>Common Law Fraud and Negligent Misrepresentation</u>

Plaintiff next asserts claims for common law fraud (Count III) and negligent misrepresentation (Count IV). The Plaintiff does not assert what state's laws I should properly use to assess the validity of its claims for fraud and negligent misrepresentation. Bayer's Motion indicates that under the Plaintiff's allegations, the laws of Tennessee and New Jersey are implicated as the Plaintiff's benefit plan is administered in Tennessee, and as Bayer is alleged to have its principal place of business in New Jersey. However, Bayer further suggests that the location of the Bayer Defendants actually makes the proper place of jurisdiction for diversity purposes Indiana or Pennsylvania, or possibly, but not likely Connecticut,[14] and so, the laws of those states apply. However, I find that the issue of which states' law applies appears to have little or no impact on resolution of the Plaintiff's claims for fraud and negligent misrepresentation.

To state a cause of action for fraud under New Jersey, Pennsylvania and Indiana law, a plaintiff must allege (1) material misrepresentation of the presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely upon it; (4) reasonable reliance thereon by the other person; and (5) which proximately caused damage. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350 (N.J. 1997). "Negligent misrepresentation is . . . a[n] incorrect statement, negligently made and justifiably relied on" which results in damages.

---

[14] Specifically, Bayer asserts that Plaintiff's allegations as to the principal place of business are incorrect.

The key element, reliance, is the same for both.[15]  *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138,

143 (N.J. 1983)(abrogated on other grounds,  *E. Dickerson & Son, Inc. v. Ernst & Young, LLP*,

846 A. 2d 1237, 1240 (N.J. 2004): *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994);  *Westfield Ins.*

*Co. v. Yaste, Zent & Rye Agency*, 806 N.E.2d 25, 31 (Ind. App. 2004).

Under Tennessee law, an essential requirement of any action for "fraud . . . or negligent

misrepresentation is also detrimental reliance on a false premise" as well.  *McNeil v. Nofal,* 185

S.W.3d 402, 408 (Tenn. Ct. App. 2005);  *Schwab v. Walters,* 251 S.W. 42 (Tenn. 1923).

In the Complaint at bar, the Plaintiff has not properly alleged the elements of fraud or

negligent misrepresentations under any of the aforementioned jurisdictions as each of them

require a plaintiff to properly allege that a defendant made a knowingly or recklessly false

statement to another and that the person receiving the statement reasonably relied upon it, and

that such reliance injured the receiving party.  The element of reasonable reliance is where

Plaintiff's claims for fraud or negligent misrepresentation fail.

The Complaint is devoid of any allegation relating to any statement made directly to

Plaintiff, nor does it set forth any allegation of how Plaintiff reasonably relied upon any

statement made to it.  Thus the Plaintiff fails to set forth a claim for either fraud or

misrepresentation. To the extent that Plaintiff seeks to utilize a fraud-on-the-market theory as

substitution for this required element of reliance, such avenue is foreclosed by the discussion

*supra*.

---

[15]  Indiana does not recognize the claim of negligent misrepresentation outside of an
employer-employee relationship.  *Darst v. Ill. Farmers Ins. Co.*, 716 N.E.2d 579, 584 ( Ind. Ct.
App. 1999).

31

In granting the Motion to Dismiss the fraud and negligent misrepresentation claims of the Master Complaint governing the individual patient suits against Bayer, after noting that the individual complaints similarly failed to allege specific statements upon which the individual patients or their physicians had relied upon, I provided the individual plaintiffs thirty (30) days within which to amend their individual complaints to set forth allegations specifying particular statements made by Bayer to any of the plaintiffs' individual treating physicians upon which their physicians relied in deciding to administer Trasylol.  Therefore, while I again question its ability to do so, I will accordingly give the Plaintiff herein  the same thirty day period within which to set forth any particular statements upon which it reasonably relied to its detriment and how such statement[s] proximately caused it the alleged harm.

<u>Unjust Enrichment</u>

Courts generally have held that where all of the plaintiff's other tort claims have failed because of the remoteness of a plaintiff's injuries form a defendant's wrongdoing, an unjust enrichment claim should not be allowed to proceed. *See e.g., Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999); *Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 851 (6th Cir. 2003); *Ironworkers Local Union No. 68 v. Astrazeneca Pharma.*, 585 F.Supp.2d 1339 (M.D. Fla. 2008).  As all other counts have been dismissed, Bayer's  Motion as to the unjust enrichment claim is due to be granted at this juncture.

Accordingly, for the reasons set forth above, it is

ORDERED and ADJUDGED that the Defendants' Motion to Dismiss the First Amended Class Complaint be and is hereby GRANTED.  The First Amended Class Action Complaint is DISMISSED WITH LEAVE TO AMEND EITHER TO CURE THE PLAINTIFF'S

32

DEFICIENCIES AS TO PREDICATE ACTS, COMMON PURPOSE, PROXIMATE CAUSE
OR RELIANCE DISCUSSED HEREIN WITHIN THIRTY (30 ) DAYS FROM THE DATE OF
THIS ORDER.

DONE and ORDERED in Chambers, this 30 day of July 2009.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

33