UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-1928 - MDL-MIDDLEBROOKS

IN RE TRASYLOL PRODUCTS
LIABILITY LITIGATION

This document relates to all actions
_____/

## ORDER GRANTING  DEFENDANTS' MOTION FOR PROTECTIVE ORDER

THIS CAUSE comes before the Court upon Bayer's motion for a protective order.  In the Motion, Bayer asserts that  I should issue a protective order barring deposition of four attorneys from the law firm of Zuckerman Spaeder LLP (the "Firm").

Trasylol is the trade name for the drug aprotinin.  Aprotinin was developed some time in the 1950s, and is derived from bovine lungs  The drug assists the body in preventing excessive bleeding during surgical procedures.  As such, it is ordinarily administered to patients during surgery.  The plaintiffs have alleged that for a period of over twenty-plus years, Bayer knew that use of Trasylol presented a high risk of renal damage or other serious adverse physical reactions.

Almost simultaneously, in 2006, two independent studies were published in reputable medical journals.  The articles indicated that the use of Trasylol was associated with increased risks of renal damage and other serious adverse reactions (the "2006 Studies" or the "Studies"). Specifically, the 2006 Studies indicated that patients receiving aprotinin experienced much higher rates of renal failure or dysfunction than those receiving tranexamic acid, an existing alternative drug which similarly reduced blood loss during surgery.  The 2006 Studies also posited the theory that discontinuing the use of the drug would prevent serious harm and/or death to patients, and save millions of dollars in dialysis costs.

After the 2006 Studies, the FDA issued a public health advisory in February of 2006 and

set an advisory committee meeting for September 21, 2006 (the "Adcom Meeting").  Plaintiff claims that, despite the 2006  Studies and the February public health advisory, Bayer continued to aggressively market Trasylol and mislead everyone about the dangers associated with the drug. After the 2006 Studies, Bayer commissioned an independent study through a Dr. Alexander Walker of i3 Drug Safety ("i3"), an independent medical research company (the "i3Study).  Bayer commissioned the i3Study to assess the accuracy of the 2006 Studies's findings.  Bayer requested that the i3Study be completed in time for the September 21, 2006 Adcom meeting.

On September 14, 2006, one week before the Adcom Meeting, Bayer received the Preliminary Report of the i3Study which appeared to confirm the 2006 Studies' findings that Trasylol users experienced a higher level of serious, adverse reactions than patients using either no drug or alternative drugs (the "Preliminary Report").

Bayer did not bring up the Preliminary Report nor mention the existence of the i3Study at the September 21, 2006 Adcom Meeting.  Circumstances are not clear as to how the existence of the i3Study came to light, but it did come to the attention of the FDA during the week following the Adcom Meeting.  Bayer responded that it was not sure what had occurred relating the non-disclosure, but that it would look into the matter.  Initial investigation revealed that the Preliminary Report had been received by two Bayer scientists, but because the scientists had strong concerns regarding the adequacy of the i3's science, and because of the preliminary nature of the i3 Study's findings, the two scientists sent a list of questions to i3 to clarify certain information within the Preliminary Report.  They did not inform any other Bayer researcher, manager or executive that they had received the Preliminary Report.  Bayer, after receiving the results of the initial investigation, commenced its own investigation into why the study had not been disclosed prior to the AdCom meeting.

2

To this end, Bayer hired the Firm in 2007 to conduct an independent investigation (the "Investigation") into the circumstances surrounding Bayer's delay in disclosing the Preliminary Report to the FDA at the September 21 Adcom Meeting. The results of the Investigation were reported in August of 2007 in a document entitled <u>REPORT ON TRASYLOL®</u> (the "Investigative Report"). The Investigative Report informed that the Firm had been hired to answer the following four questions:

1.   Who at Bayer knew of the existence of the i3Study and which of those persons, if any, were functionally responsible for informing FDA of its existence;

2.   Why was the existence of the i3Study not communicated to FDA in advance of the Advisory Committee meeting on September 21, 2006;

3.   Which employees of Bayer received, or otherwise knew about the findings and conclusions of the i3Study in advance of the Advisory Committee meeting on September 21 ,2006.

4.   Why were the findings and conclusions from the Preliminary Report of the i3Study not communicated to FDA in advance of the Advisory Committee meeting?

