IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to: **ALL ACTIONS**

**BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT
MARK DERSHWITZ, M.D., Ph.D. AND MEMORANDUM OF LAW IN SUPPORT**

PLEASE TAKE NOTICE that Defendants Bayer Corporation, Bayer Healthcare Pharmaceuticals Inc., and Bayer Schering Pharma AG move to exclude the testimony of plaintiffs' expert Mark Dershwitz.

**MEMORANDUM OF LAW**

Plaintiffs offer Mark Dershwitz, M.D., Ph.D., a pharmacologist and anesthesiologist who has not worked with a bypass patient in 24 years, to offer his views on "potential mechanisms" through which Trasylol may cause kidney damage. They also have asked him to opine on general causation. Neither of Dr. Dershwitz's opinions is admissible.

Dr. Dershwitz's "mechanism" opinion is nothing but speculation. He concedes that no study has shown a cause-and-effect relationship between Trasylol and kidney injury in humans. In the absence of such support, he has developed two theories – both unproven – by which Trasylol might cause kidney injury. These ruminations should be excluded because "the courtroom is not the place of scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1247 (11th Cir. 2005); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific

principles. The courtroom is not the place for scientific guesswork.") (internal quotation marks and citation omitted).

Dr. Dershwitz does not offer an opinion on causation at all, instead asserting only that there is a "significant link" between Trasylol, renal dysfunction, renal failure, and death. Dr. Dershwitz admits that, in developing his opinion, he accepted without question those articles purporting to raise safety concerns while discounting studies favorable to Trasylol because, according to Dr. Dershwitz, such findings are "not news." Deposition of Mark Dershwitz, M.D., Ph.D., ("Dershwitz Dep.") (Ex. A) at 294:16-295:10. However, the admissibility of an expert opinion regarding potentially causative relationships is not based on "newsworthiness," but must instead be rooted in scientific reliability and an examination of the totality of the evidence. *Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1331, 1335 (10th Cir. 2004) (affirming exclusion of plaintiffs' causation expert because "selective reliance" on certain evidence to the exclusion of other evidence is "not a generally accepted methodology"); *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 596 (9th Cir. 1996) (affirming exclusion of expert opinion as unreliable based on district court's finding that expert "has seen fit to 'pick and chose' [sic] from the scientific landscape and present the Court with what he believes the final picture looks like. This is hardly scientific.") (alteration in original). Accordingly, Dr. Dershwitz's opinion on the putative "significant link" between Trasylol and risk of certain alleged side effects should be excluded.

## ARGUMENT

I.  **DR. DERSHWITZ'S OPINION ON THE MECHANISM THROUGH WHICH TRASYLOL MIGHT AFFECT KIDNEY FUNCTION IS INADMISSIBLE SPECULATION.**

Dr. Dershwitz asserts that there are two different mechanisms by which Trasylol "*might* contribute to kidney damage." Dershwitz Rep. (Ex. B) ¶ 49 (emphasis added). Specifically, Dr. Dershwitz opines that Trasylol "*can* affect autoregulation" in the kidney leading

to decreased blood supply, which in turn may result in temporary or permanent renal damage. *Id.* ¶ 40 (emphasis added). Dr. Dershwitz also contends that Trasylol *may* affect platelet aggregation, which in turn *might* lead to blood clot material that *might* impede blood flow in the kidney. *Id.* ¶ 48.

Both proposed mechanisms are unproven and therefore must be excluded. *See McClain*, 401 F.3d at 1253 (holding that the trial court abused its discretion in admitting the opinion of a general causation expert who had not "offered a reliable explanation of the physiological process by which [the drug] causes heart attacks and ischemic strokes"); *Kilpatrick v. Breg Inc.*, No. 08-10052, 2009 WL 2058383, at *5 (S.D. Fla. June 25, 2009) (excluding an expert where "none of the articles [upon which the expert relied] explains the mechanism by which bupivacaine damages cartilage").

> **A.    There Is No Scientific Support for Dr. Dershwitz's Hypothesis That Trasylol Impaired Regional Blood Flow in the Kidney.**

Dr. Dershwitz first opines that Trasylol impacts the autoregulation of renal blood flow through its effects on vasodilatory mediators. Dershwitz Dep. (Ex. A) at 158:21-159:4. Testimony on this theory should be excluded for three reasons.

