**Exhibit A**

**Part 1**

**EXPERT REPORT of
SUZANNE PARISIAN, M.D.**

August 18, 2009

Prepared at the Request of
The Trasylol Products Liability Plaintiffs' Steering Committee

**TABLE OF CONTENTS**

QUALIFICATIONS.................................................................................1

PURPOSE OF THE
REPORT.............................................................................................8

SUMMARY OF OPINIONS AND EXECUTIVE SUMMARY.................................10

EXECUTIVE SUMMARY......................................................................14

DISCUSSION

ISSUE #1

I.      BAYER'S COMMUNICATIONS OF APROTININ RISKS TO
HEALTH CARE PROFESSIONALS.......................................................24

A.  ROLE OF THE FOOD AND DRUG ADMINISTRATION...............................24

    1.  NEW DRUG APPLICATION ("NDA") REVIEW & APPROVAL....................26

    2.  PRESCRIPTION DRUG USER FEES.............................................33

    3.  DRUG LABEL NEGOTIATIONS AT TIME OF APPROVAL.......................35

    4.  POST APPROVAL DRUG PROMOTION..........................................37

    5.  POST APPROVAL SAFETY STUDIES............................................40

    6.  PHARMACOVIGILANCE AND ADVERSE EVENT REPORTING................44

    7.  POST APPROVAL REVISION OF A DRUG'S LABEL.............................53

    8.  PHARMACEUTICAL INDUSTRY AND STANDARDS.............................54

ISSUE #2

II.     FDA'S APPROVAL OF BAYER'S APROTININ (TRASYLOL)....................55

A.     APROTININ AS AN ORPHAN DRUG............................................55

        1.  BAYER'S APROTININ IND........................................58

        2.  BAYER'S PREPHASE 3 MEETING.................................61

3.  BAYER DISREGARDS OUTSIDE MEDICAL
    EXPERT'S RECOMMENDATION AGAINST
    INTRODUCTION OF TRASYLOL IN THE
    UNITED STATES BASED ON UNACCEPTABLE
    RISK...................................................................70

4.  BAYER'S SUBMITS NDA #20-304 APROTININ
    (TRASYLOL).....................................................72

        b.  FDA CLINICAL REVIEW......................................72

        c.  UNITED STATES CLINICAL TRIALS.....................75

        d.  UNITED STATES HUMAN PHARMACOKINETIC
            (PK) STUDIES (D90-028, D90-001)............................80

        e.  NON-US CLINICAL STUDIES...............................81

        f.  FDA's CLINICAL OVERALL ASSESSMENT
            OF BAYER'S NDA..............................................82

        g.  RENAL DYSFUNCTION  IN BAYER'S
            CLINICAL TRIAL POPULATIONS............................84

        h.  BAYER'S ANIMAL STUDIES FAILED TO
            FULLY EXAMINE APROTININ EFFECTS ON
            RENAL FUNCTION.............................................85

        i.  FDA's ASSESSMENT OF APROTININ'S
            RISK/BENEFIT..................................................86

        j.  APROTININ'S ANIMAL
            PHARMACOKINETICS.........................................89

        k.  BAYER'S RESPONSE TO FDA'S 1993
            APPROVABLE LETTER.........................................90

        l.  BAYER'S SAFETY UPDATE REPORT FOR ITS
            PENDING NDA...................................................94

        m.  FDA APPROVES BAYER'S TRASYLOL
            NDA................................................................95

        n.  FDA PLACES A HOLD ON TRASYLOL LAUNCH
            MATERIALS.....................................................96

o. FDA'S DDMAC LETTER TO BAYER FOR
FALSE & MISLEADING PROMOTION....................….....98


ISSUE #3

III.   BAYER'S INTERACTIONS WITH FDA REGARDING REPORTING AND
INVESTIGATION OF RISKS FOR APROTININ..............................................99

A.   BAYER'S ATTEMPT TO EXPAND APROTININ'S INDICATIONS................100

1.   BAYER'S PURSUIT OF A HIP REPLACEMENT SURGERY
INDICATION....................................................................100

2.   BAYER'S PURSUIT OF A PRIMARY CABG INDICATION........102

a.   DDMAC LETTER REGARDING BAYER'S LACK OF FAIR AND
BALANCED LAUNCH MATERIALS FOR PRIMARY CABG
INDICATION........................................................108

3.   FDA VOICES "CONCERNS ABOUT EXPANSION OF INDICATIONS"
AT A JANUARY 2005 MEETING.........................................109

4.   CHANGES TO TRASYLOL'S LABEL...................................113

a.   APROTININ GETS A BLACK BOX WARNING FOR RISK OF
ANAPHYLAXIS AS A RESULT OF INCREASING PATIENT
EXPOSURE.........................................................113

b.   BAYER UPDATES BLACK BOX WARNING FOR
ANAPHYLAXIS TO INCLUDE RISK FOR ALL APROTININ
CONTAINING PRODUCTS.......................................116

c.   BAYER ADDS PRECAUTION FOR GERIATRIC USE......117

d.   BAYER REVISES DOSING INSTRUCTIONS REGARDING USE
OF HEPARIN.......................................................117

5.   SAFETY ISSUES REPORTED BY BAYER TO FDA...................118

a.   CANADIAN ADVERSE EVENTS................................118

b.  BAYER INFORMS FDA THERE WAS A STOPPED RENAL STUDY.......................................................................119

c.  BAYER PROVIDES FDA WITH THREE *NEJM* ARTICLES ABOUT TRASYLOL RISK.............................................120

6.  FOREIGN PHARMACOVIGILANCE INSPECTIONS SHOW MAJOR DEFICIENCIES IN BAYER'S PROCEDURES FOR IDENTIFICATION OF SAFETY ISSUES..............................................................122

7.  EUROPEAN UNION AND  LABEL CHANGE TO ADD WARNINGS ABOUT RENAL DYSFUNCTION WITH TRASYLOL.....................129

8.  FDA ADVISORY PANEL MEETING SEPTEMBER 2006.................130

a.  FEBRUARY 3, 2006 TELECONFERENCE WITH FDA...........130

b.  FDA'S MAY 1, 2006 COMMUNICATION TO BAYER............131

c.  BAYER'S  JULY 17, 2006 MEETING WITH FDA..................131

d.  BAYER PROVIDES FDA WITH IT'S ANALYSIS OF POST MARKETING SPONTANEOUS REPORTS –JULY 2006.........133

e.  BAYER'S INTERNAL RE-REVIEW OF RECOMBINANT APROTININ PRECLINICAL STUDIES.............................140

f.  BAYER'S REASSESSMENT FOR FDA OF TRASYLOL'S BENEFIT VERSUS RISK..............................................142

g.  FDA's CARDIOVASCULAR AND RENAL DRUGS ADVISORY COMMITTEE TRASYLOL SAFETY UPDATE- SEPTEMBER 21, 2006..............................................................................144

h.  BAYER'S INTERNAL PLAN TO  OBTAIN A NEGATIVE STATEMENT AGAINST MANGANO'S FINDINGS  FROM FDA............................................................................146

i.  BAYER's UPDATE  FOR FDA  ABOUT EXISTENCE OF i3 DRUG SAFETY STUDY..................................................147

j.  FDA ASKS BAYER "ARE THERE ANY ADDITIONAL STUDIES BAYER HAS NOT GIVEN TO FDA?".............................147

k.  BAYER PROVIDES FDA A CHRONOLOGY OF SUBMISSIONS, CONTACTS AND ACTION PLANS.................................151

iv

l. BAYER'S PACKAGE TO FDA REGARDING I3'S RESPONSES.........................................................154

m. BAYER AND A FOLLOW-UP I3 MEETING....................154

9. BAYER AND TRASYLOL SAFETY........................................155

a. A SEPTEMBER 29, 1997 BAYER CONTACT WITH FDA HAS FDA SUGGESTING TO BAYER THAT IT IS UNDER REPORTING THE RISK OF THROMBOSIS IN ITS PACKAGE INSERT...............................................................155

b. ITALIAN HEALTH MINISTRY SUSPENDS SALES OF TRASYLOL..........................................................156

c. REPORT OF A RISK OF ACCUMULATION OF HIGH DOSE APROTININ IN KIDNEY WITH COADMINISTRATION OF ANTIBIOTIC PROPHYLAXIS DURING CABG.................158

d. BAYER BEGINS TO PLAN A BART STRATEGY IN 2002 INCLUDING A PROPOSAL TO CONDUCT A COMPARATVE STUDY WITH AMICAR...........................................160

e. BAYER AWARE THAT MICROMEDEX DESCRIBES SIGNIFICANT NEPHROTOXICITY POTENTIAL FOR TRASYLOL..........................................................161

f. BAYER DELAYS IN PROVIDING FDA WITH SAFETY STUDIES ABOUT TRASYLOL SHOWING INCREASED RISK AND MORTALITY

i. ST. GEORGE HOSPITAL RETROPSECTIVE ANALYSIS UNEXPECTEDLY SHOWS TRASYLOL ASSOCIATED WITH INCREASED RISKS OF HOSPITALIZATION, BLOOD LOSS AND DEATH.............................164

ii. KRESS & STONE UNPUBLISHED STUDY OF CABG AND INCREASED RISK OF RENAL FAILURE.............165

iii. DR. MANGANO AND REPORTS OF RENAL RISK AS EARLY AS 2004............................................168

iv. REPORT BY DR. KINCAID OF NEGATIVE EFFECTS PRODUCED BY INTERACTION OF APROTININ AND ACE INHIBITORS ON RENAL FUNCTION IN CABG PATIENTS.................................................170

     v.   BAYER'S INITIATION OF ITS i3 PHARMACOEPIDEMIOLOGICAL DRUG SAFETY IN MARCH 3, 2006…………………………………………178

     v.   DR. WHITE'S HARTFORD HOSPITAL STUDY AND ASSOCIATION OF TRASYLOL WITH  INCREASED RISK OF RENAL DYSFUNCTION…………………………...179

     vii.  BAYER'S DRUG SAFETY AND COMPLIANCE COMMITTEE MUST RESPOND TO THE EUROPEAN UNION'S CONCERNS ABOUT TRASYLOL SAFETY AND EFFICACY…………………………………………….....180

     viii. I3 EMAILS BAYER UPDATES ON THESTATUS OF ITS APROTININ PROJECT DRUG SAFETY PROTOCOL...181

     ix.  I3 HAS  SAFETY REPORT AVAILABLE FOR BAYER FOR MORTALITY, CARDIOVASCULAR AND RENAL OUTCOMES BY SEPTEMBER 13, 2006………….……183

     x.   BAYER FAILED TO DISCLOSE TO FDA EXISTENCE OF i.3 DRUG SAFETY STUDY FOR APROTININ PRIOR TO FDA'S ADVISORY PANEL MEETING………………..184

     xi.  I3 EMAIL TO BAYER DISCUSSES  BAYER'S LACK OF ADEQUATE DISCLOSURE…………………………187

10. BAYER GIVES FDA THE RESULTS OF i3 APROTININ PHARMACOEPIDEMIOLOGICAL STUDY…………………………...188

11. FDA IN 2006 WARNS PHYSICIANS ABOUT RISKS OF RENAL DYSFUNCTION WITH TRASYLOL AND BASED ON ITS RISK VERSUS BENEFIT DETERMINATION FURTHER NARROWS THE APPROVED INDICATIONS…………………………………………………………189

12. BAYER FAILS TO ADEQUATELY ADDRESS SAFETY SIGNALS IN ITS OWN ADVERSE  EVENT REPORTS…………………………………190

13. FDA'S CARDIAC AND RENAL AND DRUG SAFETY  ADVISORY COMMITTEE PANEL MEETING SEPTEMBER 12, 2007 TO DISCUSS TRASYLOL SAFETY………………………………………………198

14. FDA QUESTIONS WHETHER "BAYER SHOULD DESIGN A STUDY TO EXAMINE RENAL SAFETY?" OCTOBER 10, 2007.....................201

15. BAYER TEMPORARILY SUSPENDS GLOBAL TRASYLOL MARKETING NOVEMBER 5, 2007.........................................202

16. *NEJM* FEBRUARY 21, 2008 TITLED APROTININ DURING CORONARY-ARTERY PYPASS GRAFTING AND RISK OF DEATH...................................................................................203

17. *NEJM* FEBRUARY 21, 2008 "THE EFFECT OF APROTININ ON OUTCOME AFTER CORONARY-ARTERY BYPASS GRAFTING"...............................................................204

18. *NEJM*- MAY 29, 2008 PUBLICATION OF BART RESULTS.......205

ISSUE #4

IV.   BAYER'S COMMUNICATION OF TRASYLOL RISK TO HEALTHCARE PROVIDERS..............................................................................207

A. BAYER'S TRASYLOL MEDICAL SCIENCE LIAISONS RECEIVE FALSE & MISLEADING TRAINING SCENARIOS ABOUT UNAPPROVED USE IN ORTHOPEDIC AND SPINAL SURGICAL PROCEDURES, UNSUBSTANTIATED ANTIINFLAMMATORY CLAIMS, REDUCED RISK OF STROKE AND RENAL SAFETY..................................................................208

B. BAYER MINIMIZES RISKS TO ITS SALES FORCE IN TRAINING OF JANUARY 2006......................................................................215

C. BAYER DEVELOPS TRASYLOL PHYSICIAN/PHARMACIST COMMUNICATION PLANS............................................218

   1. BAYER SENDS DEAR HEALTHCARE PROVIDER LETTER REGARDING LACK OF RENAL EFFECTS.........................218

D.     BAYER MAINTAINS PHYSICIAN/PHARMACIST EFFICACY LETTERS TO SEND OUT FOR SUPPORT OF TRASYLOL..........................................220

E.         BAYER DEVELOPS TRASYLOL PUBLISHING & COMMUNICATION PLANS...................................................................222

F. BAYER PROVIDES QUESTIONS & ANSWERS TO REFUTE THE PUBLISHED FINDINGS OF MANGANO AND KARKOUTI STUDIES.....................223

G.         BAYER AND TRASYLOLS UNAPPROVED PROMOTION....................224

    1.  DDMAC WARNINGS ABOUT BAYER TRASYLOL PROMOTIONS...............................................................224

    2.  BAYER UTILIZED TRASYLOL CORE SLIDE KITS AND VISUAL AIDS WITH UNSUPPORTED CLAIMS OF ANTI-INFLAMMATORY BENEFICIAL EFFECTS FOR FULLDOSE TRASYLOL AND EDUCATIONAL SYMPOSIA AS PRIMARY PROMOTIONAL TOOLS...............................................................................225

    3.  BAYER HAD A BUSINESS PLAN TO "EXPLOIT" TRASYLOL FOR NEW INDICATIONS..........................................................229

    4.  BAYER'S SCIENTIFIC COMMUNICATIONS CONTINUE TO SUPPORT ITS MESSAGE FOR TRASYLOL EXPANDED USE......................233

    5.  BAYER'S SALES FORCE ATTENDED WORKSHOP SESSIONS TO HANDLE COMMON PHYSICIAN OBJECTIONS TO USE OF TRASYLOL SUCH AS CONCENRS ABOUT RISKS OF RENAL DYSFUNCTION AND THROMBOSIS......................................234

    6.  DESPITE FDA'S CONCERNS ABOUT PUBLC SAFETY BAYER MARKETING SOUUGHT TO MINIMIZE RISK OF HYPERSENSITIVITY AND ANAPHYLAXIS REACTIONS ASSOCIATED WITH APROTININ.........................................240

    7.  IN 2003 BAYER SALES USED DR. MANGANO'S McSPI DATABASE FOR CABG PATIENTS TO SUPPORT RENAL SAFETY OF TRASYLOL ..............................................................................241

    8.  BAYER SALES HAD ACCESS TO A SERIES OF BAYER STANDARDIZED FAXBACK TOPIC LETTERS TO RESPOND TO QUESTIONS FROM HEALTCARE PROFESSIONALS.................242

9.  BAYER INTERNALLY WAS AWARE THAT COMPAISON CLAIMS
    FOR TRASYLOL COULD NOT BE MADE WITHOUT CLINICAL DATA
    ...................................................................................242


10. BAYER MADE USE OF ITS KEY OPINION LEADERS TO GET ITS
    MISLEADING RENAL SAFETY MESSAGE TO PHYSICIANS.....243


11. BAYER DOES NOT SUPPORT PHYSIAN STUDIES THAT REQUEST
    TO OBTAIN TRASYLOL RENAL SAFETY INFORMATION.......243


12. BAYER'S PHARMACOVIGILANCE PROCEDURES DELAY IN
    FOLLOW-UP OF SERIOUS ADVERSE EVENTS.....................246

## QUALIFICATIONS

**APPENDIX 1:**     **CURRICULUM VITAE**
**APPENDIX 2:**     **LEGAL TESTIMONY HISTORY**

1.     In August 1995, I founded MD Assist, Inc., a regulatory and medical consulting firm specializing in matters involving the regulation of products by the United States Food and Drug Administration ("FDA").   I received my medical degree from the University of South Florida in 1978 and Board Certification in Anatomic and Clinical Pathology in 1989.  I also received a Masters in Biology from the University of Central Florida.  I have been a general practitioner and President of Mountain Emergency Physicians.  I am the author of FDA Inside and Out, published in May 2001, which is a text about the FDA.

2.     From 1991 to 1995, I served as a Commissioned Officer in the United States Public Health Service and achieved the rank of Lt. Commander.  During that time, I was primarily assigned to the Center for Devices and Radiological Health ("CDRH") at the FDA. Concurrently, I was also assigned clinical responsibilities at the Armed Forces Institute of Pathology, Office of the Medical Examiner for the Armed Forces, Washington, D.C.

3.     From 1991 to 1993, I was a FDA Medical Officer in the Office of Health Affairs ("OHA"), a staff office within CDRH, FDA. In OHA, I provided regulatory support to both FDA's Office of Compliance and Office of Device Evaluation.  My responsibilities in OHA included health hazard and health risk assessment, Safety Alerts and physician and layperson communications, review of adverse event reports ("AER") and medical literature and review of product labeling, promotions, advertising, and corporate records.  As to compliance with the Food, Drug and Cosmetic Act ("FDCA").  I was responsible for the review of mandatory adverse event reports submitted by manufacturers, as well as the review of reports voluntarily

2

submitted directly to FDA by health care providers, patients and others. I presided over 162 health risk assessments convened to advise FDA on overall health risk issues for the public. Along with others, I made recommendations to FDA regarding regulatory actions that should be undertaken by FDA, health care providers, user groups and manufacturers to help protect the public's welfare. My assignment at OHA specifically included identification of safety issues. I participated in mandatory recalls and in an administrative hearing as FDA's expert witness.

