**Exhibit B**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON


IN RE:  TRASYLOL PRODUCTS            )

LIABILITY LITIGATION-MDL-1928        )

                                     )

THIS DOCUMENT RELATES TO ALL         )

ACTIONS                              )

                                     )

_____     )




VIDEOTAPED DEPOSITION OF SUZANNE PARISIAN, M.D.


Phoenix, Arizona

October 6, 2009

9:12 a.m.



Reported by:  Deborah Cleary, RPR/CR

Certified Reporter

Certification No. 50663

1                   SUZANNE PARISIAN, M.D.

2          THE VIDEOGRAPHER:  This is the video operator

3   speaking, Jessica Watson of Merrill Legal Solutions, 25

4   West 45th Street, New York, New York 10036.  Today is

5   October 6th, 2009, and the time on the video monitor is

6   9:12.  We are at the Arizona Grand, 800 -- 8000 South

7   Arizona Grand Parkway, Phoenix, Arizona 85044 to take the

8   videotaped deposition of Dr. Suzanne Parisian in the

9   matter of Trasylol Products Liability Litigation in the

10  United States District Court, Southern District of

11  Florida.

12          Will counsel please introduce themselves for the

13  record.

14          MS. COOK:  Shayna Cook for Bayer.

15          MR. HASTON:  Tripp Haston for Bayer.

16          MR. OVERHOLTZ:  Neil Overholtz for the

17  plaintiffs.

18          MR. MONSOUR:  Doug Monsour for the plaintiffs.

19          THE VIDEOGRAPHER: Will the court reporter, Deb

20  Cleary of Merrill Legal Solutions, please swear the

21  witness.

22

23                   SUZANNE PARISIAN, M.D.,

24  a witness herein, having been first duly sworn by the

25  Certified Reporter to speak the truth and nothing but the

1                    SUZANNE PARISIAN, M.D.

2    truth, was examined and testified as follows:

3

4                         EXAMINATION

5    BY MS. COOK:

6        Q.   Good morning, Dr. Parisian.

7        A.   Good morning.

8        Q.   How did you prepare for your deposition today?

9        A.   I went through my files and went over my adverse

10   and my report, pulled up a few patents that I didn't have,

11   and I discussed it with my -- with the plaintiffs'

12   counsel.

13       Q.   How long did you spend preparing?

14       A.   I would say maybe 15 hours.

15       Q.   Over how many days?

16       A.   That would be over three days.

17       Q.   Where did you prepare for your deposition?

18       A.   In this hotel, the Grand hotel, the room below in

19   the third floor.

20       Q.   And the three days that you spent preparing, was

21   that the past three days?

22       A.   Yes, yes, ma'am.

23       Q.   How long were you meeting with the attorneys

24   during that time?

25       A.   That would be about the 15 hours.

Page 16

1                    SUZANNE PARISIAN, M.D.

2       Q.    Before being contacted by Motley Rice, had you

3    ever heard of Aprotinin?

4       A.    Yes, I had heard of Aprotinin.

5       Q.    How did you hear of it?

6       A.    I had heard of it because I had an -- I'm a

7    pathologist, and I had an interest in coagulation

8    products.  I also had heard of it as a -- involved with

9    anesthesia products when I was at CDRH.  So I was in

10   discussions with anesthesiologist.

11           I was also involved with issues involving

12   cardiopulmonary devices in terms of also blood salvage

13   devices.  So from 1991, I was involved, and so I would

14   hear of Aprotinin as part of the medical regimen that was

15   being used in particularly heart surgery.

16      Q.    You're not saying you were actually involved with

17   Aprotinin while you were at the FDA, are you?

18      A.    No, ma'am.  I'm saying that I was involved with

19   coagulation and blood products, cardiovascular products.

20   So it would be the devices that actually had been used by

21   the cardiothoracic surgeons.  Then I've been involved in

22   litigation, I believe, one case involving cardiopulmonary

23   bypass machines.

24      Q.    Had you ever been involved in litigation

25   involving Aprotinin before you were contacted by the

Page 21

1                    SUZANNE PARISIAN, M.D.

2    processes of the FDA and the role of a manufacturer.

3    That's primarily what I do is to help instruct the Court

4    as to what manufacturers are required to do in the United

5    States.  That's fairly generic.  That's not even Bayer.

6    And then specifically to talk about the information that

7    I've seen as a former medical officer in more than the FDA

8    would see.  It would be the company documents, the

9    depositions, the testimony as to what I saw that the

10   company knew before 1993 before they got NDA approval.

11   Then through the NDA approval process, what they knew.

12   They were seeing human experience, the medical literature,

13   and to tell the jury what my opinion would be based on my

14   experience and training that a manufacturer who -- a

15   reasonable manufacturer would do in order to protect the

16   safety of patients in terms of updating their labeling,

17   pharmacovigilance, monitoring, interaction with the FDA.

