**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to:  **ALL ACTIONS**

**BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT
MARK J. S HEATH, M.D., AND MEMORANDUM OF LAW IN SUPPORT**

PLEASE TAKE NOTICE that Defendants Bayer Corporation, Bayer HealthCare

Pharmaceuticals Inc., and Bayer Schering Pharma AG move to exclude certain testimony of

plaintiffs' expert Mark J. S. Heath.

**MEMORANDUM OF LAW**

Mark J. S. Heath, M.D., is an anesthesiologist who used Trasylol with patients

who were at high risk for bleeding.  Expert Report of Mark J. S. Heath ("Heath Rep.") (Ex. A) at

8.  He testified that in "[o]ur total experience we believed aprotinin was reducing bleeding,

reducing the need for blood transfusions."  Deposition of Mark J. S. Heath, M.D. ("Heath Dep.")

(Ex. B) at 202:5-8.  He scaled back use of the medicine after the Mangano and Karkouti articles

were published in 2006, and discontinued its use after the BART study was terminated in 2007.

*Id*. at 253:2-14, 272:14-273:1.

Dr. Heath proposes to testify that Trasylol is an unsafe product and that Bayer

withheld information about the risks of Trasylol from the medical community.  *See* Heath Rep.

(Ex. A) at 15-16.  But he has not employed a scientific method in arriving at these conclusions.

Dr. Heath does not even know what medical literature about Trasylol he has read.  Heath Dep.

(Ex. B) at 57:4-22, 341:14-24.  Rather, he decided to act as an advocate for plaintiffs' position

after plaintiffs provided him with 140 internal Bayer documents, handpicked from among the millions produced by Bayer in this litigation. *Id.* at 298:17-299:7.

Plaintiffs already have advocates and Dr. Heath's testimony as an advocate will not aid the trier of fact. *See U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1376 (S.D. Fla. 2005) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments"). Dr. Heath's opinions should therefore be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## ARGUMENT

### I.  DR. HEATH'S OPINIONS ABOUT THE SAFETY OF TRASYLOL SHOULD BE EXCLUDED AS UNRELIABLE.

Dr. Heath proposes to tell the jury that (1) Trasylol causes renal failure and mortality, *see* Heath Dep. (Ex. B) at 247:3-8, 265:15-267:7; and (2) he "could not envision any patient population for which the benefits outweighed the risks ... when there was an available alternative with comparable efficacy." *See* Heath Rep. (Ex. A) at 10. Both of these opinions should be excluded because they are not based on a scientific foundation.

#### A.  Dr. Heath's Causation Opinion Should Be Excluded.

Dr. Heath's opinion that Trasylol causes renal failure and mortality rests entirely on his reading of certain medical articles. *See* Heath Rep. (Ex. A) at 12; Heath Dep. (Ex. B) at 229:11-230:5. But his literature review was performed in such a haphazard way that it is scientifically unreliable.

##### 1.  Dr. Heath's haphazard review of the scientific literature is insufficient to support his opinion.

Although Dr. Heath, in collaboration with heart surgeons, has administered Trasylol during heart surgery, he does not purport to base his opinions on his experience using

the medicine.  *See* Heath Dep. (Ex. B) at 229:11-230:5 ("Q. With the number of surgeries that you have participated in at your hospital and that others have experience in, do you agree that you would have seen adverse events from the use of Trasylol if there had been any? A. No.  .... I wouldn't be in a position to see that"); *id*. at 249:4-8 (admitting that Dr. Heath has never reviewed his hospital's cardiac surgery database for any evidence of injuries to patients who were administered Trasylol).

Indeed, Dr. Heath's only experience with Trasylol was that it was an *effective blood-sparing agent* that reduced the risks associated with coronary artery bypass graft (CABG) surgery.  *Id*. at 201:5-202:8 ("Our total experience we believed aprotinin was reducing bleeding, reducing the need for blood transfusions."); *id*. at 220:20-221:9 ("I just know . . . that it reduces bleeding, it reduces the need for transfusions, and our complex patients are at more of a risk for bleeding and, also, being in many cases, more fragile, more at risk for the complications of transfusions."); *id*. at 291:6-16 (Dr. Heath is "not a[ware] of anything" that suggests that Trasylol does not effectively reduce bleeding); *id*. at 364:10-365:1 ("[O]bviously, everyone believed and believes that Aprotinin reduces bleeding.").

