# Exhibit B

MARK J.S.   HEATH, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON
----
IN RE:  TRASYLOL PRODUCTS LIABILITY
LITIGATION-MDL-1928

THIS DOCUMENT RELATES TO ALL ACTIONS

----
Thursday, September 24, 2009
----
Videotape deposition of MARK J.S. HEATH, M.D., held
in the offices of WHATLEY DRAKE & KALLAS, 1540
Broadway, New York, New York, commencing at 9:08
a.m., on the above date, before Mickey Dinter,
Registered Professional Reporter, Notary Public for
the State of New York.

----
MERRILL LEGAL SOLUTIONS
LegaLink Manhattan
25 West 45th Street
Suite 900
New York, New York 10036
(212) 557-7400  Fax (212) 692-9171

----

MARK J.S.   HEATH, M.D.

Page 5

```
 1                   THE VIDEOGRAPHER:  My name
 2          is Robert Gibbs.  The time is 9:07 a.m.
 3          We're here to take the videotape
 4          deposition of Dr. Mark J.S. Heath in the
 5          matter of Trasylol Product Liability
 6          Litigation, MDL 1928, in the United
 7          States District Court for the Southern
 8          District of Florida with MDL jurisdiction
 9          with cross notice in Pennsylvania,
10          New Jersey and Connecticut.
11                   Will counsel, please,
12          introduce themselves for the record.
13                   MR. MATTHEWS:  David Matthews
14          and Mike Moreland for the plaintiffs.
15                   MS. ARTINIAN:  Susan Art-
16          inian for defendants.
17                   MARK J. SHERMAN HEATH, M.D.,
18          630 West 168th Street, New York, New
19          York 10032, being first duly
20          sworn/affirmed, was examined and
21          testified as follows:
22     BY MS. ARTINIAN:
23          Q. Good morning.
24          A. Hi.
25          Q. My name is Susan Artinian.  I'm here
```

MARK J.S.  HEATH, M.D.

Page 25

```
 1   total of twenty-five hours of contact with
 2   the attorneys.
 3       Q. Do you have your CV in front of you
 4   doctor?  I believe it's marked as Exhibit 2.
 5       A. Yes.
 6       Q. And let's take a look first at
 7   Exhibit 3, excuse me, your report.
 8       A. Yes.
 9       Q. It identifies documents, Bayer
10   documents, as well as studies that you have
11   reviewed in pursuance of your report and
12   testimony.
13       A. Yes.
14       Q. Can you take a look at the reference
15   list of the studies that you reviewed and
16   verify for us, as your counsel did last
17   week, that those are the studies that you
18   have reviewed in pre- paration for your
19   report and your testimony today?
20                   MR. MORELAND:  Form.
21                   MR. MATTHEWS:  Objection to
22       the form.
23                   THE WITNESS:  This list of
24       documents?
25   BY MS. ARTINIAN:
```

MARK J.S.   HEATH, M.D.

Page 26

 1        Q. The list of studies.

 2        A. The list of publications?

 3        Q. Yes.

 4        A. Just to clarify, I looked at many

 5   more things than this, but these are the

 6   ones that I put forward as, I think, being

 7   exemplary for my opinion and a report of

 8   mine.  In my literature search, I reviewed

 9   many other publications.

10        Q. Are you testifying that the

11   reference list attached to your report are

12   the articles you relied on for the written

13   report?

14        A. I think the term relied is probably

15   a legal term.  I spent a lot of time

16   reviewing literature on without keeping a

17   record of everything I was looking at.

18   Many things I looked at had no relevance

19   whatsoever in my opinion and others did.  I

20   was much later asked to provide a list of

21   everything I relied upon.  This was my best

22   attempt at that list.

23        Q. And that's identified as Exhibit C

24   to your report, Doctor?

25        A. Yes.

MARK J.S.   HEATH, M.D.

Page 39

1    the article.  I might not.  Basically, what

2    I just did would be most helpful in

3    refreshing and informing me about Trasylol.

4         Q. Did you keep any track of favorable

5    studies or the studies that confirmed the

6    safety of Trasylol while you reviewed them

7    on Medline?

8                   MR. MATTHEWS:  Object to the

9         form.

10                  THE WITNESS:  I wasn't keeping

11        track of anything when I was reviewing

12        it.

13   BY MS. ARTINIAN:

14        Q. You have not reviewed medical

15   records pertaining to any specific plain-

16   tiffs?

17        A. Not related to Trasylol, no.

18        Q. You had not been asked to consider

19   the specific medical conditions of many of

20   the plaintiffs for your opinions?

21        A. No, not anything to do with this.

22        Q. Okay.

23        A. I just hesitate because it's

24   possible an attorney at some point asked me

25   to look at a case where a patient may have

MARK J.S.  HEATH, M.D.

Page 46

1   certain.  That sounds quite right, though.

2       Q. Are there any additional opinions

3   that you have been asked to give or plan to

4   give that you have not already told me

5   about in the last few moments?

6       A. Perhaps this wasn't completely, not

7   articulated.  Embedded in my opinion that I

8   wasn't given information is that Bayer had

9   information and, I believe, should have had

10  more information, should have developed or

11  tried to find more infor- mation in an

12  earlier time.  That comes under me not

13   getting the information.

14      Q. Anything else, Doctor?

15      A. I think that's everything.

16      Q. You have not been asked to offer a

17  benefit risk opinion of the safety of

18  Trasylol in comparison to placebo?

19              MR. MATTHEWS:  Object to the

20          form.

21              THE WITNESS:  Not in those

22          specific terms, no.  It was certainly

23          discussed extensively, but it does

24          not -- I was asked to offer an opinion.

25          I'm sure I presented my opinion about

MARK J.S.  HEATH, M.D.

Page 47

1      it, but I did not put that in the report.

2   BY MS. ARTINIAN:

3      Q. It's not in the report?

4      A. I don't remember -- I said Aprotinin

5   stops bleeding, so, or helps prevent

6   bleeding, but I don't know if that counts.

7   When I was discussing with attorneys, I

8   don't know if that counts as providing an

9   opinion in a report.

10      Q. It was pretty clear I thought.

11            Have you been asked to provide

12   an opinion?

13      A. I don't think I was asked to provide

14   that opinion.  I think I just said many

15   things that I think that, I suppose, were

16   opinions during discussions.

17      Q. Have you been asked to provide a

18   benefit risk opinion of Trasylol in

19   comparison to Amicar?

20      A. Benefit risk opinion?

21      Q. Um-hum.

22      A. I have been asked if I think

23   Aprotinin is safe.  Which is better to use,

24   Amicar or Aprotinin?  I have opined that, I

25   think, Amicar is better to use.  I'm not

MARK J.S.   HEATH, M.D.

Page 48

```
 1   sure that's what you mean.
 2       Q. How long do you believe it took you
 3   to draft your report?
 4       A. Just writing?  Or you mean also
 5   reviewing material and everything for it?
 6   Which one?
 7       Q. Do both, the review and the drafting.
 8       A. A guess 60, 70 hours, 80 hours.  I'm
 9   not sure.
10       Q. To review materials and draft it?
11       A. Yes.
12       Q. Do you remember when you started
13   writing it?
14       A. I'm guessing in late May, but I'm
15   not sure; late May or early June, perhaps.
16       Q. Do you remember when you completed
17   it?
18       A. I had the great bulk of it done and
19   then there was an extension on the time
20   when it was due and dated; a small amount
21   of work after that, small amount of changes
22   on the document, but continued to review
23   things in the interim, continued to do
24   literature searches and stuff like that.
25       Q. When did you have the great bulk of
```

MARK J.S.   HEATH, M.D.

Page 54

1        Q. As you were preparing your report in
2    this litigation, were you given reports
3    from other litigation, non-Trasylol
4    litigation, to help kind of organize what
5    you were drafting as an example?
6        A. No, nothing like that at all.
7        Q. Do you know Dr. Mangano?
8        A. No.
9        Q. Do you know Howard Heybert?
10       A. I don't.
11       Q. Do you know Dr. Karkouti?
12       A. No.
13       Q. So, what did you do precisely in
14   formulating your opinions that you have set
15   forth in your report and that you're going
16   to provide today?
17       A. I wouldn't describe it as a process,
18   really, not even a systematic process.  It
19   was intermittent review of materials that
20   were Bayer documents and of literature, and
21   that was it, mixture of both of those things.
22       Q. Okay.  I know that you met with
23   counsel for plaintiff yesterday.  You told
24   me that.
25       A. Yes.

MARK J.S.  HEATH, M.D.

Page 57

1     Q. That was provided, that was
2     identified for me late last week.
3     A. Yes, thank you.
4     Q. And then the other documents that
5     you billed plaintiffs' counsel for reviewing,
6     are those the couple of invoices that I was
7     provided, I'm sorry, the couple of e-mails
8     that I was provided?
9     A. No.  I put that in there, I think,
10    because I, because I'm not sure of every-
11    thing I looked at, is the truthful answer.
12    I spent time online looking at things.  One
13    doesn't have control when one clicks on a
14    link as to what it will take you to.  It's
15    spending time on behalf of these attorneys,
16    reviewing information about Trasylol or
17    related to this litigation about coagulation
18    or breathing, et cetera, et cetera.
19                 I'm recalling now newspaper
20    articles that I'm not sure I have listed
21    here.  I have seen a lot of material in
22    reviewing this.
23    Q. The next item on your invoice is
24    "review of published literature."  Have you
25    and I already discussed the published

MARK J.S.  HEATH, M.D.

Page 104

1      Q. My question was, were any of them

2    randomized control trials?

3      A. No trials.  A trial implies human

4    studies and stuff.

5      Q. Were any of your peer reviewed

6    articles observational studies?

7      A. Not in the clinical context.  They

8    are on mice.

9      Q. Because they were not clinical

10   studies?

11     A. Exactly, yes.

12     Q. Can we agree that none of them

13   addressed CABG heart surgery, talking about

14   your peer reviewed articles?

15     A. Yes, that's correct.

16     Q. Or the risks of CABG surgery?

17     A. Correct.

18     Q. None of them dealt with Aprotinin or

19   the lycine analogs?

