UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to All Actions

**BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT
MARK J. EISENBERG AND MEMORANDUM OF LAW IN SUPPORT**

PLEASE TAKE NOTICE that Defendants Bayer Corporation, Bayer HealthCare Pharmaceuticals Inc., and Bayer Schering Pharma AG move to exclude certain testimony of plaintiffs' expert Mark J. Eisenberg.

**MEMORANDUM OF LAW**

Dr. Mark J. Eisenberg is a clinical epidemiologist, cardiologist, and professional expert witness who has sent mass mailings to plaintiff lawyers to drum up business. Deposition of Mark J. Eisenberg (Ex. A) at 53:4-7, 103:19-104:3. He is not board-certified in any surgical field, and has never performed open heart surgery. *Id*. at 84:12-15, 85:9-18. He also has never prescribed Trasylol or other blood-sparing medications (known as the "lysine analogues") to any patient, participated in a study involving those medications, or written about their safety or efficacy. *Id*. at 89:5-16, 97:2-16; *see id.* at 100:8-10 ("I grant you that I have not done any research in this area.").

Nevertheless, Dr. Eisenberg now proposes to offer opinions concerning Trasylol and the lysine analogues. These opinions should be excluded because (i) he has done no research or analysis on the lysine analogues, and therefore cannot opine about their safety and

efficacy; and (ii) his opinions about certain alleged effects of Trasylol are based solely on a general impression that lacks scientific support.

In addition, Dr. Eisenberg proffers opinions on marketing, corporate ethics, and a range of issues that are far beyond the scope of his expertise and/or not proper subjects for expert testimony. These opinions, which have been generated solely for the purpose of this litigation, should be excluded under *Daubert v. Merrell Dow. Pharms., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 401-03 and 702.

## ARGUMENT

The proponent of expert testimony "carries a substantial burden under Rule 702." *Cook ex rel. Tessier v. Sheriff*, 402 F.3d 1092, 1107 (11th Cir. 2005). Plaintiffs must demonstrate by a preponderance of the evidence that: (1) Dr. Eisenberg "is qualified to testify competently regarding the matters he intends to address"; (2) the methodology underlying "his conclusion is sufficiently reliable"; and (3) "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999) (citations omitted); *accord United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (describing the requirements as "qualification, reliability, and helpfulness"). The final prong of this standard requires that the court evaluate the testimony's relevance, ensuring that it "has a justified scientific relationship to the pertinent facts." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (excluding opinion due to "analytical gap between the data and the opinion proffered"). The trial court must "act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *McClain v.*

2

*Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589 n.7).

**I.     DR. EISENBERG'S EPIDEMIOLOGY OPINIONS REGARDING ALTERNATIVES TO TRASYLOL, AND THAT TRASYLOL CAUSES OR IS ASSOCIATED WITH VARIOUS ADVERSE EFFECTS, ARE INADMISSIBLE.**

Dr. Eisenberg seeks to testify that the lysine analogues (*i.e.*, aminocaproic acid and tranexamic acid) are better alternatives to Trasylol, and that Trasylol is associated with or causes myocardial infarction ("MI") and graft occlusion.[1]  Eisenberg Report (Ex. B) at 8, 12-14.

These opinions fail to meet the methodological standards articulated by Dr. Eisenberg himself.  *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (requiring that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").  Dr. Eisenberg testified that an epidemiologist must review the "totality of the evidence" "in order to make . . . impartial conclusions about the safety of a drug." Eisenberg Dep. (Ex. A) at 21:10-12, *see id.* at 18:7-9, 20:19-21:12, 126:20-127:3 (discussing importance of "totality of the evidence" review).  He did not do this.

**A.     Dr. Eisenberg's Opinions Regarding Alternatives to Trasylol Are Unsupported by Reliable Method or Data.**

Dr. Eisenberg asserts that "the preponderance of the evidence clearly favors the use of lysine analogues over aprotinin."  Report (Ex. B) at 12; Eisenberg Dep. (Ex. A) at 329:14-332:2.  This opinion should be excluded because Dr. Eisenberg did not consider the totality of the evidence and thereby "violated his own standard of proper methodology that '[a]ll evidence

---

[1] Dr. Eisenberg also refers in his report to stroke being a possible risk of Trasylol.  *See, e.g.*, Report (Ex. B) at 3, 5, 13; *see also* Eisenberg Dep. (Ex. A) at 265:6-17.  But at his deposition, he stated:  "I am not saying that aprotinin causes stroke."  Eisenberg Dep. (Ex. A) at 265:22-23.

