# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to:  **ALL ACTIONS**

## BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT CHIRAG PARIKH AND MEMORANDUM OF LAW IN SUPPORT

PLEASE TAKE NOTICE that Defendants Bayer Corporation, Bayer HealthCare

Pharmaceuticals Inc., and Bayer Schering Pharma AG move to exclude the testimony of

plaintiffs' expert Chirag Parikh, M.D., Ph.D.

## MEMORANDUM OF LAW

Dr. Chirag Parikh is a nephrologist offered by plaintiffs to testify that Trasylol is

nephrotoxic and causes acute kidney injury in any patient to whom it is administered.  Report of

Chirag Parikh, M.D. (Ex. A) ("Parikh Report") at 19-21.  To arrive at this extraordinary

conclusion, Dr. Parikh relies on:

- an "injury" definition that is not used in clinical medicine,

- preliminary findings based on experimental biomarkers, and

- a causal theory that relies on syllogism to cover a fatal gap in the supporting data.

Using this unreliable methodology, Dr. Parikh arrives at an extraordinary conclusion that goes

far beyond the testimony of plaintiffs' other experts:

Q:     Is it your expert opinion, with a reasonable degree of medical
       certainty, that aprotinin causes acute kidney injury *in everyone*?

A:     It's likely.

. . .

Q:      And when you say that acute kidney injury is caused in everyone
        who gets Trasylol, what is the basis for your saying that?  What
        data underlies that?

A:      When I am saying it, I am saying it *may* cause injury in a lot of
        people if we invoke more sensitive markers of kidney injury. *We
        do not know that*. . . . It is *possible* that *if there were better tools
        available* . . . we  may see different results, and we may see that
        aprotinin is . . . nephrotoxic in a much larger population.

Deposition of Chirag Parikh, M.D., Ph. D., ("Parikh Dep.") (Ex. B) at 268:5-8, 268:19-269:13

(emphasis added).  *But see* Deposition of F. Gary Toback, M.D. (Ex. C) at 104:10-16 (testifying

that Trasylol does not "result in an increase in creatinine in every patient").

        At bottom, Dr. Parikh's causation opinion is based upon scientifically

unsupportable leaps in logic and should be excluded as unreliable under *Daubert v. Merrell Dow

Pharms., Inc.*, 509 U.S. 579 (1993) and Federal Rules of Evidence 403 and 702.  *See Gen. Elec.

Co. v. Joiner*, 522 U.S. 136, 146 (1997) (explaining that "opinion evidence that is connected to

existing data only by the ipse dixit of the expert" is inadmissible, and excluding testimony due to

the "analytical gap between the data and the opinion proffered").

## ARGUMENT

        As the proponents of Dr. Parikh's testimony, plaintiffs bear the burden of proving

that all of his opinions are grounded on reliable scientific principles.  Fed. R. Evid. 702; *Boca

Raton Comm. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see

Cook ex rel. Tessier v. Sheriff*, 402 F.3d 1092, 1107 (11th Cir. 2005) (proponent "carries a

substantial burden under Rule 702").  Plaintiffs cannot merely show that Dr. Parikh is qualified

in the subject areas in which he seeks to testify, but must demonstrate that all of the methodology

underlying "his conclusion is sufficiently reliable," and that "the testimony assists the trier of

fact, through the application of scientific, technical, or specialized expertise, to understand the

evidence or to determine a fact in issue."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309

(11th Cir. 1999).  Thus, plaintiffs must show that "proposed testimony . . . derive[s] from the scientific method; good grounds and appropriate validation must support it."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) (requiring that every step in expert's method be supported by "good grounds"); *see Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (requiring that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").  Plaintiffs cannot carry these burdens with respect to Dr. Parikh.

