IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to:  CLASS CASES

*Southeast Laborers Health and Welfare Fund
v. Bayer Corp., et al,*  Case No. 9:08-cv-80873

**PLAINTIFF'S RESPONSE IN OPPOSITION TO BAYER DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiff in its Second Amended Complaint has pled viable claims for violations of RICO and the New Jersey Consumer Fraud Act and claims for fraud and breach of warranty. In accordance with this Court's July 30, 2009 Order, Plaintiff included facts that establish a direct causal link between Bayer's wrongful conduct and injury to Plaintiff. Bayer's arguments to the contrary ignore key facts and distort Plaintiff's allegations of causation. Bayer's other arguments likewise lack merit. Accordingly, Bayer's motion to dismiss should be denied.

I.      **PLAINTIFF'S RICO CLAIMS SHOULD NOT BE DISMISSED**

Bayer argues that Plaintiff's RICO claims should be dismissed because Plaintiff has failed to allege proximate cause and the existence of a cognizable RICO enterprise. Yet, Plaintiff has more than sufficiently pled a RICO enterprise and causation in its Second Amended Complaint[1], fully addressing the Court's concerns set forth in its July 30, 2009 Order.[2]

   A.      **Plaintiff Has Sufficiently Alleged Causation**

Notably, Bayer does not suggest that Plaintiff has not sufficiently pled injury. Bayer only suggests that the injury Plaintiff has pled is too remote to permit recovery. Yet, Plaintiff has pled a direct relation between Bayer's fraudulent conduct and the injury Plaintiff sustained. The

---

[1] Plaintiff's Second Amended Class Action Complaint shall be referenced through Plaintiff's Opposition as "SAC". Plaintiff's Amended Civil RICO Case Statement shall be referenced as "RCS". Bayer Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint shall be referenced as "Bayer MTD".

[2] Plaintiff has also alleged each additional element necessary for pleading a claim pursuant to 18 U.S.C. 1982(c) including the requisite predicate acts and has pled its claims with sufficient particularity. Bayer, in its motion to dismiss, does not suggest otherwise.

causal chain Plaintiff has alleged is simple, direct and uninterrupted. Plaintiff has therefore alleged a cognizable RICO claim and Bayer's motion to dismiss should be denied.

Plaintiff paid a premium in excess of $900 for every dose of Trasylol prescribed for a plan participant as compared to Trasylol's competitors, Amicar and TA, which are both safer and more efficacious than Trasylol. SAC ¶ 187. Plaintiff would never have incurred this expense had Bayer been honest about the safety and efficacy of Trasylol. SAC, ¶¶ 2, 187, 262. Rather than being honest, however, Bayer engaged in a fraudulent scheme whereby Bayer misrepresented the safety, effectiveness and relative value of Trasylol and concealed material facts regarding the drug in the face of a duty to disclose. *See* SAC ¶¶ 2-5, 44-60, 69-201, 206-239, 247, 253-259. Bayer's scheme was essential because, as Bayer understood, once payors learned that the risks of Trasylol outweighed its benefits for all patient populations[3], no payor would pay for Trasylol, especially given the availability of significantly cheaper and more efficacious alternative drugs. SAC ¶¶ 4, 261, 265. Bayer knew its profits would be significantly impacted once payors learned the truth and refused to pay for Trasylol. SAC ¶ 265 Plaintiffs have sufficiently alleged that Bayer's fraudulent scheme proximately caused substantial injury to the business and property of Plaintiff and other Class Members in that they paid enormous sums of money to Bayer that they would not have paid had they been aware that Trasylol was not safer, more efficacious or of greater value than available alternatives that were significantly cheaper. SAC ¶ 267

---

[3] Bayer suggests that Plaintiff has misrepresented the FDA's statement regarding the relative safety of Trasylol, citing and asking the Court to take judicial notice of an FDA News Release issued on November 5, 2007. Not only is the introduction of evidence inappropriate but the evidence cited by Bayer fails to call into question Plaintiff's allegations. Bayer fails to point out that the FDA also held two press conferences on November 5, 2007. Plaintiff would likewise ask the Court to take judicial notice of the transcripts of these conferences wherein the following statements were made:

"At this time, FDA cannot identify a specific patient population where we believe the benefit of using Trasylol outweighs the risk."
http://www.fda.gov/downloads/NewsEvents/Newsroom/MediaTranscripts/UCM122284.pdf, p.2.

"FDA decided that we could not identify at this time a specific patient population for benefit of using Trasylol would outweigh the serious risk identified in the BART study."
http://www.fda.gov/downloads/NewsEvents/Newsroom/MediaTranscripts/UCM122315.pdf, p.3.

As in *Bridge v. Phoenix Bond*, 128 S. Ct. 2131, 2144 (2008), Plaintiff and Class Members were the primary and intended victims of Bayer's scheme to defraud. SAC ¶¶ 3, 263, 264, 269. As set forth in the Amended Complaint, while Bayer's scheme was also directed at others such as the United States Food and Drug Administration ("FDA"), physicians and the general public, Plaintiff and other Class Members who actually paid monies for Trasylol were the focus of Bayer's fraudulent scheme with Bayer's ultimate goal being continued payments and, accordingly, enormous profits. SAC ¶¶ 3, 263, 264, 269. As in *Bridge*, Plaintiff's injuries were the foreseeable and natural consequence of Bayer's scheme and ascertaining the amount of damages attributable to Bayer's conduct will not be difficult given the clear differential between the exorbitant cost of Trasylol and the price of competing products that ultimately proved to be both safer and more efficacious.

