**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**

**IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928**

**This Document Relates to All Actions.**

**PLAINTIFFS' OPPOSITION TO BAYER'S MOTION TO EXCLUDE
TESTIMONY OF PLAINTIFFS' EXPERT CHIRAG PARIKH
AND BRIEF IN SUPPORT THEREOF**

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ........................................................................................... ii

**TABLE OF AUTHORITIES** ................................................................................. iv

**INTRODUCTION AND SUMMARY OF PLAINTIFFS' OPPOSITION** ............................. 1

**INCORPORATION BY REFERENCE OF MATTERS SET FORTH IN PLAINTIFFS' CONCURRENTLY FILED OPPOSITION TO BAYER'S MOTION TO EXCLUDE THE TESTIMONY OF DR. MARK J. EISENBERG** .................................................... 3

**EVIDENCE** ........................................................................................................ 3

**ARGUMENT AND AUTHORITIES** ....................................................................... 6

  A. BAYER DOES NOT DISPUTE (1) DR. PARIKH'S QUALIFICATIONS TO OFFER OPINIONS REGARDING THE EFFFECT OF TRASYLOL ON THE KIDNEYS, OR (2) THE METHODOLOGY OR ACCURACY OF THE NUMEROUS STUDIES ASSOCIATING TRASYLOL WITH KIDNEY INJURIES. ............................................. 6

    1. That Dr. Chiraq Parikh is Well-Qualified to Offer Opinions Regarding The Effect of Trasylol on the Kidneys is Not Disputed by Bayer. .......................................... 7

    2. Bayer Does Not Contest The Methodology Or Reliability of The Many Studies Finding An Association Between Trasylol And Kidney Injuries. ...................................... 9

  B. DR. PARIKH'S CAUSATION OPINIONS ARE NOT UNRELIABLE BECAUSE THEY USE THE NEPRHOLOGY RESEARCH COMMUNITY'S ACCEPTED TERMINOLOGY REGARDING ACUTE KIDNEY INJURY OR BECAUSE THEY RECEIVE SECONDARY SUPPORT FROM STUDIES EMPLOYING PROTEIN BIOMARKERS. [IN RESPONSE TO BAYER'S ARGUMENT AT I. P. 3-11]. ........................................... 10

    1. Background Information Regarding Kidney Research And The Emergence Of The Acute Kidney Injury Terminology. .......................................................... 11

    2. Dr. Parikh's Opinions Are Not Unreliable Due To His Use Of The Term "Acute Kidney Injury." ................................................................................. 13

      a. Although a relatively new term, "acute kidney injury" is the accepted definition for the entire spectrum of acute renal failure and enjoys broad support, acceptance and use in the nephrology community. .................................................. 13

b.   Dr. Parikh's expert opinion is not unreliable because it uses the currently accepted terms and definitions in his field............................................................................. 14

c.   Use of the term AKI will not confuse the jury.  [In Response to Bayer's Argument at I.A.2 p.6-7].............................................................................................................. 17

3. Dr.  Parikh's Opinions Are Not Unreliable Merely Because They Receive Secondary Support and Confirmation from Studies Employing Protein Biomarkers.  [In Response to Bayer's Argument I.B. p.8-11]. ...................................................................................... *17*

a.   Use of protein biomarkers is broadly accepted in nephrology research for purposes of determining Acute Kidney Injury........................................................................ 18

b.   Scientific study data derived from the use of biomarkers is consistent with the results of the serum creatinine based studies. ......................................................... 20

D.   DR. PARIKH'S CAUSATION OPINIONS ARE SUPPORTED BY SCIENTIFIC DATA AND DERIVED FROM A RELIABLE METHODOLOGY AND SHOULD BE ADMITTED.............................................................................................................................. 21

**CONCLUSION** ......................................................................................................................... 24

**CERTIFICATE OF SERVICE** ............................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ambrosini v. Labarraque,*
  101 F.3d 129 (D.C.Cir.1996) ............................................................... 8

*Berry v. CSX Transportation, Inc.,*
  709 So.2d 55 (Fla.App. [1st. Dist.] 1998) ....................................... 24

*In re Fosamax Prods. Liab. Litig.,*
  645 F. Supp. 2d 164 (S.D.N.Y 2009) ................................................ 8

*Jones v. Otis Elevator Co.,*
  81 F.3d 655 (11th Cir. 1988) ........................................................... 23

*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ............................................... 8

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,*
  326 F.3d 1333 (11th Cir. 2003) .................................................. 7, 23

*Tambourine Comercio Int'l. SA v. Solowsky*
  312 Fed.Appx. 263 (11th Cir. 2009) ............................................... 17

*U.S. v. Bradberry,*
  466 F.3d 1249 (11th Cir. 2006) ...................................................... 17

*U.S. v. Church,*
  955 F.2d 688 (11th Cir. 1992) ........................................................ 17

*U.S. v. Elkins,*
  885 F.2d 775 (11th Cir. 1989) ........................................................ 17

*U.S. v. Tinoco,*
  304 F.3d 1088 (11th Cir. 2002) ...................................................... 17

*U.S. v. W.R. Grace,*
  *504 F.3d 745 (9th Cir. 2007)* ........................................................ 24

*United States v. Downing,*
  753 F.2d 1224 (3d Cir. 1985) ........................................................... 8

**Rules**

FED.R.EVID. 403 .............................................................................. 17

COME NOW, Plaintiffs in the above styled cause ("Plaintiffs") and submit the following "Plaintiffs' Opposition to Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Chirag Parikh and Brief in Support Thereof." Plaintiffs would respectfully show the Court that the expert testimony of Chiraq Parikh, M.D., Ph.D. should be admitted for the following reasons:

## I.
## INTRODUCTION AND SUMMARY OF PLAINTIFFS' OPPOSITION

> *"Our finding that aprotinin [Trasylol] is associated with renal dysfunction is now confirmed by meta-analyses of randomized controlled trials. . . [T]he FDA concluded that 'aprotinin inrceases the risk for renal dysfunction. . . ' based on the totality of clinical data."[1]*

Bayer's *Daubert* challenge to Dr. Parikh's expert testimony is curious for several reasons: (1) Bayer[2] does not dispute that Dr. Parikh is a leader in the field of acute kidney injury ("AKI") research and well-qualified to provide the expert opinions he proffers, (2) Bayer does not dispute that numerous randomized clinical trials, meta-analyses and cohort studies have drawn the conclusion that Trasylol is associated with renal injuries all along the AKI spectrum; (3) Bayer did not contest the admissibility of the same substantive opinion offered by Dr. Parikh, namely that Trasylol causes kidney dysfunction, when it was offered by Plaintiffs' epidemiologist, Dr. Mark Eisenberg, and (4) Dr. Parikh's unremarkable causation opinion is shared by leading nephrology researchers and epidemiologists and has been adopted by the FDA. In fact, lesser evidence than that which was considered by Dr. Parikh, was sufficient for the FDA

---

[1] Karkouti K, Beattie WS,  "Letter by Karkoutti and Beattie Regarding Article 'Aprotinin Does Not Increase the Risk of Renal Failure in Cardiac Surgery Patients" 117:e472 (Circulation 2008)(Plaintiffs' Compendium of Exhibits at Exhibit "X").

