# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

**IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928**

**This Document Relates to All Actions.**

## PLAINTIFFS' OPPOSITION TO BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT F. GARY TOBACK, M.D., PH.D. AND BRIEF IN SUPPORT THEREOF

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION AND SUMMARY OF PLAINTIFFS' OPPOSITION ............................ 1

INCORPORATION BY REFERENCE OF MATTERS SET FORTH IN PLAINTIFFS'
CONCURRENTLY FILED OPPOSITION TO BAYER'S MOTION TO EXCLUDE THE
TESTIMONY OF DR. MARK J. EISENBERG ..................................................................... 2

EVIDENCE .......................................................................................................................... 2

ARGUMENT AND AUTHORITIES ................................................................................... 3

   A.   BAYER'S CHALLENGE TO DR. TOBACKS'S OPINIONS IS LIMITED. ................... 3

   B.   DR. TOBACK'S TESTIMONY REGARDING THE BIOLOGICAL MECHANISMS
       WHEREBY TRASYLOL NEGATIVELY IMPACTS THE FUNCTION AND
       STRUCTURE OF THE KIDNEYS IS PLAUSIBLE AND SUPPORTS DR. TOBACK'S
       CAUSATION OPINION. [In Response to Bayer's Argument I. p. 2-9] ........................... 4

     1.   Dr. Toback's Challenged Opinions Do Not Require Proof of the Precise Mechanism of
        Action To Be Admissible. ............................................................................................ 5

     2.   Dr. Toback's Testimony Regarding the Non-Essential Mechanism of Action and
        Biological Plausibility Considerations are Admissible As Support for His Causation
        Opinion. ..................................................................................................................... 10

       a.   Dr. Toback's testimony regarding the biologically plausible mechanisms whereby
          Trasylol causes kidney injuries is not unreliable because it is supported (in part) by
          animal studies ........................................................................................................ 11

       b.   Dr. Toback's testimony regarding the biologically plausible mechanisms whereby
          Trasylol causes kidney injuries is consistent with the mechanism of action testimony
          provided by Bayer's expert and listed by Bayer on its product insert. ..................... 13

       c.   Dr. Toback's testimony regarding the biologically plausible mechanisms whereby
          Trasylol causes kidney injuries is not unreliable merely because Bayer contests the
          quality of the studies upon which Dr. Toback relies. .............................................. 16

     3.   Dr. Toback's Biological Plausibility Testimony Is Not Unreliable Due to Failure to
        Establish a Threshold Dose. ........................................................................................ 16

C.    DR. TOBACK'S OPINION THAT TRASYLOL SHOULD HAVE BEEN STUDIED IN COMPARISON TO AMICAR AND TRANEXAMIC ACID IS ADMISSIBLE.  [In Response to Bayer's Argument II. p. 9-10]...................................................... 17

D.    DR. TOBACK WILL NOT BE OFFERED TO OPINE ON ISSUES OF FDA LABELING, EVENTS OCCURING AT FDA ADVISORY COMMITTEE MEETINGS, MATERIALS PROVIDED OR WITHHELD FROM THE FDA AND BAYER OR THE FDA'S KNOWLEDGE OR STATE OF MIND. ............................................................ 18

**CONCLUSION** ................................................................................................................ 19

**CERTIFICATE OF SERVICE** ...................................................**Error! Bookmark not defined.**

## TABLE OF AUTHORITIES

**Cases**

184 F.3d 1300 (11th Cir. 1999) ........................................................................ 12

*Allison v. McGhan Med. Corp.,*
    184 F.3d 1300 (11th Cir.1999) ............................................................... 10, 12

*Bourne v. Dupont De Nemours & Co., Inc.,*
    189 F.Supp.2d 482 (S.D.W.V. 2002) ............................................................ 11

*Capizzano v. Secretary of Dep't of Health & Human Servs.,*
    No. 00-759V (Fed. Cir. 2004) 2004 U.S. Claims LEXIS 149 .......................... 7

*Carey v. General Motors Corporation,*
    377 Mass. 736 (1979) ................................................................................... 7

*Daubert v. Merrell Dow Pharms., Inc.,*
    43 F.3d 1311 (9th Cir.1995) ................................................................... 7, 10

*Golod v. La Roche,*
    964 F. Supp. 841 (S.D.N.Y. 1997) ............................................................... 6

*Hopkins v. Dow Corning Corp.,*
    33 F.3d 116 (9th Cir. 1994) ....................................................................... 11

*In re Hanford Nuclear Reservation Litigation,*
    292 F.3d 1124 (9th Cir. 2002) .................................................................... 17

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,*
    289 F.Supp.2d 1230 (W.D.Wash.2003) ................................................. 10, 11

*In re Seroquel Products Liability Litigation,*
    2009 WL 3806435 (M.D.Fla. 2009) ........................................................ 8, 10

*In re Stand "N Seal Products Liability Litigation,*
    623 F.Supp.2d 1355 (N.D.Ga. 2009) .......................................................... 17

*Jones v. Otis Elevator Co.,*
    81 F.3d 655 (11th Cir. 1988) ..................................................................... 16

*Kennedy v. Collagen Corp.,*
    161 F.3d 1226 (9th Cir. 1998) ..................................................................... 7

*McCarrell v. Hoffman-La Roche, Inc.,*
    2009 WL 614484 (N.J.Super.A.D., March 12, 2009) ................................... 12

*McClain v. Metabolife International, Inc.,*
    403 F.3d 1233 (11th Cir. 2005) ................................................................... 7

*Metabolife International, Inc. v. Wornick,*
    264 F.3d 832 (9th Cir. 2001) ..................................................................... 11

*Perkins v. Origin Medsystems Inc.,*
    299 F. Supp. 2d 45 (D. Conn. 2004) ............................................................ 6

