**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

**This Document Relates to All Actions.**

**PLAINTIFFS' OPPOSITION TO BAYER'S MOTION TO EXCLUDE**
**TESTIMONY OF PLAINTIFFS' EXPERT CURT D. FURBERG**
**AND BRIEF IN SUPPORT THEREOF**

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................ii

TABLE OF AUTHORITIES.......................................................................................................iv

**I. INTRODUCTION AND SUMMARY OF PLAINTIFFS' OPPOSITION**.............................. 1

**II. INCORPORATION BY REFERENCE OF MATTERS SET FORTH IN PLAINTIFFS' CONCURRENTLY FILED OPPOSITION TO BAYER'S MOTION TO EXCLUDE THE TESTIMONY OF DR. MARK J. EISENBERG**..................................................................... 2

**III. EVIDENCE**.......................................................................................................................... 2

**IV. ARGUMENT AND AUTHORITIES**................................................................................... 3

    A.   THAT DR. FURBERG IS WELL-QUALIFIED TO OFFER OPINIONS ON DRUG SAFETY AND RELATED TO DRUG STUDIES IS NOT DISPUTED BY BAYER. ..... 4

    B.   DR. FURBERG'S TESTIMONY IS NOT AN IMPERMISSIBLE NARRATIVE HISTORY.  [In Response to Bayer's Argument I. p. 3-4]............................................ 5

    C.   DR. FURBERG'S OPINION REGARDING THE SAFETY PROFILE OF  TRASYLOL IS BASED ON SCIENTIFIC DATA AND DERIVED THROUGH A  RELIABLE METHODOLOGY.  [In Response to Bayer's Argument II. p. 4-10]........................ 7

       1. Bayer's Criticism Regarding The Universe Of Documents Considered By Dr.   Furberg Goes To The Weight Of His Opinions Not Their Admissibility................................ 8

       2. Dr. Furberg did not "cherry-pick" data from the studies cited in his report. ...................... 10

       3. Dr. Furberg Was Aware of Criticisms of Some of the Studies Supporting His Opinions…………………………………………………………………………….. 12

    D.   DR. FURBERG'S OPINION REGARDING TRASYLOL'S SAFETY PROFILE IS ADMISSIBLE. [In Response to Bayer's Argument III. p. 10-12]. ........................................ 13

    E.   DR. FURBERG'S OPINIONS WILL TOUCH UPON BAYER'S FAILURES ONLY AS THEY RELATE TO HIS OPINIONS REGARDING DRUG SAFETY, DRUG STUDIES AND BAYERS' RESPONSE TO SAFETY SIGNALS IN DRUG STUDIES. [In Response to Bayer's Argument IV. p. 12-15, and Argument V. p. 15-20]. .................. 15

       1. Dr. Furberg's Opinion that the Study Data Did Not Support Bayer's Representations in Promotional Literature Does Not Require Him to Be an Expert in Marketing or FDA Labeling Requirements. [In Response to Bayer's Argument IV.A. p. 12-13]. .................. 17

       2. Dr. Furberg's Opinions Regarding What Safety Signals Were Apparent from   Study Data and the Adequacy of Bayer's Response to Those Safety Signals    Does Not Impermissibly Attest to Bayer's Knowledge or State of Mind. [In    Response to Bayer's Argument V.B. p 16-17]........................................................................ 17

       3. Dr. Furberg's Opinions Regarding Bayer's Response to Safety Signals Revealed in the Drug Studies Is Not an Improper Legal Conclusion.  [In Response to Bayer's  Argument V.B. p 17-18]. ........................................................................................................ 19

4. Dr. Furberg Does Not Intend to Offer The Opinion That Bayer Had A Duty to Patient's Directly. [In Response to Bayer's Argument IV.B. p 13-14]..................................................21

**CONCLUSION**.............................................................................................................22

**CERTIFICATE OF SERVICE**....................................................................................23

# TABLE OF AUTHORIES

**Cases**

*Ambrosini v. Labarraque,*
  101 F.3d 129 (D.C.Cir.1996)..................................................................................5

*Berry v. City of Detroit,*
  25 F.3d 1342 (6th Cir.1994). ............................................................................... 20

*Bouchard v. American Home Products Corp.,*
  2002 WL 32597992 (N.D.Ohio May 24, 2002)................................................... 15

*Cano v. Everest Minerals Corp.,*
  362 F.Supp.2d 814 (W.D.Tex. 2005).................................................................. 10

*Highland v. Capital Management, L.P. v. Schneider,*
  *379* F.Supp.2d 461 (S.D.N.Y. 2005)....................................................................5

*In re Fosamax Prods. Liab. Litig,*
  645 F.Supp.2d 164 (S.D.N.Y. 2009),.......................................................... passim

*In re Rezulin,*
  309 F.Supp.2d 531 (S.D.N.Y. 2004) .....................................................................6

*In re Seroquel Prods. Liab. Litig.,*
  2009 WL 3806436 (July 20, 2009) .......................................................................8

*In re Vioxx Products Liability Litigation,*
  401 F.Supp.2d 556 (E.D. La. 2005) .................................................................... 12

*Jones v. Otis Elevator Co.,*
  81 F.3d 655 (11th Cir. 1988)............................................................................... 12

*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)...................................................................5

*MTX Commc'ns Corp.v. LDDS/WorldCom, Inc.,*
  132 F.Supp.2d 289 (S.D.N.Y. 2001)................................................................... 10

*Procter & Gamble Pharmaceuticals, Inc. v. Hoffmann-LaRoche Inc.,*
  2006 WL 2588002 (S.D.N.Y. 2006) .....................................................................1

*Quiet Technology DC-8, inc. v. Hurel-Dubois UK Ltd.,*
  326 F3d 1333 (11th Cir. 2003)............................................................................ 12

*Rimbert v. Ei Lilly & Co.,*
  2009 WL 2208570 (D.N.M. July 21, 2009) ......................................................9, 10

*Smith v. Wyeth-Ayerst Laboratories Co.,*
  278 F.Supp.2d 684 (W.D.N.C. 2003)................................................................. 14

*United States v. Barile,*
  286 F.3d 749 (4th Cir. 2002)............................................................................... 20

