# Exhibit B

## SERVICES AGREEMENT

This Services Agreement (this "**Agreement**") is made effective as of February 15, 2006 (the "**Effective Date**"), by and between Bayer HealthCare AG, with offices at Aprather Weg, 42113 Wuppertal, Germany ("**Client**") and i3 Drug Safety, a division of Ingenix Pharmaceutical Services, Inc., a Delaware corporation with offices at 12125 Technology Drive, Eden Prairie, MN 55344 ("**Company**" or "**i3 Drug Safety**").

1.   **Services**.

   (a)   Client hereby retains i3 Drug Safety to provide the services that are described in Exhibit A to this Agreement (the "Services"). Exhibit A specifies (a) the Services to be performed; (b) the charges or billing rates for the Services, including any maximum total expenditure authorized; (c) the time lines, milestones and deadlines for performing the Services; and (d) a payment schedule.

   (b)   The terms of this Agreement may be amended or modified by mutual written agreement of i3 Drug Safety and Client. Client may request changes in the timelines, deliverables or scope or scale of the Services covered by this Agreement, or request the reduction or removal of any of the Services covered by this Agreement. If i3 Drug Safety believes a change in the scope or scale of Services is necessary or advisable, i3 Drug Safety shall so advise Client. The parties will negotiate diligently and in good faith the proposed revisions to the timelines, deliverables, scope or scale of Services and the professional fees and costs for performing changed or additional services or for reducing or removing Services, and shall execute an amendment to this Agreement. In the event i3 Drug Safety provides additional services or expends resources, at Client's written request and in strict accordance with Client's requirements, in the absence of a written amendment to this Agreement, Client will compensate and/or reimburse i3 Drug Safety for all fees and reasonable costs incurred.

   (c)   It is the intent of the parties that in the event of a conflict between this Agreement and any attached Exhibit, the terms of the Agreement will govern, provided, however, that the parties may expressly agree that one or more terms of a specific Exhibit will override one or more terms of this Agreement, but such conflicting provision shall have effect only if the parties (i) state this intent in the Exhibit, (ii) identify the specific provision(s) of this Agreement the Exhibit is intended to override, and (iii) set forth the exact substitute provision(s), which provision(s) shall govern for the purposes of that Exhibit only.

   (c)   Neither party shall have any obligation of exclusivity of any nature to the other, or any obligation to conduct, or to offer to conduct, any particular services or study or any number of studies. Each party shall be free to provide services to or conduct or sponsor research studies involving other parties, so long as a party's agreement with any such third party does not prevent it from performing its obligations under this Agreement.

1

Bayer I3 Service Agr (968286) i3 draft 9 jun 06.doc

(d)     i3 Drug Safety shall use its commercially reasonable efforts in the performance of the Services and shall perform such Services diligently and conscientiously in accordance and in compliance with all applicable professional standards, laws and regulations.

2. **Compensation.** In return for the Services performed under this Agreement, Client shall pay to i3 Drug Safety the amounts set forth in this Agreement and in accordance with the payment schedule set forth therein.

3. **Expenses.** i3 Drug Safety shall furnish, at its own expense, any and all materials, equipment, services or supplies necessary or useful to successfully completing the Services. Client will reimburse i3 Drug Safety for authorized and reasonable expenses i3 Drug Safety incurs in performing the Services, provided that i3 Drug Safety provides Client with a detailed invoice together with receipts, for such expenses.

4. **Method of Payment.**

   (a)     i3 Drug Safety shall invoice Client according to the agreed upon payment schedule, for fees and authorized expenses. Within sixty (60) days after the receipt by Client of an invoice, Client shall issue a check to i3 Drug Safety for the applicable amount. All payments shall be sent to:

   Ingenix  
   P.O. Box 32144  
   Hartford, CT 06150-2144

(b)     All invoices shall be submitted by i3 Drug Safety to the attention of Bayer HealthCare AG, Global Drug Safety, Pharma Research Center, Aprather Weg, 42113 Wuppertal, Germany, Attention Accounts Payable for review and approval.

5. **Independent Contractor.**

   (a)     i3 Drug Safety agrees that i3 Drug Safety is an independent contractor when performing the Services and for all other purposes under this Agreement and that the relationship between i3 Drug Safety and Client shall not constitute a partnership, joint venture or agency. Neither i3 Drug Safety nor any of i3 Drug Safety's employees or agents (collectively referred to herein as the "**Employees**") shall, as a result of this Agreement, (i) be deemed to be an employee, agent or legal representative of Client, or (ii) shall have any authority to represent Client or to enter into any contracts or assume any liabilities on behalf of Client. i3 Drug Safety retains all the rights and privileges of sole employer of its Employees, including, without limitation, the right to control, hire, discipline, compensate and terminate such Employees. Neither i3 Drug Safety nor any of its Employees shall, as a result of this Agreement, have any right to receive any employee benefits as are in effect generally for Client's employees.

