# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
-  -  -

CASE NO. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON


IN RE:  TRASYLOL PRODUCT
        LIABILITY LITIGATION – MDL 1928


This Document Relates to All Actions.

-  -  -

C O N F I D E N T I A L

-  -  -

February 11, 2009

-  -  -

Videotape deposition of

JENNIFER A. MAURER, R.Ph., Ph.D. held at

the Four Points Sheraton, 800 East Park

Drive in Harrisburg, Pennsylvania

commencing at 9:17 a.m., on the above date,

before Linda Rossi Rios, RPR, CCR and

Notary Public.


-  -  -
GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 301

1  Dr. Kress publishing his paper?

2       A.    We certainly had additional

3  questions.  So in the form that it was

4  in, I think that that would be

5  concerning.  So no.

6       Q.    Okay.  Do you know whether

7  Dr. Kress' study was ever disclosed to

8  the FDA?

9       A.    I do not know that.

10      Q.    Okay.  Sitting here today

11  and having been a Bayer employee for the

12  number of years that you were and working

13  in the scientific communications

14  division, did Bayer have an obligation to

15  disclose Dr. Kress' findings to the FDA?

16      A.    They weren't individual

17  patient data.  They were not clear with

18  respect to understanding the acuity of

19  the base population.  So I don't think

20  that they rose to the level of being a

21  required submission regarding safety.

22  They were incomplete.

23      Q.    What is the basis for your

24  understanding of that?

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 302

1          A.    Individual patient data

2    where you can -- and you have a full and

3    complete dataset or relatively complete

4    dataset on that individual case.

5          Q.    Okay.  Let me hand you a --

6    what we're going to mark as Plaintiffs'

7    next numbered exhibit which is

8    Exhibit 14.

9                     -   -   -

10               (Exhibit Maurer-14, U.S.

11          Food and Drug Administration Title

12          21--Food and Drugs Chapter I--Food

13          and Drug Administration Department

14          of Health and Human Services

15          Subchapter--Drugs for Human Use,

16          was marked for identification.)

17                     -   -   -

18    BY MR. OSBORNE:

19          Q.    And for the record, let

20    me -- let me represent that I've handed

21    to you U.S. Food and Drug Administration

22    Title 21 -- Food and Drugs, part 314 --

23    application for FDA approval to market a

24    new drug, and then under subpart B,

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 303

1    section 314.81 "Other postmarketing

2    reports."  Postmarketing obviously means

3    that once the drug is put on the market

4    and it's been approved, then there are

5    other postmarketing obligations that a

6    company still has with the FDA --

7           A.    Yes.

8           Q.    -- even though the drug is

9    on the market.  Correct?  Is that right?

10          A.    Yes.

11          Q.    And you're familiar with

12   obligations in general that in its

13   obligation and rule to be responsible for

14   safety surveillance, Bayer has an

15   obligation to provide postmarketing

16   reports to the FDA as it becomes aware of

17   certain safety data during the course of

18   the time the market -- I mean the drug is

19   on the market.  Correct?

20          A.    Yes.  But I -- to comment on

21   this, I have to be able to look at it.

22          Q.    I understand.  I'm just --

23   I'm not asking you to comment on it yet.

24   I'm just asking you questions in general.

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 304

1    Okay.  I'm just saying in general, in

2    case this is played to a jury, they need

3    to understand, I'm trying to get them to

4    understand, that just once a drug goes on

5    the market, that's not the end of the

6    story.  Correct?

7            A.    No.

8            MR. SCHOON:  Objection.

9  BY MR. OSBORNE:

10           Q.    The company still has an

11   obligation as it receives additional

12   safety information to provide

13   postmarketing reports to the FDA.

14   Correct?

15           A.    Yes.

16           Q.    Okay.  And that's part of

17   its obligation and rule, to be

18   responsible for safety surveillance.

19   Correct?  Part of Bayer's obligation.

20   Correct?

21           A.    This doesn't say obligation.

22   It says --

23           Q.    No, no, no.  I'm not asking

24   you about that.

