UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to **ALL ACTIONS**
_____/

### BAYER'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT MARK J. EISENBERG

Plaintiffs' Opposition mischaracterizes the opinions Bayer has moved to exclude, the opinions Dr. Eisenberg offers, the standards governing admissibility, and the manner in which Dr. Eisenberg attempts to support his opinions. Plaintiffs fail to salvage the challenged testimony.

Bayer moved to exclude Dr. Eisenberg's testimony about five subjects: (1) the lysine analogues' alleged superiority over Trasylol in CABG surgery, (2) Trasylol's alleged association with myocardial infarction ("MI") and graft occlusion, (3) Bayer's alleged breach of unidentified "ethical standards" by not responding to alleged "safety signals," (4) Trasylol's marketing assertedly driving physicians' widespread use of the medication, and (5) Trasylol's alleged prothrombotic or procoagulatory mechanism of action. Motion (Docket Entry 3074) at 3-14.[1]

Plaintiffs offer no substantive response regarding the last three opinions. They instead claim that "Dr. Eisenberg has not offered an expert opinion in any of those areas."

---

[1] Bayer did not move to exclude Dr. Eisenberg's supposed risk-benefit opinion, *see* Opp. at 16 (Opinion 5), because Dr. Eisenberg did not offer such an opinion. Plaintiffs do not cite his report or deposition to support the claim that he did. If Dr. Eisenberg had offered such an opinion, it would be inadmissible for the reasons set forth in Part I of Bayer's motion and Part II of this reply.

1

Opp. (D.E. 3840) at 16-17 n.35.  But Dr. Eisenberg has opined on all of them.  *See infra* § I.  If plaintiffs believed otherwise, they could have stipulated not to offer such testimony.  *Cf. Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 901-902 (N.D. Ill. 2001) (stipulating that expert would not testify about topics challenged in motion *in limine*).  Because they have not done so, Bayer's motion remains ripe and meritorious.  *See infra* § I.

Plaintiffs fail to establish the admissibility of Dr. Eisenberg's opinions regarding the alleged superiority of the lysine analogues and Trasylol's alleged link to MI and graft occlusion.  Plaintiffs focus on the standards governing motions to exclude expert testimony, *see* Opp. at 17-21, and the significance of an expert's qualifications to the reliability of his testimony, *id.* at 21-22.  In effect, they argue (mistakenly) that expert testimony is presumptively admissible and that, because Dr. Eisenberg is a qualified epidemiologist, his testimony is presumptively reliable and admissible.[2]  Because these arguments are relevant to all of Bayer's motions directed at plaintiffs' generic experts, *see*, *e.g.*, Parikh Opp. (D.E. 3841) at 3 (incorporating Eisenberg Opp. by reference), they are addressed in detail here.  Bayer addresses the arguments specific to Dr. Eisenberg's lysine analogue and MI/graft occlusion opinions in Part II, below.

Plaintiffs badly mischaracterize the standard for admissibility of expert testimony, arguing that it "'is a liberal one'" and "[c]ourts are to start with the assumption that a well-qualified expert's testimony is admissible."  Opp. at 17; *id.* at 18 (exclusion is "'the exception rather than the rule'").  They imply that *United States v. Frazier*, 387 F.3d 1244, 1294 (11th Cir. 2004), supports these propositions, but fail to mention that all of their *Frazier* citations are to a

---

[2] Plaintiffs also mischaracterize the record by stating that "numerous courts have previously admitted expert testimony from Dr. Eisenberg." Opp. at 21.  Despite Dr. Eisenberg's mass solicitations to plaintiffs' counsel, *see* Motion at 1, he acknowledged "I have only testified twice." Eisenberg Dep. (Ex. L attached hereto) at 22:13.

*single judge's opinion dissenting* from the otherwise unanimous en banc court. *See* 387 F.3d at 1294 (Birch, J., dissenting). The en banc court held that a "*rigorous* … inquiry" is required before expert testimony will be admitted. *Frazier*, 387 F.3d at 1260 (majority) (emphasis added). Far from suggesting that there is a thumb on the scale in favor of admissibility, the Eleventh Circuit holds that the proponent of expert testimony "*always* bears the burden" of demonstrating admissibility, *id.* (emphasis added), and that burden is "substantial," *Cook ex rel. Tessier v. Sheriff*, 402 F.3d 1092, 1107 (11th Cir. 2005).

