**Exhibit T**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION NO: 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS LIABILITY

LITIGATION -- MDL-1928

VIDEOTAPED DEPOSITION OF:

CURT DANIEL FURBERG, M.D., PH.D.

S T I P U L A T I O N S

    IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

    CURT D. FURBERG, M.D., PH.D.

may be taken before Lisa Bailey, Notary Public, State at Large, at Cory, Watson, Crowder & Degaris, 2131 Magnolia Avenue, Birmingham, Alabama, on September 29, 2009 commencing at approximately 9:10 a.m.

CURT D.   FURBERG, M.D., PH.D.

Page 5

1    I, Lisa Bailey, a court reporter of

2    Birmingham, Alabama, and a Notary Public for the

3    State of Alabama at large, acting as commissioner,

4    certify that on September 29, 2009 pursuant to

5    Rules of Civil Procedure and the foregoing

6    stipulation of counsel, there came before me at

7    Cory, Watson, Birmingham, Alabama, CURT FURBERG, M.D.,

8    witness in the above cause, for oral

9    examination, whereupon the following proceedings

10   were had:

11              CURT FURBERG, M.D., PH.D.,

12   being duly sworn, was examined and testified as

13   follows:

14                    EXAMINATION

15   BY MR. PHILLIPS:

16     Q.    Good morning, Dr. Furberg.

17     A.    Good morning.

18     Q.    Could you please state your full name?

19     A.    Curt Daniel Furberg.

20     Q.    Do you understand that you have been

21   designated by the plaintiffs as an expert witness in

22   the Trasylol litigation?

23     A.    I do.

CURT D.   FURBERG, M.D., PH.D.

Page 124

1   all of them are to generate hypotheses, I assure you.

2   They're done to present associations and describe

3   various relationships and distributions and so on.  So

4   it's -- I wouldn't limit it to say just

5   hypothesis-generating.  That's my view today.

6       Q.    In your view one of the purposes of the

7   observational studies is to generate hypotheses so they

8   can be studied in clinical trials?

9       A.    Well, that's one.  But I think there are

10  also situations that we -- that are extremely important

11  that can also prove a relationship.  They can show

12  harm.  They can document harm.  And so it's --

13          I mean, no one ever tested to see whether

14  smoking can cause lung cancer.  They never trialed for

15  that.  But still it's generally accepted.  So there are

16  aspects of the findings that you take into account,

17  whether you have the strengths of the association, the

18  time relationship.  The biological plausibility and so

19  on.  So several of those you take into account but you

20  can document harm with observational studies.

21      Q.    Would you agree that when you're evaluating

22  the safety and efficacy of a drug it's important to

23  look at the totality of the evidence and not just two

CURT D.   FURBERG, M.D., PH.D.

Page 125

1  or three studies about a drug?
2      A.   Well, I think you try to look at as much as
3  possible.  And the question is then you try to find out
4  which are the most informative studies.  And then if
5  there are small studies above that, they have very
6  little -- you need to look at the major ones.
7      Q.   Do you agree as a general proposition that
8  when you're studying the safety and efficacy of a drug
9  you should look at all the studies and the quality of
10 all the studies of a drug?
11          MR. RASMUSSEN:  Objection.
12     A.   Efficacy I'll -- I'm more for trials.  And I
13 rely on trials.  I don't look at observational studies
14 to look for efficacy.  There I look at the totality of
15 the evidence of the trials, and I focus on the ones
16 that contribute the most to the totality, those who
17 have the most events.  And I look at those.  And, you
18 know, you can run some analyses or you pool information
19 in a meta-analysis.  I believe in those from the --
20     Q.   You believe in the power of meta-analyses?
21     A.   Yeah, and I probably published 30 papers on
22 that. So I believe in that.  And safety, again, that's
23 where we are struggling because the trials may not give

CURT D.   FURBERG, M.D., PH.D.

