# EXHIBIT I

# Douglas R. Schuch, M.D.

5041 Jardin Lane, Carmichael, CA  95608
916-206-7445    schuchdc@comcast.net

## LICENSURE & CERTIFICATION

- State of California Medical License (active: 1986 - Present)
- State of Alabama Medical License (presently inactive: 1980-2007)
- State of Florida Medical License (presently inactive: 1987-1994)
- UNOS Certified
- DEA Certified (AS9353056)
- American Board of Surgery (3224) 1987
- American Board of Thoracic Surgery (4731) 1988
- American Board of Thoracic Surgery Recertification 1997 & 2008
- Advanced Trauma Life Support UAB 1981
- Cardiogenesis TMR Certification 1999
- Abiomed BVS 5000 Certification 2005
- St. Jude Symmetry Bypass Certification 2002

## PROFESSIONAL EXPERIENCE

- Sacramento Cardiovascular Surgeons Medical Group 1986-2006
  5301 F. Street, Sacramento, CA 95819 916-452-8291
- Sutter Medical Center Medical Staff 1986-Present
- University of California School of Medicine, Sacramento, CA
  Clinical Instructor of Surgery 1990-1996
- Roseville Medical Center Medical Staff 1995-2000

## EDUCATION

- University of North Carolina, Chapel Hill, North Carolina
  BA Chemistry & Biology, 1975
- University of Virginia, Charlottesville, Virginia
  MD, 1979
- University of Alabama, Birmingham, Alabama
  General Surgery Residency, 1979-1984
- University of Alabama, Birmingham, Alabama Cardiothoracic Fellowship
  1984-1986 Chairman John W. Kirklin, MD & Al D. Pacifico, MD

## AWARDS & HONORS

- Phi Eta Sigma
- Phi Beta Kappa
- University of Virgina Medical School Admissions Committee, 1978-1979
- Lange Outstanding Medical Student Award 1976
- Fisher Scientific Scholarship Award, 1972

## APPOINTMENTS

- Sutter Community Hospitals, Sacramento, Ca 1986-Present
- Medical Director Heart Transplantation, Sutter Medical Center, Sacramento 1997-Present
- Medical Director Ventricular Assist Device Program, Sutter Medical Center, Sacramento 2006-Present
- Quality Review Board, Sutter Medical Center Sacramento 1986-1995
- Vice-Chief Division of Cardiology and Cardiac Surgery, Sutter Medical Center Sacramento 2003-2005
- Medical Board of California Consultant and Expert Reviewer 2005-Present
- Norcal Early Consultant Program 2007-Present
- Scios Speaker Services 2005-2006
- Cardiogenesis Corporation Director and Instructor Western US Region 1999-2006
- Annals of Thoracic Surgery Publication – Expert Reviewer 2008-present

## ORGANIZATIONS

- American College of Cardiology
- Society of Thoracic Surgeons
- Western Thoracic Surgical Association
- The International Society of Heart and Lung Transplantation
- American Medical Association
- California Medical Association
- Sacramento-El Dorado Medical Society
- John W. Kirklin Society
- American College of Surgeons
- American College of Chest Physicians
- Southwestern Surgical Society

## PUBLICATIONS

Crosby, I.K., Wellons, H.A., Martin, R.P., Schuch, D., Muller, W.H.(1980). Employability – A New Indication for Aneurysmectomy and Coronary Revascularization. Circulation 62 (suppl I), I-79 – I-83

Schuch, D. & Wolff, L (1991). Repair of Mycotic Aneurysm of the Innominate Artery With Homograft Tissue. Ann Thorac Surg. 1991;52:863-4

Samuels, L., Lattouf, O., Grosso, M., ALZeerah, M., Schuch, D., Wehberg, K., Muchrcke, D., Dowling, R. (2004) Transmyocardial Laser Therapy: A Strategic Approach  The Heart Surgery Forum #2003-3011 7 (3), 2004:125-136.

Allen, K., Dowling, R., Schuch, D., et al. (2004) Adjunctive Transmyocardial Revascularization: Five-Year Follow-up of a Prospective, Randomized Trial. Ann Thorac Surg. 2004;78:458-65

Allen, K., Dowling, R., Schuch, D., et al. (2000). Transmyocardial Laser Revascularization Combined with Coronary Artery Bypass Grafting: A Multicenter, Blinded, Prospective, Randomized, Controlled Trial. J Thorac Cardiovasc Surg 2000;119:540-549

Schuch, D. Complete Revascularization Strategies Utilizing TMR: Careful Patient Selection May Yield Improved Survival. Presented at the Sixth Annual Scientific Meeting of the International Society of Minimally Invasive Cardiac Surgery, June 19, 2003.

Schuch, D. Management of Tricuspid Valve Replacement (2007) Ann Thorac Surg. 2007:84:2138

Schuch, D. CMS Standards In Reviewing Low Volume Cardiac Transplant Centers (2008) Ann Thorac Surg. In print.

# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to:
*Bryant v. Bayer Corporation, et al.*,
Case No. 9:08-cv-80868-DMM

_____/

REPORT OF ANTHONY PAUL FURNARY, M.D., F.A.C.S., F.A.C.C.

DECEMBER 21, 2009

December 21, 2009

I have reviewed the medical records of Anna Bryant and have read the expert reports, addenda, and deposition transcripts of Drs. Chertow and Schuch. I hereby incorporate everything I have previously written in my generic report, dated November 1, 2009, as pertinent to this report as well. I have extensive clinical experience with and knowledge of, have published research papers in, lectured on and taught on the subjects of CABG surgery, diabetes, hyperglycemia and tight glycemic control in heart surgery patients. As reflected in my curriculum vitae, I have given numerous lectures around the world and trained thousands of cardiac surgeons, endocrinologists and other health care professionals in these concepts and techniques. As such, I have an extensive knowledge of the background literature in, and have read and reviewed a multitude of publications on these subjects, which are too numerous to list in a comprehensive fashion. I hold the opinions expressed in this report to a reasonable degree of medical and scientific certainty and/or probability.

Anna Bryant was, at the time of her CABG surgery a 58 year old African American, hypertensive, hypercholesterolemic, insulin-requiring diabetic female with chronic renal insufficiency, congestive heart failure, poor exercise tolerance and silent ischemia due to multi-vessel coronary artery disease when she was admitted to Harbor UCLA Medical Center for coronary artery bypass grafting (CABG) on 3/8/2006. She underwent CABG X 4 on 3/9/2006. Following that surgery the patient had a number of post-operative complications that included low cardiac output syndrome, cardiac arrhythmias, myocardial infarction, acute heart failure, low systemic vascular resistance, hypotension, and renal failure requiring dialysis. She continues to require dialysis. I have been asked to give my opinion as to the causes of the patient's renal failure following CABG surgery.

Ms. Bryant was born on 12/28/1947. Her diabetes was longstanding, having been diagnosed in 1983. Her diabetes was poorly controlled. This is indicated by a multitude of factors. Her Hgb A1c levels – a measure of the overall effectiveness of blood sugar (glycemic) control -- ranged from a low of 7.6 to a high of 14.4 between 2000 and 2006. The American Diabetes Association (ADA) recommends that all patients with diabetes keep their Hgb A1c less than 7% to prevent the microvascular complications of diabetes – such as diabetic retinopathy, neuropathy, and nephropathy. Glycemic control was never adequately achieved in this patient and she developed diabetic neuropathy (2001), diabetic retinopathy (2002) and, most importantly as it relates to this case, diabetic nephropathy with chronic renal insufficiency, for which she was referred to a nephrologist in 2005. Diabetes is one of the two leading causes of kidney failure.

A further indication of the severity of her diabetes is the fact that Ms. Bryant was placed on insulin therapy in January 2006 because of the continuing inability to control her blood sugars with oral medications. Thus, Ms. Bryant had prolonged, uncontrolled, insulin requiring diabetes.

