UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION - MDL-1928

This Document Relates To: All Actions

_____/

## ORDER ON BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT MARK J. EISENBERG

THIS CAUSE comes before the Court upon Defendants' (hereinafter, collectively, "Bayer's") Motion to Exclude Testimony of Plaintiffs' Expert Mark J. Eisenberg[1] ("Motion") (DE 3074), filed on December 18, 2009. Plaintiffs filed a Response (DE 3840), to which Bayer replied (DE 4096). The Court has reviewed the pertinent parts of the record and is advised in the premises. For the reasons stated below, Bayer's Motion shall be granted in part and denied in part.

I.      **Legal Standard**

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The party seeking to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of proof. *Davidson v. United States Dep't of Health & Human Servs.*, 2007 WL

_____

[1] Dr. Mark J. Eisenberg is a clinical epidemiologist and cardiologist. (DE 3074 at 1; DE 3840 at 16.)

1

3251921, at *2 (E.D. Ky. Nov. 2, 2007) (internal citations omitted).  *See also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

    According to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. According to the Supreme Court, the inquiry envisioned by Rule 702 is a flexible one, in which federal judges perform a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("It's [Rule 702's] overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

    In *Daubert*, the Supreme Court listed several factors federal judges may consider in determining whether to admit expert scientific testimony under Rule 702: whether an expert's theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally accepted in the scientific community.[2]  509 U.S. at 593-94

---

[2] In *Daubert*, the Supreme Court considered the federal judge's gatekeeping role in ensuring that all *scientific* expert testimony is not only relevant, but reliable.  The Supreme Court later held that this basic gatekeeping obligation and *Daubert*'s general principles apply to *all* expert testimony, not just testimony that is classified as scientific. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999).

2

(declining to set forth a "definitive checklist or test").

The Supreme Court subsequently held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150 (internal citations and quotations omitted). Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . [A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. The trial court has the same kind of latitude in deciding how to test an expert's reliability as it enjoys when it decides whether or not that expert's relevant testimony is reliable. *Id.*

The Eleventh Circuit engages in a three part inquiry to determine the admissibility of expert testimony under Rule 702, considering whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (internal citations omitted). The Eleventh Circuit has noted that "the primary purpose of any *Daubert* inquiry is for the district court to determine whether that expert, 'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho*, 526 U.S. at 152).

3

## II.   Background & Analysis

Bayer moves to exclude Dr. Eisenberg's expert testimony relating to five of his proposed opinions: (1) that lysine analogues are preferable to Trasylol; (2) that Trasylol is associated with myocardial infarction ("MI") and graft occlusion; (3) that Bayer breached "ethical standards" by not responding to "safety signals"; (4) that Trasylol's marketing "assertedly" [sic] drove physicians' widespread use of the medication; and (5) that Trasylol has a prothrombotic or procoagulatory mechanism of action. (DE 4096 at 1.) Bayer's arguments in support of exclusion and Plaintiffs' arguments against exclusion are organized into these five categories below, as well as the Court's decision as to each opinion.

### A.   Dr. Eisenberg's Opinion that Lysine Analogues are Preferable to Trasylol

Bayer seeks to exclude Dr. Eisenberg's opinion that "the preponderance of the evidence clearly favors the use of lysine analogues over aprotinin" because he did not consider the totality of the evidence necessary to arrive at a scientifically reliable opinion on the superiority, or even the safety of the lysine analgoues, in violation of his own standard of proper methodology. (DE 3074 at 3-6; DE 3074-2 at 12.) In support of its argument, Bayer cites to the following: (1) Dr. Eisenberg considered only a fraction of the data available on the lysine analogues because he did not use the terms "aminocaproic acid" or "tranexamic acid" (the two lysine analogues at issue) in any of his searches for studies or literature; (2) Dr. Eisenberg did not recall reviewing a single randomized controlled trial that compared either lysine analogue to placebo; (3) the discussion of meta-analyses in Dr. Eisenberg's Report makes clear that the studies do not represent that the lysine analogues

4

demonstrated superiority over Trasylol; (4) Dr. Eisenberg did not know that the FDA has not approved either lysine analogue for use in CABG surgery. (DE 3074 at 4-6.)

Bayer also argues that Dr. Eisenberg's opinion that the "[l]ysine analogues are more cost-effective than aprotinin" should be excluded because: (1) it falls outside Dr. Eisenberg's area of expertise[3]; (2) is not relevant to issues at trial[4]; and (3) lacks foundation.[5] (DE 3074 at 7; DE 3074-2 at 13.)

Plaintiffs respond that Dr. Eisenberg's opinion that use of lysine analogues is preferable to use of Trasylol was reached by reliable methods and is supported by scientific data. (DE 3840 at 28.) Plaintiffs cite to the following in support of their argument that "peer-reviewed and published scientific data supports Dr. Eisenberg's view that the lysine analogues are effective at reducing bleeding and are not associated with adverse clinical events": (1) five published randomized controlled trials, cited by Dr. Eisenberg in his Report, drew the conclusion that Trasylol and the lysine analogues have equivalent effects on bleeding; (2) a randomized controlled trial, the BART trial, concluded that Trasylol, but not the lysine analogues, is negatively associated with mortality;

---

[3] According to Bayer, the cost issue is not within Dr. Eisenberg's expertise because epidemiologists do not measure or assess the safety of a medicine by assessing its cost effectiveness. (DE 3074 at 7.)

[4] According to Bayer, cost is not germane to the fundamental issue in these cases: Trasylol's safety. (DE 3074 at 7.) At the deposition, Dr. Eisenberg agreed that the cost of a medicine has "nothing to do with whether the drug is safe." (DE 3074-1 at 200:21-25.)

[5] According to Bayer, Dr. Eisenberg did not conduct sufficient research to opine on the effectiveness, much less cost-effectiveness, of the lysine analogues. More specifically, although he acknowledged that cost-effectiveness must be assessed not simply by how much a drug costs, but with respect to downstream expenditures/savings, he testified that he reviewed just one study to assess these costs, and that study involved only one of the two other lysine analogues. (DE 3074 at 7.)

and (3) numerous meta-analyses, set forth in Dr. Eisenberg's Report, indicated that aminocaproic acid and Trasylol had similar efficacies in reducing blood loss but only Trasylol was associated with a statistically significant risk of renal dysfunction.[6]  (DE 3840 at 29-31.)

