Confidential - Katherine Wentworth Sheffield-Motika

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

-----------------------------------------------------------

IN RE TRASYLOL PRODUCTS LIABILITY

LITIGATION - MDL-1928

THIS DOCUMENT RELATES TO:


ANNA E. BRYANT v. BAYER CORPORATION, et

al., Case No. 9:08-cv-80868

-----------------------------------------------------------

* C O N F I D E N T I A L *


              Video examination of KATHERINE WENTWORTH

SHEFFIELD-MOTIKA, taken under and pursuant to all

applicable rules, before JESSICA R. WAACK, Registered

Merit Reporter, Certified Realtime Reporter, Registered

Diplomat Reporter and Notary Public in and for the State

of Wisconsin, at Quarles & Brady, 33 East Main Street,

Suite 900, Madison, Wisconsin, on October 1, 2009,

commencing at 11:52 a.m. and concluding at 5:08 p.m.



Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Katherine Wentworth Sheffield-Motika

Page 6

1    TRANSCRIPT OF PROCEEDINGS

2    (Exhibit No. 1 was marked.)

3    VIDEOGRAPHER:  We are on the record.

4    This is DVD No. 1 of the deposition of Katie

5    Sheffield.  This is Case No. 08-CV-80868 in the

6    matter of Anna F. Bryant versus Bayer Corporation,

7    et al.  This deposition is taking place in

8    Madison, Wisconsin.  Today's date is October 1,

9    2009.  The time is 11:52 a.m.

10   The reporter today is Jessie Waack.  My

11   name is Jon Hansen, CLVS.  We're both associated

12   with Brown & Jones Reporting, Milwaukee,

13   Wisconsin.  At this time counsel will now

14   introduce themselves.  After that, the court

15   reporter will swear in the witness.

16   MR. MOSKOW:  Neal Moskow, Ury & Moskow

17   for the plaintiff.

18   MS. CURTIN:  Elizabeth Curtin, Sidley

19   Austin, for Bayer and for Ms. Sheffield.

20   MR. HUEY:  Nathan Huey, Sidley Austin,

21   for Bayer and Ms. Sheffield.

22   * * * * *

23   KATHERINE WENTWORTH SHEFFIELD-MOTIKA,

24   called as a witness herein, having been first duly

25   sworn on oath, was examined and testified as

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Katherine Wentworth Sheffield-Motika

Page 45

1     could have won a trip, but, I mean, I didn't win

2     anything; so --

3   BY MR. MOSKOW:

4   Q   Okay.  How would you rate your performance as a

5       sales rep?

6   A   I would say that I started last in the country,

7       and I finished one of the top reps.

8   Q   And just -- I mean, don't be shy.  I mean, do you

9       think you did a good job?

10  A   I did a stellar job, but I also, you know, walked

11      away from a stellar territory.  So, you know, I

12      just -- I don't know.  I think luck fell into my

13      lap for a lot of it, because I got in -- you know,

14      I got a territory that was really big.  And people

15      were already using Trasylol when I came in, you

16      know, so -- but, yeah, I would say I'm a good rep

17      as well; so --

18  Q   Okay.  And what are the qualities that make you a

19      good rep?

20  A   I don't know.  I'm personable.  I'm likable.  I

21      am -- I like to be their friend.  I don't -- I

22      don't sell based on, you know -- I'm -- I like to

23      be their friend first, and then, you know, sell

24      the -- I sell -- I sell drugs based on if my mom

25      and dad were to walk into a hospital and need an

Confidential - Katherine Wentworth Sheffield-Motika

Page 46

1      open heart surgery, I want the doctor in my --

2      that -- and that's -- that's why I focused on that

3      area where Dr. Omari was, because my parents lived

4      really close to there.

5              And if they were to have open heart

6      surgery, this is just an example, I would want to

7      make sure they had the best care.  And I've only

8      sold drugs that -- like that in my life, where I

9      would want the drug, I would make sure my parents

10     would get the drug, my grandmother would get the

11     drug.

12             So I would say that I sold with passion.

13     And -- and, you know, integrity for sure.  Like,

14     I'm too honest a lot of the time.  So if I didn't

15     believe in something, like, you would know.  So I

16     think doctors see that in me, so I think that's

17     kind of why I do well.

18   Q   Okay.  And we went through a lot of information

19     before about where you came by your knowledge

20     based specifically with regard to Trasylol.  But

21     did you have a sense where the physicians you were

22     selling to were coming by their information

23     concerning Trasylol?

24             MS. CURTIN:  Object to form and

25     foundation.

