UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-MD-01928-MIDDLEBROOKS/JOHNSON

FILED by _____ D.C.

MAR 0 5 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – W.P.B.

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION - MDL-1928

This Document Relates To: All Actions

_____/

## ORDER ON BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT CHIRAG PARIKH

THIS CAUSE comes before the Court upon Defendants' (hereinafter, collectively, "Bayer's")

Motion to Exclude Testimony of Plaintiffs' Expert Chirag Parikh[1] ("Motion") (DE 3078), filed on

December 18, 2009.  Plaintiffs filed a Response (DE 3851), to which Bayer replied (DE 4097).  The

Court has reviewed the pertinent parts of the record and is advised in the premises.  For the reasons

stated below, Bayer's Motion shall be granted in part and denied in part.

I.      **Legal Standard**

The admissibility of expert testimony is governed by the framework set out in Federal Rule

of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The party seeking

---

[1] Dr. Chirag Parikh is a medical doctor who has practiced as a nephrologist for the past
ten years.  Dr. Parikh also completed a Ph.D. in Clinical Investigation, with a focus on
epidemiology and translational research.  As part of his Ph.D., Dr. Parikh completed a thesis on
"Acute Kidney Injury (AKI) following Hematopoietic Cell Transplantation."  Dr. Parikh is an
Associate Professor of Nephrology at Yale University and has published various articles,
editorials, and book chapters on nephrology, kidney transplantation, hypertension, and general
medicine.  (Parikh Report at 1.)

to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of proof. *Davidson v. U.S. Dep't of Health & Human Servs.*, 2007 WL 3251921, at *2 (E.D. Ky. Nov. 2, 2007) (internal citations omitted). *See also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

According to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. According to the Supreme Court, the inquiry envisioned by Rule 702 is a flexible one, in which federal judges perform a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("Its [Rule 702's] overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

In *Daubert*, the Supreme Court listed several factors federal judges may consider in determining whether to admit expert scientific testimony under Rule 702: whether an expert's theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally accepted in the scientific community.[2] 509 U.S. at 593-94

---

[2] In *Daubert*, the Supreme Court considered the federal judge's gatekeeping role in ensuring that all *scientific* expert testimony is not only relevant, but reliable. The Supreme Court later held that this basic gatekeeping obligation and *Daubert*'s general principles apply to *all*

(declining to set forth a "definitive checklist or test").

The Supreme Court subsequently held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150 (internal citations and quotations omitted). Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . [A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. The trial court has the same kind of latitude in deciding how to test an expert's reliability as it enjoys when it decides whether or not that expert's relevant testimony is reliable. *Id.*

The Eleventh Circuit engages in a three part inquiry to determine the admissibility of expert testimony under Rule 702, considering whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (internal citations omitted). The Eleventh Circuit has noted that "the primary purpose of any *Daubert* inquiry is for the district court to determine whether that expert, 'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McClain v. Metabolife Int'l, Inc.*, 401

---

expert testimony, not just testimony that is classified as scientific. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999).

F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho*, 526 U.S. at 152).

## II.    Background & Analysis

Bayer moves to exclude Dr. Parikh's expert testimony with regard to the following proffered opinions: (1) all opinions based on the term "acute kidney injury" ("AKI")[3]; (2) Dr. Parikh's opinion on the findings of aprotinin studies that utilized protein biomarkers as indicators of AKI; and (3) the opinion that aprotinin causes AKI.[4]   Bayer's arguments in support of exclusion and Plaintiffs' arguments against exclusion are organized into these three categories below, as well as the Court's decision as to each opinion.

### A.    Dr. Parikh's Opinions Based on the Term "Acute Kidney Injury" ("AKI")

The following background on AKI is taken from Dr. Parikh's Report (DE 3078-1).  The kidneys perform many functions to keep the blood clean and chemically balanced.  Clinicians most commonly use the glomerular filtration rate (GFR) to detect abnormal kidney function.  However, the GFR cannot be measured directly and has been estimated, since the 1930's, via the clearance of substances such as creatinine.  The loss of kidney function is most easily detected by a sudden increase in serum creatinine: an initial small rise in serum creatinine reflects a marked fall in GFR and large injury to the kidney, while a marked rise in serum creatinine in patients with advanced disease reflects a small absolute reduction in GFR.  Elevations in serum creatinine are rough measures of kidney function that occur after the kidneys have been injured: more sensitive

---

[3] According to Bayer, AKI is a term that was developed by researchers to test a hypothesis and is not used in clinical practice.

[4] According to Bayer, Dr. Parikh departs from standard epidemiological and clinical practice by building his general causation theory around AKI and biomarkers.  (DE 3078 at 3.)

biomarkers for early diagnosis of kidney injury are being developed.

