**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-01928- MIDDLEBROOKS/JOHNSON**

| | |
|---|---|
| IN RE TRASYLOL PRODUCTS LIABILITY LITIGATION-MDL-1928 | ) |
| | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| *Anna Bryant v. Bayer Corp., et al.,* Case No. 9:08-cv-80868 | ) |
| | ) |
| | ) |
| *Melissa Morrill v. Bayer Corp., et al,* Case No. 9:08-cv-80424 | ) |
| | ) |
| | ) |
| *Naguib Bechara, et al. v. Bayer Corp., et al.* Case No. 9:08-cv-80776 | ) |
| | ) |

**PLAINTIFFS' BRIEF REGARDING ADMISSIBILITY OF REGULATORY EVIDENCE**
**AND  INADEQUATE SUBMISSIONS TO THE FDA**

In response to the questions raised by the Court during the February 26, 2010 hearing,

Plaintiffs respectfully submit this Brief Regarding Admissibility of Regulatory Evidence and

Inadequate Submissions to the FDA.  In part, this brief is responsive to Defendants' Motion *in*

*Limine* to exclude evidence of inadequate submissions to the FDA (D.E. 3994).

I.      **Federal Regulations Govern Bayer's Behavior and Are Integral to and Inseparable**
        **From the Standard of Care.**

        A.      **Testimony by Bayer's Own Expert.**

        Dr. Robert Fenichel is a former FDA officer and Defendants' primary liability expert.  As

an acting Deputy Division Director and later, Deputy Division Director for the FDA, Dr.

Fenichel's extensive experience includes writing drug labels and review of materials submitted

to the FDA in connection with pharmaceutical prescription products.  As explained by Dr. Fenichel in his report produced by Defendants:  "[his] work at FDA required daily application of the laws and regulations that the FDA is charged with administering."  Exhibit 1, Fenichel Report excerpt.[1]

The following testimony by Dr. Fenichel demonstrates how the behavior of a pharmaceutical company is inextricably intertwined with the federal regulations:

Q.      Okay.  Let's talk about laws and regulations.

Dr. Fenichel:   Okay.

Q.      You mentioned those specifically in your report on page 2.  And obviously you cannot render any conclusions in this case or come to any opinions in this case without having an understanding of the regulations and laws which govern Bayer's behavior, true?

Dr. Fenichel:   That's correct.[2]

Q.      That's exactly my point.  And in order for you to come to conclusions in either case, you have to have an understanding of how the courts are interpreting the laws and regulations, true?

Dr. Fenichel:  Yes.

Q.      Okay. Now, these laws and regulations that we're discussing -- and you cited a number of them in your reports, and Dr. Parisian cites a number of them – these are kind of like the rules of the game for pharmaceutical companies, at least in part.  They set the standard of care of what pharmaceutical companies are supposed to do with respect to, for instance, reporting adverse events, true?

Dr. Fenichel:   Yes.

Q.      Okay.  And there may be other things that set standards, like industry guidelines or standard operating procedures, true?

---

[1] Exhibit 1, Fenchel Excerpt
[2] Exhibit 2, Fenichel 44:10 - 21

Dr. Fenichel.   Yes.

Q.      Okay.  And these are all things that you factor into your analysis when evaluating the appropriateness of Bayer's conduct in this case?

Dr. Fenichel:   Yes.[3]

Q.      Standard operating procedures, you understand that Bayer currently has them and has had them with respect to, for instance, how they identify adverse events, report adverse events, and engage in pharmacovigilance, true?

Dr. Fenichel:   Yes.[4]

Q.      Okay.  So we've got documents you've looked at, laws and regulations, your experience.  For lack of a better word, is there anything else that played into your methodology in coming to the conclusions that you did in this case?

Dr. Fenichel:   I think you've described my whole life, Mr. Love.

Q.      Okay.  Is it accurate for me to say that as far as your methodology and forming your opinions in this case, that those are the three key components:  The documents you looked at, the laws and regulations you applied, and the experience you've had over the course of the last 20-plus years?

Dr. Fenichel:.   Yes, I think that's fair.[5]

Q.      Were you asked to opine on the appropriateness of Bayer's interaction with physicians?

Dr. Fenichel:   Well, that's -- that is -- perhaps this was worded -- badly written because inasmuch as labeling and advertising and other communication with physicians is regulated by FDA,

---

[3] *Id.* at 48:22 – 49:24

[4] *Id.* at 51:11 - 17

[5] *Id.* at 55:7 - 23

I considered those interactions with physicians as channeled through FDA to be also part of my remit.

