IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**
IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to**: CLASS CASES**

| | | |
|---|---|---|
| **SOUTHEAST LABORERS** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | |
| **On behalf of itself and all others** | ) | |
| **similarly situated,** | ) | **9:08-cv-80873-DMM** |
| | ) | **(transferred from USDC Middle** |
| **Plaintiffs,** | ) | **District of Tennessee 3:08-cv-508)** |
| | ) | |
| **vs.** | ) | **THIRD AMENDED CLASS** |
| | ) | **ACTION COMPLAINT** |
| **BAYER CORPORATION, BAYER** | ) | |
| **HEALTHCARE PHARMACEUTICAL,** | ) | **JURY TRIAL DEMANDED** |
| **INC., BAYER HEALTHCARE, LLC,** | ) | |
| **BAYER HEALTHCARE, A.G.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Plaintiff, Southeast Laborers Health and Welfare Fund ("Southeast Laborers" or "Plaintiff") by its undersigned counsel, brings this class action on behalf of itself and all private, non-governmental entities in the United States and its territories that purchased, reimbursed and/or paid all or part of the cost for Trasylol for purposes other than resale, from January 1, 1999 to November 2007 (the "Class"), against Defendants and alleges as follows[1]:

---

[1] Plaintiff acknowledges that the Court's February 11, 2010 Order Granting Bayer's Motion to Dismiss Plaintiff's Second Amended Class Action Complaint dismissed the following claims with prejudice: Violation of 18 U.S.C. 1962(c), Violation of New Jersey Consumer Fraud Act N.J.S.A. 56:8-1 *et seq*, Common Law Fraud, Negligent Misrepresentation and Unjust Enrichment. Plaintiff includes those claims in this Third Amended Complaint solely for the purpose of preserving Plaintiff's appeal rights with regard to those claims. Accordingly, Plaintiff acknowledges that no additional answer or response is required with regard to those claims.

## I.      INTRODUCTION

1.      Southeast Laborers Health and Welfare Fund ("Southeast Laborers") is a trust fund administered pursuant to the requirements of the Taft-Hartley Act, 29 U.S.C. 186, by trustees appointed in equal numbers by labor representatives and union representatives. Southeast Laborers is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to Sec. 302 (c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 186(c)(5) and is defined by Sec. 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. sec. 1001, et. seq.  As such, Southeast Laborers is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. sec. 1132(d).  Southeast Laborers' place of administration is located in Goodlettsville, Tennessee.  During the class period, Southeast Laborers paid for the purchase of Trasylol.

2.      This class action is brought against Defendants, Bayer Healthcare Pharmaceuticals Inc., Bayer Healthcare, LLC, Bayer Corporation, and Bayer Healthcare, A.G. (collectively "Bayer" or "Defendants") to recover the hundreds of millions of dollars that the Plaintiff and Class paid to Bayer as a result of Bayer's misrepresentations and omissions regarding Trasylol, payments Plaintiff and Class Members would not have otherwise incurred given the availability of much cheaper alternative drugs that were either equally or more efficacious than Trasylol but for decades of misrepresentation and suppression by Bayer regarding the drug's safety, effectiveness and relative value whereby Bayer intended to and did conceal the fact that Trasylol's benefits are outweighed by its safety risks for all patients.

3.      As set forth in detail in Section VII, Bayer undertook a fraudulent scheme more than fifteen years ago with the ultimate goal of ensuring continued payments for Trasylol from Plaintiff and Class Members.  For much of the relevant period, Trasylol was the second most

profitable drug in Bayer's portfolio. Bayer's ultimate goal in implementing the fraudulent scheme was to secure ongoing payments from Plaintiff and Class Members and thus to reap enormous profits from the sale of Trasylol.

4.      Plaintiff and other class members who actually paid monies for Trasylol were the primary and intended victims of Bayer's fraudulent scheme.  Throughout the relevant period, Bayer knew that if payors learned that, as the FDA stated on November 5, 2007, Trasylol was a drug for which there is no specific patient population where the benefits of the drug outweigh the health risk associated with the drug, no payor would have paid for Trasylol, especially given the availability of significantly cheaper and more efficacious alternative drugs.

5.      Bayer had a duty to fully disclose all relevant information in its possession regarding the safety, efficacy and relative value of Trasylol to Plaintiff and Class Members to correct its misrepresentations and half truths, to prevent a safety hazard, and because the information was critical to payors such as Plaintiff in determining whether Trasylol was a medically necessary treatment for which they could lawfully pay.   However, rather than making such disclosures, Bayer and a group of physicians Bayer referred to as "Key Opinion Leaders" ("KOL") developed and implemented a plan to assure continue revenue from the sale of Trasylol.  This plan included disseminating false statements on the Trasylol label, on physician pamphlets and other materials, and through medical literature and debate that Trasylol was safe and effective; and suppressing the dissemination of accurate scientific information which established extreme risks associated with Trasylol usage.

6.      There is no more direct victim of Bayer's fraud with regard to financial losses than Plaintiff and Class Members.  While Bayer's fraud was also directed at others including the FDA and prescribing physicians, neither is a more direct victim with regard to economic losses

than Plaintiff and Class Members because neither paid for Trasylol.  Likewise, neither the actions of the FDA nor the decision of a physician to prescribe Trasylol breaks the causal chain between Bayer's fraudulent scheme and the injuries sustained by Plaintiff and Class Members. The FDA's decision to approve Trasylol and physicians' decisions to prescribe Trasylol were completely separate and distinct from the decision of Plaintiff and Class Members to pay for Trasylol.  Obviously, Plaintiff and Class Members would have never incurred liability for payment of Trasylol if the FDA had not approved the drug or if a physician had not prescribed the drug – events that would not occurred but for Bayer's scheme to suppress evidence that established, as the FDA determined, that there was no circumstance under which Trasylol's benefits outweighed its risks. While both FDA approval and a physician's prescriptions were necessary antecedent events to Plaintiff and Class Member's liability for payment, neither negates nor lessens the directness of the injury Plaintiff and Class Members sustained in paying for Trasylol.  Irrespective of the physician's decision to prescribe Trasylol, an alternative drug or no drug at all, Plaintiff and Class Members had an independent choice to pay for Trasylol or to pay only for a cheaper alternative.   The fact that Bayer denied physicians the necessary information to make an informed decision regarding prescribing Trasylol does not negate the fact that Bayer also denied Plaintiff and Class Member the information necessary to determine whether or not to pay for Trasylol.

7.    Likewise, while some patients may have directly paid for Trasylol as well, such payments place the patients in a parallel position with Plaintiff and Class Members rather than as an intervening link between Bayer's fraudulent conduct and the resulting harm to Plaintiff and Class Members.  While some beneficiaries of Plaintiff or Class Members may have suffered physical injuries as a result of ingesting Trasylol, the presence of such injuries does not lessen

the economic losses sustained by Plaintiff and Class Members who paid for Trasylol on their behalf.

8.      Despite the efforts of Bayer and the Key Opinion Leaders to misrepresent and suppress information regarding Trasylol, the truth about Trasylol was ultimately revealed, resulting in the voluntary removal of Trasylol from the market.  Unfortunately, by the time the truth was known, Bayer had enjoyed enormous profits while Plaintiff and Class Members had suffered significant financial losses.

9.      Bayer's fraudulent and deceptive conduct violated the New Jersey Consumer Fraud Act as well as other state laws.

10.     Bayer's conduct also violated the Federal Civil Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. 1962, et seq. ("RICO").

## II.     PARTIES

11.     Southeast Laborers Health and Welfare Fund ("Southeast Laborers") is a trust fund administered pursuant to the requirements of the Taft-Hartley Act, 29 U.S.C. 186, by trustees appointed in equal numbers by labor representatives and union representatives. Southeast Laborers is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to Sec. 302 (c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 186(c)(5) and is defined by Sec. 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. sec. 1001, et. seq.  As such, Southeast Laborers is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. sec. 1132(d).  Southeast Laborers' place of administration is located in Goodlettsville, Tennessee.  During the class period, Southeast Laborers paid for the purchase of Trasylol.

12.     Defendant Bayer Healthcare Pharmaceuticals, Inc is a Delaware corporation with its principal place of business in Morris, New Jersey. Bayer HealthCare Pharmaceuticals Inc. is the U.S.-based pharmaceuticals unit of Bayer HealthCare LLC, a division of Bayer AG. Bayer Healthcare Pharmaceuticals engaged in the business of testing, manufacturing, labeling, licensing, marketing, advertising, distributing, promoting and selling either directly or indirectly through third parties or related entities, the drug Trasylol for use in surgery.  Bayer Healthcare Pharmaceuticals, Inc is the successor in interest to Bayer Pharmaceuticals Corporation.

13.     Defendant Bayer Healthcare, LLC is a Delaware corporation with its principal place of business in Morristown, New Jersey. Bayer Healthcare, LLC is a division of Bayer A.G.

14.     Defendant Bayer Corporation is an Indiana corporation with its principal place of business in Pittsburgh, PA.  Bayer is a global pharmaceutical company.

15.     Defendant Bayer Healthcare, A.G. is a subsidiary of Bayer A.G. and is incorporated and headquartered in Germany.

16.     The Defendants acted uniformly and in concert with regard to all allegations in the complaint. For this reason, the Defendants are collectively referred to as "Bayer" throughout the complaint, though one or more of the Defendants may have undertaken all or only part of the actions described in the complaint.  The various Bayer corporate entities as they acted as one unit in perpetrating the fraudulent scheme alleged herein without regard to any legal divisions.

## III.    JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, based on its claims under 18 U.S.C. § 1962(c), and supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this

Court, as members of the proposed nationwide Class are citizens of states that are different from Defendant's state of citizenship, and the aggregate amount in controversy exceeds $5,000,000.

18.     This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in this state, Bayer is authorized to do business here, Bayer has sufficient minimum contacts with this state, and/or Bayer otherwise intentionally availed itself of the markets in this state through the promotion, marketing and sale of their its products in this state, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965.  Bayer transacts business in this district, and is subject to personal jurisdiction in this district, and therefore, is deemed to reside in this district. Plaintiff operates in this district and paid for purchases of Trasylol from the Middle District of Tennessee.

## IV.     THE DUTIES AND RESPONSIBILITIES OF THE PLAINTIFF FUND

### A.     <u>Purpose of the Fund Is To Provide Medical Benefits To Its Participants</u>

20.     The Fund was originally established under the terms of an Agreement and Declaration of Trust by and between Laborers International Union of North America, AFL-CIO, and its Locals No. 386 and No. 1441, and the Tennessee Contractors Association and the West Tennessee Construction Industry Collective Bargaining Group Inc.  The Trust Agreement was subsequently amended to allow for the participation under the Trust Fund of additional Local Unions affiliated with the Laborers International Union of North America, and for their appropriate representation on the Board of Trustees.

21.     The Fund is governed by the provisions of the Employee Retirement Income Security Act ("ERISA"). Pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), the Fund is

established, maintained, and administered in accordance with a written instrument (the "Plan Document").

22.    The Fund is administered by a joint Board of Trustees ("Trustees") comprised of both union and management members that govern the Fund in accordance with ERISA and the Plan Document.  The Trustees have the sole authority to administer the Plan, although they may in their discretion make appropriate delegations of authority.

23.    ERISA also requires that a plan sponsor prepare and deliver to participants a Summary Plan Description ("SPD") containing basic information about the plan.  The SPD must be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."   ERISA § 102(a), 29 U.S.C. § 1022(a). Throughout the relevant period, the Fund distributed an SPD to its participants.

24.    The purpose of the Fund is to provide health and welfare and other such benefits to its participants and/or their dependants ("Covered Persons") calculated on the amount of contributions paid under a labor agreement.   The benefits provided by the Trustees are established to meet the objectives of the Fund and are consistent with the provisions of the Plan Document.

25.    Both ERISA and the Plan Document require that the Fund's assets are held in trust.  ERISA § 403, 29 U.S.C. §1103.

26.    The Plan is a legal entity that can sue in order to recover losses.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

**B.**     **The Trustees Operate the Fund In Accordance With ERISA and the Plan Document**

27.     The Trustees are vested with the exclusive authority and discretion to manage and control the assets of the plan, under both ERISA 29 U.S.C.S. § 1103(a) and the Plan Document.

28.     The Trustees, in administering the Fund, have an obligation under law to operate the Fund in accordance with the documents and instruments governing the Fund. § 1104(a)(1)(D)

29.     The Fund reimburses for "Covered Medical Expenses" incurred by its participants in the course of their health care.  Covered Medical Expenses are defined in the Plan Document as the "actual Usual, Customary and Reasonable Expenses" incurred by the Covered Person for health care services enumerated in the Plan Document which are required in connection with the treatment of the Covered Person.

30.     In addition, the Plan Document provides that a "Covered Medical Expense" shall be limited to those expenses which are "Medically Necessary."

31.     The Plan Document defines "Medically Necessary" as those services, treatments, or supplies provided by, or under the direction of a Hospital or Physician that are required in the judgment of the Trustees to identify or treat an injury or sickness and which are, among other things, "Appropriate according to standards of good medical practice," and "The most appropriate which can be safely administered to the Covered Person."

32.     Consistent with the provisions of the Plan Document, the Trustees will not reimburse or otherwise pay for any medical expense which it knows does not satisfy the definition of "Medically Necessary," irrespective of whether a hospital or physician utilizes or prescribes the medical expense in the course of treating a Covered Person.

C.      **Trustees Have Fiduciary Duties Requiring Them to Preserve And Maintain Fund Assets**

33.     As fiduciaries of the Fund, the Trustees have certain fiduciary duties for administering the Fund and its assets.  ERISA fiduciary duties are the highest known to the law, and as a result, an ERISA fiduciary must have an eye single toward beneficiaries interests

34.     One of the fundamental duties of an ERISA trustee is to preserve and maintain the integrity of trust assets, thus ensuring that a plan receives all funds to which it is entitled so that those funds can be used on behalf of participants and beneficiaries.

35.     ERISA § 404(a), 29 U.S.C. § 1104(a), imposes strict fiduciary duties upon the Board of Trustees as plan fiduciaries. in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan **solely in the interest of the participants and beneficiaries** and –-
>> (A) **for the exclusive purpose** of:
>> (i) **providing benefit to participants and their beneficiaries**; and
>> (ii) **defraying reasonable expenses of administering the plan**;
>> (B) **with the care, skill, prudence, and diligence under the circumstances then prevailing** that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>> ….
>> (D) and **in accordance with the documents and instruments governing the plan** insofar as such documents and instruments are consistent with the provisions of this title . . . .

36.     Thus, ERISA imposes on the Fund the duty of loyalty--that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

37.     The duty of loyalty requires that the Board of Trustees must always administer a plan with an "eye single" to the interests of the participants and beneficiaries.

38.     ERISA's fiduciary provisions are interpreted and construed consistent with the principles of trust law.

39.     ERISA Section 404(a)(1)(B) also requires that the Fund act prudently in managing its assets--that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

40.     Congress provided that trustees who breach their fiduciary duty "shall be personally liable to make good to [the] plan any losses resulting from each such breach," and may be removed as a trustee.  29 U.S.C. § 1109(a)

41.     Federal courts have recognized that a substantial public interest is served by protecting the fiscal integrity of ERISA benefit plans.  *Gerardi v. Pelullo*, 16 F.3d 1363.

42.     Third-party suits brought by trustees, and the resulting plan assets, effectuate Congress's desire in ERISA to provide special protection to participants and beneficiaries of ERISA plans.  See 29 U.S.C. § 1001(b); *SEC v. Capital Consultants*, LLC, 397 F.3d 733.

43.     Pursuant to their fiduciary duties to faithfully and loyally preserve and maintain Fund assets for the benefit of its participants, and pursuant to their duty to **operate the Fund in accordance with the** Plan Document, the Fund Trustees have brought the instant action seeking to recover losses incurred by the Fund as a result of its paying for and/or reimbursing for the cost of Trasylol during the relevant period.

## V.      BAYER HAD AN OBLIGATION TO DISCLOSE TRASYLOL'S TRUE SAFETY AND EFFICACY PROFILE

44.     Despite its obligations under FDA regulations and its duties of disclosure regarding information in its possession regarding Trasylol, Bayer engaged in a series of events that served to delay the full and timely disclosure of critical safety information to the FDA, health care professionals, and patients, all so that Trasylol could remain on the market.  In doing so, Bayer violated reasonable practice standards and did not behave as a responsible pharmaceutical company.

