UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION - MDL-1928

This Document Relates To: All Actions

_____/



## ORDER ON BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT MARK DERSHWITZ

THIS CAUSE comes before the Court upon Defendants' (hereinafter, collectively, "Bayer's") Motion to Exclude Testimony of Plaintiffs' Expert Mark Dershwitz[1] ("Motion") (DE 3064), filed on December 17, 2009. Plaintiffs filed a Response (DE 3889), to which Bayer replied (DE 4104). The Court has reviewed the pertinent parts of the record and is advised in the premises. For the reasons stated below, Bayer's Motion shall be granted in part and denied in part.

I.  **Legal Standard**

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The party seeking

---

[1] Dr. Mark Dershwitz is a medical doctor with a Ph.D. in Pharmacology. He is currently an anesthesiologist at the University of Massachusetts and a Professor of Anesthesiology and Biochemistry & Molecular Pharmacology at the University of Massachusetts. He has testified in court as an expert witness on twenty occasions concerning the pharmacology and toxicology of anesthetic drugs and other medications. (Dershwitz Report at 1-2.) Plaintiffs note that Bayer does not dispute Dr. Dershwitz's competence and qualifications to offer expert opinions on pharmacology and biologic plausibility.

1

to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of proof. *Davidson v. U.S. Dep't of Health & Human Servs.*, 2007 WL 3251921, at *2 (E.D. Ky. Nov. 2, 2007) (internal citations omitted). *See also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

According to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. According to the Supreme Court, the inquiry envisioned by Rule 702 is a flexible one, in which federal judges perform a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("Its [Rule 702's] overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

In *Daubert*, the Supreme Court listed several factors federal judges may consider in determining whether to admit expert scientific testimony under Rule 702: whether an expert's theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally accepted in the scientific community.[2] 509 U.S. at 593-94

---

[2] In *Daubert*, the Supreme Court considered the federal judge's gatekeeping role in ensuring that all *scientific* expert testimony is not only relevant, but reliable. The Supreme Court

(declining to set forth a "definitive checklist or test").

The Supreme Court subsequently held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150 (internal citations and quotations omitted). Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . [A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. The trial court has the same kind of latitude in deciding how to test an expert's reliability as it enjoys when it decides whether or not that expert's relevant testimony is reliable. *Id.*

The Eleventh Circuit engages in a three part inquiry to determine the admissibility of expert testimony under Rule 702, considering whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (internal citations omitted). The Eleventh Circuit has noted that "the primary purpose of any *Daubert* inquiry is for the district court to determine whether that expert, 'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual

---

later held that this basic gatekeeping obligation and *Daubert*'s general principles apply to *all* expert testimony, not just testimony that is classified as scientific. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999).

rigor that characterizes the practice of an expert in the relevant field.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho*, 526 U.S. at 152).

## II.  Bayer's Motion to Exclude

Bayer moves to exclude Dr. Dershwitz's opinions regarding: (1) the two potential mechanisms through which Trasylol[3] may cause kidney damage; and (2) the "significant link" between Trasylol use and renal dysfunction and death.

### A.  Potential Mechanisms through which Trasylol May Cause Kidney Damage

Dr. Dershwitz opines that "*in vitro* studies utilizing both human and animal tissues suggest several mechanisms by which aprotinin might contribute to kidney damage." (Dershwitz Report at ¶ 49.)

Specifically, Dr. Dershwitz's opinion first discusses the mechanism of autoregulation. Autoregulation is "the physiological process by which blood flow is kept nearly constant within a wide range of blood pressure values." (Dershwitz Report at ¶ 40.) According to Dr. Dershwitz, Trasylol can affect autoregulation in the kidneys through its effect on the concentration of vasodilatory mediators such as prostaglandins; this in turn decreases the blood supply to the kidney in the presence of low blood pressure, which might lead to renal damage. (Dershwitz Report at ¶ 40.)

Dr. Dershwitz's second proposed mechanism involves blood clots. According to Dr. Dershwitz, Trasylol increases platelet aggregation, which may increase the formation of small clots

---

[3] Trasylol is also known as aprotinin. The Court will use these terms interchangeably.

that decrease microvascular blood flow in organs such as the kidney. (Dershwitz Report at ¶ 48.)

