## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

|  |  |
|---|---|
| IN RE TRASYLOL PRODUCTS LIABILITY LITIGATION – MDL-1928 THIS DOCUMENT RELATES TO: *Linda Mordecai v. Bayer Corp., et al.,* Case No. 9:08-cv-80781-DMM | ) ) ) ) ) ) ) ) ) |

### BAYER'S MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY OF DR. QUIGG, AND COMBINED MEMORANDUM OF LAW IN SUPPORT

PLEASE TAKE NOTICE that pursuant to Rule 702 of the Federal Rules of Evidence Defendants Bayer Corporation, Bayer HealthCare Pharmaceuticals Inc. (as successor in interest to Bayer Pharmaceutical Corporation), Bayer HealthCare LLC, and Bayer Schering Pharma AG (as successor in interest to Bayer HealthCare AG) (collectively, "Bayer") move to exclude the testimony of plaintiff's specific causation expert Richard J. Quigg, M.D.  Because plaintiff has no admissible expert testimony on causation and has no evidence that Trasylol's allegedly inadequate warnings proximately caused her husband's renal failure and death, Bayer moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### MEMORANDUM OF LAW

Michael Mordecai already was an extraordinarily sick man when he underwent his second Coronary Artery Bypass Graft ("CABG") surgery in October of 2006.  His cardiac surgeon testified that Mr. Mordecai possessed a perfect storm of risk factors, placing him in a "very small" group at highest risk for post-CABG complications.  Deposition of Constantine

Athanasuleas ("Athanasuleas Dep.") (Ex. A[1]) at 200:23-203:24.  Mr. Mordecai did indeed suffer numerous complications from that second CABG surgery, including massive post-surgical bleeding that required him to undergo an emergency "take-back" operation.  Following the surgery and until his death three days later, Mr. Mordecai remained on a ventilator and an intra-aortic balloon pump to help his cardiac function.  His treating physicians testified that Mr. Mordecai's various pre-surgical risk factors, the surgeries themselves, and post-surgical complications caused his kidneys and other organs to fail.  But plaintiff Linda Mordecai blames Trasylol.

Bayer is entitled to summary judgment for two reasons.  First, plaintiff cannot establish proximate causation.  Plaintiff's claims turn on the allegation that Bayer failed adequately to warn of the risk of renal failure purportedly associated with Trasylol.  Mr. Mordecai's cardiac surgeon testified that he prescribed Trasylol *knowing* of this purported risk. Plaintiff therefore cannot establish that any alleged deficiency in the Trasylol label proximately caused Mr. Mordecai's injury and death.

Second, plaintiff has no admissible evidence that Trasylol was the cause-in-fact of Mr. Mordecai's renal failure.  Plaintiff's entire causation case rests on the testimony of hired expert Dr. Richard Quigg,[2] whose testimony must be excluded because it is not supported by a scientifically reliable differential diagnosis.  During his deposition, Dr. Quigg admitted that Mr. Mordecai suffered from many problems that placed him at risk for renal failure and further

---

[1] Exhibit citations are to the exhibits attached to the Statement of Facts being filed contemporaneously with this motion.

[2]   Plaintiff's other expert, Dr. Dianne Zwicke, does not opine that Trasylol caused Mr. Mordecai's renal failure.  *See* Deposition of Dianne Zwicke ("Zwicke Dep.") (Ex. B) at 153:7-9 ("Q.  [Y]ou're not here testifying that Trasylol actually caused [Mr. Mordecai's] renal failure, are you?  A.  No.").  Dr. Zwicke's testimony is the subject of a separate *Daubert* motion filed concurrently with this motion.

admitted that he could not rule out potential alternative causes. On this record, the single

unsupported sentence in Dr. Quigg's Report claiming to have ruled out potential alternate causes

is insufficient as a matter of law to establish that he performed a reliable differential diagnosis.

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005) ("an expert does not

establish the reliability of his techniques or the validity of his conclusions simply by claiming

that he performed a differential diagnosis on a patient").

      Because plaintiff has no evidence of proximate causation and no admissible

evidence of causation-in-fact, Bayer is entitled to summary judgment as a matter of law.

## BACKGROUND

**A.**    **Mr. Mordecai's Pre-Operative Medical History, And Its Role In Significantly Increasing His Risk Of Renal Failure And Death Following CABG Surgery.**

      On October 9, 2006, after doing a cardiac catheterization, cardiac surgeon

Constantine Athanasuleas scheduled Mr. Mordecai for CABG surgery the next day because Mr.

Mordecai's longstanding coronary artery disease was worsening and there were no "available or

viable" options left to treat the condition. Athanasuleas Dep. (Ex. A) at 33-35, 66-68; *see id.* at

56-58 (Mr. Mordecai's condition was "life-threatening" and he was at risk of becoming "a

chronic heart failure patient, who then would invariably die of a heart attack"); *id.* at 69-70 (the

surgery was "urgent" due to Mr. Mordecai's "progressive symptoms").

      In addition to the risks inherent to CABG surgery, Mr. Mordecai had numerous

pre-operative conditions that increased his risks of renal failure and other serious complications.

