UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION - MDL-1928

This Document Relates To: All Actions

_____/



## ORDER ON BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT LUCA A. VRICELLA

THIS CAUSE comes before the Court upon Defendants' (hereinafter, collectively, "Bayer's") Motion to Exclude Testimony of Plaintiffs' Expert Luca A. Vricella[1] ("Motion") (DE 3075), filed on December 18, 2009. Plaintiffs filed a Response (DE 3828), to which Bayer replied (DE 4106). The Court has reviewed the pertinent parts of the record and is advised in the premises. For the reasons stated below, Bayer's Motion shall be granted in part and denied in part.

---

[1] Dr. Luca A. Vricella is a medical doctor who completed his residency training in Cardiothoracic Surgery and Thoracic Transplantation. He has been on Faculty at the Johns Hopkins University since 2003, caring for adults and children with cardiac disease requiring surgical intervention. He is currently Associate Professor of Surgery, Attending Adult and Pediatric Cardiac Surgeon and Director of the Johns Hopkins Pediatric Cardiac Surgical and Heart Transplantation Service, as well as co-Director of the Johns Hopkins Adult Congenital Heart Disease Unit. Dr. Vricella has published 52 peer-reviewed scientific articles. (Vricella Report at 1-2.)

I.    **Legal Standard**

The admissibility of expert testimony is governed by the framework set out in Federal

Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The party

seeking to have the expert testimony admitted bears the burden of demonstrating its admissibility

by a preponderance of proof. *Davidson v. U.S. Dep't of Health & Human Servs.*, 2007 WL

3251921, at *2 (E.D. Ky. Nov. 2, 2007) (internal citations omitted). *See also United States v.*

*Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification,

reliability, and helpfulness rests on the proponent of the expert opinion.").

According to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2)
> the testimony is the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. According to the Supreme Court, the inquiry envisioned by Rule 702 is a

flexible one, in which federal judges perform a "gatekeeping role" to ensure that speculative and

unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("Its [Rule 702's]

overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of

the principles that underlie a proposed submission. The focus, of course, must be solely on

principles and methodology, not on the conclusions that they generate.").

In *Daubert*, the Supreme Court listed several factors federal judges may consider in

determining whether to admit expert scientific testimony under Rule 702: whether an expert's

theory or technique can be and has been tested; whether the theory or technique has been

2

subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally accepted in the scientific community.[2] 509 U.S. at 593-94 (declining to set forth a "definitive checklist or test").

The Supreme Court subsequently held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150 (internal citations and quotations omitted). Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . [A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. The trial court has the same kind of latitude in deciding how to test an expert's reliability as it enjoys when it decides whether or not that expert's relevant testimony is reliable. *Id.*

The Eleventh Circuit engages in a three part inquiry to determine the admissibility of expert testimony under Rule 702, considering whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[2] In *Daubert*, the Supreme Court considered the federal judge's gatekeeping role in ensuring that all *scientific* expert testimony is not only relevant, but reliable. The Supreme Court later held that this basic gatekeeping obligation and *Daubert*'s general principles apply to *all* expert testimony, not just testimony that is classified as scientific. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999).

3

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (internal citations omitted). The Eleventh Circuit has noted that "the primary purpose of any *Daubert* inquiry is for the district court to determine whether that expert, 'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho*, 526 U.S. at 152).

## II.    Background & Analysis

Bayer moves to exclude Dr. Vricella's expert testimony with regard to the following proffered opinions that Bayer claims are not based on scientific methodology: (1) Trasylol[3] is unsafe for use in clinical practice; (2) there are safer alternatives to Trasylol; (3) Bayer should have included additional warnings in Trasylol's label; (4) Bayer withheld information from the FDA and medical community; and (5) Bayer should have conducted studies on Trasylol earlier than it did. Bayer's arguments in support of exclusion and Plaintiffs' arguments against exclusion are organized into these five categories below, as well as the Court's decision as to each opinion.

