UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates To:

MORDECAI V. BAYER CORPORATION, ET AL.,
Case No. 9:08-cv-80781

PLAINTIFF'S RESPONSE IN OPPOSITION TO BAYER'S MOTION
FOR SUMMARY JUDGMENT AND TO EXCLUDE
EXPERT TESTIMONY OF DR. QUIGG
AND MEMORANDUM OF LAW IN SUPPORT

PLEASE TAKE NOTICE that Plaintiff, Linda Mordecai ("Plaintiff") submits the following Opposition to Bayer's Motion for Summary Judgment and to Exclude Expert Testimony of Dr. Quigg. When the totality of the evidence is viewed in the light most favorable to the Plaintiff, the record will establish that there are genuine questions of facts for the jury and summary judgment should be denied, as a matter of law.

As a preliminary objection, despite its certification to the contrary, Bayer did not contact counsel for the Plaintiff to confer about the motion prior to filing as required under the local rule. Notwithstanding the preliminary objection, the Plaintiff responds to Defendant's Motion.[1]

I.    PRELIMINARY STATEMENT

By way of Amended Complaint dated July 3, 2008[2], Linda Mordecai, as Administratix of the Estate of Michael Mordecai, deceased, brought this action against Defendant Bayer Corporation, a corporation formed in the State of Indiana with its principal place of business

---

[1] While Plaintiff would obviously not concede that Dr. Quigg should be stricken or summary judgment granted, conferring may have limited the issues the Court would need to address.
[2] Plaintiff's original complaint was filed on May 14, 2008 in the U.S. District Court for the Northern District of Alabama and was subsequently transferred to the U.S. District Court for the Southern District of Florida.

located at 100 Bayer Road, Pittsburgh, Pennsylvania 15205; Defendant Bayer Healthcare, LLC, a Delaware limited liability company, registered to do business and doing business in Alabama; Defendant Bayer Healthcare A.G., a German corporation with its principal place of business in Leverkusen, Germany; and Defendant Bayer Healthcare Pharmaceuticals, Inc., a successor in interest of Bayer Pharmaceuticals Corporation, a Delaware corporation, registered to do business and doing business in Alabama.  Plaintiff will refer to the Defendants collectively as "Bayer" or "Defendants."

Bayer manufactured, promoted, marketed, distributed and sold a drug called Trasylol, also known as Aprotinin, in the United States beginning in 1993.  Trasylol has been associated with a significant increased risk of renal failure, and Bayer engaged in deliberate efforts to hide clinical data and studies regarding this risk from the FDA, the medical community, and the public.  To this end, Bayer concealed study results and other clinical information illustrating the connection between Trasylol and renal failure.  Bayer, through its concealment of information and data, denied evidence of this risk, until finally revising its product label in December 2006, after Mr. Mordecai's surgery, to warn that Trasylol creates an increased risk of renal dysfunction and renal failure.  Bayer suspended worldwide marketing of Trasylol in November 2007.

Decedent Michael Mordecai was administered high dose Trasylol during his coronary artery bypass graft surgery on October 10, 2006 at Carraway Methodist Medical Center in Birmingham, Alabama.   Immediately, Mr. Mordecai began experiencing renal failure that led to other medical complications.  Mr. Mordecai died of these complications precipitated by renal failure on October 14, 2006.  His widow, Plaintiff Linda Mordecai, brought two claims of wrongful death (based on negligence/wantonness and product liability/Alabama's Extended

Manufacturer's Liability Doctrine), as well as claims for breach of warranties, fraudulent concealment and estoppel against Bayer.

On March 19, 2010, Bayer moved for summary judgment on all of Plaintiff's claims.  In their Motion, Bayer asserts that Plaintiff's claims must be dismissed because (1) she cannot establish proximate causation and (2) she cannot prove that Trasylol was the cause-in-fact of Mr. Mordecai's renal failure.  For the reasons set forth herein, both of these arguments must fail as Plaintiff has more than sufficient evidence to raise a question of material fact as to her claims. Summary judgment should therefore be denied and Plaintiff should be permitted to present each of these claims to the jury.

## II.    FACTS

### A. The Trasylol Story: Bayer's Development, Promotion, and Sale of a Drug Without Warning of its Risks

Trasylol was first launched in Germany in 1959, and was approved by the FDA and launched by Bayer in the United States in 1993 (Ex. A) Answer at ¶ 11,12. The drug is a naturally occurring proteolytic enzyme inhibitor obtained from bovine lung, and was indicated for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass surgery (Ex. A) Answer at ¶ 13.  In 2005 alone, the drug generated about $293 million in sales.  (Ex. A) Answer at ¶ 17.

Among other things, Bayer failed to perform timely post-marketing analysis (Ex. B: Parisian Rep.) of its profitable drug which would have indicated -- years before Michael Mordecai was given it -- that it posed a grave risk of renal injury and failure. Bayer never funded a randomized clinical trial with adequate power to show the negative renal effects of Trasylol, and never funded any observational studies of sufficient power and against other drugs used for

blood loss to determine which of the two drugs was safest and most effective. (Ex. C) Maurer Dep. at 105:3-11; 128:21-129:9.

