## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS
LIABILITY LITIGATION – MDL-1928

This Document Relates to:

*Melissa Morrill, as personal representative*
*of the estate of William Cyrus Morrill, III, v.*
*Bayer Pharmaceutical Corp., et al.*

Case No.  9:08-cv-80424
_____/

### JOINT PRE-TRIAL STIPULATION

Plaintiff Melissa Morrill and Defendants Bayer Schering Pharma AG, as successor in

interest to Bayer HealthCare AG, Bayer HealthCare LLC, Bayer HealthCare Pharmaceuticals

Inc., as successor in interest to Bayer Pharmaceuticals Corporation and Bayer AG ("Bayer"),

pursuant to Local Rule 16.1.E and PTO-6, hereby file their Joint Pretrial Stipulation.

**1.      Statement of the Case.**

      **A.      Plaintiff**

This is a law suit brought by Melissa Morrill, the wife of William Morrill, individually

and on behalf of the estate of Mr. Morrill for the wrongful death of Mr. Morrill.  Specifically Ms.

Morrill claims that the defendants, all Bayer companies, are responsible for the death of Mr.

Morrill because: (1) the Bayer companies failed to adequately warn heath care professionals of

the dangers of a drug the Bayer companies manufactured, marketed and sold called aprotinin,

which the Bayer companies marketed under the name of Trasylol; and (2) aprotinin/Trasylol is

defective.   Ms.  Morrill  further  claims  that  as  a  result  of  the  failure  to  warn  and  that

aprotinin/Trasylol is defective, that Mr. Morrill died and that Mr. and Ms. Morrill suffered other damages.  The Bayer defendants deny these allegations.

**B.     Defendants**

On October 3, 2003, William C. Morrill, III, age 61, underwent quadruple bypass open heart surgery and transmyocardial laser revascularization at Sarasota Memorial Hospital, located in Sarasota, Florida.  Persistent right-side neck and shoulder pain led him to the emergency room at Doctors Hospital in Sarasota on the morning of September 27, 2003, where he was diagnosed with having suffered an acute myocardial infarction and was admitted to the hospital.   On October 1, 2003, a heart catheterization performed at Doctors Hospital revealed that he had severe multivessel native coronary artery disease as well as the total occlusion of two (2) vein grafts and the compromise of a third artery graft from a prior bypass surgery.  He also had pulmonary hypertension.  His left ventricular ejection fraction was severely reduced at about 25%, signifying a very weak heart.  Due to the poor condition of his native arteries and vein grafts, percutaneous revascularization (use of a balloon catheter to open blocked vessels) was not recommended to Mr. Morrill by his treating cardiologist.  Instead, it was recommended and Mr. Morrill elected to undergo a second coronary artery bypass graft ("CABG") surgery to be performed at Sarasota Memorial Hospital.  At the same time, Mr. Morrill consented to a MAZE procedure to provide relief for atrial fibrillation (an irregular beat due to electrical problems in his heart), which had recurred periodically since his first CABG surgery in 1995 and which he was currently experiencing.

The second, this time quadruple, bypass operation was performed on October 3, 2003. After the four vein grafts were completed, the surgeon (Dr. Thomas Kelly) performed a transmyocardial laser revascularization ("TMR") procedure on the back side of the heart.

Through this procedure, sixteen laser channels were drilled into the posterior surface of Mr. Morrill's heart.  Upon completion of the TMR procedure, Mr. Morrill's chest was closed.  Mr. Morrill was on the heart/lung machine (also called a cardio-pulmonary bypass machine or CPB machine) for 126 minutes.  While Mr. Morrill was still in the operating room, his heart experienced ventricular fibrillation (also an irregular beat due to electrical problems) and stopped pumping blood, requiring the surgeon to reopen his chest, massage and defibrillate his heart to get it pumping again.  The surgeon then inserted an intra-aortic balloon pump to help maintain Mr. Morrill's blood pressure and cardiac output.

Post-operatively, Mr. Morrill continued to experience numerous bouts of ventricular fibrillation requiring electrical shock defibrillation to jolt the heart back to normal rhythm.  On October 6, 2003, Mr. Morrill died when the electric shock treatments failed to resuscitate him from cardiac arrest resulting from a bout of persistent ventricular fibrillations.

