**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 08-MD-01928-MIDDLEBROOKS/JOHNSON**

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION - MDL-1928

This Document Relates To: All Actions

_____/

FILED by _____ D.C.

MAY 11 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. - W.P.B.

## ORDER ON BAYER'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT MARK J. S. HEATH

THIS CAUSE comes before the Court upon Defendants' (hereinafter, collectively, "Bayer's") Motion to Exclude Testimony of Plaintiffs' Expert Mark J. S. Heath[1] ("Motion") (DE 3066), filed on December 18, 2009. Plaintiffs filed a Response (DE 3827), to which Bayer replied (DE 4108). I have reviewed the pertinent parts of the record and am advised in the premises. For the reasons stated below, Bayer's Motion shall be granted in part and denied in part.

## I.    Legal Standard

The admissibility of expert testimony is governed by the framework set out in Federal Rule

---

[1] Dr. Mark J. S. Heath is a medical doctor whose clinical practice primarily involves providing anesthetic care for adult patients undergoing cardiac and thoracic surgery; he has served as an attending anesthesiologist at Columbia University Medical Center in New York, NY, since 1993. He is also an Assistant Professor of Clinical Anesthesiology at Columbia University Medical Center. (Heath Report at 1.) The Plaintiffs Steering Committee proffers Dr. Heath as an expert "on anesthesiology, particularly in the context of cardiac surgery and drugs utilized during cardiac surgery, specifically antifibrinolytics, and their risks and benefits in a clinical setting." (DE 3827 at 4.)

of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The party seeking to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of proof. *Davidson v. U.S. Dep't of Health & Human Servs.*, 2007 WL 3251921, at *2 (E.D. Ky. Nov. 2, 2007) (internal citations omitted). *See also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

> According to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. According to the Supreme Court, the inquiry envisioned by Rule 702 is a flexible one, in which federal judges perform a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("Its [Rule 702's] overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

In *Daubert*, the Supreme Court listed several factors federal judges may consider in determining whether to admit expert scientific testimony under Rule 702: whether an expert's theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the

expert's theory or technique is generally accepted in the scientific community.[2] 509 U.S. at 593-94 (declining to set forth a "definitive checklist or test").

The Supreme Court subsequently held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150 (internal citations and quotations omitted). Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . [A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. The trial court has the same kind of latitude in deciding how to test an expert's reliability as it enjoys when it decides whether or not that expert's relevant testimony is reliable. *Id.*

The Eleventh Circuit engages in a three part inquiry to determine the admissibility of expert testimony under Rule 702, considering whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (internal citations omitted). The Eleventh Circuit has noted that "the primary purpose of any *Daubert* inquiry is for

---

[2] In *Daubert*, the Supreme Court considered the federal judge's gatekeeping role in ensuring that all *scientific* expert testimony is not only relevant, but reliable. The Supreme Court later held that this basic gatekeeping obligation and *Daubert*'s general principles apply to *all* expert testimony, not just testimony that is classified as scientific. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999).

the district court to determine whether that expert, 'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho*, 526 U.S. at 152.).

## II.      Background & Analysis

Bayer moves to exclude Dr. Heath's expert testimony with regard to the following proffered opinions that Bayer claims are inadmissible under Rule 702 and *Daubert*: (1) Trasylol[3] causes renal failure and mortality; (2) Trasylol is an unsafe product, and there is no patient population for whom Trasylol's benefits outweigh its risks; (3) Bayer marketed Trasylol unethically and influenced the medical community; (4) Bayer was aware of significant risks inherent in the use of Trasylol but was withholding important evidence and manipulated the clinical community's impressions and opinions regarding the safety and efficacy of Trasylol; and (5) Trasylol's label was inadequate in various ways, and Bayer failed to conduct adequate safety studies on Trasylol.

Bayer's arguments in support of exclusion and Plaintiffs' arguments against exclusion, as well as the Court's decision, are organized into these five categories below.

