## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

**IN RE: TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928**

**This Document Relates To:**

**MORDECAI V. BAYER CORPORATION, ET AL.,
Case No. 9:08-cv-80781**

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
### IN LIMINE TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING THE
### TIMING OF BAYER'S DISCLOSURE OF THE i3 DRUG SAFETY STUDY
### AND PRELIMINARY RESULTS FROM THAT STUDY

**COMES NOW** Plaintiff, by and through her attorneys of record, and files this, her response in opposition to Bayer's motion in limine to exclude evidence and argument regarding Bayer's tardy disclosure to the federal Food and Drug Administration ("FDA") of the existence and preliminary results of an observational study of Trasylol safety by i3 Drug Safety (the "i3 Study"). Plaintiff would respectfully show the Court that the motion in limine sought by Bayer[1] is unwarranted for the following reasons:

### I.      INTRODUCTION

Bayer's motion in limine presents two simple questions.   First, has a defendant established that plaintiff cannot prove proximate cause by offering testimony of one biased, unreliable witness?  Second, has a defendant carried its burden to prove that evidence should be categorically excluded prior to trial merely by showing that such evidence may be irrelevant to

---

[1] Defendants Bayer Healthcare Pharmaceuticals Inc. (as successor in interest to Bayer Pharmaceutical Corporation), Bayer HealthCare LLC, Bayer AG, and Bayer Schering Pharma AG (as successor in interest to Bayer HealthCare AG), are referenced collectively throughout this opposition as "Bayer."

*one issue* in the case when *multiple other issues* exist (or may exist depending upon how the case develops during trial) for which the challenged evidence is relevant?  The obvious answer to both questions is no.

Bayer's sole ground for excluding evidence and argument that it concealed the existence and preliminary results of the i3 Study is a claim of irrelevance.[2]  Bayer contends the i3 cover-up in the late summer and fall of 2006 is irrelevant because the results of the study were ultimately disclosed in the final days of September 2006 and they did not substantially impact Mr. Mordecai's treating physician's decision to use Trasylol on Mr. Mordecai in October 2006.

Bayer's argument fails for two significant reasons.  First, this Motion advances one of the same arguments that Bayer set forth in its Motion for Summary Judgment: that decedent's treating physician, Dr. Athanasuleas, was unmoved by any amount of negative information about Trasylol and would have used it regardless of any additional warnings the company could have provided.[3]  Therefore, according to Bayer, Plaintiff cannot establish proximate cause despite the fraudulent concealment of the i3 study because Dr. Athanasuleas would not have heeded the warnings of that research anyway.  This argument fails because Plaintiff has amassed evidence that Bayer could have conducted the i3 study years earlier than when it did, raising the question of whether the tardy disclosure is truly confined to the events of 2006.  In addition, Plaintiff has evidence that (1) Dr. Athanasuleas was a Bayer agent and consequently a biased and questionable witness; (2) Dr. Athanasuleas was not provided with information indicating the full extent of the risks of Trasylol before prescribing it to Mr. Mordecai, and there is a question of

---

[2] Bayer also asserts that its failure to timely disclose the i3 Study is unduly prejudicial pursuant to Federal Rule of Evidence 403.  However, the only prejudice Bayer asserts is that of being subjected to evidence that is not relevant or probative. [Bayer's Motion in Limine p. 8-10].  Consequently, it is the relevance of the i3 Study disclosure that determines Bayer's claims for exclusion under both Rule 402 and Rule 403.
[3] Plaintiff respectfully refers the Court to her Opposition to Defendants' Motion for Summary Judgment and Statement of Material Facts filed concurrently for a full recitation of the applicable facts.

fact as to whether he would have prescribed the drug had he known of the true nature of the risks; and (3) Dr. Athanasuleas did not weigh the risks and benefits of the use of Trasylol with any of his patients in any circumstances, and is thus not a credible learned intermediary such that Bayer can employ that defense here.

The second reason Bayer's argument fails is that the circumstances under which Plaintiff was prescribed Trasylol are not the *only* issues in this case. This case also involves: (1) witnesses whose credibility is called into question by their involvement in the i3 Study cover-up, (2) assertions by Bayer that it acted properly with regard to FDA disclosures and that FDA approval demonstrates Trasylol safety which Plaintiffs wish to refute, (3) a pattern and routine by Bayer of hiding adverse study findings, and (4) a non-bifurcated claim for punitive damages.   Bayer's cover-up of the i3 Study is directly relevant to each of these areas.   At the very least, it is not so obvious that no set of facts will be presented at trial which would render the i3 cover-up relevant, that this Court should depart from the preferred practice of deferring evidentiary rulings until trial so that they may be resolved in the proper context of the facts and arguments that are developed there. 21 Charles A. Wright & Kenneth W. Graham, Jr., FEDERAL PRACTICE AND PROCEDURE ¶ 5042 (1977 & Supp.1993); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.,* 2001 WL 617521, *1 (M.D.Ala. Feb.20, 2001).

