UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  1:08-md-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION MDL 1928

This document relates to:

*Peyton et al.* v. *Bayer Corp. et al.*,
Case No. 9:10-cv-80431

## FIRST AMENDED COMPLAINT

COME NOW the Plaintiffs, Thomas Peyton, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Patricia Peyton, deceased; Renae Obedisco, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Wilma Corfont, deceased; Melodie Urban, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Nancy Viers, deceased; Kimberly McCrimager, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Julie Scoggins, deceased; Stacey Williams, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Ludella Williams, deceased; Joanne Unetich, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Michael Unetich, deceased; John Tisher, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Glen A. Tisher, deceased, and Donna Spanos, individually and as Personal Representative of The Estate of and on behalf of the heirs and beneficiaries of Wilma Cooper, deceased, and file this Complaint seeking judgment against Defendants  BAYER CORPORATION, BAYER

HEALTHCARE PHARMACEUTICALS, INC. (As Successor in Interest of Bayer Pharmaceuticals Corporation, and BAYER SCHERING PHARMA AG (As Successor in Interest of Bayer Healthcare AG) (hereinafter collectively referred to as "Defendants" or "Bayer")for equitable relief, monetary restitution, and compensatory and punitive damages, arising from the injuries and deaths of Decedents as a result of their exposure to the drug product Trasylol®.

**<u>The Parties</u>**

1.      Plaintiff Thomas Peyton, an adult, is an heir to the estate of the decedent, Patricia Peyton (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Patricia Peyton.

2.      Plaintiff Renae Obedisco, an adult, is an heir to the estate of the decedent, Wilma Corfont (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Wilma Corfont.

3.      Plaintiff Melodie Urban, an adult, is an heir to the estate of the decedent, Nancy Viers (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Nancy Viers.

4.      Plaintiff Kimberly McCrimager, an adult, is an heir to the estate of the

decedent, Julie Scoggins (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Julie Scoggins.

5.     Plaintiff Stacey Williams, an adult, is an heir to the estate of the decedent Ludella Williams (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Ludella Williams.

6.     Plaintiff Joanne Unetich, an adult, is an heir to the estate of the decedent Michael Unetich (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Michael Unetich.

7.     Plaintiff John Tisher, an adult, is an heir to the estate of the decedent Glen A. Tisher (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Mary Jevnikar.

8.     Plaintiff Donna Spanos, an adult, is an heir to the estate of the decedent Wilma Cooper (hereinafter "Decedent" or collectively "Decedents"), and is fit to serve as personal representative of the estate and therefore has standing to bring this action pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful death of Wilma Cooper.

9.     Defendant BAYER CORPORATION is a corporation formed in the State of Indiana with its principal place of business located in Pittsburgh, Pennsylvania.  At all times material to this lawsuit, Bayer was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce throughout the United States, including Ohio and Michigan, either directly or indirectly, the drug product Trasylol.

10.     Defendant BAYER HEALTHCARE PHARMACEUTICALS INC., as successor in interest of BAYER PHARMACEUTICALS CORPORATION, is a wholly owned subsidiary of Defendant Bayer Corporation, incorporated in the state of Delaware, with its principal place of business located in Wayne, New Jersey.  Prior to January 1, 2008, Bayer Pharmaceuticals Corporation was a wholly owned subsidiary of Defendant Bayer Corporation.  Bayer Pharmaceuticals Corporation's principal place of business was located in West Haven, Connecticut.  At all times material to this lawsuit, BAYER HEALTHCARE PHARMACEUTICALS INC., as successor in interest of BAYER PHARMACEUTICALS CORPORATION was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce throughout the United States, including Ohio and Michigan, either directly or indirectly, the drug product Trasylol.

11.     Defendant BAYER SCHERING PHARMA, as successor in interest of BAYER HEALTHCARE A.G., a healthcare and medical products company, is a German corporation with its principal place of business in Leverkusen, Germany.  At all times relevant herein, Bayer HealthCare A.G., and its predecessor Bayer A.G., was in the business of designing, testing, manufacturing, distributing and promoting certain pharmaceutical products, including Trasylol.

55195.1                                                4

**Jurisdiction and Venue**

12.     Jurisdiction and venue are proper under the United States Constitution as well as under Ohio law regarding personal jurisdiction.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1332 for diversity of citizenship and Plaintiffs claim an amount in controversy exceeding $75,000.00.

13.     Venue in this district for pretrial proceedings in these civil actions is proper under 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claim occurred in this district.

**General Bayer Allegations**

Plaintiffs hereby incorporate by reference paragraphs 1 through 11 of this Complaint and further state the following:

**Allegations of Fact**

14.     Trasylol® is the brand name of a drug product known generically as "aprotinin for injection", which is available for medical use only by prescription.    It is a member of a class of prescription drug products known as Antifibrinolytics, which are used as a means of controlling or reducing bleeding and limiting or avoiding blood transfusions in current medical practice.  Since the early 1990's, antifibrinonlytic therapies have been widely accepted by the medical community for use during cardiac and other types of surgery to reduce the number of patients requiring blood transfusion and to reduce total blood loss.

