UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to:

*Deborah Bakan, etc. v. Bayer Corp., et al.*,
Case No. 9:08-cv-80423-DMM
_____/

**BAYER'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
TO EXCLUDE EXPERT TESTIMONY OF DR. DONALD WILLIAMS**

Plaintiff's motion to preclude Dr. Williams from testifying about "any case-specific issues" should be denied. Motion [D.E. 80 in 9:08-cv-80423] at 1. Dr. Williams is a professor of clinical surgery and the Chief of Cardiothoracic Surgery at the University of Miami Hospital. *See* Case-Specific Expert Report of Dr. Donald Williams (Ex. A) ("Case-Specific Report") at 1. He submitted an extensive, heavily-referenced report in which he offers the following expert opinions to a reasonable degree of medical and scientific certainty:

1.  Mr. Lucas had multiple pre-operative factors that placed him at an increased risk of suffering acute renal failure requiring dialysis after his coronary artery bypass graft/valve replacement surgery, including advanced age, the complex nature of the procedure, a pre-operative serum creatinine level of greater than 2.0 mg/dl, and pre-existing congestive heart failure, myocardial infarction, diabetes mellitus, hypertension, anemia, and renal insufficiency;

2.  Mr. Lucas developed contrast-induced acute renal failure requiring dialysis after he was exposed to nephrotoxic contrast dye during his heart catheterization;

3.  Performing Mr. Lucas's surgery approximately 24 hours after his exposure to a large volume of nephrotoxic contrast dye compounded the risk of contrast-induced acute renal failure requiring dialysis;

4.  Mr. Lucas's risk of post-operative acute renal failure requiring dialysis was compounded by the relatively long period of cardiopulmonary bypass during which his kidneys were exposed to non-pulsatile blood flow;

      5.      Mr. Lucas had significant underlying pathology involving both kidneys;

      6.      Mr. Lucas had intra-abdominal problems, most likely sigmoid diverticulitis or acalculous cholecystitis, or both, post-operatively, which compounded his post-operative acute renal failure requiring dialysis;

      7.      Mr. Lucas had an increased risk of bleeding due to many of the same factors that placed him at an increased risk of renal failure and the use of Trasylol was appropriate given that risk of bleeding;

      8.      Mr. Lucas died of septic complications related to a fungal infection in his central intravenous line;

      9.      Mr. Lucas's renal failure requiring dialysis was not caused by Trasylol; he would have endured the same outcome due to his pre-, intra-, and post-operative factors regardless of whether Trasylol was administered.

*See id.* at 9-10.

Plaintiff contends that Dr. Williams's testimony should be excluded because (1) he is not qualified to testify about nephrology and (2) his methodology and opinions are unreliable. Motion at 2. As shown below, Dr. Williams's opinions are within his expertise; based on his education, extensive clinical experience, and research; and well-founded on Mr. Lucas's medical records. Plaintiff's bid to exclude his testimony should be denied.

## ARGUMENT

**I.    PLAINTIFF'S ATTACKS ON DR. WILLIAMS'S QUALIFICATIONS ARE UNFOUNDED.**

Plaintiff's first argument is that because Dr. Williams is a cardiothoracic surgeon (and not a nephrologist) he should not be allowed to testify about renal problems associated with cardiothoracic surgery. Motion at 5-8. This Court has already ruled that cardiothoracic surgeon Luca Vricella, a PSC generic expert, may opine on the renal effects of Trasylol. *See In re*

*Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489725, at *2-6 (S.D. Fla. Mar. 29, 2010).[1] Dr. Williams is eminently qualified to offer an opinion on specific causation in this case.

