# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY § 
LITIGATION – MDL-1928 §
§
THIS DOCUMENT RELATES TO: §
*WALKER, ET AL. v. BAYER CORPORATION, ET AL.* §
Case No. 08-cv-80642 §

FILED by _____ D.C.

AUG 16 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. ANTHONY P. FURNARY RELATING SPECIFICALLY TO THE CLAIMS OF TONIA WALKER AND MEMORANDUM OF LAW IN SUPPORT

PLEASE TAKE NOTICE THAT Plaintiff Clarence Walker, Individually and as Personal Representative for the Estate of Tonia Walker, respectfully submits this motion to exclude the purported expert testimony of Dr. Anthony P. Furnary on any case-specific issues.

### MEMORANDUM OF LAW

Defendants' purported expert, Dr. Anthony P. Furnary (hereinafter "Furnary"), should be disqualified from testifying at trial about Plaintiff Tonia Walker's ("Ms. Walker")specific case because he is unqualified as an expert as well as the fact that his ultimate conclusions are not supported by objective, peer-reviewed data. The testimony of Furnary reveals that over the last ten years he has testified on 17 Trasylol-related cases, not once finding that Trasylol contributed to the renal failure of the patients (Carr Furnary Dep. (Ex. G) 37:13-19; 38:5-7, Jul 16, 2010). Furnary further admitted that he could not support his opinions with objective peer-reviewed literature (Furnary Dep. (Ex. A) 81:4-82:5; 127:19-128:22; 147:4-25, Jul 18, 2010). Because Furnary's opinions are unsupported by objective data and cannot properly be cross examined, they are unreliable, inadmissible and must be excluded. *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993); FED R. EVID. 702.

## BACKGROUND

On April 7, 2010, Defendants served the expert report of Anthony P. Furnary, M.D., a cardiothoracic surgeon (Furnary Report (Ex. D)).  Then on July 18, 2010, Dr. Furnary was deposed regarding this matter (Furnary Dep. (Ex. A)).

## LEGAL STANDARD

Rule 702 permits expert testimony to assist the jury in understanding the evidence or determining a fact in issue only where it is "based upon sufficient facts or data," is "the product of reliable principles and methods," and where "the witness has applied the principles and methods reliably to the facts of the case." FED R. EVID. 702.  The Supreme Court's decision in *Daubert*, and its progeny, governs the application of Rule 702.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 137 (1999).  Rule 702 authorizes the district court to act as "gatekeepers" concerning the admissibility of expert opinions; to ensure that unsupported opinions do not reach the jury. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (citing *Daubert*, 509 U.S. at 589, n.7).

In undertaking a *Daubert* analysis, courts apply a "rigorous three-part inquiry," considering whether:

1.  the expert is qualified to testify competently regarding the matters he intends to address;

2.  the methodology by which the expert reaches his conclusions IS sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

3.  the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* at 1260.

The first prong of the *Daubert* analysis is utilized to determine whether the expert witness is qualified to testify. An expert may establish his qualifications through "knowledge, skill, experience, training, or education" as related to the scope of his testimony. FED R. EVID. 702.

As to methodology, among the reliability factors the Court should consider is whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead a subjective, conclusory approach that cannot be reasonably assessed for reliability. FED R. EVID. 702; *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (holding that conclusory statements "devoid of factual or analytical support [are] simply not enough"). Furthermore, the Eleventh Circuit has held that, while not an exhaustive list, important factors weighing on reliability are "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

The expert must adduce competent evidence that "affords a reasonable basis for a jury to conclude that it is more likely than not" as to the expert's theory. *Lamb* v. *Sears, Roebuck & Co.*, 1 F.3d 1184, 1191 (11th Cir. 1993) (citations omitted). Expert testimony must have a "justified scientific relationship to the pertinent facts." *McDowell* v. *Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). "If the court determines that any step of the expert's chain of logic is unreliable, his entire opinion must be excluded." *Kilpatrick* v. *Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *3 (S.D. Fla. June 25, 2009). The "predominant lesson of *Daubert* is that federal courts are not simply to take the expert's 'word for it.'" *Haller v. AstraZeneca Pharms.*

*LP,* 598 F.Supp. 2d 1271, 1299 (M.D. Fla. 2009) (excluding expert's specific causation opinions because they amounted "to no more than the *ipse dixit* of an expert witness"); *see also* FED R. EVID. 702 advisory committee's note (2000 amendment) ("[t]he trial court's gatekeeping function requires more than simply "taking the expert's word for it'"). As the Eleventh Circuit has explained, "if admissibility could be established merely by *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier,* 387 F.3d at 1261. Indeed, the Supreme Court has held that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho,* 526 U.S at 157.

