# Exhibit A

**Patrick E. Mahoney, ISB No. 5242**
**MAHONEY LAW, PLLC**
The Veltex Building
420 W. Main Street, Suite 206
Boise, Idaho 83702
Telephone:  (208) 345-6364
Facsimile:  (208) 336-2088
patrick@patrickmahoneylaw.com

**Douglas W. Crandall, ISB No. 3962**
**CRANDALL LAW OFFICE**
The Veltex Building
420 W. Main Street, Suite 206
Boise, ID 83702
Telephone:  (208) 343-1211
Facsimile:   (208) 336-2088
dwc@crandall-law.net

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**

IN RE: TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL – 1928

**This Document Relates to:**
**FRANK BRADY AND ALTHEA BRADY**
**Case No. 9:08-cv-80789**

_____

**PLAINTIFFS' CASE-SPECIFIC EXPERT WITNESS DISCLOSURE**

Pursuant to Federal Rule 26(a)(2) and Pretrial Orders Nos. 4, 7, 16, and 21, Plaintiffs

hereby disclose case-specific expert witnesses that will and may be called to testify at trial in the

above-captioned matter:

> 1.  Dr. Arif Asif, M.D.
>     7401 SW 63rd Court
>     Miami, FL 33143
>     (786) 473-4041

Dr. Asif is a nephrologist who will be called to testify at the trial of this case.  He is a

PLAINTIFFS' CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -1

Professor of Medicine at the University of Miami School of Medicine in Miami, Florida. His report, curriculum vitae, and other disclosures are attached hereto. He has also reviewed and approved the life care plan prepared by expert Debbie Hendricks. Dr. Asif's hourly rate is $675.

2. Dr. Robbin G. Cohen, M.D., M.M.M.
Associate Professor of Cardiothoracic Surgery
Co-director, Aortic Center at USC/Keck School of Medicine
Los Angeles, CA
(323) 442-5849

Dr. Cohen is a cardiothoracic surgeon who will be called to testify at the trial of this case. He is an Associate Professor of Cardiothoracic Surgery at the Keck/University of Southern California School of Medicine in Los Angeles, California. His report, curriculum vitae, and other disclosures are attached hereto. Dr. Cohen's hourly rate is $700.

3. Dr. Peter Rost, M.D.
29 Great Hills Road
Short Hills, NJ 07078
(973) 273-4668

Dr. Rost is an expert on pharmaceutical industry standards who will be called to testify at the trial of this case. He has held positions with Pfizer, Inc., Wyeth Pharmaceuticals, and Lederle Laboratories. His report, curriculum vitae, and other disclosures are attached hereto. Dr. Rost's hourly rate is $500.

4. Debbie Hendricks, RN CCM, CDMS
Cascade Enterprises
PO Box 9616
Boise ID 83707
(208) 343-4009

Ms. Hendricks is a registered nurse, disability manager, nurse case worker, and life care planner who will be called to testify at the trial of this case. Her report, curriculum vitae, and other disclosures are attached hereto. Nurse Hendrick's hourly rate is $85.

5. Paul A. Randle, M.B.A., Ph.D.
Paul A. Randle and Associates
21 Shadow Mountain Drive
Logan, UT
(435) 753-1009

Mr. Randle is an economics expert who will be called to testify at the trial of this case. He was Professor of Finance at Utah State University in Logan, UT, where he is now Emeritus Professor of Finance. His report, curriculum vitae, and other disclosures are attached hereto. His hourly rates are set forth in the attached Fee Schedule.

6.   Melissa Lopez of Elko Dialysis (or another appropriate representative of Elko Dialysis)
1517 Shoshone Circle
Elko NV 89801-5073
(775) 738-4090

Melissa Lopez (or another appropriate representative of Elko Dialysis), is a non-retained treating healthcare provider who may be called to testify at the trial of this case.  She is expected to testify to a reasonable degree of medical certainty consistent with the dialysis records from her facility, including, without limitation as to past, present, and future dialysis treatment, that the same was reasonable and necessary, and that the dialysis bills claimed as damages in this case are reasonable and necessary.

7.   Dr. James C. Stringham (treating heart surgeon)
24 S 1100 E
Salt Lake City, UT
(801) 746-4440

Dr. Stringham is a non-retained treating heart surgeon who may be called to testify at the trial of this case.  Dr. Stringham is expected to testify consistent with his records (and his deposition if taken in this case) to a reasonable degree of medical certainty.

8.   Dr. Nicholas C. Hunt, M.D. (treating nephrologist)
5610 Gage Street
Boise, ID 83706-1332
(208) 367-3370

Dr. Hunt is a non-retained treating nephrologist who may be called to testify at the trial of this case.  He is expected to testify consistent with his deposition and his medical records to a reasonable degree of medical certainty.  It is anticipated that he would testify that the past, present, and continuing renal treatment (dialysis) ordered or prescribed by him for Plaintiff Frank Brady was and is reasonable and necessary.

9.   The Plaintiffs specifically reserve the right to amend and supplement this list for good cause shown, based on continuing medical treatment and/or continuing discovery.

**DATED** this _11th_ day of August, 2010.

**MAHONEY LAW, PLLC**

By _____
PATRICK E. MAHONEY
Attorney for the Plaintiff

PLAINTIFFS' CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -3

**Peter Rost, M.D.**

# PETER ROST, M.D.

29 Great Hills Road
Short Hills, New Jersey 07078
Phone:  (973) 273-4668
rostpeter@hotmail.com
http://DrugExpertWitness.com/

## EXPERT REPORT

## INDUSTRY STANDARDS FOR DRUG COMPANIES

### ASSIGNMENT

I have been asked to author a concise, objective summary of industry standards for drug companies.  I have been asked to provide a basic overview on how a reasonable, prudent, drug company behaves in this industry.  My opinions are based on my business experience, education, training, and observations developed over my nearly two decades in the pharmaceutical industry working for some of the largest drug companies in the world.  I hold and state my opinions herein to a reasonable degree of professional certainty.

### QUALIFICATIONS AND EXPERIENCE

The qualifications and experience I possess such that I am able to confidently summarize pharmaceutical industry standards in an objective and understandable fashion are as follows.

I have held positions from the least to most senior in pharmaceutical marketing and operations, and I worked with or oversaw the legal, regulatory, and medical departments.  These positions provided me with a broad range of experience in marketing and selling drugs, as well as in drug company management.

I graduated from the University of Gothenburg, School of Medicine, Sweden in 1984.

For a time I practiced medicine in the anesthesiology department and in the intensive care unit, where I gained experience treating patients with, among other things, drug induced complications and adverse effects.

I switched fields to advertising and pharmaceutical marketing in 1985. I worked for a number of advertising agencies from then until 1992, at which time I was hired by Lederle Laboratories in New Jersey, where I worked as U.S. product manager, associate director of medical education, and then director of medical education in the U.S. In 1995, after Wyeth bought Lederle, I was made Director of Marketing and, in 1996, Director of Commercial Operations with responsibility for European operations, located in Pennsylvania. In 1999 I was promoted to Managing Director and sent to Sweden, with responsibility for the Nordic region in Europe. During this assignment I had four countries reporting to me and I oversaw marketing, regulatory, medical, human relations, legal, and other corporate functions. In 2001 I became Vice President, Marketing, Women's Healthcare Division at Wyeth in Pennsylvania. This involved U.S. and global marketing responsibility for all of Wyeth's female hormone replacement products and contraceptives, with $2 billion in sales.

Most recently I was employed by Pharmacia—later becoming Pfizer—the world's largest drug company, as Vice President, Marketing, Endocrine Care for the U.S. and globally, located in New Jersey. I oversaw the creation, publication, and distribution of marketing and educational materials for drugs and devices, including ads, brochures, flyers, and other advertising materials. I also oversaw launch strategies, business plans, marketing plans, and the creation of marketing materials that drug representatives provided to physicians and pharmacists.

I worked with legal, regulatory, and medical departments to develop long-term strategies, business plans and tactical plans for the drugs assigned to me, and also provided input for

2

PETER ROST, M.D.

medical studies and regulatory matters, such as package inserts for new drug launches (which would eventually be part of the drug listing in the Physician's Desk Reference). At times I was also directly responsible for deciding the pricing of pharmaceuticals and I also accompanied company drug representatives on visits with physicians, allowing me to observe their relationships and interactions.

The cases in the past four years in which I testified as an expert at trial or by deposition as well as additional details in my experience, including publications, can be found in my attached C.V.

## INTRODUCTION TO RESPONSIBILITIES OF DRUG COMPANIES

Public safety relative to the pharmaceutical industry depends upon the integrity and accuracy of the data, disclosures, warnings, and information provided by the drug companies to doctors and patients, as well as on the actions of drug companies in studying their drugs, monitoring their drugs, and marketing their drugs.

As a practical matter in terms of their operations, the pharmaceutical industry operates with the recognition that, due to limited resources and manpower, the FDA is largely dependent on the drug companies (or "drug sponsors") themselves to provide safety information to doctors and patients and relies on the honesty and accuracy of safety disclosures by each company made to doctors and patients. Simply put, the drug companies are the ones responsible for conveying drug safety information to doctors and patients.

The drug manufacturers analyze safety and efficacy data on their drugs' performance as a matter of basic industry practice. Usually, this is based, in large part, upon clinical trials that test the safety and efficacy of drugs on a population limited both in size and diversity. Even when

3

PETER ROST, M.D.

based on quality data, however, clinical trial results do not guarantee that a drug will turn out to be safe for broad-scale use. A serious adverse event that occurs in one out of 10,000 patients, for example, or that occurs only after long-term use, may not be detected in a trial of 2,000 subjects that lasts only a few months or even a couple of years. For these reasons, at the time of initial marketing, a drug manufacturer necessarily does not have the breadth of information that it will ultimately possess as time goes by -- information that can and should be used, as it is acquired by the manufacturer, to promptly warn doctors and the public about the risks of its drug. This being said, a drug company should disclose and analyze all available information and studies of which it is aware as it brings a drug to market and should continually assess, study, and monitor its drugs -- the FDA simply does not have the resources to do this for the drug companies. These are all basic, practical, general industry standards that a responsible pharmaceutical company follows in the interest of drug safety.

## RESPONSIBILITY TO USE DRUG WARNING LABELING

As discussed above, in many cases, serious or life-threatening adverse events are discovered only after a drug has been on the market for several years. It is standard practice in the industry for the drug manufacturer to report any drug-related adverse events it becomes aware of to healthcare professionals, and to ensure that approved labeling reflects the drug company's current knowledge of the drug, including, but not limited to, adverse events. Once an adverse event or product problem is identified, the drug manufacturer can take any of the following actions:

1. Labeling changes — The manufacturer may make changes, including warnings, precautions, and contraindications.

4

PETER ROST, M.D.

2. Black box warnings — A manufacturer may elect to highlight a warning by including a black box (literally a bold, black box placed around crucial warning text, placed at the top of the label and insert so as to direct the reader's attention to it as critically important information).

3. Product recalls and withdrawals — A manufacturer may elect to recall or withdraw a product.

4. Medical and safety alerts such as "Dear Doctor Letters"— Used to provide important safety information about a product to health professionals and academics (such as research professors).

Manufacturers of prescription drugs provide information on drugs' risks in the contraindications, warnings, precautions, and/or adverse reactions sections of the labeling. This includes clinically significant adverse reactions for which there is reasonable evidence of an *association* between the drug and the adverse reaction (a causal relationship need not have been established). There are also circumstances in which an adverse reaction could be expected to occur with a drug, despite its not having been observed with that drug, based on observations from other drugs in the same class or from animal studies.

Serious potential hazards of a drug may necessitate the addition of a black box warning. The black box warning indicates the highest level of risk on prescription medications. In the industry, the black box appears not only on the package insert but also on all promotional materials. A boxed warning can also be used in other situations to highlight information that is especially important to the prescriber.

Boxed warnings can be based on observed adverse reactions, in which the causal relationship between exposure to the drug and the adverse reaction is well established. However, there are also instances when a boxed warning based on an expected adverse reaction would be appropriate, for example a warning based on clinical data showing a material likelihood that the

5

PETER ROST, M.D.

adverse reaction will occur with the drug, or animal data raises substantial concern. A boxed warning can also be considered for a drug that has important risk/benefit information that is unique among drugs in a drug class (e.g., to note that a drug is the only one in its class to have a particular risk that makes it inappropriate for use as a first line therapy).

