UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-01928 – CIV - MIDDLEBROOKS

This Document Relates to:
Case No. 9:09-cv-81885

| | |
|---|---|
| **BARBARA LYDICK as Representative** | § |
| **Of the Estate GLENN S. LYDICK; MAE** | § |
| **ANNA MATHIS; JOYCE MCGUIRE;** | § |
| **JIMMIE McWHITE; LEONIA ROACH;** | § |
| **SHARON SLIGH-GENES** | § |
| | § |
| **VS.** | § |
| | § |
| **BAYER CORPORATION; BAYER** | § |
| **HEALTHCARE PHARMA-** | § |
| **CEUTICALS, INC., as Successor in** | § |
| **Interest of Bayer Pharmaceuticals** | § |
| **Corporation; BAYER SCHERING** | § |
| **PHARMA AG** | § |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

### Allegations Common to all Counts

### Parties

1.      Plaintiff **Barbara Lydick** is a resident of the state of Pennsylvania.  Plaintiff brings this civil action in a representative capacity against Defendants for personal injuries sustained by Glenn Lydick, Deceased.

2.      Plaintiff **Mae Anna Mathis** is a resident of the state of Mississippi.  Plaintiff brings this civil action for the injuries she received as a direct result of her use of Trasylol.

3.      Plaintiff **Joyce McGuire** is a resident of the state of Mississippi.  Plaintiff brings this civil action for the injuries she received as a direct result of her use of Trasylol.

4.      Plaintiff **Jimmie McWhite** is a resident of the state of Pennsylvania.  Plaintiff brings this civil action for the injuries he received as a direct result of his use of Trasylol.

5.      Plaintiff **Leonia Roach** is a resident of the state of Mississippi.  Plaintiff brings this civil action for the injuries she received as a direct result of her use of Trasylol.

6.      Plaintiff **Sharon Sligh-Genes** is a resident of the state of Pennsylvania.  Plaintiff brings this civil action for the injuries she received as a direct result of her use of Trasylol.

7.      Defendant BAYER CORPORATION, is a corporation formed in the State of Indiana with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. At all times material to this lawsuit, Bayer was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce in the state of Minnesota and within this judicial district, either directly or indirectly, the pharmaceutical Trasylol, also known as Aprotinin.  BAYER CORPORATION has previously been served and has answered herein.

8.      Defendant BAYER HEALTHCARE PHARMACEUTICALS INC., as successor in interest of Bayer Pharmaceuticals Corporation, is a wholly owned subsidiary of Defendant Bayer Corporation, incorporated in the state of Delaware, with its principal place of business located in Wayne, New Jersey.  At all times material to this lawsuit, Bayer was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce in the state of Minnesota and within this judicial district, either directly or indirectly, the pharmaceutical Trasylol, also known as Aprotinin.   BAYER HEALTHCARE PHARMACEUTICALS INC. has previously been served and has answered herein.

9.      Defendant BAYER SCHERING PHARMA AG at all times material to this lawsuit, was

2

engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce in the state of Minnesota and this judicial district, the pharmaceutical Trasylol, also known as Aprotinin. BAYER SCHERING PHARMA AG  has previously been served and has answered herein.

## JURISDICTION AND VENUE

10.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) as there exists complete diversity of citizenship between the Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

11.     Pursuant to 20 U.S.C. §1391(a)(2) and (c), venue for trial of this civil action is proper in the United States District Court for the District of Connecticut.

12.     Trasylol (also known as aprotinin injection) is a naturally occurring proteolytic enzyme inhibitor obtained from bovine lung.  Aprotinin consists of 58 amino acid residues.  It is a single-chain polypeptide, consisting of 6512 daltons and is cross-linked by three disulfide bridges.

13.     The reactive bond site for Aprotinin is lysine – 15 – alanine – 16, and it forms reversible stoichiometric complexes.

14.     Aprotinin reacts with the serine site of the enzyme.

15.     Aprotinin was discovered in the 1930s when Kraut et al. isolated a kallikrein inhibitor from bovine lung.

16.     Aprotinin was launched as Trasylol in Germany in 1959.

17.     Trasylol was approved by the FDA in 1993 and is used to control bleeding in open-heart surgeries.   It is supplied as a clear, colorless, sterile isotonic solution for intravenous administration.

18.     Trasylol is indicated for prophylactic use to reduce peri-operative blood loss and the need

for blood transfusion in patients undergoing cardiopulmonary bypass in the course of open-heart surgical procedures.

19.     Trasylol is a broad-spectrum protease inhibitor, which modulates the systemic inflammatory response associated with cardiopulmonary bypass surgery.  The effects of Trasylol use in cardiopulmonary bypass surgery involve a reduction in inflammatory response, which translates into a decreased need for blood transfusions.

20.     The following is the warning carried by Trasylol prior to the FDA Advisory Board Committee Meeting:

> Anaphylactic or anaphylactoid reactions are possible when Trasylol is administered.   Hypersensitivity reactions are rare in patients with no prior exposure to Aprotinin.  The risk of anaphylaxis is increased in patients who are re-exposed to Aprotinin-containing products.  The benefit of Trasylol to patients undergoing primary CABG surgery should be weighed against the risk of anaphylaxis should a second exposure be required.

