UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION - MDL-1928

This Document Relates To: All Actions

_____/

## ORDER ON PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT J. PAUL WAYMACK

THIS CAUSE comes before the Court upon Plaintiffs' Motion in Limine to Exclude Improper Opinion Testimony of Defendants' (hereinafter, collectively, "Bayer's") Expert J. Paul Waymack[1] ("Motion") (DE 6112), filed on June 7, 2010. Bayer filed a Response (DE 6272), to which Plaintiffs replied (DE 6339). The Court has reviewed the pertinent parts of the record and is advised of the premises. For the reasons stated below, Plaintiffs' Motion shall be granted, in part, and denied, in part.

I.   **Timeliness of the Motion**

As an initial matter, the parties dispute whether the Motion should be denied as untimely. Bayer argues that, although Plaintiffs labeled the Motion a motion *in limine*, nevertheless the substance of the Motion and the cases Plaintiffs cite address the admissibility of expert witness

---

[1] Dr. J. Paul Waymack is proffered as an expert on FDA regulations and procedures and labeling obligations. He received an M.D. degree from the Medical College of Virginia and an Sc. D. Degree from the University of Cincinnati. Dr. Waymack was an FDA medical officer for the FDA's Center for Drug Evaluation and Research's Division of Medical Imaging Agents, Surgical and Dental Products. He formed Waymack, Inc., a medical consulting company, (Waymack Dep. at 13-14), and he is a physician. (Waymack Report at 1-2).

testimony under *Daubert* and Rule 702.[2] According to Bayer, Plaintiffs did not meet the deadline for such motions. (DE 6272 at 1-5). Furthermore, Bayer argues that Plaintiffs have no excuse for their delay and that, although denial of the Motion does require a showing of prejudice, granting Plaintiffs' Motion would prejudice Bayer, which has included Dr. Waymack's testimony in its trial preparations. (DE 6272 at 5-6).

Plaintiffs reply that their Motion should not be denied as untimely because this Court has broad discretion in determining how to perform its gatekeeper function. Plaintiffs' Motion is meritorious and this Court's hearing of it will not prejudice Bayer. (DE 6339 at 1-2).

The Court concludes that Plaintiffs' Motion should not be denied on the basis that it is untimely. The Court agrees with Bayer that Plaintiffs' Motion is a *Daubert* motion;[3] however, Bayer proffers Dr. Waymack's testimony as to all actions in this MDL, and Bayer does not cite a scheduling provision that applies to all cases.[4] Given the lack of clear authority indicating that Plaintiffs' motion is untimely, the Court declines to deny the Motion solely on that ground.

---

[2] Bayer states that, "For example, the *Gadolinium* opinion on which plaintiffs heavily rely was issued in response to 'omnibus Generic *Daubert* motions filed by the Plaintiffs Steering Committee' in which plaintiffs argued that Rule 702 and *Daubert* provided the basis for exclusion." (DE 6272 at 5).

[3] Plaintiffs move to exclude the testimony of one expert, Dr. Waymack, because it is "unreliable," "will not assist the trier of fact," and it is "misleading." (DE 6112 at 1; *see also* 1-4, 6-12).

[4] Bayer states, "Consistent with PTO 13, Bayer submitted Dr. Waymack's generic expert report over seven months ago, on November 3, 2009, and plaintiffs deposed him on January 6, 2010. *See* PTO 13 ¶ I.B, at 2. Yet plaintiffs did not meet the deadline for filing *Daubert* motions. *See id.* ¶ I.K, at 4 ('Plaintiffs' *Daubert* motions shall be filed and served by January 22, 2010')." (DE 6272 at 5).

## II.  Legal Standard

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The party seeking to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of proof. *Davidson v. U.S. Dep't of Health & Human Servs.*, No. 7:06-129-DCR, 2007 WL 3251921, at *2 (E.D. Ky. Nov. 2, 2007) (internal citations omitted). *See also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

According to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. According to the Supreme Court, the inquiry envisioned by Rule 702 is a flexible one, in which federal judges perform a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("Its [Rule 702's] overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

In *Daubert*, the Supreme Court listed several factors federal judges may consider in determining whether to admit expert scientific testimony under Rule 702: whether an expert's

theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally accepted in the scientific community.[5] 509 U.S. at 593-94 (declining to set forth a "definitive checklist or test").

