**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON**

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION - MDL - 1928

This Document Relates to:  ALL CASES
_____/

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT
CHERYL BLUME AND MEMORANDUM OF LAW IN SUPPORT**

Defendants Bayer Corporation, Bayer HealthCare Pharmaceuticals Inc., and

Bayer Schering Pharma AG, now known as Bayer Pharma AG, move to exclude the testimony of

plaintiffs' supplemental generic expert, Cheryl Blume, Ph.D.  *See* Fed. R. Evid. 702, 401-403;

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  This motion is supported by the

incorporated Memorandum of Law and attached exhibits.

**INTRODUCTION AND BACKGROUND**

Plaintiffs offered Dr. Blume as their supplemental generic expert following the

exclusion of Dr. Suzanne Parisian and the withdrawal of Dr. Curt Furberg.[1]  *See* Expert Rep. of

Cheryl D. Blume, Ph.D. ("Blume Rep.") (Oct. 4, 2010) (Ex. A).  Despite this second chance,

---

[1] In August 2009, pursuant to Pretrial Order ("PTO") No. 13, the Plaintiffs' Steering Committee
("PSC") designated certain generic expert witnesses, including Dr. Parisian and Dr. Furberg.
The parties subsequently engaged in extensive expert discovery and defendants filed *Daubert*
motions to exclude the testimony of Dr. Parisian and Dr. Furberg on various grounds.  The Court
held a *Daubert* hearing related to the proposed testimony of Dr. Parisian on April 13, 2010, and
subsequently excluded Dr. Parisian's testimony in its entirety.  *In re Trasylol Prods. Liab. Litig.*
("Parisian Order"), 709 F. Supp. 2d 1323 (S.D. Fla. 2010).  In June 2010, before the Court ruled
on defendants' pending *Daubert* motion to exclude Dr. Furberg, the PSC informed the Court that
Dr. Furberg was withdrawing as an expert in the Trasylol litigation, and sought leave to file a
supplemental generic expert report to replace Dr. Parisian and Dr. Furberg.  Pls.' Br. in Support
of Mot. for Leave to File Supplemental Generic Expert Report at 2-3 (D.E. 6173, June 11, 2010).
The Court granted plaintiffs' motion, subject to a number of restrictions and conditions limiting
the scope of the substitute expert's testimony.  Order Granting Pls.' Mot. for Leave to File
Supplemental Generic Expert ("Substitution Order") (D.E. 6807, Aug. 6, 2010); *see* § II, *infra*.

plaintiffs have failed yet again to produce an expert who offers permissible FDA regulatory testimony within the scope of her expertise. In addition to offering numerous inadmissible opinions in her expert report, Dr. Blume proved herself at deposition to be an uncontrollable witness whose testimony raises the same core concerns that led the Court to exclude Dr. Parisian. *See* Parisian Order, 709 F. Supp. 2d at 1351 ("Plainly stated, Dr. Parisian is an advocate, presented with the trappings of an expert but with no expectation or intention of abiding by the opinion constraints of Rule 702."). For example:

- *Failure to support opinions with regulatory analysis:* Dr. Blume frequently could not identify FDA regulations supporting her opinions without referencing dozens of binders accompanying her at deposition: "Q. Without going to get the whole book, can you tell me sitting here right now what provisions require that? A. No. And that's why these notebooks are all here." Deposition of Cheryl Blume, Ph.D. (July 21, 2011) 126:21-130:5 (Ex. B).[2] Other times, the standards she cited did not support her conclusion. *E.g., id.* 206:13-221:5.

- *Long, rambling advocacy instead of responsive, expert analysis:* Instead of directly answering whether FDA ever asked Bayer to update labeling based on mortality data, Dr. Blume advocates for plaintiffs' theory of the case: "Well, we do know what FDA did when they knew about mortality information, they immediately issued a public health advisory when they became aware of [i]3 on this issue and noted that they weren't aware of it prior to that. And then FDA requested additional information." *Id.* 280:4-18. After the third time being asked the same question, Dr. Blume finally acknowledged that FDA never requested updated labeling on mortality data. *Id.* 281:12-16.

- *Uncontrollable answers:* On multiple occasions, plaintiffs' counsel had to direct Dr. Blume to answer defense counsel's questions: "[Plaintiff's counsel]: Dr. Blume, wait one second. The question pending was where in Exhibit 12, the code, does it relate to the Medical Safety Overview, Exhibit 11." *Id.* 173:10-13.

*See* § I, *infra.* As with Dr. Parisian, this kind of advocacy presented under the guise of expertise, along with a practice of not responding to the questions that are asked, would not assist the trier of fact, would interfere with the efficient conduct of the trial and waste the Court's time, and should be excluded. Parisian Order, 709 F. Supp. 2d at 1339-45; Fed. R. Evid. 702, 401-403.

---

[2] Plaintiffs' counsel have informed defense counsel that Dr. Blume will not be reviewing her deposition transcript or submitting an errata sheet until after this brief is due. By the agreement of the parties, the parties will rely upon the final deposition transcript that already has been delivered by the vendor for purposes of *Daubert* motions.

Dr. Blume is a pharmacologist and toxicologist who never worked at FDA and has not worked in the pharmaceutical industry since 1998.  Blume Rep. ¶ 1; Blume Dep. 66:18-20.  For the past five years, Dr. Blume has testified for plaintiffs in products liability cases more than 50 times; she has never testified on behalf of a pharmaceutical company.  Blume Dep. 91:2-6; 95:3-98:6.  Despite the limits of her qualifications—and the fact that "everything [she] learned relating to Bayer's activities and Trasylol [she] learned as a result of this litigation," *id.* 138:2-4—Dr. Blume seeks to offer six broad opinions related to Bayer's alleged failure to conduct sufficient post-marketing studies and to provide adequate warnings.  Blume Rep. ¶¶ 4, 23, 34-39.

Numerous courts have excluded similar testimony from Dr. Blume, in whole or in part, because her opinions fail to meet the standards of Rule 702 and *Daubert*.  *See*, *e.g.*, *In re Prempro Prods. Liab. Litig.* (*Ingram v. Wyeth, Inc.*), No. 4:05-cv-00718, 2010 WL 5663003, at *2-3 (E.D. Ark. Sept. 16, 2010) (excluding Dr. Blume's and Dr. Parisian's proposed testimony because it "could only be a subjective opinion on what they believe Defendants *could have done* rather than what industry or governmental standards *require* them to do"); *In re Prempro Prods. Liab. Litig.* (*Laferrara v. Wyeth, Inc.*), No. 4:04-cv-02271, 2010 WL 5576305, at *2-3 (E.D. Ark. June 29, 2010) (same).[3]  The Court should likewise exclude her testimony here.

---

[3] *See Smith v. Pfizer Inc.*, No. 3:05-0444, 2010 WL 1963379, at *11 (M.D. Tenn. May 14, 2010) (excluding Dr. Blume's improper state-of-mind testimony, unreliable testimony, unduly prejudicial bad company-type opinions, and testimony based on subsequent remedial measures); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 962-67 (D. Minn. 2009) (excluding Dr. Blume's opinions about defendant's motives, foreign regulatory actions, regulatory chronology, speculation about what advertisements plaintiffs or their physicians may have seen, unreliable comparisons of adverse event reports, and adverse event reports for unrelated conditions); *Wright v. Am. Home Prods. Corp.*, 557 F. Supp. 2d 1032, 1037-38 (W.D. Mo. 2008) (excluding Dr. Blume's testimony about defendants' intent).

