# Exhibit B

# In The Matter Of:

*IN RE: TRASYLOL PRODUCTS LIABILITY LITIGATION - MDL-1928*

_____

## BLUME, Ph.D., CHERYL  - Vol. 1
### July 21, 2011

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

CHERYL BLUME, Ph.D. - 7/21/2011

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  1:08-MD-01928-MIDDLEBROOKS/JOHNSON


IN RE:  TRASYLOL PRODUCTS LIABILITY
LITIGATION - MDL-1928

THIS DOCUMENT RELATES TO ALL ACTIONS

-------------------------------------/



VIDEOTAPED
DEPOSITION OF:          CHERYL BLUME, Ph.D.

DATE:                   Thursday, July 21, 2011

TIME:                   8:30 a.m. to 7:10 p.m.

PLACE:                  Pharmaceutical Development
                         Group
                        13902 N. Dale Mabry Avenue
                        Tampa, Florida

REPORTED BY:            Nancy J. Rivera

                        Court Reporter

                        Notary Public

                        State of Florida at Large



Pages  1 - 387

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 2

```
 1   APPEARANCES:

 2

 3   STEVEN DERRINGER, ESQUIRE
          Bartlit, Beck, Herman, Palenchar & Scott, LLP
 4        54 West Hubbard Street, Suite 300
          Chicago, Illinois 60610
 5        312.494.4400
          steven.derringer@bartlit-beck.com
 6        and
     KATHERINE STRONG CARNER, ESQUIRE
 7        Sidley Austin, LLP
          1501 K Street, N.W.
 8        Washington, DC 20005
          202.736.8026
 9
               APPEARING ON BEHALF OF THE DEFENDANT,
10             BAYER CORPORATION, BAYER HEALTHCARE
               PHARMACEUTICALS, INC., AND BAYER SCHERING
11             PHARMA AG

12

13   NEAL L. MOSKOW, ESQUIRE
          Ury & Moskow, LLC
14        883 Black Rock Turnpike
          Fairfield, Connecticut 06825
15        203.610.6393
          Neal@urymoskow.com
16        and
     JAMES R. RONCA, ESQUIRE
17        Anapol, Schwartz, Weiss, Cohan, Feldman
           & Smalley, P.C.
18        1710 Spruce Street
          Philadelphia, Pennsylvania 19103
19        215.735.1130

20             APPEARING ON BEHALF OF THE PLAINTIFFS

21

22   ALSO PRESENT:

23        Kevin Martin, Videographer

24

25
```

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 3

1                      I N D E X

2

3                                          PAGE

4   TESTIMONY OF CHERYL BLUME, Ph.D.

5       Direct Examination by Mr. Derringer        7

6       Cross-Examination by Mr. Moskow          355

7       Redirect Examination by Mr. Derringer    377

8   CERTIFICATE OF OATH                          385

9   CERTIFICATE OF REPORTER                      386

10  ERRATA SHEET                                 387

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 4

```
1                    E X H I B I T S
2    DEFENDANT BAYER'S
     NO.    DESCRIPTION                               PAGE
3
     1    Trasylol Expert Report of Cheryl D.
4         Blume, Ph.D., October 4, 2010                  8
5    2    Trasylol Expert Report - Cited
          Literature References                         17
6
     3    E-mail string January 2011 between
7         S. Derringer, S. Ronca, re:  Blume
          materials                                     18
8
     4    E-mail from J. Ronca to S. Derringer,
9         February 12, 2011, re:  Blume Trasylol
          docs                                          22
10
     5    Invoices of PDG, Inc.                        102
11
     6    Medical Officer's Review, Review completed:
12        2-3-1993                                     152
13   7    Medical Officer's Review, Date of Review:
          12-13-1993                                    152
14
     8    Medical Officer's Review, Date of Review:
15        1-3-1997                                      156
16   9    Medical Officer's Review, Date of Review:
          8-10-1998                                     156
17
     10   PhRMA Code of Pharmaceutical Marketing
18        Practices                                    166
19   11   Medicine Safety:  Overview document from
          PhRMA                                        170
20
     12   PhRMA Code on Interactions With Healthcare
21        Professionals
     13   Document from PhRMA, Health Question FAQ
22        Archive                                      174
23   14   Document from PhRMA, U.S. Prescription Drug
          Safety:  The World's Standard                174
24
     15   Document from PhRMA, Safety Monitoring       174
25
```

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 5

```
 1                      E X H I B I T S
                          (continued)
 2
    DEFENDANT BAYER'S
 3  NO.    DESCRIPTION                               PAGE

 4  16     Document from PhRMA, Safety Principles     174

 5  17     Document, Backgrounder PhRMA, U.S.
           Prescription Drug Safety:  The World's Best  174
 6
    18     Document, What is CIOMS?                   191
 7
    19     Benefit-Risk Balance for Marketed Drugs:
 8         Evaluating Safety Signals, Report of CIOMS
           Working Group IV                          191
 9
    20     Document from PhRMA, Code on Interactions
10         with Healthcare Professionals             184

11  21     Document, 21 CFR 314.70                    209

12  22     Document, 21 CFR 314.80                    209

13  23     Guidance for Industry, Good
           Pharmacovigilance Practices and
14         Pharmacoepidemiologic Assessment          221

15  24     Three-page document, Trasylol
           Mortality/Renal Studies                   226
16
    25     Document, Food and Drug Administration,
17         HHS 201.56, 201.57                        260

18  26     Document, 21 CFR 201.56, effective
           June of 2006                              260
19
    27     Document, 21 CFR 201.57                    260
20
    28     Document, 21 CFR 201.57, effective
21         June 2006                                 260

22  29     Document, 21 CFR 314.70, in place
           prior to 2008                             260
23
    30     The New England Journal of Medicine
24         Article, October 24, 2002, by
           D. Mangano, Ph.D., M.D.                   306
25
```

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 6

1                        E X H I B I T S
                           (continued)
2
    DEFENDANT BAYER'S
3   NO.    DESCRIPTION                                PAGE

4   31     Document, Trasylol Safety: Graft Patency   315

5   32     Summary Minutes of the Joint Meeting of
           the Cardiovascular and Renal Drugs Advisory
6          Committee with the Drug Safety and Risk
           Management Advisory Committee,
7          September 12, 2007                          322

8   33     Document, Trasylol Project Team Meeting,
           31 March 1998                               337
9
    34     Dec. 17, 2010 letter to S. Derringer from
10         S. Love                                     353

11  35     CD containing documents referenced in
           Dr. Blume's expert report                  353
12
    36     Document, revision made to paragraph 11 of
13         Dr. Blume's expert report                   383

14  37     Document, Incidence of Serum Creatinine
           Elevations or Dialysis                      382
15

16

17

18

19

20

21

22

23

24

25

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 7

1            THE VIDEOGRAPHER:  We are now on the record in

2       the matter of In Re:  Trasylol Products Liability.

3       Today's date is July 21, 2011.  The time is 8:42

4       a.m.

5            This is the videotaped deposition of

6       Dr. Cheryl Blume, being taken at 13902 North Dale

7       Mabry Avenue, Suite 230, Tampa, Florida.  My name is

8       Kevin Martin, I am the camera operator representing

9       First Choice Reporting & Video, located at 121 South

10      Orange Avenue, Suite 800, Orlando, Florida.  The

11      court reporter is Nancy Rivera with First Choice

12      Reporting.

13           Will Counsel please introduce themselves.

14           MR. RONCA:  Jim Ronca for plaintiff.

15           MR. MOSKOW:  Neal Moskow for plaintiffs.

16           MR. DERRINGER:  Steve Derringer from Bartlit,

17      Beck for the Bayer defendants.

18           THE VIDEOGRAPHER:  And will the court reporter

19      please swear in the witness.

20           THE COURT REPORTER:  Raise your right hand,

21      please.  Do you solemnly swear or affirm the

22      testimony you're about to give in this case will be

23      the truth, the whole truth, and nothing but the

24      truth?

25           THE DEPONENT:  I do.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 8

1           THE COURT REPORTER:  Thank you.

2                    DIRECT EXAMINATION

3    BY MR. DERRINGER:

4        Q.   Good morning, Dr. Blume.

5        A.   Good morning.

6        Q.   I'm handing you what I've marked as Exhibit 1.

7    Is this your expert report in the Trasylol litigation?

8        A.   Yes.

9        Q.   Dr. Blume, are all of the opinions that you

10   intend to give in the Trasylol litigation contained in

11   this report?

12       A.   Yes.

13       Q.   Does this report contain all of the facts and

14   information upon which you are basing your opinions?

15       A.   This report contains numerous citations.  I

16   have also provided, over the course of the preparation

17   for this deposition, additional documents that may be

18   relied upon.  I understand that those have been provided

19   to Counsel.

20            They are also included with these notebooks

21   that I plan on using during the course of the

22   deposition.  These notebooks contain all the documents

23   cited in this report and any additional documents that

24   were provided to Counsel earlier.

25       Q.   Okay.  Let me -- let me try my question again.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 9

1    Does this report, Exhibit 1, your expert report in the
2    Trasylol litigation, either in the text of the report
3    itself or in the materials to which you cite in the
4    report, in addition to any other materials that you have
5    provided to me, Bayer's counsel, as materials that you
6    considered or relied upon, does that collection of
7    information that I just described contain all of the
8    facts and information upon which you are basing your
9    opinions in this matter?
10        A.   I believe so, yes.
11        Q.   Did you write the report, Exhibit 1, yourself?
12        A.   Yes.
13        Q.   Typed it up yourself?
14        A.   No.
15        Q.   Who typed it up for you?
16        A.   Well, I would have to check the billing
17   records, but probably my office assistant, Sylvia
18   Blakeslee.
19        Q.   Explain to me, if you would, how that works
20   when you say you wrote it, but someone else typed it up.
21        A.   Generally, what happens is I will write the
22   report and word process it in a somewhat rough manner;
23   and as I edit it and finish it, it will be a compilation
24   of what I do electronically, as well as by hand.  Once
25   it is done, it is usually given to Sylvia or one of the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 10

1    research associates here to put it into this type of

2    final format.

3        Q.    And by final format, you mean they actually

4    type up the final product based on --

5        A.    Yes.

6        Q.    -- based on your notes?

7        A.    Well, based on my rough drafts and edits that

8    I have made to my various drafts, yes.

9        Q.    So --

10       A.    And then I check that.  And they also prepare

11   the list of the references.

12       Q.    And did you also check the list of references

13   to confirm that it was accurate?

14       A.    Yes.

15       Q.    Okay.  So even though someone else actually

16   typed what we see in Exhibit 1, that is all of your

17   original work product.  Is that correct?

18       A.    Yes.  Yes, it is my work product.

19       Q.    Did anyone assist you in writing or drafting

20   this report, Exhibit 1, outside of what you just

21   described?

22       A.    The -- our office is constructed in such a way

23   that there are numerous professionals here who have also

24   participated in the review of documents and in the

25   review of the literature.

CHERYL  BLUME, Ph.D. - 7/21/2011

 1     Q.   Okay.  Did anyone assist you in writing or

 2   drafting this report?

 3     A.   No, not in the compilation of the language of

 4   the report; but they did preview documents and they did

 5   look at literature.

 6     Q.   Is there any literature or documents that you

 7   cite in your report, in your materials considered list,

 8   or in any of the materials that you sent to me that you

 9   did not look at yourself?

10     A.   No.

11     Q.   Did you cut and paste anything from previous

12   reports into this report, Exhibit 1?

13     A.   Let's see.  Yes.  Some of the initial

14   paragraphs that describe my education and my experience

15   have probably appeared in earlier reports because my

16   education hasn't changed.

17     Q.   Which paragraphs are those?

18     A.   One, two, three, and four segues into Trasylol

19   specifically.

20     Q.   So did you cut and paste any of paragraph

21   four?

22     A.   I don't know.  I can't recall.  It's a -- it's

23   pretty standard language.

24     Q.   Would this be something that one of your

25   assistants might have just done for you?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 12

1      A.    No.   No.   No.  I would have done -- I would

2    have done the transition, but the sentence may have some

3    structures from previous reports.  I don't think so from

4    four because it appears to be a specific mortality and

5    renal events.

6             Then the standards and various documents upon

7    which I base my opinion beginning five, much of this

8    language deals with the process of post-marketing

9    pharmacovigilance, so there may well be paragraphs in

10   five, information in five, six, seven, eight, nine, 10,

11   11, 12, 13, 14, 15, 16, 17 and 18 deal with labeling,

12   19, 20, 21, 22 that are common to other reports.

13             What I do with these reports, with all of

14   these projects, are generally look at the process upon

15   which post-marketing pharmacovigilance information is

16   acquired, the standard of care for addressing it, the

17   use of that information in either amending or amplifying

18   labeling that is common across all projects.  So many of

19   these paragraphs may be similar, if not identical to

20   earlier reports.

21      Q.   And the paragraphs you're talking about are

22   paragraphs 1 through 22 of your report.  Correct?

23      A.    Well, 23 segues to Trasylol again; 24 may be a

24   general report because it's simply talking about the

25   types of documents that I rely upon in addressing the

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 13

1    adequacy of post-marketing information, so that may be

2    common, 24 may be common.  The specific comments to

3    Trasylol really begin with paragraph 25.

4        Q.   So paragraphs 1 through 24, in total or in

5    part, are things that you cut and paste from prior

6    reports.  Is that correct?

7            MR. MOSKOW:  Objection to form.

8        A.   Yeah.  I don't know if I would -- yeah, in

9    part.  Yeah, in part, correct.

10   BY MR. DERRINGER:

11       Q.   In whole or in part; correct?

12       A.   Right.  Because all of these are describing

13   the process that are employed by pharmaceutical

14   companies with various post-marketing activities and

15   those are common across projects.

16           I do notice in 11 that I notice a -- that I

17   note a particular Bayer employee, that would not be

18   common to all reports.

19       Q.   Did anyone review this report, Exhibit 1,

20   before you submitted it?

21       A.   Exhibit 1 before I submitted it?

22       Q.   Yes, your report.

23           MR. RONCA:  I thought -- other than Counsel?

24           MR. DERRINGER:  Yes, other than Counsel.

25       A.   No, no one other than Counsel.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 14

1   BY MR. DERRINGER:

2        Q.    How long did it take you to write this report?

3        A.    Let's see.  I believe that I first met with

4   Counsel in the spring of 2010, I think our contract was

5   signed in late spring or early summer, and the report, I

6   believe, is in October.

7        Q.    That's correct.

8        A.    So it was a period of we met several times

9   between -- between late winter, early spring, I guess,

10  of 2010 and October of 2010.

11       Q.    I want to know how long it took you to write

12  the report.  You didn't start --

13       A.    I don't know.  I didn't --

14       Q.    Let me finish my question.  You didn't start

15  writing the report when you started meeting with

16  Counsel.  Correct?

17       A.    No.  I met with Counsel and did independent

18  research to even decide if I wanted to participate in

19  the project.

20       Q.    Okay.  Do you recall when you started writing

21  the report?

22       A.    No.  I would have to look at the invoices.

23  And I did not provide invoices in this case, so I don't

24  have them with me.

25       Q.    I have what have been represented to me as

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 15

1    your invoices in this case, although they don't contain

2    details about when you started writing your report.

3            So do you have any recollection, Dr. Blume, of

4    when you started writing your report?  If you don't have

5    a recollection, you can just say so and we'll move on.

6    I don't think there is anything in the report that

7    reflects when you started writing.

8        A.   Well, I'm trying to look at other projects

9    that I was working on at the time and try to go down

10   memory lane and attempt to piece together.  But I have

11   no specific recollection without checking.

12       Q.   Dr. Blume, what do you view your role to be in

13   this litigation?

14       A.   I view my role as the -- as a reference person

15   who has extensive experience in the pharmaceutical

16   industry and who interacts with multiple comp --

17   multiple pharmaceutical companies in the development of

18   new products and in the elaboration of their product

19   labeling and assisting them with pharmacovigilance

20   responsibilities.

21           And I see myself as describing the process,

22   processes that are undertaken, procedures, the general

23   plans of action that are undertaken by pharmaceutical

24   companies in the development of their products, but more

25   importantly in the monitoring of their products

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 16

1    following approval, and in the elaboration of current

2    labeling and in the execution of any necessary

3    activities that may be required after the initial

4    approval.

5            So I'm a conduit between the industry,

6    explaining what goes on in the industry, explaining

7    interactions of FDA in the industry, and hopefully I'll

8    be able to take those years of experience and be a value

9    in explaining that to the jury, the process it is.

10       Q.   Can you turn to paragraph 23 of your report,

11   please, it's on Page 14.  Are you there?

12       A.   Twenty-two?

13       Q.   Twenty-three.

14       A.   Yes, I'm there.

15       Q.   Can you confirm for me that this describes

16   your assignment in the Trasylol litigation?

17       A.   Labeling.  Yes.

18       Q.   Are there any other subjects that are the

19   assignment, or part of your assignment in this

20   litigation, outside of what you described in paragraph

21   23 and about which you intend to give opinions?

22       A.   No.

23       Q.   Okay.  I want to discuss with you the

24   materials that you considered in reaching your opinions

25   and putting your report together.  I want to know about

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 17

1    all of those materials, and I believe you've described

2    them in your report.  I'm going to list them and I want

3    you to confirm that these are the materials that you

4    considered.  Okay?

5        A.   Okay.

6        Q.   All right.  First category are any materials

7    that you mention in your report itself.  Correct?

8        A.   Yes.

9        Q.   Okay.  Second category are those materials

10   that you have listed at Pages 61 through 65 of your

11   report.  Is that correct?

12       A.   Yes, I considered those.

13       Q.   Okay.  The third category is a group of

14   references that are listed on what I'm about to hand you

15   as Exhibit 2.

16            MR. RONCA:  That's okay.

17   BY MR. DERRINGER:

18       Q.   And, Dr. Blume, with Exhibit 2 -- well, first

19   let me ask you, Exhibit 2, am I correct, that supersedes

20   and replaces the reference list that was described at

21   Pages 66 through 86 of your report, Exhibit 1.  Is that

22   right?

23       A.   I believe this is the alphabetical -- it's the

24   alphabetical listing of the cited references in the

25   report, yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 18

1      Q.   Well, both Exhibit 2 and the references that

2  you list at Pages 66 through 86 of your report I believe

3  are alphabetical.

4           My question is, does Exhibit 2 supersede and

5  replace the list of references at Pages 66 through 86 of

6  your report?

7           I'll withdraw that question for the time being

8  and show you another exhibit that I think might help

9  answer the question.  Let me show you Exhibit 3.

10          Dr. Blume, Exhibit 3 is an E-mail that Scott

11  Love sent to me on January 21st.  You can see that

12  Mr. Ronca and Mr. Moskow are copied on that E-mail.

13  This is part of an E-mail string that actually includes

14  another E-mail on the second page of this exhibit,

15  ma'am, also from Scott Love on January 7th, 2011.  I

16  will represent to you that Exhibit 2 is the reference

17  list that Mr. Love attached to his E-mail from January

18  7th.

19          And if you take a look at the first page of

20  Exhibit 3, there's in that first E-mail, Mr. Love, or

21  someone at least, writes in point three that the

22  reference list attached to PDG's January 7, 2011 E-mail

23  supersedes and replaces the reference list attached to

24  Dr. Blume's report at Pages 66 through 86.  Do you see

25  that?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 19

1       A.   I do.

2       Q.   Okay.  Can you now confirm that that's

3   actually correct information; that Exhibit 2, which is

4   PDG's January 7th, 2011 reference list, replaces and

5   supersedes the reference list attached to your report at

6   Pages 66 through 86?

7       A.   Exhibit 2 appears to be all the references

8   that are specifically cited in the report, so this note

9   cited references.  This lists all references that were

10  relied upon or in any way looked at in the writing of

11  the report.

12      Q.   Okay.

13      A.   I think that's the difference between the

14  two -- the two sets of references.

15      Q.   All right.  So is what Mr. Love wrote in his

16  January 21st E-mail incorrect?

17      A.   Oh, I don't -- I have no idea.  I know that

18  this specifically says the cited literature

19  references --

20      Q.   No.  What --

21      A.   -- and this does not.

22      Q.   Okay.  What I'm asking, ma'am, is -- first, do

23  you know who wrote this E-mail, the January 21st E-mail?

24      A.   It says that it's from Mr. Love's law firm.

25      Q.   Right.  I understand that.  But do you know

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 20

1   who actually wrote this, "Responses to BB's inquiry of

2   January 14, 2011 follow," points one, two and three?

3   Did anyone from your office write that?

4        A.   I don't re -- I don't recall at this time.   I

5   assume that BB is Bartlit, Beck, yes.   I don't know.

6        Q.   Okay.   I'll ask my question one more time and

7   see if I can get an answer to it.

8             Am I correct that the reference list that is

9   attached to PDG's January 7th, 2011 E-mail, which is

10  contained in this Exhibit 3 and which is, the reference

11  list is Exhibit 2 that I've handed you, am I correct

12  that that reference list, Exhibit 2, supersedes and

13  replaces the reference list attached to Dr. Blume's

14  report at Pages 66 through 86?

15            MR. MOSKOW:  Objection to form, asked and

16       answered.

17            MR. DERRINGER:  Not answered.

18       A.   Okay.  My understanding is that I was -- it

19  was needed, a list was needed of references that were

20  specifically cited in the report; that is my

21  understanding of what this correction or this additional

22  list is.

23            This list does not include all of the ones

24  that may have been reviewed in the course of my

25  preparation of the report, but a subset of that was

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 21

1    requested that were specifically cited in the report.

2    So my recollection is any differences between these

3    lists are those that may have been looked at, reviewed,

4    not specifically cited and those specifically cited.

5    BY MR. DERRINGER:

6        Q.   Okay.  That's different from what was

7    requested, ma'am, but we'll go ahead and take your

8    testimony.

9            Is it your testimony that all of the

10   references listed at Pages 66 through 86 of your report

11   are materials that you considered?

12       A.   Or saw in the course of my preparation of the

13   report.

14       Q.   Or saw did you say?

15       A.   Uh-huh.

16       Q.   But not consider, you saw them, but you didn't

17   consider them?

18       A.   Or I didn't specifically cite them.

19       Q.   Well, did you consider them?

20       A.   If I reviewed them, I considered them.

21       Q.   Okay.  And your testimony is you reviewed all

22   of the materials listed at Pages 66 through 86 of your

23   report?

24       A.   Yes, in some form.  Yes.

25       Q.   What do you mean "in some form"?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 22

1      A.   Well, I may not have read the -- well, what I

2  mean is I may not have read the entire literature

3  article.  If I glanced at it and saw that it wasn't

4  appropriate or it wasn't applicable to what point I was

5  trying to research, I would not have read the entire

6  article.

7      Q.   Okay.  Let's continue trying to figure out the

8  list of materials that you considered.  So we have those

9  mentioned in the report itself; those listed at Pages 61

10 through 65 of the report; apparently, those listed at

11 Page 66 through 86 of the report; those listed in

12 Exhibit 2.  Correct?

13     A.   I have documents reviewed as Appendix 3.

14     Q.   No.  Exhibit 2.

15     A.   Oh, Exhibit 2, yes.

16     Q.   Is that correct?

17     A.   Cited.

18     Q.   Are those materials that you reviewed in

19 preparing your report and arriving at your opinions?

20     A.   Yes, and cited them.

21     Q.   Let me show you Exhibit 4.  Dr. Blume, this is

22 an E-mail from Jim Ronca to me, you are copied on this

23 E-mail, it's dated February 12th.  You can see that

24 Mr. Ronca writes that in the course of preparing for

25 your deposition, you reviewed additional documents that

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 23

1    were not listed before.  Do you see that?

2        A.   Yes.

3        Q.   Do you see there are attachments described on

4    this cover page?

5        A.   Yes.

6        Q.   And do you see the next page includes a list

7    of Bates numbers?

8        A.   Yes.

9        Q.   Okay.  I will represent that that document

10   attached to this E-mail, or attached to the cover page

11   on Exhibit 4, is the document that is listed under

12   attachments as Blume additional docs.

13            Did you consider the materials listed in

14   Exhibit 4 in preparing your report and arriving at your

15   opinions?

16       A.   Yes.

17       Q.   Okay.  So to summarize, ma'am -- and again,

18   I'm trying to find the complete listing of the materials

19   you considered and reviewed in formulating your opinions

20   in this litigation -- we've got those that were

21   mentioned in the report itself, those listed at Pages 61

22   through 65 of the report, those listed at Pages 66

23   through 86 of your report, those listed in Exhibit 2

24   titled Trasylol Expert Report - Cited Literature

25   References, and those listed in Exhibit 4.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 24

1        Is that a complete listing of all the

2   materials that you considered or reviewed in formulating

3   your opinions in this matter?

4        A.   Yes.  As I sit here now, I believe that's

5   true.

6        Q.   Do you recall when you first received

7   Trasylol-related documents?

8        A.   I met with Counsel in the early part of 2010

9   and I re -- I was able to view documents at that time.

10       Q.   You say the early part of 2010.  Can you tell

11   me when that was?

12       A.   Again, I don't have my invoices with me.

13       Q.   Would it be reflected on your invoices you

14   believe?

15       A.   I think so, yeah.

16       Q.   Okay.

17       A.   I think the contract was signed in the spring

18   that I would go forward with the case; but I recall,

19   this is really recollection, that I met with Counsel

20   prior to that.

21       Q.   Okay.  Now, that list of documents we just

22   went over, in terms of those that you considered or

23   relied upon in formulating your opinions in this case,

24   you didn't read every single one of those, did you?

25       A.   Well, certainly every document that's cited in

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 25

1   the report I reviewed.

2        Q.   When you say cited in the report, you mean in

3   the text of the report.   Correct?

4        A.   Versus what?

5        Q.   Versus listed at Pages 61 through 86.

6        A.   Well, there's only one page of listed

7   documents in this report on Page 61.

8        Q.   Keep going, ma'am, 61 through 86.

9        A.   Well, 61 through 62 are the only ones I've

10  listed Bates documents, and I believe that I reviewed

11  all of those, they're not very extensive.

12       Q.   Okay.

13       A.   And I received multiple depositions and

14  exhibits.  And I believe that if my billing statements

15  do not note which of these that I specifically read, I

16  could probably share that with you now from

17  recollection.

18           The other documents that are noted on Page 65

19  I have reviewed.  All of the references cited in my

20  report as I've already noted would have been reviewed.

21  The ones not cited were either reviewed in whole or

22  part, depending on their applicability to my comments.

23       Q.   You've now confused me.  When you say cited in

24  your report, you mean cited in the text of your report.

25  Correct?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 26

1      A.   No.   I was talking about the references on

2   Pages 66 through 86.

3      Q.   Okay.  And your testimony was that you

4   reviewed every one of those?

5      A.   Well, I said that I looked at every one of

6   those.  I did not say that I reviewed them.  I already

7   told you I did not review them all.

8           MR. RONCA:  Let's cut through this problem.

9      When you say cited in the report, just the report up

10      to Page 44, does that mean that they're actually

11      noted and referenced in the report itself, as

12      opposed to the appendices attached?

13           THE DEPONENT:  Yeah.  The appendix will have

14      more.  The appendix may have references in there

15      that were not cited in the report or general

16      references.

17   BY MR. DERRINGER:

18      Q.   And your testimony is that you reviewed, your

19   eyes passed over some part of every one of those

20   documents?

21      A.   Well, yeah.  There's not that many of them

22   back here, but that is my recollection, yes.

23      Q.   Okay.  There's not that many described at

24   Pages 66 through 86; that's your testimony?

25      A.   Well, relative to other reports, no, they're

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 27

1    not extensive.

2        Q.    Okay.  And you -- you admit you didn't read

3    every one of those in its entirety?

4        A.    If they were not -- I did not waste time.  If

5    they were not applicable to the point at hand, if they

6    were in a different language, if they were repetitive to

7    something I already read, no, I did not read them in

8    entirety.

9        Q.    And who made the decision about whether they

10   were applicable or not?

11       A.    Oh, I did.

12       Q.    Did you look at any databases in preparing

13   your report?

14       A.    I was provided with a database.

15       Q.    What database?

16       A.    Of production documents.

17       Q.    Okay.  That was from the Plaintiff's Steering

18   Committee?

19       A.    From the attorneys with whom I'm working, yes.

20       Q.    Okay.  Did you review any other database?

21       A.    We -- yes.  We worked with the Food and Drug

22   Administration's database.  We would have accessed FLI,

23   FOIE.  I don't think we independently accessed the AERs

24   database in the preparation of this report.  I mean, I

25   may have glanced at the AERs adverse event database, but

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 28

1    I don't specifically recall doing that for this case.

2        Q.    You didn't do any analysis of the AERs

3    database?

4        A.    Of the AERs data, no.  The product has been

5    off the market.  I don't recall doing that, no.

6        Q.    And you didn't do any analysis, in fact, you

7    didn't even look at any Bayer database of adverse event

8    reports.  Is that correct?

9        A.    I reviewed the Bayer's database with respect

10   to reports that included dialysis.

11       Q.    Well, did you do that in electronic version?

12       A.    Yes.

13       Q.    That was from the database that the

14   Plaintiff's Steering Committee provided to you?

15       A.    Yes.

16       Q.    Okay.  You didn't independently look at the,

17   for example, Goldmine database, did you?

18       A.    No.

19       Q.    You didn't independently look at the Clintrace

20   database, did you?

21       A.    No.

22       Q.    Section B of your report, in fact the appendix

23   to your report, List of Documents Reviewed, Section (b)

24   describes Bayer documents, Pages 61 through 62; do you

25   see that?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 29

1      A.   Yes.

2      Q.   You didn't review every document produced by

3    Bayer in this litigation, did you?

4      A.   I'm trying to think.  No.  No.

5      Q.   You agree that the internal Bayer documents

6    that you reviewed and that are reflected at Pages 61

7    through 62, those are not all of the relevant Bayer

8    documents that have been produced in this litigation

9    that bears on the issues that you're testifying about.

10   Correct?

11           MR. MOSKOW:  Objection to form, calls for

12       speculation.

13     A.   Just to clarify, these are also the documents

14   that are cited in the report.  These are not necessarily

15   all the documents that I looked at from the Bayer

16   database, similar to the literature.  These are

17   documents cited.

18   BY MR. DERRINGER:

19     Q.   Okay.  Where is the list of the Bayer

20   documents that you looked at?

21     A.   I don't know if that's been provided.

22     Q.   I can tell you it hasn't.

23     A.   I don't even know if that's been assembled.

24   If I look at a document and it's repetitive or it's not

25   going to be valuable, it is not on a list.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 30

1      Q.   If it's not on a list and you determined it
2    was not valuable, that means you didn't consider it in
3    formulating your opinions in this case.  Correct?
4      A.   No.  It means I didn't cite it in the report.
5      Q.   Okay.  Can you tell me about the Bayer
6    documents you considered in formulating your opinions in
7    this case that are not listed anywhere in your materials
8    reviewed compilations?  Do you have any way of telling
9    me what those documents are, Dr. Blume?
10     A.   Well, we would have to -- one example of that
11   would be is the adverse event reports that I looked at
12   relating to the dialysis.  And I would have to check
13   with one of the computer people here if there's any way
14   of seeing if there is a -- if that is in any way
15   memorialized what documents were looked at but are not
16   necessarily cited.  I don't know.
17     Q.   Can you think of any other category of Bayer
18   documents that you may have looked at but not cited?
19     A.   Yes.  I recall that I looked at different
20   versions of the summary of product characteristics over
21   the years; they didn't change.  They didn't change
22   material -- materially from what I was looking at in the
23   relevant time periods, so those are not individually
24   cited.
25     Q.   And those documents, are those materials you

CHERYL   BLUME, Ph.D. - 7/21/2011

1    considered in formulating your opinions in this case?

2         A.   I make a statement that the labeling did not

3    materially change between 2002 and 2008.  And in coming

4    to that decision, coming to that opinion, I would have

5    looked at all of the FDA labeling that was submitted,

6    those are cited.  I would have looked at any inserts

7    that were approved.  And I would have also looked at the

8    summary of the product characteristics, perhaps the core

9    data sheets.  I don't recall that there were significant

10   changes during that period, but those may not

11   necessarily be all cited.

12        Q.   Or listed anywhere in your materials

13   considered compilation.  Is that right?

14        A.   I discuss summary of product characteristics

15   in the report.

16        Q.   That's not my question.  I'm wondering if it's

17   listed.

18        A.   I'd have to check if I listed -- I would be

19   surprised if I listed them because they didn't change.

20             MR. DERRINGER:  Okay.  Neal, as you know,

21        we're entitled to a full list of any materials that

22        Dr. Blume considered in formulating her opinions in

23        this case.  I thought we had that.  Dr. Blume's

24        testimony now suggests that we don't.

25             So I'm going to ask that you provide -- either

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 32

1       you confirm that what I've described earlier in this

2       deposition is the full list of materials considered,

3       and which Dr. Blume confirmed was the full list of

4       materials considered, is in fact the full list of

5       materials considered; and if it is not, I want you

6       to produce a list of materials that she considered.

7               MR. MOSKOW:  We'll look into that as soon as

8       we're done today.

9   BY MR. DERRINGER:

10      Q.   Dr. Blume, Pages 63 and 64 of your report

11  contain the list of depositions that you apparently

12  reviewed.  Well, let me strike that.  It contains a list

13  of depositions; do you see that?

14      A.   Yes.

15      Q.   And to be fair, Mr. Ronca, I believe it was

16  yesterday or the day before, added one deposition to

17  this list, that of Dr. Robert Fenichel.  Did you review

18  that deposition?

19      A.   Yes, I did.

20      Q.   Okay.  Now, earlier today you suggested that

21  you did not review every one of these 40 depositions.

22  Can you tell me which ones you actually reviewed?

23      A.   I think I said I didn't review them all and

24  that I could attempt to tell you the list of the ones

25  that I did review.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 33

1           As I recall, these include Dr. Ciavaglia,

2    Dr. Cyrus, Dr. Eisenberg, Dr. Horton.  I reviewed, I

3    believe, a portion of the preclinical -- Lettieri, John

4    Pascale.  I reviewed a part -- a portion of Dr. Shah.

5    Laurie Simpson I reviewed.  I reviewed Dr. Springer, I

6    cannot recall if I did it in full or in part;

7    Dr. Parisian, Dr. Eisenberg, Dr. Parikh, Dr. Waymack, as

8    we just said Dr. Fenichel.

9        Q.   You reviewed all of their depositions you

10   just -- the five people you just listed, Parisian,

11   Waymack, Eisenberg, Fenichel and Parikh, you reviewed

12   all of their depositions?

13       A.   Well, I reviewed Dr. Parisian's and -- yeah,

14   these are their expert reports.  I'd have to look and

15   check on the depositions.  I definitely reviewed

16   Dr. Suzanne Parisian's.

17       Q.   And you reviewed Dr. Fenichel's deposition?

18       A.   Yesterday, yeah.

19       Q.   Okay.  Did you review depositions of Waymack,

20   Eisenberg or Parikh?

21       A.   I know I read Waymack's report and

22   Dr. Parikh's report.  I would have -- I don't -- I can't

23   recall if I read their depositions.

24       Q.   And the folks you listed that you just

25   identified as depositions that you read, you said you

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 34

1    read a portion of Lettieri and a portion of Shah, can't

2    recall if you read part or whole of Springer's.

3             For the other folks that you've listed,

4    Ciavaglia, Cyrus, Eisenberg, Horton, Pascale, Laurie

5    Simpson, Suzanne Parisian, Robert Fenichel, did you read

6    their entire deposition?

7        A.   Yeah, I can't specifically recall at the time.

8    I think I did, but there may have been sections that

9    were completely outside the areas I was reviewing, so

10   those may have -- may have been skipped.

11       Q.   Have you read any deposition of any doctor who

12   treated the plaintiff or a patient in this litigation?

13       A.   No.

14       Q.   The Expert Reports listed under D on Page 64

15   of your report, are you relying on any of those expert

16   reports for your own opinions?

17       A.   No.  I didn't rely on them for my expert

18   report, no.

19       Q.   Did you talk to Dr. Parisian about this case?

20       A.   No.  No, I've never talked or met her.  No.

21       Q.   If you look at Section E on the next page,

22   Page 65, Other Documents --

23       A.   Yes.

24       Q.   -- you list down towards the end, "FDA

25   materials including documents related to NDA approvals

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 35

1   and supplements."

2       A.    Yes.

3       Q.    Can you be more specific?

4       A.    Well, the report lists specific guidances

5   throughout the report.  It lists FDA and code -- CFR

6   regulations.  I believe the report also -- I know it

7   does, it also lists that I have reviewed the summary

8   bases of approvals.

9       Q.    Let me stop you for a second.  I think you're

10  answering the next category.  I want you to focus on FDA

11  materials including documents related to NDA approvals

12  and supplements, okay, not regulations or guidances

13  right now because that's your next category.

14      A.    Well, I just said that I reviewed the summary

15  bases of approvals, so that would be of NDA's and

16  supplements.

17      Q.    Okay.  Anything else that falls under the

18  category of FDA materials including documents related to

19  NDA's approvals and supplements?

20      A.    Okay.  Just to be specific, I reviewed

21  portions of the original NDA, as well as the later

22  supplements for Bayer's product.

23      Q.    That product is Trasylol?

24      A.    For Bayer's Trasylol product, yes,

25  specifically.  And I think those are the only NDA

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 36

1    documents that I reviewed.

2         Q.    And you said you reviewed portions of them?

3         A.    Yeah.  I didn't -- I wasn't interested in the

4    chemistry and manufacturing controls or the

5    environmental procedures.  I was primarily interested in

6    the -- the animal review, the PK, pharmacokinetic,

7    reviews and the clinical study reviews.

8         Q.    And you say those are the materials that you

9    reviewed from the original NDA.  Is that right?

10        A.    I would have reviewed the NDA, both materials

11   that were provided in the production documents and, if

12   necessary, I would have accessed whatever information I

13   would have needed from either the FDA's database or from

14   the Private Freedom of Information database.

15        Q.    That wasn't my question.  You just described

16   animal review, pharmacokinetic reviews, and the clinical

17   study reviews as the things that you were primarily

18   interested in.

19        A.    Right.

20        Q.    Are those the materials from the original NDA

21   that you reviewed from that NDA?

22        A.    Well, I thought I was answering that.  If it

23   were in the database, I would review it from the -- from

24   Bayer's database.  If it were not in the database, I

25   would also attempt to access information from the two

Merrill Corporation - New York

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 37

1   other sources that I noted.

2       Q.   Okay.

3       A.   Relating to the original NDA.

4       Q.   What portions of the original NDA did you

5   review?  Let's try it that way.

6       A.   I recall reading the overview of the

7   pharmacokinetic data; overview of a portion of the

8   animal studies, I don't think I reviewed all of the

9   animal information; the three studies that were

10  considered critical for the original approval; the

11  additional study for the half strength.  I recall

12  looking at the 1998 submission and the submissions that

13  were made later in response to requests from FDA for the

14  complete overview of all studies.

15      Q.   That was from 2006?

16      A.   And FDA's request for --

17      Q.   Is that yes, that was from 2006?

18      A.   Yes.  And the FDA's later request for an

19  overview of any study -- any additional studies that

20  were missing, I reviewed that submission.  I reviewed

21  the various labeling -- the labeling changes and the

22  correspondences back and forth relating to the various

23  labeling changes.

24           I had -- I also had related to the NDA the

25  opportunity to review annual reports, as well as

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 38

 1    periodic safety update reports.  I think that's it

 2    relating to the NDA.

 3        Q.   Okay.  You mentioned the 1998 submission,

 4    that's SNDA-4.  Is that correct?

 5        A.   I don't -- it's where the indication was open

 6    to -- open to a greater population.

 7        Q.   Okay.  And what from that submission did you

 8    review?

 9        A.   I think it's discussed in the report.  Yeah,

10    it's my paragraph 48, and I think there was two parts to

11    that one.  The submission originally went in and then

12    this is the -- I think this is the one where there was a

13    follow-up, FDA wanted additional information, there was

14    a follow-up with European data.  So I believe it started

15    in '96, but it didn't finish until '98.

16        Q.   Well, in paragraph 48, you list the Trasylol

17    Medical Officer's Review from August of 1998.  Do you

18    see that?

19        A.   Yes.

20        Q.   Okay.  Is there anything else that you

21    reviewed from SNDA-4?

22        A.   Well, we also list separately S-004, so the

23    actual supplement would have been examined.

24        Q.   In its entirety?

25        A.   Oh, I can't know if I did it in its entirety

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 39

1    or not.  I can't remember.  I think I was interested in

2    the overview from the two additional European studies.

3    And that's as much as I recall about the opening -- for

4    that period of time that the indication was opened.

5        Q.    Under the next category on Page 65, FDA Code

6    of Federal Regulations and Guidances, Dr. Blume, am I

7    right that the regulations and guidances that you

8    reviewed are specifically noted and cited in your -- in

9    the text of your report?

10       A.    Well, yes, I certainly noted specific

11   regulations and guidances.  I deal with these every day.

12   Whether I may have relied upon something else that isn't

13   specifically cited in the report, it may have happened.

14       Q.    Okay.  I'd like to know what that is then.

15   What regulations or guidances have you specifically

16   relied upon in arriving at your opinions in this case

17   that are not specifically identified in your report?

18       A.    Let's see the ones I identify first.

19       Q.    Well, let me stop you there.  That could take

20   some time, and I certainly don't want to waste my time

21   with you reviewing your entire report.

22            MR. DERRINGER:  Neal, again, we're entitled to

23       know all of the materials that she considered and

24       relied upon in arriving at her opinions.  If there

25       are materials, regulations or guidances that she

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 40

1       relied on outside of what's listed in her report,

2       we'd like to know about it.  I will note that that

3       would be contrary to what was expressly represented

4       to us in E-mail from Mr. Love that was communicated

5       back in January of 2011.

6            MR. MOSKOW:  Well, I'll certainly look into

7       that, Steve.  I believe that there's a semantic

8       issue going on here.  Just like she may be relying

9       on a textbook that she had during her Ph.D. process

10      as a general background for how the process works,

11      there also may be guidances or regulations that

12      form -- help her form her opinion on how the FDA

13      operates or how the FDA interacts with

14      pharmaceutical companies and the obligations of an

15      ethical pharmaceutical company.

16           And I think items that were specifically

17      relied on for this report versus items that are kind

18      of in the ether are two different issues, but I'll

19      certainly look into it.

20           MR. DERRINGER:  Well, I disagree that they're

21      two different issues.  If there's any guidance or

22      regulation or materials she is going to rely on in

23      testifying in this case, we are entitled to know

24      about it.  And we will move to strike any reliance

25      on anything that's not disclosed to us.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 41

```
 1          MR. RONCA:  And you're specific to the word
 2     "reliance," because you've also used the word
 3     "considered" and you've also used the word
 4     "reviewed" in your -- in various questions.  And
 5     that's not a criticism of any of the questions, I'm
 6     just saying that your statement there was what was
 7     relied upon.  So we're doing the right thing when we
 8     go back and try to clarify this.
 9          MR. DERRINGER:  Yeah.  I mean, I'd
10     specifically like to know, of course, what she
11     relied on.  I believe you've already represented
12     that we have that complete list.
13          MR. RONCA:  We'll check that.
14          MR. MOSKOW:  That's right.
15          MR. DERRINGER:  I'll expect that that's true,
16     but tell me if that isn't true.  And if there are
17     materials that Dr. Blume has considered in arriving
18     at her opinions that are not specifically listed, I
19     imagine she'll be able to identify those, and I want
20     to know what those are, too.
21          MR. MOSKOW:  And I have no problem doing that,
22     Steve.  My point is that I will assure you that
23     there is no reference in this report to the enabling
24     regulation and statutes for the FDA, but part of
25     Dr. Blume's opinions are that the FDA exists and has
```

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 42

1      a role in this process.  So she's relying on the

2      fact that the FDA exists and plays a role in this

3      process, but we didn't specifically cite that.

4      That's what I was trying to get at.

5   BY MR. DERRINGER:

6      Q.   Dr. Blume, let's turn to Page 66, Section F,

7   References.  Will you agree with me that the materials

8   listed in Section F are not the only articles in the

9   published literature on Trasylol?

10      A.   Yes, of course.

11      Q.   How did you decide which articles to read and

12   which ones not to read?

13      A.   Well, as I indicated, as the focus of my

14   report became finalized, I was interested in certain

15   types of articles.  In coming to that point, I reviewed

16   many other articles that were either outside the focus

17   of what my report was going to be or were simply not

18   worth reading the entire article.  It may have been

19   duplicative of what I already knew or it may have been

20   an article that simply wasn't germane or wasn't well

21   done.  So for that reason, there will be references that

22   I may have looked at, but are certainly not part of the

23   cited reference list.

24      Q.   Well, every reference you would have looked at

25   would be part of what's described at Pages 66 through

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 43

1    86.  Correct?  That's different from the cited reference

2    list that is Exhibit 2 to this deposition.  Is that

3    correct?

4         A.   Everything for which an article was actually

5    obtained and glanced, glanced at or more, would be on

6    the all purpose -- the all References list.

7         Q.   That would be Pages 66 through 86 of your

8    report?

9         A.   Right.

10        Q.   Okay.

11        A.   Whether as time went on and we sent you

12   additional documents, I don't recall if there were any

13   additional references in there.  If there were any new

14   references, they would have been included in those

15   compilations of additional documents that we sent you.

16        Q.   Okay.  Did you do any independent research on

17   Trasylol as part of your assignment in this case?

18        A.   Yes, of course.

19        Q.   Can you tell me what you did?

20        A.   Yes.  When we were first approached about

21   participating in Trasylol, as I indicated to you, we met

22   several times on this.

23             My independent research would have included a

24   review of literature, a review of the history of the

25   product, publicly available information relating to the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 44

1   history of the product in the United States, outside the

2   United States; articles that may have been written about

3   post-marketing observations relating to the product,

4   either by the company or people outside the company.

5          I would have looked at any articles relating

6   to labeling changes for the product over time.  If those

7   weren't available, I would have accessed publicly

8   available iterations of the label, if those were still

9   available, either on the FDA's site or on the FOI site,

10  and reviewed those.  Most of the tasks that I can do

11  independently, independent of a production of the actual

12  production documents I would have done.

13     Q.   When you say you did a review of literature,

14  how did you decide which articles you were going to

15  read?  And I'm talking about any independent research

16  you did, not articles and materials that the PSC

17  provided to you.

18     A.   Oh, I understand, and that's to what I was

19  referring to.  We have, of course, access here to

20  computerized literature searching that we use in our

21  product development efforts.  And I would have had

22  literature search run with the terms that I developed at

23  the very beginning of my research into this project that

24  would have included information, general information to

25  antifibrinolytic therapies, as well as information

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 45

1    specific to your client's product and competing

2    products.

3        Q.    What were the search terms that you used?

4        A.    Antifibrinolytic therapies, methods to

5    alleviate -- methods to address blood loss during bypass

6    surgery.  I would have used the generic term and the

7    brand-name terms of the products, both in the U.S. and

8    in Europe.

9        Q.    What are those terms?

10       A.    I can't remember the European terms.  I would

11   have used aprotinin and Trasylol in the United States.

12   For the competitor products, I would have used, what's

13   Ferring's product, Amicar, aminocaproic acid, the TXA

14   product, I forget the trade name on that one now.  I

15   would have used the general terms of the Lysine

16   products, broad-spectrum protease inhibitors.  I recall

17   using SIRS inflammatory response during an attempt to

18   find information on that.

19            And once I went through the -- any articles

20   written by regulatory authorities on, if there were any,

21   I don't recall any sitting now -- sitting here now, on

22   CABG surgery, products to be employed with CABG surgery,

23   I would have looked at that, and then started looking at

24   any review articles I could have found.

25            First I always start with review articles

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 46

1  regarding the product of interest and the review article

2  is generally a roadmap to the pivotal articles by

3  individual authors you want to look at.  So I would have

4  gone, then gone through review articles to any specific

5  articles that they reference, both for -- if I'm

6  interested in efficacy, I would have looked at those;

7  interested in safety, I would have looked at those.  And

8  those would have been looked at in a chronological

9  fashion in an effort to see if new information evolved

10  over time.

11         So that's sort of my general approach to

12  looking at a new product.

13     Q.   Okay.  Throughout the deposition I'm going to

14  ask that you try your best to listen to my question and

15  to answer it.  I asked what were the brand-name terms

16  that you searched for, and what you just gave me was a

17  much longer answer that had nothing to do with my

18  question.  So going forward, Dr. Blume --

19         MR. RONCA:  That's not fair, no.  She gave you

20     a lot of terms and in the process of answering the

21     question.  And then when she couldn't remember an

22     exact term, she tried to describe what search terms

23     she used and words other than the actual search.

24     But she listed for you aprotinin, Trasylol,

25     aminocaproic acid, Amicar, she listed a Lysine

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 47

1      analogue, a lot of search terms.  So your comment
2      was not correct.
3              MR. DERRINGER:  Well, I disagree.
4  BY MR. DERRINGER:
5      Q.   My request and instruction still stands.
6  Please listen to my question and try your best during
7  the course of this deposition to answer the question
8  that I ask.  Okay?
9      A.   I thought I had.
10     Q.   Will you agree with me that you did not review
11 everything that Bayer provided to the FDA regarding
12 Trasylol?
13     A.   Yes.  Because I was not interested in the
14 chemistry, manufacturing and environmental-related
15 issues.
16     Q.   Will you agree that the FDA has reviewed a lot
17 more information about Trasylol than you have?
18             MR. MOSKOW:  Object to form, calls for
19     speculation.
20     A.   I don't know how to speculate on what FDA
21 reviewed.  But I would agree that they reviewed more
22 chemistry, manufacturing and environmental information
23 than I have reviewed.
24 BY MR. DERRINGER:
25     Q.   You wouldn't want to speculate, you said,

CHERYL  BLUME, Ph.D. - 7/21/2011

1   about what the FDA reviewed, that's because you don't

2   know what they reviewed.  Right?

3       A.   Well, I wasn't there while they were

4   reviewing, so I can't tell you what they reviewed

5   specifically.

6       Q.   Okay.  You agree that you didn't review the

7   full regulatory file on Trasylol?

8           MR. MOSKOW:  Objection to form.  You can

9       answer.

10           MR. RONCA:  The regulatory file at the FDA?

11       What regulatory file?

12           MR. DERRINGER:  All regulatory --

13           MR. RONCA:  All reg --

14           MR. DERRINGER:  All regulatory submissions,

15       including all communications between Bayer and FDA

16       regarding Trasylol.

17   BY MR. DERRINGER:

18       Q.   You agree you didn't review all of that?

19       A.   I did not review CMC-related information,

20   environmental information.  I did not review documents

21   that were submitted to the IND relating to individual

22   investigators during the clinical trials.  I didn't

23   review the IND summary updates.  So those I recall that

24   I did not review.

25       Q.   And your testimony is you reviewed everything

CHERYL  BLUME, Ph.D. - 7/21/2011

1   else that was submitted to FDA by Bayer or that was sent

2   by FDA to Bayer about Trasylol?

3       A.   Oh, I don't know how I would ever answer that

4   question because I would never know that complete

5   universe.

6       Q.   Did you ever ask for that complete universe?

7       A.   Well, FDA does not release certain documents

8   between the company and FDA, so obviously, I would not

9   be able to access those.

10      Q.   Outside of those, did you ever ask anybody for

11  the complete universe of documents that were exchanged

12  between Bayer and FDA about Trasylol?

13      A.   I asked for all of the documents relating to

14  my interest in this report.

15      Q.   Who did you ask that?

16      A.   Counsel.

17      Q.   Okay.  And --

18      A.   And I believe we did order individually

19  article -- documents from Freedom of Information.

20      Q.   Did you make any effort to ensure that you

21  reviewed every contact report between Bayer and the FDA

22  regarding Trasylol?

23      A.   No.

24      Q.   Do you agree that Bayer and the FDA were

25  consistently in touch with each other about Trasylol

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 50

1    from the time that Bayer filed its IND in 1989 until

2    today?

3              MR. MOSKOW:  Objection to form, the word

4         "consistently" is a problem.

5         A.    Yeah.  I don't -- you would have to define

6    consistent interactions with FDA.

7    BY MR. DERRINGER:

8         Q.    Can you, sitting here today, Dr. Blume,

9    identify a period of time when Bayer and the FDA were

10   not in touch with each other about Trasylol?

11        A.    I cannot because I did not review all the

12   different sections of the NDA.

13        Q.    If there are sections in the NDA, that's

14   certainly -- that you didn't review, those sections

15   certainly would not indicate a lack of communication

16   between Bayer and the FDA.  Correct?

17        A.    Well, I can't address if there were periods in

18   which FDA and the company were not in contact if I

19   haven't reviewed chemistry sections or manufacturing

20   sections, because they may well have been review -- in

21   contact over chemistry issues over a two-month period

22   when perhaps they weren't in contact with each other

23   over a labeling issue.  So I don't have the universe of

24   their contacts.

25        Q.    Can you identify a period of time when Bayer

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 51

1    and the FDA were not in communication with each other

2    about Trasylol?

3        A.    I can't do it because I haven't reviewed all

4    the sections.

5        Q.    Have you ever communicated with anyone other

6    than plaintiffs' lawyers or your own staff about

7    Trasylol?

8        A.    No.

9        Q.    Have you ever communicated about Trasylol with

10   anyone who was an investigator or an author in any of

11   the studies that you discussed or cite to in your

12   report?

13       A.    Repeat the question, please.

14       Q.    Sure.  Have you ever communicated about

15   Trasylol with anyone who was an investigator or an

16   author of any of the studies that you discuss or cite to

17   or reference in your report?

18       A.    I have not communicated about Trasylol, no.

19       Q.    With any of those people that I just

20   described.  Correct?

21       A.    I have not communicated with them about

22   Trasylol, correct.

23       Q.    Have you communicated about Trasylol with

24   anybody who participated in either of the two FDA

25   advisory committee meetings that took place regarding

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 52

1    Trasylol?

2       A.   I have not communicated with them about

3    Trasylol, no.

4       Q.   Have you communicated about Trasylol with

5    anybody who participated on the expert advisory panel

6    that was convened by Health Canada to examine Trasylol?

7       A.   No.

8       Q.   Have you ever spoken to any doctor or patient

9    about Trasylol?

10          MR. RONCA:  By patient, you mean patient who

11      got Trasylol?

12          MR. DERRINGER:  Yes.

13      A.   No.

14   BY MR. DERRINGER:

15      Q.   Have you ever spoken to any doctor or patient

16   who received Trasylol about the Trasylol label?

17      A.   No.

18      Q.   You don't know, Dr. Blume, what any particular

19   doctor was told by Bayer about Trasylol, do you?

20      A.   I think there -- I think there are documents

21   in the database I was provided that talked about

22   responses that were to be used by the Trasylol field

23   staff if queried about certain issues with Trasylol; but

24   I have not talked with any doctors regarding what a

25   Bayer representative may or may not told them.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 53

1      Q.   You don't know what any particular doctor did

2   or did not know about the risks associated with

3   Trasylol.  Correct?

4           MR. MOSKOW:  Objection to form.  You can

5      answer.

6      A.   I have not talked to any of the doctors.

7   BY MR. DERRINGER:

8      Q.   So I'm correct that you don't know what any

9   particular doctor knew or did not know about the risks

10   associated with Trasylol?

11           MR. MOSKOW:  Objection to form.

12      A.   Yeah, I thought I answered it.  I have not

13   talked with any of the doctors.  I only know what was

14   available to them in the labeling.

15   BY MR. DERRINGER:

16      Q.   Okay.  I'm correct then?

17           MR. MOSKOW:  Objection to form.

18           MR. DERRINGER:  I just want an answer to my

19      question, Neal.

20      A.   You are correct that I did not talk with any

21   of the individual doctors.

22   BY MR. DERRINGER:

23      Q.   That wasn't my question.  Am I correct that

24   you do not know what any particular doctor knew or did

25   not know about the risks associated with Trasylol?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 54

 1            MR. RONCA:  She answered that she didn't speak

 2       to any of them, but she knows that if the -- and you

 3       know that if the label is out there, a doctor may

 4       have known that stuff.  So what the individual

 5       doctor knew -- I don't even know what you're asking.

 6       She said she never spoke to any of the individual

 7       doctors.

 8            MR. DERRINGER:  Jim, I think that's an

 9       improper speaking objection.

10            MR. RONCA:  But "Dear Doctor" letters are sent

11       to all the doctors.

12  BY MR. DERRINGER:

13       Q.   Dr. Blume, you're not a mind reader; you don't

14  know what's in the mind of any particular doctor.

15  Correct?

16       A.   I will agree that I'm not a mind reader.

17       Q.   Okay.  And you don't know what's in the mind

18  of any particular doctor.  Correct?

19       A.   I'm not a mind reader.  I don't know what's in

20  the mind of an individual doctor at an individual time.

21  I know what the staff was instructed to talk to their

22  doctors about, I know what's in the "Dear Doctor"

23  letters, I know what was in the labeling.

24       Q.   Okay.  But you don't know what any particular

25  doctor actually knew about any risks associated with

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 55

1   Trasylol?

2       A.   Yeah, I don't know how to answer this any

3   differently.  I have not talked with any of the doctors

4   and I'm not a mind reader.

5       Q.   And in order to know what a particular doctor

6   knew about the risks regarding Trasylol, you would have

7   had to have talked to them about that.  Correct?

8       A.   Or been provided with the transcripts of

9   depositions, and perhaps I will be, but I have not been

10  to date.

11      Q.   Okay.  Let's take a look at paragraphs 34

12  through 39 of your report.

13          MR. RONCA:  I'll step out a second.

14          MR. MOSKOW:  We've been going about an hour,

15      so do you want to get through this section and

16      then --

17          MR. DERRINGER:  Sure.

18          MR. MOSKOW:  Okay.

19  BY MR. DERRINGER:

20      Q.   Page 18, Dr. Blume, of your report.

21      A.   Yes.

22      Q.   Will you just confirm that the opinions that

23  you're going to offer in this case are listed in summary

24  form at Section III of your report which is on Page 18?

25      A.   Yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 56

1      Q.   And these opinions listed in paragraphs 34

2   through 39 are described in more detail in the remainder

3   of your report.  Correct?

4      A.   Yes.

5      Q.   In other words, the bases for the opinions

6   that you describe on Page 18 of your report are set

7   forth in Sections IV and V of your report.  Is that

8   correct?

9      A.   Correct.

10      Q.   The paragraph -- the opinions that you list on

11   Page 18 at paragraphs 34 -- I'm sorry, 35 and 36, those

12   deal with mortality.  Right?

13      A.   Just one second.

14      Q.   Sure.

15      A.   Yes.

16      Q.   Okay.  And those opinions are described in

17   more detail at Section IV of your report, which is at

18   Pages 19 through 33.  Correct?

19      A.   Well, yes.  I'd like to clarify one thing.

20   Yes, certainly IV and V focus on mortality and the renal

21   impairment issues.

22      Q.   I'm sorry, IV and V?  Oh, Sections IV and V --

23      A.   Yes.

24      Q.   Section IV focuses on mortality and Section V

25   focuses on renal.  Right?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 57

1       A.   Yes.  That's correct.

2       Q.   Okay.  And so the opinions that are at

3    paragraphs 35 and 36 on Page 18, we've already

4    established those deal with mortality, and those are

5    described, the bases for those opinions are described at

6    Section IV of your report, the section that deals with

7    mortality.  Correct?

8       A.   Yes.  The only reason I wanted to bring up is

9    that preceding Section II is, of course, Section II, and

10   Section II is a -- is a brief overview to the life of

11   Trasylol in the United States, but it also does include

12   some information regarding renal and renal injury.  So

13   there are parts of II that would also apply to -- that

14   would be used in coupling with Section V.

15      Q.   Okay.  I was talking about Section IV and the

16   mortality opinions, however.

17      A.   Yes.  I was just trying to be complete when I

18   said IV is mortality and V is renal.  There are also

19   some comments in Section II that relate to these issues.

20      Q.   Okay.  But generally speaking, if I wanted to

21   find the bases for your opinions on mortality, I'd look

22   at Section IV of your report.  Correct?

23      A.   For mortality, that's correct.

24      Q.   And if I wanted to find the bases for your

25   opinions -- well, strike that.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 58

1          First, paragraphs 37 and 38 are your

2     renal-related opinions.  Correct?

3          A.   Yes.

4          Q.   Okay.  And if I wanted to find the bases for

5     those opinions, I'd look at Section V of your report.

6     Correct?

7          A.   Primarily;

8          Q.   Okay.  Opinion 34 -- I should say paragraph

9     34, the opinion that's described there on Page 18, do

10    you see that?

11         A.   Yes.

12         Q.   Okay.  The bases for that opinion are

13    described in Sections IV and V of your report.  Correct?

14              MR. MOSKOW:  Objection to form.

15         A.   Yes.

16    BY MR. DERRINGER:

17         Q.   Okay.  And paragraph 39, the bases for that

18    opinion are also described at Sections IV and V of your

19    report.  Correct?

20         A.   Yes.  I will agree with you with that with a

21    provision that many of the studies described in these

22    sections do overlap in some form with mortality and

23    renal events.  So there are certain parts of -- there

24    will be certain studies discussed in IV with mortality

25    that may well have a renal component and they will also

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 59

1   be discussed in Section V.

2       Q.   Right.  If they have a -- if any study that

3   you describe in your mortality section of your report

4   also is a basis for one of your renal opinions, you've

5   also then described it in your renal section.  Correct?

6       A.   Well, that would have been a goal, but I don't

7   want to be precluded from using something in IV for

8   renal if renal events weren't discussed in Section IV

9   simply because the heading says mortality.

10      Q.   I can tell you that renal events are not

11  discussed in your Section IV.

12      A.   Well, they are discussed in II because they

13  talk about AKI in II.  So I want to just re -- just want

14  to note that there are -- there is some overlap among

15  these events.

16      Q.   Among the events?

17      A.   Sure.  Studies report mortality, they discuss

18  renal events, they talk about mortality secondary to

19  renal impairment, so they're not completely independent

20  events.

21      Q.   But in putting your report together,

22  Dr. Blume, you made your very best effort to be sure

23  that if there were a study you were going to rely upon

24  as a basis for your renal opinion, you discussed that in

25  Section V of your report.  Correct?  You made your best

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 60

1    effort to do that?

2         A.    Let's see.  Yes, I made that effort.  But I

3    just want to point out once more that these events are

4    not necessarily mutually exclusive.

5         Q.    And you made your best effort, your very best

6    effort that if there was a study you were going to rely

7    upon for your mortality opinions in this case, you

8    described it in Section IV of your report.  Correct?

9         A.    Yes, recognizing that death may also be

10   discussed in the mortality section -- I'm sorry, in the

11   renal section.

12              MR. DERRINGER:  Okay.  Neal, you wanted a

13        break, that's fine.

14              MR. MOSKOW:  Just five minutes, stretch legs.

15              MR. DERRINGER:  Sure.

16              THE VIDEOGRAPHER:  The time is 9:52 and we're

17        off the record.

18              (Break taken.)

19              THE VIDEOGRAPHER:  The time is 10:05 and we

20        are back on the record.

21   BY MR. DERRINGER:

22        Q.    Dr. Blume, how did you prepare for your

23   deposition today?

24        A.    Well, I had originally prepared in February

25   when the deposition was first scheduled and

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 61

1    unfortunately I became ill, and at that time I had

2    constructed the notebooks that you see surrounding us in

3    the conference room, which include all -- they're

4    divided, as you can tell, by paragraph from the report

5    and include all cited documents.

6            So that was initiated in an effort to

7    familiarize, refamiliarize myself with all of the

8    documents that are cited in the report.  And as you

9    know, additional documents were also deemed to be

10   important and those were sent to you, and as applicable

11   to the individual paragraph sections, those individual

12   documents that were sent to you are also included in

13   these notebooks.

14           So I began first with reviewing the notebook

15   and all of the documents cited.  Second, second step is

16   generally to examine either parts, or in part or in

17   whole any depositions that may have been taken that are

18   relevant to my opinion, if these had not already been

19   cited.  We discussed earlier the specific ones that were

20   examined.  I also looked over the -- a few of the expert

21   reports as I've noticed, noticed to you earlier that I

22   examined.

23           I reviewed -- I also reviewed any information

24   that we received independently, either in books or from

25   FOI or from FOIE; reviewed, again, the labeling, various

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 62

1   iterations of the labeling; looked over the "Dear

2   Doctor" letters that were sent; met with the -- met with

3   our attorneys, I met with them earlier in February when

4   we thought the deposition was going to happen, and then

5   met with them again this week.

6        Q.   How long did you meet with the attorneys

7   total, including February and for this deposition?

8        A.   We met one day in February, probably around a

9   six-hour day, as I recall, and I was getting ill at that

10  point, so I think the second day was cut short.  And

11  then in this week we met yesterday, yesterday.

12       Q.   So two full days plus a little bit?

13       A.   Yes, as I recall.  Yes, that's right.

14       Q.   Okay.  And in preparing for your deposition,

15  did you review any materials that are not on -- among

16  the list of materials that we discussed earlier in this

17  deposition as described in the materials that you

18  considered or relied on?

19            MR. RONCA:  Object.  Part of our stipulated

20       agreement was that she would provide you with things

21       considered and relied upon, and also that

22       conversation with Counsel would be not part of the

23       deposition or a part of any questioning.  We had

24       that for both sides, that was the rule.  And if

25       there was -- I mean, you're asking her is there

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 63

1        anything else that she might have looked at, even if

2        she didn't rely on it or consider it, in a

3        conversation with Counsel and I think that violates

4        our agreement.

5    BY MR. DERRINGER:

6        Q.   I'm not asking you about anything you

7    discussed with Counsel.  I am asking about any documents

8    that are not on your Materials Reviewed list that you

9    reviewed as part of your preparation for the deposition

10   and -- well, let me start there.  Don't describe them to

11   me, just tell me yes or no, and then we can decide where

12   to go from there.

13       A.   I don't think so.

14       Q.   Okay.  Take a look at your CV that you

15   included in your expert report, it's Appendix 1 at Page

16   45.  Do you have it in front of you?

17       A.   I do.

18       Q.   Okay.  When was this CV put together?

19       A.   Oh, well, I don't see that it's dated.  It

20   would have been at least as recently at the close of

21   2009 because it has my most recent academic appointment

22   on it, and I think that came at the end of 2009 or the

23   beginning of 2010.

24       Q.   Okay.  Was this put together by you?

25       A.   The last one that I had was edited by me and

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 64

1    Ms. Blakeslee in our office would have prepared it,

2    would have typed it.

3         Q.   Is this CV complete and accurate, to the best

4    of your knowledge?

5         A.   I believe it is, but I did not check to see if

6    any of the pending patents have been granted.

7         Q.   Outside of pending patents that may or may not

8    have been granted, is there anything that's missing from

9    this CV?

10        A.   Missing?

11        Q.   Correct.

12        A.   Not that I'm aware of.

13        Q.   What languages do you read?

14        A.   I can read a little bit of -- I can read

15   French articles, that's it.

16        Q.   So you read some French?

17        A.   Yes.

18        Q.   Okay.  And, obviously, English.

19        A.   Yes.

20        Q.   Okay.  And what languages do you speak?

21        A.   English.

22        Q.   On Page 47 of your report, this is the second

23   page of your CV, you have a section titled

24   Highlights/Accomplishments.  Do you see that?

25        A.   Yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 65

1      Q.    Is this a summary of some of the most

2    significant aspects of your professional work?

3      A.    Yes, but with the caveat that product

4    development efforts that are done with PDG, so from 1999

5    forward, are bound by confidentiality agreement, so I am

6    not allowed to discuss much of the product development

7    work that I do with drug companies.  So you will not see

8    in here lists of products approved or presentations to

9    FDA.

10     Q.    Right.  I'm just asking if this is a summary

11   of some of the most significant aspects of your

12   professional work?

13     A.    Yes, I think so.  Yes.

14     Q.    Go to professional accomplishments -- or, let

15   me see, that might be Professional Experience.  You've

16   worked at two pharmaceutical companies.  Is that right?

17     A.    Yes.

18     Q.    Any others?

19     A.    Prior to the founding of PDG, no.

20     Q.    Okay.  PDG is not a pharmaceutical company, is

21   it?

22     A.    Correct.  And it doesn't include any of the

23   companies with which we work.

24     Q.    Okay.  Somerset Pharmaceuticals and Mylan

25   Laboratories, those are the two pharmaceutical companies

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 66

1   at which you worked?

2       A.   Yes.

3       Q.   Was either one of those a member of the

4   Pharmaceutical Research and Manufacturers of America at

5   the time you worked for them?

6       A.   I don't know.

7       Q.   You don't know one way or the other?

8       A.   I don't know one way or the other.

9       Q.   Okay.  Was either one of those, that is

10  Somerset or Mylan, a member of the Council for

11  International Organizations of Medical Sciences at the

12  time that you worked for them?

13      A.   I don't know.

14      Q.   Have you ever served on a committee of the

15  Council for International Organizations of Medical

16  Sciences?

17      A.   No.

18      Q.   The last time that you worked in industry was

19  1998.  Is that correct?

20      A.   Yes.

21      Q.   At Mylan, when you were there, am I right that

22  the main focus of the company was the development and

23  marketing of generic drugs?

24      A.   No.

25      Q.   Gemfibrozil, do you know that product?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 67

1      A.    Well, the generic name of Lopid?

2      Q.    Yes.  You're familiar with that?

3      A.    I'm familiar with what gemfibrozil is.

4      Q.    Okay.  Mylan marketed gemfibrozil, which is a

5   generic version, like you said, of Lopid for the

6   treatment of hypolipidemia.  Correct?

7      A.    I think we had it approved.  I don't have a

8   recollection if it were marketed.  I don't know.

9      Q.    Okay.  But it was a drug that Mylan had

10  applied for approval to market.  Correct?

11     A.    I think they received an ANDA approval for it.

12     Q.    Okay.  Do you recall when Mylan began to

13  market this drug in the United States?

14     A.    I don't know if they ever marketed it.

15     Q.    At Somerset Pharmaceuticals, did you ever work

16  on any branded products as opposed to generics?

17     A.    Well, Somerset has no generics.  Just to

18  answer my question -- answer your earlier question.

19  Mylan was, when I was there, was half brand name and

20  half generic formulations.  Somerset has no ANDA, no

21  generic formulations.

22     Q.    Okay.  When you were at Mylan, did you work

23  mainly on the branded side or on the generic side?

24     A.    I, you can tell by my titles, I would have

25  worked on both sides.  And I was actually hired to

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 68

1    develop the branded side and was responsible for their

2    original, their original New Drug Applications.

3       Q.   Can you explain why there is an overlap in the

4    dates of your employment with Mylan and Somerset?

5       A.   Yes.  I was at Mylan when Mylan decided in the

6    early '90s to purchase Somerset as -- really, it was to

7    be an acquisition.  And it was being purchased because

8    they had a line of products from Europe, from some

9    European licensing opportunities that were interesting

10   for -- that we thought would be interesting for the

11   United States.  It was to be an investment only.

12          And it was purchased with that idea, and

13   immediately upon the purchase of the company, within six

14   months, the founder and CEO of the company died suddenly

15   at a board meeting, and was clearly the anchor of the

16   company and was independently -- and was really handling

17   most of the product development efforts and interactions

18   with FDA, and it left a tremendous void.

19          The decision was made at that time that Mylan

20   was -- that Somerset would be moved to Tampa and would

21   be located near the Mylan Tampa facilities, and that the

22   Mylan Tampa operation would step in and help fill that

23   void.  And over a period of time, it was decided that

24   the product would likely have significant FDA

25   interactions and there would be follow-up FDA approvals,

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 69

1    and I was asked to -- actually, it was a promotion for

2    me -- to step up to the opportunity at Somerset and it

3    was going to give me an opportunity to do -- to become a

4    CEO -- COO, which I had not yet become.

5            So from '93 to '95, I was working in two

6    different offices, and then in '95, became involved

7    completely with Somerset.

8        Q.   So you were employed, your employer formally

9    was both companies from '93 to '95?

10       A.   Gee, I don't know how -- I can't remember

11   how -- I don't know if I got two separate paychecks.  I

12   don't remember.  I just don't remember.

13       Q.   Go back to Page 47 on your CV.  Midway down

14   the page, one of your points you say you had ultimate

15   responsibility for the design, development,

16   implementation, finalization and submission of Phase I

17   through IV clinical, and all phases of toxicology trials

18   to FDA and other regulatory scientific review bodies.

19   Do you see that?

20       A.   Yes.

21       Q.   Can you identify all drugs for which you had

22   that ultimate responsibility?

23       A.   Yes.  I think this is public information.  It

24   would have been the Maxzide, the Maxzide-25 products,

25   the ulcer product that we developed, there was a

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 70

1   fluoroquinolone, the selegiline products that eventually

2   evolved into Eldepryl and Emsam.  There was an orphan

3   drug for children, Asista-E analogue.  And those were

4   the NDA-type products.  But I was also responsible for

5   the PK, PK studies, and the submissions of all of the

6   ANDA's as well.

7        Q.   Are those for the same products, or are you

8   now talking about different drugs?

9        A.   Well, no.  The NDA's were the first list.

10       Q.   Correct.

11       A.   The ANDA's were abbreviated applications which

12   would be for generic formulations.

13       Q.   Understood.  Can you tell me all of those?

14       A.   For all the generics?

15       Q.   Well, for --

16       A.   I think there were over 100 or 150 ANDA's

17   approved while I was at Mylan, so no, I can't give you

18   the list.

19       Q.   And is your testimony that for every one of

20   those generic products, you had ultimate responsibility

21   for the design, development, implementation,

22   finalization and submission of Phase I through IV

23   clinical and all phases of toxicology trials to FDA and

24   other regulatory scientific review bodies?

25       A.   Well, that would be true for the NDA's.  Of

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 71

1    course, we don't have Phase I, II, IV -- Phase I, II,

2    and III for the ANDA's, but I would have done -- well,

3    yeah, we do have phase -- yeah, we do.

4         We have Phase I and Phase IV only for the

5    ANDA's, so yes, I would have been responsible for that.

6    Product development was my responsibility.  At the end

7    of the day, the success or failure of it was my

8    responsibility.

9    Q.   And you say there were hundreds of them that

10   fall understand the ANDA category, the generics.

11   A.   Yes.

12   Q.   You can't list them for me today.  Can you

13   tell me what the time period was when you had ultimate

14   responsibility, as described on Page 47 of your CV?

15   A.   I would say from the time I became technical

16   director.

17   Q.   When was that?

18   A.   Let's see.  I think I became technical

19   director in 19 -- 1985, I believe.

20   Q.   Until when did you have that responsibility?

21   A.   Well, then I became a -- I became a corporate

22   officer in 1990 and remained a corporate officer until I

23   left.

24   Q.   In 1995?

25   A.   From Mylan, yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 72

1      Q.    Okay.  So you had ultimate responsibility, as

2    you've described in that bullet on Page 47, for the

3    design, development, implementation, finalization,

4    submission for the ANDA's Phase I and IV clinical and

5    all phases of toxicology trials to FDA and other

6    regulatory scientific bodies, for all generic drugs at

7    Mylan from 1985 until 1995.  Is that right?

8      A.    Yeah.  Product development fall -- somewhat of

9    a term of art, but product development FDA liaison falls

10   within technical director, and I was vice president of

11   scientific affairs.

12     Q.    Okay.  Have you ever directed a

13   pharmacovigilance department at a pharmaceutical

14   company?

15     A.    At both Mylan and Somerset.

16     Q.    Was that for pre- or post-marketing

17   pharmacovigilance?

18     A.    Pharmacovigilance was post-marketing.

19     Q.    And you actually directed a pharmacovigilance

20   department, you were the director?

21     A.    It fell within technical director and vice

22   president of scientific affairs and COO, yes.

23     Q.    You had day-to-day responsibility for the

24   pharmacovigilance department at both Somerset and Mylan.

25   Is that your testimony?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 73

1      A.   Yes.  Yeah.

2      Q.   Did you ever work in sales and marketing at a

3   pharmaceutical company?

4      A.   No.

5      Q.   Have you ever worked --

6      A.   Marketing, regulatory -- well, let me explain

7   something.  The regulatory review of sales and marketing

8   materials fall within regulatory affairs.  So we had to

9   review either launch materials, or whatever was being

10  used, submitted by the sales or marketing group, but

11  that assignment, even though it was sales and marketing,

12  fell within reg affairs.

13     Q.   Right.  You never worked within the sales and

14  marketing group at any pharmaceutical company.  Correct?

15     A.   Never.

16     Q.   Okay.  I'm correct?

17     A.   You are correct, I never did.

18     Q.   Okay.  And I said at a pharmaceutical company.

19  You've never worked in sales and marketing at any

20  company.  Correct?

21          MR. MOSKOW:  Objection to form.  Other than

22     her current PDG.

23     A.   Yes.  Well, I don't know if we have sales and

24  marketing.  I don't know.  No.  I am not a marketer.

25  BY MR. DERRINGER:

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 74

1      Q.    Not a marketer, not someone who works in

2    sales?

3      A.    I mean, at PDG we interview potential new

4    clients, we talk with potential new clients, we look to

5    see if there's a fit.  I guess that could be loosely

6    described as a sales and marketing function.  We don't

7    have a sales and marketing department, but.

8      Q.    Right.  Any sales and marketing you've ever

9    done in your career has been here at PDG.  Right?

10     A.    Yes.  I mean, Mylan has had multiple licensing

11   agreements with other companies.  There's always initial

12   meetings and introductory meetings and see if there's a

13   fit kind of meeting.  My role was to, in more in the

14   science and regulatory end.  I mean, does that loosely

15   fall under potential marketing and licensing

16   opportunities, perhaps, but I've never been part of a --

17   I've never been a member of a division that is primarily

18   involved with the sale of a product or the marketing of

19   a product.

20     Q.    Thank you.  Do you own stock in any drug

21   companies?

22     A.    I've never been asked that question before.

23   I've never been asked that.  I'd like to -- I'm not

24   going to answer it until I check with my counsel.

25     Q.    Okay.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 75

1              MR. DERRINGER:  Neal, we'll put it under a

2        confidential designation, that's fine.  You can

3        check, the question remains outstanding.

4              MR. MOSKOW:  Can we talk at the next break and

5        we can respond at that point?

6              MR. DERRINGER:  Sure.

7              MR. MOSKOW:  Thank you.

8              THE DEPONENT:  Yes.

9   BY MR. DERRINGER:

10       Q.   On your CV under Awards and Organizations, the

11  last bullet discusses or lists -- not the last bullet,

12  the last bullet on Page 49 says Regulatory Affairs

13  Professional Society.  Do you see that?

14       A.   Yes.

15       Q.   Are you currently a member of that society?

16       A.   I think so.  I'd have to check with Sylvia.  I

17  think we're paid up.

18       Q.   We, is it the organization that's a member or

19  is that you yourself?

20       A.   I don't know.  I was -- because of my years of

21  experience, I know I was grandfathered into RAPS because

22  I was in Regulatory Affairs before it was founded.  But

23  I think the company has a corporate membership and I

24  know several of our employees have sat for the test, the

25  actual test.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 76

1     Q.    Do you have an individual membership?

2     A.    I don't know.  I don't know.

3     Q.    Have you ever sat for the RAPS test?

4     A.    I was grandfathered in.

5     Q.    Grandfathered in, what does that mean, you're

6   grandfathered in as a member?

7     A.    I think so, yeah.

8     Q.    Okay.

9     A.    If you were in -- if you were in regula --

10  working in U.S. Regulatory Affairs before the founding

11  of the company -- or before the founding of the society,

12  they called you grandfathered in.  I don't remember any

13  more details other than that.

14    Q.    Do you know whether or not this Regulatory

15  Affairs Professional Society offers a regulatory affairs

16  certification?

17    A.    Oh, several of my employees have it, yes.

18    Q.    But do you have it?

19    A.    No.  I don't think I need to take it because

20  of my long-term experience; but no, I'm not.

21    Q.    I appreciate your perspective.  You do not

22  have a regulatory affairs certification --

23    A.    No.

24    Q.    -- from the Regulatory Affairs Professional

25  Society?

CHERYL   BLUME, Ph.D. - 7/21/2011

1      A.    I do not.

2      Q.    Have you ever?

3      A.    Well, I have to ask -- you know what, I'll

4    have to ask that.  With my grandfathering in, I don't

5    know if that includes that or not.  I don't know.

6      Q.    To the best of your knowledge today, you don't

7    have anything hanging on your wall --

8      A.    No.

9      Q.    -- that is a certificate or a certification

10   from the Regulatory Affairs Professional Society.

11   Correct?

12     A.    Correct.

13     Q.    You talk about your teaching experience in

14   your CV, that you are an associate professor or an

15   affiliate associate professor to the voluntary faculty

16   at the University of South Florida.  Do you see that?

17     A.    Yes.

18     Q.    Okay.  That's not a tenured position, is it?

19     A.    I don't think so, no.

20     Q.    What have you actually taught?

21     A.    It's a really interesting -- I've been doing

22   it for several years now.  It's a seminar, what it is is

23   a seminar series with professionals in the area who have

24   backgrounds, and it's now pharmacology and physiology,

25   it's generally medical students or Ph.D. students,

CHERYL  BLUME, Ph.D. - 7/21/2011

1    public health students who are interested -- who may be

2    interested in careers other than academia.

3              It's seminars; it's a topic-type discussion.

4    A couple of the students from that have come here and

5    done internships, one of them came here as an employee.

6    But it's a very loose, really a real-world kind of a

7    roundtable seminar-type discussion.

8        Q.   You don't grade these students, do you?

9        A.   Do I grade them, no.

10       Q.   You don't issue a test to them, do you?

11       A.   No.  It's a seminar series, volun -- it's

12   really voluntary for the students, I don't even know if

13   they get credit for coming to the seminars, different

14   topics and it's to show different opportunities

15   available to them outside of academia.

16       Q.   You've never taught a course in anything

17   having to do with Trasylol, have you?

18       A.   No.

19       Q.   You've never taught a course in anything

20   having to do with regulatory affairs, have you?

21       A.   I think one of the seminars that I did was

22   regulatory affairs, FDA interactions, how drugs are

23   approved, how drugs are maintained.  I think that was

24   one of the early seminars I did.

25       Q.   So when you say early seminars, that was one

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 79

1    topic in the semester that you might have had these

2    discussions.  Is that right?

3         A.   I believe so, yeah.  I believe that's right.

4         Q.   So like for one session you might have talked

5    about regulatory affairs?

6         A.   Yeah.  I can't remember now if it was one or

7    two.  I've been doing this for some time.

8         Q.   And how long ago was that?

9         A.   It was the first year I did it, so that would

10   have been fall, I think it was the fall of 2004.

11        Q.   That would be the last time you would have

12   taught anything on anything having to do with regulatory

13   affairs?

14        A.   Well, I talk about regulatory affairs in

15   everything.  That's why I'm there is to talk about

16   careers either within the pharmaceutical industry or the

17   Food and Drug Administration, I mean, that's what I do.

18   So I intersperse it with everything that I talk about,

19   how drugs are approved, all the way to how FDA functions

20   today and how FDA interacts with European authorities.

21   I mean, that's why I'm there.

22        Q.   And I think I understand now.  The purpose of

23   the seminar, I think you had mentioned, was to allow

24   students who want to come and explore options for

25   careers outside of academia.  Is that fair?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 80

1        A.   Well, I see it that way.  It's also -- they

2    know the topics.  If they have a particular interest --

3    I recall when I was there one time and it had been after

4    one of the major public releases about a product, a

5    safety issue about a product that had come up and had

6    been marketed for some time, and their interest was

7    really kind of right on point to this, is why wasn't

8    this discovered before the drug was approved, what's

9    going on, I mean, how does this work in the United

10   States.  So we had a great discussion about evolution of

11   adverse events and why things occur at different points

12   of time in the life of a product.  So it's interspersed

13   with everything I do over there.

14       Q.   This is a volunteer position?

15       A.   Yes.

16       Q.   You have a list of patents in your CV.  None

17   of these patents -- none of these patents involve

18   Trasylol or a Lysine analogue, do they?

19       A.   No.  Correct, they do not.

20       Q.   None of these patents involve cardiac surgery,

21   do they?

22       A.   They do not.

23       Q.   None of these patents involve nephrology, do

24   they?

25       A.   If you're referring to the treatment of

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 81

1    conditions by nephrologists, I would say no, they do

2    not; but several of them talk about renal disposition of

3    products, renal handling of drug products.

4         Q.   You're talking about pharmacokinetics?

5         A.   Yeah, or -- yes.

6         Q.   Okay.  None of these patents involve FDA rules

7    or regulations or guidances, do they?

8              MR. MOSKOW:  Object to the form.  You can

9         answer.

10        A.   Yeah, I'm not exactly sure how that would work

11   its way into a U.S. patent, but they have not -- it does

12   not work its way into my U.S. patents or any foreign

13   patents.

14   BY MR. DERRINGER:

15        Q.   How many patents have you filed applications

16   for but have been rejected by the patent office?

17        A.   I have no idea.

18        Q.   Is it more than 10?

19        A.   I don't know if any have been rejected for a

20   novelty.  They have been rejected for overbroad and I've

21   been told to put them into multiple applications.  I

22   don't -- I don't recall sitting here that any of them

23   have been rejected for the science or the novelty of it.

24   Most of them have been administrative.  But it's been a

25   long time since I've searched that.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 82

1     Q.    Some of your applications have been rejected.

2  Right?

3     A.    Well, if they thought they were too unwieldy

4  and they needed to be subdivided, if they thought things

5  needed to be limited.

6     Q.    Just answer my question, please.

7     A.    Well, I'm trying to describe why the --

8     Q.    I'm not interested in why.  I just want to

9  know, some of your patent and patent applications have

10  been rejected.  Correct?

11     A.    I'm somewhat stunned by that comment.  But

12  some have been rejected, but none that I, sitting here

13  now, recall for reasons of science.

14     Q.    Under Publications, is this list complete?

15     A.    Yes.

16     Q.    All of your publications are in the field of

17  pharmacology.  Correct?

18     A.    We have pharmacology -- well, a couple of them

19  are clinical articles.  We have clinical studies.  There

20  are clinical -- there's Maxzide articles that are not

21  pharmacology.

22     Q.    Which ones are those?

23     A.    Clinical experience with a combination

24  formulation of triamterene and hydrochlorothiazide in

25  hypertension, and antihypertensive agent, so those two

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 83

1    would be -- those would -- those don't involve

2    pharmacology.  They're the clinical studies that went in

3    the NDA's.

4         Q.   The rest of your publications are focused on

5    the field of pharmacology.  Correct?

6         A.   If you -- yes, pharmacokinetics,

7    pharmacodynamics and basic -- basic pharmacologic

8    receptor interactions, yes.

9         Q.   You've never published something on the FDA.

10   Correct?

11        A.   I have not.

12        Q.   You've never published anything on FDA

13   regulations.  Correct?

14        A.   Correct, I have not.

15        Q.   You've never published anything on FDA

16   guidances.  Correct?

17        A.   No, I've never -- no.

18        Q.   I'm correct?

19        A.   You're correct.  I have not commented on an

20   FDA guidance.

21        Q.   You've never published anything having to do

22   with the regulatory process.  Correct?

23        A.   Correct.  I have not published on that.

24        Q.   You've not published anything on industry

25   standards in the pharmaceutical industry.  Correct?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 84

 1      A.    Correct, I have not.

 2      Q.    You've never published anything having to do

 3   with renal impairment or cardiac surgery.  Correct?

 4      A.    We had renal -- I would have to check the

 5   Maxzide clinical articles because I believe there is --

 6   there were discussions in patients with renal -- with

 7   renal dysfunction.  As I recall, the drug is primarily

 8   administered renally, but I would have to check that.

 9      Q.    And if you do, if you have any publications

10   that have anything to do with renal issues, those would

11   be those two Maxzide publications that you described

12   before, the first two bullet points on Page 52?

13      A.    Yes.  And the third one clearly is, it's

14   absorption of formulations and influence of age in renal

15   function.

16      Q.    That's the publication from 1986; correct?

17      A.    Uh-huh.

18      Q.    Okay.  Anything else on your list that you

19   think may have something to do with renal issues?

20      A.    I can't remember when we were doing the --

21   actually, I forgot about the cardiac drug.  We did

22   publish on disopyramide.  I can't remember if, when we

23   did that study, if we included renal patients in the

24   group or not.

25      Q.    Which one is that?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 85

 1     A.   Disopyramide, next to the last on the first

 2   page.

 3     Q.   That's from 1984?

 4     A.   Yes.  It's the disopyramide one.  I forgot

 5   that that -- actually, disopyramide is a cardiac

 6   product, and triamterene and hydrochlorothiazide, the

 7   indications are cardiology-related to hypertension.

 8     Q.   But none of these publications have anything

 9   to do with cardiac surgery.  Correct?

10     A.   No.

11     Q.   I'm correct?

12     A.   Correct.  You are correct, they do not.

13     Q.   And I think this is obvious, but I'll ask it

14   anyway, you've never published anything about aprotinin?

15     A.   Never published anything about what?

16     Q.   Aprotinin?

17     A.   I have not.

18     Q.   Or any Lysine analogue?

19     A.   Correct, I have not.

20     Q.   The Web site for your company is that

21   www.pharmdevgroup.com?

22     A.   Yes.

23     Q.   Okay.  Spelled P-H-A-R-M-D-E-V-G-R-O-U-P?

24     A.   Yes.

25     Q.   Okay.  And you founded this company in 1999?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 86

1      A.   Yes.

2      Q.   It's a consulting firm that serves both the

3   pharmaceutical industry and the legal community.  Is

4   that right?

5      A.   Yes.

6      Q.   You describe in your CV, I believe, that you

7   are a consultant to national and international

8   pharmaceutical firms?

9      A.   Yes.

10      Q.   Can you tell me the pharmaceutical firms or

11   industry clients for whom you've been a consultant?

12      A.   I can, but I can't.  I'm not permitted to.

13          MR. DERRINGER:  Neal, we'll take that up at

14      the break?

15          MR. MOSKOW:  Okay.

16   BY MR. DERRINGER:

17      Q.   And the basis for why you're not permitted to

18   disclose who you've worked for?

19      A.   Well, because I have a letter from our

20   corporate counsel saying you aren't going to disclose

21   anyone you work for under the tenets of the

22   confidentiality agreements that we have with those

23   clients.

24          So I'll be glad, Neal, to give you our

25   corporate counsel's name, and this has come up before

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 87

1    and the letter has been given out before.

2        Q.   Dr. Blume, have you ever advised a company in

3    their preparations for an advisory committee meeting?

4        A.   Somerset had an advisory committee meeting.

5    The meeting actually took place after I left.  As I

6    recall, I was aware of it before I left and had

7    participated in the preparation of the materials and

8    slides that would be used for the preapproval meeting.

9        Q.   Did you ever advise -- is that the only

10   company that you've worked with or advised in

11   preparation for an advisory committee meeting?

12       A.   I think so, yes.

13       Q.   Did you advise Somerset to hold a mock panel

14   or mock ad comm as a way for preparing for that meeting?

15       A.   Yes.

16       Q.   Nothing wrong with a company doing that, is

17   there?

18       A.   Certainly not when it's going to be a vote on

19   the approval of a new product, no, of course not.

20       Q.   Or a vote on whether a current product

21   marketing authorization should be continued?

22       A.   I'm -- I'm a supporter of preparation panels.

23       Q.   Mock panels like we've talked about?

24       A.   I don't usually refer to them as that; but

25   yes, preparation panels, I am a supporter of that.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 88

 1      Q.   In your CV on Page 48, the last kind of arrow
 2   point there, one thing you say is that you assist
 3   counsel in developing strategies related -- relating to
 4   regulatory and marketing elements associated with
 5   litigation.  Do you see that?
 6      A.   Yes.
 7      Q.   There you're not talking about assisting
 8   clients in their interactions with the FDA, you're
 9   talking about working with lawyers who have sued drug
10   companies.  Correct?
11      A.   Well, I would first correct the question -- or
12   correct your comment.  My work in litigation is not
13   restricted to working with attorneys who sue drug
14   companies.  I think if you look over my experience list,
15   you'll see I've worked on quite a few cases that have
16   nothing to do with suing of drug companies.
17      Q.   But you do work with a lot of attorneys who
18   have sued drug companies?
19      A.   Well, I'm always driven by the science.  So
20   I've worked with companies who are being sued and I've
21   worked with companies who have -- companies who are
22   being -- I work with attorneys who are working for the
23   companies being sued and I've also worked with attorneys
24   for patients who have been injured.
25           But certainly we've done patent litigation

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 89

1   here, we've done antitrust litigation in this group, and

2   we've worked with a variety of attorneys who have worked

3   with patients who have been injured, as well as

4   companies who have been accused of having products being

5   injured.

6            So with that in mind, when we are assisting

7   counsel, oftentimes we are asked to review the

8   regulatory appropriateness of marketing elements that

9   have been cited in litigation efforts answering the

10  question were the marketing elements compliant with FDA

11  regulations or FDA standards for marketing materials for

12  various product categories.

13      Q.   Have you ever sent solicitation letters

14  seeking business?

15      A.   We are a member -- we are a member of an

16  attorneys -- well, we were, I don't think we are

17  anymore.  We used to be on a list of expert witnesses

18  and if that -- and we discontinued all of those except

19  one that had a term on it.  We may still be on that,

20  SEEK, we may still be on the SEEK list, but that will

21  not be renewed, and the other ones are not -- have not

22  been renewed.

23      Q.   But you have solicited business through

24  listings as an expert witness firm.  Is that right?

25      A.   There was two, I think.  I think there was two

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 90

1    at the beginning of -- when we started this.  One was

2    SEEK because it was for technical witnesses.  And there

3    was another one that clearly is in the file, I did not

4    know their affiliation, and once I knew the affiliation,

5    we withdrew it.

6         Q.   When was that?

7         A.   Oh, I guess a couple of years ago.

8         Q.   You can't remember the name of it?

9         A.    It was affiliated with a group of attorneys

10   and I had no idea of that, and once I knew that, it

11   was -- no, I don't remember it.  But we turned down a

12   tremendous amount of work, so we don't advertise for

13   litigation.

14        Q.   Can you think of a case, Dr. Blume, in which

15   you've testified on behalf of a pharmaceutical company

16   in a personal injury lawsuit brought by a plaintiff?

17        A.    All the antitrust cases are on behalf of drug

18   companies.

19        Q.   I'm not talking about antitrust.

20        A.   Okay.  Well, tell me again how you narrowed it

21   down to get that answer.

22        Q.   My question was specific to personal --

23   personal injury cases.

24        A.   I think you probably already know the answer

25   to this, but the cases that I have been on behalf of

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 91

1   industry settled before they went to litigation.

2       Q.   That's not my question.  Can you think of a

3   case in which you testified on behalf of a

4   pharmaceutical company in a personal injury lawsuit

5   brought by a plaintiff?

6       A.   No.  Because the ones that I did settled

7   before it got to testifying.

8            MR. DERRINGER:  Okay.  I'll move to strike the

9       last part of that.

10  BY MR. DERRINGER:

11      Q.   Have you ever given the opinion in litigation

12  that a medication's label was adequate?

13      A.   If I'm in the litigation, if I'm appearing in

14  litigation for a patient's injury, generally the

15  labeling is not adequate.

16      Q.   Have you ever given the opinion that a

17  medication's label is adequate?

18      A.   Yes.  But then I was not -- then I did not

19  participate in that litigation.  So yes, I have given

20  the opinion that I found nothing wrong with the

21  labeling; in fact, I think I testified to that.  And if

22  that is the case, then I'm not a participant in that

23  litigation.

24      Q.   The pharmaceutical company has never hired you

25  to give an opinion that the medicine's label was

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 92

1    adequate, have they?

2        A.    The two cases that I did that did not reach

3    litigation both involve labeling adequacy.

4        Q.    You say those are the cases where you were

5    preparing to testify on behalf -- well, let me strike

6    that.

7              Those two cases, what were they?

8        A.    One was PPA and the other was for an

9    ophthalmic diagnostic device and its labeling.  And I'd

10   have to check who the company was, I think it's -- I

11   think it's Abbott, but I have to check that.  I'm not

12   sure, it's been some time.

13       Q.    Outside of PPA, as you've said, and the Abbott

14   case, have you ever provided the opinion that a

15   medication's labeling was adequate?

16       A.    Yes.  I've provided that many times, then I

17   don't participate in the cases.

18       Q.    Okay.  And in PPA and the Abbott case, did you

19   actually participate in the cases?

20       A.    Yeah.  But I didn't -- I didn't testify.

21       Q.    You didn't testify, okay.  Did you file a

22   report in those cases saying that the medication's label

23   was adequate?

24       A.    I'll have to check.  I think, but they go back

25   some years ago.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 93

1      Q.    And PPA, who did you -- who were you retained

2  by?

3      A.    Elan -- oh, the attorneys, they were in New

4  York.

5      Q.    No.  The company.  The company.

6      A.    I forgot their names.  Elan.

7      Q.    Have you ever given the opinion in litigation

8  that a pharmaceutical company adequately studied its

9  medicine?

10     A.    Yes.

11     Q.    Which cases?

12     A.    Well, if I -- if that's the opinion, then I'm

13  not hired for those cases.  If attorneys bring to me a

14  case and I can't find -- there's nothing wrong with the

15  labeling and I see nothing wrong with what the company

16  did, then obviously, I don't go for that case.

17     Q.    Okay.  The attorneys you're talking about that

18  don't hire you when you have those opinions, those are

19  plaintiffs' attorneys.  Correct?

20     A.    Okay.  I'm a little confused by this because

21  my experience has been that it's somewhat unique that I

22  had an opportunity to do any of the defense work because

23  we know that defense cases, the witnesses are always

24  former FDAers.  I mean, that's standard across the board

25  for the defense -- the defense people to use former

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 94

 1  FDAers for their regulatory work.

 2          I have never been a -- I've never been working

 3  in a case where the regulatory person hired by the

 4  defense has not been a former FDA reviewer or a former

 5  FDA supervisor.

 6          The cases that attorneys representing injured

 7  patients bring to me are reviewed here first, and if I

 8  find nothing wrong with the conduct of the company,

 9  nothing wrong with the employed labeling, then I don't

10  participate in the cases, which is why we require the

11  opportunity to interact, as I noted that we did in this

12  case, before we even look at a contract.

13          So in those cases, I find nothing wrong, so

14  I'm of no value.  I'm not -- I don't support their

15  opinion, so I'm not hired.

16      Q.   By the plaintiffs' attorneys?

17      A.   Yes.

18      Q.   Right.

19      A.   That's the way -- if I -- if there is value to

20  their premise and I think there's value to it, then we

21  decide if we want to enter into a contract or not.

22          THE VIDEOGRAPHER:  The time is 10:49, this

23      concludes tape number one and we're off the record.

24          (Off the record.)

25          THE VIDEOGRAPHER:  The time is 10:51, here

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 95

1        begins tape number two and we're back on the record.

2    BY MR. DERRINGER:

3        Q.   If you go to Appendix 2 of your report, it

4    starts at Page 53.  This is where you describe

5    Depositions and Trial Testimonies from 2006 to 2010.  Do

6    you see that?

7        A.   Yes.

8        Q.   Okay.  I counted this up, this has 50

9    depositions or instances of testimony at trial in the

10   past four years.  Is every one of these a product

11   liability case?

12       A.   Just a second, please.  The Biddiscombe case

13   is a GMP case.

14       Q.   What page are you on?

15           MR. MOSKOW:  Fifty-five.

16       A.   Yeah.  I was just starting at the beginning

17   and going forward.  That's a GMP case.

18   BY MR. DERRINGER:

19       Q.   What is GMP?

20       A.   Good Manufacturing Practices.

21       Q.   Is that not a product liability case?

22       A.   I have -- no, not my end of it.  I don't know

23   if it had any product liability to it, but I didn't do

24   any of it.  Let's see.

25       Q.   Did you say that was Biddiscombe?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 96

1      A.   Yes.

2      Q.   Where you testified on behalf of the plaintiff

3  or the defendant there?

4      A.   I'd have to go back and check.  I actually

5  think it was the government that hired me to go in and

6  examine their facility.  I'll have to check that one.

7      Q.   Okay.  Any other cases on this list that are

8  not product liability cases?

9      A.   Hold on a second.  I'm just starting.  I

10  think, yeah, these are -- I think these are Accutane,

11  Prempro, Phen-fen and the Neurontin cases.  Yes, they

12  are product liability.

13      Q.   Other than the Biddiscombe case, all the cases

14  listed on your list of depositions over the past four

15  years are product liability cases.  Correct?

16      A.   These are depositions and --

17      Q.   And trial testimony.

18      A.   These are not expert reports, okay.  I got it.

19  Yes.  This is -- these appear to be those falling into

20  those four categories.

21      Q.   Okay.  And is there any -- other than the

22  Biddiscombe case where you think you were brought in by

23  the government, am I right that every other one of these

24  cases listed on Appendix 2 of your report are cases

25  where you testified on behalf of the plaintiff?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 97

1      A.    Yes, for those four products.  Yes.

2      Q.    Those four products again were what?

3      A.    Accutane -- let me make sure.  These appear to

4    be the Accutane cases, depositions or trials; I see the

5    Neuron -- the Fentanyl deaths secondary to the patch.

6    Well, I don't know how to do the Fentanyl cases.  The

7    Fentanyl are death cases secondary to the malfunctioning

8    of the transdermal Duragesic products.  So I don't know

9    if that's a GMP case, I don't know how you categorize

10   that, but there's deaths secondary to the malfunctioning

11   patch.

12     Q.    And you were testifying for the plaintiffs in

13   those cases.  Correct?

14     A.    Yes, with regard to the GMP issues.  And the

15   patch delivered everything and the patient died.

16     Q.    You were testifying on behalf of the plaintiff

17   in those cases.  Correct?

18     A.    Yeah, because the patient died because of the

19   malfunctioning of the patch.

20           Phen-fen, Phen-fen is off the market, but

21   there are still trials going on then -- on that.  Those

22   are on there.  Accutane, Phen-fen, I see Prempro.  And

23   the last group that I -- what was four?  Neurontin, the

24   suicide cases with Neurontin.  Yeah, I think those are

25   it.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 98

1      Q.    This goes through 2010.  How many times have
2   you been deposed or given trial testimony in 2011?
3      A.    I think this is my first deposition in 2011,
4   but I was in trial on another Accutane case and --
5   another Accutane and a Levaquin case in 2011.  I think
6   that's it.
7      Q.    Two trials?
8      A.    I think so, yeah.
9      Q.    Okay.  Now, this gives us 50 depositions or
10   trial testimony for four years, 2006 to 2010.  Can you
11   tell us how many times you've been deposed in your life?
12      A.    Deposed, no.  I have a master list somewhere,
13   but I only give four years.
14      Q.    I understand.  I'm asking if you can tell me
15   how many times you've been deposed total?
16      A.    No.  No.  I was 30(b)(6) for both Mylan and
17   Somerset, so I'd have to -- no, I can't tell you how
18   many times I've been deposed.
19      Q.    Excluding -- what about how many times you've
20   been deposed at PDG.  Since you've been an employee of
21   PDG, how many times have you been deposed?
22      A.    I'd have to count them up, I don't know.
23      Q.    Well, you have a list somewhere; right?
24      A.    Well, this type of list exists for everything,
25   yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 99

1      Q.     How many hours do you work per week?

2      A.     Oh, 80.

3      Q.     How are you paid?

4             MR. MOSKOW:  Object to the form.

5   BY MR. DERRINGER:

6      Q.     Do you have a salary?  Do you take a

7   percentage of the revenues of the firm?  Do you get a

8   bonus?

9      A.     I don't know if I've ever answered that kind

10  of question either.  I need to talk -- I'm not sure I'm

11  going -- I'm not sure how to address that.  I need to

12  talk to corporate counsel.

13     Q.     You can't answer it or you're refusing to

14  answer it?

15     A.     I don't know if he would want me to answer it.

16     Q.     Okay.  We'll hold the deposition open for that

17  as well.

18            What percentage of your time that you spend

19  working do you spend consulting for lawyers on

20  litigation matters?

21     A.     I have no idea.  I have no idea.  I've never

22  calculated it.

23     Q.     What percentage of PDG's income is generated

24  from work on litigation matters?

25     A.     That, I think that I can answer.  It has

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 100

1    varied over the years.  I have testified to this on

2    multiple occasions.  I believe that the range for

3    litigation ranges anywhere from, annual numbers,

4    anywhere from 17 percent to 40 percent.

5        Q.   What was it in 2010?

6        A.   I don't know.  I don't know.  I'd have to find

7    a specific year.  I do know the range.  And there may

8    have been one year, I think the year that I did Phen-fen

9    it was the highest because I came in at the end, and

10   that year might have been -- that year might have been

11   50 percent.

12       Q.   What year was that?

13       A.   Oh, early, Phen-fen was early.  I started with

14   that 2003 or something.

15       Q.   How much money have you made over the years

16   for your work on behalf of plaintiffs in litigation?

17       A.   Yeah, I'm going to have to talk to him about

18   answering that.

19       Q.   I guess we'll come back.  What's your hourly

20   rate?

21       A.   The same as it is in the contracts for this

22   case.  My hourly rate is $400 an hour, I think it's been

23   that way since 2007, and there is a $50 override per

24   hour for deposition and trial testimony.

25       Q.   So your rate for the time you're in deposition

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 101

1    or giving testimony at trial is $450 per hour?

2        A.    Right.

3        Q.    What about for preparation for your deposition

4    or preparation for trial testimony?

5        A.    That's the hourly rate, 400 an hour.

6        Q.    Are you being paid strictly by the hour in

7    this litigation?

8        A.    Yes.  That's the way I'm paid for everything.

9    There is no -- we charge the same for product

10   development clients as we do for attorneys.

11       Q.    There's no retainer that you were paid by the

12   plaintiffs in this litigation, was there?

13       A.    Yeah.  There is a retainer in all.  Yes, I

14   think so.  There's a retainer in all of our cases.

15       Q.    What was the retainer here?

16       A.    It's usually $10,000 that's held on the front

17   end and then returned when everything is done.

18       Q.    When you spend time on a case, do you keep

19   track of that time?

20       A.    Yes.

21       Q.    Do you do that carefully?

22       A.    Yes.

23       Q.    Do you do your best to keep that time

24   accurately?

25       A.    Yes.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 102

1    Q.   I'm handing you what I've marked as Exhibit 5.

2  These are the invoices that Counsel sent to us

3  reflecting your time and amounts paid, or at least

4  amounts billed in this litigation.  Do they look

5  familiar to you?

6    A.   Let me check something.  So multiple months

7  are clipped together?

8    Q.   Yes, they are.  The first set are invoices

9  that were sent back in February, and the second set are

10  invoices that were generated after December of 2010 and

11  sent to me yesterday.

12    A.   Okay.  So the first one is May of 2011?

13    Q.   No.  That's the second set.  I put them in the

14  order in which they were sent to me.

15         MR. DERRINGER:  Let's go off the record for a

16    moment.

17         (Off the record.)

18         THE VIDEOGRAPHER:  The time is 11:04 and we

19    are back on the record.

20  BY MR. DERRINGER:

21    Q.   Dr. Blume, Exhibit 5 is an exhibit that

22  contains all of the invoices that PDG, your firm, has

23  sent to the plaintiffs reflecting your work in this

24  case.  Is that right?

25    A.   So the first one is for professional services

Merrill Corporation - New York

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 103

1    ended in May of 2010.  I have no idea if there was one

2    before then.

3              MR. DERRINGER:  Neal, I've asked for all the

4         invoices.

5              MR. MOSKOW:  I'll represent to you that

6         this -- that Exhibit 5 is the totality of invoices

7         that we have from PDG.

8              MR. DERRINGER:  From Dr. Blume?

9              MR. MOSKOW:  Yes.

10             MR. DERRINGER:  Okay.  So.

11   BY MR. DERRINGER:

12        Q.   With that representation, Dr. Blume, does that

13   reflect then that your work began on this case sometime

14   in May 2010?

15        A.   Well, I thought we met earlier with them,

16   that's why I asked that.  I thought that we had met a

17   couple -- two or three times with the attorneys prior to

18   signing the contract, which I think we signed in June.

19   I don't know.  I thought we had met before then; perhaps

20   because there was no contract, there was no billing.

21        Q.   Is that your standard practice, when you meet

22   with attorneys you don't bill for your time?

23        A.   If we're deciding if we're going to stay with

24   a case, yes.

25        Q.   Okay.  Well, if the first time that you

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 104

1  actually billed was in May of 2010, does that help you

2  pinpoint when you first started working on this case?

3      A.   No.  Because we -- I reviewed documents -- I

4  think I reviewed documents earlier before the meetings.

5      Q.   How much before May of 2010?

6      A.   I keep thinking February, but I'd have to

7  check the records on that, especially if there's no

8  billing.

9      Q.   You understand you were brought into this case

10  as a replacement expert for Dr. Parisian?

11      A.   I don't think it was quite phrased that way,

12  but I understand there was work done before I came on

13  the case, yes.

14      Q.   You understand that Dr. Parisian was excluded

15  from this case in, I believe it was, May of 2010.  Do

16  you understand that?

17      A.   Oh, I didn't know the date.  I didn't know the

18  date, but I understand she was excluded.

19      Q.   Your testimony is that you believe you started

20  conversations with plaintiffs' counsel sometime in

21  February of 2010?

22      A.   I think so, yeah.

23      Q.   Okay.  Is there any outstanding work for which

24  an invoice has not yet been submitted to the plaintiffs?

25  I imagine that there is since the last invoice we have

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 105

 1   is for services rendered up through May of 2011.

 2       A.   Yeah.   There may -- there may be.   I would

 3   have to check to see if there was a June invoice, and

 4   there will be a July invoice.

 5            MR. DERRINGER:  Neal, I request copies of

 6       those.

 7            MR. MOSKOW:  That's fine.

 8   BY MR. DERRINGER:

 9       Q.   I've added up the totals here that PDG has

10   been paid, it comes to $401,335.47.   Does that sound

11   right?

12       A.   I don't know.

13       Q.   You don't have any reason to dispute the

14   amounts that are reflected in these invoices, do you?

15       A.   No.   I was referring to your total.   I'd have

16   to sit and add these up.

17       Q.   Right.

18       A.   I don't know.

19       Q.   Okay.   But you don't have any reason to

20   dispute the amounts reflected in the invoices.   Correct?

21       A.   No.   No.

22       Q.   Okay.   I think you've been asked this before,

23   Dr. Blume.   I just want to make sure nothing has changed

24   since your last deposition or trial testimony.   You're

25   not a medical doctor; correct?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 106

1      A.    No.  My Ph.D. is in pharmacology.

2      Q.    Which means you're not a medical doctor,

3   you're not a physician.  Correct?

4      A.    That's what it means.  It means I have a

5   Ph.D., not an M.D.

6      Q.    Have you ever been licensed to practice

7   medicine?

8      A.    I've never been an M.D.

9      Q.    Have you ever been licensed to practice

10  medicine?

11     A.    No, because I've never been an M.D.

12     Q.    Have you ever had hospital privileges

13  anywhere?

14     A.    I've never been an M.D., so I haven't had

15  hospital privileges.

16     Q.    Have you ever prescribed a medicine to a

17  living human being?

18     A.    No.

19     Q.    Have you ever treated a living patient?

20     A.    No.

21     Q.    You're a pharmacologist?

22     A.    Yes.

23     Q.    You're not a nephrologist?

24     A.    No, because I'm not an M.D.

25     Q.    You're not board certified in nephrology;

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 107

 1   correct?

 2        A.    Correct, because I'm not an M.D.

 3        Q.    In this case, you're not claiming to be an

 4   expert in nephrology.  Correct?

 5        A.    No.

 6        Q.    I'm correct?

 7        A.    It is correct, I am not claiming that.

 8        Q.    You're not an expert in the mechanism of

 9   action of Trasylol in the kidneys.  Correct?

10        A.    Certainly no one is more involved in

11   mechanisms of action than pharmacologists of drugs,

12   that's what pharmacologists do.  But in this instance, I

13   have not been asked to opine on the specific mechanism.

14        Q.    Have you ever diagnosed a patient with renal

15   impairment of any kind?

16        A.    I know that we, from our earlier discussion,

17   of course, we've looked at renal-impaired patients

18   across a variety of studies.  I've written protocols

19   where we have defined the criteria for the patients who

20   will be entering that study or excluded from that study,

21   but I have not specifically diagnosed a living patient

22   with it.

23        Q.    With renal impairment?

24        A.    Right.

25        Q.    Have you ever treated a patient for renal

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 108

1    impairment?

2         A.    No.  I don't treat patients.

3         Q.    Have you ever made a decision to dialyze a

4    patient?

5         A.    No.  I'm not an M.D., so I don't treat any

6    patients, far less dialyze them.

7         Q.    You're not a cardiac surgeon?

8         A.    Still not an M.D., so I'm not a cardiac

9    surgeon either.

10        Q.    You're not board certified in surgery?

11        A.    I don't know that non-M.D.'s can be board

12   certified in surgery, but I am not.

13        Q.    You're not claiming to be an expert in cardiac

14   surgery, are you?

15        A.    No.

16        Q.    You've never performed open-heart surgery,

17   have you?

18        A.    No.

19        Q.    You've never performed any surgery requiring

20   the use of the cardiopulmomary bypass machine, have you?

21        A.    Correct, I have never used the pulmon --

22   cardiopulmomary bypass machine.

23        Q.    Have you ever been in the room to watch a

24   surgeon perform cardiac surgery?

25        A.    You know, I have to think about that because

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 109

1   my father had cardiac surgery done and I think that we

2   were permitted for part of the time to be behind the

3   glass.  I might have been, but as I recall, I left with

4   my mother.  She did not want to stay.

5        Q.   When was that?

6        A.   Well, we lost him four years ago, so it would

7   have probably been the year before that, five years ago.

8        Q.   And you said you were just behind the glass?

9        A.   I think so.  I think they gave us that

10   opportunity, but it was short-lived.

11        Q.   You didn't stay very long?

12        A.   She didn't want to.

13        Q.   Understood.  You're not an epidemiologist;

14   correct?

15        A.   Yeah, that's always very difficult to answer.

16   My Ph.D. is not in epidemiology, it's in pharmacology,

17   but epidemiology is used every day.  I have to use

18   epidemiology every day, so I read epidemiology, I quote

19   epidemiology.  We have an epidemiologist on staff at

20   PDG.  I have to write labeling that discusses

21   epidemiology for physicians who are also not

22   epidemiologists to read and understand.  So epidemiology

23   is a part of my life, but I -- my Ph.D. is in

24   pharmacology.

25        Q.   Do you have any degree in epidemiology?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 110

1       A.   No.  Well, no.

2       Q.   You're not a biostatistician; correct?

3       A.   That would be the same answer, to review

4  epidemiology, you're reviewing biostatistics.  So it's

5  certainly something that I do every day as part of my

6  professional career, but my Ph.D. is not in

7  biostatistics.

8       Q.   And you have no degree in biostatistics;

9  correct?

10      A.   I have no degree in statistics.  But, you

11  know, biostatistics, biostatistics is part of every

12  Ph.D. program because all findings have to be

13  statistically analyzed.  So employ it, review it, use it

14  every day, write it in labeling, but my degree was not

15  that.

16      Q.   You have no degree in biostatistics; correct?

17      A.   I have no degree in statistics at all.

18      Q.   You're not an expert in the design of

19  epidemiological studies, are you?

20      A.   I do not serve as an expert witness in the

21  design of epidemiology studies.

22      Q.   Have you ever designed or performed an

23  epidemiological study by yourself, that is, without the

24  help of a trained epidemiologist?

25      A.   We have advised clients on the need for

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 111

1    epidemiology studies and the critical elements for that

2    study.  In that meeting -- in those meetings, however,

3    like meetings at all pharmaceutical companies, we do

4    have an epidemiologist and we do work with a

5    biostatistician in that.

6             But as far as examining the need for the study

7    and reviewing the critical design elements for that

8    study, I have participated in that.

9       Q.   But you always enlist the opinion and help of

10   a trained epidemiologist and biostatistician to do that

11   work.  Correct?

12      A.   Well, not only do I do that, any company with

13   whom I am working, I always advise those types of people

14   be in the room, as well as the clinician for whatever,

15   who might have a specialty in whatever disease we're

16   looking at.  So if I were designing one for your

17   client's product, I would, of course, want clinicians in

18   the room who would use that product on an everyday

19   basis.  The design of an epidemiology study is very much

20   a group effort.

21      Q.   A very complex effort; right?

22      A.   It is.  And there are certain elements that

23   are common across all epidemiology studies that one has

24   to address, and then each one has to have specific

25   elements depending on the doctors using the product and

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 112

1    the patients receiving the product and the product

2    itself.

3        Q.    Have you ever been listed as an author of an

4    epidemiology study?

5        A.    As an author on an -- no, I don't think so, as

6    a consultant, no.

7        Q.    Now, you understand that in this case you're

8    not the plaintiffs' epidemiology expert.  Correct?

9        A.    I understand.

10       Q.    You're aware that the plaintiffs have hired

11   someone else to provide opinions on epidemiology?

12       A.    Yes.

13       Q.    Okay.  And do you know what his name is or her

14   name?

15       A.    Yes.  I just -- Eisenberg?

16       Q.    Eisenberg?

17       A.    I thought I saw it on the list that I just

18   had.

19       Q.    It's Eisenberg.

20       A.    Yes, Eisenberg.

21       Q.    Would you defer to his judgment and opinions

22   on epidemiology and the epidemiology studies in this

23   case?

24       A.    Well, perhaps you could give me a more

25   specific question.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 113

1      Q.    I'm just asking generally if you'd defer to

2    his opinion on epidemiology and the epidemiological

3    studies in this case?

4      A.    I would defer on the adequacy, perhaps, or the

5    construction and design of the study, the findings.  I

6    think there are certain issues relating to the need for

7    epidemiology studies, the regulatory role of

8    epidemiology studies, the reporting of studies, the need

9    for reporting them to patients and physicians.  I would

10   not defer to that.

11     Q.    Do you agree, Dr. Blume, that one needs to

12   examine and evaluate each epidemiology study before

13   reaching a conclusion about its importance and meaning?

14          MR. MOSKOW:  Objection to form.  You can

15      answer if you understand the question.

16     A.    I agree that you have to examine all the

17   critical elements of a study before you can assign

18   strength to its meaning.  But I also believe that it's

19   the responsibility of the drug company to make available

20   information -- make information that is available

21   available.

22          MR. DERRINGER:  Move to strike the last

23      sentence, nonresponsive.

24   BY MR. DERRINGER:

25     Q.    You're not a causation expert, are you?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 114

 1            MR. MOSKOW:  Object to form.

 2       A.   I do not think I've been named a causation

 3   expert, no.

 4   BY MR. DERRINGER:

 5       Q.   You won't be providing causation opinions in

 6   this case, will you?

 7       A.   I have not been asked to do that.

 8       Q.   And you're not going to?

 9       A.   I guess it -- I guess it depends on what I'm

10   asked, but I haven't been asked to do that.

11       Q.   You don't --

12       A.   I don't generally do causation opinions, no.

13       Q.   You're not going to be offering opinions on

14   any specific plaintiff in this litigation, will you?

15       A.   With respect to the medical conditions, no.

16       Q.   Or with respect to what caused those

17   conditions?

18       A.   No.  I have -- no.  I haven't been asked to do

19   that, no.

20       Q.   You haven't reviewed any plaintiffs' medical

21   records, have you?

22       A.   Yeah, I had already mentioned I had not.

23       Q.   Now, in this litigation, you've not been asked

24   to serve as an expert in the renal mechanism of action

25   of Trasylol, have you?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 115

1      A.   I have not.

2      Q.   You're not an expert on Bayer's intent or

3   state of mind.  Correct?

4           MR. MOSKOW:  Objection to form.

5      A.   No.  I will be not commenting on -- I will not

6   be commenting on that, no.

7   BY MR. DERRINGER:

8      Q.   You will not be commenting on Bayer's intent

9   or state of mind?

10     A.   I will not be, that's correct.

11     Q.   Have you ever talked to anybody at Bayer about

12   anything having to do with Trasylol?

13     A.   No.

14     Q.   You're not an expert on the FDA's intent or

15   state of mind, are you?

16          MR. MOSKOW:  Objection to form.

17     A.   Well, if FDA issues an opinion or issues a

18   guidance that says it is the intention of the agency to

19   accomplish this, I think that I would be able to address

20   that from a guidance.

21   BY MR. DERRINGER:

22     Q.   That's based on your reading of the guidance.

23   Right?

24     A.   Sure.  Or just, you know, 30 years of

25   experience.  FDA will often tell you what their goals

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 116

1    are with certain issues when you're working with them on

2    a new product development.  So based on that experience,

3    if it were another project similar to one we just did

4    where I knew the FDA's intentions, FDA's goals, I think

5    I would be able to comment on that.

6              But in general, I don't go around speaking for

7    the FDA and saying what is the state of mind or the

8    intention of something FDA has not yet said.

9         Q.   Is that something you're going to do here?

10   Are you going to talk about the FDA's intention or state

11   of mind in this litigation?

12        A.   Well, it would help to have a somewhat more

13   specific question.  If I understand why -- if FDA has

14   stated why they asked for certain things or what

15   interests they had in certain things, I would certainly

16   comment on that.  But I will not be using a -- I will

17   not be a mind reader in this case.

18        Q.   So you will not be offering opinions about the

19   FDA's intent or state of mind in this case, other than

20   to the degree that the FDA has made that intent clear in

21   its communications reflected in documents.  Correct?

22        A.   Or in -- or in other documents, perhaps not

23   directly related to Trasylol.  FDA has noted many times

24   they expect companies to provide them with at least an

25   annual listing of all studies that have been done and a

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 117

1   summary of the data.

2       Q.   Where is that expectation?

3       A.   Well, it's in their guidances relating to

4   annual reports.  There's a section you list studies that

5   have been conducted, not required by FDA, but conducted

6   by the company.

7       Q.   And that's something that anybody can read;

8   right?

9       A.   Yes.  And certainly, based upon meetings with

10  the agency as approvals near or post-approval activities

11  are ensuing, I've been in multiple discussions with FDA

12  where it's quite clear they expect to know -- they

13  expect to know if there's been outside studies.  I mean,

14  there's certainly comment letters written by FDA to

15  companies where they have failed to provide them with

16  post-marketing studies or foreign studies or whatever.

17          So yes, I would opine that I believe FDA

18  expects to be provided with certain information or

19  certain types of adverse events.  So I would speak based

20  on 30 years of experience, but I will not be reading

21  anybody's mind.  I will not be divining what somebody

22  might have been thinking when something wasn't either

23  specifically said or is outside my range of comfort from

24  30 years of experience.

25      Q.   Well, you just left a big escape patch there.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 118

1    You said you won't be divining what someone was thinking

2    outside of your range of experience.  You're not going

3    to be trying to divine what anybody was thinking in

4    their own head even on issues that are in your alleged

5    range of experience.  Correct?

6         A.   Well --

7              MR. MOSKOW:  Objection to form.  You can

8         answer.

9         A.   I mean, I would probably be able to comment

10   that FDA expects to be made aware of certain foreign

11   events.

12   BY MR. DERRINGER:

13        Q.   And that's based on?

14        A.   Well, it's based on years of experience.  It's

15   based on issues with other publicly available issues

16   that I could cite.  But I will not be drawing -- I will

17   not be -- I will never be saying this is the intent of

18   the FDA or this is what FDA was thinking about a

19   particular -- I don't say it for my own projects, far

20   less projects I was not part of.

21        Q.   And closing this out, ma'am, you're not going

22   to be serving as an expert in this case on the intent or

23   state of mind of any prescribing physician.  Correct?

24             MR. MOSKOW:  Object to form.  You can answer.

25        A.   Well, I have not seen anything regarding

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 119

1  prescribing physicians to date and I will not be

2  discussing their intent.

3           MR. MOSKOW:  Is this a good place to take a

4      short break?  We've been going another hour and a

5      half.

6           MR. DERRINGER:  Sure.

7           THE VIDEOGRAPHER:  The time is 11:22 and we're

8      off the record.

9           (Break taken.)

10          THE VIDEOGRAPHER:  The time is 11:37 and we

11     are back on the record.

12  BY MR. DERRINGER:

13     Q.   Dr. Blume, you're not a lawyer, are you?

14     A.   No.

15     Q.   You have no legal training; correct?

16     A.   That is correct.

17     Q.   You're not an expert on state law, are you?

18     A.   State law?

19     Q.   Yeah, the laws of any states.

20     A.   No.

21     Q.   You're not an expert on what the standard of

22  care would be for a pharmaceutical company under state

23  law.  Correct?

24          MR. MOSKOW:  Objection to form.

25     A.   I think -- I think I can address the standards

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 120

1   of care that a company needs to undertake, but I'm not

2   so sure if I could differentiate those among various

3   states or -- no, I don't think I can discuss state law.

4   BY MR. DERRINGER:

5       Q.   Nor do you discuss or you're not qualified to

6   discuss state law standards of care applied to

7   pharmaceutical companies.  Right?

8            MR. MOSKOW:  Objection to form.

9       A.   Yeah, I don't even know if I understand the

10  question.

11  BY MR. DERRINGER:

12      Q.   Okay.  Are you aware of any state law standard

13  of care?

14      A.   I don't understand.

15      Q.   All right.

16      A.   I don't know.  You're going to have to give me

17  an example.  I don't understand.

18      Q.   You're not going to offer an opinion that

19  Bayer violated any state law standard of care in this

20  litigation.  Correct?

21           MR. MOSKOW:  Objection to form.

22      A.   I don't think I address state law violations

23  in my report.

24  BY MR. DERRINGER:

25      Q.   I'll agree with that.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 121

1      A.   So it wasn't my plan to address that.  But if

2    that is being couched in some -- if that is a sub --

3    unknown to me as a nonattorney, that is a subset of

4    something that I am going to discuss, I just don't know.

5    I don't know.  I'm not a lawyer, I don't know.

6           MR. MOSKOW:  Can I ask you a question to help

7        clarify this so maybe we can move on?  Is your

8        question whether there is a specific state law

9        statute or decisional law standard of care as

10        opposed to the general standard of care that she's

11        going to be testifying to?

12           MR. DERRINGER:  Well, I don't -- I'm asking

13        whether -- I think Dr. Blume has answered the

14        question.

15           MR. MOSKOW:  Okay.  All right.  That's fair.

16           MR. DERRINGER:  We can move on.

17    BY MR. DERRINGER:

18      Q.   You've not offered and you're not going to

19    offer any opinion on whether Bayer complied or did not

20    comply with any specific state law standard of care.

21    Correct?

22           MR. MOSKOW:  Objection to form.

23      A.   Yes.  I have not commented on that.  I don't

24    think I'm going to be offering an opinion on that, but

25    since I'm not completely clear on what you're asking

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 122

1    about, I don't -- I don't think I'm going to be

2    discussing state laws.

3    BY MR. DERRINGER:

4        Q.   Okay.  You've never worked at Bayer?

5        A.   No.

6        Q.   Correct?

7        A.   You're correct, I have not.

8        Q.   In your report, you cite to some standard

9    operating procedures from Bayer's internal documents.

10   Do you recall that?

11       A.   Yes.

12       Q.   Okay.  Now, you were never on a committee or

13   part of a group charged with coming up with any standard

14   operating procedure for Bayer.  Correct?

15              MR. MOSKOW:  For Bayer?

16              MR. DERRINGER:  For Bayer.

17       A.   Yes.  I have neither worked, nor consulted for

18   Bayer.

19   BY MR. DERRINGER:

20       Q.   Okay.  And so you've never developed, drafted,

21   conceived of standard operating procedures for Bayer?

22       A.   Not specifically for Bayer, that is correct.

23       Q.   Okay.  You were never in a position where you

24   had to interpret, implement or follow any Bayer standard

25   operating procedure?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 123

1      A.   We have worked with multiple drug companies,

2   but I don't think any of them in their evolution screens

3   brought Bayer-derived SOP's with them for the projects.

4      Q.   Okay.  So let's answer my question.  You've

5   never worked in a position where you had to interpret,

6   implement or follow any Bayer standard operating

7   procedure.  Correct?

8            MR. MOSKOW:  Other than this case.

9            MR. DERRINGER:  We'll talk about this case in

10      a minute.

11   BY MR. DERRINGER:

12      Q.   Outside of your litigation-related work here

13   in this case.  Correct?  Is that right, Dr. Blume?

14      A.    I think so, but I would like the opportunity

15   to come back to that because we have worked with several

16   companies and, of course, there have been multiple

17   changes in ownership, et cetera, of companies over the

18   years.  I just -- I think that is a correct statement,

19   but I want to confirm it.

20      Q.   You've never worked in any position where you

21   had to enforce any Bayer standard operating procedure.

22   Correct?

23      A.   Correct.

24      Q.   You're not an expert in Bayer's standard

25   operating procedures.  Correct?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 124

1       A.   Well, I don't know how to answer that

2    question.  How would one be an expert in one company's

3    standard operating procedures?

4            I have extensive experience in standard

5    operating procedures, but I do not -- I don't know how

6    you'd be an expert in any one of them.  But I do not

7    consider myself an expert in Bayer's standard operating

8    procedures.

9       Q.   First time you ever saw Bayer's standard

10   operating procedures that are cited in your report was

11   after the plaintiffs' lawyers had hired you to be their

12   paid expert in this litigation.  Correct?

13      A.   I'm not sure that's the case.

14      Q.   Well, when was the first time --

15      A.   I have been in other litigations, so those

16   standard operating procedures may have been available

17   earlier.

18      Q.   You don't know?  Can you confirm that?

19      A.   If I still have production documents, I could

20   confirm it.

21      Q.   The first time you ever saw a Bayer standard

22   operating procedure in any event was after you had been

23   hired in litigation by plaintiffs' attorneys?

24      A.   I believe that's -- I believe that's correct.

25      Q.   I want to ask you what you did with these

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 125

1    Bayer standard operating procedures as part of your

2    analysis in this case.  Did you read them?

3         A.   Yes.

4         Q.   Okay.  Did you discuss them with anybody at

5    Bayer?

6         A.   During the course of litigation, no, I did not

7    talk with anyone at Bayer.

8         Q.   Okay.  Have you ever discussed Bayer's

9    standard operating procedures with anybody at Bayer?

10        A.   I don't recall any Mylan Bayer meetings, so I

11   don't believe I would have discussed outside of any,

12   unless there was a cooperative meeting, I would have

13   discussed any of Bayer's procedures.

14        Q.   With anybody at Bayer?

15        A.   Yes, of course.

16        Q.   Okay.  So as you sit here today, you have no

17   recollection of discussing Bayer's standard operating

18   procedures with anybody at Bayer.  Correct?

19        A.   The reason for my hesitancy is we have worked

20   with many companies and Bayer has bought and merged, et

21   cetera, with many companies.  And I just want to look

22   through the list and make sure that we don't have, with

23   companies that we work with, who at some time may have

24   been evolved from or a component of the Bayer family

25   that we have standard operating procedures.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 126

1      Q.   Okay.  I'm talking about the specific standard

2   operating procedures that you cite in your report.

3      A.   I don't recall ever seeing them before, but

4   when we meet with companies, we very often are

5   discussing pharmacovigilance.

6      Q.   Okay.  You don't recall seeing them before,

7   you've already told me that.  I want to make sure that

8   you don't have any recollection as you sit here today of

9   ever discussing Bayer's standard operating procedures

10  with anybody at Bayer?

11     A.   I don't have any recollection of that sitting

12  here today.

13     Q.   Outside of reading the Bayer's standard

14  operating procedures that you describe or cite to in

15  your report in this litigation, and outside of perhaps

16  discussing those with plaintiffs' lawyers, have you

17  discussed those standard operating procedures with

18  anybody else?

19     A.   I don't recall discussing them outside of PDG

20  or with Counsel, no.

21     Q.   Now, your factual conclusions about whether or

22  not Bayer followed its own standard operating

23  procedures, that's not based on any FDA regulation, is

24  it?

25     A.   That you need to develop procedures and follow

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 127

1   them?

2       Q.   No, that wasn't my question.  Your factual

3   conclusion about whether or not Bayer followed its

4   standard operating procedures, that conclusion is not

5   based on any FDA regulation.  Correct?

6       A.   Okay.  Please direct me to the paragraph

7   you're referring.

8       Q.   I'm not referring to any specific paragraph.

9   I think there are numerous paragraphs where you talk

10  about Bayer not following its own standard operating

11  procedures, its own internal procedures.  That factual

12  allegation that you make, is that based on any FDA

13  regulation, or is it instead based on your reading of

14  the standard operating procedure and applying your

15  understanding of the facts to that scenario?

16      A.   Okay.  Well, I'll address this again when we

17  actually do have a specific paragraph in front of us.

18  But my answer would be that there are regulations that

19  require you to develop and follow your standard

20  operating procedures.  I am aware of those regulations.

21          When I see standard operating procedures, the

22  first thing I do is review the standard operating

23  procedures and then check to see if those standard

24  operating procedures were followed, either by having

25  data to address that or having commentary from the

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 128

1   company saying they did or they didn't follow

2   procedures, whatever.

3            So I develop a process of knowing that you

4   need to have standard operating procedures, I look to

5   see if there's standard operating procedures, then look

6   to see if those procedures were indeed followed.

7            If a company has a standard operating

8   procedure that says that when new safety information

9   becomes available, we're going to be compliant with

10  201.570 and we're going to get it into our labeling as

11  quickly as we can so that that information is shared and

12  is scientifically correct in an open and unbiased

13  manner, then I will look to see if that information

14  happens.  I will go through this process and if it

15  didn't happen, what will be the procedure for not

16  employing that SOP.

17           So that's my procedure across any project, and

18  that would have been the procedure that I followed here

19  in general.  Now, it might be a little bit more -- a

20  little different if you give me a specific paragraph,

21  but that will be my general procedure.

22      Q.   Okay.  I'll try my question once more and then

23  we'll move on if I can get an answer.

24           You've told me that the regulations come into

25  play because the regulations require companies to

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 129

1    develop standard operating procedures.  Is that right?

2              MR. MOSKOW:  Object to the form.

3         A.   Yes.  The regulations require you to develop

4    appropriate ones and, of course, to follow them.

5    BY MR. DERRINGER:

6         Q.   And what regulation in particular?

7         A.   That's the 20 -- the procedures that are in

8    210 or 211 require you to have standard operating

9    procedures.  I also believe there is one in 314 that

10   deals with standard operating procedures for

11   post-marketing reporting.

12        Q.   Can you tell me the specific regulatory

13   provision that requires --

14        A.   Well --

15        Q.   Let me finish my question -- the development

16   of standard operating procedures?

17        A.   Well, that's definitely under 210 and 211.

18        Q.   What part of those?

19        A.   Well, there are a whole book of them, so if

20   you want, I will go get the book and look up specifics.

21        Q.   You're telling me you're the expert in the

22   regulations.  Do you know --

23        A.   And I told you that their procedures are in

24   210 and 211 that require you to have standard operating

25   procedures.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 130

1    Q.   Without going to get the whole book, can you

2  tell me sitting here right now what provisions require

3  that?

4    A.   No.  And that's why these notebooks are all

5  here.

6    Q.   Okay.  What about in 314?

7    A.   And then there is one for pharmacovigilance in

8  314, in 314.8, and I will get the 314.8 book while I'm

9  back there; but if we're going to talk about specific

10  regulations, I want to have them in front of me.

11    Q.   Okay.

12    A.   And if you would give me the courtesy of

13  giving me a paragraph and perhaps I won't even have to

14  leave the room and I can go to the notebooks that I

15  prepared to avoid issues such as this and look up both

16  regulations I have listed in there.

17    Q.   When you say 314.8, you mean 314 point --

18    A.   Yes, 314.7 leads to 314.8.

19    Q.   Okay.  But your conclusion, ma'am, about

20  whether or not Bayer followed its own standard operating

21  procedures, okay -- you make conclusions, correct, in

22  your report that Bayer either did or didn't follow its

23  own internal procedures.  Right?

24    A.   Well, I make multiple -- I have multiple

25  conclusions in the report and they differ between the

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 131

1    two main end points.  So if you'd like to tell me a

2    paragraph, I'll go to that paragraph; otherwise, I'm

3    just -- I'm just speaking hypothetically.

4         Q.   Okay.  Let's just go to your summary, Page 18.

5         A.   Okay.

6         Q.   First paragraph, paragraph 34, "Bayer failed

7    to comply with regulations, industry standards and

8    internal procedures in their post-launch regulatory

9    responsibilities relating to Trasylol."  So let's focus

10   on internal procedures, those are the standard operating

11   procedures we've been talking about.  Right?

12        A.   Well, it can be SOP's.  It can be other

13   procedures that are developed that aren't standardized

14   procedures.

15        Q.   Well, can you think of any internal procedure

16   that you're referring to there that's not a standard

17   operating procedure as cited in your report?

18        A.   They had a -- they had an early warning system

19   for detecting problem -- for detecting safety issues and

20   then evaluating those and getting them into the

21   labeling, that was an internal procedure.  I don't know

22   if it rose to the level of a standard operating

23   procedure because I think in the end it was not

24   implemented.

25        Q.   Okay.  Well, that --

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 132

1      A.   So that might be an example of one where they

2   had a procedure for attempting to determine early, early

3   warning signals, once they're detected to evaluate them,

4   then to get them in their informational, their various

5   dissemination of information outlets; that they had an

6   internal procedure, but I'm not sure it made it all the

7   way through their SOP system since it was not employed.

8      Q.   All right.  Well, in any event, Dr. Blume, in

9   paragraph 34 when you're talking about Bayer failing to

10   comply with its internal procedures, okay --

11      A.   Well, that would be an example, the Bayer

12   early warning system.  They had an early procedure.

13      Q.   Okay.  I didn't ask the question.  With

14   respect to that conclusion, that opinion that Bayer

15   failed to comply with its internal procedures, okay,

16   that factual conclusion that you're making, that's not

17   based on any FDA regulation.  Correct?  That's based on

18   your reading of the internal procedure and then your own

19   opinion about whether Bayer followed it or not.

20   Correct?

21          MR. MOSKOW:  Objection to form.

22      A.   Yeah.  It's part -- yes.  It is -- I am not

23   relying upon FDA making a statement on this.  I'm

24   relying on my review of the records and what the

25   industry standards are relating to this.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 133

```
 1   BY MR. DERRINGER:

 2       Q.   We'll get to the industry standards in a

 3   little bit.

 4            Dr. Blume, prior to being contacted by

 5   plaintiffs in this litigation, had you ever heard of

 6   aprotinin or Trasylol?

 7       A.   Yes.

 8       Q.   In what context?

 9       A.   I have worked on a -- a project with another

10   agent that is involved in clotting mechanisms.

11       Q.   Which agent?

12       A.   Various warfarin derivatives.

13       Q.   Warfarin derivatives?

14       A.   That was a defense case.  I have worked with a

15   defense firm in defending a company, yeah, and this is

16   all public information now; that I worked with Winston &

17   Strawn, it's a pharmaceutical client, with various

18   warfarin-related issues.

19       Q.   What was the issue in the litigation?

20       A.   This is going back years.  I think it was the

21   quality, procurement and quality of outside sourcing.

22       Q.   This was not a personal injury lawsuit, was

23   it?

24       A.   It was not.

25       Q.   Had you heard of Trasylol or aprotinin in any
```

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 134

1   other context?

2       A.   Well, to finish that, in the beginning of

3   that, looking over that, I familiarized myself with

4   other agents in that area, so that's really the first

5   time I remember doing any reading regarding fibrinolytic

6   agents and antifibrinolytic agents.

7       Q.   And you recall reading about Trasylol at that

8   time?

9       A.   Yeah.

10      Q.   And when was that?

11      A.   Oh, that started early, '90 -- it was one of

12  our first cases so, '99 or 2000.

13      Q.   Before being contacted by the plaintiffs in

14  this litigation, had you ever reviewed the Trasylol

15  label?

16      A.   We have an ongoing collection here of products

17  that are removed for safety-related reasons.  The label

18  is in that notebook, but I don't specifically recall

19  reviewing it for any other reason.

20      Q.   You don't specifically recall reviewing the

21  Trasylol label before the plaintiffs retained you in

22  this litigation.  Correct?

23      A.   I don't specifically recall it, no.

24      Q.   Okay.  Have you ever prescribed or

25  administered aprotinin or any antifibrinolytic

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 135

1    medication?

2        A.    No.  I don't prescribe any medications.

3        Q.    Have you ever given a lecture on aprotinin or

4    any antifibrinolytic medication?

5        A.    I don't believe so.

6        Q.    Have you ever conducted any research of any

7    kind on aprotinin or any antifibrinolytic medication

8    outside of the context of this lawsuit?

9             MR. MOSKOW:  Objection to the form.  I think

10        she's already indicated she did an investigation in

11        the context of the warfarin case.

12             MR. DERRINGER:  All right.  Let's have the

13        witness testify.

14        A.    There's nothing additional.

15   BY MR. DERRINGER:

16        Q.    So the only research or alleged research that

17   you did on any antifibrinolytic medication was part of

18   your work on the warfarin matter back in the late

19   1990's.  Is that right?

20        A.    And that extended for several years, but I

21   believe it started in the late '90s or 2000.

22        Q.    And warfarin is a fibrinolytic medication?

23        A.    Right.

24        Q.    Okay.  It's not an antifibrinolytic

25   medication?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 136

1      A.    No.  Hopefully not, no.

2      Q.    Right.  So my question was whether you had

3   ever done any research of any kind on aprotinin or any

4   antifibrinolytic medication.

5      A.    I know.  But I explained in my answer that in

6   the beginning of that project, I did an overview of both

7   agents that direct themselves to lysing of the fibrin

8   clot and those that prevent the lysing of the clot, and

9   that's where I first recall reading about aprotinin.

10     Q.    And that wasn't any kind of systematic

11   research or heavily-involved research; that was to give

12   you an overview?

13     A.    I'm not exactly sure what that means; but yes,

14   it was to give me an overview in which to approach this

15   new project.

16     Q.    So this activity, what did you read about

17   Trasylol?  How many articles?

18     A.    Gee, that would require me to go to the

19   billing statements for the other project.  I don't

20   recall.

21     Q.    Okay.  Have you ever performed any statistical

22   analysis related to aprotinin or any antifibrinolytic

23   medication?

24          MR. MOSKOW:  Objection to form.  You can

25      answer it if you understand the question.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 137

1      A.   Prior to this case?

2   BY MR. DERRINGER:

3      Q.   Yes.

4      A.   No.

5      Q.   And have you done any statistical analysis as

6   part of this case?

7      A.   I cannot recall at this time that when I was

8   reviewing the various studies involved in this case if I

9   asked Mr. Scheer, our epidemiologist, to run any stats.

10  I can't remember.

11     Q.   You don't know one way or the other right now?

12     A.   Yeah.  I can't recall.

13          MR. DERRINGER:  Okay.  Neal, if any such work

14     was done, we're going to request that work product;

15     in fact, we do request that product.

16  BY MR. DERRINGER:

17     Q.   Have you ever been a consultant to any

18  regulating agency, academic institution or anyone else,

19  other than the plaintiffs' lawyers here, about Trasylol?

20     A.   No.

21     Q.   About any antifibrinolytic?

22     A.   No.

23     Q.   Would you agree that you learned everything

24  that you know today about Trasylol for the purpose of

25  this litigation?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 138

1            MR. MOSKOW:  Objection to form.

2       A.   I would agree that everything I learned

3  relating to Bayer's activities and Trasylol I learned as

4  a result of this litigation.

5  BY MR. DERRINGER:

6       Q.   And outside of this litigation, the only other

7  information you had learned about Trasylol was as part

8  of your work starting in the late 1990's on the warfarin

9  case.  Is that right?

10      A.   Yes.

11      Q.   Would you defer to the FDA on the question of

12  whether aminocaproic acid or tranexamic acid are

13  approved by the FDA for the same kinds of surgical

14  situations as Trasylol?

15           MR. MOSKOW:  Object to the form.

16      A.   Well, I don't think they have the same types

17  of indications, but I would defer to the FDA for their

18  indications.

19  BY MR. DERRINGER:

20      Q.   Have you ever worked for a foreign regulatory

21  agency?

22      A.   No.

23      Q.   You don't question the competence of the FDA

24  personnel who were involved with Trasylol, do you?

25           MR. MOSKOW:  Object to form.

CHERYL   BLUME, Ph.D. - 7/21/2011

 1      A.   No.

 2  BY MR. DERRINGER:

 3      Q.   Do you have any criticism of the FDA reviewers

 4  who reviewed the IND, NDA and SNDA's for aprotinin?

 5           MR. MOSKOW:  I'm going to object to form and

 6      state, Steve, I think we're getting, you know, well

 7      beyond the opinions that are stated in the -- in the

 8      report and in the disclosure, and I'm concerned that

 9      we're creating some sound bites that could be used

10      to say well, she's talking about the FDA, when

11      that's not anything that's been stated in her

12      report.

13           MR. DERRINGER:  Dr. Blume gives a narrative

14      history, which we think is inappropriate, but she

15      gives it, about Trasylol, the IND, the NDA, the

16      SNDA.  I'm entitled to ask questions related to

17      those submissions, related to the review of those

18      submissions.  So I appreciate your objection.

19           MR. MOSKOW:  Okay.

20  BY MR. DERRINGER:

21      Q.   The question stands.  Do you have any

22  criticism of FDA reviewers who reviewed the IND, NDA and

23  SNDA's for aprotinin?

24      A.   I don't know where you're seeing that in the

25  report, but I do not criticize the FDA.  Over half of

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 140

1   my -- well, all of my professional life prior to PDG has

2   been dealing with the FDA and over half of my life

3   continues with the FDA.  So I don't criticize any

4   individual reviewers.

5        Q.   You're not here to express criticism of the

6   FDA's actions with respect to Trasylol.  Correct?

7        A.   I also don't know where you're seeing that in

8   the report, but I have not done that and that is not my

9   intention.

10       Q.   Do you have any reason to believe that folks

11  at the FDA who were responsible for aprotinin did not

12  keep up with the medical literature regarding aprotinin?

13            MR. MOSKOW:  Objection, calls for speculation.

14       A.   I have no idea how to answer that.  That would

15  be completely speculative on my part.

16  BY MR. DERRINGER:

17       Q.   That's because you don't know what's inside

18  the minds of the folks at the FDA.  Right?

19       A.   Right.  And I also don't know what their work

20  assignments were as it relates to aprotinin on a daily

21  basis.

22       Q.   You're not an expert on the regulatory or

23  legal requirements for marketing a drug in Germany, are

24  you?

25       A.   No.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 141

1    Q.    What about in Italy?

2    A.    No.

3    Q.    What about in Canada?

4    A.    No.

5    Q.    You're not an expert on the regulatory or

6    legal requirements for monitoring drug safety in those

7    three countries.  Correct?

8            MR. MOSKOW:  Object to form.  You can answer.

9    A.    We work with the pharmacovigilance data

10   collected in those countries and the quality and the

11   adequacy of that information as it relates to our

12   requirements for submitting information -- submitting

13   that information to the U.S. FDA.

14           So I am -- I would certainly say I am

15   experienced in collecting, evaluating and preparing that

16   information for FDA's purposes.  But I would not say I'm

17   an expert on what is required in those specific details

18   of what's required in those countries for that.

19   BY MR. DERRINGER:

20   Q.    Now, the FDA requires safety and effectiveness

21   or efficacy data from controlled clinical trials

22   involving human patients before it will approve a

23   medicine for use in the United States.  Right?

24   A.    Generally.

25   Q.    And when the FDA approves a drug for marketing

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 142

1    and sale for a particular use, that's because it's

2    determined that the drug is safe and effective for that

3    particular use.  Correct?

4            MR. MOSKOW:  Objection to form.  You can

5        answer.

6        A.   Generally, that's the case, yes.

7    BY MR. DERRINGER:

8        Q.   The people at the FDA who decide whether to

9    approve drugs, they are scientists and doctors.  Right?

10            MR. MOSKOW:  Object to form.

11        A.   There's a wide variety of types, but include

12    those, of course.

13    BY MR. DERRINGER:

14        Q.   And scientists and doctors at the FDA, they're

15    smart, conscientious and hardworking.  Right?

16            MR. MOSKOW:  Object to form, calls for

17        speculation.

18        A.   Well, again -- again, that's a speculation.  I

19    have -- I do not have any criticisms with the ones with

20    which I have worked.

21    BY MR. DERRINGER:

22        Q.   Now, the IND, now, that stands for

23    Investigational New Drug Application.  Right?

24        A.   Yes.

25        Q.   Okay.  That's the formal submission through

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 143

1    which a drug company requests permission from the FDA to

2    begin a clinical study of the drug in humans.  Right?

3        A.   Yes.

4        Q.   And the FDA has to approve the study before

5    the drug company is permitted to begin that study in

6    humans here in the United States.  Correct?

7        A.   That's not quite right.  FDA does not

8    technically approve the study plan.  IND's are not

9    approved and the study is not approved.  It's rather if

10   they don't stop you.  It's more of they can stop you

11   from conducting the study, but you don't get a letter

12   generally saying your study plan is approved.  That is a

13   very special type of submission that is called a Special

14   Protocol Assessment.

15       Q.   Okay.  But the FDA does have the power to stop

16   the company from starting the trial.  Correct?

17       A.   If they -- if they do it within 30 days of

18   submitting the IND, they have that power, yes.

19       Q.   Do you -- in your review of the IND here in

20   the Trasylol case, did you see that there was any

21   information that was missing or incomplete from it, from

22   Bayer's submission?

23            MR. MOSKOW:  Object to form.  Just restating

24       my concern from before, nowhere in this report does

25       Dr. Blume state that there was a failure to provide

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 144

1        specific information to the FDA.  That's not her

2        opinion, that's not what she's going to be

3        testifying about today, and I'm concerned that that

4        type of question would evoke -- could evoke

5        testimony that's inconsistent with what her state of

6        opinions are going to be.

7             MR. DERRINGER:  Okay.  Well, to respond to

8        that first, I don't think your statement is

9        accurate, but -- but we can clear that all up now.

10   BY MR. DERRINGER:

11        Q.   Dr. Blume, are you going to be offering any

12   opinion in this litigation that Bayer failed to provide

13   information to the FDA that it should have provided to

14   the FDA?

15        A.   With respect to the IND?

16        Q.   No.  With respect to anything.

17        A.   I think the report suggests -- not suggests.

18   My report indicates that certain studies were not

19   provided to the FDA.

20        Q.   Okay.

21        A.   And that would be long past the IND stage.

22        Q.   I understand.

23             MR. DERRINGER:  She discusses that in her

24        report, I'm entitled to ask about it.

25             MR. MOSKOW:  Not with regard to the IND,

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 145

1      though.

2           MR. DERRINGER:  Absolutely I am.  You can make

3      your objection at trial.

4  BY MR. DERRINGER:

5      Q.   Dr. Blume, was there any information that was

6  missing or incomplete from Bayer's IND application for

7  Trasylol?

8      A.   And again, I can't answer that question for

9  the following reasons:  I did not review components of

10  the IND relating to the chemistry and manufacturing, so

11  I wouldn't know if there was information lacking or not

12  in that area.  And I also did not, because I was not

13  commenting on the adequacy of the animal studies or even

14  the clinical studies, I did not go back to the original

15  case report forms for those studies and assess if all of

16  the ad -- all of the necessary information were

17  provided.  So I can't answer it.

18      Q.   You will not be offering any critique of

19  Bayer's IND submission for Trasylol in this litigation.

20  Correct?

21           MR. MOSKOW:  Object to form.  You can answer.

22      A.   Yeah, I didn't think I had, and it's not my

23  plan to do that.

24  BY MR. DERRINGER:

25      Q.   If a company wants to study a medicine outside

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 146

1    of the indication for which it was approved, am I right

2    that it would have to file a new IND in order to get

3    permission from the FDA to start the clinical trials in

4    that different indication?

5        A.   Generally, it's generally negotiated with FDA,

6    especially if it's approved for one indication already.

7    And my experience has been that it's not a new IND

8    that's filed, it's a -- it's a continuation of the IND

9    that already exists for that product.

10            If the product that you wish -- with which you

11   wish to compare your product has been long-studied or is

12   an old product from which there's adequate information,

13   you will sometimes get that requirement waived and

14   simply note the ways in which you will be studying the

15   comparator product within the protocol that is submitted

16   through the IND.

17       Q.   Lots of clinical trials have been performed

18   involving Trasylol, would you agree with that?

19       A.   There have been, yes.

20       Q.   Okay.  And some of those clinical trials are

21   referred to as pivotal trials or pivotal clinical

22   studies.  Is that right?

23       A.   Yes.

24       Q.   What does that mean?

25       A.   To me, in my experience with interacting with

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 147

1    the FDA, pivotal studies are generally those studies

2    that form the foundation for the basis of the approval

3    or a pivotal study can be the study upon which the

4    approval is not granted.

5        Q.   FDA's job is to evaluate the clinical trial

6    protocols that a company puts together?

7        A.   They can.  It's not required that they review

8    the protocols.

9        Q.   But in your experience, your experience with

10   the FDA, they do in fact review the clinical trial

11   protocols that a company puts together; that's why you

12   submit them.  Right?

13       A.   Well, if the company wishes for the FDA to

14   approve them, FDA will sometimes approve them.  That is

15   one area in which you often do not get a timely

16   response.

17       Q.   But you do wait for the response; right?

18       A.   It depends.  If it's going to be a pivotal

19   study, generally, the wiser way to do it is to submit a

20   Special Protocol Assessment and that puts a time frame

21   on when FDA has to respond.

22            Generally, I wait for a response.  It is not

23   necessarily always done, especially if the protocol is

24   very similar to a protocol FDA has already -- which with

25   FDA has already agreed.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 148

1     Q.   Do you know one way or the other whether the

2   FDA reviewed the clinical trial protocols for Trasylol

3   before FDA gave Bayer permission to conduct those

4   trials?

5          MR. MOSKOW:  Object to form.  You can answer.

6     A.   I'm not sure how they would give them

7   permission to conduct the trials.  I do not recall

8   seeing a clinical hold.  But I didn't recall seeing a

9   letter saying that we approve, I didn't recall seeing

10   that.

11   BY MR. DERRINGER:

12     Q.   Now, there are medical officers at the FDA

13   whose job it is to review NDA's after they are filed.

14   Right?

15     A.   Well, medical officers have several functions,

16   but among those are NDA reviews.

17     Q.   And they're not the only folks at the FDA who

18   review the NDA.  Right?  You've got the statistical

19   reviewers?

20     A.   Yes.

21     Q.   You've got pharmacology reviewers?

22     A.   Yes.

23     Q.   You've got toxicology reviewers?

24     A.   Yes.

25     Q.   Would you agree, though, that it's the medical

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 149

1   officer who spends the most time reviewing the NDA?

2           MR. MOSKOW:  Object to form, calls for

3       speculation.

4   BY MR. DERRINGER:

5       Q.   If you know, based on your experience.

6       A.   The medical officer generally reviews the

7   clinical studies and the medical officer is usually the

8   author of the overall NDA review.  That doesn't

9   necessarily mean they did that review, but that he or

10  she approves that review.

11      Q.   But the --

12      A.   I have never seen an hourly breakout among the

13  various officers, though.  I don't know the answer.

14      Q.   The medical officer, I think you referred to a

15  review or a report or something, they write a

16  comprehensive report about their review of the NDA.

17  Right?

18      A.   Well, more than that.  It actually includes

19  the various critical sections of the other NDA reviews.

20  It's not necessary -- it doesn't necessarily follow that

21  they have written those other sections, but they are

22  appended to that review.

23      Q.   Understood.  But one thing you'll find in the

24  NDA is a medical officer review?

25      A.   Well, you'll find that for all the major

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 150

1    disciplines.

2        Q.   Okay.  And if we wanted to know what the

3    medical officer's views were about the safety and

4    efficacy of a drug, based on their review of the NDA,

5    one thing we could do is read the medical officer's

6    report.  Right?

7            MR. MOSKOW:  Object to form.  You can answer.

8        A.   Well, yes, you could do that.

9    BY MR. DERRINGER:

10       Q.   And if we wanted to know what factors the

11   medical officer considered when making a recommendation

12   about whether to approve a drug or not to approve a

13   drug, we could read the medical officer's report.

14   Right?

15           MR. MOSKOW:  Object to form, calls for

16       speculation.  You can answer if you --

17       A.   Well, actually, it is speculative because it

18   really isn't the medical officer that approves or

19   disapproves a product.  The medical officer makes a

20   recommendation.

21   BY MR. DERRINGER:

22       Q.   That's what I just said.  If we wanted to know

23   what factors the medical officer considered when making

24   a recommendation about whether or not a drug should be

25   approved, one thing we could do is read their report?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 151

1            MR. MOSKOW:  Same objection.

2   BY MR. DERRINGER:

3      Q.    Correct?

4      A.    Yeah, one thing you could do is read their

5   report.

6      Q.    And you think it's fair to presume that the

7   FDA is aware of whatever information is in the medical

8   officer's report?

9            MR. MOSKOW:  Object to form.  You can answer.

10     A.    To whom are you referring at FDA?

11  BY MR. DERRINGER:

12     Q.    Anybody, the FDA generally.

13     A.    Well, no.  I don't think the FDA generally

14  knows what's in a medical officer's report because it's

15  kept confidential until the time of approval.  So no,

16  not everyone at FDA would be aware of what's in a

17  medical officer's review.

18     Q.    What about the folks at FDA who are

19  responsible for making the decision about whether or not

20  to approve a drug, do you think it's fair to presume

21  that they are aware of what's in the medical officer's

22  report?

23           MR. MOSKOW:  Object to form, calls for

24      speculation.

25     A.    I have no way of knowing that, but I would

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 152

1    certainly hope that the person making the decision had

2    read the statistical review, the medical review and the

3    other principal reviews.

4              MR. MOSKOW:  We're up to 6; right?

5              MR. DERRINGER:  Yes.

6    BY MR. DERRINGER:

7       Q.   Dr. Blume, I put in front of you Exhibits 6

8    and 7, these are the Medical Officer's Review reports of

9    the original NDA.  I just want to have you confirm that

10   these are, in fact, what I just represented them to be

11   and that is the Medical Officer's Review.  The officer

12   here was Dr. Lilia Talarico, these are her reviews

13   dated, it looks like -- well, review completed, it looks

14   like February 3rd, 1993 on the first one and the date of

15   review on Exhibit 7 is December 13, 1993.

16             Did you review these as part of your work in

17   this case?

18      A.   I'm sorry, when did you say that the date was

19   of her first one?

20      Q.   It looks like the review completed date on the

21   first page is February 3rd, I think that's a two, if you

22   look at, again, the first page of Exhibit 6.

23      A.   Exhibit 6, her review -- her review, okay.

24      Q.   I think it says February 3rd, 1993; do you see

25   that?

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 153

1      A.   Yes.

2      Q.   In any event, the stamp at the right is April

3   16, 1993, that we can see clearly.  Right?

4      A.   Yes.

5      Q.   Okay.  So did you review these two documents

6   as part of your work in this case?

7      A.   I think the other one is the four-month

8   update.

9      Q.   Correct.

10     A.   Yes.

11     Q.   Okay.  These are the reports that

12   Dr. Talarico, the medical officer, submitted that

13   reflect her review of the NDA.  Correct?

14     A.   Yes.  Yes.  And I think that -- yeah.

15     Q.   Okay.  And I didn't see it in your report, so

16   I want to confirm, Dr. Blume, that you're not going to

17   be offering any critique of Bayer's NDA submission for

18   Trasylol.  Is that right?

19     A.   You did not see that in the report and it's

20   not my intention to do that.  I hadn't planned on doing

21   that.

22     Q.   Do you believe that the FDA made the right

23   decision in 1993 to approve Trasylol?

24     A.   Well, again, I don't -- I haven't reviewed all

25   the sections of the report.  I -- yes, I'm not arguing

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 154

1    with it.  I know Dr. Talarico and I know her boss

2    Dr. Fredd, and I've worked with both of them on

3    projects.  So yes, I'm familiar with their capabilities,

4    so I am not arguing with the initial approval.

5         Q.   Do you think Dr. Talarico is smart?

6              MR. MOSKOW:  Object to the form.

7         A.   Yeah, that's kind of speculative.  I --

8    BY MR. DERRINGER:

9         Q.   Asking for your opinion.

10        A.   I enjoyed working with her.

11        Q.   Do you think that she's smart?

12        A.   I think she's capable, yes.

13        Q.   Do you think she's hardworking?

14             MR. MOSKOW:  Object to form.

15        A.   I don't know.  I never know how hardworking

16   they are.

17   BY MR. DERRINGER:

18        Q.   Do you think she's diligent?

19             MR. MOSKOW:  Object to form.

20        A.   I don't know how to answer those kind of

21   questions.  I don't know her working hours, so I don't

22   know if she's a hard worker or works long hours.

23             In her inter -- in their interactions, both of

24   them, in their interactions with me and my projects, I

25   believe that they were hardworking, yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 155

1    BY MR. DERRINGER:

2        Q.    You're talking about Dr. Talarico and

3    Dr. Stephen Fredd?

4        A.    Stephen Fredd, yes.

5        Q.    Do you know how many supplemental NDA's were

6    submitted for Trasylol?

7        A.    I think that -- no, I don't know how many

8    since those include the CMC issues, which again, I did

9    not review.  I only discuss the supplements for the

10   lower strength and the supplements for the expanded

11   indication and the labeling supplements.

12       Q.    So the supplement for the expanded indication

13   you're talking about, that's Supplement 004, right?

14       A.    Yes.  We've already discussed it, I believe it

15   is 4.

16       Q.    And same kind of questions on the SNDA as we

17   talked about with the NDA, Dr. Blume, you've got a

18   medical officer who will review the SNDA, among other

19   folks, too.  Right?

20       A.    Well, you're partly right.  It depends on what

21   type of SNDA it is.

22       Q.    Let's talk about SNDA 004.

23       A.    For a clinical-related SNDA, you would

24   generally have a medical officer review, yes.

25       Q.    And Lilia Talarico was the medical officer for

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 156

1    SNDA 004; do you recall that?

2        A.   I'll have to find the document.  I don't

3    specifically recall.  I'll have to see a document.

4        Q.   Okay.  I can do that for you.  I put in front

5    of you, Dr. Blume, Exhibits 8 and 9.  Exhibit 8 is

6    dated, the date of review is January 3rd, 1997 from the

7    Medical Reviewer Lilia Talarico, and the date of Exhibit

8    9 is August 10th, 1998, also from Lilia Talarico, both

9    of these are Medical Officer's Review.  Do you see that?

10       A.   I do.

11       Q.   Okay.  And if we wanted to know, again, like

12   with the NDA, if we wanted to know what the medical

13   officer's views were about the safety and efficacy of

14   Trasylol at that time, we could read her report.  Right?

15       A.   Well, there's several things you could read.

16   You could read the publicly available documents.  You

17   could read the documents that are internal at FDA before

18   it's been made ready for FOI.  And then they release --

19   I think it was during this time frame as well, they

20   would have various questionnaires that they filled out

21   on each of their reviews, you could review those as

22   well.

23       Q.   One of the things that we could look at if we

24   wanted to know what the medical officer's views were

25   about the safety and efficacy of Trasylol was -- is her

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 157

1    Medical Officer Review report, Exhibits 8 and 9.

2    Correct?

3       A.   Yes.  That's certainly one of the things you

4    could look at.

5       Q.   If we wanted to know what factors the medical

6    officer considered when making a recommendation about

7    whether or not to approve the expanded indication for

8    Trasylol, one thing we could do is read her reports,

9    Exhibits 8 and 9.  Correct?

10          MR. MOSKOW:  Object to form.

11      A.   Yes.  That's one of the things you could do.

12   BY MR. DERRINGER:

13      Q.   And again, do you think it's fair to presume

14   that -- well, I'll strike that.

15          Again, I didn't see it in your report, so I

16   want to confirm.  You're not going to come into court

17   and offer any critique or criticism of Bayer's SNDA

18   submissions for Trasylol.  Right?

19          MR. MOSKOW:  Object to form.  You can answer.

20      A.   I won't -- sorry.  I will not be criticizing

21   FDA's reviews for Supplement 004.

22   BY MR. DERRINGER:

23      Q.   Okay.  That wasn't my question, but thank you

24   for that answer.

25          Do you have any -- are you going to be coming

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 158

1    into court and offering any critique or criticism of

2    Bayer's SNDA submissions for Trasylol?

3           MR. MOSKOW:  Object to form.

4       A.   No.

5    BY MR. DERRINGER:

6       Q.   And you're not going to be offering any

7    opinion in this litigation that FDA should not have

8    approved SNDA 004 for the expanded indication.  Correct?

9           MR. MOSKOW:  Object to form.

10      A.   Not at that time.  I have no criticisms of the

11   approval.

12   BY MR. DERRINGER:

13      Q.   Can FDA ask a company to perform

14   post-marketing studies prior to its approval of a

15   medication?

16      A.   Well, the FDA can ask for it.  FDA had no

17   ability to require it until 2008.  FDA can ask for it.

18      Q.   If a company agrees to do the studies that the

19   FDA asks to be done, is the company bound by its

20   agreement?

21      A.   Well, no, because part of the reason that FDA

22   requested the ability to require it in 2008 is there was

23   such an abysmally low percentage of studies actually

24   completed for which there had been a pre-marketing

25   commitment.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 159

1      Q.   You're not saying that Bayer ever refused to

2   do a post-marketing study requested by FDA, are you?

3            MR. MOSKOW:  Object to form.

4      A.   I don't think I just said that.  I was

5   answering the question that FDA did not have a high

6   record of that.

7   BY MR. DERRINGER:

8      Q.   Did Bayer ever refuse to do a post-marketing

9   study requested by FDA?

10      A.   I don't know.  I don't know.

11      Q.   You didn't do any investigation into that?

12      A.   Well, I only had the records for aprotinin.  I

13   don't know if Bayer has ever refused to do a

14   post-marketing study for FDA.  I don't know.

15      Q.   You're not saying that Bayer ever refused to

16   do a post-marketing study requested by FDA about

17   Trasylol, are you?

18      A.   No.

19      Q.   Are you aware of any post-marketing commitment

20   related to Trasylol requested by the FDA that Bayer did

21   not fulfill?

22            MR. MOSKOW:  Object to form.

23      A.   Wow, I'd have to see that initial list.  I've

24   forgotten everything that's on the initial list that

25   were post-marketing commitments.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 160

 1    BY MR. DERRINGER:

 2        Q.    As you sit here today --

 3        A.    I'd have to recall that list again.  I recall

 4    there was a commitment for ongoing -- well, I don't

 5    know.  There was a commitment by FDA for ongoing safety

 6    evaluations, to provide FDA with information relating to

 7    ongoing studies post-approval relating to the safety of

 8    the product.  I would not say that that was -- that

 9    Bayer completely complied with that.

10        Q.    That's your conclusion?

11        A.    I would first have to see the wording of it,

12    yes, because -- well, as I outlined in my report, that

13    would be my conclusion.  But I would have to see the

14    specific nature of the commitment requested by FDA.

15        Q.    Okay.  You'd also be interested in seeing what

16    the FDA concluded about whether that commitment was

17    fulfilled.  Right?

18        A.    Well, yeah.  I'd like to see whatever you

19    would have to show me, plus the information I provided

20    in the record.  I mean, FDA has noted that they were not

21    provided with information from Bayer.

22        Q.    And when was that?

23        A.    When they wrote their press release regarding

24    the I3 data.

25        Q.    Can you think of any other time that FDA noted

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 161

1   that they were not provided with information from Bayer?

2       A.   In 2006, they asked them for an update for any

3   other studies for which they had not been provided

4   information and Bayer responded with, in addition to the

5   I3, a couple of additional studies on that list.

6            As I recall, that was in 2006 for data that

7   were available in 2003, so I guess in addition to I3, I

8   would add the studies have been called the Kress and

9   Stone study, and the Treasure study, St. George Hospital

10  study, I would add those, that FDA did not receive

11  those.

12      Q.   Anything else?

13      A.   That's all I can think of.

14      Q.   And FDA's request for those studies, that was

15  in September of 2006.  Correct?

16      A.   Well, when they knew that studies had not been

17  provided to them, yes.

18      Q.   That's when the request was made; correct?

19      A.   Yes.  After they realized that I3 had not been

20  provided, they asked for an update for any other studies

21  that had not been provided to them.

22      Q.   Anything else, any other study -- well, strike

23  that.

24           Can you, as you sit here today, think of any

25  post-marketing commitment made by Bayer to the FDA about

CHERYL   BLUME, Ph.D. - 7/21/2011

                                                  Page 162

 1   Trasylol that Bayer did not fulfill to the FDA's

 2   satisfaction?

 3              MR. MOSKOW:  Asked and answered.

 4      A.   No.  But I would like to see that list again

 5   of the --

 6   BY MR. DERRINGER:

 7      Q.   Okay.  So you'd have to look at the documents?

 8      A.   There was a listing I saw of what FDA wanted

 9   post-approval, one was the ongoing -- being updated on

10   an ongoing basis regarding the safety of a product.

11      Q.   Take a look at paragraph 11 of your report.

12   This is where you talk about industry standards.  Right?

13      A.   Paragraph, what paragraph?

14      Q.   Paragraph 11 on Page 9.

15              MR. MOSKOW:  Steve, just for the record, this

16      was --

17              MR. DERRINGER:  I'm going to get to that.

18   BY MR. DERRINGER:

19      Q.   Are you there?

20      A.   Yes.

21      Q.   Now, you need to make a correction, I believe,

22   here.  In the middle of that paragraph -- well, tell me

23   what the correction is.

24      A.   Well, really paragraph 10 relates to

25   regulatory obligations, the codes -- the CFR codes are

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 163

1   cited and -- yeah, CFR codes are cited for both 200 and

2   300 series, and some guidelines are cited.  Really 11 is

3   not so much regulatory obligations or regulatory

4   requirements as much as they are what we call standard

5   of care of the industry, what industry generally

6   applies.

7           So what I have in 11 are not the codes or FDA

8   guidances, but have also included what PhRMA imposes

9   upon themselves and their members, what their

10  commitments are.  It also has various books that are

11  written by industry, include industry authors such as

12  Brian Strom.  And I think for this one, because the

13  product was in Europe as well, so there's also a

14  standard for people who belong to CIOMS.

15      Q.   What's the correction that you need to make in

16  this paragraph?

17      A.   Well, I describe regulatory obligations,

18  that's not really what it is.  It's really regulatory or

19  standards of care that have been developed and imposed

20  upon industry more by industry than with somebody

21  calling it a requirement.

22      Q.   So these things that you are calling industry

23  standards, they don't describe regulatory obligations.

24  Correct?

25      A.   No.  That's in paragraph 10.  Paragraph 10 and

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 164

1    11 are differentiated.

2        Q.   Understood.  The things you are claiming to be

3    industry standards in paragraph 11 do not describe

4    regulatory obligations.  Correct?

5        A.   Well, they're regulatory obligations imposed

6    on themselves by the regulatory -- generally by the

7    companies.  PhRMA imposes standards upon themselves, the

8    members of big PhRMA.

9        Q.   We'll get to that.

10       A.   Okay.

11       Q.   But just answer my question, ma'am.  The

12   industry standards, the things you claim to be industry

13   standards in paragraph 11, they do not describe

14   regulatory obligations.  Correct?

15       A.   They describe obligations that the companies

16   have put on themselves, not obligations specifically

17   noted in the code.

18       Q.   They do not describe regulatory obligations;

19   correct?

20       A.   Well, I don't know how to answer that.

21   They're obligations the companies have said, have got

22   together and said this is important, we're writing

23   textbook of -- or standards of industry in textbooks.

24   These are what we are obligating ourselves to do.

25       Q.   Okay.  Do they describe regulatory obligations

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 165

1    or not?

2        A.    To me, if I belong to a company and I signed

3    off -- I belong to an organization and signed off that I

4    was going to do certain things, it would be a regulatory

5    obligation for me.

6        Q.    Okay.  But there is no regulatory provision in

7    the CFR, ma'am, to which these are tied; correct, these

8    claimed industry standards?

9        A.    Well, the CFR has the same sorts of standards

10   in that they say when labeling will be updated with new

11   information.  The CFR describes different types of

12   studies that will be done to address safety concerns.

13   So yeah, the CFR does address both of those.  The CFR is

14   more, in my mind, is more of a legal mandate for you to

15   do something versus a regulatory -- an obligation

16   imposed upon you willingly by virtue of your writing a

17   textbook chapter or being a member of the PhRMA

18   organization.

19       Q.    Tell me the regulatory provision where I will

20   find the claimed industry standard that you describe as

21   PhRMA 1995.  What regulatory provision, what code

22   provision?

23       A.    PhRMA -- you are familiar with PhRMA, correct,

24   the PhRMA codes, the PhRMA overviews?

25       Q.    You list here PhRMA 1995.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 166

1     A.    Right.

2     Q.    Okay.  Can you show me the regulatory

3   provision, the code provision where I'm going to find

4   that claimed industry standard?

5     A.    That you shall keep your labeling updated?

6     Q.    Do you think that that's what PhRMA 1995 says?

7     A.    Well, PhRMA 1995 says several things about

8   labeling and safety.

9     Q.    You may not recall this, but when I asked

10   earlier of your counsel a few months ago to tell us

11   specifically what PhRMA 1995 refers to, you gave us a

12   document.

13     A.    There is a document.

14     Q.    Actually, let me strike that and deal with a

15   different one.  Well, no, go ahead.  We'll do that.

16           Okay.  I'm showing you Exhibit 10.  This is

17   what you represented to us through correspondence via

18   your attorneys as PhRMA 1995, it's titled PhRMA Code of

19   Pharmaceutical Marketing Practices.  Do you see that?

20     A.    Yes.

21     Q.    Now, is it your testimony, ma'am, that this

22   describes regulatory obligations?

23           MR. MOSKOW:  I'm going to object to the extent

24       it calls for a legal conclusion.  I think she's

25       trying to explain self-regulation versus statutory

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 167

1     regulation.

2              THE DEPONENT:  Exactly.

3              MR. MOSKOW:  That's the distinction between --

4              THE DEPONENT:  Exactly.

5              MR. MOSKOW:  -- the two paragraphs 10 and 11,

6     and I think that's the confusion that the two of you

7     are having.

8  BY MR. DERRINGER:

9     Q.   Okay.  Well, you have changed the language of

10 your report, apparently because you thought the way you

11 originally wrote it was misleading or it was inaccurate.

12 Okay.

13          The language that your counsel has told me

14 you've changed is you've deleted "describe regulatory

15 obligations," and instead you write, "describe the

16 standard of care that is expected of pharmaceutical

17 companies."

18    A.   Right.

19    Q.   Is that -- is that the change you want to make

20 in your report?

21    A.   Right.  Because I feel 11 is self-imposed and

22 10 is what is required.

23    Q.   Required by?

24    A.   Required by the FDA.

25    Q.   Now, you list in paragraph 11 all of the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 168

1    industry standards on which you -- alleged industry

2    standards on which you are relying.  Correct?

3        A.   Well, I tried to use the ones that are not

4    only the current ones, but also fulfill the years of

5    relevance for Trasylol.

6        Q.   Okay.  Are you -- are there any other alleged

7    industry standards on which you are relying in this

8    litigation, other than those listed in the first

9    parenthetical in paragraph 11?

10       A.   Well, the only textbook that I listed was the

11   gold standard one that involves -- that includes

12   industry opinions, and I only included Brian Strom's

13   book.  There are other books and there are other

14   chapters that have been written by industry on

15   post-marketing obligations, those have not been

16   included.

17       Q.   All right.  I'm entitled to know what those

18   are.

19            MR. DERRINGER:  In fact, we asked this before,

20       Neal, and Dr. Blume confirmed in E-mail

21       correspondence that what's listed here is the

22       entirety of what she's relying on.

23            MR. MOSKOW:  Correct.

24            MR. DERRINGER:  So now she's telling me that

25       there are others.

CHERYL   BLUME, Ph.D. - 7/21/2011

1          THE DEPONENT:  Yeah, there are.  I rely on --

2     I consider Brian Strom's textbook the best; I rely

3     on Brian Strom.  But I am aware that there are other

4     review articles that have been written by industry

5     and written by PhRMA, the PhRMA group on obligations

6     individual to their code.  I don't particularly rely

7     upon those.

8  BY MR. DERRINGER:

9     Q.   Are there any that are not listed here that

10 you are going to refer to or rely upon in your testimony

11 in this case?

12     A.   I hadn't planned on relying on anything but

13 these.

14     Q.   Okay.  Now, you claim these are industry

15 standards.  Is that right?

16     A.   Yes.

17     Q.   What establishes these as industry standards,

18 other than your saying that they are?

19     A.   I guess because PhRMA calls it the world

20 standard.  PhRMA is the organization of research,

21 research-intensive manufacturers.  Bayer is a member of

22 it, has been a member for as long back -- as long as I

23 could check back, as are the Miles subsidiary and

24 others.  They call it, if you look at some of their

25 titles, they call it the prescription drug safety, the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 170

1    world standard.  And because the companies belong to it,

2    they -- this is the code that they have agreed upon.  It

3    was written by their members, it was agreed upon by

4    their members.  I consider it the code upon which they

5    have adopted.  And they have affirmed it with the 90 --

6    I think it's the '98th edition -- or the 2002 edition,

7    it's confirmed again in the 2008.  So there has

8    certainly been no effort from them to distance

9    themselves from it; in fact, they continue to increase

10   it.

11        Q.   Let me show you what's been marked as Exhibit

12   11.  This is the Medicine Safety Overview document from

13   PhRMA that you refer to in your report.  Please show me,

14   Dr. Blume, what establishes this as an industry

15   standard?

16        A.   It's in the Code of Pharmaceutical

17   Manufacturing Practices agreed upon by the members of

18   PhRMA.

19        Q.   This is not, ma'am.

20        A.   Well, this is later.  But this is on the PhRMA

21   Web site.

22        Q.   I want to know everything you're relying on to

23   support your conclusion that Exhibit 11, Medicine Safety

24   Overview, is an industry standard.

25        A.   Well, because it appears on the -- with the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 171

1    PhRMA Code, it appears on the PhRMA Web site.

2         Q.   Wait.  What PhRMA Code, ma'am?

3         A.   Where did you get this copy from, from me?

4         Q.   Yes.

5         A.   These appear -- here's the PhRMA Code.  These

6    appear as subsections from the various PhRMA Codes and

7    on the PhRMA Web site.

8         Q.   What code are you looking at right there,

9    ma'am?

10        A.   It says right here PhRMA Code on Interacting

11   With Healthcare Professionals.  I'm not sure --

12        Q.   I'm not sure you provided that to us.

13        A.   I'm not sure -- well, I'm not sure what --

14        Q.   We asked for all standards that you are going

15   to be relying on.

16        A.   Well, I cited it in my report.

17        Q.   Is that from 2002 or --

18        A.   Well, I have all the years -- in my report, I

19   have all the years that are available.  They updated

20   again, Code on Interaction With Healthcare

21   Professionals, here's the 2008.

22        Q.   I think I have it.

23             MR. MOSKOW:  That's it.

24             MR. DERRINGER:  Okay.  Let's mark this as

25        Exhibit 12.  Neal, I only have one copy.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 172

1           MR. MOSKOW:  That's all right.  She has one in

2      the book, so I'll look at this while --

3  BY MR. DERRINGER:

4      Q.   Can you show me, Dr. Blume, where this

5  Medicine Safety Overview, which is Exhibit 11, is

6  contained in the code?

7      A.   Yeah, I'll have to find it.  I don't know

8  where it's at here.  Where did you pull it from?

9      Q.   I pulled it from you, Dr. Blume.

10     A.   I mean what section.  The section is a

11  notebook long of the PhRMA Code.

12     Q.   This is what you gave me as the PhRMA Code,

13  Exhibit 11.

14     A.   Okay.

15          MR. DERRINGER:  Neal, go ahead and give her

16     Exhibit 11.

17          THE DEPONENT:  This is Exhibit 11 right here.

18     This is my paragraph 11.

19          MR. DERRINGER:  That's your paragraph 11 --

20          THE DEPONENT:  -- that includes all the PhRMA

21     Code information.

22          MR. MOSKOW:  Hold on a second.  The question

23     is about this specific document.

24          MR. DERRINGER:  No.  The question actually

25     originated with Exhibit 11.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 173

1   BY MR. DERRINGER:

2        Q.   I want to know what establishes Exhibit 11,

3   not your paragraph 11, ma'am, where you allege that

4   there are industry standards, I'm talking about Exhibit

5   11 that I gave you, which is one of the things you

6   allege to be an industry standard.

7        A.   Well, why don't I read to you what the front

8   end of it is and it will give you the obligations of the

9   PhRMA members.

10            MR. MOSKOW:  Dr. Blume, wait one second.  The

11       question pending was where in Exhibit 12, the code,

12       does it relate to the Medical Safety Overview,

13       Exhibit 11.

14            MR. DERRINGER:  Correct.

15            MR. MOSKOW:  That was the question pending.

16       So this is the document that he's asking the

17       question about.

18            If you're willing to go off the record while

19       the question is pending, I think we can move

20       forward.

21            MR. DERRINGER:  I want to get her answer to

22       this, then we can do that.

23            THE DEPONENT:  Oh, this is talking about the

24       need for pharmacovigilance studies following

25       approval because approvals are based on small

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 174

1       studies.  This --

2               MR. MOSKOW:  The question pending --

3               MR. DERRINGER:  Let me handle this, Neal.

4    BY MR. DERRINGER:

5       Q.   So Exhibit 11 doesn't actually appear in what

6    you're calling the code.  Correct?

7       A.   This comes from PhRMA.

8       Q.   It comes from their Web site, that's correct.

9       A.   Okay.  Here's the code --

10      Q.   I'm not talking about the code anymore, ma'am,

11   unless you can show me where in the code Exhibit 11 is.

12      A.   Yeah.  I'll look.  This is their code.  Okay.

13   Do we know where this is at in this notebook, because

14   it's going to take me 10 minutes to go through here?

15              MR. DERRINGER:  Let's go off the record, then,

16      if she's going to need 10 minutes to go through it.

17              THE VIDEOGRAPHER:  The time is 12:44 and we're

18      off the record.

19              (Off the record.)

20              MR. DERRINGER:  Let's go back on the record.

21              THE VIDEOGRAPHER:  The time is 12:50 and we're

22      back on the record.

23   BY MR. DERRINGER:

24      Q.   Dr. Blume, I've put in front of you, through

25   Exhibits 10 through 17, all of the different alleged

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 175

1   industry standards that you cite to in paragraph 11,

2   with the exception of Brian Strom's book

3   "Pharmacoepidemiology," and with the exception of the

4   CIOMS document, which we'll get to.

5        But with PhRMA, okay, what I want to know is

6   your basis for stating that Exhibits 11, 13, 14, 15, 16

7   and 17 constitute industry standards.

8        A.   Okay, because -- well, I include them because

9   they are overviews compiled and published by PhRMA.

10       Q.   Is that the extent of the basis for why you

11  include these or describe these as industry standards?

12       A.   Well, yes.  Because the companies in question

13  certainly all belong to PhRMA as active members of

14  PhRMA, and the principles within the PhRMA Code address,

15  although in a much more broad fashion, the same issues.

16  I mean, as early as the first code, it says we've got to

17  get information out regarding the safety of our product

18  and we've got to do studies that aren't -- that aren't

19  marketing studies, that aren't just restricted to

20  marketing studies.

21       So even as early as the first one, they say

22  the two issues upon which I'm opining, labeling needs to

23  go on and, if necessary, need to do studies.

24       Q.   And that's in Exhibit 10 you say?

25       A.   Ten.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 176

1      Q.    That's the 1995 PhRMA Code, right, Code of

2      Pharmaceutical Marketing Practices.   Right?

3      A.    That's '95.

4      Q.    Correct.   That's what we've marked as Exhibit

5      10.   I know you're looking at your notebook, but that's

6      Exhibit 10.   And what language were you just referring

7      to?

8      A.    Particular care must be taken that essential

9      information as to our product safety, contraindications

10     to side effects or toxic hazards is appropriately and

11     consistently communicated subject to legal, regulatory

12     and practices in the United States.

13           It also says post-marketing and surveillance

14     studies should be conducted on a scientific and

15     educational basis.   These studies should not be

16     conducted simply as a means that promote a product or

17     influence physicians without attention to science or

18     educational basis.

19     Q.    Okay.   So I understand that that's what it

20     says.   Exhibit 10, Exhibit 12, all of these exhibits

21     from PhRMA -- well, you've already described Exhibits

22     11, 13 through 17.   Exhibits 10 and 12, these are, by

23     the way, titled PhRMA Code on Interactions With

24     Healthcare Professionals, that's Exhibit 12.   Exhibit 10

25     is PhRMA Code of Pharmaceutical Marketing Practices.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 177

 1   Right?

 2       A.   Well, everything we do is directed towards the

 3   healthcare provider, the healthcare professional, so

 4   both the labeling comments that I make --

 5           MR. MOSKOW:  Can you just look at Exhibit 12

 6       and identify that that's the title.

 7   BY MR. DERRINGER:

 8       Q.   That's the title.  I'm asking you what the

 9   title is.

10       A.   Twelve is the PhRMA Code.

11       Q.   Exhibit 12 and Exhibit 10, what is the basis

12   for your claim that these constitute industry standards?

13           MR. MOSKOW:  Asked and answered.

14       A.   Yeah, I don't know how else to say it.

15   They -- it isn't -- these are people who pay to belong

16   who meet on these issues and come up with these

17   together.  There are sign-off sheets with them.  We --

18   your client belongs to this, has belonged to this

19   society.  This is what they pledge to do.

20   BY MR. DERRINGER:

21       Q.   Do you see anything in here that mentions the

22   word "industry standard"?

23           MR. MOSKOW:  Why don't you look at one

24       document at a time.  So start with 10 and work your

25       way --

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 178

1           THE DEPONENT:  So I'm looking for the word
2       "industry standard."  So it isn't enough to say the
3       obligations of our industry.  I didn't do it quite
4       as severely as they did by saying these are our
5       obligations.  It said industry standards.
6   BY MR. DERRINGER:
7       Q.   Where does it say obligations?
8       A.   First page, the obligations of the industry
9   are identified below, and what I read you earlier are
10  from the below part.  So they call it obligations; if
11  you want to upgrade it to obligations, we can.
12      Q.   Okay.  And the title of this is the code of
13  what?
14      A.   All of the codes are relating to what -- how
15  they interact with physicians.
16      Q.   I'm asking you the title, ma'am, right up here
17  on the font page.
18      A.   Pharmaceutical Marketing Practices.
19      Q.   Okay.  Thank you.
20      A.   Okay.  I'm not sure where that goes.  But
21  anyway, what they say is that care has to be given to
22  our marketing -- our marketing goal, of course, is
23  physicians, it's not the same as most industries, and
24  they're saying we've got to get information to them and
25  we have to do studies and the studies just can't be

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 179

1    promo studies, and that's as early as '95.

2              MR. DERRINGER:  Move to strike all of that,

3         nonresponsive.

4    BY MR. DERRINGER:

5         Q.   Are all -- are any of these PhRMA standards

6    binding on any pharmaceutical company, legally binding?

7         A.   Oh, I don't know what their contract is with

8    PhRMA.  It's what they commit to.  I mean, they have to

9    apply to be members to PhRMA.  There are certain minimum

10   criteria to be in PhRMA.

11        Q.   Do you know whether any --

12             MR. MOSKOW:  I'm going to offer a belated

13        objection to the extent it calls for a legal

14        conclusion.

15   BY MR. DERRINGER:

16        Q.   Do you know whether any of these alleged

17   industry standards that you're describing in paragraph

18   11 of your report are established standards of care in

19   any state?

20             MR. MOSKOW:  Again, object to form to the

21        extent it calls for a legal conclusion.

22        A.   I didn't understand your state law

23   requirements earlier and I don't understand them now.  I

24   don't know if -- there's three -- you know, all of us

25   agree that the FDA standards are the floor.  I mean,

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 180

1    it's written everywhere, FDA standards are the minimum.

2            There's three tiers of standards in the

3    industry:  FDA are the floor, everyone from the FDA to

4    the Supreme Court has said it.  The next tier are

5    industry standards, what industry have put upon

6    themselves.  And the third tier, and the most

7    significant, are the standards that each individual

8    company places upon themselves.  Those are the most

9    rigorous.

10           Industry standards, we have used this with 10

11   other companies and no one has -- no other brand-name

12   company has ever said that this wasn't the PhRMA

13   standards upon which they have agreed.

14   BY MR. DERRINGER:

15      Q.   And that's the basis for your conclusion that

16   these are industry standards --

17      A.   No.  My basis --

18      Q.   Let me finish my question.

19      A.   I'll change it to obligations.  Yes, industry

20   standards, there's three tiers to standards.

21      Q.   Your basis for saying that these are industry

22   standards is because they are on the PhRMA Web site and

23   PhRMA publishes them.  Is that right?

24      A.   And they're in the PhRMA Code.

25      Q.   The Code of Marketing Practices; right?

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 181

1      A.   As it relates to healthcare professionals.  So

2   yes, as it relates to healthcare professionals, this is

3   their obligations they've placed upon themselves,

4   obligations as it relates to dissemination of

5   information and the execution of studies, and that's

6   exactly what I am referring to in my report.

7           So yes, I am relying to that -- relying upon

8   that.  And, quite frankly, I have never heard anyone

9   from a PhRMA company deny that they adhere to these

10  standards.

11          MR. DERRINGER:  Move to strike all of the last

12      sentence there.

13  BY MR. DERRINGER:

14      Q.   In your line of work, ma'am, when you want to

15  determine the intent behind FDA Rules and Regulations,

16  do you think that the notice and comment exchange in the

17  preamble published in the federal register is relevant?

18      A.   Yeah, it can be.  Interactions with the agency

19  are also relevant.

20          MR. DERRINGER:  Okay.  Why don't we go off the

21      record for our lunch break.

22          MR. MOSKOW:  Okay.  Great.

23          THE VIDEOGRAPHER:  Time is 12:58 and we're off

24      the record.

25          (Lunch break taken.)

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 182

1           THE VIDEOGRAPHER:  Here begins tape number

2      three, the time is 1:34 and we are back on the

3      record.

4           MR. MOSKOW:  Steve, before you ask a question,

5      I know I mentioned this to you off the record.  I

6      was concerned that you and Dr. Blume were talking at

7      cross purposes when we were discussing, in

8      particular, the regulatory issues in paragraphs 10

9      and 11 and the issue of industry standards and how

10      that related to PhRMA.

11           And I think Dr. Blume now has a better

12      understanding of what you were asking and I think it

13      may be appropriate to clear that up, if you're

14      amenable.

15           THE DEPONENT:  Yeah.  I was having --

16  BY MR. DERRINGER:

17      Q.   Is there something you wanted to add?

18      A.   Yes, I would, if you wouldn't mind.  I was

19  having a little difficulty, as I was walking back to eat

20  lunch, why you weren't understanding what I was saying

21  about the pharmaceutical code.

22           And as I was reflecting on it in there, I

23  realized that I probably didn't point out something

24  about what goes into my thinking about the PhRMA code,

25  and that is, it is a true that it's a code that they all

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 183

1    read and sign off on and approve, well, members do; but

2    the code is based upon what goes on in industry.  I

3    mean, those types of studies and those types of

4    communications go on every day in those companies.

5           When I worked with them, they are looking to

6    make sure the labeling reflects what is the most current

7    information, and if not, they're looking to do studies

8    to see what else they have to do.  So the PhRMA Code

9    just isn't simply a piece of paper that's thrown into

10   the file here.  It is what they do on a daily basis.

11   It's what I do with them, with the companies when we

12   work on a daily basis.  It's what the experience is.

13          So I didn't want you thinking I was parroting

14   the PhRMA Code simply because it's this written

15   document.  It's a written document based on what they

16   do.

17   Q.   Okay.  The PhRMA Code that you're referring

18   to, ma'am, that's Exhibit 10 and then it was updated, I

19   think, in Exhibit 12.  Right?  Is that the actual code

20   when you use the word "code"?

21          Exhibit 10, I believe, is from 1995, Exhibit

22   12 in 2002.  When you're referring to code, those are

23   the documents you're referring to?

24   A.   Yes, certainly those two dates.  I just want

25   to make sure my answer is complete.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 184

1     Q.    I think there is one more in 2008.

2     A.    That's why I was looking because I believe

3   there was another iteration on it.  There is '95, 2002,

4   2008 and information from 2010.  So we should have --

5   there is at least four of them.

6     Q.    I think you're mistaken in this regard.

7   There's 2000 -- 1995, 2002 and 2008.  I didn't see a

8   marketing code for 2010, you didn't provide one.  Maybe

9   at a break you want to look for that in your binders,

10  and if you find it, please let me know.

11          But I'll mark as Exhibit 20 what I believe is

12  the one from 2008.  Is that right?

13    A.    One second, please.  Yeah.  Well, it says

14  updated to take effect in January of 2009, so it would

15  have been done in 2008.

16    Q.    So these are the three PhRMA codes to which

17  you refer in your record as PhRMA 1995, PhRMA 2002 and

18  PhRMA 2008.  Is that correct?

19    A.    Yes.  Trying to encompass the years of

20  interest for Trasylol, yes.

21    Q.    Right.  And then my question from before,

22  ma'am, was all those other PhRMA references that you

23  include in paragraph 11 -- and I will tell you that

24  those are Exhibits 11, 13, 14, 15, 16 and 17.  Okay?

25    A.    Yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 185

1      Q.    Do you have those in front of you?

2      A.    Yes.

3      Q.    Okay.  These ones that I'm talking about now,

4    Exhibits 11 and then 13 through 17, these are all taken

5    off of the PhRMA Web site.  Correct?

6      A.    That's my understanding, yes.

7      Q.    Okay.  And the basis for why you claim these

8    are industry standards is because they are on the PhRMA

9    Web site.  Is that your basis?  I think that's what you

10   said before.

11     A.    Well, the industry standards are applying

12   primarily to -- to the various iterations of the code.

13     Q.    Okay.  Are you saying that Exhibits 11 and 13

14   through 17 are or are not industry standards?

15     A.    Well, I think that one of them is a Q and A

16   that is really -- yeah.  This one is -- this one is a

17   Q and A really directed towards patients.

18     Q.    Is that an industry standard?

19     A.    I don't know if I would call it an industry

20   standard.  I guess in the loosest sense it would be an

21   industry -- it would be an agreed-upon industry

22   adaptation in how to instruct patients how to take

23   medicines.  And that's what I would say, they've

24   agreed -- the people that belong to PhRMA have agreed

25   upon this, it's on their Web site, but it's directed to

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 186

1   a very -- very specific thing about expired and patient

2   information.

3       Q.   Where does it say in this document that the

4   folks who are part of PhRMA have agreed that this is the

5   standard way to instruct patients how to take medicine?

6       A.   Yeah, I don't even know if it's instructing

7   them on how to take medicines.  It's answering queries,

8   giving abbreviations.  So I think this is a patient

9   assistance that's been put out by the PhRMA group.

10      Q.   Okay.  What's the basis -- again, let's just

11  see if I can get an answer to this question.  Exhibits

12  11 and then 13 through 17, just tell me the entire basis

13  for your assertion that any of those constitute industry

14  standards.

15      A.   My understanding is that on the Web site,

16  PhRMA members have an over -- a principal sheet

17  overview.  I believe this is it for one of the years, I

18  guess PhRMA 10, which it says PhRMA members are

19  committed to the following.

20      Q.   What exhibit is that?

21      A.   Well, you've coded it as 16.

22      Q.   Okay.

23      A.   Okay.  So the members of PhRMA, the signed

24  members have committed to the following as it relates to

25  medication safety and efficacy -- no, as it relates to

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 187

 1   safety of medicines and safety monitoring.  So this to

 2   me represents their commitment page as to what they're

 3   going to do for safety monitoring.

 4        Q.   And that is the basis for your statement that

 5   Exhibit 16 constitutes an industry standard?

 6        A.   It's a, yeah, a PhRMA commitment as to

 7   stand -- a PhRMA commitment within the PhRMA indust --

 8   within the members of the PhRMA group, yes.  That's

 9   their commitment.  What they're saying is their

10   commitment regarding safety of products already launched

11   into the marketplace.

12        Q.   You are not a member of PhRMA, are you?

13        A.   PDG is not a member of PhRMA.

14        Q.   Okay.  Cheryl Blume is not a member?

15        A.   Oh, I didn't even know they had individual

16   human members.

17        Q.   Can you tell me any other basis for any of

18   these Exhibits, 11, 13 through 17, to support your

19   assertion that these are industry standards?

20        A.   Well, for example, this Backgrounder, and I'm

21   not sure these years match up necessarily, but this

22   Backgrounder says as America's pharmaceutical research

23   companies, we are constantly striving to improve drug

24   safety.  Today we support a number of recommendations

25   for improving post-marketing surveillance of drugs,

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 188

1    including use of adverse event systems, maximizing use

2    of databases, et cetera.

3         Q.    I can read that, too.  My question is, what is

4    your basis for saying this is an industry standard?

5         A.    Because this is a -- this is a collection of

6    companies who have committed to belong to the PhRMA

7    organization.  The PhRMA organization represents most of

8    the major drug companies and has put out a series of

9    commitments to the public, among those are those

10   relating to safety surveillance.

11        Q.    Okay.  Can you point to anything published by

12   PhRMA about these documents where PhRMA has said we

13   adopt these as an industry standard?

14        A.    I will certainly go back and look at the

15   preface sheets to these.  These are individual sheets

16   that have been pulled that relate to safety.  I will go

17   back to the individual cites and see if they give a

18   prelude other than this one.  I thought this -- I think

19   this is the prelude one, these are the principles we're

20   going to live by.

21        Q.    Okay.  It doesn't say we adopt this as an

22   industry standard, does it?

23        A.    Well, PhRMA members are committed to the

24   development of life-saving medicines, blah-blah.  We are

25   going to adhere to the following principles, and then

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 189

1    they list four principles.

2        Q.   Right.  It doesn't ever say we adopt these as

3    an industry standard.  Correct?

4        A.   I will look and see if there's any more, but

5    this is what -- these are what members of the PhRMA Code

6    adhere to.  I have never heard anyone who belongs to the

7    PhRMA Code -- or the PhRMA group say we don't adhere to

8    these; these aren't the commitments we have made to

9    belong to PhRMA.

10       Q.   Okay.  I'll ask it one more time, Dr. Blume.

11   Can you point to anything, anything at all in the PhRMA

12   Web site or in the PhRMA document that says we, the

13   members of PhRMA, adopt this as an industry standard?

14   I'm not talking about Exhibit 10, 12 or 19 right now

15   which deal with the Code of Pharmaceutical Marketing

16   Practices.  I'm talking about all the other ones,

17   Exhibit 13, Exhibit 11, 14, 15, 16 and 17.  Show me

18   where it says --

19       A.   But, Mr. Derringer --

20       Q.   Show me where it says that these have been

21   adopted as industry standards.

22       A.   Okay.  Just to finish off one thing before I

23   jump into that.  The Code of Pharmaceutical Marketing

24   Practices say these are the obligations of the industry

25   and we are conscious of our obligations, and those

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 190

1    represent -- those include the ones in my report.  The

2    ones directed to my report deal with the two in the

3    PhRMA Code, which are labeling currentcy and adequacy

4    and the need to do studies.

5           These additional sheets are found on the Web

6    site.  I will look to see if these play a role or if

7    these say these are what we consider our commitment, our

8    industry standard.  But what's related to my report deal

9    with what they discuss in the actual PhRMA Code and

10   that's the labeling and the need to do studies.

11       Q.   That code, just so we're clear, is Exhibit 10,

12   Exhibit 12 and Exhibit 19.  Correct -- I'm sorry, 20?

13       A.   Ten --

14       Q.   Ten --

15       A.   -- 12 is --

16           MR. MOSKOW:  It's what's in front of you, that

17       one.

18           THE DEPONENT:  I was just trying to -- 12 is

19       2004; 10 is the one in '95.

20   BY MR. DERRINGER:

21       Q.   And then Exhibit 20 is the one I just gave

22   you.

23       A.   And so this -- I don't have 20.  Where is 20?

24   I don't know where 20 went.

25           MR. MOSKOW:  I think it's right here.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 191

 1     A.   Exhibit 20 is 2008.  So we may be missing one.

 2   But the PhRMA Code intended for healthcare prescribers,

 3   who it's their marketplace, embodies what I am

 4   discussing in my report, and they have signed on that

 5   these are the obligations of our members.

 6          I will look to see if, additionally, these

 7   additional sheets which have been picked simply because

 8   they reflect information on the PhRMA Web site, on the

 9   PhRMA-approved Web site that relate to safety concerns

10   with drug products.  They are additional, but certainly

11   not the focus of what I am talking about in my report.

12   BY MR. DERRINGER:

13     Q.   I put in front of you Exhibits 18 and 19.

14   These are the CIOMS documents that you referred to as

15   alleged industry practices in paragraph 11, on your

16   right-hand side.

17     A.   Yes.  I have them, CIOMS, yes.

18     Q.   You have those in front of you.  Can you tell

19   me the basis for your assertion that these two documents

20   constitute industry standards?

21     A.   Well, initially it says that CIOMS in 2009

22   included members across -- across all science, including

23   those people involved in drug development and use.  The

24   programs that are developed by CIOMS, and much of this

25   is for the European marketplace, include several issues

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 192

1   relating to safety of drug products, including the

2   publications in '90, '92 -- '90, '92 and '98 primarily

3   relate to benefit-risk balance and safety information

4   for pharmaceutical products.

5            I included this because CIOMS is -- the Bayer

6   family belongs to CIOMS.  They put out a report, that

7   CIOMS put out a report in 2000 relating to picking up

8   safety signals, the need to do additional study with

9   safety signals, and included on one of the CIOMS boards

10  participating in this was a member of the Bayer family,

11  Dr. Weidmann.

12           So CIOMS is certainly involved primarily

13  with -- well, with U.S., but also with Europe, and

14  they're involved with safety surveillance.  They have

15  looked at signal detection, the need to do it, do

16  studies, and   Dr. Weidmann was part of it.

17       Q.   Is that the end of your answer?

18       A.   Yes.

19       Q.   Okay.  Now, why don't you answer my question,

20  which you didn't.

21           Tell me the basis for your assertion that

22  Exhibits 18 and 19 constitute industry standards.

23       A.   Well, CIOMS is composed of industry members.

24  The exhibit you gave me does not have a list of the

25  participating drug PhRMA members in here, but there is a

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 193

1    list within the document and it says that it is the hope
2    of CIOMS working group that manufacturers and regulators
3    will adopt the proposed approaches to the evaluation and
4    reporting between benefits and risk of marketing
5    products, especially with suspected major safety
6    problems, strategies, and it goes on and on.
7            In summary, the CIOMS working group foresees a
8    harmonized approach to the analysis, reporting and
9    decision-making involved in the re-examination of
10   benefit-risk weighing and important new safety issues,
11   and this is directed towards drug companies and drug
12   regulators.  And it says that CIOMS is now fifth in the
13   series, is now the widely adopted practices of using
14   CIOMS forms and procedures for standardized
15   international reporting and evaluation of adverse drug
16   reactions.
17           So I think that addresses to whom it is
18   directed and that it's been around for several years,
19   and it's being used by those people and that they are
20   attempting to standardize issues by offering these
21   various proposals.
22      Q.   Any other bases for why Exhibit 18 and 19 is,
23   according to you, an industry standard?
24      A.   More than this, more than what I've already
25   given you?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 194

1      Q.    Yes.  Is there anything else?

2      A.    Okay.  I'll keep finding sections in here to

3   talk about.

4      Q.    Ma'am, I'm not asking for you to now

5   cherry-pick sections.  You in your report identified

6   these as industry standards.  I want to know what, what

7   you're relying on to claim that these are industry

8   standards.  Show me a statement in either one of these

9   documents that says we adopt these as the industry

10  standard; or if that doesn't exist, show me why you

11  believe that these documents are industry standards.

12          MR. MOSKOW:  Object to form.  You can answer.

13     A.    Yeah.  Here's a group, the membership and

14  activities, a group that participated in this, are

15  listed at the back.  I'm really not cherry-picking, it's

16  the full report.  Included in this report, in the

17  membership and activities of those who have participated

18  in this, included in here are Bayer representatives.

19  But more importantly than just Bayer, there's probably

20  20 other major drug companies that are listed in that as

21  well.

22          So to believe that this isn't directed towards

23  pharmaceutical safety, it isn't composed, compiled by

24  members of the pharmaceutical community is ludicrous.

25  BY MR. DERRINGER:

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 195

1      Q.   Do you have any, anything in these documents
2   or anything in your mind that you're using as a basis,
3   other than what you've just identified, to claim that
4   Exhibits 18 and 19 are industry standards?
5      A.   Are 18 and 19, these are the CIOMS ones again?
6      Q.   Yes.
7      A.   I don't know what else to tell you.  They're
8   all members of it, they formed a writing board, and
9   their goal is to harmonize their efforts to ensure the
10  safe use of the products.  And they have been meeting
11  repeatedly for years and years and fine-tuning their
12  documents.  So I think that makes it an effort.  And if
13  we want to use the PhRMA Code as industry obligation, we
14  can use industry obligation.
15     Q.   Paragraph 10 of your report, ma'am, it's on
16  Page 9.  Page 9 is actually the end of paragraph 10.
17  I'm interested in your last sentence there.  Tell me
18  when you're there.
19     A.   My last sentence?
20     Q.   You say, "FDA has described regulations as the
21  minimum standards required of industry."
22     A.   Yes.
23     Q.   Then you provide a cite and that would be 21
24  CFR 210.1 and 211.1?
25     A.   Right.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 196

1      Q.   Is that the basis for your statement that FDA

2   has described regulations as the minimum standards

3   required of industry?

4      A.   I think -- well, yes, they certainly are in

5   210 and 211.  I think FDA also defined in that in the

6   various hearings they had prior to the new 2008 rule

7   that expanded the rules of the FDA.  And I believe that

8   it's been described as minimum standards in various

9   court documents as well.

10     Q.   Okay.  Any other basis than what you've just

11  said for your statement that FDA has described

12  regulations as a minimum standards required of industry?

13     A.   Well, I used the CFR, used Supreme Court

14  documents and FDA documents themselves.

15     Q.   Right.  But the CFR, you cited to two

16  provisions.  Any other provisions?

17     A.   Yes.  But the two that I have are the overall

18  procedures for the company under 210 and 211.

19     Q.   210.1 and 211.1 as you've described them?

20     A.   Yes.

21     Q.   Okay.  Paragraphs 36 and 38, this is on Page

22  18, these are your summaries of opinions.  Do you see

23  that?

24     A.   I'm there.

25     Q.   Okay.  36, you say that Bayer failed to

Merrill Corporation - New York

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 197

1   conduct the necessary pharmacovigilance assignments

2   and clinical investigations required for a full

3   evaluation of the mortality properties associated with

4   Trasylol.  In 38, you say the same thing with respect to

5   the renal toxicities associated with Trasylol.  Do you

6   see that?

7      A.   Yes.

8      Q.   Okay.  I want to know what specific standard

9   or standards you are using as the basis for those

10  opinions, what regulations specifically, guidances,

11  claimed industry standards or standard operating

12  procedures?

13     A.   Okay.

14          MR. DERRINGER:  Let's go off the record.

15     Strike that.  We don't have to formulate at the end

16     of the videotape or anything like that, but I don't

17     want --

18          MR. MOSKOW:  Right.  It won't count against

19     your time, that's fine.

20          THE DEPONENT:  Okay.  And I think that the

21     balance of the report that deals specifically with

22     mortality and with the renal failures addresses

23     these within the individual paragraphs, too,

24     different things that I'm relying upon.

25  BY MR. DERRINGER:

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 198

 1      Q.    I'm just trying to figure out what your

 2    standard or standards are, that is specific regulations

 3    or guidances or alleged industry standards.

 4      A.    Okay.

 5      Q.    Operating procedures.

 6      A.    I'll do it that way then.  And then as we get

 7    to individual paragraphs, we'll have the specifics.

 8            Companies are required to maintain the

 9    currentcy, completeness and adequacy of their labeling,

10    it's in the 201.57 series, especially within the

11    warnings.  So I would be relying upon that for both

12    mortality and renal.  It certainly --

13      Q.    Let me just stop you there because you're

14    going in a direction that I'm going to get to later.  I

15    don't think it's responsive to my question.

16            You talk about labeling, okay, labeling is

17    addressed in your opinions, I believe, 35 and 37.  I'm

18    asking about 36 and 38 which deals with

19    pharmacovigilance and clinical investigations.

20      A.    Well, part of pharmacovigilance, as we've just

21    been talking about for the last half-hour, is

22    maintaining your labeling as well.  As one conducts

23    proper pharmacovigilance and finds the information, you

24    have to update your labeling to reflect that

25    information.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 199

1          With respect to pharmacovigilance assignments,

2    the company did not, with regard to -- renal is more

3    straightforward, let's take renal.  The labeling did not

4    reflect a -- the pharmacovigilance, the proper

5    pharmacovigilance review of even their in-house study.

6    Their labeling up until 2006 suggested that there

7    weren't renal concerns for studies that were conducted

8    as -- that were completed as early as 2001.

9        Q.   Okay.  I'm not --

10       A.   So I would say that they were not conducting

11   an annual review of their studies, as is required by the

12   annual report, and evaluating their studies relative to

13   their labeling.  So that would be an example of by

14   failing to conduct an ongoing -- conduct an ongoing

15   review of their internal work as is required for safety

16   surveillance and is required for pharmacovigilance, they

17   either did not detect or did not share to detect that

18   their labeling was no longer current for their actual

19   renal data; that they did have renal impairment,

20   significant renal impairment changes.

21       Q.   Okay.  Please listen to my question.  What

22   specific standard or standards are you using as the

23   basis for the opinions described in paragraphs 36 and

24   38; that is, what specific regulations, what specific

25   guidances, what specific alleged industry standards, and

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 200

1   what specific internal operating procedures are you

2   using to measure and come to your conclusion as the

3   standard for the opinions in 35 -- 36 and 38?

4       A.   Okay.

5            MR. MOSKOW:  I believe that was answered and

6       she gave an example of one such process, but she can

7       answer again if you don't feel it was adequate.

8   BY MR. DERRINGER:

9       Q.   I'll be even more specific.  What regulations,

10  let's start with that, what regulations do you believe

11  are the proper standard for coming to your conclusion

12  that Bayer failed to provide -- to conduct the necessary

13  pharmacovigilance assignments and clinical

14  investigations?

15      A.   Well, I would -- okay.  Are we doing

16  regulations now?

17      Q.   Yes.  What regulations are you using as your

18  standard.

19      A.   I'm trying to do it in the order -- you keep

20  changing the order on me.  I would cite for you the

21  314.7, 314.8, 201, 202 series of the Code of Federal

22  Regulations.

23      Q.   What part of 201 and 202?

24      A.   Well, I'm going to the labeling, but one can't

25  get just one labeling because you have different

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 201

1    obligations.  201.57 is the labeling for -- (e) would be

2    the labeling for warnings.  There is a different

3    labeling for adverse reactions.  I think both of them

4    needed to be updated.

5         Q.   Any other regulations that you're using as

6    your standard for determining whether Bayer conducted

7    the necessary pharmacovigilance, assignments and

8    investigations with respect to mortality and renal

9    failure -- or renal issues?

10        A.   Okay.  Well, we're bound by the 21 CFR Code

11   under the Food, Drug and Cosmetic Act.  So I'm citing

12   21 -- Title 21 Code of Federal Regulations.

13        Q.   I know.  That's a very large code.  I want to

14   know specifics.

15        A.   These are very large topics.  I gave you four

16   specific sections of 21 CFR Code that bind, okay.  And

17   the other one I would add for you is the FDA form, the

18   356-H form.  356-H form is the form that has to be

19   signed by an officer of the company every time a

20   supplement, amendment or communication is provided to

21   the FDA.  That supplement said that you will constantly

22   keep track of all new safety information and report it

23   to the agency as soon as you have it.  So we could also

24   cite form 356-H for this.

25        Q.   Do you rely on that for your opinion?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 202

 1      A.    Oh, yeah.  356-H, it's in my book.

 2      Q.    For your opinion?

 3      A.    Yes.  I rely on it for everything I do with

 4  the FDA because that is your routine assertion that you

 5  are providing FDA every time you sign that, and this is

 6  upon -- it's really not very humorous because it's

 7  punishable by imprisonment.  Every time you sign that,

 8  you are asserting to the agency that an authority of the

 9  company has provided all safety information to the

10  agency.  So I take it very seriously.

11      Q.    So for your pharmacovigilance and clinical

12  investigations or investigations opinions in paragraphs

13  36 and 38, the regulations you're using is the basis for

14  those opinions as your standard are 314.70, 314.80, I

15  heard 201.57(e) --

16      A.    Well, that's an example of 201.

17      Q.    Well, I'm not interested, ma'am, in just

18  examples.  I'm entitled to know all of the specific

19  regulations you're relying on to come to these opinions.

20      A.    Why don't we go to a specific paragraph where

21  I cite them by individual and not the summary paragraphs

22  at the beginning of those sections.

23          MR. MOSKOW:  Actually, I was going to object

24      on exactly that basis.  I was going to use as an

25      example paragraph 85, which specifically identifies

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 203

1        regulations by section --

2               MR. DERRINGER:  Okay.

3               MR. MOSKOW:  -- as opposed to generally as

4        they're reflected in Roman numeral III.

5    BY MR. DERRINGER:

6        Q.   Dr. Blume, do you agree that information on

7    mortality was collected and analyzed in every single

8    pivotal clinical trial on Trasylol conducted by Bayer?

9        A.   Well, there was really a very small database

10   for the approval of Trasylol.  So within that small

11   database, I will agree that deaths were measured.

12   Deaths have to be reported in every trial, yes.

13       Q.   And they were recorded in Bayer's trials.

14   Correct?

15       A.   Well, I believe there was some debate about

16   the -- there was some debate on one record I saw about

17   the qualifying of the deaths; but yes, I would say

18   deaths were collected.

19       Q.   And analyzed; correct?

20       A.   Yes.  In the 640 patients or whatever that

21   were in the NDA trials, they were collected.

22       Q.   Do you agree that information on renal

23   outcomes was collected and analyzed in every single

24   pivotal clinical trial on Trasylol conducted by Bayer?

25       A.   Yes.  And I am taking no issue with the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 204

1  original approval of the NDA, either for the

2  full-strength or the half-strength.  My comments relate

3  to what happened after the product was approved.

4          MR. DERRINGER:  Move to strike everything

5      other than "yes."

6  BY MR. DERRINGER:

7      Q.   Let's go to page -- paragraph 74, Page 30 of

8  your report.  Do you see that you write, "Beginning in

9  2002, Bayer was obligated to fully investigate mortality

10  risks associated with Trasylol."  Do you see that?

11     A.   Yes.

12     Q.   Okay.  Was it the publication in the New

13  England Journal of Medicine of Dr. Mangano's aspirin

14  study that triggered this obligation?

15     A.   Well, I think it was that, plus the fact that

16  they had an I3 study that was going on in which

17  mortality was being examined that needed to be reviewed

18  and submitted as well.

19     Q.   The I3 study was going on beginning in 2002?

20     A.   Well, I don't think it was in 2002.  I said

21  beginning in 2002, they were put on notice by outsiders

22  of a couple of different things, that there might be an

23  increased risk in a non-NDA study.  By then, it became

24  apparent that there might be an increased risk in the

25  2002 Mangano data when one looked at that, so I was

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 205

1   referring to that.

2        Q.   My question is, what triggered the obligation,

3   the alleged obligation that you described at paragraph

4   74 in 2002?

5        A.   When the Mangano publication was put forth

6   that there was an increased risk of mortality in

7   patients who used antifibrinolytics.  And among those

8   fibrinolytics (sic) -- and I think the one most

9   frequently used in the study was Trasylol.  So the

10  category as a whole appeared to have a problem that was

11  published in the New England Journal.  And within that

12  category, Bayer's product was frequently employed.

13            Shortly thereafter, information became

14  available, probably late 2002, beginning 2003, that the

15  information with the Bayer product was indeed

16  statistically significant.

17       Q.   Can you tell me the basis of the obligation in

18  2002 that Bayer was allegedly obligated to fully

19  investigate mortality risks; that is, what regulation

20  required them to do that, what guidance required them to

21  do that, what alleged industry standard required them to

22  do that?

23            MR. MOSKOW:  Objection to form.

24       A.   They're marketing a product that's been

25  suggested may have increased mortality, and that isn't

CHERYL BLUME, Ph.D. - 7/21/2011

Page 206

1    in their labeling that the product in general may have

2    increased mortality.  So I would offer that the -- well,

3    let's just go get them.

4            There are two pharmacovigilance guidances that

5    say that you have to track nonsignals, and, of course,

6    mortality would be high among that signal; and that

7    we've already talked about the multiple labeling

8    provisions that say that you have to update your

9    labeling when there is a potential serious adverse event

10   that may have -- it may have an association with your

11   product.

12   BY MR. DERRINGER:

13       Q.   I want to know what regulation obligated Bayer

14   in 2002 to fully investigate mortality risks associated

15   with Trasylol, your language, as a result of the

16   publication of Mangano's aspirin study in 2002.  What

17   regulation?

18       A.   I'm trying to find the paragraph that I list

19   them.  Okay.  I'm going to have to get 49, 50 -- 49 and

20   50.  Let's start with 50.  All right.  201.56 and 20 --

21   201.56 and 201.57 obligate you to change your labeling

22   when there's information to suggest there may be a new

23   adverse event for which there is evidence of an

24   association with your product.  Certainly, the

25   background information that they had relating to even

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 207

1   issues prior to approval would have put them on notice

2   that mortality might be an issue.  I think they were

3   told that from a PK study that occurred prior to

4   approval; Dr. Pitt told them that based on his review of

5   the NDA documents; and that there had been marketing

6   authorizations prior to this in other parts -- in other

7   parts of the world, part of which were related to

8   concerns with mortality.

9          So certainly, they were on notice indicating

10  there might be an association, and the data in 2002 by

11  Mangano suggested that indeed that was the case in the

12  United States as well.

13         201.56 and 201.57 say that you have to update

14  your labeling when there is evidence of a new adverse

15  event for which there is evidence of association.

16         Okay.  With respect to that they should have

17  done more studies --

18     Q.   Which, by the way, was my question.  Go ahead.

19     A.   You just really can't tear -- they're really

20  not two different issues.

21     Q.   Well, you've described them very differently

22  in your report ma'am.  But go ahead.

23     A.   Well, no.  I don't think that --

24         MR. MOSKOW:  All right.

25  BY MR. DERRINGER:

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 208

1    Q.   Show me the regulatory obligation, the
2    regulatory requirement that obligated Bayer to fully
3    investigate mortality risks associated with Trasylol
4    starting in 2002 as a result of the Mangano aspirin
5    study publication.
6    A.   We're going back again to the PhRMA Code
7    which, of course, says that one does studies to follow
8    up on safety information, and I would think that death
9    would include that.  I would also have in my report the
10   view from industry in the Brian Strom textbook that says
11   that the manufacturer has an obligation to evaluate all
12   safety of product, especially more severe safety.  A
13   view from the regulatory agency is in here.
14           I have the guidances from 2001 post-marketing,
15   safety-related issues that need to be addressed
16   immediately and the approved product labeling.
17   Unexpected adverse experiences need to be fully
18   evaluated.  Oh, and then, of course, telling the FDA in
19   Form 356-H.
20   Q.   I didn't hear any regulation that you just
21   described.  Let's answer my question, please.
22   A.   Well, I said the CFR, I said the guidances,
23   and I said the FDA's form that goes in with every
24   submission that you make to the FDA.  I don't know what
25   else --

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 209

1     Q.   You didn't give me a specific regulation with

2   respect to your allegation that Bayer in 2002 was

3   obligated to fully investigate mortality risks.

4        Name the regulation, not a guidance, not a

5   standard, I want to know the regulation.

6        MR. MOSKOW:  Asked and answered.

7        MR. DERRINGER:  She talked about labeling

8     regulations.

9        THE DEPONENT:  All right.  So now we have to

10    get to 314.7 and 314.8 on the responsibilities of

11    pharmacovigilance.  I mean, you really know what the

12    answer is because when FDA finally knew about the

13    increased mortality, we know what they did.

14       MR. DERRINGER:  Move to strike.

15       THE DEPONENT:  Well, I need -- I have to get

16    314.7 and 314.8.  You probably have them in here.

17       MR. MOSKOW:  I have them here.

18       MR. DERRINGER:  Neal, I'm going to mark those.

19       MR. MOSKOW:  Okay.  Here's 314.70 --

20       THE DEPONENT:  And also, the FDA approval,

21    conditions for approval, I want those as well,

22    because FDA's condition for approval was to monitor

23    ongoing safety.

24       Okay.  These are 2008 and 2009.  Do you want

25    me to use ones that are past the operant date?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 210

1              MR. MOSKOW:  For purposes of today, that's

2       fine.

3    BY MR. DERRINGER:

4       Q.    Please point to me -- point me to the section

5    in 314.70 or 314.80 that supports your statement that

6    beginning in 2002, Bayer was obligated to fully

7    investigate mortality risks associated with Trasylol,

8    and that multiple investigations and design should have

9    been considered.

10      A.    Well, we can start with March 26, 2009 version

11   of 3, what is this, 314.8, unexpected adverse

12   reactions -- well, first, let's start with what's the

13   definition of serious and, of course, the first one is

14   serious is death.

15              Unexpected are adverse reactions that don't

16   occur in the labeling and you don't have -- did not have

17   a general labeling issue relating to mortality.  (B) is

18   review of adverse drug experiences.  Everyone having an

19   approved NDA shall promptly review all adverse drug

20   experience obtained or otherwise received from the

21   applicant from any source, including those not required

22   by the FDA.  Applicants --

23      Q.    Where are you, ma'am, 314.80 section (b), is

24   that where you're reading from?

25      A.    I've moved to (c), you have to report it to

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 211

1    the FDA.

2        Q.   What are the sections that you're relying on

3    that allegedly obligated Bayer in 2002 to investigate

4    mortality risks associated with Trasylol and multiple

5    investigational design should have been considered?

6             You're reading sections, I appreciate that.

7    But point to me the language that obligated Bayer to

8    fully investigate mortality risks associated with

9    Trasylol beginning in 2002, as a result of Dr. Mangano's

10   publication of his aspirin study, which is what you talk

11   about in paragraph 70 of your report.

12       A.   So we're not discussing that they should have

13   done labeling changes.  Now we're discussing the part

14   where they should have now gone and done studies?

15       Q.   That's what you write in paragraph 74.

16       A.   They cover both.  Okay.  So then we need to go

17   to 314.7.  314.7 and the balance is in 314.8 about the

18   conduct of pharmacovigilance studies.

19            MR. MOSKOW:  Which one are you looking at?

20            THE DEPONENT:  I want the conduct of doing

21       post-marketing studies and I need it for the operant

22       time periods.  Here, let me just use the ones in the

23       book.

24            MR. DERRINGER:  Let's mark those, ma'am.

25            THE DEPONENT:  They fall outside.  I've been

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 212

1        trying to keep it inside the date range, but.  So

2        let's get to the post-marketing guidance --

3   BY MR. DERRINGER:

4        Q.   Ma'am, before you move to the guidance, I want

5   you to focus on my question which is the regulation, not

6   guidance.

7        A.   But the guidance includes -- if you read the

8   guidance, they cite the regulations that go with the

9   guidance, so I'm just trying to pull it together here.

10  So if I could have the guidance that has the

11  post-marketing, let's do the post-marketing -- the most

12  recent post-marketing vigilance guidance, that will be

13  2000 -- let's do 2005, the 2005 one.

14            MR. DERRINGER:  Neal, again, I'm not -- this

15       is not coming off of my time.

16            MR. MOSKOW:  You know, I think, once again,

17       we're talking across each other and I think -- the

18       first question you asked is show me where in the

19       code, the standards, the guidances; and then you

20       broke it down into let's just look at the code.  And

21       I believe Dr. Blume is still looking at the grand --

22            MR. DERRINGER:  No.  The grand scheme of

23       things we talked about with paragraphs 36 and 38.

24       You asked me to move on, I did to paragraph 74,

25       where the only thing I've asked about with respect

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 213

1       to the specific allegation in paragraph 74 are

2       regulations, not guidances.

3               MR. MOSKOW:  Well, you've -- if you look at

4       paragraph 74, it says was obligated to investigate,

5       and then you've asked her to identify which

6       regulations obligated her.

7               She's indicated in prior answers that it was

8       more than just the regulations, but she's now

9       endeavoring to look at the regulations.  She's

10      indicated that one way to assess which regulations

11      are to look at the guidances which specifically

12      refer to it.  So that's the issue.

13              THE DEPONENT:  I need 74.

14              MR. MOSKOW:  It's on that side.

15              MR. DERRINGER:  I can bring that to you.

16              MR. MOSKOW:  And I have no problem with you

17      marking, you know, what she's looking at.

18              THE DEPONENT:  Oh, we should also Mark Brian

19      Strom's textbook because I think that section was

20      written by industry when we do studies.

21              MR. MOSKOW:  But the question that's pending,

22      Dr. Blume, is specifically the regulation as it

23      relates to paragraph 74.  So we'll get to Strom,

24      we'll get to, you know, CIOMS and PhRMA, but.

25              THE DEPONENT:  Would you get me the conditions

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 214

1      for the approval?

2            MR. MOSKOW:  Yeah.

3            THE DEPONENT:  Now, while he's doing that, I

4      can point you to the FDA guidance for good

5      pharmacovigilance practices, safety signals that

6      warrant further investigation.  A new event, which

7      yours would be, and apparent increase in the

8      severity of an issue, any concerns of safety for the

9      patient, the sponsor or the FDA.  So the title of

10     this is these are the safety signals that warrant

11     further investigation.

12  BY MR. DERRINGER:

13     Q.   What page are you on, ma'am?

14     A.   Ten.  And then it goes into a concern about an

15  excess of adverse events or a signal warrants further

16  investigation and analysis, it's important to put a

17  signal into context.

18     Q.   What page is that on, ma'am?

19     A.   I'm moving into different types of studies to

20  put signals into context.

21     Q.   No.  What page are you on?

22     A.   Oh, I'm still on Page 10.

23     Q.   Let me know when you get to anything that

24  helps you answer my question which dealt with a

25  particular regulation, that's what I'm looking for, a

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 215

1    particular regulation that --

2        A.   So now a guidance isn't enough.  Now we can't

3    get through the guidance.  Now we're going to guidance

4    and regulation?

5        Q.   No.  I've only asked for a regulation, ma'am.

6    You're the one who's gone on to guidances.

7             MR. MOSKOW:  Let me stop the back and forth.

8        The pending question that you asked for the guidance

9        to review was to say which regulations other than

10       314.7 and 314.8 relate to paragraph 74.

11            MR. DERRINGER:  Neal, that's a misstatement of

12       the testimony.  314.70 and 314.80 were mentioned by

13       Dr. Blume, but without pointing to any specific part

14       of those regulations that support the statement that

15       beginning in 2002, Bayer was obligated to fully

16       investigate mortality risks associated with Trasylol

17       and multiple investigational designs should have

18       been considered.  That's what we're still looking

19       for.  So we're looking for the regulatory citation

20       supporting that para -- that assertion.

21            MR. MOSKOW:  Do you want to look through 314.7

22       and 314.8 that you've already identified as related

23       to this, and we can look at the guidance later?

24       You've already indicated where in the guidance it

25       refers to it.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 216

1          THE DEPONENT:  Oh, I thought we were going to

2     talk about the types of studies that should be done

3     when one identifies the signal.

4          MR. MOSKOW:  That's not the question that's

5     pending, so that's --

6          THE DEPONENT:  The question is the CFR that

7     links itself to the need to recognize a signal and

8     to do a study.

9          MR. MOSKOW:  Correct.

10          THE DEPONENT:  Okay.  I need them back again,

11     I'm going to need 7, 8, 201 and 202.

12          MR. MOSKOW:  201 and 202 are not in those.

13          MR. DERRINGER:  I can mark those, if you'd

14     like.  We'll be talking about those.  Well, which

15     part of 201 and 202?

16          MR. MOSKOW:  Let's focus on these two first.

17          THE DEPONENT:  Well, under 314.50, it said or

18     anyone with an effective approved application shall

19     promptly review all adverse drug experiences

20     obtained or otherwise received by the applicant from

21     any and all -- any sources, including foreign and

22     domestic, derived from commercial marketing,

23     post-marketing studies, clinical investigation, a

24     series of others.

25  BY MR. DERRINGER:

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 217

1      Q.    What section is that, ma'am, 314.50 did you

2   say?

3      A.    Well, 314.8 reports back to 314.50.

4      Q.    What are you reading from right now?

5      A.    Well, we said that we wanted to go to the

6   regs, so I went to the first one I went to is 314.8.

7      Q.    Okay.  And what section are you reading?

8      A.    I was just reading from the beginning of it,

9   the preamble, where it says the first thing that one

10   must do when one gets an adverse event is go in and

11   search for all possible adverse events.  So I'm noting

12   that once one was put on notice --

13      Q.    Ma'am, please point to the specific language,

14   I'm not asking you to paraphrase, tell me the section

15   and the language you're relying on.

16      A.    Okay.  It is little (b) on the first page of

17   Exhibit 22 that you handed me.

18      Q.    Okay.

19      A.    Where it says one shall promptly review all,

20   obtained from all sources.  So clearly, mortality was on

21   Bayer's radar screen long before Mangano.  But

22   nonetheless, it was really on the radar screen once

23   Mangano was published, and the requirement is that one

24   goes out first and gets a handle on all adverse

25   reactions that are available.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 218

1        Q.    Okay.  So for your statement at paragraph 74
2    that we've been discussing, you are relying on section
3    314.80(b)?
4        A.    Well, I generally just say 314.80.
5        Q.    Section (b) of 314.80; is that right?
6        A.    Well, it wouldn't be just that.  That's just
7    the first step.
8        Q.    Okay.  What else?
9        A.    Okay.  To go out and get all -- to get it all.
10   And then once you have --
11       Q.    Wait.  Where does it say to go out and get it
12   all?
13       A.    Okay.  I'll read it, each application -- each
14   applicant shall promptly review all adverse drug
15   experience information obtained or otherwise received
16   from any source.  That's all.
17       Q.    Okay.
18       A.    Okay.  Are we done with that one now?
19       Q.    Well, I'm done -- you're describing (b).  Show
20   me where else.
21       A.    Okay.  So the first report is with (b) is to
22   go out and get all information.  The second part then,
23   if we keep going, once we have that information, there
24   should be a submission of all pertinent reports and that
25   starts in one (i), (ii), (iii) and continues.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 219

1       Q.   These are reporting requirements to the FDA

2   now.  Right?

3       A.   Yes, about certain adverse events, of which

4   death requires --

5       Q.   Okay.  And that's not addressed in paragraph

6   74?

7       A.   In what?

8       Q.   Let's not waste our time with that.

9            MR. DERRINGER:  Reporting requirements to the

10      FDA, I thought, Neal, you had said that's not going

11      to be a subject of her testimony.

12           MR. MOSKOW:  That's correct.

13           MR. DERRINGER:  Okay.

14           THE DEPONENT:  Okay.  But what this reports to

15      is you have to go out and look for -- when you have

16      a serious adverse event, the requirement is to go

17      out and search all sources.

18   BY MR. DERRINGER:

19      Q.   And where is that that you should search all

20   sources?

21      A.   Well, any and all.

22      Q.   Where?

23      A.   Shall promptly --

24      Q.   "All adverse drug experience information

25   obtained or otherwise received by the applicant" --

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 220

 1     A.    -- "by the applicant from any source."

 2     Q.    Right.

 3     A.    Okay.  So once you have an adverse event, you

 4  know about an adverse event, you go and search for that

 5  same adverse event everywhere and you can report it

 6  either as a 15-day report to the FDA, or, if the timing

 7  is correct, part of your periodic report.  And that's

 8  what continues over with Section (c) and (d).

 9     Q.    And you believe that that also applies to what

10  they heard from the Mangano study published in 2002?

11     A.    Well, of course, it says there any and all,

12  includes even to foreign case reports.

13     Q.    Mangano's 2002 study is a post-marketing

14  study.  Correct?

15     A.    Yes.  That's when post-marketing -- 314.8 is

16  post-marketing.

17     Q.    Any other regulatory provision you're relying

18  on for your assertion in paragraph 74?

19     A.    Yes.  I'm relying on --

20           MR. MOSKOW:  These.

21           THE DEPONENT:  Did we limit this to just --

22  are we still in regs --

23           MR. MOSKOW:  Just regs.

24           THE DEPONENT:  -- or have we moved to

25  guidances yet?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 221

1                MR. MOSKOW:  Just regs.

2     BY MR. DERRINGER:

3        Q.   Just regs.

4        A.   Okay.  Yeah, I don't think 314.7 has anything

5     directly applicable.

6        Q.   Any other regulatory provisions that you are

7     relying on for your statement in paragraph 74?

8        A.   That's -- the only other ones that I see are

9     the ones that FDA cites as far as federal register

10    notices.  In the 2005 guidance, it says you have to

11    do -- that you need to do studies to follow up on a

12    safety signal.

13       Q.   And you're talking about the 2005 guidance.

14    Is that right?

15       A.   Yes.  The FDA has a series of federal register

16    guidances -- federal register notices in there, and

17    whether those apply to your question or not, I don't

18    know.

19       Q.   I'm handing you Exhibit 23, I believe that's

20    the guidance you're referring to.  Is that right?

21       A.   Yeah.

22       Q.   And where, just point me to the pages or

23    footnotes or whatever it is that contain these federal

24    register notices.

25                THE DEPONENT:  Neal, do you have the FDA

Merrill Corporation - New York

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 222

 1    approval --

 2              MR. MOSKOW:  It's not in that book.  I have to

 3        go over there.

 4              THE DEPONENT:  Okay.  Because that's where I'm

 5        going to go next is the FDA requirements.

 6              I'm sorry --

 7    BY MR. DERRINGER:

 8        Q.    You mentioned federal register.

 9        A.    Yeah.  The FDA is talking about, if you look

10    at the bottom, FDA puts their cites at the bottom and

11    they list a series of sections CFR parts 45, 46 and

12    parts 50 and 56 of 21 CFR.

13        Q.    Where are you, what footnote, ma'am?

14        A.    Page 3, bottom of Page 3.

15        Q.    Footnote three?

16        A.    It happens to be in footnote three at the

17    bottom of three.  And then there's a citation --

18        Q.    Right.  In footnote three in this guidance,

19    can you read to me the paragraph that footnote three is

20    attached to?

21        A.    Hold on.

22        Q.    Just read it out loud.

23        A.    Yeah.  During all risk assessment and risk

24    minimization activities, sponsors will comply with the

25    applicable regulatory requirements involving human

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 223

1   subjects or patients' privacy.

2        Q.    Human subjects research and patient privacy.

3   Correct?  That's what footnote three has to do with.

4        A.    Yes.  You were asking for the ones that were

5   cited.  I don't cite those, but FDA cited those.

6        Q.    I'm only interested in what you're relying on,

7   ma'am.

8        A.    Well, what I rely upon is the fact that FDA

9   says that one has to follow up on all safety signals

10  that suggested increase in severity, and then give a

11  list of ways in which one can follow up with that with a

12  variety of studies.

13       Q.    Right.  And you believe that Mangano's 2002

14  paper triggered that obligation?

15       A.    Oh, yes, because they were on -- because I

16  believe that your client was on notice before Mangano's

17  2002 that mortality may be a concern with the product.

18       Q.    Aren't you reading into the mind of Bayer now,

19  ma'am?

20       A.    I said I believe.

21       Q.    You believe.  That's your personal belief;

22  right?

23       A.    I believe that they were on notice.

24       Q.    Okay.  Based on what, before 2002?

25       A.    Yeah.  Based on the fact that they asked one

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 224

1    of their advisors to do a review of the NDA and the

2    advisor came back and said I wouldn't -- you might not

3    want to go forward with this, I have several concerns

4    and one of them is mortality.

5        Q.   You're talking of Dr. Pitt?

6        A.   Bertram Pitt, yes.

7        Q.   Have you spoke with Dr. Pitt?

8        A.   Oh, no.

9        Q.   No, you haven't; right?

10       A.   No.  But I --

11       Q.   Do you know what material he reviewed?

12       A.   Well, it says in his letter that he reviewed

13   the NDA, pending NDA.

14       Q.   It says he reviewed the NDA?

15       A.   The studies relating to the NDA, yeah.

16       Q.   But you don't know exactly what material he

17   did or didn't review, do you?

18       A.   No.  But whatever material he reviewed, he

19   relayed a concern with mortality.

20       Q.   And that was before the NDA was approved.

21   Correct?  That letter was in 2002 --

22       A.   Yes.

23       Q.   -- 1992; correct?

24       A.   Yes.

25       Q.   Okay.  And the FDA approved the drug in 1993.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 225

1    Correct?

2        A.   Yes.  And I'm searching for what FDA asked for

3    additional safety monitoring.

4        Q.   Okay.  Other than your reading of Dr. Pitt's

5    letters, do you have any other basis --

6        A.   For mortality?

7        Q.   -- for your belief that Bayer was on notice of

8    a mortality concern before 2002?

9        A.   Before 2002, I think there was a '93 issue

10   in -- '93 issue in Italy.  There was a '95 study, I

11   believe, that had a mortality end point that was more

12   with aprotinin.  Yeah, there was a Canadian, I think

13   there was a Canadian study, but let me find it.  There

14   was an -- let me get my list of studies so I can give it

15   to you directly.

16           MR. DERRINGER:  Let's mark that, Neal.

17           MR. MOSKOW:  Which one?

18           MR. DERRINGER:  Whatever she has in her hand.

19      She's relying on it at her deposition, I want to

20      mark it.

21           MR. MOSKOW:  Yeah.  I don't have a problem

22      with that.

23           THE DEPONENT:  Okay.  Now?

24           MR. DERRINGER:  Yes.

25   BY MR. DERRINGER:

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 226

1      Q.   Dr. Blume, who prepared Exhibit 24?

2      A.   I listed the studies and either one of the

3   research associates or Ms. Blakeslee prepared the

4   actual graph.

5      Q.   Ms. Blakeslee works for you?

6      A.   Yes.  Or one of the research associates here.

7   Okay.  But I think your date was 2002, so I'm going to

8   share with you the mortality studies or mortality

9   indices prior to that.  We've already talked about

10   Dr. Pitt --

11      Q.   Remember, my question was I want to know

12   everything that forms the basis for your personal belief

13   that Bayer was on notice of the mortality issue prior to

14   2002.

15      A.   Well, I could never get into the head of what

16   Bayer was on notice.  I will say what was publicly

17   available, and drug companies are required to access

18   routinely publicly available sources.  In fact, some of

19   these studies I believe they may have even sponsored.

20   But if you'll let me continue.

21      Q.   You know what, I'm going to move on.

22      A.   Well, I have a series of studies prior to 2002

23   that suggest there's a mortality.

24           MR. MOSKOW:  He's withdrawing the question.

25      That's it.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 227

 1          THE DEPONENT:  Okay.

 2   BY MR. DERRINGER:

 3      Q.   Have we finished with any other regulatory

 4   provisions that you're relying on as the basis for your

 5   opinion in paragraph 74?  You mentioned 314.80(b);

 6   anything else?

 7      A.   Well, the PhRMA Code, of course, and we've

 8   already discussed that.

 9      Q.   I'm talking about regulations, ma'am.

10      A.   Do we have the requirements for post-approval

11   activities?

12          MR. MOSKOW:  I'm not finding it in your book,

13      but I'm looking.

14      A.   Okay.  The FDA issued a series of requirements

15   for approval time and one was the ongoing safety

16   monitoring of the product.

17   BY MR. DERRINGER:

18      Q.   That's not a regulation; right?

19      A.   Well, it's a requirement of the approval.

20      Q.   It's not a CFR regulation; correct?

21      A.   No.  But it's an FDA requirement as a

22   condition of the approval.

23      Q.   And this is -- this was a listing of

24   different -- this is post-marketing commitments, this is

25   what we're talking about here?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 228

1      A.   Well, I think it was with the approval letter,

2   so it was probably post-marketing for one, and whether

3   it addressed the upcoming lower dose or not, I can't

4   recall.  But among it was ongoing safety reviews.

5      Q.   These were the commitments FDA required of

6   Bayer when they approved the medicine in December of

7   '93.  Correct?

8      A.   Yes.  And one of them was ongoing safety

9   evaluations and, of course, to alert the FDA of those.

10      Q.   Okay.  Paragraph 76, at the end of that on

11   Page 33 when you note that, "Bayer safety staff had

12   proposed an internal operating procedure called the

13   early warning system, but this procedure was never

14   implemented," what do you rely -- what are you basing

15   that conclusion on that the early warning system was

16   never implemented?

17      A.   I reviewed both Dr. Weidmann and Dr. Kuno --

18   Dr. Springer's comments.

19      Q.   So you're relying on their depositions?

20      A.   Yes.

21      Q.   Anything else?

22      A.   I recall that the operating procedure I

23   reviewed, BE -- yeah, Bayer's early warning, BEW's

24   whatever it is, had not been finalized.

25      Q.   Anything else you're relying on to say that

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 229

1    the early warning system was never implemented?

2        A.    No.

3        Q.    Paragraph 76, you also say that, "The

4    documents show Bayer knew that an observational study

5    could have been rapidly implemented and completed."  Do

6    you see that?

7        A.    Yes.

8        Q.    The documents that show, that allegedly show

9    that, those are all documents from 2006.  Correct?

10       A.    They are -- I think the short-term citations,

11   the short-month citations relate to the I3 study.

12       Q.    And those were documents from 2006; correct?

13       A.    Yes.  But that database was available earlier

14   than 2006.  In fact, the Pfizer database for which they

15   had access was available in 1979.

16       Q.    But the documents that you say allegedly show

17   that Bayer knew that an observational study could have

18   been rapidly implemented and completed, those are

19   documents from 2006?

20       A.    Well, yes, because that's what they choose to

21   look at, the Premier database.  But my comment is those

22   type of databases were openly available and employed by

23   pharmaceutical industries companies as early as 1979.

24   They just chose to wait until that late.  But the

25   databases very similar to Premier had been available

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 230

1   decades earlier.

2       Q.   You have no basis, ma'am, to say that anyone

3   from Bayer knew how long an observational study of

4   Trasylol would have taken at any point before 2006?

5       A.   Well, the same types of databases were

6   available decades earlier.

7       Q.   But you don't have any basis to say that

8   anyone from Bayer knew how long an observational study

9   of Trasylol would have taken prior to 2006.  The

10  documents you're relying on for your conclusion are all

11  from 2006.

12      A.   Well, they are the schedule that they put

13  together for the Premier study.  The same schedule would

14  have been implemented for any database study.

15      Q.   Is that your testimony, that you know that the

16  same schedule would have been put together at any time

17  for any database study done by --

18      A.   Well, it could have been shorter for a larger

19  database, you're correct.  It could have been an even

20  shorter period if they were using a database with even

21  more CABG procedures in it, you're right; it could have

22  been an even shorter period of time.

23      Q.   You're going to testify, ma'am, that you know

24  how long it would have taken and what a schedule would

25  have looked like prior to 2006 for any observational

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 231

1    study done by Bayer?

2        A.    I would testify that this database was

3    available earlier, and other databases were available

4    decades earlier that contain much the same types of

5    patient information as was in the Premier or the Ingenix

6    database.  Whether they bothered to check those

7    databases earlier, I don't know; although, they are all

8    publicly available to the pharmaceutical industries, but

9    they certainly were available for checking.

10              And if with the Premier size database it could

11    be done in that short of period of time, I would think

12    that the epidemiologists participating in this study

13    would argue that it could have been done earlier with

14    even bigger databases.

15        Q.    That's pure speculation by you, isn't it?

16        A.    Well, based on my, yeah, 30 years of

17    experience in the field, the larger the database, the

18    faster the studies can be done.

19        Q.    Right.  But what you just said was pure

20    speculation, right, about what an epidemiologist would

21    have said before 2006 about how long it would have taken

22    to do an observational study?

23              MR. MOSKOW:  Object -- I'm sorry, are you

24        done?  Object to the form, asked and answered.

25        She's explained how she arrives at her position.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 232

1              THE DEPONENT:  Right.

2    BY MR. DERRINGER:

3         Q.   Go ahead.

4         A.   Having worked with epidemiologists, I have

5    been instructed the bigger the database, the faster it

6    is to conduct a study.

7         Q.   Have you seen any document or any other

8    evidence suggesting that the FDA -- strike that.

9              Are you aware, ma'am, of any mortality study

10   that was undertaken after 2002 by the manufacturers of

11   aminocaproic acid, tranexamic acid or --

12        A.   I don't have their production documents, I

13   don't know.

14        Q.   Paragraph 85 of your report, you say -- here

15   you're talking about the Munoz study in 1999.  Is that

16   right?

17        A.   Yes.

18        Q.   And you say that after that study came out in

19   1999, Bayer was responsible for more -- I'm sorry, for

20   conducting further evaluations.  Do you see that?

21        A.   I'm sorry, what paragraph?

22        Q.   Paragraph 85.

23        A.   Okay.

24        Q.   "At this point in time," meaning '99 after

25   Munoz is published, "Bayer was responsible for warning

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 233

1   of these risks and conducting further evaluations."  Do

2   you see that?

3        A.   Yes.

4        Q.   Okay.  I want to focus right now just on the

5   part where you stated that Bayer was responsible for

6   conducting further evaluations.  Okay.

7             What regulatory provisions support that

8   statement?  We've been through this, I think, before

9   with mortality.  Is it the same provision, that is

10   314.80(b)?

11        A.   I think I first say they were responsible for

12   warning of these risks.

13        Q.   Ma'am, please listen to my question.  I said I

14   want to focus at this point just on the portion where

15   you talk about conducting further evaluations.  We'll

16   get to the warning later.

17             Is there any regulatory -- what regulatory

18   provision, what regulation are you relying on to support

19   your statement that in 1999, after Munoz was published,

20   Bayer was responsible for conducting further

21   evaluations?

22        A.   It would be -- it would be the same ones, that

23   there was an increase in the frequency or the

24   populations involved with a serious adverse event, so it

25   would be under the definition that I read under the

CHERYL   BLUME, Ph.D. - 7/21/2011

1    guidance 314.8 that deals with conducting of

2    pharmacovigilance studies.

3        Q.   But the regulation is 314.8 subsection (b).

4    Correct?

5        A.   Right.  And the guidance that deals with how

6    to conduct the safety surveillance and then conduct

7    studies around those would be applicable to the

8    mortality as well as the -- to the renal as well as the

9    mortality.

10       Q.   And it's Munoz in '99 that triggered that

11   obligation.  Right?

12       A.   Oh, well, I mean, Munoz is interesting because

13   it's a published record, it says it's a serious concern

14   and they reviewed 52 studies.  Certainly, the individual

15   studies that led to that concern would be interesting.

16   And then I have a chart here of all of the other

17   available information relating to mortality before 1999.

18       Q.   We're on renal failure, ma'am.

19       A.   I know.

20       Q.   You just mentioned mortality.

21       A.   Renal failure and mortality, I have the whole

22   listing of --

23       Q.   That's Exhibit 24?

24       A.   I'm sorry?

25       Q.   That's Exhibit 24 that you're referring to?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 235

1      A.   Exhibit 24 is both renal events as well as

2  mortality.

3      Q.   That's the exhibit you were just referring to?

4      A.   Yes.

5      Q.   Okay.

6      A.   And so there were multiple ones before --

7  before the first Munoz article.

8      Q.   But your opinion is that certainly Munoz

9  triggered an obligation to conduct further evaluations

10  of renal effects of Trasylol.  Is that right?

11      A.   Well, yes.  The group called it a major

12  concern and reviewed 52 -- reviewed 52 articles.  So

13  because it was at that point in time somewhat -- 52

14  articles, it did not obtain statistical significance.

15  So while a serious concern, it still hadn't obtained

16  statistical significance, which I think leads to him

17  saying at this point it's still somewhat inconclusive.

18  So given that there's a potential adverse event that

19  extends across the population, I believe that studies

20  should have been done to resolve it either way, either

21  there is a mortal -- or either there is a renal event

22  concern or there isn't a renal event concern.

23      Q.   And what specifically supports that belief,

24  what standard?  You mentioned the 2005 guidance.  Is

25  that right?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 236

1      A.    Uh-huh.  Yes.

2      Q.    Yes, okay.  And you mentioned 314.80(b).

3  Right?

4      A.    Right.

5      Q.    Okay.  Anything else?

6           MR. MOSKOW:  Specifically related to

7      regulations?

8           MR. DERRINGER:  Well, now we're talking

9      guidances and other things, too.

10      A.    Guidance and regulations for studies I think

11  we're talking.

12  BY MR. DERRINGER:

13      Q.    That's right.

14      A.    I think it should have also impacted the

15  labeling, but that would be it for the requirement of

16  the studies and the ones preceding.  I mean, we're using

17  2005; but, of course, there were ones that preceded

18  that.

19      Q.    Which ones?  I mean, I want to know what

20  you're going to be relying on at trial, ma'am.

21      A.    Well, we said we were going to use the latest

22  ones earlier.  That's why people kept handing me the

23  2008 and 2009 labeling, and when I commented on that,

24  you said just use the --

25      Q.    I'm not talk -- any labeling, by the way.  I'm

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 237

1    talking about guidances now.  You said 2005 and the

2    earlier ones.

3              MR. MOSKOW:  I think the confusion is that if

4         you look at paragraph 85, it specifically refers to

5         the March 2001 draft guidance as well.

6    BY MR. DERRINGER:

7         Q.    Okay.  So that one as well?

8         A.    That's in the report.

9         Q.    I'm asking you, that one as well?

10        A.    Yes.  That preceded it.

11        Q.    Okay.  Same thing, by the way, with the

12   obligation to study mortality effects, it would be

13   314.80(b), the 2005 guidance and the 2001 guidance,

14   March.  Is that right?

15        A.    Yes.  And any obligations that were put upon

16   the company that relate to serious adverse events at the

17   times of approval.

18        Q.    Okay.  So post-marketing commitments?

19        A.    Well, the 58 put it on as a post-marketing

20   requirement, yes.

21        Q.    Okay.  Anything else for mortality or renal

22   issues that would require the company to conduct further

23   studies?

24              MR. MOSKOW:  Anything else?

25              MR. DERRINGER:  Yes.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 238

 1     A.   So now we can talk again about the PhRMA Code.

 2   The PhRMA code says that if there is a new event that

 3   occurs, studies must be conducted, so we can use the

 4   PhRMA Code.

 5   BY MR. DERRINGER:

 6     Q.   Where?  Show that to me.

 7     A.   Okay.  Post-marketing and surveillance studies

 8   will be conducted on a scientific and educational basis.

 9   These studies will not be conducted simply as a means to

10   promote the product with little or no scientific or

11   educational basis.

12     Q.   Okay.  Where else in the PhRMA marketing code

13   do you find support, alleged support for your statement

14   that studies must be done?

15     A.   I think that's all, with the exception of the

16   ones that we talked about earlier, and the need to do

17   studies.

18          MR. MOSKOW:  She's referring to --

19     A.   I'm referring to the ones that are on the

20   PhRMA Web site.

21          MR. MOSKOW:  Give him the exhibit number.

22   BY MR. DERRINGER:

23     Q.   Which ones do you say support your opinion

24   about Bayer's obligation to conduct studies?

25     A.   Okay.  11.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 239

1      Q.    Where?

2      A.    First page, last paragraph, although companies

3   do extensive studies during clin development, there are

4   times when important safety information cannot be

5   gleaned from these studies, usually carried out in a few

6   thousand patients.  Information on the very rare safety

7   issues of a med and its appropriate use might only

8   emerge once a drug has entered the market and is used by

9   a wider population.

10            In other words, some risks and patient

11   reactions are not determinable -- may not be

12   determinable until a med is used by hundreds of

13   thousands.

14            For this reason, companies track safety issues

15   that might arise from the use of their products.

16   Companies have both a regulatory and ethical obligation

17   to monitor safety data reported to FDA.  In addition, to

18   reporting to FDA, should new safety arise, the company

19   and the FDA must work towards changing the drug label to

20   reflect new information.  And important new information

21   is, da-da-da-da-da.

22      Q.    Okay.  Anywhere else that supports your

23   statement that Bayer was obligated to perform studies?

24      A.    In 17, it says today we support a number of

25   recommendations for improving post-marketing

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 240

1    surveillance of drugs, including the more efficient use

2    of adverse event reporting systems, and maximizing the

3    use of large patient healthcare databases to assess drug

4    safety and efficacy.

5         Q.   That's Exhibit 17?

6         A.   Uh-huh.

7         Q.   Okay.  Anywhere else?

8         A.   Fifteen talks about safety monitoring

9    continues into post-marketing and has a little bit of

10   information about known as Phase IV post-marketing

11   studies, they can continue for years and involve

12   thousands of patients, but I don't have the rest of it,

13   mine cuts off.  It says learn more about post-marketing,

14   but I don't have the rest of it.

15        Q.   Well, that's all there is, ma'am, in the

16   document that you cited to.

17             So tell me again on Exhibit 15 what specific

18   language you're referring to.

19        A.   They just -- they talk about safety

20   monitoring, it needs to continue into the post-marketing

21   stage and can take thousands of patients after approval.

22        Q.   You're talking about the last two paragraphs

23   of Exhibit 15?

24        A.   Well, it actually starts on the page before.

25        Q.   Well, what is it that you're relying on in

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 241

1   Exhibit 15 that --

2        A.   I'm just saying Exhibit 15 mentions

3   post-marketing safety data, but I don't think it was

4   complete because I don't have -- if there indeed is any

5   more about it.  Where it underlines, it appears as if

6   there is something to click onto.

7        Q.   So Exhibit 15, again, what particular part of

8   it are you relying on to support your contention about

9   Bayer's obligations to conduct studies?

10       A.   I was saying that this section talks about

11  that sometimes there is a need to conduct studies after

12  a product is approved.

13       Q.   It actually says, "Sometimes, the FDA requires

14  a manufacturer to conduct additional studies."  Is that

15  what you're referring to?

16       A.   Well, and then after it, it talks about "known

17  as Phase IV or post-marketing studies."

18       Q.   Right.  These are the studies that the FDA

19  sometimes requires a manufacturer to conduct.  Correct?

20       A.   Well, I don't know.  You read it that way?

21       Q.   Well, we'll let the jury decide how to

22  interpret this.

23       A.   I don't know, I guess because --

24       Q.   But that's the paragraph you're now focusing

25  on?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 242

1      A.   Yes.  Well, actually, I was looking earlier at

2   the whole paragraph where it talks about Phase IV

3   studies.

4      Q.   Okay.  Anything else?

5           MR. MOSKOW:  Did you already talk about these?

6           THE DEPONENT:  I think I talked about where it

7      says we need to post -- sometimes we need to do

8      studies after approval.  I think we already did that

9      one.  This one is for patients.  We already talked

10     about that one.

11          MR. MOSKOW:  The ones she already talked about

12     is Exhibit 14.

13          THE DEPONENT:  And here's all the PhRMA codes,

14     I think we got them.

15   BY MR. DERRINGER:

16     Q.   Anything else you're relying on to support

17   your contentions about Bayer's alleged obligation to

18   conduct additional studies or further investigations?

19     A.   That's all.  I think that's all I have now,

20   but if I notice anything else that's in other

21   paragraphs, I'll point it out to you.

22     Q.   Okay.  Thanks.

23          MR. DERRINGER:  Why don't we take a break.

24          MR. MOSKOW:  Perfect.

25          THE VIDEOGRAPHER:  The time is 2:59 and we're

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 243

1    off the record.

2         (Break taken.)

3         THE VIDEOGRAPHER:  The time is 3:24 and we are

4    back on the record.

5    BY MR. DERRINGER:

6    Q.   Dr. Blume, could you turn to Page 13 of your

7    report, please.  Are you there?

8    A.   Yes.

9    Q.   Paragraph 20, you write the pharmaceutical

10   companies must ensure that, "Prescribers and patients

11   have all available data so that the best decision may be

12   made for individual patients."  Do you see that?

13   A.   Yes.

14   Q.   Okay.  Do you really mean all there, every

15   piece of available data, no matter how reliable or

16   unreliable it is?

17   A.   This paragraph is relating to safety

18   information, especially when there are conflicting

19   results.  And the point of this article and the

20   illustrations that are given specifically are

21   post-launch labeling modifications that are made with

22   respect to adverse events in which there are conflicting

23   data with respect to those adverse events which may in

24   part be due to the quality of the study, different type

25   of study design, or whatever.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 244

1          But the point is that it is within the

2     industry practice that when there is a post-marketing

3     event, especially with a -- especially with these with

4     serious adverse events, there is an opportunity to

5     include that information in the product labeling, and to

6     note that not all the data necessarily agree with each

7     other and there may be conflicting results.

8          And the purpose of doing that, my experience

9     has been the purpose of doing that is companies believe

10    that it is prudent, especially with post-marketing

11    safety data, to provide the information, good, bad,

12    conflicting, not conflicting, and that way the

13    prescriber has all available information and he or she

14    can then make the decision what is most appropriate for

15    a particular patient.

16    Q.   Okay.  So your opinion is that conflicting

17    data should be reflected in the labeling?

18    A.   Oh, it's very commonly post-marketing --

19    conflicting results with post-marketing data are

20    commonly included in the labeling and it's for that

21    purpose.

22    Q.   Okay.  Pharmaceu -- your sentence that I

23    talked about before, "Pharmaceutical companies must

24    ensure that prescribers and patients have all available

25    data so that the best decision may be made for

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 245

1    individual patients," can you tell me what regulatory

2    provision you're relying on for that statement, what

3    regulation?

4         A.   Well, it would be the same as the ones that

5    we've already discussed with regard -- with respect to

6    labeling that outline --

7         Q.   We were talking before about obligation,

8    alleged obligation to study.  Why don't you list for me

9    the particular regulatory provisions you're relying on

10   to say that pharmaceutical companies must ensure that

11   prescribers and patients have all available data.

12        A.   Well, it would be 201 point -- it would be the

13   201 labeling series.

14        Q.   Is that 201.56 and 57?

15        A.   Generally, yeah.  There's other sections to

16   it, but those are generally the ones with adverse

17   events.

18        Q.   Are there any other sections in 201 that

19   you're relying on for that statement in paragraph 20?

20        A.   With regard to conflicting data?

21        Q.   No.  "Pharmaceutical companies must ensure

22   that all prescribers and patients have all available

23   data."  So you've listed 201.56, 201.57.  Any other

24   regulatory provision that you claim support that

25   statement?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 246

```
 1      A.    That -- okay.  So all available data that

 2    would be needed for the best decision relating to an

 3    individual patient.  That's what that sentence says.

 4      Q.    No.  It says, "have all available data so that

 5    the best decision may be made for individual patients."

 6      A.    Exactly.

 7      Q.    What data then -- well, that was my original

 8    question and you went off and answered something else.

 9    Is there any data that should not be provided to

10    prescribers and patients?

11            MR. MOSKOW:  Object to the form.  You can

12      answer.

13      A.    Is there any post-marketing data that should

14    not be provided?  Well, if FDA were to disagree with its

15    inclusion, that would not be provided.  If the data were

16    in any way found to be tarnished or untrue, that would

17    not be provided.  Perhaps a -- a single report of an

18    isolated event would not necessarily need to be provided

19    until -- it could be, I mean, there's certainly events

20    that have two or three events in a labeling until you

21    might have a repeat confirmation of that event, and I

22    guess in those instances you could say those should not

23    be included.

24    BY MR. DERRINGER:

25      Q.    Do you agree that data, safety data needs to
```

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 247

1    be analyzed before it is communicated to doctors and

2    their patients?

3        A.   You mean the company, by the drug company?

4        Q.   By the drug company or by FDA, there's got to

5    be some analysis done before you hand the data over or

6    disclose it to doctors.

7        A.   I don't know.  I mean, certainly published

8    literature, companies frequently provide new published

9    literature that may impact a drug product safety with

10   "Dear Doctor" letters immediately upon publication of

11   the results.  I have seen several of those that don't

12   require internal analyses, they simply provide the

13   published data to doctors if they feel it will be

14   helpful.

15           I've also seen companies who provide published

16   information or information about to be published where

17   they have provided a preliminary paragraph to describe

18   what they see the limitations of the data are.  So I

19   think "Dear Doctor" letters can be submitted without

20   there being -- well, of course, they can be.  "Dear

21   Doctor" letters do not have to be approved by the FDA or

22   contain FDA comments, no.

23       Q.   Do you agree that FDA regulations bear upon

24   the type of drug safety information that should be

25   communicated to treaters?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 248

1    A.   Do I agree that FDA regulations bear upon the

2    type of information?

3    Q.   What type of drug safety information should be

4    communicated to treaters?

5    A.   Well, I think you can.  I think there's FDA

6    regulations relating to patient privacy and those types

7    of issues, yes.

8    Q.   I'm talking about what kind of drug safety

9    information should be communicated to treaters.

10        Let me put it this way.  Do you agree that

11   Sections 201.56, 201.57, 314.70, those are relevant to

12   the issue of what type of safety information should be

13   provided to treaters?

14   A.   May I see them?  May I see that section?  I

15   want to read the whole section.  I'm going to read the

16   section he just cited.

17   Q.   You're not familiar with 201.56, 201.57 and

18   314.70?

19   A.   Yes.  I've been quoting them all day.

20   Q.   Right.  That's why I figured you might be able

21   to answer this question.  Do you agree that those

22   regulations bear upon what type of drug safety

23   information should be communicated to treaters?

24   A.   Yes, I do agree that may bear upon them.

25   Q.   Do you agree that if the regulations do not

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 249

1    require that FDA be informed about a piece of potential

2    drug safety information, that reflects a judgment by the

3    FDA that the information is not something that needs to

4    be communicated to treaters?

5              MR. MOSKOW:  Objection to form, calls for

6         speculation.  It's outside the scope of the expert

7         report.

8              THE DEPONENT:  Answer?

9              MR. MOSKOW:  Yes, if you're able.

10   BY MR. DERRINGER:

11        Q.   Yes.

12        A.   I believe that not all information -- not all

13   safety information has to be sent to the FDA

14   immediately, but companies may implement changes to

15   their labeling based on that information.  For example,

16   companies can update their post-marketing adverse event

17   sections, that does not necessarily have to be first

18   cleared by the FDA.

19        Q.   That's through the CBE provision of 314.70.

20   Is that right?

21        A.   Yes.  And that information can be shared with

22   physicians.

23        Q.   Right.  My question is that if the regulations

24   do not require that the FDA be informed about a piece of

25   potential drug safety information, do you agree that

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 250

1   that reflects a judgment by the FDA that the information

2   is not something that needs to be communicated to

3   treaters?

4       A.   Are you indicating that the FDA never wants to

5   see that piece of information, or they don't have to see

6   it before it's implemented into the labeling?

7       Q.   No.  I'm talking about information that the

8   regulations say does not need to be submitted to FDA.

9       A.   Ever, ever?

10      Q.   Correct.  In that instance, do you agree it's

11  not something that needs to be submitted to doctors?

12      A.   Okay.  I want to read that, where it says that

13  it never, ever has to be reported to the FDA.

14      Q.   Well, I don't want to waste time with you

15  reading regulations.

16          MR. MOSKOW:  Well, Steve, are you able to

17      direct Dr. Blume to an area where it says certain

18      data doesn't ever have to be --

19  BY MR. DERRINGER:

20      Q.   I'm not asking you to agree whether that

21  exists or not, that regulation.  I'm just saying if

22  there is information that the regulations note do not

23  need to be submitted to FDA, do you agree that that

24  reflects a judgment by the FDA that it does not need to

25  be submitted to treaters?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 251

```
 1              MR. MOSKOW:  Again, I'm going to object to
 2       form, calls for speculation and it's outside the
 3       scope of her expert work.
 4       A.   Well, I guess I'm struggling with it because
 5  I'm trying to think of an instance where information did
 6  not ever have to be reported to the FDA.
 7  BY MR. DERRINGER:
 8       Q.   Let's move on.  Do you agree that if there is
 9  a particular type of label amendment or change that the
10  regulations -- I'll strike that, too.
11              Hasn't FDA encouraged companies to request a
12  waiver of the requirement to submit individual case
13  reports for nonserious expected adverse events?
14       A.   Some, yes.  Instead, those are summarized
15  instead of having to submit the individual ones.
16       Q.   Do you presume that doctors read public health
17  advisories that are issued by the FDA?
18       A.   I hope they do.
19       Q.   Do you presume that doctors read "Dear
20  Healthcare Professional" letters when they are sent by
21  pharmaceutical companies?
22       A.   Well, I certainly hope they do.  I am aware of
23  the studies that show that there are certain ones who
24  don't read them or only read a handful of them; but the
25  goal always is that you send the "Dear Healthcare"
```

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 252

1    letters in the hopes that they will be read.

2        Q.   Are you aware of any time when the FDA

3    requested that Bayer issue a "Dear Healthcare Provider"

4    letter about Trasylol and Bayer did not do so?

5        A.   I know of a few letters that they sent.  I

6    recall that FDA requested one of them and they sent it.

7    No.

8        Q.   So you're not aware of anytime when the FDA

9    requested that Bayer issue you a "Dear Healthcare

10   Provider" letter about Trasylol and Bayer did not do so?

11   You're not aware of any such instance; correct?

12       A.   I'm trying to think of the times they did send

13   any.  I only can recall a few that they ever did send,

14   and I only recall once that FDA wanted a letter and it

15   was with new labeling.

16       Q.   So I'm correct?

17       A.   You're correct that when FDA asked them to

18   send it about the new labeling, they sent the new

19   labeling letter.

20       Q.   And you can't -- you don't know of any

21   instance when FDA asked them to send a "Dear Healthcare

22   Professional" letter and they didn't do it?

23       A.   I don't -- no.  I know when FDA issued

24   information independently, but I don't know where

25   they -- I don't know where they asked them any other

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 253

1    time to do it.

2         Q.    Do you agree that the FDA has the ultimate

3    authority over a drug's label when a drug is marketed in

4    the United States?

5         A.    How to answer that now.  I believe that

6    companies are responsible for their labeling.

7         Q.    Do you agree that the FDA has the ultimate

8    authority over the contents of a drug's label when a

9    drug is marketed in the United States?

10        A.    In that FDA can declare -- I guess still

11   today, even after all the Supreme Court decisions, FDA

12   could declare a product misbranded.  But other than

13   that, the responsibility for the maintenance of the

14   labeling is the drug company's.

15        Q.    If the FDA concludes that a label is false or

16   misleading or inaccurate, they can declare the product

17   misbranded.  Correct?

18        A.    That's my only understanding of what they can

19   do with the labeling, yes.

20        Q.    Do you agree that the FDA carefully examines

21   proposed labeling to ensure that the label adequately

22   warns about the known risks of the medicine?

23             MR. MOSKOW:  Object to form.  You can answer

24        it if you're able.

25        A.    I understand the only label that FDA claims

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 254

1   ownership for is the launch label.

2   BY MR. DERRINGER:

3      Q.   Is it your testimony that FDA does not

4   carefully examine proposed labeling after launch to

5   ensure that the label adequately warns about the known

6   risks of the medicine?

7            MR. MOSKOW:  Object to form.  You can answer.

8      A.   I believe that FDA reviews labeling

9   supplements when they are submitted, but that many of

10  the labeling changes that are affected are affected

11  without first seeking clearance from FDA.

12  BY MR. DERRINGER:

13     Q.   Do you agree that product labeling should be

14  accurate?

15     A.   Yes.

16     Q.   Do you agree that product labeling should be

17  based on reliable scientific information?

18     A.   Yes, with the understanding that that may

19  include spontaneous post-marketing adverse event

20  reports.  Yes.

21     Q.   Do you agree that the FDA approved every word

22  of every Trasylol label?

23     A.   I agree that the launch labels are the

24  provenance of the FDA.  I think some of those were

25  approved -- I think some of the later labels might have

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 255

1   been a CBE, I'd have to go back and check.

2        Q.   CBE, you're talking about changes being

3   effective?

4        A.   Yes.

5        Q.   And that's at 314.70 of the regulation?

6        A.   Yes.

7        Q.   Okay.  Do you agree that if possible, the FDA

8   wants significant changes in warnings to be made through

9   consultation with the FDA rather than through the

10  changes being effective provisions?

11       A.   I think FDA would like to be -- my experience

12  is that FDA will certainly agree to, in fact suggest

13  CBE's for significant new changes to the labeling.

14  Generally, however, that has been when there has been

15  some discussion with the FDA about those changes.

16       Q.   Do you agree that in practice, manufacturers

17  typically consult with FDA prior to adding risk

18  information to labeling?

19       A.   For significant new events, I think that is

20  the case, that's my experience.  I think for less risky

21  events, lesser events that companies often CBE it.

22       Q.   Do you agree that the FDA reviews all CBE

23  submissions?

24            MR. MOSKOW:  Object to form.

25       A.   Eventually the CBE's are reviewed by agency.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 256

1   BY MR. DERRINGER:

2        Q.    And do you agree that even changes made

3   pursuant to the CBE mechanism must ultimately be

4   approved by the FDA?

5             MR. MOSKOW:  Object to form.

6        A.    Yes.  FDA indicates that they will eventually

7   review all of the CBE supplements.

8   BY MR. DERRINGER:

9        Q.    Do you agree that the FDA will not permit a

10  change to labeling that would misbrand the product?

11       A.    Product labeling cannot be misbranded.

12       Q.    Do you agree that FDA will not permit a change

13  to labeling that would misbrand the product?

14       A.    Yes.  The product cannot be misbranded.

15       Q.    For example, the FDA wouldn't allow a change

16  to labeling to add a warning in the absence of

17  reasonable evidence of an association between the drug

18  and the adverse event.  Correct?

19            MR. MOSKOW:  Object to form.

20       A.    I have not seen that.  Yes, I agree.  I have

21  not seen where there hasn't been some reason to think

22  it, although there is certainly a wide gradient of

23  information which can be considered the association

24  evidence.

25  BY MR. DERRINGER:

CHERYL  BLUME, Ph.D. - 7/21/2011

1        Q.    Do you agree that changes made pursuant to the

2   changes being effective mechanism must meet the general

3   requirements and standards for labeling as set forth at

4   201.56 and 201.57?

5        A.    Yes.

6        Q.    Do you agree that the changes being effective

7   provision or mechanism is a narrow exception to the

8   general rule of requiring prior FDA approval of labeling

9   changes?

10           MR. MOSKOW:  Object to form.

11        A.    I would have to -- I know that's been written

12   in the past.  I haven't seen -- I know that -- but I

13   know the numbers of CBE's have gone up.  I'd have to

14   check the statistics on that.  I don't know if it still

15   falls under narrow exception.

16   BY MR. DERRINGER:

17        Q.    Do you agree that companies should utilize the

18   CBE mechanism only in situations where there is

19   sufficient evidence of a causal association between the

20   drug and the information that is sought to be added?

21           MR. MOSKOW:  Object to form.  Could you define

22        causal association for the witness?

23           MR. DERRINGER:  She can define it how she

24        wants.

25        A.    Well, let's break this down a little bit.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 258

1   CBE's are used for a variety of purposes.  Causal

2   association only has to do with a very narrow spectrum

3   of labeling.

4   BY MR. DERRINGER:

5       Q.   Okay.  I'm talking about -- I'm talking about

6   adding warnings or precautions.

7       A.   I believe that -- yes.  I believe there should

8   be some documented within the CBE to support a causal

9   association.

10      Q.   So in your report when you talk about when

11  product labeling should be changed or should have been

12  changed, what regulations, specific regulatory

13  provisions are you relying on to come to that

14  conclusion?  I think we've mentioned 201.57; is that

15  right?

16      A.   201.56, 57, yes.

17      Q.   Okay.  And also 314.70; is that right?

18      A.   Yes.

19      Q.   Okay.  Can you tell me what particular

20  sections of those provisions you're relying on?

21      A.   Let me get my report.  I think I have them

22  rolled out in the report.

23      Q.   My recollection, ma'am, is that in your report

24  you don't get any more specific on those regulatory

25  provisions than what I've just said.  Feel free to take

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 259

1   a look, but I think that that's --

2       A.   If you want more specificity in those two

3   sections, then I'll get the notebooks.

4       Q.   What I can do is give you those sections, if

5   you'd like, that we just talked about and you can just

6   identify the subsections that you are relying on for

7   your labeling of --

8       A.   No.  I really want to have them in front of

9   me.  I don't want to do that, not with the new labeling,

10  no.

11      Q.   Sure, go right ahead.

12      A.   I want to have the new -- I want to have the

13  sections in front of me.

14           MR. MOSKOW:  He's giving you the --

15           MR. DERRINGER:  I was going to give you the

16      sections, but.

17           THE DEPONENT:  No.  He wants the specificity

18      of it, so he wants the subsections.

19           MR. MOSKOW:  So what would you like for me to

20      get?

21           THE DEPONENT:  I'd like to get the actual

22      labeling.

23           MR. MOSKOW:  Okay.  If you tell me what

24      paragraphs.

25           THE DEPONENT:  I'm going to find the labeling

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 260

1      paragraph in one second.

2              MR. DERRINGER:  Let's go off the record.

3              THE VIDEOGRAPHER:  The time is 3:44 and we're

4      off the record.

5              (Off the record.)

6              THE VIDEOGRAPHER:  The time is 3:53 and we're

7      back on the record.

8   BY MR. DERRINGER:

9      Q.   Dr. Blume, I've put in front of you Exhibits

10   21, which is 314.70, effective September of 2008;

11   Exhibit 25, which is 201.56; Exhibit 26, which is

12   201.56, the version effective June of 2006; Exhibit 27,

13   which is 201.57; Exhibit 28, which is 201.57, effective

14   June 2006; and Exhibit 29, which is 314.70, the version

15   that was in place prior to 2008.

16              And my -- my question is, I'd like you to

17   identify the sections of these regulatory provisions

18   upon which you are relying as the basis for your

19   labeling opinions in this litigation; that is, opinions

20   about when Bayer was required to change its labeling, in

21   terms of warnings, precautions or adverse reactions, and

22   in terms of what that label should have said.

23      A.   Okay.

24      Q.   Should we start with 201.56?

25      A.   I have to find it first.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 261

1      Q.    Exhibit 25 and Exhibit 26.

2      A.    Okay.  I have them both.

3      Q.    So which subsections here are you relying on

4   for your labeling opinions in this matter?

5      A.    Well, 201.56 is the preamble, if you will, to

6   the labeling section and it's very short, and what it

7   says is that the labeling shall contain certain

8   sections --

9           MR. MOSKOW:  I'm going to interrupt you,

10      Dr. Blume.  All we want is the section.  And I know

11      in your book you had highlighted it, you can just

12      give us the number and then we can -- if there are

13      further questions, they'll be asked.

14           THE DEPONENT:  Okay.  Well, 201.56 is only (a)

15      through (d), so (a) through (d).

16   BY MR. DERRINGER:

17      Q.    Okay.  What about on Exhibit 26, which is the

18   201.56 effective in June 2006?

19      A.    Okay.  For 201.56 only we're on; right?

20      Q.    That's Exhibit 26, yes.

21      A.    Okay.  I would say (1), (2), (3) and all the

22   attendant categories.

23      Q.    That's (a), (a)(1), (a)(2) and (a)(3)?

24      A.    Uh-huh.

25      Q.    Okay.  Is that a yes?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 262

1      A.   Yes.  Let's see, their NDA was approved '93,

2   so.  And (d)(1) for the highlighting section; (e)(1).

3   Okay.

4      Q.   Let's go to -- is that it for 201.56?

5      A.   For the -- well, this is effective June 2006.

6      Q.   Right.  The two exhibits we just looked at,

7   you've now identified the provisions of 201.56 upon

8   which you're relying for your labeling opinions?

9      A.   Yes.

10      Q.   Okay.  Let's go to 201.57, can you identify

11   the provisions in Exhibit 27 and 28 upon which you are

12   relying for your labeling opinions?

13      A.   Well, for my labeling opinion, I would be

14   interested in the clinical pharmacology, so that would

15   be 201.57(2)(b).

16      Q.   Actually, I think just (b).

17      A.   Just (b), clinical pharmacology.  And I would

18   be certainly interested if there were changes in

19   indications, so (c), indications; (d), the

20   contraindications; (e) is warnings.

21      Q.   I know that's what these are.  Are you relying

22   on 201.57(d) or (e) for your opinions on labeling in

23   this case?

24      A.   For what should be in the warnings?

25      Q.   Yes.

CHERYL BLUME, Ph.D. - 7/21/2011

Page 263

 1      A.   Yeah, of course.  Labeling shall be revised as
 2   soon as there is evidence, yes.
 3      Q.   Actually, can you read that again.
 4      A.   Under (e)?
 5      Q.   Yes.
 6      A.   "Under this section heading, the labeling
 7   shall describe" -- I'm sorry, this is the 2005 edition.
 8   Did you mean to give me that?  I thought you wanted to
 9   give me the current one.
10           MR. MOSKOW:  He's giving you both.
11   BY MR. DERRINGER:
12      Q.   You have both.
13      A.   Oh, but we're changing years here?  I see
14   different years.  All right.  This is the old one.
15   "Under this section heading, the labeling shall describe
16   serious adverse reactions and potential safety hazards,
17   limitations in use imposed by them, and steps that
18   should be taken if they occur.  The labeling shall be
19   revised to include this warning as soon as there is
20   reasonable evidence of an association of a serious
21   hazard with the drug.  The causal relationship need not
22   be proved."
23   BY MR. DERRINGER:
24      Q.   Okay.  You can stop there.
25      A.   Okay.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 264

1      Q.   Any other sections of 201.57 in Exhibit 27

2   that you're relying on for your labeling opinions?

3      A.   Yeah.  Just one second.  I don't think

4   pregnancy and pediatrics apply for this.  Then I would

5   move to adverse reactions, which is (g).

6      Q.   Okay.  You're relying on that section?

7      A.   Yes.  Because one has to make a decision

8   between putting information in adverse reactions or

9   warnings.

10           And then I believe the last one would be under

11   some of the special categories, animal pharmacology and

12   certainly clinical studies.  So I'd be talking about (l)

13   and (m).

14      Q.   Okay.  Anything else?

15      A.   Yeah, that would be the new clinical studies.

16   I think that's it for this version.

17      Q.   Okay.  I'm going to give you Exhibit 28, which

18   is the version of 201.57 effective June of 2006.  Just

19   tell me the provisions of this regulation, this

20   provision that you're relying on in this litigation for

21   your labeling opinion.

22      A.   Okay.  The highlight section.

23           MR. MOSKOW:  So that's (a)?

24      A.   (a) because that, well, highlights; box

25   warnings.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 265

BY MR. DERRINGER:

2      Q.   Is that (c)(1)?

3      A.   Uh-huh.  Yeah.  Indications.

4      Q.   (c)(2)?

5      A.   Yes.

6      Q.   Is that right, (c)(2)?

7      A.   Yes.  That's true.  Six, section (6), warnings

8  and precautions; section (7) immediately following that,

9  adverse reactions.  Under the general sections of (12)

10  is the description; (13) is the clin pharm; (14) begins

11  the tox information; clinical studies, because we have

12  epidemiology studies, would be (15); and because we

13  would have clinical studies, we would need references

14  which are in (16).

15      Q.   Anything else?

16      A.   That's it.  I am not including the information

17  about how headings should be done and that type of

18  information; for example, how they want the labeling

19  printed, et cetera, would be in the last of these

20  sections.

21      Q.   I'm not asking about what you're not relying

22  on, just what you are relying on.  Let's go to 314.70,

23  Exhibit 29, this is the 2005 version.  What are you

24  relying upon here for your labeling opinions; that is,

25  that Bayer should have changed the labeling at any point

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 266

1    in time?

2        A.    Let's see.  Let's see, (4) because promotional

3    material has to be consistent with labeling; (5), (6).

4              MR. MOSKOW:  You're in subsection (a)?

5              THE DEPONENT:  Yes.  I'm so used to looking at

6        it.  Let's see.  (6) would be -- let's see.  Now we

7        go over to the 30 days.  The 30-day labeling change

8        is (c), (4)(c).

9    BY MR. DERRINGER:

10       Q.    (4)(c).

11       A.    Applicant may ask FDA to expedite its review

12   of a supplement, and little (c), changes requiring

13   supplement submission.

14       Q.    Well, what provision are you relying on?

15       A.    I'm trying to -- okay.  (c) is if you want --

16   this is one that would be under the 30-day rule and

17   what's included in there, or if there are any changes in

18   the product that impact the safety and effectiveness.

19       Q.    So 314.70(c) you're relying on; is that what

20   you're saying?

21       A.    Well, among the ones I would be looking at, if

22   there's a change of any -- if there is a physical change

23   in the product that impacts the safety and

24   effectiveness, I would be relying on that as well

25   because --

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 267

1      Q.   Well, was there a physical change in

2   Trasylol's product?

3      A.   Oh, not that I know of.

4      Q.   I'm not asking you, ma'am, to describe when

5   labeling changes are appropriate.  I'm talking about

6   what sections are you relying on for your opinions in

7   this case for labeling.

8      A.   Okay.  Well, then we'll do (6), (6)(a).

9      Q.   Where is (6)(a)?

10      A.   The agency may designate a category for the

11   purpose of providing, and then there is (i), little

12   (ii), and then you see (A), (B), (C) on the last --

13      Q.   You're talking about 314.70(c)(6)?

14      A.   I'm talking about capital (C) on the next to

15   the last page, the --

16      Q.   Can you tell me what that provision is?  I

17   mean, my understanding from your resume is you deal with

18   this stuff quite a bit.  So what's the provision?

19           MR. MOSKOW:  Object to the form.

20      A.   I am at 314.70 (6), and under (6) there's a

21   series of subsets including little (iii), and under

22   (iii) it's to add or strengthen a warning.

23   BY MR. DERRINGER:

24      Q.   Okay.  So you're relying on that provision for

25   your labeling opinions in this case?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 268

1      A.   Yes.

2      Q.   Okay.  Anything else in Exhibit 29?

3           MR. MOSKOW:  So the record is clear, I believe

4      that's (C)(6)(iii).

5           THE DEPONENT:  Right.  Yeah.  Okay.  Annual

6      report changes.  In this case, I don't think there

7      is any annual report changes.

8  BY MR. DERRINGER:

9      Q.   Okay.  Let's go to Exhibit 21, 314.70 this is

10  the one effective in 2008.  Are you relying on -- what

11  provisions from 314.70 effective 2008 are you relying on

12  for your labeling opinions in this case?

13          MR. MOSKOW:  To the extent that it was

14     applicable at all for Tras.

15          MR. DERRINGER:  To the extent it was

16     applicable or reflected agency practice at the time,

17     yes.

18          MR. MOSKOW:  Okay.  I don't want to invoke

19     your wrath in terms of a speaking objection, but --

20          MR. DERRINGER:  Then don't, then don't say it.

21     You can say it to me off the record.  I don't want

22     you to testify for the witness.

23          MR. MOSKOW:  I think there has to be some

24     relation as to the marketing of the drug when she's

25     looking at the statute about regulation.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 269

 1            MR. DERRINGER:  Your objection is noted.

 2            THE DEPONENT:  Okay.  So should I answer or

 3       not?

 4            MR. MOSKOW:  If you're able.

 5   BY MR. DERRINGER:

 6       Q.   Yes.  Did you rely on any portion of Exhibit

 7   21, 314.70 effective in September 2008, for your

 8   labeling opinions in this case?

 9            MR. MOSKOW:  Did you hear that question,

10       Dr. Blume?

11            THE DEPONENT:  Yes, I heard it.  Okay.  So if

12       I'm reporting under 201.57, I'm going to need

13       (d)(2)(x), so let's find (d)(2)(x).

14            Okay.  CBE changes will be (3).  So the CBE

15       changes are -- for this one is 314.7, let's start

16       (3), then it will be (3)(iii) for 201.57(A), (A) is

17       to add or strengthen a contraindication, warning or

18       precaution.

19   BY MR. DERRINGER:

20       Q.   That's on Page 4 of Exhibit 21; is that right?

21       A.   Yes.

22       Q.   Okay.  And you're talking about the paragraph

23   that begins, "Changes in the labeling to reflect newly

24   acquired information"?

25       A.   Yes.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 270

1    Q.   And then you're talking specifically about

2    subsection (A), "To add or strengthen a

3    contraindication, warning, precaution, or adverse

4    reaction for which the evidence of a causal association

5    satisfies the standard for inclusion in the labeling

6    under 201.57(c) of this chapter."  Correct?

7    A.   Yes.

8    Q.   That's one of the things you were relying on

9    in arriving at your labeling opinions in this case.

10   Correct?

11   A.   Yes.  And then I would add (C) in there as

12   well, to add or strengthen instruction in the D and A.

13   Q.   D and A being dosage and administration?

14   A.   Yes.

15   Q.   Okay.  Anything else in Exhibit 21 upon which

16   you are relying for your labeling opinions in this case?

17   A.   I think that's it.

18   Q.   Okay.  Thank you.  Dr. Blume, if a doctor, a

19   medical doctor withholds Trasylol -- I'm done with that

20   document.  You're free to continue to look at it, but

21   I'd like you to focus on my question.

22        If a medical doctor withholds Trasylol from a

23   patient based upon safety warnings that turn out to be

24   unjustified or wrong, that can harm a patient.  Right?

25             MR. MOSKOW:  Objection to form, calls for

CHERYL   BLUME, Ph.D. - 7/21/2011

1        speculation.  You can answer it if you're able.

2        A.    Yeah, I don't know how I would answer that

3    without speculating on that doctor not including

4    anything -- I can't answer it.

5    BY MR. DERRINGER:

6        Q.    Do you agree that overwarning can have a

7    negative effect on patient safety and public health?

8        A.    Oh, I -- for certain events, I think

9    overwarning can cause -- may be associated with label

10   fatigue.  I don't think mortality and renal failure fall

11   into those categories at all.

12       Q.    Do you agree that including conflicting

13   opinions about warnings would result in uncertainty and

14   confusion and it would decrease the usefulness of the

15   warnings in protecting the public?

16       A.    No.

17       Q.    We've talked about the changes being effective

18   provisions, that's 314.70.  Right?

19       A.    Yes.

20       Q.    Okay.  If you look at 314.70, I'm talking

21   about the 2008 version here, it's Exhibit 29 -- I'm

22   sorry, 21.  I'm sorry about that.

23             MR. DERRINGER:  21, Neal, do you have it?

24             MR. MOSKOW:  Yes.

25   BY MR. DERRINGER:

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 272

1      Q.   If you go to that section, Section

2    (c)(6)(iii)(A), it's on Page 4, you talked about that a

3    little before.  Do you see that this allows changes to

4    be made to add or strengthen a contraindication,

5    warning, precaution or adverse reaction for which the

6    evidence of a causal association satisfies the standard

7    for inclusion in the labeling under 201.57(c)?

8      A.   Yes.

9      Q.   So if you go over to 201.57(c), which is

10   Exhibit 28 -- just a second.  Go to (c)(6), please, and

11   let me help you out there, that's at Page 5 of Exhibit

12   28.

13     A.   Okay.

14     Q.   Do you see that?  Under (c)(6)(i), general, it

15   describes warnings and precautions.  Right?

16     A.   Yes.

17     Q.   In the middle you'll see that Section 314.70

18   is invoked?

19     A.   Yes.

20     Q.   It says that the labeling must be revised to

21   include a warning about a clinically significant hazard

22   as soon as there is a reason -- as soon as there is

23   reasonable evidence of a causal association with a drug.

24   A causal relationship need not have been definitively --

25   I'm sorry, definitely established.  Do you see that?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 273

1      A.   Yes.

2      Q.   Will you agree, Dr. Blume, that under

3  314.70(c)(6)(iii) and under 201.57(c)(6) some type of

4  causation analysis must be undertaken before determining

5  whether a label change should be made?

6      A.   Well, an analysis of causal association must

7  be undertaken, yes.

8      Q.   Okay.  And while we're at it, let's keep

9  201.57(c) out, let's look at (c)(7), this is on Page 6,

10  this describes adverse reactions.  Do you see that?

11      A.   Yes.

12      Q.   So this says that, "This section must describe

13  the overall adverse reaction profile of the drug based

14  on the entire safety databases."  Do you see that?

15      A.   Yes.

16      Q.   Towards the end, it says that, "This

17  definition does not include all adverse events observed

18  during the use of a drug, only those adverse events for

19  which there is some basis to believe there was a causal

20  relationship between the drug and the occurrence of the

21  adverse event."  Do you see that?

22      A.   Yes.

23      Q.   Do you agree that here, too, a causation

24  analysis of some type must be undertaken before

25  determining whether an adverse reaction should be

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 274

1    described in the labeling.  Correct?

2        A.   There must be some effort to examine for a

3    causal association.  You must confirm the patient took

4    the drug.  You must confirm that there is a reason -- a

5    background reason why that event may be connected with

6    the patient.  But it is only a causal association, it's

7    certainly not causation and it's not statistical

8    significance.

9        Q.   Right.  But some type of causation analysis

10   must be undertaken?

11       A.   It's a causal association.  We define that

12   differently than we do a causation.

13       Q.   Okay.  Some type of causal association

14   analysis must be undertaken before determining whether

15   an adverse reaction should be described in labeling?

16       A.   Yes.

17       Q.   Correct?

18       A.   Yes.

19       Q.   And how do you define causal association?

20       A.   Well, if you read the FDA's new guidances with

21   this, they attempt to define it over time.  But a causal

22   association means that a person who is involved in the

23   area, and it does not have to be a panel, it can be an

24   individual person, has reason -- has a reason to believe

25   that there may be a link between the event and the use

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 275

1    of the drug, and that link may be something as simple as

2    it was observed in animal studies.  It may be a similar

3    event has been observed with this drug.  It may even be

4    that an event was not observed with this drug, but was

5    observed with a drug in a similar chemical class or

6    pharmacologic family.  It's those type of associations.

7    It's very clear to show that it does not have to come

8    from a prospective controlled clinical trial and

9    statistical significance is not required.

10       Q.   Can you just point me to any guidance or any

11   other document that supports that --

12       A.   Yes.  It's the new FDA guidance --

13       Q.   Ma'am, let me finish my question.  Can you

14   point me to the guidance or guidances that support that

15   definition of causal association?

16       A.   Yes.  I have it with me, it is the new

17   warnings and precautions -- warnings and precautions and

18   adverse reaction guidances associated with the new

19   labeling.

20       Q.   And what year was that guidance promulgated?

21       A.   Well, that would be the new labeling, so I

22   think it was 2008 or 2009.

23       Q.   And do you know if that's final or a draft

24   guidance?

25       A.   I don't know.  I don't know.  It is the one

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 276

1   that's being employed now.  And the standard was less

2   prior to that because it said a causal -- in the past it

3   said that it was a lesser standard prior to the new

4   labeling.

5        Q.   This is said in the guidances you're saying?

6        A.   No.  When you read the labeling, labeling

7   guidances under warnings and precautions, it previously

8   said causal association need not be proved or something

9   to that effect.

10       Q.   Now, at paragraph 30 -- I'm sorry.  At

11  paragraph 50 of your report, this is where you described

12  the Mangano article in 2002, the aspirin article?

13       A.   Yes.  Mortality events, yes.

14       Q.   Right.  And you say that "labeling changes

15  were not effected in violation of industry standards."

16  Do you see that?

17       A.   Yes.

18       Q.   What should the labeling have said in 2002?

19       A.   That a published -- published clinical trial

20  has -- has indicated that there may be more -- that

21  there may be increased mortality in CABG patients who

22  are receiving aprotinin therapy.

23       Q.   And that's based on Mangano's published study.

24  Right?

25       A.   Well, it would be based on Mangano's study

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 277

1   which looked at it as a whole.  And then it would be

2   based on later when they broke out the individual

3   products and showed that there was a statistically

4   significant difference in the patients who actually

5   received the aprotinin.

6         Q.   That later was the publication in 2006; right?

7         A.   Well, they knew it earlier than that.  I think

8   Linda Shore, Lesserson, and the depositions indicate

9   that it was actually known in 2003 or 2004.

10        Q.   We'll get to what you think Bayer knew or not

11  in a little bit.  But your opinion, your statement in

12  paragraph 50 about the labeling should have been

13  changed, that was based on Mangano 2002.  Right?

14        A.   Well, it would certainly include Mangano 2002.

15  But there were also, the second sentence would be other

16  studies have suggested this and further information

17  is -- further information is needed or further study is

18  required to confirm this.

19        Q.   Okay.  What are the other studies before 2002

20  that support your allegation that the labeling should

21  have been changed regarding mortality in 2002?

22        A.   Uh-huh.  Well, we -- let's see.  This study

23  was available, the European study was available.

24        Q.   What European study?

25        A.   1995.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 278

1      Q.    What study?

2      A.    TRA-BO5, T-R-A-B-O 5.

3      Q.    Do you know what study that is?

4      A.    Yes.  I think it was a Canadian study that

5   looked at aprotinin.

6      Q.    Do you know the name of it?  That's the

7   Jamison study?

8      A.    I don't have it coded like that, I just have

9   TRA-BO5 and a --

10     Q.    TRA-BO5?

11     A.    Yes.

12     Q.    Anything else before 2002?

13     A.    Okay.  Sundt, of course, published in 1993

14  that there was a difference in it.  Let's see, 2002, the

15  PK study -- yes.  There was a -- there was a PK study in

16  which there was mortality, there was a mortality

17  difference, as I recall, as well.

18     Q.    What study was that, ma'am?

19     A.    I'll have to find it.

20     Q.    What year was it?

21     A.    I think it was 1993.

22     Q.    Do you know the name of the study?

23     A.    I thought I had listed it in here, but if not,

24  I will get it on the break and bring it in, the Bates

25  number.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 279

1      Q.   So let me ask you this, Dr. Blume.   TRA-BO5,

2   which I will represent to you is the Jamison study, that

3   was submitted to FDA.  Correct?

4      A.   Following approval June 19 -- or January 1995.

5      Q.   Correct?

6      A.   January 1995.

7      Q.   It was submitted to FDA?

8      A.   1995.

9      Q.   Okay.  And the Sundt study was submitted to

10   FDA?  Do you know one way or the other?

11      A.   I don't know.  I don't know.

12      Q.   Okay.  The PK study you referred to, that was

13   submitted to FDA.  Correct?

14      A.   I will have to check on if that was a European

15   study.  I don't recall.

16      Q.   Mangano 2002 was published in the New England

17   Journal of Medicine.  FDA had access to that; correct?

18           MR. MOSKOW:  Object to form.

19      A.   I'd have to be speculating as to what FDA

20   reads and doesn't -- read and didn't read.

21   BY MR. DERRINGER:

22      Q.   Do you believe that the New England Journal of

23   Medicine is one of the most widely read medical journals

24   in the world?

25      A.   I understand that, but I also don't know what

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 280

1    individual FDA reviewers read, nor do I believe it was

2    FDA's responsibility to be reading it searching out for

3    aprotinin articles.

4         Q.   Are you aware of any time, any time actually,

5    ma'am, that the FDA requested that Bayer change its

6    labeling to reflect different mortality information?

7         A.   Well, we do know what FDA did when they knew

8    about mortality information, they immediately issued a

9    public health advisory when they became aware of I3 on

10   this issue and noted that they weren't aware of it prior

11   to that.  And then FDA requested additional information.

12            There was another advisory committee meeting

13   in which they agreed to wait for the BART study.  And

14   when the BART study came out with its data, the next

15   step was that FDA asked that the product be discontinued

16   in the United States.

17            So I think we do have an idea of FDA's

18   reactions to mortality data.

19            MR. DERRINGER:  Move to strike the entire

20       nonresponsive answer.  I'll ask my question again

21       and I ask that you answer it, ma'am.

22   BY MR. DERRINGER:

23       Q.   Are you aware of any time that FDA requested

24   that Bayer change its labeling to reflect different

25   mortality information?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 281

 1          MR. MOSKOW:  Object to form, asked and

 2     answered.

 3          MR. DERRINGER:  Not answered.  Asked.

 4          THE DEPONENT:  Do I answer again?

 5          MR. MOSKOW:  If you're able to.

 6          THE DEPONENT:  Well, I thought I answered it,

 7     but I guess the answer is when FDA became aware of

 8     the mortality data, the product was largely

 9     discontinued from the market, so labeling issues

10     became much less of a concern.

11     BY MR. DERRINGER:

12     Q.   Are you aware of any time that the FDA

13     requested that Bayer change its labeling to reflect

14     different mortality information?

15     A.   No, because the product was removed from the

16     market.

17     Q.   Now, do you contend that events after 2002

18     triggered an obligation by Bayer to change its labeling

19     or otherwise warn doctors about any alleged association

20     between Trasylol and mortality?

21     A.   Yes.

22     Q.   Okay.  What are the events you think triggered

23     that obligation?

24     A.   Okay.  Well, I think it began with what we've

25     already discussed, with 2002.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 282

1      Q.    Okay.  What else?

2      A.    The 2002 data.  And then following 2002 data,

3   there is information available relating to mortality

4   from the 2003 Treasure results, the results in 2003 or

5   2004 with the Kress and Stone study, certainly Mangano

6   2006 addresses an increase in the risk of mortality,

7   that is further confirmed with the I3 data, and the

8   2007, continuation of the observations of Mangano in

9   2007.

10     Q.    Any other event that you claim triggered an

11  obligation by Bayer to change its labeling or otherwise

12  warn doctors about any alleged association between

13  Trasylol and mortality?

14     A.    In addition to those?

15     Q.    Correct.

16     A.    Mangano, Kress, Treasure, Mangano, I3.  I

17  think that's it.

18     Q.    Do you agree, ma'am, that Bayer and the FDA

19  were in regular contact about Trasylol between January

20  of 2006 and November of 2007?

21          MR. MOSKOW:  Object to form.  You can answer

22     if you're able.

23     A.    I'm sorry, what were those dates again?

24  BY MR. DERRINGER:

25     Q.    January 2006, when Mangano 2006 was published,

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 283

1    and November of 2007.  Do you agree that Bayer and FDA

2    were in regular contact about Trasylol during that time

3    period?

4                MR. MOSKOW:  Object to form.  You can answer.

5        A.   Well, again, I didn't review all the

6    components of their New Drug Application.  I agree that

7    they were in contact regarding the two advisory

8    committees and what happened and didn't happen in the

9    advisory committees.

10   BY MR. DERRINGER:

11       Q.   I didn't ask about the NDA, ma'am.  Do you

12   agree that Bayer and FDA were in regular contact about

13   Trasylol between January of 2006 and November of 2007?

14               MR. MOSKOW:  Object to the form.  You can

15       answer.

16       A.   With the FDA, I would link everything to the

17   NDA.  I agree there was communications.  There were two

18   advisory committees, there were multiple events during

19   that time period and a couple of advisory committees.

20   So I would imagine that there were communications

21   between the company and the agency.

22   BY MR. DERRINGER:

23       Q.   Do you agree or do you have any basis to know

24   that between September and December of 2006, FDA and

25   Bayer had extensive interactions about label revisions

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 284

1   for Trasylol?

2         MR. MOSKOW:  Object to form.  You can answer.

3     A.   Yes.  Based on the information FDA had, there

4   was communications relating to the upcoming labeling

5   change.

6   BY MR. DERRINGER:

7     Q.   There were extensive communications; correct?

8         MR. MOSKOW:  Object to the form.

9     A.   I'm not quite sure what the term "extensive"

10  means when it comes to labeling indications.

11  BY MR. DERRINGER:

12    Q.   You can't define that?

13    A.   I just have 30 years of experience and it

14  ranges from 10 conversations a day with the FDA to three

15  conversations over a quarter.

16    Q.   FDA provided its input on the issue of what

17  should be included in the Trasylol labeling between

18  September 2006 and December 2006, didn't they?

19    A.   Between what dates in 2006?

20    Q.   September 2006 and December 2006.

21    A.   I saw correspondences between the company and

22  the FDA, yes.

23    Q.   FDA approved every word of the December 2006

24  Trasylol label.  Correct?

25    A.   Yes.  Based on the information made available

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 285

1    to FDA, they approved the label.

2        Q.    Now, in December of 2006 when they approved

3    the Trasylol label, FDA was aware of the I3 preliminary

4    report.  Correct?

5              MR. MOSKOW:  Object to form.  You can answer.

6        A.    Let me check that.  September of 2006, became

7    aware of the I3 report -- well, I talked to Alex Walker.

8    Yes.

9    BY MR. DERRINGER:

10       Q.    So, in fact, FDA had the I3 preliminary report

11   in September of 2006.  Right?

12       A.    Yes.  That's when they issued their health

13   advisory.  Yes.

14       Q.    Right.  So let's see if you can answer the

15   question.  FDA was aware and even had the I3 preliminary

16   report when the FDA approved the December 2006 Trasylol

17   labeling.  Correct?

18       A.    Yes.  It did not include -- did not yet

19   include any mortality information.

20       Q.    And FDA was aware of and had analyses of

21   Mangano's 2006 study when FDA approved the December 2006

22   Trasylol labeling.  Correct?

23             MR. MOSKOW:  Object to form.  You can answer.

24       A.    Mangano 2006, let's see.  They had 2006, yes.

25             MR. MOSKOW:  You know what, we've been going,

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 286

1      again, it's been a long day.  I know we have more

2      time on the record, but I think the witness could

3      use a few minutes to stretch her legs.

4           MR. DERRINGER:  Do you want a break?

5           MR. MOSKOW:  Yes.

6           MR. DERRINGER:  That's fine.

7           THE VIDEOGRAPHER:  The time is 4:35, we are

8      off the record.

9           (Break taken.)

10          THE VIDEOGRAPHER:  The time is 4:50 and we're

11     back on the record.

12 BY MR. DERRINGER:

13     Q.   Dr. Blume, can you point to any suggestion

14 that the FDA wanted Bayer to include new or different

15 information about mortality in the December 2006

16 Trasylol labeling?

17     A.   No.

18     Q.   In paragraph 43 on Page 20, the first sentence

19 you say, "Numerically greater rates of death were also

20 reported in two additional randomized, double-blind,

21 placebo-controlled studies."  What studies were those?

22     A.   I'll have to get these Bates numbers.

23     Q.   It's paragraph 43.  Would it be in your binder

24 that is related to 43?

25     A.   Yes.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 287

1           MR. DERRINGER:  Neal, do you want to get that

2      for her?

3   BY MR. DERRINGER:

4      Q.   Are you looking at the medical officer's

5   report there?

6      A.   Well, I have -- yeah, that's part of it.

7   Yeah.

8      Q.   Okay.

9      A.   Let's see.  The first one to which she is

10  referring, and again, this is Dr. Talarico, group of

11  investigators reported increased mortality, higher

12  incidence of renal dysfunction in a study conducted at

13  Washington University.  Twenty patients, seven of the 20

14  died.

15     Q.   Is that one of the two to which you're

16  referring in paragraph 43?

17     A.   Yes.

18     Q.   Okay.  What's the second one?

19     A.   She refers to an increase in mortality rate of

20  19 percent occurred in one of two uncontrolled clinical

21  trials conducted in the U.S.

22     Q.   Is that the second one you're referring to in

23  paragraph 43?

24     A.   Yeah.  Let me keep looking here a second.

25  Yeah, those are the two.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 288

1      Q.    Those are the two you're referring to in the

2   first sentence in paragraph 43?

3      A.    Yes.

4      Q.    Okay.  And those you got from Dr. Talarico's

5   medical review.  Is that right?

6      A.    Yes.

7      Q.    So clearly, Dr. Talarico at the FDA was aware

8   of those two studies when she was reviewing Bayer's

9   application for Trasylol.  Correct?

10     A.    Oh, yes.  So clearly, Bayer -- it's in here

11  because clearly Bayer was on notice of a concern of

12  mortality.

13     Q.    And that was disclosed to the FDA; correct?

14     A.    Yes.  A known, there is a basis for their

15  pharmacovigilance markers.

16     Q.    Can you turn to paragraph 85 of your report,

17  it's on Page 37.

18     A.    Okay.

19     Q.    We've talked about this paragraph before with

20  respect to the Munoz study in the year 1999 with respect

21  to further evaluations and study.  Now I want to focus

22  on labeling and warning.

23         You allege in paragraph 85 that it was when

24  Munoz was published in 1999 that Bayer was responsible

25  for warning of the risks described, I presume, in the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 289

1    Munoz article.  Is that right?

2         A.   Well, I think what I said was in '99, Munoz

3    did a 52-study meta-analysis and indicated that

4    additional studies may be needed just because of this

5    concern with those studies.  And then I also added that

6    prior to -- there was, of course, earlier concerns

7    associated with mortality prior to the '99 Munoz

8    article.

9         Q.   We're not on mortality, ma'am.

10        A.   I meant renal.

11        Q.   I'm on kidney issues.

12        A.   Renal.

13        Q.   So is it your contention that labeling with

14   respect to renal issues needed to be changed in 1999

15   with the publication of the Munoz article?

16        A.   And those preceding dealing with renal in

17   those populations that were the general populations for

18   aprotinin, not those getting the hypothermic treatment.

19   The general -- I think that there should have been an

20   across-the-board statement for all patients who were

21   receiving aprotinin that there may be diminutions in

22   renal efficiency and indicate which studies are being

23   referenced and additional research is ongoing or is

24   warranted.

25        Q.   That's what you think the label should have

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 290

1    said in 1999?

2        A.    Yes.

3        Q.    That's on the basis of Munoz; is that right?

4        A.    Well, Munoz's work across 52 studies leading

5    to that.

6        Q.    And what else?

7        A.    And other studies that were available prior to

8    Munoz that suggested mortality was a concern.

9        Q.    We're on renal, ma'am, not mortality.

10        A.    I mean renal.

11        Q.    Okay.  What were the other studies before

12    1999?  You're looking at Exhibit 24?

13        A.    Sure.  Yes.  Let's see.  Certainly, Sundt was

14    13 out of -- let's see, that was --

15        Q.    Just tell me the studies that you believe

16    triggered an obligation by Bayer to change its labeling

17    with respect to renal issues.

18        A.    Sundt, '93, the trend towards creatinine was

19    -- Levy, '95.  D'Ambra had, yeah, differences in

20    creatinine, as well as renal dysfunction, and then the

21    Munoz article.

22        Q.    Anything else in 1999?

23        A.    Prior to 1999?

24        Q.    '99 or before.

25        A.    Oh, yes.  That there were -- there were

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 291

1    adverse events -- there were adverse events in the

2    database that were miscoded that did not include -- that

3    there were patients before 1999 that also had -- that

4    were miscoded and did not include the fact that their

5    renal dysfunction had progressed to dial -- to requiring

6    dialysis.  I think three out of 20, three out of 17

7    actually occurred in the time frame before Munoz.

8           So you have in this very small adverse event

9    database, so you have miscoded events that actually

10   failed to show that patients required dialysis, you have

11   the Munoz overall article, and then the other articles

12   that I mentioned, I believe certainly warrant a

13   statement in there that general -- attention needs to be

14   given to the general population receiving aprotinin for

15   incidences of renal dysfunction, which may include this,

16   this and this, and additional research is ongoing or

17   warranted.

18       Q.   That's what the label should have said, in

19   your opinion?

20       A.   Or words to that effect, yes.

21       Q.   Now --

22       A.   And it could even note that it was from

23   literature articles and from the company's internal

24   adverse event database.

25       Q.   You've not done an analysis of that internal

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 292

1   adverse event database as it was in 1999, have you?

2        A.   Yes.  I checked --

3        Q.   You have done an analysis of the entire Bayer

4   internal adverse event database in -- as it existed in

5   1999.  Is that your testimony?

6        A.   I did an analysis of the entire database of

7   miscoded renal events where the renal events were

8   minimized and dialysis was not included, specifically

9   checking for the time course -- the time periods in

10  which patients received the drug.

11       Q.   You're testifying that you did an independent

12  analysis of that?  You looked at the whole database and

13  tried to determine when renal events were miscoded in

14  every adverse event report?

15       A.   No.  I was given a section of the database

16  that included 17 or 20 adverse events that were miscoded

17  to not include dialysis, and I reviewed those looking

18  for, first, did I agree with those analyses, and

19  secondly, did any of them occur in 1999 or earlier.

20       Q.   And who gave you that?

21       A.   Counsel.

22       Q.   Plaintiffs' counsel here?

23       A.   Yes.

24       Q.   Did you ask to see any other adverse event

25  reports in the Bayer database?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 293

1      A.   I don't recall if I asked for the death events

2   or not.  I don't recall.  I can't remember.  I can't

3   remember.

4      Q.   So you don't recall whether you asked to see

5   any other adverse event report in the Bayer database.

6   Is that right?

7      A.   Well, I was only interested in renal events

8   and mortality events, and I specifically recall

9   reviewing the renal events.

10      Q.   The ones that Counsel gave you; right?

11      A.   Well, no.  It was listed in other areas that

12   there had been a miscoding of renal events and the ones

13   requiring dialysis had not been included, so I asked to

14   see those.

15      Q.   At no time did you ask to see all of the

16   adverse event reports in the Bayer database.  Correct?

17      A.   I did not.

18      Q.   In paragraph 103, Page 43, you write that,

19   "Adverse renal effects of Trasylol were apparent prior

20   to the launch of the product in United States."  Do you

21   see that?

22      A.   Yes.

23      Q.   Do you mean prior to December 1993?

24      A.   Well, prior to the approval and launch, yes.

25      Q.   And you'll agree with me that the FDA was

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 294

1    aware of these alleged adverse renal effects before the

2    FDA approved Trasylol in the United States.  Correct?

3         A.   Yes, I would -- yes, I would believe FDA knew

4    what was in the NDA.

5         Q.   Also in paragraph 103, a little bit further

6    down you say, "During the '94 and '98 period, several

7    studies had noted either increased rates of renal

8    dysfunction, more frequent elevations of serum

9    creatinine, or a prolongation of the time required for

10   creatinine values to normalize."  And then you mention

11   in '99, the Munoz article.  Do you see that?

12        A.   Uh-huh.

13        Q.   Are you referring to any studies between '94

14   and '98 that you haven't already described in your

15   earlier answer today?

16        A.   Munoz may have some additional ones in his

17   review, his 52, I think 52 studies in his review, but I

18   did not specifically review any other ones other than

19   the ones I have listed here.

20        Q.   On Exhibit 24?

21        A.   Yes.  So there may -- Munoz may well have

22   included ones additional to the ones that I had, but I

23   don't recall specifically reviewing his additional

24   studies.

25        Q.   But when you write in your report several

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 295

1    studies had noted various outcomes on renal issues, the

2    ones you're referring to are the ones between '94 and

3    '98 listed in Exhibit 24.  Is that right?

4         A.   Yeah.  And any others that are in my report,

5    if I missed any and put them on this list, but I don't

6    think so.  I think I have them all.  And the information

7    I just told you about the adverse event database.

8         Q.   What additional data regarding alleged adverse

9    renal events between the years '94 and 2005 do you

10   believe that the label did not account for?  I'm looking

11   at paragraph 102 of your report.

12        So I believe you've already described '94 to

13   '99.  Is that right?

14        A.   Yes.

15        Q.   Okay.  Tell me what else you're referring to

16   up in paragraph 102 of your report?

17        A.   And you're breaking this one where, 2005?

18        Q.   2004 to 2000 -- from 1994 to 2005.

19        A.   Okay.  Well, let's see.  Kress and Stone

20   indicated greater increase -- greater rates of renal

21   failure.  Kincaid in looking at drug interactions and

22   reported more.  And then there were additional ones, of

23   course, during that period in the adverse event database

24   that occurred between 1999 and 2000, whatever you told

25   me, '4 or '5.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 296

1      Q.    Anything else that you're relying on for your
2  statement in paragraph 102 that the changes that were
3  made to the label between 1994 and 2005 failed to
4  account for additional data describing the increased
5  risks associated with Trasylol?
6      A.    I would have to check -- there's two others
7  that I don't have on here that I would have to check.
8      Q.    What are they?
9      A.    The German 2003 data and the Mangano article.
10      Q.    The Mangano was published in 2006; right?
11      A.    Two.
12      Q.    You're talking about the aspirin study?
13      A.    Yeah.  I was just going to look at that one,
14  too.  And I can't -- I don't have it listed on there
15  whether they have renal events listed.  The ones I have
16  here are the Kress and Stone and Kincaid article, and I
17  have no idea who's on the list with Brown in 2006, who
18  did the follow-up to Munoz.  And then I have the adverse
19  events from the internal database that miscoded and
20  neglected to include that it had advanced to dialysis
21  requiring.
22      Q.    Okay.  In that group of studies that you just
23  referred to or that group of data, I want to confirm
24  that's the additional data to which you are referring in
25  paragraph 102 when you say that label changes made from

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 297

1    '94 to 2005 "failed to account for additional data

2    describing increased risks," renal risks.

3            MR. MOSKOW:  Object to form.

4    BY MR. DERRINGER:

5        Q.   Is that right?

6            MR. MOSKOW:  Object to form.  You can answer.

7        A.   Hold on a second, I want to check something

8    before I answer that.  Hold one second, let me get book

9    one and three.  I'll get it.

10           Okay.  Yeah.  There were additional ones in

11   the internal database during that time period that

12   included dialysis that were not reported.

13   BY MR. DERRINGER:

14       Q.   You're talking about additional adverse event

15   reports?

16       A.   Yes.

17       Q.   And you're claiming that those were not

18   reported, those reports were not submitted to the FDA?

19       A.   No.  I'm saying the same thing I said before,

20   they did not include dialysis.  They did not include

21   dialysis in the coding section, but if one reads the

22   reviews, we'll see evidence of dialysis.

23       Q.   Okay.  But you're not going to testify that

24   any of those adverse event reports that you've been

25   talking about were not submitted to the FDA, will you?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 298

 1     A.   I don't know if I -- I didn't specifically
 2   look at that.
 3     Q.   Okay.  So now that you've checked your binder,
 4   I think that the list you gave us -- well, see if you
 5   can do it for me.  What are, in paragraph 102, the
 6   additional data to which you're referring that was going
 7   on between 1994 and 2005 that you believe was not
 8   described in the label?  You talked about Kress --
 9     A.   I thought I did that already.
10     Q.   Well, I want to make sure I've got your
11   complete list.  Go ahead.
12     A.   Okay.  We talked about their internal
13   database, Kress and Kincaid -- Kress and Kincaid.
14     Q.   Anything else?
15     A.   I don't have the renal outcomes from the
16   2002/2003 Mangano and -- I don't know about those.  I
17   have those under mortality only.
18     Q.   Okay.  Anything else?
19     A.   Those two studies and -- yeah.  Those two
20   studies and their own internal database continued to
21   support that they had worsening of renal function during
22   that time period.
23     Q.   '94 to 2005; right?
24     A.   No.  I stopped at '99.
25     Q.   I'm sorry, '99 to 2005; correct?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 299

1      A.    Yes.  And I'd have to check on those other
2   two.  Plus, all the results that are in Brown's article.
3      Q.    That's 2006; right?
4      A.    Yeah.  But you can do it by date.
5      Q.    In paragraph 103, at the very end, last page
6   of your report, you write that, "the label did not
7   provide an accurate risk-benefit profile regarding renal
8   events prior to 2006."  Do you see that?
9      A.    Yes.
10     Q.    Do you agree that after December of 2006, the
11  labeling did provide an accurate risk-benefit profile
12  regarding renal events?
13     A.    Well, the label after 2006 included the
14  information that had been in their database since 2001,
15  so it was a help.  It increase -- it showed an increase
16  in renal dysfunction from their own internal control
17  database.
18     Q.    How about if you answer my question.  Do you
19  agree that after December of 2006, the labeling for
20  Trasylol did provide an accurate risk-benefit profile
21  regarding renal events, yes or no?
22          MR. MOSKOW:  Object to form, asked and
23      answered.  You can answer.
24     A.    Yes.  It was certainly better in that it
25  included mortality data from their own controlled

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 300

1   databases, albeit some years later.  It did not include

2   other avenues, it did not include the adverse event

3   database, et cetera.  But it did include for the first

4   time that there is mortality across -- I mean renal

5   events across the board.

6   BY MR. DERRINGER:

7       Q.   Do you believe that that December 2006 label

8   provided an accurate risk-benefit profile regarding

9   renal events?

10      A.   Well, the profile specifically says this is

11  based on the controlled clinical trial database, so yes,

12  I think it was accurate for what it specifically said it

13  was doing.

14      Q.   Has the Trasylol labeling, if you know,

15  Dr. Blume, ever suggested or recommended that more than

16  a full dose of Trasylol be used?

17      A.   I don't think so.

18      Q.   Can you cite to me one study completed or

19  published by 2002 that demonstrated an association

20  between Trasylol and renal failure requiring dialysis?

21      A.   Okay.  Now -- okay.  I'm in a puzzle here.

22  Between '98 and 2002 --

23      Q.   No.  Any study completed or published by 2002.

24      A.   So we're limiting it to 2002.

25      Q.   No.  By 2002.  Any time in 2002 or before, can

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 301

1    you tell me one study that demonstrated an association

2    between Trasylol and renal failure requiring dialysis?

3        A.   Requiring dialysis.  Yeah.  I don't have it

4    coded this way on the chart.  I think Munoz looks at

5    that, but I don't -- I don't know.  I can't answer it, I

6    don't know the answer.

7        Q.   Can you name a clinical trial that shows a

8    statistically significant increased risk of renal

9    failure with aprotinin?  This is at any time, ma'am.

10       A.   At any time now?

11       Q.   Yes.

12       A.   For any type of renal -- what's the limitation

13   on the renal?

14       Q.   Renal failure, statistically significant

15   increased risk of renal failure with aprotinin, clinical

16   trial.

17       A.   Okay.  Mangano 2006 says significant increase

18   in the risk of renal events.

19       Q.   That's not a clinical trial, ma'am.

20       A.   Oh, I see.  We have it limited now to a

21   clinical trial.  So you mean prospectively designed

22   clinical trials?

23       Q.   I'm talking about clinical trials, correct,

24   not epidemiological studies, not observational studies.

25            Can you name a clinical trial that shows a

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 302

 1   statistically significant increased risk of renal

 2   failure with aprotinin?

 3       A.    No.  All the -- I don't know of one -- I don't

 4   know of any trials done by your client for that, and

 5   those studies that were done by others are, as they

 6   generally are, database studies or epidemiology studies.

 7       Q.   Can you name a clinical trial that shows a

 8   statistically significant increased risk of mortality

 9   with aprotinin compared to placebo?

10       A.   Clinical trial for mortality, so you're asking

11   if someone did a clinical trial with mortality as an end

12   point?

13       Q.   I'm asking if you can name a clinical trial

14   that shows a statistically significant increased risk of

15   mortality with aprotinin compared to placebo?

16       A.   I can't even imagine how that type of study

17   would be done.

18       Q.   Can you name one?

19       A.   Let's see.  TRA-BO5 did deaths between placebo

20   and aprotinin, placebo-controlled, but all I have here

21   is that it was nine-to-two.  I don't know if that

22   reached statistical significance, I'd have to check, but

23   that appears to be a placebo-controlled clinical trial

24   where there was a fourfold increase in death relative to

25   placebo.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 303

1      Q.    Anything else?

2      A.    Let's see.  Death in the -- retrospective, the

3    Sundt trial was seven-to-one, seven times more frequent

4    with Sundt.  Oh, actually, on the renal trial, there was

5    a significant difference in the Levy trial relative in

6    the prolongation of time for creatinine to return to

7    normal, decline in the hypercreatinemia state relative

8    to the placebo, so I'd have to change that answer.  Levy

9    '95 was significant.

10     Q.    That's not renal failure, ma'am.  That was my

11   question.

12     A.    Oh, renal -- you're right.  Well, it was a

13   renal event, the creatinine shot up.

14     Q.    Other than Sundt and TRA-BO5 --

15     A.    I'm looking at D'Ambra if it had --

16     Q.    -- can you name a clinical trial that shows a

17   statistically significant increased risk of mortality

18   with aprotinin compared to placebo?

19     A.    I'd have to check D'Ambra if that was

20   statistically significant because that had a placebo in

21   it, 11 percent to zero percent.

22     Q.    Anything else?

23     A.    I'll check that one because that was renal

24   failure.  And I can't even imagine how you would do a

25   mortality trial.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 304

1           But I don't know -- all of the mortality data

2     that I have on my chart that confirmed increased death

3     rates with aprotinin compared to others were from --

4     were from studies, database or epidemiology studies.

5          Q.   Okay.  Can you name any observational --

6          A.   Oh, wait a minute.  Wait a minute.  Wait a

7     minute.  Wait a minute.  Wait a minute.  BART, BART is a

8     randomized blinded trial.

9          Q.   Yeah.  I said compared to placebo, ma'am.

10         A.    Well, okay.  Notwithstanding that, the death

11    rate was different in a randomized blinded clinical

12    trial, aprotinin and other products, the other, the

13    Lysine.

14         Q.    So now you're continuing to answer a question

15    I haven't asked.

16         A.    I'm just trying to be complete.  I'm having

17    trouble keeping up with the variables that precede.

18    They change with each question.

19         Q.    I'm asking the questions.

20         A.    BART would be an example of a nonplacebo study

21    but with a positive control, although it was blinded,

22    and the rate of deaths were significantly different.

23              MR. DERRINGER:  I'll move to strike that,

24         nonresponsive.

25    BY MR. DERRINGER:

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 305

1      Q.    Can you name any observational study published

2   prior to 2006, ma'am, that showed a statistically

3   significant increased risk of renal failure with

4   aprotinin?

5      A.    Prior to 2006?

6      Q.    Correct.

7      A.    So -- okay.  Prior to 2006 that shows

8   statistical renal failure.  Kincaid had a confidence

9   interval that was statistically significant.

10     Q.    Not an observational study, I don't believe.

11  But you know what, I'll take it.  Kincaid is one you

12  would list of renal failure, aprotinin --

13     A.    Aprotinin associated renal failure.

14     Q.    Okay.  So that's Kincaid.  What else?

15     A.    Kress and Stone, I have to check that, but

16  that's a retrospective review.

17     Q.    I'm looking for an observational study.  Any

18  observational study published prior to 2006 that showed

19  a statistically increased risk of renal failure with

20  aprotinin.  You've mentioned Kincaid?

21     A.    Kress and Stone wasn't published, I guess that

22  one comes out in your analogy.  We talked about TRA-BO,

23  we talked about Sundt, significant difference of Levy,

24  D'Ambra.  I think that's it.  And what year did you say?

25     Q.    2006.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 306

1    A.   Okay.  So the follow-up to Munoz, the Brown

2  data showed a significant difference in renal failure

3  across studies in 2006.

4    Q.   Is that your testimony, you believe that the

5  Brown follow-up in 2006 showed a statistically

6  significant increased risk of renal failure with

7  Trasylol?

8    A.   I have a confidence inter -- no, renal

9  dysfunction, 1.47.

10    Q.   I'm talking about renal failure.

11    A.   I have it coded as renal function.  I'm not

12  sure what this was.

13    Q.   You'd have to go back and look?

14    A.   Renal dysfunction.

15    Q.   You'd have to go back and look at that study?

16    A.   Yeah.  But they had statistical significance

17  and whatever the omnibus term was of renal dysfunction,

18  but I don't know if that extended -- I don't know if

19  that -- I don't know if he had a separate subset, I

20  don't think he did, for renal failure, but I'd have to

21  check that.

22    Q.   Okay.  Take a look at Exhibit 30 which I put

23  in front of you.  This is the Mangano 2002 aspirin

24  publication.  Can you show me anywhere in here where

25  there is any data showing the relative risk of aprotinin

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 307

1  standing alone of mortality?

2      A.   No.  And I didn't say that.  I said that the

3  subsequent analyses that were done later broke out

4  aprotinin -- well, broke out the other ones.  The only

5  thing that's in the 2002 is to show that across the

6  board, there is a significant risk in those patients who

7  were given an antifibrinolytic compared to those who

8  were given the aspirin.

9      Q.   That actually only -- that only exists with

10  patients who had aspirin as well as the

11  antifibrinolytic.  Is that correct?

12      A.   Right.

13      Q.   For patients who did not receive aspirin and

14  did receive an antifibrinolytic, there was no

15  statistically significant increased risk of death.

16  Correct?

17      A.   I'm sorry, can you point to me where you're

18  talking -- from where you're reading?

19      Q.   I'm not reading.  I'm asking you about the

20  data in this study.  Look at panel B on Page 1314.

21      A.   Panel B, no antifibrinolytic therapy and --

22  yes.  The patients who received antifibrinolytic

23  therapy, 3,659, were compared with the ones who did not.

24      Q.   And among those who did not have aspirin

25  administered, there was no statistically significant

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 308

1    difference in mortality between those that received

2    antifibrinolytic therapy and those who did not.

3    Correct?

4        A.   Yes.  It's in -- it's in the group that

5    received the aspirin where we see the increase in the

6    death rate.

7        Q.   And can you show me anything at all in Mangano

8    2002 that presents any data separately for aprotinin?

9        A.   No.  But I've already said that three times,

10   it's not in here, it's in the work that followed later.

11       Q.   That's the 2006 publication?

12       A.   Well, actually, I think it was available -- I

13   think it was available before 2006.  The data from this

14   observation was broken down into the individual

15   antifibrinolytic agents.

16       Q.   And that was published for the first time in

17   2006.  Correct?

18       A.   Yes, but it was available.  It was available.

19       Q.   Available to whom?

20       A.   It was known to Bayer.

21       Q.   And that's on the basis of your review of

22   documents in this case.  Correct?

23       A.   Yes.

24       Q.   Have you ever spoken to anybody at Bayer about

25   that issue?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 309

1      A.   Oh, no.  It was only based upon my review of

2    the E-mails back and forth between Bayer and

3    Dr. Lesserson.

4      Q.   The Kress/Stone report that you refer to in

5    your expert report, that was a post-marketing study.

6    Correct?

7      A.   Yes.

8      Q.   That was not peer-reviewed, was it?

9      A.   I don't recall.  I don't -- I don't think so.

10   I don't know.

11     Q.   Have you ever spoken to anyone or otherwise

12   communicated with anyone at the St. Luke's Hospital in

13   Milwaukee, Wisconsin, to your knowledge?

14     A.   Since working on Trasylol, no.

15     Q.   Have you ever spoken or otherwise communicated

16   with Dr. Kress?

17     A.   No.

18     Q.   Or Dr. Stone?

19     A.   No.

20     Q.   Have you ever spoken to or otherwise

21   communicated with anyone at Bayer about the Kress/Stone

22   report?

23     A.   No.  As I told you this morning, I haven't

24   talked with anyone with Bayer at all.

25     Q.   The Treasure report, that's a post-marketing

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 310

1   study.  Correct?

2        A.    Yes.

3        Q.    That was conducted outside of the United

4   States.  Is that correct?

5        A.    St. George, yes.

6        Q.    That also was not a peer-reviewed study.

7   Correct?

8        A.    Are you referring to peer review as in

9   publication or peer review within the hospitals -- the

10  hospital review board?

11       Q.    Well, either one.

12       A.    Well, it would have been reviewed before it

13  was done in a hospital-based study.

14       Q.    It would have been reviewed before it was done

15  you said?

16       A.    Well, the hospital review board would have had

17  to allow the study to happen.

18       Q.    Right.  The report that you're relying on that

19  you cite to in your -- in your Exhibit 1 here, your

20  report, the report of the St. George study, that wasn't

21  peer-reviewed.  Correct?

22       A.    I didn't -- I don't think -- I didn't see that

23  it did, no.

24       Q.    Have you ever spoken or otherwise communicated

25  with any person involved in the St. George Treasure

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 311

 1   study?

 2       A.   No.

 3       Q.   Would you defer to the study authors of the

 4   Treasure report as to whether there was a reasonable

 5   possibility that Trasylol caused any of the adverse

 6   experiences that are reflected in the St. George

 7   Treasure report?

 8       A.   We're dealing with mortality here.  From a

 9   pharmacovigilance perspective, I would collect all the

10   data across all studies and evaluate the data.  Whether

11   it is deemed to be caused or not caused specifically by

12   the drug is, of course, of interest; but it doesn't

13   impact calculations that are done when one is comparing

14   the frequency of an event occurring in patients compared

15   with what is anticipated to occur.

16            So yes, I would be interested in it from an

17   individual patient's, but it doesn't take away from the

18   fact that there were increased death rates seen across

19   several studies, including one that was done at that

20   hospital.  So I would not take it out of the list

21   because some -- the physicians who were conducting the

22   study didn't specifically think that the drug caused the

23   event.  The outcome is there were more with the patients

24   who received the drug than who didn't receive the drug.

25       Q.   Would you defer to the study authors of the

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 312

1   Treasure, St. George report, as to whether there was a

2   reasonable possibility that Trasylol caused any of the

3   adverse experiences that are reflected in that report?

4       A.   Well, I thought I just answered that.  I would

5   defer to them for their opinions, their opinions with

6   individual patients; but I would include the information

7   in the listing of events -- in listing of studies that

8   showed an increase in mortality.

9       Q.   Bayer provided the FDA with a full copy of the

10  St. George Treasure report in November of 2006.

11  Correct?

12      A.   Let's see, they provided one or didn't provide

13  one.  St. George, I believe they did -- yes, St. George

14  they provided, belatedly, but they provided it.  I think

15  it was Kress and Stone that the report did not get

16  attached.

17      Q.   The revised Trasylol labeling that FDA

18  approved in December 2006 doesn't mention anything about

19  the St. George Treasure report, does it?

20      A.   No.  I -- no.  I thought I answered this

21  already.  I mean, they were waiting for the -- they were

22  waiting for the BART study, and we know what happened

23  when the BART study occurred.

24      Q.   Okay.  Now you're speculating about what was

25  in the mind of the FDA?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 313

 1              MR. MOSKOW:  Object to form.  You can answer.

 2         A.    No.  The advisory committee indicated they

 3    were going to not take any action on the mortality until

 4    they were going to be looking at the results of the

 5    ongoing BART study that had been discussed at the

 6    advisory committee meeting.  And we do know that when

 7    the BART data came out, the product was discontinued

 8    from the United States.

 9    BY MR. DERRINGER:

10         Q.    Which advisory committee meeting are you

11    talking about that said that they were going to wait?

12         A.    The second one.

13         Q.    The second one.  That wasn't the first one.

14    The first one --

15         A.    Well, the first one was renal.  The first one

16    was more directed to the renal concerns with

17    Dr. Karkouti's article, Dr. Mangano's latest article,

18    and based on that, they did change the labeling.  But

19    after that -- from what I understand, right after that

20    meeting it became -- the FDA became aware from

21    Dr. Walker that there was a mortality concern with I3.

22    So really, mortality was not discussed at the 2006

23    meeting.

24         Q.    Okay.  Now, let me get an answer to my

25    original question.  The revised Trasylol labeling that

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 314

1    FDA approved in December 2006 doesn't mention anything

2    about the St. George Treasure report, does it?

3           MR. MOSKOW:  Asked and answered.  You can

4      answer.

5           MR. DERRINGER:  Not answered.

6      A.   I did answer it.  Correct, it does not mention

7    it.

8    BY MR. DERRINGER:

9      Q.   Now you answered it.  Thank you.

10          You have referred in your report and today to

11   knowledge that Bayer had about Dr. Mangano's data.  In

12   your report you talk about that as being in 2003, 2004.

13          If you look at paragraphs 51 and 56 of your

14   report, I've identified those as the paragraphs in which

15   you discuss this subject.  Could you just confirm that

16   that's the subject that you are -- or that -- strike

17   that.  Could you confirm that that subject is discussed

18   in paragraphs 51 and 56 of your report?

19     A.   I think those -- I think those paragraphs are

20   discussing that.

21     Q.   In fact, in those paragraphs you specifically

22   cite to Bayer documents.  Is that right?

23     A.   I'm going to get the notebook that has 54, 55

24   and 56 in it.

25          MR. MOSKOW:  Here's 54.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 315

1            THE DEPONENT:  And I need the other two.

2       Okay.  54 --

3    BY MR. DERRINGER:

4       Q.   Fifty-four is not one of the paragraphs,

5    ma'am.

6       A.   Okay.  55 --

7       Q.   Neither is 55.  51 and 56.

8            MR. MOSKOW:  All right.  Here's 56.

9            THE DEPONENT:  Okay.  And then 51.  Okay.  In

10      56, the historical perspective indicates that in

11      June, the period between June and September of

12      2003 --

13   BY MR. DERRINGER:

14      Q.   Okay.  Ma'am, I am not asking you to read

15   documents.  There's not -- the only question that I've

16   asked is that paragraphs 51 and 56, you specifically

17   cite to Bayer documents.  Is that right?  That's the

18   question.

19      A.   Yes.

20      Q.   Okay.  I am handing you Exhibit 31, which is a

21   group exhibit of the documents, the internal Bayer

22   documents that you cite in paragraphs 51 and 56 of your

23   report.

24           Are these the documents in Exhibit 31 upon

25   which you are relying to make your statements that are

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 316

1    in paragraphs 51 and 56 about when Bayer became aware of

2    certain information maintained by Dr. Mangano and what

3    that information was?

4        A.   Do I have the Ciavaglia deposition?

5        Q.   That's not in Exhibit 31, but I'll go ahead

6    and acknowledge that you also refer to the Ciavaglia

7    deposition at Pages 95 to 99.

8        A.   Now, you said 31, do you mean 31 or 51?

9             MR. MOSKOW:  It's Exhibit 31.

10            THE DEPONENT:  For 51 paragraph.

11            MR. MOSKOW:  For 51 and 56.

12            THE DEPONENT:  Yes.  I have Ciavaglia's

13       deposition in there as well.

14   BY MR. DERRINGER:

15       Q.   Right.  Other than Ciavaglia's deposition at

16   Pages 50 -- excuse me, 95 to 99, does Exhibit 31 contain

17   all of the documents upon which you are relying to make

18   your statements in paragraphs 51 and 56 about when Bayer

19   became aware of certain information maintained by

20   Dr. Mangano and what that information was?

21       A.   485289.  Am I doing 56 as well, paragraph 56

22   as well?

23            MR. MOSKOW:  I'll stipulate for the record

24       that the ones that are in 56 are included in 31.

25            THE DEPONENT:  Okay.  Yes.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 317

 1    BY MR. DERRINGER:

 2         Q.    Okay.  But the answer to my question was yes.

 3    Right?

 4         A.    Yes.

 5         Q.    Okay.

 6         A.    Your question was were they all in here?

 7         Q.    My question is, does Exhibit 31 -- my question

 8    is, in addition to the Ciavaglia deposition, Pages 95 to

 9    99, which you cite at paragraph 51 of your report, does

10    Exhibit 31 contain all of the documents upon which you

11    are relying to make your statements in paragraphs 51 and

12    56 about when Bayer became aware of certain information

13    maintained by Dr. Mangano and what that information was?

14         A.    And the deposition, yes.

15         Q.    The Ciavaglia deposition?

16         A.    Yes.  That's not on here.

17         Q.    Are you aware of anything that prevented

18    Dr. Mangano from going directly to the FDA with the

19    information he had about aprotinin in 2003 or 2004 or

20    2005?

21              MR. MOSKOW:  Objection to form.  You can

22         answer.

23         A.    Yeah, I have no idea if they had a

24    confidentiality relationship with him.  I don't know.

25    BY MR. DERRINGER:

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 318

1    Q.   Well, I'm just asking if you're aware of

2  anything that prevented Dr. Mangano from going directly

3  to the FDA with the information that he had about

4  aprotinin in 2003, 2004 or 2005?

5    A.   And the answer is I don't know if Dr. Mangano

6  had agreements with Bayer or with his employees with the

7  various people at Bayer they interacted that would allow

8  that or not allow that.  I don't know.

9    Q.   Are you aware of anything that prevented

10  Dr. Mangano from going directly to Bayer with all of the

11  data that he had about aprotinin in 2003, 2004 or 2005?

12        MR. MOSKOW:  Object to form.  You can answer.

13    A.   For him to go to Bayer.  I haven't seen any of

14  his contracts, but I don't know of anything that would

15  have prevented him from going to Bayer.

16  BY MR. DERRINGER:

17    Q.   Paragraph 56 -- well, we can skip that.

18        Dr. Blume, you're familiar with advisory

19  committees.  Right?

20    A.   Yes.

21    Q.   One reason that the FDA can -- well, the FDA

22  uses advisory committees to obtain independent expert

23  advice on scientific matters.  Correct?

24    A.   Yes.

25    Q.   One reason the FDA convenes an advisory

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 319

1   committee is when there's a question about the

2   interpretation of data.  Correct?

3       A.   Well, that could be a reason, yes.

4       Q.   Can you -- let's go to Page 60 -- paragraph

5   64.  What information, what materials did you review

6   related to the I3 study?  Is it all described in this

7   paragraph here, these Bates numbers?

8       A.   Well, I discuss I3 in more than one paragraph.

9       Q.   Let me maybe ask it a different way.  What I3

10  study materials do you recall reviewing?  I'm not

11  talking about E-mails relating to the start of the study

12  or the progress of the study, I mean the actual study

13  materials, protocols, procedures, proposals, preliminary

14  reports, analyses of the data.

15      A.   I recall seeing analyses of the data.

16      Q.   What analyses?

17      A.   Variety of -- a variety of sheets with

18  different end points.

19      Q.   And those would be included in your materials

20  reviewed lists.  Correct?

21      A.   Either in the cited or materials reviewed.

22      Q.   I'm sorry, either in the cited or materials

23  reviewed?

24      A.   Yes.  If I cited them specifically, they would

25  be in here; if not cited specifically, it would be with

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 320

 1   my materials I sent to you with reviewed.

 2       Q.    Okay.  We've discussed those materials earlier

 3   in today's deposition.

 4       A.    Right.  I recall seeing the contract, the

 5   schedule of events, the due dates of it.  I recall

 6   multiple E-mails relating to the study, E-mails from --

 7       Q.    My question was prefaced by not asking about

 8   that.  I'm talking about analyses of the data, the data,

 9   I'm talking about study reports.

10       A.    Uh-huh.  Right.  I recall -- I recall a data,

11   series of data arrays, and I recall Dr. Walker talking

12   about analyses in his E-mails.  And the schedule of

13   events, the timetable, the rest of the contract, and the

14   others were just general E-mails.

15       Q.    The preliminary report of the I3 study that's

16   dated September 13, 2006, that was not peer-reviewed.

17   Correct?

18       A.    Okay.  Please clarify.  For a study that

19   was -- a private study that was contracted with the

20   Premier Ingenix group, to what are you referring that

21   peer review?

22       Q.    Did anybody other than the authors of the

23   study review it when it was given to Bayer -- at the

24   time it was given to Bayer on -- I'm sorry, strike that.

25            The preliminary report dated September 13th,

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 321

1   2006, do you know if it was reviewed by anybody other

2   than the study authors?

3       A.   I don't know.  Are you asking if it were sent

4   out to some outside board to review?

5       Q.   You're familiar with what peer review is.

6   Right?

7       A.   Well, I'm certainly familiar with peer review

8   within the context of a journal, a journal or a hospital

9   peer review board, but --

10      Q.   Are you aware of a journal review board or any

11  hospital review board that reviewed the preliminary

12  report of the I3 study dated December 13, 2006?

13      A.   No.  I don't recall seeing the provision for

14  that to happen with a private database study, that's why

15  I'm a little confused by this.

16      Q.   Would you defer, ma'am, to an epidemiologist

17  to interpret and analyze the I3 study?

18      A.   With respect to the design of the epidemiology

19  study and the methods in which --

20      Q.   And the interpretation of the results.

21      A.   -- the methods in which the data were

22  collected, perhaps.  Perhaps.

23      Q.   Would you defer --

24      A.   But the need to report the data and the

25  regulatory ramifications of the I3 and its absence from

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 322

1   the FDA's package, no, I wouldn't defer to an

2   epidemiologist for that.

3      Q.   Yeah.  That wasn't my question.  But you would

4   defer to an epidemiologist to interpret and analyze the

5   I3 study.  Correct?

6          MR. MOSKOW:  Asked and answered.

7      A.   Yes.

8   BY MR. DERRINGER:

9      Q.   Would you defer to a cardiac surgeon or a

10  nephrologist to determine the relevance of the I3 study,

11  the questions of clinical practice?

12         MR. MOSKOW:  Objection, form.

13     A.   If I were going to ask that question, I would

14  probably defer to someone who actually used the product.

15  BY MR. DERRINGER:

16     Q.   Paragraph 69, I want to focus on your

17  statement here where you say, "the committee again

18  deferred action pending additional data for the larger

19  powered study."  What action did the committee defer?

20     A.   Well, I'll have to read the minutes of the

21  meeting.

22     Q.   Let me get those for you.

23     A.   Okay.

24     Q.   I'm handing you Exhibit 32, Dr. Blume.  These

25  are the minutes and the vote from the September 2007 ad

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 323

1    comm meeting.  My question is, what action was deferred

2    by the committee?

3        A.   I also need the FDA's minutes from their

4    teleconference when -- in 2007 when the product was

5    discontinued because they discuss this meeting as well.

6        Q.   All right.  That's not my question.  I don't

7    have those with me because you're --

8        A.   Well, I have them, so I can find them.

9        Q.   Hold on.  Before you go and talk about the FDA

10   teleconference, I want you to answer what action the

11   committee deferred, the committee, the advisory

12   committee, what action did that committee defer pending

13   additional data from a larger powered study?

14       A.   Are you going to give me the transcript?

15   Because it says please refer to the transcript for the

16   details.

17       Q.   You'd have to look at the transcript in order

18   to determine what action was deferred.  Is that right?

19       A.   Well, you're not letting me go to the FDA

20   summary when they did the teleconference call, so.

21       Q.   I'm not talking about the teleconference.  I'm

22   talking about the actual advisory committee meeting

23   because that's what you said in your report.

24            MR. MOSKOW:  I'm going to interrupt.  You

25       know, Steve, I think the witness has indicated that

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 324

1        there is information about what happened at the
2        meeting that's reflected in the minutes of those --
3        the transcript of those advisory committee
4        proceedings that would be helpful to her in
5        answering your question.  She's unable to answer it
6        without that document.
7              MR. DERRINGER:  She had referred to a
8        teleconference with the FDA, and that's not what I'm
9        interested in because the opinion, the statement
10       here talks about action that the committee deferred.
11             MR. MOSKOW:  And I agree with you, she did say
12       that, and you said that's something different,
13       that's not what I'm asking you about.  And she said
14       well, then I need to see the transcript of the
15       proceeding.
16             MR. DERRINGER:  Okay.
17  BY MR. DERRINGER:
18       Q.   You have the transcript of the advisory
19  committee meeting?
20       A.   Yes.  We have it in the office.  I do not have
21  it in these notebooks.
22       Q.   Okay.  Because it's actually not something
23  that was cited as materials that you reviewed.  Correct?
24       A.   Well, I say right here in 69 that the
25  transcripts' lines and minutes can be found at.  I just

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 325

1    didn't include them because of how voluminous they were.

2        Q.   Right.   The transcript is quite long.   And

3    you'd have to go back to the transcript in order to let

4    us know what action the advisory committee in 2007

5    deferred pending additional data from a larger powered

6    study.   Is that right?

7        A.   Well, you keep cutting me off.   But the reason

8    I asked for the FDA teleconference is FDA summarized --

9    well, I mean, I wasn't at this meeting.   The FDA

10   summarized what happened at advisory committee one and

11   advisory committee two, and I was hoping by looking at

12   that teleconference it would give a summary of what

13   happened there so that we didn't have to go to the

14   transcript.

15       Q.   Okay.   We can deal with that -- or, Neal, you

16   can deal with that on direct, if you'd like.

17           Go to paragraph 31.

18           MR. MOSKOW:  Three one?

19           MR. DERRINGER:  Three one, yes.

20   BY MR. DERRINGER:

21       Q.   Are you there, ma'am?

22           MR. MOSKOW:  Dr. Blume, we're moving to --

23       he's withdrawing the question, so we can move to

24       paragraph 31.

25           MR. DERRINGER:  Well, I haven't withdrawn it.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 326

1          MR. MOSKOW:  We're moving on.

2          MR. DERRINGER:  Because it was not answered

3      and I'll move on.

4  BY MR. DERRINGER:

5      Q.   Paragraph 31, you say that Bayer was asked to

6  withdraw Trasylol from the U.S. marketplace in 2007.  Do

7  you see that?

8      A.   Yes.

9      Q.   Okay.  And you say it's "because of escalating

10  data linking the drug product to increases in mortality

11  compared to tranexamic acid and aminocaproic acid."  Do

12  you see that?

13      A.   Yes.

14      Q.   Okay.  Now, what you're talking about here is

15  the preliminary BART data shared by the BART

16  investigators in October of 2007?

17      A.   I'll just get 31, I think it has the phone

18  conference in it, maybe it will be easier.  Do you have

19  paragraph 31?

20          Okay.  I'll have to read a little bit of it,

21  but I'll get to the answer.  FDA is talking, "We," FDA,

22  "held another advisory committee in September 2007, this

23  one focusing on the mortality risks that these two

24  studies identified."  And they've already talked about

25  these two studies.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 327

1          "The committee recommending a randomized

2     controlled clinical trial."  Now, the Canadian study

3     that was done two weeks ago was a randomized controlled

4     study designed to, and it talks about the study.  "The

5     study was halted because Trasylol increased risk for

6     death compared with the two other drugs.  Based on that

7     preliminary finding of this most recent study, combined

8     with the fact that FDA doesn't expect to receive any

9     study data for another six to eight weeks, FDA has

10    requested that Bayer suspend Trasylol."

11       Q.   Right.  So the escalating data then that

12    you're referring to in paragraph 31 is that preliminary

13    BART data that was just described in what you read.

14    Correct?

15       A.   Well, before that, it says that after -- to

16    start it, it said, "After the September 2006 meeting,

17    FDA learned another study Bayer had commissioned

18    suggested Trasylol increased the risk for in-hospital

19    deaths in cardiac surgery patients.  Then a publication

20    in February of 2007 suggests that Trasylol increased

21    long-term mortality in patients undergoing cardiac

22    surgery.  We then held another advisory committee to

23    discuss these mortality risks.  The committee at that

24    time didn't find the results compelling enough to

25    warrant a withdrawal, so the committee recommended

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 328

1   another study review; specifically, the committee

2   recommended," and then it goes into the Canada study.

3       Q.   Into the Canada study?

4       A.   Review of the Canadian study, yes.

5       Q.   All I'm asking you, Dr. Blume, is that

6   paragraph 31, your language, your language now, you say

7   that, "Bayer was asked by FDA to withdraw Trasylol from

8   the U.S. marketplace in 2007 because of escalating data

9   linking the drug product to increases in mortality

10  compared to tranexamic acid and aminocaproic acid."

11  Just tell me what that escalating data was, please.

12      A.   That there was a third study that suggested

13  there was an increase in mortality.

14      Q.   And that study was the BART study; correct?

15      A.   Yes.

16      Q.   Okay.  Now, do you agree that Trasylol is

17  still available to doctors who want to use it?

18           MR. MOSKOW:  Object to form.

19      A.   I think there are special IND provisions for

20  those who have requested it, yes.

21  BY MR. DERRINGER:

22      Q.   Will you agree or do you agree that the

23  analysis of Trasylol by regulatory authorities did not

24  end in November of 2007?

25           MR. MOSKOW:  That's all regulatory

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 329

1     authorities?

2              MR. DERRINGER:  Yeah.

3              MR. MOSKOW:  If you know, you can answer the

4     question.

5        A.   Yes.  I included a statement in 2008 about a

6     permanent withdrawal.  Yes.  I understand that, yes.

7     BY MR. DERRINGER:

8        Q.   You understand that the analysis of Trasylol

9     by regulatory authorities did not end in November 2007.

10    Correct?

11       A.   I understand that, yes.

12       Q.   Okay.  And that further analysis of Trasylol

13    by regulatory authorities has been ongoing.  Correct?

14       A.   I did hear that, yes.

15       Q.   In other words, this marketing suspension in

16    November of 2007, that's not the end of the Trasylol

17    story.  Correct?

18             MR. MOSKOW:  Object to form.

19       A.   I think I have a 2008 announcement in here.

20    Yes, I agree it did not end in 2007.

21    BY MR. DERRINGER:

22       Q.   On the BART study, ma'am, you've never spoken

23    to any of the BART investigators about it, have you?

24       A.   I have not.

25       Q.   You've never spoken to anybody at Health

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 330

1    Canada about the BART study, have you?

2         A.    No.

3         Q.    Would you defer to an epidemiologist to

4    interpret and analyze the results and data of the BART

5    study?

6         A.    Well, I would refer to the FDA, and FDA

7    probably had their epidemiologist look at it, yes.

8         Q.    What about Health Canada, would you defer to

9    Health Canada's analysis of the BART study?

10        A.    I'm not familiar with Health Canada's

11   analysis.  I would certainly be interested in reading it

12   and comparing it with FDA's review.

13        Q.    Would you defer to a cardiac surgeon or a

14   nephrologist to determine the clinical relevance of the

15   BART study to questions of clinical practice?

16             MR. MOSKOW:  Object to form.  You can answer.

17        A.    I don't know how to answer that.  If there's

18   an increased risk of mortality, would I then defer to a

19   cardiac surgeon for interpretation of that event to

20   clinical practice?

21   BY MR. DERRINGER:

22        Q.    No.  Would you defer to a cardiac surgeon to

23   determine the relevance of the BART study to questions

24   of clinical practice?

25        A.    I don't know how to answer that when the end

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 331

1   point is death.

2       Q.   What's an expert advisory panel?

3       A.   In what respect?

4       Q.   In the Canadian regulatory scheme.

5       A.   My understanding it is similar -- well,

6   actually, it can have more of internal people from HPB

7   on the committee, but it's a group of -- a group of

8   scientists or a group of individuals who are asked to

9   address a specific set of questions relating to a

10  specific topic.

11      Q.   Health Canada is Canada's version of the FDA.

12  Is that right?

13      A.   Yeah.

14      Q.   And you've never served on an expert advisory

15  panel, have you?

16          MR. MOSKOW:  For Health Canada?

17          MR. DERRINGER:  Yes, for Health Canada.

18      A.   No.

19  BY MR. DERRINGER:

20      Q.   Are you aware that Health Canada convened an

21  expert advisory panel to examine the benefit-risk

22  profile of Trasylol in light of the BART study?

23      A.   I think I was aware of that.

24      Q.   Did you ever speak to anyone who participated

25  on that expert advisory panel?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 332

1        A.    No.

2        Q.    Will you agree that that expert advisory panel

3    reviewed more data and more information about the BART

4    study than you've reviewed?

5              MR. MOSKOW:  Object to form, calls for

6         speculation.  You can answer if you're able.

7        A.    Right.  I have no idea what was provided to

8    the advisory committee.

9    BY MR. DERRINGER:

10       Q.    Have you reviewed any materials that were

11   written by this expert advisory panel?

12       A.    No.

13       Q.    Do you know what the expert advisory panel

14   concluded at the end of its review about Trasylol's

15   risk-benefit profile?

16       A.    No.

17       Q.    Would you be interested in knowing about it?

18       A.    Of course.

19       Q.    Do you understand that the expert advisory

20   panel's findings from their review of Trasylol's

21   benefit-risk profile were communicated to Health Canada

22   for Health Canada to review and consider and make its

23   own findings?

24             MR. MOSKOW:  Object to the form.

25   BY MR. DERRINGER:

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 333

1      Q.   Are you aware of that?

2           MR. MOSKOW:  Object to form.  She's already

3      answered that in a previous question.  But if you're

4      able, go ahead.

5      A.   I know that that is the process when an

6   advisory committee finishes.  I do not specifically know

7   what Health Canada has said in response to their

8   advisory committee.

9   BY MR. DERRINGER:

10     Q.   Would you be interested in knowing what Health

11  Canada has said about the expert advisory panel's

12  conclusions regarding the risk-benefit profile of

13  Trasylol?

14     A.   Yes.

15     Q.   But that's not something you've reviewed?

16     A.   No.

17          MR. DERRINGER:  Why don't we go off the record

18     and change the tape.

19          THE VIDEOGRAPHER:  The time is 6:00.  We are

20     off the record.

21          (Off the record.)

22          THE VIDEOGRAPHER:  The time is 6:03 and we're

23     back on the record.

24  BY MR. DERRINGER:

25     Q.   Dr. Blume, could you turn to paragraph 49 of

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 334

1   your report.  Are you there?

2        A.    Yes.

3        Q.    Here you discuss the marketing authorization

4   for Trasylol being suspended in Italy in February of

5   1998.  Do you see that?

6        A.    What paragraph?

7        Q.    Forty-nine on Page 22.

8             MR. MOSKOW:  We were both at a different

9        paragraph, sorry.

10       A.    Yes.

11  BY MR. DERRINGER:

12       Q.    Your second sentence you say, "Based on a

13  review of provided documents, this suspension does not

14  appear to have been reported in either the NDA Annual

15  Report For Trasylol or the Periodic Adverse Drug

16  Experience Report as required."  Do you see that?

17       A.    Yes.

18       Q.    Okay.  I want to just make sure I understand

19  what you're saying here.  Are you claiming that Bayer

20  was required to report the fact of the Italian marketing

21  suspension to the FDA and that Bayer violated FDA

22  regulations and guidances by not doing so?

23       A.    Yes.  I could not find where the suspension

24  was provided in the documents that I had to the FDA, and

25  anything relating to the safety of your product, and the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 335

1    actions taken in foreign countries that relate to the

2    safety of your product, be it chemical or physiological

3    or patient safety, is to be reported to the FDA.  And I

4    couldn't find it in their -- in the documents relevant

5    to the time periods that this was occurring in Italy.

6        Q.    You claim that, "The marketing authorization

7    for Trasylol was suspended in Italy in February due, in

8    part, to higher mortality and myocardial infarction

9    rates associated with Trasylol compared to placebo."

10   Right?  That's what you write?

11       A.    Yes.

12       Q.    Okay.  You say "in part."  Why else was the

13   marketing authorization suspended?

14       A.    There were several things on there.  Germane

15   to this discussion would be the clinical, but I also

16   think that they were concerned with -- let me think.  I

17   think they were concerned with chemistry manufacturing-

18   related issues as well that may have -- that may have

19   safety ramifications.

20       Q.    They were concerned with bovine spongiform

21   encephalopathy.  Correct?

22       A.    Right.

23       Q.    That's BSE; right?

24       A.    Right.

25       Q.    That's also mad cow disease?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 336

1    A.   Yeah.  And that also -- given that that's a

2  potential -- or is a safety concern, that would have

3  necessitated alerting to the FDA.

4    Q.   Well, I'm not talking about the FDA right now.

5  I'm talking about your understanding of why the

6  marketing authorization for Trasylol was suspended in

7  Italy in February of 1998.

8    A.   My understanding is that the authorities were

9  concerned with the accumulation of the product, the

10  physical accumulation, potential chemistry components of

11  the product, and reports that there were MI's and higher

12  mortality.

13    Q.   Did you ever talk to anybody from the Italian

14  authorities about this subject?

15    A.   I thought I answered that earlier; but no, I

16  have not talked to anyone from Italy about an action

17  that took place in 1998.

18    Q.   Have you ever seen any document from an

19  Italian regulatory authority saying that the reason for

20  the marketing suspension of Trasylol is concern about

21  higher mortality and MI rates compared to placebo?

22    A.   I'll have to get -- let me get the documents

23  for this one.

24        MR. MOSKOW:  That's paragraph 49?

25        THE DEPONENT:  Yes.  The documents that I've

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 337

1          cited first is the Trasylol Project Team Meeting,

2          March 1998, in which -- let's see who signed this.

3          It's signed by the committee.  February 3rd, Italy

4          suspended marketing authorization for Trasylol based

5          on, number one, new data suggesting that bovine lung

6          should be considered a specified risk material; and

7          two, results of trial suggesting higher mortality

8          and myocardial rates of Trasylol versus placebo

9          group.

10   BY MR. DERRINGER:

11        Q.   Can you take a look at Exhibit 33, which I

12   just put in front of you, your Counsel has put in front

13   of you.  This is the Trasylol Project Team Meeting

14   document dated March 31, 1998.  Isn't that the document

15   you were just reading from?

16        A.   Yes.

17        Q.   Okay.  And you were reading from Page 3 of

18   that document.  Is that correct?

19        A.   No.  1.

20        Q.   Okay.

21        A.   Page 1.

22        Q.   The third bullet -- the fourth bullet point?

23        A.   One, two, three, fourth bullet.

24        Q.   Okay.  That bullet point is discussed in more

25   detail later on Page 3, isn't it?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 338

1      A.    Hold one second.  Okay.

2      Q.    Is it?

3      A.    Yes.

4      Q.    That's under EU Safety Concerns, is that

5    right, on Exhibit 33?

6      A.    Well, it's EU and it discusses Dutch -- the

7    Dutch actions and -- yes, it's here.

8      Q.    Okay.  Is this document the basis for your

9    knowledge of -- or your -- I'm sorry.

10          Is this document the basis for your statement

11   that the marketing authorization for Trasylol was

12   suspended in Italy in February 1998 due in part to

13   higher mortality and myocardial infarction rates

14   associated with Trasylol compared to placebo?

15     A.    That's the document I cite.

16     Q.    Is that the document you rely on?

17     A.    Well, it's the document I cite, yes.

18     Q.    Okay.  What studies were those that showed

19   higher mortality and myocardial infarction rates?

20     A.    Let's see.  They note two studies on Page 3.

21     Q.    That's the studies noted as 0434 and 0472?

22     A.    Yeah.  I'd have to look and see if those

23   are -- this is connecting with what they're talking

24   about on the front page.

25     Q.    Well, go ahead and do that.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 339

1           MR. MOSKOW:  Are you able to do that as you

2      sit here now?

3           THE DEPONENT:  No.  I'll have to get it out of

4      the database.  No, I didn't cite them.  I just cited

5      this document.  When you asked about the studies, I

6      can look for the studies in the database, but I

7      haven't looked at them.  I cited only this document.

8  BY MR. DERRINGER:

9      Q.   All I'm saying is this document talks about

10  "results of trials suggesting higher mortality and

11  myocardial infarction rates in Trasylol versus placebo

12  treatment groups."  Do you see that?

13     A.   Yes.

14     Q.   Okay.  And then in this same paragraph,

15  there's a note that actually identifies, quote, "both

16  studies."  Do you see that?

17     A.   Under EU Safety Concerns?

18     Q.   Yes, both studies.

19     A.   Yeah.  I'm not -- I wasn't really sure that it

20  did because it says articles in Script are citing a

21  controversy over the safety of Trasylol and suggesting

22  Bayer has not been prompt in the reporting of negative

23  study results.

24     Q.   Right.  And what does the next parenthetical

25  say?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 340

1    A.   These have been reported, both have been

2   reported to FDA, but I was never sure if the negative

3   press for Bayer on absence of reporting referred back to

4   Page 1 in the two studies they're talking about.

5    Q.   Okay.  Do you have any reason to dispute the

6   statement here in Exhibit 33 that both studies, 0434 and

7   0472, had previously been reported to the FDA?

8    A.   No.  And I don't know if they relate back

9   to -- actually, on Page 1, it says results of trials, it

10   doesn't really say two trials.

11    Q.   Well, trials could be two trials; right?

12    A.   Well, it could, but I have no --

13       MR. MOSKOW:  It could be.

14    A.   It could be or it could be 200.  I have no way

15   of linking these two with this one because they don't

16   give me the ability to link them.

17   BY MR. DERRINGER:

18    Q.   Okay.  My original question, ma'am, was if

19   you'd ever seen any document from an Italian regulatory

20   authority saying the reason for the marketing suspension

21   of Trasylol is concern about higher mortality and

22   myocardial infarction rates compared to placebo.

23    A.   Italian documents, I don't have them cited

24   here.  I don't recall seeing one.  But even if the event

25   were safety related because of the mad cow disease, it

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 341

1   would still have needed -- the report would still have

2   noted it needed to have been reported to the FDA because

3   it's a potential safety concern issued by another

4   company that led to an action; in this case, it was the

5   suspension of the marketing authorization.  So it's

6   still a safety-related concern that was required to be

7   given to FDA.

8       Q.   When evaluating the safety and efficacy of a

9   medicine, ma'am, isn't it true that you'd want to look

10  at the totality of the evidence about the medicine and

11  not just one or two studies?

12          MR. MOSKOW:  Objection to form.

13      A.   Well, certainly for the approval, you'd want

14  to look at the totality of both safety and efficacy

15  information.  But like it or not, if a foreign

16  government takes any action against a product that's

17  approved in the United States that leads to an action of

18  some sorts, labeling change, market, market influence,

19  it has to be reported to the U.S. FDA.

20  BY MR. DERRINGER:

21      Q.   I'm not talking about reporting requirements

22  now, Dr. Blume.  I'm just asking the question generally

23  speaking.  Okay.  Forget about the Italian situation,

24  I'm moving on to another subject, okay.

25          When evaluating the safety and efficacy of a

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 342

1    medicine, isn't it true that you'd want to look at the

2    totality of evidence about the medicine and not just at

3    one or two studies?

4         A.   I would say certainly for the initial

5    assessment, everything should be examined.  I think once

6    a product is on the market, if something new arises and

7    that event, even one or two of those events can be

8    catastrophic, it may well impact.  Certainly, there are

9    many examples of products that have been removed from

10   the market based on one or two isolated events.

11             MR. MOSKOW:  Steve, are we almost there?

12             MR. DERRINGER:  Yes.

13   BY MR. DERRINGER:

14        Q.   Do you agree, Dr. Blume, that statistical

15   significance is a traditional measure that's used by

16   epidemiologists and biostatisticians to determine

17   whether an observed difference between a drug and a

18   control is due to chance?

19        A.   Yes.

20        Q.   You agree that in the absence of a finding of

21   statistical significance, the observed result might be

22   due to chance?

23        A.   Well, I guess it could be.  But statistical

24   significance is not what is -- is required for

25   pharmacovigilance, although it may be employed by

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 343

1   epidemiologists.

2        Q.   You've been retained by plaintiffs in this

3   case to provide opinions and testimony against Bayer.

4   Correct?

5        A.   Well, they asked me to review the documents

6   and to examine the -- the use of the information in

7   labeling -- notifying healthcare providers and their

8   patients, and if there existed a need for any additional

9   actions to address those events.  So I don't know if

10  they specifically said it was against Bayer, it was to

11  look at their actions regarding the labeling and their

12  decisions relating to post-marketing studies.

13       Q.   Okay.  I'm not trying to be coy here at all.

14  Just in this case, you are providing testimony for the

15  plaintiffs and this is a case where Bayer is the

16  defendant.  Correct?

17       A.   Well, certainly Bayer is a defendant.  Whether

18  there's other defendants, I don't know, but Bayer is a

19  defendant.

20       Q.   Okay.  Can you tell me any other retentions

21  that you've -- into which you've been engaged in cases

22  against Bayer?

23       A.   Yes.  Baycol, and there is potentially another

24  one, but I do not believe it's been finalized, so I'm

25  not going to mention anything.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 344

1      Q.   You've not been retained?

2      A.   I don't know if we're going -- I don't know if

3   I'm going -- the decision hasn't been made whether I

4   want to participate.

5      Q.   Can you name something that Bayer did that was

6   reasonable with respect to Trasylol?

7           MR. MOSKOW:  I'm going to object to form.  You

8       can answer if you can.

9      A.   That Bayer did that was reasonable.  Well,

10   they secured initial FDA approval.

11   BY MR. DERRINGER:

12      Q.   Anything else?

13      A.   They secured approval for a lower strength.

14   When the decision was made, that FDA made the decision

15   that it was going to be discontinued, I believe it was

16   discontinued, and I would anticipate that Bayer

17   cooperated in assisting those doctors who wanted to file

18   for a private IND.

19      Q.   Anything else?

20      A.   That's all I can think of.

21      Q.   Is there any opinion that you intend to give

22   in this litigation that we haven't discussed today?

23           MR. MOSKOW:  Or that's not included in her

24       report?

25           MR. DERRINGER:  Sure.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 345

1     A.   No.  I did forget to give you a CFR citation,

2    though, earlier.

3    BY MR. DERRINGER:

4     Q.   Which one was that?

5     A.   Earlier when we were discussing all the

6    citations that related to labeling and to

7    post-marketing -- post-marketing studies, I forgot to

8    include -- wait one second, let me give you the exact

9    one -- I forgot to include 314.81, 81(2), I forgot to

10   include the information regarding the annual report, so

11   314.81(2) small (i), and the summary documents tells

12   what's required to be provided to the FDA.  And in

13   there, there is a discussion if there has been new

14   adverse event reported.  And specifically, it said that

15   the annual report is required to include a description

16   of actions taken by the applicant or intends to be taken

17   as a result of new information, and this is relating to

18   new information affecting the safety or effectiveness of

19   the product, including new labeling to add warnings or

20   the initiation of a study.

21    Q.   Which paragraph are you on?

22    A.   314.81 small (b) --

23    Q.   Small (b) titled Reporting Requirements?

24    A.   Small (b), Reporting Requirements, under that

25   (2), annual report.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 346

1    Q.   Okay.

2    A.   Okay.  And under that, small (i) where it

3  talks about what has to be in the -- I just did the

4  summary section.

5    Q.   Okay.  And --

6    A.   And in there, it's another section where it

7  talks about the need if there has been new information

8  the previous year that might impact the safety of the

9  product, what actions are going to be taken, including

10 the addition of new warnings or the initiation of a

11 study.  So that's another section where submission of

12 information with respect to labeling or studies as a

13 result of a safety, potential safety event.

14   Q.   Okay.  You're relying on 314.81(b)(1) -- I'm

15 sorry, (b)(2)(i) as the basis for your opinion that

16 Bayer at any time was obligated to initiate studies for

17 further investigation of mortality or renal events.  Is

18 that right?

19   A.   Well, yeah, in part, because it says brief

20 description of -- okay.  It starts off, "In this brief

21 summary, a significant new information from the previous

22 year that might affect the safety or effectiveness of

23 the labeling of the drug product."  The report is

24 required -- is also required to contain a description of

25 the actions the applicant has taken or intends to take

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 347

1   as a result of this new information; for example,

2   submitting a labeling supplement, add a warning,

3   initiate a new study.

4        Q.   And your testimony is that that section

5   somehow obligates a drug company to initiate a new

6   study?

7        A.   Well, this section -- and my version of this

8   is 2006, this section.  This section, in addition to

9   everything else that we've talked about with regard to a

10  company's obligation, indicates to me that when there is

11  new information relating to labeling -- relating to

12  safety, issues, certain issues have to be carried out,

13  one of those is labeling, and in certain circumstances

14  that is also compounded by the need to do a study.

15       Q.   What are those circumstances, according to

16  this regulation?

17       A.   Issues that might impact the safety,

18  effectiveness or the labeling of the drug product that

19  occurred during the previous year.

20       Q.   And you're saying that in those circumstances,

21  this regulation obligates a company to initiate a new

22  study?

23       A.   Well, I'll read it again.  "This report is

24  required to contain a description of the actions the

25  applicant has taken or intends to take as a result of

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 348

 1   this new information."  Examples given are to --

 2        Q.   Doesn't it say "for example"?

 3        A.   Yeah.  There could be more things you would

 4   have to do.

 5        Q.   Why don't you read it instead of summarizing

 6   it?

 7        A.   I could read it all again.  It goes on

 8   multiple paragraphs.

 9        Q.   Go ahead.

10        A.   But the point of this is that if there are

11   safety information, among the follow-up actions that a

12   company takes is an examination of the information, get

13   the information, new safety information or new efficacy

14   information is included in the labeling and is

15   necessary, a study can be conducted.

16        Q.   Okay.  It said it can be conducted.

17        A.   Can be conducted.

18        Q.   You're not testifying that this section

19   obligates a company to conduct a study, are you?

20        A.   I would say that it is a section that

21   indicates that when safety is a concern, studies are

22   among the list of actions that are taken.

23        Q.   That can be taken; correct?

24        A.   Can be taken.  And certainly given the

25   incident -- the specifics of this event, event with

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 349

1    Trasylol, and coupled the regulations with the practices

2    outlined in the guidances, this would be an instance in

3    which a study would be done.

4         Q.   Show me the language in the regulation that

5    sets the standard for when a study must be done, 314.81.

6         A.   Okay.  And I understand why you're doing it,

7    but you keep focusing on the standard in the

8    regulations.

9         Q.   That's right.

10        A.   Okay.  But in the pharmaceutical world, the

11   actions that we take are derived from a variety of

12   places, including guidances that FDA issues.  The FDA

13   code says studies may need to be taken when there's a

14   safety issue, labeling needs to be addressed.  The

15   guidance that I showed you very clearly says these are

16   the instances in which studies should be done.

17        Q.   Which guidance again was that?

18        A.   The 2005 guidance I showed you.

19        Q.   The March 2005 guidance; correct?

20        A.   Right.  Right.  And that guidance says if

21   these types of safety events occur, you need to do

22   something, and among those are a study.  PhRMA Code

23   recognizes that.  And the reality of it is, this is what

24   pharmaceutical companies do.  Pharmaceutical companies

25   do studies to evaluate safety signals.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 350

 1    Q.    The March 2005 guidance is Exhibit 23; is that
 2  right?
 3    A.    Yes.  I thought we'd already reviewed this,
 4  but yes.
 5    Q.    I just want to be sure we're talking about the
 6  same thing.  And so 314.81, in conjunction with the
 7  March 2005 guidance, Exhibit 23, is the basis for your
 8  opinion -- or you believe that those in conjunction
 9  obligated Bayer to conduct a study, at what point in
10  time?
11    A.    Well, I certainly believe it obligated Bayer
12  to share the information in the labeling, get the
13  information in the labeling, and given the -- this isn't
14  my copy of it -- given the magnitude of the events, both
15  renal as well as mortality events, it obligated them to
16  do the study.
17    Q.    And you'd have to go to the guidance in order
18  to see that standard.  Correct?  It's not in the --
19    A.    Well, it says that if there is a safety,
20  there's actions that can be taken, including a study.
21  This tells you when the study should be done.  PhRMA
22  Code certainly supports that.
23         And probably more importantly, this is what --
24  this is every day what companies do, or they do
25  post-marketing studies.  If you check peer-reviewed

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 351

1    literature, you will see examples after examples of

2    companies who have done post-marketing studies to run

3    down a safety signal, to run down a signal.  That is

4    what we do in the industry.  That's what I've done

5    working for drug companies, that's what I do as the

6    safety surveillance person for other companies in my

7    consulting practice.

8             So yes, that is what I'm telling you.  You

9    have regulations.  You have guidances.  You have the

10   PhRMA Code saying it.  And you have certainly examples

11   after examples of other articles.  In fact,

12   Pharmacoepidemiology, the Brian Strom textbook which is

13   called the gold standard for pharmacovigilance behavior,

14   chapters written by industry talk about the need to

15   conduct studies when there is a safety signal

16   identified.

17        Q.    Who calls that the gold standard?

18        A.    Everyone calls it the gold standard.

19        Q.    Who?

20        A.    Manfred Hauben from Pfizer has called it that.

21   FDA has referred to it as the gold standard.

22        Q.    Where?

23        A.    We all refer to it as gold standard.

24        Q.    We all.  You've talked about someone from

25   Pfizer and the FDA.  But you can't point me to where the

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 352

1    FDA actually used that term?

2        A.   Well, I'll have to find that for you.

3    Certainly, if you talk to your client, you will find

4    that the Brian Strom textbook is heavily relied upon, to

5    the point that industry personnel write some of the

6    chapters in that textbook.

7            So I think that coupled with a very unique --

8    I have a very unique database.  I worked for two

9    companies, but now I've been associated with many, many

10   more, and the essence of pharmacovigilance, a good

11   pharmacovigilance will always, always for a serious

12   adverse event examine a safety signal, attempt to do the

13   studies or whatever is necessary to confirm that safety

14   signal.

15           So this isn't predicated upon one sentence

16   you're attempting to parse out.  It's attempting based

17   on years of experience with many, many drug companies

18   and FDA's guidances telling you when you need to do it;

19   and in fact, the PhRMA Code embraces it and endorses it.

20       Q.   Are you done now, ma'am?  Oh, you're not.  I'm

21   sorry.  Keep going.

22           MR. MOSKOW:  Don't be rude.

23           THE DEPONENT:  Yeah.  I mean, really, why

24       would you do that?  Why would you do that?

25   BY MR. DERRINGER:

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 353

1      Q.   Go ahead.  Keep going.

2      A.   This is an example of where the code says that

3   when there's a safety issue, there are events that can

4   be done, including doing a study, and that coupled with

5   the guidance of when to do a study, how to do a study,

6   when to report the study, those coupled with the PhRMA

7   Code and those coupled with years and years of

8   experience of being a pharmacovigilance person and

9   reading the literature and reading the gold -- Brian

10  Strom's textbook and other literature, indicates that

11  the proper action is to review your database, do a study

12  and get it into the labeling as soon as possible.

13          MR. DERRINGER:  I move to strike all of that

14      as nonresponsive.

15          The last thing that I want to do today is I've

16      marked Exhibit 34 and a CD as Exhibit 35.  Exhibit

17      34 is a letter that Mr. Love sent me on December

18      17th, 2010.  He encloses Exhibit 35, which is a CD

19      which are the materials regarding documents

20      referenced in Dr. Blume's expert report in this

21      matter.  They are in .pdf format and saved on the

22      enclosed CD.

23          What I'd like Dr. Blume to do is just to

24      verify that what's on this CD is, in fact, the

25      material that she refers to in her report.

CHERYL   BLUME, Ph.D. - 7/21/2011

 1          MR. MOSKOW:  You know, I don't know that we'll

 2     be able to do that.  But Steve, you and I have

 3     worked together for a long time.  If you're

 4     representing to me that that was the CD that was

 5     delivered to you by Mr. Love, I have no problem

 6     accepting your representation.

 7          MR. DERRINGER:  Okay.  I will represent that

 8     Deposition Exhibit 35 is a copy of the CD, I have

 9     the original at my office, that Mr. Love delivered

10     to me on or about December 17, 2010.

11          MR. MOSKOW:  That's fine.  And I would just

12     note that I know you marked earlier a couple of

13     additional submissions that reference documents by

14     title or Bates number, which I assume are not

15     included on this CD, and so copies of those

16     documents may never have been provided.  I don't

17     know one way or the other.

18          MR. DERRINGER:  I'm not sure what you're

19     talking about, but.

20          MR. MOSKOW:  Well, earlier you put in the list

21     of E-mails that refer to additional documents that

22     Dr. Blume had reviewed and considered since the

23     initial disclosure.

24          MR. DERRINGER:  Oh, I understand that.  Okay.

25          That's all I have for today, reserving my

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 355

1      right to reopen the deposition subject to any

2      rulings of the Court entitling us to come back and

3      ask further questions.

4           MR. MOSKOW:  I'm going to ask the court

5      reporter and the videographer if you have the

6      stamina for 15 or 20 more minutes, and we'll try to

7      do this quickly and get everybody going.  Is that

8      all right?  Thank you.

9                CROSS-EXAMINATION

10  BY MR. MOSKOW:

11      Q.   Good afternoon, Dr. Blume.

12      A.   Good afternoon.

13      Q.   Do you have Exhibit 1, your report handy?

14      A.   Yes.

15      Q.   Could I turn you to your CV, which is Appendix

16  1.

17      A.   Yes.

18      Q.   And on Page 48, it's the second page of your

19  highlights and professional accomplishments.  Do you see

20  that?

21      A.   I'm sorry.  I picked up one that doesn't have

22  the attachments.

23      Q.   Okay.  Here, let me give you this.

24      A.   Okay.  Yes.

25      Q.   I'm turning you to Page 48.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 356

1      A.   I'm there.

2      Q.   All right.  And there are bullet points, the

3  first and second bullet points.  The first one reads,

4  "Responsible for the regulatory oversight of the sales

5  and marketing development and implementation programs

6  for generic, nonprescription and prescription drug

7  products, biologics and devices"?

8           MR. DERRINGER:  I'm sorry, I don't see where

9      you are.

10 BY MR. MOSKOW:

11     Q.   And the second one reads, "Designation as the

12 regulatory point of contact for both U.S. and

13 international manufacturers with the U.S. FDA"?

14     A.   Yes.

15     Q.   Could you describe for the jury what those two

16 bullet points refer to?

17     A.   Yes.  The second one is probably the easier

18 one.  PDG, and I in particular am the point of contact

19 for companies for which we serve as their regulatory

20 spokesperson.  So these companies do not wish to

21 communicate directly with the FDA and don't.  I submit

22 all the correspondence.  I am the voice on the

23 telephones with them, and I conduct all meetings with

24 the agency.  So I am the point of contact, I serve as

25 that, my cover letter says I am their U.S. point of

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 357

 1   contact.

 2        Q.   Okay.  So with regard to that second bullet

 3   point on Page 48, how often do you interact with the FDA

 4   with regard to medical -- I should say pharmaceutical

 5   products?

 6        A.   Oh, all -- every week.  Every week.

 7        Q.   Okay.

 8        A.   Probably three days out of every week, three

 9   or four days out of every week, yes.

10        Q.   And for how long have you done that?

11        A.   Well, I started with Mylan in '77, so starting

12   then.  And for one of the companies, we became their

13   U.S. agent or U.S. point of contact immediately, that

14   was around when we first started the company, so '99.

15        Q.   Okay.  And what company is that?  Are you able

16   to -- since you have interaction with a public agency,

17   are those interactions public?

18        A.   One of them is because I -- yeah, I think one

19   of them is because products have been approved.  And

20   that's a Japanese firm, Hisamitsu.  The other one I'm

21   reluctant to give the name.

22        Q.   Okay.  With regard to the first bullet point

23   on Page 48, could you describe what those functions are?

24        A.   Yes.  We've been tasked by some of our clients

25   that, because of concern with product launches, usually

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 358

1    with product launches of the sales materials that they

2    plan to use, not only advertisements, but also the

3    marketing materials that they plan to use with the reps

4    in the field or with their hospital base, whatever, of

5    reviewing and coming up with a standard operating

6    procedure for them of what would be an appropriate --

7    what would be appropriate comparisons, what would be

8    problematic comparisons, which are absolutely violative

9    comparisons, and for them, as they -- when they launch

10   products, and this is generally when they're launching

11   their first or maybe their first couple products in the

12   United States, we've actually reviewed the launch

13   materials for them, and continue to do that to this day.

14       Q.   What, if any, responsibility do you have

15   for -- well, strike that.

16            What is pharmacovigilance?

17       A.   Pharmacovigilance is pretty much what it

18   sounds like, it's being vigilant about your

19   pharmaceutical product.  It refers to the study of the

20   data generated in association with your product

21   following its approval.  So it's really tracking the

22   product through use for its labeled, its nonlabeled

23   indications, use for potentially new indications, and

24   tracking to see if there is any change in either the

25   magnitude or the frequency of your already recognized

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 359

1   adverse events, or if there is the appearance of any new

2   previously unknown or unlabeled adverse events.

3       Q.   Do you have any experience in

4   pharmacovigilance?

5       A.   Yes.

6       Q.   Could you briefly describe that to the jury?

7       A.   Sure.  My responsibilities at Mylan with the

8   titles that I had there was, we talked just a moment ago

9   about annual reports that have to be submitted to the

10  FDA.  I was responsible for reviewing our

11  pharmacovigilance, our databases, the literature for the

12  products -- for the products, and that would be true for

13  both the generic, as well as the brand-name products, at

14  least at Mylan.

15          And then for the NDA products, if we had done

16  any additional studies or if anyone else had done any

17  additional studies, good, bad, indifferent, whatever,

18  responsibility for submitting those to the FDA, and

19  reviewing those data with respect to the need for either

20  a labeling amplification or, in some instances, the

21  labeling can actually be shortened.

22      Q.   Since you left Mylan, have you had any

23  pharmacovigilance responsibilities?

24      A.   Yes.  I had to do the same types of tasks at

25  Somerset.  We were the central, central office for

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 360

1   receiving adverse event information for all the

2   Selegiline products.  In fact, I think there were a

3   couple years at Mylan where it was actually my name and

4   my various telephone coordinates in the PDR to report

5   adverse information or questions, and then that

6   continued at Somerset.

7          And then here, for some of our companies who

8   are either new to pharmacovigilance, either because

9   they're new to the United States or they're new to an

10  NDA product, they've been primarily ANDA products in the

11  past, we have developed SOP's for them and helped them

12  at the beginning in evaluating how to handle receipts of

13  calls on adverse events, what information to attempt to

14  obtain, when it's necessary to visit the doctor or the

15  hospital, help them evaluate what goes into the annual

16  reports; and when, most importantly when a labeling

17  change needs to be made or when the data are such that

18  it would be beneficial for the company to do a study to

19  help evaluate those.

20     Q.   You used the phrase SOP, does that stand for

21  standard operating procedures?

22     A.   It does.

23     Q.   You indicated that as part of your role at

24  PDG, you've aided in the determination of when a label

25  needs to be changed?

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 361

1      A.   Right.

2      Q.   Can you briefly describe circumstances in

3   which you've been involved in label changes?

4      A.   At PDG?

5      Q.   At PDG.

6      A.   Well, for example, for one of the ones that we

7   have approved, we became somewhat concerned that maybe

8   the pregnancy information needed to be amplified.  So

9   that just recently happened, we submitted a CBE to

10   amplify the pregnancy-related information.

11      Q.   The CBE, what is that?

12      A.   CBE is, I thought -- maybe I hadn't identified

13   the term earlier.  It's the changes being effected

14   supplement to the agent -- to the FDA, whereby we

15   outline the change we're making for the FDA and telling

16   them because it's an effort to increase the safety

17   information, we're implementing it now.  So we don't

18   wait for FDA to review it.  And FDA may come back with

19   an approval or not an approval or something in between.

20      Q.   Okay.  What is a safety signal?

21      A.   Really, a signal is -- you'll see 20 different

22   definitions, but they all kind of come down to when

23   you're reviewing adverse event data, a signal is

24   something that makes you look differently at your data,

25   something that really catches your eye.  Oftentimes it's

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 362

1    defined as an event that is occurring more frequently

2    than you think it should relative to other products or

3    relative to a baseline population.  But in reality, it's

4    something that you catch, that you pick up and you

5    want -- when you want to study further.

6            You know your product.  The company that

7    submits the NDA knows your product more -- knows their

8    product better than anyone else.  And if you're used to

9    seeing stomachaches or, you know, upset stomachs and all

10   of a sudden you're starting to see reports of

11   gastrointestinal carcinoma, that would be a signal,

12   there was something different there than I was used to

13   seeing.

14           And your baseline grows.  When you're first

15   approved, your baseline is the basis of your approval;

16   and then as you gather more and more information in your

17   label changes, your baseline is always changing.  So

18   you're always having to look for either changes in

19   frequency or severity or new events relative to whatever

20   is your current baseline of label knowledge and

21   information.

22       Q.   You said your baseline is always changing.  Is

23   that significant as it relates to rare but serious side

24   effects?

25           MR. DERRINGER:  Object to the form.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 363

1      A.   It is.  Pharmacovigilance is not a passive

2   sport.  It is a very -- it's aggressive and you're in --

3   I use the term all the time for labeling, it's a living

4   organism.  Your label is always changing in response

5   primarily to pharmacovigilance activities.

6           And for the more rare events, the more

7   infrequently-occurring events, it is especially

8   important to be on the lookout for those because not --

9   you don't need very many of those to justify a labeling

10  change, and I've talked about that a couple of times

11  today.  I mean, I think the "Dear Doctor" letter that I

12  sent out in the late '90s, I made a change in the

13  Eldepryl labeling regarding hypertensive episodes we

14  were seeing that we hadn't seen in the past and I think

15  it was based on two events, two -- two post-marketing

16  adverse events, and we ended up making a labeling change

17  and sending "Dear Doctor" letters out.

18          There's one that's been recently removed from

19  the marketplace where they did the initial -- Raptiva, I

20  think is the product.  Recently it was removed from the

21  marketplace based on two or three events, very serious,

22  rare adverse event.

23          So yeah, the rare events are particularly, you

24  know, particularly concerning because you don't need

25  very many for it to be a signal.

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 364

 1   BY MR. MOSKOW:

 2      Q.   What, if any, signal do you believe there was

 3   with Trasylol as of 2002?

 4           MR. DERRINGER:  Object to form, outside the

 5      scope.

 6      A.   Answer?

 7   BY MR. MOSKOW:

 8      Q.   You can answer.

 9      A.   I believe that there was both mortality and

10   renal signals with Trasylol.  Certainly, the company has

11   said that they had information in their own studies that

12   were done by -- in the early 2000's that there was

13   significant changes in renal function.  And I believe,

14   as I discussed earlier today, that the initial data that

15   were obtained from some of the foreign sources,

16   certainly from the early Mangano work, suggested that

17   there may be mortality concerns associated with the use

18   of antifibrinolytics and specifically including with the

19   use of -- with the use of Trasylol.

20      Q.   You testified earlier that you've reviewed the

21   Dr. Robert Fenichel deposition transcripts?

22      A.   Yes.  Yes, I did.

23      Q.   Do you agree with his statement on Page 93 of

24   that transcript that when a company receives a signal,

25   it shouldn't be ignored?

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 365

```
 1      A.   Yes, I certainly agree with that.  Yes.
 2      Q.   Do you agree with Dr. Fenichel's testimony on
 3   that same page that there are a number of things that a
 4   company can do once a signal is received?
 5      A.   Yes.  I think I've talked about several of
 6   them, labeling, "Dear Healthcare" letters,
 7   discontinuation or suspension of the marketing, yes.
 8           MR. DERRINGER:  What page are you referring
 9      to?
10           MR. MOSKOW:  Ninety-three.
11   BY MR. MOSKOW:
12      Q.   Do you agree with his testimony on Page 93
13   that one of the things a company can do is to initiate a
14   study?
15      A.   Sure.  Yes.
16      Q.   Do you agree with his testimony on Page 94
17   that one of the things that could be done is to report
18   it to the FDA?
19      A.   Yes.
20      Q.   Do you agree that one of the things a company
21   can do is send out a "Dear Doctor" letter?
22           MR. DERRINGER:  Object to form.
23      A.   Yes.
24   BY MR. MOSKOW:
25      Q.   Or a "Dear Healthcare Provider" letter?
```

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 366

1             MR. DERRINGER:  Object to form.

2        A.   Yes.

3   BY MR. MOSKOW:

4        Q.   In your experience in the -- in performing

5   pharmacovigilance duties, how do the PhRMA Code and

6   related documents govern what you do?

7             MR. DERRINGER:  Object to form.  Neal, when

8        you talk about PhRMA Code, you're talking about the

9        1995, 2002 and the 2008 documents relating to

10       marketing?

11            MR. MOSKOW:  That's correct.  I was referring,

12       yes, to that whole series of documents that was put

13       into evidence.

14            MR. DERRINGER:  Those three; correct?

15            MR. MOSKOW:  Those three; and when I said

16       related documents, I was referring to the, I think

17       they're Exhibits 10 through 18.

18            MR. DERRINGER:  Seventeen.

19            MR. MOSKOW:  Ten through 17, yes.

20       A.   Well, for -- certainly for members of the

21   PhRMA Code when assessing adverse events and the need

22   for additional, it's certainly a reference to use, that

23   that is -- that is their credo, that is their -- that is

24   the plans that they live by.  It's my experience with

25   them that that is the plans that they use; that is the

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 367

1   obligations that they fulfill.  These are publicly

2   available documents.

3           So on occasions for other companies where

4   they're new, not new in the regulatory world, but maybe

5   new to the U.S. or new to pharmacovigilance, I will

6   often use those as a reference source that collections

7   of companies with long-term experience have put forth

8   what their standards of care are going to be, their

9   standards of behavior and use that as an example; that

10  companies address their regulatory obligations to FDA,

11  the hoops that they must jump through for FDA as a

12  minimum.

13          I mean, I know everybody is using the ceiling

14  and basement and that, but really, that's what it sets

15  the minimum that has to be done, and circumstances

16  dictate that additional have to be done.  And this is an

17  example of when it says studies needs to be done,

18  labeling needs to be modified.  So I use it in

19  conjunction with the CFR.

20          Certainly, I use the textbook, I use Brian

21  Strom's textbook for pharmacy -- pharmaceutical

22  employees have written about different studies that can

23  be done to address different types of signals.  So I use

24  all of that in putting together that it is really true

25  what they say, that no one knows your product the way

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 368

 1   the NDA-holder knows their product.  So there are three

 2   tiers:  The minimum you have to do for FDA; what other

 3   companies do as an example of standards of behavior,

 4   standards of care for their products; and what you

 5   specifically, company, have to do because you know your

 6   product, you know your adverse events.  So you have to

 7   take this knowledge and apply it this way and this way

 8   and then show them in textbooks.

 9            MR. DERRINGER:  Move to strike.

10   BY MR. MOSKOW:

11       Q.   Specifically with regard to your practice as

12   a -- as a pharmacovigilance person or someone who

13   performs pharmacovigilance duties, how do you use the

14   PhRMA documents that we looked at in evidence today from

15   the Nos. 10 to 17?

16            MR. DERRINGER:  Object to form, asked and

17       answered.

18       A.   Well, I -- I agree with the statements in

19   there when it's necessary to increase the labeling when,

20   one should consider doing a study.  I mean, I -- now

21   that the FDA guidance is out, I couple my thinking

22   with -- and every example is different, every product is

23   different, everybody's databases are different.  But I

24   take that basic agreement with that, I agree with that.

25   It's always good to hear when the other -- the other

CHERYL   BLUME,  Ph.D. - 7/21/2011

Page 369

1   side's regulatory person, pharmacovigilance person

2   agrees with what I've said today on the need to do

3   studies and the need to examine labeling.

4          And I take the information I have at hand from

5   this specific adverse event database and I take that

6   information and I -- the first thing I do is I have them

7   collect their adverse event information to the minute,

8   especially for those types of events.  If you're asking

9   me the order we do it in, the next thing --

10  BY MR. MOSKOW:

11     Q.   No.  Let me -- let me try to just focus you on

12  the issues related to the PhRMA standards and the PhRMA

13  Code and the related documents that came off their Web

14  site.

15         There was a lot of questioning during your

16  examination earlier today on industry standards, and you

17  quoted some language in the PhRMA Code that talked about

18  obligations.  But I'm asking you how that is -- those

19  documents actually work in your practice as standards.

20         MR. DERRINGER:  Object to form.

21  BY MR. MOSKOW:

22     Q.   If you understand the question.

23     A.   There's not only can be used for FDA for, I

24  guess, legal or regulatory standards, but also for

25  standards of care within the industry.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 370

1    Q.   That's what I'm trying to --

2    A.   Yeah.  And it's necessary to explain both to

3    the clients, this is what we have to do immediately for

4    the agency, but this is what a standard of care is for

5    the company with respect to their patients.

6         General -- for most of those companies, we

7    have actually developed SOP's for them or thinking

8    elements for consideration for their particular product.

9    So if the product is used primarily in -- can be used

10   primarily in women -- that include women of childbearing

11   potential and we believe that the product may have a,

12   some sort of an effect on the development of pregnancy

13   or developing fetus, that's a different set of

14   discussions that we have than with a product that's used

15   primarily in patients that are 75 or older.  Then we

16   have a much different series of considerations because

17   they are at increased risk for morbidity and mortality,

18   and we have to find ways of examining those and the

19   contribution, if any, of the product to those

20   calculus -- to those data calculus.

21   Q.   Okay.  When you observe -- strike that.

22        What part of your practice, if any, is

23   involved in observing how other pharmaceutical companies

24   deal with regulatory issues?

25        MR. DERRINGER:  Object to form.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 371

1      A.   Well, in addition to the ones that we work

2   with where we have an insight into how they handle their

3   regulatory practices, everyone here that has taken the

4   RAPS, keeps up with RAPS and attends those seminars and

5   Webinars, and oftentimes those are actually delivered by

6   company representatives.  We also track very closely FDA

7   action letters, warning letters, FDA 483's, any actions

8   FDA may take against a facility; and then most

9   importantly, FDA takes against a product, be it for

10  adverse event reporting or violations with marketing and

11  advertising.

12         And we study those very carefully and we use

13  those in our analyses; in fact, you'll see a couple of

14  them in my report as examples of actions FDA has taken

15  against other companies for -- for a similar effect.  I

16  think in this report, I mention the FDA took against the

17  manufacturers of Avandia for not reporting an episode --

18  an issue that happened with the French authorities.

19  BY MR. MOSKOW:

20     Q.   In evaluating how the FDA reacts, do you also

21  evaluate how the pharmaceutical companies are

22  performing?

23         MR. DERRINGER:  Object to form.

24     A.   We do.  Yes.  Insofar as possible when there

25  is an issue, we attempt to get the information publicly

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 372

1    available, in those instances generally publicly-

2    available information; and the company, what actions

3    FDA -- or the company decided to take as they enumerated

4    those to the FDA; if there was a conflict between the

5    company and the -- and the FDA, we attempt to track that

6    as far as we can.

7    BY MR. MOSKOW:

8        Q.   Based on your practice and pharmacovigilance,

9    your observations at the FDA and your observations of

10   pharmaceutical companies, have you been -- have you

11   formed an opinion as to whether or not the PhRMA Code

12   and related documents are an industry standard?

13       A.   For the ones with which I have had experience,

14   the ability to observe information, I would believe that

15   the PhRMA Code -- I believe that the PhRMA Code is used

16   as a reference for their standard of care, yes.

17       Q.   Just give me one more second here.

18            We spent a lot of time today talking about

19   obligations to conduct further post-marketing studies.

20   Do you recall that?

21       A.   Yes.

22       Q.   But we didn't quite -- spend quite as much

23   time talking about the obligation to warn.

24       A.   Yes.

25       Q.   When you look at your report, how do you

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 373

1  assess the significance of the failure to warn opinions

2  versus the failure to conduct further studies?

3            MR. DERRINGER:  Object to form.

4       A.   Well, I kind of look at -- I look at the

5  labeling as really part of a warnings platform that the

6  company has with their product.  Certainly, companies

7  share information in ways other than -- other than

8  labeling.

9            It's important the labeling be updated as soon

10  as it's reasonable to do so, as soon as possible.  But

11  the labeling is, as I said, labeling is a living

12  organism, and you will see a labeling change many times

13  over the same event.  So an initial labeling change

14  where you alert someone to an event certainly doesn't

15  mean it's the end of the story.  It can change many

16  times over time.

17            I look at doing studies a, whether a study is

18  needed or not, as a component of the labeling, as more

19  studies needed in order to fully prescribe -- or fully

20  alert prescribers; and in today's world, patients who

21  have access to all the prescribing information, are

22  additional studies needed for them to be able to more

23  safely use the product; are there certain populations we

24  suspect may be problems and we need to rule them in or

25  rule them out, if that's the case, then studies need to

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 374

1  be done so that that labeling can be the most complete

2  vehicle of information as possible.

3  BY MR. MOSKOW:

4      Q.   As it relates to your opinions on Trasylol as

5  contained in your testimony today and in your report

6  that's in evidence as Exhibit 1 --

7              MR. DERRINGER:  It's not in evidence.

8              MR. MOSKOW:  Well --

9              MR. DERRINGER:  It's Exhibit 1 to this

10        deposition.

11             MR. MOSKOW:  -- Exhibit 1 in this deposition.

12        Let me rephrase the question.

13  BY MR. MOSKOW:

14      Q.   To the extent that you formed opinions about

15  Trasylol, as you've indicated during today's deposition

16  and in Exhibit 1 to this deposition, your report, have

17  you formed an opinion as to whether Bayer complied with

18  21 CFR 201.56(a) and 21 -- let me start with 201.56(a).

19  Did the label contain a summary of the essential

20  scientific information needed for safe and effective use

21  of the drug?

22             MR. DERRINGER:  Neal, let me stop you for a

23        second.  Are you seeking to elicit opinions than are

24        different from what's in her report?

25             MR. MOSKOW:  No.  No.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 375

1            MR. DERRINGER:  Okay.  So I don't understand

2       the purpose of the questioning then.  If they're in

3       her report, they're in her report.

4            MR. MOSKOW:  To the extent that there's any

5       confusion in the record based on your questioning, I

6       just wanted it to be clear.

7            MR. DERRINGER:  Okay.  We'll object to it

8       being a solicitation of any new opinions at this

9       stage of the case and of the deposition.

10            MR. MOSKOW:  I absolutely agree.

11       A.   No.  I don't think I have a new opinion on

12   that.  I think that the report outlines that I believe

13   that the labeling needed to be amplified and provide

14   additional information regarding the mortality events --

15   I'm sorry, regarding the renal events and also the

16   mortality events.

17            And certainly by 2002, the initial information

18   could have been noted and I certainly would have

19   expected that labeling information to grow over time as

20   more and more information became available.

21   BY MR. MOSKOW:

22       Q.   And with regard to 21 CFR 201.57(e), do you

23   have an opinion as to whether the label that Bayer had

24   for Trasylol after 2002 was in compliance?

25            MR. DERRINGER:  Same objection.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 376

1       A.   I think there was an inadequate presentation

2    of the renal events from the placebo-controlled -- I

3    mean from their controlled studies, from the various

4    database and evaluations, including spontaneous

5    databases and a complete lack of information relating to

6    the mortality data.  So I think that information should

7    have been included within the -- within the warning

8    section.

9    BY MR. MOSKOW:

10      Q.   And finally, you indicated that you, as we

11   discussed earlier, you had had an opportunity to review

12   Dr. Fenichel's deposition.  Correct?

13      A.   Yes.

14      Q.   Did you review that part of his deposition

15   beginning at approximately Page 262, where he reviewed

16   the label to determine whether or not it reflected renal

17   toxicity?

18           MR. DERRINGER:  Object to form.

19      A.   I believe so.  I believe so.

20   BY MR. MOSKOW:

21      Q.   Do you agree with Dr. Fenichel's testimony

22   from Page 263 to 267 that there are at least three

23   places in the label that indicated that the product was

24   safe for renal function?

25           MR. DERRINGER:  Object to form to the degree

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 377

1        it mischaracterizes Dr. Fenichel's testimony.

2        A.   Yes.  I did see that he noted that.  And I did

3    see in the documents where that also formed part of the

4    renal cell -- the cell comments.

5              MR. MOSKOW:  I have no further questions.

6                     REDIRECT EXAMINATION

7    BY MR. DERRINGER:

8        Q.   Dr. Blume, you reviewed Dr. Fenichel's

9    deposition when?

10       A.   I think I was just -- I just received that

11   this week.

12       Q.   Okay.  Not before you wrote your report and

13   formed your opinions.  Correct?

14       A.   No.  I was pleased to see his opinions,

15   though.

16       Q.   And this 2000 -- this Bayer, internal Bayer

17   database that you refer to in your report, you've

18   referred to in your deposition, I think in your report

19   you say that the renal events or effects were apparent

20   in that database, I think you said, as early as 2002.

21   Is that right?

22       A.   I believe that that was what Bayer said in

23   their response to legal briefs or legal pleadings,

24   whatever.

25       Q.   All right.  Do you know what the renal event

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 378

1    was that was found to have an association with Trasylol

2    in that Bayer database?

3        A.   I have to check.  I don't specifically recall,

4    no.

5        Q.   Okay.  You'd have to go and look at the

6    reports of that database or --

7        A.   Yeah.  There's a list of specific reports, so

8    I'd have to -- I think I have a chart in my notes made

9    of that.  I would have to check that.

10        Q.   But you're familiar that that database was

11    presented to the ad comm in 2006.  Correct?

12        A.   Yes.

13        Q.   Okay.  And --

14        A.   My comment was that that database was

15    available years earlier.

16        Q.   Right.  And as you sit here today, you don't

17    know what the renal event was, what specific renal event

18    was that that database found in association of Trasylol

19    for?

20        A.   No, but I can check.

21        Q.   You don't need to.  Can you check very easily?

22        A.   Sure.  Should we go off?

23        Q.   Go ahead.

24            THE VIDEOGRAPHER:  The time is 7:01 and we're

25        off the record.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 379

1               (Off the record.)

2               THE VIDEOGRAPHER:   The time is 7:07 and we're

3        back on the record.

4    BY MR. DERRINGER:

5        Q.   Okay.  Dr. Blume, the question that I had

6    asked was, what renal event -- strike that.

7               You discuss Bayer's database, internal

8    database, and that it showed a renal event as early as

9    2002.  Can you tell me what the renal event that that

10   database shows to have been or to have had in

11   association with Trasylol?

12       A.   Yes.  With an odds ratio of 1.41, which was

13   significant, it was an increase in creatinine of 0.5

14   milligrams over baseline, and they noted that this risk

15   may be increased for patients with preexisting renal

16   impairment or those who are receiving some other drug

17   products.

18       Q.   Okay.  And that database also examined the

19   incidents of dialysis among aprotinin and placebo

20   patients.  Correct?

21       A.   Right.

22       Q.   And that did not have a statistically

23   significant finding.  Correct?

24       A.   Yeah.  There were only -- there was only a

25   total of 13 patients in this study that had dialysis, at

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 380

1    least for this purpose, and they were evenly split

2    between active and placebo.

3        Q.   And there was no statistically significant

4    finding in the Bayer database that Bayer had any

5    association with the outcome of dialysis.  Correct?

6        A.   Right.  Because there was only 13 patients.

7    Out of the entire database, there was very -- none, very

8    few, six in one group and seven in another group.

9        Q.   Six in the aprotinin group and seven in the

10   placebo group?

11       A.   Right.

12       Q.   Okay.  And when you say there were only 13,

13   that's 13 who had dialysis.  How many total patients

14   were in this database?

15       A.   Okay.  Well, it was partly right.  It was

16   people who either had dialysis performed or had been

17   recommended.  So some of the 13 didn't actually have

18   dialysis.

19       Q.   But how many total patients were in that

20   database?

21       A.   The total database --

22       Q.   You can add up the columns from full dose and

23   other dose and placebo?

24       A.   Well, the only thing we have here is full dose

25   and placebo.

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 381

1       Q.    Right.

2       A.    And the total number is 4,400 total.

3       Q.    Okay.

4       A.    Between half got placebo and half got drug.

5       Q.    And looking at that cohort, looking at that

6    population, that internal database from Bayer did not

7    find any association between Trasylol and the need for

8    dialysis.  Correct?

9       A.    Oh, not with 13 patients.

10      Q.    Am I correct?

11      A.    You are correct that the study was too small

12   to determine a dialysis change.

13      Q.    That's not what I asked.

14      A.    That's how I'm answering, the study was too

15   small.

16      Q.    4,400 patients is too small, is that your

17   testimony?

18      A.    Yes.  But of those, even in the placebo group,

19   the patients that were entered into this study were not

20   dialysis-type patients, because out of that number there

21   was only 13, even with half of them on medication.  So

22   this -- the patient entry criteria into these studies

23   were not such that it yielded populations with large

24   numbers of dialysis.

25      Q.    Did you review the patient enrollment criteria

CHERYL   BLUME, Ph.D. - 7/21/2011

Page 382

1   for any of these studies?

2       A.   Yes.  Well, yes, for the ones that are listed

3   that make up the constellation of these, because you

4   only have 13 total and not all -- not all of these even

5   required dialysis.  So half, perhaps half of this would

6   have actually had dialysis in the placebo group.

7       Q.   Did you review the patient enrollment criteria

8   for all of the studies that are included in the database

9   that's reflected at the document you're looking at?  In

10  fact, we'll mark that as document number -- Exhibit

11  No. 37.

12      A.   Yes.  I recall doing that.

13      Q.   You looked at every --

14      A.   I looked at the patient criteria.

15      Q.   For every one of the studies that's in there?

16      A.   Well, I looked at all of the ones that were

17  listed on the notice of admissions as being available by

18  2001.

19      Q.   Well, how many studies are included in the

20  database that you're looking at there?

21      A.   I don't know.  It doesn't say.

22      Q.   You don't know?

23      A.   No.

24      Q.   I can tell you there's 45.

25      A.   It doesn't say.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 383

1      Q.    There's 45.  Did you look at the patient

2    enrollment criteria for all 45 of those studies?

3      A.    I looked at the ones that were on the list

4    that they acknowledged that were available before 2001.

5      Q.    Which list?

6      A.    The one that was in the notice of admissions.

7      Q.    I'll take that.  Did you ever see any data

8    like what's reflected in Exhibit 37 for the studies that

9    were available before 2002?

10     A.    I'm sorry?

11     Q.    Did you ever see any data like the compilation

12   shown in Exhibit 37 for the studies that were available

13   before 2002?

14     A.    Oh, I have the whole package of the data.  I

15   just pulled this one out because it examined the 0.5,

16   which is what went into the label.

17     Q.    Last thing, I'm just going to mark as Exhibit

18   36, Dr. Blume, your -- the revision that you've now made

19   to paragraph 11 of your report.  Can you just confirm

20   for me that that paragraph 11 is accurate in terms of

21   the revision that you have made to that paragraph?

22     A.    Yes, the standard of care.  Yes.

23     Q.    Okay.

24            MR. DERRINGER:  All right.  Thank you.  That's

25            all I have.

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 384

1          MR. MOSKOW:  I have nothing further.

2          THE VIDEOGRAPHER:  The time is 7:12, this

3    concludes today's deposition.  We're off the record.

4          (Deposition concluded at 7:12 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 385

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6         I, Nancy J. Rivera, Professional Reporter, Notary

7    Public, State of Florida, certify that Cheryl Blume,

8    Ph.D.  personally appeared before me on the 21st day of

9    July, 2011 and was duly sworn.

10        WITNESS my hand and official seal this 25th day

11   of July, 2011.

12

13

14

15

16

17                      _____

18                      NANCY J. RIVERA
                        Notary Public
19                      State of Florida
                        My Commission Expires 1/14/2013
20                      Commission No. DD843903

21

22

23

24

25

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 386

```
 1                  C E R T I F I C A T E

 2

 3    STATE OF FLORIDA

 4    COUNTY OF HILLSBOROUGH

 5

 6          I, NANCY J. RIVERA, Professional Reporter, do

 7    hereby certify that I was authorized to and did

 8    stenographically report the foregoing deposition of

 9    Cheryl Blume, Ph.D.; that a review of the transcript was

10    requested; and that the transcript, pages 1 through 384,

11    is a true record of my stenographic notes.

12          I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorneys or counsel connected with the action, nor am I

16    financially interested in the action.

17          DATED this 25th day of July, 2011.

18

19

20

21          _____

22          NANCY J. RIVERA

23

24

25
```

CHERYL  BLUME, Ph.D. - 7/21/2011

Page 387

```
 1                        ERRATA SHEET

 2          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

 3   IN RE:  Trasylol Products Liability Litigation
             Case No.:  1:08-MD-01928-MIDDLEBROOKS/JOHNSON
 4           Deposition of:  Cheryl Blume, Ph.D.

 5   PAGE   LINE  CORRECTION

 6   ----   ---- ---------------------------------------

 7   ----   ---- ---------------------------------------

 8   ----   ---- ---------------------------------------

 9   ----   ---- ---------------------------------------

10   ----   ---- ---------------------------------------

11   ----   ---- ---------------------------------------

12   ----   ---- ---------------------------------------

13   ----   ---- ---------------------------------------

14   ----   ---- ---------------------------------------

15   ----   ---- ---------------------------------------

16   ----   ---- ---------------------------------------

17   ----   ---- ---------------------------------------

18   ----   ---- ---------------------------------------

19   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
20   are true.

21

22   _____          _____
      DATE                        CHERYL BLUME, PH.D.

23

     cc:  Steven Derringer, Esq.
24        Neal L. Moskow, Esq.

25
```

# Exhibit 13

EXHIBIT

Blume 13

Mr 7/21/11

HEALTH QUESTIONS FAQ ARCHIVE

**Q. Does the time of day when I take my medicines matter?**

A. Yes. Some drugs should be taken in the morning, while others should be taken just before bedtime at night. Ask your doctor or pharmacist when it is appropriate to take your medicines.

**Q. Can I take expired medications?**

A. Expired medicines should not be used. If they are past the expiration date, they often do not work as well and sometimes can be harmful. To make sure you do not take a potentially dangerous expired drug, examine your medicines every year and discard those that are out-of-date.

**Q. Should I store my medicines in the bathroom medicine cabinet?**

A. No. The heat and humidity of the bathroom can cause drugs to become less effective. A cool, dry place is best for storage of medications.

**Q. Is it okay to have an emergency supply of medicine handy in my car?**

A. No. Just as patients should not store drugs in the bathroom, they should not leave them in cars because heat and humidity can reduce their effectiveness. All drugs have requirements for proper storage that can be found on the product package or a pharmacist can summarize them.

**Q. Can I crush drugs that I have difficulty swallowing?**

A. Ask your pharmacist. Some treatments are designed to have a long-acting effect and if they are crushed, the long-acting effect can be destroyed. Some drugs are available in liquids or tablets that easily disintegrate and you can ask the pharmacist if there is a formulation for you that is easier to swallow.

**Q. Does it matter what I drink when I take medications?**

A. It does matter and a pharmacist should be consulted. In most cases, though, patients take medicines with water.

**Q. The doctor prescribed me a brand name drug but the pharmacist**

gave me a generic. How are they different and why does the brand name drug look different from the generic?

(Greensboro, North Carolina)

A. The Food and Drug Administration (www.fda.gov) defines a generic drug as a copy of a brand-name drug in dosage, safety, strength, how it is taken, quality, performance and intended use.

While a generic drug must have the same active ingredient as the brand drug, colors, flavors, and certain other inactive ingredients may be different.

Q. I would like to print out drug information that is easy-to-understand on all of my medicines and my husband's medicines to have for our records. I can't remember what all of them are for and hate to bother my doctor.

(Albany, New York)

A. You can ask your pharmacist or go to the FDA website on Patient Information Sheets http://www.fda.gov/cder/drug/DrugSafety/DrugIndex.htm, click on the name of your specific medicine, and read the "patient friendly" description of things you should know about your medicine.

Q. I would like to be a pharmacy technician because I think it would help me to go beyond that level and become a pharmacist. I would eventually like to work in the pharmaceutical industry. Where can I learn more about the educational process of becoming a pharmacy technician as well as a pharmacist?

(Salem, Massachusetts)

A. It is best to contact your state board of pharmacy because requirements may differ, depending on which state you live in and plan to practice. See http://www.nabp.net/whoweare/boards3.asp.

Q. I visited a farm and my friend said that I should not drink the unpasturized milk because I could get a terrible stomach bug, called Listeria. What is it and how can I find out what foods I should avoid?

(Houston, Texas)

A. According to the FDA Center for Food Safety and Applied Nutrition (http://www.cfsan.fda.gov/~pregnant/whillist.html), listeria is a harmful bacteria (listeriosis) that may be found in refrigerated, ready-to-eat foods such as meat, poultry, seafood, dairy and unpasturized milk. You can get listeria by eating contaminated foods processed or packaged in unsanitary conditions or by eating vegetables contaminated from the soil or manure used as fertilizer.

You can avoid this bacteria by taking a few simple steps. Maintain your refrigerator at 40 degrees Fahrenheit or below and the freezer at 0 degrees.

Case 1:08-md-01928-DMM   Document 10595-2   Entered on FLSD Docket 08/22/2011   Page 393 of 394

Refrigerate or freeze perishables and discard food that's left out at room temperature for longer than 2 hours. Use ready-to-eat, perishable foods, such as dairy, meat, poultry, and seafood as soon as possible. Clean your refrigerator regularly and wipe up spills immediately. Clean the inside of the refrigerator with hot water and mild dishwashing detergent, then rinse. Once a week, check expiration dates on all products in your refrigerator.

**Q. I am looking for a doctor and would like to know how to find out more information on my physician (i.e. where he went to school, any special residencies, etc).**
(San Antonio, Texas)

**A.** You can go to the American Medical Association website http://www.ama-assn.org/ and go to a section "For Patients: Doctor Finder." The AMA Doctor Finder provides information on virtually every licensed physician in the United States, including more than 690,000 doctors of medicine and doctor of osteopathy or osteopathic medicine.

**Q. I don't know what some of the abbreviations mean on my prescription and my prescription bottle, such as "prn".**
(Troy, Texas)

**A.** The medical abbreviation "PRN" means "as needed." Your provider determines the times of administration for a medication according to the individual patient needs. If you think that he/she intended for you to take it more regularly or if you have any questions, ask your provider for clarification.

**Q. How many milligrams are in a gram?**
(Tyler, Texas)

**A.** A milligram (mg) is a metric unit of weight equal to one thousandth of a gram (g) (1 gram = 1000 milligrams). Your correct dosage recommendation should be clearly written on your medication label. If you have any questions, you should ask your pharmacist or provider about your dosage questions.

**Q. My 11 year old child was on a prescription. Because she is feeling much better, I don't think she needs to take the rest of it, especially since it is an especially large pill. Is this okay?**
(New Cumberland, PA)

**A.** The American Academy of Pediatrics emphasizes the importance of reading and following the directions on the label. For example, certain medicines may say "Take full course" which means that your child should finish taking the entire contents of the prescription, even if she is feeling better. This is especially true if your child is taking antibiotics because the infection can come back if you stop too soon. You should ask your doctor or

12/9/2010                    Health Questions FAQ Archive | PhRMA

pharmacist if this medicine may be crushed if it is too big for your child to swallow. Also, some medicines may come in liquid form. Check with your pediatrician.

**Q. I was just diagnosed with OCD and my doctor said that this condition requires life-long medication in order to manage the symptoms. What is OCD and where can I get more information on it?**
(Roseburg, Oregon)

**A.** The National Institute of Mental Health (NIMH) describes OCD (Obsessive Compulsive Disorder) as a condition that affects approximately 3.3 million people. Those with OCD may suffer from recurrent, unwanted thoughts (obsessions) or rituals (compulsions), which they feel they cannot control. These obsessions can severely affect a person's life and treatment may be appropriate. A combination of medications and behavioral therapy are often effective in treating OCD. See http://www.nimh.nih.gov/publicat/ocdfacts.cfm to find out more about OCD.

Back to Current Health Questions

Ask a Question

Share This...

    

© PhRMA 2010