The Investigative Report informed that: (1) numerous employees at Bayer knew of the existence of the i3Study, and that Bayer's Global Regulatory Affairs department had functional responsibility for communicating with the FDA about Trasylol; (2) Bayer failed to disclose the existence of the i3Study due to "regrettable human error," with no intent of deceiving the FDA; (3) at the time of the Adcom Meeting only two Bayer scientists knew of the existence of the Preliminary Report; and (4) those two scientists had "serious questions about the study's quality" which they articulated in written questions to the researchers at i3. Having received no answers to their questions, the two scientists thought it premature to inform Bayer higher-ups that they

3

had received the i3Study's conclusion.

The Plaintiffs now want to depose several of the Firm's lawyers as to the events that transpired and the documents that they reviewed concomitant with the Investigation. Bayer and the Firm seek protection from those depositions. Their Motion suggests that a protective order is required for two reasons. The first is that the Plaintiffs cannot overcome the heavy presumption against depositions of lawyers. The second is that the information Plaintiffs seek are protected as attorney work product or opinion. The Motion additionally asserts that all of the information that Plaintiffs are seeking has already been made available via document production and deposition testimony.

In response the Plaintiffs assert that because Bayer hired the Firm to conduct an "independent" investigation to determine what had happened, and because it specifically asserted that it was not hiring the Firm for any present or future litigation actions, Bayer cannot now hide behind attorney work-product or opinion privilege, nor can it make a valid claim to attorney - client privilege.

Alternatively the Plaintiffs argue that to the extent that Bayer makes out an adequate claim for work or opinion product privilege, it has waived its right to any such privilege pursuant to two separate courses of behavior. The first is by evidencing an intent to rely on the substance of the Report to use affirmatively in Bayer's defense of the case (the "Implied Waiver"). The second reason that Plaintiffs assert that Bayer has waived any work-product is premised on Bayer's publication of the Report (the "Disclosure Waiver"). As to this second claim, Plaintiffs assert that the Public dissemination of the Report was made for the purely business purpose of averting a "public relations/business" crises. Specifically, Plaintiffs allege that:

From the very inception of the investigation, Bayer proclaimed that

4

the findings of the investigation would be made public. . . . Once
the investigation was concluded, Bayer announced [its] conclusions
. . . and posted the report in its entirety on its website.[1]

Depositions of attorneys who have provided legal advice to clients is disfavored as such

depositions "should be employed only in limited circumstances." This is because, as stated by

the United States Supreme Court:

> In performing his various duties, . . . it is essential that a lawyer work with a
> certain degree of privacy, free from unnecessary intrusion by opposing parties and
> their counsel . . . .
>
> Inefficiency, unfairness and sharp practices would inevitably develop in the giving
> of legal advice and in the preparation of cases for trial. The effect on the legal
> profession would be demoralizing. And the interests of the clients and the cause
> of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). Clients must at all times feel free to openly

communicate with their attorneys without fear that the attorneys will later be witnesses against

them. *See Upjohn v. United States*, 449 U.S. 338, 389 (1981).

"The attorney-client privilege is the oldest of the privileges for confidential

communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389,

101 S. Ct. 677, 682, 66 L. Ed. 2d 584. "[T]he attorney-client privilege applies to 'confidential

communications between an attorney and his client relating to a legal matter for which the client

has sought professional advice.'" *Miccosukke Tribe of Indians of Florida v. U.S.*, 516 F.3d 1235,

1262 (11th Cir. 2008)(quoting *Mead Data Central, Inc. v. U.S. Dept. Of Air Force*, 566 F.2d 242,

252 (D.C. Cir. 1977) The burden of establishing that a particular communication is subject to

---

[1] I note that the argument that Bayer waived any privilege regarding the circumstances
under which the Firm created the Report by disseminating it in a public forum is a mixed issue
which not only goes to the waiver issue, but also goes to whether or not it is reasonable to find
the Report was created in "anticipation of litigation," as discussed *infra*.

5

attorney-client privilege rests upon the party invoking the privilege. *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003).  I note that Bayer, in its Motion, indicates that:

> [it] has not asserted attorney-client privilege as a ground for blocking the depositions in their entirety because – to avoid any argument that Bayer waived the attorney-client privilege through release of the Zuckerman Spaeder report – Zuckerman Spaeder was not provided with any privileged documents or allowed to explore privileged communications during their witness interviews. Accordingly, Bayer could not assert attorney-client privilege as to every line of questioning that plaintiff's might explore during a deposition.  If the depositions were allowed to go forward, however, Bayer anticipates that many questions would give rise to objections on grounds of attorney-client privilege.