*First*, the theory cannot work unless a cascade of events occurs, each step of which, as described by Dr. Dershwitz, is merely possible. In essence, Dr. Dershwitz opines that Trasylol "may" reduce the concentration of one organic compound, which *may* affect the synthesis of another, which *can* affect the concentration of a third compound, which "*could*" affect the dilation of blood vessels in part of the kidney, which "*may*" have an effect on regional blood flow.[1] Dr. Dershwitz's equivocation at each step of his proposed mechanism cascade

---

[1] Specifically, Dr. Dershwitz opines that Trasylol "*can* affect the concentration of prostaglandins in the kidney." Dershwitz Rep. (Ex. B) ¶ 41 (emphasis added). According to Dr. Dershwitz, this is achieved through a multi-step process where Trasylol inhibits kallikrein (Dershwitz Rep.

3

emphasizes the speculative nature of his entire theory. Indeed, Dr. Dershwitz concedes that his hypothesis does not establish causation; rather it is merely "one plausible description of what [Trasylol] may do." Dershwitz Dep. (Ex. A) at 199:4-7.

It was such a "trail of equivocation" that led the Eleventh Circuit to exclude similar causation testimony in *McClain*, 401 F.3d at 1240, where the proferred expert opined:

> Sympathomimetics *can* constrict blood vessels. And *when* you constrict blood vessels, you *may* raise blood pressure. Sympathomimetics stimulate the heart and increase the pulse, increase the heart rate. *If* you stimulate the heart, you *may* cause an abnormal heart rate or an abnormal heart rhythm. *If* you constrict blood vessels, *if* it happens in a cerebral vessel in the brain, it *may* cause vasospasm which *may* lead to a stroke. *If* you stimulate or cause a constriction in the coronary blood vessel that *can* cause vasospasm and it *may lead* to chest pain, angina, arrhythmia, or myocardial infarction.

*Id*. (emphasis in original). The Eleventh Circuit held that such "equivocation … expose[d] a tenuous basis for [the expert's] opinions," *id.*, and therefore excluded the testimony as lacking in scientific support. Dr. Dershwitz's proposed mechanism suffers from the same equivocation, evinces the same "tenuous basis" that "impugn[s] his methodology," *see id.*, and should be excluded.

*Second*, Dr. Dershwitz limits his opinion to the purported effect of Trasylol on localized blood flow in a part of the kidney known as the renal medulla. *See* Dershwitz Rep. (Ex. B) ¶ 43 ("the structures that are most commonly damaged leading to renal failure are the renal tubules located within the renal medulla"); Dershwitz Dep. (Ex. A) at 162:14-23 ("the medulla is more sensitive to decreased oxygen delivery when autoregulation fails"). Dr.

---

(Ex. B) ¶17), which "is the enzyme that converts kininogen to bradykinin" (Dershwitz Dep. (Ex. A) at 137:24-138:5). The lack of bradykinin decreases the synthesis of prostaglandins. *Id*. at 153:9-13. The decreased release of prostaglandins "*could* cause a decrease in the vasodilation that participates in the autoregulation of renal blood flow." *Id*. at 152:13-19 (emphasis added). Dr. Dershwitz also posits that Trasylol's effects on other vasodilatory mediators, including nitric oxide, "*may* have an effect" on regional blood flow. *Id*. at 202:24-203:5 (emphasis added).

4

Dershwitz, however, can cite to no study establishing Trasylol's effect on blood flow in that region of the kidney.

The only study he does cite (Kramer 1983) examined blood flow changes in the outer renal cortex (not the medulla) and in animals (not in humans).[2] Dr. Dershwitz conceded that the Kramer study assessed blood flow in a different region of the kidney than the one he claims may be affected by Trasylol, and Dr. Dershwitz does not know if it is appropriate to assume that the relevant part of the kidney would be affected in the same way:

> Q. Can you find the data in the article showing the level of decreased flow to the medulla?
>
> ***
>
> Q. You found that data point for me, Doctor?
>
> A. Okay. It's on page 966 in Figure 1. They are using blood flow to the outer cortex as a marker for blood flow in the medulla.
>
> ***
>
> Q. And is that an appropriate substitute measurement, in your view?
>
> A. I don't know. They seem to think so.

Dershwitz Dep. (Ex. A) at 188:24-192:4. In addition, Dr. Dershwitz concedes that a decrease in blood flow to the renal cortex (which was studied) does not necessarily lead to decreased blood flow to the renal medulla (as his theory would require):

> Q. Would decreased flow to one mean decreased flow to the other?
>
> A. No.
>
> Q. So when you talk about – if somebody says there was decreased flow in the deep cortical section, that in turn means decreased flow to the medullary section.
>
> A. Not necessarily.