4.      An example of a drug safety issue that I helped identify and manage for FDA as its medical officer involved ACE Inhibitors ("ACEI"). The FDA had received adverse experience reports in its MedWatch databases of serious adverse events and deaths occurring in renal patients taking ACEI drugs for regulation of blood pressure. From reviewing the MedWatch AERs, the renal patients shared a common precipitating event - blood exposure to certain types of hemodialyzer membranes during a dialysis session shortly after taking a dose of ACEI. ACEI had been a class of drugs that had been first approved by the FDA for marketing in the 1980s. There had been relatively little safety information about these drugs and none regarding hemodialysis safety. When a patient would take an ACEI and then have their blood exposed to specific type of membrane surface, whether for hemodialysis or LDL apheresis, a sudden life-threatening anaphylactoid reaction could be triggered. As the only FDA medical officer involved in this safety issue, I reviewed both drug and device adverse event reports, reviewed medical literature, performed a health risk assessment as described per 21 C.F.R. Part 7, and, ultimately, made a clinical recommendation to FDA to a reasonable degree of medical certainty. Health care providers needed to be quickly informed by FDA of

the ACEI membrane association. FDA and the pharmaceutical and medical device industries needed help to identify the etiology of the reaction. Physicians needed recommendations as to emergency treatment. No other FDA medical officer was assigned involvement in the work-up or handling of this drug/device safety issue. Working with an FDA epidemiologist, I helped design and issue the FDA's epidemiologic study to quickly obtain additional data for FDA and the involved industries. The epidemiology study was in the form of a questionnaire contained in the FDA's Safety Alert and designed to help capture the overall risk to the public; to raise awareness of the issue for medical providers; to define the pharmacological mechanisms involved; and to trigger the appropriate label changes for both the drugs and devices involved in order to protect the public. As a result, I helped draft the current ACEI class drug warning about the risks of membrane surface exposure and anaphylactoid reaction.

5.      From March 1993 to December 1993, I was a Medical Officer in the Office of Device Evaluation ("ODE"), Division of Reproductive Abdominal, Ear, Nose and Throat, and Radiology Devices, FDA; from January 1993 through June 1995 I was one of two Chief Medical Officers in ODE. ODE, in contrast to OHA, is primarily responsible for pre-marketing evaluation of new product applications and clinical trials that support safety and effectiveness which, if proven, allow a company to begin marketing within the United States. In ODE, I participated in the review of proposed clinical trials, the review of pre-marketing applications (including review of animal toxicology and biocompatibility data), and training new medical officers and scientific reviewers in application, clinical trial, and labeling evaluation. I was the primary reviewing medical officer in charge of pre-marketing approval applications required for adherence to drug Guidances published by FDA's Center for Drug

Evaluation and Research's ("CDER") and for presentation at the FDA Advisory Panel with members from CDRH and CDER.   I was a primary author for FDA's guidance for Hemodialyzer Reuse labeling.   I consulted as a medical officer on INDs for combination products including drugs and biologics.  While in ODE, I conducted an additional 100 health risk assessments and was required to train medical officers as to methods for health risk assessments, health hazard evaluations, annual report requirements, adverse event reporting, and labeling review.

6.     I was an initial instructor in the FDA's Staff College for training FDA reviewers in the design and evaluation of clinical data in investigational and pre-marketing applications.  I had primary responsibility for review of marketing applications and labeling and was required to teach medical officers the process for evaluation and review required by the FDCA directed to product marketing.   I was also charged with training medical officers on the process for health risk assessment and health evaluation per 21 C.F.R. Part 7.

7.     Regarding post-market surveillance of marketed products, I participated with FDA's District Offices, Office of General Counsel, and the Office of Compliance in the review of manufacturing records, product labeling, product complaints and adverse event reports submitted to FDA.  I was the primary clinician involved in several of FDA's Major Corporate-Wide Actions for which I received various citations and honors for my services to FDA.  My awards have included Department of Health and Human Services and Food and Drug Administration Employee of the Month.

8.     I was sent by FDA to serve as an official Agency representative to medical meetings and seminars to help identify and monitor conduct of manufacturers for potential

deviations from regulations governing promotional activities. At those events, I was required to provide official guidance as to FDA's interpretation of Food and Drug Laws as they pertain to all medical products and the roles of manufacturers and health care providers.

9.      While at FDA, I helped draft Agency documents, guidance documents for the industry outlining the requirements for obtaining FDA's marketing approval and the FDA Safety Alerts directed to the healthcare providers and their patients. I also provided FDA's comments for voluntary warnings, physician and user notifications, and voluntary industry standards. I was one of FDA's liaisons with the National Institutes of Health ("NIH") for issues involving ENT, renal, respiratory, and women's health. I was also FDA's first liaison for the Office of Alternative Medicine. In that position, I was required to provide support to the Health Care Financing Agency regarding FDA's approval of products and issues involving hemodialysis. As part of my work, I was assigned responsibility for product adverse event reporting to the Department of Defense and Veterans Administration.

10.     One of my assigned responsibilities at FDA, based on my clinical training and experience, was to review facts contained in product marketing applications, clinical trials, medical literature, reports of post-marketing experience, and available manufacturing documents gathered by FDA or provided to FDA by the manufacturer or other regulatory agencies. I then used those facts and documents to (a) make a clinical determination for the FDA pursuant to the FDCA to a reasonable degree of medical certainty, and (b) recommend the courses of action available to FDA to protect the public health. I was also required by FDA to advise and train other FDA employees regarding the review of facts of a case or issue and the requirements of the FDCA, and how to make a determination to a reasonable degree

of medical certainty regarding the clinical impact of the Agency's actions to the public. The health risk assessment process is further described in 21 C.F.R. Part 7. During my tenure at the FDA, I reviewed hundreds of marketing applications for safety and efficacy as well as proposed draft labeling. In this capacity, I worked with industry scientists and academic clinical investigators for the evaluation, marketing and labeling review of new products. I organized national conferences with industry representatives and physicians to discuss and obtain expert consensus regarding the development of new products and labeling as well as evaluating existing products on the market for safety and efficacy.

11.     At the Armed Forces Institute of Pathology, Office of the Medical Examiner, I was required, again based on my clinical training and experience in pathology, to take all available facts surrounding a patient's death and any involved adverse events and (a) make a final determination, to a reasonable degree of medical certainty, as to the cause of death, and (b) to recommend the next steps that should be taken by the military or another agency of the federal government. In that capacity as a Medical Examiner, I provided support to the various legal staff of the armed services, as well as to the FBI and CIA[1].

12.     Since leaving FDA, and founding MD Assist, Inc., I continue to provide information to individuals, manufacturers, and organizations regarding FDA's requirements, including: AER, labeling, as well as premarket and postmarket applications for devices, biologics and drugs. In 1997, I was requested by FDA to participate in a panel of experts

---

[1]      While a medical examiner at the AFIP, I determined that a cause of civilian patient deaths, occurring in military hospitals, to a reasonable degree of medical certainty, appeared to have been associated with unanticipated drug/device effect. I then reported my findings as a MedWatch report to FDA. As an AFIP Medical Examiner, I was able to trigger FDA to investigate a major drug regulatory safety action which resulted in the protection of public health.

convened to comment on changes proposed in requirements for medical device labeling. I continue to consult with manufacturers and lecture at conferences and seminars regarding FDA, pre-market clearance, design of clinical trials, product labeling, Corrective and Preventive Action ("CAPA") and Good Manufacturing Practices (GMP).

13.    I have attached a list of my last four years of deposition and court testimony at Appendix 2. A copy of my most recent *Curriculum Vitae* is attached at Appendix 1. I receive $400/hr for study and $600/hr for deposition and trial testimony.

## PURPOSE OF THE REPORT

14.     The Trasylol Products Liability Plaintiffs' Steering Committee has requested that I address the following issues: (a) the role of the FDA and duties and obligations of prescription drug manufacturers; (b) FDA's approval of Bayer's Aprotinin (Trasylol®) New Drug Application ("NDA"); (c) Bayer interactions with FDA following NDA approval; d) communication of Trasylol's risks to health care providers.  The report is subdivided into a separate discussion of each of these four issues with related opinions and illustrative examples.

15.     I have reviewed the following groups of materials in the process of writing this report.

   a)   Medical literature;

   b)   Internal Bayer documents;

   c)   Depositions of: Michael Rozycki, Robert Harrison, Anita Shah, Felix Monteagudo, Pam Cyrus, Stanley Horton, Jennifer Mauer, Kuno Sprenger, John Lettieri , Ernst Weidmann, Kemal Malik;

   d)   Relevant regulatory statutes, Guidances, documents and communications.

16.     My opinions expressed in this report are all within reasonable medical and scientific probability and are based upon my education, training and experience as a physician, and specifically as a board certified Pathologist.  My education, training and experience qualify me to render the opinions in this report.  My qualifications are set out at length in my *Curriculum Vitae*, which is attached hereto as Appendix 1.  Further, my opinions are based upon the literature and studies I have reviewed and upon Bayer internal documents and employee testimony and exhibits I have reviewed.   In rendering my opinions in this case,

I have also reviewed and rely upon those items reviewed. The materials I rely upon in rendering my opinions are materials generally relied upon by experts in the area. Further, the methodology used my opinions in this case is generally accepted in the scientific and medical community and is not new or novel, but is based on my experience and the work I have done, using the methodology I was first trained to use for FDA for pre-market clinical review and post-market health risk assessment. I have reached the following opinions, made to a reasonable degree of medical, scientific and professional probability and certainty. I reserve the right to amend my opinions as the case progresses and new information becomes available or in response to new testimony or documents that are offered by the defendant or any third party.

## SUMMARY OF OPINIONS AND EXECUTIVE SUMMARY

### SUMMARY OF OPINIONS

17.     Bayer failed in its duties and obligations with its marketing of Trasylol to United States physicians for administration to surgical patients when it did not adequately ensure patient safety and its own fulfillment of requirements of the Food Drug and Cosmetic Act. Bayer failed to adequately test, monitor, and warn healthcare providers about Trasylol's dose dependent risks as well as its immunological risks of hypersensitivity, anaphylaxis, renal failure, thrombosis and death. Bayer has failed to adequately communicate risks of Trasylol, including renal failure and death, to FDA or physicians since Trasylol first became available in the United States as an Orphan drug in 1993.   Bayer failed to use reasonable care in its testing, pharmacovigilance, marketing and promotion of Trasylol.  Bayer deviated from the standard conduct of a pharmaceutical manufacturer when it did not adequately address the mounting safety concerns of the FDA, physicians and as discussed in the medical literature regarding Trasylol's significantly changing risk versus benefit profile.  Bayer's Postmarketing Adverse Drug Experience (PADE) failures and lack of adequate follow-up and timely communication of important clinical safety information to FDA and physicians directly contributed to the increased post-operative risks for patients receiving Trasylol.

### ISSUE # 1

### GENERAL ROLE OF THE FDA AND DUTY AND OBLIGATIONS OF ALL PRESCRIPTION DRUG MANUFACTURERS

**OPINION #1:** Bayer failed to fulfill its duty and obligations as a prescription drug manufacture pursuant to the requirements of the Food, Drug and Cosmetic Act when it did not adequately and timely test, monitor, update and warn FDA about the post-operative risks of aprotinin (Trasylol), which included renal failure, thrombosis and death.

**OPINION #2:** Bayer failed to adhere to the requirements of the Federal Food Drug and Cosmetic Act when it promoted Trasylol to physicians in the United States for unapproved and off-label uses without having first obtained FDA's approval, performed adequate testing and developed directions and warnings. By 2004, Bayer had knowledge that almost 50% of all Trasylol was used off-label with the non cardiac focus surgical sectors including patients with musculoskeletal, GI, orthopedic, surgical oncology, respiratory and non-heart transplant procedures. Despite this knowledge of the change in Trasylol's intended use, Bayer failed to update its product insert and promotions, failed to warn physicians, and failed to provide adequate instructions for use. (21 U.S.C.§ 352). Bayer also failed to conduct adequate large clinical trials with meaningful clinical endpoints necessary to obtain FDA's approval of these new indications.

## ISSUE #2

### FDA'S APPROVAL OF BAYER'S APROTININ (TRASYLOL)

**OPINION #3**

Bayer failed to adequately perform clinical testing and monitoring of the safety and efficacy of Trasylol administration in complex CABG patient populations despite its awareness of potential negative post-operative renal effects, thrombosis and death.

**OPINION #4**

Bayer failed to perform clinical testing necessary to support a new indication for benefits of full dose Trasylol versus half dose Trasylol in terms of effects on kallikrein and Systemic Inflammatory Response Syndrome (SIRs). As stated by Bayer's Dr. Horton, Bayer never conducted clinical studies to obtain FDA's approval for that new indication. Rather, Bayer slipped information into its product insert's mechanism of action section to help allow it to promote a benefit for full dose Trasylol to physicians that did not have FDA's approval.

## ISSUE #3

**BAYER'S INTERACTIONS WITH FDA REGARDING TIMELY
REPORTING AND INVESTIGATION OF RISKS FOR
APROTININ**

**OPINION #5**

Bayer disregarded its obligation and duties for providing FDA timely and
accurate reports of risks being associated with Trasylol in both unpublished and
published studies. (21 CFR § §314.80 and 314.81)   FDA was not provided in a
timely manner with significant risk information in Bayer's sponsored St. George
Hospital Retrospective Study; Kress & Stone Study; Dr. White's Hartford
Hospital Study and an i3 pharmacoepidemiological study.  Bayer also failed to
test and update FDA, physicians or its labeling with safety information derived
from published medical literature regarding renal effects of co-administration
with ACE Inhibitors.

**OPINION #6**

Bayer failed to fully disclose to FDA prior to September 2006 that it had
sponsored a pharmacoepidemiological safety study conducted by i3 to address
risks of renal failure, thrombosis and death.  Bayer delayed in providing FDA
with i3 initial results until after FDA's September 2006 Advisory Panel meeting
had been held about the safety of Trasylol.  Bayer's actions denied FDA an
opportunity to reschedule its Advisory Panel meeting until after it had received
and reviewed the i3 data.   The outcome of the meeting would have been
different, and in fact label changes did later result as a consequence of the i3 data.

**OPINION #7**

Bayer deviated from its own internal standard operating procedures (SOP) for
Global Drug Safety to develop a robust pharmacovigilance system when it
ignored and dismissed safety signals occurring with Trasylol in unpublished
studies, medical literature, and Bayer's Adverse Event Reports database.  Since
1997, Bayer was tracking adverse event reports of renal failure, the second most
common adverse event reported to Bayer for Trasylol, yet failed to adequately
update FDA or warn physicians.

**OPINION #8**

Bayer in 2005 was able to use 21 CFR§ 99 to legally disseminate medical
literature regarding the unapproved use of Trasylol for primary hip replacement
procedures as a response to unsolicited health care provider requests.  However,
Bayer was never approved by FDA to promote or facilitate use of Trasylol for any
unapproved orthopedic indication.

## OPINION #9

In January 2005, following a meeting with FDA, Bayer was aware the agency considered the risk versus benefit profile of Trasylol to have significantly changed since its approval in 1993 as an Orphan Drug for a limited patient population, specifically for re-do CABG. FDA indicated that for Bayer to expand Trasylol's indications would now require larger clinical trial populations and a clinically meaningful endpoint to support the proposed product benefit as safe and effective. Approval of Trasylol would no longer be allowed by FDA to be based on support of statistical significance of selected endpoints. This change in FDA's approval policy for Trasylol was partly based on FDA's increased safety concerns about hypersensitivity/anaphylaxis reactions and death. Despite FDA's safety concerns for the public, Bayer continued to expand the Trasylol sales force and provided training and sales aids designed to help minimize the risks of Trasylol for physicians.

## <u>ISSUE #4</u>

## BAYER'S COMMUNICATION OF TRASYLOL RISK TO HEALTHCARE PROVIDERS

## OPINION #10

As testified to by Dr. S. Horton in April 2009, Bayer utilized well-planned and coordinated communication schemes and sales representatives and key opinion leader training to "exploit" Trasylol as Bayer's "wonder drug." As part of Bayer's Business Plan, it viewed use of publications, supplements, abstracts, health care provider continuing medical education, and Key Opinion Leader presentations at professional meetings as Promotional Programs intended to reinforce Bayer's message to use Trasylol at full dose (Hammersmith Regimen). The full Hammersmith dose was promoted as safe and with additional benefits. The use of the full dose, however, was an "organizational driver" for Bayer and potentially less safe than the half dose Trasylol regimen.

## OPINION #11

Despite interaction with FDA and the agency's approval of the half dose Trasylol regimen as potentially safer and just as effective, Bayer utilized false and misleading marketing to physicians of unverified claims of benefits for SIRs to support its promotion of full dose Trasylol. Bayer was aware that despite its promotion of the full dose regimen, it had not tested, labeled or adequately warned physicians of the increased dose-dependent risks of the full dose when compared to the half dose.

**OPINION #12**

Despite FDA's concerns about public safety, Bayer continued to train its sales representatives and Medical Science Liaisons (MSL) in methods to minimize the life-threatening risks of aprotinin to health care providers.

**EXECUTIVE SUMMARY**

18.     Bayer failed to respond adequately to safety signals arising with aprotinin beginning in the initial animal studies, as well as its own clinical trials for its still pending NDA. Of Bayer's animal studies for its IND and NDA the most noteworthy characteristic of aprotinin in the rat, dog, and rabbit models was aprotinin's "affinity to accumulate in renal tissue". A study not specifically addressed in Bayer's discussion of animal studies in the scientific literature in its NDA was a 1984 rat study conducted by H.J. Kramer, et al[2] showing that, just as in Bayer's own animal studies, aprotinin had a high affinity for accumulation in kidney proximal tubule cells. The accumulated aprotinin remained in the kidney cells until it was digested by intra-cell enzymes and released out into the patient's systemic circulation.   However, the authors in Kramer, et al. went further than Bayer; they investigated a population of rats fed a high salt diet and aprotinin to determine the effects of aprotinin on kidney function. Aprotinin inhibited kallikrein activity and was determined responsible for producing a decrease in renal glomerular blood flow (GFR). The Kramer data suggested that CABG patients receiving Trasylol at surgery would be at increased risk for kidney changes associated with perioperative changes in fluid

---

[2] Kramer HJ, et al Effects of Aprotinin on Renal Function Contr Nephrol 1984; Vol 42; pp 233-241(Krager, Basel)(BAY00146128-36)

volume. The 1984 data also suggested potential hazards for administration of aprotinin to certain sub-populations of patients at time of CABG surgery. The patients at increased risk included patients with fluid volume shifts (for example intraoperative blood loss), as well as patients with cardiac or hepatic failure in which tissue hormones played an important protective role in maintaining sodium balance and fluid volume against endogenous hormones.