18        Q.   So to summarize what you said, I heard you say

19   three things:  The role of the FDA, what Bayer knew, and

20   what a reasonable manufacturer would do; is that correct?

21        A.   Well, I can't say what Bayer knew, but I can say

22   what the documents show that Bayer knew in terms of the

23   information that they had.  Only Bayer could answer for

24   what Bayer knew or why Bayer did things.  But my role is

25   to as if I were a consultant going into a manufacturer, I

Page 22

1                   SUZANNE PARISIAN, M.D.

2    would do the same thing, look at their documents, see what

3    trends and things are there, what they need to address.

4        Q.   So in other words, not try -- you're not here to

5    try to see inside Bayer's mind, but you're here to

6    interpret the documents, what you think they mean in terms

7    of what Bayer knew?

8        A.   Yes.  And that is the same process I did at the

9    FDA.  So I was first taught to do that at the FDA in terms

10   of mandatory recalls, to look at the documents, try to put

11   them into some sequence and how, a chronology, things

12   occurred and what -- and then to give my opinion as to the

13   application of the regulations, which is also something I

14   did at the FDA.

15            Ultimately, the Court determines what Bayer knew

16   and what Bayer did.

17       Q.   So you agree that it's a question for the Court

18   or the jury what Bayer knew; correct?

19       A.   What their motives and what they knew.  That's

20   ultimately the decision of the Court.  All I can do is

21   provide my training and experience and my opinions based

22   on that as to what I am seeing in the documents.

23       Q.   Did you review internal company e-mails when you

24   were at FDA?

25       A.   I did under mandatory recalls.  Unlike the center

1                    SUZANNE PARISIAN, M.D.

2    not listed in the 12 opinions that you're planning to

3    give; right?

4        A.    Sitting here today.

5        Q.    So you agree that in these 12 opinions listed

6    here, there's no opinion that says that Trasylol causes

7    renal failure; correct?

8        A.    Well, no, I do say that.  But I'm not the

9    causation person, and that's why I'm not addressing

10   causation.  What I'm saying is there is knowledge that the

11   Trasylol will -- is nephrotoxic, will injure the kidney.

12   And so that's expressed really through all these 12

13   opinions.  But you're right.  There is no causation

14   opinion because I am not the causation expert.

15       Q.    When you say you're not the causation expert, you

16   mean that your role in the Trasylol case is not to give

17   the opinion that Trasylol causes renal failure or death or

18   thrombosis or anything like that; correct?

19       A.    In the context of a specific patient, because I

20   believe when this goes to court, it would actually have

21   individual patients and I wouldn't be the one saying that

22   Trasylol caused an individual patient.

23            What I do say in my opinions and throughout the

24   report is there is a mechanism.  There's a basis for that

25   it does -- it can be associated and that the company was

Page 33

1              SUZANNE PARISIAN, M.D.

2      A.    Except for my own head.  I can say what's in my

3   own head.

4      Q.    Will you be offering opinions on epidemiology

5   studies related to Trasylol?

6      A.    I believe there's an epidemiologist that's going

7   to be testifying.  I think the way I would discuss

8   epidemiology is, again, in the context of the information

9   that was known to Bayer and in the context of their i3

10  study, the types of pharmacovigilance mechanisms that any

11  manufacturer can use.  So I won't be specifically focusing

12  as an epidemiologist on documents, but I will be

13  discussing what the documents would have shown a

14  responsible manufacturer in terms of pharmacovigilance.

15     Q.    Would you agree, Dr. Parisian, that an

16  epidemiologist would be better qualified than you to speak

17  about the epidemiology studies related to Aprotinin?

18     A.    No, I wouldn't, not in certain contexts because

19  at the FDA, I had to do review and use epidemiology

20  studies with manufacturers.  I still look at epidemiology

21  studies.  I would not be the one who specifically talked

22  about statistical significance and power.  But the use of

23  epidemiology studies for pharmacovigilance, I would have

24  opinions about that.

25     Q.    So you would not defer to an epidemiologist on

1                    SUZANNE PARISIAN, M.D.

2    questions about whether observational studies were

3    properly done, whether a propensity analysis has proffered

4    questions about the studies themselves?

5        A.    I would defer to them on specific things about

6    epidemiology.  But there are uses of epidemiology that

7    I've had to use in terms of the FDA in training.  So I'm

8    not going to be focusing on the epidemiology of the

9    studies.  But in terms of what a manufacturer would have

10   had available to them, the types of studies, the design of

11   a study, what is a study actually designed to look at,

12   those I'll have opinions on.  That's based on my training

13   and experience.  But the specific science of epidemiology

14   would be an epidemiologist.

15       Q.    Okay.  So you would defer to an epidemiologist

16   about the science of epidemiology; right?