Thus, Dr. Heath plainly is not offering an opinion based on his own clinical experience.  Where, as here, an expert offers an opinion that conflicts with his clinical experience, that conflict indicates the unreliability of his opinion and its litigation-driven nature. *See*, *e.g., Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) (emphasizing the importance of expert testimony that "grow[s] naturally and directly out of research [the expert has] conducted independent of the litigation"); *Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1362 (M.D. Ga. 2009) (considering "[w]hether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the

litigation, or whether he has developed his opinion expressly for purposes of testifying"); *Craig v. Orkin Exterminating Co.*, No. 99-8931-CIV, 2000 WL 35593214, at *6 (S.D. Fla. Nov. 22, 2000) ("Courts have discounted the reliability of ex parte opinions formed within the context of litigation and not the laboratory.").

Rather than relying on his clinical experience, Dr. Heath arrived at his opinion that Trasylol is unsafe for all patients by reading a subset of the medical literature on Trasylol, which he selected without using any orderly method, and then read uncritically.  The record here demonstrates that in forming his opinion, he failed to employ a methodological approach:

Q.     So, what did you do precisely in formulating your opinions that you have set forth in your report and that you're going to provide today?

A.     I wouldn't describe it as a process, really, not even a systematic process.  It was intermittent review of materials that were Bayer documents and of literature, and that was it, mixture of both of those things.

Heath Dep. (Ex. B) at 54:13-21.

Q.     You're saying this without even knowing whether you reviewed fifty percent of the studies that had been done on Trasylol?

***

A.     That's correct.  I don't know the total number of studies that were done on Trasylol, nor can I tell you the number of studies that I have reviewed.

*Id*. at 341:14-24.

Q.     Did you keep any track of favorable studies or the studies that confirmed the safety of Trasylol while you reviewed them on Medline?

***

A.     I wasn't keeping track of anything when I was reviewing it.

*Id*. at 39:4-12; *see also id*. at 25:14-26:22 (same).  Dr. Heath also "forgot" to include certain articles in his report:

Q.     Are you [aware] of any other study that suggests long-term mortality risk with Aprotinin?

4

A.      After Mangano, other studies came out.

Q.      What are they?

A.      One is Schneeweiss.  S-C-H-N-E-E-W-E-I-S-S.

Q.      That's not on your list of references.

A.      I just realized that.  That's an article I looked that [sic].

Q.      Why wasn't it referenced in your expert report?

A.      Because I forgot to put it in there.

*Id*. at 264:5-19.

Because of his admittedly intermittent and unsystematic literature review, Dr. Heath did not consider the totality of the evidence necessary to offer a scientifically reliable and admissible opinion.  *See*, *e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) (rejecting as unreliable expert's opinion that a drug's risks outweigh its benefits based on "glaring" omission in his review of relevant scientific literature); *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 596 (9th Cir. 1996) (affirming exclusion of expert opinion as unreliable based on district court's finding that expert "has seen fit to 'pick and chose' [sic] from the scientific landscape and present the Court with what he believes the final picture looks like. This is hardly scientific") (alteration in original); *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 472-73 (M.D.N.C. 2006) (rejecting as unreliable expert's literature review based on "a number of disparate and unconnected studies . . . to reach a piecemeal conclusion with respect to general causation").  It is well established that "the trial court must 'make certain that an expert ...  employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233,

1237 (11th Cir. 2005) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Dr. Heath's unsystematic review of the literature does not come close to meeting that standard.

> **2.     Dr. Heath's causation opinion also is unreliable because it does not consider the background rate of the injury alleged and does not set forth a mechanism of action for the injury.**

Dr. Heath's causation opinion fails for the additional reasons that Dr. Heath fails (1) to consider the background risk of renal failure or death for patients who undergo CABG surgery, and (2) to identify a proven biological mechanism by which Trasylol could cause renal failure or death.