20     A. Correct.

21     Q. And none of them pertained to bypass

22   surgery --

23     A. Correct.

24     Q. -- or to bleeding for coagulation

25   issues?

MARK J.S.   HEATH, M.D.

Page 143

1    my concern that there will be some adverse

2    outcome in the operation organ or both.

3         Q. And do some of them also effect

4    bleeding and the need for transfusions?

5         A. Yes.

6         Q. Do you happen to know what risk

7    factors are identified by the Society for

8    Thoracic Surgeons for renal failure after

9    CABG surgery?

10        A. No.

11        Q. Do you happen to know what factors

12   are identified by the Society for Thoracic

13   Surgeons as risk factors for mortality

14   after CABG surgery?

15        A. Not as identified as such a list,

16   no.  I don't know what they specifically

17   identify.

18        Q. Your report goes on to say, "Once

19   this assessment is complete, we formulate a

20   plan."

21        A. Could I clarify that last question?

22   I'm confident that many of the factors that

23   I'm identifying here are also identified by

24   them.  I'm sure I do know factors that they

25   have identified, but in terms of what their

MARK J.S.   HEATH, M.D.

Page 163

1   an extended pump time?

2       A. It can ensue from an extended pump

3   time.

4       Q. Yes, excellent.

5       A. Injury to the blood.

6       Q. Describe those injuries.  What are

7   they?

8       A. There is contact activation of the

9   blood, not exactly injuries.  When there is

10  a lot of that continued for a long time,

11  that can cause coagulopathy.  There is

12  injury to the red blood cells and that can

13  be injury or dysfunction to the platelets.

14  There can be activation of immune cells

15  that are in the blood and consequent release

16  of factors by then.

17      Q. Release of factors?

18      A. By immune cells and platelets.

19      Q. Do you know which factors?

20      A. I teach my residents for every

21  factor, we know there's probably ten that

22  we don't know and yet to be discovered.  I

23  know many of them, yes.

24      Q. So, those are injuries to the blood

25  as a result of an extended pump time?

MARK J.S.   HEATH, M.D.

Page 164

```
 1       A. Yes.

 2       Q. Consequence -- what are other

 3   consequences that might follow that?

 4       A. From injury from the blood?

 5       Q. From the extended pump time.

 6       A. There can be an overall inflammatory

 7   response that can effect every organ in the

 8   body.  The main areas that we are concerned

 9   about and look for are the brain, the lungs,

10   the kidneys, the gut.

11       Q. Anything else?

12       A. Liver.  All of them.  But those are

13   the main, the main things.

14              Our number one priority is

15   the person's life and next, the next are

16   the brain and then the next are those

17   things to keep those things going.

18       Q. Is it often the case that there's

19   low perfusion during extended pump time?

20              MR. MORELAND:  Form.

21              THE WITNESS:  Low perfusion

22       rate of flow or low blood pressure?

23   BY MS. ARTINIAN:

24       Q. Low blood pressure.

25       A. Usually, not.
```

MARK J.S.   HEATH, M.D.

Page 165

 1        Q. Low flow?

 2        A. Usually, not.

 3        Q. In a situation where there is, what

 4     are some of the consequences from low blood

 5     pressure?

 6                    MR. MORELAND:  Form.

 7     BY MS. ARTINIAN:

 8        Q. From low perfusion.

 9        A. From low rate of perfusion?

10                    MR. MORELAND:  Form.

11                    THE WITNESS:  Again, to

12        clarify, I don't relate this to long

13        pump runs.  I take independent question

14        from the relm we're discussing now.

15                    A low rate of flow can result

16        in hypoperfusion in end organs depending

17        on how long it lasts for.

18     BY MS. ARTINIAN:

19        Q. Whether a long pump time or a

20     regular?

21        A. That's correct, yes.

22        Q. And all of these injuries to the

23     blood, the inflammatory response, the organ

24     damage, can happen whether or not Trasylol

25     is being used?

MARK J.S.   HEATH, M.D.

Page 166

```
 1              MR. MORELAND:  Form.
 2              THE WITNESS:  We try to
 3       avoid any of them happening in surgery.
 4   BY MS. ARTINIAN:
 5       Q. There are risks of surgery whether
 6   or not Trasylol or Amicar is being used?
 7       A. Yes.
 8       Q. Your report, again, on page five,
 9   talks about circulating blood through the
10   cardiopulmonary bypass system as injurious
11   to the blood.  I think you have already
12   described the blood injuries for us, is
13   that correct?
14       A. At least in part, yes.
15       Q. Were there more that you felt you
16   needed to describe?
17       A. I think that's a pretty good
18   description.
19       Q. Are there additional risks or
20   consequences when the clamp times are
21   especially long?  We have talked about when
22   the pump times are.  How about when the
23   clamp times are long?  Different risk?
24   Different problems?  Additional ones?
25       A. Yes.
```

MARK J.S.   HEATH, M.D.

Page 177

 1  Columbia to minimize blood loss in its

 2  cardiac surgery patients?

 3      A. We are doing a risk benefit analysis.

 4  That's one of the things we try to do.  We

 5  try to balance out the risks of blood loss

 6  that are substantial.

 7      Q. What do you mean by that?

 8      A. Well, to keep the patient in the OR

 9  for five extra hours with an open chest,

10  that would be, we don't think that that

11  risk, the benefit that one accrues from that,

12  merits the risk.

13      Q. Why is it important to reduce blood

14  loss?

15              MR. MORELAND:  Form.

16  BY MS. ARTINIAN:

17      Q. Is it important to reduce blood

18  loss?

19              MR. MATTHEWS:  Objection to

20      the form.

21              THE WITNESS:  Reduce it from

22      what?  We try.

23  BY MS. ARTINIAN:

24      Q. How about minimize blood loss?

25  Thank you.

MARK J.S.  HEATH, M.D.

Page 178

1      A. Our goal is to have a, the lowest

2   blood loss that we can achieve without

3   accruing an excess of risks from the

4   practices we use to lower blood loss.  We

5   are not -- you can absolutely minimize

6   blood loss by having the patient not

7   survive the operation.  Obviously, we are

8   not going to do that.  Things that we do to

9   minimize blood loss is akin to reduce --

10   there's a benefit to reducing blood loss.

11   There's risks that we incur in order to

12   achieve that benefit.

13      Q. What are the benefits of reducing

14   it?

15      A. I think we optimize cardiovascular

16   hemodynamic status with the amount of blood

17   that the patient comes with.  Usually, most

18   of our patients come with the right amount

19   of blood with them.  The ideal rule is to

20   keep that right amount of blood.  As we

21   lower the amount of, the amount of blood

22   that they have in their body, the red blood

23   cells, platelets and plasma are lowered,

24   they can effect hemodynamics and it can

25   effect end organs.  At some point, we need

MARK J.S.  HEATH, M.D.

Page 179

```
 1   to intervene by replacing blood.  Before

 2   that time, we can usually intervene by

 3   replacing with fluids, usually with

 4   crystalloid fluids.  When we reach a point

 5   where we have to replace blood or blood

 6   components and we feel that that is adverse

 7   to our patients to do that, and the more we

 8   have to do that, the more adverse it is.

 9       Q. Have you described all of the

10   benefits of reducing blood loss?

11                  MR. MATTHEWS:  Form.

12                  MR. MORELAND:  Form.

13                  THE WITNESS:  No, I have

14       not.

15   BY MS. ARTINIAN:

16       Q. What are some additional ones?

17                  MR. MATTHEWS:  Objection to

18       the form.

19                  THE WITNESS:  Well, perhaps,

20       under-reducing blood transfusions are

21       reducing some of the consequences of

22       blood transfusions.

23   BY MS. ARTINIAN:

24       Q. Okay.

25       A. I think that's probably the best way
```

MARK J.S.   HEATH, M.D.

Page 195

1      Q. Have you ever considered renal

2   dysfunction as a possibility as a

3   consequence of blood transfusion?

4      A. Yes.

5      Q. Prior to 2006, do you recall any

6   determination at your hospital with respect

7   to any patient that the risk of aprotinin

8   outweighed its benefits?

9                  MR. MORELAND:  Form.

10                 THE WITNESS:  The medical

11        risk outweighed the medical benefits, I

12        do not.

13   BY MS. ARTINIAN:

14      Q. On page seven of your report, you

15   discuss Amicar and Trasylol.

16      A. I'm sorry, on page seven?

17      Q. Starting at page seven.  Can you

18   confirm on the record that you have no

19   opinions and you intend to offer no

20   opinions regarding transexamic acid?

21      A. I have no opinions from my experience

22   because I've never used it, but I've

23   reviewed a lot of literature that discusses

24   transexamic acid.

25      Q. So your report, however, does not

MARK J.S.   HEATH, M.D.

Page 196

```
 1  give any opinions regarding transexamic
 2  acid, does it?
 3              MR. MORELAND:  Form.
 4  BY MS. ARTINIAN:
 5     Q. Do you know if you're opining on
 6  transexamic acid in your report, Doctor?
 7     A. Part of what I'm opining about is
 8  whether or not, whether to use Trasylol or
 9  not; and in our practice, or in most
10  practices, if one is not using Trasylol,
11  one will use transexamic acid or Amicar.
12  So, there's a comparison you have there and
13  the value of Trasylol in many places is
14  influenced by the availability and use of
15  transexamic acid.
16     Q. Which you had never used?
17     A. But I've never used it.
18     Q. So, you certainly aren't relying on
19  your experience if you offer any opinions
20  about transexamic acid?
21              MR. MORELAND:  Form.
22              THE WITNESS:  That's abso-
23     lutely correct.
24  BY MS. ARTINIAN:
25     Q. The first sentence of this section
```

MARK J.S.   HEATH, M.D.

Page 199

1    BY MS. ARTINIAN:

2        Q. Is that your answer, you believe

3    Karkouti?

4        A. I'm not sure.  I'm not sure.

5        Q. Fine.

6        A. And BART, and first author's name is

7    Ferguson, involves transexamic acid; wasn't

8    the focus of what I was reading, but I'm

9    confident that many of the articles I looked

10   at all involved transexamic acid.  I'm

11   certain of it.

12       Q. Was it your experience in your

13   practice that Amicar reduced re-exploration?