should be taken into account.'" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004).[2]

As a preliminary matter, Dr. Eisenberg did not perform any searches for studies or literature on the lysine analogues. *See* Eisenberg Dep. (Ex. A) at 101:3-13 (admitting that he did not use the terms "aminocaproic acid" or "tranexamic acid" in any of his searches). The focus of his research in this litigation was Trasylol, not the lysine analogues. As a result, the materials that Dr. Eisenberg considered contain only a fraction of the data available on the lysine analogues. *See also id.* 192:7-17, 192:18-21, 193:1-10 (testifying that the lysine analogues are not risk free therapies, that he has not "done an exhaustive analysis" of their risks, and that Trasylol's safety and efficacy in CABG surgery has "been studied far more extensively" and "explored much more in depth" than for the lysine analogues). Thus, it is not surprising that, when asked about the safety of the lysine analogues in CABG surgery, Dr. Eisenberg responded: "I didn't specifically list that as one of my objectives [in this litigation], so I didn't speak to it directly either." *Id.* at 190:25-192:6.

Dr. Eisenberg did not recall reviewing a single randomized controlled trial that compared either lysine analogue to placebo. *Id.* at 101:14-102:10. Such randomized controlled trials are "the best way to ensure that any observed difference between the two groups in outcome is likely to be the result of exposure to the drug;" they serve as the "gold standard" for determining whether a drug is related to a particular health outcome. Michael D. Green et al., *Reference Guide on Epidemiology,* in Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 333, 338 (2d ed. 2000); *see also* Eisenberg Dep. (Ex. A) at 130:5-23 (acknowledging

---

[2] As with Trasylol, Eisenberg Dep. (Ex. A) at 89:5-10, Dr. Eisenberg has not used or prescribed the lysine analogues, *id*. at 89:11-16, nor has he reviewed their package inserts, *id*. at 89:17-22, 90:19-91:7, 92:17-93:13.

that randomized controlled trials are the "gold standard" for assessing efficacy); Report (Ex. B) at 6. Dr. Eisenberg's lack of evidence on this score therefore is significant.

Notwithstanding the lack of randomized controlled trial data, Dr. Eisenberg claims that he believed he reviewed meta-analyses (compilations of studies) comparing the lysine analogues to placebo, but he was unable to identify a single such analysis during his deposition. Eisenberg Dep. (Ex. A) at 190:25-192:6. He therefore purports to base his opinions on an "overall impression" that he received from meta-analyses. *Id.* at 191:25-192:6. But that "overall impression" does not withstand scrutiny. Even his report's discussion of these meta-analyses makes clear that the studies do not represent that the lysine analogues demonstrated superiority over Trasylol. *See*, *e.g.*, Report (Ex. B) at 50 (discussing Carless (2005) study's conclusion that "[p]eri-operative blood loss was *significantly greater* with [each lysine analogue] than with aprotinin") (emphasis added); *id.* at 48 (discussing Brown (2007)). By contrast, a recently published cohort study concludes that "[a]protinin tends to have a better risk-benefit profile than tranexamic acid in high-risk . . . patients." Karkouti, "The Risk-Benefit Profile of Aprotinin Versus Tranexamic Acid in Cardiac Surgery," Anesth Analg. (2009) (Ex. C).

Clinching his utter lack of familiarity the lysine analogues, Dr. Eisenberg did not even know that the FDA has not approved either for use in CABG surgery (*i.e.*, the FDA-approved indication for Trasylol):

> Q. Please try to answer my question which is: What is tranexamic acid indicated for? What's the approved indication for tranexamic acid?
>
> A. I am not sure what the approved indication is.
>
> Q. Do you know whether tranexamic acid is approved by the FDA for prophylactic use to reduce perioperative blood loss and the need for blood transfusion for patients undergoing CABG surgery with cardiopulmonary bypass?

> A. I do not, but I know that in Canada, as far as I am aware, neither tranexamic acid nor aminocaproic acid are approved, although they are used, and not only aprotinin was approved for that indication.

Eisenberg Dep. (Ex. A) at 90:13-91:3; *see also id.* at 89:20-22.

> Q. Do you know whether aminocaproic acid is approved by the FDA for prophylactic use to reduce perioperative blood loss and the need for blood transfusion for patients undergoing CABG with cardiopulmonary bypass?
>
> A. No, I don't.