**I.     BY BUILDING HIS CAUSATION THEORY AROUND "ACUTE KIDNEY INJURY" AND BIOMARKERS, DR. PARIKH IS DEPARTING FROM STANDARD EPIDEMIOLOGICAL AND CLINICAL PRACTICE.**

   **A.     Dr. Parikh's Opinions Based on AKI Should Be Excluded.**

To assure the reliability of expert testimony under *Daubert* and Rule 702, it is axiomatic that "[l]aw lags science; it does not lead it."  *McClain,* 401 F.3d at 1247; *see also Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles.  The courtroom is not the place for scientific guesswork. . .") (internal quotation marks and citation omitted).  Testifying experts, therefore, cannot present to the jury untried theories, dressed up as reliable science.  *See, e.g., In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007) (excluding a general causation expert whose theories had not "been tested or proven").

Here, Dr. Parikh's entire opinion rests on a term – "acute kidney injury" or "AKI" – that was developed to test a hypothesis and is not used in clinical practice.  His attempt to offer a causation opinion here based on "acute kidney injury" therefore is foreclosed under *Daubert* and Rule 702.  Moreover, because his use of this term is likely to confuse jurors, Rule 403 also requires exclusion of this testimony.

### 1.    AKI Is Not a Reliable Basis for Expert Testimony on Causation.

Dr. Parikh refers to AKI as "a new name for an old disease," Parikh Report (Ex. A) at 4.  AKI, however, is not a disease or an injury.  "AKI" simply refers to an increase in a *lab value*, namely "serum creatinine," above a certain threshold (0.3 mg/dL).  *See id.* at 5 and Table 2; Mehta, "Acute Kidney Injury Network: Report of An Initiative to Improve Outcomes in Acute Kidney Injury," Crit. Care 2007, 11(2):R31 (Ex. D) (cited in Parikh Rep. (Ex. A) at 5).  Mehta et al. proposed that such lab values be called "AKI" to allow researchers and treating physicians to better test a hypothesis that increased serum creatinine eventually *might* be linked to serious long-term outcomes.  *See* Mehta (Ex. D) at 1, 3, 5-7; *accord* Parikh Report (Ex. A) at 5, 22.

Thus, AKI is not a synonym for acute renal failure leading to dialysis, renal dysfunction, or even an umbrella term for the two.  Instead, it encompasses these conditions but also extends to a mild elevation of a lab test.  By using the term AKI in his analysis, Dr. Parikh blurs distinctions drawn by other researchers exploring the safety and efficacy of Trasylol.  Dr. Parikh's testimony concerning AKI therefore should be excluded.  *See McClain,* 401 F.3d at 1240 (upholding rejection of testimony based upon sweeping generalization that *any* use of *any* dose of medication posed a risk of harm where expert did not account for differences in ingredients and dosages recognized in the relevant field); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001) (finding that expert could not rely on overbroad interpretation of possible class effect of chemicals to sweep aside recognized differences) (citing *Schudel v. Gen. Elec. Co.*, 120 F.3d 991, 996-97 (9th Cir. 1997)); *In re: Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1236 (D. Colo. 1998) (rejecting "expert" testimony grounded on information not accepted in the relevant field of medical professionals).

Moreover, Dr. Parikh's reliance on serum creatinine levels as the basis for his causation opinion is fundamentally inconsistent with his concessions about the limited utility of serum creatinine testing.  Specifically, Dr. Parikh has acknowledged:

• Serum creatinine increases alone are not clinically significant:  "Q. . . . [Y]ou can have things that elevate serum creatinine that don't result in structural damage to the kidney?  A. That is correct."  Parikh Dep. (Ex. B) 106:24-107:3; *id.* at 235:3-6 ("serum creatinine is not harmful, it doesn't cause renal failure").  *Accord* Mehta (Ex. D) at 2 ("Serum creatinine levels . . . do not provide any information about the nature or site of kidney injury").

• Even where an increase in serum creatinine is accompanied by minor renal injury, the kidney can "complete[ly] repair" itself thereafter.  Parikh Report (Ex. A) at 7.

• Only a rare subset of cases showing an increased serum creatinine lab value will "lead to progressive kidney disease and the requirement of dialysis."  *Id.* at 7; *see also id.* at 8 (noting that "the use of serum creatinine alone to follow disease progression is fraught with imprecision").