Also, as in *Bridge*, there is no independent factor that accounts for Plaintiff's injury, there is no risk of duplicative recoveries and there is no more immediate victim better situated to sue. Bayer's arguments to the contrary flow from a simple miscomprehension of Plaintiff's allegations. While Bayer's fraud was also directed at others including the FDA and prescribing physicians, neither is a more direct victim with regard to economic losses than Plaintiff and Class Members because neither paid for Trasylol. In addition, while some patients may have directly paid for some portion of the cost of Trasylol as well, such payments place the patients in a parallel position with Plaintiff rather than as an intervening link between Bayer's fraudulent conduct and the resulting harm to Plaintiff. SAC ¶¶ 7, 271, 272. Obviously, each was injured economically to the extent they paid for the drug and each should be permitted full recovery. In contrast to *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 273, 112 S. Ct. 1311, 1320 (1992), no complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts will be necessary because there is no risk of multiple recoveries.

Likewise, while some beneficiaries of the Plaintiff Plan may have suffered physical injuries as a result of ingesting Trasylol, the presence of such injuries does not lessen the economic losses sustained by Plaintiff and Class Members who paid for Trasylol on their behalf. SAC ¶¶ 7, 271, 272. There is a need to deter Bayer's injurious conduct and there are no more directly injured victims with regard to the economic injury Plaintiff has sustained that can

3

generally be counted on to vindicate the law as private attorneys general as in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 273, 112 S. Ct. 1311, 1320 (1992).

Finally, despite Bayer's argument to the contrary, the presence of prescribing physicians does not negate the directness of the causal link between Bayer's fraudulent conduct and Plaintiff's injury. Bayer MTD, at 6. Would Plaintiff have paid for Trasylol if a physician had not prescribed the drug? Obviously not. However, on the other hand, was the Plaintiff required to pay for Trasylol simply because a physician prescribed the drug? Absolutely not.

Irrespective of the physician's decision to prescribe Trasylol, Plaintiff had an independent choice of whether or not to pay for Trasylol. The cases cited in support of Bayer's argument where the Plaintiff's theory of causation was dependent on the physician's decision to prescribe are simply inapposite. Here, Plaintiff has alleged that it would not have paid for Trasylol had it known the truth that it was unsuitable for use by any patient, regardless of the decision of any prescribing physician (SAC ¶¶ 4, 6, 266, 270) and regardless of the existence of alternative drugs or therapies for preventing blood loss Therefore, how can a physician's medical decision to prescribe Trasylol logically or plausibly sever the causal link between Bayer's fraud and Plaintiff's resulting economic injury as Bayer suggests? Admittedly, the physician's prescription of Trasylol was a necessary antecedent event to Plaintiff's liability for payment. Yet, this is not the dispositive question in determining whether Bayer's conduct proximately caused Plaintiff's injury. The fact that Bayer denied physicians the necessary information to make an informed decision regarding prescribing Trasylol does not negate the fact that Bayer also denied Plaintiff and Class Member the information necessary to determine whether or not to pay for Trasylol. Because Plaintiff has alleged that it would not have paid for Trasylol, even if prescribed by a physician, Plaintiff's proximate causation is wholly independent of the decision of any doctor.

Plaintiff has sufficiently alleged a direct causal chain between Bayer's conduct and Plaintiff's injury. In addition, as Plaintiff alleged, Bayer also defrauded the FDA as part of its overarching scheme and Bayer's fraudulent conduct with regard to the FDA also proximately harmed Plaintiff. In response to these allegations, Bayer simply argues that there is no private right of action for such a claim. Yet, Plaintiff does not seek to assert a cause of action pursuant to statutes or regulations related to fraud on the FDA. Instead, Plaintiff seeks to recover under RICO for the injuries it sustained as a result of Bayer's fraud on the FDA which resulted in economic injury to Plaintiff. Bayer's fraud on the FDA was not an end unto itself. As set forth

4

in the Complaint, Bayer's ultimate goal was to defraud Plaintiff and Class Members in order to ensure continued payments. SAC ¶¶ 3, 263, 264, 269. The FDA was simply a necessary conduit for securing Plaintiffs' payments for Trasylol.

Finally, as Plaintiffs have alleged, Bayer caused Plaintiff and Class Members to pay significantly more for heart surgeries. SAC ¶ 275. Bayer suggests that Plaintiff's allegations regarding increased surgical charges are "remote, speculative and attenuated" because there are "dozens of facts that affect prices that hospitals charge." Bayer MTD, at 9. Yet, Plaintiff has alleged that Trasylol is a very expensive drug which increased the cost of heart surgery and that the cost of Trasylol was sufficiently high that it increased the DRG or other similar payment methodology for heart surgeries. Plaintiff's allegations sufficiently establish causation and for purposes of deciding the sufficiency of the pleadings, must be accepted as true.[4]

B.  **Plaintiff Has Also Adequately Pled Enterprise**

As set forth in the Complaint, the following persons constitute an association-in-fact enterprise: (1) the German Bayer parent corporations; (2) its American subsidiaries, and their Scientific Affairs and Clinical Communications Liaisons; and (iii) the Key Opinion Leaders retained by Bayer. SAC ¶ 205. RCS, question 6(a), p. 44. As association in fact "enterprise is…a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). "[A]n association-in-fact enterprise must have at least three structure features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 129 S. Ct. 2237, 2244 (2009). The Court in *Boyle* further clarified:

> "[An association in fact enterprise] need not have a hierarchical structure or a 'chain of command"; decisions may be made on an ad hoc basis and by any number of methods – by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular

---

[4] Bayer again seeks to introduce summary judgment evidence by citing factual explanations from other cases in an attempt to suggest that "the amount that payors reimburse is not affected by whether a surgeon decides to use a medication such as Trasylol during the procedure." Bayer's Brief, p. 8-9 n.6. Bayer's argument which directly conflicts with Plaintiff's factual allegations is both irrelevant and procedurally inappropriate. Factual disputes exist that will in all likelihood preclude summary judgment with regard to this issue. Clearly, this disputed question cannot be resolved on a motion to dismiss.