[2] Defendants Bayer Healthcare Pharmaceuticals Inc. (as successor in interest to Bayer Pharmaceutical Corporation), Bayer HealthCare LLC, Bayer AG, and Bayer Schering Pharma AG (as successor in interest to Bayer HealthCare AG), are referenced collectively throughout this opposition as "Bayer."

to conclude that Trasylol "increases the risk for renal dysfunction."[3]   Thus, in order to exclude Dr. Parikh's opinions, Bayer would have this Court conclude that not only Dr. Parikh, but also Dr. Eisenberg, the multiple authors of at least nine different studies, the many reviewers that examined those studies as part of the peer review process, and the FDA have *all* been taken in by "junk science" so meritless as to preclude even consideration of Dr. Parikh's opinion.

Perhaps recognizing that it was unlikely to prevail in excluding Dr. Parikh's opinions on the traditional grounds – either a deficiency in the qualifications of the expert or an absence of evidence   supporting the expert's opinion – Bayer focuses instead on linguistic distinctions. However, the mere fact that the predominant label applied to kidney injuries changed from "acute renal failure" ("ARF") to "acute kidney injury" ("AKI") around the same time that Trasylol suffered its knockout blows in the medical literature, does not mean that an expert using the modern term, AKI, cannot base his opinion on studies using the predecessor terms.  Nor does the fact that AKI is used more prevalently in nephrology *research* than in the *clinical practice* of nephrology diminish its reliability for the purpose for which it is cited here. In the research context, AKI is the prevailing terminology and definition for renal injuries. And because the multi-staged definition of AKI encompasses virtually every definition of renal injury used in the published studies, any finding of an association between Trasylol and ARF is equally viable (if not *under*representative of an association) under the AKI terminology.

Linguistic nuances are not enough to distract from what is glaringly apparent:  This is not a case where causation rests precariously on a small handful of case reports.  This is not a case requiring blind trust to be placed in a weakly qualified expert.  This is a case involving multiple

---

[3] US Food and Drug Administration.  FDA Advisory Committee briefing document: joint meeting of the cardiovascular and Renal Drugs advisory Committee and the Drug Safety and Risk Management Committee. Available at http:/www.fda.gov/ohrms/dockets/ac/07/briefing/2007-4316b1-00-index.htm. (Plaintiffs' Compendium of Exhibits at Exhibit "Y").

studies interpreted by a qualified expert on AKI to arrive at the same conclusion which has been reached by others in non-litigation contexts:  Trasylol causes AKI.  As demonstrated herein, Dr. Parikh's testimony is not "junk science" and should be admitted to the jury.

## II.
## INCORPORATION BY REFERENCE OF MATTERS SET FORTH IN PLAINTIFFS' CONCURRENTLY FILED OPPOSITION TO BAYER'S MOTION  TO EXCLUDE THE TESTIMONY OF DR. MARK J. EISENBERG

In the interest of brevity and to avoid burdening the Court with duplicative briefing, Plaintiffs have set forth the following matters in their "Plaintiffs' Opposition to Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Mark J. Eisenberg and Brief in Support Thereof" (hereinafter "Eisenberg Opposition") which are fully incorporated herein by reference.

- Section "I" – BACKGROUND AND HISTORY OF MDL LITIGATION

- Section "IV.B" – THE PROPER DAUBERT STANDARDS

In order to further the Court's understanding of the history of this litigation, the scientific data that underlies the expert testimony in this case, and the separate and distinct areas of each expert's proffered testimony, Plaintiffs would respectfully encourage the Court to begin its review of Plaintiffs' Daubert briefing with Plaintiffs' Eisenberg Opposition.

## III.
## EVIDENCE

In support of this Opposition to Bayer's motion to exclude the expert testimony of Dr. Parikh, Plaintiffs specifically rely upon the following documents which are set forth in Plaintiffs' Compendium of Exhibits filed herewith:

A.    Expert Report of Chirag Parikh, M.D., Ph.D. (hereinafter "Parikh Report") (Exhibit "A").

B.      Excerpts from the Deposition of Chirag Parikh, M.D., Ph.D (hereinafter "Parikh Depo.") (Exhibit "B").

C.      Fergusson DA, Hebert PC, Mazer CD; et al. BART Investigators, "A comparison of aprotinin and lysine analogues in high-risk cardiac surgery," 2319-2331 (NEJM 2008) (Exhibit "C").

D.      Brown JR, et al, "Meta-analysis comparing the effectiveness and adverse outcomes of antibrinolytic agents in cardiac surgery," 115(22):2801-13 (Circulation 2007) (Exhibit "D").

E.      Mangano DT, "Mortality associated with aprotinin during 5 years following coronary artery bypass graft surgery," 297:471-9 (JAMA 2007) (Exhibit "E").

F.      Mangano DT, et al., "The risk associated with aprotinin in cardiac surgery," 354:353-65 (NEJM 2006) (Exhibit "F").

G.      Sundt TM 3rd, et al., "Renal Dysfunction and intravascular coagulation with aprotinin and hypothermic circulatory arrest," 55:1418-24 (Ann. Thorac Surg. 1993) (Exhibit "G").

H.      D'Ambra MN, et al., "Aprotinin in primary valve replacement and reconstruction: a multicenter, doubleblind, placebo-controlled trial," 112:1081-9 (J Thorac Cardiovasc Surg 1996) (Exhibit "H").

I.      O'Connor CJ, et al, "The impact of renal dysfunction on aprotinin pharmacokinetics during cardiopulmonary bypass," 9:1101-7 (Anesth Analg. 1999) (Exhibit "I").

J.      Karkouti, "A Propensity Score Case-Control Comparison of Aprotinin and Tranexamic Acid in High-Transfusion-Risk Cardiac Surgery," (TRANSFUSION January 20, 2006) (on-line edition) (Exhibit "J").

K.      Schneeweiss S, et al., "Final Report:  Risks of renal failure, and death following use of aprotinin or aminocaproic acid during CABG surgery," (August 7, 2007) (Exhibit "K").

L.      Shaw AD, et al., "The effect of aprotinin on outcome after coronary-artery bypass grafting," 358:784-93 (NEJM 2008)(Exhibit "L").

M.      Bagshaw S, et al., "A comparison of the RIFLE and AKIN criteria for acute kidney injury in critically ill patients" 23:1569-1574 (Nephrol Dial Transplant 2008) (Exhibit "M").

N.     Karkouti K, "The Risk-Benefit Profile of Aprotinin Versus Tranexamic Acid in Cardiac Surgery," 110:21-29 (Cardiovascular Anesthesiology 2010) (Exhibit "N").

O.     Mehta R, et al., "Acute Kidney Injury Network: report of an initiative to improve outcomes in acute kidney injury," 11:R31 (Critical Care 2007) (Exhibit "O").

P.     Wagener G, et al., "Increased incidence of acute kidney injury with aprotinin use during cardiac surgery detected with urinary NGAL," 28(4):576-582 (Am. J. Nephrol. 2008) (Exhibit "P").

Q.     Fauli A, et al., "Kidney-specific proteins in patients receiving aprotinin at high- and low-dose regimens during coronary artery bypass graft with cardiopulmonary bypass," 22(9):666-671 (Eur. J. Anaesthesiol. 2005) (Exhibit "Q").

R.     Nguyen MT, et al., "Urinary aprotinin as a predictor of acute kidney injury after cardiac surgery in children receiving aprotinin therapy," 23(8):1317-1326 (Pediatr. Nephrol. 2008) (Exhibit "R").