*Quiet Technology DC-8, inc. v. Hurel-Dubois UK Ltd.*
    326 F3d 1333 (11th Cir. 2003) ................................................................... 16

*Snyder ex rel. Snyder v. Secretary of Dept. of Health and Human Services,*
    2009 WL 332044 (Fed.Cl. Feb. 12 2009) ................................................... 16

*Solimene v. B. Grauel & Co., KG, et al.,*
    399 Mass. 790 (1987) ................................................................................... 7

*State v. Kliphouse,*
    771 So. 2d 16 (Ct. App. Fla., 2000) .............................................................. 7

*Tivoli v. U.S.,*
  93 Civ.5817 (CLB) (MDF), 1997 U.S. Dist. LEXIS 23356 (S.D.N.Y., November 3, 1997) ... 7
*Turpon v. Merrell Dow Pharms.* Inc.,
  959 F.2d 1349 (6th Cir. 1992) ................................................................................................. 11
*Woodley v. PFG-Lester Broadline, Inc.,*
  556 F.Supp.2d 1300 (M.D.Ala. 2008) ................................................................................ 14

COME NOW, Plaintiffs in the above styled cause ("Plaintiffs") and submit the following "Plaintiffs' Opposition to Bayer's Motion to Exclude Testimony of Plaintiffs' Expert F. Gary Toback, M.D., Ph.D. and Brief in Support Thereof" ("Plaintiffs' Opposition"), and would respectfully show the Court that Dr. Toback's proposed expert testimony should be admitted for the following reasons:

## I.
## INTRODUCTION AND SUMMARY OF PLAINTIFFS' OPPOSITION

Dr. Toback is an expert nephrologist offered by Plaintiffs to opine upon: (1) the biological mechanism whereby Trasylol impacts renal function, (2) whether Trasylol causes an increased risk of renal dysfunction and/or renal failure, (3) the need for dialysis by patients experiencing renal failure, and (4) the long-term effects of renal impairment and renal failure. Of these opinions, Bayer[1] contests only the first and the second. Thus, the admissibility of Dr. Toback's third and fourth expert opinions -- regarding the need for dialysis and the effects of renal injury on patients -- is not disputed.

Even allowing for the fact that only two of Dr. Toback's four areas of testimony are at issue, Bayer's challenge to Dr. Toback's testimony is extremely narrow. Specifically, Bayer contends that Dr. Toback has insufficient support for his opinions regarding biologically plausible mechanisms of action (in relation to opinion no. 1) and that the lack of a clear biological mechanism dooms Dr. Toback's causation opinion (in relation to opinion no. 2). Bayer's reasoning is fundamentally flawed. First, there is no requirement under Daubert that a mechanism of action be known to a certainty in order for general causation testimony to be reliable. To the contrary, numerous courts have admitted causation testimony in the face of

---

[1] Defendants Bayer Healthcare Pharmaceuticals Inc. (as successor in interest to Bayer Pharmaceutical Corporation), Bayer HealthCare LLC, Bayer AG, and Bayer Schering Pharma AG (as successor in interest to Bayer HealthCare AG), are referenced collectively throughout this opposition as "Bayer."

mechanical uncertainty. [*See* Argument *supra* at IV.B.1]. Second, even if knowing the mechanism of injury was a requirement for causation (which it is not), Dr. Toback has demonstrated a sufficient basis for his testimony as to the biologically plausible mechanisms whereby Trasylol causes kidney injury. For these reasons Bayer's Motion should be denied.

## II.
## INCORPORATION BY REFERENCE OF MATTERS SET FORTH IN PLAINTIFFS' CONCURRENTLY FILED OPPOSITION TO BAYER'S MOTION TO EXCLUDE THE TESTIMONY OF DR. MARK J. EISENBERG

In the interest of brevity and to avoid burdening the Court with duplicative briefing, Plaintiffs have set forth the following matters in their "Plaintiffs' Opposition to Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Mark J. Eisenberg and Brief in Support Thereof" (hereinafter "Eisenberg Opposition") which are fully incorporated herein by reference.

- Section "I" – BACKGROUND AND HISTORY OF MDL LITIGATION

- Section "IV.B" – THE PROPER DAUBERT STANDARDS

In order to further the Court's understanding of the history of this litigation, the scientific data that underlies the expert testimony in this case, and the separate and distinct areas of each expert's proffered testimony, Plaintiffs would respectfully encourage the Court to begin its review of Plaintiffs' Daubert briefing with Plaintiffs' Eisenberg Opposition.

## III.
## EVIDENCE

In support of this Plaintiffs' Opposition to Bayer's motion to exclude the expert testimony of Dr. Toback, Plaintiffs specifically rely upon the following documents which are set forth in Plaintiffs' Compendium of Exhibits filed herewith:

A.     Expert Report of F. Gary Toback, M.D. (hereinafter "Toback Report") (Exhibit "A").

B.     Excerpts from the Deposition of F. Gary Toback, M.D. (hereinafter "Toback Depo.") (Exhibit "B").

C.     Expert Report of David Humes, M.D. (hereinafter "Humes Report") (Exhibit "C").

D.     Excerpts from the Deposition of David Humes, M.D. (hereinafter "Humes Depo.") (Exhibit "D").

E.     2006 Bayer HealthCare, Trasylol Label/Package Insert. (Exhibit "E").

F.     Mangano DT, et al., "The risk associated with aprotinin in cardiac surgery," 354:353-65 (NEJM 2006) (Exhibit "F").

G.     Sundt TM 3rd, et al., "Renal Dysfunction and intravascular coagulation with aprotinin and hypothermic circulatory arrest," 55:1418-24 (Ann. Thorac Surg. 1993) (Exhibit "G").