*United States v. Downing,*
  753 F.2d 1224 (3d Cir. 1985). ..............................................................................5

*Virginia M. Damon Trust v. Mackinaw Financial Corp.,*
  2008 Wl 53230 (W.D.Mich. Jan. 2 2008)..............................................................6

**Rules**

FED. R. EVID. 704……………………………………………………………....…………19

COME NOW, Plaintiffs in the above styled cause ("Plaintiffs") and submit the following "Plaintiffs' Opposition to Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Curt D. Furberg and Brief in Support Thereof."   Plaintiffs would respectfully show the Court that Dr. Furberg's testimony should be admitted for the following reasons:

## I.
## INTRODUCTION AND SUMMARY OF PLAINTIFFS' OPPOSITION

Dr. Curt Furberg is an expert on drug safety, clinical trials, and drug studies.  The Courts before whom Dr. Furberg has offered his expert opinions have regularly recognized his expertise in these areas. *E.g. Procter & Gamble Pharmaceuticals, Inc. v. Hoffmann-LaRoche Inc.*, 2006 WL 2588002, *8 fn. 26 (S.D.N.Y. 2006) ("The parties are in agreement that [Curt Furberg and his coauthors] are leading experts in the field of biostatistics and that their text, Fundamentals of Clinical Trials, is a recognized, authoritative treatise.");  *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 194 (S.D.N.Y. 2009) (noting that Dr. Furberg's "extensive experience as a clinical trial investigator" qualifies him to interpret drug study information regarding drug efficacy and safety).

Here, Dr. Furberg is proffering two general areas of opinions, each of the which arise from his recognized expertise in drug studies:  (1) that the scientific data indicates Trasylol's risks outweigh its benefits, and (2) that Bayer failed to adequately respond to safety signals that emerged from the drug studies.  Aware that Dr. Furberg is qualified to offer these opinions (and that these opinions from Dr. Furberg were admitted in other drug litigation, *In re Fosamax,* 645 F.Supp.2d at 194), Bayer[1] attempts to portray Dr. Furberg's testimony as anything other than what it is.  Yet, however much Bayer might wish otherwise, Dr. Furberg is *not* offering opinions

_____

[1] Defendants Bayer Healthcare Pharmaceuticals Inc. (as successor in interest to Bayer Pharmaceutical Corporation), Bayer HealthCare LLC, Bayer AG, and Bayer Schering Pharma AG (as successor in interest to Bayer HealthCare AG) are referenced collectively throughout this opposition as "Bayer."

on FDA regulations, Trasylol sales and marketing or corporate ethics.   Dr. Furberg is offering

expert opinions solely related to drug safety and the design, implementation, interpretation and

use of drug studies.   There is no basis for excluding Dr. Furberg's testimony in these areas.

## II.
## INCORPORATION BY REFERENCE OF MATTERS SET FORTH IN PLAINTIFFS' CONCURRENTLY FILED OPPOSITION TO BAYER'S MOTION TO EXCLUDE THE TESTIMONY OF DR. MARK J. EISENBERG

In the interest of brevity and to avoid burdening the Court with duplicative briefing,

Plaintiffs have set forth the following matters in their "Plaintiffs' Opposition to Bayer's Motion

to Exclude Testimony of Plaintiffs' Expert Mark J. Eisenberg and Brief in Support Thereof"

(hereinafter "Eisenberg Opposition") which are fully incorporated herein by reference.

- Section "I" – BACKGROUND AND HISTORY OF MDL LITIGATION

- Section "IV.B" – THE PROPER DAUBERT STANDARDS

To further the Court's understanding of the history of this litigation, the scientific data that

underlies the expert testimony in this case, and the separate and distinct areas of each expert's

proffered testimony, Plaintiffs would respectfully encourage the Court to begin its review of

Plaintiffs' Daubert briefing with Plaintiffs' Eisenberg Opposition.

## III.
## EVIDENCE

In support of this Opposition to Bayer's motion to exclude the expert testimony of Dr.

Furberg, Plaintiffs specifically rely upon the following documents which are set forth in

"Plaintiffs' Compendium of Exhibits in Support of Plaintiffs' Opposition to Exclude the

Testimony of Expert Curt D. Furberg and Brief in Support Thereof " (hereinafter "Compendium

of Exhibits") filed herewith:

A.   Report of Curt Daniel Furberg, M.D., Ph.D. (hereinafter "Furberg Report) (Exhibit "A").

B.   Excerpts from the Deposition of Curt D. Furberg, M.D., Ph.D. (hereinafter "Furberg Depo.") (Exhibit "B").

C.   Karkouti K, "A Propensity Score Case-Control Comparison of Aprotinin and Tranexamic Acid in High-Transfusion-Risk Cardiac Surgery," (TRANSFUSION January 20, 2006) (on-line edition) (Exhibit "C").

D.   Brown JR, et al., "Meta-analysis comparing the effectiveness and adverse outcomes of antifibrinolytic agents in cardiac surgery," 115:2801-2813 (Circulation 2007) (Exhibit "D").

E.   Fergusson DA, Hebert PC, Mazer CD; et al. BART Investigators, "A comparison of aprotinin and lysine analogues in high-risk cardiac surgery," 2319-2331 (NEJM 2008) (Exhibit "E").

F.   Mangano DT, et al., "The risk associated with aprotinin in cardiac surgery," 354:353-65 (NEJM 2006) (Exhibit "F").

In addition, Plaintiffs rely upon all pleadings, discovery and evidence filed in this case and any admissions made by Bayer therein.

# IV.
## ARGUMENT AND AUTHORITIES

Bayer claims that Dr. Furberg's testimony has been excluded in two instances on "the same issues he proposes to testify about here."  [Bayer's Daubert Motion p. 1].  In reality, Dr. Furberg's testimony was excluded on the areas of corporate ethics, FDA regulations and the motive, intent and state of mind of a pharmaceutical company.  *In re Fosamax,* 645 F.Supp. 2d at 194.  Dr. Furberg does not propose to testify on any of those areas in this case.  To the contrary, Dr. Furberg's testimony was *admitted* on the issues which are the subject of his testimony in this case: (1) the utility and limitations of clinical trials with respect to assessing drug efficacy and drug safety; (2) interpretation of data from clinical trials as it relates to the drug's safety and

3

efficacy, (3) the adequacy of the drug companies response to safety signals. *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 194 (S.D.N.Y. 2009).[2]

### A. THAT DR. FURBERG IS WELL-QUALIFIED TO OFFER OPINIONS ON DRUG SAFETY AND RELATED TO DRUG STUDIES IS NOT DISPUTED BY BAYER.