(b) i3 Drug Safety shall be solely and unconditionally responsible for paying any and all city, state and federal taxes and assessments, including, without limitation, all income, social security, withholding and employment taxes, relating to any income or other consideration that i3 Drug Safety or any of its Employees derives from this Agreement and for providing all other employee compensation, contributions, and benefits with respect to its Employees.

6. **Ownership of Deliverables.**

(a) All materials, documents, data, software and information supplied to i3 Drug Safety by or on behalf of Client shall be and remain the sole and exclusive property of Client ("Client Property"). i3 Drug Safety shall deliver the Client Property to Client immediately upon demand.

(b) The results of the performance by i3 Drug Safety of the Services shall be delivered to Client and shall be described in Exhibit A (the "Deliverables"). i3 Drug Safety agrees that the Deliverables that are copyrightable subject matter shall upon delivery by i3 Drug Safety and payment by Client of all amounts due therefor, be considered "work made for hire" within the meaning of the copyright laws of the United States and that Client is and shall be the sole author of the Deliverable and the sole owner of all rights therein in perpetuity. With respect to any Deliverable that is not "work made for hire," upon delivery by i3 Drug Safety and payment by Client of all amounts due therefor, i3 Drug Safety hereby irrevocably assigns to Client in perpetuity all of i3 Drug Safety's rights, titles and interests worldwide in and to such Deliverable. At Client's request and expense, i3 Drug Safety shall execute all documents and take all actions that Client reasonably deems necessary to perfect Client's ownership of the Deliverables.

(c) i3 Drug Safety may use proprietary tools, computer programs, algorithms, databases, methods and techniques, processes and other materials and ideas developed by itself or others to perform the Services for Client ("i3 Drug Safety Tools"). Client acknowledges and agrees that the i3 Drug Safety Tools are not deemed a Deliverable or "work made for hire" under this Agreement, and remain the property of i3 Drug Safety. Client expressly acknowledges that performance of the Services under this Agreement may result in the development by i3 Drug Safety of new proprietary tools or concepts, methods, techniques, processes, adaptations and ideas related to the aforesaid i3 Drug Safety Tools or enhancements thereof, and that such new or enhanced i3 Drug Safety Tools shall be the sole property of i3 Drug Safety.

(d) Each party shall have publication privileges with respect to the results of the Services. i3 Drug Safety shall submit a copy of any proposed manuscript, abstract, presentation or other document to Client for review and comment at least forty-five (45) days prior to its submission for publication or presentation. Within thirty (30) days of its receipt of the draft document, Client will provide i3 Drug Safety its written comments thereon. Before it submits any manuscript based on the Services for publication, Client shall allow i3 Drug Safety an opportunity to conduct a non-binding review of the manuscript. i3 Drug Safety shall determine, at its sole option, whether to allow Client to acknowledge i3 Drug Safety in writing in publication(s) of Client

3

referencing the Services. i3 Drug Safety shall have the right to use and disclose the findings from the Services for purposes of administering and managing any affiliate of i3 Drug Safety or for purposes of disclosing publicly any results of the Services which may in i3 Drug Safety's judgment indicate potentially significant public health issues, regardless of Client's use or disclosure of the same. This paragraph shall survive the termination of this Agreement.

7. **Confidential Information**.

   (a) Each party acknowledges that in the course of performing under this Agreement, or in the course of discussing or negotiating future agreements between the parties, each party may learn confidential, trade secret, or proprietary information concerning the other party or third parties to whom the other party has an obligation of confidentiality ("Confidential Information"). Without limiting the foregoing, i3 Drug Safety's Confidential Information shall include, without limitation, the i3 Drug Safety Data; information regarding i3 Drug Safety's business, products, software, data, services and documentation: reports generated by and for i3 Drug Safety; i3 Drug Safety's methods of database creation; i3 Drug Safety's translation, standardization, enhancement, and health data analysis techniques, health data reporting and profiling methods and formats; software tools for report creation, distribution and retrieval; and associated algorithms, tools, programs, software architecture and technology. Without limiting the foregoing, Client's Confidential Information shall include information regarding Client's business and information regarding Client's products. During the term of this Agreement and for a period of three (3) years after the expiration or termination of this Agreement, each party agrees it will not use or disclose the Confidential Information to any other individual or company except as specifically permitted herein without the prior written consent of the other.