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 305

1          A.     -- other postmarketing

2     report.

3          Q.     I'm sorry.  I'm saying in

4     general, providing those types of

5     postmarketing reports is part of Bayer's

6     obligation --

7          A.     Yes.

8          Q.     -- to be responsible for

9     safety surveillance.  Correct?

10          A.     Yes.

11          Q.     Okay.  Now, let's take a

12     look at what I've handed you which is

13     section 314.81, "Other postmarketing

14     reports."  If you look at -- if you look

15     at section (b) where it says "Reporting

16     requirements," look at the first page.

17          A.     Can I just look at the whole

18     document, please?

19          Q.     Oh, sure.  I'm sorry.  Go

20     ahead.

21          A.     Okay.

22          Q.     Okay.  Have you had a chance

23     to review this?

24          A.     Briefly.

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 306

1          Q.    Okay.   I'm only going to ask

2     you about a couple sections of it.   But

3     take a look at 314.81(b) "Reporting

4     requirements."   Do you see where it says

5     "Each applicant shall submit to the Food

6     and Drug Administration at the specified

7     times two copies of the following

8     reports."   And then it lists, if you turn

9     over to page 2, examples of the reports

10    that it's looking for.   Do you see that?

11          A.    Okay.

12          Q.    All right.   Take a look at

13    number 2, "Annual report.   The applicant

14    shall submit each year within 60 days of

15    the anniversary date of U.S. approval of

16    the application, two copies of the report

17    to the FDA division responsible for

18    reviewing the application."   Did I read

19    that correctly?

20          A.    Yes.

21          Q.    Okay.   Each annual report is

22    required to be accompanied by a completed

23    transmittal form, FDA 2252, and must

24    include -- must include all the

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 307

1      information required under this section

2      that the applicant received or otherwise

3      obtained...  Did I read that correctly?

4              A.    Yes.

5              Q.    "...during the annual

6      reporting interval that ends on the U.S.

7      anniversary date.  The report is required

8      to contain in the order listed," and then

9      it lists the things the report is

10     required to contain.  Correct?

11             A.    Yes.

12             Q.    All right.  Let's turn over

13     the page.  Under number Roman Numeral

14     (vi), "Clinical data," the report, the

15     yearly report, postmarketing report to

16     the FDA should include "Published

17     clinical trials of the drug (or abstracts

18     of them)..."  Correct?

19             A.    Uh-huh.

20             Q.    Yes?

21             A.    Yes.

22             Q.    "...including clinical

23     trials on safety and effectiveness;

24     clinical trials on new uses;

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 308

1    biopharmaceutic, pharmacokinetic, and

2    clinical pharmacology studies..."

3    Correct?

4            A.    Yes.

5            Q.    All right.  And then you

6    read the next sentence.

7            A.    Or analysis --

8            Q.    No, "...and reports..."

9            A.     ...and reports of clinical

10   experience pertinent to the safety (for

11   example, epidemiological or analyses of

12   experience in a monitored series of

13   patients) conducted by or otherwise

14   obtained by the applicant.

15           Q.    Okay.  So let's go back.

16   Let's take a look at that.  So in the

17   postmarketing reports, the FDA requires

18   that once a year, that Bayer provide

19   information that's relevant to reports of

20   clinical experience pertinent to safety

21   or analysis of experience in a monitored

22   series of patients conducted by or

23   otherwise obtained by the applicant.  So

24   it doesn't matter if Bayer didn't do the

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 309

1    study.  If it's done somewhere else and

2    Bayer obtains the information, it's

3    required to be included in the

4    postmarketing report, at least based on

5    this.  Correct?

6              MR. SCHOON:  Object to form.

7              THE WITNESS:  They're not

8         published clinical trials.

9    BY MR. OSBORNE:

10             Q.    I understand that.

11             A.    No, I'm stating this

12   paragraph appears to be specifically

13   addressing published clinical trials.