Plaintiffs also argue that "qualifications and professional stature" alone are "circumstantial evidence of the reliability of his methods." Opp. at 22. This too is wrong. "[T]he basic requirements – qualification, reliability, and helpfulness – … remain distinct concepts and the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260. It is imperative not to conflate qualifications and reliability because "[m]ost junk science is the work of people with Ph.D. degrees and academic positions." *United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008) (Easterbrook, C.J.); *accord Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory. '[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.'"); *Goebel v. Denver & Rio Grande W.R.R. Co.,* 215 F.3d 1083, 1088 (10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate.").[3]

---

[3] Ignoring the governing rules in the Eleventh Circuit and its sister circuits, plaintiffs cite two stray decisions of an out-of-circuit district court (*Malletier* and *Fosamax*), as well as the pre-*Daubert* decision (*Downing*) and the inapposite post-*Daubert* case (*Ambrosini*) upon which *Malletier* and *Fosamax* rely. Opp. at 22. *Ambrosini* did not apply the rule plaintiffs seek, but simply noted that "several [other] circuits have treated [qualifications] as circumstantial evidence of" reliability. *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996). Moreover, *Ambrosini* pointed to the Eleventh Circuit's now *overruled* decision in *Joiner v. General Electric*

3

Stripped of these purported presumptions in favor of admissibility, plaintiffs' arguments for admitting Dr. Eisenberg's testimony concerning the alleged superiority of the lysine analogues and Trasylol's alleged association with MI and graft occlusion are threadbare. *See infra* § II.  Plaintiffs ignore the record about how Dr. Eisenberg formed these opinions, and instead seek to substitute counsel's views on the scientific evidence for Dr. Eisenberg's opinions.  But, as an MDL court explained in rejecting a similar effort involving another expert designated by plaintiffs here, "the arguments and extrapolations of counsel alone are not sufficient to prove the reliability of the experts' conclusions.  If Dr. Parisian was unable to explain why these studies help inform her conclusion …, Plaintiffs' counsel cannot fill in the gaps."  *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 667 (D.N.J. 2008).

I.   **DR. EISENBERG'S TESTIMONY ABOUT THE SUBJECTS ON WHICH PLAINTIFFS MISTAKENLY CLAIM HE DOES NOT OPINE SHOULD BE EXCLUDED.**

   A.   **Dr. Eisenberg, In Fact, Offers Ethics Opinions Regarding Trasylol, And Testimony About That Subject Is Inadmissible.**

Bayer's motion (at 10-12) demonstrated that Dr. Eisenberg offers inadmissible testimony that Bayer breached an undefined "ethical" duty to conduct certain studies in response to alleged safety signals.  Plaintiffs now suggest that Dr. Eisenberg is not offering an opinion about ethical standards.  Opp. at 34 (characterizing the opinion as whether "Trasylol studies raised serious safety issues warranting further investigation"); *id.* at 35 (same).  This is disingenuous.

Dr. Eisenberg's report and testimony, as well as plaintiffs' Opposition, illustrate that the challenged opinion is no more than Dr. Eisenberg's subjective take on ethics and the

---

*Co.*, 78 F.3d 524, 532 (11th Cir. 1996), as the lead proponent of that view.  *See Ambronsini*, 101 F.3d at 140 (citing *Downing* and a Ninth Circuit decision as the "several [other] circuits").  The Supreme Court repudiated the Eleventh Circuit's former view, holding that the "*ipse dixit* of the expert" cannot save unreliable methods.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