Page 126

1  us the answer.  And that would explain why.  They may
2  not have enough events or may not follow the patients
3  long enough or the patients are not high risk.
4      Q.    My question wasn't about randomized
5  controlled trials.  It was about the totality of the
6  evidence.
7      A.    Totality.  I mean, I'm for looking at the
8  totality, and I realize that sometimes the totality is
9  very limited.
10     Q.    Do you agree with me that when you're
11 considering the safety of a drug and/or efficacy of a
12 drug you want to look at all of the studies, whether
13 they're randomized controlled trials or observational
14 studies or something else?
15     A.    I answered that already.  I said for
16 efficacy I look at the clinical trials.  I don't pay
17 much attention to the observational studies.
18     Q.    How about on safety, Doctor?
19     A.    Safety is different because safety I don't
20 get enough information from the trials typically.  And
21 that's why we're having this -- we're here today.
22 Because the safety evaluation of drugs prior to
23 approval is very sketchy.  It's very incomplete based

CURT D.  FURBERG, M.D., PH.D.

Page 155

1    A.    Correct.

2    Q.    My question is simply was Trasylol ever

3  approved for use in the valve surgeries that

4  Dr. D'Ambra studied?

5    A.    I don't believe so.  It was disapproved.

6    Q.    Are you aware of any clinical trial that

7  shows a statistically significant increase in dialysis

8  with aprotinin in CABG patients?

9        MR. RASMUSSEN:  Objection.

10    A.    I think the trials are too small to show

11  that.

12    Q.    So sitting here today can you identify for

13  me any clinical trial that shows a statistically

14  significant increase in dialysis with aprotinin in CABG

15  surgery?

16        MR. RASMUSSEN:  I'm going to object.  These

17    are unfair questions, and if you're going to ask

18    him that we're going to stop and we're going to let

19    him review documents.  Now, we didn't assign it --

20    we didn't assign that task to him.  And if you want

21    to pay him as an expert to go put together a

22    summary of these studies with these limited

23    criteria, you can do that.  We didn't ask him to do

CURT D.  FURBERG, M.D., PH.D.

Page 206

1   was on that?

2      A.   I have -- it's in that -- I don't remember

3   the name.  It's in that document.  I think the

4   proposals are all in here.  The three references there

5   are the proposals.  And I need to look at that to give

6   the name.

7      Q.   Flip over to paragraph 44 of your report.

8      A.   Okay.

9      Q.   You talk about two high profile

10  publications.

11     A.   Yes.

12     Q.   You're talking there about the Mangano 2006

13  study and the Karkouti 2006 study?

14     A.   Correct.

15     Q.   You say that in response to those two

16  publications Bayer submitted a long overdue safety

17  update of Trasylol?

18     A.   Right.

19     Q.   I'm just quoting there from your report.  Do

20  you see that?

21     A.   I see it.

22     Q.   What is the basis for your opinion that the

23  safety update was, quote, long overdue, unquote?

CURT D.   FURBERG, M.D., PH.D.

Page 223

1   submitted in a timely way to the FDA?

2        A.    I think they were.  There were copies of the

3   reports and they have dates on them so they were

4   timely.  But it doesn't -- the issue is not whether

5   it's supported.  The issue is they have to be compiled

6   and summarized.  And that was not done.

7        Q.    I just want to make clear --

8        A.    But they were submitted to the best of my

9   knowledge.

10       Q.    You are not saying that Bayer failed to meet

11  any requirement to timely report the adverse events

12  themselves?

13       A.    The individual events.

14       Q.    So it's not your opinion that the adverse

15  event reports themselves were not filed --

16       A.    Correct.

17       Q.    -- in a timely way?

18       A.    Correct.

19             MR. RASMUSSEN:  Objection.

20       Q.    Let's talk for a moment about the BART

21  study.

22       A.    Okay.

23       Q.    Have you read the published BART study

CURT D.   FURBERG, M.D., PH.D.