All of these additional factors relating to her diabetes – the long duration, the poor control, and the requirement for insulin to control blood sugar levels -- placed Ms. Bryant at an even higher risk of post-operative complications, including renal failure, than patients with shorter-term, well-controlled, non-insulin requiring diabetes whose risks are already increased. HgbA1c levels above 7.0% in patients with diabetes are associated with an increased incidence of postoperative complications including postoperative renal failure, as compared to patients with diabetes whose A1c levels are <7.0%. Ms. Bryant's most recent preoperative A1c level was 8.6%, putting her at particularly high risk.

Ms. Bryant also had a past medical history punctuated by frequently uncontrolled hypertension. This is seen in the multitude of blood pressure readings taken at her outpatient clinic visits. Because of the compounding effects of diabetes and hypertension on kidney function, stroke, development of heart disease and other complications, the American College of Cardiology, the American Heart Association and the ADA have established blood pressure guidelines for patients with diabetes. These guidelines recommend that the systolic (upper number) blood pressure always be kept below 130mm/Hg and the diastolic (lower number) blood pressure be maintained below 80 mg/dl. In the 23 outpatient visits I reviewed, Ms. Bryant's blood pressure was below the combined recommended limits only 22% of the time. She thus had longstanding uncontrolled hypertension, which is the other leading cause of chronic kidney disease and renal failure.

Ms. Bryant's uncontrolled hypertension and diabetic nephropathy, along with the use of some mildly nephrotoxic drugs such as metformin and ACE inhibitors, eventually led to the development of chronic renal insufficiency (CRI) also known as chronic kidney disease (CKD), yet another major risk factor for kidney failure. This CRI was documented as early as May 2000. Ms. Bryant's CRI is shown by her elevated, varying, but gradually increasing concentrations of serum creatinine over time ranging from 1.1 – 1.7. Furthermore she had proteinuria on several occasions with urine protein levels higher than 394 mg/<24 hour period, and a microalbumin / creatinine ratio of 293mg/dl (just below frank albuminuria) indicating the severity of her ongoing renal dysfunction, kidney damage and CRI secondary to her uncontrolled diabetes and hypertension.

These measures – the rising creatinine and the proteinuria -- are yet another indicator of the severity of Ms. Bryant's pre-existing kidney disease that indicate an increased likelihood of progression to kidney failure, and an increased risk of kidney failure following the use of cardiopulmonary bypass (CPB). Her serum creatinine at the time of heart catheterization and subsequent cardiology clinic visit and referral for open heart surgery in late January and early February 2006 was 1.6mg/dl, indicating CRI. This increased her preoperative risks of developing post-operative renal failure.

Silent ischemia often occurs in patients with diabetes who have coronary artery disease and would otherwise experience "angina" or chest pain when their heart does not receive enough blood. Because Ms. Bryant noted that she would get short of breath just walking up one flight of stairs carrying groceries, and based on the possibility of silent ischemia with dyspnea on exertion as an anginal equivalent, a thallium scan was done. This revealed an anterior wall ischemic defect in her myocardium. She was referred for cardiac catheterization. This revealed a diffusely diseased LAD with a 70% stenosis, a 70% stenosis in the mid circumflex, an 80% stenosis in the third obtuse marginal, a 70% stenosis in the mid RCA and a 50% stenosis at the takeoff of the PDA. The estimated left ventricular ejection fraction was 64%. With multivessel disease in a diabetic patient with silent ischemia and congestive heart failure, the patient was appropriately referred for CABG surgery. There was no further assessment of the patient's ejection fraction until March 11th, two days postoperatively.

The fact that Ms. Bryant had dyspnea on exertion, bilateral 2+ pitting lower extremity edema, and poor exercise tolerance indicates that she had congestive heart failure. This was most likely secondary to both longstanding uncontrolled hypertension and silent ischemia as she was found to have a normal ejection fraction at the time of heart catheterization. Congestive heart failure is another risk factor for postoperative renal failure.

Upon her admission to Harbor UCLA Medical Center, Ms. Bryant underwent a preoperative workup, or a series of tests, which further showed that she was anemic (hemoglobin of 11.7 g/dl) and had mild chronic lung disease, as signified by pulmonary function tests which showed that her FEV-1 was 70% of predicted for her size and weight. These are both additive risks for postoperative renal failure.

The Society of Thoracic Surgeons (STS) maintains a large national database of patient-related factors and related outcomes from millions of open heart surgery cases performed over the past two decades in this country. The STS has created predictive risk algorithms that allow the user to predict the expected rate of various adverse outcomes from specific patient-related characteristics. These can be applied to groups of patients, or can be used for any one patient who is about to undergo open-heart surgery. Renal failure listed as one of the potential risks.

Taking Ms. Bryant's preoperative history and cardiac catheterization results into consideration, the STS calculated risk of renal failure for Ms. Bryant at the time of cardiac catheterization and referral to cardiac surgery was 11.4%. Immediately prior to the surgery, the STS risk of renal failure would have been calculated as 7.1% because the creatinine had dropped to 1.3 immediately pre-operatively. This was likely due to the decrease in her dose of Lasix, which is also what likely caused her to gain 9 pounds in the previous 6 weeks, and experience an increase in her congestive heart failure symptoms, such as pitting edema and dyspnea on exertion. Thus, the preoperative predicted risk of the postoperative development of renal failure in Ms. Bryant was significantly elevated.

There are other factors, unaccounted for in the STS risk model, that likely increased Ms. Bryant's preoperative risk of postoperative renal failure even more than the STS model would suggest. These include Ms. Bryant's preoperative anemia, the duration of her diabetes, the fact that both her diabetes and hypertension were largely uncontrolled, and her known proteinuria. On admission to the hospital Ms. Bryant was found to be anemic, with a preoperative hemoglobin level of 11.7 g/dl. Preoperative anemia has been shown to be associated with the development of postoperative renal dysfunction or failure. At preoperative levels between 11-12 g/dl the incidence of such postoperative dysfunction or failure is approximately 9%, as compared to less than 3% without anemia. In addition, the patient's pre-existing diabetic retinopathy predicts worse short and long-term outcomes after cardiac surgery than would be expected in patients with diabetes, but without retinopathy.

On March 9th 2006, Ms. Bryant underwent CABG X4 utilizing a LIMA to the LAD, a reversed saphenous vein graft to the posterior descending artery, and a sequential saphenous vein graft to the first and second obtuse marginal arteries performed by, or under the direction of, Bassam Omari, MD. There were several intraoperative events that further increased her risk of developing postoperative renal failure.

First, just prior to going on bypass the patient became suddenly and severely hypotensive. Hypotension causes a decrease in blood flow to the major organs, including the kidneys. Hypotension can cause a low perfusion state for the kidney and induce kidney injury, especially in kidneys that are dysfunctional at baseline. This hypotensive episode must be taken into consideration when considering Ms. Bryant's subsequent kidney failure.

Second, according to the perfusion and anesthesia records, and seemingly in response to the pre-cardiopulmonary bypass (CPB) hypotensive episode, three units of packed red blood cells were "emergently" placed into the cardiopulmonary bypass machine priming volume just prior to placing the patient on CPB. Perioperative transfusions have been shown to increase the baseline risks of postoperative renal failure. In my published research, such transfusions have been shown to increase the baseline odds ratio of renal failure by 1.2 times for each unit of packed red blood cells given. Thus, the three units of blood transfused at the start of CPB increased the baseline STS predicted risk of postoperative renal failure beyond either the 7.1% (using a baseline creatinine of 1.3) or 11.4% (using a baseline creatinine of 1.6) estimates.