In response to Bayer's argument that Dr. Eisenberg considered only a fraction of the data available on the lysine analogues because he did not use the terms "aminocaproic acid" or "tranexamic acid" in any of his searches for studies or literature, Plaintiffs state that the fact that Dr. Eisenberg did not specifically search for the individual lysine analogues by name does not mean he did not consider and review literature dealing with those two products, particularly as they compared to Trasylol.  (DE 3840 at 32.)  Plaintiffs cite to the Report, which is "replete with discussion of studies on tranexamic acid and aminocaproic acid."  (DE 3840 at 32.)

In response to Bayer's argument that Dr. Eisenberg considered only a fraction of the data available on the lysine analogues because he did not recall reviewing a single randomized controlled trial that compared either lysine analogue to placebo, Plaintiffs state that it is "not methodologically unsound for Dr. Eisenberg to base his opinion comparing lysine analogues and Trasylol upon the many randomized controlled trials, meta-analysis, and cohort studies directly comparing the two agents at issue: lysine analogues *and Trasylol*."  (DE 3840 at 32-33.)

---

[6] Plaintiffs argue that there are several problems with Bayer's argument that two of the meta-analyses (Brown and Carless) in the Report prove that lysine analogues are not shown to be preferable to Trasylol.  First, allegations of inadequacies in a study go to the weight of the expert's testimony, not its admissibility.  (DE 3840 at 31.)  Second, no inadequacy in support exists because both meta-analyses were subsequently updated to include increased risks not apparent from the lesser-powered earlier analyses.  (DE 3840 at 31.)  Third, Plaintiffs argue that even if the Court were to limit its assessment to the Carless study's conclusion that peri-operative blood loss was greater with the lysine analogues than with Trasylol, that single conclusion does not demonstrate a flaw in Dr. Eisenberg's opinion: "it is not necessary that the lysine analogues be superior to Trasylol in all measures for Dr. Eisenberg to draw the conclusion that their use is preferable to Trasylol."  (DE 3840 at 31-32.)

Plaintiffs also argue that data supports Dr. Eisenberg's view that lysine analogues are more cost-effective than Trasylol,[7] and that Dr. Eisenberg is fully qualified, as an epidemiologist and cardiologist, to offer an opinion on the effectiveness of Trasylol in comparison to the lysine analogues in relation to their respective costs.[8] (DE 3840 at 33.)

In its Reply, Bayer argues that Plaintiffs' response ignores Dr. Eisenberg's testimony about the limitations of his opinions and attempts to fill out these opinions with evidence that Dr. Eisenberg did not discuss, or which Bayer showed is insufficient to demonstrate superiority. (DE 4096 at 11.) According to Bayer, Plaintiffs' response does not cure Dr. Eisenberg's methodological shortcomings with respect to the three factors that are essential to his superiority opinion: efficacy, safety, and cost. (DE 4096 at 12.) In regards to efficacy, Bayer argues that Dr. Eisenberg did not study how the lysine analogues performed versus placebo, and the trials newly identified by Plaintiffs' counsel did not provide evidence of superior efficacy for the lysine analogues over Trasylol. (DE 4096 at 12.) In regards to safety, Bayer argues that Plaintiffs' counsel give their own opinions rather than those of Dr. Eisenberg. (DE 4096 at 12.) In regards to cost, Bayer asserts that Plaintiffs dodge its points regarding Dr. Eisenberg's qualifications and foundation to opine about Trasylol's cost-effectiveness. (DE 4096 at 13.) According to Bayer, "Eisenberg's opinion regarding the alleged superiority of the lysine analogues over Trasylol is not scientifically sound with respect

---

[7] Plaintiffs cite to several studies that have conducted cost-effectiveness analyses of Trasylol in comparison to the lysine analogues and concluded that the lysine analogues are more cost-effective than Trasylol. (DE 3840 at 34.)

[8] In support of the argument that Dr. Eisenberg is qualified in this regard, Plaintiffs state that Dr. Eisenberg has published over a dozen peer reviewed articles dealing with cost evaluations for medical treatments, and that as an epedimeologist, he is qualified to assess the various studies that have performed cost-effectiveness analyses of Trasylol and the lysine analogues. (DE 3840 at 33.)

7

to efficacy, safety, or cost. Even if it were only unreliable as to one of those measures, however, Dr. Eisenberg's testimony still would be inadmissible because all three criteria are necessary to his overall opinion." (DE 4096 at 14.)

The Court finds that Dr. Eisenberg's opinion that "the preponderance of the evidence clearly favors the use of lysine analogues over aprotinin" meets the admissibility criteria of *Daubert* and Rule 702: it is supported by reliable data and methods and does not violate Dr. Eisenberg's own standard of proper methodology–a review of the totality of the evidence.[9] Bayer's arguments are unavailing in this regard. While Dr. Eisenberg did not use the terms "aminocaproic acid" or "tranexamic acid" in any of his searches for studies or literature, his objective was to "examine whether aprotinin is better than aminocaproic acid or tranexamic acid at reducing bleeding outcomes" and to "examine the risks and benefits of these agents."[10] (DE 3074-2 at 4.) In reaching the opinion that the use of lysine analogues is preferable to aprotinin, Dr. Eisenberg considered various randomized controlled trials, meta-analyses, and cohort studies that compared aprotinin to the lysine analogues, in terms of efficacy and safety. (DE 3074-2 at 15-126.) Similarly, while Dr. Eisenberg may not have reviewed meta-analyses or randomized controlled trials comparing either lysine analogue to placebo, he does not attempt to opine on the risk-benefit comparison between the

---

[9] This opinion is made under the section "Association of aprotinin with increased mortality," and it appears that it refers to the risk-benefit comparison rather than a risk-benefit-cost comparison. As explained below, the Court finds this opinion to be admissible insofar as it refers to the risk-benefit comparison, not the risk-benefit-cost comparison of the lysine analogues and aprotinin.