Confidential - Katherine Wentworth Sheffield-Motika

Page 55

```
 1          Amicar?

 2     A    I have no idea.

 3     Q    Did any physician ever say to you words to the

 4          effect of, "Why would I use Trasylol when Amicar

 5          is 1/400th of the price?"

 6                     MS. CURTIN:  Object to form.

 7                     THE WITNESS:  I'm speculating, but, I

 8          mean, probably somebody would say that.  That

 9          sounds like something a doctor would say.

10     BY MR. MOSKOW:

11     Q    And did you have a response for that?

12     A    Yeah.  I mean, as a sales rep, you're trained to

13          say that there are benefits of Trasylol over

14          Amicar, and that's -- you know, you're trained to

15          talk about that, those benefits.  And doctors

16          usually would use Trasylol because of those

17          benefits.  And that's why they were using the drug

18          before I came on board.

19     Q    As you sit here today, I know we're somewhat

20          removed from the last time you sold Trasylol --

21     A    Yeah.

22     Q    -- but do you recall what the benefits are over

23          Amicar?

24     A    I don't -- I think something with SIR, like

25          systemic inflammatory response something.  That's
```

Confidential - Katherine Wentworth Sheffield-Motika

Page 56

1        all I remember.

2    Q   Okay.  All right.

3    A   I had two babies.  My brain went with it.  My

4        brain flew out of my body.

5    Q   Well, again, if you need a break at any time, let

6        me know.  I'm going to start the process now of

7        showing you a bunch of documents.

8    A   Okay.

9    Q   And I'm also going to be providing your counsel

10       with a copy.  So make sure that everybody has a

11       chance to look at them before you just start

12       speaking --

13   A   Okay.

14   Q   -- so it will make things go a lot more smoothly.

15   A   Okay.

16   Q   The first document I'm showing you I've marked as

17       Exhibit 1, is a copy of your deposition --

18   A   Okay.

19   Q   -- notice.  The first thing I want to note for the

20       record, the person identified for this deposition

21       is Katie Sheffield-Motika.  In fact, your name as

22       put on the record was Katherine Wentworth

23       Sheffield-Motika, correct?

24   A   Uh-huh.

25   Q   Yes?

Confidential - Katherine Wentworth Sheffield-Motika

Page 106

```
 1   Q    I'm showing you what I've marked as Exhibit 14.

 2        It's an e-mail dated October 10, 2007, from Joseph

 3        Scheeren to Anita Shaw and Margaret Foley.

 4   A    Okay.

 5   Q    First of all, do you know who Anita Shaw and

 6        Margaret Foley are?

 7   A    I don't think so.

 8   Q    Do you see the paragraph that begins, "First"?

 9   A    Yes.

10   Q    And I'll read it.  It says, "First, because of

11        investigators and Bayer's own database

12        consistently point to a renal safety issue, and

13        the label has been changed to reflect this issue,

14        it would seem most reasonable to first design a

15        focused small study in this area."  Did I read

16        that correctly?

17   A    Yeah.

18   Q    Does it concern you that Bayer's own database had

19        consistently pointed to a renal safety issue?

20                  MS. CURTIN:  Object to form, foundation.

21                  THE WITNESS:  I mean, not really.

22   BY MR. MOSKOW:

23   Q    Okay.  Bayer's mission statement says, "Patient

24        safety is the first priority," is that not

25        correct?
```

Confidential - Katherine Wentworth Sheffield-Motika

Page 107

1    A    I think so.

2    Q    Yeah.  And you understood that when you were

3         selling the product?

4    A    I wouldn't sell the product if I didn't feel that

5         was.

6    Q    In fact, you told me earlier you sold it as if one

7         of your family members were going to use it?

8    A    Right.

9    Q    So doesn't the statement from someone using, you

10        know, a Bayer e-mail address indicating that

11        Bayer's own database has consistently pointed to a

12        renal safety issue concern you that perhaps you

13        were selling a drug that was not being adequately

14        described to physicians?

15              MS. CURTIN:  Object --

16              THE WITNESS:  No.

17              MS. CURTIN:  -- to form.

18   BY MR. MOSKOW:

19   Q    I only have one copy of this.  I don't know why.

20              MS. CURTIN:  I've probably seen it

21        before.

22              (Exhibit No. 15 was marked.)

23   BY MR. MOSKOW:

24   Q    I'm showing you -- both of you what's been marked

25        as Exhibit 15.  It's an August 25, 2006 e-mail

Confidential - Katherine Wentworth Sheffield-Motika

Page 114

1   A    Right.

2   Q    Right?

3   A    I mean, that's what they're saying for us to do.

4   Q    Right.  And this was your training -- part of your

5        draining as a sales rep, right?