Acute renal failure (ARF) has been conceptualized as the abrupt loss of kidney function and has been called by several other terms in the literature such as acute renal dysfunction, acute renal insufficiency, and kidney failure. Numerous epidemiologic studies and clinical trials have used drastically different cut-off values for serum creatinine to quantitatively define clinical ARF. For example, a review of published studies on aprotinin demonstrates more than ten definitions of ARF. Such a lack of consensus in terminology and quantitative definition of ARF has hindered clinical research since it confounds comparisons between studies.

The term "acute kidney injury" (AKI) was proposed by the Acute Kidney Injury Network in 2005 to represent the entire spectrum of acute renal failure and to facilitate communication among nephrologists and provide a framework for comparison of populations across cohort studies and clinical trials. The Network also provided a staging system, comprised of three stages, to classify severity of AKI based on elevations in serum creatinine and reductions in urine output. For example, Stage 1 AKI is defined by an increase in serum creatinine of more than or equal to 0.3 mg/dl or an increase of more than or equal to 50%. The Stage 1 AKI definition is the most sensitive definition of AKI (ARF) employed in the literature and nephrology community. AKI requiring hemodialysis is a rare and uncommon phenotype of AKI.

According to Bayer, Dr. Parikh's opinions based on AKI should be excluded for two reasons: (1) AKI is not a reliable basis for expert testimony on causation under Rule 702 because the term was developed to test a hypothesis and is not used in clinical practice; and (2) the risk that the AKI testimony will confuse and mislead the jury far outweighs its probative value, such that it should be excluded under Rule 403.

In regards to excluding the AKI testimony under Rule 702, Bayer mentions the following: AKI encompasses many conditions of the kidneys, including mild elevation of a lab test; use of the term blurs distinctions drawn by other researchers exploring the safety of Trasylol; and reliance on serum creatinine levels as a basis of Dr. Parikh's causation opinion is inconsistent with his concessions regarding the limited utility of serum creatinine testing.

Plaintiffs first respond that Bayer does not dispute Dr. Parikh's qualifications to opine on Trasylol's effect on the kidneys,[5] or the methodology and accuracy of studies associating Trasylol with kidney injuries at various points along the AKI spectrum.

Plaintiffs argue that AKI is a reliable basis for Dr. Parikh's causation opinion: the term represents the entire spectrum of renal injuries by using a staging system and has been endorsed by nephrology organizations and adopted by the nephrology clinical and research community.[6] AKI does not simply represent an increase in a lab value, nor is it a new disease: it represents the standardization of diagnostic criteria for renal diseases (such as "renal failure" or "renal dysfunction") that have been used for many years. Contrary to Bayer's assertion, Plaintiffs argue that use of the term is not incompatible with reliance upon the work of other researchers exploring the safety of Trasylol. Instead, the purpose of the AKI system is to develop consensus in terminology and permit comparison between studies; the definitions of renal injuries examined in each study that is relied on by Dr. Parikh are encompassed in the AKI definition. Plaintiffs also argue that there is

---

[5] Among Dr. Parikh's numerous qualifications, Plaintiffs cite to his independent research on the precise issues raised in this litigation preceding his involvement in this Case.

[6] According to Dr. Parikh, the term AKI has become widely used in medical research and clinical practice: several national nephrology conferences have used the term AKI when referring to renal injury or disease; and over one thousand published medical articles have used the term AKI since the beginning of 2007. (Parikh Aff. (DE 3851-29/Ex. AA))

no inconsistency in relying on serum creatinine levels to build a causation theory while acknowledging the limited utility of serum creatinine testing: Dr. Parikh's criticism is that serum creatinine measures may not be detecting some kidney injuries because they are not the most sensitive markers of early renal dysfunction.

In its Reply, Bayer acknowledges that AKI is a widely used research term, but claims that it has not been used in the clinical setting to diagnose the types of injuries Plaintiffs complain of in this litigation (i.e. kidney failure requiring dialysis). (DE 4097 at 2.) Moreover, observational studies distinguish between outcomes, using different cut-off values to define clinical acute renal failure rather than the AKI definition and its staging standards. Meanwhile, Dr. Parikh does not use the AKI stages, which correspond to different degrees of renal impairment, in his general causation opinion. Instead, he opines that there is a causal relationship between Trasylol and AKI. According to Bayer, this is not good scientific methodology and departs from the generally accepted view that distinctions between different degrees of renal impairment are clinically meaningful.[7]

In regards to exclusion under Rule 403, Bayer argues that a lay jury will not be able to sort out the various causation issues merged in an opinion that Trasylol causes AKI, especially considering Dr. Parikh's admission that not all stages of AKI are treated equally. Plaintiffs respond that use of the AKI term should not be excluded under Rule 403: there is no substantial danger of unfair prejudice warranting the extraordinary step of excluding highly probative testimony.