Q.     And you understand that pharmaceutical companies interact directly with physicians without any communication going to the FDA, true?

Dr. Fenichel:   Yes.

Q.     Okay. And they do that on a regular basis, right?

Dr. Fenichel:   Yes, but those interactions are regulated by FDA, even though they don't go through FDA.

Q.     I hear what you're saying. I mean, they may be regulated by their own standard operating procedures, too, right?

Dr. Fenichel:   Also true.

Q.     Okay. And it's important for a pharmaceutical company to comply not only with their own internal rules but with the rules that the FDA sets out, true?

Dr. Fenichel:   Yes.[6]

Q.     Okay. You agree with the proposition that the federal labeling standards are minimal standards for drug labels?

[objection omitted]

Dr. Fenichel:   I think we've just recently had a very well known case in which that was very clearly laid out.[7]

As is evident from Dr. Fenichel's testimony, federal regulations determine the minimum standard of care and thus, are an integral part of Plaintiffs' claims.

---

[6] *Id.* at 61:19 – 62:23

[7] *Id.* at 79:20 – 80:3

**B.      The Role of Regulatory Evidence in Other Cases.**

Courts have long recognized Federal Regulations as the applicable minimum standard of care for pharmaceutical companies.  *See Wyeth v. Levine,* 129 S. Ct. 1187, 1199 - 2000 (2009)(rejecting Wyeth's argument that Food Drug and Cosmetic Act establishes maximum standard); *Motus v. Pfizer Inc.,* 127 F.Supp.2d 1085, 1092 (C.D. Ca. 2000)("most courts have found that FDA regulations as to design and warning standards are minimum standards which do not preempt state law defective design and failure to warn claims."); *Hill v. Searle Labs.*, 884 F.2d 1064, 1068 (8th Cir. 1989) ("FDA approval is not a shield to liability … FDA regulations are generally minimum standards of conduct unless Congress intended to pre-empt common law, which Congress has not done in this area"); *Kociemba v. Searle & Co.*, 680 F.Supp. 1293, 1299 (D.Minn. 1988) ("The mere fact that the [drug] received FDA approval does not, by itself, indicate that Congress impliedly intended to preclude state tort actions against prescription drug manufacturers.  This is especially true in light of the widely held view that FDA regulation of prescription drugs establishes minimum standards, both as to design and warning"); *Mazur v. Merck*, 742 F. Supp 239, 247 (E.D. Pa. 1990) ("compliance with an FDA regulation may establish that the manufacturer met the appropriate minimum standards of due care, but compliance does not necessarily absolve the manufacturer of all liability … Manufacturers must meet state safety requirements, whether codified or embodied in the common law, in addition to the satisfying initial FDA requirements").

Thus, Courts allow regulatory experts in pharmaceutical litigation to explain the regulatory scheme and opine as to compliance or lack thereof.  For example, in the Fen-Phen litigation, former FDA officer Dr. John Gueriguian was allowed to testify, *inter alia*, regarding

"how information should be communicated to the FDA and what information should be reflected in labels, as mandated by applicable regulations."   *In re Diet Drugs Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 1174, \*56-57 (E.D. Pa. Feb. 1, 2001).[8]

In the Fen-Phen litigation, the MDL Court also allowed the testimony of Dr. Gueriguian regarding what a reasonable FDA officer would have done with information that the drug manufacturer had not supplied to the FDA.  The Court observed:

> . . . Dr. Gueriguian is clearly qualified to testify as to what reasonable FDA officials, in the position occupied by [the FDA official], would do with adverse event information.  . . . **He cannot testify as to what [the FDA official] would have done. He can, however, testify as to what a reasonable official in the position of [the FDA official] would have done.**

*In re Diet Drugs Prods. Liab. Litig.,* 2001 U.S. Dist. LEXIS 1174 at \*58-59 (emphasis added).

Likewise, in the Fosamax MDL, the Court allowed Dr. Suzanne Parisian to testify "about regulatory requirements relating to the development, testing, marketing, and surveillance of prescription drugs."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190 (S.D.N.Y. 2009).  The Fosamax MDL Court observed:

> A lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry. Dr. Parisian's assessment of the reasonableness of Merck's conduct in light of her experience and her understanding of FDA regulations will be helpful to the jury. . . . Cross-examination and competing expert testimony by Merck's regulatory experts will ensure that the jury carefully weighs her testimony.