45.     The FDA has established an evolving standard for the proper conduct of human clinical trials to be followed by drug companies who wish to market their products in the United States:

-        The 1938 Act established safety as the FDA's primary concern, requiring proper labeling of a drug's indications and proper warnings about its dangers.

-        In 1962, the Act changed the approval criteria by which a new drug could be marketed.  For approval a drug has to be both safe and efficacious for its intended use.  Therefore, drug companies were now expected to investigate any known or anticipated safety problems during the pre-approval phase.

-        In 1988, the FDA updated the guidelines for reporting particular clinical trial efficacy and safety data to the agency.

46.     The pre- and post-approval processes for new drugs are governed by federal regulations such as 21 C.F.R. Parts 312 and 314, among others, federal statutory law, and other generally-accepted standards and obligations of sound health policy.

47.     According to federal regulations, the FDA must be informed about adverse drug experiences in a timely manner during both the pre- and post-approval phases (21 C.F.R. sec. 312.32, 310.305, 314.98)

48.     Pharmaceutical companies are also expected to update the adverse reactions section of labeling when new adverse reaction information becomes available (21 C.F.R. sec. 201.57)

49.     All marketed drugs are required to have an FDA-approved drug label, which constitutes the primary source of safety information for clinicians.   This safety information, written and distributed by the pharmaceutical companies, is used by clinicians to determine the risk-to-benefit balance of marketed drugs and must be complete and up-to-date.

50.     Importantly, drug companies are subject to the requirement that a products labeling must be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.

51.     If a drug company knows about significant problems regarding a drug's usage, particularly those that may lead to death or serious injury, the FDA may require the company to display the frequency of such serious adverse reactions and, if known, the approximate mortality and morbidity rates for patients sustaining the reaction, in a prominently displayed box as part of the "Adverse Reactions" section of the labeling (21 C.F.R. sec. 201.57).

52.     Drug companies also have an obligation in conducing medical research of a drug product to report and publish new research findings, good or bad, in an unbiased and timely manner.   Delay in reporting or the suppression of unfavorable trial results by drug companies violates the generally accepted standards and fundamental principles of medical research and health care policy.

53.     Bayer also had a duty to assure that it disclosed all relevant information in its possession regarding the safety, efficacy and relative value of Trasylol to Plaintiff and Class

Members in light of its misrepresentations and half truths and because such information was critical to payors such as Plaintiff in determining whether to pay for Trasylol.

54.     In order to keep Trasylol on the market such that it would be sold to Plaintiff and others and maintain its profile as the second most profitable drug in the United States, throughout the relevant period Bayer concealed Trasylol's safety profile through affirmatively misleading statements and material omissions that it had a duty to disclose.  Bayer was aware of the dangers and risks, such as renal failure, heart attacks, stroke, and increased mortality associated with the use of Trasylol since before the drug was first approved by the FDA in 1993, but failed to disclose this information to the medical community, payors, and the general public.

55.     In order to maintain and increase the sales of Trasylol in light of its awareness of these dangers, Bayer undertook an aggressive marketing campaign which touted the safety, efficacy, and cost savings of the drug compared to both placebo and its competitors.   Behind the scenes, Bayer crafted a comprehensive campaign to suppress negative information from becoming public and to criticize negative information when it did become public.  Bayer also failed in its fundamental duty to protect the public by negligently overlooking safety signals associated with Trasylol and purposefully rejecting studies that would confirm the drug's safety risks.

56.     Bayer dedicated a considerable amount of Company resources to conceal and misrepresent the safety risks of Trasylol over its existence. The Trasylol brand campaign not only involved a highly-funded marketing department and dedicated in-house sales force aimed at traditional sales through doctors, but also included the use of "independent" Key Opinion Leaders retained and paid by Bayer specifically based on their ability to control the debate regarding the safety and efficacy of Trasylol.

57.     Bayer carefully hand-picked its Key Opinion Leaders for Trasylol based largely on their sphere of influence and induced them to propagate their false and misleading message about Trasylol through numerous financial incentives.  Bayer utilized this organization of KOLs to go directly to doctors with carefully tailored messages about the safety and efficacy of the drug, designed to quell any concerns regarding the safety and efficacy of Trasylol.  However, this plot also utilized these Key Opinion Leaders to control the medical literature and debate regarding the drug, ensuring that Bayer's message touting the safety, efficacy and cost-effectiveness of Trasylol would be the only message heard.

58.     Despite Bayer's best efforts to attack and suppress adverse safety information about Trasylol, the FDA uncovered enough information about the drug to conclude in November 2007 that it "could not identify a single patient population where the benefits of using Trasylol could outweigh the risks." At that time, Bayer agreed with the FDA and pulled Trasylol from the market due to its safety risks.

59.     Bayer's suppression and misrepresentation of Trasylol's true safety and efficacy profile during the Relevant Period, to wit the fact that there is no specific patient population where the benefits of the drug outweigh the health risks associated with the drug, caused Plaintiff and other like entities to pay for or reimbursed the price of the drug where they would not have otherwise.  End-Payors such as the Plaintiff are specifically prohibited from paying for drugs whose risks outweigh its benefits for the patient who would otherwise be afforded health coverage, even if a doctor prescribes the drug in question.

60.     Bayer's fraudulent scheme violated its own ongoing duty to disclose adverse safety and efficacy information about Trasylol.  But for the misrepresentations and omissions by Bayer, Trasylol's true safety profile would have been known, the drug would not have been on

the market, and Plaintiff and Class Members would not have paid for the drug.  Bayer's wrongful conduct in this regard also violated the consumer protection laws of many states, and the Federal Civil Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. 1962, *et seq*. ("RICO").

## VI.    BACKGROUND ABOUT TRASYLOL

61.    Trasylol is the trade name by which Bayer markets the drug aprotinin, a substance derived from bovine lungs.  First developed in Germany in the 1950s to treat pancreatitis, scientists eventually discovered that Trasylol aids the body in preventing bleeding by inhibiting certain enzymes which dissolve blood clots and increase the risk of excessive bleeding in particularly "bloody" surgeries.

62.    Trasylol was, in Bayer's words, "an extremely profitable drug," with a price tag of over $1,000 per dose, and a profit margin over its cost of about 70 percent.   According to Bayer, the United States was the priority market for Trasylol on the international stage.   On December 9, 2005, Bayer's CEO predicted that sales of Trasylol would top $600 million in 2006.

63.    Bayer, jointly through each of the named defendant entities, produced and heavily promoted Trasylol as a drug to prevent excessive bleeding during surgery.  In 1993, the FDA first approved Bayer's application to permit the use of Trasylol by physicians for "prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of repeat coronary artery bypass graft surgery" where "the risk of bleeding is especially high."  In 1998, Bayer sought and received approval by the FDA to permit Trasylol's use in all coronary bypass graft ("CABG") surgeries.

64.    CABG is the most commonly performed major surgery in the United States. Approximately 500,000 patients undergo a form of CABG each year.

65.     From 1993 through 2007, Trasylol was routinely administered to patients undergoing heart bypass surgery to reduce the risk of blood loss. At one point, Trasylol was ranked 7th in usage among Bayer's drug offerings. Trasylol was administered to approximately 110,000 patients alone in the United States in 2006.

66.     The total costs paid for Trasylol is affected both by its relatively high price tag (well over $1,000 per dose), but also by the fact that multiple doses are often administered during a single surgery.   Trasylol is injectible and is usually administered intravenously along with other medications during surgery. In fact, the vast majority of patients do not know they have been administered Trasylol.

67.     While Trasylol was only labeled for use in certain heart surgeries, Bayer promoted the drug as safe and effective for use in other major surgeries, including orthopedic, oncology, and other non-approved cardiac surgeries. As of 2004, approximately half the Trasylol purchased in the United States was for non-approved usage.  Until it was pulled from the market, Bayer was actively seeking FDA approval of the use of Trasylol to prevent excessive bleeding for at least two of these major surgeries, orthopedics and oncology.

68.     Trasylol commanded a premium price compared to competitor antifibrinolytic drugs used to manage blood loss during surgery, such as Amicar (aminocaproic acid) and Cyklokapron or TA (tranexamic acid). These alternative drugs used by health care providers to reduce the risk of excessive bleeding during bloody surgeries are considerably cheaper than Trasylol.  In fact, both Amicar and TA are available as generics and cost less than $50 per dose.

## VII.    MATERIAL MISREPRESENTATIONS AND OMISSIONS BY BAYER ABOUT TRASYLOL DURING THE RELEVANT PERIOD

69.     Throughout the relevant period, Bayer suppressed, omitted, or failed to inform that Trasylol significantly increases the risk of experiencing serious adverse events, including

specifically, fatal and nonfatal renal injuries and renal failure, such that the adverse effects clearly outweigh the benefit of Trasylol.

70.     Additionally, Bayer suppressed, omitted, or failed to inform that the overall risk/benefit profile of Trasylol is unfavorable, i.e. the sum of the health risks caused by Trasylol outweighs the sum of the benefits.

71.     Despite having extensive documentation of the safety concerns posed by Trasylol, Bayer failed to comply with industry standards and violated federal regulations and tenets of good health policy by failing to properly inform physicians, patients, payors, and the public about these serious risks.

72.     During the relevant period, Bayer continued to violate accepted industry standards and federal regulations both before and after FDA approval.  Specifically, Bayer's response to the new information on renal damages caused by Trasylol was totally inadequate.  Its failures includes:

- Failure to conduct large and long-term trials in a timely manner to address the multitude of safety problems known to Bayer, highlighted in the FDA review of published and unpublished studies;

- Failure (while the original New Drug Application (NDA) was pending) to inform the FDA about the Canadian trial;

- Failure to alert Trasylol investigators about alarming safety problems with Trasylol in the Investigator's Brochures;

- Failure to inform potential participants in Trasylol trials about the potential safety problems with Trasylol in the Informed Consent forms;

- Failure to adequately inform healthcare professionals about the true health risks of Trasylol;

- Failure to inform physicians and patients about the troubling risks of Trasylol in the drug label;

- Misrepresentation of the effects of Trasylol in promotional materials prepared for medical education seminars, and training materials for company sales representatives which claimed that Trasylol had no effect upon the kidneys, its effects were "comparable to placebo," or the effects were "transient and reversible."

- Similarly, Bayer made misrepresentations regarding the effectiveness of Trasylol and improperly claimed superiority based solely upon the product's mechanism of action, rather than on comparative effectiveness trials.

A.   **Bayer Knew or Should Have Known Since 1993 that the Risks Associated with Trasylol Outweighed its Benefits**

73.   Bayer had overwhelming evidence of renal impairment and other safety issues with Trasylol prior the drug's approval by the FDA for marketing in the United States.  The evidence in Bayer's possession before 1993 was so damaging to Trasylol's safety profile that one expert consulted by the Company opined that the drug's risks so outweighed its benefits that, even if Bayer convinced the FDA to approve Trasylol, Bayer "**could face severe liability risks in the future**."

74.   In Bayer's own words, renal dysfunction following CABG surgery is a major health concern, both because "[s]table renal function is a major criteria that must be met before a patient can be transferred to the ICU setting and/or discharged from the hospital," and due to studies showing that in-hospital mortality, ICU length of stay, and duration of hospitalization were significantly increased in patients who had renal failure or renal dysfunction, compared to patients who had neither.

1.   **Bayer Had Ample Data In Its Possession Pre-FDA Approval That Linked Trasylol to Kidney Problems**

75.   Bayer began researching Trasylol/aprotinin at least by the early 1980s. In early trials, Bayer researchers found severe kidney damage from the use of Trasylol testing the drug on animals. Bayer never undertook a full study during the drug's development to more fully

consider the significant risks of Trasylol or to assess the safety of the drug until the i3 study released in 2006.  However, these early animal studies conducted pre-marketing approval in the U.S. showed that Trasylol tended to accumulate in the renal system, leading the studies to conclude that the substance might be expected to have a renal effect on humans as well as other serious adverse events.

76.    In 1984, a study concluded that Trasylol, even in low doses, causes small and temporary impairment of renal function.  The expert authors recommended monitoring when higher doses are administered to patients.

77.    In 1987, a study reported that Trasylol use was associated with a transient increase in serum creatinine in the kidney.  Serum creatinine is an indicator which measures the effectiveness of the filtration function served by the kidney in the human body.  Increased levels of creatinine over baseline is a potential signal of decreased kidney function or kidney damage.  Studies demonstrate that even a temporary high creatinine level of 25 percent over baseline increases the risk of early death over the long term.

78.    Studies that continued into the 1990s found a very high risk of renal failure associated with the use of aprotinin.  In a 1992 study not funded by Bayer, a researcher found that in a very small sample group of 20 patients administered aprotinin, 13 (or 65%) suffered renal dysfunction.

79.    Also in 1992, a published study showed that myocardial infarctions occurred more frequently in Trasylol-treated patients (17.5% for high-dose, 14.3% for low-dose) than in those receiving placebo (8.9%).

80.    Significantly, in 1992 a randomized controlled trial compared the effect of Trasylol and tranexamic acid (TA) on renal function in patients undergoing CABG surgery.  The

study suggested "that aprotinin potentiates alteration of renal function after CPB...[i]n this aspect TA [tranexamic acid] may seem less deleterious."

81.     In 1993, as Bayer was preparing its New Drug Application (NDA) for the FDA, a published review of Trasylol suggested that the drug increases the risk of myocardial infarction and other potentially fatal adverse effects.  In fact, based on the data known to Bayer at that time, internal memos from the company revealed that it was Bayer's opinion that the half-dose regimen was the "first choice."

### 2.     Bayer Concealed Adverse Safety Data Pre-Approval

82.     Before Trasylol was approved by the FDA, Bayer was on notice that the agency expected the company to report any adverse trends regarding the drug's safety profile.  On June 28, 1991, Dr. Stephen Fredd and other medical professions from the FDA met with Bayer representatives in preparation for Bayer's upcoming NDA submission.  During that meeting, Dr. Fredd told Bayer that the FDA was relying on the company to "do a thorough review" of adverse event reporting "so he could be assured that he would be informed of any significant trends in kidney toxicity, etc."

83.     Contrary to the FDAs admonition, however, Bayer was already engaged in suppressing negative information about the drug pre-NDA submission.  Starting in 1991, Bayer conducted a trial through its Canadian subsidiary involving 122 patients randomized to Trasylol or placebo which reported troubling safety findings.  A total of 30 (50%) Trasylol and 22 (36%) placebo-treated patients experienced at least one serious adverse event, but in the Trasylol group 15 had "drug-related" adverse events compared to 9 placebo-treated patients.  Most concerning was the reported difference in number of deaths—9 among Trasylol-treated patients verses 2

placebo-treated patients.  Although some of the results were reported to the Canadian regulatory body, Bayer did not inform the FDA of the study's results until 1995.

84.     In 1992, a study of 212 CABG patients receiving Trasylol reported post-operative renal dysfunction in 11% in those patients receiving high-dose Trasylol and none in the placebo group.  The findings, however, were not published until 1996.  Similarly, in 1991, Bayer initiated a pilot study of the effect of Trasylol on renal function.  However, in less than 6 months after enrollment of 7 patients, the study was terminated by the Company without any explanation

**3.     Bayer Was Told By Its Expert In 1992 That Trasylol's Benefits Were Outweighed By Its Risks**

85.     The adverse data that was known to Bayer that was included as part of its New Drug Application (NDA) to the FDA for approval to market Trasylol was sent to Dr. Bertam Pitt, a highly-respected cardiologist at the University of Michigan Medical Center.  Dr. Pitt reviewed Efficacy and Safety Data Summaries from Bayer's Trasylol NDA and observed "**evidence for an adverse effect in regard to renal** and hepatic function as well as the trends for an increase in graft closure and **most significantly for adverse trend in mortality make me concerned**." Dr. Pitt told Bayer at that time that he "would not recommend pursuit of this indication in the United States," concluding in his letter to Bayer executives that:

> **..These potential benefits (reduced requirements for blood-transfusions) are more than offset by the real increase in risk to the patient in regard to hepatic function, renal function, graft closure, and mortality.  I believe that even if the drug was approved by the FDA,..the company could face severe liability risks in the future….**

(emphasis added).