Bayer argues that Dr. Dershwitz's opinions on the two different mechanisms by which Trasylol "might contribute to kidney damage" should be excluded: both proposed mechanisms are speculative, unproven and nothing more "than leaps of logic from animal and laboratory studies." (DE 3064 at 1-3, 9. (citing Dershwitz Report at ¶ 49.))

### i.      Potential Mechanism #1: Trasylol's Effect on Autoregulation

Bayer claims that there is no scientific support that Trasylol impairs regional blood flow in the kidney: the theory is merely plausible, not proven. According to Bayer, this testimony must be excluded for three reasons: (1) the theory can not work unless a cascade of events[4] occurs, with each step being merely "possible"; (2) the opinion is limited to the effect of Trasylol on localized blood flow in the renal medulla, but Dr. Dershwitz can cite to no study establishing Trasylol's effect on blood flow in that region; and (3) Dr. Dershwitz provides no support for the conclusion that reduced blood flow leads to renal failure. (DE 3064 at 3-7.)

In regards to the first reason, Bayer asserts that Dr. Dershwitz's equivocation at each step of his proposed mechanism cascade emphasizes the speculative nature of his entire theory, such that the opinion should be excluded. (DE 3064 at 4.)

In regards to the second reason, Bayer states that Dr. Dershwitz cites to one study, the 1983

---

[4] Bayer refers to Dr. Dershwitz's description of the first proposed mechanism of action. Accordingly, Trasylol inhibits kallikrein, which is an enzyme that converts kininogen to bradykinin. The lack of bradykinin decreases the synthesis of prostaglandins; the decreased release of prostaglandins could cause a decrease in the vasodilation that participates in the autoregulation of renal blood flow. (DE 3064 at 3 n.1.)

Kramer study,[5] in support of the statement that "the structures that are most commonly damaged leading to renal failure are the renal tubules located within the renal medulla." (Dershwitz Report at ¶ 43.) However, that study examined blood flow changes in a different region of the kidney, the outer renal cortex, and Dr. Dershwitz does not know if it is appropriate to assume that the medulla would be affected in the same way while conceding that a decrease in blood flow to the cortex does not necessarily lead to a decrease in blood flow to the medulla. (DE 3064 at 5.) Furthermore, Bayer states that animal studies are insufficient to support general causation in humans due to inconsistent extrapolation between species and issues with dosing. (DE 3064 at 6.) According to Bayer, because the Kramer study suffers from both infirmities, "Dr. Dershwitz has offered a hypothesis that is not based on scientifically reliable evidence and which would serve to confuse, rather than inform, the jury." (DE 3064 at 6-7.)

In regards to the third reason, Bayer argues that even if Dr. Dershwitz could show that Trasylol affects blood flow in the renal medulla, he has not provided scientific support for the conclusion that reduced blood flow in the medulla leads to renal failure. (DE 3064 at 7.) According to Bayer, this lack of scientific support is fatal to Dr. Dershwitz's opinion. (DE 3064 at 7.)

### ii. Potential Mechanism #2: Trasylol's Effect on Platelet Aggregation

As with the first potential mechanism, Bayer argues that there is no scientific support that Trasylol impacts platelet aggregation, resulting in microscopic blood clots that lodge in the kidneys

---

[5] H.J. Kramer, *Interaction of the Kinin and Prostaglandin Systems in Mediating Renal Function and Intrarenal Hemodynamics*, 156 ADV. EXPER. MED. & BIOL. 961 (1983). According to Dr. Dershwitz, the Kramer study "showed in rats that although aprotinin had no effect on overall renal blood flow, aprotinin decreased blood flow in the medulla by decreasing the concentration of prostaglandins in the kidney." (DE 3064 at 43.)

and reduce blood flow. (DE 3064 at 7.) According to Bayer, this testimony must be excluded for three reasons: (1) the only study Dr. Dershwitz relies upon, the 1992 Havel study,[6] does not support his mechanism opinion; (2) sole reliance on the Havel study is improper because it is an *in vitro* cell culture study, and extrapolation to human subjects is problematic; and (3) Dr. Dershwitz failed to consider the fact that the aprotinin dose in the Havel study bears no relation to what any patient would be administered in surgery, and that failure to account for Havel's limitations renders his opinion unreliable. (DE 3064 at 7-9.)