Dr. Athanasuleas — who has performed between 7,000 and 8,000 cardiac surgeries using

bypass, 70% of which were CABG surgeries, *id.* at 25:5-13 — testified that Mr. Mordecai was in

a "very small" group of patients most at risk for post-CABG complications, including death. *See*

*id.* at 200:23-203:24 (estimating that "five percent or less" of CABG patients fit the decedent's

risk profile); *id.* at 72:16-73:5, 78:21-25, 204:17-20 (Mr. Mordecai was told that he had a five to eight percent risk of death post-CABG).

Perhaps most significantly, Mr. Mordecai's 2006 procedure was his second CABG surgery, and undergoing a repeat CABG greatly increased his risk of surgical complications, including renal failure and death. *See* Athanasuleas Dep. (Ex. A) at 41:13-15; Deposition of Richard Quigg ("Quigg Dep.") (Ex. C) at 319:13-17; Zwicke Dep. (Ex. B) at 120:13-15; *see generally* Statement of Material Facts ¶ 6 (hereafter, "Statement") (April 1990 CABG surgery followed diagnosis of coronary artery disease with 90% bilateral stenosis). As Dr. Athanasuleas testified, "[t]he most common complication" after repeat CABG surgery is "death, which is at least two to three times higher than primary surgery." Athanasuleas Dep. (Ex. A) at 39:9-21.

Mr. Mordecai also suffered from "uncontrolled" diabetes, which placed him at "high risk for heart attack, stroke or renal failure after surgery." Athanasuleas Dep. (Ex. A) at 51:12-17; *see id.* at 42:25-43:7; Deposition of Richard Lyerly ("Lyerly Dep.") (Ex. D) at 34:9-12; *see also* Quigg Dep. (Ex. C) at 88:13-24; *see also* Statement ¶ 13. Mr. Mordecai's risks of renal failure and death also were increased because he:

- was morbidly obese, weighing nearly 300 pounds and with a body mass index of 43.6 kg/m$^2$, *see* Athanasuleas Dep. (Ex. A) at 50:4-51:17;

- had multiple angiograms and a cardiac catheterization in which IV contrast dye was used less than 24 hours before his 2006 CABG surgery, Statement ¶ 15; *see* Lyerly Dep. (Ex. D) at 29:18-31:3 (discussing risks); Quigg Dep. (Ex. C) at 327:19-328:19 (such dye "can be toxic to the kidneys");

- used the prescription drug Vytorin for his high cholesterol, Statement ¶ 10; *see, e.g.,* Quigg Dep. (Ex. C) at 324:9-14 (testifying that Vytorin is associated with an increased risk of kidney injury);

- had uncontrolled hypertension, Statement ¶ 9; s*ee* Zwicke Dep. (Ex. B) at 119:24-120:6, 160:25-161:4 (discussing increased risks);

- had a family history of diabetes, myocardial infarction, hypertension, and strokes, *see* Deposition of Linda Mordecai ("Mordecai Dep.") (Ex. E) at 54:20-58:7; Athanasuleas Dep. (Ex. A) at 49:3-19 (discussing increased risk); and

- smoked two packs of cigarettes per day for between 26 and 40 years until several years before his surgery, Statement ¶ 11; *see* Athanasuleas Dep. (Ex. A) at 47:15-18.

**B.      Events During And After Mr. Mordecai's CABG Surgery Further Increased His Already High Risks Of Postoperative Renal Failure And Death.**

Mr. Mordecai's considerable pre-operative risks were heightened by a difficult surgical and postoperative course.

A patient is inherently at risk of renal failure when he or she is on a cardiac pump. Indeed, Dr. Quigg conceded that there is up to a 20 percent background risk of kidney damage, including renal failure, following CABG surgery with cardiopulmonary bypass. Quigg Dep. (Ex. C) at 77:23-78:15; *id.* at 79:12-20; *see* Athanasuleas Dep. (Ex. A) at 60:8-62:24, 80:9-82:25 (discussing CABG risks). Those risks increase the longer a patient is on the bypass pump. Quigg Dep. (Ex. C) at 82:19-23; Athanasuleas Dep. (Ex. A) at 66:4-13. During Mr. Mordecai's bypass procedure on October 10, he was on the pump for roughly 161 minutes. Quigg Dep. (Ex. C) at 332:2-5. Moreover, because Mr. Mordecai's bleeding could not be controlled following the first surgery, he required a second surgery (*aka*, "take-back" surgery) less than two hours after leaving the first surgery, involving an additional 87 minutes on bypass. Athanasuleas Dep. (Ex. A) at 118:25-119:9, 121:1-8, 123:3-14.