### A.    Trasylol is Unsafe for Use in Clinical Practice

Dr. Vricella does not claim to be a general causation expert in this Case but is instead testifying based on his clinical experience. Accordingly, Dr. Vricella opines that

---

[3] Trasylol is also known as aprotinin. The Court will use these terms interchangeably.

> The safety risks posed by the administration of aprotinin, including increased risks for renal failure requiring dialysis, myocardial infarction, and death, render aprotinin unsafe for use in clinical practice. In light of the evidence disclosed by the peer-reviewed literature, as well as data that was available but not disclosed until recently, I believe that no reasonably prudent physician would use aprotinin for patients undergoing cardiac surgical procedures.

(Vricella Report at 16.) Bayer claims that Dr. Vricella's safety opinion should be excluded under

*Daubert* and Rule 702 because it is (1) contrary to his own clinical experience with Trasylol

although Dr. Vricella claims to be testifying as a clinician and not as a general causation expert,

(2) based on a haphazard review of cherry-picked data, (3) not based on critical review,[4] (4) not

based on the consideration of the impact of confounders,[5] (5) based on preliminary data,[6] (6) not

based on the consideration of the background rate,[7] and (7) invades the province of the FDA in

---

[4] Bayer cites to Dr. Vricella's assumption that if an article was published in a peer-review journal, its findings must be reliable. (DE 3075 at 9. (citing Vricella Dep. at 153:14-25, 348:18-25.))

[5] Bayer claims that while an expert relying on observational studies must show that he evaluated confounders before drawing conclusions from the study results, Dr. Vricella did not consider whether the Trasylol studies upon which he relied were confounded. (DE 3075 at 9. (citing Vricella Dep. at 345:11-349:5.))

[6] Bayer refers to the i3 study and the BART study. Accordingly, Dr. Vricella cites a draft i3 study report but fails to cite the final results that were later published in the *New England Journal of Medicine*; he did not compare the preliminary and published results to assess whether the results were different after peer review and statistical analysis. (DE 3075 at 10. (citing Vricella Dep. at 359:10-363:22, 365:7-15.)) While Dr. Vricella knew that Health Canada had commissioned an expert advisory panel to review the BART results, he did not recall the panel's conclusions and did not know whether it reviewed additional data beyond that reported initially. (DE 3075 at 10. (citing Vricella Dep. at 385:11-24.))

[7] Bayer cites to Dr. Vricella's admission that he does not know the background rate of renal failure, stroke, myocardial infarction, thromboses, or mortality for adult patients undergoing CABG surgery. (DE 3075 at 11. (citing Vricella Dep. at 235:21-236:4, 260:13-17, 263:10-22, 265:22-266:8, 321:22-322:6, 427:16-428:15.)) "Without a baseline against which to compare adverse events purported to be associated with aprotinin, Dr. Vricella cannot render an accurate

evaluating the safety profile of pharmaceutical products.

In regards to the claim that Dr. Vricella's experience as a cardiac surgeon does not support his opinion that Trasylol is not safe, Bayer refers to Dr. Vricella's concession that he had no evidence from his clinical practice that the administration of Trasylol was associated with an increased risk of renal failure or dysfunction, heart attack, graft thrombosis, or mortality. (DE 3075 at 4-6.) "Thus, Dr. Vricella plainly is not offering an opinion based on his own clinical experience. Where, as here, an expert offers an opinion that conflicts with his clinical experience, that conflict indicates the unreliability of his opinion and its litigation-driven nature." (DE 3075 at 6.)

Rather than relying on his clinical experience, Bayer claims that Dr. Vricella arrived at his opinion by reading just a fraction of the available medical literature that he selected without using an orderly scientific methodology.[8] (DE 3075 at 6.) As a result of this haphazard review, Bayer claims that Dr. Vricella did not consider the totality of the evidence necessary to offer a reliable opinion. (DE 3075 at 8.) Further, because Dr. Vricella did not determine which studies are clinically important, he cannot explain why he relied on some rather than others; Bayer claims that such an explanation is required for admission under *Daubert*. (DE 3075 at 8.)