As is standard in the industry, Bayer had an internal database to track adverse events relating to Trasylol use.  However, through the course of this litigation Bayer has admitted that, when it reanalyzed its own database in 2006, after Mordecai's surgery, the analysis led directly to the label change regarding the adverse renal consequences of Trasylol. (Ex. D) Horton Dep. at 1597:8-1598:4; (Ex. E) MacCarthy Dep. at 19-24.   Bayer has also admitted that the "flag" indicating Trasylol's connection to renal issues was readily available in the database as far back as 2002.  (Ex. F) Bayer's Response to First Request for Admission No. 14.   In fact, Bayer acknowledged internally that "all investigators and Bayer's own database consistently pointed to a renal safety issue" (Ex. G) BAY06124380.

Despite this knowledge, Bayer sales force never advised physicians of renal failure or dysfunction associated with Trasylol.  (Ex. H) Harville Dep. at 81-82; 116.  In fact, sales persons were provided material to discuss with physicians that Trasylol did not have adverse effects on renal function.  (Ex. H) Harville Dep. at 126-129.  Thus, despite the fact Bayer had knowledge of studies and data concerning the adverse renal effects of Trasylol, Bayer concealed important clinical data, namely Kress and St. Georges Studies, regarding safety issues with Trasylol in contravention of its obligations under the Code of Federal Regulations.  Bayer failed to produce the results of these and other studies to the FDA until November 10, 2006, after Mr. Mordecai's surgery.  (Ex. I) BHCAG01625521-1625524.  The results of both the Kress and St. George's Study were available to Bayer in 2003.  (Ex. C) Maurer Dep. at 335-340.

As the Court is aware, Bayer was requested by the FDA to meet and discuss two recent publications, namely Mangano (2006) and Karkouti (2006), which correlated the use of Trasylol

and adverse events, including but not limited to, renal failure and dysfunction and death. Disturbing is the fact that Bayer was made aware of the Mangano data by one of its consultants, Dr. Royston, in 2004, yet did nothing to warn of the increased risk of renal failure, myocardial infarction and other adverse consequences associated with Trasylol. (Ex. J) BAY04541433.

Bayer also had knowledge that another of its consultants, Dr. Linda Shere-Lesserson, was reviewing the Mangano data in 2003 which showed increased adverse events on patients receiving Trasylol. (Ex. C) Mauer Dep. pp 386-390.

Despite having information concerning the Mangano data dating as far back as 2003, Bayer put out a press release in 2006 within days of the publication of the Mangano article misrepresenting it had "only just become aware of the results of this observational study and we have not yet had an opportunity to receive and review the data from which the authors derived their conclusions." (Ex. K) Press Release. Yet, Bayer had known about the data and it had been reviewed by two of its consultants years earlier. Bayer further represented in the press release that the results "are not consistent with the more than 15 years of clinical data and experience Bayer has assessed on this drug." *Id.* Bayer failed to advise of the clinical data of the Bayer-funded Kress and St. George's Studies and continued to mislead the medical community in the months preceding Mr. Mordecai's surgery of the risks of Trasylol.

In marked contrast to the FDA's response to the Mangano study, Bayer's internal documents illustrate that the company's first objectives upon receiving preliminary reports about this important safety data about Trasylol were to "rebut" and "discredit" the report. *See* (Ex. C) Maurer Dep. at 835:3-9, 853:2-854:1. Upon official publication of the Mangano study, however, Bayer decided to conduct its own safety study of Trasylol.[3] To that end, Bayer contacted Dr.

---

[3] Bayer has admitted, through the testimony of Dr. Jennifer Maurer, who managed the publication of peer-reviewed materials for the company, that Bayer's acceptance or rejection of study proposals was contingent upon whether

Alexander Walker, a professor at Harvard's School of Public Health and a researcher at i3 Drug Safety, a company that conducts drug safety studies for the pharmaceutical industry and provides "integrated global pharmacovigilance services."  Dr. Walker's study became known as the "i3" study, and in February 2006, Bayer's upper management asked Dr. Walker to present the results of the i3 study at the FDA's planned September meeting. (Ex. L) Rozycki Dep. at 468:8-17. Indeed, upon approving the study in June 2006, Bayer instructed Dr. Walker to complete the i3 study in time for the FDA meeting.  (Ex. M) Sprenger Dep. at 97.

Despite their agreement with Dr. Walker and the ongoing i3 study, Bayer concealed any evidence of the study from the FDA during the Summer of 2006. *See* (Ex. M) Sprenger Dep. at 35:6-12.  Bayer had multiple opportunities to let the FDA know that the study was underway. To wit:

- On June 28, 2006, Bayer had a telephone conference with the FDA but did not inform the FDA of the study during that call. *See* (Ex. L) Rozycki Dep. at 541:2-5.

- On July 17, 2006, Bayer met with FDA officials in person in Silver Spring, Maryland, and again, no one informed the FDA of the i3 study. *Id.* (Ex. L) at 547:6-21, 548:19-550:3, 555:4-17.