### Mr. Morrill's Health Before His Second Bypass Surgery

Before his second bypass surgery in October 2003, Mr. Morrill suffered from a litany of medical problems.  In particular, he had a history of chronic alcoholism, cirrhosis of the liver, hepatic encephalopathy (confusion or irritability caused by the build up of toxic substances that the liver fails to remove due to alcoholism/cirrhosis), portal hypertension (high abdominal blood pressure due to alcoholism/cirrhosis), esophageal varices (dilated veins due to alcoholism/cirrhosis), esophageal bleeding, chronic lung disease, hypertension, peripheral vascular disease, cerebrovascular disease, congestive heart failure, ischemic cardiomyopathy, chronic atrial fibrillation, severe coronary artery disease, tobacco abuse, glucose intolerance, left ventricular dysfunction, and prior myocardial infarctions.

Even before his first CABG surgery in 1995, Mr. Morrill had been diagnosed with high blood pressure (hypertension) and high cholesterol (hypercholesterolemia).  He had been smoking two packs of cigarettes per day for eight years and was a sporadic smoker before that.  He had also abused alcohol, drinking a bottle of wine per day for many years.  On October 9, 1995, Mr. Morrill collapsed on his boat dock and was brought to Morton Plant Hospital in Clearwater, where he was diagnosed with a heart attack (an acute inferior posterior myocardial infarct) and administered lidocaine to treat continuing ventricular tachycardia (rapid heart beat).  During Mr. Morrill's triple bypass operation on October 13, 1995, and following chest closure, he experienced several episodes of atrial fibrillation and required cardioversion (a procedure using drugs or electrical shocks to convert abnormal heart rhythms back to normal sinus rhythm).  Thereafter, Mr. Morrill was prescribed anti-arrhythmic medications to help to control his chronic atrial fibrillation and atrial flutter, as well as Coumadin to help prevent a stroke caused by the irregular heart beat.

His heart condition following his first CABG operation disqualified him from flying as a pilot for Delta Airlines, and he qualified for disability benefits from the Delta Pilots Disability Fund as well as Social Security Disability benefits.  He did not seek gainful employment thereafter.  He did increase his alcohol consumption to about two bottles of wine per day and discontinued cigarettes in favor of cigars, smoking as many as twenty cigars per day.  He was also treated medically for chronic depression.

In March 1999, Mr. Morrill was admitted to Sarasota Memorial Hospital with complaints of shortness of breath, wheezing, coughing and a headache.  After five days he was discharged with a diagnosis of bronchitis and alcohol dependence.  He experienced delirium tremens from alcohol withdrawal during his hospital stay.  He was also noted to have some left ventricular

dysfunction with an estimated ejection fraction of 40-45% (evidencing weakness of his heart), which was attributed to alcohol use. Discharge orders included directions to stop smoking and to stop alcohol use.

An evaluation by an electrophysiologist in 1999 recommended electrophysiologic studies due to non-sustained ventricular tachycardia noted on treadmill exercise tests. A radiologic scan at Emory University in Atlanta estimated Mr. Morrill's left ventricular ejection fraction at 36-40%. In September 1999 Mr. Morrill underwent electrical cardioversion at Morton Plant Hospital to restore normal sinus rhythm to his heart. Despite successful cardioversion, he was continued on anti-arrhythmic drug therapy, Coumadin and Cordarone.

In December 1999 he was noted to have recurrent atrial arrhythmia. His long-time cardiologist recommended atrial ablation, which is a surgical procedure to identify the area of the heart causing an arrhythmia and destroy it, but Mr. Morrill deferred treatment. He also continued to have left ventricular dysfunction at that time with an ejection fraction estimated at 40%.

In 2000, Mr. Morrill's liver function tests were abnormally elevated and his cardiologist felt this was related to his continued alcohol consumption. His cardiologist highly encouraged Mr. Morrill to undergo atrial ablation, but he again deferred this treatment. In April of 2001, his cardiologist again recommended atrial ablation and that he decrease his alcohol intake. Mr. Morrill again declined to follow his doctor's advice.

In 2003, Mr. Morrill's health took a significant turn for the worse. In March, he went to the Doctors Hospital emergency room in Sarasota because he was spitting up blood. On examination he appeared to have an enlarged liver and slow blood flow in the veins of his lower legs. He admitted to drinking more wine and eating less at that time. The emergency room

doctor warned him about his elevated liver profile and its probable connection to excessive drinking. It was suggested that he establish with a local physician as he might need further evaluation.