### A.      Trasylol Causes Renal Failure and Mortality

Dr. Heath testified that it was his opinion that, to a reasonable degree of medical certainty, Trasylol causes renal failure and carries a risk of short-term and long-term mortality.  (Heath Dep. at 247:3-8, 265:15-267:7.)

---

[3] Trasylol is also known as aprotinin.  The Court will use these terms interchangeably.

Bayer argues that this causation opinion should be excluded because it is not based on a sufficient scientific foundation: Dr. Heath arrived at the causation opinion by performing a haphazard review of the scientific literature. (DE 3066 at 2-6.) Furthermore, according to Bayer, the causation opinion is unreliable because Dr. Heath fails to: 1) take into account the background risk of renal failure or death for patients who undergo CABG surgery; and 2) identify a proven biological mechanism by which Trasylol could cause renal failure or death.[4] (DE 3066 at 6-7.)

In response, Plaintiffs state that they "are not offering Dr. Heath's testimony as evidence of causation." (DE 3827 at 7.) Instead, Dr. Heath will opine on "the risk/benefit analysis of administration of aprotinin *vis-à-vis* less expensive, safer and efficacious alternatives." (DE 3827 at 7.)

Plaintiffs do not attempt to establish the admissibility of Dr. Heath's causation opinion and state that he will not be offering a causation opinion at trial. Therefore, the causation opinion at issue is inadmissible under Rule 702 and *Daubert*.

### B.   Trasylol is an Unsafe Product and There is No Patient Population for Whom Trasylol's Benefits Outweigh its Risks

In his Report, Dr. Heath writes that after the BART study had been terminated due to a mortality signal in the aprotinin arm, he and his colleagues "could not envision any patient population for which the benefits outweighed the risks especially when there was an available

---

[4] Bayer states that "Dr. Heath's failure to consider the background rate of renal failure or death renders his methodology unreliable because the trier of fact cannot determine, from his opinion, whether the claimed injury was from the medicine of from some other background risk factor." (DE 3066 at 6.) Additionally, failure to explain the mechanism by which Trasylol allegedly causes injury renders Dr. Heath's causation opinion to be "mere guesswork that is unsupported by scientific foundation." (DE 3066 at 6-7.)

alternative with comparable efficacy." (Heath Report at 10.) Dr. Heath concludes that, "Based on the information that is now available to me, I believe that Trasylol is an unsafe product that should not be used during cardiac surgery. . . . Instead, it was and still is safe and more appropriate to use the alternative antifibrinolytic medication Amicar." (Heath Report at 16.)

Bayer argues that Dr. Heath's opinion that there is no patient population for whom Trasylol's benefits outweigh its risks should be excluded as unreliable because it has no foundation: Dr. Heath compares Trasylol's risk-benefit profile to Amicar and tranexamic acid but does not consider the full spectrum of risks and benefits associated with either therapy, and thus can not reliably testify to either the risks or benefits of these medicines.[5] (DE 3066 at 8.) Bayer also argues that Dr. Heath's opinion contradicts one of the most recent Trasylol studies, performed by Dr. Karkouti, upon whose earlier work Dr. Heath relies.[6] (DE 3066 at 9.) Further, Bayer argues that it is inappropriate for Dr. Heath to opine that Trasylol should not be used in all medical cases because Congress has empowered the FDA alone to make the risk-benefit analysis involved in the marketing of prescription drugs. (DE 3066 at 9.)

Bayer argues that Dr. Heath arrived at his opinion that Trasylol is unsafe for all patients by

---

[5] Bayer states that Dr. Heath's opinion boils down to a comparison of Trasylol to Amicar and tranexamic acid because he testified that he was not asked to offer a risk-benefit opinion on the safety of Trasylol compared to a placebo. (DE 3066 at 7. (citing Heath Dep. at 46:16-47:1.)) Bayer notes that Dr. Heath has never used tranexamic acid. (DE 3066 at 7-8. (citing Heath Dep. at 196:5-23.)) Bayer also cites to Dr. Heath's testimony that Trasylol is a more effective blood-sparing agent than either Amicar or tranexamic acid. (DE 3066 at 8. (citing Heath Dep. at 347:18-23. ("[W]e think Amicar is better than placebo. We think tran[]examic acid is similarly better than placebo. I think most of us think that Aprotinin is a little better in terms of bleeding than either of those two other drugs."))) Bayer argues that Dr. Heath simply failed to consider the independent risks and benefits of Amicar and tranexamic acid.