Simply stated, if Bayer wishes to (1) concede that its learned intermediary defense fails because Dr. Athanasuleas was not an independent actor who properly considered all available risks when considering whether to prescribe Trasylol to Mr. Mordecai; (2) withdraw all statements by its experts that Bayer  acted properly with regard to its disclosures to the FDA, (3) withdraw all witnesses who had knowledge regarding the i3 Study prior to September 21, 2006, (4) bifurcate the punitive damage portion of the trial, and (5) stipulate that it will not assert the

ongoing approval by the FDA of Trasylol's use and labeling as evidence that its product was safe and its responses were adequate based on what was known or knowable, -- then its present motion in limine would present a much closer question.  As the case currently exists, however, Bayer's motion must fail because its proximate cause argument is unsupportable and it is impossible to conclude *in advance of trial* that Bayer's concealment of the i3 Study is not, and will not be, relevant to any of the other issues.  Consequently, Bayer's motion in limine to exclude evidence and argument regarding Bayer's untimely disclosure of the i3 Study must be denied.

## II.
## ARGUMENT AND AUTHORITIES

I.      **Bayer's Motion *in Limine* Improperly Raises the Same Disputed Issues of Material Fact Addressed in its Motion for Summary Judgment, and Must Be Denied as these are Jury Questions.**

At the outset, Plaintiff acknowledges that this Court granted a similar motion *in limine* when analyzing cases where Plaintiffs ingested Trasylol before September 2006.  There, however, the Court cautioned that while it did not consider the timing of the i3 study disclosure to be relevant in those cases, it reserved judgment for "another case where there is a different surgery date."  *See* Exhibit A, Transcript of Status Conference (Feb. 26, 2010) at 79.  This is such a case, and Plaintiff raises different proximate cause issues before the Court here.  Moreover, Plaintiff respectfully requests that the Court reconsider its Ruling as it pertained to Plaintiffs' position that the i3 disclosure is relevant to numerous other issues in this litigation.

Defendants contend that the timing of the i3 disclosure must be excluded as Plaintiff cannot rely upon it to prove proximate causation.  Just as they did in their Motion for Summary Judgment, Defendants contend that Dr. Athanasuleas was already aware of the risk of renal failure from the use of Trasylol and testified that he would not have heeded stronger warnings

382817

had Bayer provided them.  Defendants' argument fails to consider several significant facts which support the use of the tardy disclosure of the i3 study to establish proximate cause, and consequently denial of Defendants' motion.  Moreover, each of these issues are questions of fact properly considered by the jury and not in the context of a motion *in limine*.

First, there is a question of fact as to whether Bayer could have commissioned the i3 study as early as 2003 when it received results of other studies indicating the risk of renal failure from Trasylol, namely the Kress and St. George's studies. *See* Exhibit B, Maurer Dep. at 335-340; *see also* discussion, infra, § II(b)(4).  Bayer had further reason to undertake the i3 study in 2003 because it knew that one of its consultants, Dr. Linda Shere-Lesserson, was reviewing the Mangano data at that time, and that the data showed increased adverse events in patients using Trasylol. *See* Exhibit B, Mauer Dep. at 386-390; Exhibit C, BAY04541433.  The delayed results of the i3 study were therefore not only the result of Bayer's concealments in the summer and fall of 2006, but for several years beforehand.  Had the i3 study been commissioned years earlier, the chain of events leading to the increased warnings and eventual removal of the product from the market might have occurred in time to save Mr. Mordecai's life.

Second, Plaintiff raised three significant facts regarding Dr. Athanasuleas' reliability and objectivity in her Opposition to Defendants' Motion for Summary Judgment, which are also relevant to opposing this Motion:

The first of these issues is that, despite Bayer's attempts to cast Dr. Athanasuleas as an "objective" treating physician, Plaintiff has amassed evidence showing that Dr. Athanasuleas was a key opinion leader for Bayer, in other words, someone who would receive compensation for promoting and defending Trasylol. *See*, Exhibit D, Harville Dep. at 52:1-56:6.   Dr. Athanasuleas was in fact identified as a potential key opinion leader by Bayer both before and

after the seminal Mangano article was published. *Id.* at 62:6-12.   Bayer described Dr. Athanasuleas as a "strong supporter of Trasylol" and would regularly ask him to speak with other physicians about Trasylol. *Id.* at 70:9-17, 71:22-72:16, 152:10-12.   Dr. Athanasuleas attended Bayer-sponsored dinner meetings and regularly sat down with Bayer sales representatives over lunch. *Id.* at 49:15-22; 212:12-16.   Further, Dr. Athanasuleas, as a "CTM grad", was a physician who was paid by Bayer to attend meetings and filter promotional materials to see if they would be effective in selling the use of Trasylol to physicians. *Id.* at 157-58.   Plaintiff has therefore raised a question of fact as to whether Dr. Athanasuleas is biased towards Bayer's position in this litigation. As Plaintiff argued in her Opposition to Defendants' Motion for Summary Judgment, Dr. Athanasuleas' clear bias should consequently not be used to undercut Plaintiff's proof of proximate cause.

Second, despite Dr. Athanasuleas' testimony that he was aware of the risk of renal failure when using Trasylolol, he was never provided *all* the information required to know of the extent of the risks of renal failure in order to properly consider it in his risk-benefit analysis for Mr. Mordecai.  The studies which truly revealed the risks, namely Kress, St. George and i3, were not disclosed to the FDA and subsequently to the public until it was too late for Dr. Athanasuleas to properly consider them when determining the course of Mr. Mordecai's care.  Mere days passed between the publicity of Bayer's tardy disclosure of the i3 study (on September 30, 2006) and Mr. Mordecai's hospitalization on October 9, 2006.  It is simply a question of fact as to whether Dr. Athanasuleas had the opportunity to digest the most recent findings and reconsider his practice of unqualified Trasylol use.  After all, Dr. Athanasuleas testified himself that reading current scientific literature is the "most important" way he learns of the risks and benefits of the medications he uses in his practice.  *See* Exhibit E, Athanasuleas Dep. at 29:1-19.   Dr.

Athanasuleas further testified that, "if [he] had any increased data about any drug that [he] use[s], [he] would take that valuable information in making a risk versus benefit analysis for a patient." *Id.* at 186:25-187:16.   Because Bayer did not disclose the most relevant studies to the FDA in a timely fashion, Dr. Athanasuleas did not have the opportunity to take advantage of this crucial tool and was consequently not truly aware of the risks confronting his patient.

Third, Bayer's reliance on Dr. Athanasuleas as its learned intermediary must fail because he does not fit the definition of a "learned" intermediary.  Pursuant to *Reyes v. Wyeth Labs.*, 498 F.2d 1264 (5th Cir. 1974), the most widely-cited learned intermediary doctrine case:

> where prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. . . Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect.  As a medical expert, the prescribing physician can **take into account the propensities of the drug, as well as the susceptibilities of his patient**.  His is the task of **weighing the benefits of any medication against its potential dangers**.  The choice he makes is an informed one, an **individualized medical judgment bottomed on a knowledge of both patient and palliative**."

498 F.2d at 1276 (emphasis added).  Contrary to the comforting scenario envisioned by *Reyes* and its progeny, Dr. Athanasuleas did not perform an "individualized medical judgment" based on knowledge of a specific patient before prescribing Trasylol.  Indeed, Dr. Athanasuleas exercised absolutely <u>no</u> discretion in his use of Trasylol.  He testified that when Trasylol was first released he was "selective" and used it in "high risk" patients, but that, within a year or two of using it, he "became less selective" and "extended [Trasylol use] to <u>all patients</u> who were going to be placed on cardiopulmonary bypass." Exhibit E, Athanasuleas Dep. at 113:21–115:15 (emphasis added); *see also* Exhibit D, Harville Dep. at 226:5-11 (agreeing that, while many surgeons reserved Trasylol for use in their "sickest patients," Dr. Athanasuleas instead "used Trasylol in each and every cardiac patient.")  Moreover, while Dr. Athanasuleas initially used a

half dose Trasylol in his patients, he eventually began to use a full dose of Trasylol in each and every on-pump CABG case. *See* Exhibit E at 165:17-166:13. Dr. Athanasuleas never saw fit to exercise caution or discretion in the use of Trasylol and only discontinued its use when it was taken off the market in 2007. *Id.* at 166:14-19. He in no way fits within the parameters of a "learned intermediary" as understood by the courts applying this defense. Consequently Defendants cannot rely upon his testimony to undermine Plaintiff's evidence of proximate causation.

Plaintiff has raised several questions of fact surrounding whether Bayer's late disclosure of the i3 study to the FDA could have altered the course of Mr. Mordecai's care and, ultimately, his life. Plaintiff should be permitted to present this evidence to the jury. Defendants' motion must consequently be denied.

**II. Bayer's Motion in Limine is Limited to the Tardy *Disclosure* of the i3 Study; Bayer Does Not Seek to Exclude the Fact of the i3 Study or the i3 Study's Conclusions.**

The narrow scope of Bayer's motion in limine should also be made clear. Bayer does not presently dispute that the i3 Drug Study is relevant and admissible on the following issues: (1) general causation, (2) specific causation, (3) the safety and efficacy of Trasylol, (4) the feasibility of conducting a study on Trasylol's safety concerns, and (5) what was "knowable" by Bayer if it had conducted an earlier study on Trasylol safety. Indeed, Bayer's motion in limine is not directed at the substantive data or conclusions of the i3 Study at all. Bayer's motion is directed solely at argument and evidence concerning Bayer's failure to disclose the existence of the i3 Study and the preliminary results of the i3 Study to the FDA in connection with the September 21, 2006 FDA Advisory Committee Meeting. Yet, even properly limited to the cover-up of the i3 Study, Bayer's motion in limine must be denied for the reasons set forth below.

382817

### A.  Bayer's Tardy Disclosure of the i3 Study to the FDA is Relevant to Multiple Claims and Defenses in this Case.

Bayer's sole ground for excluding evidence that it failed to timely disclose the i3 Study and the i3 Study's preliminary results to the FDA is a claim of irrelevance. Bayer is able to argue irrelevance by fixating exclusively on the question of whether concealment of the study was a substantial factor in Trasylol having been prescribed to Mr. Mordecai days after the results were revealed.   But even if Bayer is correct with regard to the i3 cover-up's non-role in Dr. Athanasuleas' prescribing practices – and Plaintiff disputes this fact, as discussed above – the reasons Plaintiff was prescribed Trasylol are not the only issues in this case.   This case also involves (1) witnesses whose credibility is called into question by their involvement in the i3 Study cover-up, (2) assertions by Bayer that it acted properly with regard to FDA disclosures and that FDA approval demonstrates Trasylol safety, (3) a pattern and routine by Bayer of hiding adverse study findings, and (4) a non-bifurcated claim for punitive damages.   Bayer's untimely disclosure of the i3 Study and the facts surrounding that non-disclosure are relevant to either prove or refute each of these issues.   Because Bayer has not shown that its failure to disclose the i3 Study is irrelevant to *all* of these issues, evidence of Bayer's non-disclosure should not be excluded at this time. *Luce v. United States*, 469 U.S. 38, 41, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

The standard for what constitutes relevant evidence is a low one: evidence is relevant if it has "*any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Luce*, 469 U.S. at 41; *United States v. La Rosa*, 236 Fed. App. 584, 588 (11th Cir. 2007); FED. R. EVID. 401. Thus, when evidence is challenged solely on the ground that it is irrelevant (as it is here), the evidence must be without probative value on *any* fact of consequence.  If it is relevant to *any*

issue, it is relevant to the action and should not be excluded. The movant has the burden of demonstrating that the evidence is inadmissible on <u>any</u> relevant ground. *Bowden,* 2001 WL 617521 at *1. Because Bayer's cover-up of the i3 Study is relevant to at least five different issues in this case, it should be admitted. At the very least, Bayer's untimely disclosure should not be categorically excluded from evidence via a limine motion prior to this Court even seeing the manner in which the evidence in the case develops. *Bowden,* 2001 WL 617521 at *1.

      **1.    Bayer Has Not Carried its Burden to Prove that the Facts Surrounding Bayer's Non-Disclosure of the i3 Drug Study Are Irrelevant to Refute Testimony by Bayer and its Experts.**

Bayer and its experts have repeatedly professed that: (1) Bayer has acted properly with respect to its disclosures to the FDA generally and with regard to the i3 Study specifically, and (2) that ongoing FDA approval of Trasylol and the Trasylol label are evidence that the product was safe and the warning was adequate. Evidence that Bayer withheld unfavorable i3 Study data from the FDA is relevant and necessary to refute each of these statements.

      **a.    Evidence of the i3 Study cover-up is relevant to refute testimony by Bayer that it acted properly with regard to its communications and disclosures to the FDA.**

Bayer and its experts have made numerous statements to the effect that Bayer acted properly with respect to its disclosures to the FDA generally and with regard to the i3 Study specifically. For example, experts for Bayer have offered the following opinions and testimony:

- "After initial approval, the sponsor satisfactorily discharged its obligations for post-marketing surveillance and reporting." Exhibit F, Expert Report of Dr. Robert R. Fenichel, p. 55, ¶ 121.

- "Bayer cooperated appropriately with the FDA during the months of preparation for the Advisory Committee meetings of 2006 and 2007." Exhibit F, Expert Report of Dr. Robert R. Fenichel, p. 57, ¶ 125.

- "With respect to the ongoing i3 study, and its preliminary report, Bayer complied with FDA regulations." Exhibit G, Expert Report of Paul Waymack p. 32, ¶ 173.

Evidence that (1) the FDA had requested any information or studies Bayer had regarding

Trasylol and kidney injuries or other safety issues and (2) that Bayer did not even mention the i3

Study (let alone its preliminary findings) when both were known to the drug maker is certainly

relevant to rebut the opinions of Bayer's experts that Bayer always acted properly in connection

with its disclosures to the FDA.

At the very least, it is impossible to say, at this juncture, that the i3 Study cover-up has no

possible relevance to the testimony likely to be developed at trial.  Unless it is clear that the

evidence is inadmissible for any purpose, evidentiary rulings should be deferred until trial so that

questions of foundation, relevancy, and potential prejudice may be resolved in proper context.

See generally 21 Charles A. Wright & Kenneth W. Graham, Jr., FEDERAL PRACTICE AND

PROCEDURE ¶ 5042 (1977 & Supp.1993). It is the better practice to wait until trial to rule on

objections when admissibility substantially depends upon what facts may be developed there.

*Bowden,* 2001 WL 617521 at *1; *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712

(6th Cir.1975)).

> **b.  Evidence of the i3 Study cover-up is relevant to refute testimony by Bayer that FDA approval demonstrates that  Trasylol was safe and that the warnings were adequate.**

Bayer and its experts are anticipated to defend the drug manufacturer's conduct at trial by

asserting a position that they have taken throughout the pretrial and discovery processes: namely,

by that the FDA's ongoing approval of Trasylol and the Trasylol label are proof that the drug

was safe and the warning was adequate.  Evidence that Bayer withheld relevant information from

the FDA until after the 2006 Advisory Committee had voted to permit continued Trasylol use is

directly relevant to refute Bayer's assertion.

An analogous personal injury case involved a negligence claim against a laboratory when errors in typing the patient's blood resulted in injury to the patient. *Harms v. Laboratory Corp. of America,* 155 F.Supp.2d 891 (N.D.Ill. 2001). The laboratory moved to exclude evidence about an investigation it conducted (and its failure to file a report on the investigation which Plaintiff contended was required) on the ground that what occurred after the patient's injury was irrelevant because it did not cause the injury. *Id*. at 900. The court disagreed. Instead, the Court held that evidence about the investigation, and what that investigation revealed was relevant to the case at hand. *Id.* The same holding is appropriate in the case at bar. Even though the cover-up occurred after Plaintiffs' respective injuries, it is relevant to Bayer's anticipated defense that ongoing FDA approvals demonstrate the adequacy of its conduct with regard to Trasylol. Simply stated, evidence of the i3 cover-up cannot be ruled irrelevant prior to determining the evidence and arguments presented by Bayer at trial.

### 3.    Bayer Has Not Carried Its Burden to Prove That The  Non-Disclosure of the i3 Drug Study is Irrelevant to the Credibility of Witnesses Who Were Involved in Hiding the Study from the FDA.

Once a witness testifies, the witness' credibility becomes a fact of consequence in issue under Rule 401, and an opponent might well attempt to impeach the witness' credibility. Under Federal Rule of Evidence 608(b), the witness may, in the discretion of the court, be cross-examined about specific instances of conduct probative of untruthfulness. In other words, the witness on the stand can be asked about "prior bad acts" related to untruthfulness such as lying, cheating, filing false application, and other such acts.

Conflicting information exists regarding who at Bayer had information regarding the i3 Study in advance of the September 21, 2006 Advisory Committee meeting. Bayer admits that Bayer employees Dr. Weidman and Dr. Kuno Sprenger had received a preliminary report from i3

prior to the Advisory Committee meeting.   In addition, Bayer's own investigation into the cover-up, conducted by the Zuckerman-Spaeder law firm, cites Dr. Schereen as recollecting disclosure of the i3 study an agenda item on a June 28 conference call between Bayer and the FDA. [Zuckerman-Spaeder Report, p.6 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit A and attached hereto as Exhibit H)]. The Zuckerman Spaeder Report also concluded that a large group of Bayer leaders and consultants had tasked Drs. MacCarthy, Scheeren and Rozycki with informing the FDA of the i3 Study during the July 17 meeting.  Hence, at a minimum, Dr. Weidman, Dr. Sprenger, Dr. Macarthy, Dr. Shereen, and Dr. Rozycki had some knowledge regarding the i3 Study's existence and/or preliminary results in advance of the September 2006 Advisory Committee meeting.

The fact that these witnesses were aware of the i3 Study, understood that the purpose of the study was to look at Trasylol's relationship to kidney injuries and were aware that the FDA Advisory committee meeting was called to examine Trasylol's impact on the kidneys – but did not even mention the existence of the i3 Study bears on their credibility and truthfulness as witnesses.  Moreover, their failure to disclose was not a one-time omission.  Bayer had not disclosed the i3 Study to the FDA by the time of the Advisory Committee meeting. On July 17, Bayer met with the FDA to review the drug maker's data submissions relating to the Advisory Committee meeting.   The i3 Study was not discussed at that time.   On August 17, Bayer submitted a substantial briefing document to the FDA for purposes of the Advisory Committee meeting that did not mention the i3 Study. On September 21, the Advisory Committee conducted a day long meeting on Trasylol.  Dr. Weidman and Dr. Sprenger were present at the Advisory Committee meeting.   Yet, they never once mentioned the preliminary results of the i3 Study throughout that day long meeting.   That Drs. Weidman, Sprenger, MacCarthy, Schreen and

Rozycki were demonstrably less than truthful with the FDA in a matter, quite literally, impacting life and death –is certainly probative on the credibility and truthfulness of those same persons when proffered as witnesses in this case.

>    4.    **Bayer Has Not Carried Its Burden to Prove that Its Cover-Up of the i3 Drug Study is Irrelevant to Demonstrate a Pattern of Non-Disclosure of Adverse Study Information by Bayer.**

Bayer had a routine practice of concealing the negative results of studies on Trasylol. This routine practice began with studies, such as Kress and St. George's Hospital that were completed in 2003.   Thus, the practice was in place prior to the surgery dates of any of the three Plaintiffs.   In analogous circumstances, acts occurring after the harm occurs have been held admissible as evidence of the wrongdoing. *United States v. Rubenstein*, 151 F.2d 915, 917-918 (2nd Cir. 1945) (finding acts that occurred after the conspiracy ended relevant to prove the conspiracy).

In 2002, Bayer arranged with Dr. David Kress of St. Luke's Medical Center in Milwaukee to conduct a full dose atrial fibrillation study.[4] Dr. Kress was awarded a $48,000.00 grant from Bayer to perform the study.[5]   In 2003, Dr. Kress determined that he was able to answer his proposal question based on the preliminary data which showed that there was a renal failure concern with Trasylol at doses higher than half dose and that there was no significant difference in Trasylol and non-Trasylol patients with regard to their rate of atrial fibrillation.[6] Bayer, concerned that Dr. Kress' study would influence other physicians, voiced specific

---

[4] BAY05025291 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit B and attached hereto as Exhibit I).
[5] BAY05025291   (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit B and attached hereto as Exhibit I).
[6] BAY05253843-9 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit B and attached hereto as Exhibit I).

opinions that his findings should not be published.[7] Thus, in 2003, Bayer made the decision not to publish Dr. Kress' study, not to release the results of this study, and not to reveal the adverse health and safety information contained in the study.  It was not until November 9, 2006 that Bayer finally informed the FDA about the renal safety findings of Dr. Kress.[8]

A similar course of action was pursued by Bayer in connection with the St. George's Hospital London study. In October 2001, Bayer approved a protocol for St. George's Hospital London to study the benefits of using Trasylol.[9]  Richardson Research prepared a report for Bayer analyzing the St. George's Hospital data and unexpected outcomes.[10]  The report, prepared in December of 2003, stated that the use of Trasylol was associated with longer stays, with increased use of blood products and with higher mortality.[11]  Bayer did not provide the St. George's Hospital report to the FDA until September 21, 2006.[12]

Bayer's conduct with the i3 Study is merely the last (and perhaps most egregious) in a line of adverse study results handled by Bayer in a consistent manner. Bayer commissioned the i3 Study as a response to the unfavorable Mangano study.  Indeed, the original i3 study proposal was shortened from six months to three month in order to insure timely delivery of the preliminary results to the FDA in advance of the September 2006 Advisory Committee meeting. Yet, when the preliminary results of the i3 Study came in unfavorable, Bayer did just what it had

---

[7]  BAY05322498, BAY04691537-8; BAY05322498-9 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit B and attached hereto as Exhibit I).
[8]  Responses and Objections of Defendants to Plaintiffs' Second Set of Interrogatories, Fifth Set of Requests for Production of Documents and First Requests for Admission, p.81. (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit C and attached hereto as Exhibit J).
[9] BAY04213410-17 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit B and attached hereto as Exhibit I).
[10] BHCAG01306584-BHCAG01306637; BAY03446626-8; BAY03446626; BAY04213407-9 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit B and attached hereto as Exhibit I).
[11]  BHCAG01306586 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit B and attached hereto as Exhibit I).
[12]  Responses and Objections of Defendants to Plaintiffs' Second Set of Interrogatories, Fifth Set of Requests for Production of Documents and First Requests for Admission, p.83 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit C and attached hereto as Exhibit J).

done with the Kress and the St. George's Hospital studies: it hid the study results.  If the lead author of the i3 Study, Dr. Walker, had not advised Bayer that it must turn the over the preliminary results to the FDA, it is unclear whether Bayer would have ever brought the study forward on its own.

Even though it occurred after Plaintiffs' surgeries, Bayer's concealment of the i3 Study is relevant because it demonstrates a consistent pattern of response that makes it more probable that Bayer's non-disclosure of the Kress and St. George study results (which were available prior to Plaintiffs' surgeries)[13] was an act of willfulness or neglect.  In that way, this case is factually akin to *King v. Salazar*, 2009 WL 1311521 (D.N.M., March 16, 2009).  In *King*, the defendant employer sought to exclude evidence of later-occurring events offered by the plaintiff in support of his hostile work-environment claim.  *Id*. at 1.  The plaintiff argued that later conduct is part of the same hostile work environment and therefore the jury should be allowed to consider the later-occurring evidence as part of the totality of the circumstances.  The court agreed, stating "the Court believes that these subsequent events would have a tendency to make the existence of a hostile-work environment more probable than it would be without the evidence." *Id.* at 1. Such is the case here as well.   That Bayer's non-disclosure of the Kress and St. George's Hospital studies (during the time period when disclosure may have affected Plaintiffs' surgeries) was at least negligent, and likely willful, is made more probable by the fact that Bayer followed the

---

[13]Bayer's routine practice of concealing information that might hurt Trasylol sales extended beyond withholding unfavorable study results to concealing safety data.  Bayer admits that by November 2001, its global database had all the information necessary to support the Trasylol label change that was eventually made in December of 2006. Responses and Objections of Defendants to Plaintiffs' Second Set of Interrogatories, Fifth Set of Requests for Production of Documents and First Requests for Admission, Response to Amended Request for Admissions No. 14 (originally produced with D.E. 4228 as Plaintiffs' Compendium of Exhibits at Exhibit C and attached hereto as Exhibit J). Although the data supporting the warning existed five years earlier, the warning itself was delayed because Bayer had successfully concealed the data by doing safety summaries only on the US trials and not on the global database.  If Bayer had been forthright about the information contained in the global database, the warning that was eventually added to the Trasylol label - warning of increased risks of renal dysfunction particularly among patients with pre-existing renal impairment – would have been in place in time to have benefitted Plaintiffs. *See* 12/15/2006 Trasylol Product Label (referenced in D.E. 4228 as "Plaintiffs' Compendium of Exhibits at Exhibit "D" and attached hereto as Exhibit K).

same pattern of non-disclosure on numerous occasions.  Consequently, evidence of that pattern of behavior is relevant and should be admitted.

>   **5.      The Timing of Bayer's Disclosure of the i3 Drug Study is Relevant to the Issue of Punitive Damages.**

As required by Alabama law, Plaintiff is only seeking punitive damages in this case. The facts of the i3 Study cover-up are relevant to a jury's assessment of whether Bayer's conduct was intentional and the reprehensibility of Bayer's conduct.  The degree of Bayer's awareness of the dangers to patients caused by Trasylol, its concealment or "cover-up" of those dangers, and the existence and frequency of similar past conduct are all relevant considerations when assessing punitive damages. *Ledbetter v. United Ins. Co. of America*, 845 F.Supp. 844, 848 (M.D.Ala.1994).  Bayer's conduct with regard to concealing the i3 Study is relevant to the issue of punitive damages.

**C.      Evidence That Bayer Failed to Disclose the Adverse Results of the i3 Drug Study Until Compelled to Do So Should Not Be Excluded Under Rule 403.**

The Court should also reject Bayer's alternative argument that evidence of its delay in disclosing the i3 Study should be excluded under Federal Rule of Evidence 403. A court's "discretion to exclude evidence under Rule 403 is narrowly circumscribed." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (citations and internal quotations omitted). Rule 403 permits a district court to exclude relevant evidence only when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *United States v. Ross,* 33 F.3d 1507, 1524 (11th Cir.1994).  Thus, Rule 403 "favors admissibility of relevant evidence" and should be invoked "very sparingly" to bar admission of relevant evidence. *Hendrix v. Raybestos-Manhattan, Inc.,* 776 F.2d 1492, 1502

(11th Cir. 1985) (emphasis added); *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984) ("Rule 403 is an extraordinary remedy ...."). It is particularly difficult to make a pretrial determination on Rule 403 evidentiary issues without a substantive background. As one court has observed: "Excluding evidence under Fed. R. Evid. 403 at the pretrial stage is an extreme measure." *Hines v. Consol. R.R. Corp.,* 926 F.2d 262, 274 (3d Cir. 1991).

The only argument Bayer presses for finding evidence that it failed to timely disclose the i3 study prejudicial is its claim that the same evidence is irrelevant. [Motion in Limine p. 10]. As set forth above, the timing of Bayer's disclosure of the i3 Study is relevant to Plaintiffs' proof of a pattern of non-disclosure by Bayer, and punitive damages. It is also relevant and necessary for Plaintiffs to refute anticipated testimony by Bayer that the FDA's ongoing approval of Trasylol is evidence of the drug's safety and efficacy and the adequacy of its warnings. Finally, Bayer's involvement in the concealment of the i3 Study is relevant to the credibility of witnesses designated by both parties. "Unfair testimony ... is 'not to be equated with testimony simply adverse to the opposing party.' " *United States v. 0.161 Acres of Land in Birmingham, Ala*., 837 F.2d 1036, 1041 (11th Cir. 1988). That relevant evidence regarding Bayer's non-disclosure of the i3 Study is potentially harmful to Bayer's defenses simply does not make it prejudicial.

Finally, Bayer's half-hearted suggestion that admission of the evidence it seeks to exclude could "consume an extraordinary amount of time" does not warrant exclusion of the evidence. Like its other arguments, Bayer's waste-of-time argument is premised on the mistaken belief that the i3 Study is not relevant to any issue in the case. Having demonstrated that concealment of the i3 Study is relevant to multiple issues in this litigation, it can hardly be said that Plaintiffs are "wasting time" by presenting evidence relevant to overcoming Bayer's statute

of limitations defense, or by refuting Bayer's assertions that Trasylol is safe based on its ongoing FDA approvals.

### III.
### CONCLUSION AND PRAYER

Plaintiffs respectfully request that the Court deny Bayer's motion in limine to exclude evidence and argument regarding Bayer's untimely disclosure of the i3 Study. Plaintiffs additionally pray for all other or further relief to which they may be justly entitled.

**PLAINTIFF**

**By Counsel**

*/s/ Jonathan D. Boggs*
P. Gregory Haddad, Esq.
*ghaddad@baileyglasser.com*
Kerrie Wagoner Boyle, Esq.
*kboyle@baileyglasser.com*
Jonathan D. Boggs, Esq. (FL Bar #0106305)
*jboggs@baileyglasser.com*
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110 *facsimile*

David F. Miceli
*dmiceli@simmonsfirm.com*
Simmons, Browder, Gianaris, Angelides & Barnerd, LLC
119 Maple Street, Suite 201
Carrollton, GA 30117
770-834-2122
770-214-2622

Leslie Ann Caldwell, Esq.
*lac@lusklaw.com*
LUSK, CALDWELL & DEAN P.C.
2101 Highland Avenue, Suite 410
Birmingham, Alabama 35205
(205) 933-7090 Telephone
(205) 933-7099 Facsimile

382817

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-1928-MIDDLEBROOKS/JOHNSON**

**IN RE TRASYLOL PRODUCTS LIABILITY**
**LITIGATION – MDL-1928**

**This Document Relates to:**
**LINDA MORDECAI v. BAYER CORPORATION, et al.,**
**Case No. 9:08-civ-80781-DMM**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of May, 2010, the foregoing **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING THE TIMING OF BAYER'S DISCLOSURE OF THE i3 DRUG SAFETY STUDY AND PRELIMINARY RESULTS FROM THAT STUDY** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

> Brian A. Wahl
> Bradley, Arant, Rose & White, LLP
> One Federal Place
> 1819 Fifth Avenue North
> Birmingham, Alabama 35203
>
> Phillip S. Beck
> Bartlit Beck Herman Palenchar & Scott LLP
> Courthouse Place
> 54 West Hubbard Place, Suite 300
> Chicago, IL 60610
>
> Patricia Elaine Lowry
> Barbara Bolton Litten
> Squire Sanders & Dempsey LLP
> 777 S Flagler Drive, Suite 1900
> West Palm Beach, FL 33401-6198
>
> Elizabeth C. Curtin
> Sidley Austin LLP
> 1 S Dearborn Street
> Chicago, IL 60603

Richard K. Dandrea
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

Daniel G. Wyllie
Dykema Gossett
400 Renaissance Center, 35th Floor
Detroit, MI 48243


*/s/ Jonathan D. Boggs*
Jonathan D. Boggs, Esq. (FL Bar #0106305)
*jboggs@baileyglasser.com*