15.     The aprotinin protein, which is the active pharmaceutical ingredient in Trasylol, is a naturally occurring proteolytic enzyme inhibitor derived from bovine lung tissue.  Aprotinin consists of 58 amino acid residues in a single-chain polypeptide, consisting of 6512 daltons and is cross-linked by three disulfide bridges.  The reactive bond site for Aprotinin is lysine – 15 – alanine – 16, and it forms reversible stoichiometric complexes.

16.     Aprotinin was first discovered in or about 1930 in Germany.  Since the 1950's, Aprotinin was sold outside the United States as a treatment for acute pancreatitis and for several other indications.  Trasylol is manufactured in Germany by Bayer Healthcare A.G.

17.     From 1994 to 2007, Bayer sold Trasylol in the United States in 100 and 200 milliliter vials.  When used during surgery, Trasylol was generally delivered to the patient intravenously in the operating room by a health care professional and without the specific knowledge of the patient.

18.     Amicar® (epsilon-aminocaproic acid or "EACA") and Cyklokapron® (tranexamic acid or "TEA") are additional drug products in the antifibrinolytic class.   EACA was first sold in the United States in or about 1964, and TEA was first sold in the United States in or about 1986.

19.     In 1987, a study was published by Dr. David Royston *et al.* in *The Lancet* suggesting that the use of aprotinin in repeat CABG surgery would reduce blood loss and the need for transfusions in patients undergoing coronary artery bypass graft (also known as "CABG") surgery.

20.     In December 1993, the U.S. Food and Drug Administration (the "FDA") approved Trasylol for sale in interstate commerce in the United States as a prescription drug product and approved Trasylol's principal label, known as the "Package Insert," based on the criteria employed by the federal agency pursuant to the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*  In that package insert, Trasylol was indicated "for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of repeat coronary artery bypass graft

surgery [and] in selected cases of primary coronary artery bypass graft surgery where the risk of bleeding is especially high . . . or where transfusion is unavailable or unacceptable."

21.     According to the FDA, the risk of renal toxicity associated with exposure to Trasylol was known to Bayer in 1993.  According to Dr. Dennis Mangano, M.D., Ph.D., of the Ischemia Research and Education Foundation, despite pre-existing clinical and animal evidence, only a minority of 45 clinical studies conducted on aprotinin exposure during surgery prior to FDA's approval in 1993 commented on renal function and, of those, none had an adequate number of patients to determine, with statistical significance, whether Trasylol exposure increased the risk of  renal failure.

22.     In October 1994, the FDA approved amendments to the Trasylol Package Insert to provide an optional, lower dosage regimen of aprotinin.

23.     In August 1997, the FDA approved amendments to the Trasylol Package Insert to highlight information about the risk of anaphylactic shock and certain other adverse effects associated with exposure to aprotinin.

24.     In August 1998, the FDA approved amendments to the Trasylol Package Insert.  In that package insert, Trasylol was indicated for use during both primary and repeat CABG surgeries.

25.     On information and belief, between August 1998 and December 2006, no material safety information was reviewed and either approved or deemed not approvable by the FDA for inclusion in the Trasylol Package Insert.

26.     On information and belief, the FDA required Bayer to conduct certain post-approval clinical studies and/or evaluations and analyses as conditions of the its approval of the revised Package Insert in 1998.  On information and belief, Bayer either did not fulfill

those obligations and/or did not conduct those clinical studies and/or evaluations and analyses so as to generate clinically meaningful information about the safety of Trasylol.

27.     On information and belief, Bayer did not conduct any clinical studies comparing the safety and efficacy of Trasylol with EACA and/or TEA.

28.     Bayer aggressively promoted Trasylol to physicians through medical journal advertisements, mass mailings, and direct communications from the Bayer sales force, among other methods.   On information and belief, Bayer sponsored continuing medical education ("CME") seminars and paid physicians to advocate the use of Trasylol, orally and in writing, over the use of other antifibrinolytics and in various types of surgery, and to downplay the significance of the adverse effects of Trasylol.

29.     Bayer regularly represented in its advertising and promotional messages that the risk of renal and certain other injuries including death, associated with exposure to Trasylol were "comparable to placebo" and other similar messages.   These messages represented to physicians that Trasylol did not cause more renal and certain other injuries than the number of injuries resulting from surgery without the use of Trasylol.   In other advertising and promotional messages, Bayer overstated the benefits of Trasylol.

30.     According to Bayer, an estimated 4.3 million patients were given Trasylol. Bayer estimated that Trasylol sales generated about $293 million in 2005 alone, making it the company's 11th largest-selling drug.   In late 2005, Bayer forecast that Trasylol would someday generate upwards of $600 million annually.