Dr. Williams is board-certified in general surgery and cardiothoracic surgery, and currently is Professor of Clinical Surgery, Chief of Cardiothoracic Surgery, Director of Surgical Services, and Associate Chief Medical Officer at the University of Miami Hospital in Miami, Florida. *See generally* Case-Specific Report (Ex. A), Curriculum Vitae. His surgical practice is "solely devoted to cardiac surgery," and Dr. Williams has "performed over 500 open heart procedures per year since 1981," most of which "have been coronary bypass operations." Generic Expert Report of Donald Williams, MD. ("Generic Report") (Ex. B) at 1; *see also id.* ("I have had extensive clinical experience in the pre-operative, intra-operative and post-operative management of thousands of cardiac surgical patients."); Deposition of Donald B. Williams, M.D., *Mordecai v. Bayer Corp.* (Ex. C) at 30:3-6 (explaining that he "has done over 15,000 open heart operations and has seen . . . so many high-risk patients").[2] As a result of this experience, he has diagnosed acute renal failure in his cardiosurgical patients between 100 and 500 times. Deposition of Donald B. Williams, M.D., *Bakan v. Bayer Corp.* ("Williams *Bakan* Dep.") (Ex. D) at 14:2-11. Accordingly, he has extensive experience taking care of patients with renal problems following cardiac surgery:

---

[1] Bayer's *Daubert* motion challenged Dr. Vricella's methodology – not his credentials – to opine on renal failure associated with CABG surgery. *See* Bayer's Motion to Exclude Testimony of Plaintiffs' Expert Luca A. Vricella [D.E. 3075 in 1:08-md-1928].

[2] Indeed, for a number of years, Dr. Williams tracked his own clinical experience with extensive data. From 1993 to 1998, Dr. Williams performed "often over 600 open heart procedures per year," and recorded the procedures in "a highly detailed data base" which, *inter alia*, "tabulated pre-operative data including risk factors, operative data such as the length of time on the heart-lung machine, and postoperative data, particularly complications and deaths." Generic Report (Ex. B) at 24-26; *see generally Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (emphasizing the importance of expert testimony that "grow[s] naturally and directly out of research [the expert has] conducted independent of the litigation"); *Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1362 (M.D. Ga. 2009) (same).

> [I]n the postoperative period I do a lot of time taking care of the patients and associated with the residence [sic] and fellows, and we would oftentimes see people that have renal dysfunction and we manage it. . . .
>
> I have had an extensive experience managing renal dysfunction postoperatively, so frequently I will manage it . . .

*Id.* at 15:6-22.

Dr. Williams also has "personal experience with the use of [Trasylol] in hundreds of coronary artery bypass surgery patients utilizing cardiopulmonary bypass." Generic Report (Ex. B) at 1. He has administered Trasylol during cardiac surgery at least 1,000 times. Williams *Bakan* Dep. (Ex. D) at 30:25-31:24. Additionally, he has extensively researched "the physiologic effects of [Trasylol] in humans and its use as a blood conservation agent in patients undergoing coronary artery bypass surgery." Generic Report (Ex. B) at 1-2. *See also* Case-Specific Report (Ex. A) at 2 (same); Williams *Bakan* Dep. (Ex. D) at 18:14-19 ("I have maintained a file for years and years and years about Aprotinin, and I have read much of what was published in the literature that was pertinent to cardiac surgery over the years long before I was ever involved with the Aprotinin litigation.") In short, Dr. Williams testified that his opinions about Trasylol "are the product of multiple things: My own experience as a cardiac surgeon; all the reading that I have done, the thousands and thousands of articles that I have read over the years; discussions with other physicians; information that you learn in conferences, meetings and seminars and the like. . . . My opinion or my thinking is a product of years and years and years of multiple inputs." Williams *Bakan* Dep. (Ex. D) at 28:18-29:13.