In addition to the objectivity of the expert's testimony, the expert must also account for obvious alternative explanations. *Frazier,* 387 F.3d at 1297, n. 13. An expert's testimony must be excluded if that expert did not adequately account for alternative explanations, to ensure that one-sided, unreliable opinions do not reach the jury. *Evans v. Matrixx Initiatives, Inc.,* No. 3:07-cv-357-J-34JRK, 2009 WL 2914252, at *10 (M.D. Fla. Feb. 18, 2009).

Finally, "[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit ...." *Frazier,* 387 F.3d at 1260.

## ARGUMENT

Furnary's testimony must be barred because he is not qualified to testify as a case-specific expert for Ms. Walker. Furthermore, the methods that he utilized are unreliable and unsound. Allowing his testimony to be admitted would not assist the trier of fact with Furnary's unsupported, *ipse dixit* statements.

## I.   FURNARY FAILED TO SUPPORT HIS SUBJECTIVE, CONCLUSORY OPINIONS WITH RELIABLE DATA THAT COULD BE OBJECTIVELY CHALLENGED.

Furnary's opinions regarding the causes of Ms. Walker's cardiac complications and death must be barred because he fails to support his subjective opinions with objective, reliable data. Furnary only performed one medical literature search, for mortality rates related to BiVADs, for the *Walker* case[1] (Walker Furnary Dep. (Ex. A) 8:18-9:9, 10:17-19).   Throughout Furnary's testimony he makes assertions which he readily admits are completely unsupported by any kind of medical literature (Walker Furnary Dep. (Ex. A) 75:25-76:5, 77:20-78:3, 81:16-82:5; 127:19-128:22; 147:4-25).  Furnary draws his ultimate conclusions without relying on a single piece of peer reviewed literature that can back them up.  When asked to supply the sources that he used when drawing his conclusions regarding Ms. Walker's hypertension, Furnary would initially respond that literature supported his position, but when asked to provide that information, Furnary withdrew such assertion to then state he only had his "background and training" to support his opinions (Furnary Dep. (Ex. A) 80:21-82:5).  It is not possible for Plaintiff's counsel to objectively cross-examine Furnary's "background and training."

Furnary offers unsupported opinions on cardiac complications and renal complications. Furnary's opinions on cardioplegia (medication used during open heart surgery to stop the heart) is central to his opinions.  However, Furnary concedes his opinions are not supported by any literature, let alone objective medical support (Furnary Dep. (Ex. A) 128:15-22).  Furnary also could not provide literature to support any opinion that the amount of cardioplegia may have caused or contributed to Ms. Walker's myocardial infarction (Furnary Dep. (Ex. A) 127:19-128:2).  Finally, Furnary suggests that a constellation of factors caused Ms. Walker's renal

---

[1] Furnary then does not even list the only piece of literature he searched for in this case (Walker Furnary Dep. (Ex. A) 9:13-25).

failure; however, when pressed to supply his sources for this opinion he had none (Furnary Dep. (Ex. A) 147:4-14). In fact, at no point in the deposition can Furnary back up his opinions with literature that he used in formulating his report. Furnary admits this when questioned directly:

> **Q.** Is there any medical literature in Exhibit 4 that discusses any of the issues, any of these individual items as causing or contributing to renal failure?
>
> . . . .
>
> **A.** To me, these are, again things that are learned all the way back in medical school, and I don't need to cite those.

(Furnary Dep. (Ex. A) 147:15-25). He essentially concocted a list of materials that he "used" to create his "expert" report for his generic report, but not this case. Furnary did not perform any literature search to obtain support for his speculative opinions, aside from the mortality rate for BiVAD patients which literature he did not even use (Walker Furnary Dep. (Ex. A) 8:18-9:9, 10:17-19). As such, all of his opinions regarding the cause of Ms. Walker's cardiac and renal injuries must be excluded.

As noted from Furnary's testimony above, he cannot cite a single piece of literature that will support his subjective, speculative conclusions. He is essentially expecting the Plaintiff's counsel and this Court to simply take his word for it. As the Supreme Court noted in *Kumho*, a Court is not required to admit "expert" testimony that is merely *ipse dixit*. 526 U.S at 157. Accordingly, Furnary's opinions must be barred.

## II.   FURNARY'S OPINIONS REGARDING THE PROXIMATE CAUSES AND RESULTING INJURIES OF MS. WALKER ARE UNSUPPORTED BY THE FACTS OF THE CASE AND MUST BE BARRED.