Manufacturers in the industry voluntarily update a product label when necessary, conduct post-approval safety studies, and warn physicians and patients about increased rates of expected risks or new, unanticipated side effects when such information becomes known. The manufacturers are responsible for investigating their drugs, including initiating studies, rescheduling studies and/or analysis of data in order to ensure that a drug is safe for use for consumers both before and after approval. Industry management recognizes that their companies have a responsibility in the interest of drug safety to revise a warning to identify a clinically significant hazard as soon as there is reasonable evidence of an association with a drug. See, e.g., 21 C.F.R. §201.57(e), (g) and 21 C.F.R. §201.80(e).

In a recent Supreme Court decision, *Wyeth v. Levine*, which was very closely followed by the pharmaceutical industry, the Supreme Court re-affirmed that the responsibility to adequately warn of a drug's risk lies with the manufacturer. The Supreme Court stressed that the manufacturer has this obligation since the manufacturer has the most knowledge of its own product.

As a matter of industry standard practice, as soon as a drug company discovers risks that are not clearly stated or addressed in the product label, a company can and should update the label. The following types of statements may be added to a label:

1.      Those that add or strengthen a contraindication, warning, precaution, or adverse reaction;

6

PETER ROST, M.D.

2.    Those that add or strengthen a statement about drug abuse, dependence, psychological effect, or overdose;

3.    Those that add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug;

4.    Those that delete false, misleading, or unsupported indications for use or claims of effectiveness.

A manufacturer can and should provide new warnings or additional information to healthcare providers and patients as information is gathered and learned by way of ongoing monitoring, studying, reports, and assessment.    Manufacturers do so through labeling, advertising, "Dear Doctor Letters," trade associations, medical associations, journals, the Internet, and the many ways in which they communicate to healthcare professionals and patients when promoting their drugs.

## MARKETING AND SALES FORCE

The following industry standards are, in practical experience, well recognized by pharmaceutical companies in the interest of drug safety as it relates to marketing and the companies' sales employees.    Drug companies' relationships with healthcare professionals should benefit patients and enhance the practice of medicine.    Interactions should be focused on informing healthcare professionals about products, providing scientific and educational information and supporting medical research and education.

No financial benefit or benefit-in-kind (including grants, scholarships, subsidies, support, consulting contracts or educational or practice related items) should be provided or offered to a healthcare professional in exchange for prescribing, recommending, purchasing, supplying or administering products or for a commitment to continue to do so.    Nothing should be offered or

7

PETER ROST, M.D.

provided in a manner or on conditions that would have an inappropriate influence on a healthcare professional's prescribing practices.   Promotion should encourage the appropriate use of pharmaceutical products by presenting them objectively and without exaggerating their properties.

Promotion should not be disguised.  Clinical assessments, postmarketing surveillance and experience programs and postmarketing studies must not be disguised promotion.   Such assessments, programs and studies should be conducted with a primarily scientific or educational purpose.   Promotional materials provided to healthcare professionals by or on behalf of a company should be accurate and not misleading; make claims about a product only when properly substantiated; and reflect the balance between risks and benefits.  Material relating to pharmaceutical products and their uses, whether promotional in nature or not, which is sponsored by a company should also clearly indicate by whom it has been sponsored.  No pharmaceutical product should be promoted for use in a specific indication until the requisite approval for marketing for such use has been given.  Promotional information should be clear, legible, accurate, balanced, fair, objective and sufficiently complete to enable the recipient to form his or her own opinion of the therapeutic value of the pharmaceutical product concerned.

Promotional information should be based on an up-to-date evaluation of all relevant evidence and reflect that evidence clearly.   It should not mislead by distortion, exaggeration, undue emphasis, omission or in any other way.  Every effort should be made to avoid ambiguity. Absolute or all-embracing claims should be used with caution and only with adequate qualification and substantiation.

Promotion should be capable of substantiation either by reference to the approved labeling or by scientific evidence.   Such evidence should be made available on request to

8

PETER ROST, M.D.

healthcare professionals. Companies should deal objectively with requests for information made in good faith and should provide data which are appropriate to the source of the inquiry.

The purpose and focus of all symposia, congresses and other promotional, scientific or professional meetings for healthcare professionals organized or sponsored by a company should be to inform healthcare professionals about products and/or to provide scientific or educational information.

Payments of reasonable fees and reimbursement of out-of pocket expenses, including travel and accommodation, may be provided to healthcare professionals who are providing genuine services as speakers or presenters on the basis of a written contract with the company at the event.

All events should be held in an appropriate venue that is conducive to the scientific or educational objectives and the purpose of the event or meeting. Companies should avoid using renowned or extravagant venues. Hospitality should be limited to refreshments and/or meals incidental to the main purpose of the event and should only be provided to participants of the event and not their guests; and if it is moderate and reasonable as judged by local standards.

Cash payments in cash or cash equivalents (such as gift certificate) should not be offered to healthcare professionals. Gifts for the personal benefit of healthcare professionals should not be provided or offered.

Promotional aids or reminder items may be provided or offered to healthcare professionals and appropriate administrative staff, provided the gift is of minimal value and relevant to the practice of the healthcare professional. Items of medical utility may be offered or provided free of charge provided that such items are of modest value and are beneficial to the provision of medical services and for patient care.

9

PETER ROST, M.D.

It is appropriate for consultants who provide advisory services to be offered reasonable compensation for those services and reimbursement for reasonable travel, lodging, and meal expenses incurred as part of providing those services. Any compensation or reimbursement made in conjunction with a consulting arrangement should be reasonable and based on fair market value.

Company decisions regarding the selection or retention of healthcare professionals as speakers should be made based on defined criteria such as general medical expertise and reputation, knowledge and experience regarding a particular therapeutic area, and communications skills. Companies should ensure that speaking arrangements are neither inducements nor rewards for prescribing a particular medicine or course of treatment. Any compensation or reimbursement made to a healthcare professional in conjunction with a speaking arrangement should be reasonable and based on fair market value. Token consulting or advisory arrangements should not be used to justify compensating healthcare professionals for their time or their travel, lodging, and other out-of-pocket expenses.

The manufacturer can—and should—educate its sales force to provide new information and warnings to healthcare providers as soon as possible. A prudent manufacturer who wanted to ensure that physicians and patients were adequately warned about safety risks would use the same tactics to communicate the risks as it does to communicate the benefits of its drug (particularly when a drug has been on the market for a number of years).

Companies should ensure that all representatives who are employed by or acting on behalf of the companies and who visit healthcare professionals receive training about the applicable laws, regulations and industry codes of practices that govern the representatives' interactions with healthcare professionals. In addition, companies should train their

10

Peter Rost, M.D.

representatives to ensure that they have sufficient knowledge of general science and product-specific information to provide accurate, up-to-date information. Companies should provide updated or additional training in all of these areas as needed for their representatives who visit healthcare professionals. Companies should also assess their representatives periodically to ensure that they comply with relevant company policies and standards of conduct. Companies should take appropriate action when representatives fail to comply.

Drug companies should establish and maintain appropriate procedures to ensure full compliance with relevant codes and applicable law and to review and monitor all of their promotional activities and materials. A designated company employee, with sufficient knowledge and appropriate scientific or healthcare qualifications should be responsible for approving all promotional communications.

Manufacturers should not market drugs for use in patient groups, purposes, dosages, or combinations that are not approved by the FDA. Manufacturers, however, often have others speak on their behalf, i.e., opinion leaders or patient organizations. A physician's medical judgment is influenced by studies, medical articles and data presented at scientific meetings. Pharmaceutical companies may try to place articles supporting their drugs into the most prominent journals and often use so called "medical education agencies" to ghostwrite the manuscripts and assist with publishing and placement of those articles. Journal articles are also an important source of new adverse reaction information and other data on drugs.

Many physicians have limited time to search for information from established scientific venues, and are influenced by pharmaceutical sales reps and marketing campaigns conducted by the pharmaceutical industry, as well key opinion leaders, patient organizations and other entities that may not always be readily identifiable as speaking on behalf of the drug manufacturers.

11

PETER ROST, M.D.

Manufactures are also well-aware that physicians will be more influenced by key opinion leaders ("KOL's") and fellow medical professionals than by sales representatives. Manufacturers have come to use KOL's and members of their speaker's bureau as a more credible version of the sales representatives.

Pharmaceutical manufacturers should not market their drugs for use in patient groups, for purposes, or dosages, or in combinations other than FDA-approved ones. The promotion of drugs is highly regulated; however, pharmaceutical manufacturers can avoid scrutiny by having others speak on their behalf, i.e., opinion leaders or patient organizations. If they pay for others to promote their drugs, these individuals or entities must follow product labeling, however, it may be difficult for the audience to ascertain if there is a financial relationship. The same sources can be used to legitimately educate the target audience about labeling revisions and other important news about drugs.

The most effective marketing to generate sales is marketing which the target audience is not aware of, hence, can't evaluate based on who paid for the message. This takes place when "independent" experts or institutions or groups support a particular drug, and have a financial relationship with the drug company marketing the product or when an independent expert is co-opted to quell negative information or to generate data which may rebuke adverse findings.

In fact, pharmaceutical companies regularly submit articles supporting their actively marketed drugs into prominent scientific and medical journals that have actually been written by medical education agencies that also assisted with the publishing and placement process for those articles.

Pharmaceutical companies also use direct promotional efforts, including sending sales representatives to physicians' offices to "detail" the drug on a weekly basis, often bringing food,

PETER ROST, M.D.

gifts and drug samples to gain entrance into the physician's office. During these visits, the sales reps discuss the drugs with the physicians and provide them with literature regarding the drugs. Sales representatives also visit pharmacists and other healthcare professionals in the same manner. Sometimes drug companies use "medical science liaisons" that purport to provide more scientific information than a sales representative, or patient care consultants to "educate" patients about the drug company's drugs to maximize use and revenues, through audio conferences, speaker programs, patient brochures, etc. In times of crisis these large sales forces can be used to blunt negative press about a drug, or associated competitive onslaught and downplay side-effect data, or they can also be used ethically to rapidly inform healthcare providers of new and dangerous side-effects.

## DRUG COMPANY EMPLOYEES

It is industry standard that employees should conduct business with honesty and integrity and in a professional manner. Employees should:

- Build relationships with customers, vendors, suppliers, and fellow employees based on trust, and provide current, accurate and reliable information.

- Become familiar with and comply with legal requirements, policy and procedures.

- Avoid any activities that could involve or lead to involvement in any unlawful practice.

- Avoid actual or potential conflicts of interest, or the appearance thereof, in all transactions.

- Promptly report any breach of law or regulation, ethical principles, or policies and cooperate fully in any audit, enquiry, review, or investigation.

- Managers should ensure all their employees receive guidance, training, and

PETER ROST, M.D.

communication on ethical behavior and legal compliance relevant to their duties.

## DRUG COMPANY MANAGEMENT

The management of every drug company in the industry should have, as its highest priority, to see to it that the company puts drug safety and patient safety first, and that the company creates an environment of transparency and integrity in all that it does. As part of this commitment, management must understand that they are uniquely responsible for devoting serious and sustained efforts to develop systems, processes and personnel to advance these goals.

Management should seek continuously to enforce the company's Code of Ethics and provide direct leadership in establishing the highest standards of ethics and integrity at all levels of the company. Management should also provide strong personal commitment to candor and absolute truthfulness in the company's operations and in its communications to the marketplace, including developing communications and disclosure policies that provide comprehensive information concerning the company's operations, its financial results, its record of compliance with law and its own ethical policies, in addition to all legally required disclosure. Management should also commit to the goal of providing shareholders and the marketplace with a strong and effective disclosure program exceeding minimum requirements and seek consistently high levels of transparency.

Management should further endeavor to implement reliable and effective internal controls capable of detecting meaningful failures to comply with industry standards or the company's internal ethical and governance requirements.

Drug companies need to be able to represent that they will support robust levels of capital investment in internal controls, including management information systems and internal audit

14

PETER ROST, M.D.

resources that will be capable of ensuring the accuracy and completeness of publicly reported financial information of the company to the most reliable degree practicable, as well as accurate, timely information being provided to healthcare professionals.

Drug companies should also ensure corporate governance mechanisms that will seek to establish the highest and best practices of healthy corporate governance to advance the best interests of shareholders, creditors and the public at large. The CEO needs to use all reasonable efforts to ensure that the company's board has a membership that represents shareholder interests and in addition to the CEO is composed entirely of members who are fully independent of the company, and who are individuals of extraordinary skill and accomplishment. A strong board of directors and meaningful checks and balances against excessive power are important elements of healthy governance practices.

The drug company also must cooperate fully and without reservation with all official inquiries and investigations into wrongful activities that may have taken place in the past, and provide assurance to customers and the public that the company is fully committed to operating at the highest levels of integrity with personnel who are personally committed to the company's goals and values.