21.     Trasylol inhibits pro-inflammatory cytokine release and maintains glycoprotein homeostasis.

22.     According to Bayer, since its approval, an estimated 4.3 million patients have been given Trasylol.

23.     Bayer estimated that Trasylol generated about $293 million in sales in 2005 alone, making it the company's 11th largest-selling drug.

24.     In late 2005, Bayer forecast that Trasylol would someday generate upwards of $600 million annually.

**Trasylol's Association With the Increased Risk of Renal Failure and/or Cardiac Injury**

27.     On January 26, 2006, The New England Journal of Medicine (NEJM) published an article by Mangano, et al. reporting an association of Trasylol with, among other things, serious

4

renal toxicity in patients undergoing coronary artery bypass grafting surgery. This study was an observational study of patients who received either Trasylol, one of two alternative drugs intended to decrease peri-operative bleeding (aminocaproic acid or tranexamic acid), or no specific drug treatment.

28. The FDA evaluated this study, along with other studies in the literature, and reports submitted to the FDA through the MedWatch program, to determine if labeling changes or other actions were warranted.

29. While the FDA was continuing its evaluation it provided the following recommendations to healthcare providers and patients:

> Physicians who use Trasylol should carefully monitor patients for the occurrence of toxicity, particularly to the kidneys, heart, or central nervous system and promptly report adverse event information to Bayer, the drug manufacturer, or to the FDA MedWatch program, as described at the end of this advisory. Physicians should consider limiting Trasylol use to those situations where the clinical benefit of reduced blood loss is essential to medical management of the patient and outweighs the potential risks.FDA September 21, 2006 Advisory Board Committee Meeting and the Walker Study

30. The FDA Advisory Board Committee convened on September 21, 2006 to discuss its findings regarding the safety of Trasylol and determine whether the warning on Trasylol needed to be changed.

31. After reviewing what it considered to be all of the available data on the safety of Trasylol, the 19-member advisory panel recommended to the FDA that Defendant Bayer didn't need to strengthen a warning to doctors about the drug.

32. Just days later, the FDA was contacted by Alexander Walker, a professor at Harvard's School of Public Health, about a 67,000 patient-study he assisted in conducting at Bayer's request.

33.     Bayer knew of this study and data and failed to disclose this data to the FDA at the September 21 Advisory Board Committee meeting.   This new data confirmed that Trasylol increased the risk of renal failure, among other things.

34.     The Walker study, conducted at the request of Bayer, examined 67,000 hospital records of patients undergoing bypass surgery.   The study suggests that the patients who received Trasylol were at an increased risk for death, kidney failure, congestive heart failure, and stroke.

35.     On December 15, 2006, the FDA sent an Alert to healthcare professionals advising of a change in the product label for Trasylol:

> The new labeling for Trasylol (December 2006) has a more focused indication for use, a new Warning about renal dysfunction, a revised Warning about anaphylactic reactions, and a new Contraindication. Trasylol is now indicated only for prophylactic use to reduce peri-operative blood loss and the need for blood transfusion in patients who are at an increased risk for blood loss and blood transfusion undergoing cardiopulmonary bypass in the course of coronary artery bypass grafting (CABG) surgery.   Trasylol should be administered only in the operative setting where cardiopulmonary bypass can be started quickly.   Trasylol should not be administered to any patient with a known or suspected exposure to Aprotinin within the past 12 months.FDA is evaluating additional recently submitted epidemiological safety study data (discussed below), in the context of all other safety and efficacy information available on Aprotinin.   This review may result in other actions, including additional changes to the full prescribing information (product labeling).

36.     An independent study released in January 2006 pioneered by Dr. Dennis T. Mangano examined the safety and risk factors associated with Trasylol and found alarming results that Trasylol may double a patient's risk for heart attack and heart failure.   Dr. Mangano's study examined over 4,300 heart surgery patients.   The patients who were given Trasylol during heart surgery had a significantly higher incidence of heart attacks, renal failure, strokes and death.   The study showed an increase from 1.3 percent to 2.8 percent.

37.     The results of a study published in January 2006 in the New England Journal of Medicine by the independent Ischemia Research and Education Foundation (IREF) found that the use of Trasylol increased the risk of myocardial infarction in patients undergoing heart surgery by 48% and heart failure by 109% when compared to patients receiving alternate drugs.

38.     The Trasylol warning label change in December 2006 also included the increased risk of heart attacks.

### FDA Revises Labeling for Trasylol on December 15, 2006

40.     On December 15, 2006, the FDA sent an Alert to healthcare professionals advising of a change in the product label for Trasylol:

> The new labeling for Trasylol (December 2006) has a more focused indication for use, a new Warning about renal dysfunction, a revised Warning about anaphylactic reactions, and a new Contraindication.  Trasylol is now indicated only for prophylactic use to reduce peri-operative blood loss and the need for blood transfusion in patients who are at an increased risk for blood loss and blood transfusion undergoing cardiopulmonary bypass in the course of coronary artery bypass grafting (CABG) surgery.  Trasylol should be administered only in the operative setting where cardiopulmonary bypass can be started quickly.  Trasylol should not be administered to any patient with a known or suspected exposure to Aprotinin within the past 12 months.FDA is evaluating additional recently submitted epidemiological safety study data (discussed below), in the context of all other safety and efficacy information available on Aprotinin.  This review may result in other actions, including additional changes to the full prescribing information (product labeling).