The Supreme Court subsequently held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150 (internal citations and quotations omitted). Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . [A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. The trial court has the same kind of latitude in deciding how to test an expert's reliability as it enjoys when it decides whether or not that expert's relevant testimony is reliable. *Id.*

The Eleventh Circuit engages in a three part inquiry to determine the admissibility of expert testimony under Rule 702, considering whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[5] In *Daubert*, the Supreme Court considered the federal judge's gatekeeping role in ensuring that all *scientific* expert testimony is not only relevant, but reliable. The Supreme Court later held that this basic gatekeeping obligation and *Daubert*'s general principles apply to *all* expert testimony, not just testimony that is classified as scientific. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999).

*Quiet Tech. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (internal citations omitted). The Eleventh Circuit has noted that "the primary purpose of any *Daubert* inquiry is for the district court to determine whether that expert, 'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho*, 526 U.S. at 152).

## II. Background & Analysis

Plaintiffs move to exclude Dr. Waymack's expert testimony in its entirety as it is unreliable, will not assist the trier of fact, and is misleading. Plaintiffs contend that Dr. Waymack's opinion contradicts principles set forth by the Supreme Court in *Wyeth v. Levine*, 129 S. Ct. 1187 (2009). (DE 6112 at 1-4, 6-12). Plaintiffs further argue that the exclusion of Dr. Waymack's testimony in a recent case, *In re Gadolinium*, No. 1:08 GD 50000, 2010 WL 1796334 (N.D. Ohio May 4, 2010) should persuade this Court to exclude his testimony in this case. (DE 6112 at 3-4, 10).

Dr. Waymack's Report contains opinions on the following subjects: (1) Bayer's labeling of Trasylol; (2) Bayer's reporting of safety information concerning Trasylol; and (3) Bayer's testing of Trasylol and the testing results.

### A. Bayer's labeling of Trasylol

Plaintiffs argue that the following statements by Dr. Waymack are contrary to law: (1) the FDA can require manufacturers to change labeling to reflect updated safety information; (2) the FDA is the ultimate authority on the information included in the labeling; (3) major labeling

changes require FDA approval prior to implementation rather than using the CBE process; and (4) statements expressly addressing the Supreme Court's opinion in *Wyeth*.

    1.    The FDA can require manufacturers to change labeling to reflect updated safety information

Dr. Waymack states that if "the FDA determines a change in the risk/benefit profile of a drug warrants it, they can require a labeling change to provide physicians with newly available important information." (Waymack Report at ¶ 67).

Plaintiffs argue that this testimony is contrary to law because, under *Wyeth*, the manufacturer does not need pre-approval to make a labeling change and the FDA lacks the authority to order a post-marketing labeling change. (DE 6112 at 7).

Bayer responds that Dr. Waymack's testimony is not contrary to law because the FDA could compel manufacturers to change drug labeling indirectly prior to 2007 through exercise of its power to declare a product misbranded or withdraw underlying marketing approval, and directly after 2007 pursuant to a new express grant of statutory authority. (DE 6272 at 10-12).

    2.    The FDA is the ultimate authority on the information included in the labeling

Dr. Waymack states that the "FDA has ultimate authority over pharmaceutical development and marketing, including the labeling of such products" and "Sponsors must follow the dictates of the FDA with respect to the content and format of labeling, as well as all other areas of pharmaceutical development." (Waymack Report at ¶ 76).

Dr. Waymack also states that drug labeling is a "co-primary" responsibility between manufacturers and the FDA, and that manufacturers "are responsible for the content of their labeling with FDA concurrence." (Waymack Dep. at 130).

Plaintiffs argue that this testimony is contrary to law because, under *Wyeth*, the manufacturer has primary responsibility for drug labeling and does not need to obtain FDA pre-approval to make safety changes. (DE 6112 at 7-8).

Bayer responds that Plaintiffs mischaracterize both Dr. Waymack's testimony and *Wyeth*, and that Dr. Waymack's statements are consistent with *Wyeth*. Under *Wyeth*, the FDA has ultimate authority to approve or reject labeling changes, and this authority is not mutually exclusive with a manufacturer's responsibility for ensuring adequate drug labeling. (DE 6272 at 8-9).

> 3. Major labeling changes require FDA approval prior to implementation rather than using the CBE process

According to Plaintiffs, Dr. Waymack's statement that major label changes require FDA approval and can never be done under the CBE process[6] is contrary to law because under *Wyeth*, adding information to the label is accomplished through the CBE process and never requires pre-approval by the FDA.[7] (DE 6112 at 7-9).

---

[6] The "changes being effected" (CBE) FDA regulation "permits a manufacturer to make certain changes to its label before receiving the agency's approval." This regulation "provides that if a manufacturer is changing a label to 'add or strengthen a contraindication, warning, precaution, or adverse reaction' or to 'add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product,' it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval." *Wyeth*, 129 S. Ct. at 1196.