## ARGUMENT

Given their gatekeeping function, courts must ensure that expert testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  Plaintiffs bear the burden of establishing the admissibility of the expert testimony they propose.  *See*, *e.g.*, *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F. 3d 1227, 1232 (11th Cir. Sept. 4, 2009) ("The party offering the expert testimony has the burden of demonstrating" admissibility and "must show that the opinion meets the *Daubert* criteria . . . by a preponderance of the evidence.").

First, plaintiffs must show that the witness is "qualified as an expert by knowledge, skill, experience, training, or education" with regard to the topics of the proposed testimony. Fed. R. Evid. 702.  Second, plaintiffs must demonstrate that "the testimony is relevant to the task at hand." *Boca Raton*, 582 F. 3d at 1232 (internal quotation omitted); *see* Fed. R. Evid. 401-402.  The testimony must assist the jury to understand the issues but not "'usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'"  *Dubiel v. Columbia Hosp. (Palm Beaches) Ltd. P'ship*, No. 04-80283-CIV, 2005 WL 5955691, at *3 (S.D. Fla. Jan. 11, 2005) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).[4]  Third, plaintiffs must show that the expert's testimony is reliable.  *See*, *e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589.  The expert's testimony must be based on "good grounds," not "leaps of faith."  *Kilpatrick v. Breg, Inc.*, No. 08-10052, 2009 WL 2058384, at *3 (S.D. Fla. June 25, 2009).  Overall, in conducting this analysis, courts must ensure that the

---

[4] *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); *In re Rezulin Prods. Liab. Litig.* 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004) (*Daubert* precludes "engagement of 'expert' witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit").

proposed expert is applying the same "intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  Moreover, expert testimony should be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion, misleading the jury, undue delay, or waste of time.  *See* Fed. R. Evid. 403.

Dr. Blume's proposed testimony does not meet these standards.  First, because Dr. Blume has proven to be an uncontrollable witness who volunteers non-responsive answers, cannot cite relevant regulatory provisions without looking through dozens of binders of material, and testifies beyond the scope of the materials that she disclosed reviewing, her testimony should be excluded in its entirety because it would not assist the jury, would waste the Court's time, and would unfairly prejudice Bayer.  *See* § I, *infra*.  Second, portions of Dr. Blume's testimony are inadmissible under the Court's prior rulings.  Dr. Blume's testimony is constrained by (i) the Court's prior *Buckman* and Parisian Orders, which substantially limit the permissible areas of this witness's testimony, (ii) the scope of original experts' opinions, and (iii) plaintiffs' concessions in this litigation.  Substitution Order ¶¶ 1-2.  As detailed below, at a minimum, the Court should exclude the significant portion of Dr. Blume's testimony that violates these limitations.  *See* § II, *infra*.  Finally, by her own admission, Dr. Blume is not qualified to offer expert testimony on issues of medical causation, epidemiology, Bayer's internal standard operating procedures ("SOPs"), foreign regulatory action, or state-law standards.  *See* § III, *infra*.

## I.    DR. BLUME'S DEPOSITION CONDUCT DEMONSTRATES THAT SHE WOULD NOT BE A HELPFUL OR CONTROLLABLE WITNESS AT TRIAL.

Rule 702 requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see also* Fed. R. Evid. 401-403.  Rather than assisting in this manner, Dr. Blume's deposition conduct shows that, if permitted to testify at trial, she is likely to confuse the jury, waste the Court's time, and unduly prejudice

Bayer.  Indeed, Dr. Blume's testimony suffers from many of the same problems that led the

Court to exclude Dr. Parisian.  *See* Parisian Order, 709 F. Supp. 2d at 1345 (concluding that Dr.

Parisian "is not an appropriate witness" to provide FDA regulatory testimony in this case).

    ***Evasive answers and non-responsive commentary***.  Just as Dr. Parisian did, Dr.

Blume repeatedly provided non-responsive answers and long, rambling commentary not

confined to the question asked.  *See* Parisian Order, 709 F. Supp. 2d at 1339 (observing that Dr.

Parisian "retreated into obfuscation and referenced irrelevant FDA regulations while refusing to

answer questions").  For example, as noted above, in response to defendants' question about

whether FDA ever requested that Bayer change its labeling to reflect certain mortality data, Dr.

Blume evaded the question with several non-responsive answers before finally conceding that

the answer was "no":

> Q. Are you aware of any time, any time actually, ma'am, that the FDA requested that Bayer change its labeling to reflect different mortality data?

> A. Well, we do know what FDA did when they knew about mortality information, they immediately issued a public health advisory when they became aware of [i]3 on this issue and noted that they weren't aware of it prior to that.  And then FDA requested additional information.

> There was another advisory committee meeting in which they agreed to wait for the BART study.  And when the BART study came out with its data, the next step was that FDA asked that the product be discontinued in the United States.

> So I think we do have an idea of FDA's reactions to mortality data.

[Defense counsel]:  Move to strike the entire nonresponsive answer.  I'll ask my question again and I ask that you answer it, ma'am.

> Q. Are you aware of any time that FDA requested that Bayer change its labeling to reflect different mortality information?

* * *

> A. Well, I thought I answered it, but I guess the answer is when the FDA became aware of the mortality data, the product was largely discontinued from the market, so labeling issues became much less of a concern.

6

> Q.      Are you aware of any time that the FDA requested that Bayer change its labeling to reflect different mortality information?
>
> A.      No, because the product was removed from the market.

Blume Dep. 280:4-281:16.  In another illustrative exchange, for over six deposition transcript pages, Dr. Blume refused to concede that her conclusions about whether Bayer violated its own SOPs are not based on FDA regulations, before finally admitting that she is "not relying upon FDA making a statement on this."  *Id.* 126:21-132:25; *see id.* 178:16-179:3; 181:8-12; 191:18-192:20; 203:22-204:5; 304:6-24; 351:24-353:14.  Indeed, on several occasions, plaintiffs' counsel had to intercede to try to direct Dr. Blume to answer defendants' questions.  *E.g.*, *id.* 213:18-24 ("[Plaintiffs' counsel]:  But the question that's pending, Dr. Blume, is specifically the regulation as it relates to paragraph 74.  So we'll get to Strom, we'll get to, you know, CIOMS and PhRMA, but."); *see id.* 173:1-174:16; 214:23-216:12; 261:9-13.  In short, like Dr. Parisian, Dr. Blume is an unwieldy witness with no "expectation or intention of abiding by the opinion constraints of Rule 702."  Parisian Order, 709 F. Supp. 2d at 1351.