In this case then, it is unnecessary to determine whether Bayer has carried its burden of establishing that the depositions should not occur due to the existence of attorney-client privilege. Rather, it is necessary to determine whether Bayer has sufficiently established an alternative basis for protecting the Firm's attorneys.  The Motion asserts that protection is appropriate under either an attorney work-product or attorney opinion privilege.

The attorney work-product privilege is encompassed by FED. R. CIV. P. 26(b)(3), which provides, in pertinent part, that:

> [o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by [a party's attorney unless] . . . they are otherwise discoverable under Rule 26(b)(1) and [the party seeking the discovery] shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Bayer asserts that "[i]n light of [the FDA's] investigations and the prospect of imminent tort litigation, Bayer commissioned its own investigation of the delay in disclosing the Preliminary Report."  Bayer further represents that it does not intend to utilize the Investigative

6

Report in defense of this litigation, and that the Investigative Report is properly protected as attorney work-product because it was obtained in anticipation of forthcoming litigation. Plaintiffs counter that Bayer had only a business purpose and did not intend to use the Investigative Report in defense of anticipated litigation at the time it commenced the Investigation, that Bayer has used the Investigative Report as a defense in this litigation, and because Bayer has touted the Report as being conducted by an "independent" entity, it is barred from using the attorney work-product privilege. I disagree.

Bayer, as the party asserting entitlement to attorney work-product privilege, bears the burden of demonstrating the existence of the privilege. . *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003). After argument on this Motion, I find that Bayer has satisfied its burden. Papers submitted in camera in support of Bayer's Motion support a finding that Bayer hired the Firm in response to FDA inquiries relating to Bayer's non-disclosure of the Preliminary Report at the Adcom meeting, and while there may not have been immediate litigation present, Bayer faced potential exposure to liability on multiple fronts including, but not limited to, regulatory investigation, personal injury suits, congressional inquiry and even shareholder claims.

The Eleventh Circuit has not specifically defined the meaning of the phrase "prepared in anticipation of litigation." The Fifth Circuit in *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. Unit A Feb. 1981)[2] stated that "litigation need not necessarily be imminent . . . as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." The question "should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or

_____

[2]   In *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued prior to October 1, 1981.

obtained because of the prospect of litigation . . . , and litigation should be understood generally

to include proceedings before administrative tribunals if they are of an adversarial nature.   'Dual

purpose' documents created because of the prospect of litigation can be protected even though

they were also prepared for a business purpose. Fed. Pract. & Proc. Civ.2d §2024 (2009); U.S.

v. Adlman, 134 F.3d 1194, 1203 (2nd Cir. 2003).

The case of *In re Vioxx Products Liability Litigation*, 2007 WL 854251 (E.D. La. 2007),

dealt with an almost identical set of circumstances as those presented herein. *In re Vioxx*

involved an anti-inflammatory drug which, after it had received FDA approval, was discovered to

pose serious cardiac risks to patients.  After the cardiac risks of Vioxx were discovered, Merck

directors established a special committee to investigate the conduct of its senior management in

relation to the development and marketing of the drug.  The special committee hired a former

federal judge to lead the investigation.  The investigation led to the writing and ultimate

publication of a report which exculpated Merck from any wrongdoing.  Personal injury suits were

later filed against Merck, and the plaintiffs in those suits served subpoenas upon the lawyers

involved in creating the report for both depositions and for the materials that they had utilized in

creating the report.

The drug manufacturer in *Vioxx* sought a protective order over the depositions and

materials underlying the creation of the report.  It set forth an argument which is identical to the

one Bayer has set forth in its Motion in which the manufacture claimed "that: (1) the[] materials,

including drafts of the Report and attorney interview notes and memoranda developed in

preparation of the Report, [were] attorney work-product protected from discovery uner Rule

26(b)(3) and also contain[ed] attorney-client communications; (2) the publication of the final

Report did not waive protection for the underlying materials; and (3) the Plaintiffs do not have a

"substantial need" for the[] materials."