---

[2] H Kramer, "Interaction of the Kinin and Prostaglandin Systems in Mediating Renal Function and Intrarenal Hemodynamics," 156 Adv. Exper. Med. & Biol. 961 (1983) (Ex. C).

Dershwitz Dep. (Ex. A) at 188:12-19.

Moreover, courts generally recognize that results from animal studies are insufficient to support general causation in humans due to, *inter alia*, inconsistent extrapolation between species and issues with dosing. Dr. Dershwitz's reliance on Kramer 1983 suffers from both of these infirmities. Dr. Dershwitz fails to demonstrate how the results of Kramer 1983 correlate to human anatomy, and thus cannot rely on that study to support his blood flow opinion. *See, e.g., Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002) (holding that the trial court did not abuse its discretion in concluding that "plaintiffs offered insufficient evidence … that the effect of bromocriptine would be the same on humans as it is on animals"); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1313-14 (11th Cir. 1999) (holding that the trial court properly excluded an expert who "failed to explain the correlation of the results of Lightfoote's rat studies … to symptoms in a human patient"); *Kilpatrick*, 2009 WL 2058384, at *6 (recognizing "the difficulty inherent in extrapolating conclusions about human disease from animal-based studies").

Nor has Dr. Dershwitz attempted to account for the dosage levels used in the Kramer study, as compared to the vastly different dosing used in humans patients:

> Q. Do you know how the aprotinin dose levels used in this study compare with dosage levels that are used in patients, human patients?
>
> A. So this was dosed on the basis of kallikrein inhibitory units per kilo, which is similar to the method of how aprotinin was given to humans in terms of, you know, milligrams. And so I would have to refer to the package insert to see how many kallikrein inhibitory units are found per milligram of the standard aprotinin preparation.
>
> ***
>
> Q. My question is not whether you can do it. My question is whether you have done it.
>
> A. No.

6

Dershwitz Dep. (Ex. A) at 186:21-187:21. By failing to provide grounds for extrapolating from the Kramer animal study to humans, Dr. Dershwitz has offered a hypothesis that is not based on scientifically reliable evidence and which would serve to confuse, rather than inform, the jury. *See Rider*, 295 F.3d at 1201.

Moreover, even if Dr. Dershwitz could show that Trasylol had a theoretical effect on blood flow in the renal medulla, he still has not provided any scientific support for the conclusion that reduced blood flow there would lead to renal failure. This lack of scientific support is fatal to his opinion. Although Dr. Dershwitz's "biological theory may be exactly right, at this point it is merely plausible, not proven, and biological plausibility is not proof of causation." *In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1296.

### B. There Is No Scientific Support for Dr. Dershwitz's Hypothetical Microscopic Blood Clot Mechanism Theory.

Dr. Dershwitz's second proposed possible mechanism to explain how Trasylol can cause kidney damage is just as speculative as his first. He opines that the medicine impacts platelet aggregation resulting in microscopic blood clots that lodge in the kidneys and reduce blood flow. Dershwitz Rep. (Ex. B) ¶ 48. Dr. Dershwitz's opinion on this potential mechanism suffers from three major flaws.

First, the only study Dr. Dershwitz relies upon (Havel 1992) does not support his mechanism opinion.[3] As Dr. Dershwitz confesses, Havel studied Trasylol's effect on enzymes in a test tube, not on platelet aggregation in an animal (let alone in a human):

> Q. Havel did not report on increased platelet aggregation, he just reported on changes in prostacyclin and thromboxane, right?
>
> A. Yes.

---

[3] M Havel, "Aprotinin Decreases Release of 6-Keto-Prostaglandin $F_{1\alpha}$ and Increases Release of Thromboxane $B_2$ in Cultured Human Umbilical Vein Endothelial Cells," 104 J. Thorac. Cardiovas. Surg. 654 (1992) (Ex. D).

Dershwitz Dep. (Ex. A) at 207:11-14.  Nevertheless, Dr. Dershwitz improperly extrapolates from Havel's conclusion that Trasylol impacts platelet aggregation enzymes to opine that Trasylol "increases platelet aggregation."  Deshwitz Rep. (Ex. B) ¶ 48.  Because Dr. Dershwitz cannot point to a single study where Trasylol's effect on platelet aggregation was actually reported, he has no scientific support for his theory.

Second, Dr. Dershwitz's sole reliance on Havel for his platelet aggregation mechanism is improper since Havel is an *in vitro* cell culture study.  Extrapolating from such cell culture studies is problematic because "these [studies] necessarily remove the cells from the dynamic metabolic context in which the human body actually processes chemical compounds." *In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1295.  Dr. Dershwitz "ha[s] not run across" a study replicating Havel's results in human subjects, Dershwitz Dep. (Ex. A) at 207:20-208:12, and he fails to offer any basis to extrapolate Havel's results from a petri dish to a human body.  Without such an explanation, Dr. Dershwitz's platelet aggregation mechanism opinion is unreliable.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that a court may exclude expert testimony if "there is simply too great an analytical gap between the data and the opinion proffered").

Third, even if the Havel study actually supported Dr. Dershwitz's platelet aggregation mechanism opinion, Dr. Dershwitz still fails to explain away the fact that the dose used in the study bears no relation to what any patient would be administered in surgery.  When asked about the comparison between the Trasylol concentration used in the Havel study against a clinical dose, Dr. Dershwitz concedes that he has not considered the issue:

> Q.    And this question is not, can you do it, but have you evaluated how the concentration levels that were used in this study equate to or compare to the clinical dose used in humans?
>
> A.    I have not asked that question.

Dershwitz Dep. (Ex. A) at 208:13-17.  Dr. Dershwitz's failure to account for Havel's limitations renders his platelet aggregation mechanism opinion unreliable.  *See In re Accutane Prods. Liab.*, 511 F. Supp. at 1294 (excluding an expert who "ma[d]e[] no attempt to overcome these varying and significant problems" contained in the studies he used to support his opinion).

* * *

In short, the two mechanisms offered by Dr. Dershwitz to explain the biological process by which Trasylol may contribute to renal failure are nothing more than leaps of logic from animal and laboratory studies.  As the *Accutane* court make clear, even if Dr. Dershwitz's "biological theor[ies] may be exactly right, at this point [they are] merely plausible, not proven, and biological plausibility is not proof of causation." *In re Accutane Prods. Liab.*, 511 F. Supp. 2d at 1296; *McClain*, 401 F.3d at 1247 ("the courtroom is not the place of scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it").  The speculative mechanism opinions theorized by Dr. Dershwitz should be excluded.

## II. DR. DERSHWITZ'S OPINION THAT THERE IS A "SIGNIFICANT LINK" BETWEEN TRASYLOL USE AND RENAL DYSFUNCTION, RENAL FAILURE AND DEATH IS INADMISSIBLE TO PROVE CAUSATION

Plaintiffs offer Dr. Dershwitz as a general causation expert – that is, to prove that Trasylol causes various side effects – but Dr. Dershwitz's opinion does not address causation; he only opines that there is "a significant link" between Trasylol and renal dysfunction, renal failure and death.  Dershwitz Rep. (Ex. B) ¶ 49; Dershwitz Dep. (Ex. A) at 274:20-25.  This opinion is inadmissible because (1) a purported association is not the same as causation; and (2) in coming to this half-hearted statement of association, Dr. Dershwitz relied solely on a one-sided literature review, with no explanation for his decision to disregard studies that do not support his opinions.  For these reasons, Dr. Dershwitz's "causation" opinions fail to pass muster under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993).

9

### A. Dershwitz's "Significant Link" Testimony Does Not Establish Causation.

Dr. Dershwitz opines that "recent epidemiologic data describe a *significant link* between the perioperative administration of aprotinin and an increased risk of both death and the development of renal dysfunction." Dershwitz Rep. (Ex. B) ¶¶ 49, 22-39 (emphasis added). Dr. Dershwitz, however, does not opine that there is a causative relationship between Trasylol and the renal and mortality outcomes he describes.

This falls far short of what is required to prove causation. As the Reference Manual on Scientific Evidence explains, "[e]ven when an association exists, researchers must determine whether the exposure causes the disease or whether the exposure and the disease are caused by some other confounding factor." Michael D. Green, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 333, 369 (Fed. Judicial Center, 2d. ed. 2000). Here, for instance, Trasylol may be "associated" with increased incidences of renal failure because patients administered Trasylol have higher risk procedures, pre-existing conditions that increase the risk of surgery, or are simply sicker than patients given other blood-sparing agents. Dershwitz Dep. (Ex. A) at 311:25-312:11 (listing "confounding risk factors," including "surgery performed without bypass" and "concomitant use of ACE inhibitors").[4]

---

[4] This is so because, while Trasylol is more effective than the other blood sparing agents, it also is significantly more expensive. Deposition of Mark J.S. Heath (Ex. E) at 347:16-23, 208:7-17. Practicing physicians therefore sometimes reserved use of Trasylol for cases involving higher risk patients, where the treaters believed the incremental benefit from Trasylol justified the increased cost. *Id.* at 210:19-211:2. *See generally* D Mangano, "The Risk Associated with Aprotinin in Cardiac Surgery," 354 N. Eng. J. Med. 353 (2006) (Ex. F) at 356-57, Table 1 (a significant number of patients receiving Trasylol also had an urgent or emergency status, history of insulin-dependent diabetes, hypertension, angina, congestive heart failure, heart block, carotid disease, liver disease, renal disease, pulmonary disease, CABG surgery, and valve disease); SA Olenchock, "Impact of Aprotinin on Adverse Clinical Outcomes and Mortality up to 12 years in a Registry of 3,337 Patients," 86 Ann. Thorac. Surg. 560 (2008) (Ex. G) at 561, Table 1 (Trasylol patients had significantly lower creatinine clearance and ejection fraction and significantly higher hypertension, history of renal failure, hypercholesterolemia, peripheral

Upcoming trial case *Morrill* is an example. Plaintiff's decedent had a history of multiple heart attacks and other serious health problems, and died after undergoing redo CABG combined with another high risk procedure because CABG was not restoring blood flow to all of his heart. *See* Bayer's Motion to Exclude Plaintiff's Case-Specific Causation and Damages Experts and Memorandum of Law in Support (*Melissa Morrill, as personal representative of the Estate of William Cyrus Morrill, III, v. Bayer Pharma. Corp.*, Case No. 9:08-cv-80424) at pp. 2-8.

Indeed, "strength of association" is just one of nine criteria used by scientists in determining whether an association suggests general causation. *See* Deposition of Mark J. Eisenberg (Ex. H) at 110:18-114:17; *Gannon v. United States*, 292 Fed. Appx. 170, 172-73 & n.1 (3d Cir. 2008). The other eight criteria are Consistency, Specificity, Temporality, Biologic Gradient, Plausibility, Coherence, Experimental Evidence, and Analogy. Dr. Dershwitz does not discuss these criteria. *See Gannon*, *supra* (discussing Bradford Hill criteria, which are "broadly accepted . . . for evaluating causation," and excluding expert testimony on general causation for failure to satisfy them); *accord In re Stand 'N Seal Prods. Liab. Litig.*, 623 F. Supp. 2d 1355, 1372-73 (N.D. Ga. 2009). Therefore, Dr. Dershwitz's opinion merely establishes association, which "is far removed from proving *causation*." *Allison*, 184 F.3d at 1315, n.16 (emphasis in original). This opinion is therefore scientifically unreliable to prove causation and should be excluded under *Daubert*.

Further, Dr. Dershwitz should not be allowed to testify about the alleged association between Trasylol and putative side effects because association in-and-of-itself is not probative of general causation and therefore is not relevant. *See In re Accutane*, 511 F. Supp. 2d at 1297-98 (excluding an expert opinion that relied on internal company documents that may

---

vascular disease, cerebrovascular disease, previous cardiovascular intervention, myocardial infarction, heart failure, cardiogenic shock and arrhythemia than Amicar patients).

support an association conclusion because "*an association is not equivalent to causation*") (emphasis in original); *Kilpatrick*, 2009 WL 2058384, at *5 (excluding an expert opinion that relied on evidence that "[a]t best, … tend[ed] to show an association … [which] is far removed from proving causation"). Allowing plaintiffs to put such evidence before a jury would prejudice defendants by confusing, rather than informing, the members of the jury. *See Frazier*, 387 F.3d at 1263 ("[e]xclusion [of expert evidence] … is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury") (internal citations omitted). Accordingly, Dr. Dershwitz's "association" opinion should be excluded.

      **B.**    **Dr. Dershwitz's One-Sided Literature Review Is an Unscientific Methodology.**

Dr. Dershwitz's "significant link" opinion also is inadmissible because he based it entirely on an improper, results-oriented review of the scientific literature. Dr. Dershwitz describes his literature review methodology as "if it's been shown in a study, it's likely to be true until disproven by someone else." Dershwitz Dep. (Ex. A) at 25:5-11. Under this methodology, Dr. Dershwitz gave great weight to the most recent studies supporting safety signals (so long as they were not "junk"), and ignored earlier studies that he declared "less relevant", and those that did not suggest safety concerns. *Id*. at 213:20-214:11, 22:4-12. In Dr. Dershwitz's view, "[i]t's news when somebody finds a signal," but not when the signal does not exist:

> Q. This was not one of the old clinical trials that you were referring to, though, right?
>
> A. No. This is a relatively new paper; I think it's from 2007.
>
> Q. Right, 2007.
>
> A. So it's contemporaneous with some of these others.

12

> Q. And so you can't discount it on the fact that this is old information, Right?
>
> A. I'm not discounting it. I'm just saying they didn't find a signal, but that's not news. It's news when somebody finds a signal.

Dershwitz Dep. (Ex. A) at 294:23-295:10.

Intentionally excluded from Dr. Dershwitz's methodology is any meaningful discussion of the studies with conclusions contrary to his opinions and why those studies apparently did not have any impact on his views. *Id*. at 295:19-296:9. Dr. Dershwitz concedes that there are studies that came to the opposite result – that is, studies that "failed to find any effects of [Trasylol] on short- or long-term mortality" and "found no relationship between aprotinin use and renal damage." Dershwitz Rep. (Ex. B) ¶¶ 22, 39. Dr. Dershwitz omitted discussion of these studies, however, because he considered them, with no further explanation, to be "less relevant to [the opinions in] my report so that they're not included." Dershwitz Dep. (Ex. A) at 22:4-12.

Dr. Dershwitz's failure to offer any meaningful rationale to explain away studies with contrary outcomes demonstrates the impropriety of his "scientific" method. *See Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 607 (D. N.J. 2002), *aff'd*, 68 Fed. Appx. 356 (3rd Cir. 2003) (excluding opinions because the expert "d[id] not provide any methodology for weighing and discounting" information); *In re Bextra & Celebrex Mktg. Sales Pracs. and Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) ("cherry-picking" studies that support an opinion, and rejecting contradictory evidence, "is not 'good science;' it is therefore inadmissible"); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 851 (W.D. Tex. 2005) ("failure to consider both positive and negative associations in the literature is not reliable methodology"). Because Dr. Dershwitz employs the flawed methodology of considering only

13

studies that support his conclusion, his opinion that Trasylol causes renal dysfunction, renal failure, and death should be excluded.

## CONCLUSION

Dr. Dershwitz's opinions discussed above lack support under scientific literature and settled principles of law. Because they do not meet the standards set forth in Fed. R. Evid. 702 and *Daubert v. Merell Dow Pharms., Inc.*, 509 U.S. 579 (1993), defendants respectfully request that this testimony be excluded.

## RULE 7.1(A)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(A)(3)(a), counsel for defendants hereby certifies that counsel for the defendants has made reasonable efforts to confer in good faith with counsel for all parties who may be affected by the relief sought in the motion, and has been advised that plaintiffs will contest this motion.

December 17, 2009                                  Respectfully submitted,

*/s/ Barbara Bolton Litten*
Patricia E. Lowry
Florida Bar No. 332569
E-mail: plowry@ssd.com
Barbara Bolton Litten
Florida Bar No. 91642
E-mail: blitten@ssd.com
**SQUIRE SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR  & SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL  60603
Telephone:  312-494-4400
Facsimile:  312-494-4440

Eugene A. Schoon
Email:  eschoon@sidley.com
Susan A. Weber
Email:  saweber@sidley.com
Catherine Valerio Barrad
Email:  cbarrad@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  312-853-7000
Facsimile:  312-853-73036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:  313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMENS CHERIN &  MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:  412-566-6099

*Attorneys for Bayer Corporation,
Bayer HealthCare Pharmaceuticals Inc.,
and Bayer Schering Pharma AG*

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 17, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

      */s/ Barbara Bolton Litten*
      Barbara Bolton Litten

# SERVICE LIST

### In re Trasylol Products Liability Litigation – MDL-1928
### Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON

## United States District Court
## Southern District of Florida

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone:  215-790-4584
Facsimile:  215-875-7701
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE & LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone:  561-684-2500
Facsimile:  561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509
*Liaison Counsel for Defendants*

Scott A. Love
Email:  slove@triallawfirm.
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-757-1400
Facsimile:  713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone:  203-610-6393
Facsimile:  203-610-6399
*Federal-State Liaison for Plaintiffs*