19.    Bayer disregarded a November 4, 1992 letter from Dr. Pitt, a Bayer hired consultant reviewing its IND clinical trial database. The Trasylol IND database was closed in 1991 and included a total population of 649 patients. Dr. Pitt observed a presence of negative safety trends for Trasylol. His feedback regarding Trasylol's risks, adverse survival potential, and an unacceptable risk versus benefit profile for cardiac patients should also have placed a responsible pharmaceutical manufacturer on notice in 1992 prior to NDA approval to proceed with caution with Trasylol in terms of monitoring mortality, graft patency, renal and hepatic failure risks (BAY00983471-2).

20.    The FDA's medical officer reviewing the Trasylol marketing application noted negative renal effects in Bayer's clinical trials. In a manner reminiscent of Kramer's 1984 rat model, reduced blood volume and renal ischemia were enhanced with administration of aprotinin (BAY00674734-5). The risk of post-operative renal dysfunction in Bayer's clinical trials was found to be dose dependent, highest for full dose (Hammersmith Regimen) Trasylol, lower for low dose and lowest for placebo, no aprotinin. Likewise, changes to clotting parameters with increased risk of bleeding were found to be dose dependent, with the highest risk for bleeding associated with the full dose Trasylol. As a result of the increased risks seen in the clinical trials with full dose Trasylol, it was FDA's reviewer that recommended Bayer consider conducting

further investigations using a low dose regimen to determine if Bayer could improve patient safety while still producing the same therapeutic benefit.

21.     Factors associated with increased renal failure risk in the Trasylol IND trials were patient age older than 60 years, an underlying history of congestive heart failure (CHF), transfusion of three or more units of blood and co-administration of aprotinin with an aminoglycoside antibiotic.  Renal failure in the trials could occur within a follow-up period of seven days after surgery  (BAY00674796). Patients treated with full dose Trasylol remained significantly longer in the ICU and were hospitalized longer than the placebo group. (BAY00674798-9).  Also, female patients receiving aprotinin appeared to require more blood products than males (70% vs. 30%) (BAY00674829-2).

22.     At time of NDA approval, some of the major remaining safety concerns for FDA's medical officer, Dr. Talarico, included statistically significant increased risks seen for:  the kidneys (BAY00674852-3); the heart and myocardial infarction (BAY006748444-8); clotting parameters ( BAY00674849; BAY00674851); liver function tests (BAY00674849); mortality and life-threatening events (BAY00674854).   Dr. Talarico wrote regarding the renal effects of aprotinin:

> Aprotinin inhibits plasma and tissue kallikrein.  This effect is relevant for renal toxicity because the kininogen-kinin system has a protective role in the maintenance of itrarenal homeostasis....

> The percentage of patients with an increase in serum creatinine of $\geq 0.5$ from baseline in the total population of patients receiving high-dose aprotinin was 23% (54/237), that of patients receiving low-dose aprotinin was 18% (22/125), and that of patients receiving placebo was 12% (28/235); the overall p-value was 0.007...

> For patients undergoing CABG, the effect of aprotinin on kidney function was particularly noticeable in patients treated preoperatively with ACE

inhibitors, in patients with CHF, and in patients treated perioperatively with aminoglycoside antibiotics.

In most patients, the renal impairment was reversible and its outcome was dependent on the cardiac status. Few patients, however, required hemodialysis for limited periods of time (BAY00674852-3)

Therefore, based on the risk/benefit assessment, the use of aprotinin in patients at low risk of bleeding complications for surgery with CPB, as for primary CABG and primary CVR is not recommended.

23.     Dr. Talarico's recommendation for FDA's actions for Bayer's NDA as of April 16, 1993 (underlining for emphasis):

Aprotinin (high-dose regimen) for prophylactic use to reduce perioperative blood loss and transfusion requirements in patients undergoing cardiac surgery with CPB who are at risk of major bleeding complications… Additional studies are needed to assess the efficacy and possibly increased safety of low-dose aprotinin regimens…Close post-marketing surveillance will be required to evaluate the incidence an d severity of adverse events, particularly the risk of allergic reactions. (BAY00674856-7).

24.     Therefore even before FDA's approval of the NDA for Trasylol, Bayer should have been aware of the increased dose dependent risks which had been associated with patients receiving full dose Trasylol. Bayer should also have been aware that Trasylol carried an increased risk at any dose of renal failure for certain populations of patients.

25.     Bayer's NDA Supplement S004 was submitted on October 10, 1996 requesting to expand the indications of Trasylol from patients undergoing repeat CABG and high-risk primary CABG, its initial Orphan Drug indication to "all patients undergoing CABG surgery with cardiopulmonary bypass (CPB)". On August 5, 1997, FDA issued a "not-approvable letter" based on that the benefit to patients with low risk of bleeding did not outweigh the risk of serious allergic reactions. On August 15, 1997, according to FDA's medical officer, Dr. Talarico's review, Bayer followed-up the non-approvable letter by notifying FDA of its intention to amend

its supplement to continue to pursue efficacy for primary CABG.  On November 10, 1997, Bayer requested a meeting with FDA to discuss the following proposed label changes:

> Expansion of the indication to all patients undergoing CABG;
> Addition of a Clinical Trials section for the package insert;
> Address the agency's concerns of anaphylaxis upon re-exposure to aprotinin;
> Include a proposed revision for the CLINICAL PHARMACOLOGY, Mechanism of Actions section for the package insert.

26.     According to Dr. Talarico's review, page 8, on January 20, 1998, there was a meeting held between FDA and Bayer regarding expansion of the aprotinin indication to include all patients undergoing primary CABG and the labeling changes that would be necessary.  To support a clinical rationale for expansion, Bayer provided FDA with a re-analysis of the data in S004, Study D92-048, but now with analysis of a subset of patients at low risk for bleeding.  Later, in 2006, FDA would ask Bayer to go back and re-analyze study D92-048 since it had been the key study for obtaining FDA's approval of an expanded use.  At the 1998 meeting, Bayer re-presented data from two non-US studies, SN 406 and SN 0407, included in its original NDA.  A Bayer  January 28, 1998 record of the January 22 meeting had Bayer indicating that "*Dr. Talarico stated that the agency would be willing to expand the indication to include all CABG patients, if a black box warning was included listing the increased risk of anaphylaxis to patients who are re-exposed to the drug.*" (BAY00225695).  Dr. Talarico was also reported to have said to Bayer that "*the concerns of the agency have been related to safety and, in particular, to anaphylaxis.*" The Bayer memo indicated that Dr. Talarico remarked that "*if the indication is expanded to all CABG, the anaphylaxis rate will increase.*"  Dr. Talarico then reportedly stated that "*she would only consider accepting the expanded indication if a black box warning, specifically delineating the risk of anaphylaxis given the possibility of a need for a second*

*CABG, was included.*" From the Bayer note, the expanded indication was partly negotiated in response to FDA's public safety concerns and desire to obtain a new black box warning from Bayer for Trasylol's product insert about the risk of life-threatening anaphylaxis from re-exposure. Under "Clinical Trials", Dr. Talarico reportedly suggested "*a footnote be added to explain that the two doses (high and low) were equivalent, relative to both efficacy and safety*". Dr. Talarico stated that her main issue was "how to choose one dose over the other", to which Dr. Coniff remarked that "there may be theoretical reasons to choose the high dose . . . ." Dr. Talarico was recorded as saying she "suspected that surgeons would consider whether the patients was high or low risk, initial or repeat CABG, and the cost". She concluded "that the footnote clarifying the dose issue should be included". Dr. Talarico's review, unlike Bayer's record, does not include details about label negotiations with Bayer. Instead she indicated that the data now supported FDA's approval of Bayer's proposed expansion of the indication to include all patients undergoing primary CABG and that the low dose versus the high dose aprotinin had been shown to be equally effective. Dr. Talarico made no reference to approval of new claims for anti-inflammatory effectiveness for SIRs at any dose. Her review continued:

> No significant difference in safety analyses was observed between high dose or low dose regimens. However, the comparison of safety for the two regimens has included only relatively small study populations. A post-marketing analysis of safety in relation to dose regimen used would be very useful information.
>
> The sponsor has included the new information pertaining the mechanism of action of aprotinin in the CLINICAL PHARMACOLOGY section for the revised labeling. The information is acceptable, however, the statement that the reduction in inflammatory response by aprotinin translates into improved patient (clinical) outcome is unsubstantiated. The only claim is decreased need for donor blood transfusion.

### 1. STATE-OF-THE-ART SCIENCE

27.   I have seen no Bayer documentation suggesting Bayer affirmatively followed-up or investigated the post-approval safety of Trasylol, or that it attempted to answer the valid scientific questions being raised by the authors regarding renal adverse events and survival risks in published studies from 1993 through 2006.

28.       By failing to properly monitor the state-of-the-art scientific literature on the potential effects of Trasylol on surgical patient safety and by not conducting further scientific studies, Bayer's conduct falls below the standard of care of a reasonably prudent pharmaceutical company.

### 2. EPIDEMIOLOGICAL STUDIES – REASONABLE EVIDENCE OF ASSOCIATION

29.       Bayer did not act in a reasonably prudent manner in establishing robust pharmacovigilance procedures designed to monitor, investigate and follow-up with epidemiological and safety studies pursuant to 21 CFR§ 314.80 from 1993 through 2006.   In 2006, Bayer contracted a pharmacoepidemiological study with the i3 group.   On multiple occasions, Bayer failed to update, revise and correct its label in accordance with 21 CFR §201.57(c)(6)(i). Bayer failed to conduct studies that were powered sufficiently large enough to be able to identify safety issues such as renal failure, thrombosis and death in populations of complex post-surgical CABG and cardiovascular surgery patient populations.   Bayer knew or should have known of a reasonable evidence of potential causal association of Trasylol with renal failure and increased mortality beginning as early as its initial Orphan drug approval and then expansion of indications to include primary CABG patients.

30.        According to Bayer's Dr. Rozycki's testimony in 2009, the following three safety

studies were not provided by Bayer to FDA prior to the September 2006 FDA Advisory Panel

meeting convened to discuss aprotinin's safety (Rozycki, 2/9/09. P 147-8, L. 13-17):

> T. Treasure, UK An investigation into the effect of aprotinin usage of blood products and lengths of stay at St. George's Hospital in London. Use of aprotinin appeared to be associated with longer stays, with increased use of blood products and higher mortality. (BHCAG01830629-33; BAY02187824-67).

> Kincaid E, et al. Does the Combination of Aprotinin and Angiotensin-Converting Enzyme Inhibitor Cause Renal Failure After Cardiac Surgery? *Ann Thorac Surg* 2005; 80:1388-93. A retrospective review of Wake Forest University Baptist Medical Center Cardiac patient records from 2002-2002. The preoperative administration of ACE inhibitors coupled with intraoperative use of aprotinin was significantly associated with production of acute renal failure (OR 2.9, 95% CI: 1.4 to 5.8, p<0.0001). The authors concluded that based on risk, the combination of preoperative use of ACE inhibitors and intraoperative aprotinin should be avoided in cardiac surgery.

> D. Kress and M. Stone, What is the Effect of Aprotinin (Trasylol) on the Incidence of Selected Outcome after CABG?" Study supported by Bayer as a retrospective electronic chart review at St. Luke's Medical Center in Milwaukee, WI between January 1, 2002 and July 1, 2003 of CABG or CABG + valve. As the dose ranges of aprotinin increased, patients had significantly higher incidence of post-operative renal failure, length of stay, and mortality. Patients most likely to develop renal failure had received >400 cc aprotinin. Post operative renal failure was statistically significant at p=0.01 for CABG only group. (2003 Draft) Compared to control, renal failure was no more frequent for the half-dose group, but was 1.7 times more frequent in the full dose group and 3.1 times more frequent in the more than full dose group. The results suggested to St. Luke staff to abandon use of full dose or higher aprotinin for CABG patients.(BAY05426839-46; Exhibit 13 Rozycki).

31.        These three studies above provide reasonable evidence of causal association of

risk of Trasylol as well as association of increased risk with increasing dose. Yet Bayer failed to

provide these studies to FDA and it failed to warn doctors of the risks associated with Trasylol.

Bayer also failed to warn of the risks of administration of full dose of Trasylol by revising its

label warning under 21 CFR §201.57 and 21 USC §352(a); (f)(1)&(2), and (n). Bayer delayed in

informing FDA about its conductance of a pharmacoepidemiological study in 2006 with i3 and then further delayed in providing FDA with the new Trasylol safety data in a manner that could be reviewed and analyzed by FDA prior to its holding an Advisory meeting to discuss the safety of Trasylol.  There is nothing that would have prevented Bayer from conducting a retrospective pharmacoepidemiology similar to the i3 study prior to 2006 or studies designed to examine the risk of renal failure at any dose.

32.    FDA had wanted Bayer to continue to gather safety and efficacy.    Bayer performed studies designed and powered to show effectiveness for blood loss, not real world efficacy or safety issues such as renal failure and mortality.    However, even with Bayer's underpowered studies, safety issues continued to appear.

**3.    FAILURE TO PROPERLY MONITOR AND ANALYZE SPONTANEOUS ADVERSE EVENTS**

33.    Bayer continued to ignore safety signals from reported adverse events related to Trasylol.  Bayer was aware that since 1997, adverse reports of renal failure were the second most common AER received for Trasylol. However, Bayer persisted in providing regulatory agencies with conflicting and misleading information about risks of Trasylol.  Bayer minimized the risks of exposure to Trasylol to healthcare professionals and failed to fairly, adequately and truthfully update its own product warnings.

**4.    BAYER NULLIFIED WARNINGS BY FALSE AND MISLEADING MARKETING**

34.    Bayer violated FDA regulations requiring fair and balanced marketing and advertisements pursuant to 21 CFR §202.1; 21 USC §352.  It engaged in elaborate marketing schemes and obtained key opinion leader speakers as advocates to promote Bayer's unapproved and off-label message for Trasylol as well as the unsupported benefits of full dose Trasylol.

Bayer was aware that by 2004 almost 50% of the use of Trasylol was off-label and unapproved by FDA.  In terms of misbranding, 21 USC §321(n), such conduct by Bayer fell below the standard of care for a reasonably prudent drug manufacturer. Also, Bayer's marketing targeted sales of full dose Trasylol as producing unsubstantiated and untested anti-inflammatory effects regarding SIRS, all while without warning physicians about the increased risks associated with increased dose.

     **5.**     **BAYER PROMOTED TRASYLOL IN VIOLATION OF FDA REGULATIONS**

     35.     BAYER promoted Trasylol to health care providers for unapproved uses in surgical procedures for which Bayer knew it had failed to obtain approval as safe or effective.   Failure to disclose such material facts in advertising and promotions about the lack of scientific support for anti-inflammatory SIRs effects of full dose Trasylol, lack of difference between full dose and half dose efficacy, lack of obtaining FDA approval for expanded indications, changes in the risk versus benefit profile of Trasylol to physicians constitutes misbranding and Bayer's failing to reveal material facts (21 USC §321(n); 21 USC §352(a), ((f) (1) and (2); 21 CFR§ 1.21 ).

24

# DISCUSSION

## I.   BAYER'S COMMUNICATION OF APROTININ RISKS TO HEALTH CARE PROFESSIONALS

### ISSUE # 1

### ROLE OF THE FDA AND DUTY AND OBLIGATIONS OF PRESCRIPTION DRUG MANUFACTURERS

#### OPINION #1:

Bayer failed to fulfill in its duty and obligations as a prescription drug manufacture pursuant to the requirements of the Food, Drug and Cosmetic Act when it did not adequately and timely test, monitor, update and warn FDA about the post-operative risks of aprotinin (Trasylol) which included renal failure, thrombosis and death.

#### OPINION #2:

Bayer failed to adhere to the requirements of the Federal Food Drug and Cosmetic Act when it promoted Trasylol to physicians in the United States for unapproved and off-label uses without having first obtained FDA's approval, performed adequate testing and developed directions and warnings. By 2004, Bayer had knowledge that almost 50% of all Trasylol was used off-label with the non cardiac focus surgical sectors including patients with musculoskeletal, GI, orthopedic, surgical oncology, respiratory and non-heart transplant procedures. Despite this knowledge of the change in Trasylol's intended use, Bayer failed to update its product insert and promotions, failed to warn physicians and failed to provide adequate instructions for use.(21 U.S.C.§ 352 and 21 CFR§ 201.5). Bayer also failed to conduct adequate large clinical trials with meaningful clinical endpoints necessary to obtain FDA's approval of these new indications.

#### BASES OF OPINIONS # 1 & #2

### A. THE ROLE OF THE FOOD AND DRUG ADMINISTRATION

29.    The United States Congress identified FDA as the federal agency responsible for overseeing the authorization and marketing of new prescription drugs sold in the United States. The FDA's authority comes directly from the Federal Food and Drug Act of 1938

24

(FDCA or the Act) and subsequent amendments. The FDA was not required by Congress to develop, design or test new drugs, author new drug labels, treat patients or conduct human clinical trials with investigational drugs. There is no "FDA hospital" and the FDA's medical officers do not engage in daily treatment of patients at the FDA.

30.     The Act was designed to provide the regulated-pharmaceutical industry with minimal standards of conduct. Beginning in 1938, all new drugs were required to obtain the FDA's approval prior to beginning U.S. marketing by obtaining approval of a new drug application (NDA). For NDA approval, FDA relied on a sponsor providing acceptable safety and manufacturing information.

31.     The Kefauver-Harris Amendment of 1962 to the 1938 Act expanded FDA's oversight role for drugs. After 1962, FDA reviewed materials submitted by the sponsor to determine if there was substantial evidence to support "safety and efficacy" when the drug was labeled for an intended use and intended patient population. The agency's processes informing safety and efficacy began to change in 1987 for manufacturers of a new drug by requiring manufacturers of a new drug to conduct scientifically valid human clinical trials capable of providing substantial evidence of safety and efficacy.

32.     The FDA's approval of an NDA for a new drug or an approved drug for a new indication reflects the agency's determination, based on its review of the information contained in a sponsor's filed marketing application and proposed draft label, that the NDA and the manufacturer have fulfilled specific minimal statutory requirements of the Act, allowing approval (licensing) to begin US marketing (21 C.F.R. Part 312; 21 C.F.R. Part 314,

21 U.S.C. § 355).   The Act's statutory requirements include the FDA considering the following based upon information provided by the sponsor:

    1.    Whether the new drug or new indication for an approved drug is safe under the conditions prescribed, recommended or suggested in the labeling proposed by the company;

    2.    Whether the company provided information that demonstrates "substantial evidence" that the drug or the drug for a new indication will have the effect it purports or is represented to have under the conditions of use in the labeling proposed by the company; and

    3.    Whether, based on FDA's evaluation of all material facts as stated by the company, the labeling proposed by the company is false or misleading in any particular way.

33.    If the statutory conditions are judged to have been successfully met by a sponsor, based on the information provided by the sponsor in its NDA submission, and there are no other reasons known to deny approval, FDA will approve the NDA (21 C.F.R.§ 314.125- Refusal to approve an application).

## 1. NEW DRUG APPLICATION ("NDA") REVIEW & APPROVAL

34.    Around the mid 1970s, FDA began to institute the processes a pharmaceutical sponsor must follow to begin human clinical trials with a new drug.   Certain regulatory safeguards have been put in place by Congress to protect subjects enrolled in drug clinical trials (21 C.F.R. Part 312, 21 C.F.R. Part 50, 21 C.F.R. Part 56).   It is the responsibility of a new prescription drug sponsor to monitor (21 C.F.R. § 312.3; 21 C.F.R.§ 312.50) and fully disclose to FDA all safety and efficacy risk information about its drug (21 C.F.R. Part 312; 21 C.F.R. Part 314).   The process of full risk and benefit disclosure must begin with the

sponsor's first request to obtain FDA's approval of an Investigational New Drug ("IND") protocol to begin human clinical trials. Full disclosure of risks and benefits to the FDA in an NDA is a continuing sponsor obligation up to the time of FDA's NDA approval or denial. This duty to fully disclose risks and benefits is picked up by and continues through the post approval process.

35.     In the FDA's description of the IND, 21 C.F.R.§ 312.23, the sponsor is required, among other things, to provide to the FDA: (8) *Pharmacology and Toxicology Information;* (9) *Previous human experience with the investigational drug;* and (10) *Additional information* including (iv) *Other information.* This basic IND information is intended to help FDA's reviewers evaluate the adequacy of the sponsor's proposed clinical trial protocols, the adequacy of safeguards used for subjects in the study, and to help determine whether or not to approve or deny the initial request. The company's IND submission to FDA must include (3) (ii): *"a brief summary of previous human experience with the drug ...and ... investigational or marketing experience in other countries that may be relevant to the safety of the proposed clinical investigation(s)"* and (iv) (f) *"any risks of particular severity or seriousness anticipated on the basis of the toxicological data in animals or prior studies in humans with the drug or related drugs."* 21C.F.R. § 312.23. In terms of the clinical protocol(s) submitted to FDA, according to 21C.F.R. § 312.23 (6) *(iii) (g)* they are to contain: *"A description of clinical procedures, laboratory tests, or other measures to be taken to monitor the effects of the drug in human subjects and to minimize risk."*

36.     An IND sponsor is responsible for monitoring adherence to the IND's protocol by its clinical investigators, ensuring the safety of subjects enrolled, and reviewing the data to

determine patient outcomes.  The IND sponsor is required to provide FDA with full and complete disclosure of all safety information during the following phases: the Pre-IND submission meeting; the End of Phase II meeting; and the Pre-NDA meeting.  There are also multiple interactions with FDA during the IND and NDA stages where full disclosure of safety information should occur to inform FDA's risk versus benefit decision and labeling.  It is the responsibility of a new drug sponsor, not FDA, to ensure the accuracy and completeness of all information it provides to FDA.  The role of the manufacturer as new drug "sponsor" is described in the IND regulations by Subpart D: Responsibilities of Sponsors and Investigators (21 C.F.R. § 312.50 to 21 C.F.R. § 312.70).  The "General Responsibilities of Sponsors" is described in 21 C.F.R.§ 312.50.[3]

37.    On June 12, 2002, Congress for the third time reauthorized the Prescription Drug User Fee Act (PDUFA) Act.   In accordance with Section VII of the PDUFA III Reauthorization Performance Goals and Procedures, FDA agreed to satisfy certain requirements or goals for a risk management program ("RMP").  One of those goals was for FDA to produce additional written Guidance to industry regarding risk management activities. In March 2005, FDA issued "*Guidance for Industry, Premarketing Risk Assessment.*"  This Guidance was FDA's current best thinking, and one of a series of three risk management program Guidances.  The risk assessment guidance did not include new information or new methodologies but was written by FDA as a guide to help improve the pharmaceutical

---

[3]      21 C.F.R. § 312.50: Sponsors are responsible for selecting qualified investigators, providing them with information they need to conduct an investigation properly, ensuring proper monitoring of the investigation(s), ensuring that the investigation(s) is conducted in accordance with the general investigational plan and protocols contained in the IND, maintaining an effective IND with respect to the investigations, and ensuring that FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the drug.

industry's current methods being used for its risk management activities and improve the quality of the marketing submissions to FDA. FDA issued this Guidance in communication with the European Medical Agency ("EMEA") to help harmonize industry requirements between the United States and Europe.

38.    The FDA's risk assessment guidance explained current expectations for generating, acquiring, analyzing and presenting premarketing safety data. The FDA's Risk Assessment Guidance, 2005, on pages 4-5 describes risk management activities for the product's lifecycle:

> Risk management is an iterative process designed to optimize the benefit-risk balance for regulated products. Risk assessment consists of identifying and characterizing the nature, frequency, and severity of the risks associated with the use of a product. Risk assessment occurs throughout a product's lifecycle, from the early identification of a potential product, through the premarketing development process, and after approval during marketing. Premarketing risk assessment represents the first step in this process, and this guidance focuses on risk assessment prior to marketing.

> It is critical to FDA's decision on product approval that a product's underlying risks and benefits be adequately assessed during the premarketing period. Sponsors seeking approval must provide from the clinical trials a body of evidence that adequately characterizes the product's safety profile.

> IV.    GENERATING RISK INFORMATION
>        DURING CLINICAL TRIALS

> In reaching a final decision on approvability, both existing risk information and any outstanding questions regarding safety are considered in a product's risk assessment and weighed against the product's demonstrated benefits. The fewer a product's demonstrated benefits, the less acceptable may be higher levels of demonstrated risks. Likewise, the fewer the benefits, generally, the less uncertainty may be accepted about a product's risks.

To maximize the information gained from clinical trials, FDA recommends that from the outset of development, sponsors pay careful attention to the overall design of the safety evaluation.

39.    FDA's Risk Assessment on pages 20-21 provided Guidance on assessment of temporal associations, causality, and dose effect:

B.    Analyzing Temporal or Other Associations

For individual safety reports, the temporal relationship between product exposure and adverse event is a critical consideration in the assessment of potential causality. However, temporal factors, including the duration of the event itself, are often overlooked during the assessment of aggregate safety data....Temporal associations can help further understand causality, adaptation, and tolerance, but may be obscured when only frequencies of adverse events are compared.

...analyzing changes over time may be important for assessing risk and potential causality...

Descriptions of risk as a function of subjects' duration of exposure to a product, or as a function of times since initial exposure, can contribute to the understanding of the product's safety profile. Temporal associations identified in previous experience with related products can help focus sponsor analyses of potential temporal association for a product under study, but sponsors should balance this approach with an attempt to detect unanticipated events and associations as well.

C.    Analyzing Dose Effect as a
      Contribution to Risk Assessment

For studies involving the evaluation of a range of doses, dose response is most commonly assessed by analyzing adverse event frequencies by administered dose.  In such studies, it may also be useful to consider event frequencies by weight-adjusted or body surface area-adjusted dose, especially if most patients are given the same dose regardless of body weight or size....For products administered over prolonged periods, it may be useful to analyze event rates based on cumulative doses.

40.     The Guidance and Regulations make clear that the company's duty to collect, analyze and disclose product safety information is continuing.  The NDA submission process (this step follows completion of the IND), per 21 C.F.R. § 314.50, requires the sponsor to again provide full and complete disclosure to FDA of all relevant safety issues for its proposed new drug.  The safety information the company must provide during the NDA process is included in numerous sections:

Summary (2)(v) a summary of the non-clinical pharmacology and
    toxicology section of the application;

  (d)  Technical sections (2) Non-clinical and pharmacology and toxicology section;

  (5)  Clinical data section (iv) relevant safety data from any source, (vi) summary and updates of safety information;

  (f)  Case report forms and tabulations (1) Case report tabulations, (3) Additional data; and

  (j)  Claimed exclusivity (4)(ii) "essential to approval."

41.     The *"essential to approval"* additional information is described as:

A list of all published studies or publicly available reports of clinical investigations known to the applicant through a literature search that are relevant to the conditions for which the applicant is seeking approval, a certification that the applicant has thoroughly searched the scientific literature and, to the best of the applicant's knowledge, the list is complete and accurate and, in the applicant's opinion, such published studies or publicly available reports do not provide a sufficient basis for the approval of the conditions for which the applicant is seeking approval without reference to the new clinical investigations(s) in the application, and an explanation as to why the studies or reports are insufficient.

42.     The FDA's NDA approval process, as with the IND process, was not designed to identify fraudulent information.  The NDA application process does not require the FDA to

31

speculate on the completeness of an application or guess at what information buried in a large submission is material to the safety determination. Rather, FDA is largely dependent on the sponsor to summarize and direct it to important safety information in the submission. FDA only has limited ability to inspect some of the clinical investigation sites for an original submission and to examine records present in an NDA submission to help authenticate the accuracy of data provided. FDA depends on the sponsor and clinical investigators to adhere to protocol procedures at an investigation site.

43. Neither the IND nor NDA process anticipate that FDA's reviewers will need to conduct or "re-conduct" a full literature search to find out if all relevant safety information has been submitted to FDA. The sponsor is considered by FDA to be an expert in the product class, the most knowledgeable about its own and similar products, and responsible for having conducted an adequate search of the literature. The sponsor, not the FDA, is required to be the most knowledgeable about the risks and benefits of its product (21 C.F.R. § 314.50). The FDA relies on the skill, training, honesty, and complete safety disclosures of each drug sponsor. The pharmaceutical industry is aware of FDA's reliance on it, knowing that FDA has limited resources and manpower. Despite documented instances of industry exploiting this lack of FDA resources, FDA must still function from an assumption that all pharmaceutical manufacturers will provide truthful and complete information to FDA in marketing applications and communications.

44. FDA also relied for many years on industry to conduct the first and most thorough literature search about a product, product class, or chemical class. Historically, FDA had limited library facilities and support research staff to help it conduct literature searches for

each FDA Center.  Only in the mid to late 1990s were FDA reviewers allowed access to the internet while working at FDA.  Prior to that, literature searches were focused requests conducted for agency reviewer(s) as special projects.

45.      Following disclosure that clinical trials were prematurely stopped or that safety information was not being published, Congress amended the Act with the Food and Drug Administration Amendments Act of 2007.  The amendment included a clinical trial registry databank.  The Act also amended Section 402 of the Public Health Service Act (42 U.S.C. § 282) in terms of the requirements for use of the clinical trial registry databank. Other than phase I clinical drug trials, prospective drug clinical trials subject to 21 U.S.C. § 355 and described within the meaning of 21 C.F.R. Part 312 were to have certain clinical trial information listed within a central database maintained by the NIH.  The purpose of the clinical trial databank was to enhance subject enrollment and also to help track the subsequent progress of clinical trials being conducted in the United States.  Prior to the amendment, all registries on a drug were maintained by the manufacturer and did not have to be shared with FDA or the medical community.

## 2.  PRESCRIPTION DRUG USER FEES

46.      Congressional action on product safety resulted from action it had taken years before when, in response to the public's demand for faster access to new drugs, Congress passed the 1992 Prescription Drug User Fee Act (PDUFA), referred to as PDUFA I.  PDUFA I, over a set period of time, authorized FDA to collect user fees from pharmaceutical manufacturers to help defray the expenses of the FDA's new drug approval process.  Congress has continued to re-authorize PDUFA through 2008.  In return for industries' payment of user

fees, PDUFA established mandatory time goals for FDA's reviewers to complete their reviews and determine whether to approve or deny NDA application requests.

47.     PDUFA changed the FDA's "customer" from the public to pharmaceutical sponsors.   Under pressure to annually report to Congress its ability to meet PDUFA's aggressive timelines, FDA became more reliant on the sponsor to provide all data in a user-friendly format.

48.     Following passage of PDUFA it became difficult for a single reviewer to raise additional or new scientific questions about safety and efficacy of a new drug or a class of drugs.   In other words, the reviewer's ability to look behind the sponsor's information or engage in a deliberative review of the data was lessened.   In a March 2003 Office of the Inspector General's ("OIG") report titled, *FDA's New Drug Application Review Process,* on page 12 it stated that an internal survey of CDER new drug reviewers found that one-third of reviewer respondents expressed not feeling comfortable enough to raise differing opinions during a drug review cycle.   The March 2003 OIG survey also found that 18 percent of CDER respondents felt pressured to approve or recommend approval of a drug, despite still having reservations about safety, efficacy or quality.   CDER's reviewer respondents expressed reluctance to raise disagreements due to a fear of slowing down the review process.

49.     FDA historically had limited ability to publicly disclose decisions about why it did not approve a drug or new indication.   Information about products that aren't approved is generally considered proprietary, confidential or trade secret, shielding it from disclosure to the medical community or public by FDA.   If a drug application or a new indication is eventually approved, then the FDA can disclose limited information.

### 3.  DRUG LABEL NEGOTIATIONS AT TIME OF APPROVAL

50.    The drug manufacturer drafts the proposed product label and submits it to the FDA.  FDA traditionally negotiates with the sponsor the contents of a new drug's final drug label ("package information or insert, "PI").  Negotiation is based on the information FDA received from the manufacturer in the NDA application as well as similar drug product labels for the therapeutic class.  When the FDA approves a drug, it approves both the drug's active ingredient and the drug's final negotiated label.  As the pharmaceutical industry is aware, following PDUFA, the FDA often negotiates the final drug label just ahead of a looming mandatory PDUFA deadline.  The tension between the looming PDUFA deadline and the agency's best opportunity to negotiate a new product label with a sponsor is just prior to initial drug approval, when the sponsor is most eager to get a new drug onto the market, was discussed in the Office of the Inspector General's ("OIG") March 2003 report OE1-01-01-00590 titled *FDA's Review Process for New Drug applications*, *A Management Review,* on pages 17-18 under a subheading "Rush to finalize labels at the end of the review cycle:"

> Labels, which FDA approves as part of the NDA review process, are a key leverage point for FDA.  The label provides the parameters on how a company can market a drug and provides key information concerning is safe and effective use, such as indications, dosages, contraindications, warning and precautions.
>
> However, we found that labeling negotiations are considerably rushed at the end of the review process and can occur up to the day the drug is actually approved. To some extent, labeling negotiation must occur toward the end of the review process, after reviewers have evaluated the data in the NDA and are familiar with the drug's efficacy and safety, but it appears to be too compressed...

> The rush to finalize labels at the end may be in part caused by the lengthy negotiations that can occur between FDA and the sponsor over the label.   Some of this interaction reflects the different perspectives of each.   Sponsors are looking to obtain the best position to market their drugs, as the label serves as the legal basis from which they can advertise their drugs.  Sponsors may also be concerned with liability issues and may want to list every possible adverse event.  The FDA is primarily concerned with ensuring that the label provides useful information to health care professionals. Tension can erupt between what information is clinically significant versus what information is important for advertising and liability purposes.

51.     Having streamlined the new drug process to help rush new drugs to market with still incomplete safety data from narrow clinical trials, the post-marketing adverse event reporting process following passage of PDUFA became even more important.   Only limited information about the safety of a drug is gleaned from clinical trials for approval.  At the time of NDA approval, the FDA's knowledge base about potential risks is limited to only the preclinical and limited clinical information provided to it by a sponsor.  Prior to approval, the new drug has been tested in a relatively small and well-defined population of patients, for a limited amount of time and a limited indication.

52.     The pivotal phase III clinical studies are designed by a sponsor to optimize its ability to demonstrate acceptable performance of a drug to FDA to obtain approval, not to explore all side effects of the drug.  The most relevant timeframe for learning about the human performance of a new drug is actually post-approval when the drug is commercially prescribed and used by a larger population of patients.

53.     Once the approved drug enters the broader commercial market, over time and with greater patient exposure previously-known risks (disclosed and undisclosed to FDA) may

be magnified and new risks, including rarer side effects, begin to manifest. These risks may not have been disclosed to or foreseen by FDA at time of drug approval. It is these new or magnified risks, which may not have been disclosed to or known by the FDA at time of approval, that necessitate each sponsor to have established adequate post approval surveillance and pharmacovigilance methods, the results of which should be communicated to FDA, health care providers and patients. Government reports and FDA sources have chronicled how companies have gamed the post-marketing surveillance system to hide the existence or magnitude of side effects, to bury data in large submissions so as to not highlight the issue to FDA, or to threaten independent reporters and authors into not reporting or publishing adverse events so as to not create interest at FDA. If adverse event reports did start to accumulate, recent public disclosures demonstrate that companies employed ghost-writers to publish contrary published literature so that the company could point to "independent" journal articles when questioned by FDA.

### 4. POST APPROVAL DRUG PROMOTION

54.     According to a Government Accountability Office ("GAO") report, the oversight scheme used by FDA for monitoring the regulated United States human prescription pharmaceutical industry's post approval conduct for promotions and marketing of drugs is through its review of drug launch materials submitted to it by the pharmaceutical firm. (GAO-08-835 *Promotion of Drugs for Off-Label Uses*, July 2008). FDA is in essence comparing the information the company has provided to it about its new drug to the launch statements being made in advertising and literature that is intended to be given to healthcare providers and patients. If information will not be physically given to a healthcare provider or

patient, then FDA does not receive or evaluate it.  The FDA expects the company to be the primary source of supplementation about risk information to the Agency and physicians through additional monitoring and surveillance.   The FDA has not been provided a separate oversight mechanism specifically designed to help it monitor and address off-label or unapproved promotion by industry.  As the pharmaceutical industry is aware, the limitations in FDA's oversight capabilities and resources in terms of the monumental task of monitoring the entire pharmaceutical industry's actions post-approval to find violations in promotion and marketing, failing to mention or downplaying safety issues reduces the likelihood that FDA will quickly detect and be able to effectively address violations.

55.    As of March 2008, FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") had only the equivalent of 44 full-time staff devoted to overseeing all prescription drug promotions.  The DDMAC staff is tasked with examining all required submission of final promotional materials to FDA before product launch.  These include materials which may be shown to or left with the health care providers or patients, including print advertisements, professional slides, exhibit panels, reprints, and internet promotions.  Drug companies can also make voluntary submissions to FDA and DDMAC to request an advisory review.  Manufacturers submit advertising materials to FDA, usually after they are being used.  If DDMAC finds material to be violative, it usually only requires the company to stop using the material, not to issue a corrective statement.  A larger problem is that FDA does not review sales representative training materials and marketing sales tools such as scripts and talking points, nor does it review company-sponsored physician training such as continuing medical education courses ("CME").  Published reports have documented

improper safety and efficacy messages being delivered by armies of sales representatives all beyond the FDA's review powers. Even with materials submitted and reviewed by DDMAC, the GAO, July 2008, *Promotion* report, found the enforcement mechanism to be lacking[4].

56.     In 1997, Congress passed the Food and Drug Administration Modernization Act (FDAMA) which included a provision that authorized drug manufacturers to disseminate journal articles and reference publications on off-label uses when they adhered to certain conditions. This FDAMA provision would sunset on September 30, 2006. The Food and Drug Administration Modernization Act of 1997, in 21 USC § 360aaa, set out its 1999 implementing regulations for industry, which allowed for a method to disseminate information on unapproved use of FDA-approved products. In light of the statute's sunset, FDA still provides the implementing regulations in 21 C.F.R. Part 99. On February 15, 2008, FDA issued a new draft guidance, "*Guidance for Industry: Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on*

---

[4]      July 2008 GAO-08-835 *Promotion of Drugs for Off-Label Uses*, page 5-6: "For example, FDA staff can only attend a small number of the thousands of continuing medical education (CME) activities that take place every year and depend on voluntary complaints from physicians to identify off-label promotions, such as statements made by sales representatives in physicians' office when the information was not requested by the physician.

FDA has taken regulatory and enforcement action against drug companies in response to off-label promotions. During calendar years 2003 through 2007, FDA issued 42 regulatory letters in response to off-label promotion, which was the third most common promotional violation identified by FDA during this time frame. Our analysis of FDA documentation showed that it took FDA an average of about 7 months to issue the 42 regulatory letters- 19 untitled letters and 23 warning letters- from the time these letters were first drafted. Because violative materials remain in circulation prior to the issuance of regulatory letters, the length of time it takes FDA to issue these letters limits their effectiveness. In 2002, GAO recommended that the agency issue regulatory letters more quickly...According to DDMAC officials and our analysis, drug companies have generally complied with the agency's proposed actions as suggested in these letters. For example, in most instances, drug companies ceased dissemination of identified violative materials upon receipt of a regulatory letter. However, we found that it took drug companies an average of about 4 months to take corrective actions in response to 23 warning letters that were issued for the more serious violations. DDMAC officials told us that because drug companies have generally complied with FDA's requests in the untitled and warning letters, they have not taken any enforcement action through referrals to DOJ. However, we found that during the same time period, DOJ took action against drug companies in response to off-label promotions. DOJ enforcement action resulted in 11 settlements with drug companies that included allegations of off-label promotion. These settlements often involved promotional practices that are more difficult for FDA to detect, such as violative discussions between physicians and drug company sales representatives. While none of these actions were initiated by DDMAC, the agency's DDMAC, OCC, and OCI were ultimately involved in their resolution."

*Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices*" with a comment period closing April 21, 2008.  The Guidance was intended to describe FDA's current thinking regarding "Good Reprint Practices" with regard to distribution of medical journal articles and scientific or medical reference publications.   The draft Guidance recommended that the drug companies limit such activities to distribution of reprints from peer-reviewed research from scientific or medical journals published by organizations with editorial boards having experts with demonstrated expertise in the subject of the article.  The agency's draft Guidance also stated that:

> A scientific or medical reference publication that is distributed should not be:
>
> edited or significantly influenced by a drug or device manufacturer or any individuals having a financial relationship with the manufacturer

### 5.  POST APPROVAL SAFETY STUDIES

57.    As discussed in the Institute of Medicine's ("IOM") *The Future of Drug Safety, Promoting and Protecting the Health of the Public,* National Academies Press, 2007, a report commissioned by the FDA, "the Agency was not given authority by Congress to require or mandate a pharmaceutical company perform additional safety studies for its already approved and marketed drug."  The FDA's statutory and regulatory tools for gathering post-approval information from a sponsor is not as well defined or supported by the regulations, especially when contrasted with the tools given to the Agency for a sponsor to obtain NDA approval.

58.    Following public concerns about delayed drug safety actions by FDA with approved drugs such as Bayer's VIOXX, on September 27, 2007, Congress amended the Act

with the Food and Drug Administration Amendments Act of 2007. To, among other things, help ensure drug safety and surveillance it included a heading entitled "Enhanced Authorities Regarding Postmarket Safety of Drug." According to the GAO March 2006 *Drug Safety* Report, page 14, pursuant to 21 U.S.C. § 355(e), FDA may propose withdrawal of a drug when it determines through experience, tests or other data that a drug is unsafe under the conditions of use approved in its application, that there is lack of substantial evidence that the drug will behave as it purports to behave, or that is suggested in its labeling. The same result may occur if FDA determines that patient safety information has not been timely filed. Prior to withdrawal, FDA notifies the affected parties and provides them an opportunity for a hearing. Drug approval may be suspended immediately prior to the hearing if the marketing of a drug is judged by FDA to constitute an imminent hazard to public health. Although FDA has this authority, it rarely utilizes it. One of the last times FDA used its authority to withdraw a prescription drug over sponsor objection was in November 15, 1978 when FDA withdrew the drug phenformin from the market after Ciba-Geigy (now Novartis after a merger) refused to voluntarily withdraw it. Of the 10 drugs withdrawn from the market since 2000, all have been voluntarily withdrawn by the sponsor.[5]

59.    In the new Section 901 - Postmarket Studies and Clinical Trials Regarding Human Drugs; Risk Evaluation and Mitigation Strategies - FDA, under certain circumstances, on the basis of scientific data, may require a sponsor to conduct a post approval study or clinical trial for an approved drug. Such scientific data for FDA to be able to require a post approval study includes information obtained regarding chemically-related or pharmacologically-related drugs.

---

[5]      Phenformin was used to treat diabetics and was associated with a life-threatening buildup of lactic acid in the blood. The sponsor, Ciba- Geigy opted not to conduct a voluntary withdrawal of the drug from the market.

The purpose of the post approval study or clinical trial is to assess a known serious risk related to the drug involved, to assess signals of serious risk related to the drug and to identify unexpected serious risk when available data indicates a potential for a serious risk.

60.    However, there is still a significant limitation to FDA's authority.  FDA may not require a sponsor to conduct a post approval study unless it can show that the manufacturer's active post-market risk identification and pharmacovigilance systems already available are not sufficient to address the safety issue.  FDA may not require a sponsor to conduct a clinical trial unless the agency makes a determination that a post-approval study will be sufficient to address the safety issue.  For each study or clinical trial required to be conducted by FDA, the responsible person is required to submit a timetable for completion of the study or clinical trial to investigate a safety issue, as well as provide FDA with periodic updates on status.  As a practical matter, FDA has limited authority to set the time within which a post approval study is completed or to participate in the study protocol.

61.    In terms of changes to labeling post approval under the amendment, if FDA becomes aware of new safety information that the agency believes should be included in the label of the drug, FDA is to promptly notify the sponsor.  The sponsor then will have 30 days to submit a supplement proposing changes to the approved label to reflect the new safety information.  The FDA is to review the supplement and, if it disagrees with the proposed changes, it is to initiate negotiation discussions with the sponsor so that mutual agreement can be reached on whether the label for the drug shall be modified to reflect the new safety information.  Discussions between FDA and the sponsor are not to extend to more than 30 days, unless the Agency gives an extension.  Within 15 days of the conclusion of discussions, FDA may issue an

order directing a sponsor to make label changes as FDA deems appropriate to address the new safety information. The sponsor still has the ability to appeal the decision within 5 days. If FDA determines that the label change is a public health threat, then the agency can accelerate the label change process in order to protect public health. The new rule is not to be construed as affecting the responsibility of a sponsor to maintain its own label in accordance with all existing requirements.

62.     The Amendment also included "Risk Evaluation and Mitigation Strategy" which required that sponsors of approved drugs have a risk and mitigation strategy under 21 U.S.C. § 355-1. With respect to a drug, the failure of the sponsor to conduct a post-market study commitment under subpart H of 21 C.F.R. Part 314 is to be deemed a violation of the Act. If FDA becomes aware of new safety information and makes a determination that a risk evaluation and mitigation strategy is necessary for a drug to ensure that the benefits of the drug outweigh the risks of the drug, the sponsor is required to submit its proposed risk evaluation and mitigation strategy to FDA. The definition of new safety information according to the 2007 amendment, with respect to a drug, means information derived from:

- A clinical trial, an adverse event report, a post approval study (including a study under section 505(o)(3)) or a peer-reviewed biomedical literature;

- Data derived from the post-market risk identification and analysis system under section 505(k);

- Other scientific data deemed appropriate by FDA about a serious risk or an unexpected serious risk associated with use of the drug that the FDA has become aware of (that may be based on a new analysis or existing information) since the drug was approved, since the risk evaluation and mitigation strategy was required, or since the last assessment of the approved risk evaluation and mitigation strategy for the drug; or

- The effectiveness of the approved drug evaluation and mitigation strategy for the drug obtained since the last assessment of such strategy.

63.   With its limited Agency resources and authority, FDA usually relies on manufacturers to voluntarily update a product label, conduct post-approval safety studies, and warn physicians and patients about new and/or increased risks.  Since the 1970s, FDA has not withdrawn NDA approval of a drug as an imminent hazard.  Instead, FDA has allowed a manufacturer to voluntarily withdraw its own drug from the market.  When a drug raises serious safety concerns, FDA has requested sponsors to establish patient registries, restrict distribution to only certain populations and/or ensure that patients receive medication guidelines or additional consulting from other health care providers, including pharmacists.

64.   FDA does have a regulatory method to withdraw a drug's approval and prevent commercial marketing for a product that can be shown to be an "imminent hazard to the public" (21 C.F.R. § 314.150).  However, the legal burden of showing an imminent hazard rests with the FDA which has effectively limited its use.

### 6.  PHARMACOVIGILANCE AND ADVERSE EVENT REPORTING

65.   Both the manufacturer and FDA are obligated under the Act to engage in some form of post-market surveillance (Pharmacovigilance- See ISSUE #3) or monitoring of the human performance with an approved drug.  For NDA approved prescription drugs, the requirements for reporting are described in 21 C.F.R. § 314.80. According to the GAO (*Drug Safety,* March 31, 2006), page 14, the FDA receives over 400,000 reports of adverse events (AERs) annually.  Some reports are not entered into FDA's AERs, such as periodic reports for drugs that have been approved for more than 3 years and that are considered nonserious.  The FDA does have its own program in place for post-market surveillance of approved drugs, but

the program has been chronically underfunded and understaffed according to recent studies by the Institute of Medicine (IOM) (*Drug Safety,* September 2007) and the GAO, (*Off-Label Promotion,* July 2008).

66.     According to the IOM Report (*Drug Safety,* September 2007), although the FDA receives more than 400,000 AER reports annually, "this is only a small fraction of all adverse effects of drugs." There are almost 11,000 FDA-regulated drugs on the market (including both prescription and over-the-counter (OTC)), with nearly a hundred more drugs approved annually. Once drugs are marketed, FDA does continue to monitor AERs filed in its database to attempt to identify safety signals or trends. Despite mandatory reporting requirements for the pharmaceutical industry, there is recognized under-reporting of AERs. The GAO's GAO/HEHS-00-21 report titled *"Adverse Drug Events The Magnitude of Health Risk is Uncertain Because of Limited Incidence Data"* was issued in January 2000. On page 1, it reported that in 1998 about 2.7 billion prescriptions were filled in the United States, continuing "Because exposure to prescription drugs is so high, even a low adverse drug effects (ADE) rate can lead to a large number of serious injuries and deaths." The GAO report continued on page 4: "Some ADRs are the predictable result of a drug's known pharmacological properties, some become predictable as experience with using a drug expands, and others are not predictable because they are caused by individual sensitivities or allergies in particular patients." Regarding the ability of the FDA to monitor all drug adverse drug events and patient safety, the GAO Report again on page 10 discussed under-reporting:

> FDA's current postmarketing data collection systems for approved drugs are intended to compensate for the limitations of information from clinical trials by detecting the existence of previously unidentified ADES. However, because FDA's Adverse Event

Reporting System (AERS) relies on voluntary reports from physicians, pharmacists, patients, and others, it can uncover instances of problems but it cannot determine incidence. The same intrinsic limitation applies to the incidence reporting systems that many hospitals have established to monitor adverse events, including ADEs. All such systems based on spontaneous reporting detect only a fraction of the total number of adverse events (Cullen and others, 1995). FDA's AERS includes an estimated 1 to 10 percent of adverse events (Goldman and others, 1996).

67.    The FDA's AER database is a "passive surveillance" system.  It receives reports from all sources without further FDA verification or follow-up.  Filed AERs are usually limited in the amount of information provided to FDA regarding the patient, drug and event.

68.    The FDA receives annual reports, AERs, unpublished and published reports, and reports from other agencies and governments to supplement what the sponsor is supposed to be providing regarding trends and safety signals.  When safety trends are identified, the Agency assesses its limited options based on the agency's resources and its perception of public health risk.  The traditional mechanisms available to the FDA have included; public statements, safety alerts, untitled letters, warning letters, public health advisories, public advisory meetings and workshops, record and or product seizures, disbarment of investigators, and monetary fines.

69.    Unlike physicians and other healthcare professionals whose reports are strictly voluntary, pharmaceutical manufacturers are required to file AERs with FDA, whether or not the event is considered drug related. 21 C.F.R. § 314.80 provides categories for classification of drug experiences and specified reporting timeframes.  On December 23, 2007 mandatory filing of AERs was expanded to include over-the-counter (OTC) and behind the counter (BTC) drug manufacturers.  The AER information is included in FDA's MedWatch AER

database.  Drug reports are filed as 15-day expedited reports when the report is serious and unexpected.  Drug reports that are not considered serious or unexpected can be filed together with other reports by a company through Periodic Reporting unless otherwise directed.  The differences in reporting time (15 days v. annual) is open to interpretation and allows companies, as here, to delay filing reports.  For adverse events reported in the scientific literature, a 15-day report on safety information is required to be filed with FDA, together with the actual published piece when the event is serious and unexpected.  Such reports can occur in scientific or medical journals either as case reports or as formal trials.

70.    The responsibility for performing adequate pharmacovigilance (21 C.F.R.§ 314.70 and §314.80, sec 505(k)) and providing adequate and truthful communications of risks to health care professionals and consumers (21 C.F.R. 201.57,201.80, 202.10, sec 502(f)(1)& (2), (n)) rests only with a drug sponsor and not with FDA.  As indicated in an October  2008 Report to the House of Representatives, FDA's career staff indicated that it is a drug sponsor, and the sponsor alone, that is responsible for post market surveillance of its products, conducting additional safety studies and updating its labeling[6].  The sponsor is also to consider the likelihood that certain adverse events will be reported back to it by physicians and health care providers, particularly when occurring in seriously ill patients. The FDA career staff also views courts and litigation as a safety net for the Agency and the public to get manufacturers to voluntarily update product label instructions for use and warnings[7].

---

[6] October 2008, United States House of Representatives Committee on Oversight and Government Report Majority Staff Report prepared for Chairman Henry A. Waxman, FDA Career Staff objected to Agency Preemption Policies

[7] EXECUTIVE SUMMARY October 2008, United States House of Representatives Committee on Oversight and Government Report Majority Staff Report prepared for Chairman Henry A. Waxman, FDA Career Staff objected to Agency Preemption Policies.

71.     As part of the performance goals of Section VIII of the PDUFA III Reauthorization Performance Goals and Procedures, FDA issued three RMP documents in 2005, including, "*Guidance For Industry Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment.* Unlike the FDA's *Guidance for Industry: Premarketing Risk Assessment* that concerned premarket evaluation of drugs, the 2005 RMP focused on pharmacovigilance in a drug's post-approval period. Another of the FDA 2006 documents was *Guidance for Industry: "Development and Use of Risk Minimization Action Plans (RiskMAP Guidance)."* At any point in product development through approval, a sponsor can voluntarily submit a proposed RMP for agency review and comment. Alternatively, FDA may propose to the sponsor that an RMP merits consideration and discussion with the FDA. A RiskMAP means the development of tools by a sponsor necessary to create a strategic safety program to minimize risks to patients while preserving benefits and improving the benefit-risk balance. RiskMAP goes beyond the FDA-approved labeling.

72.     The FDCA and FDA's implementing regulations have established further regulations for routine risk assessment and risk minimization by sponsors. The term pharmacovigilance means all scientific and data gathering activities relating to the detection, assessment, and understanding of adverse events. Both the FDA's March 3, 2003 Concept Paper entitled Risk Assessment of Observational Data: Good Pharmacovigilance Practices and the FDA's subsequent 2005 Pharmacoepidemiologic Assessment Pharmacovigilance Guidance both indicate that even a single well-documented case report may be a safety signal. A safety signal refers to a concern about an excess of adverse events compared to what would

be expected to be associated with a product's use.  Signals can arise from postmarketing data and other sources, including preclinical data and events associated with other products in the same pharmacologic class.  Safety signals generally indicate the need for further investigation by a sponsor.  Once a signal is identified, it should be further assessed to see if it represents a potential safety risk and whether other additional actions should be undertaken.  The 2005 guidance on page 3 indicated in "III: THE ROLE OF PHARMACOVIGILANCE AND PHARMACOEPIDEMIOLOGY IN RISK MANAGEMENT" that:

> Risk assessment during product development should be conducted in a thorough and rigorous manner; however, it is impossible to identify all safety concerns during clinical trials... Therefore, postmarketing safety data collection and risk assessment based on observational data are critical for evaluating and characterizing a product's risk profile and for making informed decision on risk minimization.

73.    The 2005 Guidance had "VI. IDENTIFYING AND DESCRIBING SAFETY SIGNALS: FROM CASE REPORTS AND CASE SERIES," which described that good pharmacovigilance is generally based on acquiring data from spontaneous event reports, also known as "case reports."  The case reports are then used to develop a case series.  FDA's Guidance, 2005, stated on pages 6-10:

> C.    Developing a Case Series
>
> FDA suggests that sponsors initially evaluate a signal generated from postmarketing spontaneous reports through a careful review of the cases and a search for additional cases. Additional cases could be identified from the sponsor's global adverse event databases, the published literature, and other available databases, such as FDA's Adverse Event Reporting Systems (AERS)...When available, FDA recommends that standardized case definitions (i.e., formal criteria for including or excluding a case) be used to assess potential cases for inclusion in a case series...

D.      Summary Descriptive Analysis of a Case Series

In the event that one or more cases suggest a safety signal warranting additional investigation, FDA recommends that a case series be assembled and descriptive clinical information be summarized to characterize the potential safety risk and, if possible, to identify risk factors.  A case series commonly includes an analysis of the following:

1.  The clinical and laboratory manifestations and course of the event;

2.  Demographic characteristics of patient with events (e.g., age, gender, race);

3.  Exposure duration;

4.  Time from initiation of product exposure to the adverse event;

5.  Doses used in cases, including labeled doses, greater than labeled doses, and overdoses;

6.  Use of concomitant medications;

7.  The presence of co-morbid condition, particularly those known to cause the adverse event, such as underlying hepatic or renal impairment;

8.  The route of administration (e.g., oral vs. parenteral);

9.  Lot numbers, if available, for products used in patients with events;

10. Changes in vent reporting rate over calendar time or product life-cycle.

E.      Use of Data Mining to Identify
        Product-Event Combinations

At various stages of risk identification and assessment, systematic examination of the reported adverse events by using statistical or mathematical tools, or so-called *data mining*, can provide additional information about the existence of an excess of adverse events reported for a product.

F.      Safety Signals That May Warrant Further Investigation

FDA believes that the methods described above will permit a sponsor to identify and preliminarily characterize a safety signal. The actual risk to patients cannot be known from these data because it is not possible to characterize all events definitely and because there is invariably under-reporting of some extent and

incomplete information about duration of therapy, numbers treated, etc. Safety signals that may warrant further investigation may include, but are not limited to, the following:

1. New unlabeled adverse events, especially if serious;

2. An apparent increase in the severity of the labeled event

3. Occurrence of serious events thought to be extremely rare in the general population;

4. New product-product …interactions;

5. Identification of a previously unrecognized at-risk population;

6. Confusion about a product's name;

7. Concerns arising from the way a product is used;

8. Concerns arising from potential inadequacies of a currently implemented risk minimization action plan (e.g., reports of serious adverse events that appear to reflect failure of a RiskMAP goal); and

9. Other concerns identified by the sponsor and FDA.

74. FDA's *Pharmacovigilance Guidance* addressed three types of non-randomized observational studies available to manufacturers: (a) pharmacoepidemiologic studies; (b) registries, and (c) surveys. Pharmacoepidemiologic studies can be of various designs, including cohort (prospective and retrospective), case-control, nested case-control, case-crossover, or other models.[8]

---

[8] FDA's Pharmacovigilance Guidance, 2005, p 12-23 had:
Unlike a case series, a pharmacoepidemiologic study which is designed to assess the risk attributed to a drug exposure has a protocol and control group and tests pre-specified hypotheses. Pharmacoepidemiologic studies can allow estimation of the relative risk of an outcome associated with a product, and some (e.g., cohort studies) can also provide estimates of risk (incidence rate) for an adverse event. Sponsors can initiate pharmacoepidemiologic studies at any time.

For uncommon or delayed adverse events, pharmacoepidemiologic studies may be the only practical choice for evaluation, even though they can be limited by low statistical power. Clinical trials are impractical in almost all cases when the event rates are less common than 1:2000-3000… It may also be difficult to use clinical trials: 1) to evaluate a safety signal associated with chronic exposure to a product, exposure in populations with co-morbid conditions, or taking multiple concomitant medications, or (2) to identify certain risk factors for a particular adverse event.

75.     The Food Drug Administration Act Amendment of 2007, Section 901 titled "Postmarket Studies and Clinical Trials Regarding Human Drugs, Risk Evaluation and Mitigation Strategies" amended 21 U.S.C. § 355-1 to add risk evaluation and mitigation strategies and included definitions of certain words and phrases.  Under definitions, a "serious risk" means a risk of serious adverse drug experience.  A "signal of a serious risk" means information related to a serious adverse drug experience associated with use of a drug and derived from: (a) a clinical trial; (b) adverse event reports; (c) a postapproval study, including a study under 21 U.S.C. § 355(o)(3); (d) peer-reviewed biomedical literature; (e) data derived from the postmarket risk identification and analysis system under 21 USC §355(k)(4); or (f) other scientific data.  An "unexpected serious risk" means a serious adverse drug experience that is not listed in the labeling of the drug, or that may be symptomatically and pathophysiologically related to an adverse drug experience identified in the labeling, but differs from such adverse drug experience because of greater severity, specificity, or prevalence.

76.     Potential elements of the risk evaluation and mitigation strategy can include; the use of: a medication guide; a patient package insert; a communication plan (including sending letters to health care providers), dissemination of information about the risk evaluation, a mitigation strategy encouraging implementation by health care providers and to explain certain safety protocols (such as medical monitoring by periodic laboratory tests); or dissemination of information to health care providers through professional societies about any serious risks of the drug and any protocol to assure safe use.

### 7. POST APPROVAL REVISION OF A DRUG'S LABEL

77.     Labeling must be revised by a manufacturer to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug. A causal relationship need not be established (21 C.F.R. § 201.57 ( c)(6)(i); 21 C.F.R. § 201.80(e)).  Statements that may be added to a label without first receiving FDA's approval (Changes Being Effected ("CBE") NDA Supplement) are those:

1.     To add or strengthen a contraindication, warning, precaution, or adverse reaction;

2.     To add or strengthen a statement about drug abuse, dependence, psychological effect, or overdosage;

3.     To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;

4.     To delete false, misleading, or unsupported indications for use or claims of effectiveness; or

5.     Any labeling change normally requiring a supplement submission and approval prior to distribution of the drug product that FDA specifically requests be submitted under this provision. (21 C.F.R. § 314.70 (c) (6) (iii) (A)-(C) (2006)).

78.     The regulations for a label should not to be viewed as an obstacle to a manufacturer voluntarily providing additional warnings or information to health care providers and patients[9].  As discussed in the RiskMAP above, manufactures can provide additional information and warnings to health care professionals and patients through labeling, advertising, or vehicles such as "Dear Doctor, Patient or Health Care Provider" communication letters, trade associations, medical associations, journals and the internet.  The

---

[9] October 2008, United States House of Representatives Committee on Oversight and Government Report Majority Staff Report prepared for Chairman Henry A. Waxman, FDA Career Staff objected to Agency Preemption Policies

manufacturer, as soon as it discovers risks that are not clearly stated or addressed in the product label, (21 C.F.R.§ 202.1, 21 U.S.C. § 352 (n)), has the ability to update its label by filing either a special NDA supplement (CBE) or an NDA supplement.  The manufacturer can and should educate its sales representatives to provide new information and warnings.

79.     In FDA's Office of Policy's *Proposed Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices* [Docket No. 2008N-0021] published January 16, 2008, the agency proposed to amend its regulations regarding changes to an approved new drug application as a "Changes Being Effected (CBE) special supplement."  FDA ultimately has the authority to accept, reject, or request modifications of the proposed changes to the label in the CBE as the agency deems appropriate.  FDA also has the authority to bring an enforcement action against a firm if the added information makes the labeling false or misleading.

### 8.  PHARMACEUTICAL INDUSTRY AND STANDARDS

80.     United States Pharmaceutical manufacturers utilize various standards, voluntary and mandatory, for production and sale of human drugs in the United States.  A manufacturer is to ensure its own compliance with the Federal Food Drug and Cosmetic Act, 21 U.S.C. §§ 321 et seq. and amendments and applicable sections of the FDA's Code of Federal Regulations ("C.F.R.") for marketing and labeling United States pharmaceuticals. Pharmaceutical manufacturers comply with the applicable and accepted industry standards and practices described by a recognized National Formulary such as the United States Pharmacopeia ("USP").  Manufacturers voluntarily elect to comply with recognized national and international industry standards for production, marketing and labeling of

pharmaceuticals, with such organization including International Standards Organization ("ISO") and International Conference on Harmonization of Technical Requirements ("ICH"). The pharmaceutical manufacturers can elect to conform to voluntary codes of conduct issued from their own trade associations such as the pharmaceutical trade association - Pharmaceutical Research and Manufacturing Association ("PhRMA"). There is a national code of conduct for Pharmaceutical Sales Representatives ("NAPSRx"). Under accepted good manufacturing practices ("GMP"), Bayer is to adhere to its own written internal standard operating procedures ("SOP"), policies and practices.

## ISSUE #2

II.   **FDA'S APPROVAL OF BAYER'S APROTININ (TRASYLOL)**

### OPINION #3:

Bayer failed to adequately perform  clinical testing and monitoring of the safety and efficacy of Trasylol administration in complex CABG patients populations despite its awareness of potential negative post-operative renal effects, thrombosis and death.

### OPINION #4:

Bayer failed to perform clinical testing necessary to support a new indication for benefits of full dose Trasylol versus half dose Trasylol in terms of effects on kallikrein and Systemic Inflammatory Response Syndrome (SIRs).  As stated by Bayer's  Dr. Horton, Bayer never conducted clinical studies to obtain FDA's approval for that new indication. Rather Bayer slipped information into its product insert's mechanism of action section to help allow it to promote a benefit for full dose Trasylol to  physicians that did not have FDA's approval.

### BASES OF OPINIONS #3 and #4:

A.   **APROTININ AS AN ORPHAN DRUG**

81.     Aprotinin's NDA was initially approved by FDA in 1993 for Bayer to begin

commercial marketing in the United States as an Orphan Drug and for a limited clinical

indication.  The road to aprotinin's marketing in the United States really began with a 1987

published study in Lancet by D. Royston[10], et al. indicating that aprotinin could significantly

reduce the amount of blood transfused to patients undergoing repeat open-heart surgery.

82.     Aprotinin would eventually be approved by FDA for marketing initially in the

United States indicated for use in a limited patient population undergoing repeat CABG and

repeat cardiac valve surgery to help reduce risk of infectious transmission by exposure to blood

products.   In 1998 Bayer obtained an NDA approval for a much wider patient indication, use

during primary cardiac surgery.  FDA had initially found Bayer's supplement NDA for a primary

cardiac surgery indication non-approvable based on unacceptable risk.  However, Bayer in 1997

resubmitted its clinical data with a re-analysis, as well as additional data, able to support an

acceptable benefit and risk for approval.  Bayer committed to include a new black box warning

in its label regarding the risk for anaphylaxis.

83.     In 2006, the use of aprotinin became controversial when the drug was associated

with increased risk of renal failure, myocardial infarction, stroke, death and increased risk of

death in a large observational study.[11],[12]  There were two subsequent cohort studies which also

linked aprotinin to an increased risk of death.[13],[14]  The controversy increased when an updated

---

[10] Royston D, et al. Effect of aprotinin on need for blood transfusion after repeat open-heart surgery. Lancet 1987; 2:1289-91.

[11] Mangano DT, Tudor IC, et al. The risk associated with aprotinin in cardiac surgery. NEJM 2006; 354:353-65

[12] Mangano DT, Miao, et al. Mortality associated with aprotinin during 5 years following coronary artery bypass graft surgery. JAMA 2007; 297:471-9.

meta-analysis of clinical trials showed there was no increased risk of myocardial infarction, stroke or death in patients receiving aprotinin.[15],[16]

84.     A subsequent study, Blood Conservation Using Antifibrinolytics in a Randomized Trial (BART),[17] compared aprotinin with the lysine analogues in patients undergoing high-risk cardiac surgery.  BART did provide evidence that aprotinin was an effective hemostatic agent in patients with risk of massive bleeding (relative risk, 0.79; 95% CI 0.61 to 1.01), although the difference was of borderline statistical significance.  Patients receiving aprotinin also had a reduced need for postsurgical blood products.  These findings were supportive of the positive findings for aprotinin.  However, at 30 days, the patients receiving aprotinin in BART had an increased risk of death of greater than 50% (relative risk, 1.53; 95% CI, 1.06 to 2.22).  The increased risk of death was an outcome that led the authors to conclude that aprotinin should no longer be used in cardiac surgery.

85.     The term "orphan-drug" for aprotinin refers to a type of drug product intended to treat a rare disease or condition that affects fewer than 200,000 Americans.  The Orphan Drug Act was signed into law on January 4, 1983 (21 C.F.R. § 316.20).  Since the Orphan Drug Act was passed, over 250 orphan-drugs and biologics have been approved for United States

---

[13] Schneeweiss S. et al. Aprotinin during coronary-artery bypass grafting and risk of death. NEJM. 2008; 358:771-83

[14] Shaw AD, et al. The effect of aprotinin on outcome after coronary-artery bypass grafting. NEJM 2008; 358:784-93.

[15] Ray WA. Learning from aprotinin-mandatory trials of comparative efficacy and safety needed. NEJM 2008; 358:840-2

[16] Henry DA, et al. Anti-fibrinolytic use for minimizing perioperative allogenic blood transfusion. Cochrane Database Syste Rev 2007;4:CD001886.

[17] Fergusson DA, et al. A comparison of aprotinin and lysine analogues in high-risk cardiac surgery. NEJM 2008; 358:2319-31.

marketing out of 1952 designated orphan-products.  To encourage the development of orphan products for underserved populations, sponsors of approved products designated by FDA as orphan products, such as aprotinin, will be given seven years of exclusivity after approval. Sponsors of orphan drugs are also granted certain tax incentives for conducting clinical research. FDA's Office of Orphan Drug Products Development (ODPD) must first designate a product as an orphan product and then it will assist a sponsor in coordinating the research for FDA and approval.  There is also grant funding from FDA designated for orphan products available to help a sponsor defray the costs of conducting clinical research and testing.  Generally, health insurance will pay the cost of orphan products after approval by FDA for marketing. Historically, the approval time of orphan products will be less than for other drugs because the application receives an expedited or accelerated review and approval based on public health benefit.  Orphan products pursuant to section 526 of the Act are exempted from payment of user fees.  The application to request orphan-drug designation is submitted to FDA before the sponsor submits a New Drug Application.

### 1.  BAYER'S APROTININ IND

86.     Aprotinin was investigated for human use in the United States under Investigational New Drug (IND) application # 33,145 (21 C.F.R. Part 312). According to a meeting summary written by Donald Suko, Miles Inc., FDA and Miles had held an October 17, 1988 strategy workshop to discuss its marketing and clinical development plans for aprotinin (BAY00110895-00).  Dr. Simon, Bayer, began the meeting with Bayer's review of the current marketing situation for aprotinin outside the United States.  FDA was told that sales of aprotinin had been declining at a rate of 19% per year since 1975.  Bayer's shares of the world market for

aprotinin had declined from 62.7% in 1983 to 51.6% in 1987. The reasons given to FDA for the decline in sales included a lack of patent protection and a lack of product differentiation.

87.     Miles indicated that a promising area for aprotinin use was for open heart surgery (OHS). The 1987 clinical Lancet study with aprotinin (Dr. Royston (1987)) had shown an 80% (8 fold) reduction in blood loss compared to placebo and 93% reduction in blood transfusions. In another article (Bidstrup, et al.) presented at the Thoracic Society Annual Meeting, FDA was told that there had been 46% and 78% reductions in blood loss and 50-90% reduction in blood transfusions. The Miles minutes indicated that "[c]learly such effects offer significant sales potential, given, the shortage of blood supply around the world, the high cost of donor blood and the concern for infection, i.e. Hepatitis and AIDS."

88.     Dr. Bonney, Miles, provided FDA with its US Clinical Development Plan based on: 1) FDA's acceptance of Orphan Drug status for Trasylol and repeat open heart surgery for CABG; and 2) repeat cardiac valve replacement, and that FDA will not require invasive cardiac catherization for testing graft patency, i.e. a non-invasive technique will be acceptable. It was estimated by Bayer that it would take about one year to complete a proposed clinical plan at a cost of $1.7MM, based on whether or not FDA required vessel patency testing. The key incentives for Bayer obtaining approval as an orphan drug included seven years of marketing exclusivity; a clinical protocol written with assistance from FDA; tax credits (50% of qualified development costs); and FDA grant money. Bayer was intended to seek designation as an orphan drug for OHS involving repeat valve replacement and repeat CABG. Through use of this orphan strategy, FDA was told that Bayer anticipated that aprotinin would be commercially

60

available in the United States by 1992 and still provide a cushion of seven years of exclusivity with protection from generic encroachment.

89.     Bayer also intended to pursue obtaining FDA's approval of a new primary OHS indication. Following Bayer's approval of a primary OHS indication, aprotinin would obtain an additional three years of marketing exclusivity. (Bayer would get approval of an NDA supplement for a primary indication for aprotinin in 1998.)

90.     There are Miles internal minutes of a Trasylol Project Team meeting of November 8, 1988 (BAY00110901-2). The Trasylol Project still was not funded by Bayer. At that time, there was receipt of acute animal toxicology reports, however written in German and which needed to be translated into English. The animal toxicology was forwarded on to Mr. Hartnagel.

91.     The pharmacology section of Bayer's new IND had been completed not by Bayer or Miles, but by Dr. Emerson of Cutter Regulatory. As discussed by Dr. Bonney, there had already been approval of clinical protocols, physicians' brochure and a summary made of previous human experience. A decision was still needed as to when Bayer should submit its application for designation as an orphan product to FDA's Office of Orphan Drug Products.

92.     Miles was aware that there had been an earlier IND submitted for Trasylol (1960s) but that the IND could not be located. FDA already had a drug master file (DMF) for aprotinin.

93.     Bayer had initially obtained the Trasylol trademark in 1957 with a renewal in 1977. There had been an earlier meeting, not with FDA but with National institutes of Health

(NIH), about aprotinin.  Dr. Royston was brought to the NIH meeting by Bayer as an outside clinical consultant to convey his own personal experience with treating patients with Trasylol.

94.     On June 15, 1989, FDA had sent a letter to Miles, Inc. regarding its submitted IND #33,145.  Bayer was proposing to use a new higher-dose of Trasylol in Bayer's United States Phase III clinical protocols.  FDA recorded a June 9, 1989 teleconference discussion held between Marsha Petersen and members of FDA.  FDA notified Bayer that its proposed IND studies could not be initiated because there were remaining preclinical testing deficiencies under 21 C.F.R. § 312.42(b).  The agency summarized the deficiencies:

> The doses proposed in your three Phase III clinical protocols, study number D89-004, D89-005, and D89-006, are not adequately justified.  The lack of an adequate safety margin between the preclinical no effect dose and the proposed human dose, together with a lack of rationale for the necessity of the proposed human dose lead us to conclude that those studies may pose a significant and unreasonable risk to human subjects.

95.     In follow-up to the FDA's IND's HOLD communication, there is an FDA summary of a subsequent IND pre-Phase 3 meeting held between Bayer and FDA.  The minutes are written by Stephen Fredd, M.D, Director, Division of Gastrointestinal and Coagulation Drug Products and copies were provided to Miles, Inc. ("BAYER") on November 2, 1989 (BAY00102387-96) for its own files.

## 2.  BAYER'S PREPHASE 3 MEETING

96.     In terms of FDA's looming public health concerns surrounding consideration of aprotinin, in 1985 the CDC had issued routine precautions for all personal-service workers (hairdressers, barbers, cosmetologists and massage therapists) to help curb the transmission of disease to personal-service workers to clients despite a scientific lack of evidence of transmission

risk by these routes. The FDA of 1989 was facing a potential epidemic of life-threatening infectious disease transmission in the nation's blood supply.  FDA and the public were concerned about the transmission of at least Hepatitis B and AIDS in the blood supply. Therefore, the FDA meeting with Bayer about aprotinin viewed a product like aprotinin with a history of safe human use outside the US and a proven ability to reduce the need for transfusion of blood products as a product with a tangible potential health benefit.   The FDA's summary of the aprotinin meeting:

> BACKGROUND:
> Aprotinin is a polypeptide that is derived from bovine lung.  Aprotinin inhibits the activity of many proteolytic enzymes including trypsin, kallikrein, plasmin, and urokinase.  This drug is marketed abroad under the trade name Trasylol by Bayer AG and is used for counteracting excessive bleeding that occurs during certain types of surgery and shock.  It also has been used in Europe for treatment of acute pancreatitis although not as an approved use.  In 1966, Trasylol was submitted to the Agency to request approval for an indication for acute pancreatitis but which was not approved.  The firm was now planning to conduct phase III studies for approval of an indication for prophylactic use in adults undergoing open heart surgery to reduce or eliminate the requirement for homologous (donor) blood transfusions.  The doses being proposed in the Phase III protocols were substantially higher than the doses being used in Europe for existing accepted indications.
>
> Aprotinin's biological activity is expressed in "kallikrein inactivator units" (KIUs).  One mg of Aprotinin is equal to 7,143 KIUs.  The drug is to be packaged in 50ml vials and each 50 ml vial contains 500,000KIUs.

97.     The FDA indicated that the purpose of its meeting was to discuss Bayer's proposed Phase III studies for marketing of aprotinin.  At the time of the meeting, Bayer's IND was on clinical hold as the direct result of FDA's June 15, 1989 letter.  The letter listed "that the doses proposed in the three Phase III trials were not adequately justified from the preclinical standpoint."  The FDA's Pharmacology Review had noted that the sponsor had failed to conduct

a "subacute intravenous infusion toxicity study" in a non-rodent species. The deficiencies of

Bayer's animal testing would be one primary topic for the meeting.

98.     The FDA's summary continued on about the preclinical risks noted in the animal

studies that it reviewed for aprotinin.   Dr. Posner, Vice President, Medical Affairs, Miles Inc.

began the meeting and was followed by Dr. Detzer, Bayer AG, West Germany, Institute of

Toxicology (underlining added for emphasis):

> Dr. Posner opened up the meeting by explaining that Miles is wholly owned by
> Bayer AG and by reviewing Trasylol's history.  Trasylol had been used in Europe
> for approximately 30 years for hyperfibrinolysis.

> Dr. Detzer reviewed toxicology studies that had been previously presented in the
> IND.  These studies were performed in dogs and a summary of their findings
> includes allergy-like symptoms, independent of dose; <u>macroscopic and
> microscopic kidney changes</u> (large, pale kidneys, hyaline-droplet changes within
> tubular cells)…;increases in urinary enzymes…; and elevated BUN and creatinine
> clearance.  The dog seemed to be the most sensitive species for renal proximal
> tubule toxicity.  Dr. Detzer said that their findings indicate that the kidney damage
> is due to an <u>overload of the proximal tubule cells inevitable from such high dose
> administration</u> of the drug <u>rather than from the drug being toxic</u> itself and damage
> the kidney directly.  He said the fact that the <u>kidney cells do survive and continue
> to function and that the kidney was found intact</u> in a broad dose range indicates
> that the damage is due to <u>overload of the proximal tubule cells.</u>  Furthermore,
> <u>nearly all the damage is reversible in eight weeks showing complete
> morphological rebound.</u>  Renal impairment was only found when using very high
> doses.

> Dr. Choudary asked about their <u>cardiovascular study in doses</u> which showed <u>EKG
> changes at almost all doses studies</u>.  The firm denied adverse cardiac changes and
> said that any changes in the EKG could be attributed to increased histamine
> release which results in an increase in heart rate.  Dr. Choudary reminded Mr.
> Detzer of the fact that there was <u>sinus bradycardia and elevated ST segments</u> as
> well.  He said that it this is an allergic reaction appearing as a cardiac change, then
> the firm should provide evidence from studies demonstrating that the drug has a
> positive effect on histamine release which would better support their case. He also
> asked if <u>intolerance of high dose infusions</u> caused discontinuation of some
> animals from a study after 5 weeks and whether the animals which survived up to
> 13 weeks showed EKG changes.  The firm responded that discontinuations

occurred primarily as a result of manipulation of the animals, not as a result of drug effects….

Dr. Choudary stated that the firm did not associate cardiac changes with histamine release in their IND. The firm responded by emphatically stating that they interpret the cardiac changes in dogs as not clinically relevant; the reaction is not dose related; pseudoallergy typically occurs in dogs; it has not been observed in cats. They added that this occurrence is not a toxicity but is a typical way of handling foreign proteins by renal tubular cells. The renal cells may burst once they are overloaded, but this is due to overload of lysosomal capacity from administering too larger of a dose.

Dr. Temple asked the firm what differences it makes clinically if the damage was directly due to the drug or indirectly due to an overdose once the cells are destroyed. He suggested to the firm that they perform a study administering an antihistamine first and see if the pseudoallergic responses (EKG changes and itching) are blocked.

Dr. Fredd asked about the allergic potential of Aprotinin. The firm stated that immunology studies in dogs are not predictive for humans. Human experience shows that the chance for anaphylaxis is higher with a second treatment of Trasylol but the rate is very low. A representative from Bayer said that clinical studies have been done in which up to four courses have been given; rechallenge was preceded by an eye drop test. Rechallenges were 4 weeks apart and allergic reactions did not occur. Dr. Posner said that he believes the allergic response is specific to dogs…Dr. Choudary expressed concern that the doses given in the IV toxicology studies were not adequate to justify the doses proposed for this indication.

99.    Dr. Sharon Bonney, Associate Director of Medical Research, Miles, Inc. reviewed the history of Trasylol and its adverse event profile for FDA. She indicated that Trasylol had started   marketing in 1959 outside the US for treatment of hemorrhagic pancreatitis. Trasylol was later approved for use for treatment of traumatic/hemorrhagic shock, septic/endotoxic shock, fat embolism, prophylaxis in upper abdominal surgery, and to control hemorrhage due to hyperfibrinolysis. Trasylol was marketed in 33 countries for an approved dosing of 500,000-1,000,000 KIUs initially followed by 200,000 KIUs per hour until bleeding was controlled. The

adverse effects reported for Trasylol at that dose included local thrombophlebitis and hypersensitivity reactions (including anaphylaxis) at an incidence of less than 0.1%.

100.    Bayer proposed to use a higher dosing regimen for Trasylol in its US Phase III study that it called the "Hammersmith Regimen".  In this regimen for cardiac bypass procedures (CBP) for open heart surgery, the investigations would use an initial loading dose of 2,000,000 KIUs followed by 500,000KIUs per hour throughout the duration of the operation (4-6 hours) with 2,000,000KIUs added to the oxygenator prime.   This new dosing regimen was developed empirically from a series of aprotinin studies conducted at Hammersmith Hospitals in London. One of the original clinical investigators was Dr. Royston, who now was brought to FDA as Bayer's outside clinical consultant.  Dr. Royston was to provide FDA's reviewers with his own real-world personal clinical experience with use of Trasylol in patients for open heart procedures.

101.    There had been two earlier studies done at Hammersmith Hospital using roughly one-half of the dose requested ( half-Hammersmith or Regimen B) for the US Phase III studies. Dr. Royston, based on his own personal experience treating with 300 patients with aprotinin, told FDA's reviewers that they should disregard their concerns about the adverse dog kidney findings.  The agency's summary of Dr. Royston's clinical information and presentation (underlining for emphasis):

> Dr. Royston presented a summary of the rationale for aprotinin and his clinical study experience.  He explained that the heart/lung machine is a massive foreign surface that dramatically alters the physiological activities of blood (clotting cascade/complement, fibrinolysis, kinins, plasmin, and increased inflammatory response.)  Heparin has always been given to block coagulation.  Dr. Royston tried Trasylol hoping to block white cell changes and inflammatory reactions. Although Trasylol failed he noticed that Trasylol patients bled less after the traumatic procedure.  Hence, he looked at blood loss and found that Trasylol patients required fewer units of donor blood.  The results appeared to be dose related.  As a result, he initiated studies to determine if blood transfusion could be

eliminated completely if he increased the dose of Trasylol to a plasma level of 200 KIUs/ml through the operation by giving an extra dose into the oxygenator. Dr. Royston's results showed that roughly 25% of the patients required transfusions with donor blood or RBCs, representing a significant reduction in total transfusions. Furthermore, although patients who are undergoing their second by-pass always bleed more than first time patients, they required 0.5 units of donor blood per patients compared to 3 units of donor blood per patients in the placebo group.  Regarding the allergy issue Dr. Royston said that a test dose is always given.  He expressed the view that the adverse renal findings in dogs were being over emphasized and that his patients have shown no change in serum creatinine.  Dr. Royston added that none of his patients went home anemic; however, glucose levels and WBC's changed in treated groups.

Dr. Royston said that using the Hammersmith regimen, one could anticipate a blood level of approximately 280 KIU/ml.  He stated that he has treated approximately 300 patients (including 4 patients twice) and has yet to see a case of anaphylaxis.,  If anaphylaxis were to occur it would be of little clinical significance since the patients is in a protected environment in surgery or a post surgical ICU where emergency care is available instantly.

102.    Dr. Fredd asked Dr. Royston if he had ever seen interactions occur between the use of heparin and aprotinin. According to FDA's summary, Dr. Royston indicated that, despite in vitro findings that would suggest changes, he personally had not observed an increased risk of bleeding in vivo for patients and that he also had not seen any changes produced in platelet aggregation.  Dr. Choudary asked Dr. Royston if the platelets from previously treated patients had also been studied to look for ex-vivo changes.  Dr. Royston indicated that he had detected no difference in platelet function for any of his patients.

103.    Dr. Fredd indicated to Bayer that the Agency still needed to have safety information including characterization of the adverse drug reaction (ADR) profile for a new high dose Hammersmith regimen as well as additional safety information for all the proposed doses. Regarding the use of the Hammersmith data, Dr. Royston "cautioned that some of the safety data was obtained using a product that contained benzyl alcohol".  He explained that "in England it is

only available on compassionate basis reserved for those who are at risk of bleeding and it not used in routine primary coronary operations". Dr. Royston added that "[i]n Germany and on the Continent Trasylol's use is not restricted."

104.   Dr. Fredd asked if all patients' outcomes had been similar between treated and untreated patients. Dr. Royston said he had not noticed there was any difference (increased risk) for complications. He also said there appeared to be no effect on a CABG graft's patency but that further studies were underway to support that claim. With regard to safety information from the non-US clinical trials, Dr. Bonney said there had been no evidence of renal problems in any of the patients. Some studies had shown increased serum creatinine, but that with further analysis there was no difference when compared to placebo.

105.   Dr. Choudary pointed out to Bayer that they had not used any other measure of kidney function other than serum creatinine. Dr. Aronoff, another outside clinical expert brought to the FDA meeting by Bayer, Professor of Medicine and Pharmacology, Chief Division of Nephrology, University of Louisville, KY, told FDA's reviewers that it was his clinical opinion that obtaining only a serum creatinine would be adequate to quantify a patient's renal physiology. Dr. Royston added that Trasylol treated patients had shown significant naturesis and diuresis. Dr. Fredd emphasized that there would be a need to have adequate patient fluid management instructions in the product label.

106.   Bayer proposed conducting Phase III protocols for prophylactic use in adults undergoing open heart surgery to either reduce or eliminate requirements for homologous blood transfusion. Bayer proposed three protocols: 1) Protocol D89-004 repeat CABG patients; 2) Protocol D89-005 primary valve replacement; and 3) Protocol D89-06 repeat CABG patients

with a subgroup for examination of graft patency.  All three protocols were to use Bayer's new US  higher Hammersmith regimen.  Protocol D89-005 also would include a comparator group using a one-half Hammersmith regimen (Regimen B) dose.

107.   FDA's Dr. Robert Temple indicated that Bayer could be unnecessarily delaying completion of its clinical trials if it limited enrolled to only patients for repeat CABG (D89-004). Dr. Temple suggested that graft patency be made a primary endpoint so that Bayer would not have to restrict itself to repeat CABG enrollment.  Both Dr. Fredd and Dr. Temple agreed that a study for valve replacement and a study for repeat CABG would be sufficient for approval of an NDA, if the outcomes were successful in terms of the final indication for the label.

108.   Dr. Bonney indicated to FDA that patients previously exposed to aprotinin would have to be excluded.  Dr. Temple indicated that they did not need to be excluded as long as they tested negative for allergy at the initial test dose.  However, Dr. Bonney reiterated to Dr. Temple that patients are at increased risk of allergy and hypersensitivity if previously exposed to aprotinin as an investigational "biologic" topical hemostatic agent, fibrin sealant (Immuno AG), which also contained aprotinin.

109.   Bayer's Protocol D89-004 was to be conducted at the Cleveland Clinical where the fibrant sealant of aprotinin was undergoing investigation as a closure for aortic suture lines. However, Dr. Temple said that if Bayer persisted in conducting the study for aprotinin at the Cleveland Clinic, then Bayer would need a right to reference medical records of patients with exposure to investigational use of the aprotinin sealant.  Use of the Cleveland Clinic could unnecessarily delay the study with additional questions and may eventually complicate the end results.

110.     For data analysis, Dr. Kaufman, Manager, Biostatistics, Miles Inc., proposed a one-tailed test.  He felt that would be sufficient since all Bayer needed to show FDA was that Trasylol was better than placebo.  However, Dr. Temple told Bayer that FDA is accustomed to a two-tailed analysis and he cautioned Bayer not to skimp on the population size for showing efficacy for other parameters that would alter proposed sample size calculations.

111.     FDA agreed that repeat and primary CABG graft patency studies did not need to be   stratified in order to allow all patient data to be able to be pooled and analyzed together. When Bayer reviewed its proposed exclusion criteria for the investigations, Dr. Fredd took issue with Bayer's use of an exclusion of patient data for all patients dying within 24 hours of surgery. He thought that exclusion should be reduced to include only patients dying within six hours post surgery.

112.     Bayer brought up at the meeting the issue of Trasylol's exclusivity with FDA approval.  The FDA wrote:

> Trasylol is off patent but has never been introduced in the U.S.  Dr. Temple said the product appears to qualify as a new molecular entity, in which case it would be eligible for 5 years exclusivity.  He suggested they write to the Agency for an opinion.

113.     Finally, Dr. Fredd brought up Bayer's lack of subacute infusion toxicity study in the IND in a second, non-rodent species, the subject of the FDA's hold letter.  There was further discussion of whether human experience would be sufficient to suffice as support for subacute toxicity.  Dr. Choudary argued that a study in a second species should still be useful safety information since Bayer had provided very little toxicology data for safety of infusion at higher doses.  Bayer had fulfilled the usual Agency requirements, but most of the available human data had been obtained at doses much lower than the new proposed Hammersmith Regimen.  Dr.

Fredd "strongly suggested that Bayer perform the study" however, he then added that such testing "wasn't mandatory". He noted that that "since the firm has postulated a reason why the drug provokes renal changes they need to test it". Dr. Fredd placed the final responsibility for ensuring adequacy of renal testing and assurance of human safety on Bayer. Dr. Fredd added that the histamine study still was needed.

114.    The FDA's SUMMARY of the pre-Phase III meeting:

Trasylol may decrease the number of units of blood needed during certain types of surgery, and may also eliminate the need for transfusion entirely. The proposed Phase III trials will remain in clinical hold. It was suggested that the firm:

   i.        Provide a subacute IV infusion toxicology study in a rodent species.
   ii.       Show that the drug has a positive effect on histamine release through pretreatment with an antihistamine. EKG changes should be blocked.
   iii.      Determine the cause of the renal damage.
   iv.      Try to determine plasma levels after dosing.
   v.        Provide safety information on the Hammersmith Regimen.
   vi.      Document the specifics in fluid management so that they can be incorporated in the labeling.
   vii.     Rewrite Phase III protocols incorporating suggesting on patient populations, statistical analysis, dose ranges, patient criteria, and efficacy analysis.

115.    Bayer's Pre-NDA meeting with FDA was held in June 1991. (BAY00329792-5)

**3.    BAYER DISREGARDS OUTSIDE MEDICAL EXPERT'S RECOMMENDATION AGAINST TRASYLOL IN THE UNITED STATES BASED ON UNACCEPTABLE RISK**

116.    Before submission of the NDA for Trasylol to FDA, Miles Pharmaceutical Division had obtained an outside expert medical review of Trasylol's Summaries of Efficacy and Safety Data for the NDA by Dr. Bertram Pitt, Professor & Associate Chairman, Department of Internal Medicine, University of Michigan Medical Center according to his November 4, 1992 letter sent to Timothy Seaton, MD, Miles (BAY00983471-2). Dr. Pitt had charged Bayer a fee of $2000 to review the Trasylol Summaries for its clinical studies of coronary bypass

cardiovascular surgery.  Dr. Pitt's response should have provided Bayer notice of the increased

risk for Trasylol in terms of mortality, graft patency and renal and hepatic failure before it

submitted the NDA to FDA.  It did not appear that Dr. Pitt's analysis and concerns from

reviewing the Summaries of the clinical data were shared by Bayer with FDA.

117.    Dr. Pitt wrote that, looking only at the IND clinical results in the Summary of

Efficacy and Safety, he could discern negative safety trends for Trasylol (Underlining added for

emphasis):

> There is in my opinion clear evidence of efficacy based upon the significant
> reduction of the use of blood transfusion in both the US and European studies as
> well as shortened operative time.  While there are clearly important parameters, I
> was concerned by the adverse trials in regard to safety.  While reasonable
> explanations are given to the excess in incidence of myocardial infarction in the
> treatment group the evidence for an adverse effect in regard to renal and hepatic
> function as well as the trends for an increase in graft closure and most
> significantly for adverse trend in mortality make me concerned.  Although none
> of the studies were powered to look at mortality there is nevertheless a clear trend
> toward excess mortality in the US studies.  While I did not perform a statistical
> analysis I would believe that if one performed a metanalysis of the US trials that
> you would be close to statistical significance for adverse effect on survival.
> (BAY00983471)

118.    Dr. Pitt's letter continued to provide his discussion of risk versus benefit and that

he in 1992 would not be able to recommend approval for Trasylol in the United States based on

unacceptable risk (underlining for emphasis):

> Although it would be desirable to reduce blood transfusion requirements for a
> potential reduction in the risk of AIDS, hepatitis, and other consequences of
> transfusion, I believe that given the current quality of blood transfusion services
> in the United States that these potential benefits are more than offset by the real
> increase in risk to the patient in regard to hepatic function, renal function, graft
> closure and mortality.  I believe that even if the drug was approved by the FDA,
> which I have considerable doubts, the company may face severe liability risks in
> the future if current trends for mortality are substantiated by future metanalysis of

future randomized trials, which would likely be performed in view of the trade offs in risk and benefits.

In summary, I do not believe that the potential benefits for Trasylol balance the observed risks and I would not recommend pursuit of this indication in the United States. (BAY00983471)

### 4.  BAYER'S SUBMITS NDA #20-304 APROTININ (TRASYLOL)

119.    Bayer's NDA 20-304 for aprotinin (Trasylol) was submitted to FDA on 11/24/1992 to obtain approval of aprotinin for prophylactic use to reduce perioperative blood loss and homologous blood transfusion requirements in patients undergoing CPB surgery at risk of major perioperative hemorrhage.  The NDA submission consisted of 115 volumes.  The FDA's assigned Medical Officer Reviewer, Dr. Lilia Talarico, indicated in her Medical Officer Review (MOR) of April 16, 1993 that the clinical data section consisted of volumes 16 through 38, and Bayer's patient case reports forms (CRF) were contained in volumes 101 through 118. The effects of aprotinin on the coagulation system and possible mechanisms to prevent excessive bleeding during and after CPB, according to the MOR, consisted of the following:

      i.  Inhibition of contact activation

      ii.   Antifibrinolytic activity

      iii.  Prevention of platelet dysfunction.

### b.  FDA CLINICAL REVIEW

120.    Dr. Talarico went on to summarize her understanding of Bayer's ANIMAL TOXICOLOGY and the SCIENTIFIC RATIONALE for use of aprotinin (below).  Bayer's NDA data had provided data for both redo and primary CABG populations.  The FDA medical officer review had (underlining for emphasis) (published FDA MOR for NDA):

No toxicity was detected in mice and rats after oral administration of aprotinin…

In normal conditions, the renal changes induced by aprotinin appear to be reversible because tubular cells are rapidly regenerated. However, the effects of aprotinin on the kidney are enhanced by hypovolemia or renal ischemia. In animals, the effect of aprotinin on the kidney was found to be reversed in 7 days after single i.v. administration in dogs, in 15 days after 6 consecutive daily administrations in dogs, and in 29-57 days after 15 daily administrations in rats and dogs…(BAY00674734-5) .

SCIENTIFIC RATIONALE FOR INTENDED USE:
 The majority of patients undergoing CABG surgery require blood transfusion in the peri-operative period. Some patients develop bleeding tendency of such severity to require reoperation and excessive blood product administration. The need for multiple transfusion can place a burden to the available blood supply and poses potential serious risks to the recipient of the transfused blood or blood products. The risk include blood-related infections, transfusion reactions, alloimmunization.

The risk of transfusing an infectious blood product is dependent on the number of units of donor blood transfused per recipient and on the presence of undetectable infectious blood product within the blood supply available for transfusion. Avoidance or maximal reduction of any blood transfusion can therefore, substantially lower the risk of infection.

The risk of transfusion of infectious agents through excessive bleeding must be considered for some patients (HIV and/or Hepatitis B seropositive). Unavailability as well as unacceptability of donor blood transfusion must be considered for other patients regardless of the absence of other risk factors for excessive bleeding.

The precise nature of the hemostatic defects(s) that can develop during open-heart surgery with cardiopulmonary bypass is still undefined. Extensive coagulation studies have failed to show a consistent pattern of coagulation abnormalities. The complex alterations of the hemostatic mechanisms have been attributed to activation of the coagulation mechanism, increased fibrinolysis and clot instability, and to impairment of platelet function…

The inhibitory effects of aprotinin on plasmin and kallikrein enzymes have been known for decades. Aprotinin has been used for treatment of hyperfibrinolytic states, acute pancreatitis and shock for many years in Europe.

Its use in open-heart surgery started in the late 1970s and early 1980s in the attempt to reduce operative blood loss. However, the administration of aprotinin

at doses ranging from 350,000 to 2,600,000 KIU to patients undergoing CABG or valve replacement produced only modest reduction in blood loss and transfusion requirement. Significant reduction in blood loss was not observed until the aprotinin dosage was increased to reach blood levels adequate to block the action of Kallikrein. These high dose regimen were actually intended to inhibit complement activation and cell activation, and, thus, prevent the damaging effect of extracorporeal circulation (ECC) on lung tissue and pulmonary circulation. In order to achieve the desired concentration of about 4 uM (200 KIU/mL for plasma), a regimen of $2x10^6$ KIU over 20 minute period followed by a continuous infusion of 500,000 KIU per hour until the end of surgery, plus a further $1X10^6$KIU (140mg) added to the prime volume was devised in 1987. Patients treated with this aprotinin regimen were noted to have significantly lower blood loss (47% of that of untreated controls) from the post-operative drains during the day following surgery. Aprotinin effectively reduced blood loss regardless of the type of blood oxygenator used for CPB and in conditions known to be associated with greater risk of bleeding complications, such as repeat open-heart surgery or surgery with infection of native or prosthetic heart valves.

Since the target blood level of aprotinin was not achieved during bypass; the aprotinin regimen was subsequently modified further at the Hammersmith Hospital in England increasing the amount of aprotinin added to the prime volume to a total of $2 X 10^6$ KIU (280 mg). This so called "Hammersmith regimen" was used in patients undergoing repeat cardiac surgery with high risk of excessive peri-operative bleeding. The Hammersmith regimen was more effective in reducing both peri-operative blood loss (80% reduction, p<0.001) as well as the number of patients requiring transfusion (64% vs. 100% in the placebo group). The Hammersmith regimen has been used in most subsequent studies. Since the first clinical trial conducted in Germany in 1983 to compare the effectiveness and safety of Trasylol, C1-Inhibitor and placebo in patients undergoing cardiac surgery, a total of 26 studies have been conducted in US, Europe, UK and Canada (BAY00674736-8).

In most of the non-US studies, the primary criterion of effectiveness was represented by post-operative blood loss measured in volumes of blood collected through thoracic drainage for the first 24 hours and at time of removal of drainage tubes....

Three double-blind, controlled, randomized clinical trials were conducted in US. In the design of these adequate and well-controlled clinical trials, the following issues were of particular importance:

1. the patient population (primary or repeat CABG or CVR)
2. the selection of efficacy criteria (primary=avoidance of blood transfusion, that is reduction in the percentage of patients requiring transfusion; secondary=

reduction in the number of donor blood units transfused, and reduction in perioperative blood loss

3.  the selection for the dosage regimen
4.  the evaluation of safety, particularly evidence of prothrombotic activity, adverse effect on renal function, and allergic/hypersensitivity events.

The efficacy criteria chosen for the US studies differed from those used in the non-US studies …

US Study D89-004 was a single center study performed in patients undergoing repeat CABG. Patients were stratified on the basis of whether or not they had aspirin within 5 days of surgery. US D89-006 was a multicenter study in patients with primary and repeat CABG. Patients were stratified on the basis of CABG procedure and prior aspirin therapy. All patients underwent evaluation of graft patency.
US Study D89-005 enrolled only patients undergoing primary cardiac valve replacement (CVR).

In studies D89-004 and D89-005, full Hammersmith and 50% Hammersmith regimen were compared to placebo. In study D89-006, patients were randomized only to full Hammersmith regimen or placebo.

Studies D89-004 and D89-006 represent the two pivotal studies of the NDA in support of aprotinin's efficacy in reducing perioperative blood loss and donor blood requirements in cardiac surgery…

Study D89-005 will be reviewed only for purpose of safety. All European studies will be reviewed together, except for the study with additional objectives such as Study 0414 whose primary objective was the assessment of graft patency, and Study 0418 which addressed specific safety issues relative to the effect of aprotinin on renal function. (BAY00674740-1 )

### c. UNITED STATES CLINICAL TRIALS

121.    **Study No. D89-004-01** was conducted only at the Cleveland Clinic by Delos

Cosgrove, M.D. as the primary investigator. The objective was to compare the efficacy and

safety of aprotinin at two different doses (high- and low-dose) to placebo for reducing donor

blood transfusion in patients undergoing repeat CABG. The efficacy variables were derived

from the number of units  blood transfused, total volume in mL of blood transfused,  volume of

thoracic drainage from the first 8 hours and then until drains were removed, number of other blood products transfused and reoperation rates because of diffuse bleeding.  The safety variables were monitored for day 1 and day 7 with baseline laboratory tests repeated postoperatively, 1 and 7 days postop and then at 4-6 weeks post-op.  The primary efficacy for the US studies was changed and/or simplified from the non-US endpoints to a percent (%) of patients requiring any blood transfusion, the secondary efficacy variable was the actual number of units of transfused blood.  For high –dose aprotinin (Hammersmith regimen, Regimen A) there were 53 patients (6 females), 49 (5 females) low-dose aprotinin (50% Hammersmith, Regimen B) and 52 (6 females) placebo. There was no requirement that patients be enrolled with a certain percentage of "complex cardiac lesions".   Significantly fewer amounts of blood were required to be transfused for either of the aprotinin treatment arms than for the placebo arm.  However, no statistical benefit was shown for females for either primary efficacy (%) or secondary efficacy in either of the aprotinin treatment arms.  However, both males and females, showed an overall reduction in number of units of blood products transfused for both aprotinin arms compared to placebo, but the  difference in transfusion was only statistically significant for males.  For patients receiving donor blood, the mean number of units of donor blood transfused was not substantially different among any of the three groups (BAY00674761).  There was no overall statistically significant difference in incidence of treatment-emergent events for any of the three groups including death (BAY00674767).   In terms of changes in renal function, a higher incidence of clinically significant increase above baseline in serum creatinine was noted in both of the aprotinin-treated groups, but the difference was not considered statistically significant.  For patients with an increase in serum creatinine of $\geq 2.0$mg/dL from pre-operative baseline the values were high-

dose 1/8 (13%), low-dose 0/6 (0%) versus placebo 1/12 (8%) (BAY00674772). The reviewer wrote: "A dose related effect on renal function was noted which appeared to be enhanced by age, preoperative use of aspirin and ACE inhibitors and by perioperative treatment with aminoglycosides" (BAY00674778) .

122.    **Study D89-005** was conducted at five centers by seven principal investigators, with 23 different surgeons participating in the study.  It used the same US primary and secondary efficacy endpoints.  There was no statistical difference shown among treatment groups in either the percent of patients requiring transfusion (primary efficacy) or the number of units transfused (secondary efficacy).  The range of units transfused in all three groups was actually wider for the aprotinin groups (1-21 units and 1-25 units) than for the placebo group (1-8 units) (BAY00674782).  When the transfusion requirement for the three treatment groups was analyzed over the surgical time interval, the results showed that aprotinin-treated patients were more often transfused intra-operatively than patients in the placebo group. (BAY00674787).  A total of 212 patients were available for evaluation of safety.  Serious or life-threatening events occurred in 12/71 (17%) of high-dose aprotinin patients, 6/70 (9%) of low-dose aprotinin and 6/71 (8%) of placebo patients (overall p=value=0.191).    Death occurred in 3/71 (4%) of the high-dose aprotinin patients; 2/70 (3%) of the low- dose aprotinin patients; and 0/71 (0%) of the placebo (BAY00674791).  When all patients reporting congestive heart failure ("CHF") or heart failure ("HF") or both were combined into a subset, the incidence of CHF appeared dose-related to aprotinin and was 8/71 (13%) in the high-dose aprotinin group, 4/70 (6%) in the low-dose aprotinin group and 2/71 (3% ) in the placebo group (overall p-value=0.1302).  The medical

reviewer had the following comments regarding the apparent occurrence of renal failure in the patients enrolled in this study (underlining added for emphasis):

> If all events reflecting post-operative renal dysfunction are combined (acute renal failure, kidney failure, abnormal kidney function, and tubular necrosis), the respective rates are 8/71 (11%) in the high-dose aprotinin group, 5/70 (7%) in the low-dose aprotinin group, and 0/71 (0%) in the placebo group (overall p-value=0.008). The difference remains statistically significant even if all patients with CHF are excluded (overall p-value=0.019)

> Renal function occurred more frequently in diabetic patients in the high dose aprotinin group; however, the number of patients with diabetes was small. Table 32 (NDA v 1.20, p 685A) shows the incidence of renal dysfunction in association with various additional risk factors in the three groups. Factors associated with development of renal dysfunction in the aprotinin groups were age ≥ 60 years, a baseline diagnosis of CHF, transfusion of 3 or more units of blood, aminoglycosides treatment.

> Most of the patients who experienced renal dysfunction had associated significant cardiac dysfunction with postoperative hypotension. Renal failure occurred within 7 days of surgery; it was usually reversible and its prognosis was related to the outcome for the cardiac failure. (BAY00674796)

123.   The FDA published medical review of this study made the following

CONCLUSIONS AND COMMENTS:

> Aprotinin administered to patients undergoing primary cardiac valve replacement did not provide any clinical benefit in terms of reduction in number of patients requiring transfusion or in average number of units of blood transfused per patients. Aprotinin, however, significantly reduced the thoracic drainage rates.

> The most important adverse events in the high-dose aprotinin groups were represented by higher incidences of CHF and renal dysfunction. The elevations in serum creatinine occurred more frequently in the high-dose aprotinin group, occurred within 7 days of surgery, were related to cardiac dysfunction, and were eversible upon improvement of cardiac function.

> Patients treated with high-dose aprotinin remained significantly longer in the ICU and had longer hospitalization than the placebo patients.

> The overall risk/benefit assessment of aprotinin in patients undergoing primary cardiac valve replacement appears to be unacceptable. (BAY00674798-9)

124.    **Study No. D89-006** was a study performed at five centers by eight principal investigators.  Patients with primary (151 patients) or re-do CABG (63 patients) were randomized to one of two treatment groups: high-dose aprotinin or placebo (BAY00674805).  In terms of treatment-emergent events, serious and life-threatening events occurred in 21/108 (19%) of aprotinin patients and in 16/108 (13%) of placebo patients.  A total of 6/108 (6%) aprotinin patients died and 4/108 (4%) for the placebo (p=0.517) (BAY00674819).  Six patients (6%) in the aprotinin group and 5 patients (5%) in the placebo group showed post-operative renal dysfunction (BAY00674822).  The FDA medical officer review continued:

> The <u>CONCLUSIONS AND COMMENTS</u> for Study D89-006:
>
> Compared to placebo, aprotinin effectively reduced the requirement for donor blood in the overall patient population undergoing primary or re-do CABG. For all patients undergoing <u>primary CABG,</u> the reduction of the percent of patients in the overall aprotinin groups requiring blood transfusion was borderline in the efficacy analysis (p=0.052), and non significant in the ITT analysis (p=0.087).  The number of units of blood transfused, however, was significantly reduced by both ITT analysis (p=0.0246) and efficacy analysis (p=.043).  Also significantly reduced were the total amount of all blood products transfused (p=0.0100) and the thoracic drainage rate for the first 8 hours (p=0.0001). For all patients undergoing repeat CABG, the percent of patients requiring any donor blood (primary efficacy variable) was reduced from 72% in the placebo group to 30% in the aprotinin group, a reduction of 58% (p=0.001 for the efficacy analysis and 0.015 for the ITT analysis)…
>
> In the <u>primary CABG</u> stratum, 20% of patients were females.  <u>In these patient population there was no statistically significant difference in transfusion requirement between the treatment groups…</u>
>
> <u>The percentage of female requiring transfusion in the aprotinin group was higher than the male counterpart</u> (77% vs. 30%). However in the placebo group as well, the number of female patients requiring transfusion was higher than that of male patients: 81% compared to 43%.  <u>The reason for such a difference is unclear, but raises the possibility of a different gender response</u> to the underlying condition besides that than to treatment.

The redo-CABG stratum, only 5 patients (9%) were females: 2 in the aprotinin and 3 in the placebo group. The number was too small to analyze.

The study protocol was initially designed to include a total sample size of 75 repeat CABG designed to include a total sample size of 75 repeat CABG patients and it was amended on 1/23/1991 with the statement that an attempt would be made to enroll sufficient number of patients so that a total of 70 evaluable patients would complete the study.  However, the total number of patients enrolled was 65 and the total number of evaluable patients was only 55.  The reason for reduction in patients number is unclear.  No interim analyses were reported…

When all the centers were combined, the number of patients undergoing repeat CABG who required transfusion was significantly less in the aprotinin group both by ITT (p=0.015) and evaluable patient population analyses (p=0.001)….
The most important safety concern was represented by the higher rate of graft closure observed in the aprotinin group: 16% of aprotinin patients had one or more closed SVG compared to 9% in the placebo group (p=0.170).  The percent of closed SVG was 8% in the aprotinin group and 5% in the placebo group (p=0.248).

Although these differences are not statistically significant, it must be noted that the assessment of graft patency used in this study had numerous weaknesses.…All these factors may have obscured a true difference between the groups.  Moreover, because only 170 patients had readable scans, the study did not have sufficient power to detect a difference at the alpha level of 0.10 specified in the protocol. (BAY00674829-2).

**d.  UNITED STATES HUMAN PHARMACOKINETIC (PK) STUDIES (D90-028, D90-001)**

125.     There were two uncontrolled clinical trials conducted in the US patients to determine the pharmacokinetic (PK) profile of high-dose aprotinin (single I.V. bolus doses of 0.5, 1.0 and 2.0 million KIU).  The PK studies were all performed in patients already scheduled to undergo CABG surgery receiving either high or low-dose aprotinin two days later.  A total of 37 patients were enrolled, with patient data included only in the safety analysis of aprotinin's NDA data.  All 37 patients experienced one or more life-threatening events. In protocol D90-028, none of the six patients experienced a serious or life-threatening event.  However, for