17       A.    The specific science of certain articles and

18   talking about different criteria and design.  But I would

19   talk about the use of epidemiology in terms of medical

20   officers in terms of pharmacovigilance.  It's not

21   specific.  It's not specifically focused on key

22   characteristics of an epidemiology study other than what

23   the intended use of a study may have been and some of the

24   shortcomings in terms of the information that can be

25   obtained from the study.

Page 36

1                    SUZANNE PARISIAN, M.D.

2       Q.   So why don't you write at the end of the list,

3    just write world patent and however you want to do that.

4       A.   Yes, ma'am.

5       Q.   And now is Exhibit 4 a complete list of the

6    materials that you've reviewed or relied on in forming

7    your opinions in the Trasylol case?

8       A.   Yes, ma'am.  And I've signed it for you and dated

9    it.

10      Q.   Thank you.  Did you create this list yourself?

11      A.   I did not create it by myself, no, ma'am.

12      Q.   Did you review it?

13      A.   Yes, ma'am.  And then I added additional

14   documents at the end.  I was requested to add any other

15   documents that I may have obtained.

16      Q.   And this list supersedes the list that's attached

17   to your expert report; correct?

18      A.   Yes, ma'am.

19      Q.   How were the materials selected that you

20   reviewed?

21      A.   I was provided about five or six disks usually

22   with a heading like NDA, IND, sales information, broken

23   down that way.  And then I also had access to the, I

24   believe, the discovery website I had, could go in and if I

25   saw something, I could use a search word and look.  So I

Page 41

                    SUZANNE PARISIAN, M.D.

1

2      A.   I would have reviewed -- in terms of Trasylol

3  documents, that's the only database that I -- I know that

4  it was some computer database.  I don't know what the name

5  of it is.  I looked at other databases such as the FDA's

6  database, the NIH database, National Library of Medicine

7  database.  But the only Trasylol specific Bayer documents

8  I looked at was on that database which I don't know what

9  the name of it is.

10     Q.   How were the deposition transcripts that you

11  reviewed selected?

12          MR. OVERHOLTZ:  Object to form.  We have

13  stipulation about that, so...

14     Q.   (By Ms. Cook) Well, did you select the deposition

15  transcripts that you looked at?

16     A.   No, ma'am.

17     Q.   Do you -- do you think there's any depositions

18  missing from this list that you should have looked at?

19     A.   I wouldn't -- I haven't seen anything in any of

20  the discussions that I've come across.

21     Q.   Do you know who the head of global regulatory

22  affairs for Trasylol is?

23     A.   I know that Weidmann and Sprenger were the ones

24  involved in terms of the i3.

25     Q.   The head of global regulatory affairs?  You're a

Page 46

1                    SUZANNE PARISIAN, M.D.

2        A.    In terms of that scenario, clinical practice.

3   Let me see when the last time was.  Pathologists don't

4   tend to treat living patients in a clinical practice.  And

5   people at the FDA don't treat patients.

6        Q.    So my question is a yes or no question.  The last

7   time you treated a live patient was in 1988?

8        A.    Let me look.  It's all just -- let me look at

9   my -- make sure I'm right.  I think the last time I

10  treated a living patient in a general practice taking care

11  of patients would have been 1987 at AVTEX Fibers.

12       Q.    Okay.  And the last time that you treated a

13  living patient at all was 1987; correct?

14       A.    Well, in a clinical -- I mean, I still treated --

15  in terms of a clinical practice, yes.  1987, I was at

16  AVTEX Fibers.  Then I went back and finished my pathology

17  training.  We had living patients that we would do frozen

18  sections on and work in a hospital.

19       Q.    Let me ask you a question that is a yes or no

20  question.  The last time you treated a live patient in

21  clinical practice was in 1987; correct?

22       A.    Yes.

23       Q.    And the last time you wrote a prescription for a

24  living patient was in 1987; is that correct?

25       A.    No.

Page 48

1                    SUZANNE PARISIAN, M.D.

2    for since 1987, would you characterize those as families

3    or -- family or friends or colleagues?

4         A.   It would have been in situations where someone

5    needed medication.  I've written for people who just are

6    sick, and you write a prescription for them.  So --

7         Q.   Just people you don't know?

8         A.   Well, no, I know them, but they're sick.  And so

9    they're patients.  Technically you're taking care of them.

10   You're responsible for their health, so I can write a

11   prescription.  I was up in New York -- I mean, I can write

12   prescriptions anywhere.  So it's not -- I'm not involved

13   in clinical practice.  I don't have patients.  But I can

14   take care of people who are sick.

15        Q.   You've worked at MD Assist since you left the

16   FDA?

17        A.   Yes, ma'am.  It's my company.

18        Q.   And you changed the name in 2007 from Medical

19   Device Assistance to MD Assist?

20        A.   Yes, ma'am.

21        Q.   Why did you change the name?

22        A.   Because it really didn't reflect what I was

23   involved in in terms of the interactions I was having with

24   corporations, with lecturing, after I wrote my book about

25   FDA Inside and Out.  I talk about drugs, medical devices,

Page 53

1               SUZANNE PARISIAN, M.D.

2     United States Public Health Service assigned to the FDA.

3          Q.   So your assignment at FDA was in the part of the

4     FDA that regulates medical devices; correct?

5          A.   Yes, ma'am.

6          Q.   And you never were assigned to the part of the

7     FDA that has the authority to regulate prescription drugs;

8     right?

9          A.   That's correct.

10          Q.   And while you were at FDA, did you review any

11     investigational new drug applications?

12          A.   In a peripheral manner.  I wouldn't have been

13     primarily involved with IND.  We only had 10 medical

14     officers.  There's 300 and something over at CDER.  And so

15     my center would have been quite angry if I was doing

16     CDER's work.

17          Q.   So you were not responsible for reviewing any

18     investigational new drug applications while you were at

19     FDA; correct?

20          A.   That's not correct.  I did review them, but I

21     wasn't the primary reviewer for them.  There are

22     combination products, and also an IND is for biologics,

23     since biologics is IND.  So I was being -- I was going

24     back and forth between particularly for dialysis, new

25     organs, various different issues with biologics, and I was

Page 54

1                    SUZANNE PARISIAN, M.D.

2    reviewing INDs with them as a medical officer.

3         Q.    Okay.  So you were not the primary reviewer for

4    any investigational new drug application involving a

5    medicine while you were at FDA?

6         A.    That's correct.

7         Q.    Right?  And similarly you were not the primary

8    reviewer for any new drug applications while you were at

9    the FDA; right?

10        A.    I would not have been the primary reviewer,

11   that's correct.

12        Q.    And similarly you were not the primary reviewer

13   for any supplemental new drug applications while you were

14   at FDA; correct?

15        A.    I don't recall that I was.  That's correct.

16        Q.    And you never approved a label for a prescription

17   drug while you were at FDA; is that right?

18        A.    I approved a warning that went into ACE inhibitor

19   labels, but I didn't approve the entire label for a drug.

20   Again, that would have been over in CDER.

21        Q.    And did you ever write a label for a drug while

22   at the FDA?

23        A.    The warning for ACE inhibitors.

24        Q.    So you're mentioning this ACE inhibitor warning,

25   and you also talk about that in your report.

Page 57

1                    SUZANNE PARISIAN, M.D.

2    inhibitor label?

3            MR. OVERHOLTZ:  Objection.

4        A.   Well, it would have been the manufacturer

5    interacting with the branch, that cardiovascular branch

6    for hypertensive drugs, and they would change over time.

7    So whoever the reviewer was for this NDA at various times

8    would have been the one who was involved with this 2006

9    label.

10       Q.   (By Ms. Cook) Okay.  Now you've never

11   participated in an advisory committee meeting related to a

12   drug, have you?

13       A.   I've -- well, technically, no.  Would you like --

14       Q.   Okay.

15       A.   -- me to explain that answer or not?

16       Q.   Your answer is, no, you've never participated in

17   an advisory committee related to a drug; right?

18       A.   Specifically for a drug, that's correct, but I've

19   used the drug advisory committee for my devices.  So I've

20   been involved with both drug and device advisory

21   committees.

22       Q.   But you've never participated in an advisory

23   committee meeting related to a drug; right?

24            MR. OVERHOLTZ:  Objection.  Asked and answered.

25       A.   Yes, that's correct.

Page 61

1               SUZANNE PARISIAN, M.D.

2          MR. OVERHOLTZ:  Objection.

3     Q.   (By Ms. Cook) Is that what you're saying?

4          MR. OVERHOLTZ:  Objection.  Asked and answered.

5     Q.   (By Ms. Cook) Yes or no?

6          MR. OVERHOLTZ:  Objection.  Asked and answered.

7     I'll ask counsel to refrain from instructing my witness

8     how to answer questions.

9     A.   No, that's not what I'm saying.  I'm saying that

10    of course there's people in the Center for --

11    Q.   (By Ms. Cook) Okay.  Thank you.

12    A.   But what I'm staying is that in that particular

13    safety issue, I was the only medical officer reviewing it

14    specifically to address the safety issue that had been

15    identified.

16    Q.   And that was the safety issue with dialysis

17    membranes which is a device; correct?

18    A.   No.  It was the safety issue of people dying from

19    anaphylactoid reactions, hypersensitivity reactions.

20    Q.   To the dialysis membrane?

21    A.   No, it wasn't the dialysis membrane.  It was a

22    membrane surface of which there were other things besides

23    dialysis products.  And so I had to determine, number one,

24    what type of membrane surface it was, what was the cause,

25    what was the timing, what was -- why were ACE inhibitors

Page 62

1                    SUZANNE PARISIAN, M.D.

2    causing that.  So in terms of the science, going through,

3    I had to do all of that, looking at combination of drug

4    and device adverse events.

5        Q.   Now you reviewed new device applications;

6    correct?

7        A.   That was one of the things I did.

8        Q.   Did you carefully review the new device

9    applications you looked at while you were at FDA?

10       A.   Yes.

11       Q.   On average about how much time would you spend on

12   them?

13       A.   When are you talking about because from 1991

14   through 1993 I was involved with post market issues which

15   were labeling, marketing, promotion.  In 1993 and 1995,

16   then I was totally focused on new medical device issues.

17   So --

18       Q.   During the time that you were handling new

19   medical device issues, how long would you spend on

20   reviewing a new drug -- device application?

21       A.   It depends.  I was also teaching the staff how to

22   do that, too.  So I would say that over 80 percent of my

23   time was involved with something to do with either an IDE,

24   a clinical trial, a marketing application for approval.

25   Once I -- from '93 to '95, I was primarily involved with

Page 77

1                    SUZANNE PARISIAN, M.D.

2  worked with the MHRA?

3      A.   No, ma'am.

4      Q.   Have you reviewed the laws and regulations that

5  are relevant to the MHRA?

6      A.   For that context of a product, the MHRA was going

7  to call the product a drug.  So I had to go over and argue

8  why it fulfilled their requirements for device and not a

9  drug.  So I had to be -- to discuss the difference between

10  the two products in England.

11      Q.   So other than reviewing the laws or regulations

12  relevant to the difference between a drug and device under

13  the MHRA, have you reviewed any other laws or regulations

14  for the MHRA?

15      A.   Oh, no, not for the MHRA.

16      Q.   Have you reviewed the laws or regulations that

17  govern an MHRA inspection?

18      A.   No.  I've reviewed their inspection report for

19  Bayer, but I've not gone through their regulations.

20      Q.   Other than the Bayer inspection by MHRA, have you

21  ever seen another MHRA inspection report?

22      A.   Yes, ma'am.

23      Q.   And what was the context of that?

24      A.   It would have been primarily involved in

25  litigation.

Page 78

1              SUZANNE PARISIAN, M.D.

2      Q.    So other than the litigation context, have you

3   ever seen an MHRA inspection report?

4      A.    No, I don't believe so.

5      Q.    And other than the MHRA, have you ever interacted

6   with another foreign regulatory authority?

7      A.    Now I assume you're talking about after leaving

8   the FDA because when I was at the FDA we interacted with

9   foreign regulatory authorities.

10     Q.    Who did you interact with?

11     A.    We, that I can recall, we interacted with the

12  MHRA, and we also interacted with Health Canada.  At that

13  time, they were drawing up their Food, Drug and Cosmetic

14  Act for Health Canada.  So they were in our offices, and

15  we were dealing with them in terms of their regulations.

16     Q.    You personally were interacting with Health

17  Canada while you were at the FDA?

18     A.    Yes, ma'am.

19     Q.    Are you familiar with the laws and regulations

20  concerning prescription drugs in Health Canada?

21     A.    No, ma'am, only the interaction in that capacity.

22     Q.    Have you ever consulted with Health Canada?

23     A.    I haven't consulted for Health Canada.  I've gone

24  to Health Canada meetings, but I've not consulted for

25  Health Canada.

Page 80

1                     SUZANNE PARISIAN, M.D.

2       Q.    And so are you familiar with the process by which

3    Health Canada calls an expert advisory panel?

4       A.    You know, peripherally.  I wouldn't say that I'm

5    knowledgeable about -- they don't call that many advisory

6    panels in Health Canada.  And so I'm not familiar with the

7    policies that Health Canada uses.

8       Q.    Okay.  Are you familiar with the laws and

9    regulations for drugs under the EMEA?

10      A.    I have a working knowledge of it.  I wouldn't be

11   a consultant for it.  I look at the EMA website.  I go

12   through EMA documents.  I've done that for litigation, for

13   other things.  I'm not a person that would hold themselves

14   out as an expert consulting for the EMEA, but I'm familiar

15   with their regulations and requirements and their process.

16      Q.    You wouldn't hold yourself out as an expert on

17   the laws, regulations or standards governing the EMA,

18   EMEA; correct?

19      A.    I personally would not.  That's correct.

20      Q.    And similarly you wouldn't hold yourself out as

21   an expert on the laws, regulations or standards governing

22   an EMEA inspection; is that correct?

23      A.    Well, other than that I've reviewed them, I'm

24   familiar with them, I would not be the person that would

25   be a consultant about them.  But I have looked at many

Page 81

1                    SUZANNE PARISIAN, M.D.

2    EMEA inspections.

3         Q.    And are all of the EMEA inspections that you've

4    looked at in the context of litigation?

5         A.    Not necessarily.

6         Q.    What were the other contexts in which you looked

7    at EMEA inspections?

8         A.    It would have been in terms of the conclusions of

9    their inspections, but I don't -- I mean, it's not what I

10   primary do, but I've looked at EMEA inspections.  I just

11   don't recall in what context.  I would say that many of

12   them have been involved with litigation.

13        Q.    Sitting here today, do you remember any context

14   in which you looked at a specific EMEA inspection report

15   that was not in the litigation context?

16        A.    Not sitting here today, no, ma'am.

17        Q.    Now you're not a pharmacologist; correct?

18        A.    That's correct.

19        Q.    And you're not a nephrologist?

20        A.    That's correct.

21        Q.    You're not an expert in the renal mechanism of

22   action of medications; right?

23        A.    Well, I'm not sure.  Can you rephrase that.

24        Q.    Would you defer to an nephrologist in terms of

25   expertise about the renal mechanism of action of

1                    SUZANNE PARISIAN, M.D.

2    time, we had to make it very cost effective.  And so we

3    were limited in the amount that we could ask because it

4    could only be on one page.  So therefore we were just

5    trying to find out information about the timing of the

6    safety issues that were occurring.

7        Q.   Do you consider yourself an expert in designing

8    epidemiological studies based on this experience with the

9    ACE inhibitor study at FDA?

10       A.   I've -- I've -- I consider myself an expert in

11   the review of epidemiological studies because I had to do

12   that for the FDA.  So in looking at what I'm reading and

13   being able to interpret that in terms of public health and

14   the effects, yes.  I'm not the person that would

15   originally design large epidemiological studies.

16       Q.   So would you consider yourself an expert in

17   designing epidemiological studies?

18       A.   It depends.  But in terms of what my primary role

19   is it's usually in the review and the utilization by a

20   manufacturer in terms of putting that information in the

21   labeling, warnings, communications with the FDA and with

22   physicians.  So it's the use of epidemiological

23   information that I would consider myself the expert in.

24       Q.   When you say "it depends," is there any context

25   in which you would hold yourself out as an expert in

Page 97

1                    SUZANNE PARISIAN, M.D.

2       A.   Yes, ma'am.

3       Q.   What's that based on?

4       A.   Based on my training and experience, my training

5    in pathology, my experience in the FDA doing that from

6    1991 through 1995.

7       Q.   Anything else?

8       A.   And then since I've been involved with

9    manufacturers from '95 to 2009, there's various animal

10   data that would go by that I have to look at so, yes.  So

11   I have.  I have had to do that, take animal data and

12   extrapolate to human data.  And then in the litigation and

13   then also for consulting, I still do that, so...

14      Q.   Have you ever performed surgery?

15      A.   Well, yes.

16      Q.   Have you ever performed open heart surgery?

17      A.   Yes.

18      Q.   When was that?

19      A.   When I was in medical school, I was on a

20   two-month rotation on cardiothoracic surgery and we were

21   doing bypass grafts.  So I was in the -- I was not the

22   primary doctor.  I was assisting, and I would be taking

23   the leg veins and helping make the grafts.

24      Q.   What year of med school was this?

25      A.   This would have been in 1970 -- I think, when did

1                    SUZANNE PARISIAN, M.D.

2    I graduate?  '74, '75 period of time.

3        Q.   Have you been involved in any open heart surgery

4    since 1974 or 1975?

5        A.   That would have been primarily it.  I've seen

6    open heart surgery, but I've not been involved in it.

7    That was the last time I was actually in the surgical

8    field involved with it.

9        Q.   When's the last time you saw an open heart

10   surgery?

11       A.   I can't recall.  It would have been probably in

12   the late '90s in a hospital context.

13       Q.   What was the context for watching the open heart

14   surgery?

15       A.   I was at a hospital, went into the OR was

16   watching it.  I wasn't involved in it.

17       Q.   Did you watch the entire surgery?

18       A.   Not that I recall.

19       Q.   Well, certainly you're not -- you wouldn't hold

20   yourself out as an expert on open heart surgery from your

21   time spent watching it or involved in medical school;

22   right?

23       A.   I would not hold my -- I don't think I ever did

24   in my report.  I mean, I'm not an expert in cardiothoracic

25   surgery.  I've been in the OR.  I've seen the procedures.

Page 99

1                    SUZANNE PARISIAN, M.D.

2    I know the heart.  I know the anatomy.  But I'm not

3    holding myself out surely as a cardiothoracic surgeon or

4    an expert in this.

5         Q.   Have you ever discussed Trasylol with a heart

6    surgeon?

7         A.   No, ma'am.  Plus I understand that I would not

8    even be able to discuss this in terms of the

9    confidentiality agreements.

10        Q.   And you're not a cardiologist; right?

11        A.   That is correct.

12        Q.   And you're not a hematologist?

13        A.   I'm not a practicing hematologist but

14   pathologists do hematol -- I mean, they have to learn

15   about hematology in order to run the hematology lab, but

16   I'm not a practicing hematologist.

17        Q.   Are you a legal expert?

18        A.   I don't believe so.

19        Q.   Have you ever prescribed Trasylol?

20        A.   No, ma'am.

21        Q.   Have you ever done a risk-benefit analysis of

22   whether to use a certain dose of Aprotinin in a patient?

23        A.   No, ma'am.

24        Q.   And have you ever performed an autopsy on a

25   patient who had received Trasylol as far as you know?

Page 107

1              SUZANNE PARISIAN, M.D.

2   pathologist, you have an interest in coag.  So there were

3   issues that were not specific to litigation that I had

4   heard of Aprotinin in terms of heparin, Protamine, so I

5   was peripherally aware of Aprotinin before I got involved

6   in litigation.

7       Q.   Have you ever testified as an expert on behalf of

8   a pharmaceutical company?

9       A.   Not at this time, no.

10      Q.   Have you --

11      A.   And there's nothing that would prohibit me from

12  other than being consistent.  But at this time, I have

13  not.  I have not.

14      Q.   Have you ever turned down a case against a

15  pharmaceutical company?

16      A.   Yes.

17      Q.   And why did you do that?

18      A.   Because I did not feel that I had a role to play

19  in that particular litigation.  And I, you know, I don't

20  accept every case that comes through in terms of

21  litigation and drugs.  I get to pick what cases I want.

22      Q.   How many cases have you turned down against a

23  pharmaceutical company?

24      A.   I don't know.  Maybe seven or eight.

25      Q.   And were those all because you didn't feel like

1                    SUZANNE PARISIAN, M.D.

2    you had a role to play in the case?

3        A.   Or I didn't feel that the case was something that

4    I wanted to be involved with in terms of the issues.

5        Q.   Have you ever given an opinion in a case that a

6    medication's label was adequate?

7        A.   Not at this time.

8        Q.   Have you ever given an opinion in a case that a

9    pharmaceutical company adequately studied its medication?

10       A.   Not at this time.  But, again, I pick the cases

11   that I want to take.

12       Q.   Have you ever given the opinion in a case that a

13   pharmaceutical company appropriately followed up on safety

14   concerns?

15       A.   Not yet.

16       Q.   Sitting here today, can you think of a major

17   pharmaceutical manufacturer that you have not testified

18   against?

19       A.   I don't know.  I don't know of them all, and they

20   change.  They change all the time.

21       Q.   How many times has your deposition been taken?

22       A.   It would be over 100 times.

23       Q.   And how many times have you testified at trials?

24       A.   I believe it's around 30 times.

25       Q.   And I'm going to hand --

1          SUZANNE PARISIAN, M.D.

2     A.   I would work -- let's see.  How many days are

3   there?  I work seven days a week, and I would work on an

4   average seven days a week and I would work at least about

5   10 hours a day.  So I work about an 80-hour day -- a week,

6   every week.

7     Q.   Okay.  And what percentage of your time that you

8   spend working do you spend on consulting with companies,

9   let's say, in 2009?

10    A.   In 2009, it would vary.  It would be maybe about

11  10 percent this year.

12    Q.   And in 2008, what percentage of your time you

13  spent working did you spend consulting with companies?

14    A.   I believe last year it was about 20 percent would

15  have been for companies.  And that's for new products and

16  the FDA issues, nothing to do with litigation.

17    Q.   And the remainder of your time in 2008 and 2009,

18  was that spent on litigation?

19    A.   Yes, ma'am.  Every year it changes, and the

20  number -- the amount of litigation has gone up.

21    Q.   And would the amount of your time that you spend

22  on litigation versus consulting with companies, would that

23  correspond to the percentage of your income that's spent

24  on each activity?  Does that make sense?

25         Well, let me ask this question.  In 2009, what

                         SUZANNE PARISIAN, M.D.

1

2    percentage of MD Assist's income was from litigation work?

3        A.   I would say it's probably 90 percent.  I charge

4    manufacturers less because the going rate for

5    manufacturers is less.

6        Q.   And in 2008, what percentage of MD Assist's

7    income was from litigation?

8        A.   That year it would probably have been about 80

9    percent.

10       Q.   And are you the only employee who actually brings

11   in income for MD Assist?

12       A.   I'm the only one involved in consulting at MD

13   Assist.

14       Q.   The only other employee is your husband; right?

15       A.   Correct.

16       Q.   And does anyone pay your husband?

17       A.   Yes, I do.

18       Q.   I'm sorry.  Do any of your clients directly pay

19   your husband?

20       A.   No.

21            MS. COOK:  Let me mark your invoices in this

22   case?

23            (Deposition Exhibit Number 9 was marked

24             for identification.)

25       Q.   (By Ms. Cook) And I marked them all as Exhibit 9.

1                    SUZANNE PARISIAN, M.D.

2     look at what's in the application.  I look at -- I'm not

3     reviewing the FDA.  I look at what the FDA reviewer has

4     said and what they're understanding in terms of the

5     information.

6         Q.   Well, certainly you'd want to consideration

7     information on both sides; correct?

8         A.   If you want to provide me information to look at,

9     yes, I will look at it.

10        Q.   You'd want to consider information on both sides

11    of a safety issue; right?

12        A.   I want to the consider the information that I

13    have.  It's not like I'm looking at information from one

14    side or the other.  I'm looking at the information that I

15    find.  If you have other information you want me to look

16    at, I will look at it.

17        Q.   Would you agree that randomized, double blinded

18    clinical trials are the most reliable studies to evaluate

19    the safety or effectiveness of a medication?

20        A.   It depends.  It depends on the drug, and it

21    depends on whether there's a latency period.  It depends

22    if there's chronic issues.  It depends.

23             The FDA does heavily rely on randomized

24    controlled studies where you're trying to remove bias to

25    support a specific end point for efficacy.  But even in

Page 183

1                    SUZANNE PARISIAN, M.D.

2       A.    Part 99?  No, it's all described there.  And we

3  --

4       Q.    Did you enforce --

5       A.    -- discuss it in here.

6       Q.    Did you enforce 21 CFR 99 when you worked at the

7  FDA?

8       A.    Actually they didn't have 21 CFR part 99 when I

9  worked at the FDA.  It was just totally in violation of

10  the Act.  So for a manufacturer to provide information to

11  physicians about unapproved use changes the intended use

12  of the drug and it misbrands it under 21 USC 352 (f)1 and

13  (f)2 if you don't provided adequate warnings and

14  instructions for use.

15            The product's not approved.  So therefore it's

16  prohibited under 21 USC 331 (a) to provide information.

17  And if you want to look at misbranding, it would be 21 USC

18  321 would be the definition of misbranding under (n).  And

19  so anything that a manufacturer provides is considered

20  labeling.  And if you're providing medical literature with

21  unapproved use, then you've misbranded your product.

22      Q.    Is everything you just said a legal

23  interpretation of what the regulations require and don't

24  require?

25      A.    No, this is what I was required to interpret in

Page 253

1                    SUZANNE PARISIAN, M.D.

2    regulations, is there any other standard of reasonableness

3    that you say was violated in paragraph 392?

4         A.   I believe that my role is to talk about the Food,

5    Drug and Cosmetic Act and the regulations primarily.  And

6    so when I'm talking about the standard of care, if I was

7    consulting for a manufacturer, I would say this is what

8    you need to know and how you apply the law.  So we're

9    talking about the Food and Drug and Cosmetic Act and CFR.

10        Q.   Okay.  Can you name, sitting here today, a

11   reasonable pharmaceutical manufacturer?

12        A.   I think there's lots of reasonable manufacturers.

13   In terms of Bayer, they could be reasonable.  But in this

14   particular case, they're not reasonable with Aprotinin.

15   So I'm not saying that all medical device manufacturers

16   are not reasonable.  But in terms of the conduct with

17   Aprotinin, they are not being reasonable because they're

18   selling a product that they're not doing post market

19   follow up and pharmacovigilance.

20        Q.   Can you name, sitting here today, a reasonable

21   pharmaceutical manufacturer?

22        A.   I think I just answered it.  I'm not saying that

23   Bayer is not across the board.  But I'm saying that in

24   terms of Aprotinin and the documents I looked at at

25   Aprotinin, they're not being reasonable and responsible

Page 254

1          SUZANNE PARISIAN, M.D.

2  when they allow product to be out there with labeling that

3  can potentially hurt people.

4          And marketing, we haven't even talked about their

5  volatile marketing in terms of their full dose and half

6  dose and what they're telling physicians about SIRS, the

7  systemic inflammatory reaction.  That's not reasonable.

8      Q.   Okay.  Putting aside your opinions about Bayer,

9  which I'm aware of from your report, can you tell me the

10  name of a pharmaceutical manufacturer that lives up to the

11  standard of reasonableness that you're talking about in

12  paragraph 392?

13          MR. MONSOUR:  Objection.  Form.

14      A.   I think I've answered it in terms of -- I'm not

15  saying that every manufacturer in the country is not

16  reasonable and responsible, but there are times --

17      Q.   (By Ms. Cook) Can you give me a name?

18      A.   There's thousands of manufacturers.  What I'm

19  saying is that in terms of this particular issue and this

20  particular drug, they're not reasonable and responsible.

21  We're not talking about every manufacturer.  I can't make

22  a blanket statement about every manufacturer's product in

23  this country.  They all have reasonable things where

24  they're reasonable, but they have products where they make

25  -- they make an error in terms of the way they've marketed