*First*, Dr. Heath's expert report omits any discussion of his consideration of the background risk – that is, the "risk ... members of the general public have of suffering the disease or injury that plaintiff alleges without exposure to the drug." *McClain*, 401 F.3d at 1243.  He agrees that there are risks associated with CABG surgeries "whether or not Trasylol or Amicar is being used," but there is no indication that Dr. Heath considered, much less factored out those risks, which he admits include kidney "organ failure."  Heath Dep. (Ex B) at 165:22-166:7; *see also id*. at 163:24-164:17; *cf. id*. at 143:6-17.  Dr. Heath's failure to consider the background rate of renal failure or death renders his methodology unreliable because the trier of fact cannot determine, from his opinion, whether the claimed injury was from the medicine or from some other background risk factor.  *See McClain*, 401 F.3d at 1243 ("[a] reliable methodology should take into account the background risk"); *Kilpatrick v. Breg, Inc*., No. 08-10052, 2009 WL 2058384, *8 (S.D. Fla. June 25, 2009) (expert's failure to offer "sufficient explanation of the background risk" for the injury "casts further doubt on the reliability of his methodology").

*Second*, neither Dr. Heath's expert report, his deposition testimony, nor any of the literature upon which he purports to rely attempts to explain the mechanism by which Trasylol is

supposedly causes injury.[1]  Without any such explanation, Dr. Heath's causation opinion is mere guesswork that is unsupported by scientific foundation.  *See McClain*, 401 F.3d at 1253 ("The underlying predicates of any cause-and-effect testimony are that medical science understands the physiological process by which a particular disease or syndrome develops") (citation omitted); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007) (excluding a general causation expert whose possible mechanisms had not "been tested or proven" because his "theory remains an educated guess"); *Kilpatrick*, 2009 WL 2058383, at *5 (excluding an expert where "none of the articles [upon which the expert relied] explains the mechanism by which bupivacaine damages cartilage").

### B.  Dr. Heath's Opinion that He Cannot Envision a Patient Population for Whom Trasylol's Benefits Outweigh Its Risks Is Inadmissible.

Dr. Heath also seeks to tell the jury that he cannot "envision any patient population for which the benefits [of Trasylol] outweighed the risks[,] especially when there was an available alternative with comparable efficacy."  Heath Report (Ex. A) at 10.  This opinion should be excluded because, among other reasons, it has no foundation.

Dr. Heath is not opining that Trasylol is less safe than placebo.  Heath Dep. (Ex. B) at 46:16-47:16.  His opinion therefore boils down to a comparison of  Trasylol to Amicar and tranexamic acid.  *Id*. at 47:17-48:1, 196:5-15.  But Dr. Heath has "never used" tranexamic

---

[1] *See* Heath Dep. (Ex. B) at 239:15-240:2 (relying on Karkouti, "A Propensity Score Case-Control Comparison of Aprotinin and Tranexamic Acid in High-Transfusion-Risk Cardiac Surgery," Transfusion, 2006; 46(3): 327-38 and Mangano, "The Risk Associated with Aprotinin in Cardiac Surgery," N. Eng. J. Med., 2006; 354(4): 353-65); *id.* at 261:3-23 (relying on Fergusson D., et al., "A Comparison of Aprotinin and Lysine Analogues in High-Risk Cardiac Surgery," N. Eng. J. Med., 2008; 358(22): 2319-31); *id.* at 264:5-267:7 (relying on Henry, "The Safety of Aprotinin and Lysine-Derived Antifibrinolytic Drugs in Cardiac Surgery: a Meta-Analysis," Can. Med. Ass'n J., 2009; 180(2): 183-93, Mangano, "Mortality Associated with Aprotinin During 5 Years Following Coronary Artery Bypass Graft Surgery," J. Amer. Med. Ass'n, 2007; 297(5): 471-9, and Schneeweiss, "Aprotinin During Coronary-Artery Bypass Grafting and Risk of Death," N. Eng. J. Med., 2008; 358(8): 771-83).

acid, *id.* at 195:17-24, and does not know the indications for Amicar. *Id.* at 225:17-20. Nor has he conducted any independent research on either tranexamic acid or Amicar. *See id.* at 104:5-20. Despite Dr. Heath's experience in administering Amicar, he was unable to assess its effect on re-exploration, or to compare it to Trasylol's effect on re-exploration. *Id.* at 199:12-20. Moreover, he testified that Trasylol displayed some superiority over Amicar in terms of bleeding and transfusion. *Id.* at 279:11-23.

Dr. Heath does not even list, let alone discuss and consider, the full spectrum of risks and benefits associated with either therapy. *See, e.g., id.* at 206:2-5 (Q. "Are you [aware] of any studies for the proposition that Amicar reduces the inflammatory response? A. I'm not."). He therefore cannot reliably testify to either the risks or benefits of these medicines. *See In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1068 (D. Minn. 2007) (excluding expert's opinion where there was no "reliable foundation for the opinion as to the comparative toxicity" of the drugs); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 355 (S.D.N.Y. 2005) ("[A]n expert opinion inadequately informed about the factual grounding of the subject it is called to address, bears none of the hallmarks of reliability necessary for the opinion to be admissible").

Moreover, Dr. Heath testified that Trasylol is a more effective blood-sparing agent than either Amicar or tranexamic acid. *See* Heath Dep. (Ex. B) at 210:19-211:2 ("In the high-risk patient, we felt that the primary safety goal in CABG surgeries is to limit blood loss to avoid the several serious risks associated with blood transfusions., that it would have a significant reduction in bleeding, a significant clinical benefit overall"), 347:16-23 ("I think most of us think that Aprotinin is a little better in terms of bleeding than either of those two other drugs."); *see also id.* at 177:17-179:8, 221:23-223:5.

8

Furthermore, Dr. Heath's bald assertion that there is "no patient population" for which the benefits of Trasylol outweigh the risks flies in the face of one of the most recent Trasylol studies, performed by Dr. Keyvan Karkouti – upon whose earlier work plaintiff and Dr. Heath both rely. *See id*. at 246:5-15. That study concludes that "Aprotinin tends to have a better risk-benefit profile than tranexamic acid in high-risk ... patients." Karkouti, "The Risk-Benefit Profile of Aprotinin Versus Tranexamic Acid in Cardiac Surgery," Anesth. & Analg. (2009) (Ex. C) (emphasis added). Ironically, this conclusion is consistent with Dr. Heath's former practice of administering Trasylol to high-risk patients. *See* Heath Dep. (Ex. B) at 210:19-212:7 (Trasylol was used for "high risk patients" "[b]ecause we believed that Trasylol was superior to Amicar in reducing bleeding").

It is settled that "Congress empowered the FDA alone ... to make the necessary risk/benefit analysis involved in the marketing of prescription drugs." *Feldman v. Lederle Labs*., 592 A.2d 1176, 1207 (N.J. 1991). Therefore, it would be inappropriate for Dr. Heath, as a practicing physician with no experience with or ties to the FDA, to opine that Trasylol should not be used *in all medical cases*, particularly in light of his recognition of Trasylol's superiority in reducing bleeding during complex surgeries. For all these reasons, the Court should exclude Dr. Heath's opinions that Trasylol causes renal failure and mortality and that there is no patient population for whom the benefits of the use of Trasylol outweigh the risks.

## II.    DR. HEATH'S OTHER OPINIONS ARE INADMISSIBLE.

Although Dr. Heath is designated as a causation expert, much of his proposed testimony consists of his personal view of Bayer's corporate behavior. The Court should exclude Dr. Heath's sweeping and inadmissible opinions about Bayer's marketing of Trasylol; Bayer's knowledge, motives, intent, and state of mind; and the adequacy of the Trasylol labels. *See* Heath. Rep. (Ex. A) at 13-14, 15-16.

As an initial matter, Dr. Heath lacks adequate foundation to opine on these topics based on review of limited set documents hand-picked for him by counsel for plaintiffs.  *See* Heath Dep. (Ex. B) at 297:23-298:24.  That type of litigation-driven conclusion is inherently suspect under Rule 702.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) (a "very significant fact" that courts must consider is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation").  Most fundamentally, because he was provided with only a tiny fraction of the relevant documents without any context or framework to evaluate those documents, his opinions are unreliable.

Moreover, even assuming Dr. Heath had any foundation for these opinions – which he does not – they are not the proper subjects of expert testimony and are therefore inadmissible under Federal Rules of Evidence 702 and 403.  *See In re Baycol Prods. Litig.*, 532 F. Supp. 2d at 1053 ("Personal views on corporate ethics and morality are not expert opinions"). There is plainly nothing "scientific" about Dr. Heath's proposed testimony about his personal reflections on Bayer's behavior.  *See id.*  As a result, permitting Dr. Heath to testify about his own subjective view of Bayer would improperly inflame and confuse the jury.  *See In re Rezulin Products Liability Litig.,* 369 F. Supp. 2d at 545 ("Even assuming that the proposed ethics testimony were reliable and marginally relevant under Rule 702, it would be likely unfairly to prejudice and confuse the trier by introducing the experts' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards.") (internal quotation marks omitted).

**A.      Dr. Heath's Personal Opinions About Bayer's Marketing Efforts Are Not Admissible.**

Dr. Heath appreciated the information that Bayer provided to him.  *See* Heath Dep. (Ex. B) at 307:25-308:5 ("I received ...  from [Bayer] favorable studies.  And I appreciated receiving them.").  He admits that he attended events at which Bayer's products were promoted, that he met Bayer's sales representatives "multiple" times, and even that he affirmatively asked for additional "material [from Bayer] for teaching."  *Id*. at 322:14-323:20.

Nonetheless, Dr. Heath intends to opine that Bayer somehow unethically marketed Trasylol and influenced the medical community.  Among other things, Dr. Heath intends to tell the jury:

- "I was seeing Trasylol being *heavily promoted* by its manufacturer, Bayer."  Heath Rep. (Ex. A) at 13; *see also* Heath Dep. (Ex. B) at 307:4-18 (noting that Bayer's marketing "felt like a *constant stream of documents*");

- "It was promoted in print and at meetings and conferences, and this promotion *generated the impression* that the reduced bleeding and inflammation produced by Trasylol far outweighed any potential deleterious effects."  Heath Rep. (Ex. A) at 13; *see also id*. at 10 ("[Trasylol's] use was very *alluring and enticing* because of publications showing it reduced peri-operative bleeding and the use for peri-operative transfusions.");

- "[W]hen I was provided with Bayer documents, and began going through those, *I felt there was a lot of inappropriate comments, discussions and behavior* in those documents." Heath Dep. (Ex. B) at 303:21-304:10.

(Emphases added.)

Dr. Heath's opinions about Bayer's marketing are inadmissible for at least three reasons.  First, Dr. Heath's background as an anesthesiologist does not qualify him to opine on the ethics of Bayer's marketing of Trasylol.  *See Dura Auto. Sys. of Ind., Inc., v. CTS Corp.*, 285 F.3d 609, 612-14 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be

responsible science"). Indeed, Dr. Heath concedes that he lacks the expertise to opine on this topic:

Q.   Are you a marketing expert?

A.   No.

* * *

Q.   Okay. You're not an expert on corporate conduct, are you, Doctor?

A.   I'm not.

* * *

Q.   I asked you, if you're an expert on corporate ethics.

A.   No, not compared to a lay person who doesn't work in a corporation. I have to know more about it.

Q.   That wasn't my question. Are you an expert on regulatory requirements that the FDA imposes on pharmaceutical companies?

A.   No.

Heath Dep. (Ex. B) at 304:17-305:9.

Second, Dr. Heath's review of 140 documents provided to him by plaintiffs' counsel supplemented by his admittedly positive personal experiences with Bayer's sales representatives, *see* Heath Dep. (Ex. B) at 307:25-308:5, does not provide a foundation for him to opine about the propriety of Bayer's marketing in general. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 at 197 (excluding medical expert's testimony consisting of "broad assertions about improper industry-wide marketing practices" where the physician's opinions were based on personal experience and a limited review of documents provided by counsel).

Third, Dr. Heath's personal view about the ethics of Bayer's marketing practices is not the proper subject of expert testimony. *See In re Baycol Prods. Litig.*, 532 F. Supp. 2d at 1069. He does not purport to be aware of – much less rely upon – any industry standards in

forming his opinion.  *See* Heath Dep. (Ex. B) at 304:17-305:9, 343:13-344:18.  Courts routinely

exclude "expert" opinions about what companies like Bayer should and should not have done

where, as here, there is no standard underpinning those personal opinions.  *See* Fed. R. Evid.

702; *Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999) ("Without 'industry standards' to

rely upon, [the physician] seems to base his conclusions on his own authority"); *see also In re*

*Prempro Products Liab. Litig*., 554 F. Supp. 2d 871, 879 (E.D. Ark. 2008) (even proposed

*regulatory experts* are not "permitted to talk about or refer to what an 'ethical' or 'responsible'

pharmaceutical company does or would do"); *In re Baycol Prods. Litig.*, 532 F. Supp. 2d at 1054

(prohibiting expert from testifying "as to whether Bayer acted ethically, irresponsibly, or

recklessly").

     **B.**     **Dr. Heath's Opinions Regarding Bayer's Knowledge, Motives, Intent, or State of Mind Are Inadmissible.**

Dr. Heath makes no attempt to conceal his intention to testify about Bayer's

knowledge, motive, intent, and state of mind.  For example, Dr. Heath intends to tell the jury:

- "Bayer developed and executed a program for manipulating the clinical community's impressions and opinions of the safety and efficacy of Trasylol." Heath Rep. (Ex. A) at 14; *see also* Heath Dep. (Ex. B) at 325:17-25 (noting that Bayer had an "agenda to manipulate opinions");

- "Based on my review of the internal documents, it is my opinion that there was a withholding of important evidence, and we were led to make the wrong decision, and unfortunately we did use aprotinin on many patients." Heath Rep. (Ex. A) at 13; *see also id*. at 12 ("Bayer withheld information as well as failed to appropriately investigate known safety signals."); and

- "Bayer was aware of significant risks inherent in the use of Trasylol." *Id*. at 15; *see also id*. at 12 ("I believe Bayer had grounds for concern"); Heath Dep. (Ex. B) at 292:2-13 ("From even before it was approved, they were seeing a possibility of a renal effect, adverse renal effect on the drug"), 302:4-17 ("So the documents that I reviewed, it was very clear that Bayer personnel were aware that there was a concern about ... renal injury and rather than saying we've got to get to the bottom of this...[t]hey focused on how to assuage practitioners concerns, how to manage opinion and deflect concern about it.").

These opinions should be excluded because Dr. Heath has no foundation to opine about what Bayer knew or intended.  Even Dr. Heath admits that he cannot testify with certainty as to the state of mind of Bayer personnel.  Heath Dep. (Ex. B) at 327:16-24.  He simply adopted plaintiffs' theory of the case after plaintiffs gave him a subset of Bayer documents selected to portray Bayer as a bad actor.  *See id*. at 303:21-304:10.  Not surprisingly, Dr. Heath was not provided with any context to evaluate the wrongdoing supposedly evident in those documents:

> Q.    Are you a[ware] of the studies and information that Bayer has provided to the FDA?
>
> A.    No, I haven't seen everything they provided to the FDA
>
> Q.    Are you a Bayer of the safety signal information Bayer has provided to the FDA over the years?
>
> A.    Again, I haven't seen everything they have provided, so I don't know what is in the material that I haven't seen.
>
> Q.    What you've seen has been about 140 Bayer documents supplied to you by plaintiff's counsel.
>
> Mr. Moreland:  Objection to the form
>
> A.    That's correct. All I had access to is what they provide me with.

Heath Dep. (Ex. B) at 297:23-298:24.  Thus, Dr. Heath proposes to opine that Bayer withheld information from the FDA, but concedes that he does not "know for sure" because he does not even "know the totality of what the FDA has seen."  *Id*. at 355:9-356:5.[2]

---

[2] The genesis of Dr. Heath's opinion that Bayer withheld information and campaigned to manipulate the medical community is plaintiffs' theory that Bayer supposedly was not sufficiently forthcoming with respect to the results of two particular studies:  an unpublished study conducted by Dr. David Kress of St. Luke's Medical Center and a study conducted by St. George's Hospital in England.  *See* Heath Dep. (Ex. B) at 308:9-309:11.  However, the study conducted by Dr. Kress was never published because *Dr. Kress himself* did not want to publish it – not because Bayer ever "encouraged or . . . discouraged [it]."  Deposition of Valentine John Pascale (Ex. D) at 842:18-843:12; *see also* Heath Dep. (Ex. B) at 295:7-296:9 (demonstrating Dr. Heath's general unfamiliarity with the circumstances surrounding Bayer's treatment of Dr. Kress' study); Heath Rep. (Ex. A) at Exhibits C and D (Dr. Heath's reference lists which do not

Dr. Heath's opinions also should be excluded because Bayer's purported motive, knowledge, intent, and state of mind are not scientific or technical matters requiring specialized knowledge.  Fed. R. Evid. 702; *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 545-47, 561-66.  Rather, each of these topics is a "classic jury question and not one for experts."  *In re Diet Drugs*, MDL No. 1203, 2000 WL 876900, *9 (E.D. Pa. June 20, 2000).

### C.    Dr. Heath's Opinions About Bayer's Labeling of Trasylol Should Be Excluded.

Dr. Heath intends to tell the jury that Bayer improperly labeled Trasylol, notwithstanding that he has performed only a cursory review of the labels and is unaware of "whether or not Bayer had proposed labeling changes."  Heath Dep. (Ex. B) at 357:17-20.  His unfounded criticisms of Trasylol's label generally fall into one of two categories.

*First*, Dr. Heath complains about where information was presented in the Trasylol label.  *See, e.g., id.* at 333:18-334:10 ("[t]he way [warnings] were presented, except, for example, the initial labeling of it, it had a comment about the renal effects, but they were not listed as a warning, not listed as a precaution, not listed as an adverse event.  It feels, to me, like it was buried").  His complaints over the format of the label should be excluded because Dr. Heath admittedly is not an expert in the "regulatory requirements that the FDA imposes on pharmaceutical companies," *id.* at 305:4-7, and has no expertise in crafting or evaluating drug labels.  *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) ("The fact that [the proposed expert] never even drafted a proposed warning renders his opinion akin to 'talking off

_____

include the transcript from Mr. Pascale's deposition among the materials he reviewed).  Similarly, the investigators of the St. George concluded that the data were suspect: "[t]he presence of these significant confounding factors renders interpretation of these data problematic ...  the independent impact of aprotinin on the usage of blood products and mortality cannot be distinguished."  *An Investigation into the Effect of Aprotinin on Usage of Blood Products and Lengths of Stay at St. George's Hospital London* (Final Version, Dec. 11, 2003) (Ex. E) at 25.

the cuff' and not acceptable methodology"); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1089 (D. Kan. 2002) ("[W]ithout any data or research regarding [a label's] potential efficacy, [the proposed expert] has merely offered phrases that he thinks might be reasonably included.").

*Second*, Dr. Heath complains that the label should have included certain unspecified additional safety warnings based on the conclusions of the recent published studies. *See* Heath Dep. (Ex. B) 367:6-368:12 ("Mangano 2007 and the Duke study and the Schneeweiss i3 publication when it came out.  In totality, all of those, all of those, all the things that we have now if they had had those, we know what they would do with what we have now.  If we had the totality of all of these things, there would have been, I think come up with a different label").

He further contends that Bayer "failed to carry out well-designed definitive safety studies that would reveal ... the adverse overall effects of Trasylol" and put the results of those studies in the Trasylol label.  Heath Rep. (Ex. A) at 15; Heath Dep. (Ex. B) at 359:25-362:1 ("there should have been a look for all of these standard major things that we worry about ... the brain, the lungs, the liver, the kidneys").

Again, this opinion should be excluded for lack of foundation.  Dr. Heath cannot opine that Bayer should have done more because he does not even know *what studies Bayer actually did conduct*:

> Q.    What do you base your belief that they have an obligation?
>
> A.    Because this is not based on any corporate or regulatory notion.  This is based on their selling a product; they're selling something that I'm giving to my patients and it's going into, I don't know how many hundreds of thousands of people or more.  I don't really know the numbers, who are critically ill, where every little thing makes a difference.  If you see something could be harmful, I think you need to follow up on that.
>
> Q.    You're saying this without even knowing whether you reviewed fifty percent of the studies that had been done on Trasylol?

MR. MORELAND:  Object to the form.

> A.      That's correct.  I don't know the total number of studies that were done on Trasylol, nor can I tell you the number of studies that I have reviewed.

Heath Dep. (Ex. B) at 341:1-24, *see also id*. at 332:1-333:16.  Dr. Heath has not even read Bayer's 2006 Integrated Summary of Safety, the primary source of information concerning the studies about Trasylol that Bayer has conducted.  *See id*. at 332:1-333:16.

Moreover, since he is not a regulatory expert, Dr. Heath has no background in regulatory requirements concerning studies or labeling about studies.   *See id*. at 305:4-7; 342:7-10.  Like his other opinions about Bayer's corporate conduct, this opinion is based solely on Dr. Heath's own subjective moral view of what Bayer should have done.  *See id*. at 343:13-344:9 ("Q: You talked about Bayer having some obligation or they should have done the studies.  What standard or what rule are you relying on to make that statement.  A: *I don't have a regulatory rule.  It's a standard of fair and balanced* and, ultimately, a kind of discussion that serves patients that if you're going to promote the beneficial effects, *I think we should all be looking* for problems with drugs.")

Accordingly, Dr. Heath's opinions about Bayer's corporate conduct are based on incomplete and one-sided analysis, are not derived from any expertise he possesses, and are improper expert testimony.  The Court should therefore prohibit Dr. Heath from offering them.

## CONCLUSION

The opinions of Dr. Heath discussed above do not have support in either scientific learning and literature, or settled law.  They do not meet the standards set forth in Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Therefore, defendants respectfully request that this testimony be excluded.

## RULE 7.1(A)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(A)(3)(a), counsel for defendants hereby certifies that counsel for the defendants has made reasonable efforts to confer in good faith with counsel for all parties who may be affected by the relief sought in the motion, and has been advised that plaintiffs will contest this motion.

December 18, 2009                          Respectfully submitted,

/s/ Barbara Bolton Litten
Patricia E. Lowry
Florida Bar No. 332569
Email:  plowry@ssd.com
Barbara Bolton Litten
Florida Bar No. 91642
Email:  blitten@ssd.com
**SQUIRE SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL  33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR
    & SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL  60603
Telephone:  312-494-4400
Facsimile:  312-494-4440

Eugene A. Schoon
Email:  eschoon@sidley.com
Susan A. Weber
Email:  saweber@sidley.com
Catherine Valerio Barrad
Email:  cbarrad@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  312-853-7000
Facsimile:  312-853-73036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:  313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMENS CHERIN &**
    **MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:  412-566-6099

*Attorneys for Bayer Corporation,*
*Bayer HealthCare Pharmaceuticals Inc.,*
*and Bayer Schering Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Barbara Bolton Litten*　　　　　

Barbara Bolton Litten

**SERVICE LIST**

**In re Trasylol Products Liability Litigation – MDL-1928**
**Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON**

**United States District Court**
**Southern District of Florida**

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN,**
    **FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-790-4584
Facsimile:  215-875-7701
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE**
    **& LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile:  561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile:  561-655-1509
*Liaison Counsel for Defendants*

Scott A. Love
Email:  slove@triallawfirm.
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-757-1400
Facsimile:  713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone: 203-610-6393
Facsimile:  203-610-6399
*Federal-State Liaison for Plaintiffs*