14       A. I wouldn't have the opportunity to

15   assess that in my practice.

16       Q. Okay.  But did you experience in

17   your practice that Trasylol reduced

18   re-exploration?

19       A. Again, I would not have the

20   opportunity to assess that in my practice.

21       Q. Page eight of your report provides

22   that, "Virtually every patient at Columbia

23   who is placed on CPB receives an anti-

24   fibrinolytic drug.  This is because we

25   believed, based on published literature,

MARK J.S.   HEATH, M.D.

Page 201

1    BY MS. ARTINIAN:

2        Q. What was your belief?

3        A. When you say "it," what do you mean

4    by it?

5        Q. Well, the question was, "It has been

6    your experience that Trasylol does reduce

7    bleeding in the need for transfusion."  And

8    you said, I wouldn't be able to assess that

9    in my practice; it was our belief that it

10   was doing that."

11       A. I didn't know if you meant Amicar or

12   Trasylol.

13       Q. Trasylol.

14       A. Okay.  Could you just --

15       Q. What was your belief based on,

16   Doctor?

17       A. Our belief was based on literature,

18   medical literature.

19       Q. Your belief was not based on your

20   experience in using the drug?

21       A. No, I don't think anybody would be

22   able to know from an individual adminis-

23   tration of a drug to one patient what the

24   drug had done to that, to that one patient

25   with certainty.  It was a belief.  It was a

MARK J.S.   HEATH, M.D.

Page 202

 1   likelihood, but not a certainty.

 2       Q. My question is not about one patient,

 3   it's about your total experience.

 4                   MR. MORELAND:  Form.

 5                   THE WITNESS:  Our total

 6       experience we believed aprotinin was

 7       reducing bleeding, reducing the need for

 8       blood transfusions.

 9   BY MS. ARTINIAN:

10       Q. Certainly, in the LVAD context you

11   did?

12       A. Just to clarify what the word

13   "belief" means, we applied our knowledge

14   from the literature about complex,

15   challenging cases whether there would be a

16   lot of bleeding.  We applied that know-

17   ledge -- we applied our knowledge of

18   aprotinin to LVAD.

19                   It was an expectation, but

20   for awhile we were using it before we had

21   evidence that Trasylol affected it and we

22   don't really, I wouldn't say, have evidence

23   that Trasylol helped our LVAD's because we

24   didn't do a randomized trial to assess that,

25   but we believed at the time that we were

MARK J.S.   HEATH, M.D.

Page 206

1   BY MS. ARTINIAN:

2       Q. Are you a Bayer of any studies for

3   the proposition that Amicar reduces the

4   inflammatory response?

5       A. I'm not.

6       Q. Your report goes on to state that

7   historically -- I take that back.  Strike

8   that.

9               I want to make sure that I

10  understand what you're saying.  You were

11  using these drugs because you believed that

12  they reduced bleeding and you base this, in

13  part, on the literature.  Are you basing it

14  on your experience at all?

15      A. No, because we never did not give

16  them, so we would not be able to compare if

17  -- what would happen if we didn't give one

18  of these drugs?  Again, there were

19  exceptional cases, but they would not be

20  good comparisons and there wouldn't be

21  enough of an end anyway to make a meaningful

22  comparison.

23      Q. When did your hospital start using

24  Trasylol?

25                  MR. MORELAND:  Form.

MARK J.S.   HEATH, M.D.

Page 210

```
 1                MR. MORELAND:  Form.
 2                THE WITNESS:  Cost wasn't a
 3      consideration in the high-risk patients.
 4      So, there was only medical on the
 5      high-risk patient.  It was in the
 6      low-risk patient when the cost became a
 7      consideration.  I think, is that the
 8      answer to the question you're asking?
 9  BY MS. ARTINIAN:
10      Q. If that's the answer to the question,
11  I will take it.
12      A. That's responsive, in your opinion?
13                MR. MORELAND:  Don't worry
14      about that.  Just answer the question.
15                THE WITNESS:  I'm not sure
16      what you're asking.  I'm trying to get
17      at what, I think, you're asking.
18  BY MS. ARTINIAN:
19      Q. Why did you use Trasylol in the
20  high-risk patient?
21      A. In the high-risk patient, we felt
22  that the, that it would have a significant
23  reduction in bleeding, a significant
24  clinical benefit overall, significant
25  benefit on outcome and that that warranted
```

MARK J.S.   HEATH, M.D.

Page 211

1   spending thousands of dollars more to achieve

2   that benefit.

3       Q. As you sit here today, can you cite

4   us to any literature that this decision was

5   based on?

6                   MR. MORELAND:  Form.

7                   MS. ARTINIAN:  If it was, he

8           already testified that they were relying

9           on literature.

10                  THE WITNESS:  In, for

11          example, the studies that I pulled, we

12          went over just now, the two studies

13          about the treating, the risk from

14          transfusions, we feel that high-risk

15          patients are more at risk for bleeding

16          and also more at risk for the con-

17          sequences of transfusions.  They are

18          more fragile and less tolerant of

19          receiving transfusions.  That's why I

20          pulled these papers because I wanted to

21          be able to talk about that.

22   BY MS. ARTINIAN:

23       Q. And why would you use Trasylol for

24   those patients?

25       A. Because --

MARK J.S.  HEATH, M.D.

Page 212

```
 1                    MR. MORELAND:  Form.
 2                    THE WITNESS:  For the
 3       high-risk patients?
 4   BY MS. ARTINIAN:
 5       Q. Yes.
 6       A. Because we believed that Trasylol
 7   was superior to Amicar in reducing bleeding.
 8       Q. That was your experience?
 9       A. No.  It was not our experience
10   because to have an experience of it would
11   mean that we would have to have done a
12   trial and compared patients who didn't
13   get -- high-risk patients got Amicar versus
14   patients, high-risk patients who got
15   Trasylol.  That would be the only way to
16   garner that information from an experience.
17       Q. Did you --
18                    MR. MORELAND:  Are you
19       finished, Doctor?  Were you finished
20       with your answer?
21                    THE WITNESS:  I think so,
22       yeah.
23   BY MS. ARTINIAN:
24       Q. Did you -- when you started using
25   Trasylol or when they were using it when
```

MARK J.S.   HEATH, M.D.

Page 220

```
 1              THE WITNESS:  That is true.
 2        We believed it would be effective beyond
 3        the use in CABG's.
 4   BY MS. ARTINIAN:
 5        Q. How do you define massive trans-
 6   fusion?
 7        A. I don't have a strict cut-off for
 8   it.  It depends on the size of the patient
 9   and the timeframe over which the blood is
10   being given.
11        Q. Does the hospital have a massive
12   transfusion protocol?
13        A. I believe they -- I don't believe.
14   I'm pretty sure they have one for liver
15   transplants for hepatic surgery, But I'm --
16   we don't have one for cardiac surgery.
17   It's not a written protocol.  Just the way
18   we normally work, it's not a written
19   protocol.
20        Q. Now, why did you and the people with
21   whom you work believe that Trasylol was
22   effective beyond the CABG indication?
23              MR. MORELAND:  Form.
24              THE WITNESS:  Our discussions
25        would be along the lines of that it -- I
```

MARK J.S.   HEATH, M.D.

Page 221

1       think in my thinking, I can't be sure

2       what they're thinking.  I just know from

3       our discussions that it reduces

4       bleeding, it reduces the need for

5       transfusions, and our complex patients

6       are at more of a risk for bleeding and,

7       also, being in many cases, more fragile,

8       more at risk for the complications of

9       transfusions.

10    BY MS. ARTINIAN:

11         Q. You have already talked about some

12    of the gray zone patients and it sounds to

13    me, and tell me if I'm right, that when you

14    encountered a gray zone patient, there was

15    more of a discussion than there might have

16    been with more of, than there might have

17    been with an Amicar patient or with a

18    high-risk patient?

19         A. Exactly.

20         Q. So --

21         A. Definitely in fact.  Not might have

22    been.  There would have been.

23         Q. In that context, in the context of

24    the gray zone patient, you would have a

25    benefit risk discussion as to whether you

MARK J.S.  HEATH, M.D.

Page 222

1    should use Trasylol or Amicar?

2        A. Initially, it was more of a -- we

3    wouldn't actually talk dollar numbers.  It

4    really was more of a cost decision.  I

5    think we would say "Is it worth it?"  The

6    only -- when we're talking about the worth

7    of it, it was, was this, was there a real

8    chance that the patient is going to have,

9    or how big is the chance the patient is

10   going to have bleeding or problems from

11   bleeding or from the transfusions and

12   should we open up this expensive drug?  Is

13   it really going to make a difference or

14   not?  I think that was it.  So in terms of

15   balancing risks and benefits, I would say

16   more about balancing cost against potential

17   benefit.

18       Q. Cost against potential benefit like

19   survival?

20                   MR. MORELAND:  Form.

21                   THE WITNESS:  In the end, of

22        course, we care about survival.  But, I

23        think, our focus was on the immediate

24        bleeding.  Is this a patient who is

25        going to bleed a lot?  If we didn't

MARK J.S.  HEATH, M.D.

Page 223

```
 1        think they were going to bleed a lot,
 2        then we didn't think that the superior
 3        blood sparing effect of Trasylol over
 4        Amicar was worth opening the bottles,
 5        two bottles of it for.
 6   BY MS. ARTINIAN:
 7        Q. And the gray zone patient you would
 8   discuss the dose, half of the full dose?
 9        A. As I recall, usually not.  I think
10   it was more, it would be more accurate to
11   say that if we really didn't know and we
12   were sort of shrugging our shoulders,
13   somebody would throw out "How about half
14   dose?"  Everybody would concur with that.
15   It wasn't so much a discussion as a vehicle
16   for resolution.  I don't want to imply it
17   was a conflict.  It was just be like
18   "sure."
19        Q. Your report includes the sentence,
20   "Interestingly, our use of Trasylol was
21   typically not adjusted to the patient's
22   weight."  Why is that in your report?
23        A. I just think it's interesting that
24   we, because of the variation in weights of
25   our patients, which could be four or
```

MARK J.S.   HEATH, M.D.

Page 225

```
 1   that and, yet, I don't ever remember saying
 2   or anybody saying, "This patient weighs
 3   twice the normal weight and we want to
 4   give, we would normally give them full
 5   dose, let's double the dose."  That's sort
 6   of interesting to me about it as I look
 7   back on our practice patterns.
 8       Q. Do you recall when you first used
 9   Amicar?  I apologize if I asked you this.
10       A. I do not recall, but I expect it was
11   during my residency.  I don't recall the
12   time when it happened.
13       Q. Do you recall a time when you were
14   using Trasylol but you were not using
15   Amicar?
16       A. I don't.
17       Q. Do you know what Amicar, what Amicar
18   is indicated for?
19       A. I remember transexamic acid.  I
20   don't recall Amicar's approved indication.
21       Q. Have you taken a look at its level?
22       A. I did.  I have read it in pre-
23   paration for this litigation.  I read the
24   package insert also in the operating room.
25   I use it for teaching purposes, But I just
```

MARK J.S.   HEATH, M.D.

Page 229

```
 1   of this new information would have been
 2   given Aprotinin are now, instead, treated
 3   with Amicar."
 4              Did I read that correctly?
 5       A. I think so, yes.
 6       Q. Do you know how many patients from
 7   the time that you reached this conclusion
 8   until the time you discontinued using
 9   Trasylol, received Trasylol at your hospital?
10       A. I really don't know.
11       Q. With the number of surgeries that
12   you have participated in at your hospital
13   and that others have experience in, do you
14   agree that you would have seen adverse
15   events from the use of Trasylol if there
16   had been any?
17              MR. MORELAND:  Form.
18              THE WITNESS:  No.  It's not
19          like that.  We're not in a position, the
20          individual -- certainly, I'm not in a
21          position to give my individual patients
22          the day after surgery to say that -- let
23          me clarify.  Because of the way I see my
24          patients most of the day after surgery
25          and the first couple of days after
```

MARK J.S.   HEATH, M.D.

Page 230

```
 1      surgery, I think I'm not in a position

 2      to get a kind of gut feeling based on

 3      large numbers of patients if there is an

 4      effect happening.  I wouldn't be in a

 5      position to see that.

 6  BY MS. ARTINIAN:

 7      Q. Wouldn't the surgeon be in a

 8  position to see that?

 9              MR. MORELAND:  Objection to

10      the form.

11              THE WITNESS:  I don't think

12      they would because they didn't, because

13      we were not randomizing patients or

14      with, because our high-risk patients

15      until 2006 all got Aprotinin virtually,

16      essentially, all got Aprotinin, I don't

17      see how they would be able to know at

18      that time or have any basis for thinking

19      that Aprotinin was having beneficial

20      effect or negative effects based on

21      seeing those patients because they would

22      have no comparison.

23              It's not like they tried

24      this valve and that valve and they see

25      their patients doing better with this
```

MARK J.S.   HEATH, M.D.

Page 239

```
 1      A. My understanding is what happened is
 2   they analyzed his data in several different
 3   ways.  One was to review his database in
 4   the same way that he reviewed his database
 5   and, I believe, they found that that
 6   analysis was done properly off the database
 7   and they repeated the things that he found,
 8   but they also analyzed his database in
 9   different ways using different forms of
10   propensity analysis and came up with
11   different answers on those two factors and
12   they did it in a different kind of propensity
13   analysis.  That's my understanding of what
14   was done.
15      Q. Are there any publications beyond
16   Mangano and Karkouti that you are relying
17   on when you referenced deleterious effects
18   that could be problematic for some of your
19   patients?
20      A. As I recall, the way our discussions
21   were going then, is that once Mangano
22   especially put this square in front of our
23   radar, we then began to think about it in a
24   different way and to look at other
25   literature, literature in another way.  So
```

MARK J.S.  HEATH, M.D.

Page 240

1    we were thinking about a lot of literature

2    at that time and --

3        Q. Can you identify which ones they

4    were?

5        A. I can't because I don't remember

6    exactly.  But we were -- we just came to

7    think about Aprotinin in a very different

8    way.  As I said before, the only reason --

9    the balancing was really about cost before

10   and now it became a medical balancing.

11       Q. Can you identify any of the other

12   literature that you were thinking about?

13       A. I can't remember because it was

14   three years ago.  I don't remember what --

15   I just remember that we did it.

16       Q. You remember Mangano and Karkouti?

17       A. I don't remember Karkouti by name.

18   I remember another paper and I remember

19   Mangano specifically by name.

20       Q. You have Mangano in front of you,

21   right, Doctor?

22       A. Yes.

23       Q. I handed you a copy.

24       A. Yes.

25       Q. I don't intend to mark it.  I would

MARK J.S.  HEATH, M.D.

Page 246

1      A. My understanding of propensity

2    scoring is that it does not specifically,

3    does not adjust for unknown confounders

4    and...

5      Q. You also mentioned the Karkouti

6    article.

7      A. Yes.

8      Q. Can we agree that that article had a

9    finding of renal dysfunction, not renal

10   failure?

11             MR. MORELAND:  Form.

12             THE WITNESS:  The conclusion

13        is renal dysfunction.  It was trans-

14        examic acid.  I wasn't quite sure

15        before, but it is transexamic acid.

16   BY MS. ARTINIAN:

17      Q. So, the deleterious effects that I

18   believe you have identified have been renal

19   failure, other organ, end organ issues.  I

20   mean you mentioned MI.  Did you mention

21   something else?

22      A. I think stroke and/or coagulopathy

23   were the things that came out in the

24   Mangano article.

25      Q. Coagulopathy?

MARK J.S.   HEATH, M.D.

Page 247

1      A. I misspoke, encephalopathy.  I mean

2   stroke/encephalopathy.

3      Q. Is it your opinion that, to a

4   reasonable degree of medical certainty,

5   Aprotinin causes renal failure?

6               MR. MORELAND:  Objection to

7      the form.

8               THE WITNESS:  Yes.

9   BY MS. ARTINIAN:

10      Q. Is it your opinion that, to a

11   reasonable degree of medical certainty, it

12   causes stroke, encephalopathy?  It causes

13   encephalopathy.  I don't think you said

14   stroke.

15      A. Not directly.  But renal failure can

16   cause encephalopathy.  Not directly cause

17   it, no.

18      Q. Is it your opinion, to a reasonable

19   degree of medical certainty, that Aprotinin

20   causes myocardial infarction?

21      A. I don't know the answer.  I don't

22   have medical certainty about it.

23      Q. Have you ever seen renal failure

24   occur in the operating room?

25      A. That wouldn't be really how it

MARK J.S.   HEATH, M.D.

Page 249

```
 1   believe, I believe they are sustaining an
 2   injury that will lead to renal failure or
 3   may lead to renal failure.
 4       Q. I want to confirm that you've never
 5   reviewed the hospital's cardiac surgery
 6   database to take a look at the Aprotinin
 7   patients or the follow-up of those patients.
 8       A. That's correct.
 9       Q. So, when you became a Bayer of
10   Mangano and Karkouti, did you at the hospital
11   or the people whom you were discussing this
12   with, take a look at other publications?
13       A. Yes.  I think we talked about other
14   publications.  We would look at other
15   publications.
16       Q. That's right.
17       A. It was in the air, but I don't have,
18   I don't have a specific memory.  I just
19   remember the tone, how the conversations
20   went.  And it was -- we had a conversation
21   that was informed by the presence of these
22   articles.
23       Q. You already told me you couldn't
24   identify one of those.
25       A. I can't remember now.
```

MARK J.S.   HEATH, M.D.

Page 253

1  closer to 2008 or end of 2007.

2      Q. Okay.  So, you have given me the

3  publications that you can identify that

4  raised this concern in the minds of you and

5  your peers in 2006?

6      A. These are the ones that raised the

7  concern.  And then at that point, then I

8  think there was a complete re-thinking

9  about literature on Aprotinin, about all

10  risk benefit literature on Aprotinin.  We

11  just thought about the literature in a

12  different way.  I did and I know my

13  colleagues, we thought about the literature

14  in a different way.

15      Q. Did you go back and look at the

16  literature?

17      A. Yes.  Not all of it.  But we

18  definitely...

19      Q. But none of that is on your reference

20  list that you went back and looked at it.

21      A. No.  Maybe some of them are.  I

22  don't remember what I looked at.  I don't

23  know what my colleagues were looking at.

24  It was just a question, something that I

25  certainly didn't question; and I don't

MARK J.S.   HEATH, M.D.

Page 261

```
 1   discussion of let's try to use Aprotinin in
 2   cases after that.
 3       Q. So, what was the series of
 4   publications in 2007, and I will try to
 5   shorten it for you, was it Mangano and
 6   Karkouti plus now some BART results or is
 7   there something else in 2007?
 8       A. Mangano published again a different
 9   article in 2007 but, I think, that
10   amplified our concerns and, at the same
11   time, we recognized it as a propensity
12   analysis and harbored -- so to one extent
13   it affected our practice, but didn't all
14   that much affect the way we thought about
15   these publications because it wasn't a
16   randomized control trial.  And, also, I don't
17   remember when I became, when we became a
18   Bayer BART was actually progressing towards
19   a point where it might have a result.
20   Again, the nature of the talk was it could
21   have a result at any time; that that was
22   also influencing how we thought about all
23   of this.
24       Q. Let's talk just for a minute about
25   the second Mangano publication which you
```

MARK J.S.  HEATH, M.D.

Page 264

```
 1   the discussion was how best, should they,

 2   and if so, how best to convey to the

 3   clinicians on balance to, you know, best to

 4   serve the patient population.

 5        Q. Are you a Bayer of any other study

 6   that suggests long-term mortality risk with

 7   Aprotinin?

 8        A. After Mangano, other studies came

 9   out.

10        Q. What are they?

11        A. One is Schneeweiss.

12   S-C-H-N-E-E-W-E-I-S-S.

13        Q. That's not on your list of

14   references.

15        A. I just realized that.  That's an

16   article I looked that.

17        Q. Why wasn't it referenced in your

18   expert report?

19        A. Because I forgot to put it in there.

20        Q. And that was not --

21        A. It's my error.

22        Q. That was a 2008 publication.

23               So in 2007, there was

24   nothing else on long-term mortality or is

25   there something besides the Mangano study?
```

MARK J.S.  HEATH, M.D.

Page 265

```
 1       A. I don't recall right now.  I don't
 2    recall what we were looking at then.
 3       Q. Okay.  But Schneeweiss, is it your
 4    testimony, is long-term study?
 5       A. I'm sorry, when you mean, like, five
 6    years, no.  I'm sorry, I didn't hear the
 7    long-term part of it.  Yeah, no, you're
 8    right.  Long-term Mangano is five-year
 9    mortality.
10       Q. My question was:  Is there anything
11    that you're a Bayer of, other than Mangano,
12    that takes a look at Aprotinin in the
13    long-term?
14       A. Long-term, no.
15       Q. Is it your opinion, to a reasonable
16    degree of medical certainty, that Aprotinin
17    carries a risk of long-term mortality?
18                MR. MORELAND:  Objection to
19       the form.
20                THE WITNESS:  Yes, it is.
21    BY MS. ARTINIAN:
22       Q. And it's based on the Mangano study?
23       A. I believe there's a risk of
24    Aprotinin to long-term mortality.
25       Q. To a reasonable degree of medical
```

MARK J.S.  HEATH, M.D.

Page 266

1   certainty?

2       A. Yes.

3       Q. Based on the Mangano long-term

4   study?

5       A. Yes.

6       Q. Based on anything else?

7       A. Yes; the totality of all that, the

8   totality of all the other information that

9   we now have about, some of which we had

10  before, but have assembled, now have

11  assembled about Aprotinin, yes.

12      Q. But you can't identify another

13  long-term study?

14      A. No.  But I can identify short-term

15  mortality studies and I can identify

16  injuries that Aprotinin causes and

17  properties, nephrotoxic properties.

18  Putting it all together, I believe that it

19  increases short-term and long-term mortality.

20      Q. My question was long-term.

21      A. Yes.

22      Q. And you're supporting your opinion

23  on long-term by relying on short-term

24  studies?

25      A. That is influenced.  I'm supporting

MARK J.S.   HEATH, M.D.

Page 267

1    it, yes, absolutely.

2         Q. What are the short-term studies you

3    are relying on?

4         A. For example, Schneeweiss, I think

5    Henry, I will have to have them in front of

6    me, to make sure I'm relying on the right

7    ones.

8         Q. You understand what type of database

9    was used in the Schneeweiss study?

10                   MR. MORELAND:  Form.

11                   THE WITNESS:  I think I know

12       a few things about it, but I'm not sure

13       what you mean by what type.

14   BY MS. ARTINIAN:

15        Q. Do you know what the database is

16   called that was used in the Schneeweiss

17   study?

18        A. It's called the premier database.

19        Q. Do you know what type of database

20   the premium database is?

21        A. Multicenter database.  It's a group

22   of hospitals contributing aggregate, reams

23   of data, and make it available for analysis.

24        Q. What kinds of data?

25        A. Clinical data, demographics; just

MARK J.S.   HEATH, M.D.

Page 272

1   which the benefits outweigh the risk."

2                  MR. MORELAND:  Where are

3      you?

4                  MS. ARTINIAN:  Page ten.

5      Like right here.

6                  MR. MORELAND:  Thank you

7      very much.

8   BY MS. ARTINIAN:

9      Q. Sure.  Do you see it, Doctor?

10     A. About where?

11     Q. It's, like, two-thirds down the top

12  paragraph.

13     A. Yes, I see it.

14     Q. And then I will clarify because you

15  were not sure when in 2007, but it might

16  have been after you saw something in the

17  paper.  Do you think it might have been

18  after the interim analysis was announced?

19     A. What I remember is that it was

20  like -- I remember the effect being like a

21  thunder clap; that we, that BART had been

22  terminated because of a significant effect

23  and that we just stopped using it and to

24  some extent we stopped thinking about it.

25  It resolved a lot of uncertainty and we

MARK J.S.   HEATH, M.D.

Page 273

1   just stopped thinking about it.

2       Q. Do you know or do you not know

3   whether or not it was after the interim

4   analysis was announced?

5       A. I'm not sure what you mean by

6   interim analysis.  I believe at one point

7   they announced there was no difference,

8   we're not seeing any difference.  I think

9   that's an interim analysis.  Then, there

10  was, I don't know how many of those there

11  were, but whether there was one or more,

12  and then, and we knew that that, there was

13  a period of time when we knew about that

14  result that they were not seeing a

15  significant difference.  Actually, we didn't

16  know that.  All we needed was how we

17  discussed it.  We knew they hadn't stopped

18  it; they would stop it if they were seeing

19  a significant difference.

20      Q. Okay.

21      A. Then, there was this, presumably,

22  what you would call another interim

23  analysis, except it became the final

24  analysis.  The DSMB did another interim

25  analysis which then became a stopping

MARK J.S.  HEATH, M.D.

Page 279

```
 1      whatever, randomize and say, to the

 2      point where we could say, "I know for

 3      this patient I'm helping them reduce

 4      their bleeding by giving them a heart

 5      transplant."

 6  BY MS. ARTINIAN:

 7      Q. Are you saying you used it because

 8  it was alluring and enticing for pub-

 9  lications?

10      A. Yes.

11      Q. Your testimony is that Trasylol was

12  used at Columbia Presbyterian because the

13  publications were alluring and enticing?

14      A. Yes.  If you're a clinician and

15  we're in the trenches, we're on the front

16  line, as a clinician, I'm clawing, we're

17  all clawing for every advantage for our

18  patients and bleeding is, was and is one of

19  our major concerns in these procedures and

20  based on the literature, we believed that,

21  and I still believe, that it reduces

22  bleeding in the need for transfusions and

23  that it has some superiority to Amicar.

24      Q. What do you base that belief on?

25      A. On multiple randomized control
```

MARK J.S.   HEATH, M.D.

Page 291

```
 1   numerous studies showing, demonstrating
 2   that Trasylol reduced bleeding and the need
 3   for transfusions.  And, so, that's what
 4   lead us to believe that the drugs reduced
 5   bleeding, both Amicar and Trasylol.
 6      Q. Can you identity the literature that
 7   says Aprotinin doesn't reduce bleeding?
 8            MR. MORELAND:  Form.
 9            THE WITNESS:  You mean
10      compared to placebo or compared to
11      Amicar or transexamic acid?
12   BY MS. ARTINIAN:
13      Q. Compared to placebo.
14      A. I'm not a Bayer of anything that
15   shows no beneficial effects, excuse me, no
16   production in bleeding compared to placebo.
17      Q. Okay.  On the bottom of page 12, you
18   start in the sentence, "I believe Bayer had
19   grounds for concern."
20            Do you see where that is?
21      A. Yes.
22      Q. "Despite those grounds, Bayer
23   withheld information as well as failed to
24   appropriately investigate known safety
25   signals."
```

MARK J.S.   HEATH, M.D.

Page 292

1      A. Yes.

2      Q. To what do you base your comment, "I

3    believe Bayer had grounds for concern"?

4      A. From even before it was approved,

5    they were seeing a possibility of a renal

6    effect, adverse renal effect on the drug

7    and, I believe, that it was the obligation

8    of the company, and I relied upon the

9    company, to pursue signals like that to

10   find out if there's something that we would

11   need to know about to make the right

12   decision for our patients on the front

13   line.

14     Q. So, are you saying that you didn't

15   know that there was a possibility that

16   Trasylol could have a renal effect?

17     A. At the time, I was not aware of it.

18     Q. What time are you talking about?

19     A. In the 1990s, you know, when I

20   started using it, I did not have any

21   awareness of that.

22     Q. Did you ever hear any of the

23   surgeons with whom you worked discuss the

24   renal dysfunction or the creatinine bump

25   that Trasylol could create?

MARK J.S.   HEATH, M.D.

Page 295

1        Q. Go ahead.

2        A. And he produced his results and went

3    nowhere.

4        Q. What were his results?  I will

5    withdraw the question.

6        A. Okay.

7        Q. Do you know whether or not Dr.

8    Kress's results were ever peer reviewed?

9        A. I don't know.

10       Q. Do you know whether they were ever

11   published?

12       A. I don't believe so.

13       Q. Do you know whether or not -- do you

14   know what type of statistical analysis,

15   if any, Dr. Kress utilized?

16       A. I can tell you if you let me look at

17   it.  I don't recall right now.

18       Q. Okay.  Do you know, sitting here

19   today, whether or not Kress ever produced a

20   final study?

21              MR. MORELAND:  Form.

22              THE WITNESS:  His last study

23       was the final study that he produced,

24       whatever it was, study or version of his

25       -- I think there was a draft seven.  I

MARK J.S.   HEATH, M.D.

Page 296

```
 1      don't know if there were subsequent
 2      drafts.
 3   BY MS. ARTINIAN:
 4      Q. Are you saying draft seven was a
 5   final study?
 6      A. I'm definitely not saying that.
 7      Q. Okay.
 8      A. Whatever the last one he did, that
 9   was the final one.
10      Q. Anything else in the category of
11   information that Bayer withheld, "Despite
12   these grounds, Bayer withheld information
13   as well as failed to appropriately
14   investigate known safety signals"?  But I'm
15   still on the withheld information.  Is
16   there anything else that you can identify?
17      A. There was a publication, excuse me,
18   I take that back, a report from a hospital
19   in London where they had, again, entered
20   into a relationship or recruited a group
21   to, or person to analyze the use of the
22   Aprotinin and the effects of Aprotinin in
23   their practice.
24      Q. Do you know that the FDA had that
25   information in front of it at the 2007 ad
```

MARK J.S.   HEATH, M.D.

Page 297

1    com, don't you?

2        A. I believe so.  I believe it was

3    given to them after the issue arose with,

4    and not having been given i3 at the 2006

5    Adcom, that's my recollection of the

6    timing.

7        Q. So, your complaint is that Bayer

8    withheld that information on that study

9    from England?

10       A. It's my concern that they're seeing

11   repeated signals of potential problems with

12   the drug including in that study, including

13   in Kress, including in the approval studies

14   and seeing other signals that could be

15   concerned, such as graft thrombosis and

16   rather than designing an appropriate trial

17   to assess whether those things were

18   important or not, they kept on, basically,

19   going over and over again something that we

20   were all pretty satisfied

21   with, that it reduced the need for bleeding

22   and transfusions.  That's my concern.

23       Q. Have you ever -- I reviewed your

24   Bayer documents that you have been provided.

25   I didn't see in there any of the cor-

MARK J.S.   HEATH, M.D.

Page 298

```
 1   respondence between Bayer and the FDA of
 2   all of the information it did provide,
 3   other than you had some of the application
 4   material, you have had bits and pieces of
 5   material that was presented to the FDA in
 6   2006 and 2007.  Are you a Bayer of the
 7   studies and information that Bayer has
 8   provided to the FDA?
 9        A. No, I haven't seen everything they
10   provided to the FDA.
11        Q. Are you a Bayer of the safety signal
12   information Bayer has provided to the FDA
13   over the years?
14        A. Again, I haven't seen everything
15   they have provided, so I don't know what is
16   in the material that I haven't seen.
17        Q. What you've seen has been about 140
18   Bayer documents supplied to you by
19   plaintiff's counsel.
20                 MR. MORELAND:  Objection to
21        the form.
22                 THE WITNESS:  That's correct.
23        All I had access to is what they provide
24        me with.
25   BY MS. ARTINIAN:
```

MARK J.S.  HEATH, M.D.

Page 299

1      Q. Do you know how many thousands of
2   documents Bayer has produced in this
3   litigation?
4      A. I understand there are millions of
5   pages involved in this litigation.  I don't
6   know if they were all produced by Bayer or
7   other people.  I don't know.
8      Q. What's your basis for saying there
9   was a graft occlusion safety signal that
10   Bayer withheld or --
11      A. I'm not saying they withheld that,
12   sorry.  I misspoke if I said that.
13      Q. Why did you reference safety signal?
14      A. Because looking back on it now and
15   knowing and putting together what Aprotinin
16   does and where it goes in the body and all
17   of those things and knowing that it was
18   approved appropriately so on the basis of
19   its efficacy, which is a very short-term
20   effect and appeared over a period of a day,
21   given that there were these safety signals,
22   I think it's very important, it would have
23   been very important to have done the very
24   best with the highest of standards
25   practicable to address whether they were

MARK J.S.  HEATH, M.D.

Page 302

1  my review of internal documents, it is my
2  opinion that there was a withholding of
3  important evidence."
4             First of all, what are the
5  internal documents that support your belief
6  that there was a withholding of important
7  evidence?
8     A. So the documents that I reviewed, it
9  was very clear that Bayer personnel were a
10  Bayer that there was a concern about, for
11  example, renal injury.  And rather than
12  saying we've got to get to the bottom of
13  this, our number one priority is to do a
14  well-designed trial that will answer this
15  question.  They focused on how to assuage
16  practitioners' concerns, how to manage
17  opinion and deflect concern about it.
18     Q. My question was what were the
19  documents?  Can you identify any of them?
20     A. I will try to remember.  I can go
21  through things and pull them up.
22     Q. You can't remember any of them?
23     A. No, I do remember.  I do remember,
24  absolutely.  I remember people saying at
25  meetings or in e-mails, you know, "You've

MARK J.S.   HEATH, M.D.

Page 303

1  got a renal signal" or what have you.

2  People saying, "Oh, you've got to quickly

3  design, number one priority is to design a

4  trial to answer that question.  Let's

5  forget about efficacy for awhile and there's,

6  essentially, no question about efficacy.

7  Let's look to safety now."  That wasn't

8  what the conversation was.

9      Q. You're thinking about some docu-

10  ents you reviewed, but you can't identify

11  them, but they're in the stack of Bayer

12  documents that you've listed in your

13  report?

14      A. For example, go to see -- I forget

15  the doctor's name, go to see Dr. So and So,

16  at Palisades or Englewood Hospital.  They

17  are one of the hospitals near us in New

18  Jersey.  They've got a concern about renal

19  failure there.  Go, basically, take care of

20  that.

21      Q. When did you decide, when did you

22  form the opinion that Bayer was withholding

23  information?

24      A. I was dimly a Bayer, although I

25  wasn't dwelling on it about the i3 issue.

MARK J.S.   HEATH, M.D.

Page 304

1   That was just something that we definitely

2   discussed.  But, again, it wasn't a topic

3   of my mind in 2009.  That was old history,

4   but that was disturbing.  And then when I

5   was provided with Bayer documents and began

6   going through those, I felt there was a lot

7   of inappropriate comments, discussions and

8   behavior in those docu- ments.  So, that

9   was after I got the Bayer documents in May

10   of this year.

11       Q. My question was when?  Your answer

12   is May --

13       A. May of this year.  There was

14   initial, there was an initial withholding

15   of the i3 information back in 2006 and I

16   was a Bayer of that back then.

17       Q. Okay.  You're not an expert on

18   corporate conduct, are you, Doctor?

19       A. I'm not.

20       Q. Around corporate ethics?

21       A. Well, I have to be aware of that

22   because I work in a corporation.

23       Q. I asked you, if you're an expert on

24   corporate ethics.

25       A. No, not compared to a lay person who

MARK J.S.   HEATH, M.D.

Page 305

1   doesn't work in a corporation.  I have to

2   know more about it.

3        Q. That wasn't my question.

4              Are you an expert on

5   regulatory requirements that the FDA imposes

6   on pharmaceutical companies?

7        A. No.

8        Q. Are you a marketing expert?

9        A. No.

10       Q. Are you an expert on consumer conduct?

11       A. Can you define what that is, consumer

12   conduct?

13       Q. You don't know what it is?

14       A. I'm a consumer and I have conduct,

15   but I don't know the field you're referring

16   to.

17       Q. Are you a legal expert?

18       A. No.

19       Q. You are not an expert at making

20   legal determinations?

21             MR. MORELAND:  Form.

22             THE WITNESS:  No, I'm not.

23   BY MS. ARTINIAN:

24       Q. So, since you have only reviewed the

25   documents that have been provided for

MARK J.S.   HEATH, M.D.

Page 307

1    London study.  Is there anything else?

2        A. That's all that comes to mind right

3    now.

4        Q. And the next sentence says,

5    "Whenever favorable evidence became avail-

6    able, it would be pushed and published."

7                    What documents, what

8    evidence did Bayer push and publish?

9        A. As a practitioner, it would be, it

10   would be reminded of and sent and given.

11   It felt like a constant stream of documents,

12   which I like to get.  It bolstered my views

13   that this drug augmented my practice and

14   was helping my patients.

15                   This was, but this is all

16   studies about reducing bleeding and/or

17   reducing the transfusion of blood products

18   and it was a massive paper.

19       Q. Do you have any of it?

20       A. I don't have any of it on me.  I

21   looked at them again when I was doing my

22   literature search.  It didn't form my

23   opinion because I already held that opinion.

24   I held that opinion for years.

25       Q. The opinion being that Bayer pushed

MARK J.S.   HEATH, M.D.

Page 308

1    and published favorable evidence, is that

2    your opinion that we're talking about?

3        A. Yeah.  I received it from them,

4    favorable studies.  And I appreciated

5    receiving them.

6        Q. And then the next phrase says,

7    "Whereas, unfavorable evidence would be

8    dismissed."

9                What unfavorable evidence

10   did Bayer dismiss that you have not already

11   told us about?

12       A. A big example is Kress.  There's

13   someone who looks at something.  It's,

14   basically, I think the phrase in the e-mail

15   was "Egads," you know, basically "What do

16   we do about this and do we add fuel to the

17   fire?" Or something along those lines or

18   "let it lie," whatever.

19       Q. My question was that you haven't

20   identified yet.

21       A. Again, I go to the documents and tell

22   you individual things, but I don't have

23   anything fresh in my mind right now.

24       Q. Fresh in your mind, is there

25   anything that supports your claim that

MARK J.S.   HEATH, M.D.

Page 309

```
 1    "Whereas unfavorable evidence would be
 2    contained" because you have four different
 3    descriptors here?
 4        A. Yes, I think, like, for example,
 5    Kress is in my mind.
 6        Q. Anything else that comes within the
 7    context of unfavorable evidence being
 8    contained?
 9        A. That's all I have in my head right
10    now, according to St. George, whatever.  I
11    mean these things could be discussed.
12        Q. What about eroded?
13        A. Yes.  I was concerned about the --
14    what seemed to happen with Dr. Kress
15    seemed, again, inappropriate.  There was a
16    lot of enthusiasm for working with him
17    initially and then later on after he
18    provided results that weren't, were less
19    than fully supportive of the use of Aprotinin
20    because of the renal signal, there was a
21    comment of, "Well, I hear he's not regarded
22    by his colleagues" and all of that kind of
23    stuff like that.  I think that's an
24    inappropriate way to evaluate data.  That's
25    eroding.  That's what I mean by eroding,
```

MARK J.S.   HEATH, M.D.

Page 322

```
 1        wasn't one of the reasons we used it.
 2        That was one of the notions that we held
 3        about it, that made it like, I say,
 4        alluring, like that sounds good.
 5   BY MS. ARTINIAN:
 6        Q. The touted anti-inflammatory effect
 7   that we have discussed already?
 8        A. Exactly, yes.
 9        Q. So, you don't remember anything
10   specifically Dr. Smith said at that
11   meeting?
12        A. I don't remember any of his slides
13   or any specific sentences that he said, no.
14        Q. Have you ever had any contact with
15   anyone at Bayer's sales force?
16        A. Yes.
17        Q. Who?
18        A. I don't remember their names.
19        Q. On how many occasions?
20        A. Multiple.  I don't know.
21        Q. Did you ever have lunch with that
22   person?
23        A. They may have brought pizza to the
24   department and people would sit around and
25   talk and eat pizza.  I don't know if they
```

MARK J.S.   HEATH, M.D.

Page 323

```
1   were eating lunch, also, but, yeah, lunch
2   was lunch.  I want to be clear, I don't
3   know for sure whether that happened or not.
4   It used to happen with multiple, different
5   companies, so I don't specifically remember
6   a Bayer one.
7        Q. So, if you don't remember a Bayer
8   one, you don't remember anything anyone on
9   Bayer's sales force might have said to you?
10       A. Not at a lunch, no.
11       Q. Ever?
12                 MR. MORELAND:  Form.
13                 THE WITNESS:  I remember
14       being given materials about Aprotinin.
15       I remember asking for material for
16       teaching, largely, but I don't remember,
17       as I sit here now, whether that was
18       somebody who comes to the department or
19       whether I was at a meeting getting that
20       material.
21   BY MS. ARTINIAN:
22       Q. My question was that they said to
23   you, do you remember anything they said to
24   you?
25       A. No, I don't.
```

MARK J.S.   HEATH, M.D.

Page 325

```
 1   numbers, are the documents that you're
 2   relying on from the Bayer documents for the
 3   proposition that Bayer was manipulating
 4   the community's impression?
 5       A. These are the ones that come to mind
 6   right now.
 7       Q. Okay.  Is there any, and then
 8   there's a statement that Bayer pushed aside
 9   -- I take that back.  Strike that.
10                When you say that Bayer
11   executed a program, you're not talking
12   about a formal program, are you?
13                MR. MORELAND:  Form.
14                THE WITNESS:  I don't know
15       what you mean by that term.
16   BY MS. ARTINIAN:
17       Q. What do you mean by the term
18   "program"?  You said that they executed a
19   program.  Was it a written program?  Was it
20   a formal program?  Have you seen -- that
21   was two questions.  Was it written anywhere
22   that you saw, a program?
23       A. It was discussed, it was discussed
24   in such a way that there was clearly an
25   agenda to manipulate opinions.
```

MARK J.S.   HEATH, M.D.

Page 327

 1   for me?

 2       A. These are the ones that I have, that

 3   I found in the break.

 4       Q. Do you intend to testify about the

 5   motives or the intent of Bayer employees?

 6       A. I have no idea if I'm going to be

 7   testifying in the future or not.

 8       Q. If you do, is it your intent to

 9   testify about the intent or the motives of

10   Bayer employees?

11       A. I would be, I think people ought to

12   know what these employees said.  I cannot

13   get inside somebody's head and know with

14   certainty what they were thinking.  I can

15   only draw inferences, as can anybody else.

16       Q. You cannot testify about their state

17   of mind?

18                   MR. MORELAND:  Objection to

19       the form.

20                   THE WITNESS:  You asked for

21       my opinion about their state of mind.  I

22       can't testify with certainty, with a

23       high degree of medical certainty, what

24       their state of mind was.

25   BY MS. ARTINIAN:

MARK J.S.   HEATH, M.D.

Page 332

1                    Have you ever reviewed the

2    2006 Integrated Summary of Safety?

3         A. I don't think so.

4         Q. About 200 pages long.

5         A. It's not ringing a bell.

6         Q. Do you know how many safety studies

7    have been done either by Bayer or by other

8    organizations or other entities on Trasylol?

9         A. I'm not sure what you mean by a

10   safety study.  You mean predesignated ahead

11   of time as this is going to be a safety

12   study and this is our primary outcome?

13        Q. Yes.

14        A. No.

15        Q. Do you know how many randomized

16   control trials have been done?

17        A. For safety or efficacy?

18        Q. For either.

19        A. I don't know the number.  It's a

20   large number.

21        Q. Is it a fair statement that you have

22   not looked at most of them?

23                    MR. MORELAND:  Object to the

24        form.

25                    THE WITNESS:  Actually, I

MARK J.S.   HEATH, M.D.

Page 333

```
 1      don't know.  I looked at a lot, but I
 2      don't know what the totality is and
 3      whether I've surpassed half or not.
 4  BY MS. ARTINIAN:
 5      Q. You don't know if you surpassed
 6  half?
 7      A. I don't know how many were there
 8  altogether.  I don't know how many were done
 9  and not published.
10      Q. Not knowing how many there are, you
11  believe you have all the information to
12  testify as to your opinions in this case?
13              MR. MORELAND:  Objection to
14      form.
15              THE WITNESS:  I believe,
16      yes.
17  BY MS. ARTINIAN:
18      Q. Your report, conclusion number one
19  on page 15, starts out in paragraph one,
20  "For a period of many years, Bayer did not
21  provide me and my colleagues with adequate
22  warnings about the overall, deleterious
23  effects of administering Trasylol."
24              With respect to this state-
25  ment, are you claiming that the warnings
```

MARK J.S.  HEATH, M.D.

Page 334

 1  were inadequate?

 2                      MR. MORELAND:  Form.

 3                      THE WITNESS:  The way they

 4       were presented, except, for example, the

 5       initial labeling of it, it had a comment

 6       about the renal effects, but they were

 7       not listed as a warning, not listed as a

 8       precaution, not listed as an adverse

 9       event.  It feels, to me, like it was

10       buried.

11  BY MS. ARTINIAN:

12       Q. Are you saying that renal effects

13  were not identified in the initial label as

14  an adverse event?

15       A. I believe the event was identified

16  as a laboratory finding.

17       Q. And are you aware that --

18       A. I think that's a clinical finding,

19  not a laboratory finding.

20       Q. What does a statement such as this

21  mean to you, "Aprotinin patients showed

22  statistically significant .5 rise in

23  creatinine"?  What does that mean to you,

24  Doctor?

25                      MR. MORELAND:  Objection to

MARK J.S.   HEATH, M.D.

Page 341

```
 1      Q. What do you base your belief that
 2   they have an obligation?
 3      A. Because this is not based on any
 4   corporate or regulatory notion.  This is
 5   based on their selling a product; they're
 6   selling something that I'm giving to my
 7   patients and it's going into, I don't know
 8   how many hundreds of thousands of people or
 9   more.  I don't really know the numbers, who
10   are critically ill, where every little
11   thing makes a difference.  If you see
12   something could be harmful, I think you need
13   to follow up on that.
14      Q. You're saying this without even
15   knowing whether you reviewed fifty percent
16   of the studies that had been done on
17   Trasylol?
18                MR. MORELAND:  Object to the
19      form.
20                THE WITNESS:  That's correct.
21      I don't know the total number of studies
22      that were done on Trasylol, nor can I
23      tell you the number of studies that I
24      have reviewed.
25   BY MS. ARTINIAN:
```

MARK J.S.  HEATH, M.D.

Page 342

1          Q. Are you a Bayer of whether or not

2     Bayer violated any regulation by not doing

3     the studies that you claim they should have

4     done?

5          A. I'm not a Bayer about regulations

6     now.

7          Q. Are you a Bayer whether or not they

8     violated any law by not doing the studies

9     that you claim they should have done?

10         A. I have no awareness either way.

11         Q. The second paragraph under

12    Conclusions provides, "Bayer withheld

13    valuable information from clinical studies

14    and failed to carry out well-designed,

15    definitive safety studies that would reveal

16    as a BART trial and other studies ultimately

17    revealed the adverse effects, overall

18    effects, with Trasylol."

19                    Have we discussed everything

20    that supports that statement of yours

21    because this is a repeat of some things you

22    previously said?  But, have we discussed

23    everything?

24                    MR. MORELAND:  Form.

25                    THE WITNESS:  I think we

MARK J.S.   HEATH, M.D.

Page 343

```
 1      have discussed all we need for that
 2      statement.  There were additional
 3      publications that came out after BART,
 4      but I'm not, I wouldn't hold BART
 5      accountable for failing to provide
 6      those, obviously, because they didn't
 7      exist then.  It just leads to, when I
 8      talk about "would reveal," the problems
 9      with Trasylol, the basis for that is
10      based on studies that came out after
11      BART as well as before.
12  BY MS. ARTINIAN:
13      Q. You talked about Bayer having some
14  obligation or they should have done the
15  studies.  What standard or what rule are
16  you relying on to make that statement?
17      A. I don't have a regulatory rule.
18  It's a standard of fair and balanced and,
19  ultimately, a kind of discussion that
20  serves patients that if you're going to
21  promote the beneficial effects, I think we
22  should all be looking for problems with
23  drugs.
24              If one is going to look at
25  drugs and invest a lot of time and money
```

MARK J.S.   HEATH, M.D.

Page 344

1    and effort into looking at the properties

2    of the drug and when those -- there may be,

3    concerning aspects of that drug, there may

4    be problems with that drug.  It's important

5    to put at least some of that time and

6    effort in resources and money into looking

7    for those problems as well as looking, as

8    well as repeating over and over again the

9    beneficial aspects of it.

10       Q. My question was:  What rule or

11   standard are you relying on?

12       A. I'm relying on a standard of what I

13   think, what I, as a clinician and

14   practitioner who is actually giving these

15   substances or this substance, in this case,

16   to my patients, I'm relying on the

17   information that I need to make the right

18   decision.

19       Q. What expertise do you have to tell a

20   jury what study Bayer should do?

21       A. As a clinician, I read studies that

22   guide me in how to, and what to do,

23   including the studies that are, that we now

24   have that tell us or to not give Aprotinin.

25       Q. What's your expertise in telling a

MARK J.S.  HEATH, M.D.

Page 347

 1  BY MS. ARTINIAN:

 2     Q. What studies are you relying on for

 3  your use of Amicar with your cardiac

 4  surgery patients?  And have they been

 5  identified in your materials?

 6                  MR. MORELAND:  Form.

 7                  THE WITNESS:  I don't

 8       believe I opined that Amicar is better

 9       than control, than nothing.

10  BY MS. ARTINIAN:

11     Q. So, you're using it even though you

12  don't know if it's better than nothing?

13     A. I think it's better, but I don't

14  think I said that it's better than placebo

15  in our discussion.

16     Q. So, do you or don't you think it's

17  better than placebo?

18     A. Well, we think Amicar is better than

19  placebo.  We think transexamic acid is

20  similarly better than placebo.  I think

21  most of us think that Aprotinin is a little

22  better in terms of bleeding than either of

23  those two other drugs.

24     Q. Do you know whether or not Bayer

25  violated any law -- strike that.

MARK J.S.   HEATH, M.D.

Page 355

1    database.

2        Q. Do you agree that the FDA has

3    reviewed, or do you know whether the FDA

4    has had more information to review on

5    Trasylol since its approval back in 1993,

6    early 1994, than you have reviewed?

7        A. I'm almost sure it has, but I don't

8    know that for a fact.

9        Q. Can you agree the two advisory

10   committees that the FDA appointed, one in

11   2006, one in 2007, spent more time

12   reviewing relevant information than you

13   have reviewed?

14                  MR. MORELAND:  Objection to

15       the form.

16                  THE WITNESS:  Depends what

17       you mean by relevant information.

18   BY MS. ARTINIAN:

19       Q. Let's just say information on

20   Trasylol.

21                  MR. MORELAND:  Same objection.

22                  THE WITNESS:  For example, I

23       doubt they were reviewing these interim

24       Bayer documents that I reviewed.

25   BY MS. ARTINIAN:

MARK J.S.   HEATH, M.D.

Page 356

1       Q. Do you know?

2       A. No, I don't know.  Maybe they have

3   them now.  I doubt they had them in 2006 or

4   2007.  I don't know for sure.  I don't know

5   the totality of what the FDA has seen.

6       Q. Is it your sense that you have seen

7   more information on Trasylol than the

8   advisory committees have?

9       A. My sense is that those advisory

10  committees have not seen some of the

11  information that I've seen.  And I know

12  that they've received information that I

13  haven't seen.  For example, they saw

14  Mangano's database and I have never seen

15  that.  So there's, it's like a diagram.

16  There's overlap and there's also non-

17  overlapping areas.

18      Q. Can you agree that Health Canada and

19  its scientific advisory panel has certainly

20  seen more information on BART than you

21  have?

22      A. I'm sure they have heard from the

23  BART investigators and I haven't.  So, yes,

24  they would have more information than I

25  would have.

MARK J.S.   HEATH, M.D.

Page 357

```
 1        Q. Let's take a break.
 2                  THE VIDEOGRAPHER:  The time
 3        is 5:10 p.m.  We are off the record.
 4                  ----
 5                  THE VIDEOGRAPHER:  The time
 6        is 5:27 p.m.  We are back on the record.
 7   BY MS. ARTINIAN:
 8        Q. Dr. Heath, have you provided us
 9   today with all your opinions with respect
10   to Trasylol?
11                  MR. MORELAND:  Objection to
12        the form.
13                  THE WITNESS:  I think during
14        the conversation they have come out,
15        yes.
16   BY MS. ARTINIAN:
17        Q. Do you know whether or not Bayer had
18   proposed labeling changes to the FDA at any
19   time in 2006?
20        A. I don't know.
21        Q. Do you have any criticisms with
22   respect to the 2006 label that's the only
23   other label you have identified as having
24   with you before you right now?
25        A. The December 2006?
```

MARK J.S.   HEATH, M.D.

Page 359

```
 1      these safety concerns.
 2   BY MS. ARTINIAN:
 3      Q. So, your criticism is that studies
 4   hadn't been done?
 5      A. Adequate studies hadn't been done.
 6      Q. We have talked about when the renal
 7   study you believe should have been per-
 8   formed or should have occurred and, I
 9   think, you said '93 or '94.
10      A. It started; and it takes time to do
11   a study.  There should have been a properly
12   powered study started then to get at these
13   questions.
14      Q. I told you, I'm just, I'm asking you
15   when they should have been started.
16      A. Designed.  They should have gotten a
17   program.
18      Q. A program or design of a study
19   should have occurred, you're saying, in 1993
20   or 1994 for renal?
21                  MR. MORELAND:  Form.
22                  THE WITNESS:  In that time
23      period, yes.
24   BY MS. ARTINIAN:
25      Q. What about for stroke?  What was the
```

MARK J.S.  HEATH, M.D.

Page 360

1    time period that you think the stroke study

2    should have been begun?  What was --

3        A. I don't characterize it as a stroke

4    study.  What I think --

5        Q. Cerebral vascular.

6        A. No.  That's not what I'm saying.

7    What I think should have been done is that

8    a study designed to look at the long-term

9    effects of this drug on, basically, all

10   important end organs and function should have

11   been done, a safety study given that there

12   were safety signals.

13                   When did stroke come up?  My

14   recollection is that stroke came up as

15   opposed to what you call a green flag.  But

16   the good thing about the drug, the safety

17   thing --

18       Q. My question was when?

19       A. I don't know when that was.

20       Q. Okay.

21       A. Just as there is interest in pursuing

22   that, there should have been interest in

23   pursuing whether there's a renal problem or

24   not.

25       Q. But you don't know when the stroke--

MARK J.S.  HEATH, M.D.

Page 361

```
 1      A. I don't know what triggered the
 2   interest.  I saw from documents that they
 3   developed an interest in stroke.  They
 4   talked about using stroke, a benefit,
 5   beneficial effect on stroke to counter bad
 6   information that might come out from BART.
 7      Q. What about a study looking at MI,
 8   are you saying they should have done a study
 9   looking at MI and when?  If so, when was
10   that safety signal or was a safety signal
11   triggered?  And by MI, I'm referring to
12   myocardial infarction.
13      A. In doing the renal study, if you're
14   going to follow, do all the work to society
15   up a study, collecting the outcomes that if
16   somebody had an MI or not, that's an easier
17   part of it than, or an easy part than if
18   you're going to go through all the work and
19   doing it.
20              So along with renal, there
21   should have been a look for all of these
22   standard major things that we worry about,
23   the things that go wrong after, that cause
24   complications of surgery and the things
25   that cause bad outcomes, the brain, the
```

MARK J.S.  HEATH, M.D.

Page 362

1   lungs, the liver, the kidneys.

2       Q. So, you're saying they should have

3   initiated all this process for all these

4   end points back in '93, '94?

5       A. It should have initiated it for

6   renal.  And while doing that, it would make

7   all the sense in the world to look for the

8   other things, to look for length of stay,

9   to look for mortality, et cetera, et cetera.

10  That would have made all the sense in the

11  world.

12      Q. What is your authority for this

13  position?

14      A. I'm a clinician.  I use drugs.  I

15  need to know.  That's a lot of authority.

16  I decide whether a placement of drugs go

17  into my patients or not and how much and

18  when and I need to know information about

19  what the properties of the drugs are.

20      Q. And just to clarify, you're not sure

21  if you've read fifty percent of the studies

22  that have been done on Aprotinin?

23               MR. MORELAND:  Objection to

24      form.

25               THE WITNESS:  I do not know

MARK J.S.   HEATH, M.D.

Page 364

1   bleeding, excuse me, and reduces the need

2   for transfusions.

3             And I didn't have a firm

4   basis in the literature for my, I guess you

5   call it, a strong clinical expectation that

6   these transfusions actually are harmful for

7   people.  I acted on it -- I guess I believed

8   it in one sense of the word.  I couldn't

9   cite something.  I went to look for that.

10      Q. But you're not saying Bayer had an

11   obligation to inform you as to the risks of

12   bleeding?  Or are you?

13      A. Bayer was --

14      Q. Just yes or no.  Yes or no?

15      A. If it thought that Aprotinin caused

16   bleeding, which it didn't, obviously, but

17   were to think that Aprotinin caused bleeding,

18   then, I think, they would have an obligation

19   to follow up on bleeding and the consequences.

20   But, obviously, everyone believed and

21   believes that Aprotinin reduces bleeding.

22   So, of course, they didn't have an

23   obligation to tell me about the risks of

24   bleeding, but I wanted to know about the

25   benefits of Aprotinin.  I'm trying to

MARK J.S.   HEATH, M.D.

Page 365

1   balance this.

2       Q. I was referring to your bleeding

3   answer, Doctor.  I'm not talking about the

4   benefits of Aprotinin right now.  My

5   question was:  Did Bayer have an obligation

6   to inform you about the risks of bleeding

7   and you have answered the question.

8       A. I'm mixed up here.  I don't believe

9   Aprotinin has a risk of causing bleeding.

10      Q. Fine.

11      A. I don't think they had an obligation

12  to tell me about that.

13      Q. Okay.  You were talking about

14  bleeding at length, about wanting to be

15  informed about bleeding.  I just wanted to

16  clarify that you didn't think it was Bayer's

17  obligation to inform you about bleeding.

18  That's all.

19      A. No, I did not.

20      Q. Do you have any criticisms of the

21  2006 label, given what you know today and

22  not based upon what the FDA had in front of

23  it in 2006, when that label was promulgated?

24      A. I'm not criticizing it based on the

25  information they had then.  It could have

MARK J.S.   HEATH, M.D.

Page 367

1     the time.

2   BY MS. ARTINIAN:

3     Q. Okay.  Thanks.

4     A. I wish they had known more at the

5   time.

6     Q. You just said you were comfortable

7   with this.  You mean you were comfortable

8   with the 2006 label --

9            MR. MORELAND:  Objection to

10      the form.

11  BY MS. ARTINIAN:

12    Q. -- when you use the word "this"?

13            MR. MORELAND:  Object to the

14      form.

15            THE WITNESS:  I don't have

16      any, no criticisms come to mind right

17      now.

18  BY MS. ARTINIAN:

19    Q. I want to go back to a response from

20  a few minutes ago that you said -- "What

21  information subsequently emerged?"  was my

22  question.  You said the BART study and

23  propensity analysis.  You're talking about

24  the BART study and the analysis of the BART

25  study?

MARK J.S.  HEATH, M.D.

Page 368

```
 1      A. No, no.  Further propensity analy-
 2  sis.
 3      Q. You're talking about Mangano 2007?
 4      A. Mangano 2007 and the Duke study and
 5  the Schneeweiss i3 publication when it came
 6  out.  In totality, all of those, all of
 7  those, all the things that we have now if
 8  they had had those, we know what they would
 9  do with what we have now.  If we had the
10  totality of all of these things, there
11  would have been, I think come up with a
12  different label.
13      Q. They had the Mangano 2007 and the
14  Duke study which, I assume, you're referring
15  to?
16      A. 12/06.
17      Q. I'm not done with my question.
18              They had the Mangano 2007
19  and the Shaw study which, I believe, is the
20  Duke study that you're referring to before
21  the 2007 advisory study meeting?
22      A. Yes.
23      Q. And they also had i3 in a preliminary
24  form and in a final form, but not,
25  Schneeweiss had not published his article?
```