*Id.* at 93:5-10; *see also id.* at 92:20-93:4. Dr. Eisenberg's conclusion that lysine analogues are preferred for CABG surgery when these medicines have not been approved for such use demonstrates his failure to consider the totality of the evidence necessary to arrive at a scientifically reliable and admissible opinion.

In short, although Dr. Eisenberg is unable to offer threshold opinions regarding the safety of the lysine analogues due to his limited review, he purports to conclude that they are superior to Trasylol. *See generally* Eisenberg Dep. (Ex. A) at 97:17-98:9, 99:8-100:19 (testifying that he had only passingly reviewed literature concerning the three medications prior to the litigation); *id.* at 97:2-16 (he has never conducted or participated in a study involving, nor written about, any of the three drugs). Plainly, Dr. Eisenberg did not consider the totality of evidence in arriving at that conclusion. When, as here, an expert departs from his own standards in order to arrive at an opinion for litigation, that opinion must be excluded as unreliable. *See Rezulin*, 309 F. Supp. 2d at 563 (excluding expert who failed to follow his own standard of taking all evidence into account); *see also In re TMI Litig.*, 193 F.3d 613, 677 (3d Cir. 1999) (affirming exclusion of testimony as unreliable because expert's opinion "was not supported by his own methodology").

\* \* \*

Dr. Eisenberg also has opined that the lysine analogues are more cost-effective than Trasylol. Report (Ex. B) at 13. This proposed testimony should be excluded because it again falls outside Dr. Eisenberg's areas of expertise, is not relevant to the issues at trial, and lacks foundation.

Dr. Eisenberg admits that "cost effectiveness is not the way that epidemiologists measure or assess the safety of a medicine," Eisenberg Dep. (Ex. A) at 199:15-18, and "[t]he cost of a medicine has nothing to do with whether a drug is safe," *id.* at 200:21-25. Thus, the cost issue is not within Dr. Eisenberg's expertise and is not germane to the fundamental issues in these cases, namely Trasylol's safety.

Furthermore, although Dr. Eisenberg believes that "Bayer needed to show that . . . [Trasylol], which is a more expensive drug, is more effective than the competing agents and that it's at least as safe, if not safer," *id.* 200:1-9, he could not point to any rule, regulation, or standard imposing that obligation, *id.* at 200:14-204:16; *see also supra* § II.A (testimony about legal duties is inadmissible).

Finally, Dr. Eisenberg's opinions are inadmissible because they lack sufficient foundation. As noted above, Dr. Eisenberg did not do the basic research necessary to opine on the effectiveness, much less the cost-effectiveness, of the lysine analogues. *See supra*, Part I.A. Moreover, he acknowledged that cost-effectiveness must be assessed not simply by how much the drug costs, but with respect to downstream expenditures or savings resulting from use of the medication. *See* Eisenberg Dep. (Ex. A) at 197:14-19. He testified, however, that he reviewed just one study to assess those costs, *id.* at 197:20-199:14, and that study involved only: (i) one of the two other lysine analogues, Eisenberg Report (Ex. B) at 132-33; (ii) patients undergoing repeat cardiac operations, *id.* at 133; and (iii) 204 total patients, *id.*; *see also* Eisenberg Dep.

(Ex. A) at 21:5-12, 101:3-22 (testifying that he did not review studies comparing the lysine analogues to placebo, nor did he conduct literature searches for those medications). Accordingly, this extremely limited data fails to support Dr. Eisenberg's sweeping claim that *both* lysine analogues are more cost-effective than Trasylol.

### B. Dr. Eisenberg's Opinions that Trasylol Is Associated with Increased Risks of Myocardial Infarction, and Graft Occlusion Are Inadmissible.

Dr. Eisenberg claims that Trasylol is associated with an increased risk of myocardial infarction ("MI") and graft occlusion. *See* Eisenberg Dep. (Ex. A) at 265:6-266:17, 300:2-304:23. But this opinion is inadmissible because, again, he did not consider the totality of the evidence in arriving at this conclusion. *See*, *e.g.*, *Joiner*, 522 U.S. at 145-47; *Rezulin*, 309 F. Supp. 2d at 563 & n.137. As a result, his opinion is based solely on "indirect evidence" and on his general impressions, not reliable scientific evidence.

Numerous meta-analyses conclude that there is no association between Trasylol and MI. *See* Levi, "Pharmacological Strategies to Decrease Excessive Blood Loss in Cardiac Surgery: A Meta-Analysis of Clinically Relevant Endpoints," Lancet 1999; 354: 1940-47 (Ex. D); Munoz, "Is ϵ-Aminocaproic Acid as Effective as Aprotinin in Reducing Bleeding with Cardiac Surgery?: A Meta-Analysis," Circulation 1999; 99: 81-89 (Ex. E); Sedrakyan, "Effect of Aprotinin on Clinical Outcomes in Coronary Artery Bypass Graft Surgery: A Systematic Review and Meta-Analysis of Randomized Clinical Trials," J. Thoracic & Cardiovas. Surg. 2004; 128: 442-48 (Ex. F); Brown, "Meta-Analysis Comparing the Effectiveness and Adverse Outcomes of Antifibrinolytic Agents in Cardiac Surgery," Circulation 2007; 115: 2801-13 (Ex. G); Henry, "Anti-Fibrinolytic Use for Minimizing Perioperative Allogeneic Blood Transfusion," Cochrane Reviews, July 10, 2007 (Ex. H).

In fact, Dr. Eisenberg could not identify a single meta-analysis that concluded that there was such an association. In the face of this evidence, Dr. Eisenberg conceded that he "could not come up with definitive results" regarding Trasylol's alleged association with MI, and graft occlusion, Eisenberg Dep. (Ex. A) at 265:6-266:9, and that there is only "indirect evidence" of an association between Trasylol and MI, Report (Ex. B) at 13; *see also* Eisenberg Dep. (Ex. A) at 148:7-22 (acknowledging that MI is "not uncommon[]" background risks of CABG surgery, regardless of Trasylol use); *McClain*, 401 F.3d at 1243 (to be reliable, expert's methodology must account for "background risk").

Even the two studies that Dr. Eisenberg claims to be most "impressed by" fail to provide statistically significant support for his position. *See* Eisenberg Dep. (Ex. A) at 262:23-265:5, 303:24-304:23. Indeed, Dr. Eisenberg's report states that one of the studies, by Alderman, "suggest[ed] that [observed] graft occlusion [wa]s *not due to aprotinin*" and "found that aprotinin *did not affect the occurrence of MI*." Report (Ex. B) at 29 (emphasis added); *see* Alderman, "Analyses of coronary graft patency after aprotinin use: results from the international multicenter aprotinin graft patency experience (IMAGE) trial," 116 J. Thorac. Cardiovasc. Surg. 716-30 (1998) (Ex. I). The results of the other study are not statistically significant. Cosgrove, "Aprotinin Therapy for Reoperative Myocardial Revascularization—A Placebo Controlled Study," 54 Ann. Thorac. Surg. 1031-6 (1992) (Ex. J). Moreover, Dr. Eisenberg is unable to point to a single study that replicated even Cosgrove's insignificant results. Eisenberg Dep. (Ex. A) at 302:9-25.

Dr. Eisenberg's testimony should be excluded because he is offering a general impression that is lacking in scientific support. *See Joiner*, 522 U.S. at 146 (excluding testimony "connected to existing data only by the *ipse dixit* of the expert").

## II.    DR. EISENBERG OFFERS A NUMBER OF OPINIONS THAT FALL WELL OUTSIDE HIS EXPERTISE AND ARE OTHERWISE INADMISSIBLE.

Dr. Eisenberg seeks to provide his views on a range of topics unrelated to epidemiology and cardiology.  Dr. Eisenberg repeatedly acknowledges that he is not an expert on these topics, and it is axiomatic that a witness may not offer testimony on subjects in which he lacks expertise.  Fed. R. Evid. 702; *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (qualifications in one field "did not make him any more qualified to testify as an expert [outside his field of expertise] ... than a lay person who read the same articles"); *Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 563 (11th Cir. 1998) (affirming exclusion of testimony outside expert's competence); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (an expert must "stay within the reasonable confines of his subject area").  For this reason and those discussed below, this testimony is inadmissible.

### A.    The Opinion That Bayer Breached "Ethical Standards" Is Inadmissible.

Dr. Eisenberg claims that Bayer breached undefined "ethical standard[s]" by allegedly failing to respond to "safety signals." Eisenberg Dep. (Ex. A) 203:22-204:16; *see also*, *e.g.*, Eisenberg Report (Ex. B) at 7-8, 10, 12.  This "ethical standards" testimony is inadmissible for a host of reasons.

First, the opinions are irrelevant.  Fed. R. Evid. 401-02.  As another MDL court has explained:  "While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is not relevant to these lawsuits." *Rezulin*, 309 F. Supp. 2d at 544.  At best, the testimony would be relevant only to whether Bayer had certain duties.  However, "the existence of a duty is a question of law for the Court to decide and not a proper subject for expert testimony." *Nat'l Union Fire Ins. v. Midwestern Gen. Brokerage, Inc.*, No. 06-0782-CV-W-NKL, 2007 WL

1529011, at *6 (W.D. Mo. May 23, 2007) (excluding expert testimony); *see generally Jackson v. Carnival Cruise Lines, Inc.*, 203 F. Supp. 2d 1367, 1379 (S.D. Fla. 2002) (excluding testimony that was "nothing more than a legal conclusion"). Dr. Eisenberg has no expertise in those duties anyway. *See* Eisenberg Dep. (Ex. A) at 205:9-11 (admitting lack of expertise regarding pharmaceutical companies' duties); *id.* at 88:11, 202:17-20, 204:2-5 (no knowledge regarding obligations owed to FDA, Health Canada, or any other regulatory agency).

Second, the testimony should be excluded as unduly prejudicial. Fed. R. Evid. 403. As the *Rezulin* court explained when confronted with the same issue, "it would be likely unfair to prejudice and confuse the [jury] by introducing the 'experts'' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards." 309 F. Supp. 2d at 545.

Third, the testimony is inadmissible because "opinions concerning purported ethical standards . . . do not meet the core requirement of Rule 702 that expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *Id.* at 543 (footnotes omitted); s*ee*, *e.g.*, *In re Baycol*, 532 F. Supp. 2d 1029, 1053 (D. Minn. 2007) ("Personal views on corporate ethics and morality are not expert opinions."); *Lofton v. McNeil Consumer & Spec. Pharms.*, No. 3:05-CV-1531, 2008 WL 4878066, at *6-*7 (N.D. Tex. July 25, 2008) ("ethical obligations" opinions fail *Daubert*'s reliability requirement). Dr. Eisenberg's testimony reveals that his opinions rely on his own subjective beliefs and personal views: "Q. You are not claiming to be an expert in corporate ethics, are you? A. No, but I think the average lay person could have some opinions about corporate ethics." Eisenberg Dep. (Ex. A) at 87:12-16. Similarly, he testified that his opinions are not based on any "standard, guideline, rule or regulation." *Id.* at 323:17-324:1 ("Just because I can't name these guidelines doesn't mean they

11

don't exist."); *see id.* at 205:9-11 ("I don't know what the regulatory requirements are for pharmaceutical companies. I am not an expert in that area.").

Dr. Eisenberg's reliance on the views of "the average lay person" and what he perceives to be "common sense" are fatal. *Id.* at 322:9-12; *see also id.* at 324:6-10 (basing testimony on what "the man on the street . . . would say"). Rule 702 requires that "an expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (affirming exclusion of expert testimony "based on common sense") (citation omitted); *see Grupo Televisa, S.A. v. Telemundo Commn'c Group, Inc.*, No. 04-20073-CIV, 2008 WL 125601, at *2 (S.D. Fla. Jan. 7, 2008) (excluding "'common sense'" testimony).

Finally, Dr. Eisenberg's opinions are inadmissible because they rest on speculation about Bayer's subjective motivations. *See* Eisenberg Report (Ex. B) at 12 ("It was clearly not in [Bayer's] interest to perform these types of trials, and that is why aprotinin was on the market for so many years."); *see also* Eisenberg Dep. (Ex. A) at 206:19-208:11 (testifying that he did not do "any work per se" to support his conclusions regarding Bayer's motivations). As numerous courts have held, the "knowledge, motivations, intent, state of mind, or purposes of [Defendant], [or] its employees ... is not a proper subject for expert or even lay testimony." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192, 194 (S.D.N.Y. 2009) (collecting cases); *accord Lofton*, 2008 WL 4878066, at *6-*7 (excluding similar testimony); *Baycol*, 532 F. Supp. 2d at 1053-54 (same).

**B. Dr. Eisenberg's Opinions Regarding Trasylol's Marketing Are Outside Of His Area Of Expertise And Otherwise Unreliable.**

Dr. Eisenberg asserts that "[t]he fact that aprotinin was used so widely over the course of many years was largely due to marketing." Eisenberg Report (Ex. B) at 12. This

opinion lies outside his area of expertise, lacks foundation, and amounts to no more than inadmissible speculation. Dr. Eisenberg admits that he is unqualified to offer this testimony: "Q. You are not claiming to be an expert in sales or marketing practices, are you? A. No." Eisenberg Dep. (Ex. A) at 87:9-11. Moreover, Dr. Eisenberg effectively concedes that he has no foundation upon which to testify concerning Trasylol's marketing or its effects, if any. *Id.* at 209:6-25 (stating that he has not: (i) reviewed a single marketing document or deposition of marketing personnel or other Bayer employees concerning marketing; (ii) been informed by a single cardiac surgeon or anesthesiologist that they used Trasylol because of marketing; or (iii) heard that any hospital purchasing agent selected Trasylol due to marketing); *id.* at 143:11-145:13 (admitting that he has not spoken to any surgeon about why they chose one antifibrinolytic medication over another).

      **C.**      **Dr. Eisenberg's Opinions About Trasylol's Mechanism of Action Are Beyond His Qualifications and Lack Foundation.**

Dr. Eisenberg seeks to testify regarding Trasylol's mechanism of action, specifically that it has a prothrombotic or procoagulatory effect that may increase the risks of certain adverse clinical events. *See* Eisenberg Report (Ex. B) at 12, 14; Eisenberg Dep. (Ex. A) at 300:24-25 (claiming "we know that aprotinin is [a] prothrombotic agent"). These opinions are inadmissible.

First, Dr. Eisenberg admits that he is unqualified to testify about this subject: "I am not an expert in terms of mechanism." Eisenberg Dep. (Ex. A) at 84:2-9; *id.* at 83:25-84:1 ("[A]s to mechanisms, I don't hold myself out to be an expert").

Second, even if he were qualified to testify, Dr. Eisenberg did not apply reliable methodology to draw his conclusion. Dr. Eisenberg testified that "everything [he] know[s] about

Trasylol's mechanism of action [comes] from [his] review of a few articles." *Id*. at 84:2-9; *but see Paul*, 175 F.3d at 912 (holding that review of literature outside an expert's field is insufficient to establish admissibility).  He admitted, however, that the articles he reviewed did not address mechanistic questions.  Eisenberg Dep. (Ex. A) at 52:21-53:10.  Dr. Eisenberg's opinion that Trasylol is prothrombotic is based instead on studies "suggest[ing] that [it] is effective at reducing bleeding." *Id*. at 301:15-302:3.  Trasylol's effectiveness in reducing bleeding, however, does not demonstrate a prothrombotic effect.  *See generally*, *e.g.*, Poston, "Aprontinin Shows Both Hemostatic and Antithrombotic Effects During Off-Pump Coronary Artery Bypass Grafting," J. Ann. Thorac. Surg. 81:104-11 (2006) (Ex. K).  This point is acknowledged by Dr. Eisenberg himself.  He testified that the blood-sparing effects of lysine analogues create only a "presumption" that those agents are prothrombotic.  Eisenberg Dep. (Ex. A) at 313:5-314:3.  Because his opinions regarding mechanism are not based on scientific evidence, they are inadmissible.

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Eisenberg's testimony.

## RULE 7.1(A)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(A)(3)(a), counsel for defendants hereby certifies that counsel for the defendants has made reasonable efforts to confer in good faith with

counsel for all parties who may be affected by the relief sought in the motion, and has been advised that plaintiffs will contest this motion.

December 18, 2009                                             Respectfully submitted,

*/s/ Barbara Bolton Litten*
Patricia E. Lowry
Florida Bar No. 332569
Email:  plowry@ssd.com
Barbara Bolton Litten
Florida Bar No. 91642
Email:  blitten@ssd.com
**SQUIRE SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL  33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR
    & SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL  60603
Telephone:  312-494-4400
Facsimile:  312-494-4440

Eugene A. Schoon
Email:  eschoon@sidley.com
Susan A. Weber
Email:  saweber@sidley.com
Catherine Valerio Barrad
Email:  cbarrad@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  312-853-7000
Facsimile:   312-853-73036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:   313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMENS CHERIN &
   MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:   412-566-6099

*Attorneys for Bayer Corporation,
Bayer HealthCare Pharmaceuticals Inc.,
and Bayer Schering Pharma AG*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Barbara Bolton Litten*
Barbara Bolton Litten

# SERVICE LIST

### In re Trasylol Products Liability Litigation – MDL-1928
### Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON

## United States District Court
## Southern District of Florida

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN,
   FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone:  215-790-4584
Facsimile:  215-875-7701
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE
   & LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone:  561-684-2500
Facsimile:  561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509
*Liaison Counsel for Defendants*

Scott A. Love
Email:  slove@triallawfirm.
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-757-1400
Facsimile:  713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone:  203-610-6393
Facsimile:  203-610-6399
*Federal-State Liaison for Plaintiffs*

WESTPALMBEACH/562616.1