• Up to 33 percent of the people who undergo CABG *without* using Trasylol experience creatinine levels that Dr. Parikh would characterize as acute kidney injury.  Parikh Report (Ex. A) at 13 (table 3) (noting control groups also exceeded percentage of Trasylol patients showing AKI); *see also* Hobson "Acute Kidney Injury Is Associated With Increased Long Term Mortality After Cardiothoracic Surgery," Circulation 2009:119; 2444 (Ex. E) at 2446, 2449-50 (retrospective study reporting that 37% of patients undergoing isolated CABG experienced AKI as defined by Parikh, and that cause "is usually multifactorial") (cited in Parikh Report (Ex. A) at 10).

Nonetheless, Dr. Parikh makes a serum creatinine lab value (aka AKI) the springboard for opinions that Trasylol causes the most severe renal conditions and other serious ailments. *See* Parikh Report (Ex. A) at 10-12 (discussing chronic kidney disease, end stage renal disease, myocardial infarction, and increased risks of long- and short-term mortality). Because Dr. Parikh's reliance on the serum creatinine-based AKI standard is inconsistent with his own views about the limits of serum creatinine testing, his opinion must be excluded as unreliable. *See, e.g., In re TMI Litig.*, 193 F.3d 613, 677 (3d Cir. 1999) (affirming exclusion of testimony as unreliable because expert's opinion "was not supported by his own methodology"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) (excluding expert who "violated his own standard of proper methodology"); *United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) (rejecting testimony where expert failed to apply the same rigorous methodology that would be used in expert's profession).

At bottom, the term AKI may have a place in scientific research, but it does not have a place in the courtroom. Dr. Parikh's opinion that Trasylol causes AKI therefore should be excluded. *Rider*, 295 F.3d at 1202 ("The courtroom is not the place for scientific guesswork, even of the inspired sort") (internal quotation omitted); *see, e.g., Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1164 (S.D. Fla. 1996) (excluding testimony because "hypothesis [wa]s untested"), *aff'd*, 158 F.3d 588 (11th Cir. 1998).

### 2.    Dr. Parikh's Testimony Based on AKI Should Be Excluded under Federal Rule of Evidence 403.

In addition to failing *Daubert* scrutiny, Dr. Parikh's testimony using the pejorative term acute kidney injury should be excluded because it will confuse and mislead the jury, prejudicing Bayer. Fed. R. Evid. 403; *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). Under Federal Rule of Evidence 403, the Court should exclude any evidence whose

"probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.  This is particularly true when evidence is proffered under the guise of "expert" testimony:  "[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263 ("Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements [of Rule 702] may still be excluded under Rule 403") (internal citations omitted); *Allison*, 184 F.3d at 1310 (recognizing that expert testimony may be "both powerful and quite misleading because of the difficulty in evaluating it'") (quoting *Daubert*, 509 U.S. at 595); *see also Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1160-61 (S.D. Fla. 2007) (acknowledging the importance that jurors may attach to expert testimony and the need for careful gatekeeping to reject testimony that may confuse or mislead).

Allowing Dr. Parikh to confuse the issues here by using the term "acute kidney injury" to mean elevated serum creatinine "easily could serve to confuse the jury, and might well [mislead] it." *Frazier*, 387 F.3d at 1266; *R.K. v. Kanaski*, No. 02-61534-CIV, 2007 WL 2026388, at *10 (S.D. Fla. July 9, 2007) (same); *see also Thomas v. Evenflo Co.*, 205 Fed. Appx. 768, 773 (11th Cir. 2006) (upholding exclusion of expert testimony where potential to mislead the jury "far exceed[ed]" any probative value").  This risk far outweighs any probative value from allowing him to testify about a term developed by researchers to assist in testing a hypothesis.  Dr. Parikh's testimony about acute kidney injury or AKI therefore should be excluded.

**B.** **Dr. Parikh's Reliance On Biomarkers To Support His General Causation Theory Is Unreliable.**

Based on a handful of studies linking particular proteins (*i.e.*, biomarkers) to kidney injury, Dr. Parikh hypothesizes that kidney injury may be present even in the absence of serum creatinine elevations and speculates that novel renal biomarkers may independently predict a risk of acute kidney injury. Parikh Report (Ex. A) at 7-8; *see also* Parikh Dep. (Ex. B) at 256:13-257:8. Dr. Parikh's biomarker-based theory is not reliable methodology on which to base a general causation opinion. On the contrary, it is a prime example of improperly using the courtroom to advance a scientific hypothesis that has not been accepted or proven, much less sufficiently tested. *Rider*, 295 F.3d at 1202 (excluding causation testimony because "[l]aw lags science; it does not lead it"); *see Kilpatrick v. Breg*, No. 08-10052-CIV, 2009 WL 2058384, at *4 (S.D. Fla. June 25, 2009) (excluding general causation testimony because the witness "concedes that the medical literature supporting his claim is still a 'developing science'").

First, Dr. Parikh's biomarker opinions should be excluded because he admits that these biomarkers are not generally accepted – or even available – in the relevant clinical community:

> Q:    So in your clinical practice, when you see patients in the hospital, currently, you don't use the biomarkers to diagnose AKI?
>
> A:    That's correct.  In clinical practice, we do not have the ability to order these biomarkers.

Parikh Dep. (Ex. B) at 69:8-12.  For testimony to be admissible pursuant to Rule 702, however, the Supreme Court has held that an expert must "employ[] in the courtroom the same level of intellectual rigor that *characterizes the practice of an expert in the relevant field*."  *Kumho Tire*, 526 U.S. at 152 (emphasis added).

Second, Dr. Parikh admits that the biomarkers are not used in the field because the hypothesis that they are diagnostically meaningful has not acquired general acceptance and requires further testing.  *See McClain*, 401 F.3d at 1251 (recognizing that the "general acceptance" of an expert's method and whether it can be and has been tested are critical considerations under *Daubert*").  For instance, Dr. Parikh acknowledges that the FDA has not approved use of biomarkers as a clinical diagnostic tool.  Parikh Dep. (Ex. B) at 87:9-15.

The unreliability of using biomarkers to establish general causation is evidenced by Dr. Parikh's candor about the comprehensive shortcomings in data related to those biomarkers.  For instance, he testified:

- "These biomarkers *need validation in larger studies*, and the generalizability of biomarkers to different types of AKI as well as the incremental prognostic value over traditional clinical variables *needs to be determined*,"  *id.* at 74:17-75:6 (emphasis added);

- "uncertainty still exists . . . as to whether these biomarkers possess adequate prognostic accuracy for both established AKI and for early detection of AKI," *id.* at 76:20-77:12;

- "we don't know yet whether [NGAL, one such biomarker, is a surrogate marker of tubular injury]," *id.* at 103:3-6;

- "at the present time [the proteins in question] ha[ve] not been determined to be a good biomarker for hard outcomes like dialysis and death,"  *id.* at 104:17-21; and

- he and his fellow researchers are still trying "to understand which [proteins] *could be* better markers of acute kidney injury," *id.* at 46:8-22.

Third, even if biomarkers generally were established to be a reliable method of diagnosing clinically significant injury, Dr. Parikh's reliance on them still would be inadmissible because the data supporting *Trasylol*'s link to increased biomarkers is largely untested and does

not demonstrate general causation.  *See* Parikh Report (Ex. A) at 16-17; *see generally McClain*, 401 F.3d at 1244 ("The *Daubert* requirement that the expert testify to scientific knowledge – conclusions supported by good grounds for each step in the analysis – means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*") (emphasis in original, internal quotation marks omitted); *In re Accutane*, 511 F. Supp. 2d at 1292 (excluding general causation expert because his "theory does not show the reliability of each step necessary to make the testimony admissible under *Daubert*").  Dr. Parikh notes that there are just *three* published studies showing any link between Trasylol and increased biomarkers, each testing a different biomarker.  Parikh Report (Ex. A) at 16-17.  All together, the studies involve fewer than 400 patients.[1]  Not surprisingly, the authors of these studies recognize that these studies generate only hypotheses, but do not prove anything,[2] certainly not causation.

---

[1] Nguyen, "Urinary aprotinin as a predictor of acute kidney injury after cardiac surgery in children receiving aprotinin therapy," Pediatr. Nephrol. Aug 2008;23(8): 1317-1326 (Ex. F); Wagener, "Increased incidence of acute kidney injury with aprotinin use during cardiac surgery detected with urinary NGAL," Am. J. Nephrol. 2008;28(4):576-582 (Ex. G); Fauli, "Kidney-specific proteins in patients receiving aprotinin at high- and low-dose regimens during coronary artery bypass graft with cardiopulmonary bypass," Eur. J. Anaesthesiol. Sep. 2005;22(9):666-671 (Ex. H).

[2] For instance, the authors of Nguyen described their work as a "pilot study" that was not designed to assess Trasylol's safety, but merely to "identify [a particular protein] and test its utility as a biomarker of AKI."  Nguyen (Ex. F) at 1317.  The authors noted many "important limitations" of the study, including that it did not address causation or association with "important clinical consequences."  *Id.* at 1325; *see id.* (recognizing that the "results *will need to be validated* in a larger phase IV randomized prospective trial") (emphasis added).  Similarly, Wagener noted that their study was "the first study" of its kind, and they could merely postulate that the biomarker examined "*will likely allow* more precise and *promising studies in the future.*"  Wagener (Ex. G) at 580 (emphasis added); *accord* Eisenberg Report (Ex. B to Bayer's Motion to Exclude Testimony of Mark J. Eisenberg) at 128 (noting that Wagener studied "a novel biomarker [that] has not been validated in many studies").  Moreover, Dr. Eisenberg explained that "[e]ven if [elevations of the biomarker examined in Wagener] are sensitive markers for renal injury," their "significance" was questionable because no studies showed that the increases "lead to long-term adverse effects on the kidneys and actually are associated with adverse clinical events."  *Id.* at 128-29; *see also id.* at 129-30 (dismissing importance of Fauli, *supra*).

Because the data have not yet caught up to Dr. Parikh's method, his opinions founded on those methods should be excluded. *See generally Joiner*, 522 U.S. at 146 (excluding opinion due to the "analytical gap between the data and the opinion proffered"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) (explaining that testing hypotheses is precisely "what distinguishes science from other fields of human inquiry"); *see Haggerty*, 950 F. Supp. at 1164 (excluding causation testimony where expert's "hypothesis [wa]s untested"); *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 468 (E.D. Pa. 2008) ("the non-existence of good data does not allow expert witnesses to speculate or base their conclusions on inadequate supporting science").

## II.     DR. PARIKH'S THEORY OF CAUSATION IS NOT SCIENTIFICALLY RELIABLE.

Having recast the debate in terms of AKI, Dr. Parikh hypothesizes that Trasylol causes certain renal injuries, including renal failure leading to dialysis, based upon the association of the medication with increased serum creatinine levels. In essence, he posits a syllogism: (1) Trasylol is associated with elevated serum creatinine levels; (2) elevated serum creatinine levels are associated with bad clinical outcomes, including renal failure; and (3) therefore, Trasylol causes bad clinical outcomes, including renal failure. This reasoning is defective, and his method scientifically unreliable, because the associations he observes in the first two premises cannot support a conclusion of causation.

To demonstrate the first premise of his theory, Dr. Parikh relies on data from randomized controlled trials showing that Trasylol has been associated with increases in serum creatinine levels. *See* Parikh Report (Ex. A) at 13. This showing is unremarkable, and in fact the labeling for Trasylol describes studies suggesting an association with small, transient increased levels of serum creatinine.

11

The methodological problems arise in the second premise of Dr. Parikh's theory and in the conclusion that he draws.  *See generally McClain*, 401 F.3d at 1244 ("any step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony* inadmissible") (emphasis in original).  Dr. Parikh's second premise – that serum creatinine elevations are associated with bad outcomes – rests on his analysis of studies on AKI.  Those population studies report that increases in serum creatinine of 0.3 to 0.4 mg/dL are associated with a statistically significant relative risk of death.  *See* Parikh Report (Ex. A) at 9-10; *id.* 11, Figure 8.

Dr. Parikh relies on those studies to demonstrate far more than the studies themselves support.  First, the studies explicitly refuse to draw any conclusions about what *actually causes* the serious outcomes.  *See, e.g.*, Gruberg, "The prognostic implications of further renal function deterioration within 48 h of interventional coronary procedures in patients with pre-existent chronic renal insufficiency," 36(5) J. Am. Coll. Cardiol. 1542-48 (Nov. 1, 2000) (Ex. I) (merely examining the impact of post-surgery declines in renal function on acute and long-term mortality and morbidity); Hobson (2009) (Ex. E) at 2448 ("We can only speculate about possible cause-and-effect relationships between AKI and long-term mortality") (*cited in* Parikh Report (Ex. A) at 23); *see also* Mehta (Ex. D) at 4 (recognizing that the literature does not examine the "[e]pidemiology of AKI," including what "data [would] help determine etiology").  As the studies on which Dr. Parikh relies acknowledge, "association" is definitely *not* causation, and Dr. Parikh's inference of causation from these association studies is one of his "several scientifically unsupported 'leaps of faith.'"  *Rider*, 295 F.3d at 1202 (excluding causation expert).

12

Moreover, none of the AKI studies on which he relies involves either Trasylol or the lysine analogues. *See* Parikh Report (Ex. A) at 8-10; *id.* at 11, figure 11. Thus in developing his causation theory, Dr. Parikh relies solely on research that was designed only to generate hypotheses for future testing, disclaimed causation, and did not test any of those hypotheses with respect to Trasylol or the lysine analogs. This methodology flies in the face of *Daubert*, which held that "generating hypotheses [that are testable] and testing them" are essential components of a reliable scientific method. *Daubert,* 509 U.S. at 593; *see Kilpatrick*, 2009 WL 2058384, at *4 (excluding general causation expert who could only rely on still developing science). Because the studies on which Dr. Parikh relies do not support the causal connections Dr. Parikh attempts to make, his method is not scientifically reliable. *Joiner*, 522 U.S. at 146; *Perry*, 564 F. Supp. 2d at 468 ("the non-existence of good data does not allow expert witnesses to speculate or base their conclusions on inadequate supporting science"); *Haggerty*, 950 F. Supp. at 1164 (admissibility of expert testimony depends on a hypothesis that has been tested).

The same methodological flaws are rampant in Dr. Parikh's conclusion from his syllogism. Based upon the AKI studies, Dr. Parikh concludes that Trasylol must cause serum creatinine increases, which lead to bad long term outcomes – acute renal injury and death. Courts regularly reject as unreliable attempts to piece together causation theories in this way. *McClain*, 401 F.3d at 1245 (excluding causation testimony where expert's could not show that the drug in question "causes [one set of conditions], which in turn causes [another set of conditions], except by a leap of faith"); *see, e.g.*, *Joiner*, 522 U.S. at 146; *Allison*, 185 F.3d at 1414 (holding that "leaping from an accepted scientific premise to an unsupported one" is not a proper scientific method); *Rider*, 295 F.3d at 1202 (excluding expert opinion whose methodology depended on "several scientifically unsupported 'leaps of faith'"); *Kilpatrick*, 2009

13

WL 2058384, at *3; *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion").

   The fallacies inherent in Dr. Parikh's syllogism are illustrated by his own testimonial admissions.  First, as Dr. Parikh admits, the randomized controlled trials in which Trasylol was studied do not show a statistically significant increase in the severe renal events or increases in mortality that Dr. Parikh pulls from the literature concerning AKI and concludes are caused by Trasylol.  *See*, *e.g.*, Parikh Dep. (Ex. B) at 248:17-21; Eisenberg Dep. (Ex. J) at 258:18-259:8.  Indeed, multiple meta-analyses of randomized controlled trial data found no statistically significant risk of renal failure associated with Trasylol.  *See* Eisenberg Report (Ex. B to Bayer's Motion to Exclude Testimony of Mark J. Eisenberg) at 48, 65 (acknowledging that Brown's 2007 meta-analysis of 138 trials found no statistically significant risk of renal failure); *id.* at 53 (same re: Sedrakyan); Fergusson, "A Comparison of Aprotinin and Lycine Analogues in High-Risk Cardiac Surgery," N. Eng. J. Med. 358:22 (2008) (Ex. K) at 2330 ("aprotinin did not significantly increase the risk of renal failure").

   Second, as Dr. Parikh testified, "serum creatinine is not harmful, it doesn't cause renal failure."  Parikh Dep. (Ex. B) at 235:3-6.  In other words, serum creatinine increases alone (the definition of AKI) are not clinically significant:  "Q. . . . [Y]ou can have things that elevate serum creatinine that don't result in structural damage to the kidney?  A.  That is correct."  *Id*. 106:24-107:3; 235:3-6; *accord* Mehta (Ex. D) at 2 ("Serum creatinine levels *... do not provide any information about the nature or site of kidney injury*.") (emphasis added).  Moreover, Dr. Parikh explained that, even where an increase in serum creatinine is accompanied by minor renal injury, the kidney can "complete[ly] repair" itself thereafter.  Parikh Report (Ex. A) at 7.

Third, the extrapolation from an association between Trasylol and transient increases in serum creatinine (*i.e.*, AKI) to causation of severe renal outcomes is even more attenuated because these small serum creatinine elevations (i.e., greater than 0.3 mg/dL) are so common.  Dr. Parikh testified:  "I would say acute kidney injury is the *most common reason* for inpatient consultative nephrology team.  So, I would say *more than 80 percent of the cases* that we see while we are in the hospital are in and around acute kidney injury."  Parikh Dep. (Ex. B) at 33:14-19 (emphasis added); *see id.* at 33:22-34:7 (testifying that the other 20 percent of his cases involve chronic kidney disease).  Yet, Dr. Parikh conceded that, with or without Trasylol's exposure, only a rare subset of cases showing an increased serum creatinine lab value will "lead to progressive kidney disease and the requirement of dialysis."  Parikh Report (Ex. A) at 7; *see also id.* at 8 (noting that "the use of serum creatinine alone to follow disease progression is fraught with imprecision").  Thus, even Dr. Parikh called into question any causation link between increased serum creatinine levels and kidney failure leading to dialysis.

Fourth, in relying on these studies, Dr. Parikh does not make any adjustments for the high background rate of elevated serum creatinine among patients with cardiac illness and following CABG surgery, in whom these increased values are very common:

Q.   And within the 80 percent of your acute kidney injury, inpatients, I think your phrase was a good proportion of them are coming out of cardiac surgery; is that fair to say?

A.   A good proportion of them are postoperative acute kidney injury.  And cardiac surgery is one of the commonest cause[s] of postoperative acute kidney injury.

Parikh Dep. (Ex. B) at 34:13-22; Hobson (Ex. E) at 2448 ("It is well known that a postoperative systemic inflammatory response syndrome can result after complex cardiothoracic surgery and, in a patient with a complicated recovery or with significant comorbid conditions, may contribute to a secondary postoperative AKI.  Conversely, perioperative insults may cause AKI that then

15

results in a primary renal inflammatory state with diverse negative distal effects."); *see also*, *e.g.*, Eisenberg Dep. (Ex. J) at 147:24-48:2 (calling renal failure a "common" outcome following CABG).  As Dr. Parikh himself explained, serum creatinine increases may be "due to several different insults" during CABG that are entirely unrelated to Trasylol or other agents administered during surgery, *e.g.*, because of "blood going through pulmonary cardiac bypass[,] ... ischemia[,] …  a surgeon working on the heart[,] ...  blood loss."  Parikh Dep. (Ex. B) 258:24-259:11.  Yet he did not make any adjustments in his analysis to account for this high background rate of elevated serum creatinine (or AKI).

In the end, Dr. Parikh is left with a theory that boils down as follows:  because Trasylol *may* lead to the increase of serum creatinine, and increased serum creatinine *may* some day be proven to be indicative of clinically significant outcomes, he already can *conclude* that Trasylol is the *general cause* of those outcomes.  This is not sound science.  *Allison*, 185 F.3d at 1414 (holding that "leaping from an accepted scientific premise to an unsupported one" is not a proper scientific method); *see*, *e.g.*, *Joiner*, 522 U.S. at 146 (excluding opinion due to "analytical gap between the data and the opinion proffered"); *Hudgens*, 328 F.3d at 1344; *Rider*, 295 F.3d at 1202; *Kilpatrick*, 2009 WL 2058384, at *3.

## CONCLUSION

For all of these reasons, the Court should exclude the testimony of Dr. Parikh.

## RULE 7.1(A)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(A)(3)(a), counsel for defendants hereby certifies that counsel for the defendants has made reasonable efforts to confer in good faith with

counsel for all parties who may be affected by the relief sought in the motion, and has been advised that plaintiffs will contest this motion.

December 18, 2009                                  Respectfully submitted,

                                                   */s/ Barbara Bolton Litten*
                                                   Patricia E. Lowry
                                                   Florida Bar No. 332569
                                                   E-mail:  plowry@ssd.com
                                                   Barbara Bolton Litten
                                                   Florida Bar No. 91642
                                                   E-mail:  blitten@ssd.com
                                                   **SQUIRE SANDERS & DEMPSEY L.L.P.**
                                                   1900 Phillips Point West
                                                   777 South Flagler Drive
                                                   West Palm Beach, FL  33401-6198
                                                   Telephone:  561-650-7200
                                                   Facsimile:  561-655-1509

                                                   Philip S. Beck
                                                   Email:  philip.beck@bartlit-beck.com
                                                   Steven E. Derringer
                                                   Email:  steven.derringer@bartlit-beck.com
                                                   **BARTLIT BECK HERMAN PALENCHAR**
                                                   **& SCOTT LLP**
                                                   54 W. Hubbard Street, Suite 300
                                                   Chicago, IL  60603
                                                   Telephone:  312-494-4400
                                                   Facsimile:  312-494-4440

                                                   Eugene A. Schoon
                                                   Email:  eschoon@sidley.com
                                                   Susan A. Weber
                                                   Email:  saweber@sidley.com
                                                   Catherine Valerio Barrad
                                                   Email:  cbarrad@sidley.com
                                                   **SIDLEY AUSTIN LLP**
                                                   One South Dearborn Street
                                                   Chicago, Illinois 60603
                                                   Telephone:  312-853-7000
                                                   Facsimile:  312-853-73036

17

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:  313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMENS CHERIN &
    MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:  412-566-6099

*Attorneys for Bayer Corporation,
Bayer HealthCare Pharmaceuticals Inc.,
and Bayer Schering Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Barbara Bolton Litten*
Barbara Bolton Litten

**SERVICE LIST**

**In re Trasylol Products Liability Litigation – MDL-1928**
**Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON**

**United States District Court**
**Southern District of Florida**

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN,**
   **FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-790-4584
Facsimile:  215-875-7701
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE**
   **& LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile:  561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile:  561-655-1509
*Liaison Counsel for Defendants*

Scott A. Love
Email:  slove@triallawfirm.
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-757-1400
Facsimile:  713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone:  203-610-6393
Facsimile:  203-610-6399
*Federal-State Liaison for Plaintiffs*