5

> meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by quiescence."

*Id.* at 2245. Plaintiff has sufficiently alleged each element of an association-in-fact RICO enterprise. Bayer argues that Plaintiff has not adequately alleged a common purpose or an enterprise that is distinct from Bayer. Given Plaintiff's allegations, however, these arguments are simply unavailing.

Plaintiff has clearly alleged that the common purpose of the Key Opinion Leaders Enterprise (KOLE) was to ensure continued payments for Trasylol from Plaintiff and Class Member. SAC ¶ 241; RCS, question 6(b), p. 44. Plaintiff also alleged that the members of the KOLE sought to achieve this goal primary through illegally fraudulent means including misleading communications and attempts to eliminate or marginalize any negative communications regarding Trasylol. SAC ¶¶ 242-243, 206-239; RCS, question 6(b), p. 44 Plaintiff further alleged that all participants were aware of Bayer's control of the uniform misrepresentations and activities to conceal the fact that Trasylol was not safe, efficacious, or of greater value than readily available alternative drugs. SAC ¶ 242; RCS, question 6(b), p. 45. Plaintiff set forth each member's participation in the operation or management of the enterprise including the Key Opinion Leaders dissemination of false information regarding safety, benefits and value of Trasylol, acting to conceal the risks associated with Trasylol and participation in "mock panels" in preparation for the FDA Advisory Committee meeting in September, 2006. SAC ¶ 243; RCS, question 6(b), p. 45-46.

These allegations sufficiently plead the common purpose of the enterprise under Eleventh Circuit precedent:

> Because the complaint clearly alleges that the members of the enterprise stand to gain sufficient financial benefits from Mohawk's widespread employment and harboring of illegal works, the plaintiffs have properly alleged a 'common purpose' for the purposes of RICO....[A]ll that is required is that the enterprise have *a* common purpose. In this case, the complaint alleges that Mohawk and the recruiters, under Mohawk's direction, worked together to recruit illegal workers to come to Georgia and that they had the common purpose of providing illegal workers to Mohawk so that Mohawk could reduce its labor costs and the recruiters could get paid. This commonality is all that this circuit's case law requires.

6

*Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1285-1286 (11th Cir. 2006).

Bayer also argues that Plaintiff has not identified a proper RICO enterprise because the alleged enterprise is not sufficiently distinct from Bayer. Bayer MTD, at 11-12. Bayer reasons that distinctiveness is absent because the Key Opinion Leaders were acting as Bayer's agents and because RICO should not punish a corporation for utilizing independent agents to accomplish what could have been accomplished through use of its own employees. Bayer MTD, at 11-12. Bayer's argument completely misses the mark for several independent reasons.

First, Bayer's distinctiveness argument cannot be appropriately resolved on a motion to dismiss. Plaintiff has not alleged in the Complaint or in the RICO Case Statement that the Key Opinion Leaders act as agents of Bayer. As the Sixth Circuit concluded in *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000), a determination that a person or entity is the agent of another person or entity generally involves a fact-intensive inquiry that cannot be resolved on the pleadings.[5] The Complaint simply does not support Bayer's contention that the Key Opinion Leaders and Bayer are not distinct.

To the contrary, Plaintiff's allegations clearly establish a distinction between the Bayer and the Key Opinion Leader Enterprise. As set forth in the Complaint, the success of Bayer's scheme depended on the appearance that the Key Opinion Leaders were independent – a role that, in fact, could not have been filled by Bayer's employees. Key Opinion Leaders were "scientists and physicians identified for their prominence in their failed and ability to persuade other healthcare providers." SAC ¶ 210. "Ideally, Key Opinion Leaders were those respected for their acumen in their particular field, and well-published, precisely the kinds of people who were likely to influence the opinions and decisions of their professional contemporaries." SAC ¶ 212. "Bayer used the Key Opinion Leaders specifically to interface with healthcare professionals and to communicate with them on a level, and in a way that ordinary sales representatives could not." SAC ¶ 237. In addition, "[w]hile Bayer's ordinary sales staff was strictly limited in the scope of their messages regarding off-label use, Key Opinion Leaders, as

---

[5] "It is not clear from the pleadings, however, that the "dealers" (to take one example) are subdivisions, agents or members of PNC, and to so conclude requires that an inference be drawn against Begala, the non-moving party. Drawing that inference would violate established practice under Fed.R.Civ.P. 12(b)(6) and the rule that RICO pleadings are to be liberally construed." *Begala*, 214 F.3d at 781.

7

fellow healthcare professionals, were not similarly limited." SAC ¶ 231. "Key Opinion Leaders actively advocated for the use of Trasylol, and conveyed Bayer's misrepresentations and omissions to the medical community." SAC ¶ 202. Key Opinion Leaders "often fielded questions and provided encouraging studies or data with regard to off-label use of Trasylol to their contemporaries." SAC ¶ 231. Bayer utilized Key Opinion Leaders "to deliver Bayer's safety and cost-effectiveness message to healthcare professionals Bayer might otherwise have trouble reaching." SAC ¶ 232. Bayer utilized these Key Opinion Leaders to control the medical literature and debate regarding the drug, ensuring that Bayer's message touting the safety, efficacy and cost-effectiveness of Trasylol would be the only message heard." SAC ¶ 57.

Plaintiff's enterprise allegations are clearly sufficient under binding Eleventh Circuit law.[6] In *Williams v. Mohawk Indus., Inc.*, 411 F.3d 1252 (11th Cir. 2005)(*Williams I*), the Eleventh Circuit affirmed the District Court's denial of Mohawk's motion to dismiss the plaintiffs' federal RICO claims where the plaintiffs alleged an enterprise consisting of "Mohawk and third-party temp agencies/recruiters". The Court determined that Plaintiffs' complaint had "sufficiently alleged an 'enterprise' under RICO". *Williams I*, 411 F.3d at 1258. Mohawk subsequently filed an application for writ of certiorari on, *inter alia*, the following question:

> Whether a defendant corporation and its agents can constitute an "enterprise" under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), in light of the settled rule that a RICO defendant must

---

[6] Even the Seventh Circuit case cited by Bayer makes clear that such facts **are sufficient** to plead distinctiveness:

> The dealers were merely a conduit, and the trust and foreign subsidiaries were not even that. **The dealers did not, by the incidental role in the alleged fraud…lend an air of legitimacy to a person or entity that unless masked by a legitimate-seeming enterprise would be quickly discovered to be engaged in criminal acts….It has not established dealerships in order to fool car buyers into thinking that they are not dealing with the "racketeer" Chrysler, or to enable Chrysler to engage in fraud on a scale that would be impossible if it internalized the dealership function.** Maybe a manufacturer could use its dealers or other agents or affiliates in such a way as to being about the sort of abuse at which RICO is aimed, in which event it might be possible to characterize the assemblage as a RICO enterprise.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227-228 (7th Cir. 1997) (emphasis supplied).

8

"conduct" or "participate in" the affairs of some larger enterprise and not just its own affairs.

*Williams II.*, 465 F.3d at 1281.[7][8]

Following remand, the Eleventh Circuit again held that the Plaintiffs had "sufficiently alleged an 'enterprise' under RICO." *Id.* at 1284. Clearly, Plaintiff's allegations sufficiently satisfy the distinctiveness requirement in the Eleventh Circuit.

---

[7] The Supreme Court granted cert in *Williams* but subsequently "dismissed the writ as improvidently granted" and remanded "'for further consideration in light of *Anza* 126 S. Ct. 1991. *Williams II*, 465 F.3d at 1281.

[8] The United States filed a brief in the Supreme Court in support of the plaintiffs' position, explaining the fallacy of the argument Bayer raises here:

> As petitioner observes…, the courts of appeals have agreed that a corporation cannot be held liable under 18 U.S.C. 1962(c) for conducting the affairs of a purported association in fact consisting of the corporation and its own employees…. [B]ecause an employee is *part of* the corporation, the two are not naturally characterized as forming a combination that meaningfully be distinguished from the corporation itself. The recruiters who are alleged to have assisted petitioner in its unlawful employment practices, by contrast, have no place within petitioner's corporate structure.
>
> ….
>
> Petitioner suggests…that it is somehow anomalous to distinguish, for purposes of Section 1962(c)'s coverage, between cases in which a corporation undertakes a pattern of racketeering activity through its own employees, and cases in which it receives the assistance of persons outside the corporate structure. That distinction, however, follows directly from the fact that Section 1962(c) prohibits, not the commission of racketeering crimes per se, but the use of racketeering activity to operate or manage an *enterprise* that is distinct from the violator itself….The necessary consequence of that limitation on Section 1962(c)'s coverage is that criminal conduct undertaken in collaboration with others may trigger distinct legal sanctions that do not apply in cases of wholly unilateral wrongdoing. That feature of RICO is scarcely novel; the law of conspiracy has long reflected the judgment that "collective criminal agreement – partnership in crime – presents a greater potential threat to the public than individual delicts." *Callanan v. United States*, 364 U.S. 587, 593 (1961).

Brief for the United States as Amicus Curiae Supporting Respondents, *Mohawk Industries., Inc. v. Williams*, 2006 WL 680358 *28-30 (2006)(citations omitted).

II. **PLAINTIFF'S NEW JERSEY CONSUMER FRAUD ACT CLAIMS SHOULD NOT BE DISMISSED**

Plaintiffs have stated a claim under the New Jersey Consumer Fraud Act ("NJCFA" or "the Act"). The defendants argue for dismissal of this claim on two bases: (1) Plaintiff has not adequately pled proximate causation and relies on fraud-on-the-market analysis to establish ascertainable loss; and (2) Plaintiff is not a "consumer"[9] under the statute. See Def. Mem. at 12-13. Both arguments are unavailing.

A. **The NJCFA Requires Plaintiff To Establish A Causal Nexus Between The Illegal Act And The Ascertainable Loss**

In order to establish a claim under Section 56:8-19 of the NJCFA,[10] a plaintiff must prove three elements: (1) the existence of an unlawful act under the Consumer Fraud Act; (2) an ascertainable loss on the part of the plaintiff; and (3) a "causal nexus" between the unlawful conduct and the ascertainable loss. *Matera v. M.G.C.C. Group, Inc.*, 402 N.J. Super. 30, 40-42 (Law Div. 2007)(citing *Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 43, 752 A.2d 807 (App.Div.2000)). The causal nexus only requires allegations of a causal connection between the concealment of a material fact and the loss, not a connection between the material act and the parties. *Id.* at 40. Thus, the Act does not require either direct contact between the parties (*Neveroski v. Blair*, 141 N.J. Super. 365, 358 A.2d 473 (App.Div.1976)(holding that privity need not exist between defendant and the consumer)) or direct reliance (*Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607-08, 691 A.2d 350 (1997)(finding that the NJFCA does not require proof of reliance)).

The causal nexus required under the NJCFA is different and less onerous than the proximate cause required under civil RICO. As this Court recognized in its previous order, "most courts considering actions under the NJCFA applied a less stringent definition of proximate cause than the one those same courts have applied in RICO claims for actions that

---

[9] Plaintiff addresses this prong of defendants' argument in section II.D below.

[10] Section 56:8-19 of the NJCFA provides: "Any person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. "

were virtually identical to the one presented herein." *Southeast Laborers*, 2009 U.S. Dist. LEXIS 70491 at *110. Defendants are simply incorrect in urging the Court to analyze Plaintiff's NJCFA claim "[j]ust as with RICO" standard of proximate cause instead of the causal nexus required by the Act and without meaningful review of the facts pled in the revised complaint. See Def. Mem. at p. 12-13. The NJFCA is a remedial statute, and its provisions are construed liberally in favor of the consumer to accomplish its deterrent and protective purposes. *Lettenmaier v. Lube Connection, Inc.*, 162 N.J. 134, 139, 741 A.2d 591 (1999); *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 561 (N.J. 2009). Therefore, as New Jersey courts have admonished, any court with occasion to adjudicate a NJCFA claim "must approach dismissal of said claim with hesitation. " *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 842 A. 2d 174, 176 (App. Div. 2003).

>  B.   **The SAC Sets Forth Specific Allegations And Facts Which Establish The "Causal Nexus" Required By The NJFA**

Both the plain language of the NJCFA and interpreting NJ caselaw make clear that the same allegations in the SAC demonstrating the direct causal link between Bayer's fraudulent misrepresentations about Trasylol's safety and efficacy and Plaintiff's damages which resulted in a valid claim under RICO are more than sufficient to satisfy the less-stringent "causal nexus" standard required under the NJCFA.[11]

The New Jersey Superior Court's decision in *Matera* illustrates exactly why Plaintiff's factual allegations are sufficient to establish the "causal nexus" required by the Act. The plaintiffs in *Matera* were the owners of homes located on the defendant bank's former land, all of which had flood damage. *Matera* at 35-36 The plaintiffs sued the bank for violations of the NJCFA, alleging that the bank had misrepresented potential drainage problems in its land not to them, but to both the developer who bought the land and the town planning board which approved the development. *Id.* at 527. *Matera* found that plaintiffs established the causal nexus

---

[11] The SAC very clearly alleges facts which satisfy the first two prongs of the prima facie case. See, e.g., SAC at ¶¶82-84, 92-94,188-193 (alleging, among other things, that Bayer concealed adverse study data and the fact that "[p]otential benefits [of Trasylol] are more than offset by the real increase in risk to the patient pre-approval").Defendants have not argued otherwise and indeed have not sought to dismiss Plaintiff's NJCFA claim on this basis.

required by the Act despite there being no contact between the parties.[12] The *Matera* court concluded that although some nexus is necessary to establish a claim under the Consumer Fraud Act, that nexus need only be between the alleged unlawful conduct and the ascertainable loss; it requires no contact between the parties.

Applying the "causal nexus" test in the factually analogous *Matera* decision to the present matter, the detailed factual allegations in the SAC unquestionably establish the requisite causal link between defendants' false and misleading conduct and Plaintiff's payment for the drug. The SAC alleges that defendants' marketed Trasylol as safe and effective to hospitals, doctors, and others who proceeded to administer the drug to plan participants. The SAC also alleges, using specific citations to studies and facts about the development of Trasylol, that defendants knew the drug to be unsafe at the time of these fraudulent misrepresentations, and that defendants intended that these parties rely upon them. Similar to *Matera*'s nexus between the bank, the land developer/Planning Board, and the plaintiffs' property damage, had Bayer not lied but instead revealed the truth that Trasylol's risks outweighed its benefits for all classes of patients, the FDA would not have approved marketing of such an unsafe product and no doctor would have administered the drug. Obviously, therefore, Plaintiff would have never incurred the cost of paying for Trasylol. More importantly, as set forth in the Complaint, had the truth been disclosed to Plaintiff, Plaintiff would not have paid for the drug regardless of the decision-making process of the FDA or prescribing physicians. Plaintiff's allegations that defendants intended to deceive the hospitals, doctors, and the FDA are sufficient; no allegation of direct reliance is required. It is also enough for Plaintiff to allege loss flowing as a natural consequence

---

[12] "[T]here is no evidence of any direct or indirect promises made by BOA [defendant bank] to plaintiffs. However, there is a connection between the alleged unlawful conduct and ascertainable loss. Under plaintiffs' theory, if BOA did not misrepresent facts to the Howell Township Planning Board, the planning board would not have granted the letter of compliance and section III would not have been built, or, in the alternative, the drainage problems would have been corrected before the letter of compliance was granted. Under either scenario, plaintiffs' properties would not have been flooded. This theory is legally sufficient because "consumer fraud requires only proof of a causal nexus between the concealment of the material fact and the loss." *Matera* at 40(citing *Varacallo v. Mass. Mut. Life Ins. Co.*, supra, 332 N.J. Super. at 43, 752 A.2d 807).

12

of the fraudulent act by Bayer, even if it is conducted via a third-party contract or obligation; no allegation of privity or direct or indirect misrepresentations to the Plaintiff is required.[13]

### C. Plaintiff's NJCFA Claims Do Not Rely On Fraud On The Market To Prove Loss Causation

Respectfully, Plaintiffs here do not "alleg[e] the same type of injury under the NJCFA" as cases substituting a "fraud on the market" theory for proof of ascertainable loss, for two distinct reasons. *Southeast Laborers Health & Welfare Fund*, 2009 U.S. Dist. LEXIS 70491 at *116 (citing *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co. Inc.*, 929 A.2d. 1076, 1086 (N.J. 2007)). First, as recently explained by the Federal District Court for New Jersey, a consumer claim relying on fraud on the market alleges "only that the price charged" for the product at issue "**was higher than it should have been** as a result of defendant's fraudulent marketing campaign[.]" *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 73690 (D.N.J. 2008)(citing *Merck*, 929 A.2d. at 1088); *see also Schering-Plough Corp.*, 842 A.2d at178 a party pursues fraud on the market or "price inflation theory" when it alleges that "the fact of advertising the products caused the prices to rise **both** for the ones that are **effective and for …. allegedly ineffective products as well**.")(emphasis added). Compare this to the case at bar, which alleges that Trasylol is "a product whose risks outweigh its benefits for any class of patient," i.e. is defective for **any** purpose. Plaintiff does not allege that it and the class paid merely an "inflated price" for Trasylol, but rather that nobody should have paid any amount for

---

[13] The CFA does not even require allegations of an affirmative statement or representation in order to state a claim. A CFA claim may proceed based on allegations of an "unconscionable commercial practice." *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A. 2d 454, 462 (1994))("unconscionability is 'an amorphous concept obviously designed to establish a broad business ethic…'" (quoting *Kugler v. Romain*, 58 N.J. 522, 279 A.2d 640, 651 (1971)). "To constitute consumer fraud . . . the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer. . . ." *Schering-Plough Corp.*, 842 A.2d 174, 177 (App. Div.) (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 416, 655 A.2d 417 (1995), *cert. denied*, 516 U.S. 1066, 116 S. Ct. 752, 133 L. Ed. 2d 700 (1996)) (alterations in original), *cert. denied*, 178 N.J. 249, 837 A.2d 1092 (2003). Plaintiff's allegations that defendants marketed and sold a drug product that they knew to be dangerous and of no benefit to any class of patients undoubtedly constitute the type of unconscionable business practice the NJCFA intends to regulate.

Trasylol at all. The utter medical uselessness of Trasylol is a critical fact distinguishing this case from the "fraud on the market" cases cited by defendants.[14]

Second, Plaintiff's theory of recovery under the NJCFA is refund, or a complete rescission of all Trasylol transactions since they **would not have occurred** but for defendants' misrepresentations and omissions about the drug's safety.[15] Plaintiff alleges that defendants' misstatements led to the purchase for many years of a useless drug; as in *Desiano*, once the true science was revealed, the drug was unsuitable both for use by doctors and for reimbursement by purchasers. Neither price inflation nor fraud-on-the-market theory is implicated by these factual allegations.[16] As set forth in detail above, there is no "learned intermediary" breaking the direct

---

[14] Compare with *Merck*, 929 A.2d. at 1087 (recognizing the significant interplay between decisions of PBMs, P&T committees, formulary, plan, and physicians "concerning the benefits that would be available to its members for whom Vioxx was prescribed."); *Schering-Plough Corp.*, 842 A.2d at 178(plaintiff's theory of "the causal relation between the misstatements about these products and their ascertainable loss is that they must have paid a higher price for the less effective product."); *Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP*, 585 F. Supp. 2d 1339, 1342 (M.D. Fla. 2008)("As a result of Defendants' conduct, Plaintiffs claim that they were duped into paying hundreds of millions of dollars for Seroquel both to treat conditions for which the drug was not approved and where less expensive, and equally safe and effective, alternative treatments existed."); *Dist. 1199P Health & Plan v. Janssen, L.P.*, 2008 U.S. Dist. LEXIS 103526 (D.N.J. Dec. 23, 2008)("Plaintiffs fail to allege that their beneficiaries, insured, or employees received an ineffective medication or that Risperdal physically harmed them, but rather concede that Risperdal was safe and effective.")

[15] *See* NJCFA section 56:8-2.11-2.12. Thus, neither the Court nor the parties need undertake the "intricate, uncertain inquiry" for determining third-party payor damages suggested by the defendant in its motion to dismiss. At best, defendant's argument that it is entitled to an "off-set" on damages due to the use of alternative medicines, blood savings, etc., are affirmative defenses which are inappropriate issues for the Court to resolve on a motion to dismiss. *See Brown v. One Beacon Ins. Co.*, 317 Fed. Appx. 915, 916 (11th Cir. Ala. 2009)(*citing Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), *en banc reh'g*, 764 F.2d 1400, 1400 (11th Cir. 1985) (per curiam) (reinstating panel opinion)("Generally, the existence of an affirmative defense will not support a motion to dismiss.").

[16] Compare with *Merck*, 929 A.2d. at 1087 (plaintiff "[did] not suggest that each of the[] proposed class members, receiving the same information from defendant, reacted in a uniform or even similar manner."); *Schering-Plough Corp.*, 842 A.2d at 177-178 (noting "the intervention by a physician in the decision-making process necessitated by his or her exercise of judgment whether or not to prescribe a particular medication"); *Ironworkers Local Union No. 68*, 585 F. Supp. 2d at 1344 ("…[P]hysicians use their independent medical judgment to decide whether Seroquel is the best treatment for a given patient."); *Dist. 1199P Health & Plan*, 2008 U.S. Dist. LEXIS 103526 at *35("[T]he Court also has a substantial question as to whether…the

chain of causation between Bayer's fraudulent scheme and Plaintiffs' damages.[17] These facts belie the defendants' assertion that this third-party payor drug case is merely another "fraud-on-the-market" clone like those struck down by several other courts.

The theory of causation here is best compared to *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), a case recognized by this Court as having "substantially similar" claims to those at bar which also involved the sale of a drug deemed to have no legitimate medical use at all. *Southeast Laborers*, 2009 U.S. Dist. LEXIS 70491 at *111-112. The most analogous and informative NJCFA decision on point, *Desiano* plaintiffs alleged a direct injury and "sought to recover [all] moneys they spent purchasing Rezulin," a drug withdrawn from the market which posed "an unacceptable risk to patients." *Id.* at 344-49. As explained above, this distinguishes *Desiano* from the "fraud on the market" cases in which the defendant merely "engaged in behavior otherwise prohibited and there was a change in the price." *Southeast Laborers Health & Welfare Fund*, 2009 U.S. Dist. LEXIS 70491 at *117 (citing *Merck*, 192 N.J. 372, 929 A.2d 1076). Like Rezulin, Plaintiffs have alleged that Trasylol is in no fashion safe or efficacious, and therefore unlike the "price inflation" cases Bayer cites, it has no other legitimate use.[18]

---

independent and individualized decision-making of physicians prescribing Risperdal breaks any chain of causation between Defendants' alleged misconduct and Plaintiffs' payment for the medication.").

[17] The Court should also note that *Merck* did not overrule or otherwise disturb the lower court's statement that those plaintiffs could have shown ascertainable loss through expert proof that the drug would not have remained on the market at all had the full truth been known, thus implying the validity of such a claim under the NJCFA. *See International Union of Operating Engineers Local # 68 Welfare Fund v. Merck & Co., Inc.*, 384 N.J. Super. 275, 894 A.2d 1136 (N.J. Super. A.D. 2006)("plaintiff may establish a sufficient nexus between the alleged fraud and ascertainable loss by showing via expert proof that…**absent Merck's misconduct, Vioxx would not have been on the market at all.**")).

[18] While recognizing the "substantially similar" nature of *Desiano*, this Court previously did not apply its rule of law because it found Plaintiffs' allegations insufficient to establish the requisite fraudulent conduct and corresponding causation. *Southeast Laborers*, 2009 U.S. Dist. LEXIS 70491 at *113. Plaintiffs' have amply addressed this Court's concerns in their Second Amended Complaint. For instance, compare *Desiano* plaintiff's "numerous instances where the drug manufacturer had touted Rezulin as a pioneering and revolutionary treatment against diabetes" and "several specific instances of clinical review indicating patient safety risk while setting forth specific advertisements and public information which, in the face of those clinical reviews, were misleading" (Id. at *113-114)with SAC at ¶¶73-101, 116-123 (describing the adverse clinical safety data in Bayer's possession which was undisclosed); 102-115; 124-165 (Bayer's

### D. Plaintiff Is A Consumer Under The NJCFA

As this Court previously observed, "New Jersey cases ... have presumed that insurance payers are 'consumers' under the NJCFA but that issue has been specifically left to be determined at a later date. *Southeast Laborers*, 2009 U.S. Dist. LEXIS 70491 at *109 (citations omitted). No New Jersey court has, to date, held that a third party payor was not a consumer protected under the Act. While three federal district courts have recently held that third party payors are not covered by the NJCFA, they essentially rely on one another for authority supporting that position. This Court should properly look to the Courts of New Jersey for guidance as to the meaning of New Jersey statutes. Moreover, recognizing the claims of third-party payors under the Act acknowledges a fundamental truth about the economics of health care, as explained by one Federal District of Minnesota court:

> ...[T]his Nation's present health care regime almost always requires third-party payors to shoulder a significant portion of the employees' costs of medical services. To deny this fact, and to extract legal conclusions from the denial, denies reality, and real financial injuries occurring in the real world.

*Kinetic Co. v. Medtronic, Inc.*, 2009 U.S. Dist. LEXIS 112918 (D. Minn. Dec. 4, 2009)(denying defendants' 12(b)(6) motion to dismiss, among other counts, Minnesota Prevention of Consumer Fraud Act claims brought by third-party payors who paid or reimbursed for the cost of medical defibrillators). The Court should follow New Jersey precedent and those authorities relying on it which deem entities like the Plaintiff a "consumer" under the NJFCA.[19]

---

affirmative misrepresentations of Trasylol's safety through labeling, marketing, physician communications, and reports to regulatory agencies); 186-201 (Bayer's misrepresentations of Trasylol's safety and efficacy in relation to competitors). *See also* Appendix 1 to the SAC entitled "Select Misrepresentations /Omissions by Bayer with Respect to Health Risks linked to Trasylol," submitted as an Appendix to Plaintiffs' compliant.

[19] Defendants' suggestion that Plaintiff's claim is subsumed by the New Jersey Products Liability Act (Defs. Mem. at p. 14, n11) is invalid. The PLA provides the sole method of prosecuting a New Jersey consumer fraud claim when the claim is based on "harm" caused by a product. *Delaney v. Stryker Orthopaedics*, 2009 U.S. Dist. LEXIS 16865 (D.N.J. 2009). The PLA defines "harm" as physical damage to property or person, without including economic injury. *See Carter v. Novartis Consumer Health, Inc.*, 582 F. Supp. 2d 1271, 1288 (C.D. Cal. 2008)(citing *Sinclair v. Merck & Co., Inc.*, 195 N.J. 51, 948 A.2d 587, 595 (N.J. 2008); N.J. Stat. § 2A:58C-1(b)(2)-(b)(3) (New Jersey Products Liability Act)). Even the case *McDarby v. Merck & Co., Inc.*, 949 A.2d 223, 278 (App. Div. 2008) cited by defendants states expressly that its holding is based on the fact that the economic "harm" upon which the plaintiffs' claims were based consisted merely of losses "deriving from personal physical illness, injury or death, pain

16

III. **PLAINTIFFS COMMON LAW FRAUD CLAIMS SHOULD NOT BE DISMISSED**

Plaintiffs have amply pled a case for common law fraud based on the omission and concealment of important safety information by Defendant.[20] Defendants attempt to sidestep Plaintiff's fraud claim by contending that the SAC does not allege any "…statement made directly [by Defendant] to Plaintiff." Defs. Mem. at 15. This is not a valid ground to dismiss, as fraud may be actionable as a result of an omission or an affirmative concealment where a party has a duty to disclose particular information. Rstmt 2d of Torts § 551 (1977); *see also Strawn v. Canuso*, 657 A.2d 420 (N.J. 1995)("silence may be fraudulent."). Here, it is undisputed that defendants had a duty to disclose adverse safety information about Trasylol, not just to the medical and regulatory community at large[21], but especially to Plaintiff and the entire class of third party payors that defendants knew would be paying for the drug and would thus "reasonably expect a disclosure of those facts." Rstmt 2d of Torts § 551(2)(e). Plaintiff relied on defendants to fulfill their duty of disclosure to their financial detriment by paying for a drug with no benefits. SAC at ¶¶33-43, 322. As noted above, Plaintiff has established that defendants' omission and overt misrepresentations directly and proximately caused injuries to itself and the class.

---

and suffering, mental anguish or emotional harm." In contrast, Plaintiff claims a direct economic injury which is not contingent, either directly or derivatively, on any physical harm inflicted upon its participants.

[20] To state a cause of action for fraud, a plaintiff must allege (1) material misrepresentation of the presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely upon it; (4) reasonable reliance thereon by the other person; and (5) which proximately caused damage." *Southeast Laborers*, 2009 U.S. Dist. LEXIS 70491 at *120 (internal citations omitted).

[21] Defendant clearly had a duty to reveal information about the true dangers posed by Trasylol to prescribing doctors, patients, and parties such as the third party payors, through FDA regulations and otherwise. SAC at ¶¶ 44-60. The SAC extensively documents defendants' history of suppressing facts showing that Trasylol was a hazardous drug. *See* SAC at ¶¶ 188-193(defendants used internal policies and selective funding of studies to avoid dissemination of comparisons between Trasylol and other, more cost-effective and less risky competitors); ¶¶ 92-94 (defendants delayed responding to FDA requests for information about adverse event reports for eight years in order to conceal its knowledge about the prevalence of adverse reactions from use of Trasylol); ¶¶ 82-84 (concealing adverse study data from the FDA pre-approval and the fact that "[p]otential benefits [of Trasylol] are more than offset by the real increase in risk to the patient pre-approval").

17

IV. **BREACH OF EXPRESS AND IMPLIED WARRANTY CLAIMS SHOULD NOT BE DISMISSED**

Defendants' arguments for dismissal of Plaintiff's express[22] and implied[23] warranty claims are devoid of citation to any case addressing the facts present here—a third party payor that made payments for a drug found to have no medical use.[24] Indeed, the Second Circuit's holding in *Desiano* regarding the New Jersey warranty statutes squarely addresses defendants' arguments, and finds them unavailing. *See Id.* at 351. Defendants' suggestion that third party payors are not "purchasers" or "buyers" of the drugs is contradicted by a large body of authority, including *Desiano*. *See id.* at 350 ("[a]lthough this court has not to date held that insurance companies are, in all instances, the 'purchasers' of the drugs for which they reimburse pharmacies, we, like several other courts, have indicated that in a variety of contexts they are the buyers.")(*internal citations omitted*).

V. **CONCLUSION**

For the reasons set forth herein, Bayer's motion to dismiss should be denied.

Date: January 13, 2010

Respectfully Submitted,

/s/ William C. Wright
William C. Wright
Florida Bar No. 0138861
Leopold Kuvin, P.A.
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
(561) 514-0904; wwright@leopoldkuvin.com

---

[22] Express warranties are created by a seller with "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or with "[a]ny description of the goods which is made part of the basis of the bargain." N.J. Stat. § 12A:2-313(1)(a)-(b) (2009).

[23] "A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.J. Stat. § 12A:2-314 (2009).

[24] Beyond mere puffing or opinion, defendants warranted to members of the medical community, the FDA, and the public through its labels, sell-sheets, sales team, and KOL that Trasylol had low safety risk relative to efficacy and high cost efficiency, and that scientific data supported its assertions, when in fact none of those affirmations were true. *See* SAC at ¶¶102, 104- 105, 188, 223-233.

Joe R. Whatley, Jr.
Edith M. Kallas
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York, New York 10036
Tel: (212) 447-7070
Fax: (212) 447-7077

James G. Stranch III
J. Gerard Stranch, IV
Joe P. Leniski, Jr.
BRANSTETTER STRANCH & JENNINGS PLLC
227 Second Avenue North, 4th Floor
Nashville, Tennessee 37201-1631
Tel: 615.254.8801
Fax: 615.250.3937

W. Tucker Brown
WHATLEY DRAKE & KALLAS, LLC
1000 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203
Tel: (205)328-9576
Fax: (205) 328-9669

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I caused true and correct copies of the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO BAYER DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT to be served upon the following counsel for the Defendants in this matter through the Court's Electronic Filing System or by mailing the same to the offices of said counsel by United States, postage prepaid, on this 13th Day of January 2010 to: **Barbara Bolton Litten, Esquire**, Squire, Sanders & Dempsey, LLP, 1900 Phillips Point W., 777 South Flagler Dr., West Palm Beach, FL 33401-6198; **Philip S. Beck, Esquire** and **Steven Derringer, Esquire**, Bartlit, Beck, Herman, Palenchar & Scott, LLP, Courthouse Place, 54 West Hubbard Place, Suite 300, Chicago, IL 60610; **Eugene A. Schoon, Esquire**, Sidley Austin LLP, One South Dearborn, Chicago, IL 60603; **Richard K. Dandrea, Esquire**, Eckert Deamans Cherin & Mellott, LLC, 600 Grant Street, 44th Floor, Pittsburgh, PA 15219; **Susan Artinian, Esquire**, Dykema Gossett, PLLC, 400 Renaissance Center, Detroit, MI 48243; **Patricia E. Lowry, Esquire,** Squire, Sanders & Dempsey L.L.P, 1900 Philips Point West, 777 South Flagler Drive, West Palm Beach, FL 33401.

/s/ William C. Wright
William C. Wright
Florida Bar No. 0138861
Leopold Kuvin, P.A.
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, FL 33410
(561) 514-0904
wwright@leopoldkuvin.com