S.     Gagne J, "Aprotinin and risk of death and renal dysfunction in patients undergoing cardiac surgery: a meta-analysis of epidemiologic studies," 18:259-268 (Pharmacoepidemiology and Drug Safety, 2009)(Exhibit "S").

T.     Loef BG, et al., "Immediate potoperative renal function deterioration in cardiac surgical patients predicts in-hospital mortality and long-term survival 16(1): 195-200 (J. Am. Soc. Nephrol. 2005) (Exhibit "T").

U.     Welten GM, et al., "Temporatry worsening of reanl function after aortic surgery is associated with higher long-term mortality," 50(2):219-228 (Exhibit "U").

V.     Hobson CE, et al., "Acute Kidney Injury is Associated with Increased Long-Term Mortality After Cardiothoracic Surgery," (Circulation, April 27, 2009) (Exhibit "V").

W.     Mouton R, "Effect of aprotinin on renal dysfunction in patients undergoing on-pump and off-pump cardiac surgery: a retrospective observational study" 371:475-82 (Lancet 2008) (Exhibit "W").

X.     Karkouti K, Beattie WS,  "Letter by Karkoutti and Beattie Regarding Article 'Aprotinin Does Not Increase the Risk of Renal Failure in Cardiac Surgery Patients" 117:e472 (Circulation 2008) (Exhibit "X").

Y.      US Food and Drug Administration.  FDA Advisory Committee briefing document: joint meeting of the cardiovascular and Renal Drugs advisory Committee and the Drug Safety and Risk Management Committee. Available at http://www.fda.gov/ohrms/dockets/ac/07/briefing/2007-4316b1-00-index.htm. (Exhibit "Y").

Z.      Abstract of Brown J, Kramer R, Coca S, Parikh C, "Duration of Acute Kidney Injury Impacts Long-term Survival  Following Cardiac Surgery," (Exhibit " Z").

AA.     Affidavit of Charig Parikh (Exhibit "AA").

BB.     Report of H. David Humes, M.D. (Exhibit "BB").

CC.     National Kidney Foundation Spring Clinical Meetings, March 25-29, 2009 (Exhibit "CC").

DD.     Society of Critical Care Medicine's 39th Critical Care Congress, Schedule of Events for Courses held January 9-13, 2010. (Exhibit "DD").

EE.     Cruz, *et al,* Clinical Review: RIFLE and AKIN – time for reappraisal," Critical Care 2009:13(3):211 (Exhibit "EE").

FF.     Presentation by Bayer Vice President of Medical Affairs, Pamela Cyrus, "Trasylol (aprotinin injection) Review of Clinical Data with Focus on Specific Safety Events," Slide C-19 (2007 Advisory Committee Meeting) (Exhibit "FF").

In addition, Plaintiffs rely upon all pleadings, discovery and evidence filed in this case and any admissions made by Bayer therein.

**IV.**
**ARGUMENT AND AUTHORITIES**

**A.      BAYER DOES NOT DISPUTE (1) DR. PARIKH'S QUALIFICATIONS TO OFFER OPINIONS REGARDING THE EFFFECT OF TRASYLOL ON THE KIDNEYS, OR (2) THE METHODOLOGY OR ACCURACY OF THE NUMEROUS STUDIES ASSOCIATING TRASYLOL WITH KIDNEY INJURIES.**

The Eleventh Circuit determines the admissibility of expert testimony on the basis of a three part inquiry: (1) whether the expert is qualified to testify competently on the matters he

intends to address; (2) whether the methodology used by the expert to reach his conclusions was sufficiently reliable, and (3) whether the testimony assists the trier of fact, through application of scientific, technical or specialized expertise, to understand the evidence or determine a fact in issue. *Quiet Tech. DC-8, Inc.* v. *Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1340-41 (11th Cir. 2003). Bayer does not dispute Dr. Parikh's expert qualifications or the fact that his testimony will assist the trier of fact.   Moreover, while Bayer takes issue with Dr. Parikh's terminology and supporting data – it does not find fault with the abundant studies finding Trasylol causes various kidney injuries or with Dr. Parikh's methodology in deriving a causation opinion from those studies.  Hence, Dr. Parikh's expert opinions should be admitted.

### 1.   That Dr. Chiraq Parikh is Well-Qualified to Offer Opinions Regarding The Effect of Trasylol on the Kidneys is Not Disputed by Bayer.

Bayer does not dispute Dr. Parikh's impressive credentials as an expert. Dr. Parikh is a medical doctor currently licensed and practicing as a nephrologist in the state of Connecticut. [Parikh Report p. 1]. He is also an Associate Professor of Nephrology at Yale University.  *Id.*  He graduated medical school from Mumbai University in India. *Id.*  He completed his residency in internal medicine at Nassau University Medical Center in New York followed by a fellowship in renal diseases and hypertension at the University of Colorado.  *Id.* During his nephrology fellowship, Dr. Parikh completed a Ph.D. in Clinical Investigation, with a focus on epidemiology and translational research.  *Id.* As part of his Ph.D. studies, Dr. Parikh prepared his thesis on "Acute Kidney Injury (AKI) following Hematopoietic Cell Transplantation." *Id.*

Dr. Parikh has published over seventy (70) original articles, over twenty (20) editorials and reviews, and over ten (10) book chapters in well-respected scientific sources addressing topics in nephrology, kidney transplantation, hypertension and general medicine. *Id.*  He is the principal investigator on several federal grants from the National Institutes of Health to study the

epidemiology of AKI. *Id.* at 2. His significant contributions to research and patient care have earned him the prestigious honor of induction as a 'Fellow' in both the American College of Physicians and the American Society of Nephrology and have lead to his receipt of national awards for his academic contributions. *Id.* at 1.

Dr. Parikh's independent research, preceding any involvement in this litigation, includes scientific study of the precise issues raised in this litigation. For example, Dr. Parikh completed a study in the first half of 2009 entitled "Duration of Acute Kidney Injury Impacts Long Term Survival Following Cardiac Surgery" funded by the National Institutes of Health and co-authored by two authors of other published peer reviewed articles on Trasylol (Brown and Coca). This study was presented at the national nephrology meeting and is currently submitted for publication to the Journal of the American Society of Nephrology. [4]

Dr. Parihk's uncontested expert qualifications and professional stature provide circumstantial evidence of the reliability of his methods. "[T]he more qualified the expert, the more likely that expert is using reliable methods in a reliable manner - highly qualified and respected experts don't get to be so by using unreliable methods or conducting research in an unreliable manner." *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 616 (S.D.N.Y. 2007); *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164 (S.D.N.Y 2009). Thus, the strength of Dr. Parikh's expert qualifications provides circumstantial evidence of the reliability of his testimony *Ambrosini v. Labarraque,* 101 F.3d 129, 140; (D.C.Cir.1996); *United States v. Downing,* 753 F.2d 1224, 1239 (3d Cir. 1985).

---

[4] Abstract of Brown J, Kramer R, Coca S, Parikh C, "Duration of Acute Kidney Injury Impacts Long-term Survival Following Cardiac Surgery," (Plaintiffs' Compendium of Exhibits as Exhibit " Z")(Full manuscript is available to Bayer and the Court if requested and if confidentiality can be preserved prior to publication).

2.    **Bayer Does Not Contest The Methodology Or Reliability of The Many Studies Finding An Association Between Trasylol And Kidney Injuries.**[5]

There is an extensive array of epidemiological study data finding an association between Trasylol use and kidney injuries at various points along the AKI spectrum.  Bayer does not find fault with the methodology of these studies or the accuracy of their findings.

Among the many studies relied upon by Dr. Parihk, and not specifically challenged by Bayer, are several which found an association between Trasylol use and renal dysfunction or renal failure. *E.g.* (Brown (2007))(meta-analysis finding that Trasylol was associated with an increased risk of renal dysfunction);[6] (D'Ambra (1996)) (randomized controlled trial finding a significant association between aprotinin and renal failure as well as between Trasylol and renal dysfunction);[7] (Gagne (2009)(meta-analysis of observational studies involving over 119,000 patients finding that Trasylol was associated with renal dysfunction);[8] (Mangano (2006))(cohort study of over 4000 patients showing that Trasylol was associated with a doubling to tripling of the risk of renal failure requiring dialysis among patients undergoing complex coronary artery surgery);[9] (Schneeweisss (2007))(the "i3 Drug Study")(cohort study of over 78,000 patients

_____

[5] At most, Bayer argues that the randomized controlled trials and some, but not all, of the meta-analyses finding an association between Trasylol and renal injuries were not statistically significant. Contrary to the elevated status given to statistical significance by Bayer, it is a commonly held belief in the field of epidemiology that statistical significance is neither obligatory not appropriate to use as a requirement for drawing inferences from epidemiological data.  Rothman KJ, Greenland S, Lash TL, Modern Epidemiology: 3rd Ed., (Lippincott Williams & Wilkins, 2008). *See also, In re Viagra Prods. Liab. Litig.*, 572 F.Supp.2d 1071, 1081 (D.Minn. 2008)(" holding lack of statistical significance in epidemiologic data underlying expert's proffered testimony did not render that testimony unreliable for purposes of general causation). Statistical significance is particularly inappropriate for use in a case such as this where the endpoints being examined are rare dichotomous events such as death or renal failure which would demand an extremely large study population in order to produce statistically significant results.

[6] Brown JR, et al, "Meta-analysis comparing the effectiveness and adverse outcomes of antibrinolytic agents in cardiac surgery," 115(22):2801-13 (Circulation 2007)(Plaintiffs' Compendium of Exhibits at Exhibit "D").

[7] D'Ambra MN, et al., "Aprotinin in primary valve replacement and reconstruction: a multicenter, doubleblind, placebo-controlled trial," 112:1081-9 (J Thorac Cardiovasc Surg 1996)(Plaintiffs' Compendium of Exhibits at Exhibit "H").

[8] Gagne J, "Aprotinin and risk of death and renal dysfunction in patients undergoing cardiac surgery: a meta-analysis of epidemiologic studies," 18:259-268 9Pharmacoepidemiology and Drug Safety, 2009)(Plaintiffs' Compendium of Exhibits at Exhibit "S").

[9] Mangano DT, "Mortality associated with aprotinin during 5 years following coronary artery bypass graft surgery," 297:471-9 (JAMA 2007)(Plaintiffs' Compendium of Exhibits at Exhibit "E").

finding that dialysis was 60% more frequent among patients receiving Trasylol and that a statistically significant association existed between Trasylol use and renal failure);[10] (Karkouti (2006))(cohort study of patients drawn from a pool of over 10,000 patients finding that renal dysfunction was more common among patients receiving Trasylol as opposed to patients receiving tranexamic acid);[11] (Mouton(2008))(cohort study of patients undergoing off-pump cardiac surgery found a two-fold increase in the risk of renal dysfunction among Trasylol users).[12]  These unchallenged studies offer scientific support and a reliable basis for Dr. Parikh's opinion that Trasylol causes AKI.[13]

**B.    DR. PARIKH'S CAUSATION OPINIONS ARE NOT UNRELIABLE BECAUSE THEY USE THE NEPRHOLOGY RESEARCH COMMUNITY'S ACCEPTED TERMINOLOGY REGARDING ACUTE KIDNEY INJURY OR BECAUSE THEY RECEIVE SECONDARY SUPPORT FROM STUDIES EMPLOYING PROTEIN BIOMARKERS.  [In Response to Bayer's Argument at I. p. 3-11].**

Research regarding kidney injuries has taken a leap forward in the past decade.  Since 2005, a new term ("acute kidney injury") encompassing the full spectrum of renal injuries has been broadly endorsed by nephrology organizations, adopted by the nephrology research community and employed to the furtherance of nephrology study.  Over the past ten years, more sensitive biomarkers have been identified and put into use in nephrology research to provide additional information regarding kidney injuries.  And a better understanding of the risks from relatively mild renal injury has emerged.  While these advancements are well accepted within the

---

[10] Schneeweiss S, et al., "Final Report:  Risks of renal failure, and death following use of aprotinin or aminocaproic acid during CABG surgery," (August 7, 2007)(Plaintiffs' Compendium of Exhibits at Exhibit "K").

[11] Karkouti K, *"A Propensity Score Case-Control Comparison of Aprotinin and Tranexamic Acid in High-Transfusion-Risk Cardiac Surgery,"* (TRANSFUSION January 20, 2006) (on-line edition) (Plaintiffs' Compendium of Exhibits at Exhibit "J").

[12] Mouton R, "Effect of aprotinin on renal dysfunction in patients undergoing on-pump and off-pump cardiac surgery: a retrospective observational study," 371:475-82 (Lancet 2008) (Plaintiffs' Compendium of Exhibits at Exhibit "W").

[13] Bayer's decision not to challenge the legitimacy of the epidemiological research finding an association between Trasylol and variously-defined kidney injuries in connection with Dr. Parikh's expert causation testimony is consistent with its determination not to challenge the same evidence in connection with the testimony of Dr. Eisenberg.  [*See* Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Mark J. Eisenberg and Brief in Support Thereof"].

nephrology research community, Bayer strives mightily to portray them as "experimental" in an attempt to distinguish what is otherwise an unremarkable opinion from Dr. Parihk; namely, that Trasylol causes acute kidney injury.  As set forth herein, the term "acute kidney injury" and the use of biomarkers as a research tool are both accepted in the nephrology research community and do not render Dr. Parikh's opinions unreliable.

      **1.**    **Background Information Regarding Kidney Research And The Emergence Of The Acute Kidney Injury Terminology.**

One of the important functions of the kidneys is to process wastes in the blood that come from the breakdown of active tissues (such as muscles) and from food.  [Parikh Report p. 2 (Plaintiffs' Compendium of Exhibits at Exhibit "A")]. The kidneys also control the amount of certain elements and compounds in the body, such as potassium and sodium.  If the kidneys did not remove these wastes or properly control the amount of certain elements in the body, they would build up in the blood and damage the body. For example, too much potassium can lead to heart arrhythmias, or too much sodium can lead to fluid retention and congestive heart failure. *Id*. In performing the kidneys' waste-processing task, the glomerulus acts as a filtering unit, keeping normal proteins and cells and the proper amount of necessary elements and compounds in the bloodstream while permitting extra fluids, waste materials and excess elements and compounds to pass through to the tubules and eventually into the urinary system. *Id.*

Clinicians commonly use the glomerular filtration rate (GFR) to determine whether the kidneys are functioning normally. *Id.* at 2.  The GFR is equal to the sum of the filtration rates in all of the functioning nephrons. *Id.* Because function may be diminished or entirely absent where there is kidney injury, the GRF can provide a rough measure of the number of functioning nephrons. *Id.* at 3.  However, GFR cannot be measured directly. *Id.* Thus, since the 1930's, GFR has been estimated from the clearance of endogenous substances such as creatinine. *Id.* at 3.

Creatinine is a metabolic product of creatinine that is released by muscle and filtered and secreted by the kidney. *Id.* Serum creatinine measurement is the most common laboratory value used to determine the status of kidney function and to estimate GFR.   Many Trasylol studies examining kidney injury define acute renal failure in relation to creatinine.

There is an inverse relationship between the measurement of creatinine and loss of kidney function measured by GFR.  Small increases in creatinine represent large reductions in GFR. This is easily understood by considering the effects of kidney donation for transplant. When a healthy person donates a kidney they lose 50% of their filtration capacity. Yet, despite that loss, a kidney donor can have a normal creatinine reading. This is due to the kidney's natural overcapacity. So when a patient with two kidneys has a creatinine rise of 50% above baseline (for example: 1.0 to 1.5), it represents a loss of over 50% of kidney function measured by GFR.

Until recently, the abrupt loss of kidney function has been referred to by multiple names (including:  acute renal failure, acute renal dysfunction, acute renal insufficiency, kidney failure, acute tubular necrosis, and kidney necrosis) and has been diagnosed by varying standards.  [*See* Parihk Report p. 4, Table 1 (setting forth over fifteen different standards for identifying renal failure in Trasylol studies)].  This disparity has hindered clinical research as it confounds comparisons between studies. The term "acute kidney injury" ("AKI") was proposed by the Acute Kidney Injury Network in 2005 to represent the entire spectrum of acute renal failure. [Parikh Report p. 5].  Like with cancer diagnoses, AKI employs a staging system to classify the severity of AKI.   Stage 1 AKI is defined by any of the following: (1) a change in serum creatinine of $\geq$ 0.3 mg/dl or (2) an increase in the baseline SCr of 50% or more, or (3) urine output of less than 0.5 ml/kg per hour for more than six hours.  [Parikh Report p. 5, Table 2].

Greater increases in serum creatinine or longer periods of obstructed urine flow are criteria for Stage 2 and Stage 3 AKI.  [Parikh Report p .5, Table 2].

      **2.**    **Dr. Parikh's Opinions Are Not Unreliable Due To His Use Of The Term "Acute Kidney Injury."**

          **a.**    **Although a relatively new term, "acute kidney injury" is the accepted definition for the entire spectrum of acute renal failure and enjoys broad support, acceptance and use in the nephrology community.**

The term AKI was proposed by the Acute Kidney Injury Network in 2005 to represent the entire spectrum of acute renal failure.  [Parikh Report p. 5].  Since 2006, the number of published medical articles using the term AKI has exploded from a mere handful to over 600 in the past year alone.  [Affidavit of Charig Parikh (Plaintiffs' Compendium of Exhibits at Exhibit "AA")].   In fact, "acute kidney injury" is the term and definition used in a recently published Karkouti study finding a Trasylol was "associated with increased acute kidney injury"). (Karkouti (2010)).[14] Use of the term has also been endorsed by at least eighteen different nephrology and critical care organizations including: the American Society of Nephrology, the National Kidney Foundation,  the ARF Advisory Group, the Acute Dialysis Quality Initiative, KDIGO (Kidney Disease: Improving Global Outcomes), and the International Society of Nephrology.   (Mehta (2007)).[15]  Further demonstrating the widespread support and adoption of the term AKI is the fact that several 2009 critical care conferences used AKI as the terminology for renal injury or disease.[16] And even Bayer's own expert nephrologist, Dr. Humes, uses the

---

[14] Karkouti K, "The Risk-Benefit Profile of Aprotinin Versus Tranexamic Acid in Cardiac Surgery," 110:21-29 (Cardiovascular Anesthesiology 2010)(Plaintiffs' Compendium of Exhibits at Exhibit "N").

[15] Mehta R, et al., "Acute Kidney Injury Network: report of an initiative to improve outcomes in acute kidney injury," 11:R31 (Critical Care 2007) (Plaintiffs' Compendium of Exhibits at Exhibit "O").

[16] *E.g.* National Kidney Foundation Spring Clinical Meetings, March 25-29, 2009 (Plaintiffs' Compendium of Exhibits at Exhibit "CC")(listing "learning about the prevention and management of acute kidney injury. . . " as the purpose of the symposium); Society of Critical Care Medicine's 39th Critical Care Congress,  Schedule of Events for Courses held January 9-13, 2010 (Plaintiffs' Compendium of Exhibits at Exhibit "DD"); *See also* Affidavit of Charig Parikh (Plaintiffs' Compendium of Exhibits at Exhibit "AA").

term AKI repeatedly throughout his report.[17] Thus, there is substantial evidence that the nephrology research community implicitly and explicitly supports Dr. Parikh's reliance on the generally accepted term "AKI."

> **b.    Dr. Parikh's expert opinion is not unreliable because it uses the currently accepted terms and definitions in his field.**

Bayer makes several arguments against Dr. Parikh's use of the term AKI.  The first is that AKI cannot support an expert causation opinion because a diagnosis of AKI is made, in part, on the basis of an increase in serum creatinine lab values.  There are numerous problems with Bayer's argument.   First, AKI is not merely an increase in a lab value.   AKI is a term representing the full spectrum of acute kidney failure - which includes serum creatinine measures (Bayer's so-called "lab value") as one of several alternative staging criteria.   Hence it is disingenuous of Bayer to describe AKI as merely a lab value and not truly a disease or injury. Second, if the use of SCr lab values as a diagnostic criterion somehow renders kidney research unreliable for all purposes (which it does not do) – then there can be very little reliable research in the field of nephrology because SCr lab values have been a primary measure of GFR for seventy years.   [Parikh Report p. 3]. Presumably, Bayer does not have a problem with the previously-used terms renal failure or renal dysfunction. Yet, each of those conditions was diagnosed on the same criteria as AKI; namely, an increase in the lab value for the patient's SCr or a decrease in the patient's urine output. [*See* Parikh Report p. 4, Table 1 (noting at least eight different creatinine based definitions of renal dysfunction/failure used in roughly 40 different studies)]. Indeed, Bayer's own expert uses the same type of SCr-based criteria for classifying kidney injuries that Dr. Parikh employs.[18]   Simply stated, AKI is not a new disease, it is merely

---

[17] Report of H. David Humes, M.D. (Plaintiffs' Compendium of Exhibits at Exhibit "BB").
[18] On page 9 of his report, Bayer's nephrology expert, Dr. Humes, uses the RIFLE criteria for defining acute kidney injury which relies on creatinine measurement just like the competing AKI definition used by Dr. Parikh.   The

the standardization of the diagnostic criteria for renal diseases and injuries that have been used for many years.   Thus, even if this Court were to reject use of the term AKI (which it ought not do) the substance of Dr. Parikh's causation opinions would remain viable because they are applying essentially the same criteria regardless of the name used for renal disease. [19]

Furthermore, use of the term AKI is not incompatible with reliance upon the work of other researchers regarding the safety and efficacy of Trasylol. [Bayer's Daubert Motion p. 4]. First, one of the purposes of adopting the term AKI was to develop a consensus in terminology and quantitative definitions so as to further research by permitting comparisons between studies. Thus, far from precluding research, the AKI definitions promote it.   Second, the definitions of the various renal injuries examined in each of the studies relied upon by Dr. Parikh are encompassed by the definition of AKI.   For example, the 0.5 mg/dL increase in creatinine used to determine renal dysfunction in Brown (2007) and D'Ambra (1996) would fall within the definition for Stage 1 AKI.   In fact, most, if not all, of the studies relied upon by Dr. Parihk (and Bayer's experts as well) employ an injury definition within the AKI criteria.   Thus, the unchallenged scientific study data supporting an association between Trasylol and ARF, equally supports an association between Trasylol and AKI at the corresponding stage. [*See* Bagshaw S, et al., "A comparison of the RIFLE and AKIN criteria for acute kidney injury in critically ill patients" 23:1569-1574 (Nephrol Dial Transplant 2008) (Exhibit "M")].

---

definitions are very similar. "In recent years, the use of the consensus definitions of acute kidney injury (RIFLE and AKIN) in the literature has increased substantially. This indicates a highly encouraging acceptance by the medical community of a unifying definition for acute kidney injury" Cruz, *et al,* Clinical Review: RIFLE and AKIN – time for reappraisal," Critical Care 2009:13(3):211.  (Plaintiffs' Compendium of Exhibits at Exhibit "EE").

[19] "The definition of renal dysfunction as a 0.5-mg/dL elevation in postoperative serum creatinine is widely accepted. It is the definition consistently used and reported in the trials and other cardiac surgery studies. Renal dysfunction defined in this way has been shown to increase the risk of 30-day mortality with cardiac surgery by 18-fold, demonstrating its usefulness as a metric in clinical trials" Brown *et al*, "Meta-Analysis Comparing the Effectiveness and Adverse Outcomes of Antifibrinolytic Agents in Cardiac Surgery," Circulation 2007, vol.115:2801-2813 at 2807.

Finally, Bayer argues that Dr. Parikh's testimony is unreliable because he relies upon serum creatinine level-based studies as the basis for his causation opinions while also criticizing SCr as a limited measure of acute kidney injury.  There is nothing inconsistent about Dr. Parikh's opinions. Dr. Parikh does not criticize SCr for inaccuracy in identifying renal injury *when it is found.* Dr. Parikh's criticism of SCr is that, as a diagnostic measure of AKI, it is not the most sensitive marker of **early** renal dysfunction which may occur within hours of the original insult to the kidney. [Parikh Report p. 7, 8].  Because normal levels of SCr can vary based on numerous factors including body weight, gender, age, muscle mass, total body volume, or protein intake, the normal reference level is relatively wide.  Thus, when SCr is used as the measure, it is possible for a given person to suffer a substantial loss of kidney function or structure but still not go outside of the reference range for normal in many laboratories.  Likewise, because GFR is universally low in advanced kidney disease, extensive renal damage is needed before a reduction in true GFR will be seen due to the "renal functional reserve."  [Parihk Report p. 8]. For both of these reasons, Dr. Parikh considers SCr an insufficient **early** marker of early renal disease. Again, this criticism does not impugn the reliability of SCr-based findings of kidney *injury;* it impugns only the reliability of SCr-based findings of *non-injury* due to the fact that SCr lacks sensitivity to pick up renal damage at its earliest stages.[20]  While the significance of this distinction may be lost on Bayer, it is entirely consistent for Dr. Parihk to rely on kidney injury data derived using SCr-based measures to support his causation opinion while at the same time observing that additional injuries may exist that SCr measures did not detect.

---

[20] Bayer's artfully frames its quotations from Dr. Parikh's Report to suggest that Dr. Parikh's references to the (1) the kidney's ability to undergo complete repair in some cases and (2) the devolution of AKI episodes into progressive kidney disease and dialysis in some cases, are linked to deficiencies in the serum creatinine measure. [Dr. Parikh's Report p. 5].  Dr. Parikh has stated no such thing.  The repair capabilities of the kidney or the likelihood of a patient needing future dialysis do not implicate the "limited utility of serum creatinine testing."

**c.      Use of the term AKI will not confuse the jury.  [In Response to Bayer's Argument at I.A.2 p. 6-7].**

Rule 403 provides, in part, that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." FED.R.EVID. 403. In reviewing issues under Rule 403, courts are to 'look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Tambourine Comercio Int'l. SA v. Solowsky,* 312 Fed.Appx. 263 (11th Cir. 2009); *U.S. v. Bradberry,* 466 F.3d 1249, 1253 (11th Cir. 2006).  Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence. *U.S. v. Church,* 955 F.2d 688, 700 (11th Cir. 1992).  "The balance ... should be struck in favor of admissibility.' " *U.S. v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002); *U.S. v. Elkins,* 885 F.2d 775, 784 (11th Cir. 1989).

The only one likely to be confused by Dr. Parikh's testimony in this case is Bayer – and Bayer's confusion is self-induced.  That is, Bayer insists that Dr. Parikh is using the term AKI "to mean elevated serum creatinine" despite consistent evidence to the contrary. Dr. Parikh clearly sets forth in his report that AKI refers to the entire spectrum of renal failure.  Elevated serum creatinine is relevant to AKI only as one of several criteria for classifying, or "staging," the severity of a patient's AKI.  [Parikh Report p. 5].  There is nothing unduly complicated or confusing about the relationship between AKI and SCr as explained by Dr. Parikh.  Simply stated, there is no substantial danger of unfair prejudice warranting the extraordinary step of excluding Dr. Parikh's highly probative testimony regarding acute kidney injury in this case.

**3.      Dr.  Parikh's Opinions Are Not Unreliable Merely Because They Receive Secondary Support and Confirmation from Studies Employing Protein Biomarkers.  [In Response to Bayer's Argument I.B. p. 8-11].**

It should be noted at the outset that Dr. Parikh's causation opinion is not reliant upon biomarkers as the indicator of kidney disease.  That is because abundant scientific data exists establishing an association between Trasylol and acute kidney injury using traditional measures such as elevated SCr of 0.5 mg/dL or greater. Protein biomarkers such as urinary NGAL, IL-18 and KIM_1, are merely an additional tool for negphrology research that confirms the associations found using the SCr measure.

      a.      **Use of protein biomarkers is broadly accepted in nephrology research for purposes of determining Acute Kidney Injury.**

Biomarkers have been used for more than ten years by the nephrology research community. [Parikh Depo. 85:22-86:1]. NGAL and other proteins biomarkers are described by Dr. Parikh as "very common," and as "accepted as very important markers within the research community." [Parikh Depo. 46:14-17; 48:12-13]. Even the FDA includes protein biomarkers among its portfolio of safety biomarkers for kidney injury. [Parihk Depo. p. 48].

Bayer cites Dr. Parikh's acknowledgement that biomarker testing is not available in *clinical* practice without consideration that Dr. Parikh is not offering an opinion on physician's clinical practice habits.  Dr. Parikh is proffering an opinion on whether the medical literature and epidemiological *research* demonstrates a causal connection between Trasylol and kidney injury, that is, structural damage to the kidney.  The use of biomarkers in this research context is broadly accepted.  Dr. Parikh explained this distinction immediately prior to the exchange quoted in Bayer's motion:

      Q.      And would it be fair to say that the novel biomarkers that you're studying are generally not now used in the diagnosis of AKI?

      A.      Yes and no.  **So they are used very routinely in research practice. They are accepted as methods for acute kidney injury by research community, by FDA.**  And NIH has

> put a lot of efforts into getting them out into clinical
> practice. Currently the tests cannot be ordered. Although
> the process is known, a regular physician does not have a
> mechanism to order the test. And they are not available in
> clinical practice. And they are in that intermediate phase of
> getting, being available.

[Parikh Depo. 68:18-69:7 (emphasis added)]. The reason biomarkers are not yet in clinical

practice is that the final stage of FDA approval requires evidence of impact on clinical outcomes.

[Parikh Depo. 86:10-12]. That is, while it is accepted that the biomarkers provide reliable

information regarding kidney injuries for research purposes, it will not be approved as a clinical

diagnostic test until there is evidence that the additional diagnostic information will make a

difference to clinical outcomes. [Parikh Depo. 86:17-23]. It is only the manner in which they

will impact clinical outcomes (an issue not addressed by any opinion of Dr. Parikh) that is

implicated by the non-use of the biomarkers in clinical practice.

It is Bayer's same failure to grasp that studies using NGAL and other protein biomarkers

are being relied upon by Dr. Parikh in a research context as a diagnostic tool that taints all its

"unreliability arguments. Bayer purports to list five "shortcomings" of biomarkers testified to by

Dr. Parikh. Three of those five "shortcomings" relate to the same issue: the unsettled usefulness

of biomakers in improving clinical outcomes. For instance, Bayer cites Dr. Parikh as having

written that uncertainty exists as to whether the biomarkers possess "adequate *prognostic*

accuracy." [Bayer's Daubert Motion p. 9, *citing*, Parikh Depo. 76:20-77:12].[21]  In the cited, but

unquoted, complete answer to Bayer's question, Dr. Parikh had explained that the uncertainty

being referred to was not *diagnostic* uncertainty; but, rather uncertainty regarding how a high

NGAL impacts a patient's short and long-term prognosis. [Parikh Depo. 77:5-12].

---

[21] To the same substantive effect are Bayer's quoted statements by Dr. Parikh regarding the need to determine the
"incremental prognostic value" of biomarkers, and (2) that the proteins have not, at the present time been determined
to be a good biomarker for hard outcomes like dialysis and death. [Bayer's Daubert Motion p. 9].

Likewise, Bayer cites Dr. Parikh's statement that it is unknown whether NGAL is a "surrogate marker" of tubular injury without seeming to comprehend the role of a surrogate marker.  As Dr. Parikh explained, a *surrogate* marker is something that can stand in for an outcome.[22] [Parikh Depo. 103:9-104:16].  NGAL is a marker of tubular injury to the kidneys *for testing purposes.*  [Parikh Depo. 104:10]. The fact that is not yet clear whether NGAL is also a *surrogate* marker – in the sense that lowering NGAL is a beneficial end in and of itself because of its causal link to kidney injury -- is not central to Dr. Parikh's causation opinion.  Dr. Parikh is not relying on NGAL as a causal agent of AKI.  Dr. Parikh is relying on studies using NGAL as a test for determining whether AKI occurs in patients using *Trasylol*.  It is not necessary that NGAL be a surrogate biomarker when used for this purpose.

### b.   Scientific study data derived from the use of biomarkers is consistent with the results of the serum creatinine based studies.

The following studies, employing biomarkers as more sensitive markers of kidney injury are significant in that they support and confirm the conclusions of the RCTs and cohort studies that measured renal function by serum creatinine.  Wagener[23] showed that neutrophil gelatinase associated lipocalin (NGAL) is increased in patients receiving Trasylol as compared to patients receiving aminocaproic acid. Fauli[24] showed that aprotinin causes a significant increase in alpha1-microglobulin excretion – a finding consistent with greater renal tubular overload.  In addition, patients who received high-dose Trayslol had much higher levels of alpha1-microglobulin than patients receiving low-dose Trasylol (dose response).  Tellingly, serum

---

[22] For instance, high blood pressure is a surrogate marker for increased risk of death.  That is because it is established that increased blood pressure impacts mortality.  Thus, a medicine may be considered beneficial if it simply reduces blood pressure because high blood pressure is recognized to stand as a surrogate for death.
[23] Wagener, "increased incidence of acute kidney injury with aprotinin use during cardiac surgery detected with urinary NGAL,"  28(4):576-582 (Am. J. Neprol. 2008)(Plaintiffs' Compendium of Exhibits at Exhibit "P")
[24] Fauli, "Kidney-specific proteins in patients receiving aprotinin at high- and low-dose regimens during coronary artery bypass graft with cardiopulmonary bypass," 22(9):666-671 (Eur. J. Anaesthesiol. 2005)(Plaintiffs' Compendium of Exhibit at Exhibit "Q").

creatinine was unchanged between the high-dose and low-dose Trasylol groups - demonstrating that serum creatinine is not a sufficiently sensitive marker to show tubular damage until that damage is substantial. Nguyen[25] - urinary aprotinin was identified as a new biomarker of AKI by proteomic analysis. Urinary aprotinin levels at two hours after cardiac surgery were predictive of AKI and correlated with serum creatinine, duration of AKI and length of hospital stay.

## D.   DR. PARIKH'S CAUSATION OPINIONS ARE SUPPORTED BY SCIENTIFIC DATA AND DERIVED FROM A RELIABLE METHODOLOGY AND SHOULD BE ADMITTED.

Bayer mistakenly asserts that Dr. Parikh's causation testimony is dependent upon a three pronged syllogism: (1) Trasylol may lead to the increase of SCr; (2) elevated serum creatinine may someday be proven indicative of bad outcomes, so (3) Trasylol is the general cause of those outcomes.   [Bayer's Daubert Motion p. 16].   Whether Bayer's syllogism is considered individually or as a whole, it is devoid of merit.   In fact, Bayer itself concedes that the first prong of its so-called syllogism falsely portrays an uncertainty that does not exist.   There is no question whether Trasylol *may* lead to elevations in SCr. Bayer admits that data from randomized controlled trials *have* shown an association between Trasylol use and increased levels of  SCr.[26] [Bayer's Daubert Motion p. 11]. In fact, the Trasylol label itself describes studies suggesting an association between Trasylol and increased levels of SCr.   [Bayer's Daubert Motion p. 11]. Thus, the fact that Trasylol is associated with elevations in SCr is not in dispute.

Having conceded that Trasylol leads to increases in SCr – Bayer falsely asserts that Plaintiff must next show that elevated SCr is associated with "bad outcomes."   Bayer

---

[25] Nguyen, "Urinary aprotinin as a predictor of acute kidney injury after cardiac surgery in children receiving aprotinin therapy," 23(8):1317-1326 (Pediatr. Nephrol. 2008)(Plaintiffs' Compendium of Exhibits at Exhibit "R").

[26] *E.g.* Fergusson (2007)(the "BART trial")[26] (randomized controlled trial found a doubling of creatinine levels among patients receiving Trasylol); Shaw  (2008) (cohort study of over 10,000 patients, published in the New England Journal of Medicine, found that Trasylol users had larger increases in serum creatinine levels than patients receiving either aminocaproic acid or no antifibrinolytic agent at all).

conveniently ignores that specified elevations in SCr are the very definition of AKI (a bad outcome). It is not necessary to show that elevated SCr *is associated* with AKI because elevated SCr *is itself the definition of* AKI. Numerous studies have concluded that there is an association between Trasylol and renal injury on just such a basis. [*See* Argument *infra* at IV.A.2.]. [27]

Although unnecessary, scientific support for an association between SCr elevations and "bad outcomes" does exist. Dr. Parikh cites several studies as the basis for his opinion that even relatively small increases in SCr are associated with increased morbidity and mortality. For example, the Gruberg (2000) study found that mild deteriorations in renal function (defined as elevation of serum creatinine above 25% of baseline or a need for dialysis) impacted acute and long-term mortality for patients with preexisting renal insufficiency. When the Gruberg (2000) data was pooled with the Loef (2005)[28] and Welten (2007)[29] studies, which also examined relatively mild forms of AKI (less than 25% elevation in SCr), mild AKI was associated with a 70% increase in mortality risk. [Parikh Report p. 10]. Along the same lines, Hobson (2009)[30] found an independent association between mild AKI (defined to require at least a 50% increase in SCr) and long-term mortality risk that was consistent, dose responsive, and present throughout ten years of follow up. Most strikingly, the Hobson study found that the relationship between mild AKI and long-term mortality was present even in patients who had complete recovery of kidney function before they were discharged from the hospital. Finally, Dr. Parikh's own study

---

[27] Indeed, Bayer's nephrology expert Humes says the same thing in citing the RIFLE criteria "The RIFLE criteria consist of three graded levels of injury (risk, Injury and failure) **based upon** either **the magnitude of elevation in serum creatinine** or urine output". [emphasis added]Humes report p.9. As indicated above, and describes in his report, Dr. Parikh published research, independent of this litigation, is directly on the point of proving that not only is AKI a bad outcome in and of itself but it leads to other bad outcomes down the line such as death.

[28] Loef BG, et al., "Immediate postoperative renal function deterioration in cardiac surgical patients predicts in-hospital mortality and long-term survival 16(1): 195-200 (J. Am. Soc. Nephrol. 2005)(Plaintiffs' Compendium of Exhibits at Exhibit "T").

[29] Welten GM, et al., "Temporary worsening of renal function after aortic surgery is associated with higher long-term mortality," 50(2):219-228 (Am J. Kidney Dis. 2007)(Plaintiffs' Compendium of Exhibits at Exhibit "U").

[30] Hobson CE, et al., "Acute Kidney Injury is Associated with Increased Long-Term Mortality After Cardiothoracic Surgery (Circulation, April 27, 2009)(Plaintiffs' Compendium of Exhibits at Exhibit "V").

found that increases in creatinine measured by AKI standards results in a statistically significant increase in long term mortality in cardiac surgery patients with a direct correlation to the length of time the creatinine measurements were elevated.  Creatinine increases lasting 3-6 days resulted in a near doubling of the risk of long term death (1.94 HR) and AKI lasting more than seven days increased the risk of death over three times. (3.40 HR).[31] Based on Bayer's own database of Placebo controlled trials, Trasylol patients have elevated creatinine for an average of three additional days over placebo patients.[32]

Bayer criticizes Gruberg, and Hobson as unable to support the unneeded syllogism because (1) they do not attribute a cause for the increased morbidity and mortality they found, (2) they are not statistically significant, and (3) they do not directly involve Trasylol.  None of these criticisms render Dr. Parikh's opinions unreliable.  First, allegations of inadequacies in a study go to the weight of the expert's testimony, not its admissibility. *Quiet Tech.,* 326 F.3d at 1345; *Jones v. Otis Elevator Co.,* 81 F.3d 655, 663 (11th Cir. 1988).  Second, it is not necessary that a study draw a causation conclusion or disavow any need for future research in order for the study to be reliable. As courts have recognized, epidemiological studies generally do *not* express their findings in terms of absolute causation.[33]

> Medical and behavioral statistics is a methodology that seeks to measure degrees of probability, not causality. <u>Uncertainty is never completely abolished in any behavioral or medical science statistical manipulation. Therefore, conclusions must be defined in terms of "suggestions" or "associations" rather than causes</u>. This is not due to some inaccuracy or vagueness of the technique or conclusion, but rather is intrinsic to the properties of statistics. . .

---

[31] Abstract of Brown J, Kramer R, Coca S, Parikh C, "Duration of Acute Kidney Injury Impacts Long-term Survival Following Cardiac Surgery," (Plaintiffs' Compendium of Exhibits at Exhibit " Z").
[32] Presentation by Bayer Vice President of Medical Affairs, Pamela Cyrus, "Trasylol (aprotinin injection) Review of Clinical Data with Focus on Specific Safety Events," Slide C-19 (2007 Advisory Committee Meeting)(Plaintiffs' Compendium of Exhibits at Exhibit "FF").
[33] *See,* Reference Manual at 157 ("Most re-searchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more re-search before a conclusion of causation is drawn.").

*Berry v. CSX Transportation, Inc.,* 709 So.2d 552, 586 (Fla.App. [1st. Dist.] 1998)(emphasis added); *U.S. v. W.R. Grace, 504 F.3d 745 (9th Cir. 2007)(*"the fact that a study is associational-rather intended to show causation-does not bar it from being used to inform an expert's opinion"*).* Third, Bayer's overemphasis on statistical significance is unwarranted. Renal dysfunction and particularly renal failure are rare events. Producing statistically significant data regarding the cause of a rare dichotomous event requires extremely large, well-powered, studies. [*See, e.g*., (Brown (2007)) (noting that greater than 80,000 patients would be needed in each treatment group in order to detect a statistically significant association between treatment and renal failure)]. Thus, a lack of statistical significance is a product of study size; not an indicator that a relationship is lacking. Further, Dr. Parikh's own study finds a dose response (the longer the AKI the greater risk of death) and is statistically significant.[34] Finally, Bayer's complaint that studies using the term AKI do not directly involve Trasylol brings the argument full circle. AKI is merely an umbrella term encompassing renal injury. Numerous studies conclude that Trasylol is associated with renal injury, *e.g*. (Brown (2007)), (D'Ambra (1996)), (Gagne (2009)), (Mangano (2006)), (Schneeweisss (2007)), (Karkouti (2006)), (Mouton (2008)). At the minimum, such data provides a reasonable basis for Dr. Parikh's causation opinions which should be admitted to aid the jury.

## CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request that the Court DENY Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Chirag Parikh. Plaintiffs additionally request all other and further relief as the Court deems just and proper.

---

[34] Abstract of Brown J, Kramer R, Coca S, Parikh C, "Duration of Acute Kidney Injury Impacts Long-term Survival Following Cardiac Surgery,"  (Plaintiffs' Compendium of Exhibits at Exhibit "Z").

This the 26<u>th</u> day of January, 2010.

Respectfully submitted,

/s/ _____
Theodore Babbitt (Florida Bar No. 91146)
Email: tedbabbitt@babbitt-johnson.com
Joseph Osborne (Florida Bar No. 880043)
Email: JAOsborne@babbitt-johnson.com
Babbitt, Johnson, Osborne
& LeClainche, P.A.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: (561) 684-2500
Facsimile:  (561) 684-6308

***Liaison Counsel for Plaintiffs and Plaintiffs'
Steering Committee***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26 , 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel or records or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

/s/ _____

Theodore Babbitt

Florida Bar No. 0091146