H.     Expert Report of Chirag Parikh, M.D., Ph.D. (hereinafter "Parikh Report") (Exhibit "H").

I.     D'Ambra MN, et al., "Aprotinin in primary valve replacement and reconstruction: a multicenter, doubleblind, placebo-controlled trial," 112:1081-9 (J Thorac Cardiovasc Surg 1996) (Exhibit "I").

J.     Brown JR, et al, "Meta-analysis comparing the effectiveness and adverse outcomes of antibrinolytic agents in cardiac surgery," 115(22):2801-13 (Circulation 2007) (Exhibit "J").

In addition, Plaintiffs rely upon all pleadings, discovery and evidence filed in this case and any admissions made by Bayer therein.

## IV.
## ARGUMENT AND AUTHORITIES

A.     BAYER'S CHALLENGE TO DR. TOBACKS'S OPINIONS IS LIMITED.

The limited scope of Bayer's Daubert challenge to the testimony of Dr. Toback should be made clear at the outset.[2] Dr. Toback has offered expert opinions relating to the following four areas:

---

[2]   Bayer does not dispute that Dr. Toback is qualified to give the opinions he offers. Dr. Toback, is a medical doctor with a Ph. D. in Biochemistry.  [Toback Report p. 1 (Plaintiffs' Compendium of Exhibits at Exhibit "A")].  Dr.

(1)      Trasylol negatively impacts renal function both functionally and structurally;

(2)      Numerous studies and analysis over the last two decades establish that Trasylol increases the risk of renal impairment and acute renal failure;

(3)      Dialysis may be needed when patients experience renal failure due to an accumulation of salt, water and potassium in the body which can result in several health consequences for the patient;

(4)      Renal impairment and acute renal failure can have long term effects on patients including increases mortality, infections, sepsis, permanent decreased kidney function and other long term problems.

[Toback Report p. 2-3 (Plaintiffs' Compendium of Exhibits at Exhibit "A")]. Of these opinions, Bayer challenges only the first two. Bayer attacks Dr. Toback's opinion regarding the mechanisms whereby Trasylol impacts renal function as being speculative. [Bayer's Daubert Motion p. 2-9]. Bayer then makes the improper leap that failure to know the mechanism of action to a certainty is fatal to Dr. Toback's general causation opinion. Bayer's argument is both factually and legally flawed. Bayer fails to understand the concept of mechanism of action and how it interrelates with general causation.

B.      DR. TOBACK'S TESTIMONY REGARDING THE BIOLOGICAL MECHANISMS WHEREBY TRASYLOL NEGATIVELY IMPACTS THE

---

Toback is licensed to practice medicine in the State of Illinois. *Id.* He is a practicing nephrologist at the University of Chicago School of Medicine and certified by the American Board of Internal Medicine, Subspecialty in Nephrology, and the National Board of Medical Examiners. *Id.* He is a full Professor of Medicine and Cell Physiology at the University of Chicago and Chief of the Section of Nephrology. *Id.* He received his undergraduate degree in Biochemistry, *cum laude*, from Columbia University in 1963 and his M.D. degree in 1967, from New York University. Id. Notably, from 1979-1980 he studied the control of kidney cell growth, supported by a fellowship from the American Cancer Society, in the laboratory of Robert Holley, Ph.D., a Nobel Laureate, at the Salk Institute for Biological Studies in San Diego. *Id.* at 2. From 1986-1987, he took sabbatical at Howard Hughes Medical Institute and Department of Biochemistry and Molecular Biology at the University of Chicago under the tutelage of Donald Steiner, M.D., who discovered proinsulin. He testified before the U.S. House of Representatives house appropriations subcommittee on February 29, 1996 representing the American Society of Nephrology. *Id.* He has published approximately 100 papers and/or studies, focusing on mechanisms that control growth of the kidney, treatment of acute renal failure, interactions between kidney cells and crystals as occurs in kidney stone disease, and the discovery of novel growth factors that could be used to treat Acute Kidney Injury [Toback Report at Exhibit A (Curriculum Vitae of F. Gary Toback)(Plaintiffs' Compendium of Exhibits at Exhibit "A")]. Given Dr. Toback's extensive credentials, it is not surprising that Bayer does not challenge Dr. Toback's qualifications as an expert.

FUNCTION AND STRUCTURE OF THE KIDNEYS IS PLAUSIBLE AND SUPPORTS DR. TOBACK'S CAUSATION OPINION. [IN RESPONSE TO BAYER'S ARGUMENT I. P. 2-9]

Dr. Toback offers the expert opinion that Trasylol alters kidney function in three different ways. [Toback Depo. 88:13-14 (Plaintiffs' Compendium of Exhibits at Exhibit "B")]. First, Dr. Toback opines that kidney function is impacted because Trasylol reduces blood flow in the kidney thereby reducing the kidney filtration rate. Next, Dr. Toback offers the opinion that Trasylol accumulates in kidney cells leading to cellular injury. Third, it is Dr. Toback's opinion that kidney function is adversely impacted by Trasylol because Trasylol causes clots to form in renal arteries thereby reducing blood flow and filtration. Bayer claims that these opinions regarding the biological plausibility of Trasylol-caused injuries are unreliable because: (1) they are not known to an absolute certainty, (2) they are supported, in part, by animal studies, and (3) they are supported by human studies that Bayer views as "questionable." As demonstrated below, none of Bayer's criticisms threaten the reliability of Dr. Toback's testimony.

1.    **Dr. Toback's Challenged Opinions Do Not Require Proof of the Precise Mechanism of Action To Be Admissible.**

Bayer fails to appreciate the distinctions between a "mechanism of action," "biological plausibility" and "causation." "Biological plausibility" is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment as to whether it is *plausible* that an agent causes a disease. *Reference Manual on Scientific Evidence, supra*, at 388. Biological plausibility is one of the non-essential Bradford Hill factors for inferring causation.[3] Hill, A.B., The Environment and Disease: Association or Causation. (Proc.

---

[3] Under the "Hill Criteria," whether or not to draw a causal connection from a positive association in an epidemiological study should be determined by taking into account: (1) the temporal relationship between exposure and disease, (2) the strength of the association, (3) the dose-response relationship between exposure and incidence or severity of disease, (4) replication of the findings, (5) biological plausibility, (6) consideration of alternative explanations, (7) effect of cessation of exposure, (8) specificity of the association, and (9) consistency of the theory

R. Soc. Med. 1965). Where a biologically plausible mechanism of action can be inferred, that inference supports a causal connection. *Id.* Much of the testimony by Dr. Toback to which Bayer objects relates to biological plausibility.

"Mechanism of action," on the other hand, explains *precisely* how an agent causes a disease. Often the precise mechanism of action is uncertain even when there is substantial evidence of causation. Thus, a known mechanism whereby the drug causes the injuries complained of is merely one of many non-essential criteria that have been identified as possible considerations when looking at causation.[4] The lack of a known mechanism of injury, however, is not fatal to a causation opinion.

Courts across the country have made clear that a plaintiff does not have the burden to establish the precise mechanism of action involved in a plaintiff's injury. *See, Perkins v. Origin Medsystems Inc.*, 299 F. Supp. 2d 45, 60 (D. Conn. 2004) (*quoting Golod v. La Roche*, 964 F. Supp. 841, 858 (S.D.N.Y. 1997) ("The fact that these physicians are unable to describe the mechanism by which Tegison caused its adverse effects is irrelevant. The mechanisms of both

---

with other knowledge. Like the *Daubert* factors, the Hill Criteria are not a rigid formula for assessing a causal inference. One or more factors may be absent even when a true causal relationship exists. Hill, A.B., The Environment and Disease: Association or Causation. (Proc. R. Soc. Med. 1965).

[4] When exercising their gate-keeping function to determine whether expert testimony satisfies the *Daubert* requirements, the United States Supreme Court encouraged courts to consider the following non-exclusive factors: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or techniques degree of acceptance in the scientific community. *Daubert*, 509 U.S. 593-94. Since the *Daubert* opinion issued, additional factors have been identified in the Advisory Committee Notes to the federal rules which relate to the admissibility of expert testimony. These factors include: (1) whether the theory arose from litigation or from independent research, (2) whether the theory "fits" with the facts of the case, (3) whether the expert adequately considered alternative explanations, (4) whether the expert was as careful with his litigation consulting as he or she would have been in his regular professional work, and (5) whether the expert's field is known to reach reliable results for the type of opinion proffered. Advisory Committee Notes to 2000 Amendment of Federal Rules. A third-tier of non-essential factors which a trial court *may* consider when assessing the scientific reliability of expert testimony have been deduced by courts. Mechanism of action is identified in some cases among factors such as: (1) whether the expert's opinion is based on complete or accurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has justifiably extrapolated from an accepted premise to a conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the

therapeutic and toxic effects of drugs are often unknown... Just as the mechanism of efficacy need not be known to support a claim that Tegison causes abatement of dermatological symptoms, so the mechanism of toxicity need not be known to support an inference of causation based on accepted clinical methods of diagnosis."); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1330 (9th Cir. 1998) ("Causation can be proved when we don't know precisely *how* the damage occurred."); *Capizzano v. Secretary of Dep't of Health & Human Servs.*, No. 00-759V (Fed. Cir. 2004) 2004 U.S. Claims LEXIS 149, *53; *Tivoli v. U.S.*, 93 Civ.5817 (CLB) (MDF), 1997 U.S. Dist. LEXIS 23356 (S.D.N.Y., November 3, 1997); *Solimene v. B. Grauel & Co., KG, et al.*, 399 Mass. 790, 798 (1987); *Carey v. General Motors Corporation*, 377 Mass. 736, 740-741 (1979); *State v. Kliphouse*, 771 So. 2d 16, 38 (Ct. App. Fla., 2000) ("A strong association or correlation can lead a scientist to infer *causation* even when the scientist cannot explain the precise mechanism of the effect -- as in the association between smoking and lung cancer."). Simply stated, "[c]ausation can be proved when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow.*" Daubert v. Merrell Dow Pharm. Inc.*, 43 F. 3d 1311, 1314 (9th Cir. 1994).

In opposition to the many cases refusing to require definitive evidence of a mechanism of action as a condition for admitting causation testimony, Bayer mistakenly relies upon *McClain v. Metabolife International, Inc.*, 403 F.3d 1233 (11th Cir. 2005). Bayer erroneously posits that *McClain* stands for the proposition that a general causation opinion must be excluded if the expert has not offered a proven mechanism of action by which the drug causes the injury. [Bayer's Daubert Motion p. 3]. Not so. Even setting aside the fact that the portion of the McClain opinion Bayer relies upon is mere dicta, *McClain* actually presents a highly unique and

---

expert proposes to testify about matters growing directly out or research he or she has conducted independent of the litigation. *Black v. Food Lion, Inc.,* 171 F.3d 308, 313 (5th Cir. 1999).

distinguishable set of circumstances.[5] *In re Seroquel Products Liability Litigation*, 2009 WL 3806435 (M.D.Fla. 2009) (describing as "dicta," *McClain's* comment that lack of a physiological mechanism for injury was one reason for excluding expert's testimony). In *McClain,* the issue was whether an expert could use a differential etiology methodology (essentially determining causation by process of elimination) where no showing had been made that the product at issue was physiologically capable of causing the injury. The Eleventh Circuit specifically noted that the expert had not offered epidemiological data, clinical trial data or animal studies in support of his opinion. *McClain*, 403 F.3d at 1251. In those particular circumstances, the Eleventh Circuit concluded that the absence of a biologically plausible mechanism of action precluded a reliable causation opinion. It did not, however, hold that a mechanism of action must be known and proven to a certainty as an absolute requirement for causation. That "ruling out" other causes of injury could not support a causation opinion when no showing had been made that the remaining cause was biologically capable of being "ruled in" as the cause of the injury is neither surprising nor controlling in the case at bar.

Dr. Toback is not basing his causation opinion on the mere absence of other causes.[6] Dr. Toback is basing his causation opinion upon multiple, consistent, peer-reviewed epidemiological studies producing scientific evidence of an association between Trasylol and renal injury. [*See*,

---

[5] It is worth noting that *McClain* is an unusual case from the outset as the trial court judge expressly abdicated its' gatekeeping role saying it was unqualified to evaluate the methodology of the experts. *Id.* at 1238, fn.3. Consequently, the Eleventh Circuit had no course other than to find error in the trial court's *Daubert* ruling.

[6] It is illuminating to examine the *McClain* opinion, finding expert testimony that ephedrine products cause various cardiac injuries inadmissible, to the result of *Daubert* hearings in the Ephedra MDL, where the same substantive expert opinion was ruled admissible. *In re Ephedra Prods. Liability Litig.*, MDL 1598 (S.D.N.Y. 2005). Notably the *McClain* opinion, although not issued until 2005, was looking at an evidentiary record compiled in 2002. At that time, ephedra dietary substances had not been banned by the FDA, physicians groups had not advocated against the use of ephedrine products, and a considerable volume of the scientific data that would exist just three years later had not been generated. The state of the evidence in this case is much more akin to what was presented to the Ephedra MDL than what was presented in *McClain*. If the Eleventh Circuit had had the benefit of the data generated in the two years after the *McClain* verdict, it would likely have reached a different conclusion.

Toback Report p. 9-18; Eisenberg Opposition and "Plaintiffs' Opposition to Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Chirag Parikh and Brief in Support Thereof" (hereinafter "Parikh Opposition") filed herewith]. That the causation evidence in this case is substantial and compelling is evidenced by the fact that Bayer has not even challenged Dr. Mark Eisenberg's general causation opinion that Trasylol causes renal dysfunction. [*See* Eisenberg Opposition p. 10- 11]. In this case, a biologically plausible mechanism of action is merely one (of several) factors supporting Dr. Toback's view that the scientific data finding an association supports a conclusion of causation – it is not the sole basis for causation as was the case in *McClain.*

Nor is it necessary that the mechanism of injury be known with certainty in order for there to be biological plausibility. Biological plausibility is just that, an explanation that makes sense or is credible based upon the known effects of the drug on the body. For example, the World Health Organization's Global Advisory Committee on Vaccines defines "biological plausibility" with respect to a causation assessment of adverse events after vaccination as:

> **Biological plausibility.** The association should be coherent; that is, plausible and explicable biologically according to known facts in the natural history and biology of the disease.
>
> *The requirement for biological plausibility should not unduly influence negatively a consideration of causality. Biological plausibility is a less robust criterion than the others described.* If an adverse event does not fit into known facts and the preconceived understanding of the adverse event or the vaccine under consideration, it clearly does not necessarily follow that new or hitherto unexpected events are improbable.

[http://www.who.int/vaccine_safety/causality (emphasis added)]. Thus, the fact that biological plausibility opinions are always couched in terms of what "can" or "may" happen does not make them unreliable. The Middle District of Florida has made clear that uncertainty regarding the mechanism by which a drug causes certain adverse effects does not render expert testimony

unreliable. *In re Seroquel Products Liability Litigation*, 2009 WL 3806435 (M.D.Fla. 2009); *See Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1312 (11th Cir.1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 289 F.Supp.2d 1230, 1247 (W.D.Wash.2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question.") (citing *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311 (9th Cir.1995)). The better view is that biological plausibility works against causality only if the event is not plausible.

Any attempt by Bayer to blur the distinction between what is biologically plausible (that Trasylol "can" damage the kidney through the mechanisms of action identified by Dr. Toback) and what is known with absolute certainty (which of the mechanisms actually causes the damage) simply is not a basis for excluding Dr. Toback's testimony as mere speculation.

2.   **Dr. Toback's Testimony Regarding the Non-Essential Mechanism of Action and Biological Plausibility Considerations are Admissible As Support for His Causation Opinion.**

Although not strictly necessary, Dr. Toback has presented reliable, relevant and admissible testimony regarding three theories whereby Trasylol adversely impacts kidney function. [Toback Depo. 88:13-14]. Essentially, Dr. Toback opines that kidney function is negatively impacted because: (1) Trasylol reduces blood flow in the kidney thereby reducing the kidney filtration rate, (2) Trasylol accumulates in kidney cells leading to cellular injury, and (3) Trasylol causes clots to form in renal arteries thereby reducing blood flow and filtration. That each of these mechanisms are supported by scientific data, consistent with positions taken by Bayer and its experts, and biologically plausible, lend compelling (but unrequired) support to Dr. Toback's causation opinions.

a. **Dr. Toback's testimony regarding the biologically plausible mechanisms whereby Trasylol causes kidney injuries is not unreliable because it is supported (in part) by animal studies.**

Dr. Toback's first and second theories whereby Trasylol causes renal injury are derived (in part) from animal studies. Courts have long recognized the usefulness of animal studies. "There can be no dispute that properly designed and conducted animal testing can yield relevant and useful information in the field of human toxicology." *Bourne v. Dupont De Nemours & Co., Inc.,* 189 F.Supp.2d 482, 498 (S.D.W.V. 2002); *Turpon v. Merrell Dow Pharms*. Inc., 959 F.2d 1349, 1360-61 (6th Cir. 1992). "Animal studies often comprise the backbone of evidence indicating biological hazards and their legal value has been recognized by federal courts and agencies." *Id.* Indeed, courts have held that it is an abuse of discretion for a trial court to exclude expert testimony based on animal studies merely because of difficulty in extrapolation to humans. *See Metabolife International, Inc. v. Wornick,* 264 F.3d 832, 842 (9th Cir. 2001); *Hopkins v. Dow Corning Corp*., 33 F.3d 116, 1124-25 (9th Cir. 1994)(admitting expert testimony based in part on general scientific knowledge established by animal studies); *In re Phenylpopanolamine* (PPA) Ligitagtion, 289 F.Supp.2d 1242, 1247 (expert testimony admissible based on animal studies and other nonepidemiological evidence).

Despite Bayer's protestation that animal studies cannot support a causation conclusion, Bayer's own nephrology expert has confirmed that the *Seto* rat study relied upon by Dr. Toback supports the view that Trasylol impacts renal blood flow. Specifically, Dr. Humes testified: **"**This particular study in the rat at this dose does suggest that there is a renal hemodynamic effect of the agent" and **"**I think there -- there were studies, both in dog, in mouse, and rat, that the -- that there was a renal effect." [Humes Depo. 112:5-25 (Plaintiffs' Compendium of Exhibits at Exhibit "D"]. Thus, experts for both parties agree that the *Seto* study reflects that Trasylol

impacts renal blood flow; they merely disagree on whether that biological impact results in kidney injury for humans. Yet, having been acknowledged by Bayer's own expert, the biological mechanism by which Trasylol reduces blood flow can hardly be so unreliable as to be prohibited as even a consideration in support of the *biological plausibility* of Dr. Toback's causation opinion.[7]

Bayer cites several cases for the proposition that animal studies cannot prove causation. [Bayer's Daubert Motion p. 4]. Unfortunately for Bayer, the cases do not support its assertion. As an initial matter, the cases Bayer cites were not focused specifically on the use of animal studies to demonstrate biological plausibility (as opposed to causation). Animal studies are particularly common and useful to determine the general physiolocal effects of a substance; even while animal studies are less favored for determining causation in humans. *McCarrell v. Hoffman-La Roche, Inc.,* 2009 WL 614484 (N.J.Super.A.D., March 12, 2009)(noting animal studies are particularly useful for determining effects of a drug because animals are generally autopsied and their tissue studied).

Even within the more strenuous human causation context, animal studies have not been rejected outright. Animal studies have merely been found insufficient to single-handedly overcome contrary epidemiological evidence. For example, in *Allison v. McGhan,* the Eleventh Circuit held that animal studies on rats *directly injected* with silicone did not correlate sufficiently with the effects of *unruptured* silicone breast implants in women to overcome over twenty epidemiological studies finding no statistical correlation between silicone breast implants

---

[7] Bayer muddies the argument regarding animal studies in the same way that it confuses the entirety of its challenge to Dr. Toback's testimony: by equating biological plausibility with causation itself. Again, biological plausibility is merely one consideration in determining whether a demonstrated association is causal. Thus, it is not necessary that an animal study alone demonstrate that Trasylol causes a particular injury in humans. Dr. Toback is not asserting the animal studies for that purpose. The animal studies are merely evidence of the mechanistic effect of Trasylol on biological systems – which supports (without having to single-handedly prove) his opinion that Trasylol causes kidney injuries.

and systemic disease. 184 F.3d 1300, 1316 (11th Cir. 1999). This case is completely different. The undeniable breadth of studies, both human and animal (which in fact led to the withdrawal of Trasylol from the market) more than adequately support a conclusion of causation whether or not the precise mechanism of action is established.

> **b.    Dr. Toback's testimony regarding the biologically plausible mechanisms whereby Trasylol causes kidney injuries is consistent with the mechanism of action testimony provided by Bayer's expert and listed by Bayer on its product insert.**

That Dr. Toback's opinions regarding the mechanism by which Trasylol causes kidney injury is plausible and reliable is shown by the fact that it is consistent with the positions taken by Bayer and Bayer's expert nephrologist, Dr. David Humes.

For instance, Dr. Toback opines that Trasylol leads to vasoconstriction which can also reduce blood flow to the kidneys and reduce filtration. Dr. Toback states in his deposition how giving a patient Trasylol leads to reductions in bradykinin and prostaglandins. The reduced bradykinin and prostaglandin, in turn, restricts the afferent arterioles (blood vessels that supply blood to the kidney) which leads to less blood flow to the kidneys. When less blood is delivered to the glomeruli, glomerular filtration fails. [Toback Depo. 88:12-89:10].

Importantly, the vasoconstrictive mechanism of action described by Dr. Toback, is confirmed by Bayer's own nephrology expert, Dr. Humes. Dr. Humes, when describing the effect of Trasylol on the kidneys, reported the following:

> Aprotinin administration has a variety of direct and indirect effects on the kidney …One renal effect of Aprotinin is most likely due to an inhibition of kallikrein production, which indirectly reduces the production with other renal vasoactive hormones, including prostaglandins and angiotensin II. . . <u>Aprotinin related changes in renal blood flow and GFR *have been variable*</u> depending upon the experimental maneuvers, including intravascular volume state, presence of hemorrhagic hypotension, or the occurrence of ischemic/reperfusion injury.

[Humes Report p. 1 (Plaintiffs' Compendium of Exhibits at Exhibit "C") (emphasis added)]. Thus, experts for both parties agree that a relationship between Trasylol and reductions in renal blood flow does exist. They simply disagree as to how often it occurs and under what circumstances. That experts might reasonably differ on the extent of injury resulting from an agreed mechanism hardly makes expert testimony regarding the biological plausibility of that mechanism so unreliable as to be inadmissible. *Woodley v. PFG-Lester Broadline, Inc.,* 556 F.Supp.2d 1300, 1307 (M.D.Ala. 2008) (disagreement between experts is not ground for excluding expert testimony).

Likewise, Dr. Toback's theory regarding cellular injury being caused by the accumulation of Trasylol in the kidney sales receives support from both Bayer's expert, Dr. Humes, and the Trasylol package insert. Dr. Toback opines that Trasylol is "filtered at the glomerulus, and is reabsorbed . . . by proximal tubular epithelial cells [where it] is taken up in phagolysosomes [where it] can be slowly degraded/destroyed and thereby inactivated." [Toback Report p. 6; Toback Depo. 88:12-91:10]. Incredibly, Bayer challenges Dr. Toback's explanation of renal accumulation in the proximal tubules and potential injury to the tubules despite the fact Bayer describes this exact mechanism of action in the clinical pharmacology section of the package insert. Specifically, the 2006 Trasylol package insert states:

> "Aprotinin, after being filtered by the glomeruli, is actively reabsorbed by the proximal tubules in which it is stored in phagolysosomes. Aprotinin is slowly degraded by lysosomal enzymes."

[2006 Bayer HealthCare, Trasylol Label/Package Insert (Plaintiffs' Compendium of Exhibits at Exhibit "E")]. The testimony of Bayer's own expert, Dr. Humes, is consistent with Dr. Toback's

position that Trasylol has a renal cellular effect.[8] [Humes Report p. 10]. In fact, Bayer did not contest testimony regarding the biological plausibility of the same renal cellular effect when offered by Plaintiffs' expert Dr. Chirag Parikh. [Expert Report of Chirag Parikh, M.D., Ph.D. ("Plaintiffs' Compendium of Exhibits at Exhibit "H")].

Similarly, Bayer seeks to exclude Dr. Toback's opinion on the potential thrombin and clotting causing mechanisms associated with Trasylol as unproven. This is disingenuous given the fact that Trasylol's association with thrombin generation is clearly stated in the package insert. Specifically, in the clinical pharmacology section of the 2006 package insert it is stated:

> "Mechanism of action: Aprotinin is broad spectrum prolease inhibitor which modulates the systemic inflammatory response (SIR) associated with cardiopulmonary bypass (CPB) surgery. . . SIR results in the interrelated activation of the hemostatic fibrinolytic, cellular and hormonal inflammatory responses, fibrinolysis, and <u>thrombin generation</u>. (emphasis added)"

[2006 Bayer HealthCare, Trasylol Label/Package Insert (Plainitffs' Compendium of Exhibits at Exhibit "E")]. Bayer seeks to exclude Dr. Toback's opinion on the potential thrombin and clotting causing mechanisms associated with Aprotinin based upon Bayer's unsupported statement that it had "questionable" results and its disagreement with the (Sundt (1993))[9] study and its alleged flaws due to an alleged lack of heparinization in the patients included in the study. This is disingenuous given aprotinin's association with thrombin generation as is clearly stated in the package insert. Specifically, in the clinical pharmacology section of the 2006 package insert it is stated:

---

[8] Dr. Humes states in his report: "[Trasylol] is filtered by the glomerulus followed with renal tubule cell uptake via a pinocytosis process after binding to the apical membrane molecule, megalin. Radioisotopic studies in humans demonstrate that approximately 40% of the administered agent is concentrated in the kidney with subsequent constant urinary excretion over the following 24-hour period. This finding suggests that the renal tubular uptake process is saturable and that renal excretion of Aprotinin is proportionate to the glomerular filtration rate." [Humes Report, p. 10].

[9] Sundt TM, et al. "Renal dysfunction and intravascular coagulation with aprotinin and hypothermic circulatory arrest," 55: 14, 18-14 (Ann. Thorac. Surg. 1993) (Plaintiffs' Compendium of Exhibits at Exhibit "G").

### c. Dr. Toback's testimony regarding the biologically plausible mechanisms whereby Trasylol causes kidney injuries is not unreliable merely because Bayer contests the quality of the studies upon which Dr. Toback relies.

Dr. Toback bases his opinions regarding the mechanism whereby Trasylol can cause kidney injury on multiple sources including Bayer documents, medical literature and studies including Mangano (2006)[10] and Sundt (1993). [Toback Report p. 6-8; Toback Depo. 171:21-172:8]. Bayer criticizes the Sundt study for including patients who were given inadequate amounts of the blood-thinning agent heparin. Allegations of inadequacies in a study, however, go to the weight of the expert's testimony, not its admissibility. *Quiet Technology DC-8, inc. v. Hurel-Dubois UK Ltd.,* 326 F3d 1333, 1345 (11th Cir. 2003); *Jones v. Otis Elevator Co.,* 81 F.3d 655, 663 (11th Cir. 1988). Dr. Toback's opinions are not based upon speculation. They arise from the evidence and documents in the case, as well as his background, training and clinical experience. They are not proper considerations for exclusion under *Daubert*. Hence, any deficiencies in the Sundt study may be vigorously examined by Bayer at trial, but they do not render Dr. Toback's causation testimony inadmissible at the Daubert stage.

### 3. Dr. Toback's Biological Plausibility Testimony Is Not Unreliable Due to Failure to Establish a Threshold Dose.

Bayer's threshold dose-based argument suffers from the same misunderstanding that plagues Bayer's mechanism of action argument; namely, it is *not* an absolute requirement for a reliable causation opinion. Indeed, consideration of threshold dose in this context demonstrates the wisdom of not imposing a rigid one-size-fits-all set of Daubert factors. Threshold dose is a concept most commonly applied in the case of toxins. *E.g., Snyder ex rel. Snyder v. Secretary of Dept. of Health and Human Services*, 2009 WL 332044 (Fed.Cl. Feb. 12 2009) (discussing

---

[10] Mangano DT, et al., "The risk associated with aprotinin in cardiac surgery," 354:353-65 (NEJM 2006) (Plaintiffs' Compendium of Exhibits at Exhibit "F").

threshold dose in relation to toxin ethylmercury); *In re Hanford Nuclear Reservation Litigation,* 292 F.3d 1124 (9th Cir. 2002) (discussing threshold dose in relation to radiation exposure); *In re Stand "N Seal Products Liability Litigation,* 623 F.Supp.2d 1355 (N.D.Ga. 2009) (discussing threshold dose of exposure to grout sealant spray). It is less common to see threshold dose applied as a firm criteria in the case of a pharmaceutical product such as Trasylol where the dosage is known. That is because, where the dosage is known the pertinent question is not where is the minimum dose threshold for injury, but has the specified dose been shown to cause injury. Here, there is substantial evidence to show that it has. [*See* Toback Report p. 9-18; Eisenberg Opposition and Parikh Opposition" filed herewith]. Moreover, scientific data exists evidencing a dose-response relationship between Trasylol and kidney injuries – with high-dose Trasylol having a greater increase in risk of kidney injury that low-dose Trasylol. *E.g.* D'Ambra (1996);[11] Brown (2007).[12] Bayer did not dispute the existence of a dose-response relationship when attested to by nephrologist Dr. Chirag Parikh. [Parikh Report p. 20].

C.   DR. TOBACK'S OPINION THAT TRASYLOL SHOULD HAVE BEEN STUDIED IN COMPARISON TO AMICAR AND TRANEXAMIC ACID IS ADMISSIBLE. [IN RESPONSE TO BAYER'S ARGUMENT II. P. 9-10].

In connection with his causation opinion, Dr. Toback explained his view that studies comparing Trasylol to placebo are less compelling than studies comparing Trasylol to the lysine analogues. That is because placebos offer no protection against blood loss and hypotension which can themselves cause renal dysfunction and failure. Consequently, it is Dr. Toback's view that, in order to compare apples to apples, patients receiving the blood-loss preventative Trasylol

---

[11] D'Ambra MN, et al., "Aprotinin in primary valve replacement and reconstruction: a multicenter, double-blind, placebo-controlled trial," 112:1081-9 (J Thorac Cardiovasc Surg 1996)(Plaintiffs' Compendium of Exhibits at Exhibit "I").

[12] Brown JR, et al, "Meta-analysis comparing the effectiveness and adverse outcomes of antibrinolytic agents in cardiac surgery," 115(22):2801-13 (Circulation 200) (Plaintiffs' Compendium of Exhibits at Exhibit "J").

should be compared with patients receiving the blood-loss sparing products aminocaproic acid or tranexamic acid.[13]  [Toback Depo. 173:17-174:10].  Bayer overstates the scope of this testimony from Dr. Toback.  Dr. Toback is <u>not</u> offering the opinion that Bayer's failure to conduct a large randomized controlled trial comparing Trasylol to the lysine analogues violated FDA regulations or violated any legal, ethical or moral obligation of Bayer.  Dr. Toback merely intends to explain why he gave greater or lesser weight to particular studies when conducting his causation analysis based on whether they used placebo or one of the lysine analogues as a comparator.  For Dr. Toback to explain the factors he considered when evaluating the studies for purposes of arriving at his causation opinion, is both proper and admissible.

D.  DR. TOBACK WILL NOT BE OFFERED TO OPINE ON ISSUES OF FDA LABELING, EVENTS OCCURING AT FDA ADVISORY COMMITTEE MEETINGS, MATERIALS PROVIDED OR WITHHELD FROM THE FDA AND BAYER OR THE FDA'S KNOWLEDGE OR STATE OF MIND.  [In Response to Bayer's Arguments at III.B, III.C, III.D and III.E p. 11-15].

Dr. Toback's list of proffered opinions do <u>not</u> include any opinions regarding FDA labeling, FDA Advisory Committee Meetings, material provided or withheld from the FDA, or the state of mind of Bayer or the FDA.   Nor do Plaintiffs intend to offer Dr. Toback as an expert

---

[13] In fact, Dr. Humes, Bayer's nephrology expert agrees with Dr. Toback:

> Q    Okay.  And then wouldn't it be a fairer comparison if you were going to evaluate patient populations or groups in terms of risk of developing renal injury, understanding hypovolemia and hypotension can cause, renal injury, wouldn't it make sense to have a blood sparing agent on board for each group so that you would eliminate the difference there?
>
> A    It would be a study that would have perhaps better balance.
>
> Q    Okay.  So if you actually had a study comparing blood sparing agents, that may have more balance than going blood sparing agent versus placebo; correct?
>
> A    Correct.

on any of those issues. Consequently, Bayer's motion to exclude "FDA" or "motive" testimony from Dr. Toback is moot.

## <u>CONCLUSION</u>

Based upon the foregoing, Plaintiffs respectfully request that the Court DENY Bayer's Motion to Exclude Testimony of Plaintiffs' Expert F. Gary Toback. Plaintiffs additionally request all other and further relief as the Court deems just and proper.

This the _26th_ day of _January_, 2010.


Respectfully submitted,


/s/_____
Theodore Babbitt (Florida Bar No. 91146)
Email: tedbabbitt@babbitt-johnson.com
Joseph Osborne (Florida Bar No. 880043)
Email: JAOsborne@babbitt-johnson.com
Babbitt, Johnson, Osborne
& LeClainche, P.A.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: (561) 684-2500
Facsimile: (561) 684-6308

*__Liaison Counsel for Plaintiffs and Plaintiffs'__*
*__Steering Committee__*

## CERTIFICATE OF SERVICE

I hereby certify that on January 26 , 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel or records or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

/s/ _____
Theodore Babbitt
Florida Bar No. 0091146