Bayer does not dispute Dr. Furberg's impressive credentials as a drug safety expert. Dr. Furberg is a medical doctor admitted to practice in Sweden. [Furberg Report p. 1]. For over a decade he was employed United States National Institute of Health (NIH) in Bethesda Maryland. [Furberg Report p. 1]. For nine of those years, Dr. Furberg worked in the Clinical Trials Branch of the NIH's National Heart, Lung and Blood Institute. [Furberg Report p. 1]. He served as the Chief of the Clinical Trials Branch from 1979 until 1985. [Furberg Report p. 1].

Beginning in 1986, Dr. Furberg was appointed as a Professor of Medicine at Wake Forest University. [Furberg Report p. 1]. He has served as the Chairman of Wake Forest's Department of Public Health Science and as Director of the Center for Prevention Research which involves epidemiology, biostatistics and health policy. [Furberg Report p. 1].

Dr. Furberg has had three decades of experience in the areas of epidemiology and clinical trial design, conduct, monitoring, interpretation and reporting. [Furberg Report p. 2]. He has served as the Principal Investigator or Science Project Officer for numerous clinical trial examining the safety and efficacy of various interventions. [Furberg Report p. 2]. Dr. Furberg has also served for over fifty (50) years on the Data Safety Monitoring Committee. In that role, he monitors the safety and efficacy of treatment and prevention trials and is charged with recommending early trial termination, if efficacy is clearly documented or if harmful effects

---

[2] Bayer also cites *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531 (S.D.N.Y. 2004). *In re Rezulin,* involved a motion in limine to exclude certain categories of testimony from all plaintiffs' experts including: corporate ethics, motive and intent of the defendant, foreign regulatory matters, FDA procedures and regulations, and other matters. Id. at 539. It did not exclude Dr. Furberg's testimony on issues of drug safety or matters related to drug studies.

outweigh the benefits. [Furberg Report p. 2].  Dr. Furberg has also served on the FDA's Drug Safety and Risk Management Advisory Committee which was established by the FDA for the purpose of obtaining expert advice on drug safety issues. [Furberg Report p. 3].   Due to his expertise and professional stature, Dr. Furberg has been asked to consult with educational institutions on drug study issues, to provide testimony at Congressional Hearings as an expert on drug safety and to serve as a drug safety expert at FDA meetings. [Furberg Report p. 2-4].  Dr. Furberg has also authored numerous publications on the subject of clinical trials.

Dr. Furberg's uncontested expert qualifications and professional stature provide circumstantial evidence of the reliability of his methods. "[T]he more qualified the expert, the more likely that expert is using reliable methods in a reliable manner - highly qualified and respected experts don't get to be so by using unreliable methods or conducting research in an unreliable manner." *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 616 (S.D.N.Y. 2007); *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164 (S.D.N.Y 2009). Thus, the strength of Dr. Furberg's professional experience making drug safety and risk-benefit assessments provides circumstantial evidence of the reliability of his testimony on those same issues in this case. *Ambrosini v. Labarraque,* 101 F.3d 129, 140 (D.C.Cir.1996); *United States v. Downing,* 753 F.2d 1224, 1239 (3d Cir. 1985).

**B.    DR. FURBERG'S TESTIMONY IS NOT AN IMPERMISSIBLE NARRATIVE HISTORY.**  [In Response to Bayer's Argument I. p. 3-4].

Expert testimony excluded as a narrative generally falls into one of two categories. Either it is excluded as testimony presented to the jury solely for the purpose of constructing a factual narrative out of record evidence.  *E.g. Highland v. Capital Management, L.P. v. Schneider, 379* F.Supp.2d 461, 469 (S.D.N.Y. 2005)  Or it is factual testimony that a lay juror is

equally capable of constructing.  *E.g. In re Rezulin,* 309 F.Supp.2d 531, 551 (S.D.N.Y. 2004) (excluding testimony of expert specifically proposed to testify to a factual narrative reciting selected regulatory events).  Neither of these categories describes the expert testimony offered by Dr. Furberg.[3]

Dr. Furberg's report does set forth factual matters.  However, those facts are material to his opinions regarding Bayer's conduct with regard to the specialized practices of conducting, interpreting, and responding to drug studies and determining drug safety.  In particular, the factual matters Dr. Furberg sets forth in his report are essential to a determination of what knowledge existed at a given time and how it should have impacted Bayer's actions with regard to clinical trials and drug safety.

It is the connection between the factual events and the specialized standards of conduct required of pharmaceutical companies which makes Dr. Furberg's testimony admissible.  In an analogous context, this distinction resulted in the admission of expert testimony characterized by defendants as "nothing more than paraphrasing FDIC reports:"

> Although [the expert's] report is more a narrative of the Bank's history with the FDIC and restatement of the FDIC's conclusions, the testimony is still admissible.  Not only does the testimony provide context and explain the significance of various FDIC actions. . . but it applies those findings to determine whether [the defendant] managed the bank in a safe and sound matter.

*Virginia M. Damon Trust v. Mackinaw Financial Corp.,* 2008 Wl 53230, *12 (W.D.Mich. Jan. 2 2008) (internal citations omitted).  The same is true of Dr. Furberg's testimony in the case at bar.

---

[3] Bayer's argument that Dr. Furberg must be a historian in order to present his fact-based opinions is meritless. [Bayer's Daubert Motion, p. 4].  Dr. Furberg is not providing a factual history.  He is providing opinions regarding Bayer's clinical trial practices and Trasylol's safety and efficacy that are derived from the application of his specialized knowledge and expertise to the facts.  Dr. Furberg's extensive experience as a clinical trial investigator abundantly qualifies him to provide the opinions he offers.

The factual materials set forth in Dr. Furberg's report are not intended to be the subject of his testimony in and of themselves. Rather, the documents, evidence and factual matters he references are relevant to explaining the safety signals revealed by the studies and how a reasonable drug company would have proceeded in response to those signals. Bayer would like this Court to think that the "jury can decide for itself" what should have been known to Bayer through the interpretation of drug studies. But that is not true. Experts for the two parties do not even agree about what was apparent or significant in various studies. It is disingenuous to suggest that a lay juror would be able to determine whether Bayer's research choices and information dissemination choices were consistent with what was emerging from the drug studies. Dr. Furberg's use of factual materials to illuminate these issues does not violate the rule against factual narratives. *In re Fosamax,* 645 F.Supp.2d at 192.

## C.   DR. FURBERG'S OPINION REGARDING THE SAFETY PROFILE OF TRASYLOL IS BASED ON SCIENTIFIC DATA AND DERIVED THROUGH A RELIABLE METHODOLOGY. [In Response to Bayer's Argument II. p. 4-10].

Dr. Furberg is an expert on drug safety and on how to evaluate drugs. [Furberg Depo. 61:16-18]. The opinions he offers relate to Bayer's actions in conducting, evaluating and reporting on the testing of Trasylol and on the safety of Trasylol. One of Dr. Furberg's opinions with regard to drug safety is that Trasylol is unsafe because it increases the risk of serious adverse events, including specifically renal injuries and renal failure. [Furberg Report p. 8]. Bayer seeks to exclude this opinion on the grounds that (1) Dr. Furberg's opinion is based upon materials provided to him by Plaintiffs, (2) that Dr. Furberg did not give weight to all the data provided in the studies he relied upon, and (3) that Dr. Furberg did not give adequate weight to the criticisms of studies on which he relied. None of Bayer's arguments warrant the exclusion of Dr. Furberg's testimony regarding the safety of Trasylol.

1.     **Bayer's Criticism Regarding The Universe Of Documents Considered By Dr. Furberg Goes To The Weight Of His Opinions Not Their Admissibility.**

Bayer mischaracterizes Dr. Furberg's research practice by saying he did nothing more than assume that the documents he was provided by Plaintiffs were fairly complete.  [Bayer Daubert Motion p. 5]. Dr. Furberg did not "assume" anything.  Dr. Furberg explained that his process is to request certain documents at the outset in addition to documents that are compiled for him by attorneys.  [Furberg Depo. 32:4-6].  Dr. Furberg also explained that, if he came across a reference of interest while reviewing the compiled materials, he would arrange to get the referenced document. [Furberg Depo. 32:9-12].   That the materials he was provided by Plaintiffs' counsel in this case proved to be "fairly complete," merely obviated the need for him to use other means of obtaining information.  Simply stated, the source of Dr. Furberg's research materials does not prove any deficiency in the content or breadth of what he reviewed.

The argument that reliance on materials provided through counsel makes an expert's opinion unreliable was rejected when urged by another pharmaceutical defendant in the Seroquel litigation.   In *In re Seroquel,* AstraZeneca complained that the plaintiffs' general causation expert "relied only on documents that were 'pre-selected' by plaintiffs' counsel, and therefore, she did not conduct the requisite full and proper investigation of the facts underlying her opinion." *In re Seroquel Prods. Liab. Litig*., 2009 WL 3806436,  at *3 (July 20, 2009).

> AstraZeneca's criticisms regarding the universe of documents the experts considered go to the weight to be accorded these expert's opinions, rather than the their admissibility.

*In re Seroquel*, 2009 WL 3806436, at *4. The question is whether the expert applied a reliable methodology when examining the relevant studies. There are no methodological "bonus points" for conducting a PubMed literature search; just as there is no penalty to experts for having reviewed materials provided by the client that hired them.

Bayer is equally mistaken in claiming that Dr. Furberg's methodology is unreliable because he did not consider *every* study ever conducted on Trasylol.[4]  Exhaustive document review is not a Daubert requirement.  *Rimbert v. Ei Lilly & Co.,* 2009 WL 2208570, *14 (D.N.M. July 21, 2009) ("nor must [an expert] consider and discuss *all* relevant literature and evidence. . .").  Nor did Dr. Furberg profess exhaustive review as his personal standard.  Dr. Furberg explained that his primary focus when assessing *efficacy* was to look at the data from randomized clinical trials.  His primary focus when looking at *safety* were the studies involving large sample sizes.  Dr. Furberg's review complied with his professed practices.

Bayer attempts to describe Dr. Furberg's approach as failing to consider both positive and negative associations in the literature."  [Bayer's Daubert Response p. 6].  That is not true.  The studies cited by Dr. Furberg did include findings both supporting and contradicting his opinions.  What Bayer is really complaining about is not that Dr. Furberg did not consider the varied associations but that Dr. Furberg did not consider particular studies.  Yet, the studies, Bayer claims were ignored involved too few patient's to provided meaningful data on rare adverse outcomes like death or renal failure (e.g., Levi (1999)) (involving only 287 patients).  Or the supposedly "ignored" studies were meta-analyses that were outdated (e.g. Munoz (1999)), or were meta-analyses of randomized trials and cohort studies where Dr. Furberg had expressed his preference to review the underlying studies themselves. (Sedrakyan (2004)); (Henry (2007)); (Brown (2007)).  Favoring large, prominent, and up-to-date randomized controlled trial data over small or outdated meta-analyses is not evidence of an unreliable methodology.

---

[4] The deposition testimony Bayer cites as support for its representation that Dr. Furberg never asked to see studies that had findings contrary to his opinions does not support that statement.  Dr. Furberg was asked "Did you ever ask the question yourself, Gosh, I wonder if there's observational studies that show something different than Dr. Mangano's study. . ." [Furberg Depo. 129:1-3].  Dr. Furberg responded that he does always consider whether there are large unpublished studies and why it is that the studies may not have been timely published.  [Furberg Depo. 129:7-130:7].  Dr. Furberg made no statement one way or the other about requesting studies from Plaintiffs that were contrary to the Mangano study.

The cases Bayer cites as finding failures to consider contrary study findings proof that the expert's methodology was unreliable are both factually extreme and contextually distinguishable. For example, in *Rimbert*, the expert ignored "myriad epidemiological studies" refuting her causation conclusion while focusing solely on non-epidemiological studies supporting her opinion. *Rimbert v. Ei Lilly & Co.,* 2009 WL 2208570, *14 (D.N.M. July 21, 2009). In *MTX,* the expert offered an opinion on the value of a corporation based primarily on conversations with management and a lawyer without examining the corporation's profit/loss statements, balance sheets, or collections on bills. *MTX Commc'ns Corp.v. LDDS/WorldCom, Inc.,* 132 F.Supp.2d 289, 290, 292 (S.D.N.Y. 2001). And in *Cano,* the expert sought to extrapolate causation from small studies involving different forms of radiation without applying the Bradford Hill factors or considering more directly applicable epidemiological evidence. C*ano v. Everest Minerals Corp.,* 362 F.Supp.2d 814, 851-853 (W.D.Tex. 2005). None of these situations are akin to Dr. Furberg's review. Dr. Furberg conducted a methodologically sound review of the medical literature and cites numerous epidemiological studies as support for his drug safety opinions. There is no basis for excluding Dr. Furberg's opinions due to methodological failings.

**2.      Dr. Furberg did not "cherry-pick" data from the studies cited in his report.**

Dr. Furberg cites not fewer than fourteen (14) different studies in his report as support for the opinion that Trasylol increases the risk of adverse events and specifically or renal injuries. [Furberg Report p. 16-36]. Of these, Bayer claims that Dr. Furberg engaged in "cherry-picking" with regard to two. [Bayer's Daubert Motion p. 6-7].

First, Bayer complains that Dr. Furberg cites the primary conclusion of the Karkouti[5] study (namely, that Trasylol is associated with renal dysfunction), without citing the same study for not finding a statistically significant association between Trasylol and the rare dichotomous events of renal failure, myocardial infarction and in-hospital mortality. [Bayer Daubert Motion p. 7]. That the Karkouti study, which involved only 449 patients in its Trasylol arm, did not prove an association between Trasylol and rare dichotomous events is more a product of study-size limitations than evidence that a causal conclusion is lacking support. In order to determine whether they are associated with a particular agent, rare dichotomous events require extremely large, well-powered, studies. [*See, e.g.*, (Brown (2007))[6] (noting that greater than 80,000 patients would be needed in each treatment group in order to detect a statistically significant association between treatment and the rare dichotomous event of renal failure)]. Dr. Furberg explained that for conditions where the event rate is very low (such as death), there is little value to trials that are small and short-term. [Furberg Depo. 128:7-14]. Thus, a methodologically sound reason exists for Dr. Furberg to cite Karkouti only for its primary renal dysfunction conclusion.[7]

Second, Bayer complains of Dr. Furberg's reliance on the BART study.[8] BART was a blinded, randomized trial comparing Trasylol to the lysine analogues which was terminated prior to completion upon the recommendation of the independent data and safety monitoring committee due to its strong trend toward higher mortality in the Trasylol group. Nevertheless,

---

[5] Karkouti K, "A Propensity Score Case-Control Comparison of Aprotinin and Tranexamic Acid in High-Transfusion-Risk Cardiac Surgery," (TRANSFUSION January 20, 2006) (on-line edition) ( Plaintiffs' Compendium of Exhibits at Exhibit "C").

[6] Brown JR, et al., "Meta-analysis comparing the effectiveness and adverse outcomes of antifibrinolytic agents in cardiac surgery," 115:2801-2813 (Circulation 2007) (Plaintiffs' Compendium of Exhibits at Exhibit "D").

[7] Bayer misrepresents Dr. Furberg's testimony. Dr. Furberg did not say that Bayer's randomized control studies were "too small" to be worth examining. He said they were too small to show a statistically significant increase in dialysis among Trasylol users. [Furberg Depo. 155:6-11].

[8] Fergusson DA, Hebert PC, Mazer CD; et al. BART Investigators, "A comparison of aprotinin and lysine analogues in high-risk cardiac surgery," 2319-2331 (NEJM 2008) (Plaintiffs' Compendium of Exhibits at Exhibit "E").

Bayer finds fault in Dr. Furberg's reliance upon the study as support for his opinion that Trasylol increases the risk of adverse events. [Bayer's Daubert Motion p. 7]. Particularly, Bayer claims Dr. Furberg does not cite the absence of statistically significant evidence associating Trasylol with the relatively rare occurrences of renal failure, heart attacks, stroke and death. First, as previously stated, the absence of statistically significant evidence of particular adverse health events is not compelling when the study was not powered to provide statistically significant results (as the BART study was not with regard to rare adverse events). Second, it violates common sense to suggest necessary that a study finding a strong trend toward increased deaths with Trasylol also find an association with every other conceivable harm in order to support the opinion that Trasylol increases the risk of bad health outcomes. An increased risk of death should suffice.

### 3.     Dr. Furberg Was Aware of Criticisms of Some of the Studies Supporting His Opinions.

Bayer complains that Dr. Furberg did not weigh and consider criticisms of the Mangano, BART and i3 Drug Studies when coming to his opinions. As an initial matter, allegations of inadequacies in a study go to the weight of the expert's testimony, not its admissibility. *Quiet Technology DC-8, inc. v. Hurel-Dubois UK Ltd.,* 326 F3d 1333, 1345 (11th Cir. 2003); *Jones v. Otis Elevator Co.,* 81 F.3d 655, 663 (11th Cir. 1988). Thus, any flaws Bayer perceives were overlooked by Dr. Furberg in his review of the medical literature are best urged through vigorous cross-examination and the presentation of contrary evidence. *Daubert,* 509 U.S. at 596. The mere fact that experts may have differing opinions regarding pivotal studies does not render one or the other of the opinions inadmissible. *In re Vioxx Products Liability Litigation,* 401 F.Supp.2d 556, 596 (E.D. La. 2005) holding that, where parties relied on the same material, but interpreted it differently and reached different conclusions, testimony of plaintiffs' expert was admissible).

Furthermore, Dr. Furberg did review criticisms and debates over the studies he considered. Bayer's representations to the contrary consist largely of identifying one form of information that was not reviewed by Dr. Furberg while ignoring other sources of the same information which were reviewed. For example, Bayer complains that Dr. Furberg did not read the transcript of the Advisory Committee meeting where the Mangano (2006) study was discussed. However, while he did not read the transcript, Dr. Furberg explained that he was aware of published materials debating the merits of the Mangano (2006) study and the i3 Drug Study. [Furberg Depo. 234:4-7]. Similarly, the fact that Dr. Furberg had not reviewed a report from Health Canada which commented on the BART Study does not mean Dr. Furberg failed to weigh and consider criticisms of the BART Study:

> Q.    What other materials have you read about the BART study besides the published study?
>
> *    *    *
>
> A.    I think that Bayer had some objection to the analyses and submitted a document to the FDA. . . I don't reference that here unfortunately but its in my ring book.

[Furberg Depo. 224:3-14]. Simply stated, Dr. Furberg considered criticisms of the various studies as part of his review of the evidence that was substantively meaningful and important to the expert opinions he proffers in this case.

**D.    DR. FURBERG'S OPINION REGARDING TRASYLOL'S SAFETY PROFILE IS ADMISSIBLE.** [In Response to Bayer's Argument III. p. 10-12].

Bayer asserts that Dr. Furberg is not qualified to offer an opinion on the risk/benefit analysis of Trasylol. Bayer bases this opinion on the fact that Dr. Furberg is no longer in the active practice of medicine and does not perform bypass surgery or diagnose renal failure. [Bayer's Daubert Response p. 10]. Bayer describes the requisite area of expertise for a drug safety opinion too narrowly. In *Smith v. Wyeth-Ayerst Laboratories Co.,* the defendant drug

maker made the same argument that an expert was unqualified to offer a risk/benefit opinion due to a lack of specialized knowledge on obesity and diet drugs. *Smith v. Wyeth-Ayerst Laboratories Co.,* 278 F.Supp.2d 684, 701 (W.D.N.C. 2003).  The court rejected that argument stating that the expert had reviewed the drug's regulatory history and the medical literature – which the court judicially noticed as being consistent with the procedure whereby many experts develop their opinions.  *Id.* at 702.  Even further the Court noted that the expert's "experience as a clinical trial investigator and consultant" was sufficient to render his qualifications to provide a risk/benefit analysis "beyond question."  *Id.*  Dr. Furberg, being a clinical trial investigator and consultant himself, has equally compelling credentials for providing a risk/benefit opinion in this case.

Nor is Dr. Furberg's risk/benefit opinion lacking in support.  As previously discussed, Dr. Furberg conducted a professional review of the medical literature with special emphasis on the types of studies that provided the most compelling information regarding safety (large cohort studies) or efficacy (clinical trials). [*See* Argument *infra* at IV.C.].  Bayer does not seriously dispute that the scientific data and medical literature set forth by Dr. Furberg is adequate to support his risk/benefit opinion.  Rather, Bayer gropes around the edges of the opinion by hinting that Dr. Furberg did not consider high-risk cardiac surgery patients separately.  [Bayer's Daubert Motion, p. 11].  Bayer's criticism is disingenuous.   Dr. Furberg did evaluate studies examining Trasylol use in different patient populations.  For example, the Mangano (2006)[9] Study reported Trasylol outcomes for both patients undergoing complex coronary-artery surgery and primary surgery.   Hence, there is no truth to Bayer's assertion that Dr. Furberg failed to consider Trasylol's effects on different populations.

---

[9]Mangano DT, et al., "The risk associated with aprotinin in cardiac surgery," 354:353-65 (NEJM 2006)(Plaintiffs' Compendium of Exhibits at Exhibit "F").

Lastly, Bayer urges that Dr. Furberg's risk/benefit opinion is somehow unreliable because it invades the province of the FDA and is contrary to the favorable risk/benefit conclusion implied by FDA approval.  Not surprisingly, Bayer can cite no authority for the novel position that once a drug has received FDA approval, no expert is permitted to opine negatively on its risks as compared to its benefits.  The ridiculousness of the position Bayer advocates is apparent when one attempts to imagine Bayer championing the obvious corollary to its urged position:  that any testimony from Bayer experts that Trasylol is safe invades the province of the FDA which concluded otherwise in ordering Trasylol withdrawn from the market.  This Court should decline to impose a restriction on expert drug safety testimony that has not been imposed by any other Court.

Simply stated, Dr. Furberg's extensive experience, including work as a medical doctor, Chief of the Clinical Trials Branch of the National Heart Lung and Blood Institute of the U.S. National Institutes of Health, and professor of Public Health Sciences at Wake Forest University, gives him the appropriate expertise to opine on the complex information used to evaluate the safety and efficacy of Trasylol. *Bouchard v. American Home Products Corp.*, 2002 WL 32597992 (N.D.Ohio May 24, 2002) (admitting expert to provide risk/benefit testimony on basis of credentials less substantial than those of Dr. Furberg). Bayer's motion to exclude Dr. Furberg's testimony on a risk-benefit analysis should be denied.

## E.   DR. FURBERG'S OPINIONS WILL TOUCH UPON BAYER'S FAILURES ONLY AS THEY RELATE TO HIS OPINIONS REGARDING DRUG SAFETY, DRUG STUDIES AND BAYERS' RESPONSE TO SAFETY SIGNALS IN DRUG STUDIES. [In Response to Bayer's Argument IV. p. 12-15, and Argument V. p. 15-20].

Dr. Furberg has clearly stated that his areas of expertise are epidemiology and matters related to drug studies – including study design, conduct, monitoring, interpretation and

15

reporting.   [Furberg Report p. 2].   Consistent with this expertise, Dr. Furberg's testimony has been admitted in other cases on the specific issues of (1) the utility and limitations of drug studies with respect to assessing drug efficacy and safety, (2) interpretation of data from drug studies, and (3) the adequacy of a drug company's response to safety signals in the drug studies. *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 194 (S.D.N.Y. 2009).

Understandably, Bayer would like this Court to confine Dr. Furberg's testimony to an overly-narrow definition of drug-study-related testimony.  But the reality is that Dr. Furberg is qualified to assess (and the jury would have no way to determine absent expert assistance) whether the safety signals derived from the available studies were consistent with the information provided by Bayer in various contexts.  Thus, for example, any references by Dr. Furberg to an FDA proceeding are merely to provide the context for an opinion on the adequacy of Bayer's response to study data available at the time of that meeting.  It is not an opinion on Bayer's compliance with FDA regulations.  Likewise, passing references to the information included on the Trasylol product label, merely provide the context for assessing the adequacy of Bayer's response in relation to the data available at the time the label was developed.  It is not an opinion on label requirement compliance.  Dr. Furberg is entirely qualified to opine on the design, monitoring, interpretation and reporting of drug studies.  That the factual context or explanation of those opinions might include a passing reference to a drug label or FDA proceeding does not take them outside the scope of Dr. Furberg's expertise or make them inadmissible.

1.   **Dr. Furberg's Opinion that the Study Data Did Not Support Bayer's Representations in Promotional Literature Does Not Require Him to Be an Expert in Marketing or FDA Labeling Requirements. [In Response to Bayer's Argument IV.A. p. 12-13].**

Bayer's mischaracterization of paragraph 35.f of Dr. Furberg's Report is a prime example of how Bayer confuses a study-related opinion regarding information dissemination with an FDA-related opinion on product labeling.   The introduction to the challenged testimony makes clear that Dr. Furberg is discussing the significance of "new information on renal damages caused by Trasylol. . ." that emerged around or shortly after Trasylol's approval.   [Furberg Report p. 26].   Dr. Furberg had described that scientific information as including Cosgrove (1992), Sundt (1993), Westaby (1993), Lemmer (1995) the FDA Medical Officers review of Trasylol efficacy and safety trials [BAY00674730], Bayer's own study through its subsidiary Miles Canada, and the Bertram Pitt letter.   It is in this study analysis context (not an FDA compliance context), that Dr. Furberg has been asked to inform the jury as to whether the information available from the studies, when properly interpreted, was consistent with what Bayer was stating in its promotional materials.   It is unnecessary for Dr. Furberg to have expertise in marketing practices or FDA regulations to offer an opinion on study interpretation.[10]

2.   **Dr. Furberg's Opinions Regarding What Safety Signals Were Apparent from Study Data and the Adequacy of Bayer's Response to Those Safety Signals Does Not Impermissibly Attest to Bayer's Knowledge or State of Mind. [In Response to Bayer's Argument V.B. p 16-17].**

Bayer has expressed concern that Dr. Furberg not be allowed to speculate about Bayer's "state of mind, intent, or knowledge." [Bayer's Daubert Response p. 16]. It is not Dr. Furberg's

---

[10] Because Dr. Furberg is not offering opinions on FDA regulatory compliance or FDA labeling requirements, Bayer's complaint that Dr. Furberg had not reviewed the entirety of Bayer's various drug approval applications and or label variations does not impugn the reliability of his testimony as to whether the studies could be properly interpreted as consistent with Bayer's promotional statements.

plan to testify as to Bayer's intent.  However, that does not preclude Dr. Furberg from drawing reasonable inferences from the study data as to what information was available to a Bayer at a given time, and what the action (if any) the available information would provoke from a reasonable and prudent pharmaceutical company.

For instance, one of the issues in this case is whether Bayer acted as a reasonable and prudent drug company in response to safety signals available from the drug studies. In order to decide that question, the jury will have to understand what the drug studies, when properly interpreted, would have signaled to a drug company regarding Trasylol's safety and efficacy. Bayer is correct that Dr. Furberg refers to "What Bayer knew" in the heading of one subsection of his report.  But if the Court were to examine the actual content of that subsection, it would see that Dr. Furberg never once testifies as to Bayer's knowledge or intent. [Furberg Report p. 23-25].  Dr. Furberg's statements regarding Bayer in that section are that (1) "safety data from several sources were available to Bayer. . .", (2) "safety concerns raised by the pre-approval studies and the FDA should have been addressed by Bayer earlier. . . (3)"Bayer never conducted sufficiently large and long-term trials to document fully the magnitude of the serious renal problems," and (4) "[s]tudies had suggested increased mortality, but Bayer never followed patients long enough to determine Trasylol's full effect on mortality. . "[Furberg Report p. 23-25].   These statements are all focused on what information was available from study data and what further research was called for by the study data.[11]   These are issues a juror would not

---

[11] The only statements in Dr. Furberg's Report cited by Bayer as impermissible knowledge or motive testimony is the "What Bayer Knew" heading  and a statement that Bayer "misled the FDA" by not disclosing the i3 Drug Study. [Furberg Report p. 34].   To say that the FDA was misled is simply the result of the non-disclosure.  Whether the non-disclosure or its result was *intended* by Bayer is not implicated by Dr. Furberg's statement.   Thus, there is no impermissible opinion regarding Bayer's intent fingered in Dr. Furberg's Report.

likely know and that Dr. Furberg is qualified to explain.  Dr. Furberg should be permitted to supply this sort of information to aide the jury.

The remaining statements challenged by Bayer as knowledge or intent testimony come from Dr. Furberg's deposition – not his expert report.  The deposition testimony demonstrates that Bayer is overreaching in order to characterize Dr. Furberg's testimony as improperly focused on intent or knowledge.  For instance, one of the statements to which Bayer objects is that Bayer was scared to approve independent Trasylol studies that it could not control.  Although that statement does suggest a motive or intent on the part of the drug maker – it was offered only in response to Bayer's deposition question: "Why did Bayer reject them [investigator initiated research proposals], in your view?"  [Furberg Depo. 204:22].  Bayer cannot *ask* an expert to speculate as to Bayer's intent and then use the answer as a basis for excluding the expert's testimony.  If Bayer does not want Dr. Furberg to opine as to Bayer's motives or intentions, then all it needs do is stop asking the question.

### 3.    Dr. Furberg's Opinions Regarding Bayer's Response to Safety Signals Revealed in the Drug Studies Is Not an Improper Legal Conclusion.  [In Response to Bayer's Argument V.B. p 17-18].

The Federal Rules of Evidence make abundantly clear that an expert may offer testimony embracing an ultimate issue of fact without it being an impermissible legal opinion. FED. R. EVID. 704; *In re Fosamax*, 645 F.Supp.2d at 191.  Under Rule 704, an expert can render an opinion (even an opinion on an ultimate issue in the case) so long as the opinion is based upon the expert's analysis of the facts and not based on the expert's interpretation of the law. The distinction may be subtle; but it is significant.  Experts may reasonably disagree about whether or not a party breached the standard of care (a fact), but there is only one answer to whether a defendant is negligent (the ultimate legal conclusion).  An expert's testimony goes too far only

when it tells the jury what opinion is to be reached on the ultimate legal conclusion, for example, whether the defendant was negligent. *Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994). Thus, the question with regard to admissibility under Rule 704 is whether the expert's opinions assist the jury in understanding the evidence or determining a *factual* issue. The answer here is that they do.

The testimony which Bayer characterizes as impermissible legal conclusions actually consists of the application of Dr. Furberg's expertise to the facts.[12]  For example, Dr. Furberg opines that the emerging study data should have signaled a need for large, long-term trials but that such trials were not conducted by Bayer.  [Furberg Report p. 24].  In the same vein, Dr. Furberg opines that further research by Bayer was called for in answer to drug study safety signals.  [Furberg Depo. 165:14-166:3]. Such fact-based conclusions are distinct from conclusory legal opinions and are proper under Rules 702 and 704. *See United States v. Barile,* 286 F.3d 749, 761 (4th Cir. 2002) (To be an improper legal conclusion, the opinion must regurgitate the law with an opinion in one side's favor.  In contrast, an expert's factual determinations "give the jury insight into the bases of the expert's conclusion.").

Bayer additionally objects to two statements by Dr. Furberg that it considers merely conclusory due to a lack of basis in fact.[13]  The first is that the safety update provided by Bayer in response to the Mangano (2006) and Karkouti (2006) studies was "long overdue."  This challenged opinion is consistent with Dr. Furberg's overall testimony.  Dr. Furberg has testified extensively about the safety signals from the various studies which he believes would have called

---

[12] That Dr. Furberg was unable to cite a federal regulation or FDA guideline supporting his opinion as to what conduct was required of a reasonable drug company is immaterial.  Dr. Furberg is not offered as an opinion on FDA regulatory procedures.

[13] Bayer also objects to the factual statements that Bayer did not warn clinical trial participants and investigators of Trasylol dangers.  [Bayers' Daubert Motion, p. 14].  Dr. Furberg makes that statement in the context of demonstrating where Bayer's responses to drug safety signals fell short of reasonable conduct.  It is not intended to imply that Bayer's responsibility is conditioned on a plaintiffs' participation in a clinical trial.

20

for disclosure and/or further research by a reasonable pharmaceutical company and the inadequacy of Bayer's response thereto. That it is *theoretically* possible Bayer could have provided a timely safety update among non-public FDA filings that Dr. Furberg has no authority to obtain cannot impute his opinion. Bayer is welcome to produce evidence of timely safety updates (if it can), refuting Dr. Furberg's opinion at trial.

Likewise, Bayer objects to Dr. Furberg's testimony relating to delays in publishing the St. Luke's Medical Center study as not lacking factual basis. [Bayer's Daubert Motion p. 19]. That the St. Luke's Medical Center Study was not published following its completion in 2003 is a factual statement. Dr. Furberg's expertise regarding the manner in which studies are designed, conducted and reported qualifies him to make the statement that it is "exceedingly unusual" for an investigator to devote years to conducting a 1722 patient study and prepare a report on the study but never submit the study for publication. [Furberg Depo. 195:9-196:2]. That Dr. Furberg references some unspecified "external pressure" when repeatedly asked by Bayer "why" the St. Lukes' Medical Center study went unpublished is not impermissibly speculative. First, Dr. Furberg has left to the jury of determining whether Bayer was or was not a source of pressure to not publish the study. Second, as with other deposition testimony about which Bayer complaints, Dr. Furberg would have had no reason to speculate if Bayer had not invited the speculation. Hence, Dr. Furberg's opinions are reliably grounded in fact and should be admitted.

### 4.     Dr. Furberg Does Not Intend to Offer The Opinion That Bayer Had A Duty to Patient's Directly. [In Response to Bayer's Argument IV.B. p 13-14].

Dr. Furberg does not intend to offer expert testimony that Bayer violated a duty to warn *patients* about the risks of Trasylol. The statement to which Bayer objects was made in the context of a discussion regarding the adequacy of Bayer's attention to safety problems with

Trasylol – a subject Dr. Furberg has been admitted to opine about in other drug litigation. *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 194 (S.D.N.Y. 2009)(admitting Dr. Furberg to testify regarding the adequacy of the drug companies' response to safety signals).   In that context, Dr. Furberg discussed what was done by Bayer to alert "physicians and patients."   The passing reference to "physicians and patients" was not intended as testimony that patients should have rights beyond the confines of the learned intermediary rule.   Rather, it was merely a reference to the ultimate beneficiaries of Bayer's response to safety signals.   Bayer's efforts to inflate Dr. Furberg's word choice beyond its intended meaning should not serve as a basis for excluding his testimony.

## CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request that the Court DENY Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Curt D. Furberg.   Plaintiffs additionally request all other and further relief as the Court deems just and proper.

This the ___29th___ day of January, 2010.

Respectfully submitted,

/s/ _____
Theodore Babbitt (Florida Bar No. 91146)
Email: tedbabbitt@babbitt-johnson.com
Joseph Osborne (Florida Bar No. 880043)
Email: JAOsborne@babbitt-johnson.com
Babbitt, Johnson, Osborne
& LeClainche, P.A.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: (561) 684-2500
Facsimile:  (561) 684-6308

*Liaison Counsel for Plaintiffs and Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29 , 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel or records or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

/s/ _____

Theodore Babbitt
Florida Bar No. 0091146