   (b) Each party agrees that (i) it will use the other party's Confidential Information only as may be necessary in the course of performing duties, receiving services or exercising rights under this Agreement; (ii) it will treat such information as confidential and proprietary; (iii) it will not disclose such information orally or in writing to any third party without the prior written consent of the other party; (iv) it will take all reasonable precautions to protect the Confidential Information; and (v) it will not otherwise appropriate such information to its own use or to the use of another person or entity. Without limiting the foregoing, each party agrees to take at least such precautions to protect the other party's Confidential Information as it takes to protect its own Confidential Information. Upon termination or expiration (without renewal) of this Agreement, each party will return to the other party or certify as destroyed all tangible items containing any of the other party's Confidential Information that are held by that party or its employees, agents or contractors. Each party agrees to notify the other party if it becomes aware of an unauthorized use or disclosure of the other party's Confidential Information.

4

(c) If either party believes it is required by law or by subpoena or court order to disclose any of the other party's Confidential Information, it shall promptly notify the other party prior to any disclosure and shall make all reasonable efforts to allow the other party an opportunity to seek a protective order or other judicial relief.

(d) Nothing in this Agreement shall be construed to restrict disclosure or use of information that (i) was in the possession of or rightfully known by the recipient, without an obligation to maintain its confidentiality, prior to receipt from the other party; (ii) is or becomes generally known to the public without violation of this Agreement; (iii) is obtained by the recipient in good faith from a third party having the right to disclose it without an obligation of confidentiality; or (iv) is independently developed by the receiving party without reference to the other party's Confidential Information.

(e) Notwithstanding the obligations set forth above, a party may disclose Confidential Information to any of its employees or subcontractors who need to receive the Confidential Information in order to perform the party's obligations under this Agreement, provided that such party shall ensure that, prior to disclosing the Confidential Information, each person to whom the Confidential Information is to be disclosed is made aware of the obligations contained in this Agreement and agrees to comply with the terms of this Agreement as if it were a party to it.

(f) To the extent described as part of the Services in Exhibit A, i3 Drug Safety may analyze certain proprietary claims and administrative health care data it maintains in a proprietary research database (the "i3 Drug Safety Data") for Client and prepare reports or summaries based on such data analysis (the "i3 Drug Safety Data Deliverables") or otherwise use such analyses in the performance of the Services for Client. In performing the Services and preparing the i3 Drug Safety Data Deliverables, to the extent i3 Drug Safety Data is utilized, the following provisions will apply:

   (i) i3 Drug Safety shall only disclose i3 Drug Safety Data to Client in a form that does not disclose the identity or name of any patient or other patient-identifying information such as address, telephone number, birth date, all or part of a social security number, medical record number, or prescription number.

   (ii) Client acknowledges that the i3 Drug Safety Data Deliverables will include only aggregate patient data, not claim level data.

   (iii) Client agrees that it will not use the i3 Drug Safety Data Deliverables to identify or contact any patient, and it will at all times comply with all federal, state, or local laws or regulations relating to medical confidentiality and patient privacy.

   (iv) Client shall not sell or resell any i3 Drug Safety Data or i3 Drug Safety Data Deliverables obtained pursuant to this Agreement. Additionally, any use by Client of any i3 Drug Safety Data Deliverables outside of Client shall be in a

format, which does not identify i3 Drug Safety as the source of the i3 Drug Safety Data Deliverables, unless otherwise permitted in writing by i3 Drug Safety. No reports by Client concerning analyses of the i3 Drug Safety Data Deliverables or the results of such research shall disclose the identity of any patient.

(v) Client acknowledges that the i3 Drug Safety Data used by i3 Drug Safety to perform the Services and prepare the i3 Drug Safety Data Deliverables is confidential and proprietary to i3 Drug Safety and the data sources and is not and shall not be deemed to be an "Invention" or "Deliverables" under this Agreement. Client may describe the data source for the i3 Drug Safety Data as a large U.S. health plan affiliated with i3 Drug Safety, but Client will not disclose any health plan names as the specific data source, unless otherwise agreed by the parties in writing.

8. **Equitable Relief.** Each party recognizes that its threatened breach or breach of Sections 6 or 7 may cause irreparable harm to the other party that maybe inadequately compensable in damages and that, in addition to other remedies that may be available at law or equity, a party is entitled to seek injunctive relief for such a threatened or actual breach of Section 6 or 7.

9. **Term.** The term of this Agreement shall commence upon the Effective Date and continue for a period of one (1) year or earlier if all Services have been performed and all amounts due i3 Drug Safety have been paid. Either party may terminate this Agreement on thirty (30) days written notice. Notwithstanding the foregoing provision, either party may immediately terminate this Agreement upon delivery of written notice to the other if the other party breaches or threatens to breach any provision of this Agreement. Upon expiration or termination of the Agreement, i3 Drug Safety shall immediately deliver to Client all completed Deliverables and Client Property.

10. **Indemnification.**

    (a) i3 Drug Safety shall defend, indemnify, and hold harmless Client, its affiliates and their respective officers, directors, partners, shareholders, employees, and agents from and against any and all liabilities, claims, demands, causes of action, damages, losses and expenses, including, without limitation, attorneys' fees, (collectively, "**Losses**") arising out of or in connection with (i) any negligence or intentional misconduct of i3 Drug Safety in the performance of the Services, (ii) any breach by i3 Drug Safety or (iii) any infringement of a patent or copyright or misappropriation of a trade secret resulting from the performance of the Services of this Agreement.

    (b) Client shall defend, indemnify, and hold harmless i3 Drug Safety, its affiliates and their respective officers, directors, partners, shareholders, employees, and agents from and against any and all Losses arising out of or in connection with (i) any negligence or intentional misconduct of Client, or (ii) any breach by Client of this Agreement.

(c) Each party's obligations under Section 10 of this Agreement are further conditioned upon the indemnified party giving the indemnifying party timely written notice and reasonable cooperation and assistance in the defense of any Loss; provided however, that failure of the indemnified party to give such notice shall not limit the indemnified party's right to indemnification except in such case where such failure materially and adversely affects the indemnifying party's ability to defend against such Loss.

(d) In the event a Loss is or may be asserted against an indemnified party, the indemnified party shall have the right to select and to obtain representation by separate legal counsel. If the indemnified party exercises such right, all costs and expenses incurred by the indemnified party for such separate counsel shall be borne by the indemnified party.

(e) Neither party will enter into any settlement agreement that attributes fault or negligence to the other party, requires any payment by the other party, or restricts the future actions or activities of the other party, without the other party's prior written consent.

(f) UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE RESPONSIBLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES RESULTING FROM EITHER PARTY'S PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT.

11. **Insurance.** During the term of this Agreement, i3 Drug Safety shall maintain commercial general liability insurance with limits not less than $1,000,000 each occurrence and aggregate and errors and omissions insurance with a limit of not less than $1,000,000 each occurrence and aggregate providing coverage for claims arising out of any error, omission, or negligent act committed by i3 Drug Safety in connection with the performance of Services under this Agreement. Additionally, i3 Drug Safety shall maintain workers' compensation insurance with minimum amounts as required by federal, state, and/or local laws. It is expressly understood that Bayer does not, in any way, represent that the types and minimum limits of insurance specified herein are sufficient or adequate to protect i3 Drug Safety's interests or liability.

12. **Representations, Warranties and Covenants of the Parties.**

(a) Each party represents and warrants that it is free to enter into this Agreement and perform its respective obligations under the Agreement.

(b) i3 Drug Safety represents and warrants that: (i) i3 Drug Safety and its Employees are, and at all times during the term of this Agreement will be, qualified by training and experience with appropriate expertise to perform the Services, and (ii) i3 Drug Safety and its Employees have, and at all times during the term of this Agreement will have, appropriate licenses, approvals and certifications necessary to perform safely, adequately and lawfully their obligations under this Agreement.

7

Bayer I3 Service Agr (968286) i3 draft 9 jun 06.doc

13. **Audits and Inspections.**

    (a) Audits. i3 Drug Safety agrees to keep or cause to be kept accurate records or books of account in accordance with generally accepted accounting principles showing the information evidencing the calculation of fees charged by i3 Drug Safety in performing the Services. Such information shall be retained for seven (7) years after expiration or termination or such longer period as required by law. Client or its authorized representative shall be permitted to inspect at its sole cost and expense and upon reasonable prior written notice during regular business hours the records and books necessary to confirm the accuracy of the amounts invoiced Client hereunder. Such audits shall be performed (i) on site at i3 Drug Safety's offices where the records are maintained and (ii) in a manner least likely to disrupt i3 Drug Safety's daily operations. Such audits shall not occur more than once per year. Client agrees and acknowledges that it has no right or authority to access, review, examine or audit any i3 Drug Safety Data, or the proprietary research database(s) maintained or used by i3 Drug Safety to perform the Services.

    (b) Inspections. If any governmental or regulatory authority (i) contacts i3 Drug Safety with respect to the Services, (ii) conducts, or gives notice of its intent to conduct, an inspection of i3 Drug Safety with respect to the Services, or (iii) takes, or gives notice of its intent to take, any other regulatory action alleging improper or inadequate practices with respect to any activity of i3 Drug Safety in connection with the Services, to the extent acceptable to the regulatory authority, i3 Drug Safety shall notify Client within three (3) business days after such contact or notice, permit Client to be present at, or otherwise participate in, any such inspection or regulatory action with respect to the Services, and shall supply Client with all information received from the regulatory authority pertinent thereto. To the extent acceptable to the regulatory authority, Client shall have the right to be present at and to participate in any such inspection or regulatory action with respect to the Services. i3 Drug Safety shall provide Client with copies of all documentation issued by any governmental or regulatory authority in connection therewith and any proposed response thereto. No such response shall include any false or misleading information with respect to the Services or Client.

14. **Debarment.**

    (a) i3 Drug Safety represents, warrants and covenants that it is not currently using, and will not in the future use, to perform the Services hereunder, the services of any person debarred or known by it to be subject to debarment under 21 U.S.C. §335(a) or otherwise disqualified or suspended from performing the Services or otherwise subject to any restrictions or sanctions by the FDA or any other governmental or regulatory authority or professional body with respect to the performance of the Services (a "**Debarred Person**"). i3 Drug Safety shall immediately notify Client in writing if it becomes aware that any person who is performing Services hereunder is or becomes a Debarred Person or to its knowledge, if any action, suit, claim, investigation, or other legal or

8

administrative proceeding is pending or threatened, that would make any person performing Services hereunder a Debarred Person.

(b) i3 Drug Safety shall comply with the Fair Labor Standards Act. i3 Drug Safety shall not discriminate against any employee or applicant for employment because of age, race, religion, color, creed, national origin, or sex. Party shall comply with all applicable federal, state, and local fair employment practices laws, including all provisions of Executive Order 11246 of September 24, 1965, the Rehabilitation Act of 1973, and the Vietnam Era Veterans Readjustment Assistance Act of 1974 and any amendments thereto. Party agrees to comply with any other such laws and regulations of the United States, and any state or local jurisdiction thereof, as may govern or apply to its activities under this Agreement.

15. **Assignment**. Neither party shall assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld; provided, however, that Client shall have the right to assign or otherwise transfer this Agreement to its Affiliates or to any successor in interest having the financial or operational capacity to perform its obligations hereunder; and provided, further, that i3 Drug Safety shall have the right to retain qualified third party vendors and contractors to provide i3 Drug Safety with services or products that relate to i3 Drug Safety's obligations hereunder. Notwithstanding such retention of third parties by i3 Drug Safety, i3 Drug Safety shall remain responsible for the performance of the Services.

16. **Amendment; Waiver**. This Agreement may be amended only by a written instrument signed by the parties hereto. Each party shall have the right to enforce the provisions of this Agreement in strict accordance with its terms. The failure of either party at any time to enforce its rights hereunder strictly in accordance with the same shall not be construed as having created a custom contrary to the specific provisions hereof or as having in any way modified or waived same.

17. **Governing Law**. This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed under the laws of the State of Minnesota without reference to its principles of choice of law. All disputes pertaining to this Agreement shall be decided by a state or federal court located in Minneapolis, Minnesota.

18. **Notices**. Any notice that is required or permitted hereunder shall be deemed given only if delivered personally or sent by telecopy (with transmission confirmed) or by registered or certified mail, return receipt requested and postage prepaid, or by a nationally recognized overnight delivery service, addressed to the parties at their respective addresses first set forth above or to such other addresses at which notice of change shall have been given.

19. **Entire Agreement**. This Agreement, including all attachments hereto, sets forth and constitutes the entire agreement and understanding between the parties with respect to the Services and all prior agreements, understanding, promises and representations, whether written or oral, with respect thereto are superseded hereby.

9

Bayer I3 Service Agr (968286) i3 draft 9 jun 06.doc

20. **Severability**. The provisions of this Agreement shall be several. Invalidity or unenforceability of one provision shall not affect any other provision of this Agreement.

21. **Survival**. The respective rights and obligations of the parties set forth in this Agreement shall indefinitely survive the expiration or termination of this Agreement to the extent necessary to accomplish the intended preservation of such rights and obligations.

22. **Headings**. The headings in this Agreement are for convenience only and do not in any way limit or amplify their terms in this Agreement.

23. **Use of Name**. Neither party shall mention or otherwise use the name of the other party (or any abbreviation or adaptation thereof) in any publication, press release, promotional material or other form of publicity without the prior written approval of the other party in each instance.

24. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall together be deemed to constitute one agreement.

25. **Disputes**. The parties recognize that a bona fide dispute may arise under this Agreement which may relate to either party's rights and/or obligations hereunder. The parties each agree that it shall use all commercially reasonable efforts to resolve, in an amicable manner, any dispute which may arise. If the parties cannot resolve their dispute within thirty (30) days, either party shall have the right to initiate arbitration under the Commercial Dispute Resolutions Rules of the American Arbitration Association then in effect. The arbitration proceedings shall be held in the State of Minnesota. Notwithstanding the above, the complaining party reserves the right to seek injunctive or other relief in a court of competent jurisdiction if it believes that immediate relief is necessary to protect its business interest.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

| INGENIX PHARMACEUTICAL SERVICES, INC. | BAYER HEALTHCARE AG |
|---|---|
| BY: _[signature]_ | BY: **Dr. rer. nat. Dr. med. Ernst Weidmann** |
| NAME: Brigid M. Spicola | NAME: _[signature]_ |
| TITLE: Deputy General Counsel | TITLE: VP Global Drug Safety |
| DATE: 6/22/06 | DATE: 15/06/06 |

# EXHIBIT A

PROJECT TITLE: Aprotinin and Cardiovascular and Renal Outcomes

## 1. Description of Services:

**Background**

Aprotinin, a protease inhibitor isolated from bovine lung, is effective in reducing blood loss and preserving platelet function when administered during cardiac surgery. The use of aprotinin is associated with a reduction in the need for postoperative blood transfusion. Two alternatives for mitigating surgical bleeding and reducing the need for transfusion (aminocaproic acid and tranexamic acid) are lysine analogues that work by inhibiting fibrinolysis. A recent report of 4,374 patients undergoing cardiac surgery found a higher occurrence of adverse cardiovascular and renal outcomes among persons receiving aprotinin relative to persons who received aminocaproic acid or tranexamic acid.[1]

Ingenix will conduct a study of serious cardiovascular and renal outcomes among persons undergoing CABG surgery to quantify the association between aprotinin use and the occurrence of the specified outcomes.

**Data Source**

The Premier database is an inpatient database with data from approximately one-sixth of all hospitalizations in the United States with broad geographic diversity. Data in Premier is retained on a rolling calendar 4-year basis with a lag based on claims meaning that currently data are available from January 2001 through September 2005. This analysis will utilize data from Premier's Perspective Comparative Database (PCD). The PCD is the largest hospital-based, service-level comparative database in the country providing detailed resource utilization data along with patients' primary and secondary diagnosis and procedure codes. Detailed service level information is available for each hospital day and includes medication information (i.e., drug name and strength, quantity dispensed and unit cost). Patient information collected includes patient demographics (i.e. age, gender, and admission source), principal and secondary diagnoses, principal and secondary procedures, payor, length of stay, cost of care, drug utilization, department cost and charge detail, day-of-stay data, and physician specialty. The data available through Premier includes procedures performed, physician visits, laboratory tests, and drugs administered during the hospitalization, and these provide data on services, procedures, and their accompanying diagnoses. Information is also available on in-hospital mortality. Data are collected from each hospital's decision support or information system and a complete census of all patients, diagnoses, therapeutic classes, and procedures is captured. Premier's relationship is with the hospitals and, therefore, all patients from participating hospitals are captured, and the hospitals contributing data are generally representative of U.S. acute care hospitals. . Furthermore, Premier is able to go back to the hospitals for chart reviews for patients of interest under the oversight of an appropriate institutional review board (IRB) to use patient identifiable data for linking to medical records. The Premier database has been used

for numerous research studies in the past, including ones examining the relation between perioperative drug use and mortality.[2,3]

Variables from the PCD relevant for this study include patient demographics, hospital characteristics, treatment patterns, resource utilization and clinical outcomes for the identified study population. The following files and detailed data elements comprise available data in electronic form from Premier:

Pharmacy Department File
- Drug Quantity
- Administration Dose
- Cost for each day
- Length of therapy
- Total Pharmacy Cost

Discharge Level File
- Patient Characteristics
  - Patient ID
  - Age, Gender, Race
  - Primary Payor
  - Admission Month, Admission source, Admission type
  - Discharge status, Discharge month
  - Attending physician specialty, Consulting physician specialty
  - APR-DRG Severity Level
  - Total Hospital Cost
  - Total Charges
  - Itemized Charge Detail
  - Length of stay
- Hospital Characteristics
  - Geographic region
  - Teaching status
  - Urban/rural designation
  - Bed size
- Primary Diagnosis ( all primary ICD-9 diagnosis codes reported by hospital)
- Secondary Diagnosis (all secondary ICD-9 diagnosis codes reported by hospital)
- Primary Procedure (all primary ICD-9 procedure codes reported by hospital)
- Secondary Procedure (all secondary ICD-9 procedure codes reported by hospital)

Blood Transfusion File
- Allogenic
- Red Blood cells (units), Whole blood cells (units)
- Average Quantity/Average Cost
- Autologous
- Red Blood cells (units), Whole blood (units)
- Cell Salvage (units)
- Average Quantity/Average Cost

- Other Blood Transfusion Costs ( This may not be consistently collected across all discharges)
- Blood Processing
- Blood Antibody screening
- Blood Typing
- Blood Cross matching
- When was blood given:
    - Perioperatively or Postoperatively

In accordance with HIPPA, the Deliverables will not contain Protected Health Information (PHI). Therefore, the time of admission and discharge will be analyzed at the month and year level with day-of-service-level detail using chronologic days (e.g. day 1, day 2). The age of patients over 89 years will be reported in five year increments.

**Study Population**

Ingenix will identify all patients within the Premier database with a CABG procedure (ICD-9 procedure code 36.1x) and administration of aprotinin, aminocaproic acid, or tranexamic acid. The index date will be the date of the CABG procedure and patients will be followed until the end of the hospitalization for potential study outcomes.

A preliminary analysis of Premier database (over 500 hospitals) has identified a total of 104,539 discharges that received an antifibrinolytic agent for the time period of January 1, 2001- through September 30, 2005. Counts of potential patients provided by Premier for this proposal give 73,905 hospitalizations during which a CABG procedure was performed and aprotinin was used, 28,237 hospitalizations in which a CABG procedure was performed and aminocaproic acid was used, and 2,397 hospitalizations during which a CABG procedure was performed and tranexamic acid was used.

Two aspects of the available data in comparison to those reported by Mangano and colleagues are worth noting. First the number of hospitalizations represented in the Premier data exceeds that available to Mangano et al by an order of magnitude. Second, the distribution of use of the three antifibrinolytics differs dramatically from that reported by Mangano, for whose data the ratio of aprotinin to aminocaproic acid to tranexamic acid was roughly 1.5:1:1, while the ratio in Premier is roughly 1:0.38:0.03, and this distribution will limit the range of analyses that can be performed especially with respect to tranexamic acid. The difference between this large, contemporary US experience and the older, international data reported by Mangano may be ascribable to secular and regional trends in market share. It is noteworthy in this context that Mangano et al controlled for neither calendar time nor site in their analysis. If outcomes vary by either, as seems likely, the Mangano analysis may be severely biased.

**Outcomes**

The outcomes in this study are the occurrence of myocardial infarction, stroke, heart failure, dialysis, and death. We will identify potential study outcomes occurring after CABG surgery through the end of hospitalization using ICD-9 diagnosis codes and CPT procedure codes

13

corresponding to each of the outcomes. Ingenix will develop operational definitions of each of the study outcomes and base study analyses on outcomes that meet these definitions. Ingenix will seek to abstract medical records for a sample of 100 cases (subjects identified as having a study outcome) in order to establish the correspondence between diagnosis and procedure codes and clinical outcomes.

**Analysis**

The persons undergoing CABG surgery will be characterized according to age, gender, admission diagnosis, and aspects of medical history that can be ascertained through drug use during the admission (such as antidiabetic drugs) and discharge diagnoses that are unrelated to the surgery. Ingenix will describe the use of antifibrinolytic therapy and other drugs administered during the CABG procedure and conduct an analysis with the primary exposure of interest being the specific antifibrinolytic therapy received (aminocaproic acid, tranexamic acid, and aprotinin). Ingenix will determine the risk of each study outcome during hospitalization according to antifibrinolytic group with statistical adjustment as necessary. The analysis will account for variations in calendar time and site since the data will span several years and include widely varying hospitals.

**Medical Record Review**

Ingenix will work with Premier to obtain the necessary institutional approvals to conduct medical record abstraction for a sample of 100 patients who have had study outcomes, and an additional 100 patients at random. Ingenix will describe the correspondence of codes for study outcomes (within the Premier data set) to a clinical definition of study outcomes (as determined from the medical record). In addition, Ingenix will compare patient characteristics (clinical covariates) as determined by codes (within the Premier data set) to clinical covariates as determined from the medical records. The information obtained from medical record review will inform a sensitivity analysis (below) that will estimate the robustness of the study effect estimate to variations in assumptions about the completeness of data in the Premier database.

**Limitations**

For small relative risks, control for residual confounding (that is confounding that remains after accounting for known factors) may be a more important concern than statistical power (see below). Prior research has documented incomplete capture by inpatient administrative databases of both pre-operative and post-operative medical conditions.[4] Before concluding a full analysis of risks associated with aprotinin as opposed to tranexamic acid and aminocaproic acid, Ingenix will confirm that the prevalence and predictive power of other covariates in the risk models capture variations in the outcomes to a degree comparable to that in existing literature. There is little concern about limitations of residual confounding in the detection of relative risks as large as five (identified in Mangano et al for dialysis), but this concern is real for relative risks on the order of 1.5.

Since the medical record abstraction will provide information on clinical covariates that might not be fully ascertained in electronic form within the Premier database and on aspects of the

operative procedure that are not captured electronically, Ingenix will use the medical record information to assess the completeness of the electronic covariate data and the corresponding ability of study analyses to account for baseline differences between compared groups. This sensitivity analysis will use observed relationships between electronic and medical record derived variables to estimate a range of risks for study outcomes among users of aprotinin in relation to tranexamic acid and aminocaproic acid if complete data were available for all persons in the study.

i3 Drug Safety will not deliver patient-identifiable or other individual-level data to Bayer. The available data do not permit ascertainment of individual drug adverse events.

**Sample Size and Power**

As indicated above, there were 73,905 hospitalizations during which a CABG procedure was performed and aprotinin was used, 28,237 during which aminocaproic acid was used, and 2,397 during which tranexamic acid was used. The fraction of persons undergoing cardiac surgery who experienced a study outcome in the Mangano report was ~1% for dialysis, ~12% for myocardial infarction, 6% for heart failure, ~2% for stroke, and ~2% for death. The following figure shows the power of the study to detect a range of risk ratios (RR) for the association between antifibrinolytic treatment choice (aprotinin versus aminocaproic acid) and an outcome with a baseline risk of 1% (such as dialysis).

The figure below shows that there will be at least 90% power to detect risk ratios of 1.3 or greater for outcomes occurring in 1% or more of CABG surgeries under a wide range of assumptions about how many of the aprotinin users would be available. The calculations assume a ratio of aminocaproic acid to aprotinin of 0.38, as was actually observed in the Premier data.



## References

Mangano DT, Tudor IC, Dietzel C. The risk associated with aprotinin in cardiac surgery. N Engl J Med 2006;354:353-65.
Lindenauer PK, Pekow P, Wang K, et al. Perioperative beta-blocker therapy and mortality after major noncardiac surgery. N Engl J Med 2005;353:349-61.
Lindenauer PK, Pekow P, Wang K, Gutierrez B, Benjamin EM. Lipid-lowering therapy and in-hospital mortality following major noncardiac surgery. JAMA 2004;291:2092-9.
Best WR, Khuri SF, Phelan M, et al. Identifying patient preoperative risk factors and postoperative adverse events in administrative databases: results from the Department of Veterans Affairs National Surgical Quality Improvement Program. J Am Coll Surg 2002;94:257-66.

## 2.     Timelines and Deliverables:

The deliverables for this project are a preliminary report, a final report, and a manuscript. The table below shows the deliverables counted in months from our receipt of a fully executed contract.

| Months from receipt of fully executed Contract | Deliverable | Description |
|---|---|---|
| 3 | Preliminary Report | Report based exclusively on electronic data from Premier |
| 7 | Final Report | Report with supplemental data provided by medical record review and sensitivity analyses |

## 3.     Compensation:

As compensation for the Services, Bayer agrees to pay i3 Drug Safety a fee of $700,000; which shall become payable in accordance with the following payment schedule:

| MILESTONE/TASK | PAYMENT AMOUNT |
|---|---|
| Execution of Agreement | $140,000 |
| Access of Premier Dataset | $140,000 |
| Delivery of Preliminary Report | $140,000 |
| Completion of Chart Abstraction | $140,000 |
| Delivery of Final Report | $140,000 |