14             Q.    No.

15             A.    Review articles, papers.

16             Q.    No.  And reports of clinical

17   experience.  Do you see that?

18             A.    Okay.

19             MR. SCHOON:  Object to form.

20             THE WITNESS:  Okay.

21   BY MR. OSBORNE:

22             Q.    Okay.  Clinical trials and

23   reports of clinical experience.  Correct?

24             MR. SCHOON:  Object to form.

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 310

1          THE WITNESS:  It does state

2      that after the semicolon, yes.

3  BY MR. OSBORNE:

4      Q.    Okay.  So presuming that

5  this report is talking about reports of

6  clinical experience pertinent to safety,

7  where you're studying patients in a

8  monitored setting, sounds exactly like

9  what Dr. Kress did.  In other words, he

10  looked at patients in a monitored

11  setting.

12      A.    A monitored setting, I don't

13  think so.  I don't think that -- when I

14  think of a monitored series of patients,

15  you're looking at a prospectively

16  constructed and gathered a specific

17  series of data, not looking

18  retrospectively at observational dataset.

19      Q.    You don't think that -- you

20  don't think that Dr. Kress' patients in a

21  hospital who underwent CABG surgery were

22  monitored as patients in a hospital?

23          MR. SCHOON:  Object to form.

24          THE WITNESS:  They were

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 311

1        monitored as patients, but not as

2        a series of data collections.

3        They weren't --

4  BY MR. OSBORNE:

5        Q.    They --

6        A.    It was a retrospective

7  review of observational sets.

8        Q.    They ultimately were part of

9  an observation when Dr. Kress did his

10  retrospective study.  Correct?

11              MR. SCHOON:  Object to form.

12              THE WITNESS:  Yes, but that

13        was post hoc analysis.

14  BY MR. OSBORNE:

15        Q.    Okay.  So in looking at the

16  FDA requirements that required reports of

17  clinical experience from outside the

18  field be submitted to the FDA, once Bayer

19  is aware of it -- first off, sitting here

20  today, you have no idea whether Dr.

21  Kress' report was ultimately submitted to

22  the FDA?

23              MR. SCHOON:  Object to form.

24              THE WITNESS:  I do not know

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 312

1          affirmatively that it was.

2     BY MR. OSBORNE:

3          Q.    Okay.  Do you know whether

4     Bayer was in violation of section 314.81

5     by not sending it to the FDA?

6               MR. SCHOON:  Objection.

7          Form.  Calls for a legal

8          conclusion.

9               THE WITNESS:  I did not know

10         that.

11    BY MR. OSBORNE:

12         Q.    Is it possible they were in

13    violation of the FDA code, possible they

14    weren't, you just don't know.  Correct?

15              MR. SCHOON:  Objection to

16         form.

17              THE WITNESS:  I am not aware

18         of this, and nor was I at the

19         time -- this is a 2009 document,

20         at the time of this data here,

21         which is 2003.

22    BY MR. OSBORNE:

23         Q.    So whether this obligation

24    was present in 2003, you don't know?

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 313

1                  MR. SCHOON:  Objection to

2          form.

3                  THE WITNESS:  I would need

4          to have clarity on timing, yes.

5      BY MR. OSBORNE:

6          Q.    In looking at Dr. Kress'

7      study, when the results of -- when the

8      results became available to you and other

9      people at Bayer, do you recall what the

10     reaction was to his findings?

11         A.    I recall that there was

12     concern regarding the inherent bias in

13     his dataset.

14         Q.    Was there concern about the

15     fact that his finding as it pertained to

16     renal function and mortality could be

17     published and people could find out about

18     it?

19         A.    Well, the -- that was

20     secondary to the issue of whether he

21     conducted a good study as we were very

22     interested in addressing atrial

23     fibrillation as was outlined in the

24     proposal, that was the main objective.

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 350

1        A.    That's part of what
2    happened, yes.
3        Q.    Okay.  So the FDA called a
4    specific meeting because of the
5    publication of observational data.
6    Correct?
7        A.    Yes.
8        Q.    Dr. Kress' study and the
9    Saint George's study are observational
10   data.  Correct?
11       A.    Yes.  And I think their
12   conclusions regarding Mangano were
13   appropriate.
14       Q.    Do you know when the Saint
15   George's study, although it was finalized
16   in December of 2003, when it was actually
17   disclosed to the FDA?
18       A.    I believe it was disclosed
19   at the time of the disclosure of the i3
20   study.
21       Q.    So sometime after the
22   September 2006 advisory committee meeting
23   was held.  Correct?
24       A.    I believe so.

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 351

1          Q.    Okay.  So almost three years

2     after the results were final and reported

3     to Bayer, Bayer then turned around and

4     disclosed the results of the Saint

5     George's study to the FDA.  Is that your

6     understanding?

7               MR. SCHOON:  Objection.

8          Form.

9               THE WITNESS:  That appears

10         to be what happened.

11    BY MR. OSBORNE:

12         Q.    Do you know why that

13    happened?

14         A.    I think from the

15    communications with FDA, there is a

16    desire to be fully disclosing in their

17    release of documents to the FDA, not just

18    on our randomized controlled clinical

19    trial database, but every possible scrap

20    of paper.

21         Q.    You talked about how

22    important it is to do randomized

23    controlled trials and why in general

24    they're better than the data you can get

a26fbf2f-a24d-4fa1-a81f-a8af299ebae8

Page 446

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

-   -   -

CASE NO. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON


IN RE:   TRASYLOL PRODUCT
         LIABILITY LITIGATION - MDL 1928


This Document Relates to All Actions.

-   -   -

C O N F I D E N T I A L

-   -   -

February 12, 2009

-   -   -

Continued videotape

deposition of JENNIFER A. MAURER, R.Ph.,

Ph.D., held at the Four Points Sheraton,

800 East Park Drive in Harrisburg,

Pennsylvania commencing at 8:41 a.m., on

the above date, before Linda Rossi Rios,

RPR, CCR and Notary Public.


-   -   -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 635

1          questions that went back to the

2          vendor.  I wasn't privy to any of

3          that.  How am I going to make a

4          statement on your hypothetical

5          based on -- based on a lack of

6          data?

7   BY MR. OSBORNE:

8          Q.    You've never seen the

9   questions that were generated and the

10  answers?  You never got curious and

11  looked at it?

12         A.    I certainly had plenty of

13  work to do.

14         Q.    So you didn't look?

15         A.    I may have had copies.  I

16  had -- we had work product moving forward

17  in preparation for a second AdCom.  At

18  some point we were waiting for additional

19  data to come in from this i3 company.  At

20  some point I was -- I was, you know,

21  waiting.  But was I scrutinizing this

22  interaction?  No.

23         Q.    Okay.  Do you know who Mr.

24  Hiatt is from the FDA?

48a187e9-b85c-4245-a658-cde573bc7eba

Confidential - Jennifer A. Maurer, R.Ph., Ph.D.

Page 636

1      A.    I believe he was the chief

2  leader.

3      Q.    He was the chair of the

4  advisory committee.  Right?

5      A.    Chair, yes.

6      Q.    Do you have an understanding

7  that after he found out about the i3

8  results, that he basically said that if

9  those had been disclosed to him, he would

10  have recommended at that time suspending

11  the drug from the market?  Do you have an

12  understanding of that?

13           MR. SCHOON:  Object to form.

14           THE WITNESS:  If that was

15       his statement, yes.

16  BY MR. OSBORNE:

17      Q.    But all of this information

18  in terms of what questions were asked and

19  even though that was his position, you

20  didn't -- you didn't feel like it was

21  important to investigate this?

22           MR. SCHOON:  Objection.

23       Form.

24           THE WITNESS:  I didn't say

48a187e9-b85c-4245-a658-cde573bc7eba