alleged duties of pharmaceutical companies.  The report charged:  "In my opinion, it was the responsibility of Bayer to examine this relationship [between Trasylol and renal dysfunction] in a detailed and direct manner much earlier ...."  Eisenberg Report (Ex. B[4]) at 7-8; *see id.* at 10 ("[t]hese issues [safety signals] should have been addressed much earlier by Bayer"); *id.* at 12 ("it was the responsibility of Bayer to conduct … head to head trials").  An expert's opinion must have a reliable foundation.  Fed. R. Evid. 702.  However, Dr. Eisenberg's testimony shows that his opinions about Bayer's alleged "responsibilit[ies]" have *no* foundation except his own notion of what is ethical.  For instance, Dr. Eisenberg could not identify "[w]hat standard," "[w]hat rule, regulation, obligation, [or] what source of duty" supported his claims.  Eisenberg Dep. (Ex. A) at 201-02.  After opining that companies "have got to go the extra mile" and "need to put the patients' best interests at heart," *id.* at 202, Dr. Eisenberg was asked to identify "any source of authority … outside of your personal opinion" for the opinions in his report and related testimony regarding the responsibility to conduct further studies in response to alleged "safety signals," *id.* at 202-03; *id.* at 203-4 (same).  Yet, as plaintiffs concede, Dr. Eisenberg identified *nothing* outside of his "'hope that there would be an ethical standard'" that imposed the duties on Bayer that he claims it breached.  *Id.* at 204 (*quoted in* Opp. at 35); *see* Motion at 11-12.  Accordingly, Dr. Eisenberg's testimony should be excluded for lack of foundation and because it falls into precisely the prejudicial trap that plaintiffs claim he avoids:  It encourages "the jury [to] mistake inherently subjective standards for ethical behavior held by the expert for industry practices or legal standards."  Opp. at 37.

---

[4] Other than Exhibit L, which is attached hereto, all other references to exhibits refer to the exhibits attached to Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Mark J. Eisenberg  (D.E. 3074).

5

Finally, regardless of how Dr. Eisenberg's testimony is characterized, he clearly seeks to testify that Bayer had a duty. Plaintiffs fail to respond to Bayer's showing that the existence of a duty is a question of law for the Court, not a subject for expert testimony. Motion at 10-11 (collecting authority); *see also* Opp. at 35 (admitting that Dr. Eisenberg is not "an expert on FDA regulations"). In all events, therefore, Dr. Eisenberg's testimony must be excluded.[5]

### B.  Dr. Eisenberg Also Offers Inadmissible Opinions About Bayer's Marketing.

Bayer showed that Dr. Eisenberg opines about Bayer's marketing of Trasylol, Motion at 12 (quoting Report, Ex. B, at 12), and that the opinion is inadmissible because Dr. Eisenberg acknowledged that he was unqualified and had no foundation upon which to testify about the subject, *id.* at 13. Plaintiffs' response that Dr. Eisenberg referred to "marketing as one factor (among others) that led to Trasylol being used" does not save the opinion. Opp. at 38. Dr. Eisenberg pointedly identified marketing as the lead reason why Trasylol allegedly was used over the lysine analogues. Eisenberg Report (Ex. B) at 12 ("The fact that aprotinin was used so widely over the course of many years was largely due to marketing but was also due to fact that most of the trials were placebo-controlled rather than head to head trials."). Moreover, irrespective of whether Dr. Eisenberg believes that marketing was "one factor" or the sole factor, he remains unqualified and without foundation to testify about this subject. Any opinion about Bayer's marketing or its effect on the use of Trasylol is pure speculation by Dr. Eisenberg and should be excluded.

### C.  Dr. Eisenberg Also Opines About Trasylol's Mechanism Of Action, And That Testimony Is Inadmissible.

---

[5] For this reason especially, plaintiffs' attempt to salvage Dr. Eisenberg's testimony by claiming that Bayer's experts offer the same type of opinions is baseless. *See* Opp. at 35 (noting article by Dr. Thisted); *id.* at 36 (quoting Dr. Weintraub's testimony). Neither Dr. Thisted nor Dr. Weintraub suggests that he will testify about a pharmaceutical company's duties or whether those duties were breached.

Bayer showed that, although Dr. Eisenberg admits that he "'[is] not an expert in terms of [Trasylol's] mechanism,'" he opines that Trasylol has a prothrombotic or procoagulatory effect that allegedly increases the risks associated with the medication. *See* Motion at 13 (citations omitted); *see also*, *e.g.*, Eisenberg Report (Ex. B) at 3-4 ("Aprotinin: Mechanism of Action Summary"). In response, plaintiffs argue that, because Dr. Eisenberg purportedly is not "actually offer[ing] any substantive opinions regarding . . . [Trasylol's] mechanism of action," his testimony is admissible. Opp. at 38; *id.* at 39 (same). This argument is mistaken for several reasons.

First, plaintiffs cite no authority for the proposition – and Bayer is aware of none – that an expert may offer "non-substantive" testimony about a scientific or technical area without satisfying the requirements of Rule 702 and *Daubert*. Second, the Opposition repeatedly reveals that plaintiffs are attempting to use mechanism evidence in a substantive manner – to argue that Trasylol carries heightened risks. *See* Opp. at 3 (discussing "physiological mechanism for the startling safety signals," and calling other data "significant as an early indicator of the mechanism of action by which Trasylol causes injury, *namely its role as a coagulant*, and as support for the biological plausibility of *thrombosis-related injury in multiple organs*") (emphasis added); *id.* at 39 (acknowledging that Dr. Eisenberg is attempting to use the mechanistic hypothesis to support his causation opinions).

Finally, plaintiffs' argument that Dr. Eisenberg is not precluded "from mentioning biological plausibility and consistency with hypothesized mechanisms of action for Trasylol as criteria which he considered when arriving at his causation opinion" is simply wrong on the law. *Id.* Dr. Eisenberg must be qualified and have reliable data to support *every* step of the method that underlies his causation opinion. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) ("*any* step that renders the analysis unreliable under the *Daubert factors renders the*

7

*expert's testimony inadmissible*") (emphasis in original); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296, 1302-303 (M.D. Fla. 2007) (excluding general causation expert because his "theory does not show the reliability of each step").

## II. THE COURT SHOULD EXCLUDE DR. EISENBERG'S TESTIMONY ABOUT THE SUPPOSED SUPERIORITY OF THE LYSINE ANALOGUES, AS WELL AS TRASYLOL'S ALLEGED MI AND GRAFT OCCLUSION RISKS.

Bayer also moved to exclude Dr. Eisenberg's testimony that both lysine analogues (aminocaproic acid and tranexamic acid) are superior to Trasylol for use in CABG surgery and that Trasylol causes increased risks of MI and graft occlusion. Bayer demonstrated that Dr. Eisenberg failed to adhere to his self-described "totality of the evidence" method and that the data he cherry-picked are insufficient to establish reliable expert testimony. Motion at 3-9.

In response, plaintiffs gloss over these showings, as well as Dr. Eisenberg's testimony – indeed, their 40-page brief cites his deposition only nine times. Instead, plaintiffs' counsel seeks to testify on Dr. Eisenberg's behalf by pointing to, and making new arguments from, studies that Dr. Eisenberg's 170-plus page report cites in passing and that he testified were *not* the basis of the challenged opinions. This fails to establish admissibility. *See Rimbert v. Eli Lilly & Co.*, No. 06-0874, 2009 WL 2208570, at *17 (D.N.M. July 21, 2009) (rejecting counsel's similar efforts that "essentially ask[ed] the Court to find [expert's] methodology reliable because of the information used in counsel's attempt to supplement and bolster her report"); *In re Human Tissue Litig.*, 582 F. Supp. 2d at 667 (holding that "the arguments and extrapolations of counsel alone are not sufficient to prove … reliability," and prohibiting counsel from "fill[ing] in the gaps" in expert's testimony); *cf. Brevard Emergency Servs., P.A. v. EmCare, Inc.*, No. 6:04-cv-1892-Orl-28JGG, 2006 WL 2425423, at *6 (M.D. Fla. Aug. 21, 2006) ("An expert must 'bring to the jury more than the lawyers can offer in argument.'") (citation omitted).

8

> A. **Counsel's Attempt To Rewrite Dr. Eisenberg's Opinions On MI And Graft Thrombosis Does Not Establish An Admissible Expert Opinion.**

Bayer's motion (at 8-9) showed that Dr. Eisenberg lacks sufficient foundation upon which to base testimony that Trasylol is associated with increased risks of MI and graft occlusion. Dr. Eisenberg, for instance, testified: "in my review of the literature, I was *not convinced* that this was a consistent association but . . . I was very impressed by . . . the Cosgrove study and also the Image trial." Eisenberg Dep. (Ex. A) at 300:14-18 (emphasis added); *id.* at 301:3-5 ("I am not saying [a signal between Trasylol and MI is] not there, but we need large adequately powered studies [*to demonstrate if it is*.]"). Moreover, Dr. Eisenberg conceded that the Image trial (Alderman) concluded that Trasylol "'did not affect the occurrence of MI'" and the observed "'graft occlusion [wa]s not due to aprotinin,'" and the Cosgrove study was not statistically significant and its results were never repeated. Motion at 9 (citations omitted); *see id.* at 8 (numerous trials found no association).

In response, plaintiffs ignore the record. *Cf.* Opp. at 30-31 (discussing Cosgrove and Image without recognizing their limitations or Dr. Eisenberg's concessions). Instead, counsel suggests that Mangano (2006 and 2007) and BART provide sufficient foundation for Dr. Eisenberg's opinion. *See id.* at 29-31. This is wrong for several reasons. First, counsel ignores that, although Dr. Eisenberg referred to Mangano and BART throughout his deposition, he disavowed reliance on those studies for the opinion in question:

> Q. Any other studies [besides Cosgrove and Image] on which you are relying for the opinion that there is indirect evidence for the association between aprotinin use and myocardial infarction?
> A. No.

Eisenberg Dep. (Ex. A) at 302:4-8.[6]  Plaintiffs cannot "salvage [Dr. Eisenberg's] proposed testimony" by "fill[ing] in" his opinion and attempting "to explain why [certain] studies help inform [his] conclusion."  *Human Prods. Tissue Liab. Litig.*, 582 F. Supp. 2d at 667.

Additionally, plaintiffs misunderstand the burden they must bear to demonstrate that Dr. Eisenberg's MI and graft thrombosis opinions are admissible.  Although plaintiffs concede that "none of [five meta-analyses to which Bayer points] demonstrated a statistically significant association" between Trasylol and MI, Opp. at 32, they criticize Bayer for not definitively proving the lack of an association.  *See id.* at 29 ("that meta-analysis [*sic*] have not demonstrated an association is … *not* proof that an association is lacking"); *id.* at 32 (same).  However, Bayer need not prove the conclusion it favors (no association) in order to show that Dr. Eisenberg lacks foundation to testify that an association exists.  Whether the studies cited by Bayer showed "'no association'" or are merely "'indeterminate'" is immaterial.  *Id.* at 32.  *Plaintiffs* must carry the "substantial burden" of establishing a reliable foundation for Dr. Eisenberg's claim that there *is* an association or other "causal relationship between Trasylol and MI."  *Id.*; *see Tessier*, *supra.*  They fail to do so.  Instead, they essentially ask this Court to hold that "findings [that] do not *exclude* an increased risk of MI," Opp. at 33, allow Dr. Eisenberg to testify that not only is there an increased risk, but that Trasylol is responsible for the alleged association.  *See id.* at 32 ("That there is not a definitive study concluding that Trasylol is associated with MI is more a product of study-size limitations than evidence that a causal

---

[6] Additionally, plaintiffs misrepresent those studies by conflating increased risks of mortality with the increased MI risk at issue here.  *See* Opp. at 30 (discussing Mangano 2007's "long term mortality" results); *id.* at 31; *cf.* Eisenberg Report (Ex. B) at 75-79 (discussing Mangano 2007 without reference to MI-related findings).

conclusion is lacking support.").[7]  Doing so would allow law to lead science.  *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (excluding expert testimony because "[l]aw lags science; it does not lead it").  Dr. Eisenberg's opinions therefore are inadmissible.

      **B.**      **Dr. Eisenberg's Testimony That Both Lysine Analogues Are Superior Alternatives To Trasylol For Use In CABG Is Inadmissible.**

In moving to exclude testimony about the alleged superiority of the lysine analogues over Trasylol during CABG surgery, Bayer showed that Dr. Eisenberg failed to apply the very methodology that he said was essential to sound epidemiology.  Motion at 3-8.  Dr. Eisenberg testified that a "totality of the evidence" review is necessary, but admitted he did not conduct such an analysis of the lysine analogues.  *See id.*  Indeed, he admitted a basic lack of familiarity with the drugs, including that neither is approved for use in CABG.  *Id.* at 5-6.  In addition to Dr. Eisenberg's failure to meet his own methodological standards, Bayer showed that the data upon which he relies does not provide a sufficient foundation to claim superiority.  *See id.* at 5, 7-8.

In response, plaintiffs again ignore Dr. Eisenberg's testimony about the limitations of his testimony, attempt to fill out his opinion with evidence that he did not discuss (or which Bayer showed is insufficient to demonstrate superiority), and mischaracterize his qualifications and foundation to testify about the cost component of the lysine analogues' alleged superiority.  Opp. at 23-29; *see supra* § I.A.  Plaintiffs' response does not cure Dr. Eisenberg's

---

[7] Dr. Eisenberg contends only that there is "indirect evidence of an association" between Trasylol and MI.  Eisenberg Report (Ex. B) at 12; Eisenberg Dep. (Ex. A) at 300-302; *see also* Eisenberg Report (Ex. B) at 13 ("may be associated with a higher incidence of graft occlusion").  As noted above, however, plaintiffs' counsel now attempts to stretch Dr. Eisenberg's opinion into one supporting "causation."  *E.g.*, Opp. at 34 ("Dr. Eisenberg's opinion that Trasylol can *cause myocardial infarction* is admissible . . .") (emphasis added).  There clearly is no reliable support for such a leap.

critical methodological shortcomings with respect to the three factors that Bayer and plaintiffs agree are essential to his superiority opinion: efficacy, *see* Opp. at 23, safety, *id.* at 24-25, and cost, *id.* at 27.

On efficacy, Dr. Eisenberg testified that "placebo[-]controlled double[-]blind randomized controlled trials are a gold standard oftentimes for efficacy." Eisenberg Dep. (Ex. A) at 130:5-23. Dr. Eisenberg, however, did not study how the lysine analogues performed versus placebo. *Id.* at 102:2-6 ("I know there are studies out there comparing the two … versus placebo or no treatment. But that was not … my area of interest here for the purpose of this report."). Moreover, the head-to-head trials newly identified by plaintiffs' counsel fail to provide evidence of *superior* efficacy for the lysine analogues over Trasylol. *See* Opp. at 23 & nn.41-43. Plaintiffs' own quotations of those studies show that tranexamic acid "'showed similar clinical effects,'" "'the same effect,'" and "'was equivalent'" to Trasylol, *id.* at 23; *see also id.* at 24 ("similar efficacies"), and plaintiffs have identified *no evidence* that aminocaproic acid had even similar efficacy, *see id.* at 23-25.

On safety, plaintiffs ignore Dr. Eisenberg's testimony that the lysine analogues "are not risk-free therapies" and their risks for use during CABG have been studied less extensively than Trasylol's. Eisenberg Dep. (Ex. A) at 192:7-21. Similarly, they do not account for Dr. Eisenberg's unwillingness, given his incomplete study, to testify "that the lysine analogues are safe for use in CABG surgery involving cardiopulmonary bypass." *Id.* at 190:19-22 ("I don't know if I stated that conclusion, but that's my impression ..."). Instead of offering Dr. Eisenberg's opinions, counsel give their own. *See* Opp. at 24-25; *contra Rimbert*, 2009 WL 2208570, at *17 (rejecting counsel's efforts "to supplement and bolster [expert's] report"); *Human Tissue Litig.*, 582 F. Supp. 2d at 667 (prohibiting counsel from "fill[ing] in the gaps" in

expert's testimony).[8]  Lastly, plaintiffs' attempt to attribute an experience-based opinion to Dr. Eisenberg in order to support admissibility is specious.  *See* Opp. at 26 ("A cardiologist, such as Dr. Eisenberg, may well conclude a modest increase in bleeding is preferable to an increased risk of death or other adverse health effect for the patient").  Dr. Eisenberg has never prescribed Trasylol or either lysine analogue, Eisenberg Dep. (Ex. A) at 89:5-16, nor has he performed open heart surgery, *id.* at 85:9-18.

On cost, plaintiffs dodge Bayer's points regarding Dr. Eisenberg's qualifications and foundation to opine about Trasylol's cost-effectiveness.  First, plaintiffs brush past Dr. Eisenberg's testimony that cost-effectiveness is outside a epidemiologist's traditional expertise (*see* Motion at 7), claiming "as an epidemiologist, Dr. Eisenberg is certainly qualified to assess the various studies that have performed cost-effectiveness analyses of Trasylol," Opp. at 27.  In purported support of this notion, plaintiffs cite *In re Fosamax*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009), where an "epidemiologist [was permitted] to opine regarding *risk-benefit* profile for drug treatment."  Opp. at 27 (emphasis added).  As Dr. Eisenberg testified, however, *risk-benefit* has nothing to do with *cost-benefit*, Eisenberg Dep. (Ex. A) at 200:21-25 ("[t]he cost of a medicine has nothing to do with whether a drug is safe"), and nowhere does *Fosamax* suggest otherwise. *See* 645 F. Supp. 2d 164 (no mention of "cost" or "price" in entire opinion).

Even if Dr. Eisenberg's co-authorship of articles "dealing with cost evaluations for medical treatments" generally qualified him to testify about cost-benefit, Opp. at 27, it would not cure the lack of foundation for testifying about *Trasylol*'s cost-effectiveness versus the lysine analogues.  Plaintiffs offer no response to Bayer's showing that only one study – which analyzed

---

[8] For instance, plaintiffs attempt to support Dr. Eisenberg's superiority opinion by relying on a 2009 meta-analysis reporting safety data from randomized control trials.  Opp. at 25 & n.46.  Dr. Eisenberg, however, was dismissive of safety information drawn from randomized control trials. *See* Eisenberg Dep. (Ex. A) at 130:5-23.

a small number of patients in a limited treatment setting and did not even involve both lysine analogues – has assessed the costs that Dr. Eisenberg described as relevant. Motion at 7. Instead, they merely reinvoke that same study, as well as two other studies that assessed only Trasylol's immediate price, not the downstream costs that Dr. Eisenberg identified as necessary to evaluate in order to render an opinion about cost-effectiveness. Opp. at 28; *see* Eisenberg Dep. (Ex. A) at 198:22-199:14; *see also* Opp. at 28-29 (again confusing their burden and criticizing Bayer for not citing published studies demonstrating that Trasylol's downstream costs are lower).

For these reasons, Dr. Eisenberg's opinion regarding the alleged superiority of the lysine analogues over Trasylol is not scientifically sound with respect to efficacy, safety, or cost. Even if it were only unreliable as to one of these measures, however, Dr. Eisenberg's testimony still would be inadmissible because all three are criteria are necessary to his overall opinion.

## CONCLUSION

For all these reasons and those set forth in Bayer's motion, the Court should exclude Dr. Eisenberg's testimony.

February 5, 2010                                        Respectfully submitted,

*/s/ Barbara Bolton Litten*
Patricia E. Lowry
Florida Bar No. 332569
E-mail: plowry@ssd.com
Barbara Bolton Litten
Florida Bar No. 91642
E-mail: blitten@ssd.com
**SQUIRE SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR**
     **& SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL  60603
Telephone:  312-494-4400
Facsimile:  312-494-4440

Eugene A. Schoon
Email:  eschoon@sidley.com
Susan A. Weber
Email:  saweber@sidley.com
Catherine Valerio Barrad
Email:  cbarrad@sidley.com
Eamon Joyce
Email:  ejoyce@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  312-853-7000
Facsimile:  312-853-7036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:  313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMENS CHERIN & MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:  412-566-6099

*Attorneys for Bayer Corporation,*
*Bayer HealthCare Pharmaceuticals Inc.,*
*and Bayer Schering Pharma AG*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                */s/ Barbara Bolton Litten*
                                Barbara Bolton Litten

# SERVICE LIST

### In re Trasylol Products Liability Litigation – MDL-1928
### Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON

### United States District Court
### Southern District of Florida

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone:  215-790-4584
Facsimile:  215-875-7701
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE & LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone:  561-684-2500
Facsimile:  561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509
*Liaison Counsel for Defendants*

Scott A. Love
Email:  slove@triallawfirm.
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-757-1400
Facsimile:  713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone:  203-610-6393
Facsimile:  203-610-6399
*Federal-State Liaison for Plaintiffs*