Page 224

1   authored by Dr. Ferguson and others?
2       A.    Yes.
3       Q.    What other materials have you read about the
4   BART study besides the published study?
5       A.    I think that was it.  Wasn't it a -- maybe a
6   document --
7             MR. RASMUSSEN:  Don't look at me.  I have to
8       look at all these to refresh my memory.  I don't
9       know.
10      A.    I think that Bayer had some objection to the
11  analyses and submitted a document to the FDA.  And
12  attached at the end were people they consulted with,
13  and I don't reference that here unfortunately but it's
14  in my ring book.
15      Q.    One of the documents that's on your list is
16  a report of the BART expert advisory panel.  Do you
17  recall reviewing that?
18      A.    No.  Do you mean the expert advice, the --
19      Q.    The panel.
20      A.    You mean the data safety monitoring
21  committee?
22      Q.    No.  There was something called the expert
23  advisory panel convened to review the BART study.

MERRILL LEGAL SOLUTIONS
(800) 325-3376            www.MerrillCorp.com

CURT D.   FURBERG, M.D., PH.D.

Page 225

1   A.   Convened by whom?

2   Q.   Well, that's a question for you.

3   A.   I don't know.

4   Q.   My first question is do you remember
5   reading, or to your knowledge, have you read the expert
6   advisory panel report concerning BART?

7   A.   But that could be the document I'm referring
8   to.  But that was -- if so, it was convened by Bayer.

9   Q.   Are you aware of any panel, specifically an
10  expert advisory panel, convened by anyone other than
11  Bayer in connection with BART?

12  A.   No.  The -- no, I'm not aware of that.  I'm
13  sure this was submitted also to Health Canada, but I
14  have not seen any documents from Health Canada.

15  Q.   Have you done any analysis of your own about
16  the validity of the BART study?

17  A.   No.

18  Q.   Have you done any statistical analysis of
19  the BART results?

20  A.   No.  I think that was done -- it was
21  published in the New England Journal of Medicine and
22  went through peer reviews and went through statistical
23  reviews.  I don't think there is any problems with the

CURT D.   FURBERG, M.D., PH.D.

Page 226

1  paper or it would not have been published and passed
2  peer review.
3     Q.   Give me one second before I go to the next
4  topic.
5          Have you ever heard that certain patients
6  were excluded from the BART study after randomization?
7     A.   I don't recall.  I need to see the paper to
8  see that.  It becomes an issue in many surgical studies
9  that you randomize people and then if some of them
10 don't have surgery to be randomized to, they are
11 withdrawn from the analysis, moved from the analysis.
12 So they're not exposed to the treatment.  So I don't
13 know.  I'm saying that's in general about surgical
14 trials.
15    Q.   You're not saying specifically that's what
16 happened on BART?
17    A.   I don't know.  I need to look at the paper.
18 But I'm saying that that is one of the things I would
19 look at.
20    Q.   Let me go back to the questions I was asking
21 about the expert advisory panel.  Do you know of any
22 expert advisory panel that was convened and hosted by
23 Health Canada?

CURT D.   FURBERG, M.D., PH.D.

Page 227

```
 1     A.    No.
 2     Q.    To your knowledge, have you reviewed any
 3   documents concerning any expert advisory panel like
 4   that?
 5     A.    No, love to see it.
 6     Q.    In paragraph 58 of your report you say
 7   Trasylol was withdrawn from the market in May of 2008?
 8     A.    Yes.
 9     Q.    What is that opinion based on?
10     A.    That's what I saw somewhere in the document.
11     Q.    Can you identify for me where you got the
12   basis for that opinion?
13     A.    I don't have that here.  I need to look at
14   it.  I'm sure I have it.  But I don't know where it is.
15         MR. PHILLIPS:  Let's go off the record for a
16     five or ten-minute break.
17         THE VIDEOGRAPHER:  This marks the end of
18     Tape Number Four.  Off the record.  The time is
19     3:54 p.m.
20              (Off the record.)
21         THE VIDEOGRAPHER:  This is the beginning of
22     Tape Number Five.  Back on the record.  The time is
23     4:07 p.m.
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376           www.MerrillCorp.com