Third, poor renal perfusion while on CPB likely injured the already dysfunctional kidneys. In a patient with renal dysfunction, perfusion pressures on CPB should be kept in the 70-80mmHg range to assure optimal renal perfusion and minimize further kidney injury. Ms. Bryant's mean perfusion pressures on CPB were maintained between 55 and 65mmHg. Ms. Bryant had no recorded urine output while on CPB. Both the low perfusion pressures and the accompanying anuria on CPB are indications of poor renal perfusion during CPB. Poor renal perfusion while

on CPB is another factor that contributed to her kidney injury and eventual kidney failure.

Ms. Bryant returned from the operating room in what appeared to be a fairly stable hemodynamic state. She was not on any intravenous inotropes or pressors. She was not bleeding. Orders were given to maintain her blood glucose level between 80-130 mg/dl.

Soon after her return to the ICU, her cardiac index was found to be low at 1.8 L/min/M2 and she was started on dobutamine and dopamine. Following administration of these medications, her systolic blood pressure went from 105 to 165mmHg, indicating a good ventricular response to the inotropic support. dobutamine was stopped and milrinone was begun. Her cardiac index increased to 2.49 with a good blood pressure, again indicating a good response to the inotropic support at 1400 on 3/9/06. In the early evening she began to become hypotensive with systolic blood pressures in the 90's. As her kidney perfusion decreased due to the low blood pressure and concomitant low systemic vascular resistance (SVR), her urine output decreased slightly to 30 cc/hour and she was treated at first with a single 40 mg dose of IV Lasix, then started on an IV Lasix drip along with metolazone. Her urine output continued to be barely adequate on a Lasix drip at 40mg / hour until 1400 on 3/10/06.

Between 1000 and 1200 on 3/10/2006 (the first postoperative day) the patient became hypotensive with a low SVR and systolic pressures in the 80's. Shortly thereafter she became essentially anuric with a urine output of only 5-10 cc / hour. She was started on Natrecor – a drug indicated for use in patients with heart failure -- to improve renal perfusion and increase urine output. Her blood pressures remained in the 80's and 90's for most of the rest of that day with dips into the 70's. Because of ongoing hypotension and noted "labile blood pressure", again, due to a low SVR, she was started on Levophed at 1700 in an attempt to improve her pressure. Levophed is a powerful vasoconstrictor, which increases blood pressure by constricting peripheral arteries and arterioles, including those of the kidney, thereby reducing renal perfusion. As stated in the nursing notes, she continued to experience an alteration in renal perfusion. The decrease in renal perfusion caused by low SVR, hypotension and the use of Levophed associated with persistent oliguria, resulted in the need for continuous veno-venous hemodialysis (CVVHD) to remove fluid from this patient who had essentially stopped making urine. Once this was started both the Lasix and Natrecor drips were turned off.

Just before midnight on 3/10-11/06 the patient went into a supraventricular tachycardia with a heart rate in the 150-170's and resultant worsening hypotension. Her cardiac index dropped to 1.9 and remained low for several hours. She became hypotensive, with a systolic blood pressure in the 70's, and was only able to maintain a systolic blood pressure between 70 and 100 for most of the early hours of 3/11/06. She continued to have low SVR – which is another risk factor for acute renal failure, especially in the face of a low cardiac output. Dobutamine and

milrinone, which were being used to support her cardiac index, were turned off at 0300 and 0400 respectively. She was started on amiodarone to control her arrhythmia. Through the remainder of the day on 3/11/06 her blood pressure stabilized and the Levophed was gradually weaned off by 1630 with adequate residual blood pressures.

Ms. Bryant experienced hemodynamic instability, hypotension, and arrhythmias postoperatively. I believe these were caused by a myocardial infarction that occurred on 3/9/2006. Cardiac troponin levels – an enzyme that indicates myocardial cell damage, or infarction -- showed elevations postoperatively. By the evening of 3/9/2006 her troponin had risen to 3.82. Troponin levels not only continued to rise through the next 24 hours (peaking around 20 on the following evening), but these elevations persisted for the next three days – indicating a persistent, ongoing postoperative myocardial infarction. These enzyme elevations reveal the onset of a myocardial infarction that began on 3/9/2006 and continued at least through the third postoperative day, when troponins apparently ceased to be measured.

The changing EKG's corroborate these enzyme rises in the postoperative period. The immediate postoperative EKG reveals new inferior and lateral wall Q-waves. These were not present on the admission EKG and imply a new myocardial infarction. By the evening of 3/9/2006 the EKG continued to change showing evolving inferior and posterolateral infarctions. The EKG changes continued to evolve, showing inferior and lateral wall infarction patterns through 3/13/2006, corroborating an ongoing MI as indicated by the persistently elevated troponin levels.

On the second postoperative day (3/11/2006) the effects of Ms. Bryant's myocardial infarction were becoming more evident. There was a continuing requirement for inotropic support because of her depressed cardiac output, which was due to the acute MI. EKG revealed ST elevation in leads V5 and V6, confirming ongoing ischemia. An echocardiogram performed on 3/11/2006 showed that her ejection fraction, which had been normal at 64% in January, had now dropped to 25-35% with moderate to severe global hypokinesis. Paradoxical septal motion was noted, indicating the possibility of an anteroseptal MI. She was now in acute heart failure. Acute heart failure resulting from an acute MI is a risk factor for the development of postoperative acute renal failure. She also had prolonged post-CPB low cardiac output syndrome – another risk factor for renal failure that has been shown to increase the baseline odds of renal failure by 3.8 fold.

Ms. Bryant had longstanding diabetes. As such it would have been highly desirable to tightly control her blood glucose levels both in the operating room and postoperatively. This was the standard of care for CABG patients with diabetes at that time and remains so today. Without such tight glycemic control (TGC) the incidence of postoperative renal failure following CABG in patients with diabetes is markedly increased. Ms. Bryant's blood glucose level was never effectively

controlled; neither while she was in the operating room, nor following surgery. In the operating room her blood glucose levels were consistently elevated. Only the last measurement of 127 mg/dl was close to the acceptable range of <120mg/dl for patients with diabetes undergoing CABG. Postoperatively an order was written to maintain Ms. Bryant's glucose levels between 80 and 130 mg/dl. This virtually never happened. Of the 40 postoperative blood glucose measurements in the critical first four postoperative days (including the day of surgery), only 3 were within the specified target range; and 11 were severely hyperglycemic above 200 mg/dl. The average glucose levels on the first four postoperative days were 191, 184, 188 and 174 mg/dl respectively. Thus Ms. Bryant was not afforded the beneficial effects of tight glycemic control with an intravenous insulin infusion, a standard of care for post CABG patients with diabetes. This is an important factor in this case because peri-operative hyperglycemia has been shown to be associated with a significantly increased incidence of postoperative renal failure following CABG. Hyperglycemia is also associated with acute postoperative heart failure and arrhythmias. An intravenous insulin infusion was not used on Ms. Bryant.

By the afternoon of 3/12/2006 Ms. Bryant began to stabilize hemodynamically with adequate blood pressures above 120, but still with the aid of dopamine. The dopamine infusion was maintained to support her alteration in cardiac output until 0800 on 3/14/2006. Her cardiac function was so poor, from her preoperative CHF, her postoperative myocardial infarction and her persistently elevated blood glucose levels, that she required six days of inotropic support. Low cardiac output syndrome is a further risk factor for the development of renal failure because of poor renal perfusion, as is noted in the patient's chart.

She was on intermittent hemodialysis and was transferred out of the ICU to the floor on 3/16/2006. Between 3/16 and 3/19 the patient had systolic blood pressures in the 90's and low 100's, despite the fact that several progress notes (3/16; 3/18; 3/20) from the renal service recommended a systolic blood pressure between 110-120 "to keep good kidney perfusion"; the renal service made notes to "avoid hypotension – decrease BP meds" and to "titrate down BP meds to have BP between 110 and 130 to avoid hypotensive ATN."

Ms. Bryant had multiple and continuing insults to her kidneys which fully explain her renal failure. These include but are not limited to: preoperative factors -- uncontrolled hypertension, progressive chronic renal insufficiency, uncontrolled diabetes, anemia, and congestive heart failure, all of which, plus other factors, led to an elevated preoperative predicted risk of renal failure; intraoperative factors -- hypotension, a three unit intraoperative blood transfusion, the low perfusion pressure and anuria while on CPB, high blood glucose levels throughout CPB; and postoperative events -- prolonged hyperglycemia, multiple episodes of hypotension, persistently decreased systemic vascular resistance, the use of Levophed which can further decrease renal perfusion, a significant postoperative myocardial infarction, acute heart failure, decreased ejection fraction, prolonged low cardiac output syndrome requiring prolonged inotropic support. These multiple and continuing

insults to the patient's cardiac function, metabolic system and kidneys, taken alone, or in combination, fully explain the cause of Ms. Bryant's renal failure.

**Comments on Plaintiff's Expert reports:**

I have read the expert reports and deposition of Dr. Chertow. He claims that Ms. Bryant only had a 1.4% chance of developing renal failure following CABG surgery. I believe he is quoting the baseline risk of developing renal failure from the validation set used in his own 1997 paper and not applying all of the applicable the risks inherent in Ms. Bryant's case. Dr. Chertow's 1997 publication includes only 10 variables in the logistic regression model. Of those ten variables, three apply directly to Ms. Bryant as she entered the operating room for CABG surgery – she had an eGFR of 40-60 (OR 3.38); chronic lung disease as indicated by her pulmonary function tests (OR 1.26); hypertension > 140mmHg (OR 1.27). It is not clear to me that Dr. Chertow considered these factors in his analysis of her preoperative risk of renal failure. Moreover, I believe the STS risk model, which uses a multitude of variables in its calculations, which is derived from millions of cases, and which is a more recently compiled algorithm, is likely a better and more accurate risk predictor than the Chertow model. Nonetheless, whether using the Chertow model, or the STS model, the preoperative predicted risk of renal failure for Ms. Bryant is markedly higher than claimed by Dr. Chertow.

Furthermore, Dr. Chertow fails to account for the additional intra- and post-operative insults, which further increase the risk of renal failure that I have listed above. Even though the "vast majority" of patients with these conditions" would not develop renal failure (i.e. < 50%), a significant proportion – upwards of 11-15% in this particular instance -- of them would do so, even if aprotinin were not given to the patient. Finally, I disagree with his contention that aprotinin increases the risk of renal failure following cardiac surgery, for the reasons set forth in my November 1, 2009 expert report. Given the totality of the evidence, including Ms. Bryant's underlying health conditions, her surgical procedure, her postoperative complications and the published literature on the subject, it is more likely than not that aprotinin had nothing to do with her renal failure. She would more likely than not have suffered the same outcome whether or not she received aprotinin.

I have read the expert reports and deposition of Dr. Schuch. I disagree with his assessment that Ms. Bryant had an uneventful and uncomplicated CABG surgery. I also disagree with his statement that Ms. Bryant tolerated the surgery well. The facts that she required an emergent transfusion in the operating room, that she had a peri-operative myocardial infarction, that she had prolonged low cardiac output syndrome, with ongoing alterations in renal perfusion and persistent hypotension, are all indications that this CABG surgery was anything but "uneventful and well-tolerated."

The use of aprotinin during Ms. Bryant's surgery was not a factor in either her acute myocardial infarction or the development of her renal failure. As detailed in my November 1, 2009 expert report, aprotinin is not a causal factor for either acute myocardial infarction or dialysis dependent renal failure. The implication that aprotinin caused or contributed to Ms. Bryant's renal failure in this case ignores both the details of this particular patient's own perioperative risks and postoperative events, and the published literature on the subject. I am of the opinion that aprotinin played no role in Ms. Bryant's renal failure requiring dialysis.

I hold all of the above opinions to a reasonable degree of scientific and medical certainty and/or probability. I reserve the right to supplement or amend my opinions based on new information that may become available to me.

Respectfully submitted,

Anthony P. Furnary, MD
Senior Surgeon
Starr-Wood Cardiac Group

# EXHIBIT K

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

| | |
|---|---|
| IN RE TRASYLOL PRODUCTS<br>LIABILITY LITIGATION — MDL-1928<br><br>THIS DOCUMENT RELATES TO:<br><br>*Bryant* v. *Bayer Corporation et al.*,<br>Case No. 9:08-cv-80868-DMM | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## BAYER CORPORATION'S ANSWER AND
## ADDITIONAL DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant Bayer Corporation, for its Answer to Plaintiff's Amended Complaint (the "Complaint"), states as follows:

1.      Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence in paragraph 1 of the Complaint. Bayer Corporation denies the remaining allegations in paragraph 1 of the Complaint.

2.      Bayer Corporation admits that it is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205; that its agent for service of process in Connecticut is Corporation Service Company, located at 50 Weston Street, Hartford, Connecticut 06120-1537; and that Trasylol® is the proprietary name for aprotinin injection. Bayer Corporation is without knowledge or information sufficient to form a belief as to the time frame to which the allegations in the second sentence in paragraph 2 of the Complaint refer but denies that it was promoting, marketing, distributing, testing, or selling Trasylol® at the time of the procedure alleged in the Complaint and denies that it has developed, manufactured, or licensed Trasylol®. Because of the vagueness of the allegation in paragraph 2 that Bayer

Corporation was "warranting" Trasylol®, Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of that allegation. Bayer Corporation denies the remaining allegations in paragraph 2 of the Complaint.

3.      Bayer Corporation admits that Bayer HealthCare Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in Wayne, New Jersey; that Bayer HealthCare Pharmaceuticals Inc. is indirectly wholly owned by Bayer Corporation; and that Bayer HealthCare Pharmaceuticals Inc. is successor in interest to Bayer Pharmaceuticals Corporation. Bayer Corporation further admits that Bayer HealthCare Pharmaceuticals Inc.'s agent for service of process in Connecticut is Corporation Service Company, located at 50 Weston Street, Hartford, Connecticut 06120-1537. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 3 of the Complaint.

4.      Bayer Corporation admits that at the time this Complaint was filed Bayer HealthCare AG, the predecessor in interest of Bayer Schering Pharma AG, was a German corporation with its principal place of business in Leverkusen, Germany. By way of further answer, Bayer Corporation states that Bayer HealthCare AG was merged with and into Bayer Schering Pharma AG, effective December 30, 2008. Bayer Corporation is without knowledge or information sufficient to form a belief as to the time frame to which the allegations in the second sentence of paragraph 4 of the Complaint refer but admits that Bayer HealthCare AG was testing, manufacturing, and/or selling Trasylol® at the time of the procedure alleged in the Complaint. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 4 of the Complaint.

5.      Bayer Corporation admits that at the time of the procedure alleged in the Complaint Bayer Pharmaceuticals Corporation was a Delaware corporation with its principal

2

place of business at 400 Morgan Lane, West Haven, Connecticut 06516, and was a wholly owned subsidiary of Bayer Corporation. Bayer Corporation further admits that Bayer Pharmaceuticals Corporation was merged with and into Bayer HealthCare Pharmaceuticals Inc., effective January 1, 2008. Bayer Corporation denies that Bayer Pharmaceuticals Corporation is "doing business as" Bayer HealthCare Pharmaceuticals Inc., and denies the remaining allegations in paragraph 5 of the Complaint.

6.     Bayer Corporation admits that Trasylol® is the proprietary name for aprotinin injection. Bayer Corporation is without knowledge or information sufficient to form a belief as to the time frame to which the allegations in the first two sentences of paragraph 6 of the Complaint refer, but admits that at certain times prior to the time of the procedure alleged in the Complaint Bayer Pharmaceuticals Corporation maintained certain records relating to Trasylol®, sponsored clinical studies of Trasylol®, and was promoting, labeling, marketing, distributing, testing, and/or selling Trasylol® in interstate commerce in the United States, including in Connecticut. Bayer Corporation admits that Bayer Pharmaceuticals Corporation from time to time submitted to the FDA New Drug Application supplements for Trasylol®, and admits that Bayer Pharmaceuticals Corporation issued a press release on November 5, 2007, announcing that it had elected temporarily to suspend marketing of Trasylol®. Bayer Corporation denies that Bayer Pharmaceuticals Corporation developed, manufactured, or licensed Trasylol®. Because of the vagueness of the term "warranting" and the phrase "other actions central to the allegations of this lawsuit," Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of those allegations in paragraph 6 of the Complaint. Bayer Corporation denies the remaining allegations in paragraph 6 of the Complaint.

7.      Bayer Corporation admits that the Complaint contains allegations referring to Bayer Corporation and other entities collectively as "Defendants," "Defendant," and/or "Bayer," but Bayer Corporation is not answering the Complaint on behalf of any entity other than Bayer Corporation, and is not answering allegations that are directed to any entity other than Bayer Corporation.  Bayer Corporation accordingly denies the allegations in paragraph 7 of the Complaint.

8.      Bayer Corporation admits that Trasylol® is the proprietary name for aprotinin injection, that Trasylol® is a natural proteinase inhibitor obtained from bovine lung, that Trasylol® consists of 58 amino acid residues that are arranged in a single polypeptide chain, cross-linked by three disulfide bridges, that it has a molecular weight of 6512 daltons, that the active center of the aprotinin molecule is located on the lysine 15 and alanine 16 amino acid residues, and that aprotinin forms reversible stoichiometric enzyme-inhibitor complexes.  Bayer Corporation denies the remaining or inconsistent allegations in paragraph 8 of the Complaint.

9.      Bayer Corporation admits that, in or around 1930, Dr. Kraut and others isolated a kallikrein inhibitor from bovine lung.  Bayer Corporation denies the remaining or inconsistent allegations in paragraph 9 of the Complaint.

10.     Bayer Corporation admits that aprotinin was first marketed as "Trasylol" in Germany in 1959 for treatment of pancreatitis and has been from time to time sold outside the United States.  Bayer Corporation denies the remaining or inconsistent allegations in paragraph 10 of the Complaint.

11.     Bayer Corporation admits that the United States Food and Drug Administration ("FDA") approved the sale and distribution of Trasylol® in the United States on December 28, 1993, and that Trasylol® is supplied as a clear, colorless, sterile isotonic solution for intravenous

4

administration. Bayer Corporation admits that at the time of the procedure alleged in the Complaint Trasylol® was indicated for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of coronary artery bypass graft surgery. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 11 of the Complaint.

12.   Bayer Corporation admits that at the time of the procedure alleged in the Complaint Trasylol® was indicated for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of coronary artery bypass graft surgery. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 12 of the Complaint.

13.   Bayer Corporation admits the allegations in the first sentence in paragraph 13 of the Complaint, and admits that the effects of Trasylol® use in cardiopulmonary bypass surgery involve a reduction in inflammatory response which translates into a decreased need for allogeneic blood transfusions, reduced bleeding, and decreased mediastinal re-exploration for bleeding. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 13 of the Complaint.

14.   Bayer Corporation admits the allegations in paragraph 14 of the Complaint.

15.   Bayer Corporation admits that from January 1, 1985, through March 31, 2006, there had been an estimated cumulative 4.38 million patient exposures worldwide to Trasylol®. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 15 of the Complaint.

16.   Bayer Corporation admits that it was reported in the 2005 Annual Report of Bayer AG that in 2005 Trasylol® generated sales of €230 million and was listed as eleventh among

"Best-Selling Bayer HealthCare Products." Bayer Corporation denies the remaining or inconsistent allegations in paragraph 16 of the Complaint.

17.    Bayer Corporation admits that in late 2005 it was estimated that the sales potential of Trasylol® could exceed €500 million. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 17 of the Complaint.

18.    Bayer Corporation admits that an article authored by Mangano et al. was published in *The New England Journal of Medicine* on or about January 26, 2006. That article speaks for itself, and Bayer Corporation denies the allegations in paragraph 18 of the Complaint to the extent they are inconsistent with the contents of the article. Bayer Corporation denies the remaining allegations in paragraph 18 of the Complaint.

19.    Bayer Corporation admits that on or about December 15, 2006, the FDA issued an "FDA Alert," portions of which are quoted in the indented portions of paragraph 19 of the Complaint. Bayer Corporation denies the allegations in paragraph 19 of the Complaint to the extent they are inconsistent with the contents of that Alert.

20.    Bayer Corporation admits that the prescribing information accompanying Trasylol® sold in the United States was revised in December 2006 and now includes the statement: "Trasylol® administration increases the risk for renal dysfunction and may increase the need for dialysis in the perioperative period." Bayer Corporation denies the allegations in paragraph 20 of the Complaint to the extent they are inconsistent with the contents of the FDA-approved labeling, and denies the remaining allegations in paragraph 20 of the Complaint.

21.    Bayer Corporation admits that on or about October 19, 2007, Bayer Pharmaceuticals Corporation was informed that the executive committee of a study conducted in Canada, titled "Blood conservation using antifibrinolytics: A randomized trial in a cardiac

6

surgery population" (the "BART" study), had halted patient enrollment in the aprotinin treatment group arm of the study. Bayer Corporation further admits that the BART study was halted following a letter from the BART Data Safety Monitoring Board informing the committee that a planned periodic data analysis indicated reduced bleeding but also an increase in all-cause mortality (that almost reached conventional statistical significance for 30-day mortality) for patients receiving Trasylol® compared to patients who received either aminocaproic acid or tranexamic acid. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 21 of the Complaint.

22.     Bayer Corporation admits that the FDA announced on November 5, 2007, that Bayer Pharmaceuticals Corporation had agreed to a marketing suspension of Trasylol® pending detailed review of preliminary results from the BART study. The November 5, 2007, press release speaks for itself, and Bayer Corporation denies the allegations in paragraph 22 of the Complaint to the extent they are inconsistent with the contents of that press release. Bayer Corporation denies the remaining allegations in paragraph 22 of the Complaint.

23.     Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the Complaint.

24.     Paragraph 24 of the Complaint states legal conclusions to which no answer is required. To the extent a response may be required, Bayer Corporation denies that it promoted, distributed, or sold Trasylol® at the time of the procedure alleged in the Complaint and denies that it has designed or manufactured Trasylol®. Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 24 that Trasylol® was administered to Plaintiff. Bayer Corporation denies the remaining allegations in paragraph 24 of the Complaint.

25.     Bayer Corporation denies the allegations in paragraph 25 of the Complaint.

26.     Bayer Corporation denies the allegations in paragraph 26 of the Complaint.

27.     Bayer Corporation denies the allegations in paragraph 27 of the Complaint.

28.     Bayer Corporation incorporates by reference its responses to each and every paragraph of the Complaint.

29.     Bayer Corporation denies the allegations in paragraph 29 of the Complaint.

30.     Bayer Corporation denies the allegations in paragraph 30 of the Complaint.

31.     Bayer Corporation is without knowledge or information sufficient to form a belief as to the time frame to which the allegations in paragraph 31 of the Complaint refer, but denies that it was distributing or selling Trasylol® at the time of the procedure alleged in the Complaint. Bayer Corporation denies the remaining allegations in paragraph 31 of the Complaint.

32.     Bayer Corporation denies that it sold Trasylol® at the time of the procedure alleged in the Complaint. Bayer Corporation is without knowledge or information sufficient to form a belief as to whether or when Trasylol® was administered to Plaintiff and denies the remaining allegations in paragraph 32 of the Complaint.

33.     Bayer Corporation denies the allegations in paragraph 33 of the Complaint.

34.     Bayer Corporation denies the allegations in paragraph 34 of the Complaint.

35.     Bayer Corporation denies the allegations in paragraph 35 of the Complaint.

36.     Bayer Corporation admits that Trasylol® is intended to be administered to patients by physicians in accordance with FDA-approved labeling and without substantial change from the condition in which it was sold. Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36

of the Complaint, including as to whether Trasylol® was administered to Plaintiff and, if so, whether it reached Plaintiff without substantial change from the condition in which it was sold.

37.     Bayer Corporation is without knowledge or information sufficient to form a belief as to whether Trasylol® was administered to Plaintiff and, if so, whether it reached Plaintiff without substantial change from the condition in which it was sold.

38.     Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the Complaint.

39.     Bayer Corporation denies the allegations in paragraph 39 of the Complaint.

40.     Paragraph 40 of the Complaint states legal conclusions to which no answer is required.  To the extent a response may be required, Bayer Corporation states that because of the vagueness of the allegations, including the terms "entitled," "withdrawn," and "disagreed," it is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 of the Complaint.

41.     Bayer Corporation incorporates by reference its responses to each and every paragraph of the Complaint.

42.     Bayer Corporation denies the allegations in paragraph 42 of the Complaint.

43.     Paragraph 43 of the Complaint states legal conclusions to which no answer is required.  To the extent a response may be required, Bayer Corporation denies liability for any injury alleged in the Complaint, denies that its duties are accurately stated, denies that it breached any applicable duty of care relating to Plaintiff's claims, and denies the remaining allegations in paragraph 43 of the Complaint.

44.     Paragraph 44 of the Complaint states legal conclusions to which no answer is required.  To the extent a response may be required, Bayer Corporation denies liability for any

injury alleged in the Complaint, denies that its duties are accurately stated, denies that the warnings for Trasylol® were inadequate, denies that it breached any applicable duty of care relating to Plaintiff's claims, and denies the remaining allegations in paragraph 44 of the Complaint.

45.     Bayer Corporation denies the allegations in paragraph 45 of the Complaint, including all subparts thereof.

46.     Bayer Corporation denies the allegations in paragraph 46 of the Complaint.

47.     Bayer Corporation denies the allegations in paragraph 47 of the Complaint.

48.     Bayer Corporation denies the allegations in paragraph 48 of the Complaint.

49.     Paragraph 49 of the Complaint states legal conclusions to which no answer is required.  To the extent a response may be required, Bayer Corporation states that because of the vagueness of the terms "entitled," "bona fide scientific data," "withdrawn," and "disagreed," Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of those allegations in paragraph 49 of the Complaint.  Bayer Corporation denies the remaining allegations in paragraph 49 of the Complaint.

50.     Bayer Corporation incorporates by reference its responses to each and every paragraph of the Complaint.

51.     Bayer Corporation denies the allegations in paragraph 51 of the Complaint.

52.     Bayer Corporation denies the allegations in paragraph 52 of the Complaint.

53.     Paragraph 53 of the Complaint states legal conclusions to which no answer is required.  To the extent a response may be required, Bayer Corporation states that because of the vagueness of the terms "entitled," "bona fide scientific data," "withdrawn," and "disagreed," Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth

of those allegations in paragraph 53 of the Complaint. Bayer Corporation denies the remaining allegations in paragraph 53 of the Complaint.

54.     Bayer Corporation denies the allegations in paragraph 54 of the Complaint, including all subparts thereof.

55.     Bayer Corporation denies the allegations in paragraph 55 of the Complaint.

56.     Bayer Corporation denies the allegations in paragraph 56 of the Complaint.

57.     Bayer Corporation denies the allegations in paragraph 57 of the Complaint.

58.     Bayer Corporation denies the allegations in paragraph 58 of the Complaint.

59.     Paragraph 59 of the Complaint states legal conclusions to which no answer is required. To the extent a response may be required, Bayer Corporation states that because of the vagueness of the terms "entitled," "bona fide scientific data," "withdrawn," and "disagreed," Bayer Corporation is without knowledge or information sufficient to form a belief as to the truth of those allegations in paragraph 59 of the Complaint. Bayer Corporation denies the remaining allegations in paragraph 59 of the Complaint.

60.     Bayer Corporation denies the allegations in paragraph 60 of the Complaint.

61.     Bayer Corporation denies the allegations in paragraph 61 of the Complaint.

62.     Bayer Corporation denies the allegations in paragraph 62 of the Complaint.

63.     Bayer Corporation denies the allegations in paragraph 63 of the Complaint.

64.     Bayer Corporation incorporates by reference its responses to each and every paragraph of the Complaint.

65.     Bayer Corporation is without knowledge or information sufficient to form a belief as to the time frame to which the allegations in paragraph 65 of the Complaint refer, but denies that it tested, distributed, promoted, or sold Trasylol® at the time of the procedure alleged in the

Complaint and denies that it has designed or manufactured Trasylol®. Bayer Corporation admits that Trasylol® is intended to be administered to patients by physicians in accordance with FDA-approved labeling and without substantial change from the condition in which it was sold. Bayer Corporation is without knowledge or information sufficient to form a belief as to whether Trasylol® was administered to Plaintiff and, if so, whether it reached Plaintiff without substantial change from the condition in which it was sold. Bayer Corporation denies the remaining allegations in paragraph 65 of the Complaint.

66.     Paragraph 66 of the Complaint states legal conclusions to which no answer is required. To the extent a response may be required, Bayer Corporation admits that at the time of the procedure alleged in the Complaint Trasylol® was intended to be administered to patients by physicians in accordance with FDA-approved labeling and was safe and effective when used in accordance with FDA-approved labeling. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 66 of the Complaint.

67.     Bayer Corporation denies the allegations in paragraph 67 of the Complaint.

68.     Bayer Corporation denies the allegations in paragraph 68 of the Complaint.

69.     Bayer Corporation denies the allegations in paragraph 69 of the Complaint.

70.     Bayer Corporation incorporates by reference its responses to each and every paragraph of the Complaint.

71.     Bayer Corporation is without knowledge or information sufficient to form a belief as to the time frame to which the allegations in paragraph 71 of the Complaint refer, but denies that it tested, distributed, promoted, or sold Trasylol® at the time of the procedure alleged in the Complaint and denies that it has designed or manufactured Trasylol®. Bayer Corporation admits that Trasylol® is intended to be administered to patients by physicians in accordance with FDA-

approved labeling and without substantial change from the condition in which it was sold. Bayer Corporation is without knowledge or information sufficient to form a belief as to whether Trasylol® was administered to Plaintiff and, if so, whether it reached Plaintiff without substantial change from the condition in which it was sold. Bayer Corporation denies the remaining allegations in paragraph 71 of the Complaint.

72.     Paragraph 72 of the Complaint states legal conclusions to which no answer is required. To the extent a response may be required, Bayer Corporation admits that at the time of the procedure alleged in the Complaint Trasylol® was intended to be administered to patients by physicians in accordance with FDA-approved labeling and was safe and effective when used in accordance with FDA-approved labeling. Bayer Corporation denies the remaining or inconsistent allegations in paragraph 72 of the Complaint.

73.     Bayer Corporation denies the allegations in paragraph 73 of the Complaint.

74.     Bayer Corporation denies the allegations in paragraph 74 of the Complaint.

75.     Bayer Corporation denies the allegations in paragraph 75 of the Complaint.

76.     Bayer Corporation incorporates by reference its responses to each and every paragraph of the Complaint.

77.     Bayer Corporation denies the allegations in paragraph 77 of the Complaint.

78.     Bayer Corporation denies the allegations in paragraph 78 of the Complaint.

79.     Bayer Corporation denies the allegations in paragraph 79 of the Complaint.

80.     Bayer Corporation denies the allegations in paragraph 80 of the Complaint, including all subparts thereof.

81.     Bayer Corporation denies the allegations in paragraph 81 of the Complaint.

82.     Bayer Corporation denies the allegations in paragraph 82 of the Complaint.

83. Bayer Corporation denies the allegations in paragraph 83 of the Complaint.

84. Bayer Corporation denies the allegations in paragraph 84 of the Complaint.

85. Bayer Corporation incorporates by reference its responses to each and every paragraph of the Complaint.

86. Bayer Corporation denies the allegations in paragraph 86 of the Complaint.

87. Bayer Corporation denies the allegations in paragraph 87 of the Complaint.

88. Paragraph 88 of the Complaint states legal conclusions to which no answer is required. To the extent a response may be required, Bayer Corporation denies liability for any injury alleged in the Complaint, denies that its duties are accurately stated, denies that it breached any applicable duty of care relating to Plaintiff's claims, and denies the remaining allegations in paragraph 88 of the Complaint.

89. Bayer Corporation denies the allegations in paragraph 89 of the Complaint, including all subparts thereof.

90. Bayer Corporation denies the allegations in paragraph 90 of the Complaint.

91. Bayer Corporation denies the allegations in paragraph 91 of the Complaint.

92. Bayer Corporation denies the allegations in paragraph 92 of the Complaint.

93. Bayer Corporation denies the allegations in paragraph 93 of the Complaint.

94. Bayer Corporation denies the allegations in paragraph 94 of the Complaint.

95. Bayer Corporation denies liability for any injury alleged in the Complaint and denies that Plaintiff is entitled to the relief requested in the "Wherefore" clause following paragraph 94 of the Complaint, including all subparts thereof.

96. Wherever Plaintiff has incorporated by reference prior allegations in the Complaint, Bayer Corporation incorporates by reference its responses to such allegations.

97.     Bayer Corporation denies each and every allegation in the Complaint that relates to or is directed to Bayer Corporation unless such allegations are expressly responded to in this Answer.

## ADDITIONAL DEFENSES

Discovery and investigation may reveal that one or more of the following additional defenses should be available to Bayer Corporation in this matter.  Bayer Corporation accordingly reserves the right to assert these separate and additional defenses.  Upon completion of discovery, if the facts warrant, Bayer Corporation may withdraw any of these additional defenses as may be appropriate.  Bayer Corporation further reserves the right to amend its answer and defenses, and to assert additional defenses and other claims, as discovery proceeds.

Further answering, and by way of additional defense, Bayer Corporation states as follows:

**Defense No. 1.**    Plaintiff's Complaint and each and every count contained therein fail to state a cause of action or claim upon which relief can be granted against Bayer Corporation.

**Defense No. 2.**    Some or all of Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitation and/or statutes of repose.

**Defense No. 3.**    Plaintiff's claims are barred, in whole or in part, by laches, waiver, and/or estoppel.

**Defense No. 4.**    Plaintiff's Complaint fails to join indispensable parties necessary for the just adjudication of this matter.

**Defense No. 5.**    The alleged damages and injuries, if any, were the result of unavoidable circumstances that could not have been prevented by any person or entity, including Bayer Corporation.

**Defense No. 6.**   Plaintiff has not suffered any actual injury, loss, or damages because of the alleged use of Trasylol®.

**Defense No. 7.**   The injuries and damages claimed by Plaintiff, if any, resulted from an intervening or superseding cause and/or causes, and no act or omission on the part of Bayer Corporation was a proximate or competent producing cause of such alleged injuries or damages.

**Defense No. 8.**   The injuries sustained by Plaintiff, if any, were caused, in whole or in part, by pre-existing or subsequent physical, medical, and/or physiological conditions, for which Bayer Corporation has no legal responsibility.

**Defense No. 9.**   The acts and omissions of Plaintiff and/or other persons or entities, over whom Bayer Corporation had no supervision or control and for whose actions and omissions Bayer Corporation has no legal responsibility, caused or contributed to the alleged damages, thereby barring or reducing the amount of recovery under the doctrine of contributory and/or comparative negligence.  Plaintiff's recovery, if any, therefore is barred or should be reduced and/or apportioned in accordance with Conn. Gen. Stat. § 52-572o or other applicable law.

**Defense No. 10.**   Upon information and belief, each item of economic loss alleged in the Complaint was, or with reasonable certainty will be, replaced or indemnified in whole or in part from collateral sources.  To the extent Plaintiff is seeking recovery for benefits entitled to be received or actually received from any other source for injuries alleged in the Complaint, such benefits are not recoverable in this action under Connecticut law or any other applicable law.

**Defense No. 11.**   To the extent Plaintiff has settled or will in the future settle with any person or entity with respect to the injuries asserted in the Complaint, the liability of Bayer Corporation, if any, should be reduced accordingly.

**Defense No. 12.**   Plaintiff's claims are barred because Trasylol® was neither defective nor

unreasonably dangerous in its design, manufacture, or marketing and was reasonably safe and reasonably fit for its intended use. The warnings and instructions accompanying Trasylol® at the time of the occurrence or injuries alleged by Plaintiff were legally adequate warnings and instructions.

**Defense No. 13.**   The claims in the Complaint are barred in whole or in part by the learned intermediary doctrine.

**Defense No. 14.**   Plaintiff did not detrimentally rely on any labeling, warnings, or information concerning Trasylol®.

**Defense No. 15.**   Plaintiff's Complaint fails to state a claim upon which relief can be granted in that the methods, standards, and techniques utilized with respect to the design, manufacture, testing, distribution, marketing, and sale of Trasylol®, including but not limited to adequate warnings and instructions with respect to the product's use included in the product's package insert and other literature, conformed to the applicable state of the art. Trasylol®, including its labeling approved by the United States Food and Drug Administration, complied with the state of scientific and medical knowledge at the time of its design, testing, manufacture, distribution, marketing, and sale. Plaintiff's recovery accordingly is barred.

**Defense No. 16.**   Trasylol® complied with the applicable product safety regulations promulgated by the United States Food and Drug Administration. Compliance with such regulations demonstrates that due care was exercised with respect to the design, manufacture, testing, distribution, marketing, and sale of Trasylol®, and that it was neither defective nor unreasonably dangerous.

**Defense No. 17.**  If Plaintiff sustained the injuries or incurred the expenses as alleged, which is expressly denied, said injuries or expenses were caused by the unforeseeable alteration, improper handling, or other unforeseeable misuse of Trasylol®.  Plaintiff's recovery accordingly is barred.

**Defense No. 18.**  Plaintiff's claims are preempted, in whole or in part, by federal law pursuant to the Supremacy Clause of the United States Constitution by reason of the federal government's regulation of the manufacturing, testing, marketing, sale, and labeling of prescription drugs.

**Defense No. 19.**  Plaintiff's claims regarding warnings and labeling are barred in whole or in part by the doctrine of primary jurisdiction, in that the United States Food and Drug Administration is charged under law with determining the content of warnings and labeling for prescription drugs.

**Defense No. 20.**  Plaintiff cannot state a claim with regard to the warnings and labeling for prescription drugs because the remedy sought by Plaintiff is subject to the exclusive regulation of the United States Food and Drug Administration.

**Defense No. 21.**  This Court should abstain from adjudicating Plaintiff's claims relating to warnings and labeling in deference to the interpretation of regulations relating to prescription drug labeling by the United States Food and Drug Administration.

**Defense No. 22.**  Any claims by Plaintiff relating to alleged communications with regulatory agencies of the United States government are barred in whole or in part by operation of applicable law, including First and Fourteenth Amendment rights to petition the government.

**Defense No. 23.**  Plaintiff's claims are barred in whole or in part because the commercial speech relating to Trasylol® was not false or misleading and is protected under the First Amendment of the United States Constitution and by applicable state constitutional provisions.

**Defense No. 24.**  Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate the alleged damages.

**Defense No. 25.**  Plaintiff's Complaint fails to state a claim upon which relief can be granted as to costs, attorney fees, expenses, pre-judgment interest, post-judgment interest, or treble damages.

**Defense No. 26.**  Plaintiff's Complaint fails to state a claim upon which relief can be granted against Bayer Corporation under any applicable state product liability law.

**Defense No. 27.**  Bayer Corporation asserts all available defenses under any applicable state product liability law.

**Defense No. 28.**  Plaintiff's claims are barred pursuant to Restatement (Second) of Torts § 402A, comment k.

**Defense No. 29.**  Plaintiff's claims are barred because Trasylol® provides net benefits for a class of patients.

**Defense No. 30.**  Bayer Corporation did not sell or distribute Trasylol® directly to Plaintiff and Plaintiff did not receive or rely upon any representations or warranties as alleged in the Complaint.  Plaintiff's claims for breach of warranty are barred by lack of privity between Plaintiff and Bayer Corporation.

**Defense No. 31.**  Plaintiff's claims of breach of warranty are barred because Plaintiff failed to give timely notice of any alleged breach of warranty.

**Defense No. 32.**  Plaintiff's claims for breach of warranty, express or implied, are barred by the applicable provisions of the Connecticut Commercial Code or other applicable law.

**Defense No. 33.**  Plaintiff's Complaint fails to state a claim for fraud, misrepresentation, deceit, concealment, suppression and/or omission, and fails to allege the circumstances constituting fraud with the required particularity.

**Defense No. 34.**  Plaintiff's claims under "CUTPA" are precluded by the exclusivity provision contained in Conn. Gen. Stat. § 52-572n of the Connecticut Products Liability Act, Conn. Gen. Stat. §§ 52-572m et seq.

**Defense No. 35.**  Plaintiff's Complaint fails to state a claim against Bayer Corporation upon which relief can be granted for punitive or exemplary damages.

**Defense No. 36.**  Bayer Corporation denies any conduct for which punitive or exemplary damages could or should be awarded and denies that Plaintiff has produced evidence sufficient to support or sustain the imposition of punitive damages against Bayer Corporation pursuant to the applicable standards of proof.

**Defense No. 37.**  Permitting recovery of punitive or exemplary damages in this case would be unconstitutionally vague and/or overbroad, would violate Bayer Corporation's constitutional rights as secured by the Fifth, Seventh, and Fourteenth Amendments to the United States Constitution, and would contravene the prohibition of excessive fines and other provisions of the United States Constitution, the Connecticut Constitution, and any other applicable state constitution.

**Defense No. 38.**  Plaintiff cannot recover punitive or exemplary damages against Bayer Corporation because such an award, which is penal in nature, would violate Bayer Corporation's rights under the United States Constitution and any other applicable state constitution, unless Bayer Corporation is afforded the same procedural safeguards as are criminal defendants.

20

**Defense No. 39.**  Any imposition of punitive or exemplary damages in this case against Bayer Corporation would contravene the Commerce Clause of the United States Constitution, in that such an award would constitute an undue and unreasonable burden on interstate commerce.

**Defense No. 40.**  With respect to Plaintiff's demand for punitive or exemplary damages, Bayer Corporation incorporates by reference any and all standards or limitations regarding the determination and enforceability of punitive or exemplary damages awards under Connecticut law or other applicable state law.

**Defense No. 41.**  No act or omission of Bayer Corporation was intentional, reckless, willful misconduct, wanton, reckless, and/or with actual malice, oppression, and/or fraud as defined in Conn. Gen. Stat. §§ 52-572m, *et. seq.*, or with conscious disregard and indifference to the rights, safety and welfare of Plaintiff, or evidencing that entire want of care which would raise the presumption of conscious indifference to the consequences, and therefore any award of punitive or exemplary damages is barred.  Bayer Corporation asserts all statutory or judicial protections from punitive or exemplary damages that are available under applicable law, and any award of punitive or exemplary damages is barred.

**Defense No. 42.**  The claim for punitive or exemplary damages against Bayer Corporation cannot be sustained under Connecticut law because, in all respects pertinent to this action, Bayer Corporation complied with applicable industry standards and did not engage in a deliberate course of conduct which knowingly endangered those using Trasylol®.

**Defense No. 43.**  Plaintiff's claims of injury and claims for damages are speculative.

**Defense No. 44.**  Plaintiff's Complaint fails to state a claim upon which relief can be granted for joint and several liability.

**Defense No. 45.**  Bayer Corporation preserves all objections and defenses relating to personal

jurisdiction and venue.

**Defense No. 46.**  Bayer Corporation adopts and incorporates by reference all defenses pleaded

by other defendants except to the extent that they are inconsistent with Bayer Corporation's

defenses pleaded in this Answer.

**WHEREFORE,** Bayer Corporation denies any and all liability with regard to Plaintiff's claims

and respectfully requests that Plaintiff's claims against it be dismissed with prejudice and that

Bayer Corporation be awarded such general, further relief as justice may require.

## JURY DEMAND

Bayer Corporation respectfully requests that a jury try the issues in this matter.

DATED:  December 4, 2009                              Respectfully submitted,

                                                     /s/ Barbara Bolton Litten
                                                     Patricia E. Lowry (Florida Bar No. 332569)
                                                     Email: plowry@ssd.com
                                                     Barbara Bolton Litten (Florida Bar No. 91642)
                                                     Email: blitten@ssd.com
                                                     SQUIRE, SANDERS & DEMPSEY L.L.P.
                                                     1900 Phillips Point West
                                                     777 South Flagler Drive
                                                     West Palm Beach, FL 33401-6198
                                                     Telephone:  561-650-7120
                                                     Facsimile:  561-655-1509

                                                     *Attorneys for Defendant Bayer Corporation*

### CERTIFICATE OF SERVICE

I certify that on December 4, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/  Barbara Bolton Litten
Barbara Bolton Litten

## SERVICE LIST

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON
### Case No. 9:08-CV-80868-DMM

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN,
FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-735-1130
Facsimile: 215-875-7758
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE &
LECLAINCHE, P.A.**
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile: 561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509
*Liaison Counsel for Defendants*

Scott Love
Email: slove@triallawfirm.com
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: 713-759-1400
Facsimile: 713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone: 203-610-6393
Facsimile: 203-610-6399
*Federal-State Liaison for Plaintiffs and
Attorneys for Plaintiff Anna E. Bryant*

# EXHIBIT L

Supplement to September 21, 2009 Report

of Glenn M. Chertow, MD, MPH for

*Anna E. Bryant v. Bayer Corporation et al.,*

<u>Case No. 9:08-cv-80868 (U.S.D.C., S.D. Fla.)</u>

1. Assignment

I have been asked to review additional medical records located at the Harbor-UCLA Medical Center regarding Ms. Anna E. Bryant and relating to her coronary artery bypass graft (CABG) surgery on March 9, 2006 and to consider whether to amend or revise my initial report based on these additional materials.

2. Materials Reviewed

I was provided with two sets of additional medical records. One set is enumerated Abryant-HUCLAMC-MD-000277 to Abryant-HUCLAMC-MD-000976. The second set consists of 62 pages of laboratory records scanned into a file entitled "Anna Bryant Supp Harbor UCLA Records 12_4_09.pdf".

3. Conclusions

I have reviewed the supplementary medical records identified above. None of the information provided in these records prompts me to change my report. My conclusions regarding the role of aprotinin in contributing to Ms. Bryant's acute renal failure and persistent injury necessitating maintenance dialysis, set forth in my original report of September 21, 2009, are unchanged.

I reserve the right to amend this report based on additional materials which might be presented to me.

Dated:  December 15, 2009

_____

Glenn M. Chertow, MD, MPH