[10] In his deposition, Dr. Eisenberg was asked whether he searched for studies or articles discussing aminocaproic and tranexamic acid. He responded that he did not specifically search for aminocaproic and tranexamic acid but "identified those articles in the context of studies that looked at aprotinin, and used aminocaproic acid [and tranexamic acid] as a comparator." (DE 3074-1 at 101:3-13.)

lysine analogues and placebo, but rather on the risk-benefit comparison between the lysine analogues and aprotinin.

Further, Bayer's argument that several meta-analyses do not represent that the lysine analogues demonstrated superiority over aprotinin does not support the argument that Dr. Eisenberg did not consider the totality of the evidence necessary to arrive at a scientifically reliable opinion on the superiority of the lysine analogues. The meta-analyses cited by Bayer, Carless (2005) and Brown (2007), were considered by Dr. Eisenberg, and discussed in his Report among seven other meta-analyses. (DE 3074-2 at 48-74.) The Court finds that Bayer's argument goes to the weight rather than the admissibility of Dr. Eisenberg's testimony: vigorous cross-examination and the presentation of contrary evidence will be the appropriate means of attacking it. *See Quiet Tech.*, 326 F.3d at 1341 ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. . . . By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.") (internal citations and quotations omitted).

Finally, Bayer's argument that "Eisenberg's conclusion that lysine analogues are preferred for CABG surgery when these medicines have not been approved for such use" does not demonstrate that Dr. Eisenberg failed to consider the totality of the evidence necessary to arrive at a scientifically reliable conclusion. (DE 3074 at 6.) Dr. Eisenberg opines on the medical risks and benefits of the lysine analogues as compared to aprotinin and conducts a thorough review of the evidence in arriving at this opinion. Contrary to Bayer's assertion, lack of knowledge of FDA approval does not demonstrate a lack of familiarity with the medical risks and benefits of the lysine analogues as

compared to aprotinin.  (DE 3074 at 5.)

While Dr. Eisenberg's risk-benefit opinion is admissible, the Court finds that his opinion on

the cost-effectiveness of Trasylol in comparison to the lysine analogues is inadmissible because

Plaintiffs have not shown that: (1) it will assist the jury to understand the evidence or to determine

a fact in issue.[11]  *See* FED. R. CIV. P. 702.  Plaintiffs, as the proponents of the expert opinion, have

the burden of establishing relevance.  While the relevance of the cost-effectiveness of aprotinin, as

compared to the lysine analogues, is not readily apparent, Plaintiffs have completely ignored Bayer's

argument on relevance.  (DE 3840 at 33-35.)  Because Plaintiffs have not established the opinion's

relevance by a preponderance of proof, it is inadmissible.

**B.      Dr. Eisenberg's Opinion that Trasylol is Associated with Myocardial Infarction and Graft Occlusion**

Bayer seeks to exclude Dr. Eisenberg's opinion that Trasylol is associated with an increased

risk of myocardial infarction ("MI") and graft occlusion[12] because he did not consider the totality of

the evidence in arriving at that conclusion, and as a result, his opinion is based on "indirect

evidence" and "general impressions," not "reliable scientific evidence."  (DE 3074 at 8.)  Bayer first

cites to numerous meta-analyses concluding that there is no association between Trasylol and MI.

_____

[11] Because the Court finds that Dr. Eisenberg's cost-effectiveness opinion is inadmissible, the opinion that "the risk-benefit-cost comparison made aminocaproic acid and tranexamic acid the agents of choice" is also inadmissible.

[12] According to Dr. Eisenberg's Report, "There is indirect evidence that the use of aprotinin is associated with perioperative MI.  This evidence comes from a variety of studies. First, Cosgrove et al. showed that aprotinin use may be associated with a higher incidence of graft occlusion.  Sudden graft occlusion, such as that caused by graft thrombosis, almost always causes acute MI."  (DE 3074-2 at 13.)

(DE 3074 at 8.) Bayer also argues that Dr. Eisenberg could not identify a single meta-analysis that concluded that there was such an association, and the two studies that he was "impressed by" fail to provide statistically significant support for his position. (DE 3074 at 9.)

Plaintiffs respond that Dr. Eisenberg's opinion derives from the application of reliable methodology to scientific data. (DE 3840 at 35.) First, Plaintiffs argue that Bayer's fixation on the conclusions of meta-analyses, none of which find an association between Trasylol and MI, ignores the published results of several cohort studies and randomized clinical trials regarding the positive association of Trasylol and MI.[13] (DE 3840 at 35.) Second, Plaintiffs argue that the meta-analyses cited by Bayer do not disprove an association between Trasylol and MI. (DE 3840 at 38.) Accordingly, "That there is not a definitive study concluding that Trasylol is associated with MI is more a product of study-size limitations than evidence that a causal conclusion is lacking support. . . . [T]he cases Bayer cites for concluding there is 'no association' are more accurately described as having 'indeterminate' results due to inadequate sample sizes." (DE 3840 at 38.)

Bayer replies that Plaintiffs ignore the record and Bayer's showing that Dr. Eisenberg lacked sufficient foundation upon which to base testimony that Trasylol is associated with increased risks

---

[13] Plaintiffs refer to the Mangano 2006 and 2007 studies, the Cosgrove 1992 study, the Image trial, and the BART trial, contained in Plaintiffs' Compendium of Exhibits, Exhibit K, J, L and C. (DE 3840 at 35-37.) Plaintiffs note that Bayer's "overemphasis" on statistical significance is misplaced. Accordingly, "[I]t is a commonly held belief in the field of epidemiology that statistical significance is neither obligatory no[r] appropriate to use as a requirement for drawing inferences from epidemiological data." (DE 3840 at 38 n.62.) Plaintiffs argue that numerous courts have recognized that while small study numbers may impact statistical significance, other *Daubert* factors may nevertheless tip the scales in favor of admissibility. (DE 3840 at 39-40.) This Court notes that Dr. Eisenberg states in his Report that "whenever I use the word 'association' in this report in connection with study findings or opinions, I use it in the 'epidemiological' sense meaning that there is a statistically significant relationship with a p value less than 0.05." (DE 3074-2 at 4.)

11

of MI and graft occlusion.[14] Bayer argues that Plaintiffs' suggestion that Mangano and BART provide sufficient foundation for Dr. Eisenberg's opinion is wrong for several reasons. (DE 4096 at 9.) "First, counsel ignores that, although Dr. Eisenberg referred to Mangano and BART throughout his deposition, he disavowed reliance on those studies for the opinion in question. . . . Plaintiffs cannot 'salvage [Dr. Eisenberg's] proposed testimony' by 'fill[ing] in' his opinion and attempting 'to explain why [certain] studies help inform [his] conclusion.'" (DE 4096 at 9-10. (quoting *Human Prods. Tissue Liab. Litig.*, 582 F. Supp. 2d 644, 667)) Bayer also claims that Plaintiffs misunderstand their burden of demonstrating that the opinion is admissible: Bayer does not need to prove that there is *no* association between Trasylol and MI in order to show that Dr. Eisenberg lacks foundation to testify that an association exists. (DE 4096 at 10.) Instead, Plaintiffs have the burden of establishing a reliable foundation for Dr. Eisenberg's opinion that there is an association between Trasylol and MI: the fact that an increased risk of MI is not excluded does not allow Dr. Eisenberg to testify that "not only is there an increased risk, but that Trasylol is responsible for the alleged association." (DE 4096 at 10.)

"The general rule that the 'factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility' applies equally to *Daubert* motions in MDL matters involving allegations that a drug has caused harm to plaintiffs." *In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1077-78 (D. Minn. 2008) (quoting *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1036 (D. Minn. 2007)). *But see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") (internal citations omitted). "Although it is common that medical experts disagree on

---

[14] Bayer quotes Dr. Eisenberg's deposition, DE 3074-1 at 300-04.

diagnosis and causation, questions of conflicting evidence must be left for the jury's determination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Viagra*, 572 F. Supp. 2d at 1078 (internal citations omitted).

The *Viagra* court was faced with the question of whether a general-causation expert's report was unreliable because it was based on data that was not statistically significant. *Id.* at 1081. The court held that while statistical significance is among the factors a district court should examine when determining reliability, "there is persuasive authority stating that on a *Daubert* motion involving general-causation evidence in an MDL matter, lack of statistical significance under some circumstances 'does not detract from reliability of the study.'" *Id.* (citing *Daubert*, 509 U.S. at 592) (quoting *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1241 (W.D. Wash. 2003)). In denying Pfizer's motion to exclude the general-causation expert's report and proffered testimony, the *Viagra* court found that while the expert relied on studies that produced statistically insignificant results, those studies were based on generally accepted epidemiologic research, peer-reviewed, published, contained known rates of error, and did not result from post-litigation research. *Id.* Therefore, the court held that the studies were reliable for general-causation purposes.[15] *Id.* at 1081-82 ("The studies satisfy the precise standards that the Supreme Court has signaled that the Court should consider when determining reliability.").

The Court finds that as in *Viagra*, Dr. Eisenberg's opinion should not be excluded simply because it is based on data that is not statistically significant.[16] Plaintiffs assert that the studies relied

---

[15] According to the court, "Pfizer must be afforded meaningful opportunity to cross-examine McGwin [the general-causation expert]." *Viagra*, 572 F. Supp. 2d at 1082.

[16] During his deposition, Bayer asked Dr. Eisenberg for all the studies on which he was relying on to support his opinion that there is indirect evidence of an association between

upon by Dr. Eisenberg (Cosgrove and Image) satisfy the standards that this Court should consider when determining reliability: the studies were based on generally accepted epidemiologic research, peer-reviewed, published, contain known rates of error, and do not result from post-litigation research. (DE 3840 at 40.) Bayer does not challenge this assertion. The relied upon studies satisfy the precise standards a district court should consider when determining reliability.

Further, the opinion is not so fundamentally unsupported that it can offer no assistance to the jury. This is not a case where "there is simply too great an analytical gap between the data and the opinion proffered." *See Joiner*, 522 U.S. at 146. Dr. Eisenberg's opinion is that "There is *indirect evidence* that use of aprotinin is associated with perioperative MI." and "Aprotinin use *may* be associated with a higher incidence of graft occlusion."[17] (DE 3074-2 at 14. (emphasis added)) Dr.

---

aprotinin and MI. (DE 3074-1 at 301:15-18.) Dr. Eisenberg responded that he was relying on "the Cosgrove study, the Image trial, the breakdown of the cardiac causes of death in BART, the many studies that suggest that aprotinin is effective at reducing bleeding, so we know that it's a prothrombotic agent. So the causes of graft thrombosis are many, but one of them that – in one cause that it would promote graft thrombosis is any type of prothrombotic situation." (DE 3074-1 at 301:19-302:3.) While Dr. Eisenberg acknowledged that the Image trial "found an association between aprotinin and graft thrombosis" but "additional analyses after the primary analysis . . . made this association go away," he explained why he took issue with the additional analyses. (DE 3074-1 at 302:12-25.) Dr. Eisenberg also clarified that his testimony was not that the Cosgrove study found a statistically significant difference between aprotinin and placebo for the outcome of graft patency: "that [Cosgrove] study was not adequately powered to look at that issue . . . but it certainly raised a really important question." (DE 3074-1 at 303:24-304:13.) In the Report, Dr. Eisenberg comments on the Cosgrove study: "A small patient population did not allow for enough evidence to make strong conclusions. Not enough endpoints were looked at, more specifically, renal events and mortality. However, this was a pivotal study that suggested that aprotinin use may lead to adverse outcomes due to its procoagulatory effects and resulting graft thrombosis." (DE 3074-2 at 132.)

[17] Dr. Eisenberg lays out the evidentiary basis for this opinion in the Report. Accordingly, "First, Cosgrove et al. showed that aprotinin use may be associated with a higher incidence of graft occlusion. Sudden graft occlusion, such as that caused by graft thrombosis, almost always causes acute MI. Second, we know that aprotinin is a pro-thrombotic agent. The cause of acute MI is either thrombosis of grafts or native coronary arteries. Thus, the fact that

14

Eisenberg explicitly states that "Direct, definitive evidence is lacking because no adequately powered clinical trials have been performed with a sample size adequate to examine this issue." (DE 3074-2 at 14.)

The Court must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder. *Quiet Tech*, 326 F.3d at 1341. *See also Daubert*, 509 U.S. at 594-95 (holding that a district court must focus on the principles and methodology employed by the expert, not on the conclusions reached). Bayer's arguments in favor of exclusion will be more appropriately directed at the weight of Dr. Eisenberg's opinion rather than its admissibility. Bayer will have the opportunity to cross-examine Dr. Eisenberg and present conflicting evidence to the jury.

The Court finds that Dr. Eisenberg's myocardial infarction and graft occlusion opinion is admissible under the standards set forth in Rule 702 and *Daubert*.

### C.    Dr. Eisenberg's Opinion that Bayer Breached Ethical Standards

Bayer seeks to exclude Dr. Eisenberg's opinion that Bayer breached "ethical standards" by

---

aprotinin is a pro-thrombotic agent is consistent with the Cosgrove study and lends weight to the idea that aprotinin causes MI. Finally, data from BART suggest that majority of deaths that were associated with aprotinin use were cardiac-related. Several different cardiac-related causes of death were found, but BART was not powered to look at relatively uncommon dichotomous outcomes like MI. This is also true for all of the clinical trials and meta-analyses that examined the association between aprotinin and MI. Even if studies are adequately powered to look at all-cause mortality, they will be underpowered to examine subgroups such as cardiac death and MI. Thus, in my opinion, there is indirect evidence of an association between aprotinin use and MI. Direct, definitive evidence is lacking because no adequately powered clinical trials have been performed with a sample size adequate to examine this issue." (DE 3074-2 at 14.)

allegedly failing to respond to "safety signals"[18] on several grounds: (1) the opinion lies outside Dr. Eisenberg's area of expertise; (2) the opinion is irrelevant[19]; (3) the testimony is unduly prejudicial under Rule 403; (4) the opinion is a reflection of Dr. Eisenberg's own subjective beliefs and personal views and does not rest on knowledge as required by Rule 702; and (5) the opinion rests on speculation about Bayer's subjective motivations, which is not a proper subject for expert testimony.[20]  (DE 3074 at 10-12.)

Plaintiffs respond that the opinion at issue is not truly concerned with ethics but is simply that "beginning in the early 1990's, Trasylol studies raised serious safety issues which warranted further investigation."[21]  (DE 3840 at 41.)  According to Plaintiffs, that opinion is: (1) derived from

---

[18] The following statements, contained in Dr. Eisenberg's Report, appear to be at issue: "Early data from the 1991-1992 era showed a clearcut [sic] signal of aprotinin's association with renal dysfunction.  In my opinion, it was the responsibility of Bayer to examine this relationship in a detailed and direct manner much earlier than the i3 study. . . . Drug safety mandates that, early on, Bayer should have conducted studies that were adequately powered to examine mortality. . . . [S]erious safety issues were raised about aprotinin as early as the early 1990s. These issues should have been addressed much earlier by Bayer–by both adequately powered RCTs as well as adequately powered observational studies.  That fact that these studies were not performed exposed many patients to the adverse effects of aprotinin over the course of many years. . . . In my opinion, it was the responsibility of Bayer to conduct these types of head to head trials to demonstrate improved efficacy over cheaper alternatives and also to demonstrate safety. It was clearly not in their interest to perform these types of trials, and that is why aprotinin was on the market for so many years." (DE 3074-2 at 7-8, 10, 12.)

[19] According to Bayer, the testimony is at best relevant only to whether Bayer had certain duties, which is a question of law for the Court to decide.  (DE 3074 at 10.)

[20] Bayer cites to Dr. Eisenberg's opinion that "It was clearly not in their interest to perform these types of trials, and that is why aprotinin was on the market for so many years." (DE 3074-2 at 12.)

[21] Plaintiffs concede that Dr. Eisenberg is not an expert on pharmaceutical ethics.  (DE 3840 at 41.)  According to Plaintiffs, Dr. Eisenberg does not refer to ethical or unethical behavior by Bayer in his Report; the only reference to ethics occurred in the context of his deposition. (DE 3840 at 41.)  "Dr. Eisenberg's opinion regarding the safety risks revealed by post-marketing

interpretation of study data; (2) requires knowledge not common to the average layperson; (3) is entirely relevant to the present dispute[22]; and (4) is not unduly prejudicial.[23]

In its Reply, Bayer asserts that the challenged opinions about Bayer's responsibilities have no foundation except Dr. Eisenberg's subjective take on ethics.[24]  (DE 4096 at 4-5.)  Further, they are prejudicial and would encourage the jury to mistake the expert's subjective standards for ethical behavior for industry practices or legal standards.  (DE 4096 at 5.)  Ultimately, Bayer argues that Dr. Eisenberg is seeking to testify that Bayer had a duty, which is a question of law for the Court, not a subject for expert testimony.  (DE 4096 at 6.)

The *Rezulin* court was similarly presented with reports and depositions of proposed experts witnesses indicating that the experts would testify that the pharmaceutical company at issue acted in an unethical manner with respect to its reaction to Rezulin clinical data.[25]  309 F. Supp. 2d at 542.

_____

studies of Trasyol is nothing more than the analysis that Bayer's own expert describes as the proper and necessary role of epidemiology." (DE 3840 at 41.)  According to Plaintiffs, Bayer does not dispute that Dr. Eisenberg is qualified to offer opinions on whether the scientific data indicated that Trasylol caused various adverse health conditions and increased mortality risks, and that Dr. Eisenberg's opinion that emerging study data signaled a need for further investigation into the safety of Trasylol is merely a corollary to that. (DE 3840 at 42.)

[22] According to Plaintiffs, Dr. Eisenberg's opinion that further testing was warranted by the safety data produced in earlier studies is relevant because the jury will be asked to determine whether Bayer acted as a reasonable pharmaceutical company would have acted in testing and marketing its product. (DE 3840 at 43.)

[23] According to Plaintiffs, "The prejudice cited in cases excluding 'ethical standard' testimony derives from the possibility that the jury might mistake inherently subjective standards for ethical behavior held by the expert for industry practices or legal standards." (DE 3840 at 43.)

[24] Bayer quotes Dr. Eisenberg's deposition, DE 3074-1 at 202-04.

[25] One proposed expert, Dr. Bell, stated in his deposition, "The ethical way it should have been presented when it was seen [that] there was an enzyme problem, there usually is not with

The *Rezulin* court held that the physicians' and scientists' opinions concerning the ethical obligations of pharmaceutical companies and whether the defendants' conduct was ethical were inadmissible for the following reasons: (1) the opinions were unreliable under Rule 702 and *Daubert* because they were not based on knowledge but instead on personal, subjective views[26]; (2) the opinions were irrelevant under Rule 702 and *Daubert*[27]; and (3) the opinions were likely to unfairly prejudice the trier of fact by "introducing the 'experts' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards." *Id.* at 543-45.

The *Rezulin* court also held that the proposed experts' opinions concerning the motive, intent

---

drugs, was that this should then have been looked at more closely." *Rezulin*, 309 F. Supp. 2d at 542 n.26 (internal quotations omitted).

[26] According to the court, the Rule 702's requirement of knowledge guards against the admission of speculative opinions. *Rezulin*, 309 F. Supp. 2d at 541 (citing *Daubert*, 509 U.S. at 590.). "Rule 702 ensures that expert witnesses will not testify about lay matters which a jury is capable of understanding and deciding without the expert's help. In other words, experts should not be permitted to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." *Id.* (internal citations and quotations omitted). The *Rezulin* court cited to Dr. Bell's deposition, where he "admitted that he was not 'an expert on ethics' but that he is entitled to, and holds, a 'personal opinion' about 'the behavior of pharmaceutical companies.'" According to the court, "Plaintiffs' attempt to recast Dr. Bell's challenged testimony as relating to something other than ethics (*viz.* reasonableness) does not alter the effect of Dr. Bell's admission that his opinions in this area–however labeled–are speculative." 309 F. Supp. 2d at 543 n.27.

[27] According to the *Rezulin* court, the ethics testimony would not assist the fact-finder in determining any factual dispute in this case because "the principal issues were whether the defendants breached their legal duties to the plaintiffs in the manufacturing, labeling and marketing of Rezulin, and, if so, whether any such breaches were the proximate causes of injury." 309 F. Supp. 2d at 544. The court stated that the plaintiffs' argument that the challenged opinions were relevant to 'illuminate the applicable negligence standard' disregarded the principle that it was the role of the trial judge to instruct the jury as to the applicable law. *Id.* at 544 n.36.

and state of mind of the pharmaceutical company[28] was inadmissible because: (1) the opinions had

no basis in any relevant body of knowledge or expertise; (2) the opinions described 'lay matters

which a jury is capable of understanding and deciding without the expert's help'; and (3) "inferences

about the intent or motive of parties or others lie outside the bounds of expert testimony," but are

instead classic jury questions. *Id.* at 545-47 (internal citations omitted).

The *Rezulin* decision is instructive. Despite Plaintiffs' argument that the opinion at issue is

not an ethical opinion because Dr. Eisenberg does not use the word "ethical" or "unethical" in his

Report and only refers to ethics once during his deposition, this Court will consider the substance

of Dr. Eisenberg's proffered testimony rather than the use of the words "ethical" or "unethical" or

the labels attributed to the testimony. (DE 3840 at 41.) Much of the testimony in dispute relates to

Bayer's responsibilities, the studies that Bayer should have done to comply with drug safety

principles, and the issues that Bayer should have addressed earlier than it did.[29] (DE 3074-2 at 7-8,

10, 12.) The Court finds that this proffered testimony is akin to the ethics testimony found to be

inadmissible in *Rezulin*; Plaintiffs' attempt to recast it as an opinion that Trasylol raised serious

---

[28] The court cited the following inadmissible opinions on motive, intent, and state of mind: Dr. Furberg said that Warner-Lambert 'decided to focus on the incomplete and inaccurate approval data and to minimize the troubling post-approval data'; Dr. Gale's report stated that 'the fact that 20 patients had to be taken off the drug makes it highly improbable that the company was unaware of this issue prior to marketing'; and Dr. Smith accused Warner-Lambert of 'suppressing scientific inquiry for the stated purpose of downplaying the hepatotoxic effects of TGZ in the published literature.' *Rezulin*, 309 F. Supp. 2d at 546 (internal citations omitted).

[29] Footnote 18 of this Order cites to Dr. Eisenberg's opinion more fully. It is also possible to construe this opinion as referring to Bayer's legal duty as opposed to ethical responsibility, which would similarly be inadmissible. *See Rezulin*, 309 F. Supp. 2d at 541, 544 n.36 (testimony that states a legal conclusion must be excluded as it would encroach on the role of the trial judge in instructing the jury as to the applicable law).

safety issues that warranted further investigation does not alter the Court's analysis or outcome.[30] The Court finds this testimony inadmissible because it is a reflection of Dr. Eisenberg's own subjective beliefs and personal views and does not rest on knowledge as required by Rule 702.[31]

Dr. Eisenberg's deposition makes it clear that his opinion is not based on "scientific, technical, or other specialized knowledge" as required by Rule 702 and is instead based on his subjective beliefs and personal views. For example, Dr. Eisenberg did not claim to be an expert in corporate ethics but stated that "the average lay person could have some opinions about corporate ethics." (DE 3074-1 at 87:12-16.) Dr. Eisenberg was asked "What rule, regulation, obligation, what source of duty are you referring to when you say that Bayer was required to do studies much earlier or needed to show that aprotinin is a more effective drug?" (DE 3074-1 at 201:14-19.) He responded

> I think it's not enough to put a drug out on the marketplace. . . . I grant you that I think that we don't have any regulations requiring that. . . . It's their responsibility to the physicians and it's their responsibility to their patients. You know, is it required? Is it a regulation? I don't think so. I don't know. I am not an expert on the FDA regulations. But it seems that, you know, the drug companies need to put the patients' best interests at heart. I think in general they do. I think it's really important. . . . I believe that it's the responsibility of the drug companies to accept that, you know, there may be a problem with the drug that's only going to be seen when it's released, and you have got to do large studies in order to look for that possibility. . . . I don't know what the regulations are, so I can't point to that.

---

[30] Plaintiffs argue that Dr. Eisenberg's opinion that emerging study data signaled a need for further investigation into the safety of Trasylol is merely a corollary to the opinions on whether the scientific data indicated that Trasylol caused various adverse health conditions and increased mortality risks. Dr. Eisenberg's opinions on whether the scientific data indicated that Trasylol caused various adverse health conditions and increased mortality risks are admissible to the extent they are not excluded by other sections of this Order. There is no reason why Dr. Eisenberg can not testify as to what the data *indicated* without giving an opinion on what Bayer *should have done* in response to that data.

[31] The Court also finds that Plaintiffs have not met their burden of establishing the testimony's relevance. *See Rezulin*, 309 F. Supp. 2d at 544.

I would hope that they have that. . . . [I]f you are going to put a drug out there which is going to be efficacious, you have to be sure it's safe. . . . And if you see some signals that it may not be safe, you have got to follow them up. I think that's basic common sense, be it for an individual clinician, or for a patient or for the CEO of a pharmaceutical company. . . . I don't think you need a guideline written on stone tablets in order to govern the situation. . . . Just because I can't name these guidelines doesn't mean they don't exist. I think that they probably do exist, but whether they exist or not, any reasonable person who saw a safety signal with a drug would want to pursue that to ensure the patient's safety is ensured. It's, you know, common sense. If you ask a man on the street about this they would say: Yes, I want to know whether this drug is harmful to me. And it's the responsibility of the drug company to do that.

(DE 3074-1 at 201:20-204:5, 322:2-324:10.) When asked "when it became the responsibility of Bayer to conduct head to head trials against aminocaproic acid and tranexamic acid to demonstrate and prove efficacy and safety," Dr. Eisenberg responded: "You know, the sense as in my opinion. So, I don't know that there is a regulatory standard to do that. In my opinion, they needed to do this right at the beginning of this whole story." (DE 3074-1 at 205:15-25.)

    In addition to finding that Dr. Eisenberg's opinion on Bayer's responsibilities is inadmissible because Plaintiffs have not established relevance and that the opinion is based on knowledge, rather than Dr. Eisenberg's subjective beliefs, the Court finds that part of that opinion[32] is inadmissible because it rests on speculation about Bayer's subjective motivations, which is not a proper subject for expert testimony.[33] *See Rezulin*, 309 F. Supp. 2d at 545-47.

---

[32] That part of the opinion is: "It was clearly not in their [Bayer's] interest to perform these types of trials, and that is why aprotinin was on the market for so many years." (DE 3074-2 at 12.)

[33] When asked what work he had done to determine that it was not in Bayer's interest to perform head to head trials, Dr. Eisenberg responded "I can't say that I have done any work per se. . . . The documents I looked at were the published . . . trials, and I didn't find any large ones that were capable of looking at this issue." (DE 3074-1 at 206:24-208:11.)

**D.     Dr. Eisenberg's Opinion Regarding Trasylol's Marketing**

Bayer seeks to exclude Dr. Eisenberg's opinion that "The fact that aprotinin was used so widely over the course of many years was largely due to marketing." (DE 3074-2 at 12.) According to Bayer, this opinion lies outside his area of expertise,[34] lacks foundation,[35] and amounts to no more than inadmissible speculation. (DE 3074 at 13.)

Plaintiffs respond that Dr. Eisenberg "made a single passing reference to marketing as one factor (among others) that led to Trasylol being used even when it was his opinion that the risk-benefit-cost comparison favors use of the lysine analogues." (DE 3840 at 44.) Plaintiffs argue that it was proper for Dr. Eisenberg to take into account reasons why some physicians may have been acting contrary to the risk-benefit opinion he offers and that his explanation touches "tangentially" on the possible role of marketing, which does not convert the opinion into a marketing opinion nor requires Dr. Eisenberg to possess marketing expertise. (DE 3840 at 44.)

In its Reply, Bayer argues that "irrespective of whether Dr. Eisenberg believes that marketing was 'one factor' or the sole factor, he remains unqualified and without foundation to testify about this subject. Any opinion about Bayer's marketing or its effect on the use of Trasylol is pure speculation by Dr. Eisenberg and should be excluded." (DE 4096 at 6.)

---

[34] At his deposition, Dr. Eisenberg did not claim to be an expert in sales or marketing. (DE 3074-1 at 87:9-11.)

[35] Bayer cites to Dr. Eisenberg's deposition, in which he admitted that he has not spoken to any surgeon about why they chose one antifibrinolytic medication over another and could not identify: (1) any marketing document that he reviewed as part of his work on the case; (2) any deposition of a marketing person or any Bayer employee that he reviewed as part of his work on the case; (3) any cardiac surgeon, anesthesiologist, or hospital purchasing agent that has told him that they used or purchased Trasylol largely because of Bayer's marketing efforts. (DE 3074-1 at 143:11-145:13, 209:6-25.)

Regardless of the Plaintiffs' characterization of Dr. Eisenberg's opinion on the effect of Trasylol's marketing, the Court finds it to be inadmissible because it lies outside his area of expertise and lacks foundation. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 195 (S.D.N.Y. 2009) (granting Merck's motion to preclude Dr. Furberg from testifying about Merck's promotion or marketing of Fosamax because Dr. Furberg admitted that he was not an expert on marketing).

### E.    Dr. Eisenberg's Opinion Regarding Trasylol's Mechanism of Action

Bayer seeks to exclude Dr. Eisenberg's opinion regarding Trasylol's mechanism of action, specifically that it has a prothrombotic or procoagulatory effect that may increase the risks of certain adverse clinical events.[36] (DE 3074 at 13.)  According to Bayer, Dr. Eisenberg is unqualified to testify about this subject,[37] and even if he were qualified, his opinion lacks foundation.[38] (DE 3074 at 13.)

Plaintiffs respond that Dr. Eisenberg is not designated to offer and has not offered substantive testimony regarding the mechanism whereby Trasylol impacts the human body.  (DE 3840 at 45.)

---

[36] According to the Report, "These results are consistent with aprotinin's known prothrombotic effects which may be manifest by thrombotic events including thrombosis of bypass grafts. . . . Aprotinin is procoagulatory and is associated with graft thrombosis, renal dysfunction, and death."  (DE 3074-2 at 12, 14.)

[37] According to Dr. Eisenberg, "I am not an expert in terms of mechanisms."  (DE 3074-1 at 84:2-9.)

[38] Dr. Eisenberg testified that everything he knows about Trasylol's mechanism of action is from a review of a few articles, that he did not look at animal studies because he was focused on clinical questions rather than mechanistic questions, and that mechanistic questions are mostly dealt with in animal studies. (DE 3074-1 at 84:2-9, 52:21-53:10, 301:15-302:3.)  According to Bayer, Dr. Eisenberg's opinion that aprotinin is a prothrombotic agent is based on studies suggesting that it is effective at reducing bleeding, but this only creates a presumption that Trasylol is prothrombotic.  (DE 3074 at 14. (citing DE 3074-1 at 313:5-314:3.))

23

Rather, the comments that "Trasylol has 'known prothrombotic effects' and is 'procoagulatory' were mentioned briefly as being consistent with scientific data associating Trasylol use with conditions such as graft thrombosis and cardiac conditions."[39] (DE 3840 at 45.)  Plaintiffs also argue that Dr. Eisenberg's opinion is based on scientific literature and his experience and knowledge as a cardiologist.  (DE 3840 at 45.)

Bayer replies that Plaintiffs' argument is mistaken for several reasons.  First, Plaintiffs cite no authority for the proposition that an expert may offer "non-substantive" testimony about a scientific area without satisfying the requirements of Rule 702 and *Daubert*.  (DE 4096 at 7.)  Second, "plaintiffs are attempting to use mechanism evidence in a substantive manner–to argue that Trasylol carries heightened risks."  (DE 4096 at 7.)  Third, Bayer argues that Dr. Eisenberg must be qualified and have reliable data to support every step of the method that underlies his causation opinion, including biological plausibility and consistency with hypothesized mechanisms of action.  (DE 4096 at 7.)

The Court finds that Plaintiffs have not met their burden of demonstrating the admissibility of Dr. Eisenberg's mechanism of action opinion by a preponderance of proof.[40]  The opinion should be excluded for two independent reasons:  (1) Dr. Eisenberg admitted that he is not an expert "in terms of mechanisms" when asked about Trasylol's mechanism of action;  (2) the opinion is based

---

[39] According to Plaintiffs, "Dr. Eisenberg's references to Trasylol's prothrombotic effects are reflective of his adherence to the Hill criteria which instruct experts to consider whether a causation conclusion is biologically plausible and whether it fits with a known mechanism of action."  (DE 3840 at 45.)

[40] Plaintiffs attempt to salvage Dr. Eisenberg's mechanism of action opinion by characterizing it as non-substantive testimony.  (DE 3840 at 45.)  Regardless of how the opinion is characterized, *all* proffered expert testimony is subject to the requirements of Rule 702 and *Daubert*

on insufficient scientific evidence. (DE 3074-1 at 84:2-9.) *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." ); *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (holding that an expert's qualifications in one field does not make him any more qualified to testify as an expert in another field than a lay person who read the same articles); *Trilink Saw Chain LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (noting that many courts "have excluded testimony when they determine that the witness is testifying to an area outside of–but related to–his expertise" because an expert witness "must stay within the reasonable confines of his subject area") (internal citations and quotations omitted).

The Court finds that the exclusion of the mechanism of action opinion does not warrant exclusion of the opinion that Trasylol is associated with MI (section II.B. of this Order) despite the fact that the MI opinion is based in part on the mechanism of action opinion. (DE 3074-2 at 13.) First, biological plausibility is only one factor to be considered in determining general causation. *See In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1295 (M.D. Fla. 2007). Second, "Physicians do not usually require a specific understanding of the underlying mechanism . . . before assessing causation." *McCarrell v. Hoffman-La Roche, Inc.*, 2009 WL 614484, at *31 n.25 (N.J. Super. Ct. App. Div. March 12, 2009) (internal citations omitted). Furthermore, Dr. Eisenberg's MI opinion does not only depend on Trasylol's mechanism of action, but also on studies that the Court finds to be reliable for general causation purposes. (this Order at 15.)

III.    **Conclusion**

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Bayer's Motion to Exclude Testimony of Plaintiffs'

Expert Mark J. Eisenberg (DE 3074) is **GRANTED IN PART** and **DENIED IN PART**.  More

specifically,

- The Motion is **DENIED** as to Dr. Eisenberg's opinion that the risk-benefit analysis favors the use of lysine analogues over aprotinin.  The Motion is **GRANTED** as to Dr. Eisenberg's opinion that the lysine analogues are more cost-effective than Trasylol.
- The Motion is **DENIED** as to Dr. Eisenberg's opinion that Trasylol is associated with increased risks of myocardial infarction ("MI") and graft occlusion.
- The Motion is **GRANTED** as to Dr. Eisenberg's opinion that Bayer breached ethical standards.
- The Motion is **GRANTED** as to Dr. Eisenberg's opinion regarding Trasylol's marketing.
- The Motion is **GRANTED** as to Dr. Eisenberg's opinion about Trasylol's mechanism of action.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this _22_ day of

February, 2010.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:     Counsel of Record

26