6   A    It's training as a sales rep.  It's a tool -- like

7        a sales aid that you can use out in the field.

8        But did everybody use it in the field with

9        doctors?  No.

10  Q    My point, though, is that it's -- strike that.

11            My question is whether you understood

12       that the physicians you were meeting with were

13       also customers?

14  A    Yes.

15            (Exhibit No. 22 was marked.)

16  BY MR. MOSKOW:

17  Q    I'm showing you what I've marked as Exhibit 22,

18       and ask if you are able to identify this document.

19  A    It looks like a PowerPoint presentation.

20  Q    Do you recognize this as the Exploria slide kit?

21  A    I think so.  Exploria -- that thing never worked

22       on my computer; so -- I don't think I ever used

23       it.  I probably used it at training just to show

24       my boss I was doing a good job, but that's the

25       only time I ever used it.

Confidential - Katherine Wentworth Sheffield-Motika

Page 115

```
 1    Q      Okay.  So you don't ever recall, for example,
 2           using slide 21 --
 3    A      Hold on.
 4                    MS. CURTIN:  Are the pages at the top?
 5                    MR. MOSKOW:  Yes, correct, yep.
 6                    MS. CURTIN:  Okay.
 7    BY MR. MOSKOW:
 8    Q      Do you recall using this particular slide to help
 9           sell Trasylol?
10    A      No.
11    Q      What about the following page?
12    A      I didn't use that slide.
13    Q      What about the following page?
14    A      I mean, this is probably the same thing.  It's
15           from that renal sales sheet.  I don't remember
16           using it from this database.
17    Q      Okay.  So you don't have a recollection of having
18           used this slide presentation at all?
19    A      Not with customers, no.
20    Q      Okay.  Who is Danny Stamps?
21    A      My manager.
22    Q      And as your manager, would he provide you with
23           sales targets?
24    A      Yeah.
25    Q      Would he provide you with information that you
```

Confidential - Katherine Wentworth Sheffield-Motika

Page 116

1           used in selling the product?

2    A     Yes.

3    Q     What responsibility, if you know, did he have for

4           providing you with information concerning the

5           safety and effectiveness of Trasylol?

6    A     He would just provide what he was given from

7           corporate.  So pretty much there's the training

8           department and then there's the managers and then

9           there's the sales reps.  So training department,

10          you know, filters down information to everybody

11          below.  So whatever he would give me came from

12          training; so --

13   Q     Did you put an emphasis on selling the full dose

14          over the half dose of Trasylol?

15   A     I didn't put an emphasis on either one.  I think a

16          full dose was something everyone mostly just used,

17          because it gave the added benefits of --

18   Q     And what -- I'm sorry.

19   A     Oh, no, that was just -- in my mind, that's what I

20          remember.  That there were added benefits that

21          differentiated Trasylol from Amicar when you used

22          the full dose.

23   Q     And that was something that you told doctors when

24          you explained the risks and benefits of the

25          product?

Confidential - Katherine Wentworth Sheffield-Motika

Page 117

```
 1   A    Yeah.  I mean, it's -- there's, like, different
 2        parts of the system -- of the systemic
 3        inflammatory response and calcarine.  I don't
 4        remember all of it.  But there, like, one area
 5        that if you used a half dose, it was similar to
 6        Amicar, and the other area when you used full
 7        dose, it was -- differentiated the products.
 8              So when you're educating the doctors on
 9        the different parts of that system, you know, the
10        full dose had an impact on one area that Amicar --
11        and the half dose didn't.  So that was something
12        that you were taught in training.  And -- but most
13        of the times the doctors already knew that, and
14        they were already using that dose.
15   Q    Okay.
16   A    So it wasn't like I was -- you know, there might
17        have been a push from corporate, but my doctors
18        were already doing that; so --
19   Q    Would I be fairly characterizing your testimony if
20        I said that when you were presenting information
21        about Trasylol, the essence of that information
22        was you might as well use the full dose because it
23        had this added benefit?
24              MS. CURTIN:  Object to form.
25              THE WITNESS:  I don't know if I would
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Katherine Wentworth Sheffield-Motika

Page 118

1        say it that way.

2    BY MR. MOSKOW:

3    Q    Okay.  How would you have said it?

4    A    I don't remember how I would have said it.  But

5         I'm not like a person who just gives black and

6         white to an open heart surgeon.  I'm gonna say,

7         "You know, you have the added benefit of -- you

8         know, if you use the full dose, you'll get these

9         benefits.  If you don't use a full dose, then this

10        is what you'll get."

11                It mean, it's -- I don't know.  It's --

12        in a -- in a conversational form.  I mean, I

13        wouldn't make a blanket statement --

14   Q    Okay.

15   A    -- you know.

16   Q    As you sit here today, do you recall any clinical

17        data that was provided to you from any source that

18        showed that there were added benefits of the full

19        dose over the half dose?

20   A    I think there was a study that we used --

21   Q    Okay.

22   A    -- that was provided to us.  I don't remember who

23        was on it.

24   Q    Okay.  Okay.  So I asked you before about Danny

25        Stamps.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Katherine Wentworth Sheffield-Motika

Page 124

1        appears about eight lines down on the right-hand

2        portion.  Do you see that?

3   A    Yep.

4   Q    And this appears to be one of those series of

5        e-mails that you received as part of your ongoing

6        training in Trasylol, correct?

7   A    Yeah -- yes.  But just FYI, this came out, and I

8        went on maternity leave, like, a week later.

9   Q    Okay.

10  A    So I probably didn't use this at all.

11  Q    Okay.  About halfway down the page it reads, "This

12       study is a, quote, disseminate only," and

13       "disseminate only" is in all capitals --

14  A    Okay.

15  Q    -- "publication and is not to be used in

16       promotion."

17  A    Okay.

18  Q    Did I read that correctly?

19  A    Yes.

20  Q    Do you know what that meant?

21  A    I think it means -- wait, what does that mean?  I

22       don't know -- I don't know -- because I didn't use

23       this, so I don't know if this means you can hand

24       it out to customers, but you can't talk about it.

25       Like, you can leave it behind.  I think it might

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Katherine Wentworth Sheffield-Motika

Page 125

1        mean that.

2    Q   Okay.

3    A   Or it meant they were just giving it to us.  But

4        then I think it would have said, "Do not pass

5        out."  So I don't really know.

6    Q   Okay.  Were there times where you were given

7        information that said you can leave this behind,

8        but don't talk about it?

9    A   Yes.  And that's -- even at Eli Lilly there was

10       stuff like that that you could do.

11   Q   Okay.  Do you know why?

12   A   Because it wasn't approved, I think.  It was

13       always a black diamond reprint, and you could

14       leave it behind, but it wasn't an approved study

15       meaning I don't know if -- like it didn't get

16       legal clearance or something.  I don't know.

17   Q   Okay.

18   A   Maybe it had off-label information in it.  I don't

19       really remember.  But it was just something that

20       you couldn't talk about it, but you could leave it

21       behind.  And that's what I remember from Lilly

22       days.  Bayer, they weren't, like -- I don't know.

23       They weren't marked with -- you know, different

24       symbols, so I don't remember.

25   Q   I'm going to switch gears now for a little while

Confidential - Katherine Wentworth Sheffield-Motika

Page 160

1    Q    Okay.

2    A    So after all -- looking back at all the hard work

3         we did to try to find out what was going on,

4         why -- you know, if it was Trasylol, if it wasn't,

5         turns out once they switched the Heparin, they

6         never had a problem again.  So that's what I

7         remember from you showing me this.

8    Q    Okay.  But you recall getting a telephone call --

9    A    Uh-huh.

10   Q    -- from the physician's assistant?

11   A    Yeah.

12   Q    And he was concerned about an adverse event that

13        they had had?

14   A    Yes.

15   Q    And based on an earlier conversation, once that

16        information was transmitted to you, you

17        immediately transmitted it to others?

18   A    Yes.  That's what I'm supposed to do.

19   Q    Okay.

20              MR. MOSKOW:  Thank you.

21   BY MR. MOSKOW:

22   Q    Do you recall ever filling out an adverse event

23        report for anyone other than this particular case?

24   A    I probably did, but I don't know if it had to deal

25        with renal stuff.

Confidential - Katherine Wentworth Sheffield-Motika

Page 163

1   A   Awesome.

2   Q   That doesn't mean you can say you don't know about

3       something if you really do.

4   A   Yes.  Just kidding.

5   Q   All right.  I'm putting in front of you what I've

6       marked as Exhibit 37.  It's an e-mail trail, the

7       first page of which is March 14, 2005, an e-mail

8       from Danny Stamps to you, among other people, and

9       you're the first named addressee.  Do you see

10      that?

11  A   Yes, sir.

12  Q   Okay.  Do you recall receiving this e-mail?

13  A   Yeah, I do.  Yes.

14  Q   And what -- why do you recall it?

15  A   Because it's our sales results and our percentage

16      of attainment.

17  Q   Okay.  And, in fact, you were doing really well,

18      huh?

19  A   Yeah, I think I'm gonna put this in my book.

20      Thanks.

21  Q   Well, if you'll notice in the bottom left-hand

22      corner, it says, "Confidential, subject to

23      protective order"?

24  A   Okay.

25  Q   Do you see that?

Confidential - Katherine Wentworth Sheffield-Motika

Page 164

1    A    Yeah, I can't do that.

2    Q    So you can't do that.  And, in fact, we've been

3         pretty good about doing this earlier in the

4         depositions, and I think we're just getting so

5         comfortable with each other, we didn't do it

6         today.

7    A    Okay.

8    Q    But I've shown you a lot of documents today that

9         have that stamp in the bottom --

10   A    Okay.

11   Q    -- left-hand corner.

12   A    So I will not share them.

13   Q    Right.  You have to treat them as if they're

14        patient records.  They don't outside these four

15        walls.

16   A    Okay.

17   Q    Thank you.

18   A    You're welcome.

19   Q    So this document identifies you as the No. 1

20        salesperson in the region for the period in

21        question, right?

22   A    Yep, yes, it does.

23   Q    And do you recall if you received any additional

24        compensation because of that?

25   A    This was in 2005.  I don't know.  I don't know if

Confidential - Katherine Wentworth Sheffield-Motika

Page 165

1        I got extra compensation.  I probably hit the goal

2        and that's -- you get the -- whatever the goal

3        number is, I get -- it's a flat rate.

4    Q   Okay.  So the fact that you came in at 127 percent

5        of goal --

6    A   It didn't make a difference.  You had to be, like,

7        over 110 or something or -- you know, nothing

8        major.  This was -- this was a high number, but

9        you hit a certain number, and that's it.  You

10       get -- whatever the money was.  And then that's

11       it; so --

12   Q   Okay.  Do you recall what the bonus was in 2005?

13   A   I think it was -- it was paid once.  It was a flat

14       rate of, like, 50 grand.

15   Q   Okay.  I'm not trying to be cute, but earlier you

16       said you didn't make that much money.  Were you

17       including the 50 grand in the amount when you

18       said, "I didn't make that much"?

19   A   For -- probably.  Yeah, I mean -- that was my

20       lowest -- I mean, I made the least amount of money

21       ever selling this drug.  So it wasn't, like, I

22       made a ton of money.

23   Q   Okay.

24   A   And for California, I made crap.  Excuse my

25       language.  Sorry.  The real estate out there is

Confidential - Katherine Wentworth Sheffield-Motika

Page 166

1        not good; so --

2  Q   The e-mail that we're looking at on this first

3       page, just before Mr. Stamp signs off, he says,

4       "Let's keep up the effort and max out earning

5       potential $$." Do you see that? On this first

6       page.

7  A   Okay. Right.

8  Q   Do you see that?

9  A   Yes, I see it.

10  Q   So "max out our earning potential," is that what

11      you were just telling me about, reach a certain

12      level --

13  A   That's it. It's not, like, where I work now where

14      you can get paid the higher you go.

15  Q   Okay. On the next page of this document at the

16      top -- this was part of the e-mail trail you

17      received, correct?

18  A   Probably. I might have only paid attention to the

19      beginning.

20  Q   Okay. Do you see that there's a statement from

21      Mr. Shank that the team had to grow the business

22      by 36 percent January '05 versus January '04?

23  A   Yeah. Read that.

24  Q   Do you recall that being an issue that you needed

25      to grow business by 36 percent?

Confidential - Katherine Wentworth Sheffield-Motika

Page 251

1   STATE OF WISCONSIN   )

                         ) SS:

2   COUNTY OF MILWAUKEE  )

3

4

5              I, JESSICA R. WAACK, a Registered Merit

6   Reporter, Certified Realtime Reporter, Registered

7   Diplomat Reporter and Notary Public in and for the

8   State of Wisconsin, do hereby certify that the above

9   deposition of KATHERINE WENTWORTH SHEFFIELD MOTIKA was

10  recorded by me on October 1, 2009, and reduced to

11  writing under my personal direction.

12             I further certify that I am not a

13  relative or employee or attorney or counsel of any of

14  the parties, or a relative or employee of such attorney

15  or counsel, or financially interested directly or

16  indirectly in this action.

17             In witness whereof I have hereunder set

18  my hand and affixed my seal of office at Milwaukee,

19  Wisconsin, on October 12, 2009.

20

21             _____

                        Notary Public

22                 In and for the State of Wisconsin

23

24

    My Commission Expires:  September 1, 2013.

25

Golkow Technologies, Inc. - 1.877.370.DEPS