The Court finds that AKI is a reliable basis for expert testimony on causation, such that Dr. Parikh's opinions based on AKI are admissible under Rule 702 and *Daubert*. While the term AKI was proposed and introduced into the relevant medical community in 2005, it has been quickly and

---

[7] Bayer notes that Plaintiffs' other experts have distinguished between different degrees of renal impairment. (DE 4097 at 4.)

widely accepted. In an affidavit, Dr. Parikh declared that several national nephrology conferences have used the term AKI when referring to renal injury or disease; and over 1200 published and peer-reviewed medical articles have used the term AKI since the beginning of 2007. (Parikh Aff. (DE 3851-29/Ex. AA)) General acceptance of the term offers important support for its reliability as a basis of Dr. Parikh's causation opinion. *See Metabolife*, 401 F.3d at 1251 (citing *Daubert*, 509 U.S. at 594.).

AKI does not refer to a novel theory or disease: it is a three-stage classification system that represents the entire spectrum of acute renal failure (the abrupt loss of kidney function). The three stages classify the severity of AKI and are defined by increases in serum creatinine and decreases in urine output. The reliability of measuring serum creatinine increases to detect loss of kidney function is not disputed by Bayer. Instead, Bayer attacks the reliability of the AKI classification/staging system because it "blurs distinctions drawn by other researchers exploring the safety and efficacy of Trasylol." As Dr. Parikh analyzed in his Report, a review of published studies on aprotinin demonstrated more than ten definitions of ARF based on serum creatinine; ARF has also been called by several other terms such as acute renal dysfunction, acute renal insufficiency, and kidney failure. Instead of blurring distinctions, the AKI classification system creates its own distinctions (the three different stages of AKI): each of the aforementioned varying ARF definitions fits under one of the three stages of AKI. While the studies have called ARF by different names and used different definitions for those names, the AKI system utilizes one name (acute kidney injury) and three definitions (the three stages) to describe its severity. By standardizing the various definitions of ARF and utilizing one term for ARF, the AKI system promotes comparison between studies. Contrary to Bayer's argument, Dr. Parikh's application of the AKI term clarifies, rather than

8

confuses, the issues.

Furthermore, Bayer's argument that Dr. Parikh's opinion regarding the causal relationship between aprotinin and AKI ignores the three stages of AKI and the attendant degree of renal impairment is not completely accurate. When discussing the Hill factor of "strength of association," Dr. Parikh states:

> If we examine the relationship between aprotinin and severe forms of AKI (AKI requiring dialysis),[8] most RCTs [randomized controlled trials] do not demonstrate an association. This may be due to a variety of reasons: (a) . . ., (b) . . . , or (c) aprotinin does not cause severe forms of AKI. . . . Given that the absolute incidence of severe AKI is so much higher in the observational studies, and the relative risk is so great (>2 in some cases), it suggests that a true causal association between aprotinin and severe AKI is present.

(Parikh Report at 19.) Contrary to Bayer's assertion, Dr. Parikh's analysis does not treat findings of small serum creatinine increases the same as findings of kidney failure leading to dialysis. Instead, his Report analyzes the short and long-term outcomes of subjects experiencing different stages of AKI. (Parikh Report at 10-14.)

Overall, the Court finds that AKI is a reliable basis for expert testimony on causation, such that Dr. Parikh's opinions based on AKI are admissible under Rule 702 and *Daubert*. Bayer's arguments in favor of exclusion are directed at the weight of Dr. Parikh's opinion rather than its admissibility: vigorous cross-examination and the presentation of contrary evidence will be the appropriate means of attacking it. *See Quiet Tech.*, 326 F.3d at 1341.

According to Rule 403, relevant evidence may be excluded if "its probative value is

---

[8] Bayer also argues that AKI has not been used in the clinical setting to diagnose the type of injuries plaintiffs complain of in this litigation (e.g., kidney failure requiring dialysis). While the plaintiffs' injuries may not have been described in terms of the AKI staging criteria, Dr. Parikh has adequately shown that they can be classified into one of the three AKI stages based on increases in serum creatinine, which is a widely accepted method of detecting loss of renal function, including severe loss.

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. Rule 403 is an extraordinary remedy that the district court should invoke sparingly since it permits the exclusion of concededly probative evidence; Rule 403 balancing should be struck in favor of admissibility. *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002) (internal citations omitted); *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir. 1989) ("[T]he court's discretion to exclude evidence under Rule 403 is narrowly circumscribed.").

The Court finds that Dr. Parikh's opinion based on AKI should not be excluded under Rule 403: its probative value is not substantially outweighed by confusion of the issues or misleading the jury. While Bayer argues that Dr. Parikh's opinion that Trasylol causes AKI will confuse the jury because not all stages of AKI are treated equally, Dr. Parikh's opinion on causation refers to different stages of AKI and portrays the significance of each stage in terms of short and long-term morbidity and mortality.[9] Furthermore, Bayer will have the opportunity to cross-examine Dr. Parikh's opinion and provide clarification to the jury, if necessary.

### B.     Dr. Parikh's Opinion on the Findings of Aprotinin Studies that Utilized Protein Biomarkers as Indicators of AKI

The following background on biomarkers is taken from Dr. Parikh's Report (DE 3078-1). For various reasons, serum creatinine is not the most sensitive marker of early renal disease and lags behind renal injury. While it is largely representative of the kidneys' filtering capacity, it does not

---

[9] Based on Dr. Parikh's description of the classification of ARF prior to the use of the term AKI, it appears that expert testimony on causation that does not make use of the AKI system would have a higher chance of confusing and misleading the jury due to the variety of terms and definitions used to refer to ARF.

accurately reflect the degree of tubular injury that is present.[10] Therefore, clinically significant renal injuries may be undetected where filtration is unaffected. Researchers are actively investigating several biomarkers associated with alterations in kidney structure that are useful in improving the diagnosis of kidney disease. Biomarkers such as NGAL, alpha-1-microglobulin, and several others, are considered specific to the proximal tubule and are actively being investigated as more sensitive markers for renal injury.

According to Dr. Parikh, many studies have demonstrated that biomarkers of kidney injury are elevated in AKI: they detect mild forms of AKI, and their elevations precede the rise in serum creatinine by 24 to 48 hours. Three published biomarker studies demonstrate that "aprotinin can be deleterious to renal tubules and may cause AKI" and "clearly demonstrate that aprotinin is causing damage to the renal tubular cells."[11] (Parikh Report at 16.)

Bayer claims that Dr. Parikh's reliance on biomarkers to support his general causation theory is unreliable and seeks to exclude his opinion on biomarkers as more sensitive markers for renal injury than serum creatinine levels. Bayer offers several reasons for why Dr. Parikh's opinions on biomarkers should be excluded: Dr. Parikh admits that they are not generally accepted or even available in the relevant clinical community; Dr. Parikh admits that the biomarkers are not used in the field because the hypothesis that they are diagnostically meaningful has not acquired general acceptance and requires further testing; and even if biomarkers were established to be a reliable

___

[10] According to Dr. Parikh, in order to understand AKI, one must understand the concept of structure and function of the kidney. The function of the kidney relates to the GFR (via clearance of serum creatinine), while structural injury relates to injury/death of kidney tubular cells that does not necessarily cause discernable decrement in function. With more severe insults, the structural injury and functional impairment can be commensurate. The proximal tubule is the most common site of cellular damage in AKI.

[11] Dr. Parikh cites to the Wagener, Fauli, and Nguyen studies. (Parikh Report at 16.)

11

method of diagnosing clinically significant injury, Dr. Parikh's reliance on them would still be inadmissible because data supporting Trasylol's link to increased biomarkers is largely untested and does not demonstrate general causation.[12]  (DE 3078 at 11.)

Plaintiffs respond that Dr. Parikh's opinions are not unreliable merely because they receive secondary support and confirmation from studies employing protein biomarkers.[13]  Furthermore, the use of protein biomarkers is broadly accepted in nephrology research for the purpose of determining AKI,[14] and study data derived from the use of biomarkers is consistent with the results of randomized controlled trials and observational studies based on serum creatinine levels.

Regardless of whether Dr. Parikh's reliance on studies concerning biomarkers is secondary support for his causation opinion, Bayer argues that the opinion must still satisfy the *Daubert* requirements and Rule 702. (DE 4097 at 7.) Bayer argues that the opinion does not satisfy these requirements because "it is nothing more than a hypothesis that the data has not yet validated as reliable methodology" upon which to base a causation opinion. (DE 4097 at 9.)  Furthermore, according to Bayer, Dr. Parikh's opinion that the three biomarker studies demonstrate that Trasylol

---

[12] Bayer notes that Dr. Parikh relies on just three published studies showing any link between Trasylol and increased biomarkers: each study tested a different biomarker; and the authors of those studies recognize that the studies generate hypotheses but do not prove causation. "Because the data have not yet caught up to Dr. Parikh's method, his opinions founded on those methods should be excluded." (DE 3078 at 11.)

[13] According to Plaintiffs, Dr. Parikh's opinion does not rely on biomarkers as indicators of kidney disease; they merely confirm the association found using the serum creatinine measure. (DE 3851 at 22.)

[14] While Plaintiffs acknowledge that biomarkers are not used in clinical practice, they argue that this fact is irrelevant because Dr. Parikh is not offering an opinion on clinical practice habits. Instead, he is offering an opinion on whether the medical literature and epidemiological research, where the use of biomarkers is broadly accepted, demonstrate *a causal connection* between Trasylol and kidney injury. (DE 3851 at 18.)

is causing damage to kidney cells is not supported by adequate data.

The Court finds that Plaintiffs have failed to establish, by a preponderance of proof, that Dr. Parikh's opinion on biomarkers, specifically that the three biomarker studies "clearly demonstrate that aprotinin is causing damage to the renal tubular cells," should be admitted pursuant to Rule 702 and *Daubert*. The Court finds that the studies relied upon by Dr. Parikh do not support a contention of causation, such that "there is simply too great an analytical gap between the data and the opinion proffered." *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (internal citations omitted). *See also Metabolife*, 401 F.3d at 1247 (conducting a close analysis of the studies relied upon by the general causation expert and finding that they do not authorize his opinions).

While Dr. Parikh opines that the three "biomarker studies clearly demonstrate that aprotinin is causing damage to the renal tubular cells," the three biomarker studies, when closely analyzed, do not support his causation opinion. For example, the authors of the Nguyen study[15] conclude that

> [T]he results suggesting a possible link between aprotinin use and AKI deserve careful scrutiny and interpretation. . . . On the one hand, it is fully acknowledged that *our data merely demonstrate associations between aprotinin use and adverse renal outcomes and do not establish causality.* Subjects who received aprotinin tended to be younger and significantly more likely to have undergone previous cardiac surgery with CPB. . . . Subjects who received aprotinin also encountered significantly longer CPB times, more complex cardiac surgery . . . all of which are well known to increase the risk of AKI after cardiac surgery. . . . Indeed, the AKI encountered by subjects receiving aprotinin may simply reflect a cumulative effect of all these factors.[16]

(DE 3078-6 at 9. (emphasis added)) The Nguyen study explicitly states that it is not establishing causation, but merely association. Dr. Parikh himself cautions that association does not alone prove

---

[15] Nguyen, "Urinary aprotinin as a predictor of acute kidney injury after cardiac surgery in children receiving aprotinin therapy," Pediatr. Nephrol. Aug 2008; 23(8):1317-1326. (DE 3078-6.)

[16] The authors of the Nguyen study also describe their work as a "pilot study" of pediatric subjects that was not designed to assess the safety of aprotinin.

causation, and is "a necessary but not sufficient argument for causation." (Parikh Report at 19.) Yet,
he proffers a causation opinion based on a study that expressly limits itself to a finding of
association, not causation.

The remaining two studies similarly fail to authorize Dr. Parikh's opinion that "biomarker
studies clearly demonstrate that aprotinin is causing damage to the renal tubular cells." The authors
of the Wagener study[17] conclude that "Postoperative urinary NGAL–a novel marker for renal
injury–is increased in cardiac surgical patients receiving aprotinin compared to patients receiving
epsilon amino-caproic acid.  These results further support the hypothesis that aprotinin may cause
renal injury."[18]  (DE 3078-7 at 2.)  The Wagener study demonstrates "an association of increased
urinary NGAL with aprotinin use when compared to epsilon amino-caproic acid after cardiac
surgery. . . . [U]se of aprotinin is associated with renal injury resulting in elevated urinary NGAL."
(DE 3078-7 at 6-7.)  The Wagener study's goal was to determine whether use of aprotinin was
associated with an increased incidence of acute kidney injury and increased levels of NGAL; their
strongest conclusion is that their results support the hypothesis that aprotinin "may cause renal
injury."  Contrary to Dr. Parikh's assertion, the Wagener study does not clearly demonstrate
causation.

---

[17] Wagener, "Increased incidence of acute kidney injury with aprotinin use during cardiac
surgery detected with urinary NGAL," Am. J. Nephrol. 2008; 28(4):576-582.  (DE 3078-7.)

[18] The authors of the Wagener study note that it is the first study evaluating the effect of
aprotinin use on urinary NGAL.  As part of the "Background" section, they state that "Use of
aprotinin has been associated with acute kidney injury after cardiac surgery. . . . Urinary NGAL
may be able to detect renal injury caused by aprotinin.  This study determined if the use of
aprotinin is associated with an increased incidence of acute kidney injury and increased levels of
urinary NGAL."  (DE 3078-7 at 2, 6.)

14

Finally, the authors of the Fauli study[19] also fail to make a finding that aprotinin is clearly causing tubular *damage*. They conclude that "Aprotinin caused a significant increase in alpha1-microglobulin excretion . . . during CPB, which may be interpreted as a greater *renal tubular overload without tubular damage*." (DE 3078-8 at 2. (emphasis added)) The authors state that after 72 hours postoperatively, no statistically significant differences were found in the values of alpha1-microglobulin among the groups.[20] (DE 3078-8 at 5.)

As demonstrated in the analysis above, Dr. Parikh's biomarker opinion extrapolates a conclusion not supported by the data, and thus should be excluded under Rule 702 and *Daubert*.[21]

### C.      Dr. Parikh's Opinion that Aprotinin Causes AKI

Dr. Parikh makes the following association and causation opinions in his Report (DE 3078-1). AKI occurs in 2 to 15% of patients undergoing cardiac surgery. There are several potential complex causes of AKI occurring after cardiac surgery. Studies show that both mild AKI and AKI

---

[19] Fauli, "Kidney-specific proteins in patients receiving aprotinin at high- and low-dose regimens during coronary artery bypass graft with cardiopulmonary bypass," Eur. J. Anaesthesiol. Sep. 2005; 22(9):666-671. (DE 3078-8.)

[20] The three groups consisted of patients receiving placebo, low-dose aprotinin, and high-dose aprotinin. The authors conclude that "use of aprotinin causes a significant increase in the excretion of alpha1-microglobulin in CABG surgery with CPB, which may be interpreted as renal tubular overload. This effect persist[s] and is accentuated 24h after surgery when the high-dose protocol is used. For this reason, the use of high-dose aprotinin in older patients or in patients with preoperative renal dysfunction deserves more cautious consideration." (DE 3078-8 at 7.)

[21] The *Daubert* factors listed on page 2 of this Order provide additional support for the exclusion of Dr. Parikh's biomarker opinion. Namely, the theory and technique at issue has not been sufficiently tested: Dr. Parikh relies on just three published studies showing any link between Trasylol and increased biomarkers, each testing a different biomarker. The authors of the Nguyen study describe their work as a "pilot study"; the authors of the Wagener study note that NGAL is a "novel" marker for renal injury.

requiring dialysis (as defined by increases in serum creatinine) are associated with poor short and long-term mortality.  Among the morbidities associated with AKI, Dr. Parikh discusses chronic kidney disease, end stage renal disease, myocardial infarction, and lower health-related quality of life.

"When nephrotoxins, such as aprotinin, are added to this already delicate situation . . . [it results] in worse clinical outcomes for the patient than would occur in the absence of the administration of a nephrotoxic drug." (Parikh Report at 13.) "[I]n the setting of cardiac surgery, careful attention must be paid to effects on the kidney.  Drugs which may have the effect of increasing the risk of AKI must be used with clear recognition that this independently increases the risk of morbidity and mortality."[22]  (Parikh Report at 12.)

Dr. Parikh conducts an appraisal of the medical literature on aprotinin, finding that most randomized controlled trials (the gold standard of evidence-based medicine) demonstrate an increased risk of renal dysfunction in association with use of aprotinin versus placebo or other anti-fibrinolytics.  Moreover, many observational studies, which have several advantages over randomized controlled trials, demonstrate an increased risk of AKI and an increased risk of AKI requiring dialysis associated with aprotinin usage.  Furthermore, aprotinin not only increases the incidence of AKI, but also hampers the recovery and prolongs the duration of AKI; patients who have longer durations of AKI have poorer outcomes (in terms of the risk of long-term death)

---

[22] Dr. Parikh notes that the Mangano study demonstrated that aprotinin was independently predictive of five-year mortality, providing "compelling evidence that aprotinin is associated with increased morbidity, including permanent kidney injury, and mortality." (Parikh Report at 16.)

compared to patients who have shorter durations of AKI.[23]

Dr. Parikh clarifies that "A review of the literature indicates that aprotinin is associated with AKI. Association, however, does not alone prove causation, and further analysis is necessary." (Parikh Report at 19.) Dr. Parikh applies the generally accepted Hill criteria to determine whether there is a causal relationship between aprotinin and AKI.[24] Dr. Parikh concludes:

> [T]here is no reasonable doubt that there is a causal relationship between aprotinin and AKI. . . . [Studies] demonstrate that even mild forms of AKI in patients undergoing cardiac surgery are independently associated with long-term mortality, even when the AKI recovers by the time of hospital discharge. . . . The meta-analysis of six observational studies also demonstrates an increased risk of dialysis with aprotinin usage in cardiac surgery. . . . In summary, to a reasonable degree of medical certainty, aprotinin is nephrotoxic and causes AKI. Aprotinin also results in prolonged AKI and delayed recovery of AKI, and is associated with adverse clinical outcomes, including increased morbidity such as requirement of dialysis and mortality.

(Parikh Report at 21.)

Bayer argues that Dr. Parikh's causation opinion is not scientifically reliable. According to Bayer, Dr. Parikh posits a syllogism: Trasylol causes bad clinical outcomes because it is associated with elevated serum creatinine levels,[25] which are associated with bad clinical outcomes. (DE 3078 at 11.) "This reasoning is defective, and his method scientifically unreliable, because the associations he observes in the first two premises cannot support a conclusion of causation." (DE 3078 at 11.)

---

[23] Dr. Parikh opines that the current AKI system is limited by the fact that it does not account for duration of AKI.

[24] Dr. Parikh finds that aprotinin fulfills all but one of the Hill criteria (specificity) for determining a causal relationship between aprotinin and AKI. In regards to the specificity criterion, Dr. Parikh notes that AKI, like most other complex diseases, has multiple causative factors. (Parikh Report at 19.)

[25] Bayer does not dispute the fact that data from randomized controlled trials show that Trasylol has been associated with increases in serum creatinine levels. (DE 3078 at 11.)

Bayer takes issue with Dr. Parikh's premise that serum creatinine elevations are associated with bad outcomes because he relies on studies to demonstrate far more than those studies support: the association studies do not draw conclusions about what actually causes the serious outcomes (serum creatinine elevations versus other risk factors) and they do not involve either Trasylol or the lysine analogues.[26]  (DE 3078 at 12-13.)

Bayer also asserts that Dr. Parikh's conclusion that Trasylol causes AKI is full of methodological flaws.  First, Dr. Parikh admitted that the randomized controlled trials in which Trasylol was studied do not show a statistically significant increase in severe renal events that he pulls from the literature concerning AKI and concludes are caused by Trasylol; and serum creatinine increases alone (the definition of AKI) are not clinically significant.  (DE 3078 at 14.)  Additionally, extrapolation from an association between Trasylol and increases in serum creatinine to causation of several renal outcomes is even more attenuated because small serum creatinine elevations are so common, and only in a rare subset of cases lead to kidney disease and dialysis.  (DE 3078 at 15.) Finally, in relying on these studies, Dr. Parikh does not make any adjustments for the high background rate of elevated serum creatinine among patients with cardiac illness and following CABG surgery, in whom these increased values are very common.  (DE 3078 at 15.)

Plaintiffs respond that Dr. Parikh's causation opinion is supported by scientific data and derived from reliable methodology.  According to Plaintiffs, it is not necessary to show that elevations in serum creatinine are associated with AKI because they are the definition of AKI.  (DE

---

[26] According to Bayer, "the critical methodological flaw in Dr. Parikh's opinion is not the intrinsic weaknesses of the studies he relies on, but rather the fact that he relies on them to draw conclusions about causation that the studies themselves do not support."  (DE 4097 at 10.)  Such overreaching from studies is not a reliable scientific method and renders his general causation opinion inadmissible.  (DE 4097 at 11.)

3851 at 26.) "Although unnecessary, scientific support for an association between [serum creatinine] elevations and 'bad outcomes' does exist."[27] (DE 3851 at 26.)

The Court finds that Dr. Parikh's theory of causation is scientifically reliable, such that his opinion that aprotinin causes AKI is admissible under Rule 702 and *Daubert*. Rather than relying on "syllogism to cover a fatal gap in the supporting data," as Bayer asserts, Dr. Parikh arrives at his causation opinion via the application and analysis of the generally accepted Hill criteria: strength of association, consistency of the evidence, specificity, temporal sequence, biological gradient, biologic rationale, coherence, and experimental evidence.[28] (Parikh Report at 19-21.)

In regards to strength of association, Dr. Parikh analyzes numerous randomized controlled trials and observational studies that demonstrated an increased risk of AKI in association with use of aprotinin over placebo or other anti-fibrinolytics.[29] (Parikh Report at 13-15, 19.) While acknowledging that most randomized controlled trials do not demonstrate an association between aprotinin and severe forms of AKI, Dr. Parikh asserts that data from observational studies suggest

---

[27] Plaintiffs cite to the studies discussed in Dr. Parikh's report, including the Gruberg, Loef, Welten, Hobson, and Parikh studies. (DE 3851 at 26.) Plaintiffs also cite to studies that conclude that Trasylol is associated with renal injury; AKI is merely an umbrella term encompassing renal injury. (DE 3851 at 28.)

[28] Bayer does not dispute the reliability of using the Hill criteria to arrive at an opinion on causation.

[29] It appears that Bayer refers to the "strength of association" factor when it discusses the syllogism's first premise: that Trasylol is associated with elevated serum creatinine levels. (DE 3078 at 11.) Bayer does not dispute the accuracy of this premise. Bayer also does not dispute Dr. Parikh's explanation of the role of serum creatinine levels. According to Dr. Parikh, clinicians most commonly use the glomerular filtration rate (GFR) to detect abnormal kidney function: the GFR can not be measured directly and has been estimated via the clearance of endogenous substances such as creatinine. (Parikh Report at 3.) Therefore, the loss of kidney function is most easily detected by sudden increases in serum creatinine, which occur after kidney injury has already occurred. (Parikh Report at 4.) The AKI stages are defined by increases in serum creatinine. (Parikh Report at 5.)

that a true causal association between aprotinin and severe AKI is present. (Parikh Report at 19.)

Bayer incorrectly asserts that Dr. Parikh's conclusion that "Trasylol must cause serum creatinine increases, which lead to bad long term outcomes - acute renal injury and death" is based on his analysis of AKI studies (involving neither aprotinin nor the lysine analogues) demonstrating that serum creatinine levels are associated with poor short and long-term morbidity and mortality. (DE 3078 at 12-13.) In fact, Dr. Parikh's conclusion that aprotinin causes AKI is based on the application of the remaining Hill criteria because strength of association "is a necessary but not sufficient argument for causation."[30] (Parikh Report at 19.) Dr. Parikh finds that aprotinin fulfills all but one of the Hill criteria (specificity) for determining a causal relationship between aprotinin and AKI.[31] (Parikh Report at 20.) In regards to the specificity criterion, Dr. Parikh notes that AKI, like most other complex diseases, has multiple causative factors. (Parikh Report at 19.)

Furthermore, Bayer also incorrectly asserts that Dr. Parikh relies on AKI studies finding an

---

[30] Dr. Parikh stated at the outset that "A review of the literature indicates that aprotinin is associated with AKI. Association, however, does not alone prove causation, and further analysis is necessary." (Parikh Report at 19.)

[31] While Bayer does not explicitly dispute the application and analysis of any criterion, it is possible to interpret Bayer's argument regarding the biomarker opinion as relating to the "biologic rationale" criterion. In regards to the "biologic rationale" criterion, Dr. Parikh states that "evidence from experimental animals reveals that aprotinin accumulates in proximal tubular cells of nephrons, reduces renal blood flow, and reduces GFR. Many pharmaceutical agents that accumulate in proximal tubules are nephrotoxic. The marked increase in AKI-specific urine biomarkers immediately after exposure to aprotinin suggests that aprotinin does, in fact, result in renal tubular injury." (Parikh Report at 20.) Therefore, Parikh's finding that aprotinin fulfills the biologic rationale criterion is based in part on his opinion on the findings of aprotinin studies that utilized protein biomarkers as indicators of AKI. While the Court is excluding Dr. Parikh's opinion on the biomarkers because it extrapolates a conclusion not supported by the data, that exclusion does not sufficiently compromise Dr. Parikh's finding on the biologic rationale criterion or his causation conclusion to the extent that it should be excluded as unreliable under Rule 702 and *Daubert*.

association between AKI and short and long-term morbidity and mortality "to demonstrate far more than the studies themselves support." (DE 3078 at 12.)  According to Bayer, these studies "explicitly refuse to draw any conclusions about what *actually causes* the serious outcomes" and do not involve Trasylol or the lysine analogues. (DE 3078 at 12-13.)  Neither of these criticisms touches on Dr. Parikh's opinion that aprotinin causes AKI.  While Dr. Parikh concludes that there is a causal relationship between aprotinin and AKI, he does not conclude that there is a causal relationship between aprotinin and short and long-term morbidity and mortality.  (Parikh Report at 21.) According to Dr. Parikh, "Stage 1 AKI itself is *associated* with an increased risk of short and long-term morbidity and mortality. . . . Aprotinin also results in prolonged AKI and delayed recovery of AKI, and is *associated* with adverse clinical outcomes, including increased morbidity such as requirement of dialysis and mortality." (Parikh Report at 21. (emphasis added))

Bayer's arguments go to the weight rather than the admissibility of Dr. Parikh's opinion on causation: vigorous cross-examination and the presentation of contrary evidence will be the appropriate means of attacking it. *See Quiet Tech.*, 326 F.3d at 1341 ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. . . . By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.") (internal citations and quotations omitted).  The Court finds that Dr. Parikh's theory of causation is scientifically reliable, such that his opinion that aprotinin causes AKI is admissible under Rule 702 and *Daubert*.

21

III.    **Conclusion**

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Bayer's Motion to Exclude Testimony of Plaintiffs'

Expert Chirag Parikh (DE 3078) is **GRANTED IN PART** and **DENIED IN PART**.  More

specifically,

- The Motion is **DENIED** as to Dr. Parikh's opinions based on the term "acute kidney injury" ("AKI").
- The Motion is **GRANTED** as to Dr. Parikh's opinion on the findings of aprotinin studies that utilized protein biomarkers as indicators of AKI.
- The Motion is **DENIED** as to Dr. Parikh's opinion that aprotinin causes AKI.


**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this _5_ day of

March, 2010.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record

22