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 191; *see Reece v. Astrazeneca Pharmaceuticals,* 500 F. Supp. 2d 736, 744 (S.D. Ohio 2007) (admitting Dr. Parisian's expert

---

[8] *In re Diet Drugs Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 1174, \*56-57 (E.D. Pa. Feb. 1, 2001) is attached at Exhibit 3.

testimony on "the regulations governing the approval, labeling, advertising and marketing of pharmaceutical and medical products; the processes by which the FDA determines the efficacy and safety of new drugs and new drug applications; the issues the FDA considers in the development of product labeling and marketing information; and a manufacturer's responsibility within this system"); *Lillebo v. Zimmer, Inc.*, No. 03-2919, 2005 U.S. Dist. LEXIS 2563[9] at *5 (D. Minn. Feb. 16, 2005) (allowing Dr. Parisian" to testify to the general nature of the approval and regulatory process, the FDA's general expectations with respect to testing and marketing of new products, Zimmer's actions in that respect, and Parisian's opinion as to whether those actions were reasonable or appropriate,"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2007 U.S. Dist. LEXIS 48200[10] (D. Minn. June 29, 2007) (admitting similar testimony from Dr. Parisian); *see also American Home Assur. Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435, 451 (S.D.N.Y. 2006) (permitting Merck to introduce expert testimony on proper interpretation of FDA regulations as they relate to licensing of vaccines because "testimony on these complex regulatory provisions will assist the trier of fact"); *Simon v. Wyeth Pharms, Inc.*, 2009 Pa. Super. LEXIS 4994[11] (Pa. Sup. 2009)(Parisian testimony allowed re:  FDA approval and labeling for Prempro).

---

[9] *Lillebo v. Zimmer, Inc.*, No. 03-2919, 2005 U.S. Dist. LEXIS 2563 is attached at Exhibit 4

[10] *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2007 U.S. Dist. LEXIS 48200 is attached at Exhibit 5.

[11] *Simon v. Wyeth Pharms, Inc.*, 2009 Pa. Super. LEXIS 4994 is attached at Exhibit 6.

> **C.** **Plaintiffs are not asserting a "fraud on the FDA" claim. Thus, *Buckman* does not apply to this pharmaceutical drug case.**

The *Buckman* decision is distinguishable from the case at bar for a number of reasons including: (1) the Supreme Court was addressing the narrow issue of whether a company consulting a medical device manufacturer may be held liable for an **_independent_** claim of "fraud-on-the-FDA" and not traditional state law claims;[12] and (2) the Supreme Court was interpreting a specific preemption provision in the Medical Device Act. *See Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).

Prior to the recent Supreme Court decision in *Wyeth v. Levine*, pharmaceutical manufacturing defendants repeatedly attempted, unsuccessfully, to expand the *Buckman* decision to pharmaceutical medications by trying to obtain summary judgment for all state law tort claims based on federal preemption. *See Globetti v. Sandoz Pharmaceutical Corp.*, 2001 U.S. Dist. LEXIS 2391 (March 5, 2001 N.D. Ala.).[13] The *Globetti* court held that "[w]hile the court agrees that *Buckman* expressly pre-empts fraud-on-the-FDA claims, it is unpersuaded that the rest of plaintiffs' claims of misrepresentation, suppression, negligence, and inadequate warning are preempted." 2001 U.S. Dist. LEXIS 2391 at *1. The *Globetti* court noted that the only claim in *Buckman* was for fraud-on-the-FDA and that the case must be read in the context of the Supreme Court cases *Medtronics v. Lohr* and *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615 (1984). *Globetti*, 2001 U.S. Dist. LEXIS 2391 at *1-2. The court concluded that when reading

---

[12] In *Wyeth v. Levine*, writing for the majority, Justice Stevens observed that the dissent's reliance on Buckman was "especially curious," noting that *Buckman* "involved state-law fraud-on-the-agency claims, and the Court distinguished state regulation of health and safety matters to which the presumption does apply. *Wyeth*, 129 S.Ct. at 1195 (citing *Buckman*, 331 U.S. at 347-348).

[13] *Globetti v. Sandoz Pharmaceutical Corp.*, 2001 U.S. Dist. LEXIS 2391 (March 5, 2001 N.D. Ala.) is attached at Exhibit 7.

---

these three cases together that "**the only theory pre-empted is that resting exclusively on the fact that the federal agency was itself the victim of the fraud**." *Globetti*, 2001 U.S. Dist. LEXIS 2391 at *1 (emphasis added).

Plaintiffs in the Trasylol cases at issue have alleged traditional state law tort claims and have **not alleged an independent tort of fraud-on-the-FDA**. As discussed above, the case law has clearly indicated that FDA approval merely sets the minimum standards for pharmaceutical drugs and that state law claims can actually complement FDA regulations to provide additional safety for the consuming public. To prevent reference to the minimum regulatory standards that were breached or to prevent explanation and evidence of information regarding what was or was not provided to the FDA would be misleading and confuse the jury.

### D.     *Wyeth v. Levine.*

In *Wyeth v. Levine*, the United States Supreme Court clarified whether or not FDA approval or compliance prevents common law claims. *See Wyeth*, 129 S.Ct. at 1187. The Court expressly rejected Wyeth's claim that the Food, Drug, and Cosmetic Act established maximum standards for warnings a pharmaceutical company's drug label. *Id.* at 1199 – 1200. In determining that state court common law failure to warn/lack of adequate warning claims were not preempted, the Court discussed the applicability of the "changes being affected" (CBE) regulation and how that regulation permits a prescription pharmaceutical manufacturer to alter a product label to increase the safety of a product without FDA pre-approval of the change.[14]  *Id.* at 1196 – 1197 (citing 21 CFR §§ 314.70(c)(6)(iii)(A),(C)).          Further, the Court clarified

---

[14] As the Court noted ""because the statute contemplates that federal juries will resolve most misbranding claims, the FDA's belief that a the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to CBE regulation is difficult to accept – neither Wyeth nor the United States has identified a case in which the FDA has done so." *Id.* at 1197.

---

that a pharmaceutical manufacturer's obligations to issue a stronger warning is triggered by "newly acquired information" which includes not only new data but **"new analyses of previously submitted data."** *Id*. at 1197.  As explained by the Court,

> The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments: "[I]f the sponsor submits adverse event information to the FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information'"

*Id*. (citing 73 Fed. Reg. at 49607 – 606).  As noted by the Court,

> [P]rior to 2007, the FDA lacked authority to order manufacturers to revise their labels.  [citation omitted].  When Congress granted the FDA this authority, it reaffirmed the manufacturer's obligations and referred specifically to the CBE regulation, which both reflects the **manufacturer's ultimate responsibility for its label** and provides a mechanism for adding safety information to the label prior to FDA approval.

*Id*. at 1198 (emphasis added)(citing 121 Stat. 924 – 926 which states that a manufacturer retains the responsibility "to maintain its label in accordance with existing requirements" and any successor regulations); see 21 CFR §§ 314.70 and 601.12.

It is clear from the discussion in *Wyeth v. Levine* that the regulations are the minimum standards and the regulatory scheme, including the CBE regulation allowing label changes without FDA approval is an integral part and inextricably intertwined with the state common law claims.

E.      **Regulatory evidence is admissible for various purposes.**

As made clear by Defendants' own expert, Dr. Fenichel, regulatory evidence is relevant to establish violation of the minimum standard of care in Plaintiffs' case in chief.  Additionally,

Plaintiffs anticipate evidence and testimony that Bayer complied with FDA requirements. Regulatory evidence is admissible, *inter alia*, for impeachment with regard to such testimony. Further, Plaintiffs anticipate that Defendants will introduce testimony or other evidence that Trasylol was FDA approved. However, even without such evidence or testimony, the FDA process and its applicability to the pharmaceutical product at issue will be akin to the fabled 800 pound gorilla in the room – the looming issue that everyone wonders about but no one addresses. To prevent explanation regarding the FDA and the regulatory process in a trial involving a pharmaceutical company and one of its prescription products would leave jurors wondering and confused.

As made clear by the Supreme Court, FDA approval of a label is a minimum standard and federal regulations do not prohibit a pharmaceutical company from enhancing a warning without prior FDA approval. Thus, FDA approval is not the end of the story and the jury should be told the entire story. Reference to federal regulations is necessary to that story. Such evidence is necessary to put the facts in context.

As determined by the Superior Court in California in the Vioxx litigation: "…although evidence of Merck's communications with the FDA is inadmissible insofar as it is offered only to show the FDA was misled, such evidence *is* admissible to show Merck's knowledge, intent, and motive and to rebut its argument that the FDA approved the Vioxx labeling*." In re Vioxx Cases*, 2006 WL 6305291 (Cal. Sup.)(ruling on Vioxx Defendant's Motion *in Limine* Regarding Federal Preemption).[15] The same rationale should apply here in the Trasylol litigation.

---

[15] *In re Vioxx Cases*, 2006 WL 6305291 (Cal. Sup.)(ruling on Vioxx Defendant's Motion *in Limine* Regarding Federal Preemption) is attached at Exhibit 8.

Additionally, evidence of Bayer's disregard for regulatory requirements, including failure to disclose studies and adverse events to the FDA, *inter alia*, is relevant to the issue of punitive damages.  Bayer's disregard for regulations that Bayer's own expert agrees are necessary to evaluating Bayer's conduct in this case is evidence that the jury is entitled to hear when evaluating Plaintiffs' punitive damage claims.

DATED: March 10, 2010.

Respectfully submitted,

/s/ Michael T. Gallagher
Michael T. Gallagher
U.S. District Court Admission #5395
**THE GALLAGHER LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Telephone:  (713) 222-8080
Facsimile:  (713) 222-0066 (fax)
Email:  PamM@gld-law.com

Tim K. Goss
Tamara L. Banno
**FREESE & GOSS, PLLC**
3031 Allen Street, Suite 100
Dallas, Texas 75204
Telephone:  (214) 761-6610
Facsimile:  (214) 761-6688
Email:  Goss39587@aol.com
tbanno@tlb-law.com

David P. Matthews
Julie L. Rhoades
**MATTHEWS & ASSOCIATES**
Texas Bar No.:  16811710
2905 Sackett Street
Houston, Texas 77098
Telephone:  (713) 522-5250
Facsimile:  (713) 535-7184

Email:dmatthews@thematthewslawfirm.com
jrhoades@thematthewslawfirm.com

Joseph A. Osborne
**BABBITT, JOHNSON, OSBORNE & LECLAINCHE, P.A**.
1641 Worthington Blvd., Suite 100
West Palm Beach, FL  33409
Telephone:  (561) 684-2500
Facsimile:  (561) 684-6308
Email:  JAOsborne@babbitt-johnson.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2010, I filed the foregoing document via <u>electronic filing</u> with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via Electronic Mail or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Filing.

/s/ Michael T. Gallagher
Michael T. Gallegher

<u>SERVICE LIST</u>
**In re Trasylol Products Liability Litigation – MDL-1928**
**Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON**
**United States District Court**
**Southern District of Florida**

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN**
**& SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-735-1130
Facsimile: 215-875-7758
*Plaintiffs' Steering Committee/Co-Lead Counsel*

Joseph A. Osborne
Email: JAOsborne@babbitt-johnson.com
**BABBITT, JOHNSON, OSBORNE**
**& LECLAINCHE, P.A.**
1641 Worthington Blvd., Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile: 561-684-6308
*Liaison Counsel for Plaintiffs and Plaintiffs'*
*Steering Committee*

Patricia E. Lowry
Email: plowry@ssd.com
Barbara Bolton Litten
Email: blitten@ssd.com
**SQUIRE, SANDERS & DEMPSEY, L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509
*Liaison Counsel for Defendants and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc., Bayer*
*Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*

Scott A. Love
Email: slove@triallawfirm.com
**CLARK, DEAN & BURNETT, G.P.**
440 Louisiana #1600
Houston, TX 77002
Telephone: 713-757-1400
Facsimile: 713-759-1217
*Plaintiffs' Steering Committee/Co-Lead Counsel*

Richard K. Dandrea, Esq.
Email: rdandrea@eckertseamans.com
**ECKERT, SEAMANS, CHERIN & MELLOTT, LLC**
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Telephone: 412-566-6000
Facsimile: 412-566-6099
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc., Bayer*
*Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*

Alan G. Schwartz
Email: aschwartz@wiggin.com
**WIGGIN AND DANA LLP**
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Telephone: 203-498-4400
Facsimile: 203-782-2889
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc., Bayer*
*Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*

Eugene A. Schoon
Email:  eschoon@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone:  312-853-7000
Facsimile:  312-853-7036
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc., Bayer*
*Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*

Catherine Barrad, Esq.
Email: cbarrad@sidley.com
**SIDLEY AUSTIN LLP**
555 West Fifth Street
Los Angeles, California  90013
Telephone: 213-896-6688
Facsimile: 213-896-6600
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc., Bayer*
*Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
Shayna Cook
Email: shayna.cook@bartlit-beck.com
**BARTLIT, BECK, HERMAN, PALENCHAR**
**& SCOTT LLP**
54 West Hubbard, Suite 300
Chicago, IL 60610
Telephone:  312-494-4400
Facsimile:  312-494-4440
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc., Bayer*
*Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*