**B.     <u>Bayer Commences With a Campaign of Suppression and Misinformation Regarding the Safety and Efficacy of Trasylol</u>**

1.    **Bayer's Post-FDA Approval Misstatements and Suppression of Adverse Information About Trasylol Results in a False and Misleading Safety Profile.**

86.    Bayer had started spreading its false and misleading message about Trasylol's true risk/benefit profile to both the FDA and the general public at the time of its initial approval.

87.    Not surprisingly, given the existing studies regarding Trasylol, the FDA's review of the Trasylol NDA raised several safety concerns regarding the information submitted by Bayer as part of its NDA for the drug, including renal toxicity, acute MI, increased mortality, and congestive heart failure.  RCTs submitted by Bayer at this time showed statistically significant risk of renal composite (dysfunction and failure) in valve and CABG studies.

88.    Based on these data, and a commitment from Bayer for certain changes and promises to fulfill post-marketing commitments, in December 1993, Trasylol was given limited approval by the FDA for prophylactic use to reduce perioperative blood loss and transfusions required in CABG patients at risk of major bleeding complications.   Trasylol was not recommended in patients undergoing primary CABG.

89.    Although the FDA had initially proposed that the Trasylol package insert list renal "toxicity" as an adverse effect, the agency acceded to Bayer's request to change the word to "dysfunction."   Specifically, the FDA recommended against the use of Trasylol in patients at low-risk of bleeding complications from CABG due to the risk of renal dysfunction.

90.    After the FDA approved Trasylol, in 1995, a study reported that Trasylol caused transient increases in serum creatinine, a measure of renal function.  The authors noted that three Trasylol-treated patients had a two-fold increase in serum creatinine compared to none in the placebo-group.

91.     To address the FDA's continuing safety concerns regarding Trasylol after its initial approval, Bayer submitted the results of the D92-048 Study or IMAGE study, which was concluded and published in 1996.  The IMAGE study's primary outcome was thrombosis of the arteries that had been bypassed, and involved approximately 800 patients, half on Trasylol and half on placebo.  Bayer continued to cite the IMAGE study as late at 2006 as the pivotal study to justify its claims as to Trasylol's safety and efficacy on renal and mortality, even though the study's endpoint was not for renal or mortality events, was relatively small, and Bayer continued to receive adverse event reports of renal effects and deaths associated with Trasylol.

92.     Starting in 1996, Bayer submitted an NDA Supplement seeking to broaden Trasylol's approved indication for use in all CABG surgeries.   The supplemental NDA was approved in August, 1998.   However, Bayer continued to fail in its reporting obligations, thus perpetuating the false and misleading safety information regarding Trasylol.

93.     As part of its commitments to the FDA in seeking the NDA Supplement in 1998, Bayer agreed to analyze its internal database of spontaneous adverse event reports regarding Trasylol that had been submitted to the company.  However, Bayer failed to undertake such a review until 2006, nearly **eight years later**, at which time Bayer revealed a significant safety signal associated with Trasylol (see paragraphs 111-112 below).

94.     Bayer's wrongful conduct continued unabated post-FDA approval of Trasylol.  In 1998, Italy suspended Trasylol based on the results of trials which showed that Trasylol caused higher mortality and myocardial infarction (MI) than placebo in open heart surgery.  Although Bayer had the results of the study, the company never disclosed the study to the FDA or the public.

95.     Nearly **eight years later** in 2006, in rebuttals for two studies released by Dr. Dennis Mangano and Dr. Keyvan Karkouti which associated Trasylol use with greatly increased risk of renal dysfunction or failure, Bayer was still misrepresenting the reason for withdrawal of Trasylol from the Italian market.  In the Q + A prepared to minimize the damage from the Mangano and Karkouti studies, when asked whether the reason for withdrawal of Trasylol from the Italian market was related to the issues raised in the Mangano and Karkouti studies, Bayer's suggested answer flat-out lied about the Italian withdrawal, claiming it was due to safety concerns about "Mad Cow Disease" or BSE.  Worse, Bayer's suggested answer misleadingly if not falsely claimed that "Trasylol was not removed from the market in Italy due to safety concerns raised in these recently published studies."   In fact, the Mangano study mirrored the Italian study in that both showed significant increases in the risk of MI associated with Trasylol.

96.     The Dutch Medicines Evaluation Board reported that a study conducted at the Vancouver General Hospital in Canada, which had been completed in 1992 with the report dated 1994, had not been reported by Bayer until September 1997.  Bayer claimed that the trial did not change the risk-benefit profile of Trasylol, "so there was no reason to report" it.  Shortly after, the Dutch Medicines Evaluation Board recommended additional restrictions to Trasylol's label.

97.     In 1997, Bayer Assistant Director of Professional Services Thomas H. Chin noted in a letter to a doctor Roger Royston in North Carolina that "pooled data from…four U.S. placebo-controlled studies showed a statistically significant increase in the incidence of post-operative renal dysfunction in patients treated with Trasylol."

98.     In 1998, the Netherlands issued a "rapid alert" because two studies showed a likely "causal relationship" between Trasylol and mortality and MI.  Although Bayer had the results of these studies, the company never disclosed the study to the FDA or the public.

2.      **Bayer Suppresses Studies, Notably The Kress Study, Which Demonstrate Clear Safety Signal For Trasylol**

99.     Also in 2003, Dr. David Kress, CV surgeon at St. Luke's Medical Center, released the results of a Bayer-sponsored study which demonstrated, through an univariate analysis, that CABG patients treated with Trasylol: had a significantly higher incidence of post-operative renal failure; significant increase in morality; and that higher doses of Trasylol correlated with a higher the risk of renal failure, length of stay, and mortality.  Moreover, the logistic regression analysis utilized by this study showed that Trasylol was significantly and independently associated with these safety risks, as opposed to some confounding factor.

100.    Internal communications demonstrated that Bayer scientists in 2004 immediately recognized the devastating impact the Kress study could have on Trasylol, remarking "Eegads, it is headed for publication?  Do we want to continue to add gas to this fire?"  After Bayer scientists tried unsuccessfully to discredit both Dr. Kress and the findings in his report, the Company decided to "let sleeping dogs lie" by burying the study and its adverse results, stating internally that "if Kress has not mentioned this, neither should we.  Let this go."

101.    Internal communications at Bayer demonstrates that its scientists had known about Kress study since 2000, and even though it was a Bayer instigated study, Bayer never disclosed the study or its adverse findings to the FDA, hospitals, doctors, or those who have used and paid for Trasylol prior to November, 2006.

102.    As explained in greater detail below, as early as 2002 Bayer knew about the BART study sponsored by the Canadian government, which Bayer expected would show that competitor drugs were more efficacious than Trasylol at just a fraction of the price. As demonstrated by internal company meeting minutes, various Bayer employees discussed several

options for minimizing the negative impact of BART on Trasylol sales in the U.S., including discrediting the design and execution of the BART study.

103.    In 2003, St. George's Hospital in England released a study of the records of 1014 patients who had undergone cardiac surgery between April 2001 and March 2002, which concluded that the use of aprotinin appeared to be associated with longer stays, with increased use of blood products and higher mortality.  Notably, Bayer reviewed, revised, and approved the final report in December, 2003.  However, this study was not disclosed by Bayer until **three years later**, in October, 2006.  Significantly, the results of the St George's Hospital study remained unpublished and undisclosed from the time the final research report was issued on December 11, 2003 until November 10, 2006, and was only produced in response to the FDA's request (following the failure of Bayer to make the results of the i3 study available to the Advisory Committee meeting of September 2006) for "any additional studies pertaining to the use of Trasylol in CABG that Bayer would like to bring to the attention of the FDA."

104.    In 2003, Bayer KOL Linda Shore-Lesserson, a cardiothoracic anesthesiologist from New York who received honoraria from Bayer for speaking as well as research support from the company, alerted Bayer's product manager in charge of Trasylol that an analysis of the McSPI proprietary database of patient information revealed that patients treated with Trasylol were 50 percent more likely to die than those treated with lysine analogues.  Rather than investigate the results from this database, Bayer continued to market Trasylol relying on the same mortality information from Bayer's "pivotal" randomized controlled trials conducted ten to fifteen years earlier.  Notably, these older randomized controlled trials were based on a relatively small sampling of patients (approximately 2200 Trasylol patients verses 1900 non-Trasylol patients), and none of the trials compared Trasylol to the lysine analogues.

105.    Bayer had in its possession a study conducted by the University of Florida between July 2001 and March 2004 which showed a trend towards increased acute renal failure, but Bayer did not disclose this study to the FDA prior to the first AdComm meeting in 2006.

### 3.    Bayer Affirmatively Misrepresents Trasylol's Safety Through its Drug Label, Marketing and Physician Communications

106.    Despite representations to the contrary in its drug labeling and marketing materials, Bayer had long known that Trasylol was associated with undisclosed dangers which outweighed the benefit it provided to patients, particularly increased risk of renal dysfunction and failure.  Not only did Bayer's own internal data reveal adverse safety information about Trasylol that was never disclosed to the FDA or the public, but over many years its own employees openly discussed the need to address these safety concerns.  For instance, in May 1999, Bayer employee Val Pascale referred to renal function as a "hot topic" for Trasylol.  In March 2000, a Bayer internal marketing analysis conducted by Stanley Horton noted that "renal effects" were the number one concern of anesthesiologists regarding the safety of Trasylol.  Emails between Bayer employees Diana Isom and Debra Warneke in 2002 acknowledge a "higher risk of renal dysfunction/failure" concerning Trasylol, which is referred to as a "potentially renal toxic drug."  Even as late as 2005, Bayer representative Frances Ciavaglia was naming myocardial infarction and renal dysfunction as "hidden concerns" regarding Trasylol, and Bayer was changing its internal Company Core Data Sheet on Trasylol to reflect increase incidences of renal problems and mortality revealed through analysis of Bayer's internal study data.  In 2007, after the truth about Trasylol began to come to light, Bayer employee Joseph Schreeren admitted in an internal company email that "all investigators and Bayer's own database consistently point[s] to a renal safety issue."

107.    Trasylol's label since at least 1998 misrepresents the drug's true risk of renal impairment, stating that "Data pooled from all patients undergoing CABG surgery in U.S. placebo-controlled trials showed **no statistically or clinically significant increase in the incidence of postoperative renal dysfunction in patients treated with Trasylol**."

108.    From 1999 to as late as 2003, Bayer was acknowledging in internal documents on Trasylol that the number one safety concern facing the Trasylol brand was "renal effects."  This recognition prompted Bayer during the early 2000s to focus on developing sales materials intended "to help answer renal function."  Yet rather than cite to new studies or data, Bayer trained its sales force to respond to renal safety concerns from health care professionals by citing to the "pivotal" Trasylol trials conducted some 10-15 years prior, which Bayer claimed "have not revealed any significant trend or incidence of renal dysfunction associated with the use of aprotinin compared to placebo."

109.    For example, in 2000, internal Bayer meeting minutes reflect that Bayer's own database showed that Trasylol usage is associated with a rise in serum creatinine, which the Company deemed a **"significant"** finding.  Yet starting in at least 2002, Bayer conducted sales training workshops designed to train their sales force to handle common objections to Trasylol use, during which it instructed its sales force to distribute materials to hospitals, doctors, and thought-leaders stating that "increases in serum creatinine are transient, and are **not significantly different between Trasylol and placebo.**"  Additionally, sales guides instruct the sales force that "**aprotinin use does not appear to be associated with a significant risk of serious renal toxicity.**" Finally, the guides instruct the sales force that "the safety of Trasylol has been **well-defined** in controlled trials of over 2,000 CABG patients."

110.    A "key message" in Bayer's sell-sheet distributed to hospitals and doctors as recently as 2004 and 2005 stated in bold letters that in CABG surgery, **"Trasylol had no adverse effect on renal function."**   Compare this to Bayer's sell-sheet for 2007, which admits that "Trasylol increases risk of renal dysfunction."

111.    Brochures distributed to physicians on Trasylol's safety considerations claimed that "**Trasylol is generally well tolerated**.  Graft patency, MI, renal or hepatic dysfunction, and mortality were comparable to placebo."

112.    Bayer's Medical Science Liaisons were trained to handle concerns about using Trasylol in patients with early renal insufficiency by reassuring the questioner that data from randomized controlled trials showed no difference in the incidence of renal insufficiency between aprotinin – treated and placebo – treated patients.   This reassurance is completely misleading, as Bayer had done no studies on all sets of patients exhibiting renal insufficiency, i.e. patients whose creatinine level was above 2 but were not yet requiring dialysis.   Thus, the message being spread by Bayer MSLs as to the safety of Trasylol for patients with renal problems was false and unfounded.

113.    Bayer improperly claimed superiority of Trasylol based solely upon the product's mechanism of action, rather than on comparative effectiveness trials.  For example, as part of its 2000 Trasylol Brand Review, Bayer's "Trasylol Key Messages" included Trasylol's unique mechanism of action modulates or normalizes the systemic inflammatory response to bypass," and that it has a "**clean safety profile**," despite the mounting evidence of renal dysfunction in Bayer's possession.

114.    Bayer ignored the concerns expressed by hospitals and physicians about renal problems observed with Trasylol, focusing on re-instating the use of Trasylol and maintaining

sales levels, rather than determining the true risk of renal dysfunction associated with its use. For instance, in early 2001 Bayer became aware that University Hospitals, Cleveland, reported 16 cases of renal dysfunction/failure from October through December, 2000, and as result the hospital imposed a moratorium on Trasylol use.  According to internal Bayer emails, the Company stated that "the first issue is to resolve the renal issue and remove the moratorium from Trasylol, then we can proceed to their other interests."

115.    Bayer's response to adverse reports from surgeons was to discount them as merely the product of high risk patients.  In response to a December 2005 complaint by a San Francisco vascular surgeon who informed Bayer of the deaths which have plagued Trasylol at his institution and implored Bayer to "review their cases to help better understand the safety of T[rasylol] in cardiac surgery," Bayer's representatives merely remarked that it was due to "horribly bad luck," and lamented the fact that it "looks like the doors are closed for a long time."

116.    As part of its commitments to the FDA in seeking the NDA Supplement, Bayer agreed to analyze its internal database of spontaneous adverse event reports regarding Trasylol that had been submitted to the company.  However, Bayer failed to complete such a review until 2006, nearly **eight years later**, and only did so under the threat of the looming FDA Ad Comm meeting.

117.    In its 2006 report to the FDA, Bayer noted that of the 745 adverse event reports submitted to the company prior to March 30, 2006, 81 (11%) reports reflected adverse renal events in patients exposed to Trasylol.  At that time, Bayer reported that only 2 of the 81 renal events were clinically significant, i.e. the patient required dialysis.  **In actuality, Bayer misrepresented their data**, as the report reflects that an additional 15 events (for a total of 21%)

actually required dialysis. Bayer also omitted that another 10 of the 745 reports (or a total of 91) involved a renal event, and 6 of those 10 were clinically significant, including dialysis and/or death attributable to renal failure.  Thus, it appears that approximately 14% of the reports involved renal events, and more than 3% of all reports involved patients who required dialysis and/or died from renal-related causes.  In certain years, more than 20% of the reports received by Bayer involved renal injuries.

118.    In addition to its review of the adverse event database in 2006, Bayer provided to the FDA its analysis of its global randomized controlled trial database for renal effects.  Not surprisingly, Bayer reported that it discovered in its database a **statistically significant increase in kidney dysfunction measured by creatinine** (rise of .5 milligrams per deciliter) in Trasylol patients compared to placebo.

119.    Despite Bayer's attempt to misrepresent the data collected from their internal adverse event database, it is clear that **Bayer's failure to fulfill their commitment to review the database during this eight-year time span prevented the discovery of a potential safety signal for Trasylol which would have prompted action by the Company and the FDA to either change its label or remove it from the market entirely**. Since only 1 to 10% of adverse drug experiences are reported, the adverse event reports collected and ignored by Bayer over the years is significant, as it suggests that renal injuries associated with the use of Trasylol were far more common than Bayer claimed.  The true number of renal events could very likely be between 910 and 9,100.

120.    Even after the FDA ordered Bayer to revise Trasylol's label by strengthening safety warnings and "to limit its approved usage to specific situations," Bayer failed to present to the public the appropriate information about the drug's approved usage.  Just weeks after

agreeing to the labeling change and through the remainder of 2006, the Trasylol website declared to the public the very erroneous message that the drug was approved "for **all patients** undergoing CPB for CABG surgery."

### C.   Bayer Declines To Study Renal Safety of Trasylol

121.   Rather than seek to identify the cause and frequency of renal problems associated with Trasylol as identified in both its internal literature and database of adverse events, Bayer sought to suppress the truth by refusing to sponsor or support such studies. For example, during the relevant period Bayer rejected proposals from three major academic institutions (Duke, Rush University, and Jewish Medical Center) and one medical group (Society of Thoracic Surgeons) in the U.S. to study renal issues in patients exposed to Trasylol.

122.   The first study was proposed January 4, 2000, by Robert Kalimi, M.D., a surgeon at Long Island Jewish Hospital, to study the pharmacokinetics of Trasylol in renal insufficient patients undergoing cardiac surgery. Because Trasylol is excreted by the kidneys, wrote Dr. Kalami in his proposal, many cardiac surgeons may not want to sue this medications [sic] in patients with poor renal function, or they may opt to decrease the dose of Aprotinin, or use a different medication. The proposed randomized study was to examine the pharmacokinetics of aprotinin in patients with compromised renal function. There is no evidence that this study was ever funded or performed.

123.   Bayer also declined to sponsor a study proposed May 11, 2000 by Christopher O'Connor, M.D., Associate Professor and Director of Cardiothoracic Anesthesia at Rush University-Presbyterian-St. Luke's Medical Center, Chicago, entitled Aprotinin Therapy and the Incidence of Stroke and Renal Failure After Cardiac Surgery. The protocol for the study stated:

> **The purpose of this study is to determine the role of aprotinin therapy as a possible risk factor for stroke and renal failure after cardiac surgery.**

(emphasis added).  In addition, the effect of dose on clinical outcome was to be examined.  The proposed retrospective study of all of the patients in the hospital's 4000-patient cardiac anesthesia database would analyze and account for **"all known risk factors for stroke after cardiac surgery…."** [emphasis in original]  Notwithstanding the modest grant request to cover the cost of the study, $7,500, Bayer did not fund it, and the study was not conducted.

124.    Another proposal for a study of Trasylol outcomes would have been based on the STS (Society of Thoracic Surgeons) National Cardiac Surgery database.  Long-term outcomes were to be studied through the use of a post CAB-follow-up questionnaire was made to Bayer on September 7, 2001.   Primary outcomes of the study were to include life expectancy, risk of subsequent anginal problems, and re-operation rate to study the long-term effects for eight years of CABG patients who had radial artery grafts harvested for CABG.   A secondary endpoint of this retrospective study would have been to study those patients in this cohort, going back to 1993 or 1994, who had been given Trasylol.  The proposal was relayed by Diana Isom, RPh of Bayer, who also suggested that the database would "definitely capture" data about the frequency of atrial fibrillation in the presence of Trasylol.  This request was rejected by Steve Niemcryk, Ph.D., Bayer's Associate Director of Epidemiology and Data Analysis, who stated the STS National Cardiac Survey would not measure up as an acceptable data source was that the centers from which the data was collected "vary substantially in their ability to diagnose atrial fibrillation."   The specific request made by the investigator, Dr. L. Douglas Cowgill involved outcomes related to Trasylol, which the database could have illuminated.   The reason for rejection—that "centers vary in their ability to diagnose atrial fibrillation"—had nothing Dr. Cogwill's proposal and seems odd that the ability of centers doing CABG surgery to diagnose atrial fibrillation (at least during initial hospitalization) would be impugned.

125.    Finally, in 2002, the Duke Clinical Research Institute submitted a proposal to Bayer for funding to conduct a study titled "The Use of Aprotinin in Comparison to Amicar in Patients Undergoing Coronary Artery Bypass Surgery."    The proposal for this randomized, double-blind, placebo-controlled study called for 300 subjects to be "randomized to receive aprotinin or Amicar in a blinded manner."   Notwithstanding Bayer's ongoing position (as in January, 2006, in the wake of the Mangano study) that only "a double-blind, randomized controlled trial, which is the accepted standard for assessing the safety and efficacy of drugs," ensures that "treatment comparisons are fair and unbiased….",  this study was never conducted. Similarly, Bayer has maintained that "an observational study has limitations that do not exist in a randomized, double-blind, placebo-controlled clinical trial."   Yet, when presented with the opportunity to participate in a study which met the criteria which Bayer itself established, Bayer passed.

126.    Despite its knowledge of safety concerns raised by the pre-approval studies and its own admission that Traylol causes serious renal problem—from transient elevation of serum creatinine to renal failure requiring dialysis and in some cases being fatal—Bayer never conducted sufficiently large and long-term trials to document fully the magnitude of the serious renal problems.

127.    Similarly, Bayer knew or should have known of the increased risks of graft occlusions and heart attacks associated with Trasylol, an antifibinolytic drug, but never properly addressed the magnitude of these problems in a scientifically rigorous and standardized way.

128.    Finally, despite knowledge of the increased risk of mortality associated with Trasylol use and that the drug's effects, whether favorable or unfavorable, did not stop when

administration ceased, Bayer never followed its patients long enough to determine the drug's full effect on mortality.

### D. Bayer Goes on the Counter-Attack against Publications by Doctors Mangano and Karkouti

129.   In January 2006, two studies raised serious questions regarding the safety of Trasylol for use in CABG surgeries.  On January 20, 2006, an observational study published by Dr. Keyvan Karkouti compared patients who received Trasylol with patients from the same facility who used tranexamic acid, and found a link between the use of Trasylol and a greatly increased risk of renal dysfunction or failure.

130.   Less than a week later, on January 26, 2006 the New England Journal of Medicine published a study by Dr. Mangano, *et al* entitled "The Risk Associated with Aprotinin in Cardiac Surgery."  Dr. Mangano studied data on 4374 patients undergoing cardiac surgery, comparing those using Trasylol with the cases using its two competitor generic drugs, aminocarproic acid and tranexamic acid and with those using no drug at all for the prevention of blood loss.  In his study, Dr. Mangano found that the "use of aprotinin…was associated with a 55 percent increase in the risk of myocardial infarction or heart failure an a 181 percent increase in the risk of stroke."  Mangano found no association between the competitor generic drugs and the increased risk of these events.  The study concluded that "associations between aprotinin and serious end-organ damage indicates that continued use is not prudent." By contrast, he found "the less expensive generic medications aminocaproic acid and tranexamic acid are safe alternatives."

131.   Mangano's study predicted that stopping the use of Trasylol immediately would prevent approximately 10,000 cases of kidney failure a year and save more than $1 billion dollars a year.  Additionally, he concluded that even more money would be saved as the alternative drugs were far cheaper than the near $1,300 per dose of Trasylol.

132.    In response to these published studies, the FDA issued a Public Health Advisory on February 8, 2006. In May 2006, the FDA announced a September 21, 2006 meeting of the Advisory Committee for the sole purpose of discussing the studies and the safety of Trasylol.

133.    In actuality, Bayer had known about an impending study and article from Dr. Mangano regarding Trasylol and its impact on renal function dating back as far as 2003.  At that time, Bayer employee Stan Horton initiated a plan to discover which journals may be interested in the study and exploit his relationship with the editors to prevent publication.  In October, 2004, Bayer was alerted via email that Dr. Mangano's impending article discussed findings that Trasylol use is associated with a three or four-fold increase in the need for dialysis together with increased mortality and stroke.  Dr. Mangano's conclusions were so threatening to Bayer that Stan Horton suggested the company hire a detective to discover why Dr. Mangano "was out to get" Bayer.

134.    For at least three years Bayer was aware of the findings in the forthcoming Mangano article, which they knew to be negative for Trasylol.  However, rather than act in the interest of patient safety, Bayer instead took steps to mitigate or neutralize Mangano's findings and maintain high sales of their product.

135.    In order to neutralize the impact of the Mangano article, Bayer issued a  "press standby statement" and sales training update to its employees were issued at the beginning of January 2006, providing a response to the Mangano article that was going to be published in the NEJM three weeks later.  Three times in this document Bayer stated it has "only just become aware of this observation all study." David Royston's e-mail of October 2004 shows that this was not true, that Bayer was aware of Mangano's study at that point and aware that raised patient safety concerns.  Bayer's standby press statement states that it planned to:

contact the study authors to discuss the details of the data, study methodology, and analysis. We have also alerted regulatory authorities about this publication. Patient safety is Bayer's highest priority and, as always we take publications of this nature very seriously.

136.    Bayer appeared to regard the Mangano publication very seriously, but it didn't seem to take patient safety as seriously. Having known about the risks identified in Mangano's article for over year, Bayer's actions in response to publication of this article appear to be very different than the actions it took in response to the knowledge of the article's findings. For example, on the day before the publication of the Mangano article in an NEJM, Stanley Horton wrote an e-mail titled "marketing message," which presented an action plan for responding to the Mangano article. Rather than re-examine their own studies that had raised questions about the safety of Trasylol, Bayer's plan of action was a response which "contains only the positive message and not the restrictive messaging, " and significantly, instructed its sales force to not discuss the article.

137.    Upon receiving the NEJM published version of the Mangano study, Bayer immediately set up a "Trasylol Steering Committee" ("TSC") that included numerous highly ranked Bayer employees, both from Bayer's United States offices, but also from the German home office, to oversee Bayer's overall response to the studies and to address any regulatory fallout.

138.    The TSC was led by employees from a variety of different Bayer entities including Dr. Kemal Malik, Global Head of Development and Chief Medical Officer. Also included, among many others, on the team were Dr. Ernst Weidmann, Vice President of Bayer's Global Drug Safety operation, Dr. Michael Rozycki, Director of U.S. Regulatory Affairs and Dr. Joseph Scheeren, Senior Vice President of Global Regulatory Affairs.

139.    Bayer also created an Advisory Committee Steering Committee to coordinate Bayer's preparation for the September 21 Advisory Committee Meeting.

140.    Bayer's TSC began a coordinated response to the Mangano study designed to call its science and findings into question and to lay the groundwork for the Advisory Committee Hearing in September.

141.    First, the TSC asked Dr. Pam Cyrus, Vice-President for Trasylol and Non-Specialty Products to collect all available data on aprotinin, including internal Bayer and Bayer sponsored studies. According to Bayer's internal investigation, this was a "monumental undertaking."

142.    Second, the TSC initiated a second project to criticize the scientific methodology of the Mangano study. Dr. Allen Heller, Vice President of Medical Science in the U.S. Pharmaceutical Division headed up this project and coordinated with various outside experts.  As part of Bayer's assault on the Mangano study, Bayer wrote to the FDA to inform them of the "serious methodological and statistical flaws" in the Mangano study.

143.    This portion of Bayer's counter attack on the Mangano study included the utilization of Bayer's various Trasylol Key Opinion Leaders who Bayer asked to critique the Mangano study and disperse into the field carrying Bayer's message that Trasylol was safe for use, and that Mangano's study was fatally flawed.

144.    Bayer even hired a private detective to follow Mangano and attempt to dig up dirt on him which could be used to discredit him.

145.    Finally, Dr. Weidmann, a member of the TSC himself, decided that Bayer should create its own "independent" data comparing Trasylol with "various antifibroinolytic agents."

146.    Weidmann "concluded that a randomized controlled clinical trial" was not "practical." Thus, a "well-designed observational study" was to be undertaken to create "independent" data. This study eventually became the i3 study.

**E.    Bayer Fails to Disclose the Existence or Results of i3 Study**

147.    After it was decided that Bayer should generate its own study, Dr. Kuno Sprenger, Bayer's Risk Manager and Drug Safety Advisor for Bayer's Global Drug Safety contacted Dr. Alex Walker, a physician and epidemiologist and the Senior Vice President for Epidemelology of i3 Drug Safety to design an observation study to analyze the Mangano study's conclusions.

148.    On February 8-9, 2006, Dr. Sprenger and Dr. Walker emailed back and forth regarding the concept of the study to be undertaken. This discussion continued via email.

149.    On February 23, 2006 Dr. Sprenger emailed Dr. Walker and copied Dr. Weidman, noting that Bayer is expecting the Advisory Committee Meeting to be set in late summer 2006 and that Walker is expected to be able to present his results at that time.

150.    Dr. John Seeger, an associate of Dr. Walker's emailed Dr. Weidmann and Dr. Sprenger at Bayer on March 3, 2006 and included a formal proposal entitled "Aprotinin and Cardiovascular and Renal Outcomes: Study Proposal."

151.    The proposed study would be based on the "Premier Perspective Comparative Database" which is described as "the largest hospital-based, service-level comparative database in the country providing detailed resource utilization data along with patients' primary and secondary diagnosis and procedure codes."

152.    After the i3 proposal was received, Bayer claims that the TSC debated whether or not to undertake the study. Some members of the TSC purportedly argued that the proposed study would not provide a scientifically meaningful assessment of Trasylol. Dr. Malik, the head

of the TSC, suggested that Bayer obtain an independent evaluation of the proposed i3 study. That independent evaluation was favorable, and Dr. Malik approved the study on June 1, 2006.

153.    On June 19, 2006, Dr. Weidmann signed an agreement with i3 to begin the study. The appendix to that agreement required i3 to deliver the preliminary results of the study within 3 months, just in time for the September 21, 2006 Advisory Committee Meeting.

154.    From June 2006 until the September 21, 2006 Advisory Committee Meeting, Bayer unrelentingly prepared to defend Trasylol before the Committee.

155.    There were numerous contacts with the FDA in those months with Dr. Rozycki serving as the primary point of contact between Bayer and FDA.

156.    For instance, on June 28, 2006 there was a conference call between members of Bayer's TSC and the FDA regarding the upcoming Advisory Committee Meeting. On that call, Bayer never mentioned that it had begun the i3 study.

157.    On July 17, 2006 members of Bayer's TSC and the FDA had a meeting to discuss Bayer's submissions to the Advisory Committee. Bayer held a dress rehearsal of this meeting the day before in Maryland. During that preparatory meeting, the group allegedly agreed to disclose the existence of the i3 study to the FDA during the meeting the next day. Dr. Sprenger believes he informed the group during that prep session that i3's preliminary results would be available before the hearing.  Bayer never disclosed the study to the FDA during the meeting the next day.

158.    On August 17, 2006, Bayer made a large submission of documents to the FDA for the Advisory Committee Meeting. The i3 study was not mentioned in this documentary submission.

159.    The i3 study was also discussed during "mock panels" Bayer conducted in preparation for the Advisory Committee Meeting. These "mock panels" involved both Bayer

officials and Key Opinion Leaders specifically retained by Bayer to help prepare for the FDA meeting in September.  Dr. Sprenger recalls telling those present, including those who would present Bayer's case to the FDA, that the study's preliminary results would be ready in time for the Advisory Committee Meetings.

160.    Dr. Weidmann likewise recalls asking why the i3 study had not been disclosed to the FDA yet.  According to Weidmann, the view of others at Bayer was that Bayer did not have to disclose the study. During Bayer's internal investigation, "[t]here was consensus among Bayer people we spoke with that BPC was required to disclose results of such a study if the results had any potential impact on the drug's labeling and/or risk benefit profile."

161.    Just two weeks before the Advisory Committee Meeting, Drs. Weidmann and Sprenger learned from Dr. Walker that i3 was ready to present its preliminary results to Bayer.

162.    Weidmann and Sprenger both sent emails containing the March 3 formal proposal from i3 and Walker to various other members of the TSC.

163.    On September 9, Bayer held a third mock panel in preparation for the Advisory Committee Meeting which Dr. Sprenger attended.

164.    On September 14, 2006, Weidmann and Sprenger received by email the Preliminary Report on the study prepared by Walker and i3.  The preliminary results of the i3 study showed that in addition to serous kidney damage, Trasylol increased the risk of death, congestive heart failure, and stroke, essentially confirming the findings of the Mangano and Karkouti studies.

165.     In the following days, Weidmann and Sprenger asked another scientist to review the report. On September 18, Sprenger emailed comments and questions about the report back to Walker.

166.    On September 20, Bayer held its final "dress rehearsal" for the Advisory Committee Meeting. Sprenger, Weidmann and much of the rest of the TSC were present. Witnesses recall a question being posed to Dr. Weidmann about the status of the study, but he denies that any such discussion happened.

167.    Despite Sprenger and Weidmann's integral role in the i3 study and in the preparation for the Advisory Committee Meeting, Bayer appears to have made no plans to disclose the results or even the existence of the i3 study to the Advisory Committee.

168.    On September 21, 2006, the Advisory Committee Meeting was held.  At no point during that meeting did Bayer even mention the existence of the i3 study much less the fact that they already possessed the preliminary results of a study which confirmed the results of Dr. Mangano's study.

169.    At the meeting, the Advisory Committee invested a great deal of time questioning the science of Mangano and Karkouti's studies and considering whether the Committee should act without other studies also suggesting unreasonable risk in the use of Trasylol.

170.    Ultimately, the Advisory Committee unanimously agreed that there was not enough evidence for it to recommend any change to the safety labeling of Trasylol.  In fact, during the meeting, the Advisory Committee apparently relied heavily on the fact that the Mangano study was the only available study to have found increased cardiovascular risk with Trasylol. All the while, Bayer failed to mention all the other studies in its possession, including Kress, St. George, and its own i3 study which also found increased cardiovascular risk to patients who were administered Trasylol.

F.     **The i3 Study Author Reveals the Study Results**

171.    One day after the Advisory Committee Meeting, Dr. Walker of i3 emailed Drs. Sprenger and Weidmann of Bayer. In that email, he asked why i3's study was not disclosed or even mentioned at the Advisory Committee Meeting.

172.    On September 25, 2006, Drs. Walker and Seeger of i3 held a conference call with Drs. Weidmann and Sprenger to discuss the failure to disclose the results of the i3 study to the FDA Advisory Committee.

173.    The next day, a series of emails were exchanged between Dr. Walker of i3 and Dr. Weidmann of Bayer. In those emails, Weidman claimed that Bayer did not disclose i3 because Bayer had not received answers to a series of questions posed by Bayer after receipt of the preliminary results of the study until after the Advisory Committee Meeting and Bayer wanted an independent expert to review those results and the responses to Bayer's questions.

174.    In response to Weidmann's email, Dr. Walker informed Weidmann that, in his view, the i3 Preliminary Report had serious implications for public health and had to be disclosed to the FDA.  He requested that Bayer do so by September 28.

175.    Just 6 days after the original meeting, the preliminary results of the i3 study were leaked to the FDA. According to Bloomberg News, Dr. Walker told the FDA about the study's existence. Bloomberg quoted Dr. Walker as saying it "seemed like the right thing to do."

176.    On September 29, 2006, the FDA issued a second Public Health Advisory related to Trasylol which referenced the i3 study and noted that the FDA did not have access to this study at the September 21 Advisory Committee Meeting. Essentially, the FDA reiterated its February 2, 2006 Advisory noting that studies questioning the safety of Trasylol existed.

177.   The i3 study found a 60% increased risk for renal failure requiring dialysis and a 64% increase in the risk of in-hospital death with Trasylol, confirming the findings of the other studies.

178.   Members of the Public Advisory Committee were outraged by Bayer's conduct. Committee member Dr. Robert Harrington said "Bayer's failure to even disclose that these data were available and under preliminary analysis is very disturbing to me." "It is ironic that we spent part of the panel meeting criticizing Dr. Mangano for failing to allow the FDA to perform an independent review of his database yet Bayer failed to even acknowledge the existence of these data." "It is especially troubling when several panel members… commented that more data and more analyses were needed to fully understand the risks and benefits of the drug."

179.   Committee Member Dr. Michael Lincoff of the Cleveland Clinic said "[i]t is inconceivable that representatives from Bayer did not know about the existence of the study or its potential relevance to the committee."

180.   Dr. John Teerlink, another panel member, noted that the failure to disclose the i3 study "calls into question the honesty of Bayer." He continued "the public health has been harmed in two ways. One we didn't have complete information to make our decision, but second, it calls into question a process that all of us rely on."

181.   Even after this, Bayer kept Trasylol on the market and sold it routinely for all kinds of surgery patients.

**G.     The Aftermath**

182.   The Advisory Committee met again in September 2007. At that meeting, it voted 16-1 to recommend that Bayer be allowed to continue selling Trasylol. The FDA ultimately

decided however that Trasylol should be used only in patients at the highest risk of excessive bleeding during surgery.

183.   Following the release of the i3 study, other studies were undertaken to analyze the risks associated with Trasylol.

184.   A Canadian clinical study was designed to alleviate some of the scientific concerns raised by critics of the Mangano and i3 studies. The "BART" study was conducted by the Ottawa Health Research Institute as an independent randomized, controlled trial conducted in high-risk cardiac surgery patients.

185.   The BART study, however, was halted in October 2006 when preliminary findings suggested that, compared to aminocaproic acid and tranexamic acid, Trasylol increases the risk of death.  Based on this analysis of the data, patient enrollment in the BART study was stopped and the preliminary results were reported.

186.   Approximately two weeks after the halting of the BART study, Trasylol was pulled in Bayer's home country of Germany.

187.   On November 5, 2007, Bayer finally agreed with the FDA to withdraw Trasylol from the market in the United States pending further study.

188.   Bayer hired outside counsel to investigate how the i3 study came to be withheld from the FDA Advisory Committee. The published investigation concluded that "human error" and "mistake" were the primary culprits. Despite this, the report noted that two Bayer employees were suspended.[2]

---

[2] The employees suspended were Drs. Weidmann and Sprenger who were intimately involved in the process of preparing Bayer for the FDA Advisory Committee Meeting, and unquestionably had knowledge of the study's preliminary findings before the meeting.  The report of outside counsel Zuckerman Spaeder, LLP, laid much of the wrongdoing at the feet of these two employees of Bayer Healthcare, A.G..

189.    The BART study was published by the NEJM on May 14, 2008, and concluded "[d]espite the possibility of modest reduction in the risk of massive bleeding, the strong and consistent negative mortality trend associated with aprotinin, when compared with lysine analogues, precludes its use in high risk cardiac surgery."

190.    Following publication of the BART study, on May 14, 2008 Bayer notified the FDA of its intent to remove all remaining supplies of Trasylol from hospital pharmacies and warehouses.

## VIII.   BAYER MISREPRESENTED TRASYLOL'S COST AND EFFICACY COMPARED WITH COMPETITOR DRUGS

191.    Bayer engaged in a series of events that served to delay the full and timely disclosure of critical safety information to patients, prescribing physicians, and those who paid for Trasylol; to wit, Bayer consistently failed to disclose safety, efficacy, and cost-savings data it collected on Trasylol, thus distorting the perception of physicians, patients, and payors of Trasylol as a drug whose benefits outweigh its risks.

192.    Bayer also used its fraudulent marketing scheme to mislead decision makers into believing that Trasylol's safety and efficacy profile relative to its competitors or alternative therapies justified the drug's exorbitant price tag of over $1,000 per dose.  Since its inception, Bayer called Trasylol a "cash cow," and emphasized that the company should milk it as long as possible.  However, during the relevant period, Trasylol's competing drugs Amicar and TA, were both safer than Trasylol, and sold for a fraction of the price at around $11 and $44 per dose, respectively.

193.    Throughout the relevant period, Bayer promoted Trasylol based on a "pharmacoeconomic" message that stressed the cost effectiveness of Trasylol as compared to other treatments for blood loss during surgery, such as blood transfusions, and compared to

competitor drugs such as TA and Amicar.   Specifically, Bayer took the position and communicated to hospitals and doctors that "the costs for Trasylol are offset by the reduced use of blood products and other complications associated with CABG surgery involving CPB (cardio pulmonary bypass)."   However, Bayer lacked the data necessary to support such a claim, and at no point did Bayer ever study the relative cost effectiveness and efficacy of these drugs for CABG surgery, or any other surgery compared to Trasylol.

194.   Bayer was warned not to make cost-effectiveness claims regarding Trasylol without data to back up its claims.   In June, 1994, the FDA's Division of Drug Marketing, Advertising, and Communications (DDMAC) stated in its letter to Bayer addressing Trasylol that it "objects to claims of cost-effectiveness without adequate substantiation.   Without substantiation, such claims are false and/or misleading."   DDMAC also noted that Bayer was:

> making claims that aprotinin injection is cost – effective.   We request that you forward to DDMAC evidence to support these claims of cost – effectiveness. This evidence must be based upon adequate and well – controlled studies.   If you have such documentation, please submit all protocols, data analyses, reports, and other documentation two DDMAC to substantiate these claims.   Otherwise, we request that you discontinue dissemination of materials such as promotional Brochure, Answers to Questions about Trasylol, containing such claims.

195.   Between 1994 and 1998, Bayer failed to produce to DDMAC evidence supporting is that it would consider claims of savings based on less need for blood products were less time in the operating room associated with Trasylol.   In a letter to Bayer dated November 9, 1998, DDMAC deemed such claims "to be false and/misleading because they lack of adequate evidence to support the claims."   Specifically DDMAC stated the claims of cost-effectiveness contained in two published abstracts reporting small studies did not constitute adequate evidence.

196.    The sequence of these letters shows that Bayer continued to make claims of cost-effectiveness after being warned by DDMAC in 1994, and based those claims—at best—on small studies published only as abstracts as noted in the 1998 letter.

197.    Bayer also avoided studies which compared Trasylol directly to TA and Amicar, even though it considered them direct competitors for the same market.  In fact, as the BART study (described in more detail below) progressed, Bayer feared that the study would reveal not only the safety risks inherent in the use of Trasylol, but also that it would reveal that Trasylol has no comparative efficacy advantage over TA despite the extraordinary difference in price. Bayer's fears were driven by a 2003 study in its possession which showed that Trasylol's cost would outweigh its value by 2006.  Bayer knew that the ongoing BART study and any other similar study which undermined Trasylol's "pharmacoeconomic" message would significantly hurt its sales.

198.    Since at least 1996, Bayer had a strict policy against conducting trials comparing Trasylol with Amicar.  Despite the Company's desire to differentiate Trasylol from what it viewed as its competitor drugs, Bayer's marketing message stated that they "do not want to support trials of this nature.  The Committee's concern is that conducting such trials would further lead to classifying Trasylol as solely an antifibrinolytic without emphasizing its additional benefits."  Bayer adopted this policy despite its knowledge that "the level of interest for such trials is extremely high among cardiothoracic surgeons and anesthesiologists."

199.    One stated reason by Bayer as to why no comparison should be made between Trasylol and Amicar is because CABG is not an indicated use for Amicar.  Specifically, Bayer claimed:

> Trasylol and aminocaproic acid are different types of drugs approved for different indications.  In the U.S., Trasylol is the only drug approved for use to reduce

perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of coronary bypass graft surgery.

200.    Yet, Bayer has also maintained, when it suited other purposes (marketing claims in particular), that Trasylol and other lysine analogues are "competitor" drugs for the same market of surgeries.

201.    As early as 1996, Bayer's marketing plans specifically listed aminocaproic acid (Amicar) and Cyklokapron (tranexamic acid or TA) as competitors of Trasylol.

202.    Bayer also recognized that lysine analogue Amicar had overlapping indications with Trasylol.  In a letter dated December 4, 1998, Carol Sever, Bayer's Deputy Director of Regulatory Affairs wrote to DDMAC that "Trasylol and lysine analogs (namely Amicar) do have overlapping indications.  **Therefore comparisons should be allowed.**":

> ....**Trasylol is indicated for the treatment of a condition which is an exact subset of a condition for which Amicar is indicated, meaning the indications overlap.**

(emphasis added).  This point can be further supported by the fact that Amicar is widely used in clinical practice for the subset of conditions described in Trasylol indication.

203.    Between 2000 and as late as June, 2004, Bayer employees responsible for marketing Trasylol noted the lack of studies on cost saving associated with Trasylol usage and discussed the "need for a pharmacoeconomic message."  An action item for these employees was to conduct "a preliminary analysis to evaluate economic benefits of Trasylol and Amicar based on published data."   In other words, the action item was to take a peek (without a formal commitment) at what such a "study" would show, prior to committing to conducting such a "study" and making the results known.

204.    The preliminary evaluation conducted in 2004 showed that there were no cost savings associated with Trasylol use in primary CABG; the cost savings was variable in repeat

CABG; and that there was a definite cost savings associated with Amicar use, not with Trasylol. Given that the "preliminary analysis" showed Amicar superior on a cost-savings basis given Trasylol's relatively exorbitant price tag, the conclusion was that the differentiation of Trasylol from Amicar should not be on the basis of cost-savings (as was hoped), but on the basis of "clinical benefits that are unique to Trasylol."

205.    As the above demonstrates, Bayer was having it both ways.  For marketing purposes it claimed that comparison between the two drugs was permissible (in addition to the above, see the Bayer Pharma USA 2000-2004 Trasylol Business Plan, which ranks Trasylol's share of "the injectible anti-fibrinolytic market," in comparison with Amicar's share).   At the same time, while publicly advertising Trasylol's safety against Amicar (in banner headlines asserting that Trasylol has no adverse effect on renal function", and that "Trasylol modulates SIRS" and "attenuates the effects of IR on the kidney") and its cost-effectiveness compared to Amicar, Bayer never promoted, supported nor sponsored a study which would bluntly compare safety and efficacy of Trasylol as against its competitor drug.  When presented with a proposal such as the Duke Clinical Research Institute study, which would have addressed this issue of renal safety, Bayer chose not to explore it.

206.    For years, Bayer feared and anticipated that the BART Study would confirm for the public what the Company already knew: that both Amicar and TA were not only as cost-effective as Trasylol, but were also safer for the patient.  The BART study results released in 2007 justified Bayer's fears.

## IX.    TRASYLOL WAS NOT FIT FOR ITS INTENDED PURPOSE

207.    Despite representations to the contrary in its drug labeling and marketing materials, Bayer had long known that Trasylol was associated with undisclosed dangers which

outweighed the benefit it provided to patients, particularly increased risk of renal dysfunction and failure.

208.   The facts alleged herein demonstrate that Trasylol failed in its ordinary and intended purpose: preventing perioperative bleeding in a reliably safe and effective manner.  For this reason, Trasylol was never merchantable, nor was it fit for its intended purpose.  As explained by Luca A. Vricella, M.D., Associate Professor of Surgery, Division of Cardiac Surgery, The Johns Hopkins University:

> **The safety risks posed by the administration of aprotinin, including increased risks for renal failure requiring dialysis, myocardial infarction, and death, render aprotinin unsafe for use in clinical practice**.  In light of the evidence disclosed by the peer-reviewed literature, as well as data that was available but not disclosed until recently, I believe that no reasonably prudent physician would use aprotinin for patients undergoing cardiac surgical procedures….[E]ven if marginal decreases in blood loss and transfusions were demonstrated, **the risks associated with the use of aprotinin would still outweigh any potential short-term benefit, were there any**."

The FDA confirmed Dr. Vricella's opinions when it stated that Trasylol's safety risks outweigh the benefit to any class of patient, triggering Bayer's withdrawal of Trasylol from the market starting in 2007.   Because Trayslol's dangers outweighed its efficacy, Bayer breached its implied warranty to those who pay for the drug that Trasylol served its fundamental medical purpose.

209.   Several other medical experts who have studied the data surrounding Trasylol have given their opinion within a reasonable degree of medical certainty that, since before it was approved for marketing, Trasylol was unfit for even ordinary use by physicians:

> **Trasylol significantly increases the risk of serious adverse events, including specifically, fatal and nonfatal renal injuries and renal failure**.  Thus, Trasylol is an independent risk factor for causing such adverse events.   **The scientific evidence, prior to FDA approval, demonstrates Trasylol had a strong potential for causing renal injury.**   Additional studies post-approval further confirmed this harmful effect, and other adverse effects of Trasylol.

Curt Daniel Furberg, M.D., Ph. D., Professor of Public Health Sciences and Senior Advisor to the Dean for Health Services Research and Health Policy at Wake Forest University School of Medicine.

…[R]ecent epidemiological data describe a **significant link between the perioperative administration of aprotinin and an increased risk of both death and the development of renal dysfunction.**

Mark Dershwitz, M.D., Ph.D., anesthesiologist at the University of Massachusetts, Professor of Anesthesiology and Biochemistry & Molecular Pharmacology at the University of Massachusetts.

The issue of renal injury associated with aprotinin was signaled in previous studies spanning the past two decades. **Early data from the 1991-1992 era showed a clearcut signal of aprotinin's association with renal dysfunction.**

…

[Bayer's] RCTs and meta-analyses…were inadequately powered to look at renal failure and mortality as clinical outcomes. ….**Bayer, the FDA, and virtually all investigators accept that aprotinin causes renal dysfunction**…only the largest observational studies like those by Mangano and the i3 study investigators were powered to look at renal failure – and both of these large studies indicate that aprotinin use causes renal failure…[and] I find their results to be compelling and consistent. **Lastly, serious safety issues were raised about aprotinin as early as the early 1990s.** These issues should have been addressed much earlier by Bayer…**the fact that these studies were not performed exposed many patients to the adverse effects of aprotinin** " P. 9-10

Mark J. Eisenburg, M.D., M.Ph., Professor of Medicine, Jewish General Hospital/McGill University.

210. Throughout the relevant period where Plaintiff and the class were paying for Trasylol, there was an implied warranty by Bayer to those who paid or reimbursed for the cost of the drug that it was fit for its ordinary and intended purpose. Bayer, the drug's manufacturer: (1) knew or was charged with knowing the use to which Trasylol would be put; (2) knew or was charged with knowledge that the drug carried with it an undisclosed, heightened risk to the patient of renal dysfunction, renal failure, heart attack, stroke, and MI; and (3) knew that Plaintiff

and the class were relying on Bayer's skill or judgment in developing, producing, and furnishing a safe and effective drug product.

211.    Trasylol was not merchantable during the relevant period, because it: (1) was not fit for the ordinary purpose for which anti-fibrinolytic drugs are used; (2) was not adequately labeled with the safety dangers known only to Bayer; and (3) did not conform to the promises or affirmations of fact made on the label about its safety and efficacy.  Furthermore, because Bayer went to great lengths to conceal critical safety information that only it possessed, those who paid or reimbursed for Trasylol were not capable of conducting an examination of the drug product that could have revealed the drug's inherent dangers.

212.    Trasylol was not reasonably fit for its ordinary and intended uses.  Trasylol caused not only numerous deaths and injuries but also economic injuries to those who paid for the product including Plaintiff and Class Members.

**X.      Bayer defeated the economic expectations of the Plaintiff and the class of third-party payors which believed that, when they paid for or reimbursed for Trasylol administered to their participants, they were paying for a prescription drug product that did not carry an undisclosed, heightened safety risk that rendered the drug unsuitable for use by any class of patient.      BAYER CARRIED OUT ITS FRAUDULENT SCHEME USING THE KEY OPINION LEADER ENTERPRISE**

213.    As described above, in furtherance of its fraudulent scheme, Bayer promoted Trasylol for the purpose of maintaining and increasing sales of Trasylol and ensuring continuing payment for the drug, Bayer knew, but failed to disclose, the existence of serious risk associated with Trasylol including adverse test results regarding Trasylol's safety risks and efficacy when compared to generic competitor drugs. Indeed, as set forth above, adverse study results were withheld by Bayer.  Key Opinion Leaders actively advocated for the use of Trasylol, and conveyed Bayer's misrepresentations and omissions to the medical community.

214.     As a result of Defendants' fraudulent scheme as alleged herein, including Bayer's non-disclosures and affirmative misrepresentations regarding Trasylol's safety and effectiveness, patients, healthcare providers, formulary decision-makers, and third-party payors were lulled into believing that Trasylol could be safely prescribed.   Relying on these non-disclosures and affirmative misrepresentations, Plaintiff and other Class members paid millions of dollars in claims related to dangerous use of these drugs.

215.     Bayer's scheme to defraud and conceal the truth was carried out through the use of an illegal enterprise.   Bayer and others in this enterprise have participated in the enterprise's affairs through a pattern of racketeering activity consisting of multiple acts of mail and wire fraud.   These predicate acts of racketeering activity were related to each other in furtherance of the scheme described above and amounted to continuing racketeering activity and, therefore, constitute a pattern of racketeering through which Defendants have violated 18 U.S.C. § 1962(c).

216.     The following persons constitute an association-in-fact enterprise:   The Key Opinion Leaders Marketing Enterprise consisting of (i) the German Bayer parent corporations (ii) its American subsidiaries, and their Scientific Affairs and Clinical Communications Liaisons; and (iii) its army of "Key Opinion Leaders" who pushed Bayer's message to surgeons, other healthcare providers and those who were in a position to administer Trasylol, all while keeping its safety risks concealed from government regulators, the medical community, payors and the general public.

**A.     Bayer And The Key Opinion Leaders Agreed To Act In Furtherance Of The Fraudulent Scheme**

217.     Bayer has a symbiotic relationship with certain Key Opinion Leaders which gave rise to a sophisticated program intended to convince the physicians, patients, payors and the public of the safety and efficacy of Trasylol while enhancing sales of the product.   This scheme

financially benefitted both Bayer and the Key Opinion Leaders.  KOLs helped disseminate inaccurate and misleading information about Trasylol's dangers while simultaneously influencing health care providers nationwide to use Trasylol on their patients.

218.    In order to assure sales, Bayer aggressively marketed Trasylol, using both a traditional dedicated sales force in support of the drug, and an army of KOLs to push the drug to surgeons, anesthesiologists, and other doctors likely to utilize the drug.

219.    Throughout the relevant period, Bayer's marketing plan for Trasylol intended to and did "drive physician demand for all CABG patients" utilizing a number of different programs involving the KOLs, including peer-to-peer influence programs such as Continuing Medical Education (CME), Bayer-sponsored speakers, dinners, grand rounds, regional meetings, symposia, and cardiothoracic surgical team meetings.

220.    The Bayer KOLs were very successful during the relevant period, as Trasylol saw continuous and tremendous sales growth for both on and off label uses of the drug.  Trasylol, Bayer's second most profitable drug, saw its projected sales to double between 2003 and 2006, from approximately 65,000 in 2003 two more than 120,000 in 2006.

221.    As part of its scheme to conceal the risks of Trasylol, Bayer, primarily, through its Scientific Affairs Liaisons ("SALs"), organized a group of "Key Opinion Leaders" made up primarily of scientists and physicians identified for their prominence in their field and ability to persuade other healthcare providers. Bayer undertook this scheme in order to maintain and increase the use of Trasylol while concealing the safety risks associated with Trasylol from the medical community, payors and the general public, thereby assuring continued payment for Trasylol, thereby assuring continued payment for the drug.

222. Bayer allocated multiple-millions of dollars per year from its budget for the purpose of increasing Trasylol sales. Trasylol's marketing budget alone increased nearly three-fold between the late 1990s to 2005. Over the same period, Bayer allocated approximately the same amount of money to fund the Bayer Scientific Affairs budget. In 2006, Bayer's Scientific Affairs department spent millions funding KOL programs for Trasylol, such as "educational" programs and symposium presentations for at least three professional meetings: American College of Cardiology, Society of Cardiothoracic Anesthesiology, and AATS. Bayer also spent millions of dollars during the relevant period on its Trasylol Phase IV grant program, which was meant to expand Trasylol usage into new markets.

### 1.     Bayer Identifies And Tracks Trasylol KOLs

223. Bayer's KOL Program conducted by Bayer's Scientific Affairs department identifies potential KOLs primarily by targeting "health care professionals who have potential to be high volume prescribers and who have potential to become strong influencers of prescriptive practice." Ideally, Key Opinion Leaders were those respected for their acumen in their particular field, and well-published, precisely the kinds of people who were likely to influence the opinions and decisions of their professional contemporaries.

224. Once Bayer identifies a target or proponent, the Company develops a strategy of moving them up a continuum comprises of the following categories:

- **"Champions"** – "rare individual" who is influential and credible within peer group with a proven track record; has participated in Bayer preclinical or clinical trials; strong presence in organizations and agencies of influence; truly believes in the value of the product and uses it; is readily available for advice, consultation and support; has the ability to maintain scientific credibility while incorporating

messages on strategy; has actively participated in Bayer generated activities and group; supports Bayer products; has industry awareness.

- **<u>"Advocates"</u>** – "above average supporter of Bayer and its products."

- **<u>"Proponents"</u>** – "average supporter of the product."

225.    Bayer's KOL Program also tracked the progression of KOLs according to their relative "sphere of influence" (affiliations with health care organizations or agencies, academic research and publications, speaker); "depth and breadth of contribution" (participation with Bayer-sponsored projects, willingness to speak on behalf of Bayer products and deliver strategic messages); and "commitment and relationship" ("desire to establish or maintain a relationship with Bayer").

### 2.    Bayer Trains KOLs To Push Trasylol's "Message"

226.    After identifying Key Opinion Leaders, Bayer invited them to participate in exhaustive training on Bayer's Trasylol message.  This training included, but was not limited to, training on scripted presentations designed by Bayer to be given to groups of doctors and at medical conferences.

227.    Bayer carefully monitored the performance of Key Opinion Leaders, and took speakers to task for any variation from Bayer's scripted message.  Bayer also tracked closely the activities of the Trasylol KOLs and their impact on Trasylol sales.

228.    Bayer had a practice of cultivating KOL messaging by proving KOLs with particular topics the Company wished them to discuss in upcoming presentations with health care professionals.  For example, in an email from Bayer employees to a particularly involved KOL, Dr. David Royston, dated January 16, 2005, Bayer insisted that Dr. Royston's include in his upcoming presentation to cardiothoracic surgeons, anesthesiologists, and perfusionists

discussion of the "incidence of MI and Renal dysfunction with Trasylol."   Dr. Royston was a well-compensated Bayer KOL, receiving tens of thousands of dollars from Bayer for research and speaking about Bayer products, in particular Trasylol.

229.    In addition to setting the topic agendas for its KOLs, Bayer hired consultants to produce presentation packages to be utilized by the KOLs in advisory boards and speaker programs.

230.    During the relevant period, Bayer also conducted peer influence dinner programs and focus groups using KOL speakers, where KOLs would give a presentation off a Bayer-approved slide deck about Trasylol to doctors identified from Bayer's internal database of cardiac teams from every institution in the United States.   At particular meetings, Bayer would pay cardiothoracic surgeons $500 each to attend and partake in a question and answer session with a Bayer KOL.

231.    Bayer maintained strict control over the information generated by Key Opinion Leaders and other researchers regarding Trasylol in order to control the message regarding the safety and efficacy of the drug.   Bayer has a history of demanding that scientists who tested or analyzed its products sign a document stating that they will inform Bayer in writing of the results and will not publish or commercialize them without Bayer's written permission.

232.    Bayer also offered its own internal data as well as nearly completed studies to Key Opinion Leaders for publication or presentation but maintained significant editorial control over the final forms of the publications and presentations.   Likewise, Bayer often wrote "draft" versions of studies, and edited presentations and publications written by its Key Opinion Leaders for substance, message and tone.   Through this, Bayer was able to manipulate the medical debate over Trasylol and ensure that certain data and issues were never presented.

### 3. Bayer Provided KOLs Incentives In Exchange for Utilizing Their Services To Market Trasylol

233.    Bayer developed a sophisticated program for developing and maintaining KOLs. In addition to maintaining close contact with Bayer's SALs, Bayer cultivated its Trasylol KOLs through various (and generous) incentives, including: support of their projects or organizations through the use of unrestricted educational grants; research grants; professorships; support for publications; consultancy agreements; fellowships; retention as Bayer speakers; support for formulary decisions; and interactions with other high-level KOLs.  Bayer KOLs earned up to $2,500 for each presentation.

### 4. Bayer Used KOLs And Their Work To Sell The Safety of Trasylol

234.    Bayer had a practice of then using the KOL's presentations and publications for their own marketing purposes.  For example, Bayer's own internal sales guides instructed the sales force, when confronted with the objection that Trasylol causes renal problems, to refer to comments made by Dr. David Royston to a group of doctors in which he claims that "it is not a problem as the patient will resolve or can be dialyzed."

235.    Bayer also trained its sales force to respond to physician concerns about renal safety by citing to numerous articles and studies written by Drs. Ferraris, Meldrum, Lemmer, Levy, Sedrakyan, Spiess, Lindvall, Van der Linden, and Shrivastava—all of whom were Bayer KOLs who received monies from Bayer either for speaking programs or research.

236.    The Bayer KOLs also served the important function of being first-responders deployed by the Company to defuse safety concerns related to Trasylol and protect sales of the drug.  For example, in response to the December 2005 report of numerous Trasylol-related deaths at a San Francisco health care facility, Bayer planned to utilize Dr. Jerrold Levy, a

cardiothoracic anesthesiologist and Bayer KOL, to provide further education on Trasylol and identify practices "that may be contributing to their poor experience with Trasylol."

237.    Key Opinion Leaders were not only utilized to carry Bayer's message into the field, but also helped Bayer shape and craft its sales message regarding Trasylol against its competitor drugs.  Key Opinion Leaders routinely participated in advisory meetings or focus groups to assist Bayer in determining which messages best resonated with its target audience of physicians.

238.    Often when Bayer would either find that certain medical facilities did not use Trasylol, or encountered questions from particular physicians, Bayer would dispatch certain Key Opinion Leaders to discuss the issues with these physicians in an attempt to persuade them that Trasylol was as safe or as cost-effective as any alternative.

239.    Bayer personnel, such as the SALs, were specifically charged with interacting with the Key Opinion Leaders, directing their message, and allocating these valuable human resources on Bayer's behalf.

240.    Key Opinion Leaders such as Dr. Jerrold H. Levy and Dr. Joseph Lemmer were not only dispatched by Bayer to influence other doctors and healthcare providers, but undertook studies regarding Trasylol, peer-reviewed studies about Trasylol, and provided counsel to Bayer on many different kinds of marketing and scientific issues related to Trasylol.

241.    Bayer's considerable influence it wielded through its KOLs was exemplified in May, 2007, when, even after the 2006 FDA AdComm, a task force of thoracic surgeons and cardiovascular anesthesiologists published in the Annals of Thoracic Surgery new clinical practice guidelines for blood management during heart surgery which endorsed the use of Trasylol over lysine analogues, the safety of which "is less well studied compared to aprotinin."

Their findings were not surprising, considering that eight out of the 17 guideline authors disclosed ties to Bayer in the form of lecture and consulting fees and/or research support. When marketing for Trasylol was suspended in November, 2007, the Society of Thoracic Surgeons finally announced that the portion of the guideline relating to use of Trasylol was under review.

242. Bayer also utilized Key Opinion Leaders to address the safety of non-approved indications for Trasylol. While Bayer's ordinary sales staff was strictly limited in the scope of their messages regarding non-approved use, Key Opinion Leaders, as fellow healthcare professionals, were not similarly limited. Key Opinion Leaders were well positioned to carry Bayer's message that Trasylol was safe and effective for orthopedic, non-CABG cardiac and even oncologic surgeries where its sales staff could not. Key opinion leaders often fielded questions and provided encouraging studies or data with regard to unapproved usage of Trasylol to their contemporaries.

243. This message was disseminated by Bayer not just through an aggressive marketing campaign, but through carefully chosen and placed Key Opinion Leaders who were prepared to deliver Bayer's safety and cost-effectiveness message to healthcare professionals Bayer might otherwise have trouble reaching.

244. Bayer's plan was to expand the indication for use of Trasylol, first to total hip replacement surgery, and then to other types of surgeries which have a significant risk of blood loss. Before Bayer could achieve approval for these new indications, however, powerful evidence suggesting that Trasylol was unsafe came to light, shortcutting Bayer's intended expansion.

245. Bayer, of course, controlled a great deal of internal clinical data regarding Trasylol which would have been helpful for many sorts of studies of the drug's safety and

efficacy.  Bayer strictly controlled access to its internal data and only provided its internal data, and analyses of that data, to those researchers and studies which it thought would be beneficial to Bayer.

246.    Likewise, Bayer routinely provided funding for certain types of studies of Trasylol that were geared toward expanding non-approved usage of the drug and hence increased sales.  Bayer's interest in research regarding Trasylol was aimed at furthering the chances that the FDA would approve the new indications for Trasylol. Bayer sought out studies in order to steer academic opinion on the drug.  For example, Bayer dedicated substantial effort and expense towards its Fellowship Program in Blood Conservation, a device Bayer used to facilitate research and dissemination of favorable information regarding uses for Trasylol.  Bayer would hand-pick the research proposals submitted to the Fellowship Program which the Company knew would reflect most favorably upon Trasylol.  Most often, the selected research proposals were efficacy studies of non-approved usage of Trasylol in surgeries. Bayer would then award grant money for the research proposals and aid in getting the studies published and distributed to a wider audience.  Bayer spent considerable amounts of money advertising the Fellowship Program in various trade publications.

247.    Bayer's interest in research regarding Trasylol was aimed at furthering the chances that the FDA would approve the new indications for Trasylol. Bayer sought out studies that were "leveragable," which primarily meant only those studies that were directed towards a broader indication for the drug.  Thus, Bayer undertook no studies which might contravene its claims that the drug was safe and cost-effective for fear it would jeopardize Bayer's hopes for these new indications, and the resulting profits.

248.     Thus, these Key Opinion Leaders were central to Bayer's attempts to control the medical debate regarding Trasylol, allowing Bayer to misrepresent both the safety of the drug, and the cost-effectiveness of the drug when compared to its competitors.  Bayer used the Key Opinion Leaders specifically to interface with healthcare professionals and to communicate with them on a level, and in a way that ordinary sales representatives could not.

249.     Bayer's course of conduct of non-disclosure of (and simple failure to ever formally investigate or study) safety risks continued for the life of Trasylol and could not have been successful without the help of Bayer's Key Opinion Leaders.

**5.       KOLs Protected Trasylol From Negative Exposure**

250.     In exchange for the perks associated with speaking on behalf of Trasylol, the KOLs diligently protected the product and its reputation.  For example, the KOLs were critical in alerting Bayer to studies with findings adverse to Trasylol and in working with Bayer to formulate a response meant to counter the criticisms.  In September, 2003, KOL Dr. Linda Shore-Lesserson first alerted Bayer of a potential safety signal for mortality that was 50 percent higher for Trasylol than lysine analogues in the proprietary database that would eventually be cited by Dr. Dennis Mangano in his 2006 NEJM article.  In October, 2004, both Dr. Royston and Dr. George Despotis, both high-profile Bayer KOLs, alerted Bayer of the impending Mangano article that was critical of Bayer, altered the Company that the study linked Trasylol to 3-4 fold increase in renal failure, and advised the Company that the data "will need a pretty powerful rebuttal."   Additionally, various Bayer KOLs, including Drs. Levy, Royston, and Shore-Lesserson, helped the Company prepare and attended the September 21, 2006 FDA AdComm meeting and spoke in defense of Trasylol.

B.    **The Key Opinion Leaders Enterprise**

251.    The Key Opinion Leaders Enterprise (sometimes referred to as the "KOLE") was an ongoing organization which existed continuously from as early as 1999 through November 2007 when Bayer reached agreement with the FDA to cease marketing the drug.    Each Defendant was associated with this enterprise.

252.    The purpose of the Key Opinion Leader Enterprise was to ensure continued payments for Trasylol from Plaintiffs and Class Members.  The members of the KOLE sought to achieve this goal primarily through misleading communications and attempts to eliminate or marginalize any negative communications regarding Trasylol. The members of the KOLE acted as a continuing unit toward these ends.  Bayer and the other members of the KOLE created and maintained systematic links in order to assure consistency and uniformity in furthering the fraudulent scheme.

253.    The KOLE has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage. The structure of the Key Opinion Enterprise included the following:    (a) Bayer, through its scientific affairs and clinical communications liaisons identified, trained and deployed its Key Opinion Leaders; (b) Bayer's control over these Key Opinion Leaders through control over relevant data, research and through its financial commitments to the Key Opinion Leaders; (c) Bayer's financing and/or sponsorship of CMEs where Trasylol was promoted for use; (d) Bayer's control over financing and studies promoting the increased use of Trasylol both for on and off label uses; (e) Bayer's concealment of any conflicting studies or reports; and (f) the interaction between the Key Opinion Leaders and medical professional whereby the Key Opinion Leaders acted as a conduit for Bayer's message regarding Trasylol.    All participants were aware of Bayer's control of the uniform

misrepresentations and activities to conceal the fact that Trasylol was not safe, efficacious, or of greater value than readily available alternative drugs.  Bayer and the other Key Opinion Leaders Enterprise participants, including the Key Opinion Leaders themselves associate with, participate in, and control the affairs of the Key Opinion Leaders Enterprise.  Each member benefitted from the fraudulent scheme and from other members' participation.

254.   The members of the Key Opinion Enterprise have participated in the operation and management of the Key Opinion Leader Enterprise in at least the following ways:  (a) Bayer funded and exercised control over its Key Opinion Leaders for the purpose of promoting the use of the Trasylol; (b) Bayer provided research, data, and training regarding the purported benefits and safety of Trasylol to Key Opinion Leaders;   (c) Key Opinion Leaders in exchange for payments from Bayer disseminated false information regarding safety, benefits and value of Trasylol, acted to conceal the risks associated with Trasylol and participated in "mock panels" preparing for the FDA Advisory Committee meeting in September, 2006; (d) Bayer used, financed and/or sponsored meetings, dinners, and other events, including CMEs to promote the use of Trasylol; and (e) the members of the KOLE operated and managed the enterprise by coordinating their respective roles with regard to communications regarding Trasylol and by providing strategic planning communications regarding the drug including marketing of Trasylol.

255.   While the Bayer Defendants and the other participants are members of the Key Opinion Leader Enterprise, each has an existence that is separate and distinct from the Enterprise.

256.    The Key Opinion Leaders Enterprise oversaw, coordinated, and facilitated the commission of numerous predicate offenses in order to conceal the true safety risks associated with the use of Trasylol.

### 1.    Pattern of Racketeering Activity

257.    As alleged above, the KOLE was separate and distinct from the pattern of racketeering activity in which it engaged.  The members of the enterprise shared a common purpose, and the enterprise functioned as a continuing unit having a structure for decision-making, oversight, coordination, and facilitation of the predicate acts.  The Bayer Defendants asserted control over this association-in-fact enterprise, and used their position of control over it to ensure that Trasylol was fraudulently and unlawfully promoted.  The enterprise successfully and fraudulently promoted Trasylol despite the known safety risks and obtained excessive payments from payors, including Plaintiffs and Class members.

258.    Defendants have engaged in a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§ 1341 and 1343 within the past ten years.  In fact, Defendants have committed thousands of acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff and Class Members. The pattern of racketeering activity included numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in furtherance of Defendants' fraudulent scheme, including the use of the United States mails and wires, to disseminate Trasylol and its accompanying written materials which included the label stating that "Data pooled from all patients undergoing CABG surgery in U.S. placebo-controlled trials showed no statistically or

clinically significant increase in the incidence of post-operative renal dysfunction for patients treated with Trasylol", communications between Bayer and the FDA, communications between Bayer and the Key Opinion Leaders, communications between Bayer and physicians, communications between Key Opinion Leaders and physicians, marketing materials, medical literature, requests for payments and payments for Trasylol.  Many of these materials, including marketing materials, communications to the FDA and communications to physicians represented that Trasylol was efficacious.  None of the materials sent via mail or wire disclosed that Trasylol was not efficacious, safe or of greater value than alternative drugs.  Claims were sent to Plaintiff and Class Members through the mails or wires for payment of Trasylol; payments from Plaintiff and Class Members were likewise sent via mail or wire.

259.    The Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving, among others, third party payors such as Plaintiff and Class Members.

260.    The Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions were material.

261.    Plaintiff and Class members relied on the misrepresentations and omissions in paying for Trasylol.

262.    As a result, Defendants obtained money and property belonging to Plaintiff and Class Members and Plaintiff and Class Members have been injured in their business or property.

263.    The enterprise operated on a nationwide basis and utilized interstate communications including the United States mail and wire across state lines.  The activities of the enterprises are national in scope and have a substantial impact upon interstate commerce.

### 2.      Fraudulent Concealment

264.     Defendants have affirmatively and fraudulently concealed their unlawful scheme and course of conduct from Plaintiffs and the Class.  Plaintiffs and Class members had no knowledge of Defendants' fraudulent scheme and could not have discovered that Defendants' representations were false or that it had concealed information and materials until shortly before the filing of this Complaint.

265.     Bayer was motivated to delay the release of, and/or to indefinitely conceal the results of the truth about the safety of Trasylol to the FDA, the medical community, payors and the general public, including Plaintiff and the Class.

266.     Bayer knew or should have known since at least the early 1990s that low cost generic drugs were as effective as and far safer than Trasylol.  Bayer, nevertheless, deceptively and unfairly carried out its misleading marketing campaign to conceal the truth about Trasylol, and to maintain its sales and profits at the expense of Plaintiff and the Class.

267.     In implementing its fraudulent scheme, Defendants were aware that Plaintiff and members of the Class depended on Bayer's honesty and integrity with regard to Trasylol. Obviously, it is impractical and unduly expensive for Plaintiff and the Class to perform their own clinical trials or to assemble all known medical evidence with regard to all drugs for which they make payments.

268.     As a result of the fraudulent concealment of the truth regarding Trasylol and the wrongful and misleading marketing of the drugs, Bayer caused Plaintiff and the Class to pay hundreds of millions of dollars in unnecessary and exorbitantly expensive claims for Trasylol even though, at all relevant times, Bayer knew, but failed to disclose, that these drugs were far more dangerous than generic, less costly treatments.

269.   Properly informed third party payors would never have paid for Trasylol. Indeed, absent Bayer's fraudulent concealment of the truth regarding Trasylol, Plaintiff and Class Members would have refused to pay for the drug if it had been properly informed about the risks of the drug.

270.   Accordingly, the statute of limitations has been tolled with respect to any claims which Plaintiffs have brought as a result of the unlawful and fraudulent conduct alleged herein.

### C.   Plaintiff and the Class were Damaged by Bayer's Conduct

271.   As a direct result of Bayer's scheme to misrepresent and conceal the truth regarding the safety, efficacy and relative value of Trasylol, Bayer caused Plaintiff and the Class to incur hundreds of millions of dollars in damages.

272.   As noted above, the FDA has indicated that there is no specific patient population where the benefits of using Trasylol outweigh the safety risks of the drug.  Obviously, no payor would knowingly pay for a drug where the risks far outweigh the benefits, especially given the availability of significantly cheaper and more efficacious alternative drugs.

273.   Plaintiff and the Class have paid either all or a portion of the purchase price of Trasylol.  During the Class Period, Plaintiff and other Class members paid hundreds of millions of dollars in claims for Trasylol as a result of Bayer's fraudulent scheme, facilitated and concealed through the KOLE.

274.   While Bayer's scheme was also directed at others such as the United States Food and Drug Administration ("FDA"), physicians and the general public, Plaintiff and other Class Members who actually paid monies for Trasylol were the primary and intended victims of Bayer's fraudulent scheme.

275.    Bayer's ultimate goal in implementing the fraudulent scheme was to secure ongoing payments from Plaintiff and Class Members and thus to reap enormous profits from the sale of Trasylol.

276.    Therefore, concealment of the truth regarding the safety, efficacy and relative value of Trasylol was essential.  As Bayer understood, once payors learned that the risks of Trasylol outweighed its benefits for all patient populations, the result for Trasylol would be fatal and Bayer's profits would be significantly decreased.

277.    Absent Bayer's fraudulent scheme Plaintiff and other Class Members would not have paid for Trasylol and, at most, would have paid for the cheaper alternative drugs that were equally or more efficacious that Trasylol.

278.    Accordingly, Bayer's fraudulent scheme resulted in substantial injury to the business and property of Plaintiff and other Class Members in that they paid enormous sums of money to Bayer that they would not have paid had they been aware that Trasylol was not safer, more efficacious or of greater value than available alternatives that were significantly cheaper.

279.    The losses sustained by Plaintiff and Class Members were the direct, intended, foreseeable and natural consequence of Bayer's fraudulent scheme. There is no more direct victim of Bayer's fraud with regard to financial losses than Plaintiff and Class Members.

280.    While Bayer's fraud was directed at others including the FDA and prescribing physicians, neither is a more direct victim with regard to economic losses than Plaintiff and Class Members because neither paid for Trasylol.

281.    Likewise, neither the actions of the FDA nor the decision of a physician to prescribe Trasylol breaks the causal chain between Bayer's fraudulent scheme and the injuries sustained by Plaintiff and Class Members.  The FDA's decision to approve Trasylol and

physicians' decisions to prescribe Trasylol were completely separate and distinct from the decision of Plaintiff and Class Members to pay for Trasylol.  Obviously, Plaintiff and Class Members would have never incurred liability for payment of Trasylol if the FDA had not approved the drug or if a physician had not prescribed the drug.  While both events were necessary antecedent events to Plaintiff and Class Member's liability for payment, neither negates or lessens the directness of the injury Plaintiff and Class Members sustained in paying for Trasylol.  Irrespective of the physician's decision to prescribe Trasylol or an alternative drug or no drug at all, Plaintiff and Class Members had an independent choice whether or not to pay for Trasylol. The fact that Bayer denied physicians the necessary information to make an informed decision regarding prescribing Trasylol does not negate the fact that Bayer also denied Plaintiff and Class Member the information necessary to determine whether or not to pay for Trasylol.

282.    Likewise, while some patients may have paid for Trasylol as well, such payments place the patients in a parallel position with Plaintiffs and Class Members rather than as an intervening link between Bayer's fraudulent conduct and the resulting harm to Plaintiff and Class Members.

283.    Finally, while some beneficiaries of Plaintiff or Class Members may have suffered physical injuries as a result of ingesting Trasylol, the presence of such injuries does not lessen the economic losses sustained by Plaintiff and Class Members who paid for Trasylol on their behalf.

284.    Plaintiff and the Class were not and could not have been aware of Bayer's misconduct until it ceased marketing the drug in November 2007.    Because of these and other

acts of concealment, Plaintiff and the Class could not have discovered the scheme alleged herein in the exercise of reasonable diligence.

285.   From the time Bayer became aware of the risks of Trasylol until November 5, 2007, it reaped significant financial rewards from the sale of Trasylol at the expense of Plaintiff and Class Members.  For example, Bayer earned an estimated $135 million on Trasylol in the first three quarters of 2007.

286.   Alternatively, Bayer caused Plaintiff and Class Members to pay significantly more for heart surgeries.  Trasylol is a very expensive drug which increased the cost of heart surgery.  Heart surgery is a very common, expensive medical procedure.  The cost of Trasylol was sufficiently high that it increased the DRG or other similar payment methodology for heart surgeries.  Therefore, regardless of the payment methodology employed, Plaintiff and Class Members paid hundreds of millions of dollars of excessive payments as a result of Bayer's fraudulent scheme.

## CLASS ACTION ALLEGATIONS

287.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), Plaintiff brings this action on behalf of a Class of third party payors defined as follows:

> All private, non-governmental entities in the United States and its territories that purchased, reimbursed and/or paid all or part of the cost for Trasylol, from January 1, 1999 to November 5, 2007 for purposes other than resale.

Excluded from the Class are (a) Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees, and successors, and (b) any co-conspirators.  Also excluded from this Class is any judge or justice to whom this action is assigned, together with any relative of such judge or justice within the third degree of relationship, and the spouse of any such person.

288.   The Class consists of hundreds if not thousands of entities throughout the United States, making individual joinder impractical in satisfaction of Rule 23(a)(1) of the FRCP.  The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

289.   Plaintiff's claims are typical of the claims of the Class as required by Rule 23(a)(3) of the FRCP, in that Plaintiff is an entity which, like all Class members, purchased, reimbursed, and/or paid for Trasylol based on misrepresentations made by Bayer or  Bayer's failure to disclose that the risks of Trasylol outweighed its benefits and that Trasylol was no more efficacious than far less expensive alternatives.

290.   The factual and legal bases of Plaintiff's claims are common to all members of the Class and Bayer's activities represent a common thread of fraud and other misconduct resulting in injury to Plaintiff and the Class.

291.   Questions of law and fact are common to the Class and predominate over questions affecting only individual Class members within the meaning of Rule 23(a)(2) and 23(b)(3) of the FRCP, including the following:

    i.   Whether Bayer engaged in a fraudulent or deceptive scheme;

    ii.   Whether Bayer had a duty to disclose the relative risks and benefits of Trasylol;

    iii.   Whether Bayer engaged in unfair, unlawful, deceptive and/or fraudulent business practices by concealing material information concerning the safety and efficacy of Trasylol;

    iv.   Whether Bayer and its Key Opinion Leaders formed an enterprise;

v.   Whether it was the policy and practice of Bayer to prepare, fund, and publish materials which contained false or misleading information regarding the safety of Trasylol;

vi.   Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

vii.   Whether Plaintiffs and Class Members were harmed by Bayer's fraudulent scheme and unlawful, unfair, and/or deceptive practices;

viii.   Whether Bayer was unjustly enriched by its deceptive practices;

ix.   Whether Bayer is liable to the Class for damages for conduct actionable as common law fraud;

x.   Whether Bayer engaged in a pattern or practice that directly caused Plaintiff and the Class to pay for Trasylol despite the fact that the risks associated with Trasylol exceeded its benefits;

xi.   Whether Trasylol was merchantable or fit for its ordinary and intended use;

xii.   Whether the Class is entitled to compensatory damages and, if so, the nature and extent of such damages;

xiii.   Whether the Class is entitled to punitive damages and, if so, the nature and extent of such damages;

xiv.   Whether the alleged conduct by Bayer violated laws as alleged in this Complaint;

292.   Plaintiff's claims are typical of the claims of the Class because they arise from the same course of conduct by Bayer and the relief sought is common.

293.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Plaintiff Class members is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for the Plaintiff

and Class members to individually redress the wrongs done to them.  Finally, the case will be manageable as common or general proof will be used by each class member to establish each element of the claims

294.    Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Rule 23(a)(4) of the FRCP.   Moreover, Plaintiff has retained counsel with substantial experience in the prosecution of nationwide class actions.   Plaintiff and its counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.   Neither Plaintiff nor counsel have any interests adverse to those of the Class.

## FIRST CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against the Bayer Defendants)

295.    Plaintiff incorporates herein and make a part hereof the allegations in the preceding paragraphs as if fully set forth herein.

296.    This cause of action for violation of 18 U.S.C. § 1962(c) is brought by Plaintiff against the Bayer Defendants in connection with the activities of the Key Opinion Leaders Enterprise.

297.    As set forth above, Bayer and the other participants in the KOLE have conducted or participated in conducting the affairs of the KOLE through a pattern of racketeering activity which included numerous predicate acts of mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343.

298.    As a direct and proximate result, Plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs and members of the Class have been injured in their business or

property by paying for Trasylol, which they would not have done absent Bayer and the other KOLE participants' unlawful conduct.

299.   Accordingly, the Bayer Defendants are liable to Plaintiff and the Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## SECOND CAUSE OF ACTION
**(Violation of New Jersey Consumer Fraud Act N.J.S.A. 56:8-1 *et seq.*)**

300.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

301.   This claim is asserted by Plaintiff on its own behalf and on behalf of all other similarly situated members of the Class against Bayer.

302.   The unfair and deceptive acts and practices of Bayer have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiff and the Class.

303.   Bayer's actions and failures to act, including the false and misleading representations and omissions of material facts regarding the safety of Trasylol, and the above described course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or employment by Bayer of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts about the safety of Trasylol with the intent that others rely upon such concealment, suppression or omission of material facts in connection with the sale of merchandise of Bayer in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*

304.   Plaintiff and the Class relied on Bayer's misrepresentations and omissions in paying for or subsidizing the use of Trasylol for plan participants, despite the fact that the risk of Trasylol exceeds its benefits Plaintiff and the Class were damaged by paying for these

prescriptions which they would not have paid for if they had known the safety risk associated with Trasylol.

305.   The application of the New Jersey Consumer Fraud Act on a nationwide basis is warranted here as Defendants, Bayer Healthcare Pharmaceuticals, Inc. and Bayer Healthcare, LLC both maintain their principal places of business in New Jersey and therefore New Jersey has an interest greater than any other state in applying its consumer protection laws to these Bayer companies. Further, i3 Research, the company which conducted the i3 study for Bayer maintains its principal place of business in New Jersey.

306.   As a direct and proximate result of Bayer's wrongful conduct, Plaintiff and the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of suit.

### THIRD CAUSE OF ACTION
**(Breach of Express Warranty Under New Jersey Law, N.J. Stat. §12A:2-313)**

307.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

308.   This claim is asserted by Plaintiff on its own behalf and on behalf of all other similarly situated members of the Class against Bayer.

309.   Bayer is a seller for purposes of New Jersey's express warranty statute, codified at N.J. Stat. § 12A:2-313.  Until it took Trasylol off the U.S. market, plaintiff and other consumers purchased the drug from Bayer throughout the United States and the world.

310.   Bayer, directly and through the Key Opinion Leaders, made numerous statements about the risks associated with Trasylol which gave the false impression that Trasylol was medically necessary.  Starting in 1998, for example, Trasylol's label warranted that "Data pooled from all patients … showed no statistically or clinically significant increase in the incidence of post-operative renal dysfunction for patients treated with Trasylol.   Similarly, a physician's

brochure issued at least by 2002 that "Trasylol is generally well tolerated; graft potency, MI, renal or hepatic dysfunction, and mortality similar to placebo."

311.    Trasylol did not have the qualities warranted.  A large body of evidence available to Bayer demonstrated that Trasylol did significantly increase the risk of renal dysfunction, MI's, and mortality.

312.    Plaintiff and class members were injured when they purchased Trasylol because it was not medically necessary and in fact had no legitimate medical use.  Because Plaintiff lacked information to determine that Trasylol was not medically necessary, and were provided information by Bayer and Key Opinion Leaders that promoted the false view that Trasylol was medically necessary, they paid for a product which they would not have purchased had they been made aware of its side effects.

313.    Bayer's breach of its express warranties directly and proximately caused Plaintiff's and class members' damages, in that Plaintiff and class members paid money for a product that they would not, and legally could not - have  paid for had they known that Bayer's warranties were false and that Trasylol was not medically necessary for any condition.

314.    Bayer had ample notice of claims relating to its breach of warranty with respect to Trasylol.  In addition to the notice provided by numerous complaints filed by Trasylol victims worldwide, notice was provided through Adverse Incident Reports and studies suppressed by Bayer, which demonstrated that Trasylol caused renal failure and other severe complications which rendered the drug not merchantable.

315.    Because the defect in Trasylol was not reparable, Bayer could not have been prejudiced by lack of notice; the only means whereby Bear could cure the problem presented by Trasylol was to remove it from the market.

316.    As a direct result of Bayer's breach of its express warranties, Plaintiff and the class are entitled to compensatory damages.

### FOURTH CAUSE OF ACTION
**(Breach of Implied Warranty under New Jersey Law, N.J. Stat. §12A:2-314)**

317.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

318.    This claim is asserted by Plaintiff on its own behalf and on behalf of all other similarly situated members of the Class against Bayer.

319.    Bayer is a merchant for purposes of New Jersey's implied warranty of merchantability, codified at N.J. Stat. § 12A:2-314.

320.    Bayer sold Trasylol for purchase by Plaintiff and other ultimate consumers.

321.    Bayer, the drug's manufacturer: (1) knew or was charged with knowing the use to which Trasylol would be put; (2) knew or was charged with knowledge that the drug carried with it an undisclosed, heightened risk to the patient of renal dysfunction, renal failure, heart attack, stroke, and MI; and (3) knew that Plaintiff and the class were relying on Bayer's skill or judgment in developing, producing, and furnishing a safe and effective drug product.

322.    At the time it was sold by Bayer, Trasylol was not merchantable or medically necessary, in that it: (1) was not fit for the ordinary purpose for which anti-fibrinolytic drugs are used; (2) was not adequately labeled with the safety dangers known only to Bayer; and (3) did not conform to the promises or affirmations of fact made on the label about its safety and efficacy..

323.    Plaintiff and class members were injured when they paid for Trasylol because it was not merchantable, not medically necessary and in fact had no legitimate medical use. Because Bayer went to great lengths to conceal critical safety information that only it possessed,

those who paid or reimbursed for Trasylol were not capable of conducting an examination of the drug product that could have revealed the drug's inherent dangers..

324.    Plaintiff's and class members' damages resulted from paying for a product that was not medically necessary and had no legitimate medical use.  Said damages were directly and proximately caused by this defect inherent in Trasylol.

325.    Bayer had ample notice of claims relating to its breach of warranty with respect to Trasylol.  In addition to the notice provided by numerous complaints filed by Trasylol victims worldwide, notice was provided through Adverse Incident Reports and studies suppressed by Bayer, which demonstrated that Trasylol caused renal failure and other severe complications which rendered the drug not merchantable.

326.    Because the defect in Trasylol was not reparable, Bayer could not have been prejudiced by lack of notice; the only means whereby Bayer could cure the problem presented by Trasylol would be to remove it from the market.

327.    As a direct result of Bayer's breach of New Jersey's implied warranty of merchantability, Plaintiff and the class are entitled to compensatory damages.

## FIFTH CAUSE OF ACTION
### (Common Law Fraud)

328.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

329.    This claim is asserted by Plaintiff on its own behalf and on behalf of all other similarly situated Class members against Bayer.

330.    Bayer made misrepresentations and omissions of facts material to Plaintiff and the Class' decisions to purchase or subsidize the purchase of Trasylol by, *inter alia*, (a) concealing from Plaintiff and the Class information in Bayer's possession which indicated that unreasonable

safety risks were associated with the use of Trasylol and (b) deliberately misrepresenting the safety of Trasylol to the medical community, payors and the general public.

331.    Bayer knew at the time that it made these misrepresentations and omissions that they were false.

332.    Bayer intended that Plaintiff and the Class would rely on these misrepresentations and omissions of material fact, so that Plaintiff and the Class would pay for Trasylol.

333.    Plaintiff and the Class reasonably relied upon Bayer's misrepresentations and omissions of material fact. Plaintiff and the Class had no reason to doubt the veracity or scientific validity of the information Defendants promoted through their marketing and sales strategies and had no reason to know that Bayer had concealed or failed to disclose

334.    Plaintiff and the Class would not have paid for Trasylol had they been properly informed of the information in Bayer's possession suggesting Trasylol was unsafe for use, and that its risks outweighed its benefits in all patient populations.   Indeed, absent Bayer's concealment of the negative study results, Trasylol would not have appeared on a drug formulary issued by Plaintiff or any member of the Class, nor would Plaintiff or any member of the Class have paid for or subsidized the use of Trasylol for plan participants.

335.    Bayer's misrepresentations and omissions of material fact directly and proximately caused Plaintiff and the Class damages.

336.    By virtue of the fraud they perpetrated on Plaintiff and the Class, Defendants are jointly and severally liable to Plaintiff and the Class for all damages Plaintiff and the Class have sustained, plus punitive damages, plus the cost of this suit, including attorneys' fees.

## SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation)

337.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

338.   Defendants owed a duty to Plaintiffs and members of the Class to exercise reasonable care in making representations about the safety and efficacy of Trasylol.

339.   Defendants negligently and recklessly made such representations and omitted to disclose material facts to the medical community, payors and the general public through uniform misrepresentations, non-disclosure and concealment through promotion, marketing, advertising, and other means or by omission by Defendants or at their direction.

340.   Defendants' representations and omissions regarding the safety and health benefits of Trasylol were material.

341.   Defendants' misrepresentations and non-disclosures were intended to influence Payors decisions regarding payments for Trasylol.

342.   Plaintiff and members of the Class reasonably relied Defendants' uniform promotion and marketing of the products, which misrepresented and omitted crucial facts and, in justifiable reliance thereon, paid for Trasylol.  Plaintiff never would have paid for the drug if Bayer had disclosed the enormous risks of the drug.

343.   Defendants knew or should have known that Plaintiffs and members of the Class relied upon the misrepresentations and omissions of Defendants.

344.   Defendants' representations and omissions regarding the safety and efficacy of Trasylol were false and misleading as alleged above.

345.   As a result of these misrepresentations, omissions and concealment, Plaintiffs and members of the Class have been damaged in an amount to be proven at trial.

346.    As a result of Defendants' conduct, Plaintiff and other Class members were damaged and are therefore entitled to compensatory damages, multiple damages, and equitable relief.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

347.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

348.    This claim is asserted by Plaintiff on its behalf and on behalf of a Class of all other similarly situated members of the Class against Bayer.

349.    As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Bayer has profited and benefited from payments Plaintiff and the Class made for Trasylol.

350.    In exchange for the payments they made for Trasylol, and at the time they made these payments, Plaintiff and the Class expected that the drug was safe for use during the surgery for which it was prescribed, and that it had some benefit which would outweigh any risk associated with the drug.

351.    Bayer has voluntarily accepted and retained these payments, with full knowledge and awareness that, as a result of their wrongdoing, Plaintiff and the Class paid for Trasylol when they otherwise would not have done so. By the improper and wrongful conduct described herein, Bayer was unjustly enriched at the expense of Plaintiff and the members of the Class.

352.    It would be inequitable for Bayer to retain the profits, benefits, and other compensation they obtained through their wrongful acts.  Plaintiff and the Class are entitled in equity to seek restitution of Bayer's wrongful profits, revenues and benefits to the extent, and in

the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Bayer's unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand judgment against Defendants in each claim for relief, jointly and severally, as follows:

353.   On Plaintiff's and the Class' civil RICO claim under 18 U.S.C. 1962(c), compensatory damages and   treble damages, such amounts to be determined at trial, plus Plaintiff's costs in this suit, including all reasonable attorneys' fees.

354.   On Plaintiff's and the Class' New Jersey Consumer Fraud Act claim, compensatory damages, treble damages, punitive damages, such amounts to be determined at trial plus Plaintiff's costs in this suit, including all reasonable attorneys' fees;

355.   On Plaintiff's and the Class' Common Law Fraud claims, compensatory damages, punitive damages, such amounts to be determined at trial plus Plaintiff's costs in this suit, including all reasonable attorney's fees;

356.   On Plaintiff's and the Class' Negligent Misrepresentation claims, compensatory damages, punitive damages, such amounts to be determined at trial plus Plaintiff's costs in this suit, including all reasonable attorney's fees;

357.   On Plaintiff's and the Class' claim for unjust enrichment, restitution   in the amount of Plaintiff's and the Class' payment for Trasylol or disgorgement of Bayer's revenues from the sales of Trasylol, such amount to be determined at trial, plus Plaintiff's costs in this suit, including all reasonable attorneys' fees;

358.   Awarding Plaintiff and the Class other appropriate equitable relief;

359.   Awarding Plaintiff its costs and expenses in this litigation, including reasonable attorneys' fees and expert fees; and

360.    Awarding Plaintiff and the Class such other and further relief as may be just and proper under the circumstances.

Dated: March 12, 2010

Respectfully Submitted,

Respectfully Submitted,

/s/ William C. Wright
William C. Wright
Florida Bar No. 0138861
Leopold Kuvin, P.A.
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
(561) 514-0904
wwright@leopoldkuvin.com

Joe R. Whatley, Jr.
Edith M. Kallas
WHATLEY DRAKE
   & KALLAS, LLC
1540 Broadway, 37th Floor
New York, New York 10036
Tel: (212) 447-7070
Fax: (212) 447-7077

James G. Stranch III
J. Gerard Stranch, IV
Joe P. Leniski, Jr.
BRANSTETTER STRANCH
   & JENNINGS PLLC
227 Second Avenue North, 4th Floor
Nashville, Tennessee 37201-1631
Tel: (615) 254-8801
Fax: (615) 250-3937

W. Tucker Brown
WHATLEY DRAKE
   & KALLAS, LLC
1000 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203
Tel: (205) 328-9576
Fax: (205) 328-9669

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I caused true and correct copies of the foregoing THIRD AMENDED CLASS ACTION COMPLAINT to be served upon the following counsel for the Defendants in this matter through the Court's Electronic Filing System or by mailing the same to the offices of said counsel by United States, postage prepaid, on this 12th Day of March 2010 to: **Barbara Bolton Litten, Esquire**, Squire, Sanders & Dempsey, LLP, 1900 Phillips Point W., 777 South Flagler Dr., West Palm Beach, FL 33401-6198; **Philip S. Beck, Esquire** and **Steven Derringer, Esquire**, Bartlit, Beck, Herman, Palenchar & Scott, LLP, Courthouse Place, 54 West Hubbard Place, Suite 300, Chicago, IL 60610; **Eugene A. Schoon, Esquire**, Sidley Austin LLP, One South Dearborn, Chicago, IL 60603; **Richard K. Dandrea, Esquire**, Eckert Deamans Cherin & Mellott, LLC, 600 Grant Street, 44th Floor, Pittsburgh, PA 15219; **Susan Artinian, Esquire**, Dykema Gossett, PLLC, 400 Renaissance Center, Detroit, MI 48243; **Patricia E. Lowry, Esquire,** Squire, Sanders & Dempsey L.L.P, 1900 Philips Point West, 777 South Flagler Drive, West Palm Beach, FL 33401.

/s/ William C. Wright
William C. Wright
Florida Bar No. 0138861
Leopold Kuvin, P.A.
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, FL 33410
(561) 514-0904
wwright@leopoldkuvin.com