In regards to the first reason, Bayer states that Havel studied Trasylol's effect on enzymes in a test tube, not on platelet aggregation in an animal, let alone a human. (DE 3064 at 7.) "Dr. Dershwitz improperly extrapolates from Havel's conclusion that Trasylol impacts platelet aggregation enzymes to opine that Trasylol 'increases platelet aggregation.' Because Dr. Dershwitz cannot point to a single study where Trasylol's effect on platelet aggregation was actually reported, he has no scientific support for his theory." (DE 3064 at 8. (citing Dershwitz Report at ¶ 48.))

In regards to the second reason, Bayer argues that Dr. Dershwitz offers no basis to extrapolate Havel's results "from a petri dish to a human body," and without such a basis, Dr. Dershwitz's mechanism opinion is unreliable. (DE 3064 at 8.)

### B. Significant Link Between Trasylol Use and Renal Dysfunction and Death

Bayer argues that Dr. Dershwitz is a proposed expert on general causation but that his opinion does not address causation: he opines that there is a "significant link" between Trasylol and

---

[6] Michael P. Havel, *Aprotinin Decreases Release of 6-Keto-Prostaglandin $F_{1\alpha}$ and Increases Release of Thromboxane $B_2$ in Cultured Human Umbilical Vein Endothelial Cells*, 104 J. THORAC. CARDIOVAS. SURG. 654 (1992).

an "increased risk of both death and the development of renal dysfunction." (Dershwitz Report at ¶ 49.) Bayer argues that this opinion is inadmissible for two reasons: (1) the opinion concerns association, and association is not the same as causation; and (2) in arriving at this opinion, Dr. Dershwitz "relied solely on a one-sided literature review, with no explanation of his decision to disregard studies that do not support his opinions." (DE 3064 at 9.)

In regards to the first reason, Bayer notes that "strength of association" is just one of nine generally-accepted Hill criteria used by scientists to determine whether an association suggests general causation. (DE 3064 at 11.) Because Dr. Dershwitz does not discuss the remaining Hill criteria, his opinion is scientifically unreliable to prove causation. (DE 3064 at 11.) Furthermore, because association in-and-of-itself is not probative of general causation, it is irrelevant and should therefore be excluded. (DE 3064 at 11-12.)

In regards to the second reason, Bayer claims that Dr. Dershwitz's one-sided literature review constitutes flawed, unscientific methodology: he gave great weight to the most recent studies supporting safety signals and ignored earlier studies that he considered to be "less relevant" and those that did not suggest safety concerns; he did not discuss studies with conclusions contrary to his opinions or explain why those studies did not affect his views. (DE 3064 at 12-13.)

### III. Plaintiffs' Response

Plaintiffs respond that Bayer's criticisms do not threaten the reliability of Dr. Dershwitz's testimony regarding the potential mechanisms by which Trasylol affects the kidneys: the biological mechanisms do not have to be known to a certainty to be admissible. (DE 3889 at 10-15.) Furthermore, Dr. Dershwitz's testimony regarding biological plausibility is reliable and admissible

as support for Plaintiffs' other general causation experts. (DE 3889 at 15-22.) Finally, Plaintiffs state that Dr. Dershwitz will not provide a general causation opinion. (DE 3889 at 24.)

### A. Biological Plausibility & Mechanism of Action: Absolute Certainty Not Required

Plaintiffs assert that "Dr. Dershwitz is not offering a causation opinion at all. . . . Thus, all this Court is asked to do in connection with Dr. Dershwitz is determine whether the pharmacologist's opinions as to the biological plausibility of the mechanisms whereby Trasylol affects kidney function is reliable."[7] (DE 3889 at 14.)

According to Plaintiffs, much of Dr. Dershwitz's testimony that Bayer objects to concerns "biological plausibility,"[8] which is defined as "the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment as to whether it is *plausible* that an agent causes a disease."[9] (DE 3889 at 10. (citing the Reference Manual on Scientific Evidence)) "'Mechanism of action,' on the other hand, explains *precisely* how an agent causes a disease." (DE

---

[7] Because Plaintiffs state that Dr. Dershwitz will not offer a causation opinion, it is unclear why they argue that "biological plausibility works against causality only if the event is not plausible" or that "lack of a known mechanism of injury . . . is not fatal to a causation opinion" and that "causation can be established even when the causal mechanism is unknown." (DE 3889 at 11, 15, 21.) These arguments are irrelevant in determining whether Dr. Dershwitz's mechanism of action opinion is reliable. While a general causation opinion may not be deemed speculative and unreliable merely because the causal mechanism is unknown, the mechanism of action opinion may still be deemed speculative and unreliable for other reasons.

[8] Biological plausibility is one of the Hill factors for determining causation.

[9] Plaintiffs also include a definition of "biological plausibility" from the World Health Organization's Global Advisory Committee on Vaccines: "The association should be coherent; that is, plausible and explicable biologically according to known facts in the natural history and biology of the disease." (DE 3889 at 14.)

9

3889 at 11.)

Plaintiffs argue that Dr. Dershwitz's challenged opinions do not require absolute proof of the precise mechanism of action to be admissible: biological plausibility may exist even where the precise mechanism of action may be unknown. Because a mechanism is biologically plausible if it "makes sense or is credible based upon the known effects of the drug on the body," the fact that biological plausibility opinions are always couched in terms of possibilities (what "can" or "may" happen) does not render them unreliable. (DE 3889 at 14-15.) Accordingly, there is no basis to exclude Dr. Dershwitz's testimony as mere speculation. (DE 3889 at 15.)

### B. Dr. Dershwitz's Testimony Regarding Biological Plausibility: Reliable and Admissible as Support for Causation Opinions of Plaintiffs' Other Experts

Plaintiffs assert that Dr. Dershwitz's testimony regarding the potential mechanisms whereby Trasylol adversely affects kidney function is reliable and admissible as support for the opinions of Plaintiffs' general causation experts.[10] (DE 3889 at 15-16.) In support, Plaintiffs argue that: the use of animal studies does not render the testimony unreliable; the testimony is consistent with the mechanism of action testimony provided by Bayer's expert nephrologist, Dr. Humes, and listed by Bayer on its product insert;[11] the testimony is not unreliable merely because Bayer contests the

---

[10] Plaintiffs note that the testimony of Dr. Eisenberg and Dr. Parikh is not dependent on the testimony of Dr. Dershwitz: "biologic plausibility is considered part of a non-exclusive list of factors that the Court should consider in passing on the issue of general causation." (DE 3889 at 22.)

[11] Plaintiffs refer to Dr. Dershwitz's opinion that Trasylol leads to vasoconstriction, which can also reduce blood flow to the kidneys. According to Plaintiffs, Dr. Humes confirmed Trasylol's vasoconstrictive mechanism of action when describing its effects on the kidneys. (DE 3889 at 17.) Plaintiffs also refer to Dr. Dershwitz's opinion on Trasylol's potential clot causing mechanism: the clinical pharmacology section of the 2006 package insert for Trasylol confirmed

quality of the studies upon which Dr. Dershwitz relies; and Dr. Dershwitz applied a reliable methodology to arrive at his opinions regarding biological plausibility. (DE 3889 at 16-22.)

In regards to the use of animal studies, Plaintiffs state that courts have long recognized the usefulness of animal studies, and while Bayer discusses the insufficiency of using animal studies to support general causation in humans, Dr. Dershwitz utilizes them to determine biological plausibility, as opposed to causation. (DE 3889 at 16.) "Animal studies are particularly common and useful to determine the general physiological effects of a substance; even while animal studies are less favored for determining causation in humans." (DE 3889 at 16. (citing *McCarrell v. Hoffman-La Roche, Inc.*, 2009 WL 614484 (N.J. Super. A.D. March 12, 2009)))

According to Plaintiffs, Dr. Dershwitz's opinions are not based on speculation: they are based on scientific evidence and Dr. Dershwitz's background and experience. (DE 3889 at 19.) Plaintiffs point out that while Dr. Dershwitz's Report cites to twenty-nine separate studies supporting his opinions on the biologically plausible mechanisms whereby Trasylol causes kidney injuries, Bayer takes issue with just two of those studies. (DE 3889 at 18.) "Allegations of inadequacies in a study, however, go to the weight of the expert's testimony, not its admissibility." (DE 3889 at 19. (citing *Quiet Tech.*, 326 F.3d at 1345.))

In regards to Dr. Dershwitz's methodology, Plaintiffs state that Dr. Dershwitz conceded that some Trasylol studies showed no increased risk of adverse events.[12] However, his chosen

---

this mechanism of action by stating that Trasylol is associated with "thrombin generation." (DE 3889 at 18.)

[12] Plaintiffs argue that Dr. Dershwitz recognized that some studies came to a conclusion contrary to his opinions, and that the exclusion of citations to such studies from his Report is not a sufficient ground to exclude his testimony. (DE 3899 at 21.)

methodology was reliable given that his goal was to opine on biologically plausible explanations of how the known pharmacology of Trasylol could lead to the increased risk of various injuries, not to compile a full literature search of all available studies. (DE 3889 at 19.) "The pharmacological studies cited . . . confirm the biologically plausible explanations for the causality evidence demonstrated in the studies explained more fully by Dr. Eisenberg and Dr. Parikh. . . . The known pharmacological properties of Trasylol . . . are consistent with the biologically plausible opinions offered by Dr. Dershwitz. Dr. Dershwitz explains this multiple times throughout his report and deposition." (DE 3899 at 20.)

### C. Dr. Dershwitz Will Not Opine on General Causation Issues

Plaintiffs respond that Bayer's motion to exclude any "significant link" testimony is moot because "Plaintiffs do not intend to offer Dr. Dershwitz on issues of global general causation. . . . Plaintiffs do not intend to offer Dr. Dershwitz to offer general causation[] opinions concerning 'a significant link' between the use of Trasylol and renal dysfunction, renal failure or death."[13] (DE 3899 at 24.) Plaintiffs limit Dr. Dershwitz's testimony to the pharmacology of Trasylol and biologically plausible mechanisms through which Trasylol may cause renal dysfunction, renal failure, and an increased risk of mortality. (DE 3889 at 24.)

---

[13] Plaintiffs contend that because they do not intend to offer Dr. Dershwitz as a general causation expert, Bayer's argument regarding Dr. Dershwitz's one-sided methodology is moot. (DE 3889 at 21 n.7.) Nevertheless, Plaintiffs defend Dr. Dershwitz's methodology as being reliable for his mechanism of action opinions. (DE 3889 at 19-22.)

IV. **Bayer's Reply**

According to Bayer, while the Plaintiffs now have abandoned any effort to establish the reliability of Dr. Dershwitz's causation testimony, they will use his speculative mechanism of action opinions to shore up the causation testimony of their other experts. (DE 4104 at 1.) Bayer argues that Dr. Dershwitz's testimony on biologically plausible mechanisms is inadmissible for two reasons. First, under Eleventh Circuit law, testimony about a mechanism of injury must be based on a proven biologic process, and Plaintiffs do not contest that Dr. Dershwitz's theories are not based on a proven biologic process.[14] (DE 4104 at 3. (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005))) Second, the theories are a product of speculation and are not based on reliable scientific methodology.[15] (DE 4104 at 1.) "Rather than trying to establish the reliability of Dr. Dershwitz's methdology, as is their burden, plaintiffs again assert that [Bayer's] arguments go to the weight of the testimony, not its admissibility. An expert's failure to account for a study's limitations, however, demonstrates an improper methodology and warrants exclusion of his testimony." (DE 4104 at 9.)

V. **Analysis**

A. **Significant Link Between Trasylol Use and Renal Dysfunction and Death**

Plaintiffs state that Dr. Dershwitz will not be offered as a general causation expert and

---

[14] Bayer argues that the mechanisms must be biologically proven because they will be used as part of Plaintiffs' effort to establish causation. (DE 4104 at 3.)

[15] Bayer notes that Dr. Humes' opinion and the Trasylol label are irrelevant to the *Daubert* inquiry because there is no evidence that Dr. Dershwitz relied on these sources in developing his theories. (DE 4104 at 8.)

withdraw Dr. Dershwitz's opinion that "recent epidemiological data describe a significant link between the perioperative administration of aprotinin and an increased risk of both death and the development of renal dysfunction." (DE 3899 at 24.) Accordingly, this opinion shall be excluded, along with the discussion of studies linking aprotinin with an increase in mortality and renal injury and failure. (Dershwitz Report at ¶¶ 22-39.)

### B. Potential Mechanisms through which Trasylol May Cause Kidney Damage

Plaintiffs state that Dr. Dershwitz will not opine on issues of general causation and therefore do not attempt to establish the reliability of his causation opinion under Rule 702 and *Daubert*. They do, however, intend to offer Dr. Dershwitz's opinion on the biologically plausible mechanisms "through which Trasylol may cause renal dysfunction, renal failure, and an increased risk of mortality." (DE 3889 at 24.)

Specifically, Dr. Dershwitz opines that "inadequacy in blood supply might lead to temporary or permanent [kidney] damage" and "*in vitro* studies utilizing both human and animal tissues suggest several mechanisms by which aprotinin might contribute to kidney damage." (Dershwitz Report at ¶¶ 40, 49.) While not technically "causation opinions," the Court finds that they implicate a causation opinion. This is problematic because Dr. Dershwitz provides no scientific basis for his conclusion that either of the above mechanisms can lead to renal damage and/or failure. I find that Dr. Dershwitz's proposed opinions in fact constitute two sub-opinions. The first is an opinion as to exactly what effect Trasylol may physiologically have upon the kidney. The second is a conclusion that such physiological effects can cause kidney failure. Having no basis for permitting Dr. Dershwitz's causation testimony, I turn to his proposed testimony as to the effect that Trasylol may

have on the kidney.

Bayer argues that Dr. Dershwitz's mechanism theories are completely inadmissible because the Eleventh Circuit "requires testimony about a mechanism of injury to be based on a proven biologic process" and "requires a biologically proven mechanism to support a general causation opinion." (DE 4104 at 1, 3. (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005))) The Court does not agree with this reading of *McClain*. In that case, the general causation expert employed a differential diagnosis,[16] concluding that he could rule out all the usual causes for the plaintiffs' injuries and therefore infer that Metabolife was the cause. *McClain*, 401 F.3d at 1252-53. The court stated that a differential diagnosis may not serve as a reliable basis for an expert opinion on causation in a toxic tort case unless the expert can show the general toxicity of the drug by reliable methods. *Id.* at 1253. Because the general expert could not show a "reliable explanation of the physiological process by which Metabolife causes heart attacks and ischemic strokes," the Eleventh Circuit found that the expert testimony did not satisfy the requirements of Rule 702 and Daubert. *Id.* at 1253, 1255. Dr. Dershwitz's testimony on Trasylol's potential mechanisms of action is distinguishable: he will not be testifying as to general causation and his methodology does not involve differential diagnosis. Furthermore, *McClain* did not hold that the mechanism must be "proven," but rather that it must be "reliable."

The Court finds that Dr. Dershwitz's opinion on Trasylol's potential mechanisms of action is reliable; the fact that he does not use absolute terms but rather couches the opinion in terms of

---

[16] "Differential diagnosis involves the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings. This leads to the diagnosis of the patient's condition, not necessarily the cause of that condition." *McClain*, 401 F.3d at 1252.

"can" and "may" does not render it speculative or unreliable.

In support of the opinion that aprotinin can reduce the amount of blood supplied to the kidneys through its effect on the concentration of vasodilatory mediators, Dr. Dershwitz cites to various animal studies finding that aprotinin decreased the concentration of vasodilatory mediators such as prostaglandin and nitric oxide; he cites to the Kramer study for the proposition that a decreased concentration of prostaglandin in the kidney caused a decrease in blood flow to the renal medulla. (Dershwitz Report at ¶¶ 41-45.) While Bayer claims that the Kramer study examined blood flow changes in the outer renal cortex, not the medulla, the "summary" section of the Kramer study states that

> The roles of the renal kinin and prostaglandin (PG) systems were indirectly assessed in conscious rats by inhibition of PG synthesis with indomethacin (INDO) and of kinin synthesis with aprotinin (APRO). In control animals APRO and INDO had no effect on urine flow . . . . Both inhibitors, however, significantly depressed renal PG synthesis and deep *cortical and medullary* plasma flow.

(DE 3064-3 at 4. (emphasis added)) Further, while Bayer argues that cases excluding general causation opinions based on animal studies are applicable because Dr. Dershwitz's opinion on potential mechanisms is offered to prove causation, those cases are not on point. None of the cases cited by Bayer excluded a mechanism of action opinion due to its reliance on animal studies. Animal studies are not "per se inadmissible and should be subjected to substantive analysis, just like other scientific evidence." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001) (internal citations omitted). *See also In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1291 (M.D. Fla. 2007) ("Animal studies often provide useful information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies."). In the context of a mechanism of action

opinion rather than a general causation opinion, the Court finds that Dr. Dershwitz's reliance on animal studies constitutes reliable methodology. Bayer may cross-examine Dr. Dershwitz on this issue, including his failure to extrapolate from the Kramer animal study to humans.

In support of the opinion that aprotinin may reduce blood flow in the kidney through its affect on platelet aggregation and the formation of small clots, Dr. Dershwitz cites to the Havel study, which "studied the effects of aprotinin on the mediators of platelet aggregation in cultured human vein cells." (Dershwitz Report at ¶ 48.) Bayer attacks Dr. Dershwitz's blood clot mechanism theory by attacking his reliance on the Havel study. For example, Bayer asserts that Havel studied Trasylol's effect on *enzymes* in a test tube, not on *platelet aggregation* in an animal or human. However, according to the Havel study, "The result . . . is an *enhancement of platelet aggregation* along with improved vessel sealing. This can explain the decreased bleeding tendency after operations when aprotinin is used. On the other hand, in this mechanism also lies the principal danger, the appearance of thrombotic vessel occlusion." (DE 3064-4 at 6. (emphasis added)) Bayer also claims that reliance on Havel is unreliable because it is an *in vitro* cell culture study, and Dr. Dershwitz has not explained how its results can be extrapolated to a human body or how the dose used in the study relates to a clinical dose. In the context of a mechanism of action opinion rather than a general causation opinion, the Court finds that Dr. Dershwitz's reliance on a cell culture study constitutes reliable methodology. Bayer may cross-examine Dr. Dershwitz on this issue, including his failure to extrapolate from the cell culture study to a human body and his failure to evaluate how the dose used in the study compares to the clinical dose used in humans.

Therefore, the Court finds that the mechanism of action opinions are admissible, but to a limited extent. Dr. Dershwitz may properly opine that Trasylol can affect autoregulation, which in

17

turn affects blood supply to the kidney in the presence of low blood pressure.[17] However, having provided no scientific basis for reaching his conclusion that such blood supply inadequacy might lead to temporary or permanent kidney damage, he may not state such an opinion. Similarly, while Dr. Dershwitz may opine that Trasylol increases platelet aggregation and thus may increase the formation of small clots that decrease blood flow in the kidney,[18] he may not say that this process may cause kidney damage.

The Court finds that Dr. Dershwitz's opinion regarding Trasylol's potential mechanisms of action, as limited above, is admissible under the standards set forth in Rule 702 and *Daubert*. Bayer's arguments in favor of exclusion are either misdirected or directed at the weight of Dr. Dershwitz's opinion rather than its admissibility: vigorous cross-examination and the presentation of contrary evidence will be the appropriate means of attacking it. *See Quiet Tech.*, 326 F.3d at 1341.

## VI. Conclusion

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Mark Dershwitz (DE 3064) is **GRANTED IN PART** and **DENIED IN PART**. More specifically, the Court finds that:

- The Motion shall be **GRANTED** as to Dr. Dershwitz's opinion regarding the "significant

---

[17] The Court has referred to this as "Potential Mechanism #1: Trasylol's Effect on Autoregulation." *See* Section II.A.i. of this Order.

[18] The Court has referred to this as "Potential Mechanism #2: Trasylol's Effect on Platelet Aggregation." *See* Section II.A.ii. of this Order.

link" between Trayslol and an increased risk of the development of renal dysfunction and death.

- The Motion shall be **DENIED** as to Dr. Dershwitz's opinion regarding Trasylol's potential mechanisms of action. That opinion is limited to the extent described in Section V.B.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 19 day of March, 2010.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record