Mr. Mordecai's surgeries involved many other events that independently can cause renal failure, and therefore heightened his already high risk profile. For instance, he:

- required an intra-aortic balloon pump to help maintain heart function, Statement ¶ 20; *see* Athanasuleas Dep. (Ex. A) at 83:16-84:22 (explaining that as the balloon inflates against the aorta, it can cause particulate matter to dislodge, "move to the kidney arteries" and "obstruct kidney blood flow"); *accord* Quigg Dep. (Ex. C) at 84:23-85:3;

- developed hypotension while being weaned off bypass, Statement ¶ 22; *see* Athanasuleas Dep. (Ex. A) at 82:11-14 (this "[a]bsolutely" increased his renal failure risk); Lyerly Dep. (Ex. D) at 35:10-15;

- suffered excessive hemorrhaging following his October 10 bypass that necessitated his second ("take-back") bypass procedure, Statement ¶ 17; *see* Athanasuleas Dep. (Ex. A) at 82:11-22 (excessive bleeding and repeat surgery increased his risk for renal failure); Lyerly Dep. (Ex. D) at 35:21-36:2 (same); *see also* Quigg Dep. (Ex. C) at 348:5-9;

- received significant blood transfusions during the second surgery, Statement ¶ 18; *see* Quigg Dep. (Ex. C) at 351:3-18 (acknowledging increased risk of renal failure); and

- developed critical metabolic acidosis (*i.e.*, the inability to control the amount of acid in the body), Statement ¶ 21; Athanasuleas Dep. (Ex. A) at 141:6-18; Lyerly Dep. (Ex. D) at 40:3-42:4, which "persist[ed]" for the balance of his hospital stay and "significantly" harmed his organs, Athanasuleas Dep. (Ex. A) at 132:9-133:7; 134:20-135:14.

Mr. Mordecai died at 2:10 a.m. on October 14, as a result of atherosclerotic and hypertensive cardiovascular disease with acute myocardial infarction. Statement ¶ 27; Athanasuleas Dep. (Ex. A) at 147:11-15, 148:1-151:1.

## ARGUMENT

Summary judgment must be granted where there is no genuine issue of material fact for trial. Fed. R. Civ. P. 56; *Celotex v. Catrett*, 477 U.S. 317, 330 (1986); *Zivojinovich v. Barner*, 525 F.3d 1059, 1066 (11th Cir. 2008). Where, as here, plaintiff has no competent evidence to establish an element of her *prima facie* case, defendants are entitled to summary judgment. *Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1306 (M.D. Fla. 2009).

## I.   PLAINTIFF CANNOT CREATE A TRIABLE ISSUE ON PROXIMATE CAUSATION.

All of plaintiff's claims turn on allegations that Bayer failed adequately to warn of — or fraudulently misrepresented or concealed — the risks of renal failure and increased mortality associated with Trasylol. *See* Am. Compl. (D.E. 2-2 in 9:08-cv-80781) ¶¶ 55-56, 64,

72, 78-79.[3]  To establish a *prima facie* case on any of these claims, plaintiff must adduce evidence of proximate causation.  *See*, *e.g.*, *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 4 (Ala. 2004) (a fraud claim fails for lack of causation if the same course of action would have been taken irrespective of the misrepresentation); *Gurley ex rel. Gurley v. Am. Honda Motor Co.*, 505 So. 2d 358, 361 (Ala. 1987) (warnings theory sounding in negligence); *McClain v. Coca-Cola Co. Distributor*, No. 2:08cv614-WHA, 2009 WL 2985693, at *7 (M.D. Ala. Sept. 16, 2009) (same under Alabama Extended Manufacturer's Liability Doctrine ("AEMLD")); *accord Summerlin*, slip op. at 23.  Even where plaintiff has shown that a product's warning is inadequate, he or she still must demonstrate that the "inadequate warning proximately cause[d] plaintiff's injury."  *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 970 (Ala. 1985).  A warnings case "should not be submitted to the jury unless there is substantial evidence that an adequate warning would have been read and heeded and would have prevented the accident."  *Deere & Co. v. Grose*, 586 So. 2d 196, 198 (Ala. 1991).

Alabama applies the "learned intermediary" doctrine, meaning that the manufacturer has a duty only to warn the prescribing physician.  *Morguson v. 3M Co.*, 857 So. 2d 796, 801-802 (Ala. 2003); *Stone v. Smith, Kline & French Labs.*, 447 So. 2d 1301, 1304 (Ala. 1984).  Accordingly, proximate causation, including whether a different warning would have been heeded, is assessed based on the vantage point of the prescribing physician.  *See Bodie v. Purdue Pharma Co.*, 236 Fed. App'x 511, 520-21 (11th Cir. 2007) (Alabama law); *Brasher v. Sandoz Pharms. Corp.*, Nos. CV-98-TMP-2648-S et al., 2001 U.S. Dist. LEXIS 18364, at *48-

---

[3]   To the extent that plaintiff has attempted to plead a warranty or tort claim apart from these warnings theories, those claims fail as a matter of law as explained below, *infra* § III, and as this Court held in *Summerlin v. Bayer Corp.*, No. 08-80903-DMM, slip op. at 18-23 (S.D. Fla. Feb. 16, 2010) (D.E. 4252 in 1:08-md-1928) (granting summary judgment on warranty theories under Alabama law).

49 (N.D. Ala. Sept. 21, 2001) ("[T]he plaintiffs must demonstrate that, had the defendant given an adequate warning, it would have been read and heeded by the prescribing physicians.").

Plaintiff cannot establish proximate causation because she has not demonstrated that Mr. Mordecai's prescribing physician, Dr. Athanasuleas:  (i) relied on the warning that she contends was inadequate, or (ii) would have heeded an allegedly adequate warning had one been given, thus preventing him from prescribing Trasylol to Mr. Mordecai.

First, although the Trasylol labeling in effect at the time of Mr. Mordecai's surgery did not warn of a risk of renal failure, Dr. Athanasuleas testified that he understood renal failure to be a risk associated with Trasylol when he prescribed it to Mr. Mordecai.  Athanasuleas Dep. (Ex. A) at 116:23-117:12; *id.* at 117:23-118:9 (testifying that he was aware of the risks including "[h]eart attack, death, [and] renal failure," and "took them into consideration when [he] used aprotinin in Mr. Mordecai's surgery").  Thus, plaintiff cannot establish that any inadequacy in the warning about the risk of renal failure was the proximate cause of Mr. Mordecai's injury and death.  As the Eleventh Circuit has explained:

> Under application of Alabama's "learned intermediary" doctrine, when a prescribing physician . . . "had independent knowledge of the risk[s] that the adequate warning should have communicated," and chose to prescribe the drug based on that independent knowledge, then, by law, the allegedly inadequate warning of the drug company is not the proximate cause of the plaintiff's injury.

*See Bodie*, 236 F. App'x at 521 (citation omitted).  Accordingly, summary judgment is warranted because "even if we assume that [the drug] failed to carry adequate warnings . . . [the court] cannot conclude it was this defect that caused [plaintiff's] injury." *Id.* (affirming summary judgment for drug manufacturer).

Second, plaintiff's claims fail because she presents no evidence demonstrating that, if an allegedly adequate warning had been provided, then Dr. Athanasuleas would have heeded the warning and would not have prescribed Trasylol to Mr. Mordecai.  The evidence

repudiates that notion.  For instance, Dr. Athanasuleas testified that from approximately one to three years after Trasylol came to market onward, his protocol was to "use[] it in each and every CABG surgery . . . [d]one on cardiopulmonary bypass," *i.e.* "on-pump procedures." Athanasuleas Dep. (Ex. A) at 161:25-163:7; *id.* at 114:13-115:3; *see also id.* at 152:19-20 (testifying that he has "operated on thousands of patients").  As Dr. Athanasuleas testified, he "became less selective [over time] and applied [Trasylol] to everybody" undergoing on-pump CABG.  *Id.* at 115:11-15.

Dr. Athanasuleas did not change his prescribing patterns following the New England Journal of Medicine's January 2006 publication of an article by Dr. Mangano — an article that plaintiffs generally contend is essential to their liability theories, *see, e.g.*, Eisenberg Report (Ex. B to Bayer's Motion to Exclude, D.E. 3074-2 in 1:08-md-1928) at 6 — which, as described by plaintiff's counsel, showed "a doubling in the risk of renal problems, a 55 percent increase over the alternatives for myocardial infarction and heart failure, and a 181 percent increase [in stroke or encephalopathy] [for Trasylol] over alternative drugs that could be used to prevent excessive bleeding."  Athanasuleas Dep. (Ex. A) at 176:1-12, 175:12-14.  Instead, Dr. Athanasuleas concluded that "irrespective of this particular article, [he was] going to continue the use of aprotinin in [his] on-pump cases."  *Id.* at 178:18-22.  He emphasized that his practice of using Trasylol in all in patients did not "change . . . at any time."  *Id.* at 115:4-10.  Rather, he stopped using Trasylol only "when it was taken off of either the market or our [hospital] formulary, somewhere around 2007."  *Id.* at 166:16-19.  Moreover, plaintiff adduced no testimony that any other scientific evidence would have caused Dr. Athanasuleas to deviate from the view he held at the time of Mr. Mordecai's surgery, namely that Trasylol's benefits

9

outweighed its risks for use in surgery on that patient.  *See id.* at 70:25-72:1, 116:1-118:21, 66:19-67:3.

Because plaintiff has "produced no evidence at all that an 'adequate' warning would have been read and heeded and would have prevented the accident," summary judgment is proper.  *Deere & Co.*, 586 So. 2d at 198; *see Brasher*, 2001 U.S. Dist. LEXIS 18364, at *50 (granting summary judgment against a plaintiff who failed to adduce any evidence that "any [additional] communication by [the drug manufacturer] would have influenced [the treating physician's] decision to prescribe [the drug in question] to" the plaintiff); *Chase v. Kawasaki Motors Corp., U.S.A.*, 140 F. Supp. 2d 1280, 1287-88 (M.D. Ala. 2001) (granting summary judgment because of failure to show that different warning would have been heeded and prevented the injuries).

## II.   PLAINTIFF HAS NO ADMISSIBLE EVIDENCE OF CAUSATION-IN-FACT.

Summary judgment also should be entered for Bayer because plaintiff has no admissible evidence that Trasylol was the cause-in-fact of Mr. Mordecai's injuries.[4]  *See McClain*, 401 F.3d at 1239; *Verchot v. Gen. Motors Corp.*, 812 So. 2d 296, 303 (Ala. 2001). *McClain v. Metabolife Int'l, Inc.*, 193 F. Supp. 2d 1252, 1258 (N.D. Ala. 2002).  Absent admissible expert testimony on causation, Bayer is entitled to summary judgment.  *Emody v. Medtronic, Inc.*, 238 F. Supp. 2d 1291, 1295 (N.D. Ala. 2003); *Lyons v. Walker Reg'l Med. Ctr.*, 791 So. 2d 937, 942 (Ala. 2000).

Plaintiff fails to present admissible expert testimony on specific causation.  Mr. Mordecai's treating physicians testified, to a reasonable degree of medical certainty, that

---

[4]   *See*, *e.g.*, *Sparks v. Total Body Essential Nutrition, Inc.*, --- So. 3d ----, 2009 WL 2105533, at *3 (Ala. July 17, 2009) (like tort claims, warranty claims under Alabama law require plaintiff to establish causation); *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 281 & n.6 (Ala. 2000) (wrongful death claims); *Brushwitz v. Ezell*, 757 So. 2d 423, 433 (Ala. 2000) (wantonness claims); *First Comm. Bank v. Spivey*, 694 So. 2d 1316, 1320 (Ala. 1997) (fraud).

Trasylol did not cause him any injury or his death.  Neither of plaintiff's two hired experts, Drs.

Zwicke and Quigg, provides admissible evidence on causation.

> **A.   Mr. Mordecai's Treating Physicians Testified That Trasylol Did Not Cause Any Injury.**

Plaintiff has failed to adduce any evidence from Mr. Mordecai's treating

physicians that Trasylol caused his injuries or death.  On the contrary, Dr. Athanasuleas, Mr.

Mordecai's surgeon, expressly rejected that notion:

> Q.   Do you have an opinion, Doctor, as to whether Trasylol had any role in Mr. Mordecai's renal failure and death?
>
> [Objection to form interposed]
>
> A.   I have an opinion.
>
> Q.   And what is that opinion?
>
> A.   That it did not contribute to his renal failure and death.
>
> . . . .
>
> Q.   And do you hold that degree with a reasonable degree – do you hold that opinion with a reasonable degree of medical certainty?
>
> A.   Yes.

Athanasuleas Dep. (Ex. A) at 152:4-153:7.

Dr. Athanasuleas testified that Mr. Mordecai's death was caused by the

"arteriosclerotic and hypertensive cardiovascular disease with acute myocardial infarction"

documented in his autopsy report.  *Id.* at 146:23-147:21.  He explained that those conditions

were caused by "inadequate blood flow" throughout and following the surgery, exacerbated by,

*inter alia*, vasoactive drugs, bouts of hypotension, and "manipulation of the heart in order to fix

the bleeding site . . . further exacerbated by emergently going on the heart-lung machine."  *Id.* at

147:22-150:17; *see also id.* at 134:10-35:14, 142:7-17 (low blood flow caused acidosis).  In sum:

"Multiple events at multiple different times in the course of his initial operation . . .

compounded . . . to cause his ultimate demise," *id.* at 150:18-22, and his renal failure similarly

was caused by "hypotensive shock and the addition of vasoactive drugs and the effects of cardiopulmonary bypass . . . . compounded with his underlying . . . medical condition, which is peripheral vascular disease, hypertension, the stress of surgery, uncontrolled diabetes." *Id.* at 151:4-25; *accord id.* at 152:17-22 ("[I]in my experience as a surgeon, the events that I saw in Mr. Mordecai, having operated on thousands of patients, could have occurred . . . before Trasylol was ever invented.").

Similarly, Mr. Mordecai's nephrologist, Dr. Richard Lyerly, testified, to a reasonable degree of medical certainty, that Mr. Mordecai's acute renal failure and death were caused by pre-existing risk factors and surgical complications.  Lyerly Dep. (Ex. D) at 51:18-52:23.  Specifically, he testified that the renal failure resulted from "[r]enal hypoperfusion [and] ischemic injury," which in turn were caused by his "[c]ardiac functions, massive bleeding, massive blood transfusion requirements, [and] large [vaso]pressor requirements." *Id.* at 51:18-52:13; *see id.* at 52:14-23 (testifying that he reviewed literature on Trasylol in preparation to testify, but nothing in the literature changed his opinion regarding the causes of Mr. Mordecai's injury); *see also id.* at 46:6-49:4 (discussing the numerous harms, including renal failure and death, that hypoperfusion can inflict); *id.* at 50:21-51:17 (testifying that Mr. Mordecai's blood gas results showed that he was suffering from acidosis following the surgery, which indicated that he had hypoperfusion).

> **B.** **Dr. Zwicke Does Not Claim That Trasylol Caused Mr. Mordecai's Injury.**

Plaintiff has designated Dr. Zwicke, a retained expert, to testify in this case. However, she is not testifying that Trasylol caused Mr. Mordecai's injury:

> Q.    So you do not intend to offer an opinion to a reasonable degree of medical certainty about Trasylol's contribution, if any, to Mr. Mordecai's renal failure, correct?
>
> A.    A specific causal, no, I do not.

Zwicke Dep. (Ex. B) at 123:4-8.

> Q.    [Y]ou're not here testifying that Trasylol actually caused [Mr. Mordecai's] renal failure, are you?
>
> A.    No.
>
> Q.    Okay.
>
> A.    I will leave that to your other experts that are brighter than me on that subject.

*Id.* at 153:7-12.  Therefore, plaintiff cannot rely on Dr. Zwicke to establish causation.

> ### C.    Dr. Quigg's Failure To Exclude Alternate Causes Renders His Causation Testimony Inadmissible.

Plaintiffs' other expert, Dr. Quigg, should be excluded under Federal Rule of Evidence 702 and *Daubert*, 509 U.S. at 589.  Dr. Quigg contends that, because Mr. Mordecai "developed acute renal failure immediately following surgery, which could not be (and was not) explained by traditional risk factors," it was caused by Trasylol.  Quigg Report (Ex. F) at 8.  This opinion should be excluded because it is not supported by a reliable differential diagnosis.

Although Dr. Quigg baldly claims to have excluded "traditional risk factors," Report (Ex. F) at 8,  "an expert does not establish the reliability of his techniques or the validity of his conclusions simply by *claiming* that he performed a differential diagnosis on a patient." *McClain*, 401 F.3d at 1253 (emphasis added).  "[T]o ensure the reliability and logical correctness of [his] differential diagnosis opinion," an expert must compile a comprehensive list of all possible causes, "must 'eliminat[e] all [possible alternate causes] but one,'" and show that the remaining "ruled in" cause is capable of causing the alleged injury. *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 596 (N.D. Fla. 2009) ("[I]t is not sufficient for an expert to merely adduce an opinion and label it 'differential diagnosis.'").  When an expert is attempting to "rule out" alternative causes, Rule 702 requires the expert proffer a reasonable "explanation for why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause."

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758 n.27 (3d Cir. 1994); *accord Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) ("[I]f an expert utterly fails to consider alternative causes *or fails to offer an explanation for why the proffered alternative cause was not the sole cause*, a district court is justified in excluding the expert's testimony.") (emphasis added); *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003) (same); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000) (excluding expert testimony because of unreliable differential diagnosis that "made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition"); *see also Courtaulds Fibers, Inc. v. Long*, 779 So. 2d 198, 202 (Ala. 2000) (applying Alabama's Rule 702 and noting that "differential diagnosis" is "a diagnosis based upon ruling out *all other causes*") (emphasis added).  Accordingly, an expert opinion that fails systematically to rule out alternative causes departs from the scientific method and therefore is speculative and unreliable.  *See Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1166 (S.D. Fla. 1996) (excluding expert because, *inter alia*, testimony was speculative and "failed to eliminate many possible causes" of the complained-of injury), *aff'd*, 158 F.3d 588 (11th Cir. 1998); *Evans v. Matrixx Initiatives, Inc.*, No. 3:07-cv-357-J-34JRK, 2009 WL 2914252, at *11 (M.D. Fla. Feb. 18, 2009) (holding that experts' "failure to rule out alternative causes renders the doctors' opinions insufficiently reliable").

Plaintiff here cannot show that Dr. Quigg performed the differential diagnosis required under *Daubert* and Rule 702.  *First,* Dr. Quigg admits that he cannot rule out at least three alternative causes for Mr. Mordecai's renal failure:

> Q.     [Y]ou state that the use of relatively high doses of Trasylol during cardiac surgery . . . led to acute renal failure . . . .  [W]as there anything else that led to Mr. Mordecai's acute renal failure in your opinion?
>
> A.     Potentially, yes.

Quigg Dep. (Ex. C) 318:6-15.  Specifically, Dr. Quigg identified as potential causes Mr.

Mordecai's (i) re-bypass surgery, and that "[i]n the immediate post-operative period, he was

[(ii)] relatively hypotensive and [(iii)] had a mild decrease in his cardiac output."  *Id.* at 318:12-

319:7.  These are precisely the conditions that Mr. Mordecai's treating physicians testified were

the specific causes of his renal failure and death.  *See supra* § I.A; *see also supra* at 5 (citing Dr.

Quigg's testimony in which he admits that CABG alone presents a risk of renal failure).  Dr.

Quigg's inability to eliminate the "potential[]" causes identified by the doctors who actually

treated Mr. Mordecai makes his purported differential etiology incomplete and his causation

opinion inadmissible.  *See, e.g.*, *Evans*, 2009 WL 2914252, at *11; *Guinn v. AstraZeneca*

*Pharma. LP*, 598 F. Supp. 2d 1239, 1246-47 (M.D. Fla. 2009).

        Particularly glaring is Dr. Quigg's failure to rule-out Mr. Mordecai's repeat

bypass surgery as a potential cause of his renal failure.  One of the fundamental steps in a

differential diagnosis is to account for the "background risk" of renal failure, *i.e.*, the "risk . . . of

suffering the disease or injury that the plaintiff alleges *without* exposure to the drug or chemical

in question."  *McClain*, 401 F.3d at 1243.  Nowhere does Dr. Quigg explain what distinguishes

Mr. Mordecai's post-surgical course of injury from any case where renal failure is simply caused

by the CABG surgery alone.  Quigg Dep. (Ex. C) at 77:23-78:15 (conceding 20% background

risk of renal failure); *id.* at 79:12-20; *see* Athanasuleas Dep. (Ex. A) at 60:8-62:24, 80:9-82:25

(discussing CABG risks); *see Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1356-57 (M.D.

Ga. 2007) (excluding causation opinion because, *inter alia*, expert failed to account for

background risks of plaintiff's complaint of back injury); *Soldo v. Sandoz Pharms. Corp.*, 244 F.

Supp. 2d 434, 553-54, 566-67 (W.D. Pa. 1994) (excluding testimony because "plaintiff's experts

did not demonstrate any valid diagnostic methodology—any 'sufficient diagnostic technique'—

for excluding the background risk of stroke as the sole cause of plaintiff's stroke").  Moreover,
Dr. Quigg acknowledged that repeat CABG surgery heightens the already significant background
risk of CABG surgery, conceding "there is an association in the literature with [the] fact" that
repeat CABG "is a recognized risk factor for acute kidney injury following surgery."  Quigg
Dep. (Ex. C) at 319:10-17; *see also* Athanasuleas Dep. (Ex. A) at 39:9-21 (primary risk factor for
death); *but see* Quigg Dep. (Ex. C) at 319:18-22 (disagreeing that repeat CABG "is a recognized
risk factor for acute kidney injury *requiring dialysis* following surgery") (emphasis added).
Because Dr. Quigg's causation opinion fails to account for the background risk of the alleged
injury, that opinion is unreliable as a matter of law and may not be introduced into evidence.

Dr. Quigg also should have explained how he ruled out the admitted potential
causes that Mr. Mordecai was "relatively hypotensive" and had "a mild decrease in cardiac
output."  Quigg Dep. (Ex. C) at 318:12-319:7.  *See Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d
802, 808 (3d Cir. 1997) (holding that it "becomes necessary for the plaintiff's expert to offer a
good explanation as to why his or her conclusion remains reliable" if, "[i]n attacking the
differential diagnosis performed by the plaintiff's expert, the defendant . . . point[s] to a plausible
cause of the plaintiff's illness other than the defendant's actions"); *Hendrix*, 255 F.R.D. at 595.
Moreover, the list of potential alternative causes does not stop there.  During his deposition, Dr.
Quigg conceded that each of the following are risk factors for renal failure, and that all applied to
Mr. Mordecai:

- excessive bleeding during surgery, Quigg Dep. (Ex. C) at 343:20-344:6, 94:13-22;
- "large amounts of blood transfusions," *id.* at 351:13-18;
- long period of time spent on bypass, *id.* at 348:5-9;
- cardiac catheterization and IV contrast dye prior to surgery, *id.* at 326:4-328:19;
- use of the prescription medication Vytorin, *id.* at 324:9-325:16;

- diabetes with neuropathy, *id.* at 88:13-18, 322:19-323:4.

Dr. Quigg offers no basis for excluding these acknowledged alternative causes, a failure that is glaring because the treating physicians testified that Mr. Mordecai's difficult surgical course (*e.g.*, significant blood loss, transfusions and lengthy pump time) heightened the already considerable risks of CABG.  *See*, *e.g.*, Athanasuleas Dep. (Ex. A) at 147:22-152:22 (testifying that Mr. Mordecai had risk factors and a surgical course that have caused numerous patients' deaths long before Trasylol was invented).

A medical causation opinion that is not based on a systematic differential diagnosis is not scientifically reliable and therefore should not be placed before a jury.  *McClain*, 401 F.3d at 1237 (reiterating, in the differential etiology context, the obligation to "insure that speculative and unreliable opinions do not reach the jury"); *Evans*, 2009 WL 2914252, at *11; *Kolesar v. United Agri Prods., Inc.*, 412 F. Supp. 2d 686, 698 (W.D. Mich. 2006) (because of, *inter alia*, "the absence of a valid basis for a differential diagnosis . . . [expert's causation opinions] are wholly unreliable.  As such, they will be excluded as unreliable and unhelpful to the jury under Rule 702."), *aff'd*, 246 Fed. Appx. 977, 981 (6th Cir. 2007).  Nothing in Dr. Quigg's report or deposition testimony shows that he considered and ruled out acknowledged potential alternative causes of Mr. Mordecai's renal failure.  Dr. Quigg's testimony must therefore be excluded.  Without that testimony, plaintiff has no evidence that Trasylol caused Mr. Mordecai's alleged injuries.  Bayer therefore is entitled to summary judgment.

## III.    ANY NON-WARNINGS THEORY ALSO FAILS AS A MATTER OF LAW.

The crux of all plaintiff's claims is that Bayer warnings failed to warn about renal failure.  *Supra* § I.  Nevertheless, plaintiff nominally pleads theories concerning the design of Trasylol and its warranties.  Were those claims distinguishable from her warnings theories, and they are not, they still would fail for several additional reasons.

First, were a design defect claim distinct from a warnings theory in this setting,[5] it would fail because plaintiff "does not provide any 'proof of the existence of a feasible, available alternative design presently used' nor 'evidence to show that the utility of an alternative design outweighed the utility of the design actually used.'"  *Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1347 n.32 (M.D. Ala. 2001) (granting summary judgment) (quoting *Yarbrough v. Sears, Roebuck & Co.*, 628 So. 2d 478, 482 (Ala. 1993)); *accord Beech v. Outboard Marine Corp.,* 584 So. 2d 447, 450 (Ala. 1991) (negligent design claim failed for lack of such evidence); *Garrie v. Summit Treestands, LLC*, --- So. 3d ----, 2009 WL 2569258, at *5 (Ala. Civ. App. Aug. 21, 2009) (affirming summary judgment because plaintiff "did not offer substantial evidence of a safer, practical, alternative design as required under the AEMLD").

Second, plaintiff's warranty claims fail for the same reasons this Court identified in *Summerlin*.  *See* D.E. 4252 in 1:08-md-1928 at 18-23.  Plaintiffs Mordecai and Summerlin are represented by the same counsel and filed identical complaints governed by Alabama law. Accordingly, plaintiff's implied warranty claim fails because it is "exactly the type of claim that was rejected in" *Summerlin* based on holdings of the Eleventh Circuit and the Alabama Supreme Court.  *Id.* at 22; *see id.* at 23 (holding that the claim that "Trasylol was commercially unfit because it was unreasonably dangerous" fails under Alabama law).  Additionally, because Ms. Mordecai "never saw any warranty language that guaranteed that Trasylol would work," Mordecai Dep. (Ex. E) at 168:20-23, and has never relied on any representations from Bayer, *id.*

---

[5]  It is not.  Alabama Supreme Court has "adopt[ed] comment k to Section 402A of the Restatement (Second) of Torts, (1965)" which provides "that an unavoidably unsafe product, when properly prepared and accompanied by proper directions and warnings, is not 'defective' or 'unreasonably dangerous' under [AEMLD]."  *Purvis v. PPG Indus., Inc.,* 502 So. 2d 714, 718 (Ala. 1987).  Stated simply, under Alabama law, whether a prescription drug is unreasonably dangerous is assessed based on the drug's warnings alone, and for the reasons shown above, plaintiff's warnings claims fail.  *Supra* § II.

at 169:22-170:9; *see also id.* at 168:12-170:14 (no representations to the decedent), her express warranty claim fails just as in *Summerlin*.  *See* D.E. 4252 in 1:08-md-1928 at 18-19.

## CONCLUSION

For these reasons, Dr. Quigg should be precluded from offering expert testimony regarding specific causation, *see* Fed. R. Evid. 702, and summary judgment should be entered for Bayer.  Fed. R. Civ. P. 56.

## RULE 7.1(A)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(A)(3)(a), counsel for defendants hereby certifies that counsel for the defendants has made reasonable efforts to confer in good faith with counsel for all parties who may be affected by the relief sought in the motion, and has been advised that plaintiff will contest this motion.

March 19, 2010                                    Respectfully submitted,

                                                 */s/ Barbara Bolton Litten*
                                                 Patricia E. Lowry
                                                 Florida Bar No. 332569
                                                 E-mail:  plowry@ssd.com
                                                 Barbara Bolton Litten
                                                 Florida Bar No. 91642
                                                 E-mail:  blitten@ssd.com
                                                 SQUIRE, SANDERS & DEMPSEY L.L.P.
                                                 1900 Phillips Point West
                                                 777 South Flagler Drive
                                                 West Palm Beach, FL  33401-6198
                                                 Telephone:  561-650-7200
                                                 Facsimile:  561-655-1509

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR**
    **& SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL  60603
Telephone:  312-494-4400
Facsimile:  312-494-4440

Eugene A. Schoon
Email:  eschoon@sidley.com
Susan A. Weber
Email:  saweber@sidley.com
Eamon P. Joyce
Email:  ejoyce@sidley.com
Colin Garry
Email:  cgarry@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  312-853-7000
Facsimile:  312-853-73036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:  313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:  412-566-6099

*Attorneys for Bayer Corporation, Bayer HealthCare
Pharmaceuticals Inc., Bayer HealthCare LLC and
Bayer Schering Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2010, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission of Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronically Notices of Electronic Filing.


*/s/ Barbara Bolton Litten*
Barbara Bolton Litten

**SERVICE LIST**

**In re Trasylol Products Liability Litigation – MDL-1928**
**Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON**
**Case No. 9:08-cv-80781 *Mordecai v. Bayer Corp.***

**United States District Court**
**Southern District of Florida**

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN**
   **& SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-790-4584
Facsimile: 215-875-7701
***Co-Lead Counsel for Plaintiffs***

Scott A. Love
Email: slove@triallawfirm.
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: 713-757-1400
Facsimile: 713-759-1217
***Co-Lead Counsel for Plaintiffs***

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE**
   **& LECLAINCHE, P.A.**
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile: 561-684-6308
***Liaison Counsel for Plaintiffs***

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone: 203-610-6393
Facsimile: 203-610-6399
***Federal-State Liaison for Plaintiffs***

Leslie A. Caldwell
Email: lac@lusklaw.com
**LUSK CALDWELL & DEAN PC**
2101 Highland Ave., Suite 410
Birmingham, AL 35205
Telephone: 205-933-7090
Facsimile: 205-933-7099
***Counsel for Plaintiff Mordecai***

P. Gregory Haddad
Email: ghaddad@baileyglasser.com
Kerrie Wagoner Boyle
Email: kboyle@baileyglasser.com
Jonathan D. Boggs
Email: jboggs@baileyglasser.com
**BAILEY & GLASSER LLP**
209 Capitol Street
Charleston, WV 25301
Telephone: 304-345-6555
Facsimile: 304-342-1110
***Counsel for Plaintiff Mordecai***

David F. Miceli
Email:  dmiceli@simmonsfirm.com
**SIMMONS BROWDER GIANARIS ANGELIDES &**
    **BARNERD LLC**
119 Maple St., Suite 201
Carrollton, GA  30117
Telephone:  770-834-2122
Facsimile:   770-214-2622
***Counsel for Plaintiff Mordecai***

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:  561-650-7200
Facsimile:   561-655-1509
***Liaison Counsel for Defendants***