Plaintiffs respond that Bayer's arguments consist of a logical paradox: Bayer does not

opinion on safety." (DE 3075 at 11.)

[8] Bayer cites to Dr. Vricella's testimony that "I started from [year] 2000, and went onward, and pulled a few articles along the way. As I was reading and found that, you know, something was pertinent or important, I added to it. So – and I looked at, you know, big journals, basically, and – that's really it. I do this pretty much like I do for any clinical scenario. If I have to change something or do something new on a patient or administer a new drug, I'm going to look at what it is." (DE 3075 at 7. (citing Vricella Dep. at 91:15-92:4.))

dispute that Dr. Vricella is qualified to explain CABG surgery to a jury but argues that Dr. Vricella may not opine on the safety of drugs commonly used during this procedure. (DE 3828 at 7.) Plaintiffs state that Dr. Vricella is not offered to testify on medical causation, but will opine as to whether he would use aprotinin on his patients knowing what he knows today. (DE 3828 at 9. (citing Vricella Dep. at 46:24-47:3.)) Plaintiffs argue that Dr. Vricella is uniquely qualified to discuss the risk-benefit analysis of aprotinin as compared to alternative antifibrinolytics because he is the individual responsible for making the decision as to which medications are administered during surgery. (DE 3828 at 9.)

Additionally, Plaintiffs argue that Dr. Vricella's methodology is reliable: he employs the same methodology in this Case as he does in his clinical practice, his safety opinions are not contradicted by his clinical experience, and he did not solely rely on preliminary data. (DE 3828 at 12.)

Plaintiffs cite to Dr. Vricella's deposition, in which he stated that he based his opinion on information contained in peer-reviewed authoritative journals, the FDA stand on this issue, Bayer's internal documents, and clinical practice. (DE 3828 at 13. (citing Vricella Dep. at 464:10-23, 465:17-466:10.)) Dr. Vricella reviewed the literature to take into account aprotinin's role in blood loss reduction, renal concerns, death, myocardial infarction or ischemia, and cerebral vascular accidents such as stroke or neurological outcomes. (DE 3828 at 14. (citing Vricella Dep. at 450-54.))

Plaintiffs assert that Dr. Vricella did not develop his opinions on the safety of aprotinin for purposes of litigation: as new information emerged regarding the risks of aprotinin, he used

7

it less and less, ultimately stopping its administration in 2007. (DE 3828 at 14. (citing Vricella Dep. at 276:13-277:11, 291:25-293:2.)) While Dr. Vricella could not state with certainty whether he saw an increase in renal and cardiac injuries among patients who were administered Trasylol in his practice, this testimony is not evidence that his clinical experience contradicts his expert opinion. (DE 3828 at 15.)

Plaintiffs respond to Bayer's argument that Dr. Vricella relied on preliminary data in forming his safety opinion by pointing out that the only examples cited by Bayer are the i3 study and the BART study. In regards to the i3 study, Plaintiffs refer to the references section of Dr. Vricella's Report, which cites the final results of the i3 study as published in the *New England Journal of Medicine*. In regards to the BART study, Plaintiffs argue that it can not be considered preliminary data as it was published in the *New England Journal of Medicine*.

In its Reply, Bayer argues that Plaintiffs cannot establish the reliability of Dr. Vricella's testimony concerning the safety of Trasylol: the fact that Dr. Vricella is a clinician does not establish the reliability of his opinions because "unanalyzed clinical experience can too easily result in opinions based on personal considerations rather than scientific knowledge."[9] (DE 4106 at 3.)

Further, Bayer points out that Dr. Vricella's opinion regarding the risk-benefit profile of Trasylol is without regard to any individual patient but is instead a global risk-benefit calculation about a drug for an entire patient population. "Dr. Vricella does not arrive at global risk-benefit

---

[9] Bayer notes that the reliability of Dr. Vricella's opinions is particularly difficult to establish because he never tracked data from his clinical practice and never evaluated the results. (DE 4106 at 3-4.)

determinations as part of his clinical practice. He treats patients one-by-one." (DE 4106 at 5. (citing Vricella Dep. at 90:20-25.))

The Court finds that Dr. Vricella's opinion that Trasylol is unsafe for use in clinical practice is admissible under Rule 702 and *Daubert*. Bayer's arguments in favor of exclusion are either misdirected or directed at the weight of Dr. Vricella's opinion rather than its admissibility: vigorous cross-examination and the presentation of contrary evidence will be the appropriate means of attacking it. *See Quiet Tech.*, 326 F.3d at 1341.

For example, Bayer argues that Dr. Vricella's opinion is unreliable and litigation-driven because it "conflicts" with his clinical experience: Dr. Vricella conceded that he had no evidence from his clinical practice that the administration of Trasylol was associated with an increased risk of various adverse events. Bayer's argument is misguided. Dr. Vricella is testifying as a clinician rather than as a causation expert; as a clinician, he evaluates the medical literature regarding the medication at issue to make a risk-benefit assessment for his patients. While he did not have evidence from his clinical practice that Trasylol was unsafe, he tailored its indications to a certain group of patients in 2006 when the Mangano and Karkouti articles were published. After an additional article came out in 2007, Dr. Vricella stopped administering Trasylol entirely and switched to Amicar to control perioperative bleeding in his patients.[10] Dr. Vricella stopped administering Trasylol based on his analysis of peer-reviewed medical studies, not on his unanalyzed clinical experience with Trasylol. *See Siharath v. Sandoz Pharms. Corp.*, 131 F.

---

[10] Bayer argues that Dr. Vricella's opinion involves a global risk-benefit determination, while he treats patients one-by-one as part of his clinical practice. However, Dr. Vricella does make some global risk-benefit determinations as part of his clinical practice: he stopped using Trasylol *entirely* in 2007 and switched to Amicar.

Supp. 2d 1347, 1372 (N.D. Ga. 2001) ("Doctors in their day-to-day practices stumble upon coincidental occurrences and random events and often follow human nature, which is to confuse association and causation. . . . Dr. Kulig obviously is an exceptionally qualified practitioner . . . his clinical impression is not the sort of scientific methodology that *Daubert* demands."). Therefore, Dr. Vricella's opinion does not conflict with his clinical experience. Additionally, his actions, with respect to Trasylol as a clinician, indicate that his opinion regarding the safety of Trasylol is not litigation-driven.

Further, Dr. Vricella's opinion is based on a reliable scientific methodology. Dr. Vricella employs the same methodology in this Case as he does in his clinical practice. Bayer has not argued that Dr. Vricella's methodology is improper in the context of clinical practice or that Dr. Vricella is unqualified in this regard. While Dr. Vricella has not read all of the 7,000 articles that mentioned the word "Trasylol" or "aprotinin," the Court finds that his opinion is based upon sufficient data. While Bayer argues that Dr. Vricella did not consider the totality of the evidence in making his safety opinion, the Court finds Dr. Vricella did not have to consider *all* the available evidence regarding Trasylol to have sufficient data to support his safety opinion. Bayer does not argue that Dr. Vricella ignored studies with drastically different results from the ones used to support his opinion or that a critical study was omitted from Dr. Vricella's analysis. The Court finds Dr. Vricella's methodology to be reliable: Bayer may attack it through vigorous cross-examination.

As with Bayer's remaining arguments regarding Dr. Vricella's flawed methodology,[11] the

---

[11] The Court refers to Bayer's arguments that Dr. Vricella's opinion is: not based on the consideration of the impact of confounders, based on preliminary data, and not based on the

claim that Dr. Vricella's opinion is not based on a critical review of the literature is directed at the opinion's weight rather than its admissibility.  In arriving at a safety opinion as a clinician rather than a statistician or epidemiologist, Dr. Vricella relied on the peer-review process, which is what he does for any clinical scenario.  The Court finds that, in this context, such reliance constitutes reliable methodology.  *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1313 (11th Cir. 1999) ("Peer review is significant under *Daubert* because scrutiny of the scientific community is a component of good science, in part because it increases the likelihood that substantive flaws in methodology will be detected.") (internal quotations and citations omitted).

Finally, the Court finds no merit in Bayer's claim that Dr. Vricella's opinion invades the province of the FDA in evaluating the safety profile of pharmaceutical products.  While regulators evaluate the safety profile of pharmaceutical products and decide whether such products should be marketed, clinicians evaluate the safety profile of pharmaceutical products and decide whether such products should be administered to certain patients.  As a clinician, Dr. Vricella is qualified to opine whether Trasylol is safe for use in cardiac surgical procedures.

In accordance with the foregoing analysis, the Court finds that Dr. Vricella's opinion that Trasylol is unsafe for use in clinical practice is admissible under Rule 702 and *Daubert*.

## B.      There are Safer Alternatives to Trasylol

Dr. Vricella opines that

There are less expensive and safer alternatives to aprotinin that could have been used (and currently are), including epsilon-aminocaproic acid [Amicar] and tranexamic acid. Moreover, since replacing aprotinin with epsilon-aminocaproic acid in my practice, I

---

consideration of the background rate.

11

have personally noticed no difference in the effectiveness of epsilon-aminocaproic acid as compared to aprotinin in reducing peri-operative bleeding and need for blood product administration.  However, even if marginal decreases in blood loss and transfusions were demonstrated, the risks associated with the use of aprotinin would still outweigh any potential short-term benefit, were there any.

(Vricella Report at 16.)

According to Bayer, this opinion is nothing more that Dr. Vricella's *ipse dixit* since he did not research the risks and benefits of the comparator drugs separately but instead went back to the articles on aprotinin that he selected for his safety opinion.[12] (DE 3075 at 12. (citing Vricella Dep. at 322:7-15, 323:8-16, 326:16-19, 330:11-19, 338:4-21.)) Bayer argues that Dr. Vricella cannot salvage his opinion by discussing his personal experiences: while he has used Amicar, his "anecdotal experience with that drug is insufficient to support the weight of this opinion."[13] (DE 3075 at 13.)

Plaintiffs respond that Dr. Vricella's failure to research the lysine analogues individually or review randomized controlled trials comparing the lysine analogues to placebos does not render his opinion inadmissible: he considered and reviewed literature dealing with those two drugs as they compared to aprotinin in head-to-head trials. (DE 3828 at 17. (citing Vricella Report at 11.))

As with Dr. Vricella's safety opinion, the Court finds that the opinion that there are safer

---

[12] Bayer also cites to the fact that Dr. Vricella did not review any randomized, placebo-controlled studies of Amicar or tranexamic acid in adult patients undergoing CABG procedures. (DE 3075 at 12. (citing Vricella Dep. at 335:6-336:6.))

[13] Bayer also mentions that Dr. Vricella has done nothing to critically analyze and evaluate his personal experiences: he did not analyze whether there was a statistically significant difference in blood loss between aprotinin and Amicar. (DE 3075 at 13.)

alternatives to Trasylol is admissible under Rule 702 and *Daubert*. Bayer's arguments in favor of exclusion are either misdirected or directed at the weight of Dr. Vricella's opinion rather than its admissibility: vigorous cross-examination and the presentation of contrary evidence will be the appropriate means of attacking it. *See Quiet Tech.*, 326 F.3d at 1341.

While Dr. Vricella may not have researched epsilon-aminocaproic acid [Amicar] and tranexamic acid separately or reviewed randomized controlled trials comparing them to a placebo, he does not attempt to opine on the risk-benefit comparison between the lysine analogues and placebo, but rather on the risk-benefit comparison between the lysine analogues and aprotinin. As such, his opinion is based on sufficient data and a reliable scientific methodology.[14]

While Dr. Vricella's opinion need not be salvaged by reference to his personal experiences with Amicar in his practice, this testimony is also admissible. While the Court does not conclude that Dr. Vricella's clinical impressions alone may have constituted a sufficient basis for the opinion that there are safer alternatives to Trasylol, those clinical impressions are admissible in the context in which they are presented. Dr. Vricella relies on the peer-reviewed medical literature in arriving at his opinion and testifies as to his personal experience, as a clinician, with Amicar.[15] The Court finds this testimony to be admissible: Bayer may cross-examine Dr. Vricella

---

[14] Dr. Vricella's opinion regarding alternatives to Trasylol is based on the same 41 articles on aprotinin that he selected to support his safety opinion. As the Court found that Dr. Vricella's safety opinion was based on sufficient data and a reliable methodology, it finds that Dr. Vricella's opinion regarding alternatives to Trasylol is also based on sufficient data and a reliable methodology.

[15] According to the Report, "Several comparative studies have investigated the relative risks and benefits of aprotinin, tranexamic acid and epsilon-aminocaproic acid, and some of the most relevant are reported in section V of this report. Overall, my review of the literature reveals controversial results regarding the comparative efficacy of all three agents in reducing blood loss.

as to the limits of his personal and unanalyzed clinical experience.

### C.   Bayer Should Have Included Additional Warnings in Trasylol's Label

When asked whether Bayer did something wrong by not putting the risk of an increase in serum creatinine in the warning section of Trasylol's label, Dr. Vricella stated "[Y]es, they should have put it in the warning section.  I don't know if they violated any rule, but I would have put it in the warning."[16]  (Vricella Dep. at 396:10-17.)

Bayer argues that this opinion should be excluded because Dr. Vricella conceded that he is not an expert in label preparation and has no expertise in crafting or evaluating drug labels. (DE 3075 at 14.)

While conceding that Dr. Vricella is not an expert on labeling, Plaintiffs state that he "will testify that had the label included warnings regarding renal dysfunction . . . and cardiac adverse events, it would have altered his risk/benefit analysis and changed his prescribing practices with

---

Even though all three agents are superior to placebo, in several studies lysine analogues are found to be moderately inferior to aprotinin in limiting blood loss, although in several others they are at least equivalent. . . . What emerged on the contrary is the much higher comparative incidence of renal dysfunction (especially for high dosing) and even death in association with the use of aprotinin. . . . As surgeons we can anecdotally observe particular beneficial or detrimental effects of a drug on patients treated in our clinical practice; it may appear to us that a drug has benefits or lacks any, but in patients who have numerous comorbidities and without the benefit of large studies, it is hard for the individual surgeon to determine the existence of infrequent, severe adverse effects.  It is only with large randomized controlled trials and large observational studies published in authoritative, peer-reviewed journals that the individual prescribing physician (in this case, cardiothoracic surgeons and cardiac anesthesiologists) can make judgments on when and if a drug should be used."  (Vricella Report at 11, 15.)

[16] Dr. Vricella's deposition contains similar opinions with respect to the increased risks of renal dysfunction, myocardial infarction, and mortality.

14

respect to aprotinin." (DE 3828 at 18. (citing Vricella Dep. at 175:11-13, 396:23-397:7, 409:11-20, 415-416.)) According to Plaintiffs, such an opinion is within the scope of his expertise and qualifications and is reinforced by the FDA. (DE 3828 at 18.)

In its Reply, Bayer states that this kind of testimony should be excluded because it is speculative and not based on scientific knowledge. (DE 4106 at 11.)

As it is undisputed that Dr. Vricella is not an expert on labeling, his opinion that Bayer should have included various additional warnings in Trasylol's label is inadmissible under Rule 702 and *Daubert*. It appears that Plaintiffs attempt to get around the qualification issue by framing Dr. Vricella's testimony in terms of how additional warnings on Trasylol's label would have altered his risk-benefit analysis and thus affected his prescribing practices. Dr. Vricella's Report contains no such opinions; Plaintiffs instead refer to Dr. Vricella's deposition testimony, where he makes general statements such as "[T]here was no labeling change on September 21st. I would have probably stopped administering to my patients."[17] (Vricella Dep. at 175:11-13.)

The Plaintiffs propose that a very broad opinion be admitted based on several vague statements made by Dr. Vricella in his deposition. Dr. Vricella did not describe the exact labeling change that would have led him to stop administering Trasylol to his patients, which particular statement about serum creatinine increases would have led him to stop using the drug in patients

---

[17] Dr. Vricella also stated that the risk of a rise in serum creatinine should have been included in the warning section of the label because "[I]t's an adverse – adverse event to the patient, and so I would have put it in the warning section. So that if I have somebody who's got already an elevated serum creatinine, I would not use the drug." (Vricella Dep. at 396:23-397:7.) Finally, Dr. Vricella testified that "I as a clinician would have liked to see at least acknowledged in the label the fact that there's some large observational studies that show that there was an increase for all these events for my patients." (Vricella Dep. at 415:20-25.)

who already had elevated levels of serum creatinine, and whether and when the label would have provided him with information beyond what he already knew from the peer-reviewed medical literature and incorporated in his risk-benefit analysis.[18] The Court finds that, as presented here, Plaintiffs have not met their burden under Rule 702 and *Daubert*: Dr. Vricella's proffered labeling opinions must be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

### D. Bayer Withheld Information from the FDA and Medical Community

Dr. Vricella opines that

Cardiothoracic surgeons rely upon drug manufacturers to be forthcoming about both risks and benefits of their products. Cardiothoracic surgeons relied upon Bayer to provide adequate guidance regarding the use of aprotinin, as well as to carry out appropriate and rigorous investigations to document beneficial effects and lack of serious adverse effects. Despite Bayer's frequent claims to the public in general and cardiothoracic surgeons in particular that its 'highest priority and concern is patient safety,' it is my opinion that Bayer failed to share with the medical community some of the early concerns regarding the safety of aprotinin, never pursuing an appropriately powered randomized clinical trial.

(Vricella Report at 16-17.) Bayer argues that Dr. Vricella should not be permitted to opine that Bayer withheld information from the FDA because he admits that he has no expertise in FDA regulations; such testimony is only relevant to a fraud-on-the-FDA theory, which Plaintiffs cannot

---

[18] The Court notes that Dr. Vricella did not indicate how often he read the Trasylol label.

pursue. (DE 3075 at 15.) Bayer further states that Dr. Vricella's testimony is based on his personal opinions regarding what is ethical or moral; he is not aware of any regulation that Bayer violated.[19] (DE 3075 at 16.)

Plaintiffs respond that Dr. Vricella's Report does not characterize Bayer's behavior as ethical or unethical; the only reference to ethics occurred in the context of his deposition. (DE 3828 at 19.) While Plaintiffs concede that Dr. Vricella is not an FDA expert and thus will not offer opinions on when information should have been disclosed to the FDA, he is qualified to testify about the impact that information would have had on his risk-benefit analysis as a clinician. (DE 3828 at 19. (citing 469:2-25.))

In its Reply, Bayer states that this kind of testimony should be excluded because it is speculative and not based on scientific knowledge. (DE 4106 at 11.)

As it is undisputed that Dr. Vricella is not an expert on FDA regulations, his opinion that Bayer withheld information from the FDA is inadmissible under Rule 702 and *Daubert*. It appears that Plaintiffs again attempt to get around the qualification issue by framing Dr. Vricella's testimony in terms of the impact that FDA disclosures would have had on his risk-benefit analysis as a clinician. This testimony is also inadmissible under Rule 702 and *Daubert*: Plaintiffs have not provided the Court with any reason to assume that a disclosure to the FDA would be available to and considered by Dr. Vricella. Therefore, such testimony is purely speculative.

Dr. Vricella's opinion that Bayer withheld concerns regarding the safety of Trasylol from

---

[19] Bayer cites to Dr. Vricella's testimony that he used his moral and ethical standard as a physician to reach the conclusion that Bayer should have shared the St. George and Kress studies with the medical community. (DE 3075 at 16. (citing Vricella Dep. at 441:11-16.))

the medical community is also inadmissible under Rule 702 and *Daubert*. In proffering this opinion, Dr. Vricella is not using his specialized knowledge or expertise as a clinician to assist the trier of fact to understand the evidence or determine a fact in issue. He is instead relying on Bayer's internal documents to conclude what information was withheld from the medical community and his ethical standard as a physician to conclude whether and when that information should have been provided to the medical community. (Vricella Report at 12-15.) While Dr. Vricella may be qualified to opine as to the ethical standards applicable to physicians, Plaintiffs have not argued that these same standards are applicable to pharmaceutical manufacturers such as Bayer. The Court finds that this testimony consists of nothing more than legal advocacy presented under the guise of an expert opinion.

Further, the Court finds that Dr. Vricella's opinion regarding the impact that withheld safety information, if disclosed to the medical community, would have had on his risk-benefit analysis as a clinician, must be excluded as it is presented here. Plaintiffs argue that such a broad opinion should be admitted but do not point to any specific statement made in Dr. Vricella's Report or deposition regarding whether and how any particular withheld study or safety information, if disclosed, would have affected his risk-benefit determination. As presented here, this proffered testimony is purely speculative. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

18

**E.     Bayer Should Have Conducted Studies on Trasylol Earlier Than It Did**

When asked which studies Bayer should have conducted earlier than it did, Dr. Vricella testified, "[T]he ideal study would have been a prospective randomized – a placebo controlled study largely powered. But I think in the real world . . . observational studies that are adjusted with propensity score analysis, you know, and cohort matching, are almost just as good. They reflect the real world." (DE 3075 at 17. (citing Vricella Dep. at 371:1-15.))

Bayer argues that this opinion is inadmissible because Dr. Vricella is unqualified to offer it: he has never designed a randomized clinical study and conceded that he does not even know how to power such a study. (DE 3075 at 18.) Instead, Dr. Vricella bases his opinion on Bayer's moral obligation. (DE 3075 at 18. (citing Vricella Dep. at 377:3-17.)) According to Bayer, "even if he were qualified to opine that Bayer should have conducted additional studies (and he is not), Dr. Vricella's opinion is nothing more than legal advocacy under the guise of professional expertise." (DE 3075 at 19.)

Plaintiffs respond that Dr. Vricella will not opine on the design of studies. (DE 3828 at 20.) "Dr. Vricella may testify about the role studies demonstrating increased risks of adverse events, had they been completed earlier in time, would have had on his prescribing practice and risk/benefit analysis." (DE 3828 at 20.)

In its Reply, Bayer states that this kind of testimony should be excluded because it is speculative and not based on scientific knowledge. (DE 4106 at 11.)

As it is undisputed that Dr. Vricella is not an expert on designing studies or on the duties imposed on pharmaceutical manufacturers to perform such studies, his opinion that Bayer should

19

have conducted studies earlier than it did is inadmissible under Rule 702 and *Daubert*. As with the previous two opinions, Plaintiffs attempt to get around the qualification issue by framing Dr. Vricella's opinion in terms of how hypothetical studies, had they been completed, would have affected his risk-benefit analysis and prescribing practices. Plaintiffs argue that such a broad opinion should be admitted but do not point to any statement in the Report or deposition that may provide the basis for this opinion. As presented here, this testimony is purely speculative and must be excluded under Rule 702 and *Daubert*. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

## III.   Conclusion

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Luca A. Vricella (DE 3075) is **GRANTED IN PART and DENIED IN PART.** More specifically,

- The Motion is **DENIED** as to Dr. Vricella's opinion that Trasylol is unsafe for use in clinical practice.
- The Motion is **DENIED** as to Dr. Vricella's opinion that there are safer alternatives to Trasylol.
- The Motion is **GRANTED** as to Dr. Vricella's opinion that Bayer should have included additional warnings in Trasylol's label.

- The Motion is **GRANTED** as to Dr. Vricella's opinion that Bayer withheld information from the FDA and medical community.
- The Motion is **GRANTED** as to Dr. Vricella's opinion that Bayer should have conducted studies on Trasylol earlier than it did.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 29th day of March, 2010.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:     Counsel of Record