- Finally, on August 31, Bayer had a telephone conference with the FDA to discuss plans for the Advisory Committee. *See* (Ex. L) Rozycki Dep. at 615:24-616:7. Again, Bayer did not disclose the existence of the i3 study. *Id.* (Ex. L) at 618:2-5.

Dr. Walker provided Bayer with the preliminary results of the i3 study on September 14, 2006.  The preliminary report suggested that patients who received Trasylol were at in increased

---

Bayer thought the publication would assist sales.  *See* (Ex. C) Maurer Dep. at 59:18-60:2; 60:8-16; 66:10-13. Presumably Bayer's sponsorship of the i3 study was done with these profit-driven – rather than safety-driven – intentions as well.

risk of death, kidney failure, congestive heart failure and stroke. In the face of these alarming results, Bayer continued to prepare for the imminent FDA meeting, holding a mock panel meeting on September 20, 2006.  Bayer also held a final telephone conference with the FDA on September 20th, and again failed to mention the i3 study. *See* (Ex. L) Rozycki Dep. at 710:23-712:18, 715:10-20, 716:5-10.

The FDA Advisory Committee met as planned on September 21, 2006 to discuss its findings regarding the safety of Trasylol and to determine whether the drug's warning should be changed.  <u>No one from Bayer mentioned the i3 study or the preliminary report Dr. Walker had provided to Bayer a week earlier.</u> *See* (Ex. L) Rozycki Dep. at 722:12-16. Bayer representatives have since admitted that their failure to inform the FDA of these significant, highly material findings at the meeting was a mistake. *See* (Ex. M) Sprenger Dep. at 57:8-19; 247:12-17.[4]  In the wake of the meeting where these results were concealed, Dr. Walker expressed concern about the suppression, telling Bayer employee Dr. Ernst Weidmann: "I believe that the information contained in our report has implications for public health, and as such should be communicated to the FDA.  The timing of the Advisory Committee meeting makes it urgent that the agency have access to the information promptly." *See* (Ex. N) 9/27/06 Walker Email.  After reviewing what it falsely believed to be all available safety information regarding Trasylol, the FDA advisory panel recommended to the FDA that Bayer did not need to strengthen its warnings.

Six days after the Meeting, on September 27, 2006, Bayer finally disclosed the i3 study preliminary report to the FDA. *See* (Ex. L) Rozycki Dep. at 775:15-776:10.  The FDA was

---

[4] Bayer compounded its fraudulent concealment on the FDA by subsequently lying about who knew what, and when, in regards to the meeting. For example, in a letter to the FDA after finally disclosing the results of the i3 study, Bayer stressed that "none of our expert external consultants had prior knowledge that preliminary results from the observational study had been received by Bayer before or during the Advisory Committee meeting on September 21, 2006." Bayer has since admitted that this statement was false and at least one external consultant did know of the i3 preliminary results prior to the meeting. *See* Ex. M, Sprenger Dep. at 361:16-362:14.

justifiably furious, telling Bayer it was "very concerned about the fact that Bayer had data

relevant to the discussion at the September 21 advisory committee meeting that had not been

disclosed at the meeting." *See* (Ex. L) Rozycki Dep. at 780:21-785:16.

On December 15, 2006, FDA issued an Alert to healthcare professionals advising of a

change in Trasylol's product label:

> The new labeling for Trasylol (December 2006) has a more focused indication for
> use, a new Warning about renal dysfunction, a revised Warning about
> anaphylactic reactions, and a new Contraindication.  Trasylol is now indicated
> only for prophylactic use to reduce perioperative blood loss and the need for
> blood transfusion in patients who are at *an increased risk for blood loss and blood
> transfusion* undergoing cardiopulmonary bypass in the course of coronary artery
> bypass grafting (CABG) surgery.  Trasylol should be administered only in the
> operative setting where cardiopulmonary bypass can be started quickly.  Trasylol
> should not be administered to any patient with a known or suspected exposure to
> Aprotinin within the past 12 months.
> FDA is evaluating additional recently submitted epidemiological safety study
> data…in the context of all other safety and efficacy information available on
> Aprotinin.  This review may result in other actions, including additional changes
> to the full prescribing information (product labeling).

(Ex. O) FDA Press Release.  In December 2006, after Mr. Mordecai's surgery, Bayer finally

revised the Trasylol label to include a specific statement in the WARNING section of the label

that use of Trasylol creates an increased risk of renal dysfunction and renal failure.

Bayer pulled Trasylol from the worldwide marketing in November 2007.  Unfortunately,

Trasylol's withdrawal from the market came too late for Michael Mordecai.

B.  **Michael Mordecai's Story: A Family Man Exposed to High Doses of Trasylol
     and Consequently Taken Too Soon**

Michael Mordecai was a successful mechanic all his career. (Ex. P) L. Mordecai Dep. at

38:23-24, 63:25-64:3.  He was married to his high school sweetheart, Linda, for forty years. *Id*.

(Ex. P) at 33:5-11.  The couple had two sons, Michael Junior and Scott – described by Linda

Mordecai as her husband's two "best friends" –  as well as six grandchildren. *Id*.  (Ex. P) at 18:2,

49:24-50:17, 61:14-18.   Mr. Mordecai also had two brothers, including one, Billy, who was

mentally handicapped and for whom Mr. Mordecai and his wife cared at times. *Id.* (Ex. P) at

38:19-39:6, 44:2-8.  As remembered by his wife, Michael Mordecai "never saw a stranger… to

him, everybody was his friend." *Id.* (Ex. P) at 61:11-13.  He was a youth league umpire all his

adult life, and enjoyed woodworking, golf and traveling with his wife. *Id.* (Ex. P) at 61:23-62:16;

68:23-69:16.

In October 2006, Mr. Mordecai underwent a stress test as well as cardiac catheterization

and an angiogram. (Ex. Q) Zwicke Rep. at 2.  These tests, along with Mr. Mordecai's chest pain

and shortness of breath, revealed the need for coronary artery bypass graft ("CABG") surgery.

*Id.*  Mr. Mordecai had this surgery on the morning of October 10.  Within forty minutes of

arriving in the intensive care unit after surgery, Mr. Mordecai's physicians returned him to the

operating room for an additional procedure because of bleeding. *Id.* at 3.  He received a "high

dose" of Trasylol, intraoperatively, between these two procedures. *Id.* at 5.  Post-operatively, Mr.

Mordecai was "relatively stable," exhibiting "normal cardiovascular hemodynamics." (Ex. R)

Quigg Rep. at 8.

Mr. Mordecai's renal function tests were normal prior to his initial surgery on October

10, 2006 and his exposure to Trasylol. *Id.* at 7.  However, following surgery, Mr. Mordecai

developed acute renal failure which "could not be (and was not) explained by traditional risk

factors." *Id.* at 8.  Indeed, Mr. Mordecai's creatinine began to climb the morning after his

surgeries, and "due to the rapidly progressive renal failure and profound metabolic acidosis," he

was forced to start dialysis by the morning of October 13. (Ex. Q) Zwicke Rep. at 4.  Mr.

Mordecai ultimately died of his injuries at 2:15 a.m. on October 14, 2006. *Id.*

Plaintiff's experts, Drs. Richard Quigge and Dianne Zwicke have reviewed Mr. Mordecai's medical records and opine, to a reasonable degree of medical certainty, that:

1.    Mr. Mordecai's acute renal failure could not be, and was not, explained by traditional risk factors. (Ex. R) Quigg Rep. at 8.

2.    The "use of relatively high doses of Trasylol during cardiac surgery of 10/10/06 led to acute renal failure which led to the severe metabolic disturbances two days later." (Ex. R) Quigg Rep. at 8.   Mr. Mordecai's "post-operative clinical course (10/10/2006 through 10/14/2006) is consistent with the adverse effects noted in the published literature regarding renal failure, morbidity and subsequent catastrophic effects of Trasylol." (Ex. Q) Zwicke Rep. at 5.

3.    Mr. Mordecai's severe metabolic disturbances "were of such a profound nature, that he developed depressed function of the heart and vasculature, along with fluid retention because of renal dysfunction.  All these culminated in his having an acute myocardial infarction on the pre-terminal day, and ultimately a marked drop in both cardiac output and vascular resistance, leading to profound hypotension and his death early on the fourth day following surgery." (Ex. R) Quigg Rep. at 8; *see also* (Ex. Q) Zwicke Rep. at 5 (Mr. Mordecai "succumbed to multi-organ failure, including acute renal failure, profound metabolic acidosis, a coagulopathy and ventilatory failure.")

## III.    ARGUMENT

a.    Defendants cannot meet the rigorous standard for granting summary judgment relief.

In determining whether summary judgment should be granted to a party under Fed. R. Civ. P. 56(c), a court must "view the evidence and all factual inferences therefrom in the light

most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Skop v. City of Atlanta,* 485 F.3d 1130, 1136 (11th Cir. 2007); *Kingsland v. City of Miami,* 382 F.3d 1220, 1226 (11th Cir. 2004); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment. Summary judgment should be granted only when the evidence produced by the nonmoving party, when viewed in a light most favorable to that party, fails to establish a genuine issue." *Tippens v. Celotex Corp.,* 805 F.2d 949, 952-53 (11th Cir. 1986); *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970).

The pertinent question under Rule 56 is whether the evidence presented demonstrates a sufficient factual disagreement to require submission to the fact finder, or whether instead the controversy is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512 (1986). It can only be said that there is no genuine dispute if no reasonable jury could return a verdict for the non-moving party. 477 U.S. at 248, *see also, e.g., Chanel, Inc. v. Italian Activewear of Florida, Inc*., 931 F.2d 1472, 1477 (11th Cir. 1991). If the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact. *Scottsdale Ins. Co. v. Cutz, LLC,* 543 F.Supp. 2d 1310, 1313 (S.D. Fla. 2007).

This Court has held that "Bayer bears the burden of establishing that Plaintiff cannot, as a matter of law, establish that Trasylol was a proximate cause of [his] injury." 3/2/2010 Order on Motion for Summary Judgment at 5, *Bryant v. Bayer*, Case 9:08-cv-80868-DMM, Doc. 155 (denying summary judgment as it pertains to lack of causation). As set forth below, Plaintiff has

presented sufficient evidence to require submission of her claims to the jury.  Because there are genuine issues of material fact at play, summary judgment should be denied.

> b.  <u>Plaintiff has created a triable issue on proximate causation because questions of fact remain as to whether Dr. Athanasuleas is a reliable witness and whether he would have prescribed Trasylol had he been warned about all the risks of which Bayer was aware.</u>

Defendants contend that Plaintiff cannot prove proximate causation because one of Mr. Mordecai's treating physicians, Dr. Athanasuleas, was already aware of the risk of renal failure from the use of Trasylol and testified that he would not have heeded stronger warnings had Bayer provided them.  Defendants' argument fails to consider three significant facts which support proximate cause and denial of Defendants' motion.

First, despite Bayer's attempts to cast Dr. Athanasuleas as an "objective" treating physician, Plaintiff has amassed evidence showing that Dr. Athanasuleas was a key opinion leader for Bayer, in other words, someone who would receive compensation for promoting and defending Trasylol.  (Ex. H) Harville Dep. at 52:1-56:6.  Dr. Athanasuleas was in fact identified as a potential key opinion leader by Bayer both before and after the seminal Mangano article was published. *Id.*  (Ex. H) Harville Dep. at 62:6-12.  Bayer described Dr. Athanasuleas as a "strong supporter of Trasylol" and would regularly ask him to speak with other physicians about Trasylol.  (Ex. H) Harville Dep. at 70:9-17, 71:22-72:16, 152:10-12.  Dr. Athanasuleas attended Bayer-sponsored dinner meetings and regularly sat down with Bayer sales representatives over lunch.  (Ex. H) Harville Dep. at 49:15-22; 212:12-16.  Further, Dr. Athanasuleas as a "CTM grad" was a physician who was paid by Bayer to attend meetings and filter promotional materials to see if they would be effective in selling the use of Trasylol to physicians.  (Ex. H) Harville Dep. at 157-158.  Plaintiff has therefore raised a question of fact as to whether Dr. Athanasuleas

is biased towards Bayer's position in this litigation.[5]  This fact alone should cast sufficient doubt on all of Dr. Athanasuleas' testimony such that summary judgment should be denied.

Second, despite Dr. Athanasuleas' testimony that he was aware of the risk of renal failure when using Trasylol, he was never provided *all* the information required to know of the extent of the risks of renal failure in order to properly consider it in his risk-benefit analysis for Mr. Mordecai.[6]  The studies which Bayer concealed and which revealed the risks, namely Kress, St. George and i3, were not disclosed to the FDA until it was too late for Dr. Athanasuleas to consider them when determining the course of Mr. Mordecai's care.  Nor was Dr. Athanasuleas aware that according to Bayer, "all investigators and Bayer's own database consistently pointed to a renal safety issue", where doctors were told that Trasylol was safe on the kidneys.  Because Bayer did not disclose relevant studies in time for Dr. Athanasuleas to learn of them before treating Mr. Mordecai, Dr. Athanasuleas did not have the opportunity to take advantage of this information and was consequently not truly aware of the risks confronting his patient.

Dr. Athanasuleas has testified that, "if [he] had any increased data about any drug that [he] use[s], [he] would take that valuable information in making a risk versus benefit analysis for a patient." (Ex. S) Athanasuleus Dep. at 186:25-187:16.  Bayer's suppression of the *severity* of the risks of renal failure when ingesting Trasylol is still therefore a proximate cause of Mr.

---

[5] It is telling, for example, that Dr. Athanasuleas was so quick to disregard the results of the Mangano study and continue using Trasylol. (Ex. H) Harville Dep. at 177:3-5; (Ex. S) Athanasuleas Dep. at 178:4-22.  In marked contrast to Dr. Athanasuleas' flagrant dismissal of these important findings, Plaintiff's expert, Dr. Quigg, testified that the Mangano study was "big news," an "important thing" and a topic of discussion at his journal club. (Ex. T) Quigg Dep. at 26:3-16.

[6] Notably, Bayer has not moved for summary judgment based on any failure by Plaintiff to prove general causation; Bayer essentially acknowledges that there is ample evidence of Trasylol's risks and inadequate labeling for Plaintiff to meet her burden there.  The evidence supporting this conclusion regarding general causation – the studies, the FDA advisory, the label change, and the eventual removal of Trasylol from the market – were all unknown to Dr. Athanasuleas at the time he treated Mr. Mordecai.  The reason Dr. Athanasuleas was unaware of the extent of the risks was that Bayer concealed the relevant studies from the FDA and the medical community, and had inadequate labeling on its product.  By conceding general causation in these circumstances, Bayer undercuts its argument on proximate causation because its own actions were the proximate cause of Mr. Mordecai's treating physician's ignorance of the risks.

Mordecai's injuries, despite Dr. Athanasuleas' limited awareness of the drug's safety because the disclosed warnings failed to include data Bayer concealed.  Summary judgment should therefore be denied on this basis. *See Zanzuri v. G.D. Searle & Co.*, 748 F.Supp. 1511 (S.D. Fla. 1990) (denying summary judgment based on learned intermediary defense despite physician's independent knowledge of the risks because of misrepresentative product warnings); *Stevens v. Danek Med., Inc.*, No. 95-14293-CIV-PAINE, 1999 U.S. Dist. LEXIS 22397 at *21 n.8 (S.D. Fla. Apr. 16, 1999) (denying summary judgment and rejecting learned intermediary defense because when "a manufacturer withholds negative information about its product and a physician relies on the manufacturer's literature in forming an opinion about the product's risks, then the manufacturer must meet a heightened evidentiary standard" in order to use the defense).

Third, Bayer's reliance on Dr. Athanasuleas as its learned intermediary must fail because he does not fit the definition of a "learned" intermediary.  Pursuant to *Reyes v. Wyeth Labs.*, 498 F.2d 1264 (5th Cir. 1974), the most widely-cited learned intermediary doctrine case:

> where prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. . . Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect.  As a medical expert, the prescribing physician can **take into account the propensities of the drug, as well as the susceptibilities of his patient**.  His is the task of **weighing the benefits of any medication against its potential dangers**.  The choice he makes is an informed one, an **individualized medical judgment bottomed on a knowledge of both patient and palliative**."

498 F.2d at 1276 (emphasis added).  Contrary to the comforting scenario envisioned by *Reyes* and its progeny, Dr. Athanasuleas did not perform an "individualized medical judgment" based on knowledge of a specific patient before prescribing Trasylol.  Indeed, Dr. Athanasuleas exercised absolutely <u>no</u> discretion in his use of Trasylol.  He testified that when Trasylol was first released he was "selective" and used it in "high risk" patients, but that, within a year or two

of using it, he "became less selective" and "extended [Trasylol use] to <u>all patients</u> who were going to be placed on cardiopulmonary bypass." (Ex. S) Athanasuleas Dep. at 113:21 – 115:15 (emphasis added); *see also* (Ex. H) Harville Dep. at 226:5-11 (agreeing that, while many surgeons reserved Trasylol for use in their "sickest patients," Dr. Athanasuleas instead "used Trasylol in each and every cardiac patient.")  Moreover, while Dr. Athanasuleas initially used a half dose Trasylol in his patients, he eventually began to use a full dose of Trasylol in each and every on-pump CABG case. (Ex. S) at 165:17-166:13.

Dr. Athanasuleas was an identified potential key opinion leader and essentially an agent for Bayer. His bias and his ignorance of the extent of Trasylol's risks, which were concealed by Bayer, create a question of fact.  Summary judgment should be denied because Defendants' misguided reliance on a learned intermediary defense fails and Plaintiff has raised a significant question of material fact as to proximate causation.

    c.  <u>Plaintiff has created a triable issue on causation-in-fact.</u>

        i.  *Dr. Zwicke's testimony raises a question of fact as to whether Mr. Mordecai's renal failure led to his ultimate death.*

Defendants challenge the testimony of Plaintiff's expert, Dr. Dianne Zwicke, as insufficient to establish causation.  Defendants' challenge to Dr. Zwicke is also the subject of a *Daubert* motion in this case, to which Plaintiff is responding in a separate Memorandum of Law filed concurrently with this one.  Plaintiff respectfully refers the Court to the full argument regarding Dr. Zwicke therein.  Put simply, Defendants are correct that Dr. Zwicke's testimony does not independently establish causation regarding whether Trasylol caused Mr. Mordecai's *renal failure*.  Indeed, Plaintiff is not offering Dr. Zwicke for this purpose.  Rather, Dr. Zwicke has opined in her Report and deposition, and will testify at trial, that Mr. Mordecai's renal failure

was the link in the causal chain between Trasylol and his death from renal and multi-organ failure. Specifically, Dr. Zwicke opined that:

> Mr. Mordecai developed acute renal failure, with documentation of a significant elevation from his baseline creatinine (1.0-1.5) by 10:09 a.m. on 10/11/2006. Thereafter, the creatinine continued to significant (sic) rise, requiring dialysis. Additionally, he experienced a significant and persistent metabolic acidosis. Cumulative, he succumbed to multi-organ failure, including acute renal failure, profound metabolic acidosis, a coagulopathy and ventilatory failure.

(Ex. Q) D. Zwicke Report at 5. *See also* (Ex. U) D. Zwicke Dep. at 138:13-17 (explaining that Mr. Mordecai "developed postoperative renal failure, and which led to a metabolic acidosis syndrome, and stress on the system, and multiorgan failure, and culminating in an acute anterior lateral wall myocardial infarction and died.") Therefore, while Dr. Zwicke is not being offered for testimony that Trasylol caused Mr. Mordecai's renal failure, she is being offered – without apparent opposition from Defendants – for the proposition that Mr. Mordecai's renal failure led directly to his death. Defendants' challenge to her testimony is therefore inapposite and should be disregarded.

> ii. *Dr. Quigg's testimony is relevant, reliable, methodologically sound and raises a question of fact as to whether Trasylol caused Mr. Mordecai's renal failure.*

Defendants seek to exclude the causation testimony of Plaintiff's expert, Dr. Richard Quigg.[7] Rule 702 permits expert testimony to assist the jury in understanding the evidence or determining a fact in issue where it is "based upon sufficient facts or data," is "the product of reliable principles and methods," and where "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The Supreme Court's decision in *Daubert*,

---

[7] This Court has already denied a similar motion in this litigation. *See* 3/2/2010 Order on Motion to Exclude Plaintiff's Medical Experts, *Bryant v. Bayer*, Case 1:08-md-01928-DMM, Docket No. 4618. There, the Court correctly found that the experts Defendants sought to exclude had properly considered plaintiff's past medical history and relied on their experience and relevant literature to link Trasylol exposure to that plaintiff's renal injury. *Id.* at 6-7.

509 U.S. 579 (1993) and its progeny govern the application of Rule 702.  The Rule compels the district courts to act as "gatekeepers" concerning the admissibility of expert evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*) (quoting *Daubert*, 509 U.S. 579).  District courts enjoy "considerable leeway" in determining the admissibility of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002).  The discretion of the trial judge and his decision will not be disturbed on appeal unless manifestly erroneous. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).

Notwithstanding the district court's broad discretion, Rule 702's admissibility standard is a "liberal one," and a "review of the case law after *Daubert* shows that the rejection of expert testimony is the *exception* rather than the rule." *Frazier,* 387 F.3d at 1293-94 (citations omitted). Indeed, the "judge's role is to keep unreliable and irrelevant information from the jury" but is "not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).  The test of reliability is a flexible one. *Daubert*, 509 U.S. at 589.

In undertaking a Daubert analysis, courts apply a "rigorous three-part inquiry," considering whether:

1.  the expert is qualified to testify competently regarding the matters he intends to address;

2.  the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

3.  the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Defendants do not (and could not) argue that Dr. Quigg lacks expertise, or that his testimony would not assist the jury.  Instead, they challenge his methodology and argue that, in employing a differential diagnosis analysis, he failed to consider and reject each and every possible alternative cause of Mr. Mordecai's renal failure.[8]  Defendants ignore key aspects of Dr. Quigg's testimony and instead quibble over mere semantics, as Dr. Quigg's Report and deposition indeed reliably and soundly address the alternate causes he excluded in coming to his conclusion that Trasylol was responsible for Mr. Mordecai's renal failure.

In his Report, Dr. Quigg opined "within a reasonable degree of medical certainty," "based upon [his] education, training and experiences as a physician" and "specifically relying on [his] practice of Nephrology over the past 25 years" that Mr. Mordecai's acute renal failure immediately following surgery "could not be (and was not) explained by traditional risk factors." Further:

> [T]he **use of relatively high doses of Trasylol during cardiac surgery of 10/10/06 led to acute renal failure which in turn led to the severe metabolic disturbances two days later**.  These were of such a profound nature, that he developed depressed function of the heart and vasculature, along with fluid retention because of renal dysfunction.  All these culminated in his having an acute myocardial infarction on the pre-terminal day, and ultimately a marked drop in both cardiac output and vascular resistance, leading to profound hypotension and his death early on the fourth day following surgery.

(Ex. R) Quigg Rep. at 8 (emphasis added).  Further, in his testimony regarding general causation, Dr. Quigg meticulously explained Trasylol's mechanism of action and exactly why he has concluded that Trasylol is nephrotoxic. (Ex. T) Quigg Dep. at 68:3-69:22.

Defendants assert that Dr. Quigg failed to rule out three potential causes of Mr. Mordecai's renal failure, specifically: (1) re-bypass surgery; (2) that he was relatively

---

[8] Differential diagnosis "is a common scientific technique, and federal courts recognize that a properly conducted differential diagnosis is admissible under Daubert."  *So. States Coop., Inc. v. Melick Aquafeeds, Inc.*, No. 7:08-cv-13 (HL), 2010 U.S. Dist. LEXIS 26463 at *14 (M.D. Ga. Mar. 22, 2010) (denying motion to exclude expert testimony because differential diagnosis performed was reliable.)

hypotensive in the immediate post-operative period; and (3) that he had a mild decrease in his cardiac output.   A plain reading of Dr. Quigg's Report and deposition refutes Defendants' argument.

First, as to re-bypass, Dr. Quigg unequivocally testified that repeat coronary artery bypass graft surgery is <u>not</u> a risk factor for acute kidney injury requiring dialysis following surgery. (Ex. T) Quigg Dep. at 319:23 – 320:4.  Dr. Quigg's opinion is that re-bypass may be a risk for a patient to develop renal injury, but not to a risk of renal injury *requiring dialysis* – which is the course Mr. Mordecai's injury unfortunately took.

Second, as to Mr. Mordecai's relative hypotension, Dr. Quigg explained that he disagreed with Defendants' witness, Dr. Athanasuleas, as to the degree of hypotension. Dr. Quigg opined that the hypotension was not profound, and explained that "the kidney's remarkably resistant to hypotension absent sepsis." *Id.* (Ex. T) at 337:3-4, 347:12-17.  Dr. Quigg further testified that hypotension is simply not a "risk factor for acute kidney injury requiring dialysis after surgery" *Id.* (Ex. T) at 320:14-17.

Third, as to Mr. Mordecai's decrease in cardiac output, Dr. Quigg testified that this too was not a "risk factor for acute kidney injury requiring dialysis after surgery." *Id.* (Ex. T) 320:14-17.[9]

In addition, contrary to the underlying presumption of Defendants' motion, a differential diagnosis does not have to eliminate every other potential cause.  Rather, differential diagnosis is a well-established medical methodology whereby a physician "systematically eliminates possible

---

[9] Defendants fleetingly argue that Dr. Quigg failed to rule out other alternative causes, Defs. Mem. at 16, though again, his testimony easily refutes the argument.  As to "excessive bleeding" and "large amounts of blood transfusions," such factors are synonymous with hypotension and addressed by Dr. Quigg.  (Ex. T) Quigg Dep. at 320:14-17, 337:3-4 and 347:12-17.  As to cardiac catheterization and IV contrast dye, Dr. Quigg explained that these factors can cause "acute kidney injury as evidenced by a rise in creatinine in small levels" – clearly not the level of injury suffered by Mr. Mordecai. *Id.* at 328:23-329:5.

causes of a patient's ailment to arrive at its *most probable cause*." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294 n.8 (11th Cir. 2005) (emphasis added); *see also So. States Coop., Inc. v. Melick Aquafeeds, Inc.*, Civ. A. No. 7:08-cv-13, 2010 U.S. Dist. LEXIS 26463 at *14 (M.D. Ga. Mar. 22, 2010) (a "differential diagnosis is where the cause of a medical problem is determined by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the *most likely*.") (emphasis added); 4-702 *Weinstein's Federal Evidence* § 702.06 (2010) ("a differential diagnosis offered as proof of causation need not rule out all but a single possible cause of the plaintiff's disease to be admissible.")

Dr. Quigg's testimony is based on methodologically sound reasoning. Defendants will have the opportunity to challenge his methodology at the appropriate juncture: cross-examination at trial. Dr. Quigg should be permitted to testify to provide the jury with a reliable explanation as to how Trasylol caused Mr. Mordecai's renal injury and his ultimate death. *See Rink v. Cheminova*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) (a district court's role under *Daubert* is not to make ultimate conclusions as to the persuasiveness of the proffered evidence since "[v]igorous cross-examination ensures that (…) issues of general credibility are properly presented for consideration by the trier of fact.")

## IV.    CONCLUSION

Based on the evidence offered by Plaintiff and the material issues of fact raised therein, Defendants have failed to sustain their burden of proving that they are entitled to summary judgment. Accordingly, Plaintiff respectfully requests that this Court deny Defendants' motion in its entirety.

Respectfully submitted,

**PLAINTIFF**

**By Counsel**

*/s/ Jonathan D. Boggs*
P. Gregory Haddad, Esq.
*ghaddad@baileyglasser.com*
Kerrie Wagoner Boyle, Esq.
*kboyle@baileyglasser.com*
Jonathan D. Boggs, Esq. (FL Bar #0106305)
*jboggs@baileyglasser.com*
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110 *facsimile*

David F. Miceli
*dmiceli@simmonsfirm.com*
Simmons, Browder, Gianaris, Angelides & Barnerd, LLC
119 Maple Street
Suite 201
Carrollton, GA 30117
770-834-2122
770-214-2622

Leslie Ann Caldwell, Esq.
*lac@lusklaw.com*
LUSK, CALDWELL & DEAN P.C.
2101 Highland Avenue, Suite 410
Birmingham, Alabama 35205
(205) 933-7090 Telephone
(205) 933-7099 Facsimile

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-1928-MIDDLEBROOKS/JOHNSON

**IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928**

**This Document Relates to:
LINDA MORDECAI v. BAYER CORPORATION, et al.,
Case No. 9:08-civ-80781-DMM**

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of April, 2010, the foregoing ***PLAINTIFF'S RESPONSE IN OPPOSITION TO BAYER'S MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY OF DR. QUIGG AND MEMORANDUM OF LAW IN SUPPORT*** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Brian A. Wahl
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203

Phillip S. Beck
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 West Hubbard Place, Suite 300
Chicago, IL 60610

Patricia Elaine Lowry
Barbara Bolton Litten
Squire Sanders & Dempsey LLP
777 S Flagler Drive, Suite 1900
West Palm Beach, FL 33401-6198

Elizabeth C. Curtin
Sidley Austin LLP
1 S Dearborn Street
Chicago, IL 60603

Richard K. Dandrea
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

Daniel G. Wyllie
Dykema Gossett
400 Renaissance Center, 35th Floor
Detroit, MI 48243


*/s/ Jonathan D. Boggs*
Jonathan D. Boggs, Esq. (FL Bar #0106305)
*jboggs@baileyglasser.com*