He was back in the Doctors Hospital emergency room in mid-May 2003 complaining of a persistent fever, sinus headaches and intermittent nose bleeds. Mrs. Morrill advised that he had been very jaundiced appearing and his eyes were yellow. Mrs. Morrill also reported that he had been consuming alcohol excessively; the emergency room record indicates alcohol intake of two bottles of wine a day. He was admitted and Ativan was ordered to prevent alcohol withdrawal symptoms. He was diagnosed with pneumonia and jaundice secondary to chronic alcoholism. An echocardiogram revealed a left ventricular ejection fraction of about 20%, and a carotid ultrasound revealed moderately severe carotid artery stenosis bilaterally. His liver function tests were elevated and he had blood in his urine. He was discharged after five days in stable condition and instructed to abstain from alcohol.

In July 2003, he again was coughing up blood and was treated on an outpatient basis. Then, on August 5, 2003, Mr. Morrill was again coughing up blood, which this time was accompanied by dark stools. He went to the Doctors Hospital emergency room. Mrs. Morrill told the ER physician that Mr. Morrill was drinking two to three bottles of wine a day. An endoscopy was performed that day, revealing esophageal varices (dilated veins in the esophagus as a consequence of cirrhosis), which were surgically banded to prevent bleeding. He was transfused with approximately sixteen units of blood. His Coumadin therapy was discontinued due to the bleeding risk from the varices. During his ten-day hospitalization, Mr. Morrill was diagnosed with gastrointestinal bleed, cirrhosis, portal hypertension, ascites (fluid retention in the abdominal cavity), congestive heart failure, severe anemia, thrombocytopenia (low platelet

count), chronic obstructive pulmonary disease and respiratory failure with mild hypoxemia (decreased oxygen in the blood).   Mr. Morrill agreed to enroll in an in-patient alcohol rehabilitation program upon discharge on August 15th.

Mr. Morrill admitted himself into the alcohol abuse treatment program at Talbott Recovery Campus in Atlanta on August 18, 2003, and he remained there until September 20th, when he voluntarily left prior to completion of the treatment program.  While in treatment at Talbott, he admitted that during the last three years he had spent much of his time alone in his house drinking, while his wife was away for her job as a flight attendant for Delta Airlines.  He admitted to drinking 3-5 bottles of wine daily.  He was diagnosed with alcohol dependence, which he denied.

On September 20, 2003, Mr. Morrill went to the emergency room at the Southern Regional Medical Center near Atlanta, Georgia, complaining of shortness of breath and a cough. He was admitted for tests and was discharged four days later with a final diagnosis of acute exacerbation of chronic obstructive lung disease and stable congestive heart failure.  He declined to return to Talbott because he felt that he did not need rehabilitation any more and instead returned to his home in Sarasota.  On September 27, 2003, Mr. Morrill went to the Doctors Hospital emergency room with right side neck pain, which led to his admission and heart catheterization there and then to his transfer to Sarasota Memorial Hospital for his redo CABG surgery and transmyocardial laser revascularization.

### **The Risks of the Surgery Itself**

Mr. Morrill's quadruple bypass surgery carried a risk of renal failure and death, especially given his medical history.  Prior to the operation, Dr. Kelly specifically cautioned Mr. Morrill that his compromised health condition placed him at higher risk for the surgery and that

the surgery itself could cause death.  Additionally, the hospital consent forms he signed advised him that kidney failure and death could result from the contemplated procedures.

During surgery, Dr. Kelly opened Mr. Morrill's chest, stopped his heart, provided substitute blood circulation through the heart/lung machine for over two hours, and used blood vessels from his legs to bypass most of the major blockages in his coronary arteries.  Before taking Mr. Morrill off the heart/lung machine, Dr. Kelly performed the transmyocardial laser revascularization described above, which destroys heart muscle and therefore carries numerous risks, including disruption of normal heart rhythm during and after surgery, renal failure, myocardial infarction, and death.  Mr. Morrill was also transfused with one unit of packed red blood cells, which can increase the risk of kidney injury.

### Dr. Kelly's Decision to Use Trasylol

Before deciding to use Trasylol in Mr. Morrill's surgery, Dr. Kelly recognized that Mr. Morrill's pre-existing portal hypertension with esophageal varices, the fact that this would be his second CABG surgery, that he had been on aspirin regimen and that his blood platelet count was very low put him at a higher than normal risk of excessive bleeding and of death from the contemplated surgery.  With this information in mind, Dr. Kelly conducted an individualized benefit-risk assessment about whether Trasylol was appropriate for Mr. Morrill's quadruple bypass and decided that it was appropriate.

### Mr. Morrill's Post-Operative Course

Mr. Morrill's heart did not function properly after his bypass and laser revascularization surgery.  He experienced numerous episodes of ventricular arrhythmias, many requiring electric shock defibrillation to jolt his heart back to regular heart rhythm.  Mr. Morrill was also in cardiogenic shock, requiring an intra-aortic balloon pump and various medicines to try to

increase his low blood pressure.  He also had persistent hyperglycemia following surgery, which is associated with an increased risk of death and renal failure.  He developed hepatic failure and respiratory failure and was never taken off the ventilator.  He received additional blood transfusions.

Mr. Morrill developed hyperkalemia (elevated potassium levels) on the day of surgery and was diagnosed with acute renal failure.  He required one dialysis treatment that night.  He was also treated with diuretic medications, which were discontinued by October 5.  His potassium levels came down to normal and, on October 6, 2003, his nephrologist noted "stabilization if not even slight improvement" of his kidney function.

On October 6, 2003, Mr. Morrill suffered a cardiac arrest due to ventricular fibrillation and could not be successfully resuscitated.  The causes of death listed on the death certificate were ventricular fibrillation and cardiomyopathy.

### Trasylol Did Not Cause Mr. Morrill's Acute Renal Failure or Death

The extensive medical literature concerning Trasylol, taken as a whole, shows that it is safe and effective when used according to the label and does not increase the risk of renal failure or death.  The evidence of Mr. Morrill's poor health before surgery, including his recent heart attack, congestive heart failure, low cardiac ejection fraction, atrial fibrillation, cirrhosis, portal hypertension, chronic obstructive lung disease, esophageal varices, smoking history and essential hypertension, together with the stress of the combined bypass and laser revascularization surgery itself, and the cardiogenic shock, hypotension, hyperglycemia, transfusions, and heart arrhythmias he experienced after surgery demonstrate that these factors, not Trasylol, caused his acute renal failure and death.

2.      **Basis for Federal Jurisdiction.**

The Court has jurisdiction over this controversy pursuant to 28 U.S.C. §1332(a)(1), in that the matter in controversy exceeds $75,000 and is between citizens of different states.  This case was transferred from the Middle District of Florida to MDL-1928 pursuant to 28 U.S.C. §1407.

3.      **Pleadings Raising the Issues.**

A.      Plaintiff's Second Amended Complaint [D.E. 35 in 8:07-CV-00819-JDW-EAJ (filed in the Middle District of Florida prior to 4/17/08 transfer to the Trasylol MDL-1298)].

B.      Defendant Bayer Pharmaceutical Corporation's Answer and Additional Defenses to Plaintiff's Second Amended Complaint [D.E. 40 in 8:07-CV-00819-JDW-EAJ (filed in the Middle District of Florida prior to 4/17/08 transfer to the Trasylol MDL-1298)].

C.      Defendant Bayer HealthCare LLC's Answer and Additional Defenses to Plaintiff's Second Amended Complaint [D.E. 41 in 8:07-CV-00819-JDW-EAJ (filed in the Middle District of Florida prior to 4/17/08 transfer to the Trasylol MDL-1298)].

D.      Defendant Bayer AG's Answer and Additional Defenses to Plaintiff's Second Amended Complaint [D.E. 42 in 8:07-CV-00819-JDW-EAJ (filed in the Middle District of Florida prior to 4/17/08 transfer to the Trasylol MDL-1298)].

E.      Defendant Bayer HealthCare AG's Answer and Additional Defenses to Plaintiff's Second Amended Complaint [D.E. 48 & D.E. 50 in 8:07-CV-00819-JDW-EAJ (filed in the Middle District of Florida prior to 4/17/08 transfer to the Trasylol MDL-1298)].

4.      **List of All Unresolved Motions or Other Matters Requiring Court Attention.**

A.      Defendants' Motion to Exclude Testimony from Plaintiffs' Expert Suzanne Parisian, M.D. [D.E. 3065 in 1:08-md-1928]

B.      Defendants' Motion to Exclude Testimony from Plaintiffs' Case-Specific Causation and Damages Experts [D.E. 4006 in 1:08-md-1928; D.E. 83 in 9:08-cv-80424]

C.      Defendants' Motion for Summary Judgment [D.E. 3811 in 1:08-md-1928; D.E. 74 in 9:08-cv-80424]

D.      Defendants' motions in limine [D.E.s 3994 and 80; 4244 and 89; 4245 and 90; 4259 and 93; 4261 and 94; 4264 and 95; 4266 and 96; 4268 and 97; 4270 and 98; 4272 and 99; 5203 and 142; and 5204 and 143 – each pair in 1:08-md-1928 and 9:08-cv-80424, respectively]

E.      Plaintiff's Motion in Limine to Exclude Evidence and Argument Related to Certain Issues and/Or Request for Limiting Instructions [D.E. 5198 in 1:08-md-1928; D.E. 141 in 9:08-cv-80424]

**5.      Concise Statement of Uncontested Facts**.

The parties agree that while the following facts are uncontested, this recitation does not prevent them from presenting evidence supporting these facts at trial, nor does it indicate that either party agrees to the admissibility of any uncontested fact under the Federal Rules of Evidence:

1.      Plaintiff Melissa Morrill is a Florida resident.

2.      Bayer studied, designed, manufactured, sold, distributed, monitored and marketed Trasylol in the United States between the early 1990s and 2007.

3.      Trasylol® is the proprietary name for aprotinin, a protein derived from bovine (cow) lungs.

4.      Before a drug may be sold commercially in the United States, the drug's sponsor must submit to the federal Food and Drug Administration ("FDA"), and FDA must approve, a New Drug Application ("NDA").

5.      In November 1992, Bayer submitted the Trasylol® NDA, which included medical, scientific and historical information about Trasylol®, including data from clinical trials.

6.      From time to time, Bayer submitted NDA supplements for Trasylol® to the FDA for review; upon approval by the FDA, certain NDA supplements resulted in changes to the package insert.

7.      On October 3, 2003, Mr. Morrill underwent four-vessel CABG surgery and transmyocardial laser revascularization at Sarasota Memorial Hospital in Sarasota, Florida.

8.      Mr. Morrill suffered a myocardial infarction in October 1995 and underwent a three-vessel CABG surgery at Morton Plant Hospital in Clearwater, Florida.  His heart condition at that time disqualified him from flying commercial airline airplanes and he applied for and commenced receiving disability benefits from the Delta Pilots Disability Trust Fund and from the Social Security Administration.

9.      Dr. Thomas Kelly performed Mr. Morrill's CABG and transmyocardial laser revascularization surgery with CPB.  The Plaintiff was administered 200 cc of Trasylol® (aprotinin) while anesthetized and on the heart/lung machine.

10.     Mr. Morrill experienced numerous episodes of ventricular arrhythmias post-operatively, many requiring electric shock defibrillation to restore normal sinus rhythm.

11.     Mr. Morrill had one dialysis treatment after surgery to help eliminate elevated levels of potassium in his blood.

12.     On October 6, 2003, Mr. Morrill went into cardiac arrest and died.

**6.      Issues of Fact to be Litigated At Trial.**

The parties agree that while the following facts are contested, this recitation does not indicate that either party agrees to the relevance of any contested fact.

1.      Whether Defendants breached any duty to plaintiff.

2.      Whether any breach of a duty by Defendants was the proximate cause of Mr. Morrill's death after his October 3, 2003 surgery.

3.      Whether plaintiff's claims or damages are barred in whole or in part by preemption, the doctrine of primary jurisdiction, the learned intermediary doctrine, the state of the art doctrine, lack of detrimental reliance, any applicable law (including, but not limited to, the United States Constitution and the Restatement (2d) of Torts § 402A, comment k), or the replacement or payment by collateral sources; or whether plaintiff's injuries and damages were caused by any pre-existing or subsequent condition of Mr. Morrill, or by an intervening or superseding cause.

**7.      Concise Statement of Issues of Law on Which There is Agreement.**

A.      This Court has jurisdiction over the parties.

B.      Choice of law: The parties have agreed that Florida substantive law applies to the claims in this action.

Bayer contends that the following issue of law is undisputed.  Plaintiff disagrees.

C.      *Lexecon* waiver:  Under Pretrial Order No. 19, the parties have waived venue objections and have waived objections based on  *Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

**8.      Concise Statement of Issues of Law For Court Determination.**

**A.**      All legal issues pending in the motions listed in Section 4 above.

Bayer believes the following are additional issues of law for the Court's determination. Plaintiff disagrees.

B.      Whether plaintiff can establish a failure to warn claim against Bayer.

C.      Whether Bayer proximately caused Mr. Morrill's ventricular fibrillation and death after this October 3, 2003 surgery.

D.      Whether plaintiff's identified experts proffered reliable, admissible opinions.

E.      All legal issues that may be raised in a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

**9.      Numbered List of Trial Exhibits**.

A.      **Plaintiff**

Plaintiff has provided a list of the case-specific trial exhibits that she may use at trial [D.E. 4884 in 1:08-md-1928].  That list is incorporated by reference.  Defendants intend to file their objections contemporaneously with this stipulation.

B.      **Defendants**

Defendants have provided to Plaintiff a list of trial exhibits that they may use at trial, which is attached hereto and is incorporated by reference.  Plaintiff reserves her right to object to any of defendants' trial exhibits.

C.      **Exhibits and Demonstratives**

The parties have agreed to provide notice to the other side by 7 pm EDT the previous day of any exhibits or demonstratives (excluding demonstratives that are created during examination of a witness and demonstratives that are simply enlargements of trial exhibits to which no objection has been made) that will be used in court during direct examination (including but not limited to exhibits the party seeks to introduce into evidence), to facilitate resolution of any objections to them.  The parties have not agreed to extend this agreement to exhibits and demonstratives to be used on cross-examination.  Any objections will be made by 9 pm EDT (or within two hours of receipt of the list of exhibits or demonstratives to be used,

whichever is later).  The parties will present any unresolved objections to the Court no later than the morning of the day on which the exhibit is scheduled to be presented.

Notwithstanding any of the above, no exhibits or demonstratives may be used during opening statements unless they have been disclosed to the other side and any objections have been resolved.

**10.    Trial Witnesses**.

    A.      **Plaintiff**

Plaintiff has provided a list of the witnesses she intends to call at trial [D.E. 4807 in 1:08-md-1928].  That list is incorporated by reference.

    B.      **Defendants**

Defendants have provided a list of the witnesses they intend to call at trial [D.E. 5207 in 1:08-md-1928].  That list is incorporated by reference.

    C.      **Order of Witnesses At Trial**

The parties have agreed to provide the other side with a good faith list of witnesses each side expects to call to testify live at trial.  Plaintiff has agreed to provide her list seven (7) days prior to opening statements and defendant has agreed to provide their list by the Friday prior to the start of trial.  At the same time, each side will also provide a tentative good faith list of the intended order in which the witnesses will testify, recognizing that multiple factors may change the order of the witnesses.  The parties have further agreed that no later than 7:00 p.m. prior to each court day, they will identify the witnesses they intend to present the following day.  Bayer requests that the order in which such witnesses will be presented also be disclosed at that time.

D.     **Witnesses Offered Through Recorded Testimony**

The parties have agreed to the following procedures for preparing and presenting testimony by videotape during the trial:

(1)     For any witness whose testimony will be presented by recorded deposition during the trial, all of the testimony that would be presented through that witness, by either side, shall be presented only one time.  The testimony shall be played in the order in which it was given at the deposition.

(2)     The party presenting the witness will provide final video cuts of direct testimony at least forty-eight (48) hours in advance of the day on which the testimony is to be offered.  These video cuts shall include all of the other side's counter-designations that fall within the examination designated by the presenting party.

(3)     The other side will provide final video cuts of additional testimony twenty-four (24) hours in advance of the day on which the testimony is expected to be offered. These video cuts shall include all of the presenting party's counter-designations that fall within the examination designated by the other side.

(4)     The parties will meet and confer on any objections to the proposed testimony.  Any unresolved objections to testimony being offered shall be addressed by the Court before the testimony is presented to the jury.

11.     **Estimated Trial Time.**

The parties have stipulated that each side shall have thirty (30) hours to present their case, including direct and cross-examination and rebuttal, but not including opening and closing statements.  In calculating the 30 hours, each side will be charged with the time spent by that side in questioning a witness (whether in direct, cross examination, or re-direct).  As such,

cross examination will be charged to the time allotted to the party cross examining the witness. Accordingly, the parties anticipate that the trial will require up to three (3) weeks in total, exclusive of deliberation.

The parties have not agreed to the amounts of time for opening statements and closing arguments. Plaintiff suggests that each side shall have forty-five (45) minutes for opening statement and ninety (90) minutes for closing argument. Defendant suggests that each side shall have ninety (90) minutes for opening statement and one-hundred twenty (120) minutes for closing argument.

**12.    Maximum Allowable Attorneys' Fees.**

Prevailing party attorney's fees as contemplated by Local General Rule 16.1 are not at issue in this case.

[BALANCE OF PAGE INTENTIONALLY BLANK]

Respectfully submitted,

Dated:  April 12, 2010

FOR THE PLAINTIFF:                          FOR THE DEFENDANTS:


/s/_John D. Goldsmith                        /s/ Patricia E. Lowry
John D. Goldsmith (Fla. Bar No. 444278)      Patricia E. Lowry (Fla. Bar No. 332569)
Email: jgoldsmith@trenam.com                 *Email*: plowry@ssd.com
Amy L. Drushal (Fla. Bar No. 0546895)        Guy E. Motzer (Fla. Bar No. 562467)
Email: aldrushal@trenam.com                  *Email*: gmotzer@ssd.com
**TRENAM, KEMKER, SCHARF, BARKIN, FRYE,**    Barbara Bolton Litten (Fla. Bar No. 91642)
**O'NEILL & MULLIS, P.A**.                   Email: blitten@ssd.com
101 E. Kennedy Blvd., Suite 2700             **SQUIRE, SANDERS & DEMPSEY L.L.P.**
Tampa, Florida 33602                         1900 Phillips Point West
Telephone:  813-223-7474                     777 South Flagler Drive
Facsimile:  813-229-6553                     West Palm Beach, FL 33401-6198
                                             Telephone:  561-650-7120
**Attorneys for Plaintiff**                  Facsimile:  561-655-1509


                                             Philip S. Beck
                                             Email:  philip.beck@bartlit-beck.com
                                             Steven E. Derringer
                                             Email:  steven.derringer@bartlit-beck.com
                                             Shayna Cook
                                             Email:  scook@bartlit-beck.com
                                             **BARTLIT BECK HERMAN PALENCHAR**
                                             **& SCOTT LLP**
                                             54 W. Hubbard Street, Suite 300
                                             Chicago, IL  60603
                                             Telephone:  312-494-4400
                                             Facsimile:  312-494-4440


                                             Eugene A. Schoon
                                             Email:  eschoon@sidley.com
                                             Elizabeth Curtin
                                             Email:  ecurtin@sidley.com
                                             **SIDLEY AUSTIN LLP**
                                             One South Dearborn Street
                                             Chicago, Illinois 60603
                                             Telephone:  312-853-7000
                                             Facsimile:  312-853-7036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:   313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMANS CHERIN &
MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:   412-566-6099

*Counsel for Defendants*
***Attorneys for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 12, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive Notices of Filing electronically.

*/s/ Barbara Bolton Litten*
Barbara Bolton Litten

## SERVICE LIST

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON
### Case No. 9:08-cv-80424-DMM

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN,
FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone:  215-735-1130
Facsimile:  215-875-7758
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE &
LECLAINCHE, P.A.**
1641 Worthington Road, Suite 100
West Palm Beach, Florida 33409
Telephone:  561-684-2500
Facsimile:  561-684-6308
*Liaison Counsel for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509
*Liaison Counsel for Defendants*

Scott A. Love
Email:  slove@triallawfirm.com
**CLARK, DEAN & BURNETT, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-759-1400
Facsimile:  713-759-1217
**Co-Lead Counsel for Plaintiffs**

Neal Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone:  203-610-6393
Facsimile:  203-610-6399
*Federal-State Liaison for Plaintiffs*

John D. Goldsmith
Email: jgoldsmith@trenam.com
Amy L. Drushal
Email: aldrushal@trenam.com
**TRENAM, KEMKER, SCHARF, BARKIN, FRYE,
O'NEILL & MULLIS, P.A.**
101 E. Kennedy Blvd., Suite 2700
Tampa, Florida 33602
Telephone:  813-223-7474
Facsimile:  813-229-6553
*Attorneys for Plaintiff*

WPB/567392.3

- 21 -