[6] According to Bayer, the Karkouti study concludes that aprotinin has a better risk-benefit profile than tranexamic acid in high-risk patients. (DE 3066 at 9.)

"reading a subset of the medical literature on Trasylol, which he selected without using any orderly method, and then read uncritically. . . . [H]e failed to employ a methodological approach." (DE 3066 at 4.)

Plaintiffs first point out that Bayer does not contest that Dr. Heath is an imminently qualified anesthesiologist. (DE 3827 at 6.) Plaintiffs argue that "As an anesthesiologist who has administered both Trasylol and its alternatives [Amicar], Dr. Heath is in a unique position to opine on the safety of a drug administered in cardiac surgery." (DE 3827 at 7.)

Plaintiffs further assert that Dr. Heath employed a reliable methodology[7] in rendering his expert opinion on the safety of Trasylol in this Case: he employs the same methodology in his clinical practice, and his safety opinions are not contradicted by his clinical experience. (DE 3827 at 10-13.) Plaintiffs cite to Dr. Heath's Report, where he explains that his clinical practice changed over time with respect to usage of aprotinin based on the developments in published literature concerning its safety. (DE 3827 at 11.) Plaintiffs argue that the fact that Dr. Heath's practice changed over time in response to the medical literature indicates that his opinion is reliable. (DE 3827 at 13.) "It is true that Dr. Heath could not state with certainty whether in his practice he saw an increase in renal and cardiac injuries among patients administered the drug. This testimony is not, as Bayer argues, evidence that his clinical experience with aprotinin was positive, and thus contradictive of his expert opinions here." (DE 3827 at 12.)

In its Reply, Bayer states that this Court should, at a minimum, order that Dr. Heath is

---

[7] Plaintiffs state that Dr. Heath considered internal Bayer documents and conducted a "thorough search of available scientific literature regarding the risks and benefits of aprotinin." (DE 3827 at 13.) Dr. Heath testified that he searched Medline data using various search terms such as "Aprotinin" and "Aprotinin safety" and decided to review the articles based on the abstract in order to be refreshed and informed about Trasylol. (Heath Dep. at 38:10-39:3.)

7

prohibited from offering any safety opinions regarding Trasylol that are not specifically tailored to a comparison to Amicar or tranexamic acid because Plaintiffs conceded that Dr. Heath will not offer an opinion on the risk and benefit of using Trasylol versus a placebo. (DE 4108 at 2 n.2.) Bayer argues that Dr. Heath's opinions are litigation-driven and not founded on scientific methodology because they conflict with his actual clinical experience and are instead based on a haphazard review of some medical literature. (DE 4108 at 1, 5.) According to Bayer, Dr. Heath's analysis of Trasylol's risks was unreliable because it was based on an unexamined assumption that Trasylol causes renal failure and mortality. "Plaintiffs' attempt to divorce Dr. Heath's belief that Trasylol *causes* injury from his *comparative risk/benefit opinion* ignores that the latter is premised on the former." (DE 4108 at 5-7.)

The Court finds that Dr. Heath's opinion that he could not envision any patient population for which the benefits of Trasylol outweighed its risks "especially when there was an available alternative with comparable efficacy" is admissible under Rule 702 and *Daubert*. The opinion that Trasylol is "unsafe" and that the alternative antifibrinolytic medication Amicar is safer is also admissible.

In order to understand the intended scope and admissibility of these opinions, it is helpful to provide the context in which they are made. In the Report, Dr. Heath makes clear that virtually every patient who was placed on cardiopulmonary bypass in his practice received an antifibrinolytic drug to reduce bleeding: Trasylol or Amicar.[8] (Heath Report at 8.) "The decision of whether to use Trasylol or Amicar was based on published literature and data and our clinical experience and

---

[8] Tranexamic acid, another antifibrinolytic drug, was not used in Dr. Heath's practice. (Heath Report at 8.)

8

judgment." (Heath Report at 8.) Typically, the high-risk [for massive bleeding] patients received Trasylol; the low-risk patients received Amicar. (Heath Report at 8.)

Dr. Heath indicates that he and his colleagues used Trasylol without concern until 2006, when a series of publications raised the concern that Trasylol may have adverse effects. (Heath Report at 9.)

> We became specifically concerned that aprotinin was injurious to kidneys and renal function and that this injury would outweigh the benefits of reduced bleeding. Accordingly, we modified both our deliberative process and our practice in terms of deciding which patients would best be served by receiving aprotinin. The result was that many patients who, in the past, would have been given aprotinin, were now instead treated with Amicar.

(Heath Report at 9.)

In 2007, after considering the results of the BART study, which was terminated early due to a mortality signal in the aprotinin arm, Dr. Heath and his colleagues stopped using Trasylol. (Heath Report at 10.) According to Dr. Heath, the evidence from BART controlled their decision to stop using Trasylol in their practice. It is in this context that he provides the opinion challenged by Bayer. Accordingly,

> At this point, we could not envision any patient population for which the benefits outweighed the risks especially when there was an available alternative with comparable efficacy. Interestingly, we have not noticed an increase in bleeding or bleeding complications since we stopped using Trasylol; this is consistent with the modest reduction in bleeding by Trasylol that was reported in the BART study.

(Heath Report at 10.) It is clear that the available alternative referenced by Dr. Heath is Amicar.

Dr. Heath concludes that based on the currently available information, he believes that Trasylol is "unsafe." (Heath Report at 16.)

> Instead, it was and still is safer and more appropriate to use the alternative antifibrinolytic medication Amicar, which was and still is readily available and was and still is substantially less expensive. In our practice we have ceased using Trasylol and now use Amicar for

9

virtually all patients. I have not noticed an appreciable rise in problematic bleeding since our use of Trasylol ended.

(Heath Report at 16.)

The Court finds that these opinions are admissible under Rule 702 and *Daubert*. Bayer's arguments in favor of exclusion are either misdirected or directed at the weight of the opinions rather than their admissibility: vigorous cross-examination and the presentation of contrary evidence will be the appropriate means of attacking them. *See Quiet Tech.*, 326 F.3d at 1341.

For example, Bayer argues that Dr. Heath's opinions are unreliable and litigation-driven because they conflict with his clinical experience: he did not witness any adverse events associated with Trasylol and believed that it was an effective blood-sparing agent. Bayer's argument is misguided. Dr. Heath is testifying as a clinician rather than as a causation expert; as a clinician, he evaluates the medical literature regarding the medication at issue to make a risk-benefit assessment for his patients. While he did not have evidence from his clinical practice that Trasylol was unsafe, he tailored its indication to a more limited group of patients in 2006 upon evaluating the published literature available at that time. After the BART results became available in 2007, Dr. Heath stopped administering Trasylol entirely and switched to Amicar to control perioperative bleeding in his patients.[9] Dr. Heath stopped administering Trasylol based on his analysis of the published medical literature, and his opinion does not conflict with his clinical experiences. His actions with respect to Trasylol as a clinician indicate that his opinions are not litigation-driven.

---

[9] Bayer argues that Dr. Heath purports to make a generalized prescribing decision as to all CABG patients and disregards any individualized risk-benefit determination that is inherent in that decision. (DE 4108 at 3.) However, this is exactly what Dr. Heath did as part of his clinical practice: he stopped using Trasylol and switched to Amicar for virtually all patients.

Bayer also argues that Dr. Heath failed to employ a methodological approach: his literature review was unsystematic and he did not consider the totality of the evidence. Contrary to Bayer's assertions, the Court finds that Dr. Heath's opinions are based on a reliable scientific methodology and a sufficient foundation. Dr. Heath's list of literature references contains 22 articles, and he testified that not all of the publications he relied on are identified on that list. (Heath Dep. at 26:4-22, 34:17-35:1.) The Court finds that Dr. Heath did not have to consider *all* the available evidence regarding Trasylol to have sufficient data to support his safety opinion and comparative risk-benefit assessment. Bayer does not dispute Dr. Heath's qualifications as a clinician; he routinely conducted this type of analysis and made clinical decisions based on the types of opinions proffered in this Case. *See* Heath Report at 7-8 ("With every patient we would balance, using our best judgment, experience, available knowledge, and where appropriate, cost considerations, the risks and benefits of each modality of reducing bleeding. If a given preventative measure was felt likely to be more beneficial than harmful, we would deploy it. Conversely, if our assessment based on our experience and knowledge and judgment was that the risks of a pharmaceutical agent or preventative measure outweigh the benefit, we would not use it. . . . The decision of whether to use Trasylol or Amicar was based on published literature and data and our clinical experience and judgment.")

Further, while Dr. Heath may not have performed an *independent* review of the risks and benefits of Amicar and tranexamic acid and may not be aware of every risk and benefit associated with each medication, as Bayer suggests, he does not attempt to opine on the risk-benefit comparison between Amicar and placebo, but rather on the risk-benefit comparison between Amicar and Trasylol.

Bayer may vigorously attack any relevant aspect of Dr. Heath's methodology or the basis of

11

his opinions on cross-examination, as well as question him on any study that contradicts his opinions.

Bayer's assertion that Dr. Heath's comparative risk-benefit opinion is necessarily premised on his inadmissible opinion that Trasylol *causes* injury is speculative. The comparative risk-benefit opinion is just as likely to be based on the opinion that Trasylol is *associated* with injury. Dr. Heath's Report does not contain a causation opinion; he states that the decision to use Trasylol was based on published literature and his clinical judgment and experience. (Heath Report at 8.) Bayer does not dispute Dr. Heath's qualifications to evaluate the published literature on Trasylol and apply his clinical judgment to decide whether Trasylol should be administered during cardiac surgery.

Finally, the Court finds no merit in Bayer's claim that Dr. Heath's opinion invades the province of the FDA in evaluating the safety profile of pharmaceutical products. While FDA regulators evaluate the safety profile of pharmaceutical products and decide whether such products should be marketed nationally, clinicians evaluate the safety profile of pharmaceutical products and decide whether such products should be administered to their patients. As a clinician, Dr. Heath is qualified to opine whether Trasylol should be administered to his patients during cardiac surgery.

In accordance with the foregoing analysis, the Court finds that Dr. Heath's opinions that Trasylol is unsafe for use during cardiac surgery, that there is no patient population for which the benefits of Trasylol outweigh the risks, and that Amicar is a safer alternative with comparable efficacy, are all admissible under Rule 702 and *Daubert*.

**C.    Bayer Marketed Trasylol Unethically and Influenced the Medical Community**

The following are examples of the kind of marketing opinions Bayer contests:

12

- "I was seeing Trasylol being heavily promoted by its manufacturer, Bayer." (Heath Report at 13.)

- Dr. Heath's testimony that Bayer's marketing involved a "constant stream of documents." (Heath Dep. at 307:4-18.)

- "It [Trasylol] was promoted in print and at meetings and conferences, and this promotion generated the impression that the reduced bleeding and inflammation produced by Trasylol far outweighed any potential deleterious effects." (Heath Report at 13.)

- "Its [Trasylol's] use was very alluring and enticing because of publications showing that it reduced perioperative bleeding and the need for perioperative transfusions." (Heath Report at 10.)

- "[W]hen I was provided with Bayer documents and began going through those, I felt there was a lot of inappropriate comments, discussions and behavior in those documents." (Heath Dep. at 303:21-304:10.)

Bayer argues that these opinions are inadmissible for three reasons: 1) Dr. Heath's background as an anesthesiologist does not qualify him to opine on the ethics of Bayer's marketing of Trasylol[10]; 2) Dr. Heath's marketing opinions lack a sufficient foundation; and 3) Dr. Heath's personal view about the ethics of Bayer's marketing practices is not the proper subject of expert

---

[10] Bayer cites to Dr. Heath's testimony that he is not an expert on corporate conduct, corporate ethics, marketing, or the FDA requirements applicable to pharmaceutical companies. (Heath Dep. at 304:17-305:9.)

13

testimony.[11]  (DE 3066 at 11-13.)

Plaintiffs respond that Dr. Heath's marketing opinions are within his expertise, and that his Report outlines the sources from which he personally received information regarding Trasylol.[12]  (DE 3827 at 13-14.)

Bayer replies that the fact that Dr. Heath outlines the sources from which he personally received information regarding Trasylol provides no foundation for an expert opinion regarding marketing practices.  (DE 4108 at 8.)  "[A]t best, it may be offered as foundation for him to testify as a fact witness if his own personal experiences with Bayer's marketing were somehow relevant to this lawsuit, which they are not."  (DE 4108 at 8.)

The Court finds Dr. Heath's marketing opinions to be inadmissible under Rule 702 and *Daubert* because they undisputably lie outside of his area of expertise and are not based on any reliable methodology or scientific principle.[13]  *See In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1053 (D. Minn. 2007) ("[E]xpert testimony that is merely speculation or pure conjecture based on the expert's impressions of the physical evidence must be excluded as not based on any reliable methodology or scientific principle.") (internal citations omitted).

---

[11] According to Bayer, Dr. Heath is not aware of, and does not rely on, any industry standards in forming his marketing opinions.  (DE 3066 at 12-13.)

[12] "These sources include heavy marketing efforts by Bayer, a constant stream of documents touting the benefits and safety of Trasylol, and a seminar sponsored by Bayer at which the benefits and safety of Trasylol were emphasized by a prominent member of the medical profession."  (DE 3827 at 14.)

[13] Dr. Heath testified that he is not a marketing expert, and he does not rely on any industry standards in arriving at his marketing opinions.

14

**D.     Bayer was Aware of, but Withheld, Information Regarding Trasylol's Significant Risks**

The following are examples of the kind of knowledge, motive, intent, and state of mind opinions Bayer contests:

- "Bayer developed and executed a program for manipulating the clinical community's impressions and opinions of the safety and efficacy of Trasylol." (Heath Report at 14.)

- Dr. Heath's testimony that Bayer had an "agenda to manipulate opinions." (Heath Dep. at 325:17-25.)

- "Based on my review of the internal documents, it is my opinion that there was a withholding of important evidence, and we were led to make the wrong decision, and unfortunately we did use aprotinin on many patients." (Heath Report at 13.) When asked which internal documents supported Dr. Heath's belief that Bayer withheld important evidence, he testified, "So the documents that I reviewed, it was very clear that Bayer personnel were a[ware] that there was a concern about, for example, renal injury. And rather than saying we've got to get to the bottom of this . . . [t]hey focused on how to assuage practitioners' concerns, how to manage opinion and deflect concern about it." (Heath Dep. at 302:4-17.)

- "I believe Bayer had grounds for concern. Despite those grounds, Bayer withheld information as well as failed to appropriately investigate known safety signals." (Heath Report at 12.) When asked why Dr. Heath believed Bayer had grounds for concern, he testified, "From even before it was approved, they were seeing a

15

possibility of a renal effect, adverse renal effect on the drug." (Heath Dep. at 292:2-13.)

- "Bayer was aware of significant risks inherent in the use of Trasylol." (Heath Report at 15.)

Bayer argues that these opinions are inadmissible for two reasons: 1) Dr. Heath has no foundation to opine on what Bayer knew or intended; and 2) Bayer's purported motive, knowledge, intent, and state of mind are not matters requiring specialized knowledge, but are instead questions for the jury. (DE 3066 at 14-15.)

Plaintiffs respond that Bayer's argument is without merit because Dr. Heath does not opine on Bayer's knowledge, motives, intent, or state of mind. (DE 3827 at 14.) Instead, "Following his reliable review of the literature, Bayer's internal documents, and other information, Dr. Heath now opines that had he been in possession of the information of which Bayer was aware, he would not have used Trasylol in his clinical practice." (DE 3827 at 14.)

Bayer replies that Plaintiffs are wrong regarding the scope of Dr. Heath's opinions. (DE 4108 at 8.) Furthermore, Dr. Heath's ability to render an appropriate risk-benefit analysis in his own practice is irrelevant to any issue in this Case. (DE 4108 at 8.)

The Court finds that Dr. Heath inappropriately opines on Bayer's knowledge, motive, intent, and state of mind. These opinions are inadmissible under Rule 702 and *Daubert* because they have no basis in any relevant body of knowledge or expertise and lie outside the proper bounds of expert testimony. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545-47 (S.D.N.Y. 2004). Instead, these opinions describe lay matters which a jury is capable of understanding without the expert's help; inferences about intent and motive are classic jury questions. *See id.*

16

Further, the Court finds that Dr. Heath's opinion regarding the impact that withheld safety information, if disclosed to the medical community, would have had on his risk-benefit analysis as a clinician, must be excluded as it is presented here. Plaintiffs argue that such a broad opinion should be admitted but do not point to any specific statement made in Dr. Heath's Report or deposition regarding whether and how any particular withheld safety information, if disclosed, would have affected his risk-benefit analysis. As presented here, this proffered testimony is purely speculative. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

### E.     Trasylol's Label was Inadequate

Bayer characterizes Dr. Heath's criticisms of Trasylol's label into two categories: 1) Dr. Heath complains about *where* information was presented in the Trasylol label[14]; and 2) Dr. Heath complains that the label should have included certain unspecified safety warnings based on the conclusions of recently published studies, and that Bayer failed to carry out well-designed studies and put the results of those studies in Trasylol's label.[15]  (DE 3066 at 15-16.)

---

[14] Dr. Heath testified that "The way [warnings] were presented, except, for example, the initial labeling of it, it had a comment about the renal effects, but they were not listed as a warning, not listed as a precaution, not listed as an adverse event. It feels, to me, like it was buried." (Heath Dep. at 334:3-10.)

[15] In the Report, Dr. Heath writes that "Bayer withheld valuable information from clinical studies and failed to carry out well-designed definitive safety studies that would reveal, as the BART trial and other studies ultimately revealed, the adverse overall effects of Trasylol." (Heath Report at 15.) In regards to recently published studies, Dr. Heath testified that "Mangano 2007

17

Bayer argues that the first category of opinions should be excluded because Dr. Heath admitted that he is not an expert in the FDA requirements applicable to pharmaceutical companies and has no expertise in crafting or evaluating drug labels. (DE 3066 at 15-16. (citing Heath Dep. at 305:4-7.))

Bayer argues that the second category of opinions should also be excluded because the opinions lack a sufficient foundation, and Dr. Heath is not a regulatory expert and has no background in regulatory requirements concerning studies or labeling about studies.[16]   (DE 3066 at 16-17.) According to Bayer, Dr. Heath is offering his "own subjective view of what Bayer should have done." (DE 3066 at 17.)

The following is Plaintiffs' response, in full, to Bayer's arguments regarding Trasylol's label.

> Bayer rightly notes that Dr. Heath is not an expert on labeling and has never participated in the drafting of a label.  However, Plaintiffs have not offered Dr. Heath as a labeling expert.  Instead, Dr. Heath will testify at trial that had the label included warnings regarding renal dysfunction, renal failure, death, and cardiac adverse events, it would have altered his risk/benefit analysis and influenced his practice.  Such an opinion is squarely within his

---

and the Duke study and the Schneeweiss i3 publication when it came out.  In totality, all of those, all of those, all the things that we have now if they had had those, we know what they would do with what we have now.  If we had the totality of all these things, there would have been, I think come up with a different label." (Heath Dep. at 368:4-12.)  In regards to the studies that Bayer failed to conduct, Dr. Heath testified that "What I think should have been done is that a study designed to look at the long-term effects of this drug on, basically, all important end organs and function should have been done, a safety study given that there were safety signals. . . . [T]here should have been interest in pursuing whether there's a renal problem or not. . . . So along with renal, there should have been a look for all of these standard major things that we worry about, the things that go wrong after, that cause complications of surgery and the things that cause bad outcomes, the brain, the lungs, the liver, the kidney." (Heath Dep. at 360:7-362:1.)

[16] When asked what standard Dr. Heath was relying on to conclude that Bayer should have done studies, he responded, "I don't have a regulatory rule.  It's a standard of fair and balanced and, ultimately, a kind of discussion that serves patients that if you're going to promote the beneficial effects, I think we should all be looking for problems with drugs." (Heath Dep. at 343:13-343:23.)

18

province, as one who must weigh the risk-benefit of such medications in the course of his clinical practice.

(DE 3827 at 14-15.)

Bayer replies that Dr. Heath's personal experience with Trasylol's label is irrelevant to this Case and does not provide an adequate foundation for the expert opinion proffered. (DE 4108 at 8.)

As it is undisputed that Dr. Heath is not an expert on labeling, his opinion that Trasylol's labeling was inadequate is inadmissible under Rule 702 and *Daubert*. It appears that Plaintiffs attempt to get around the qualification issue by framing Dr. Heath's testimony in terms of how additional warnings on Trasylol's label would have altered his risk-benefit analysis and thus affected his prescribing practices. The Plaintiffs propose that a very broad opinion be admitted based on several vague statements such as this one: "Bayer withheld valuable information from clinical studies and failed to carry out well-designed definitive safety studies that would reveal . . . the adverse overall effects of Trasylol. . . . Bayer was aware of significant risks inherent in the use of Trasylol, and our practice would have been influenced had we been similarly aware of these risks." (Heath Report at 15.) Dr. Heath does not describe the exact labeling change that would have led him to stop administering Trasylol to his patients, and whether and when the label would have provided him with information beyond what he already knew from the peer-reviewed medical literature and incorporated in his risk-benefit analysis. The Court finds that, as presented here, Plaintiffs have not met their burden under Rule 702 and *Daubert*: Dr. Heath's proffered labeling opinions must be excluded. *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap

19

between the data and the opinion proffered.").

Further, as it is undisputed that Dr. Heath is not an expert on the regulatory duties imposed on pharmaceutical manufacturers to perform studies, his opinion that Bayer "failed to carry out well-designed definitive safety studies" is inadmissible under Rule 702 and *Daubert*. As Dr. Heath does not base this opinion on any standard, it amounts to a personal opinion that is outside the proper scope of his expert testimony.

## III.   Conclusion

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Mark J. S. Heath (DE 3066) is **GRANTED IN PART and DENIED IN PART.** More specifically,

- The Motion is **GRANTED** as to Dr. Heath's opinion that Trasylol causes renal failure and mortality.

- The Motion is **DENIED** as to Dr. Heath's opinion that Trasylol is an unsafe product, and that there is no patient population for whom Trasylol's benefits outweigh its risks.

- The Motion is **GRANTED** as to Dr. Heath's opinion that Bayer marketed Trasylol unethically and influenced the medical community.

- The Motion is **GRANTED** as to Dr. Heath's opinion that Bayer was aware of significant risks inherent in the use of Trasylol but was withholding important evidence and manipulated the clinical community's impressions and opinions

20

regarding the safety and efficacy of Trasylol.

- The Motion is **GRANTED** as to Dr. Heath's opinion that Trasylol's label was inadequate, and that Bayer failed to conduct adequate safety studies on Trasylol.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this _11_ day of May, 2010.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:      Counsel of Record

21