31.     On January 26, 2006, *The New England Journal of Medicine* ("NEJM") published an article by Dr. Mangano *et al.* reporting an association of Trasylol (aprotinin injection) with renal toxicity and renal failure and ischemic events (myocardial infarction and stroke) in patients undergoing coronary artery bypass grafting surgery.   This study was an

55195.1                                           8

observational study of patients who received either Trasylol, EACA or TEA, or no specific drug treatment.

32.     Overall, Dr. Mangano found a more than doubling in the risk of renal injury in patients exposed to aprotinin compared to those patients not exposed (odds ratio of 2.52 (1.66-3.82)) as well as an increased risk of cardiovascular and cerebrovascular adverse events and death.

33.     In another publication, in the medical journal *Transfusion*, on January 20, 2006, Dr. Karkouti *et al*. also suggested an association between the use of aprotinin and renal toxicity among patients undergoing cardiac surgery with cardiopulmonary bypass.

34.     On February 1, 2006, Bayer contacted Dr. Alex Walker, a highly respected Harvard-trained physician and pharmacoepidemiologist and the Senior Vice President for Epidemiology at a company named "i3" regarding the possibility of conducting its own retrospective study to compare Trasylol with EACA and TEA in response to the study published by Dr. Mangano *et al*.

35.     In May 2006, the FDA announced that it would convene a meeting of its Cardiovascular and Renal Drugs Advisory Committee on September 21, 2006, to evaluate the data regarding Trasylol.  In a contract signed by Bayer and Dr. Walker's company, i3, Bayer specifically requested that a preliminary report of Dr. Walker's study be provided to Bayer in time for it to be considered by the FDA's advisory committee.

36.     Bayer received a preliminary report of Dr. Walker's study on or about September 14, 2006.  On information and belief, the report of the study confirmed that there was an increased risk of renal and certain other injuries in patients exposed to Trasylol versus those exposed to EACA or TEA.  Bayer did not inform the FDA about the work being

conducted by Dr. Walker or existence of the preliminary report until after the September 21, 2006 Cardiovascular and Renal Drugs Advisory Committee meeting.

37.     Following an independent investigation of Bayer's conduct with respect to the disclosure of Dr. Walker's study, it was concluded that "[Bayer]'s scientific leaders opposed contracting for the i3 study because they were skeptical about its potential scientific value. This negative view colored the approach to disclosure." And, "Bayer management handled the study in a way that diminished its visibility and importance to the [company] leaders. Management assigned responsibility for the i3 study to [Bayer officials] in Germany without establishing clear lines of communication to the [company] leaders coordinating Bayer's preparation for the Advisory Committee meeting; thus, the i3 study was a secondary priority in the minds of these [Bayer] leaders."

38.     As a result of the recommendations of the FDA's advisory committee, the articles authored by Mangano *et al.* and Karkouti *et al.*, other reports and data known to and/or in the possession of the Defendants, the FDA required that the package insert for Trasylol include additional Warnings and Precautions, beginning in December 2006, regarding the risks of renal injury and renal failure associated with the use of aprotinin and recommended that aprotinin be reserved for patients who are at increased risk of blood loss and blood transfusion.

39.     The FDA described the December 2006 amendments to the Trasylol package insert as follows:

> The new labeling for Trasylol (December 2006) has a more focused indication for use, a new Warning about renal dysfunction, a revised Warning about anaphylactic reactions, and a new Contraindication. Trasylol is now indicated only for prophylactic use to reduce peri-operative blood loss and the need for blood transfusion in patients who are at *an increased risk for blood loss and blood transfusion* undergoing cardiopulmonary bypass in the course of coronary artery

bypass grafting (CABG) surgery.   Trasylol should be administered only in the operative setting where cardiopulmonary bypass can be started quickly.   Trasylol should not be administered to any patient with a known or suspected exposure to Aprotinin within the past 12 months.

FDA is evaluating additional recently submitted epidemiological safety study data (discussed below), in the context of all other safety and efficacy information available on Aprotinin.   This review may result in other actions, including additional changes to the full prescribing information (product labeling).

40.     In October 2007, Bayer was notified that the Executive Committee of a Canadian-based clinical study of Trasylol in high-risk cardiac surgery patients had halted the study.   A planned periodic data analysis in this clinical trial, the *Blood conservation using antifibrinolytics: A randomized trial in a cardiac surgery population* ("BART") study conducted by the Ottawa Health Research Institute, indicated an increase in all-cause mortality (that almost reached conventional statistical significance for 30-day mortality) for patients in the Trasylol treatment arm compared to patients who received the alternative drug products EACA or TEA.

41.     On or about November 5, 2007, Defendants discontinued the sale of Trasylol. The FDA stated at that time:   "[I]t is not possible to determine and identify a population of patients undergoing cardiac surgery for which the benefits of Trasylol outweigh the risks."

42.     On or about November 2, 2004, Decedent, Betty Sours, had open heart surgery at the Toledo Hospital in Ohio.   During the surgery, and with no contributory negligence on her part, Ms. Sours was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

43.     As a direct, proximate, and legal result of the negligence, carelessness, and

other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until her death on or about November 5, 2004.

44.     On or about September 30, 2004, Decedent, Patricia Peyton, had open heart surgery at the Parma Hospital in Ohio.   During the surgery, and with no contributory negligence on her part, Ms. Peyton was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

45.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until her death on or about October 1, 2004.

46.     On or about November 24, 2000, Decedent, Wilma Corfont, had open heart surgery at the Parma Hospital in Ohio.   During the surgery, and with no contributory negligence on her part, Ms. Corfont was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

47.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until her death on or about October 11, 2004.

48.     On or about February 18, 1999, Decedent, Nancy Viers, had open heart surgery at the Fairview Hospital in Ohio.   During the surgery, and with no contributory negligence on her part, Ms. Viers was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

49.     As a direct, proximate, and legal result of the negligence, carelessness, and

other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until her death on or about February 18, 1999.

50.     On or around October 2000, Decedent, Julie Scoggins, had open heart surgery at the Fairview Hospital in Ohio.  During the surgery, and with no contributory negligence on her part, Ms. Scoggins was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

51.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until her death on or about March 11, 2001.

52.     On or about February 22, 1998, Decedent, Ludella Williams, had open heart surgery at the St. Vincent Charity Hospital in Ohio.  During the surgery, and with no contributory negligence on his part, Mr. Casteel was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

53.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until his death on or about February 24, 1998.

54.     On or about February 11, 1997, Decedent, Joanne Unetich, had open heart surgery at the Hillcrest Hospital in Ohio.  During the surgery, and with no contributory negligence on her part, Ms. Unetich was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

55.     As a direct, proximate, and legal result of the negligence, carelessness, and

other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until her death on or about February 11, 1997.

56.     Decedent, Glen A. Tisher, had open heart surgery at the Akron Hospital in Ohio.  During the surgery, and with no contributory negligence on his part, Mr. Tisher was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

57.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until his death on or about December 10, 2005.

58.     On or about December 24, 1999, Decedent, Wilma Cooper, had open heart surgery at the Lakewood Hospital in Ohio.  During the surgery, and with no contributory negligence on her part, Ms. Cooper was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

59.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Decedent began experiencing renal insufficiency immediately after heart surgery, and subsequently went into acute renal failure; Decedent's condition deteriorated until her death on or about February 18, 2007.

60.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Decedents were forced to undergo hemodialysis and other painful and debilitating medical treatments and eventually died.

61.     As a direct, proximate, and legal result of the negligence, carelessness, and

other wrongdoing of the Defendants, as described herein, Decedents sustained devastating injuries, including but not limited to renal failure, which caused or contributed to unnecessary pain and suffering, and death.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

62. Neither the Decedents nor any of the Plaintiffs discovered that the Decedents suffered a Trasylol-related injury until well after November 5, 2007, the date when Trasylol was recalled from the market.

63. Moreover, any failure to discover such Trasylol related injury was reasonable under each of the Plaintiffs' circumstances and in light of the fact that: 1) Trasylol is typically administered interoperatively and without the patient's consent or knowledge; 2) Trasylol is typically never discussed with the patients before or after the surgery; and 3) because the types of injuries suffered by the Decedents and/or Plaintiffs can occur without Trasylol.

64. Further, the association of Trasylol with increased risks of renal failure and death did not receive any widespread public disclosure until a 60 Minutes exposé was aired in February of 2008 which was followed by attorney advertisement for those injured during cardiac surgical procedures. Such is the circumstance of each of the Plaintiffs' claims in this lawsuit.

65. The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through failing to disclose a known defect to physicians or Decedent, and misrepresenting their product as safe for its intended use, actively concealed from Decedent and Decedent's prescribing physicians the true risks associated with Trasylol.

66. As a result of Defendants' actions, Decedent and her prescribing physicians

were unaware, and could not reasonably known or have learned through reasonable diligence of the manufacturing defect and that Decedent had been exposed to the risks alleged herein and that those risks were a direct and proximate result of Defendants' acts and omissions.

67.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of Trasylol. Defendants were under a duty to disclose the true character, quality, and nature of Trasylol because this was non-public information over which the Defendants had, and continue to have, exclusive control, and because Defendants knew that this information was not available to the Decedent, medical providers and/or to their facilities. In addition, the Defendants are estopped from relying on any statute of limitations because of their concealment of these facts.

68.     Decedent had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the Plaintiff could not have reasonably discovered the wrongdoing at any time prior to November 5, 2007. Plaintiff and medical professionals could not have possibly conducted studies to determine the nature, extent and identity of related health risks dealing with the manufacturing defect of Defendants' drug and were forced to rely only on Defendants' representations.

## COUNT I
## Ohio Product Liability Act – Failure to Warn

Comes now the Plaintiff and for Count I of this Complaint against Bayer alleges:

69.     Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs 1-61 as if fully set forth herein.

70.     Plaintiffs, as personal representatives and heirs to the estate of Decedents,

bring Count I of the Complaint pursuant to Ohio Ohio Rev. Code §§ 2307.71, the Ohio Product Liability Act ("OPLA").

71.     Plaintiffs have standing to prosecute this claim pursuant to Ohio Rev. Code § 2125.02.

72.     At all times material to this lawsuit, Bayer manufactured Trasylol.

73.     At all times material to this lawsuit, Bayer was engaged in the business of distributing and selling Trasylol.

74.     Bayer sold the Trasylol, which was administered to Decedents during their cardiac surgeries, as alleged in this Complaint

75.     Pursuant to Ohio Revised Code § 2307. 71, the Defendants are manufacturers of Trasylol and manufacture ethical drugs subjecting them to claim's brought under the OPLA.

76.     Bayer owed Decedents a duty of reasonable care to adequately warn Decedents of the risks associated with the use of Trasylol.

77.     Bayer's Trasylol was defective due to inadequate warning or instruction for the following reasons:

(1) At the time Trasylol was marketed and left the control of Defendants, Bayer knew or, in the exercise of reasonable care, should have known that the warnings provided to users of Trasylol regarding the risks associated with their use were inadequate, incorrect and misleading in at least the following material ways:

(a) Trasylol was unaccompanied by proper warnings regarding all possible side effects associated with its use and the comparative severity, incidence, and duration of such adverse effects; and

(b) Trasylol was defective due to inadequate post-marketing warnings or instructions, because Bayer failed to provide adequate warnings to users or consumers and continued aggressively to promote Trasylol, even after it knew or should have known of the risks of injury from this drug; and

(c) Trasylol was unaccompanied by proper warnings regarding renal failure caused by Trasylol and Bayer continued to aggressively promote Trasylol, even after it knew of should have known of the risk of renal failure from this drug; and

(d) Trasylol was unaccompanied by proper warnings regarding heart attack caused by Trasylol and Bayer continued to aggressively promote Trasylol, even after it knew of should have known of the risk of heart attack from this drug; and

(e) Trasylol was unaccompanied by proper warnings regarding stroke caused by Trasylol and Bayer continued to aggressively promote Trasylol, even after it knew of should have known of the risk of stroke from this drug; and

(f) Bayer failed to warn that there were other drugs available that did not have the same risks as Trasylol.

(g) In light of the likelihood of developing serious injuries, including renal failure, heart attack or stroke from using Trasylol, a manufacturer exercising reasonable care would have provided warnings or instructions concerning these and other risks.

(2) Moreover, Bayer failed to provide adequate post-parketing warnings or instructions when it knew or, in the exercise of reasonable care, should have

known about the likelihood of developing serious injuries, including renal failure, heart attack and stroke associated with the use of Trasylol.

(3) In light of the likelihood of developing serious injuries, including renal failure, heart attack or stroke from using Trasylol, a manufacturer exercising reasonable care would have provided post-marketing warnings or instructions concerning these and other associated risks.

78.     Bayer failed to warn Decedents' prescribing physicians of the risks described above which prevented the physicians from making informed decisions concerning the use of Trasylol and properly conveying the associated risks to consumers, including the Decedents named herein, so that the consumers, including Decedents, could have made an informed decision concerning the use of Trasylol in light of likelihood and severity of the associated risks described herein.

79.     By failing to warn Decedents and their cardiac surgeons of the adverse health risks associated with the administration of Trasylol, Bayer breached its duty to Decedents of reasonable care and safety.

80.     As a direct and proximate result of Bayer's failure to adequate warn Decedents of the risks associated with the use of Trasylol, including renal failure, heart attack and stroke, the Plaintiffs suffered and continue to suffer injuries and damages set forth in this Complaint.


**COUNT II**
**Ohio Product Liability Act - DEFECTIVE DESIGN**

Come now the Plaintiffs and for Count II of this complaint against Bayer allege:

81.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs 1-61 as if fully set forth herein.

82.     Plaintiffs, as personal representatives and heirs to the estates of Decedents, bring Count II of this Complaint pursuant to Ohio Ohio Rev. Code §§ 2307.71, the Ohio Product Liability Act ("OPLA").

83.     At all times material to this lawsuit, Bayer manufactured Trasylol.

84.     At all times material to this lawsuit, Bayer was engaged in the business of distributing and selling Trasylol.

85.     Bayer sold the Trasylol, which was administered to Decedents during their cardiac surgeries, as alleged in this Complaint.

86.     The Trasylol administered to Decedents, was defective in design or formulation because, at the time it left the control of Bayer, the foreseeable risks associated with its design or formulation exceeded the benefits associated with Trasylol.

87.     The Trasylol administered to Decedents, was defective, and because of its defects, was unreasonably dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably forseeable manner and unreasonably dangerous to persons who might reasonably be expected to require its use. In addition, this drug was dangerous to the extent beyond that which could reasonably be contemplated by Decedents, and any benefit of this drug was far outweighed by the serious and undisclosed risks of its use, and other drugs performed the same function without the increased risks of Trasylol.

88.     The Trasylol administered to Decedents was expected to reach the user without substantial change in the condition in which it was sold.

89.     The Trasylol administered to Decedents reached her without substantial change in the condition in which it was sold.

90.     Decedents were persons who would reasonably be expected to use

Trasylol.

91.     The nature and magnitude of the risk of harm associated with Trasylol, including renal failure, heart attack and stroke, far outweighed any potential benefits of Trasylol.

92.     Bayer failed to adequately warn consumers, including the Decedents, and the Decedents' physicians of the risks alleged herein such that neither the Decedents nor their physicians could make informed decisions concerning the use of Trasylol and, therefore, did not and could not appreciate the full extent of the risks associated with Trasylol, including renal failure, heart attack and stroke.  Decedents and Decedents' physicians were unaware of Trasylol's risks and the increased likelihood of developing injuries, including renal failure, heart attack and stroke from using Trasylol.

93.     The defects in the Trasylol administered to Decedents were a direct and proximate cause of the injuries and damages sustained by Plaintiffs as set forth in this Complaint.

**COUNT III**
**Ohio Product Liability Act**
**Defects Due To Trasylol's Nonconformance with Bayer's Representations**

Come now the Plaintiffs and for Count III of this complaint against Bayer allege:

94.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-61 as if fully set forth herein.

95.     Plaintiffs, individually and as personal representatives to the estates of Decedents, bring Count III of this Complaint pursuant to Ohio Rev. Code § 2307.77, Ohio's Product Liability Act ("OPLA").

96.     Trasylol, which was designed, tested, manufactured, distributed, promoted

and sold by Bayer, was expected to, and did reach Decedents without a substantial change in its condition.

97.     Bayer, through its advertising and promotional materials, impliedly and expressly represented that Trasylol was safe for the use for which it was intended, namely as a means to reduce perioperative bleeding in patients undergoing surgery.

98.     However, when Trasylol left the control of Bayer, it did not conform with Bayer's representations of safety because Trasylol is associated with unreasonable, life-threatening side effects, including, but not limited to, renal failure, heart attack and stroke which were never disclosed to Decedents or their prescribing physicians.

99.     Decedents and their physicians relied to their detriment on Bayer's representations of safety.

100.    As a direct and proximate result of Bayer's misrepresentations and breach thereof, Plaintiffs suffered and continue to suffer from the injuries and damages set forth in this Complaint.

**COUNT IV**
**Fraudulent Concealment**

Come now the Plaintiffs and for Count IV of this complaint against Bayer allege:

101.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-61 as if fully set forth herein.

102.    Plaintiffs, individually and as personal representatives of the estates of Decedents, bring Count IV of this Complaint pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful deaths of Decedents.

103.    Bayer concealed and continues to conceal past and present facts from the consuming public, including Decedents, that it had a duty to disclose.

104.    The facts concealed and not disclosed include, but are not limited to, those set

forth in the general allegations section of this Complaint.

105.    Each of the facts concealed and not disclosed was material.

106.    Bayer concealed and continued to fail to disclose material facts to the consuming public with the intent that the consuming public, like Decedents, would take a course of action that it would otherwise not have taken if it had been informed of the actual facts known to Bayer, including the totality of the risks associated with the use of Trasylol.

107.    Decedents took such action relying on the assumption that the undisclosed facts did not exist and/or were different than they actually were.

108.    The reliance by Decedents was justified.

109.    As a result of Decedents' reliance on the incomplete and inaccurate information communicated by Bayer and Decedents' assumption that the non-disclosed facts about the risks associated with the use of Trasylol did not exist, Plaintiffs suffered the injuries and damages alleged in this Complaint.

## COUNT V
## Fraudulent Misrepresentation

Come now the Plaintiffs and for Count V of this complaint against Bayer allege:

110.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-61 as if fully set forth herein.

111.    Plaintiffs, individually and as personal representatives to the estates of Decedents, bring Count V of this Complaint pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful deaths of Decedents.

112.    At all relevant times herein, Bayer was in the business of manufacturing, promoting, advertising, selling and distributing Trasylol.

113.    Through its actions and omissions in advertising, promoting, reporting to the

FDA, labeling, and otherwise, Bayer made public misrepresentations of material facts to, and/or concealed material facts from physicians, the FDA, and consumers like Decedents, concerning the character and safety of Trasylol.

114.    Those public misrepresentations and omissions include, but are not limited to those set forth in the general allegations section of this Complaint. Those false representations and omissions include but are not limited to the following:

    a.   Bayer failed to disclose that sufficient pre-clinical and clinical testing and adequate post-marketing surveillance to determine the safety and side effects of Trasylol had not been done;

    b.   Bayer failed to timely disclose, and/or intentionally concealed, the interim and final results of the Walker Study showing that Trasylol use dramatically increased the risk for renal failure, heart attack and stroke; and

    c.   Bayer failed to include adequate warnings with Trasylol about the potential and actual risks, and nature, scope, severity, and duration of any serious side effects of this drug, including without limitation, the risk of hemorrhagic stroke.

115.    Bayer was obligated to disclose the foregoing risks, but failed to adequately and timely do so even after it was in possession of information concerning those risks. Bayer's representations that Trasylol was safe for its intended use were false, since this drug was, in fact, dangerous to the health of Decedents when used to reduce perioperative bleeding in patients undergoing surgery, and there were alternative products available that were less expensive, equally as effective and posed less risk.

116.    In the alternative, Bayer failed to exercise reasonable care in ascertaining

the accuracy of the information regarding the safe use of Trasylol and communicating that information to Decedents.

117.    Decedents were not aware of the falsity of the foregoing representations, nor were they aware that material facts concerning Trasylol had been concealed or omitted. In reliance upon Bayer's misrepresentations, Decedents' surgeons were induced to and did administer Trasylol for Decedents' surgeries.  If Decedents had known the true facts concerning the risks of the use of Trasylol, they would have requested Trasylol not be used in their surgeries, and requested the use of one of the safer alternatives available.

118.    Decedents' and their doctors' reliance on Bayer's misrepresentations were justified, among other reasons, because these misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Trasylol, while Decedents were not in a position to know the true facts, and because Bayer aggressively marketed the use of this drug while downplaying the risks in its use, thereby inducing Decedents' surgeons to use these drugs, instead of other, safer alternatives.

119.    At all times relevant, Bayer's corporate officers, directors and/or managing agents knew of and ratified the acts of Bayer, as alleged herein.

120.    As a direct and proximate result of Decedents' and their surgeons' reliance on Bayer's misrepresentations concerning the risks and benefits of Trasylol, Plaintiffs suffered and continue to suffer from the injuries and damages as set forth in this Complaint.

## COUNT VI
## Negligent Misrepresentation

Come now the Plaintiffs and for Count VI of this complaint against Bayer allege:

121.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-61 as if fully set forth herein.

122.    Plaintiffs, individually and as personal representatives to the estates of

Decedents, bring Count VI of this Complaint to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful deaths of Decedents.

123.    Bayer knew, or should have known, that there were dangerous side effects resulting from the use of Trasylol.

124.    Bayer knew or reasonably should have known that consumers such as Decedents would not have known about the increased risk of renal failure, heart attack, and stroke, among other things, associated with Trasylol.

125.    Bayer, armed with the knowledge stated in the preceding two paragraphs, proceeded with the design, production, manufacture, promotion, advertising, and sale of Trasylol without adequate warning of the side effects and dangerous risks to the consuming public, including Decedents.

126.    Bayer negligently represented to Decedents the safety and effectiveness of Trasylol and concealed material information, including adverse information regarding the safety and effectiveness of Trasylol. The misrepresentations and/or material omissions made by or perpetuated by Bayer include the following:

  a.  Bayer failed to conduct sufficient testing which, if properly performed, would have shown that Trasylol had serious side effects, and warn users of those risks; and/or

  b.  Include adequate warnings with Trasylol that would alert users to the potential risks and serious side effects of Trasylol as well as the limited benefits and the approved uses; and/or

  c.  Warn Decedents that use of Trasylol carried a risk of death or permanent injury from renal failure, heart attack, stroke, and other serious side effects; and/or

    d.   Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Trasylol.

127.    Bayer made the misrepresentations and omissions with the intent that Decedents and the consuming public rely upon such information or the absence of such information in the selection of Trasylol.

128.    Decedents justifiably relied on and/or was induced by the misrepresentations and/or active concealment by Bayer and relied upon the absence of safety information which Bayer suppressed, concealed, or failed to disclose, all to Decedents' detriment.

129.    As a direct and proximate result of the dangerous and defective condition of Trasylol, Decedents were injured, and incurred economic damages in the form of medical expenses.

130.    Plaintiffs are entitled to recover from Bayer for all damages caused by the defective product including, but not limited to, damages for pain, suffering, loss of the capacity to enjoy life, lost past and future income and incurred expense.

<u>**COUNT VII**</u>
<u>**Punitive Damages**</u>

Come now the Plaintiffs and for Count VII of this complaint against Bayer allege:

131.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs 1-61 as if fully set forth herein.

132.    Plaintiffs, individually and as personal representatives to the estates of Decedents, bring Count VII of this Complaint pursuant to Ohio Rev. Code § 2315.21.

133.    The conduct of Bayer in designing, testing, manufacturing, promoting, advertising, selling, marketing, and distributing Trasylol, and in failing to warn Decedents and other members of the public of the dangers inherent in the use of Trasylol, which were

55195.1

27

well known to Bayer, was done with malice, aggravated and egregious fraud by intentional, deliberate and extremely reckless behavior demonstrating a conscious disregard for the rights and safety of others from the probability of great and substantial harm, particularly Decedents.  Bayer acted in conscious disregard for the safety of others.  Such conduct includes, but is not limited to the following:

> a.   Upon information and belief, Bayer actually knew of Trasylol's defective nature, as set forth herein, but continued to design, manufacture, market, and sell Trasylol so as to maximize sales and profits at the expense of the health and safety of the consuming public, including Decedents, and in conscious disregard of the foreseeable substantial harm caused by Trasylol;

> b.   Bayer, which spent millions of dollars a year researching and developing medicines, and aggressively marketing Trasylol, devoted far less attention to conducting sufficient pre-clinical and clinical testing and adequate post-marketing surveillance of this drug;

> c.   Bayer continued to promote the safety of Trasylol, while providing to consumers no warnings at all about the risk of renal dysfunction and stroke associated with it, even after Bayer knew of those risks from multiple studies.

> d.   Bayer willfully downplayed the known risk of harm of Trasylol.

WHEREFORE, Plaintiffs pray for judgment against Defendant Bayer Corporation, on grounds set forth in Counts I through VII, in the amount in excess of $75,000.00 in compensatory damages in an amount to be determined by the jury and an amount of punitive damages.

## COUNT VIII
## WRONGFUL DEATH

134.   Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs 1-61 as if fully set forth herein.

135.    Plaintiffs, individually and as personal representatives to the estates of Decedents, bring Count VIII of this Complaint pursuant to Ohio Rev. Code § 2125.01, Ohio's wrongful death statute, for the wrongful deaths of Decedents.

136.    At all times material hereto, Defendants owed a duty to Decedents to protect Decedents against reasonably foreseeable harms that a prudent person would anticipate were likely to result from the Defendants' acts or omissions.

137.    Defendants breached that duty when they acted in the negligent and/or tortious manner set forth in paragraphs above.

138.    Defendants' negligent and tortious conduct was the direct and proximate cause of Decedents' death.

139.    If death had not ensued, Decedents would have been entitled to maintain a cause of action and recover damages against Defendants because of the above alleged negligent and tortious conduct.

140.    As a direct, foreseeable and proximate result of Defendants' conduct, Decedents' estates have incurred medical and funeral expenses.

141.    As a direct, foreseeable and proximate result of the Defendants' conduct, Decedents' estates have been deprived of prospective net accumulations and loss of earnings.

142.    The claims for Wrongful Death, Survival and/or those other claims available under applicable law, set forth herein are hereby asserted on behalf of all persons having such claims.

143.    In addition to a claim for Wrongful Death, Plaintiffs assert a survival claim in addition to a claim for Wrongful Death for all injuries, damages, costs and fees, to the extent allowable by law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment for damages against

Defendants for all damages allowable by law against Defendants together with interest, costs

and attorneys fees, including but not limited to those damages provided pursuant to

applicable law, set forth below, and requests a trial by jury of all issues so triable, to wit:

a) Economic and non-economic damages in excess of $75,000.00 as provided by
law and to be supported by evidence at trial;

b) For equitable relief requested;

c) For compensatory damages according to proof;

d) For punitive damages according to proof;

e) The value of lost support and services from the date of the Decedents' injury to
the date of death, with interest, and future loss of support and services from the
date of death and reduced to present value;

f) The loss of society of the decedent, including loss of companionship, consortium,
care, assistance, attention, protection, advice, guidance, counsel, instruction,
training, and education, contribution and for mental pain and suffering from the
date of injury;

g) The loss of prospective inheritance to the decedents' heirs at law at the time of the
decedents' deaths;

h) The mental anguish incurred by the children, parents, and next of kin;

i) Medical or funeral expenses due to the decedents' injuries or deaths may be
recovered;

j) Any and all loss of earnings of the deceased from the date of injury to the date of
death, less lost support of survivors excluding contributions in kind, with interest;

k) Loss of the prospective net accumulations of an estate, which might reasonably
have been expected but for the wrongful death; and,

l) Medical or funeral expenses due to the decedents' injuries or deaths that have
become a charge against the estate.

m) For all applicable statutory damages under the Medicare Secondary Payor Act;

n) For an award of attorneys' fees and costs; and

o)  For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by jury on all Counts and as to all issues.

Respectfully submitted this <u>27th</u> day of  <u>May, 2010</u>.


<u>/s/ Neil D. Overholtz</u>
Neil D. Overholtz, Esq.
Nathan C. Bess, Esq.
*Aylstock, Witkin, Kreis & Overholtz, PLLC*
803 N. Palafox Street
Pensacola, FL  32501
Telephone:  (850) 916-7450
Fax:  (850) 916-7449
Noverholtz@awkolaw.com
Nbess@awkolaw.com