Plaintiff ignores these credentials and makes two arguments for excluding Dr. Williams's testimony. *First*, plaintiff contends that Dr. Williams exceeds the bounds of his expertise by offering opinions on the cause of Mr. Lucas's kidney injury. Motion at 5-7. But plaintiff claims that Mr. Lucas suffered kidney injury due to the administration of Trasylol

4

during *heart surgery*—a subject that is well within Dr. Williams's expertise. Plaintiff cites no law – and there is none – for the proposition that a physician must be a nephrologist in order to offer an opinion on the medical cause of a patient's renal failure.[3] Indeed, the generic cardiothoracic surgeon and cardiologist proffered by the PSC are not nephrologists yet offered opinions about patients' renal failure. *See*, *e.g.*, *In re Trasylol*, 2010 WL 1489725, at *2-6 (holding that cardiothoracic surgeon Luca Vricella may opine on the renal effects of Trasylol); Deposition of Michael J. Eisenberg (Ex. E) at 79:11-80:3, 261:15-262:12 (admitting that he is not an expert in nephrology but explaining that he is qualified to opine on causation because he deals with renal problems in the normal course of his practice as a cardiologist).

*Second*, plaintiff pulls snippets of Dr. Williams's testimony out of context in an attempt to show he is unqualified to opine on the cause of Mr. Lucas's renal failure. Motion at 7-8. The full record demonstrates the weakness of these contentions:

***Definition of "Nephrotoxic."*** Plaintiff argues that Dr. Williams's statement that he has "always had problems with" the definition of "nephrotoxic" proves that he "is not even confidently familiar with the basic terms on the subject." Motion at 7; Williams *Bakan* Dep. (Ex. D) at 24:14-16. This argument ignores the next sentence of Dr. Williams's testimony, which plaintiff quotes, where Dr. Williams testifies that "in the simplest form," "nephrotoxic" means "something . . . that is toxic to the kidneys." Williams *Bakan* Dep. at 24:16-18. Dr. Williams's deposition testimony that he has "had problems" with the definition is not a reflection of any lack of expertise but rather the fact that reasonable doctors can differ as to the precise

---

[3] *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("So, the fact that Dr. Weinstein is not a cardiologist does not prevent him from testifying regarding Taylor's death; instead, we must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them").

5

definition of "nephrotoxicity" and what effect a product must have on the renal function before it becomes "nephrotoxic." *Id.*

     ***Diagnosis of Acute Renal Failure.*** Plaintiff next points to Dr. Williams's statement (taken out of context) that "all you need" to make the diagnosis of acute renal failure is a serum creatinine reading. Motion at 8, citing Williams *Bakan* Dep. (Ex. D) at 35:17-36:13. Plaintiff asserts that such statement is contrary to the testimony of Bayer's nephrology expert, Dr. Stanley Goldfarb, who testified that serum creatinine readings should be considered in conjunction with "the entire clinical case, the patient's context, and other pertinent clinical information." Motion at 8; Deposition of Stanley Goldfarb, M.D. ("Goldfarb Dep.") (Ex. F) at 37:14-19.[4] First, there is no inconsistency between Dr. Goldfarb's testimony and that of Dr. Williams. Dr. Williams, in fact, did not look to serum creatinine alone in diagnosing acute renal failure. He looked at all of Mr. Lucas's relevant medical records, Williams *Bakan* Dep. (Ex. D) at 20:7-13, 51:22-53:6 (explaining that he focused on Mr. Lucas's records from Sarasota Memorial Hospital as well as records documenting pre-existing hypertension, structural kidney disease, and aortic stensosis), along with the fact that Mr. Lucas's serum creatinine level rose .5 mg/dl during the 24 hour period following his heart catheterization. *Id.* at 35:3-13. He later explained, consistent with Dr. Goldfarb's approach, that, in determining whether a patient has incurred renal injury depends on the particular medical facts: "[E]ach case has to stand on its own data. Generalizations, again, are very misleading at times." *Id.* at 47:22-24. Moreover, even if there were an inconsistency between the two doctors as to the import that should be given to serum creatinine in diagnosing acute renal failure, again, reasonable doctors can differ as to

---

[4] Plaintiffs actually do not provide a cite to the Goldfarb testimony upon which they claim to be relying. *See* Motion at 8 (noting "Deposition Transcript not available, will be supplemented upon receipt"). Bayer simply assumes that they are pointing to this testimony of Dr. Goldfarb.

6

the symptoms necessary for a diagnosis, and certain doctors may look at certain factors differently. Such reasonable disagreement does not reflect lack of qualifications or expertise. *See*, *e.g.*, *Ojeda-Sanchez v. Bland*, No. 608CV096, 2010 WL 1873103, at *3 (S.D. Ga. May 10, 2010) (expert disagreement about whether methodology is reliable does not undermine reliability of testimony if methodology is in fact reliable).

What plaintiff really seems to be doing is launching a tardy attack on Dr. Williams's generic opinion that Trasylol does not increase patients' risk of renal failure, which he offered months ago as a generic expert. Generic Report (Ex. B) at 37 (disclosed November 3, 2009). If plaintiff intended to challenge Dr. Williams's qualification to offer that opinion, or his methodology, she should have done so by January 22, 2010. *See* Pretrial Order No. 13 [D.E. 1738 in 1:08-md-1928] § I.K.i at 4; *see also* Pretrial Order No. 6 [D.E. 268 in 1:08-md-1928] § III.C at 4-5 (contemplating that determinations regarding the admissibility of generic expert testimony would be made prior to disclosure of case-specific experts). Plaintiffs did not assert a *Daubert* challenge to Dr. Williams's generic opinions or his qualifications to make them. To the contrary, they conceded their admissibility. *See* Plaintiffs' Opposition to Bayer's Motion to Exclude Luca Vricella, M.D. [D.E. 3828 in 1:08-md-1928] at 8 (conceding admissibility of Dr. Williams's opinions); Plaintiffs' Opposition to Bayer's Motion to Exclude Mark J.S. Heath, M.D. [D.E. 3827 in 1:08-md-1928] at 7 (same). Plaintiff cannot now mount a tardy *Daubert* challenge to Dr. Williams's qualifications to opine on renal injury in conjunction with cardiac surgery.

II.  **DR. WILLIAMS EMPLOYED RELIABLE SCIENTIFIC METHODS TO REACH HIS CAUSATION OPINIONS.**

Plaintiff also attacks Dr. Williams's methodology, arguing that he used "rushed and incomplete" research and that his opinions are based solely on "his own personal

7

methodology, experience, and common sense." Motion at 9. As demonstrated below, these arguments misrepresent the record and have no basis in law.

      A.      **Dr. Williams Based His Opinions On A Thorough and Considered Evaluation Of Mr. Lucas's Medical Records.**

Plaintiff contends that Dr. Williams's opinions should be excluded because he engaged in "rushed and incomplete research." Motion at 9. Plaintiff rests this argument on the fact that Dr. Williams "did not remember how much time he spent reviewing medical records, drafting his report, or reviewing journal articles in this case." *Id.* Such memory lapses are certainly understandable given the time that had passed between his research and his deposition (four months), as well as the voluminous nature of the materials reviewed, *see* Williams *Bakan* Dep. (Ex. D) at 20:4-13 (noting medical records from Sarasota Memorial Hospital alone totaled over 3,000 pages); Case-Specific Report at Materials and Documents Reviewed, 1-8 (eight page list of materials reviewed), and have no bearing on the reliability of Dr. Williams's methodology. Even a cursory review of Dr. Williams's testimony makes clear that he carefully studied the records that he thought, based on his clinical experience, were probative to forming an opinion on the cause of Mr. Lucas's alleged injuries. *Id.* at 38:16-23 ("I have to spend as much time with the record . . . to come to an opinion. I can't just go in and say I don't believe Trasylol causes renal failure and not review the records. That would be dishonest."); *see also id*. at 51:22-53:6 (explaining how he determined what medical records to review). Dr. Williams focused on over three thousand pages of records from Sarasota Memorial Hospital, where Mr. Lucas underwent his CABG surgery, *id*. at 20:7-13, as well as additional prior documents related to pre-existing hypertension, structural kidney disease, and aortic stenosis that he found relevant, *id.* at 52:1-53:6.

Dr. Williams's case-specific report corroborates that he "focused on" those medical records that he believed most relevant to assessing the cause of the plaintiff's alleged renal injury. Case-Specific Report (Ex. A) at 2. This is the same methodology that Dr. Williams uses in his own practice, and moreover, one that *Daubert* clearly allows in support of an expert opinion. *See, e.g.*, Deposition of Donald B. Williams, M.D., *Reedy v. Bayer*, (Ex. G) at 125:25-126:3 ("I've had enough experience in looking at hospital charts over the years that I . . . know what to . . . look for and what not to look for"); *see also id*. at 127:2-6 ("I do it every day . . . I know how to glean the information that I need"); *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 606 (N.D. Fla. 2009) (expert's methodology reliable where, *inter alia*, "[he] relied on his experience as a practicing radiologist for 34 years"); *United States v. Pacheco*, No. 08-20895-CR, 2009 WL 383257, at *12 (S.D. Fla. Feb. 14, 2009) (admitting experience-based expert testimony); *In re Accutane Prods. Liab. Litig.*, 511 F. Supp. 2d 1288, 1290 (M.D. Fla. 2007) (expert physician may rely "on his own personal experience from his practice to support his opinions").

Plaintiff also asserts that Dr. Williams "could not remember how he reached many important conclusions in his report," Motion at 9, but she points to only three very small details of his so-called "important conclusions," none of which go to the heart of his opinion:

***Catheterization Report.*** Dr. Williams testified that he relied on the catheterization report to determine the extent of Mr. Lucas's coronary vessel disease and stated that he needed the report to definitively answer whether two or three of Mr. Lucas's vessels were diseased, because he did not memorize the records. Williams *Bakan* Dep. (Ex. D) at 103:5-24. Plaintiff's counsel acknowledged that the report was not in the records he brought to the deposition. *Id.* at 104:4-5. Dr. Williams explained that he would "defer to – whatever you find on the cath report," which plaintiff's counsel acknowledged as "appropriate." *Id.* at 105:4-8.

9

>   ***Ejection Fraction.***  Dr. Williams testified that he could not recall the precise value for ejection fraction used in the Society of Thoracic Surgeons risk calculator because Mr. Lucas's medical records contain various ejection fraction values.  *Id.* at 105:19-22.  But Dr. Williams explained that the number used was in the 50 to 60 range, reflecting the range of Mr. Lucas's pre-operative ejection fraction values.  *Id.* at 106:18-19, 105:19-22.

>   ***Contrast-Induced Renal Failure.***  Dr. Williams could not recall whether Mr. Lucas's treating physicians diagnosed Mr. Lucas with contrast-induced renal failure.[5]  This fact is immaterial, though, as Dr. Williams's testimony demonstrates that his own diagnosis was based on the fact that Mr. Lucas's serum creatinine levels spiked .5 mg/dl during the 24 hours after the administration of the nephrotoxic contrast dye, and was not based on the findings of any of Dr. Lucas's physicians.  *Id.* at 77:19-78:1.  Dr. Williams has extensive experience with contrast-induced renal failure, rendering him well-qualified to make such a diagnosis.  *Id.* at 142:9-14 ("I have had to deal with this problem [contrast-induced renal failure] on multiple occasions.  I have seen it.  I have read about it extensively.  I have talked to nephrologists about it.  It's been a  major problem that I have had to deal with over the years on multiple occasions.").

>   In short, this "memory test" examination by plaintiff's counsel does nothing to call into question the reliability of Dr. Williams's methods.  Dr. Williams employed reliable

---

[5] Contrary to plaintiff's assertion, Mr. Lucas's nephrologist, Dr. Andrew Lazin, did in fact diagnose contrast nephrotoxicity.  *See* Deposition of Andrew Lazin, M.D. ("Lazin Dep.") (Ex. H) at 81:21-24 ("[H]is admission creatinine is 1.6.  And then it is notable that after he went [to] the heart cath lab, his creatinine went up to 2.1.  So I suspected contrast nephrotoxicity.").  Mr. Lucas's cardiothoracic surgeon, Dr. Clifton Lewis, similarly noted "dye-induced renal insufficiency" as a cause of Mr. Lucas's renal failure.  Deposition of Clifton Lewis, M.D. ("Lewis Dep.") (Ex. I) at 183:18-24.

10

methods to reach the same conclusions as plaintiff's treating cardiothoracic surgeon,[6] nephrologist,[7] and primary care physician[8]—that, given the myriad other risk factors Mr. Lucas had for kidney injury, Trasylol was not the cause of his alleged injuries.

### B. Dr. Williams Opinions Are Based on Reliable Methodology.

Finally, plaintiff makes the broad assertion that Dr. Williams's opinion is "ipse dixit with no reliable data to support his opinions." Motion at 10. Yet her only concrete criticism is that Dr. Williams improperly used the Society of Thoracic Surgeons and Cleveland Clinic/Thakar risk calculators. Motion at 10. More specifically, she faults Dr. Williams for using rising, unsteady pre-operative creatinine levels when the STS calculator asks for steady creatinine levels. Dr. Williams explained that, because Mr. Lucas's creatinine levels were not steady, he used Mr. Lucas's last pre-operative serum creatinine level to "see where is our floor in this case. What would be the best case scenario […] if that was his steady state creatinine." Williams *Bakan* Dep. (Ex. D) at 88:3-12. He further explained that, by using a creatinine level that was still rising, and therefore probably lower than it actually was during surgery, the STS calculator likely under-predicted Mr. Lucas's risk of post-operative renal failure requiring dialysis. Case-Specific Report (Ex. A) at 6; Williams *Bakan* Dep. (Ex. D) at 86:2-90:10, 112:18-

---

[6] Dr. Lewis testified that the risks inherent in the surgery and Mr. Lucas's exposure to nephrotoxic contrast dye, along with Mr. Lucas's age and pre-existing heart and kidney conditions, placed Mr. Lucas at risk for renal failure with or without Trasylol, and that he never diagnosed Trasylol as a factor contributing to Mr. Lucas's renal failure. Lewis Dep. (Ex. I) at 187:4-11, 181:10-184:13.

[7] Dr. Lazin testified that "it's impossible to say that with or without Trasylol [Mr. Lucas] would not have gone into renal failure," Lazin Dep. (Ex. H) at 151:19-21, and that Mr. Lucas's acute renal failure started before Mr. Lucas entered the operating room. *Id.* at 81:13-82:13.

[8] Dr. Randy Powell, Mr. Lucas's primary care physician, testified that Mr. Lucas's death was wholly unrelated to Trasylol and that even if Mr. Lucas had not been given Trasylol, he would not have survived the surgery and post-operative course. Deposition of Randy Powell, M.D., (Ex. J) at 71:7-73:16.

11

114:16. Plaintiff apparently disagrees with this opinion, but she has not provided any evidence that Dr. Williams's approach was improper or incorrect. Dr. Williams's under-prediction opinion is based on his belief – shared by Dr. Lazin, Mr. Lucas's treating nephrologist[9] – that Mr. Lucas was already undergoing "the rapid evolution of acute renal failure" when he presented for surgery. *Id.* at 114:11-16. Dr. Williams explained that this belief was founded in his "own experience," "the discussions that I have had with other cardiac surgeons and nephrologists, extensive discussions, and sort of the aggregate of everything I have read over the years, which is […] tens of thousands of papers addressing various issues associated with cardiac surgery." *Id.* at 114:17-115:3.

Moreover, Plaintiff's argument, even if correct, does not go to the heart of Dr. Williams' testimony. His opinion that multiple pre-, intra-, and post-operative factors, and not Trasylol, caused Mr. Lucas's acute renal failure, is not based on a risk calculator. Indeed, Dr. Williams's report reveals that he used these risk calculators only to put Mr. Lucas's risks "into perspective." Case-Specific Report (Ex. A) at 5-6 (comparing Mr. Lucas's pre-operative risk levels as determined by the risk calculators to pre-operative risk levels of patients with minimal risk factors). Indeed, the discussion of the risk calculators constitutes less than 3 paragraphs in a ten page opinion. Dr. Williams used the risk calculators primarily for purposes of identifying risk factors that are predictive of acute renal failure requiring dialysis post-operatively; the resulting number was of much less importance. *Id.* at 6; *see also, e.g.,* Williams *Bakan* Dep. (Ex. D) at 66:8-12 (recognizing that both risk calculators identify COPD as a predictive consideration), 67:2-6 (same, for myocardial infarction), 73:15-22, 152:3-6 (same, for combination bypass/valve surgery), 149:7-12 (same, for diabetes). Therefore, even if this Court

---

[9] *See* footnote 6, *supra* at 11.

12

were to conclude that Dr. Williams improperly applied the STS or Cleveland Clinic/Thakar risk calculators, he should still be permitted to provide his case-specific opinion, which is based on his review of Mr. Lucas's medical records and his own expertise.

## CONCLUSION

Plaintiff's motion to exclude the case-specific testimony of Dr. Donald Williams should be denied in its entirety.


Dated:  August 12, 2010                     Respectfully submitted,

*/s/ Barbara Bolton Litten*
Patricia E. Lowry
Florida Bar No. 332569
E-mail:  plowry@ssd.com
Barbara Bolton Litten
Florida Bar No. 91642
E-mail:  blitten@ssd.com
Guy E. Motzer
Florida Bar No. 562467
Email:  gmotzer@ssd.com
**SQUIRE SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL  33401-6198
Telephone:  561-650-7200
Facsimile:   561-655-1509

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR &
   SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL  60603
Telephone: 312-494-4400
Facsimile:   312-494-4440

>Eugene A. Schoon
>Email:  eschoon@sidley.com
>Susan A. Weber
>Email:  saweber@sidley.com
>Tamar B. Kelber
>Email:  tkelber@sidley.com
>James W. Mizgala
>Email:  jmizgala@sidley.com
>**SIDLEY AUSTIN LLP**
>One South Dearborn Street
>Chicago, Illinois 60603
>Telephone:  312-853-7000
>Facsimile:   312-853-7036
>
>Susan Artinian
>Email:  sartinian@dykema.com
>Daniel Stephenson
>Email:  dstephenson@dykema.com
>**DYKEMA GOSSETT PLLC**
>400 Renaissance Center
>Detroit, MI  48243
>Telephone:  313-268-9788
>Facsimile:   313-568-6658
>
>Richard K. Dandrea
>Email:  rdandrea@eckertseamans.com
>**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
>USX Tower, 600 Grant St., 44th Floor
>Pittsburgh, PA.  15219
>Telephone:  412-566-6000
>Facsimile:   412-566-6099
>
>*Attorneys for Bayer Corporation and Bayer HealthCare Pharmaceuticals Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Barbara Bolton Litten*
Barbara Bolton Litten

## SERVICE LIST

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON
### Case No. 9:08-cv-80423-DMM

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN,
FELDMAN & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-735-1130
Facsimile: 215-875-7758
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE &
    LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile: 561-684-6308
*Liaison Counsel for Plaintiffs*

Brian Barr
Email: bbarr@levinlaw.com
K. Lea Morris
Email: lea.morris@levinlaw.com
Brandon Bogle
Email: bbogle@levinlaw.com
**LEVIN PAPANTONIO THOMAS MITCHELL
ECHSNER & PROCTOR PA**
316 South Baylen Street, Suite 400
Pensacola, FL 32502
Telephone: 850-435-7045
Facsimile: 850-436-6045
*Counsel for Plaintiff Deborah Bakan*

Scott Love
Email: slove@triallawfirm.com
**CLARK, BURNETT, LOVE & LEE GP**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: 713-759-1400
Facsimile: 713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone: 203-610-6393
Facsimile: 203-610-6399
*Federal-State Liaison for Plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509
*Liaison Counsel for Defendants*

WESTPALMBEACH/572062.1