Furnary opines that the ultimate causes of Ms. Walker's renal failure stemmed from a series of "surgical misadventures" which he believes resulted in an increased risk of renal failure. Furnary Rep. (Ex. B). Furnary asserts that had it not been for these surgical events, Ms. Walker's heart and kidneys would likely have been fine. *See* (Furnary Dep. (Ex. A) 74:3-25).

However, Furnary bases these assertions on incorrect factual assumptions. He admits in his deposition that there were times when he could not determine the medications that were given during the CABG procedure, forcing him to guess when and what was administered (Furnary Dep. (Ex. A) 40:21-41:6; 55:8-57:5). The Supreme Court has held that "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Furnary maintains that he did not make any assumptions when determining the cause of Ms. Walker's renal failures. However when looking at the medical records in juxtaposition to his "expert" report it is clear that all he did was make assumptions. These assumptions provide too great an analytical gap. Such speculative opinions are not sufficiently reliable and must be barred.

**Insufficient Cardioplegia.** Furnary maintains that Ms. Walker was given insufficient cardioplegia during her CABG operation, which resulted in inadequate cooling of the heart, which also lead to the myriad of cardiac events that occurred during the CABG. However, there are no facts in the medical record that will back up this guess. Furnary assumes that cardioplegia was given for the first time during the CABG procedure at 2010. Furnary Rep. (Ex. B). However, when pressed he admits that the operative report[2] refers to the administration of potassium cardiopulmonary solution, which he just *assumed* was supposed to be cardioplegia solution (Furnary Dep. (Ex. A) 39:25-40:8). Furthermore, when looking at the corresponding perfusion sheet,[3] he again *assumes* that it is referring to cardioplegia solution (Furnary Dep. (Ex. A) 40:19-41:6). It is clear from Furnary's testimony that his ultimate conclusion regarding the cause of Ms. Walker's cardiac problems is the result of pure guesswork. Accordingly, any testimony regarding cardioplegia solution must be barred.

---

[2] *See* Operative Rep. (Ex. C).
[3] *See* Perfusion Sheet (Ex. D).

Furnary admits that he does not know the makeup of the cardioplegia solution used in Ms. Walker's case (Furnary Dep. (Ex. A) 42:18-44:1). With multiple methods of cardioplegia administration, and these methods all having different times for administration, it is difficult to understand how Furnary could believe that the cardioplegia that was administered was insufficient when he could not even determine its makeup (Furnary Dep. (Ex. A) 35:25-36:25). Furnary even admits that he has no idea what the "correct" amount of cardioplegia solution would have been during Ms. Walker's surgery[4] (Furnary Dep. (Ex. A) 103:3-11). Notwithstanding the fact that Furnary cannot even accurately determine the type or when the cardioplegia was administered, he still cannot determine the actual effect of the cardioplegia solution which is used to cool the heart and lower its temperature. Furnary admits that he was unable to locate any record that reflected the temperature of the heart during Ms. Walker's CABG procedure (Furnary Dep. (Ex. A) 46:6-47:13). It is difficult to understand how he can assert that the heart was not adequately cooled throughout the procedure when he cannot even find the temperature of the heart in the records. Essentially, Furnary does not know what the right amount of cardioplegia is; he just speculates that what the doctors administered was incorrect.[5] There is absolutely nothing in the medical records that will back up this conjecture. Consequently, any opinions regarding these matters must be excluded.

**Administration of Trasylol.** Furnary asserts that Trasylol did not cause Ms. Walker's renal failure because it was not administered until the third CPB run. Furnary Rep. (Ex. B). Again, this *assumption* is not based in fact. To begin with, Furnary had difficulties determining if Trasylol was even administered, admitting that he "assumed it did say aprotinin [Trasylol]" on

---

[4] The medical records indicate in the perfusionist's cardioplegia box the number 3646, but Furnary ignores this number (Furnary Dep. (Ex. A) 105:4-15).
[5] Furnary speculates that the inadequate cardioplegia may cause the heart to work incorrectly (Furnary Dep. (Ex. A) 45:12-46:6). However, he then lists multiple causes for why a heart may not work after bypass, without performing an analysis to rule out these alternative causes (Furnary Dep. (Ex. A) 116:1-117:14).

the anesthesia record[6] (Furnary Dep. (Ex. A) 54:22-55:1).  Furthermore, Furnary completely ignores the first page of the anesthesia chart entirely, where Trasylol is listed as being administered with a test dose and full dose, admitting that he had no idea what the indications on the chart meant, stating "to me [Furnary] that means nothing" (Furnary Dep. (Ex. A) 55:5-7; 56:23-25).  When examining the anesthesia record in conjunction with Furnary's "expert" report, it is difficult to see how he can claim that Trasylol was not administered until the third CPB run after midnight when the record *clearly* indicates that Trasylol administration began between earlier.  *See* (Ex. E).  Again, Furnary's opinions are completely based on assumptions that he made about the record.  And again, this conjecture is not adequate for "expert" testimony and must be barred.

Furnary claims that since there was no total of the amount of Trasylol on the first page of the anesthesia record that it was not administered (Furnary Dep. (Ex. A) 56:23-57:1).  However, he also admits that when other medications that were listed on the anesthesia record were not administered that the doctors noted their totals to be zero (Furnary Dep. (Ex. A) 59:9-17).  Essentially, every other drug that was listed, but not administered, received a notation of "0 ml" except for Trasylol.  There is no total listed for Trasylol, so again, Furnary just *assumes* that it is zero, even when there is evidence that if it had been zero it would have been noted.  Additionally, on the second sheet of the anesthesia record, there is a volumetric indication for Trasylol of 50 ml/hr, as well as a continuation of the administration notation from the first sheet of the anesthesia record.  On the second anesthesia page, the total for Trasylol is still zero.  However, Furnary inexplicably and without excuse disregards the first page of the anesthesia record because it has no Trasylol total, but then contends Trasylol was only given on the second page and would contain no total as Trasylol is given as an infusion (Furnary Dep. (Ex. A) 59:18-

---

[6] *See* Anesthesia Rec. (Ex. E).

60:3). Furnary's excuse for disregarding the first page of the anesthesia record is without merit and contradicts the medical data itself. Trasylol administration began on the first sheet of the anesthesia record, where it is listed, and continued until three-thirty a.m. the following day. Furnary has manufactured facts that will suit his opinion which are clearly inconsistent with the medical record. This is certainly the "analytical gap" that the Supreme Court referred to in *Gen. Elec. Co.* 522 U.S. at 146. Accordingly, any opinions regarding the administration of Trasylol must be barred.

Finally, Furnary claims that Amicar was administered during the first part of Ms. Walker's CABG procedure, which would have been administered in place of Trasylol, is a red herring. Notwithstanding the fact that Trasylol *was* administered during the first CPB run, when examining the first sheet of the anesthesia record, it is obvious that the drug that was administered was *Amidar* **not** *Amicar* (but according to Furnary there is no medication that is called Amidar) (Furnary Dep. (Ex. A) 52:20-22). Yet he still asserts that it is "clear" that Amicar was given prior to the administration of Trasylol (Furnary Dep. (Ex. A) 64:4-13). This does not mean Trasylol was not administered during Ms. Walker's surgery as well, which is clear from the records. It is abundantly clear that Furnary is fabricating records to suit his own opinion. Again, his opinions have no basis in fact and must be barred.

**Ms. Walker's "urgent" procedure.** Additionally, Furnary bases his opinions on the urgency of Ms. Walker's CABG procedure on data that he simply does not have. Furnary deemed Ms. Walker's procedure to be an "urgent" procedure; however he admits that he did not have access to the cardiac cath films that would be needed to make such an assertion (Furnary Dep. (Ex. A) 15:8-11). Furthermore, Furnary continues to assert that the procedure was "urgent" even when the attending physician termed it elective, stating that it was for "longevity and

quality of life" (Furnary Dep. (Ex. A) 96:11-97:5). In fact, when Furnary is informed that it is standard practice to operate on a patient within 24 hours of a cardiac catheterization, whether the procedure is urgent or not, he still asserts that the procedure must have been urgent (Furnary Dep. (Ex. A) 98:2-100:3). Finally, Furnary notes in his report that there was no explanation for the necessity of such an urgent procedure and he could not figure out why the operation was on the same day. Furnary Rep. (Ex. B), (Furnary Dep. (Ex. A) 100:4-14).

However, in his deposition, he states that since Ms. Walker had chest pain, the procedure would have automatically been deemed urgent. It is curious why he would note on his report that there was no indication regarding the necessity of an urgent procedure and then decide in his deposition that the procedure was urgent because of chest pain.[7] Even in the face of direct evidence that the procedure was *not* urgent Furnary still asserts that it was. His opinions regarding the urgency of Ms. Walker's procedure are inconsistent with the facts and therefore must be barred.

The main facts of the record which Furnary relies upon to formulate his ultimate opinions are completely incorrect. It is hard to believe that he could read the records and still come to the conclusions that he is trying to pass off as "expert" opinion. Furnary's opinions are based upon make-believe facts that are unsupported by the medical records. His opinions are rooted in fiction and must be excluded.

---

[7] Furnary testified that Ms. Walker was operated upon urgently due to chest pain, but he testified there are multiple reasons why a patient may have chest pain, with many being unrelated to the heart (Furnary Dep. (Ex. A) 84:14-85:10, 94:7-95:2, 95:13-17). In addition, only one note mentioned chest pain on the day of surgery, with three other notes stating Ms. Walker did not have chest pain. *Id.* This selective use of medical data, which is contrary to the majority of data, is evidence of Furnary's selective use of data to go against the majority of data to merely support his speculations and flawed methodology as well as mislead a jury.

### III.   FURNARY FAILS TO OPINE THAT RISK FACTORS WERE THE CAUSE OR SUBSTANTIAL CONTRIBUTING FACTOR TO MS. WALKER'S INJURIES.

Furnary details a laundry list of risk factors in his expert report; however, when asked in deposition he fails to state that any one of these risk factors were a substantial contributing factor to any of Ms. Walker's injuries.  Indeed, Furnary ran Ms. Walker through a risk calculator, which proved that she was a low risk patient, but he failed to include these results in his report as it did not support his flawed methodology and fabricated speculations (Furnary Dep. (Ex. A) 74:3-10).  Instead, Furnary's flawed methodology  was to list risk factors in the report, thereby confusing the reader into believing they are relevant.  Only upon questioning does Furnary then concede that these risk factors did not play a role in Ms. Walker's cardiac or renal problems.

**History of arthritis.**  Furnary lists Ms. Walker's history of arthritis as a comorbid factor that was present prior to her CABG procedure.  However, when pressed in deposition he admits that the history of arthritis is "not significant in her development of heart failure and renal failure" (Furnary Dep. (Ex. A) 75:13-16).  It is unclear why he would list arthritis as one of Ms. Walker's comorbid factors when he obviously does not see a connection with her subsequent CABG-related injuries.

**Claustrophobia.**   Furnary further lists claustrophobia in his report as part of Ms. Walker's medical history.  However in deposition he admits that it had no role in her cardiac and renal injuries (Furnary Dep. (Ex. A) 75:17-19).  Again, Furnary lists this information for no apparent reason, other than for the sake of listing it, since he admittedly fails to link it to Ms. Walker's injuries.

**Recurrent migraine headaches.**  Furnary goes on to list in his report Ms. Walker's history of migraine headaches.  Furnary Rep. (Ex. B).  He further asserts that there is a connection between these headaches and potential small strokes suffered by Ms. Walker

(Furnary Dep. (Ex. A) 75:20-24).  However when pressed he admits that he fails to list any medical literature in support of this assertion (Furnary Dep. (Ex. A) 75:25-76:21).  He further admits that, even though he believes the migraine headaches were a risk factor for potential small strokes, it was "not critical" to his opinion (Furnary Dep. (Ex. A) 12-16).  Essentially, he believes that there is a possibility of a connection, but fails to analyze this risk factor to determine whether it applied to Ms. Walker.

**Degenerative joint disease and chronic back pain.**  Furnary also lists Ms. Walker's joint disease and chronic back pain as comorbid factors in his report.  Furnary Rep. (Ex. B).  However, when questioned in deposition he admitted that these two conditions had absolutely nothing to do with Ms. Walker's cardiac and renal injuries (Furnary Dep. (Ex. A) 76:22-77:1).  Again, Furnary appears to be listing the factors for the sake of listing them, without ever establishing that they could have been a contributing factor.

**Post ectopic pregnancy, salpingography and hysterectomy.**  Furnary further lists Ms. Walker's reproductive problems as comorbid factors in his expert report.  Furnary Rep. (Ex. B).  He then swiftly dismisses any notion that they could be a contributing factor to Ms. Walker's cardiac and renal injuries (Furnary Dep. (Ex. A) 77:2-8).  Again, it is unclear why Furnary listed these as comorbid factors if he clearly thought they had nothing to do with Ms. Walker's injuries.

**Chronic sinusitis.**  In Furnary's report, he asserts that Ms. Walker had chronic sinusitis.  Furnary Rep. (Ex. B).  However, when pressed in deposition he admits that he has no idea how long she actually had sinusitis (Furnary Dep. (Ex. A) 77:9-19).  He further states that her sinusitis was not "critical" to his opinion, but was an "important background piece" (Furnary Dep. (Ex. A) 77:9-78:3).  When asked what he relied upon to ascertain that her sinusitis was important Furnary admits that "there is no literature" to back him up (Furnary Dep. (Ex. A)

77:20-78:3). Again, Furnary supplies a tenuous link between the sinusitis and Ms. Walker's cardiac and renal injuries, one he himself does not even deem critical.

**Untreated hypertension.** Furnary also lists untreated hypertension as one of Ms. Walker's comorbid factors. Furnary Rep. (Ex. B). When questioned about this topic in deposition he admits that he did not make any determination as to Ms. Walker's average blood pressure over the 12 months prior to surgery (Furnary Dep. (Ex. A) 78:7-18). Furnary then goes on to claim that her blood pressure over the prior 12 months was irrelevant as the only thing that mattered in this case was the intraoperative surgical events (Furnary Dep. (Ex. A) 78:20-79:1). However, he then opines that Ms. Walker's hypertension was a risk factor for her cardiac problems (Furnary Dep. (Ex. A) 79:2-9). It is difficult to understand how Furnary could claim that Ms. Walker's hypertension was eclipsed by surgical events, yet still able to possibly relate it to her cardiac injuries. Finally, he again admits that there is no medical literature to support his assertion that her hypertension contributed in any way to her cardiac problems, including the myocardial infarction (Furnary Dep. (Ex. A) 81:16-82:5).

**Hyperlipidemia (high cholesterol).** Furnary also lists hyperlipidemia as one of Ms. Walker's comorbid factors; however, he doesn't bother to determine the length of time she suffered from high cholesterol (Furnary Dep. (Ex. A) 82:14-23). Yet he still asserts that it played a role in Ms. Walker's cardiac problems as high lipids can contribute to the development of coronary artery disease (Furnary Dep. (Ex. A) 82:24-83:7). It is curious why he doesn't bother to determine the duration of Ms. Walker's high cholesterol, yet still opines that it could be a contributing factor to her cardiac problems, only noting that it could be *one of* the sources for coronary artery disease (Furnary Dep. (Ex. A) 83:2-7). However, Furnary never provides any analysis or explanation of how Ms. Walker's high lipid count contributed to her coronary artery

disease. His flawed methodology never included determining if and how the lipids affected Ms. Walker, instead merely speculating without explanation. Again, Furnary fails to draw a reliable opinion regarding whether or not Ms. Walker's high cholesterol actually contributed to her cardiac problems.

**Hepatitis C.** Finally, Furnary lists Hepatitis C as one of Ms. Walker's comorbid factors. Furnary Rep. (Ex. B). When asked specifically if it played a role in this case Furnary responds: "Not to my knowledge. It *may have* played a role…" (Furnary Dep. (Ex. A) 109:4-10). Again, Furnary simply adds this to his ever-increasing list of comorbid factors that may or may not have contributed to Ms. Walker's cardiac or renal problems. Furnary performs no analysis regarding Hepatitis C for his speculative conclusions.

**Contrast Induced Nephropathy.** Despite mentioning the effects of the cardiac catheterization possibly affecting Ms. Walker, Furnary concedes there is nothing in the medical records to support any opinion that the cardiac catheterization, or its contrast, adversely affected Ms. Walker (Furnary Dep. (Ex. A) 93:22-94:6).

In is clear from Furnary's report and subsequent deposition that he could not say that any of the risk factors that he listed for Ms. Walker substantially contributed to her cardiac or renal injuries. Furnary attempts to color the Court's perspective of this otherwise healthy 43 year old by listing conditions that literally have no effect on her surgery in an attempt to keep the focus off Trasylol. Furnary further fails to support these opinions with literature or medical data. As such, any opinions regarding this breadth of subject matter must be barred.

## IV. FURNARY FAILED TO PERFORM AN ADEQUATE DIFFERENTIAL DIAGNOSIS AND THEREFORE HIS OPINION MUST BE DEEMED UNRELIABLE.

Furnary's opinions must be excluded because he fails to meet the reliability requirements as laid out in *Daubert* and Rule 702.  In order for an expert witness' testimony to be deemed reliable, that witness must have used some type of accepted methodology in reaching that opinion, including a differential diagnosis.  As noted from the record, Furnary failed to use adequate support in formulating his opinions.  While it has been established that performing a differential diagnosis is an acceptable methodology under *Daubert,* "an expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis." *Guinn v. AstraZeneca Pharm.*, 602 F.3d 1245, 1253 (11th Cir. 2010) (quoting *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999)).  Furthermore, the court in *Guinn* held that "a differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Id.*

Furnary's differential diagnosis in Ms. Walker's case is severely lacking.  Not only did he base it on fictional medical records (*See* § II), but he also failed to adequately rule out all possible causes, stating that "one little thing is going to put her into kidney failure" (Furnary Dep. (Ex. A) 142:20-22).  Furnary gives a vast list of possible contributing factors to Ms. Walker's renal failure; however, he never opines which contributing factor was substantial, stating "only God knows what happened" (Furnary Dep. (Ex. A) 142:6-14).  As the 11th Circuit held in *Guinn*, an expert must be able to articulate why he believes that the possible causes can be ruled out.  602 F.3d at 1253.

**Contribution of Trasylol to Cardiac Problems.**  Furnary opines that he ruled out Trasylol as a contributing factor for Ms. Walker's cardiac problems because "it wasn't given during the first pump run" (Furnary Dep. (Ex. A) 120:23-25).  It has already been established[8] that Trasylol *was* given during the first pump run and that Furnary's speculations are using flawed methodology to disregard medical data.  This effectively undermines his entire line of reasoning for ruling Trasylol out.  He cannot accurately say that Trasylol did *not* substantially contribute to Ms. Walker's renal injuries based upon this blatant disregard for the medical data.  Furthermore, he refuses to acknowledge the existence of medical literature that shows an association between Trasylol and cardiac death (Furnary Dep. (Ex. A) 121:6-13).  Accordingly, any opinions surrounding this subject must be barred.

**Cardiogenic Shock and Cardiac Problems.**  Furnary also ***thinks*** that Ms. Walker went into cardiogenic shock, which in turn required the use of a BiVAD machine, which then led to a series of complications, which ultimately resulted in Ms. Walker's death[9] (Furnary Dep. (Ex. A) 124:18-24).  Furnary believes that all of these downstream complications stemmed from Ms. Walker's inadequate protection due to an insufficient amount of cardioplegia solution (Furnary Dep. (Ex. A) 125:10-18).  However, it has been established[10] that Furnary's basis for determining that Ms. Walker received inadequate cardioplegia is not supported by the facts or any medical literature.  Thus, it is problematical to see how Furnary could "rule-in" cardiogenic shock through this extremely tenuous series of causes and effects.[11]  Accordingly, any opinions regarding this area must be barred.

---

[8] *See supra* § II.
[9] Furnary actually opines that the myocardial infarction and cardiogenic shock were concomitant (Furnary Dep. (Ex. A) 118:18-119:4).
[10] *See supra* § II.
[11] Furnary also fails to rule out alternative causes of the myocardial infarction and cardiogenic shock (Furnary Dep. (Ex. A) 116:7-117:14).

**Contributing factors to Ms. Walker's renal failure.** Furnary's differential diagnosis regarding the cause of Ms. Walker's renal failure is sub-par, at best. Admittedly, Furnary can only rule out one cause for sure—Trasylol (Furnary Dep. (Ex. A) 168:12-169:10). Again, his basis for ruling Trasylol out is based on an inaccurate account of the medical records.[12] Additionally, Furnary states that the only reason he *might* consider Trasylol to have a "profound" effect on a patient's kidneys is if it was the only risk factor present (Carr Furnary Dep. (Ex. G) 68:8-18). It is hardly likely that Furnary could proffer an unbiased "expert" opinion regarding the effects of Trasylol if he refuses to even objectively consider it as a possible risk factor. This behavior does not comport with the notion that an expert must actually take into consideration the possible causes as mandated by *Guinn.* 602 F.3d at 1253. Accordingly, Furnary's subjective and biased differential diagnosis must be barred.

Moreover, Furnary concedes in his deposition that he did not perform an analysis of the renal risk factors and could not state what caused Ms. Walker's renal failure:

Q.    But you can't say that the respiratory failure probably contributed to her renal failure, correct?

A.    I can tell you in the context of everything else up here, I can't tell you what exactly, only God knows what happened to her renal failure, why she went into renal failure. I can give you all the possibilities and what lined up, and this is one of the things that lined up. Same with ARDS.

(Furnary Dep. (Ex. A) 142:6-14). Furnary merely states items which "can contribute" and are risk factors. *Id.* at 135:13-136:11.

Furnary's testimony above is the exact opposite of the opinions he expressed in his "expert" report. In the report, he clearly states that cardiogenic shock and prolonged CPB time likely contributed to Ms. Walker's renal failure. Furnary Rep. (Ex. B). However, when questioned during deposition he states the exact opposite; that the cardiogenic shock and

---

[12] *See supra* § II.

prolonged bypass did *not* contribute to Ms. Walker's renal failure. His differential diagnosis is inconsistent; on the one hand ruling these two causes in and on the other ruling them out.

Additionally, Furnary opines that the transfusion, hypotension, sepsis, intravascular volume depletion, and high vancomycin were *all* risk factors. This certainly does not satisfy the reliability standards of *Daubert* and Rule 702. A "[d]ifferential diagnosis 'is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.'" *Guinn*, 602 F.3d at 1253 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999)). The only thing that Furnary claimed to have definitively "ruled-out" was Trasylol as he did not analyze other risk factors to rule them out (Furnary Dep. (Ex. A) 167:20-169:11). He fails to analyze the risk factors, rule out those that do not apply, and instead simply lists risk factors.[13] Moreover, Furnary can cite no literature to back up his assertion that these risk factors worked together to cause Ms. Walker's renal failure.[14] This is certainly not enough for a proper differential diagnosis. Accordingly, any testimony regarding the cause of Ms. Walker's renal failure must be barred.

## V.   FURNARY'S TESTIMONY MUST BE BARRED BECAUSE HE IS NOT QUALIFIED AS AN EXPERT TO TESTIFY IN RELATION TO TRASYLOL.

An expert may not offer testimony on subjects in which they lack expertise. FED. R. EVID. 702; *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (qualifications in one field does not make an expert qualified to testify in a field outside his expertise). An expert must stay within the reasonable confines of his subject area. *Trilink Saw Chain, L.L.C. v. Blount, Inc.*, 583

---

[13] Furnary cannot specifically state Ms. Walker's potential hypotension contributed to her renal failure as Furnary said it "depends" (Furnary Dep. (Ex. A) 128:23-129:21). Likewise, Furnary merely states the transfusions increased the risk of renal complications. *Id.* at 141:5-10. He renders similar testimony for the remaining risk factors, without analyzing them for applicability to Ms. Walker.

[14] *See supra* § II ("there is not a single paper in the medical literature that describes this constellation in one... so I don't have anything in [the materials list] that describes this entire constellation") (Furnary Dep. (Ex. A) 147:4-14).

F.Supp.2d 1293, 1304 (N.D. Ga. 2008). Furnary is present to testify as a CT expert, not an expert in nephrology where he lacks training (Furnary Dep. (Ex. A) 4:16-21). Accordingly, he is not qualified to testify regarding Ms. Walker's renal injuries.

## CONCLUSION

As stated in the above legal and factual arguments, Defendants have failed to meet their burden to show that Furnary is a competent expert witness. He lacks expertise in nephrology, disregards medical data, fails to support any opinions with literature, and therefore applies flawed methodology to reach speculative conclusions. Such testimony would clearly not assist the trier of fact. For all these reasons, Plaintiff respectfully requests that the Court exclude the purported expert testimony of Dr. Anthony P. Furnary as to this case.

DATED: August 13, 2010

Respectfully submitted,

George M. Fleming (SBN 07123000)
Karen H. Beyea-Schroeder (SBN 24054324)
Aaron Heckaman (SBN 24059920)
**FLEMING & ASSOCIATES, L.L.P.**
1330 Post Oak Blvd., Suite 3030
Houston, Texas 77056
Telephone (713) 621-7944
Facsimile  (713) 621-9638
Email: karen_beyea-schroeder@fleming-law.com

C. Andrew Childers Esq.
**CHILDERS, BUCK & SCHLUETER, LLP**
260 Peachtree Street, Suite 1601
Atlanta, GA  30303-1237
Telephone (404) 415-9500
Facsimile  (404) 415-9501
Email:  achilders@cbsfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2010, the foregoing document was served on all counsel of record identified on the attached Service List in the manner specified.

Karen Beyea Schroeder

## SERVICE LIST

### *Via Electronic Mail and Certified Mail, Return Receipt Requested*

Steven E. Derringer
Email: steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR**
    **& SCOTT LLP**
54 West Hubbard, Suite 300
Chicago, IL 60610
Telephone: 312-494-4400
Facsimile: 312-494-4440
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc.,*
*Bayer Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*

Eugene A. Schoon
Email: eschoon@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone: 312-853-7000
Facsimile: 312-853-7036
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc.,*
*Bayer Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*

Alan G. Schwartz
Email: aschwartz@wiggin.com
**Wiggin and Dana LLP**
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Telephone: 203-498-4400
Facsimile: 203-782-2889
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation*
*and Bayer Healthcare Pharmaceuticals, Inc.*

Richard K. Dandrea, Esq.
Email: rdandrea@eckertseamans.com
**ECKERT SEAMANS CHERIN & MELLOTT,**
**LLC**
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Telephone: 412-566-6000
Facsimile: 412-566-6099
*Defendants Co-Lead Counsel and*
*Attorney for Defendants Bayer Corporation,*
*Bayer Healthcare Pharmaceuticals, Inc.,*
*Bayer Healthcare LLC, Bayer AG, and Bayer*
*Healthcare AG*