Management will ultimately be judged on the degree to which the company under its leadership achieves these goals, in addition to business and financial goals that may be set from time to time by the board of directors. Management should agree to use every effort to lead the company in its growth and development in a manner that will achieve successful financial performance while adhering to the highest industry standards.

PETER ROST, M.D.

---

Additional opinions may be offered to rebut the opinions of Bayer's experts, the trial testimony of Bayer's witnesses, or exhibits offered at trial.

_____
Peter Rost, M.D.
Short Hills, NJ, June 23, 2010

16

**Patrick E. Mahoney, ISB No. 5242**
**MAHONEY LAW, PLLC**
The Veltex Building
420 W. Main Street, Suite 206
Boise, Idaho 83702
Telephone: (208) 345-6364
Facsimile: (208) 336-2088
patrick@patrickmahoneylaw.com

**Douglas W. Crandall, ISB No. 3962**
**CRANDALL LAW OFFICE**
The Veltex Building
420 W. Main Street, Suite 206
Boise, ID 83702
Telephone: (208) 343-1211
Facsimile: (208) 336-2088
dwc@crandall-law.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

**IN RE: TRASYLOL PRODUCTS LIABILITY**
**LITIGATION – MDL – 1928**

**This Document Relates to:**
**SANDRA DODGE, INDIVIDUALLY,**
**AND AS SURVIVING SPOUSE OF JOHN DODGE, DECEASED**
**Case No. 9:08-cv-80788**

---

### PLAINTIFF'S CASE-SPECIFIC EXPERT WITNESS DISCLOSURE

Pursuant to Federal Rule 26(a)(2) and Pretrial Orders Nos. 4, 7, 16, and 21, Plaintiff hereby discloses case-specific expert witnesses that will and may be called to testify at trial in the above-captioned matter:

1. Dr. Arif Asif, M.D.
   7401 SW 63rd Court
   Miami, FL 33143
   (786) 473-4041

Dr. Asif is a nephrologist who will be called to testify at the trial of this case. He is a

Professor of Medicine at the University of Miami School of Medicine in Miami, Florida.  His report, curriculum vitae, and other disclosures are attached hereto.  Dr. Asif's hourly rate is $675.

2. Dr. Robbin G. Cohen, M.D., M.M.M.
   Associate Professor of Cardiothoracic Surgery
   Co-director, Aortic Center at USC/Keck School of Medicine
   Los Angeles, CA
   (323) 442-5849

Dr. Cohen is a cardiothoracic surgeon who will be called to testify at the trial of this case. He is an Associate Professor of Cardiothoracic Surgery at the Keck/University of Southern California School of Medicine in Los Angeles, California.  His report, curriculum vitae, and other disclosures are attached hereto.  Dr. Cohen's hourly rate is $700.

3. Dr. Peter Rost, M.D.
   29 Great Hills Road
   Short Hills, NJ 07078
   (973) 273-4668

Dr. Rost is an expert on pharmaceutical industry standards who will be called to testify at the trial of this case.  He has held positions with Pfizer, Inc., Wyeth Pharmaceuticals, and Lederle Laboratories.  His report, curriculum vitae, and other disclosures are attached hereto. Dr. Rost's hourly rate is $500.

4. Patty Arellano of Nampa Da Vita Dialysis, or another appropriate representative
   of the provider
   Nampa Da Vita Dialysis
   846 Parkcentre Way
   Nampa, ID 83651-1790
   (208) 467-5180

Patty Arellano (or another appropriate representative of Nampa Da Vita Dialysis), is a non-retained treating healthcare provider who may be called to testify at the trial of this case. She is expected to testify to a reasonable degree of medical certainty consistent with the dialysis records from her facility, including, without limitation as to past dialysis treatment, that the same was reasonable and necessary, and that the dialysis bills claimed as damages in this case are reasonable and necessary.

5. Dr. David C. Stuesse, M.D. (treating heart surgeon)
   Ste 280, 333 North 1st Street
   Boise, ID 83702-6132
   (208) 345-6545

Dr. Stuesse is a non-retained treating heart surgeon who may be called to testify at the trial of this case. Dr. Stuesse is expected to testify consistent with his records (and his deposition if taken in this case) to a reasonable degree of medical certainty.

PLAINTIFF'S CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -2

6. Dr. Robert L. Davidson, M.D. (treating nephrologist)
520 S. Eagle Rd. Suite 1245
Meridian Idaho 83642
208-890-2539

Dr. Davidson is a non-retained treating nephrologist who may be called to testify at the trial of this case. He is expected to testify consistent with his deposition (if taken in this matter) and his medical records to a reasonable degree of medical certainty. It is anticipated that he would testify that the past renal treatment (dialysis) ordered or prescribed by him for John Dodge was and is reasonable and necessary.

7. The Plaintiff specifically reserves the right to amend and supplement this list for good cause shown, based on continuing medical treatment and/or continuing discovery.

**DATED** this ___11th___ day of August, 2010.

MAHONEY LAW, PLLC

By _____
PATRICK E. MAHONEY
Attorney for the Plaintiff

PLAINTIFF'S CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -3

**Peter Rost, M.D.**

# PETER ROST, M.D.

29 Great Hills Road
Short Hills, New Jersey 07078
Phone:  (973) 273-4668
rostpeter@hotmail.com
http://DrugExpertWitness.com/

**EXPERT REPORT**

**INDUSTRY STANDARDS FOR DRUG COMPANIES**

## ASSIGNMENT

I have been asked to author a concise, objective summary of industry standards for drug companies.  I have been asked to provide a basic overview on how a reasonable, prudent, drug company behaves in this industry.  My opinions are based on my business experience, education, training, and observations developed over my nearly two decades in the pharmaceutical industry working for some of the largest drug companies in the world.  I hold and state my opinions herein to a reasonable degree of professional certainty.

## QUALIFICATIONS AND EXPERIENCE

The qualifications and experience I possess such that I am able to confidently summarize pharmaceutical industry standards in an objective and understandable fashion are as follows.

I have held positions from the least to most senior in pharmaceutical marketing and operations, and I worked with or oversaw the legal, regulatory, and medical departments.  These positions provided me with a broad range of experience in marketing and selling drugs, as well as in drug company management.

I graduated from the University of Gothenburg, School of Medicine, Sweden in 1984.

PETER ROST, M.D.

For a time I practiced medicine in the anesthesiology department and in the intensive care unit, where I gained experience treating patients with, among other things, drug induced complications and adverse effects.

I switched fields to advertising and pharmaceutical marketing in 1985. I worked for a number of advertising agencies from then until 1992, at which time I was hired by Lederle Laboratories in New Jersey, where I worked as U.S. product manager, associate director of medical education, and then director of medical education in the U.S. In 1995, after Wyeth bought Lederle, I was made Director of Marketing and, in 1996, Director of Commercial Operations with responsibility for European operations, located in Pennsylvania. In 1999 I was promoted to Managing Director and sent to Sweden, with responsibility for the Nordic region in Europe. During this assignment I had four countries reporting to me and I oversaw marketing, regulatory, medical, human relations, legal, and other corporate functions. In 2001 I became Vice President, Marketing, Women's Healthcare Division at Wyeth in Pennsylvania. This involved U.S. and global marketing responsibility for all of Wyeth's female hormone replacement products and contraceptives, with $2 billion in sales.

Most recently I was employed by Pharmacia—later becoming Pfizer—the world's largest drug company, as Vice President, Marketing, Endocrine Care for the U.S. and globally, located in New Jersey. I oversaw the creation, publication, and distribution of marketing and educational materials for drugs and devices, including ads, brochures, flyers, and other advertising materials. I also oversaw launch strategies, business plans, marketing plans, and the creation of marketing materials that drug representatives provided to physicians and pharmacists.

I worked with legal, regulatory, and medical departments to develop long-term strategies, business plans and tactical plans for the drugs assigned to me, and also provided input for

2

PETER ROST, M.D.

medical studies and regulatory matters, such as package inserts for new drug launches (which would eventually be part of the drug listing in the Physician's Desk Reference). At times I was also directly responsible for deciding the pricing of pharmaceuticals and I also accompanied company drug representatives on visits with physicians, allowing me to observe their relationships and interactions.

The cases in the past four years in which I testified as an expert at trial or by deposition as well as additional details in my experience, including publications, can be found in my attached C.V.

## INTRODUCTION TO RESPONSIBILITIES OF DRUG COMPANIES

Public safety relative to the pharmaceutical industry depends upon the integrity and accuracy of the data, disclosures, warnings, and information provided by the drug companies to doctors and patients, as well as on the actions of drug companies in studying their drugs, monitoring their drugs, and marketing their drugs.

As a practical matter in terms of their operations, the pharmaceutical industry operates with the recognition that, due to limited resources and manpower, the FDA is largely dependent on the drug companies (or "drug sponsors") themselves to provide safety information to doctors and patients and relies on the honesty and accuracy of safety disclosures by each company made to doctors and patients. Simply put, the drug companies are the ones responsible for conveying drug safety information to doctors and patients.

The drug manufacturers analyze safety and efficacy data on their drugs' performance as a matter of basic industry practice. Usually, this is based, in large part, upon clinical trials that test the safety and efficacy of drugs on a population limited both in size and diversity. Even when

based on quality data, however, clinical trial results do not guarantee that a drug will turn out to be safe for broad-scale use. A serious adverse event that occurs in one out of 10,000 patients, for example, or that occurs only after long-term use, may not be detected in a trial of 2,000 subjects that lasts only a few months or even a couple of years. For these reasons, at the time of initial marketing, a drug manufacturer necessarily does not have the breadth of information that it will ultimately possess as time goes by – information that can and should be used, as it is acquired by the manufacturer, to promptly warn doctors and the public about the risks of its drug. This being said, a drug company should disclose and analyze all available information and studies of which it is aware as it brings a drug to market and should continually assess, study, and monitor its drugs – the FDA simply does not have the resources to do this for the drug companies. These are all basic, practical, general industry standards that a responsible pharmaceutical company follows in the interest of drug safety.

## RESPONSIBILITY TO USE DRUG WARNING LABELING

As discussed above, in many cases, serious or life-threatening adverse events are discovered only after a drug has been on the market for several years. It is standard practice in the industry for the drug manufacturer to report any drug-related adverse events it becomes aware of to healthcare professionals, and to ensure that approved labeling reflects the drug company's current knowledge of the drug, including, but not limited to, adverse events. Once an adverse event or product problem is identified, the drug manufacturer can take any of the following actions:

1. Labeling changes — The manufacturer may make changes, including warnings, precautions, and contraindications.

PETER ROST, M.D.

2. Black box warnings — A manufacturer may elect to highlight a warning by including a black box (literally a bold, black box placed around crucial warning text, placed at the top of the label and insert so as to direct the reader's attention to it as critically important information).

3. Product recalls and withdrawals — A manufacturer may elect to recall or withdraw a product.

4. Medical and safety alerts such as "Dear Doctor Letters"— Used to provide important safety information about a product to health professionals and academics (such as research professors).

Manufacturers of prescription drugs provide information on drugs' risks in the contraindications, warnings, precautions, and/or adverse reactions sections of the labeling. This includes clinically significant adverse reactions for which there is reasonable evidence of an *association* between the drug and the adverse reaction (a causal relationship need not have been established). There are also circumstances in which an adverse reaction could be expected to occur with a drug, despite its not having been observed with that drug, based on observations from other drugs in the same class or from animal studies.

Serious potential hazards of a drug may necessitate the addition of a black box warning. The black box warning indicates the highest level of risk on prescription medications. In the industry, the black box appears not only on the package insert but also on all promotional materials. A boxed warning can also be used in other situations to highlight information that is especially important to the prescriber.

Boxed warnings can be based on observed adverse reactions, in which the causal relationship between exposure to the drug and the adverse reaction is well established. However, there are also instances when a boxed warning based on an expected adverse reaction would be appropriate, for example a warning based on clinical data showing a material likelihood that the

5

adverse reaction will occur with the drug, or animal data raises substantial concern. A boxed warning can also be considered for a drug that has important risk/benefit information that is unique among drugs in a drug class (e.g., to note that a drug is the only one in its class to have a particular risk that makes it inappropriate for use as a first line therapy).

Manufacturers in the industry voluntarily update a product label when necessary, conduct post-approval safety studies, and warn physicians and patients about increased rates of expected risks or new, unanticipated side effects when such information becomes known. The manufacturers are responsible for investigating their drugs, including initiating studies, rescheduling studies and/or analysis of data in order to ensure that a drug is safe for use for consumers both before and after approval. Industry management recognizes that their companies have a responsibility in the interest of drug safety to revise a warning to identify a clinically significant hazard as soon as there is reasonable evidence of an association with a drug. See, e.g., 21 C.F.R. §201.57(e), (g) and 21 C.F.R. §201.80(e).

In a recent Supreme Court decision, *Wyeth v. Levine*, which was very closely followed by the pharmaceutical industry, the Supreme Court re-affirmed that the responsibility to adequately warn of a drug's risk lies with the manufacturer. The Supreme Court stressed that the manufacturer has this obligation since the manufacturer has the most knowledge of its own product.

As a matter of industry standard practice, as soon as a drug company discovers risks that are not clearly stated or addressed in the product label, a company can and should update the label. The following types of statements may be added to a label:

1.      Those that add or strengthen a contraindication, warning, precaution, or adverse reaction;

Peter Rost, M.D.

2.   Those that add or strengthen a statement about drug abuse, dependence, psychological effect, or overdose;

3.   Those that add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug;

4.   Those that delete false, misleading, or unsupported indications for use or claims of effectiveness.

A manufacturer can and should provide new warnings or additional information to healthcare providers and patients as information is gathered and learned by way of ongoing monitoring, studying, reports, and assessment.   Manufacturers do so through labeling, advertising, "Dear Doctor Letters," trade associations, medical associations, journals, the Internet, and the many ways in which they communicate to healthcare professionals and patients when promoting their drugs.

## MARKETING AND SALES FORCE

The following industry standards are, in practical experience, well recognized by pharmaceutical companies in the interest of drug safety as it relates to marketing and the companies' sales employees.   Drug companies' relationships with healthcare professionals should benefit patients and enhance the practice of medicine.   Interactions should be focused on informing healthcare professionals about products, providing scientific and educational information and supporting medical research and education.

No financial benefit or benefit-in-kind (including grants, scholarships, subsidies, support, consulting contracts or educational or practice related items) should be provided or offered to a healthcare professional in exchange for prescribing, recommending, purchasing, supplying or administering products or for a commitment to continue to do so.   Nothing should be offered or

7

PETER ROST, M.D.

provided in a manner or on conditions that would have an inappropriate influence on a healthcare professional's prescribing practices.   Promotion should encourage the appropriate use of pharmaceutical products by presenting them objectively and without exaggerating their properties.

Promotion should not be disguised.  Clinical assessments, postmarketing surveillance and experience programs and postmarketing studies must not be disguised promotion.   Such assessments, programs and studies should be conducted with a primarily scientific or educational purpose.  Promotional materials provided to healthcare professionals by or on behalf of a company should be accurate and not misleading; make claims about a product only when properly substantiated; and reflect the balance between risks and benefits.  Material relating to pharmaceutical products and their uses, whether promotional in nature or not, which is sponsored by a company should also clearly indicate by whom it has been sponsored.  No pharmaceutical product should be promoted for use in a specific indication until the requisite approval for marketing for such use has been given.  Promotional information should be clear, legible, accurate, balanced, fair, objective and sufficiently complete to enable the recipient to form his or her own opinion of the therapeutic value of the pharmaceutical product concerned.

Promotional information should be based on an up-to-date evaluation of all relevant evidence and reflect that evidence clearly.  It should not mislead by distortion, exaggeration, undue emphasis, omission or in any other way.  Every effort should be made to avoid ambiguity. Absolute or all-embracing claims should be used with caution and only with adequate qualification and substantiation.

Promotion should be capable of substantiation either by reference to the approved labeling or by scientific evidence.  Such evidence should be made available on request to

PETER ROST, M.D.

healthcare professionals. Companies should deal objectively with requests for information made in good faith and should provide data which are appropriate to the source of the inquiry.

The purpose and focus of all symposia, congresses and other promotional, scientific or professional meetings for healthcare professionals organized or sponsored by a company should be to inform healthcare professionals about products and/or to provide scientific or educational information.

Payments of reasonable fees and reimbursement of out-of pocket expenses, including travel and accommodation, may be provided to healthcare professionals who are providing genuine services as speakers or presenters on the basis of a written contract with the company at the event.

All events should be held in an appropriate venue that is conducive to the scientific or educational objectives and the purpose of the event or meeting. Companies should avoid using renowned or extravagant venues. Hospitality should be limited to refreshments and/or meals incidental to the main purpose of the event and should only be provided to participants of the event and not their guests; and if it is moderate and reasonable as judged by local standards.

Cash payments in cash or cash equivalents (such as gift certificate) should not be offered to healthcare professionals. Gifts for the personal benefit of healthcare professionals should not be provided or offered.

Promotional aids or reminder items may be provided or offered to healthcare professionals and appropriate administrative staff, provided the gift is of minimal value and relevant to the practice of the healthcare professional. Items of medical utility may be offered or provided free of charge provided that such items are of modest value and are beneficial to the provision of medical services and for patient care.

9

PETER ROST, M.D.

It is appropriate for consultants who provide advisory services to be offered reasonable compensation for those services and reimbursement for reasonable travel, lodging, and meal expenses incurred as part of providing those services.  Any compensation or reimbursement made in conjunction with a consulting arrangement should be reasonable and based on fair market value.

Company decisions regarding the selection or retention of healthcare professionals as speakers should be made based on defined criteria such as general medical expertise and reputation, knowledge and experience regarding a particular therapeutic area, and communications skills.  Companies should ensure that speaking arrangements are neither inducements nor rewards for prescribing a particular medicine or course of treatment.  Any compensation or reimbursement made to a healthcare professional in conjunction with a speaking arrangement should be reasonable and based on fair market value.  Token consulting or advisory arrangements should not be used to justify compensating healthcare professionals for their time or their travel, lodging, and other out-of-pocket expenses.

The manufacturer can—and should—educate its sales force to provide new information and warnings to healthcare providers as soon as possible.  A prudent manufacturer who wanted to ensure that physicians and patients were adequately warned about safety risks would use the same tactics to communicate the risks as it does to communicate the benefits of its drug (particularly when a drug has been on the market for a number of years).

Companies should ensure that all representatives who are employed by or acting on behalf of the companies and who visit healthcare professionals receive training about the applicable laws, regulations and industry codes of practices that govern the representatives' interactions with healthcare professionals.  In addition, companies should train their

PETER ROST, M.D.

representatives to ensure that they have sufficient knowledge of general science and product-specific information to provide accurate, up-to-date information. Companies should provide updated or additional training in all of these areas as needed for their representatives who visit healthcare professionals. Companies should also assess their representatives periodically to ensure that they comply with relevant company policies and standards of conduct. Companies should take appropriate action when representatives fail to comply.

Drug companies should establish and maintain appropriate procedures to ensure full compliance with relevant codes and applicable law and to review and monitor all of their promotional activities and materials. A designated company employee, with sufficient knowledge and appropriate scientific or healthcare qualifications should be responsible for approving all promotional communications.

Manufacturers should not market drugs for use in patient groups, purposes, dosages, or combinations that are not approved by the FDA. Manufacturers, however, often have others speak on their behalf, i.e., opinion leaders or patient organizations. A physician's medical judgment is influenced by studies, medical articles and data presented at scientific meetings. Pharmaceutical companies may try to place articles supporting their drugs into the most prominent journals and often use so called "medical education agencies" to ghostwrite the manuscripts and assist with publishing and placement of those articles. Journal articles are also an important source of new adverse reaction information and other data on drugs.

Many physicians have limited time to search for information from established scientific venues, and are influenced by pharmaceutical sales reps and marketing campaigns conducted by the pharmaceutical industry, as well key opinion leaders, patient organizations and other entities that may not always be readily identifiable as speaking on behalf of the drug manufacturers.

11

PETER ROST, M.D.

Manufactures are also well-aware that physicians will be more influenced by key opinion leaders ("KOL's") and fellow medical professionals than by sales representatives. Manufacturers have come to use KOL's and members of their speaker's bureau as a more credible version of the sales representatives.

Pharmaceutical manufacturers should not market their drugs for use in patient groups, for purposes, or dosages, or in combinations other than FDA-approved ones. The promotion of drugs is highly regulated; however, pharmaceutical manufacturers can avoid scrutiny by having others speak on their behalf, i.e., opinion leaders or patient organizations. If they pay for others to promote their drugs, these individuals or entities must follow product labeling, however, it may be difficult for the audience to ascertain if there is a financial relationship. The same sources can be used to legitimately educate the target audience about labeling revisions and other important news about drugs.

The most effective marketing to generate sales is marketing which the target audience is not aware of, hence, can't evaluate based on who paid for the message. This takes place when "independent" experts or institutions or groups support a particular drug, and have a financial relationship with the drug company marketing the product or when an independent expert is co-opted to quell negative information or to generate data which may rebuke adverse findings.

In fact, pharmaceutical companies regularly submit articles supporting their actively marketed drugs into prominent scientific and medical journals that have actually been written by medical education agencies that also assisted with the publishing and placement process for those articles.

Pharmaceutical companies also use direct promotional efforts, including sending sales representatives to physicians' offices to "detail" the drug on a weekly basis, often bringing food,

12

PETER ROST, M.D.

gifts and drug samples to gain entrance into the physician's office. During these visits, the sales reps discuss the drugs with the physicians and provide them with literature regarding the drugs. Sales representatives also visit pharmacists and other healthcare professionals in the same manner. Sometimes drug companies use "medical science liaisons" that purport to provide more scientific information than a sales representative, or patient care consultants to "educate" patients about the drug company's drugs to maximize use and revenues, through audio conferences, speaker programs, patient brochures, etc. In times of crisis these large sales forces can be used to blunt negative press about a drug, or associated competitive onslaught and downplay side-effect data, or they can also be used ethically to rapidly inform healthcare providers of new and dangerous side-effects.

## DRUG COMPANY EMPLOYEES

It is industry standard that employees should conduct business with honesty and integrity and in a professional manner. Employees should:

• Build relationships with customers, vendors, suppliers, and fellow employees based on trust, and provide current, accurate and reliable information.

• Become familiar with and comply with legal requirements, policy and procedures.

• Avoid any activities that could involve or lead to involvement in any unlawful practice.

• Avoid actual or potential conflicts of interest, or the appearance thereof, in all transactions.

• Promptly report any breach of law or regulation, ethical principles, or policies and cooperate fully in any audit, enquiry, review, or investigation.

• Managers should ensure all their employees receive guidance, training, and

13

communication on ethical behavior and legal compliance relevant to their duties.

## DRUG COMPANY MANAGEMENT

The management of every drug company in the industry should have, as its highest priority, to see to it that the company puts drug safety and patient safety first, and that the company creates an environment of transparency and integrity in all that it does. As part of this commitment, management must understand that they are uniquely responsible for devoting serious and sustained efforts to develop systems, processes and personnel to advance these goals.

Management should seek continuously to enforce the company's Code of Ethics and provide direct leadership in establishing the highest standards of ethics and integrity at all levels of the company. Management should also provide strong personal commitment to candor and absolute truthfulness in the company's operations and in its communications to the marketplace, including developing communications and disclosure policies that provide comprehensive information concerning the company's operations, its financial results, its record of compliance with law and its own ethical policies, in addition to all legally required disclosure. Management should also commit to the goal of providing shareholders and the marketplace with a strong and effective disclosure program exceeding minimum requirements and seek consistently high levels of transparency.

Management should further endeavor to implement reliable and effective internal controls capable of detecting meaningful failures to comply with industry standards or the company's internal ethical and governance requirements.

Drug companies need to be able to represent that they will support robust levels of capital investment in internal controls, including management information systems and internal audit

14

PETER ROST, M.D.

resources that will be capable of ensuring the accuracy and completeness of publicly reported financial information of the company to the most reliable degree practicable, as well as accurate, timely information being provided to healthcare professionals.

Drug companies should also ensure corporate governance mechanisms that will seek to establish the highest and best practices of healthy corporate governance to advance the best interests of shareholders, creditors and the public at large. The CEO needs to use all reasonable efforts to ensure that the company's board has a membership that represents shareholder interests and in addition to the CEO is composed entirely of members who are fully independent of the company, and who are individuals of extraordinary skill and accomplishment. A strong board of directors and meaningful checks and balances against excessive power are important elements of healthy governance practices.

The drug company also must cooperate fully and without reservation with all official inquiries and investigations into wrongful activities that may have taken place in the past, and provide assurance to customers and the public that the company is fully committed to operating at the highest levels of integrity with personnel who are personally committed to the company's goals and values.

Management will ultimately be judged on the degree to which the company under its leadership achieves these goals, in addition to business and financial goals that may be set from time to time by the board of directors. Management should agree to use every effort to lead the company in its growth and development in a manner that will achieve successful financial performance while adhering to the highest industry standards.

PETER ROST, M.D.

Additional opinions may be offered to rebut the opinions of Bayer's experts, the trial testimony of Bayer's witnesses, or exhibits offered at trial.

Peter Rost, M.D.
Short Hills, NJ, June 23, 2010

**Patrick E. Mahoney, ISB No. 5242**
**MAHONEY LAW, PLLC**
The Veltex Building
420 W. Main Street, Suite 206
Boise, Idaho 83702
Telephone:  (208) 345-6364
Facsimile:  (208) 336-2088
patrick@patrickmahoneylaw.com

**Douglas W. Crandall, ISB No. 3962**
**CRANDALL LAW OFFICE**
The Veltex Building
420 W. Main Street, Suite 206
Boise, ID 83702
Telephone:  (208) 343-1211
Facsimile:   (208) 336-2088
dwc@crandall-law.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

**IN RE: TRASYLOL PRODUCTS LIABILITY**
**LITIGATION – MDL – 1928**

**This Document Relates to:**
**JERRY HUSKEY AND DEBRA HUSKEY**
**Case No. 9:08-cv-80791**

---

### PLAINTIFFS' CASE-SPECIFIC EXPERT WITNESS DISCLOSURE

Pursuant to Federal Rule 26(a)(2) and Pretrial Orders Nos. 4, 7, 16, and 21, Plaintiffs

hereby disclose case-specific expert witnesses that will and may be called to testify at trial in the

above-captioned matter:

    1.  Dr. Arif Asif, M.D.
        7401 SW 63rd Court
        Miami, FL 33143
        (786) 473-4041

Dr. Asif is a nephrologist who will be called to testify at the trial of this case.  He is a

PLAINTIFFS' CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -1

Professor of Medicine at the University of Miami School of Medicine in Miami, Florida. His report, curriculum vitae, and other disclosures are attached hereto. He has also reviewed and approved the life care plan prepared by expert Debbie Hendricks. Dr. Asif's hourly rate is $675.

2. Dr. Robbin G. Cohen, M.D., M.M.M.
   Associate Professor of Cardiothoracic Surgery
   Co-director, Aortic Center at USC/Keck School of Medicine
   Los Angeles, CA
   (323) 442-5849

Dr. Cohen is a cardiothoracic surgeon who will be called to testify at the trial of this case. He is an Associate Professor of Cardiothoracic Surgery at the Keck/University of Southern California School of Medicine in Los Angeles, California. His report, curriculum vitae, and other disclosures are attached hereto. Dr. Cohen's hourly rate is $700.

3. Dr. Peter Rost, M.D.
   29 Great Hills Road
   Short Hills, NJ 07078
   (973) 273-4668

Dr. Rost is an expert on pharmaceutical industry standards who will be called to testify at the trial of this case. He has held positions with Pfizer, Inc., Wyeth Pharmaceuticals, and Lederle Laboratories. His report, curriculum vitae, and other disclosures are attached hereto. Dr. Rost's hourly rate is $500.

4. Debbie Hendricks, RN CCM, CDMS
   Cascade Enterprises
   PO Box 9616
   Boise ID 83707
   (208) 343-4009

Ms. Hendricks is a registered nurse, disability manager, nurse case worker, and life care planner who will be called to testify at the trial of this case. Her report, curriculum vitae, and other disclosures are attached hereto. Nurse Hendrick's hourly rate is $85.

5. Paul A. Randle, M.B.A., Ph.D.
   Paul A. Randle and Associates
   21 Shadow Mountain Drive
   Logan, UT
   (435) 753-1009

Mr. Randle is an economics expert who will be called to testify at the trial of this case. He was Professor of Finance at Utah State University in Logan, UT, where he is now Emeritus Professor of Finance. His report, curriculum vitae, and other disclosures are attached hereto. His hourly rates are set forth in the attached Fee Schedule.

PLAINTIFFS' CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -2

6.  Ben Kuhlman, MMS, PA-C of Boise Kidney and Hypertension Institute (or
    another appropriate representative of Boise Kidney)
    3525 East Louise Drive
    Meridian, ID 83642-6303
    (208) 629-8346

Ben Kuhlman (or another appropriate representative of Boise Kidney), is a non-retained treating healthcare provider who may be called to testify at the trial of this case.  He is expected to testify to a reasonable degree of medical certainty consistent with the dialysis records from his facility, including, without limitation as to past, present, and future dialysis treatment, that the same was reasonable and necessary, and that the dialysis bills claimed as damages in this case are reasonable and necessary.

7.  Dr. Scott Huerd (treating heart surgeon)
    Cardiothoracic and Vascular Associates
    333 N 1st St Ste 280
    Boise ID
    (208) 345-6545

Dr. Huerd is a non-retained treating heart surgeon who may be called to testify at the trial of this case.  Dr. Huerd is expected to testify consistent with his records (and his deposition if taken in this case) to a reasonable degree of medical certainty.

8.  Arnold Silva, MD (treating nephrologist)
    Boise Kidney and Hypertension Institute
    3525 East Louise Drive
    Meridian, ID 83642-6303
    (208) 846-8335

Dr. Silva is a non-retained treating nephrologist who may be called to testify at the trial of this case.  He is expected to testify consistent with his deposition (if taken in this matter) and his medical records to a reasonable degree of medical certainty.  It is anticipated that he would testify that the past, present, and continuing renal treatment (dialysis) ordered or prescribed by him for Plaintiff Jerry Huskey was and is reasonable and necessary.

9.  The Plaintiffs specifically reserve the right to amend and supplement this list for good cause shown, based on continuing medical treatment and/or continuing discovery.

DATED this _____ day of August, 2010.

MAHONEY LAW, PLLC

By _____
PATRICK E. MAHONEY
Attorney for the Plaintiff

PLAINTIFFS' CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -3

**Peter Rost, M.D.**

# PETER ROST, M.D.

29 Great Hills Road
Short Hills, New Jersey 07078
Phone:  (973) 273-4668
rostpeter@hotmail.com
http://DrugExpertWitness.com/

## EXPERT REPORT

## INDUSTRY STANDARDS FOR DRUG COMPANIES

## ASSIGNMENT

I have been asked to author a concise, objective summary of industry standards for drug companies.  I have been asked to provide a basic overview on how a reasonable, prudent, drug company behaves in this industry.  My opinions are based on my business experience, education, training, and observations developed over my nearly two decades in the pharmaceutical industry working for some of the largest drug companies in the world.  I hold and state my opinions herein to a reasonable degree of professional certainty.

## QUALIFICATIONS AND EXPERIENCE

The qualifications and experience I possess such that I am able to confidently summarize pharmaceutical industry standards in an objective and understandable fashion are as follows.

I have held positions from the least to most senior in pharmaceutical marketing and operations, and I worked with or oversaw the legal, regulatory, and medical departments.  These positions provided me with a broad range of experience in marketing and selling drugs, as well as in drug company management.

I graduated from the University of Gothenburg, School of Medicine, Sweden in 1984.

PETER ROST, M.D.

For a time I practiced medicine in the anesthesiology department and in the intensive care unit, where I gained experience treating patients with, among other things, drug induced complications and adverse effects.

I switched fields to advertising and pharmaceutical marketing in 1985. I worked for a number of advertising agencies from then until 1992, at which time I was hired by Lederle Laboratories in New Jersey, where I worked as U.S. product manager, associate director of medical education, and then director of medical education in the U.S. In 1995, after Wyeth bought Lederle, I was made Director of Marketing and, in 1996, Director of Commercial Operations with responsibility for European operations, located in Pennsylvania. In 1999 I was promoted to Managing Director and sent to Sweden, with responsibility for the Nordic region in Europe. During this assignment I had four countries reporting to me and I oversaw marketing, regulatory, medical, human relations, legal, and other corporate functions. In 2001 I became Vice President, Marketing, Women's Healthcare Division at Wyeth in Pennsylvania. This involved U.S. and global marketing responsibility for all of Wyeth's female hormone replacement products and contraceptives, with $2 billion in sales.

Most recently I was employed by Pharmacia—later becoming Pfizer—the world's largest drug company, as Vice President, Marketing, Endocrine Care for the U.S. and globally, located in New Jersey. I oversaw the creation, publication, and distribution of marketing and educational materials for drugs and devices, including ads, brochures, flyers, and other advertising materials. I also oversaw launch strategies, business plans, marketing plans, and the creation of marketing materials that drug representatives provided to physicians and pharmacists.

I worked with legal, regulatory, and medical departments to develop long-term strategies, business plans and tactical plans for the drugs assigned to me, and also provided input for

2

PETER ROST, M.D.

medical studies and regulatory matters, such as package inserts for new drug launches (which would eventually be part of the drug listing in the Physician's Desk Reference). At times I was also directly responsible for deciding the pricing of pharmaceuticals and I also accompanied company drug representatives on visits with physicians, allowing me to observe their relationships and interactions.

The cases in the past four years in which I testified as an expert at trial or by deposition as well as additional details in my experience, including publications, can be found in my attached C.V.

## INTRODUCTION TO RESPONSIBILITIES OF DRUG COMPANIES

Public safety relative to the pharmaceutical industry depends upon the integrity and accuracy of the data, disclosures, warnings, and information provided by the drug companies to doctors and patients, as well as on the actions of drug companies in studying their drugs, monitoring their drugs, and marketing their drugs.

As a practical matter in terms of their operations, the pharmaceutical industry operates with the recognition that, due to limited resources and manpower, the FDA is largely dependent on the drug companies (or "drug sponsors") themselves to provide safety information to doctors and patients and relies on the honesty and accuracy of safety disclosures by each company made to doctors and patients. Simply put, the drug companies are the ones responsible for conveying drug safety information to doctors and patients.

The drug manufacturers analyze safety and efficacy data on their drugs' performance as a matter of basic industry practice. Usually, this is based, in large part, upon clinical trials that test the safety and efficacy of drugs on a population limited both in size and diversity. Even when

3

PETER ROST, M.D.

---

based on quality data, however, clinical trial results do not guarantee that a drug will turn out to be safe for broad-scale use. A serious adverse event that occurs in one out of 10,000 patients, for example, or that occurs only after long-term use, may not be detected in a trial of 2,000 subjects that lasts only a few months or even a couple of years. For these reasons, at the time of initial marketing, a drug manufacturer necessarily does not have the breadth of information that it will ultimately possess as time goes by – information that can and should be used, as it is acquired by the manufacturer, to promptly warn doctors and the public about the risks of its drug. This being said, a drug company should disclose and analyze all available information and studies of which it is aware as it brings a drug to market and should continually assess, study, and monitor its drugs – the FDA simply does not have the resources to do this for the drug companies. These are all basic, practical, general industry standards that a responsible pharmaceutical company follows in the interest of drug safety.

## RESPONSIBILITY TO USE DRUG WARNING LABELING

As discussed above, in many cases, serious or life-threatening adverse events are discovered only after a drug has been on the market for several years. It is standard practice in the industry for the drug manufacturer to report any drug-related adverse events it becomes aware of to healthcare professionals, and to ensure that approved labeling reflects the drug company's current knowledge of the drug, including, but not limited to, adverse events. Once an adverse event or product problem is identified, the drug manufacturer can take any of the following actions:

    1.  Labeling changes — The manufacturer may make changes, including warnings, precautions, and contraindications.

PETER ROST, M.D.

2. Black box warnings — A manufacturer may elect to highlight a warning by including a black box (literally a bold, black box placed around crucial warning text, placed at the top of the label and insert so as to direct the reader's attention to it as critically important information).

3. Product recalls and withdrawals — A manufacturer may elect to recall or withdraw a product.

4. Medical and safety alerts such as "Dear Doctor Letters"— Used to provide important safety information about a product to health professionals and academics (such as research professors).

Manufacturers of prescription drugs provide information on drugs' risks in the contraindications, warnings, precautions, and/or adverse reactions sections of the labeling. This includes clinically significant adverse reactions for which there is reasonable evidence of an *association* between the drug and the adverse reaction (a causal relationship need not have been established). There are also circumstances in which an adverse reaction could be expected to occur with a drug, despite its not having been observed with that drug, based on observations from other drugs in the same class or from animal studies.

Serious potential hazards of a drug may necessitate the addition of a black box warning. The black box warning indicates the highest level of risk on prescription medications. In the industry, the black box appears not only on the package insert but also on all promotional materials. A boxed warning can also be used in other situations to highlight information that is especially important to the prescriber.

Boxed warnings can be based on observed adverse reactions, in which the causal relationship between exposure to the drug and the adverse reaction is well established. However, there are also instances when a boxed warning based on an expected adverse reaction would be appropriate, for example a warning based on clinical data showing a material likelihood that the

5

PETER ROST, M.D.

adverse reaction will occur with the drug, or animal data raises substantial concern. A boxed warning can also be considered for a drug that has important risk/benefit information that is unique among drugs in a drug class (e.g., to note that a drug is the only one in its class to have a particular risk that makes it inappropriate for use as a first line therapy).

Manufacturers in the industry voluntarily update a product label when necessary, conduct post-approval safety studies, and warn physicians and patients about increased rates of expected risks or new, unanticipated side effects when such information becomes known. The manufacturers are responsible for investigating their drugs, including initiating studies, rescheduling studies and/or analysis of data in order to ensure that a drug is safe for use for consumers both before and after approval. Industry management recognizes that their companies have a responsibility in the interest of drug safety to revise a warning to identify a clinically significant hazard as soon as there is reasonable evidence of an association with a drug. See, e.g., 21 C.F.R. §201.57(e), (g) and 21 C.F.R. §201.80(e).

In a recent Supreme Court decision, *Wyeth v. Levine*, which was very closely followed by the pharmaceutical industry, the Supreme Court re-affirmed that the responsibility to adequately warn of a drug's risk lies with the manufacturer. The Supreme Court stressed that the manufacturer has this obligation since the manufacturer has the most knowledge of its own product.

As a matter of industry standard practice, as soon as a drug company discovers risks that are not clearly stated or addressed in the product label, a company can and should update the label. The following types of statements may be added to a label:

    1.      Those that add or strengthen a contraindication, warning, precaution, or adverse reaction;

PETER ROST, M.D.

2.     Those that add or strengthen a statement about drug abuse, dependence, psychological effect, or overdose;

3.     Those that add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug;

4.     Those that delete false, misleading, or unsupported indications for use or claims of effectiveness.

A manufacturer can and should provide new warnings or additional information to healthcare providers and patients as information is gathered and learned by way of ongoing monitoring, studying, reports, and assessment.   Manufacturers do so through labeling, advertising, "Dear Doctor Letters," trade associations, medical associations, journals, the Internet, and the many ways in which they communicate to healthcare professionals and patients when promoting their drugs.

## MARKETING AND SALES FORCE

The following industry standards are, in practical experience, well recognized by pharmaceutical companies in the interest of drug safety as it relates to marketing and the companies' sales employees.   Drug companies' relationships with healthcare professionals should benefit patients and enhance the practice of medicine.   Interactions should be focused on informing healthcare professionals about products, providing scientific and educational information and supporting medical research and education.

No financial benefit or benefit-in-kind (including grants, scholarships, subsidies, support, consulting contracts or educational or practice related items) should be provided or offered to a healthcare professional in exchange for prescribing, recommending, purchasing, supplying or administering products or for a commitment to continue to do so.   Nothing should be offered or

7

PETER ROST, M.D.

provided in a manner or on conditions that would have an inappropriate influence on a healthcare professional's prescribing practices. Promotion should encourage the appropriate use of pharmaceutical products by presenting them objectively and without exaggerating their properties.

Promotion should not be disguised. Clinical assessments, postmarketing surveillance and experience programs and postmarketing studies must not be disguised promotion. Such assessments, programs and studies should be conducted with a primarily scientific or educational purpose. Promotional materials provided to healthcare professionals by or on behalf of a company should be accurate and not misleading; make claims about a product only when properly substantiated; and reflect the balance between risks and benefits. Material relating to pharmaceutical products and their uses, whether promotional in nature or not, which is sponsored by a company should also clearly indicate by whom it has been sponsored. No pharmaceutical product should be promoted for use in a specific indication until the requisite approval for marketing for such use has been given. Promotional information should be clear, legible, accurate, balanced, fair, objective and sufficiently complete to enable the recipient to form his or her own opinion of the therapeutic value of the pharmaceutical product concerned.

Promotional information should be based on an up-to-date evaluation of all relevant evidence and reflect that evidence clearly. It should not mislead by distortion, exaggeration, undue emphasis, omission or in any other way. Every effort should be made to avoid ambiguity. Absolute or all-embracing claims should be used with caution and only with adequate qualification and substantiation.

Promotion should be capable of substantiation either by reference to the approved labeling or by scientific evidence. Such evidence should be made available on request to

8

PETER ROST, M.D.

healthcare professionals. Companies should deal objectively with requests for information made in good faith and should provide data which are appropriate to the source of the inquiry.

The purpose and focus of all symposia, congresses and other promotional, scientific or professional meetings for healthcare professionals organized or sponsored by a company should be to inform healthcare professionals about products and/or to provide scientific or educational information.

Payments of reasonable fees and reimbursement of out-of pocket expenses, including travel and accommodation, may be provided to healthcare professionals who are providing genuine services as speakers or presenters on the basis of a written contract with the company at the event.

All events should be held in an appropriate venue that is conducive to the scientific or educational objectives and the purpose of the event or meeting. Companies should avoid using renowned or extravagant venues. Hospitality should be limited to refreshments and/or meals incidental to the main purpose of the event and should only be provided to participants of the event and not their guests; and if it is moderate and reasonable as judged by local standards.

Cash payments in cash or cash equivalents (such as gift certificate) should not be offered to healthcare professionals. Gifts for the personal benefit of healthcare professionals should not be provided or offered.

Promotional aids or reminder items may be provided or offered to healthcare professionals and appropriate administrative staff, provided the gift is of minimal value and relevant to the practice of the healthcare professional. Items of medical utility may be offered or provided free of charge provided that such items are of modest value and are beneficial to the provision of medical services and for patient care.

Peter Rost, M.D.

It is appropriate for consultants who provide advisory services to be offered reasonable compensation for those services and reimbursement for reasonable travel, lodging, and meal expenses incurred as part of providing those services. Any compensation or reimbursement made in conjunction with a consulting arrangement should be reasonable and based on fair market value.

Company decisions regarding the selection or retention of healthcare professionals as speakers should be made based on defined criteria such as general medical expertise and reputation, knowledge and experience regarding a particular therapeutic area, and communications skills. Companies should ensure that speaking arrangements are neither inducements nor rewards for prescribing a particular medicine or course of treatment. Any compensation or reimbursement made to a healthcare professional in conjunction with a speaking arrangement should be reasonable and based on fair market value. Token consulting or advisory arrangements should not be used to justify compensating healthcare professionals for their time or their travel, lodging, and other out-of-pocket expenses.

The manufacturer can—and should—educate its sales force to provide new information and warnings to healthcare providers as soon as possible. A prudent manufacturer who wanted to ensure that physicians and patients were adequately warned about safety risks would use the same tactics to communicate the risks as it does to communicate the benefits of its drug (particularly when a drug has been on the market for a number of years).

Companies should ensure that all representatives who are employed by or acting on behalf of the companies and who visit healthcare professionals receive training about the applicable laws, regulations and industry codes of practices that govern the representatives' interactions with healthcare professionals. In addition, companies should train their

10

PETER ROST, M.D.

representatives to ensure that they have sufficient knowledge of general science and product-specific information to provide accurate, up-to-date information. Companies should provide updated or additional training in all of these areas as needed for their representatives who visit healthcare professionals. Companies should also assess their representatives periodically to ensure that they comply with relevant company policies and standards of conduct. Companies should take appropriate action when representatives fail to comply.

Drug companies should establish and maintain appropriate procedures to ensure full compliance with relevant codes and applicable law and to review and monitor all of their promotional activities and materials. A designated company employee, with sufficient knowledge and appropriate scientific or healthcare qualifications should be responsible for approving all promotional communications.

Manufacturers should not market drugs for use in patient groups, purposes, dosages, or combinations that are not approved by the FDA. Manufacturers, however, often have others speak on their behalf, i.e., opinion leaders or patient organizations. A physician's medical judgment is influenced by studies, medical articles and data presented at scientific meetings. Pharmaceutical companies may try to place articles supporting their drugs into the most prominent journals and often use so called "medical education agencies" to ghostwrite the manuscripts and assist with publishing and placement of those articles. Journal articles are also an important source of new adverse reaction information and other data on drugs.

Many physicians have limited time to search for information from established scientific venues, and are influenced by pharmaceutical sales reps and marketing campaigns conducted by the pharmaceutical industry, as well key opinion leaders, patient organizations and other entities that may not always be readily identifiable as speaking on behalf of the drug manufacturers.

11

PETER ROST, M.D.

Manufactures are also well-aware that physicians will be more influenced by key opinion leaders ("KOL's") and fellow medical professionals than by sales representatives. Manufacturers have come to use KOL's and members of their speaker's bureau as a more credible version of the sales representatives.

Pharmaceutical manufacturers should not market their drugs for use in patient groups, for purposes, or dosages, or in combinations other than FDA-approved ones. The promotion of drugs is highly regulated; however, pharmaceutical manufacturers can avoid scrutiny by having others speak on their behalf, i.e., opinion leaders or patient organizations. If they pay for others to promote their drugs, these individuals or entities must follow product labeling, however, it may be difficult for the audience to ascertain if there is a financial relationship. The same sources can be used to legitimately educate the target audience about labeling revisions and other important news about drugs.

The most effective marketing to generate sales is marketing which the target audience is not aware of, hence, can't evaluate based on who paid for the message. This takes place when "independent" experts or institutions or groups support a particular drug, and have a financial relationship with the drug company marketing the product or when an independent expert is co-opted to quell negative information or to generate data which may rebuke adverse findings.

In fact, pharmaceutical companies regularly submit articles supporting their actively marketed drugs into prominent scientific and medical journals that have actually been written by medical education agencies that also assisted with the publishing and placement process for those articles.

Pharmaceutical companies also use direct promotional efforts, including sending sales representatives to physicians' offices to "detail" the drug on a weekly basis, often bringing food,

12

PETER ROST, M.D.

gifts and drug samples to gain entrance into the physician's office. During these visits, the sales reps discuss the drugs with the physicians and provide them with literature regarding the drugs. Sales representatives also visit pharmacists and other healthcare professionals in the same manner. Sometimes drug companies use "medical science liaisons" that purport to provide more scientific information than a sales representative, or patient care consultants to "educate" patients about the drug company's drugs to maximize use and revenues, through audio conferences, speaker programs, patient brochures, etc. In times of crisis these large sales forces can be used to blunt negative press about a drug, or associated competitive onslaught and downplay side-effect data, or they can also be used ethically to rapidly inform healthcare providers of new and dangerous side-effects.

## DRUG COMPANY EMPLOYEES

It is industry standard that employees should conduct business with honesty and integrity and in a professional manner. Employees should:

- Build relationships with customers, vendors, suppliers, and fellow employees based on trust, and provide current, accurate and reliable information.

- Become familiar with and comply with legal requirements, policy and procedures.

- Avoid any activities that could involve or lead to involvement in any unlawful practice.

- Avoid actual or potential conflicts of interest, or the appearance thereof, in all transactions.

- Promptly report any breach of law or regulation, ethical principles, or policies and cooperate fully in any audit, enquiry, review, or investigation.

- Managers should ensure all their employees receive guidance, training, and

13

PETER ROST, M.D.

communication on ethical behavior and legal compliance relevant to their duties.

**DRUG COMPANY MANAGEMENT**

The management of every drug company in the industry should have, as its highest priority, to see to it that the company puts drug safety and patient safety first, and that the company creates an environment of transparency and integrity in all that it does. As part of this commitment, management must understand that they are uniquely responsible for devoting serious and sustained efforts to develop systems, processes and personnel to advance these goals.

Management should seek continuously to enforce the company's Code of Ethics and provide direct leadership in establishing the highest standards of ethics and integrity at all levels of the company. Management should also provide strong personal commitment to candor and absolute truthfulness in the company's operations and in its communications to the marketplace, including developing communications and disclosure policies that provide comprehensive information concerning the company's operations, its financial results, its record of compliance with law and its own ethical policies, in addition to all legally required disclosure. Management should also commit to the goal of providing shareholders and the marketplace with a strong and effective disclosure program exceeding minimum requirements and seek consistently high levels of transparency.

Management should further endeavor to implement reliable and effective internal controls capable of detecting meaningful failures to comply with industry standards or the company's internal ethical and governance requirements.

Drug companies need to be able to represent that they will support robust levels of capital investment in internal controls, including management information systems and internal audit

14

PETER ROST, M.D.

resources that will be capable of ensuring the accuracy and completeness of publicly reported financial information of the company to the most reliable degree practicable, as well as accurate, timely information being provided to healthcare professionals.

Drug companies should also ensure corporate governance mechanisms that will seek to establish the highest and best practices of healthy corporate governance to advance the best interests of shareholders, creditors and the public at large. The CEO needs to use all reasonable efforts to ensure that the company's board has a membership that represents shareholder interests and in addition to the CEO is composed entirely of members who are fully independent of the company, and who are individuals of extraordinary skill and accomplishment. A strong board of directors and meaningful checks and balances against excessive power are important elements of healthy governance practices.

The drug company also must cooperate fully and without reservation with all official inquiries and investigations into wrongful activities that may have taken place in the past, and provide assurance to customers and the public that the company is fully committed to operating at the highest levels of integrity with personnel who are personally committed to the company's goals and values.

Management will ultimately be judged on the degree to which the company under its leadership achieves these goals, in addition to business and financial goals that may be set from time to time by the board of directors. Management should agree to use every effort to lead the company in its growth and development in a manner that will achieve successful financial performance while adhering to the highest industry standards.

PETER ROST, M.D.

Additional opinions may be offered to rebut the opinions of Bayer's experts, the trial testimony of Bayer's witnesses, or exhibits offered at trial.

Peter Rost, M.D.
Short Hills, NJ, June 23, 2010

16

Patrick E. Mahoney, ISB No. 5242
**MAHONEY LAW, PLLC**
The Veltex Building
420 W. Main Street, Suite 206
Boise, Idaho 83702
Telephone: (208) 345-6364
Facsimile: (208) 336-2088
patrick@patrickmahoneylaw.com

Douglas W. Crandall, ISB No. 3962
**CRANDALL LAW OFFICE**
The Veltex Building
420 W. Main Street, Suite 206
Boise, ID 83702
Telephone: (208) 343-1211
Facsimile: (208) 336-2088
dwc@crandall-law.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

**IN RE: TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL – 1928**

**This Document Relates to:**
**DONNA ROGERS (individually as surviving spouse of George Rogers)**
**Case No. 9:08-cv-80785**

---

### PLAINTIFF'S CASE-SPECIFIC EXPERT WITNESS DISCLOSURE

Pursuant to Federal Rule 26(a)(2) and Pretrial Orders Nos. 4, 7, 16, and 21, Plaintiff

hereby discloses case-specific expert witnesses that will and may be called to testify at trial in the

above-captioned matter:

> 1. Dr. Arif Asif, M.D.
>    7401 SW 63rd Court
>    Miami, FL 33143
>    (786) 473-4041

Dr. Asif is a nephrologist who will be called to testify at the trial of this case. He is a
Professor of Medicine at the University of Miami School of Medicine in Miami, Florida. His

report, supplemental report, curriculum vitae, and other disclosures are attached hereto.  Dr. Asif's hourly rate is $675.

    2.  Dr. Robbin G. Cohen, M.D., M.M.M.
        Associate Professor of Cardiothoracic Surgery
        Co-director, Aortic Center at USC/Keck School of Medicine
        Los Angeles, CA
        (323) 442-5849

Dr. Cohen is a cardiothoracic surgeon who will be called to testify at the trial of this case. He is an Associate Professor of Cardiothoracic Surgery at the Keck/University of Southern California School of Medicine in Los Angeles, California.  His report, curriculum vitae, and other disclosures are attached hereto.  Dr. Cohen's hourly rate is $700.

    3.  Dr. Peter Rost, M.D.
        29 Great Hills Road
        Short Hills, NJ 07078
        (973) 273-4668

Dr. Rost is an expert on pharmaceutical industry standards who will be called to testify at the trial of this case.  He has held positions with Pfizer, Inc., Wyeth Pharmaceuticals, and Lederle Laboratories.  His report, curriculum vitae, and other disclosures are attached hereto. Dr. Rost's hourly rate is $500.

    4.  Dr. Craig O. Olsen, M.D. (treating heart surgeon-retired)
        333 North 1st Street Suite 280
        Boise, ID, 83702
        (208) 345-6545

Dr. Olsen is a non-retained treating heart surgeon who may be called to testify at the trial of this case.  Dr. Olsen is expected to testify consistent with his records (and his deposition if taken in this case) to a reasonable degree of medical certainty.

    5.  The Plaintiff specifically reserves the right to amend and supplement this list for good cause shown and/or continuing discovery.

**DATED** this _18th_ day of August, 2010.

          **MAHONEY LAW, PLLC**

          By _____
            PATRICK E. MAHONEY
            Attorney for the Plaintiff

PLAINTIFF'S CASE-SPECIFIC EXPERT WITNESS DISCLOSURE -2

**Peter Rost, M.D.**

# PETER ROST, M.D.

29 Great Hills Road
Short Hills, New Jersey 07078
Phone:  (973) 273-4668
rostpeter@hotmail.com
http://DrugExpertWitness.com/

---

**EXPERT REPORT**

**INDUSTRY STANDARDS FOR DRUG COMPANIES**

## ASSIGNMENT

I have been asked to author a concise, objective summary of industry standards for drug companies.  I have been asked to provide a basic overview on how a reasonable, prudent, drug company behaves in this industry.  My opinions are based on my business experience, education, training, and observations developed over my nearly two decades in the pharmaceutical industry working for some of the largest drug companies in the world.  I hold and state my opinions herein to a reasonable degree of professional certainty.

## QUALIFICATIONS AND EXPERIENCE

The qualifications and experience I possess such that I am able to confidently summarize pharmaceutical industry standards in an objective and understandable fashion are as follows.

I have held positions from the least to most senior in pharmaceutical marketing and operations, and I worked with or oversaw the legal, regulatory, and medical departments.  These positions provided me with a broad range of experience in marketing and selling drugs, as well as in drug company management.

I graduated from the University of Gothenburg, School of Medicine, Sweden in 1984.

PETER ROST, M.D.

For a time I practiced medicine in the anesthesiology department and in the intensive care unit, where I gained experience treating patients with, among other things, drug induced complications and adverse effects.

I switched fields to advertising and pharmaceutical marketing in 1985. I worked for a number of advertising agencies from then until 1992, at which time I was hired by Lederle Laboratories in New Jersey, where I worked as U.S. product manager, associate director of medical education, and then director of medical education in the U.S. In 1995, after Wyeth bought Lederle, I was made Director of Marketing and, in 1996, Director of Commercial Operations with responsibility for European operations, located in Pennsylvania. In 1999 I was promoted to Managing Director and sent to Sweden, with responsibility for the Nordic region in Europe. During this assignment I had four countries reporting to me and I oversaw marketing, regulatory, medical, human relations, legal, and other corporate functions. In 2001 I became Vice President, Marketing, Women's Healthcare Division at Wyeth in Pennsylvania. This involved U.S. and global marketing responsibility for all of Wyeth's female hormone replacement products and contraceptives, with $2 billion in sales.

Most recently I was employed by Pharmacia—later becoming Pfizer—the world's largest drug company, as Vice President, Marketing, Endocrine Care for the U.S. and globally, located in New Jersey. I oversaw the creation, publication, and distribution of marketing and educational materials for drugs and devices, including ads, brochures, flyers, and other advertising materials. I also oversaw launch strategies, business plans, marketing plans, and the creation of marketing materials that drug representatives provided to physicians and pharmacists.

I worked with legal, regulatory, and medical departments to develop long-term strategies, business plans and tactical plans for the drugs assigned to me, and also provided input for

2

PETER ROST, M.D.

medical studies and regulatory matters, such as package inserts for new drug launches (which would eventually be part of the drug listing in the Physician's Desk Reference). At times I was also directly responsible for deciding the pricing of pharmaceuticals and I also accompanied company drug representatives on visits with physicians, allowing me to observe their relationships and interactions.

The cases in the past four years in which I testified as an expert at trial or by deposition as well as additional details in my experience, including publications, can be found in my attached C.V.

## INTRODUCTION TO RESPONSIBILITIES OF DRUG COMPANIES

Public safety relative to the pharmaceutical industry depends upon the integrity and accuracy of the data, disclosures, warnings, and information provided by the drug companies to doctors and patients, as well as on the actions of drug companies in studying their drugs, monitoring their drugs, and marketing their drugs.

As a practical matter in terms of their operations, the pharmaceutical industry operates with the recognition that, due to limited resources and manpower, the FDA is largely dependent on the drug companies (or "drug sponsors") themselves to provide safety information to doctors and patients and relies on the honesty and accuracy of safety disclosures by each company made to doctors and patients. Simply put, the drug companies are the ones responsible for conveying drug safety information to doctors and patients.

The drug manufacturers analyze safety and efficacy data on their drugs' performance as a matter of basic industry practice. Usually, this is based, in large part, upon clinical trials that test the safety and efficacy of drugs on a population limited both in size and diversity. Even when

3

Peter Rost, M.D.

based on quality data, however, clinical trial results do not guarantee that a drug will turn out to be safe for broad-scale use. A serious adverse event that occurs in one out of 10,000 patients, for example, or that occurs only after long-term use, may not be detected in a trial of 2,000 subjects that lasts only a few months or even a couple of years. For these reasons, at the time of initial marketing, a drug manufacturer necessarily does not have the breadth of information that it will ultimately possess as time goes by – information that can and should be used, as it is acquired by the manufacturer, to promptly warn doctors and the public about the risks of its drug. This being said, a drug company should disclose and analyze all available information and studies of which it is aware as it brings a drug to market and should continually assess, study, and monitor its drugs – the FDA simply does not have the resources to do this for the drug companies. These are all basic, practical, general industry standards that a responsible pharmaceutical company follows in the interest of drug safety.

## RESPONSIBILITY TO USE DRUG WARNING LABELING

As discussed above, in many cases, serious or life-threatening adverse events are discovered only after a drug has been on the market for several years. It is standard practice in the industry for the drug manufacturer to report any drug-related adverse events it becomes aware of to healthcare professionals, and to ensure that approved labeling reflects the drug company's current knowledge of the drug, including, but not limited to, adverse events. Once an adverse event or product problem is identified, the drug manufacturer can take any of the following actions:

    1.  Labeling changes — The manufacturer may make changes, including warnings, precautions, and contraindications.

4

PETER ROST, M.D.

2. Black box warnings — A manufacturer may elect to highlight a warning by including a black box (literally a bold, black box placed around crucial warning text, placed at the top of the label and insert so as to direct the reader's attention to it as critically important information).

3. Product recalls and withdrawals — A manufacturer may elect to recall or withdraw a product.

4. Medical and safety alerts such as "Dear Doctor Letters"— Used to provide important safety information about a product to health professionals and academics (such as research professors).

Manufacturers of prescription drugs provide information on drugs' risks in the contraindications, warnings, precautions, and/or adverse reactions sections of the labeling. This includes clinically significant adverse reactions for which there is reasonable evidence of an *association* between the drug and the adverse reaction (a causal relationship need not have been established). There are also circumstances in which an adverse reaction could be expected to occur with a drug, despite its not having been observed with that drug, based on observations from other drugs in the same class or from animal studies.

Serious potential hazards of a drug may necessitate the addition of a black box warning. The black box warning indicates the highest level of risk on prescription medications. In the industry, the black box appears not only on the package insert but also on all promotional materials. A boxed warning can also be used in other situations to highlight information that is especially important to the prescriber.

Boxed warnings can be based on observed adverse reactions, in which the causal relationship between exposure to the drug and the adverse reaction is well established. However, there are also instances when a boxed warning based on an expected adverse reaction would be appropriate, for example a warning based on clinical data showing a material likelihood that the

5

PETER ROST, M.D.

adverse reaction will occur with the drug, or animal data raises substantial concern. A boxed warning can also be considered for a drug that has important risk/benefit information that is unique among drugs in a drug class (e.g., to note that a drug is the only one in its class to have a particular risk that makes it inappropriate for use as a first line therapy).

Manufacturers in the industry voluntarily update a product label when necessary, conduct post-approval safety studies, and warn physicians and patients about increased rates of expected risks or new, unanticipated side effects when such information becomes known. The manufacturers are responsible for investigating their drugs, including initiating studies, rescheduling studies and/or analysis of data in order to ensure that a drug is safe for use for consumers both before and after approval. Industry management recognizes that their companies have a responsibility in the interest of drug safety to revise a warning to identify a clinically significant hazard as soon as there is reasonable evidence of an association with a drug. See, e.g., 21 C.F.R. §201.57(e), (g) and 21 C.F.R. §201.80(e).

In a recent Supreme Court decision, *Wyeth v. Levine*, which was very closely followed by the pharmaceutical industry, the Supreme Court re-affirmed that the responsibility to adequately warn of a drug's risk lies with the manufacturer. The Supreme Court stressed that the manufacturer has this obligation since the manufacturer has the most knowledge of its own product.

As a matter of industry standard practice, as soon as a drug company discovers risks that are not clearly stated or addressed in the product label, a company can and should update the label. The following types of statements may be added to a label:

1.  Those that add or strengthen a contraindication, warning, precaution, or adverse reaction;

6

PETER ROST, M.D.

2.   Those that add or strengthen a statement about drug abuse, dependence, psychological effect, or overdose;

3.   Those that add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug;

4.   Those that delete false, misleading, or unsupported indications for use or claims of effectiveness.

A manufacturer can and should provide new warnings or additional information to healthcare providers and patients as information is gathered and learned by way of ongoing monitoring, studying, reports, and assessment.   Manufacturers do so through labeling, advertising, "Dear Doctor Letters," trade associations, medical associations, journals, the Internet, and the many ways in which they communicate to healthcare professionals and patients when promoting their drugs.

## MARKETING AND SALES FORCE

The following industry standards are, in practical experience, well recognized by pharmaceutical companies in the interest of drug safety as it relates to marketing and the companies' sales employees.   Drug companies' relationships with healthcare professionals should benefit patients and enhance the practice of medicine.   Interactions should be focused on informing healthcare professionals about products, providing scientific and educational information and supporting medical research and education.

No financial benefit or benefit-in-kind (including grants, scholarships, subsidies, support, consulting contracts or educational or practice related items) should be provided or offered to a healthcare professional in exchange for prescribing, recommending, purchasing, supplying or administering products or for a commitment to continue to do so.   Nothing should be offered or

7

PETER ROST, M.D.

provided in a manner or on conditions that would have an inappropriate influence on a healthcare professional's prescribing practices.   Promotion should encourage the appropriate use of pharmaceutical products by presenting them objectively and without exaggerating their properties.

Promotion should not be disguised.   Clinical assessments, postmarketing surveillance and experience programs and postmarketing studies must not be disguised promotion.   Such assessments, programs and studies should be conducted with a primarily scientific or educational purpose.   Promotional materials provided to healthcare professionals by or on behalf of a company should be accurate and not misleading; make claims about a product only when properly substantiated; and reflect the balance between risks and benefits.   Material relating to pharmaceutical products and their uses, whether promotional in nature or not, which is sponsored by a company should also clearly indicate by whom it has been sponsored.   No pharmaceutical product should be promoted for use in a specific indication until the requisite approval for marketing for such use has been given.   Promotional information should be clear, legible, accurate, balanced, fair, objective and sufficiently complete to enable the recipient to form his or her own opinion of the therapeutic value of the pharmaceutical product concerned.

Promotional information should be based on an up-to-date evaluation of all relevant evidence and reflect that evidence clearly.   It should not mislead by distortion, exaggeration, undue emphasis, omission or in any other way.   Every effort should be made to avoid ambiguity. Absolute or all-embracing claims should be used with caution and only with adequate qualification and substantiation.

Promotion should be capable of substantiation either by reference to the approved labeling or by scientific evidence.   Such evidence should be made available on request to

8

PETER ROST, M.D.

healthcare professionals. Companies should deal objectively with requests for information made in good faith and should provide data which are appropriate to the source of the inquiry.

The purpose and focus of all symposia, congresses and other promotional, scientific or professional meetings for healthcare professionals organized or sponsored by a company should be to inform healthcare professionals about products and/or to provide scientific or educational information.

Payments of reasonable fees and reimbursement of out-of pocket expenses, including travel and accommodation, may be provided to healthcare professionals who are providing genuine services as speakers or presenters on the basis of a written contract with the company at the event.

All events should be held in an appropriate venue that is conducive to the scientific or educational objectives and the purpose of the event or meeting. Companies should avoid using renowned or extravagant venues. Hospitality should be limited to refreshments and/or meals incidental to the main purpose of the event and should only be provided to participants of the event and not their guests; and if it is moderate and reasonable as judged by local standards.

Cash payments in cash or cash equivalents (such as gift certificate) should not be offered to healthcare professionals. Gifts for the personal benefit of healthcare professionals should not be provided or offered.

Promotional aids or reminder items may be provided or offered to healthcare professionals and appropriate administrative staff, provided the gift is of minimal value and relevant to the practice of the healthcare professional. Items of medical utility may be offered or provided free of charge provided that such items are of modest value and are beneficial to the provision of medical services and for patient care.

9

PETER ROST, M.D.

It is appropriate for consultants who provide advisory services to be offered reasonable compensation for those services and reimbursement for reasonable travel, lodging, and meal expenses incurred as part of providing those services. Any compensation or reimbursement made in conjunction with a consulting arrangement should be reasonable and based on fair market value.

Company decisions regarding the selection or retention of healthcare professionals as speakers should be made based on defined criteria such as general medical expertise and reputation, knowledge and experience regarding a particular therapeutic area, and communications skills. Companies should ensure that speaking arrangements are neither inducements nor rewards for prescribing a particular medicine or course of treatment. Any compensation or reimbursement made to a healthcare professional in conjunction with a speaking arrangement should be reasonable and based on fair market value. Token consulting or advisory arrangements should not be used to justify compensating healthcare professionals for their time or their travel, lodging, and other out-of-pocket expenses.

The manufacturer can—and should—educate its sales force to provide new information and warnings to healthcare providers as soon as possible. A prudent manufacturer who wanted to ensure that physicians and patients were adequately warned about safety risks would use the same tactics to communicate the risks as it does to communicate the benefits of its drug (particularly when a drug has been on the market for a number of years).

Companies should ensure that all representatives who are employed by or acting on behalf of the companies and who visit healthcare professionals receive training about the applicable laws, regulations and industry codes of practices that govern the representatives' interactions with healthcare professionals. In addition, companies should train their

PETER ROST, M.D.

representatives to ensure that they have sufficient knowledge of general science and product-specific information to provide accurate, up-to-date information.  Companies should provide updated or additional training in all of these areas as needed for their representatives who visit healthcare professionals.  Companies should also assess their representatives periodically to ensure that they comply with relevant company policies and standards of conduct.  Companies should take appropriate action when representatives fail to comply.

Drug companies should establish and maintain appropriate procedures to ensure full compliance with relevant codes and applicable law and to review and monitor all of their promotional activities and materials.  A designated company employee, with sufficient knowledge and appropriate scientific or healthcare qualifications should be responsible for approving all promotional communications.

Manufacturers should not market drugs for use in patient groups, purposes, dosages, or combinations that are not approved by the FDA.  Manufacturers, however, often have others speak on their behalf, i.e., opinion leaders or patient organizations.  A physician's medical judgment is influenced by studies, medical articles and data presented at scientific meetings.  Pharmaceutical companies may try to place articles supporting their drugs into the most prominent journals and often use so called "medical education agencies" to ghostwrite the manuscripts and assist with publishing and placement of those articles.  Journal articles are also an important source of new adverse reaction information and other data on drugs.

Many physicians have limited time to search for information from established scientific venues, and are influenced by pharmaceutical sales reps and marketing campaigns conducted by the pharmaceutical industry, as well key opinion leaders, patient organizations and other entities that may not always be readily identifiable as speaking on behalf of the drug manufacturers.

11

PETER ROST, M.D.

Manufactures are also well-aware that physicians will be more influenced by key opinion leaders ("KOL's") and fellow medical professionals than by sales representatives. Manufacturers have come to use KOL's and members of their speaker's bureau as a more credible version of the sales representatives.

Pharmaceutical manufacturers should not market their drugs for use in patient groups, for purposes, or dosages, or in combinations other than FDA-approved ones. The promotion of drugs is highly regulated; however, pharmaceutical manufacturers can avoid scrutiny by having others speak on their behalf, i.e., opinion leaders or patient organizations. If they pay for others to promote their drugs, these individuals or entities must follow product labeling, however, it may be difficult for the audience to ascertain if there is a financial relationship. The same sources can be used to legitimately educate the target audience about labeling revisions and other important news about drugs.

The most effective marketing to generate sales is marketing which the target audience is not aware of, hence, can't evaluate based on who paid for the message. This takes place when "independent" experts or institutions or groups support a particular drug, and have a financial relationship with the drug company marketing the product or when an independent expert is co-opted to quell negative information or to generate data which may rebuke adverse findings.

In fact, pharmaceutical companies regularly submit articles supporting their actively marketed drugs into prominent scientific and medical journals that have actually been written by medical education agencies that also assisted with the publishing and placement process for those articles.

Pharmaceutical companies also use direct promotional efforts, including sending sales representatives to physicians' offices to "detail" the drug on a weekly basis, often bringing food,

12

Peter Rost, M.D.

gifts and drug samples to gain entrance into the physician's office. During these visits, the sales reps discuss the drugs with the physicians and provide them with literature regarding the drugs. Sales representatives also visit pharmacists and other healthcare professionals in the same manner. Sometimes drug companies use "medical science liaisons" that purport to provide more scientific information than a sales representative, or patient care consultants to "educate" patients about the drug company's drugs to maximize use and revenues, through audio conferences, speaker programs, patient brochures, etc. In times of crisis these large sales forces can be used to blunt negative press about a drug, or associated competitive onslaught and downplay side-effect data, or they can also be used ethically to rapidly inform healthcare providers of new and dangerous side-effects.

## DRUG COMPANY EMPLOYEES

It is industry standard that employees should conduct business with honesty and integrity and in a professional manner. Employees should:

- Build relationships with customers, vendors, suppliers, and fellow employees based on trust, and provide current, accurate and reliable information.

- Become familiar with and comply with legal requirements, policy and procedures.

- Avoid any activities that could involve or lead to involvement in any unlawful practice.

- Avoid actual or potential conflicts of interest, or the appearance thereof, in all transactions.

- Promptly report any breach of law or regulation, ethical principles, or policies and cooperate fully in any audit, enquiry, review, or investigation.

- Managers should ensure all their employees receive guidance, training, and

13

communication on ethical behavior and legal compliance relevant to their duties.

## DRUG COMPANY MANAGEMENT

The management of every drug company in the industry should have, as its highest priority, to see to it that the company puts drug safety and patient safety first, and that the company creates an environment of transparency and integrity in all that it does. As part of this commitment, management must understand that they are uniquely responsible for devoting serious and sustained efforts to develop systems, processes and personnel to advance these goals.

Management should seek continuously to enforce the company's Code of Ethics and provide direct leadership in establishing the highest standards of ethics and integrity at all levels of the company. Management should also provide strong personal commitment to candor and absolute truthfulness in the company's operations and in its communications to the marketplace, including developing communications and disclosure policies that provide comprehensive information concerning the company's operations, its financial results, its record of compliance with law and its own ethical policies, in addition to all legally required disclosure. Management should also commit to the goal of providing shareholders and the marketplace with a strong and effective disclosure program exceeding minimum requirements and seek consistently high levels of transparency.

Management should further endeavor to implement reliable and effective internal controls capable of detecting meaningful failures to comply with industry standards or the company's internal ethical and governance requirements.

Drug companies need to be able to represent that they will support robust levels of capital investment in internal controls, including management information systems and internal audit

14

PETER ROST, M.D.

resources that will be capable of ensuring the accuracy and completeness of publicly reported financial information of the company to the most reliable degree practicable, as well as accurate, timely information being provided to healthcare professionals.

Drug companies should also ensure corporate governance mechanisms that will seek to establish the highest and best practices of healthy corporate governance to advance the best interests of shareholders, creditors and the public at large. The CEO needs to use all reasonable efforts to ensure that the company's board has a membership that represents shareholder interests and in addition to the CEO is composed entirely of members who are fully independent of the company, and who are individuals of extraordinary skill and accomplishment. A strong board of directors and meaningful checks and balances against excessive power are important elements of healthy governance practices.

The drug company also must cooperate fully and without reservation with all official inquiries and investigations into wrongful activities that may have taken place in the past, and provide assurance to customers and the public that the company is fully committed to operating at the highest levels of integrity with personnel who are personally committed to the company's goals and values.

Management will ultimately be judged on the degree to which the company under its leadership achieves these goals, in addition to business and financial goals that may be set from time to time by the board of directors. Management should agree to use every effort to lead the company in its growth and development in a manner that will achieve successful financial performance while adhering to the highest industry standards.

PETER ROST, M.D.

Additional opinions may be offered to rebut the opinions of Bayer's experts, the trial testimony of Bayer's witnesses, or exhibits offered at trial.

_____
Peter Rost, M.D.
Short Hills, NJ, June 23, 2010