41.     Moreover, as of December 2006, the Defendants revised the label for Trasylol to include a specific statement in the WARNING section of the label that use of Trasylol creates an increased risk of renal dysfunction and renal failure, heart attack and strokes.

### Bayer Discontinues Trasylol Clinical Trials

42.     On January 25, 2007, Bayer announced it was discontinuing three clinical studies for

Trasylol.

43.     The studies were to investigate the safety and efficacy of Trasylol with regard to transfusion requirements and blood loss in adults undergoing spinal fusion surgery, pneumonectomy or esophagectomy for cancer, and total cystectomy in bladder cancer, all off-label uses.

### FDA Halts Marketing & Production of Trasylol

44.     On September 12, 2007, a joint meeting of the FDA's Cardiovascular and Renal Drugs Advisory Committee and Drug Safety and Risk Management Advisory Committee was held. The purpose of the meeting was to follow up on the September 2006 meeting, as well as to discuss the findings of additional studies showing an increased mortality rate in Trasylol-treated patients.

45.     The Committees unanimously voted to require additional clinical studies to further assess the risk and benefit of Trasylol.  Further, the Committees' members believed a Canadian study, Blood conservation using antifibrinolytics: A randomized trial in a cardiac surgery population (referred to herein as the "BART study"), would further illuminate the safety risks associated with Trasylol.  The BART study was designed to examine the efficacy of Trasylol in comparison to other, less expensive alternatives.

46.     On October 19, 2007, the FDA was notified by the Data Safety Monitoring Board's recommendation to stop patient enrollment in the Trasylol treatment group arm of the BART study.   The study was halted because the preliminary findings indicated that Trasylol, as compared to two cheaper alternatives, increased the risk of death for its users.

47.     On November 5, 2007, the FDA suspended marketing of Trasylol pending further review of the BART study.  At a press conference that morning, the FDA stated that it could not identify

8

a patient population in which the use of Trasylol outweighs the risk.

48.    Under pressure from international health regulatory agencies – including Germany's Federal Institute for Drugs and Medical Devices, Health Canada and others – Bayer suspended marketing of Trasylol worldwide on the same day.

## Specific Allegations Concerning Glenn S. Lydick

49.    On or about August 11, 2005, Glenn S. Lydick underwent heart surgery at Westmoreland Regional Hospital in Greensburg, Pennsylvania.

50.    With no contributory negligence on his part, Plaintiff was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

51.    As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff began experiencing renal insufficiency and shortly after surgery went into renal failure.  At no time did Plaintiff have any knowledge that his renal insufficiency and renal failure might be related to or caused by Trasylol, nor did he have any reason to suspect that those problems might in any way be related to or caused by Trasylol.

52.    As a direct, proximate and legal result of the negligence, carelessness and other wrongdoing of the Defendants, as described herein, Plaintiff was forced to be placed on hemodialysis.

53.    As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff sustained permanent and devastating injuries, including but not limited to, renal failure.  All of said injuries caused Plaintiff extensive anxiety, distress, fear, pain, suffering, and depression, while they substantially reduced Plaintiff's ability to enjoy life.

9

## Specific Allegations Concerning Mae Anna Mathis

54.     On or about March 8, 2006, Mae Anna Mathis underwent heart surgery at Baptist Memorial Hospital in Oxford, Mississippi.

55.     With no contributory negligence on her part, Plaintiff was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

56.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff began experiencing renal insufficiency and shortly after surgery went into renal failure.  At no time did Plaintiff have any knowledge that her renal insufficiency and renal failure might be related to or caused by Trasylol, nor did she have any reason to suspect that those problems might in any way be related to or caused by Trasylol.

57.     As a direct, proximate and legal result of the negligence, carelessness and other wrongdoing of the Defendants, as described herein, Plaintiff was forced to be placed on hemodialysis.

58.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff sustained permanent and devastating injuries, including but not limited to, renal failure.  All of said injuries caused Plaintiff extensive anxiety, distress, fear, pain, suffering, and depression, while they substantially reduced Plaintiff's ability to enjoy life.

## Specific Allegations Concerning Joyce McGuire

59.     On or about September 1, 2004, Joyce McGuire underwent heart surgery at North Mississippi Medical Center in Tupelo, Mississippi.

60.     With no contributory negligence on her part, Plaintiff was administered Trasylol, a

10

pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

61.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff began experiencing renal insufficiency and shortly after surgery went into renal failure.  At no time did Plaintiff have any knowledge that her renal insufficiency and renal failure might be related to or caused by Trasylol, nor did she have any reason to suspect that those problems might in any way be related to or caused by Trasylol.

62.     As a direct, proximate and legal result of the negligence, carelessness and other wrongdoing of the Defendants, as described herein, Plaintiff was forced to be placed on hemodialysis.

63.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff sustained permanent and devastating injuries, including but not limited to, renal failure.  All of said injuries caused Plaintiff extensive anxiety, distress, fear, pain, suffering, and depression, while they substantially reduced Plaintiff's ability to enjoy life.

**Specific Allegations Concerning Jimmie McWhite**

64.     On or about November 1, 2004, Jimmie McWhite underwent heart surgery at Mercy Fitzgerald Hospital in Philadelphia, Pennsylvania.

65.     With no contributory negligence on his part, Plaintiff was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

66.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff began experiencing renal

11

insufficiency and shortly after surgery went into renal failure.  At no time did Plaintiff have any knowledge that his renal insufficiency and renal failure might be related to or caused by Trasylol, nor did he have any reason to suspect that those problems might in any way be related to or caused by Trasylol.

67.     As a direct, proximate and legal result of the negligence, carelessness and other wrongdoing of the Defendants, as described herein, Plaintiff was forced to be placed on hemodialysis.

68.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff sustained permanent and devastating injuries, including but not limited to, renal failure.  All of said injuries caused Plaintiff extensive anxiety, distress, fear, pain, suffering, and depression, while they substantially reduced Plaintiff's ability to enjoy life.

**Specific Allegations Concerning Sharon Sligh-Genes**

69.     On or about June 16, 2005, Sharon Sligh-Genes underwent heart surgery at The Medical Center in Beaver, Pennsylvania.

70.     With no contributory negligence on her part, Plaintiff was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

71.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff experienced a stroke soon after surgery.  At no time did Plaintiff have any knowledge that her stroke might be related to or caused by Trasylol, nor did she have any reason to suspect that those problems might in any way be related to or caused by Trasylol.

12

72.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff sustained permanent and devastating injuries, including but not limited to, stroke.  All of said injuries caused Plaintiff extensive anxiety, distress, fear, pain, suffering, and depression, while they substantially reduced Plaintiff's ability to enjoy life.

## Specific Allegations Concerning Leonia Roach

73.     On or about March 31, 2000, Leonia Roach underwent heart surgery at The University of Mississippi Medical Center in Jackson, Mississippi.

74.     With no contributory negligence on her part, Plaintiff was administered Trasylol, a pharmaceutical product designed, manufactured, promoted, distributed and sold by Defendants.

75.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff suffered a stroke soon after surgery. At no time did Plaintiff have any knowledge that her stroke might be related to or caused by Trasylol, nor did she have any reason to suspect that those problems might in any way be related to or caused by Trasylol.

76.     As a direct, proximate and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, as described herein, Plaintiff sustained permanent and devastating injuries, including but not limited to, stroke.  All of said injuries caused Plaintiff extensive anxiety, distress, fear, pain, suffering, and depression, while they substantially reduced Plaintiff's ability to enjoy life.

## COUNT ONE – Failure to Warn
### Pursuant to CPLA, Conn. Gen. Stat. § 52-572m, et seq. 64.

77.     In each instance in which the Plaintiffs adopt and incorporate by reference the above

allegations into a specific count of this Complaint, each intends to incorporate same as follows:

a.      Plaintiff Barbara Lydick adopts and incorporates by reference paragraphs 1-48;

b.      Plaintiff Mae Anna Mathis adopts and incorporates by reference paragraphs 1-48 and 54-
        58;

c.      Plaintiff Joyce McGuire adopts and incorporates by reference paragraphs 1-48 and 59-63;

d.      Plaintiff Jimmie McWhite adopts and incorporates by reference paragraphs 1-48 and 64-
        68;

e.      Plaintiff Sharon Sligh-Genes adopts and incorporates by reference paragraphs 1-48 and
        69-72;

f.      Plaintiff Leonia Roach adopts and incorporates by reference paragraphs 1-46 and 73-76;

78.     Defendants are liable to Plaintiffs under the Connecticut Products Liability Act (CPLA),
Conn. Gen. Stat. §52.572m et seq. for innocent, negligent and/or willful failure to provide
adequate warnings regarding the appropriate use of Trasylol to Plaintiffs, Plaintiffs' families, and
to the health care providers that prescribed Trasylol.

79.     Trasylol was unreasonably dangerous, even when used for its intended purpose.

80.     Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge
of an expert in the field, and further, Defendants had knowledge of the dangerous risks of
Trasylol.

81.     Plaintiffs did not have the same knowledge as Defendants and no adequate warning was
communicated to Plaintiffs or Plaintiffs' physicians.

82.     Defendants had a continuing duty to warn consumers and physicians, including Plaintiffs,
of the risks and dangers associated with Trasylol.

83.     Defendants marketed, promoted, distributed and sold an unreasonably dangerous and

14

defective prescription drug, Trasylol, to health care providers empowered to prescribe and dispense Trasylol to consumers, including Plaintiffs, without adequate warnings and misled the medical community about the risk/benefit balance of Trasylol, which resulted in injury to Plaintiffs.

84. Despite the fact that Defendants knew or should have known that Trasylol caused unreasonable and dangerous side effects, which many users would be unable to avoid by any means, they continued to promote and market Trasylol when there existed safer and more effective alternative drug products.

85. Defendants knew or should have known that consumers, and Plaintiffs specifically, would foreseeably and needlessly suffer injury as a result of these Defendants' failure to warn.

86. Defendants failed to provide timely and adequate warnings to physicians, distributors, and consumers, including Plaintiffs and Plaintiffs' physicians, in the following ways:

(A)     Failed to include adequate warnings with the medications that would alert Plaintiffs and Plaintiffs' surgeons to the dangerous risks of Trasylol;

(B)     Failed to provided adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, kidney failure;

(C)     Continued to aggressively promote Trasylol, even after it knew or should have known of the risks of injury from this drug.

87. By failing to warn Plaintiffs and Plaintiffs' physicians of the adverse health risks associated with the administration of Trasylol, Defendants breached their duty of reasonable care and safety.

88. Defendants' actions described above were performed willfully, intentionally, and with

15

reckless disregard of the life and safety of the Plaintiffs and the public.

89.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiffs suffered the injuries and damages set forth in this Complaint.

## COUNT TWO - Strict Liability
## Pursuant to CPLA, Conn. Gen. Stat. § 52-572m, et seq.

99.    Plaintiffs hereby adopt and incorporate by reference all the above allegations and further states as follows:

100.    Defendants are liable to Plaintiffs under CPLA, Conn. Gen. Stat. §52-272m, et seq. for the injuries and damages due to the defective design or formulation of Trasylol.

101.    At all times material to this lawsuit, Defendants manufactured Trasylol.

102.    At all times material to this lawsuit, Defendants were engaged in the business of distributing and selling Trasylol.

103.    Defendants sold Trasylol, which was administered to Plaintiffs during their heart surgery, as alleged in this Complaint.

104.    The Trasylol administered to Plaintiffs were defective in design or formulation in that, when it left the hands of the Defendants, this drug was dangerous to the extent beyond that which could reasonably be contemplated by Plaintiffs, and any benefit of this drug was far outweighed by the serious and undisclosed risks of its use when prescribed and used as the Defendants intended.

105.    The Trasylol administered to Plaintiffs were defective due to inadequate warning, inadequate public or regulatory reporting regarding the results of any testing and studies, and misleading or false promotional, medical, and scientific statements.

106.    On information and belief, the Trasylol administered to Plaintiffs were defective due to

improper manufacture in that substantial amounts of Trasylol were contaminated with foreign matter and particulate.

107.    The Trasylol administered to Plaintiffs were defective at the time it was distributed by the Defendants or left their control.

108.    The Trasylol administered to Plaintiffs were expected to reach the user without substantial change in the condition in which it was sold.

109.    The Trasylol administered to Plaintiffs reached them without substantial change in the condition in which it was sold.

110.    Plaintiffs were persons who would reasonably be expected to use Trasylol.

111.    The defects in the Trasylol administered to Plaintiffs were a direct and proximate cause of the injuries and damages sustained by Plaintiffs as set forth in this Complaint.

**COUNT THREE – Negligence**
**Pursuant to CPLA, Conn. Gen. Stat. §52-572m, et seq.**

112.    Plaintiffs hereby adopt and incorporate by reference all the above allegations and further states as follows:

113.    Defendants are liable to Plaintiffs under the CPLA Conn. Stat. §52-572m, et seq. for the negligent development, study, manufacture, distribution and sale of the unreasonably dangerous product Trasylol.

114.    At all times relevant to this lawsuit, Defendants owed a duty to consumers, including Plaintiffs, and Plaintiffs' health care providers, to assess, manage, and communicate the risks, dangers, and adverse effects of Trasylol and to suspend distribution and sale of Trasylol when Defendants discovered it to be unreasonably dangerous.

115.    Defendants' duties included, but were not limited to, carefully and properly designing,

17

testing, manufacturing, licensing, packaging, promoting, advertising, selling, and/or distributing Trasylol into the stream of commerce, and providing warnings with regard to this drug.

116.    Defendants negligently and carelessly breached the above-described duties to Plaintiffs by committing negligent acts and/or omissions including, but not limited to, the following:

> (A)    Defendants failed to use ordinary care in designing, testing, and manufacturing Trasylol so as to avoid the high risk to users of unreasonable, dangerous side-effects, some of which are fatal, such as renal failure, heart attack and stroke;

> (B)    Defendants failed to accompany Trasylol with adequate warnings that would alert doctors, consumers, and other users to the potential adverse side effects associated with the use of these drugs and the nature, severity and duration of such adverse effects;

> (C)    Defendants failed to conduct adequate pre-clinical testing and post-marketing surveillance to determine the safety and side effects of Trasylol;

> (D)    Defendants failed to warn Plaintiffs prior to actively encouraging the sale of Trasylol, either directly or indirectly, orally or in writing, about the possibility of becoming disabled as a result of the use of these drugs;

> (E)    Defendants continued to promote the safety of Trasylol, while downplaying any risks, even after Defendants knew of the risk of renal failure, heart attack and stroke; and

> (F)    Defendants were otherwise careless or negligent.

117.    Although Defendants knew or should have known that Trasylol caused unreasonably dangerous side effects which many users would be unable to remedy by any means, Defendants

continued to market this drug to doctors for use in cardiac surgeries, when there were safer and less expensive alternatives available.

118.    Defendants knew or should have known that consumers, like Plaintiffs, would suffer injury as a result of Defendants' failure to exercise ordinary care, as described above.

119.    As a direct and proximate cause of Defendants' negligent acts and/or omissions, Plaintiffs suffered each of the injuries and damages set forth in this Complaint.

### COUNT FOUR - Fraud, Misrepresentation & Suppression
### Pursuant to CPLA, Conn. Gen. Stat. §52-572m, et seq.

120.    Plaintiffs hereby adopt and incorporate by reference all the above allegations and further states as follows:

121.    Defendants are liable to Plaintiffs under the CPLA,, Conn. Gen. Stat. §52-572m, et seq. for innocent, negligent and/or willful misrepresentations regarding the safety, efficacy, and risk/benefit ratio of Trasylol to Plaintiffs and to the health care providers that prescribed, recommended, ordered, and dispensed Trasylol.

122.    Through their actions and omissions in advertising, promoting, reporting to the FDA, labeling, and otherwise, Defendants fraudulently, intentionally and/or negligently made public misrepresentations of material facts to, and/or concealed material facts from physicians, the FDA, and consumers like Plaintiffs, concerning the character and safety of Trasylol.

123.    Those public misrepresentations and omissions include, but are not limited to, those set forth in the general allegations section of this Complaint.   Those misrepresentations and omissions further include, but are not limited to, the following:

> (A)    Defendants failed to disclose that sufficient pre-clinical and clinical testing and adequate post-marketing surveillance to determine the safety and side effects of Trasylol;

(B)     Defendants failed to timely disclose, and/or intentionally concealed, the interim and final results of the Walker Study showing that Trasylol use dramatically increased the risk for renal failure;

(C)     Defendants failed to include adequate warnings with Trasylol about the potential and actual risks, and nature, scope, severity, and duration of any serious side effects of this drug, including without limitation, the risk of renal failure, heart attack and stroke; and

(D)     Defendants concealed and continue to conceal past and present facts – including that as early as the mid-nineties Defendants were aware of and concealed their knowledge of an association between the use of Trasylol and dangerous side effects, including renal failure, heart attack and stroke – from the consuming public, including Plaintiffs, when it had a duty to disclose.

124.    Defendants' above-described acts and/or omissions were performed willfully, intentionally, and with reckless disregard for Plaintiffs and the public.

125.    Defendants knew or should have known that these representations were false and that Plaintiffs and their physician would rely on them.  Defendants were obligated to disclose the foregoing risks, but failed to adequately and timely do so even after they were in possession of information concerning those risks.  Defendants' representations that Trasylol was safe for its intended use were false, since this drug was, in fact, dangerous to the health of the Plaintiffs when used to reduce peri-operative bleeding in patients undergoing cardiac surgery, and there were alternative products available that were less expensive, effective and posed less risk.

126.    .In the alternative, Defendants failed to exercise reasonable care in ascertaining the accuracy of the information regarding the safe use of Trasylol and communicating that

20

information to Plaintiffs.

127.   At the time of Defendants' fraudulent misrepresentations and active concealment, Plaintiffs were not aware of the falsity of the foregoing representations, nor were they aware that material facts concerning Trasylol had been concealed or omitted.  In reliance upon Defendants' misrepresentations, Plaintiffs' physicians were induced to and did order Trasylol to be administered during heart surgery.

128.   If Plaintiffs had known the true facts concerning the risks of the use of Trasylol, in particular the risk of renal failure, heart attack and stroke they would have requested Trasylol not be used, and requested the use of one of the safe alternatives.

129.   If Plaintiffs' physicians had known the true facts concerning the risks of the use of Trasylol, in particular the risk of renal failure, heart attack and stroke, the physicians would not have administered Trasylol during surgery and would have administered one of the safe alternatives.

130.   The reliance of Plaintiffs and Plaintiffs' physician upon Defendants' misrepresentations was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Trasylol, while Plaintiffs were not in a position to know the true facts, and because Defendants aggressively marketed the use of this drug and concomitantly downplayed the risks in its use, thereby inducing Plaintiffs' physicians to use these drugs in lieu of other, safer alternatives.  At all times relevant hereto, Defendants' corporate officers, directors and/or managing agents knew of and ratified the acts of Defendants, as alleged herein.

131.   As a direct and proximate result of the reliance of Plaintiffs and the physicians on Defendants' misrepresentations and concealment concerning the risks and benefits of Trasylol,

Plaintiffs suffered the injuries and damages as set forth in this Complaint.

132.    As a direct result of Defendants' fraudulent concealment of the existence of Plaintiffs' cause of action, Plaintiffs were unable to and did not discover Trasylol was a defective product until long after it was administered to them.

**COUNT FIVE - Express Warranties**
**Pursuant to CPLA, Conn. Gen. Stat. §52-572m, et seq.**

133.    Plaintiffs hereby adopt and incorporate by reference all the above allegations and further states as follows:

134.    Trasylol was designed, tested, manufactured, distributed, promoted and sold by the Defendants; and was expected to, and did, reach Plaintiffs without a substantial change in its condition.

135.    Defendants, through their advertising and promotional materials, expressly warranted that Trasylol was safe for the use for which it was intended, namely as a means to reduce peri-operative bleeding in patients undergoing cardiac surgery.

136.    Defendants breached said express warranties in that Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, renal failure, heart attack and stroke.

137.    Plaintiffs relied to their detriment on Defendants' express warranties.

138.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs suffered the injuries and damages set forth in this Complaint.

**COUNT SIX - Implied Warranties**
**Pursuant to CPLA, Conn. Gen. Stat. §52-572m, et seq.**

139.    Plaintiffs hereby adopt and incorporate by reference all the above allegations and further states as follows:

22

140.    Trasylol was designed, tested, manufactured, distributed, promoted and sold by the Defendants; and was expected to, and did, reach Plaintiffs without a substantial change in its condition.

141.    Defendants, through advertising and promotional materials, impliedly warranted that Trasylol was safe for the use for which it was intended, namely as a means to reduce peri-operative bleeding in patients undergoing cardiac surgery.116.Defendants breached said implied warranties in that Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, renal failure, heart attack and stroke.

142.    Plaintiffs relied to their detriment on Defendants' implied warranties.

143.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs suffered the injuries and damages set forth in this Complaint.

### COUNT SEVEN - Unfair Trade Practices
### Pursuant to CUTPA, Conn. Gen. Stat. §42-110a, et seq.

144.    Plaintiffs hereby adopt and incorporate by reference all the above allegations and further states as follows:

145.    Defendants are liable to Plaintiffs under the Connecticut Unfair Trade Practices Act (CUPTA), Conn. Gen. Stat. §42-110a, et seq. as a result of unfair trade practices.  Wholly separate and apart from the personal injuries sustained by Plaintiffs, Plaintiffs further suffered financial injury, as described below.

146.    Defendants financed, assisted, supported and participated in the promotion and use of Trasylol in order to create consumer demand for the drug.

147.    Defendants deliberately misrepresented the safety of Trasylol and intentionally concealed the risks attendant to use of the drug.  In so doing, Defendants intended to and did affect the

decisions of consumers and their health care providers to purchase, prescribe and use Trasylol despite the existence of substantially cheaper alternative drugs.

148.     Defendants, while engaged in the conduct and practices identified above, committed one or more unfair trade violations of CUTPA, Conn. Gen. Stat. §42-110a, et seq., including, but not limited to, the following:

> (A)     Defendants made false and misleading representations and omissions of material facts regarding Trasylol;

> (B)     Defendants concealed and otherwise failed to publicize the risks and injuries associated with Trasylol in order to promote sales of the drug and maximize profits; and

> (C)     Defendants engaged in advertising and promotion of Trasylol without conducting sufficient pre-clinical and clinical testing and adequate post-marketing surveillance to determine the safety and side effects of Trasylol.

149.     Defendants thereby intended to and did affect the price of Trasylol, unfairly and deceptively maintaining the price of Trasylol at an inflated level not otherwise obtainable and caused Plaintiffs and the consuming public generally to pay more for the drug than was warranted or than they would otherwise have paid in the absence of Defendants' misrepresentations and concealment.

150.     The above-described conduct, practices, acts and omissions were immoral, oppressive, unethical and/or unscrupulous, in violation of international treaty and law, and/or offend public policy.

151.     The above-described conduct, practices, acts and omissions caused consumers permanent and substantial financial loss, which loss could not reasonably have been avoided, and which was

not outweighed by any countervailing benefit to the consuming public.  Consumers in general, and Plaintiffs in particular, incurred unnecessary expenses for a product that was purchased only because of the unfair, unscrupulous, oppressive and/or deceptive acts or practices of the Defendants.

152.    As a consequence of Defendants' wrongful conduct, Plaintiffs suffered an ascertainable financial loss:  the difference between the price paid for Trasylol as a result of the Defendants' unfair trade practices and the cost of any of the substantially cheaper, and safer, drug alternatives.

**COUNT EIGHT – Punitive Damages Pursuant to CPLA, Conn. Gen. Stat. §52-572m, et seq. and CUTPA, Conn. Gen. Stat. §42-110a, et seq.**

153.    Plaintiffs hereby adopt and incorporate by reference all the above allegations and further states as follows:

154.    Plaintiffs are entitled to punitive damages because Defendants' actions were reckless and without regard for the public's safety and welfare.  Defendants misled both the medical community and the public at large, including Plaintiffs, by making false representations about and concealing pertinent information regarding Trasylol.  Defendants downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the use of Trasylol, including but not limited to renal failure, heart attack, stroke and death, despite available information demonstrating the product was likely to cause serious and sometimes fatal side effects to its users.

155.    The conduct of the Defendants in designing, testing, manufacturing, promoting, advertising, selling, marketing, and distributing Trasylol, and in failing to warn Plaintiffs and other members of the public of the dangers inherent in the use of Trasylol, which were well

known to the Defendants, was attended by circumstances of fraud, malice, or willful and wanton conduct, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly Plaintiffs.

156.   At all times material hereto, Defendants had a duty to exercise reasonable care in the design, manufacture, testing, research and development, processing, advertising, marketing, labeling, packaging, distribution, promotion and sale of Trasylol.

157.   Defendants breached their duty and were wanton and reckless in their actions, misrepresentations, and omissions toward the public generally, and Plaintiffs specifically, in the following ways:

(A)     Upon information and belief, Defendants actually knew of Trasylol's defective nature, as set forth herein, but continued to design, manufacture, market, and sell Trasylol so as to maximize sales and profits at the expense of the health and safety of the consuming public, including Plaintiffs, and in conscious disregard of the foreseeable harm caused by Trasylol;

(B)     Defendants spent millions of dollars a year researching and developing medicines and aggressively marketing Trasylol, but devoted far less attention to conducting sufficient pre-clinical testing, clinical testing and adequate post-marketing surveillance of this drug; and

(C)     Defendants continued to promote the safety of Trasylol, while providing no warnings at all about the risk to consumers of death, kidney failure, congestive heart failure, and stroke associated with it, even after Defendants knew of that risk from multiple studies including the Walker Study.

158.   Defendants knew that Trasylol had unreasonably dangerous risks and caused serious side

effects of which Plaintiffs would not be aware.  Defendants nevertheless advertised, marketed, distributed, and sold the medicine knowing that there were safer methods and products available.

159.    Defendants' above-described actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiffs and the public.

160.    One or more of the aforesaid violations of the CPLA, Conn. Gen. Stat. §52-572m, et seq were committed by Defendants with reckless disregard for the safety of the public and of Plaintiffs as a product user.

161.    One or more of the aforesaid violations of the CUTPA, Conn. Gen. Stat. §42-110a, et seq. were committed by Defendants willfully and deliberately, and caused substantial financial injury to the consuming public and Plaintiffs.

162.    As a direct and proximate result of the wanton and reckless actions and inactions of the Defendants as set forth above, Plaintiffs are entitled to punitive damages.

WHEREFORE, Plaintiffs request that the Court grant each of them the following relief against Defendants, Bayer Corporation, Bayer Healthcare Pharmaceuticals, Inc. as Successor in Interest of Bayer Pharmaceuticals Corporation, and Bayer Schering Pharma AG, jointly and severally, on all counts of this Complaint, including:

(A)     Money Damages representing fair, just and reasonable compensation under Conn. Gen. Stat. §52-572m, et seq., Conn. Gen. Stat. §42-110a et seq. and for their respective common law and statutory claims;

(B)     Punitive and/or Treble Damages under Conn. Gen. Stat. §52-572m, et seq. and Conn. Gen. Stat. §42-110a, et seq.;

(C)     Attorneys' fees pursuant to Conn. Gen. Stat. §52-572m, et seq. and Conn. Gen. Stat. §42-110a, et seq.;

(D)     Pre- and post-judgment interest as authorized by law on the judgments which

enter on Plaintiffs' behalf;

(E)     Costs of suit;

(F)     Trial by jury; and

(G)     Such other relief as is deemed just and appropriate.

DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all Counts and as to all issues.

Respectfully submitted,

By:     /s/ Douglas C. Monsour
        Douglas C. Monsour
        TX Bar No. 00791289
        THE MONSOUR LAW FIRM
        404 North Green Street
        P.O. Drawer 4209
        Longview, TX 75601
        Telephone: (903) 758-5757
        Facsimile: (903) 230-5010

        **COUNSEL FOR PLAINTIFFS**

<u>**SERVICE LIST**</u>

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN
& SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-790-4584
Facsimile: 215-875-7701
*Co-Lead Counsel for plaintiffs*

Scott A. Love
Email: slove@triallawfirm.
**CLARK, BURNETT, LOVE & LEE, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: 713-757-1400
Facsimile: 713-759-1217
*Co-Lead Counsel for plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE
& LECLAINCHE, P.A.**
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile: 561-684-6308
*Liaison Counsel for plaintiffs*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS &DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone: 561-650-7200
Facsimile: 561-655-1509
*Liaison Counsel for Defendants*

Philip S. Beck
Email: philip.beck@bartlit-beck.com
Steven E. Derringer
Email: steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL 60603
Telephone: 312-494-4400
Facsimile: 312-494-4440

Eugene A. Schoon
Email: eschoon@sidley.com
Susan A. Weber
Email: saweber@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone: 312-853-7000
Facsimile: 312-853-73036

Susan Artinian
Email: sartinian@dykema.com
Daniel Stephenson
Email: dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI 48243
Telephone: 313-268-9788
Facsimile: 313-568-6658

Richard K. Dandrea
Email: rdandrea@eckertseamans.com
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA. 15219
Telephone: 412-566-6000
Facsimile: 412-566-6099
***Attorneys for Bayer Corporation and Bayer
HealthCare Pharmaceuticals Inc.***