[7] The following exchange is from Dr. Waymack's deposition:
Q: Do the FDA regulations permit a manufacturer to make certain changes to its label before receiving the agency's approval?
A. Yes.
Q. And in what situations?
A. You can correct any typographical errors. You can change contact information. You can add minor–make minor corrections to various sections such as the adverse event section.

Bayer opposes by arguing that there is no conflict with *Wyeth* because that case does not address the FDA's classification in its regulations of certain changes as "major" ones, and that Dr. Waymack's testimony is based on his experience as a former FDA official reviewing drug regulation issues and pertinent regulations. (DE 6272 at 12-13).

4. Statements expressly addressing the Supreme Court's opinion in *Wyeth*

Plaintiffs also argue that Dr. Waymack's explicit disagreement with *Wyeth* supports exclusion of his testimony as contrary to law. When asked whether he disagreed with the Supreme Court's interpretation of the regulations in *Wyeth*, Dr. Waymack stated that his experience was inconsistent with the majority opinion.[8] (DE 6112 at 9-10).

---

Q. Does it allow the manufacturer to add or strengthen a contraindication, warning, precaution or adverse reaction?
A. The FDA position on that is that is only allowed in certain unique situations. Otherwise, the FDA does not like the CBE route being utilized to accomplish that goal.

\*\*\*

Q. It says–it's talking about changes based upon clinical trials and studies and adverse events, correct?
A. Yes.
Q. You said, "The FDA's position is that such changes constitute major changes. To that end, such changes require FDA approval prior to being implemented rather than using the CBE process." Correct?
A. That is correct.

(Waymack Dep. at 79, 86-87).

[8] The following exchange occurred during Dr. Waymack's deposition:
Q. Have you seen what the United States Supreme Court has recently said about what types of changes can be made through the CBE?
A. Yes, I have.
Q. You understand that they actually interpret the laws and regulations in this country that the pharmaceutical companies live by and the FDA enforces?
A. I'm not a lawyer, but that's my understanding.
Q. Okay. What do they say about what types of changes can be made?
A. My–I don't have the four–the opinion of the justices in front of me. But I am aware that they took the position that CBEs can be used with–in certain

Furthermore, according to Plaintiffs, Dr. Waymack's assertion that the FDA's standards are not minimum standards is contrary to law because under *Wyeth*, such standards are minimum standards. (DE 6112 at 10).

Bayer responds that Dr. Waymack's testimony was in response to Plaintiffs' attempts to elicit legal opinions from him, and that he indicated that he was not an attorney and would only comment on his experience at FDA of how drugs are regulated. (DE 6272 at 7).

5.   Statements regarding FDA approval that are misleading by omission

Plaintiffs also argue that some of Dr. Waymack's statements are misleading by omission as to the principles set forth in *Wyeth*. Dr. Waymack states that the FDA can make changes upon initial drug approval, but omits the fact that the FDA lacks authority to make changes to the label after approval. (DE 6112 at 7).

Bayer responds that Plaintiffs mischaracterize Dr. Waymack's testimony, and that Plaintiffs may cross-examine Dr. Waymack as to any omissions. (DE 6272 at 13-14).

Beyond these particular objections, Plaintiffs also argue that the *Gadolinium* court's exclusion of Dr. Waymack's testimony should persuade this Court to exclude his testimony in this case. (DE 6112 at 3-4, 10 (citing *In re Gadolinium*, No. 1:08 GD 50000, 2010 WL 1796334 (N.D. Ohio May 4, 2010)).

---

\*\*\*    circumstances without the FDA's permission.

Q.   Do you disagree with the United States Supreme Court in the way they've interpreted the regulations as reflected in the opinion *Wyeth v. Levine*?
A.   I–based on my experience working at the FDA and with the FDA, I find my experience is consistent not with the majority opinion but with the minority opinion of Alito.

(Waymack Dep. at 146-49).

Furthermore, Dr. Waymack's statements at deposition indicate that he intends to testify as to a broad range of matters contrary to law based on an interpretation of laws, regulations and guidance documents associated with the FDCA, and specifically with regard to a drug manufacturer's standard of care with regard to product labeling.[9] (DE 6112 at 8).

Plaintiffs further argue that even if Dr. Waymack's testimony were relevant, it should be excluded under Federal Rule of Evidence 403 because its potential for prejudice and confusion substantially outweighs its probative value. According to Plaintiffs, such testimony suggests that the FDA has primary responsibility for aprotinin label changes concerning patient safety and that Bayer could not make such changes without pre-approval by the FDA. This testimony would confuse the jury, and rebutting it would waste time. (DE 6112 at 12-13).

Bayer responds that the *Gadolinium* decision should not guide the Court's decision in this Case.[10] (DE 6272 at 2). Bayer also argues that Dr. Waymack's testimony should not be excluded

---

[9] The following exchange occurred at Dr. Waymack's deposition:
Q.   Are you judging Bayer's conduct based solely on their compliance with the guidance documents, the Code of Federal Regulation and the Food, Drug Administration and Cosmetic Acts?
A.   Broadly defined, yes, because these also say you must use good science in developing your drugs.
\*\*\*
Q.   [W]hat I'm trying to figure out is when you're coming to your opinions on what should Bayer have done, what are you using generally speaking to determine what should Bayer have done?
A.   It is the documents you mentioned; but it's also not just those documents and what I was taught at the FDA, but what I learned in medical school, what I learned in residency, what I learned when I was getting my second Doctorate.
(Waymack Dep. at 35-36).

[10] Bayer argues that "Plaintiffs rely heavily on a recent decision, *In re Gadolinium-Based Contrast Agents Products Liability Litigation*, . . . which took the extraordinary—and, as it acknowledged, novel—step of excluding expert testimony in its entirety in light of a mistaken view that a few answers Dr. Waymack gave at a deposition contravened *Levine*. Even that court

under Federal Rule of Evidence 403 because (1) the challenged opinions of Dr. Waymack are consistent with *Wyeth* and (2) defendants will not offer legal conclusions by Dr. Waymack that contravene *Wyeth*. Furthermore, Bayer argues that challenges to the factual premise of an expert's testimony go only to the weight and not the admissibility of Dr. Waymack's testimony, and that even if the Court found certain opinions offered by Dr. Waymack to be contrary to law, only those opinions, and not his entire testimony, should be excluded. (DE 6272 at 14-16).

Plaintiffs reply that they have not mischaracterized Dr. Waymack's testimony, which, they argue, plainly contradicts *Wyeth*, and that even on reconsideration the *Gadolinium* court excluded Dr. Waymack's testimony on labeling obligations. (DE 6339 at 1-4). Furthermore, Plaintiffs reply that Dr. Waymack's testimony should be excluded in its entirety because, unlike in *Gadolinium*, where the court on reconsideration excluded only part of Dr. Waymack's testimony because the plaintiffs did not seek exclusion of the testimony in its entirety, here Plaintiffs do seek such exclusion. (DE 6339 at 4).

6.   *Wyeth v. Levine*

In *Wyeth*, the Supreme Court addressed the question of whether the FDA's approvals of Wyeth's label for Phenergan[11] provided Wyeth with a complete defense to the plaintiff's tort

---

recently reversed itself on reconsideration, and 'will modify its ruling and permit [Dr. Waymack] to testify on the rest of the regulatory process except for labeling obligations.'" (DE 6272 at 2 (internal citations omitted)).

[11] Phenergan is an antihistamine drug used to treat nausea. The FDA had approved Wyeth's label for Phenergan when it approved its new drug application in 1955 and again when it later approved changes in the drug's labeling. Phenergan may be administered by the "IV-push" method, whereby the drug is injected directly into a patient's vein. *Wyeth v. Levine*, 129 S. Ct. 1187, 1191 (2009).

claims.[12] The Court concluded that the approvals under federal law did not preempt the common law claims because (1) it was not impossible for *Wyeth* to comply with the state-law duty to modify Phenergan's labeling without violating federal law, and (2) recognition of the plaintiff's state-law tort action did not stand as an obstacle to the purposes of Congress by substituting the expert judgment of the FDA with a lay jury's decision about drug labeling.[13] *Id.* at 1193-94, 1204.

As to impossibility preemption, the Court rejected the argument that the FDCA and FDA regulations prohibited *Wyeth* from updating its label in accordance with its state-law duties. Such an argument was premised on a "fundamental misunderstanding" that "the FDA, rather than the manufacturer, bears primary responsibility for drug labeling." *Id.* at 1197. To the contrary,

> through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.

*Id.* at 1197-98. The Court recognized that the CBE regulation "both reflects the manufacturer's ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval." *Id.* at 1198. The Court also recognized that,

> the FDA retains authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications. But absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements.

---

[12] The Court identified the question as "whether federal law preempts Levine's claim that Phenergan's label did not contain an adequate warning about [the danger presented by] using the IV-push method of administration." *Id.* at 1194.

[13] Wyeth contended that the FDCA established both a floor and a ceiling for drug regulation and that once the FDA approved a drug's label, a state-law verdict may not deem it to be inadequate. *Wyeth*, 129 S. Ct. at 1999.