> ***Inability to answer questions without lengthy delays to search for support.***  Dr. Blume could not answer many basic questions within her supposed expertise without looking through volumes of binders of materials she brought with her.  The following exchange exemplifies the problem:

> Q.      Can you tell me the specific regulatory provision that requires—
>
> A.      Well—
>
> Q.      Let me finish my question—the development of standard operating procedures?
>
> A.      Well, that's definitely under [sections] 210 and 211.
>
> Q.      What part of those?
>
> A.      Well, there are a whole book of them, so if you want, I will go get the book and look up specifics.

> Q.     You're telling me you're the expert in the regulations.  Do you know—
>
> A.     And I told you that their procedures are in 210 and 211 that require you to have standard operating procedures.
>
> Q.     Without going to get the whole book, can you tell me sitting here right now what provisions require that?
>
> A.     No.  And that's why these notebooks are all here.

Blume Dep. 129:12-130:5; *see also id.* 130:12-16 (acknowledging that unless a question referenced a specific paragraph of her report she would "have to leave the room" and even with a paragraph reference she would need to "go to the notebooks that I prepared to avoid issues such as this and look up both regulations I have listed in there"); *id.* 174:12-16 ("Do we know where this is at in this notebook, because it is going to take me 10 minutes to go through here?"); *id.* 326:9-328:15 ("Okay.  I'll have to read a little bit of [the notebook], but I'll get to the answer.").

This type of non-responsiveness, delay, and distraction not only raises serious questions about the witness's expertise but also will waste time and confuse the jury.  *See* Fed. R. Evid. 702, 403; *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("Exclusion [of expert testimony] . . . is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury.").

*Lack of regulatory support for her opinions.*  Dr. Blume's testimony would not be helpful because she cannot support her opinions with relevant regulatory citations.  She resorts, instead, to obfuscation that would confuse the jury.  *See* Parisian Order, 709 F. Supp. 2d at 1340-41 (Dr. Parisian "often retreated to citing regulations that had marginal relevance to the issues being discussed" and citing examples from *Daubert* hearing).  For example, when asked what *regulation* supports her opinion that Bayer was obligated to conduct *studies* related to mortality risks in 2002, Dr. Blume cited seven different sources, not one of which was a

regulation that obligated Bayer to conduct studies.  Blume Dep. 206:13-221:5; *see also* § II.B.1, *infra*.[5]

> **Failure to disclose materials on which she is relying.**  Dr. Blume demonstrated an inability to follow either the rules about disclosing the basis for her opinions or plaintiffs' counsel's directives.  *See* Fed. R. Civ. P. 26(a)(2)(B) (standard for expert disclosures).  For example, although Dr. Blume's report purports to include a list of documents she reviewed in forming her opinions, Blume Rep. Appx. 3 at 60-86, Dr. Blume repeatedly refused to confirm that she disclosed all materials on which she relied:

> [Defense counsel]:  In fact, we asked this before, [Plaintiff's counsel], and Dr. Blume confirmed in E-mail correspondence that what's listed here is the entirety of what she's relying on.

> [Plaintiffs' counsel]:  Correct.

> [Defense counsel]:  So now she's telling me that there are others.

> [Dr. Blume]:  Yeah, there are.

Blume Dep. 168:19-169:1; *see also id.* 30:25-32:8; 39:5-41:20; 201:5-202:19.  Such expert nondisclosure is improper and unfairly prejudicial.  *See* Parisian Order, 709 F. Supp. 2d at 1339 (critiquing that Dr. Parisian "considered evidence and formed new opinions the night before the *Daubert* hearing").  Moreover, as detailed below, Dr. Blume repeatedly testified beyond the scope of plaintiffs' counsel's directives on *Buckman* issues.  *See* § II.A, *infra*.

> Because she has proven to be an uncontrollable and unhelpful witness, Dr. Blume's testimony should be excluded in its entirely.  *See*, *e.g.*, Tr. of Dr. Parisian *Daubert* Hr'g

---

[5] Dr. Blume cited (1) 21 C.F.R. §§ 201.56 and 201.57 (*labeling* regulations); (2) the PhRMA Code; (3) Brian Strom's textbook; (4) FDA guidance documents; (5) FDA Form 356-H, which is the New Drug Application form; (6) 21 C.F.R. § 314.80(b), (c), and (d) (post-marketing *reporting* requirements for adverse drug experiences); and (7) 21 C.F.R. § 314.7, which she quickly conceded did not contain "anything directly applicable," Blume Dep. 206:13-221:5.

("Parisian *Daubert* Tr.") (Apr. 13, 2010) 168:4-6 ("there's a problem with figuring out exactly what she plans to say to a jury, which causes me real concern") (excerpts at Ex. C).

## II.   THE COURT SHOULD EXCLUDE DR. BLUME'S TESTIMONY THAT EXCEEDS THE SCOPE OF THE COURT'S PRIOR ORDERS, PRIOR EXPERT DISCLOSURES, AND PLAINTIFFS' CONCESSIONS.

At a minimum, substantial portions of Dr. Blume's testimony should be excluded under the Court's prior rulings.  After extensive briefing and consideration, the Court already has restricted the scope of plaintiffs' replacement expert's testimony in this litigation.  *See* Substitution Order ¶¶ 1-5.  Thus, Dr. Blume may not offer opinions that conflict with "the Court's previous Parisian and *Buckman* Orders" or "expand upon or conflict with the scope of the original expert's documented opinions and Plaintiffs' concessions regarding those opinions." *Id.* ¶¶ 1-2.  Dr. Blume's proposed testimony violates these limits in numerous respects.

### A.   Dr. Blume's Testimony Should Be Excluded Under The *Buckman* Order.

Dr. Blume's testimony contravenes the Court's *Buckman* Order, which held that "evidence or testimony that Bayer failed to adequately or timely provide information to the FDA pursuant to FDA reporting obligations that run to the FDA . . . is generally irrelevant to Plaintiffs' state-law claims and thus inadmissible."  763 F. Supp. 2d 1312, 1331 (S.D. Fla. 2010); *id.* at 1330 ("the FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with its provisions."); *see also* Bayer's Mot. to Exclude Testimony of Pls.' Expert Suzanne Parisian, M.D. (D.E. 3065, Dec. 17, 2009) ("Parisian Mot.") at 14-15 (citing cases).

Although plaintiffs' counsel acknowledged these limitations at deposition, Dr. Blume refused to be deterred from offering such testimony:

> [Plaintiffs' counsel]:  . . . nowhere in this report does Dr. Blume state that there was a failure to provide specific information to the FDA.  That's not her opinion, that's not what she's going to be testifying about today, and I'm concerned that that type of

question would evoke—could evoke testimony that's inconsistent with what her state of opinions are going to be.

[Defense counsel]:  Okay.  Well, to respond to that first, I don't think your statement is accurate, but—but we can clear that all up now.

BY [Defense counsel]:

Q.      Dr. Blume, are you going to be offering any opinion in this litigation that Bayer failed to provide information to the FDA that it should have provided to the FDA?

A.      With respect to the IND?

Q.      No.  With respect to anything.

A.      I think the report suggests—not suggests.  My report indicates that certain studies were not provided to the FDA.

Q.      Okay.

A.      And that would be long past the IND stage.

*Id.* 143:23-144:21; *see also* Blume Dep. 219:9-12 ("[Defense counsel]:  Reporting requirements to the FDA, I thought, [Plaintiffs' counsel], you had said that's not going to be a subject of her testimony.  [Plaintiffs' counsel]:  That's correct.").

Moreover, the Court has held that plaintiffs and their experts may not speculate about what FDA may have done had data been disclosed differently to the agency.  *Buckman Order*, 763 F. Supp. 2d at 1330.  Indeed, plaintiffs' counsel previously conceded that their experts cannot speculate about what FDA may have done if Bayer had provided the information plaintiffs claim it withheld, *see* Pls.' Opp. to Defs.' Mot. *in Limine* to Exclude Evidence, Testimony, and Argument Alleging that Bayer Provided Inadequate or Incomplete Data to Federal Food and Drug Administration (D.E. 4240, Feb. 12, 2010) at 2, 9 ("Plaintiff[s] agree that speculation about FDA actions would be inappropriate."), and Dr. Blume is bound by that concession, *see* Substitution Order ¶ 1.  Despite the Court's order and plaintiff's counsel's acknowledgment of these limitations, Dr. Blume's report and deposition contain multiple

11

opinions that are inadmissible under the *Buckman* Order.  For example, Dr. Blume seeks to speculate that "[b]ased likely at least in part on the incomplete data provided to them by Bayer . . . the Advisory Committee did not require action."  Blume Rep. ¶ 62.  But "[t]his kind of speculation and second-guessing would intrude upon the FDA's right to police a violation of the reporting requirement itself and would violate the principles laid out in *Buckman*."  *Buckman* Order, 763 F. Supp. 2d at 1330.

Similarly, Dr. Blume claims that Bayer withheld safety information from FDA and violated unidentified "reporting standards" by failing to submit this information to the agency:

> Q.   Are you claiming that Bayer was required to report the fact of the Italian marketing suspension to the FDA and that Bayer violated FDA regulations and guidances by not doing so?
>
> A.   Yes.  I could not find where the suspension was provided in the documents that I had to the FDA, and anything relating to the safety of your product, and the actions taken in foreign countries that relate to the safety of your product, be it chemical or physiological or patient safety, is to be reported to the FDA.  And I couldn't find it in their—in the documents relevant to the time periods that this was occurring in Italy.

Blume Dep. 334:18-335:5.  Further, she proposes to testify that Bayer failed to submit data from scientific studies to FDA in a timely manner:  "As I recall, that was in 2006 for data that were available in 2003, so I guess in addition to [i]3, I would add the studies [that] have been called the Kress and Stone study, and the Treasure study, St. George Hospital study, I would add those, that FDA did not receive those."  *Id.* 160:20-161:11.  This improper testimony also appears repeatedly throughout her report:  "Although the final version of this unpublished study [the Treasure Study] was dated December 11, 2003, it was not submitted to the FDA until nearly three years later (November 2006) following Bayer's admission that they failed to provide information from the i3 Drug Safety (Ingenix) study to the FDA Advisory Committee."  Blume

12

Rep. ¶ 54; *see also id.* ¶¶ 49, 53, 63-66 (improper failure to report opinions).

These opinions and others like them are precluded by the *Buckman* Order.  *See* 763 F. Supp. 2d at 1330.

> **B.      Dr. Blume's Testimony Should Be Excluded Under The Parisian Order.**

Applying *Daubert* principles, the Court's Parisian Order excluded multiple, related categories of expert testimony that Dr. Blume now seeks to offer, including: (1) conclusions that are not tied to regulatory analysis; (2) factual narratives and summaries of internal Bayer documents; (3) speculation about Bayer's and FDA's knowledge, state of mind, motive, or intent; (4) personal "bad company" opinions; and (5) opinions related to foreign regulatory actions.  Parisian Order, 709 F. Supp. 2d at 1336-47.  This testimony is inadmissible.  Under the Parisian Order, Dr. Blume's pseudo "industry standards" opinions also should be excluded.

> **1.      Dr. Blume may not offer conclusions that lack expert analysis.**

Expert testimony that is not tied to meaningful standards or analysis is unreliable and should be excluded.  Parisian Order, 709 F. Supp. 2d at 1347-50 (finding opinions unreliable because Dr. Parisian could not adequately explain her analysis or methodology).  As noted above, significant aspects of Dr. Blume's testimony suffer from the same "lack of analysis or connection between the facts and the opinions," rendering them unreliable and, therefore, inadmissible.  *Id.* at 1350; *see Kaufman v. Pfizer Pharms., Inc.*, 1:02-cv-22692, slip op. at 12 (D.E. 269) (S.D. Fla. Aug. 4, 2011) (expert "must explain *how* her experiences led to the conclusions she reached, *why* her experiences are sufficient bases for her opinions, and how her experiences are *reliably applied* to the facts of the case") (Ex. D).

Dr. Blume's legal conclusions that Bayer violated the FDCA and FDA regulations are not grounded in expert analysis and therefore should be excluded.  Parisian Order,

709 F. Supp. 2d at 1349 ("Dr. Parisian does not analyze the facts under this regulation to arrive at Opinion # 10."); *id.* ("On the rare occasion where Dr. Parisian states that Bayer violated a specific regulation with some specific action, she fails to explain why that regulation was violated.").  Instead, like Dr. Parisian, Dr. Blume "generally takes a collection of facts, imputes motive and knowledge and draws unsupported conclusions unrelated to any regulatory expertise." *Id.* at 1347.  For example—in an opinion also barred by the Court's *Buckman* order, *see* § II.A., *supra*—Dr. Blume opines that Bayer's failure to publish the Kress study or to submit that study to FDA violated FDA regulations, but she does not explain *how* those regulations required Bayer to publish or submit that particular study.  Blume Rep. ¶ 53; *see also id.* ¶¶ 54, 62 (opining, without supporting analysis, that Bayer's failure to provide safety data to FDA violated FDA regulations).  Similarly, her opinion that Bayer's failure to update Trasylol's labeling in 2002, based on a scientific study that did not reach any conclusions specific to Trasylol, violated FDA regulations lacks any explanation as to what the cited regulations require or how Bayer's conduct violated them.  *Id.* ¶ 50; *see also id.* ¶ 60 (opining, without supporting analysis, that Bayer's failure to update Trasylol's labeling violated FDA regulations).  In addition, Dr. Blume's opinions that Bayer violated the FDCA and FDA regulations should be excluded on the independent ground that they are improper legal conclusions.[6]

Dr. Blume's opinions about Bayer's supposed "failure to study" Trasylol, *e.g.*, *id.* ¶¶ 36, 38, 74, 76, 85, similarly lack expert analysis and are unreliable.  For example, citing several PhRMA documents, Dr. Blume opines that it was "not appropriate for Bayer to have

---

[6] *See* Parisian Mot. at 12-14 (citing cases excluding expert testimony on legal conclusions); *Dubiel v. Columbia Hosp.*, No. 04-80283, 2005 WL 5955691, at *4 (S.D. Fla. Jan. 11, 2005) (Middlebrooks, J.) ("Generally, testimony that purports to offer legal opinions is properly excluded."); *Rezulin*, 309 F. Supp. 2d at 541 (experts may not "communicate 'a legal standard—explicit or implicit—to the jury'").

merely waited for the design, execution and finalization of the BART study," but that it "should have also conducted a prospective study in the U.S. utilizing the indicated populations." *Id.* ¶ 74. She fails, however, to explain how the supposed standards she cites required Bayer to conduct any post-marketing studies, let alone a prospective U.S. study on mortality risks.  None of her "failure to study" opinions is based on relevant FDA regulations or citable standards, Blume Dep. 206:13-221:5, and Dr. Blume fails to provide the analytical connection between the facts and her conclusions as *Daubert* requires.  *See* Parisian Order, 709 F. Supp. 2d at 1349 n.34 ("Dr. Parisian does not discuss any specific regulations and does not explain in any way how or why Bayer failed to adequately test and monitor the safety of Trasylol administration").

Similar testimony by Dr. Blume was excluded by another MDL court on these same grounds.  *See Prempro* MDL, 2010 WL 5663003, at *2-3.  The *Prempro* MDL court held that Dr. Blume failed to "point to the existence of a reasonable standard of care or a custom and practice established by either industry or governmental standards regarding Defendants' duty to test."  *Id.* at *2.  The court reasoned that, because "there is no set standard" by which to evaluate defendant's conduct, Dr. Blume "simply would be providing [her] own subjective beliefs about what could have been done."  *Id.* at *3.  Because her opinions are not grounded in any objective standard, they are not based on "good grounds" and should be excluded.  *Id.* at *3 (citing *Daubert*, 509 U.S. at 591).

**2.    Dr. Blume may not offer factual narratives or summarize documents.**

Instead of offering legitimate expert analysis, Dr. Blume attempts to support many conclusions with factual narratives and summaries of Bayer documents that invade the province of percipient witnesses and the jury.  Parisian Order, 709 F. Supp. 2d at 1346;

*In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d at 967 (excluding Dr. Blume's factual narrative testimony); Parisian Mot. at 10-11 (citing cases).

   For example, Dr. Blume seeks to testify that Bayer did not disclose preliminary results of the i3 study at the 2006 Advisory Committee meeting and that Dr. Alexander Walker requested that Bayer submit that preliminary data to FDA.  Blume Rep. ¶ 65; *see also id.* ¶¶ 25-33 (overview of Trasylol history); ¶¶ 61-72 (factual summary of 2006 and 2007 FDA Advisory Committee meetings).  Even if such testimony could survive the Court's *Buckman* Order (and it cannot), Dr. Blume was not a percipient witness to these events and her testimony requires no regulatory analysis.  Therefore, it is nothing more than an improper factual narrative and advocacy, and should be excluded.  *See* Parisian Order, 709 F. Supp. 2d at 1346 ("Dr. Parisian assumes the role of Plaintiffs' advocate in her presentation of the facts and invades the province of the jury."); *Rezulin* MDL, 309 F. Supp. 2d at 554 (expert's testimony based on "in-house documents, memos and emails" constitutes "no more than 'arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language'").  Dr. Blume also proposes to summarize a document containing a November 1992 statement from Dr. Bertram Pitt, a Bayer consultant, and to tell the jury that Dr. Pitt "did not believe the potential benefits of the drug outweighed the risk."  Blume Rep. ¶ 41.  Dr. Blume has no personal knowledge of Dr. Pitt's alleged beliefs about Trasylol and no expertise is required to read this document to the jury.  *See* Blume Dep. 224:5-10 (admitting she has never spoken to Dr. Pitt); Parisian Order, 709 F. Supp. 2d at 1347 ("expertise is not required to present the factual narrative to the jury").  Because none of the factual testimony offered by Dr. Blume requires specialized knowledge, it is not proper expert testimony and should be presented—if otherwise relevant and

admissible—"to the jury directly."  Parisian Order, 709 F. Supp. 2d at 1346-47; *see* Blume Rep. ¶¶ 40-48; 63-73; 78-81; 87-94 (narrative of Trasylol's regulatory history).

### 3. Dr. Blume may not speculate about Bayer's or FDA's knowledge or intent.

Dr. Blume's testimony about Bayer's or FDA's knowledge, state of mind, motive, or intent—whether based on speculation or her subjective interpretation of documents—also is inadmissible under the Parisian Order.  709 F. Supp. 2d at 1337-38, 1346-47 (excluding testimony that "does nothing more than rely on Bayer's internal documents to improperly opine on Bayer's motive"); *id.* at 1338 ("(corporate) intent or motive is a classic jury question and not one for experts"); *see Smith*, 2010 WL 1963379, at *11 (same); *Wright*, 557 F. Supp. 2d at 1037-38 (same); Parisian Mot. at 17-18 (citing cases excluding state of mind testimony); *see also* § II.A., *supra*.[7]

Although Dr. Blume ostensibly conceded at her deposition that she "will not be a mind reader," Blume Dep. 115:2-116:17, her report and deposition testimony prove otherwise. For example, Dr. Blume proposes to speculate that Bayer knew that an observational study of Trasylol could have been conducted before the i3 study in 2006:

> Q.   But the documents that you say allegedly show that Bayer knew that an observational study could have been rapidly implemented and completed, those are documents from 2006?
>
> A.   Well, yes, because that's what they choose to look at, the Premier database.  But my comment is those type of databases were openly available and employed by pharmaceutical industries *[sic]* companies as early as 1979.  They just chose to wait until that late.  But the databases very similar to Premier had been available decades earlier.

---

[7] Plaintiffs' counsel also have conceded that their experts may not opine about Bayer's or FDA's states of mind, motive, or intent.  *See* Substitution Order ¶ 1; Pls.' Opp. to Bayer's Mot. to Exclude Testimony of Pls.' Expert Suzanne Parisian ("Parisian Opp.") (D.E. 3841, Jan. 26, 2010) at 22; Pls.' Opp. to Bayer's Mot. to Exclude Testimony of Pls.' Expert Curt D. Furberg ("Furberg Opp.") (D.E. 3985, Jan. 29, 2010) at 17-18.

> Q.      You have no basis, ma'am, to say that anyone from Bayer knew how long an observational study of Trasylol would have taken at any point before 2006?
>
> A.      Well, the same types of databases were available decades earlier.

*Id.* 229:16-230:6.  Dr. Blume repeatedly speculates about Bayer's supposed knowledge.  *See id.* 308:7-309:3 ("A. [Data] w[ere] known to Bayer.  Q. And that's on the basis of your review of documents in this case.  Correct? A. Yes.  Q. Have you ever spoken to anybody at Bayer about that issue?  A. Oh, no.  It was only based upon my review of the E-mails back and forth between Bayer and Dr. Lesserson.").[8]  Dr. Blume also proposes to infer FDA's intent from a guidance document, which she agreed was "something that anybody can read."  *Id.* 116:18-117:9.

Dr. Blume's speculation about Bayer's and FDA's knowledge and purported motivations is inadmissible because it has no grounding in expertise, and her personal opinions based on a subjective interpretation of documents invade the province of the jury.  *See* Parisian Order, 709 F. Supp. 2d at 1347 ("she has no expertise that allows her to infer Bayer's and the FDA's knowledge and intent and present those inferences to the jury"); *id.* at 1346 ("[t]he jury can infer intent from this evidence directly").[9]  Accordingly, it should be excluded.

---

[8] *See*, *e.g.*, Blume Dep. 223:13-224:4 ("I believe that your client was on notice before Mangano's 2002 that mortality might be a concern with the product"); *id.* 277:7-9 ("Well, they knew it earlier than that.  I think Linda Shore, Lesserson, and the depositions indicate that it was actually known in 2003 or 2004."); Blume Rep. ¶ 51 (opinion that "Bayer advocated the publication of manuscripts authored by Drs. Royston and Spiess to 'counterbalance the Mangano effect'" improperly speculates about motive).

[9] *See Kaufman*, slip op. at 17 n.8 (excluding "conclusory opinions regarding Defendants' knowledge and state of mind" that are "[b]ased solely on her interpretation of Defendants' internal documents"); *Rezulin* MDL, 309 F. Supp. 2d at 546-47 (excluding expert's conclusions about intent because he merely "drew simple inferences from documents produced in discovery," which a jury can do without his help).

### 4.       Dr. Blume may not offer personal "bad company" testimony.

More generally, Dr. Blume also seeks to offer a number of personal opinions, not based on FDA regulations or other knowable standards, in an attempt to cast Bayer in a negative light before the jury.  These personal opinions should be excluded.  Parisian Order, 709 F. Supp. 2d at 1337-39 (excluding improper references to personal "bad company" opinions); *see also Smith*, 2010 WL 1963379, at *13 (excluding Dr. Blume's personal opinions as unduly prejudicial); Parisian Mot. at 19-20 (citing cases excluding personal opinion testimony).

For example, Dr. Blume refers to clinical trial data supporting Trasylol's NDA and opines, without citation to or analysis of relevant regulations or standards, that "[g]iven this, Bayer should have been more vigilant in their post approval surveillance activities."  Blume Rep. ¶ 42.  The Court excluded a similar opinion by Dr. Parisian (who sought to testify that alleged underreporting of adverse event reports increased Bayer's responsibility to test and monitor Trasylol and update physicians) because that testimony "is not based on any standard and amounts to no more than Dr. Parisian's personal opinion."  709 F. Supp. 2d at 1338-39.  *See also* Blume Rep. ¶ 103 (opining, without grounding in any standard, that Bayer "diluted" Trasylol labeling).  These types of conclusory opinions have no foundation in expertise; as merely personal opinions, they should be excluded.  *See In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) ("Opinion given through the mouth of an expert does not necessarily make it *expert* opinion.").

### 5.       Dr. Blume May Not Offer Pseudo "Industry Standard" Opinions.

Under the express limits set out in the Parisian Order, *see* § II.B.1-4, *supra*, Dr. Blume's opinions that Bayer's testing and labeling of Trasylol violated supposed "industry

standards"—including documents published by the Pharmaceutical Research and Manufacturers of America ("PhRMA") and the Council for International Organizations of Medical Sciences ("CIOMS")—should be excluded as unreliable.[10]  *See* Parisian Order, 709 F. Supp. 2d at 1337-39.  At her deposition, Dr. Blume could not articulate a valid basis for asserting that the PhRMA Code, PhRMA website, or CIOMS documents establish "industry standards."  *See* Blume Dep. 169:14-170:10; 174:24-175:23; 184:21-195:14.  Membership in these organizations is voluntary, and Dr. Blume does not contend that the alleged standards are binding on pharmaceutical manufacturers.  *Id.* 179:5-23.  She merely asserted that these documents were published by organizations composed of pharmaceutical manufacturers and her personal belief that, as members, companies *should* adhere to the general principles in the documents.  *Id.* 174:24-177:19; 184:21-187:11; 191:13-195:14.  With respect to one such document (*i.e.*, a question and answer document posted on a website, *see* Blume Dep. Ex. 13), Dr. Blume could not meaningfully identify any industry standard:  "I don't know if I would call [Exhibit 13] an industry standard.  I guess in the loosest sense it would be an industry—it would be an agreed-upon industry adaptation in how to instruct patients how to take medicine."  Blume Dep. 185:13-186:9.

This is unsurprising because the documents on which Dr. Blume relies do not support her opinions and, in any event, do not provide specific benchmarks by which to evaluate conduct.  *See Prempro* MDL, 2010 WL 5663003, at *3.  Many of the PhRMA documents she relies on as "industry standards" are background materials downloaded from the organization's

---

[10]  *E.g.*, Blume Rep. ¶ 11 (invoking "industry standards"); *id.* ¶ 50 (opining that "labeling changes were not effected in violation of industry standards"), *id.* ¶ 54 (opining that "[f]ailure to provide safety data violates industry standards"); Blume Dep. 169:14-181:12; 185:3-195:14; 237:21-242:14 (testifying that PhRMA Code and website documents and CIOMS documents are industry standards and providing opinions based on these documents).

website that do not even purport to set standards of conduct.  For example, Dr. Blume cites a PhRMA website document entitled "Health Questions FAQ Archive," Blume Dep. Ex. 13, as support for her conclusory opinion that "Bayer should have been proactive in evaluating and corroborating" a safety signal related to the alleged "mortality effects of Trayslol."  Blume Rep. ¶ 76.  But this document, which provides general information to patients about taking medication, does not address a pharmaceutical company's obligations to conduct post-marketing studies or set standards for when such studies must be done.  Blume Dep. Ex. 13.

At her deposition, Dr. Blume acknowledged the PhRMA Code is drafted in a "broad fashion."  Blume Dep. 175:14-15.  Unlike regulatory provisions that communicate clear, defined metrics by which to evaluate conduct, the supposed "industry standards" on which Dr. Blume relies speak generally in terms of goals companies should aspire to achieve.  For example, Dr. Blume opined that the PhRMA Code requires companies "to get information out regarding the safety of [thei]r product and [] to do studies . . . that aren't just restricted to marketing studies."  *Id.* 175:16-20.  This is not an "industry standard" against which meaningful conclusions can be drawn, and Dr. Blume's opinions based on such language are, therefore, merely personal opinions that are unreliable and unhelpful to assist the trier of fact.  *See Kaufman*, slip op. at 15-16 (critiquing that "Plaintiff attempts to extract a testing *mandate* from a standard that addresses only how manufacturers *should* represent and market their products.") (emphasis added).

The *Prempro* MDL court excluded just this kind of testimony from Dr. Blume, finding her reliance on such documents "would likely cause confusion, undue prejudice, and delay," and that, without an established industry standard, Dr. Blume "would only be able to subjectively testify about what companies *could* do by way of the testing rather than what

Defendants were required to do." *Prempro* MDL, 2010 WL 5663003, at *2; *see also Kaufman*, slip op. at 15-16 (excluding reliance on such documents for her testing opinion because they "do[] not mandate that drug manufacturers undertake testing"). Because Dr. Blume's testimony here is based on her own subjective beliefs, the Court should exclude it.

In addition, Dr. Blume's "industry standards" opinions should be excluded because they exceed the documented opinions of Dr. Parisian and Dr. Furberg. Substitution Order ¶ 1; *see also* PTO No. 6 (D.E. 268, Sept. 19, 2008) at III.C (case-specific experts may not offer testimony that is "broader than testimony of Generic Experts permitted by the MDL Court" or "introduce[s] any new theories or additional bases for the opinions of the Generic Expert"). Neither Dr. Parisian nor Dr. Furberg offered opinions based on the supposed industry standards on which Dr. Blume relies. Dr. Parisian expressly denied that she was offering opinions about these supposed industry standards. *See* Parisian *Daubert* Tr. 116:9-117:19 ("Q. Does [your expert] report anywhere have any discussion of what the industry standards are in connection with the way Bayer handled Trasylol? A. No, sir."). And, although Dr. Furberg's testimony included a few passing references to his own personal, undefined "industry standards," he never cited the PhRMA Code or website, CIOMS documents, or other ascertainable industry standards in reaching his opinions. *See* Furberg Report ¶ 29(j) (referencing "accepted industry standards" without elaboration or citation to the source or content of any supposed standard) (excerpts at Ex. E); Furberg Dep. 165:14-18 ("I think industry standards are if you see a signal you take action, the sponsors are taking action, and not just put it in a back stack of papers to send to the FDA.") (excerpts at Ex. F).

6.      **Dr. Blume may not testify about foreign regulatory actions.**

Finally, Dr. Blume's opinions related to foreign regulatory actions also are inadmissible.  *See generally* Parisian Order, 709 F. Supp. 2d at 1336; *see also In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d at 965-66 (excluding Dr. Blume's foreign regulatory testimony).  Dr. Blume's proposed testimony about the actions of the Italian regulatory authorities, Blume Rep. ¶ 49 (discussing marketing suspension in Italy in 1998); Blume Dep. 334:3-341:7 (same); Blume Rep. ¶ 98 (noting two reports of safety data provided to foreign regulatory authorities), should be excluded because:  (1) she has no knowledge of or expertise in Italian regulatory proceedings, *see* § III.B., *infra*, and (2) the conclusion she draws from the discussion—that Bayer's failure to report the Italian marketing suspension to FDA violated FDA regulations—contravenes the *Buckman* order, *see* 763 F. Supp. 2d at 1330; § II.A, *supra*.

* * * *

Thus, under the Court's Parisian Order, Dr. Blume's conclusory opinions lacking regulatory analysis, her factual narratives, her speculation about knowledge and intent, her merely personal opinions, her pseudo industry standards testimony, and her testimony about foreign regulatory matters are not permissible and should be excluded.  *See* Parisian Order, 709 F. Supp. 2d at 1336-47; Substitution Order ¶ 2.

## III.    THE COURT SHOULD EXCLUDE DR. BLUME'S TESTIMONY ON MATTERS ABOUT WHICH SHE LACKS EXPERTISE.

Even assuming she were qualified to offer otherwise admissible testimony about FDA regulatory standards, Dr. Blume is not qualified to address four topics that encompass significant parts of her proposed testimony:  (1) medical causation and epidemiology; (2) Bayer's internal standard operating procedures ("SOPs"); (3) foreign regulatory standards; and (4) state-law standards.  Her opinions in these areas should be excluded.  *See* Fed. R. Evid.

702 (witness must be "qualified as an expert by knowledge, skill, experience, training, or education" about the proposed testimony); *Dura Auto. Sys. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2001) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  This would not be responsible science.").

     A.     **Dr. Blume Lacks Expertise To Give Medical Causation Or Epidemiological Opinions About Trasylol.**

Although Dr. Blume is not qualified to give opinions about medical causation and epidemiology, *see infra*, many of her opinions, particularly about labeling issues, contain embedded conclusions about these matters.  These opinions should be excluded.  *See* Parisian Order, 709 F. Supp. 2d at 1336-37 (excluding opinions on study findings and Trasylol's alleged health risks because "Dr. Parisian is neither a causation expert nor an epidemiologist").

Dr. Blume is not a medical doctor, and she is not an expert in nephrology, epidemiology, biostatistics, or causation issues.  Blume Dep. 105:24-107:7; 109:13-112:9; 114:12.  She has never performed open heart surgery, prescribed Trasylol (or any other medication), or diagnosed or treated a patient, including individuals with renal impairment or requiring dialysis.  *Id.* 106:16-18; 107:14-108:22; 134:24-135:2.  She has never worked at FDA or served on an FDA Advisory Committee.  Blume Rep. Appx. 1 at 49.  And, although Dr. Blume claims that "epidemiology is a part of [her] life," she admits that she does not serve as an expert in epidemiology, always enlists the opinion and help of a trained epidemiologist in her work, and would defer to an epidemiologist on "the adequacy, perhaps, or the construction and design of the study, [and] the findings" of studies.  Blume Dep. 109:13-113:10.

Despite these acknowledged limitations, Dr. Blume seeks to offer extensive opinions about the implications of scientific studies related to Trasylol, including whether such findings medically warranted changes to Trasylol's labeling.  *E.g.*, Blume Rep. ¶ 64

("The i3 data suggested an increased risk of death associated with aprotinin use in patients undergoing CABG surgery."); *id.* ¶ 75 ("In 2002, Bayer needed to amend the professional labeling as soon as it was apparent that Trasylol potentially increased mortality in CABG patients."); *id.* ¶ 85 ("[T]he various labeling iterations should have provided accurate reflections of the true renal risks of Trasylol.").  At her deposition, Dr. Blume conceded that the regulatory provisions she relies on for her labeling opinions—21 C.F.R. §§ 314.7(c)(6)(iii), 201.57(c)(6)—require a causal analysis to be performed before determining whether labeling should be changed.  Blume Dep. 273:2-274:18 (agreeing "some type of causal association analysis" must be performed).  Even assuming Dr. Blume could properly identify FDA's regulations and explain how they operate as a regulatory matter—a task she proved unable to accomplish at her deposition without referencing dozens of binders of materials, *see* § I, *supra*—Dr. Blume still would not be qualified to give the causation opinions necessary to bridge the analytical gap between these standards and her conclusions.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  In other words, even if Dr. Blume can identify the relevant regulatory standard regarding labeling changes, she is not qualified to opine about whether or not that regulatory standard required such changes.  Making that connection requires expertise in the areas of medical causation and epidemiology that Dr. Blume lacks.  As a result, her causation and epidemiology opinions—whether they are stated directly or embedded in her opinion that labeling changes were required—should be excluded.

### B.     Dr. Blume Lacks Expertise To Give Opinions Based On Bayer's Internal SOPs.

Dr. Blume acknowledges that she does not consider herself "an expert in Bayer's standard operating procedures."  Blume Dep. 124:6-8.  She nevertheless seeks to opine that

Bayer did not comply with these internal procedures. *E.g.*, Blume Rep. ¶ 34 ("Bayer failed to comply with . . . internal procedures in their post-launch regulatory responsibilities relating to Trasylol."); *id.* ¶ 60 (failure to modify Trasylol labeling "was inconsistent with . . . Bayer's own internal policies"). This testimony should be excluded. Dr. Blume has never worked for Bayer, provided consulting services to Bayer, developed, drafted, or enforced a Bayer SOP, or discussed Bayer's internal procedures with any company employees. Blume Dep. 122:4-124:8; 126:6-12. Rather, Dr. Blume's experience with Bayer's SOPs is limited to reading Bayer's SOPs after being retained as an expert witness in this litigation and discussing them with plaintiffs' counsel. *Id.* 124:21-126:13-20. Such litigation-driven opinions are inherently suspect. *See Kumho Tire Co.*, 526 U.S. at 152 (requiring expert to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (evaluating "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of litigation").

Moreover, because her knowledge of Bayer's SOPs is limited to what she gleaned from reading them—something jurors are equally capable of doing—she fails to bring the requisite specialized knowledge in offering these opinions. *See Parisian Order*, 709 F. Supp. 2d at 1346. By her own admission, these opinions are merely factual conclusions based on her review of Bayer documents and do not require regulatory analysis:

> Q.    With respect to that conclusion, that opinion that Bayer failed to comply with its internal procedures, okay, that factual conclusion that you're making, that's not based on any FDA regulation. Correct? That's based on your reading of the internal procedure and then your own opinion about whether Bayer followed it or not. Correct? . . .

26

A.      Yeah.  It's part—yes.  It is—I am not relying upon FDA making a statement on this.  I'm relying on my review of the records and what the industry standards are relating to this.

Blume Dep. 132:13-25.  Because these opinions are not grounded in any specialized knowledge or experience, but are based instead on factual matters about which Dr. Blume lacks personal knowledge, they should be excluded.

**C.      Dr. Blume Lacks Expertise To Opine About Foreign Regulatory Matters.**

Dr. Blume also seeks to testify about foreign regulatory standards that are beyond her expertise.  *E.g.*, Blume Rep. ¶¶ 49, 98; Blume Dep. 333:25-341:7.  Dr. Blume has never worked for a foreign regulatory authority and concedes that she is not an expert on foreign regulatory matters.  *Id.* 138:20-22; 140:22-141:18.  Given this lack of training and experience, Dr. Blume is not qualified to make inferences or to draw conclusions for the jury's consideration based on foreign regulatory standards and this testimony should be excluded.  *See* § II.B.6, *supra* (describing Dr. Blume's improper foreign regulatory testimony); *see* Parisian Order, 709 F. Supp. 2d at 1336 (excluding Dr. Parisian from opining on foreign regulatory actions; she "conceded that she is not an expert in this area").

**D.      Dr. Blume Lacks Expertise To Opine About State-Law Standards.**

Perhaps recognizing the significant problems with her proposed regulatory standards testimony described above, on the morning of her deposition, Dr. Blume notified Bayer that she was making a change to her expert report to state that she is seeking to offer opinions that equate alleged "industry standards" to a "standard of care that is expected of pharmaceutical companies."  Blume Dep. at 162:21-167:22 (changing report to state that "Industry standards, such as those set forth by [PhRMA], . . . describe the standard of care that is expected of pharmaceutical companies.").  As explained above (§ II.B.5), her opinions about Bayer's labeling and testing of Trasylol based on supposed pharmaceutical industry standards are

unreliable and should be excluded.  To the extent she seeks to opine about state-law standards of care to fill this void, she cannot offer such testimony because she is not qualified to do so. Indeed, Dr. Blume conceded at her deposition that she has no expertise on the standard of care required under the laws of any state, and she confirmed that she was not offering opinions that Bayer violated any state-law standard of care.  Blume Dep. 119:13-122:2.  Because she may not base her conclusions on the standard of care required under any state law, her testimony on these ultimate issues lack foundation, and also would constitute improper legal conclusion (§ II.B.1). Moreover, vague references to a "standard of care"—when she has no knowledge or expertise about any governing state-law standard of care—would simply confuse the jury and prejudice Bayer and should, therefore, be excluded.  *See* Fed. R. Evid. 403.

## CONCLUSION

For these reasons, the Court should exclude Dr. Blume's proposed testimony.

## RULE 7.1(A)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(A)(3)(a), counsel for defendants hereby certify that counsel for the defendants have made reasonable efforts to confer in good

faith with counsel for all parties who may be affected by the relief sought in the motion, and have been advised that plaintiffs will contest this motion.

Dated:  August 22, 2011                      Respectfully submitted,


                                             */s/ Barbara Bolton Litten*
                                             Patricia E. Lowry
                                             Florida Bar No. 332569
                                             E-mail:  patricia.lowry@ssd.com
                                             Barbara Bolton Litten
                                             Florida Bar No. 91642
                                             E-mail:  barbara.litten@ssd.com
                                             **SQUIRE, SANDERS & DEMPSEY (US) LLP**
                                             1900 Phillips Point West
                                             777 South Flagler Drive
                                             West Palm Beach, FL  33401-6198
                                             Telephone:  561-650-7200
                                             Facsimile:  561-655-1509

                                             Philip S. Beck
                                             Email:  philip.beck@bartlit-beck.com
                                             Steven E. Derringer
                                             Email:  steven.derringer@bartlit-beck.com
                                             **BARTLIT BECK HERMAN PALENCHAR
                                                & SCOTT LLP**
                                             54 W. Hubbard Street, Suite 300
                                             Chicago, IL  60603
                                             Telephone:  312-494-4400
                                             Facsimile:  312-494-4440

                                             Eugene A. Schoon
                                             Email:  eschoon@sidley.com
                                             Susan A. Weber
                                             Email:  saweber@sidley.com
                                             **SIDLEY AUSTIN LLP**
                                             One South Dearborn Street
                                             Chicago, Illinois 60603
                                             Telephone:  312-853-7000
                                             Facsimile:  312-853-73036

Rebecca K. Wood
Email:  rwood@sidley.com
Amy L. Hanke
Email:  ahanke@sidley.com
**SIDLEY AUSTIN LLP**
1501 K Street, NW
Washington, DC 20005
Telephone:  202-736-8000
Facsimile:  202-736-8711

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:  313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:  412-566-6099

*Attorneys for Bayer Corporation,
Bayer HealthCare Pharmaceuticals Inc.,
and Bayer Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Barbara Bolton Litten*
Barbara Bolton Litten

**SERVICE LIST**
**Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON**

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN
& SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone:  215-790-4584
Facsimile:  215-875-7701
***Co-Lead Counsel for Plaintiffs***

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE
& LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone:  561-684-2500
Facsimile:  561-684-6308
***Liaison Counsel for Plaintiffs***

Patricia E. Lowry
Florida Bar No. 332569
Email: patricia.lowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY (US) LLP**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509
***Liaison Counsel for Defendants***

Scott A. Love
Email:  slove@triallawfirm.
**CLARK, BURNETT, LOVE & LEE, G.P.**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX  77002
Telephone:  713-757-1400
Facsimile:  713-759-1217
***Co-Lead Counsel for Plaintiffs***

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone:  203-610-6393
Facsimile:  203-610-6399
***Federal-State Liaison for Plaintiffs***