The *Vioxx* plaintiffs argued that the materials they sought were not privileged work-product because the report at issue in that case was "primarily intended to influence public opinion and to create positive publicity" for the manufacturer, the primary purpose of creating the report could not reasonably be found to be in anticipation of litigation, and so the various materials and interviews related to the preparation of the report should not have been protected. Additionally, the plaintiffs asserted that, even if the materials could have at one time been subject to any attorney work-product type of privilege, such privilege had been waived by the public dissemination of the report.

I find, as did Judge Fallon in the *In re Vioxx* matter, that litigation does not have to be existent or immediately imminent in order to find that a document was "prepared in anticipation of litigation" as contemplated by Rule 23(b). *See U.S. v. Davis,* 636 F2d at 1040. "It is . . . difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine." *Id.* at 1040. Other courts have found that "[a] document may be considered to have been prepared in anticipation of litigation even if the litigation that caused its preparation was investigation by a government agency, and not a traditional civil suit." *Abdallah v. Coca-Cola Co.*, 200 WL 33249254 (N.D. Ga. 2000)(citing *Int'l Sys. v. Int'l Sys.*, 693 F.2d 1238 (5th Cir. 1982); *In re LTV*, 89 F.R.D. 595 (N.D. Tex. 1981); *Martin v. Montford*, 150 F.R.D. (D.Colo. 1993)). This is because investigation by a governmental agency often represents "more than a remote possibility of future litigation and provides reasonable grounds for anticipating litigation." *Id.*

I next briefly address Plaintiffs' assertion that Bayer has waived any privilege to the extent that one exists by using the Investigative Report defensively in this litigation and/or by

9

creating it for the actual purpose of avoiding a business or public relations nightmare. I have considered Plaintiffs' arguments but find them unsubstantiated. First, Bayer has specifically asserted that it has no plans to utilize the Report itself in its defense, and that the witnesses interviewed by the Firm have all been made available for deposition, and that through discovery the Plaintiffs have all of the non-privileged documents which the Firm may have reviewed.

Second, I note that the mere fact that Bayer had a dual business purpose for creating the Report in addition to its prospective use in later litigation does not require a finding that Bayer has waived applicable work-product or opinion privileges over the Firm's materials and attorney testimony. *See, e.g., Hollinger Int'l Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 515 n.9 (N.D. Ill 2005). I agree with Judge Fallon's conclusion that "[t]he publication of a final investigative report does not waive the protection for the underlying drafts and materials because the work-product doctrine exists not to protect a 'confidential relationship,' but rather 'to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent.'" *In re Vioxx*, 2007 WL 854251 at *4 (quoting *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989).

Bayer, in its Motion, lastly asserts that the Plaintiffs have not overcome the hurdle of establishing that they have a substantial need for the otherwise privileged materials underlying the Investigative Report or for the deposition testimony of the Firm's attorneys. The Plaintiffs suggest that they have established a substantial need for the testimony and underlying documents because they believe that Bayer essentially cherry-picked the information that it furnished to the Firm, and that the information contained in the Report was in reality "intended to deceive the public and the FDA into believing that Bayer was committed to disclosing drug safety data but was a mere victim of two rogue employees." They claim that they have no alternative method of

10

establishing Bayer's deception without undue hardship.

In support of this contention, Plaintiffs cite to two conflicting statements in support of the assertion that protecting the material underlying the Investigative Report or depositions inquiring into the circumstances under which it was created will create an "undue hardship" upon them. The first is a statement attributed to Dr. Sprenger by the Investigative Report which reads "Dr. Sprenger says he told BPC about the compressed timeline." The second is a statement taken from the Plainitiffs' deposition of Dr. Sprenger wherein he stated that "I indeed never showed or reported on the revised timetable . . . My answer . . . is misrepresented in this report in that sentence. . . . It is a false statement." As stated earlier, Bayer has no intention of relying on the Investigative Report, so at this time, I do not find that the alleged inconsistent statements are sufficient to establish a substantial need for information which the Plaintiffs cannot otherwise obtain without undue hardship. Should Bayer's position change, should it seek to use the Report offensively, I might have to reconsider the appropriateness of protecting the underlying information and attorney depositions. Such, however, is not the case at this time. And so, for the reasons set forth herein, it is

ORDERED and ADJUDGED that the Defendant's Motion for Protective Order be and is hereby GRANTED.

DONE and ORDERED in Chambers, at West Palm Beach, Florida this 12th day of August, 2009.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE