UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-MD-1928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS
LIABILITY LITIGATION - MDL-1928

**This Document Relates To:**

*Mary Javian v. Bayer Corp., et al.,*
**Case No. 09-80682**
_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon Defendants' (hereinafter, collectively, "Bayer's")

Motion for Summary Judgment ("Motion") (DE 12393 in 08-1928 & DE 62 in 08-22119). Plaintiff

filed a Response (DE 12659 in 08-1928 & DE 64 in 08-22119), to which Bayer replied (67 in 08-

22119). The Court has reviewed the pertinent parts of the record and is advised in the premises. For

the reasons stated below I find that the Motion is due to be granted as to all Counts.

I.      **Factual Background**[1]

        Plaintiff Mary Javian is the surviving spouse of Ronald Javian ("RJ"), deceased. She is, and

the decedent was, at all times relevant to the facts herein, citizens of the State of New York. On May

22, 2007, Decedent ("RJ") underwent a Heart Transplant performed by Dr. Yoshifumi Naka.

_____

[1] The following facts are either undisputed or established by evidence attached as
Exhibits to either the Defendant's Motion ("DEFEX") or the Plaintiffs' Response ("PLEX").
They shall be referred to DEFEX __ at__ – or PLEX __ at __ accordingly.

(DEFEX C).   At the time of his surgery, RJ had a lengthy medical history which included Stage III – IV chronic kidney disease, diabetes, severe cardiomyopathy, hypertension, hyperlipidemia, two heart attacks, congestive heart failure, anemia, debilitation and malnourishment, and episodes of acute kidney failure and circulatory shock associated with two prior open heart surgeries.  (DEFEX E at 2; DEFEX D at 64:18- 65:1, 132:8-133:6; DEFEX C, F & G).

Before his May 2007 transplant surgery, RJ was extremely ill and was unlikely to survive without a new heart. (DEFEX C at 6-7 (Naka Dep. At 21-22)).  The necessity for heart transplant was the result of years of cardiac problems dating back to the 1990s.  In April of 2006, with "nearly end stage heart failure," he had his first heart surgery- a Coronary Artery Bypass Graft ("CABG"), as well as a mitral valve and aneurism repair.(DEFEX C at 5 (Naka Dep. at 20:15-16)).  RJ had chronic renal disease prior to, and he did not receive Trasylol during, the April, 2006 surgery.[2] (DEFEX A at 3 (Blond Dep. at 17)).  Before he underwent the surgery, RJ was at an "extremely high risk" for developing renal failure "without a highly successful surgical result." (DEFEX A at 13 (Blond Dep. at 19-25). He did not have the hoped-for "highly successful surgical result."  Rather, RJ had numerous post-operative complications, including acute renal failure requiring continuous venovenous hemodialysis and filtration, cardiogenic and vasodilatory shock, respiratory failure, atrial

_____

[2] RJ's Creatinine on the day of admission for the April surgery was 1.8.  (DEFEX A at 9).  "Creatinine is a waste product formed by the breakdown of a substance (creatinine) important for converting food into energy (metabolism). The creatinine is filtered out of the blood by the kidneys and then passed out of the body in urine. . . .  If the kidneys are damaged and cannot function normally, the amount . . . creatinine in the blood increases." "WebMD Medical Reference from Healthwise" 2010. Web. 9 August 2010.
Accordingly, serum creatinine is used as a measure of renal function. When the value is elevated, renal dysfunction is indicated.  A normal creatinine result falls within the range of 0.7-1.2. The numbers represent the value of mg/dL. RJ's] creatinine level of 1.8 indicates renal impairment.

fibrillation, and hypotension requiring use of multiple pressor agents. *Id.* at 9 – 10 (Blond Dep. at 30, 53); DEFEX C at 12 (Naka Dep. at 48, 51-52).

His post-surgical course led him to require, just two weeks later, another – this time "emergency"– open-heart surgery to input a pace maker type of device (the "May 2006 Surgery"). *Id.* at 11 (Blond Dep. at 55:4-9). He was still in renal failure at the time of the May 2006 Surgery, and again did not receive Trasylol, but he continued to experience renal failure after the May 2006 Surgery and was treated with renal replacement therapy.[3] (DEFEX A at 14 (Blond Dep. at 61:12-14)). His cardiac and renal function showed improvement after the May Surgery, and he was taken off renal replacement therapy at sometime in mid-June.  *Id.* His discharge creatinine level had returned to his baseline1.6 – 1.8 range which indicates Stage III Chronic Kidney Disease.  *Id.*

RJ's creatinine levels remained at his baseline up through his May, 2007 admission for a heart transplant. *Id.* His risk factors for developing a post-surgical renal injury were much the same as those that existed before his April and May 2006 surgeries.  He still had cardiomyopathy, congestive heart failure, a history of smoking, anemia, and chronic renal insufficiency.  However, added to those factors were: (1) chronic renal disease requiring renal replacement therapy; (2) incidents of prior acute post-operative renal injuries and circulatory shock; (3) two cardiac surgeries – one of which was done on an emergency basis; and (4) the emergency nature of the heart transplant surgery.[4] RJ received Trasylol during his heart transplant surgery due to the "high risk" of bleeding.

---

[3] Dr. Blond's report mistakenly states that RJ did receive Trasylol during the May 2006 Surgery. However, he in fact received aminocaproic acid, not Trasylol.  (DEFEX C at 15 -16 (Naka Dep. At 57-58)).

[4] Emergency heart surgeries place patients at a greater risk of renal injuries due to a lack of time to get the patient hemodynamically stabilized. (DEFEX C at 65:3-8).  A heart transplant surgery is by its nature an emergency procedure as patients are never aware of when a donor heart will become available.  RJ's heart became available in the middle of the night on May 22, 2007 and

(DEFEX C at (Naka Dep. at 68)).   Intraoperative risk factors for post-operative renal failure were as follows: (1) extended bypass time -- RJ was placed on bypass for approximately four hours; (2) poor transplant function – RJ's extended bypass time was partially because the new heart did not function right away. It took almost an hour to get it into a normal sinus rhythm; (3) vasodilation – a dilation of blood vessels resulting in hypotension; (4) insertion of an intra-aortic balloon pump and administration of pressure stabilizing medications; and (5) administration of multiple units of blood-products to achieve homeostasis during the surgery.

RJ's post-operative course was complicated by multi-system failure, including renal failure, respiratory failure, and right heart failure requiring additional surgery.   (DEFEX E at  11-14). Specifically, on his first postoperative day, RJ was "critically ill" with cardiogenic and vasodilatory shock.   (DEFEX C at 28-29 (Naka Dep. at 82-83)).   The new heart was not functioning well and RJ required another emergency surgery later that day to implant a ventricular assist device. *Id.*  RJ was administered cyclosporine immediately after surgery to minimize risk of his body's rejection of the new organ.   His cyclosporine dosage was increased when he exhibited signs of rejection. Cyclosporin is a nephrotoxic drug.  On June 17,2007, a renal consult revealed that RJ was in acute renal failure due to cyclosporine toxicity. (DEFEX A at 44 (Blond Dep. at 97:10-98:2).

The nephrologist discontinued dialysis and RJ's acute renal failure ultimately resolved. . (DEFEX B at 3); (DEFEX E at 11-14).  However, he remained in the hospital with a variety of clinical ailments for almost nine months.  He was discharged on February 25, 2008, but was readmitted on March 22, 2008 for anemia and hypokalemia.  He died on April 10, 2008 from

---

they rushed to the hospital.  (DEFEX D at 4 (Mary Javian Dep. at 155:12-14)).

"cardiopulmonary arrest, due to or as a consequence of flash pulmonary edema, due to or as a consequence of end stage renal disesase." (DEFEX F).

On July 25, 2008, RJ's wife filed the instant case alleging claims for: (I) Strict Liability - Failure to Warn; (II) Strict Liability - Design Defect; (III) Negligence; (IV) Negligence Per Se; (V) Fraud, Misrepresentation, and Suppression; (VI) Constructive Fraud; (VII) Breach of Implied Warranties; (VIII) Unfair and Deceptive Trade Practices; (IX) Unjust Enrichment; (X) Loss of Consortium; (XI) Wrongful Death; (XII) Survival Action; (XIII) Gross Negligence; and (XIV) Punitive Damages.

Bayer argues that summary judgment should be granted as to each of Plaintiffs' claims because (1) under New York Law each claim must be established by expert testimony, and Plaintiff's expert's causation testimony is inadmissible;[5] (2) Plaintiff's fraud claims are due to be dismissed for the additional reason that she fails to plead fraud with specificity as required by the Court's earlier Orders; and (3) Plaintiff's derivative claims must fail where her substantive claims are dismissed. (DE 62).

Plaintiffs argue that summary judgment should be denied because "the temporal connection between [RJ's] acute renal failure and the injection of Trasylol, together with the fact that Trasylol is known to be a nephrotoxic agent, in part reasonably lead[sic] to Dr. Blond's expert opinion that Trasylol was a substantial contributing factor in causing [RJ's] injuries and his untimely death."

## II.   Legal Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact"

---

[5] It is undisputed that the substantive law of the State of New York applies to Plaintiff's claims.

and "the movant is entitled to judgment as a matter of law."[6] FED.R.CIV.P. 56(c). The purpose of summary judgment is to "isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). In considering a motion for summary judgment, the trial court "must consider all the evidence in the light most favorable to the non-moving party," and "resolve all reasonable doubts in favor of the non-moving party." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990) (internal citations omitted).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (citing FED.R.CIV.P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by pointing out to the district court that the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex*, 477 U.S. at 322-23.

Once the moving party has met its burden, the non-moving party bears the burden of coming forward with evidence of each essential element of its claim, such that a reasonable jury could find in its favor. *See Earley*, 907 F.2d at 1080 (11th Cir. 1990). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

---

[6] According to the Supreme Court, "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

6

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. 324. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."[7] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Celotex*, 477 U.S. at 322-23.

## III.   Analysis

### A.   Causation

Bayer asserts that each of Plaintiff's claims are due to be dismissed due to a lack of causation – a required element of each claim. Plaintiff's claims for fraud and consumer fraud are due to be dismissed for the additional reason that they are barred by this Court's previous orders. Lastly, Plaintiff's unjust enrichment and punitive damages claims are derivative and must fail where the substantive counts they are premised upon are dismissed. With each of the relevant legal standards set forth above in mind, I turn first to Bayers' causation argument.

Specifically, Bayer asserts Plaintiff's claims require expert testimony to establish specific causation, and Plaintiff lacks any competent evidence that Trasylol caused RJ's injuries.[8] (DE 62 at 8). "Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within

---

[7] According to the *Anderson* court, "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[8] Mr. Javian's treating physician has not indicated that Trasylol caused his renal failure or his death. (See DEFEX C).

7

the sphere of the common knowledge of the lay person." *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 586 (S.D.N.Y. 2008) (quoting *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) and holding that claims for "negligence, strict liability, breach of express warranty, breach of implied warranty, fraudulent misrepresentation, fraudulent concealment, violation of consumer protection statutes, wrongful death, and loss of companionship, as well as a survival claim" must fail where a plaintiff has no evidence of specific causation.").[9]  According to Bayer, Plaintiffs' only causation expert's testimony is unreliable and inadmissible.  I agree.

### i.  Legal Standard

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The party seeking to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of proof.  *Davidson v. U.S. Dep't of Health & Human Servs.*, No. 7:06-129-DCR, 2007 WL 3251921, at *2 (E.D. Ky. Nov. 2, 2007) (internal citations omitted *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

According to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. According to the Supreme Court, the inquiry envisioned by Rule 702 is a flexible one, in which federal judges perform a "gatekeeping role" to ensure that speculative and unreliable

---

[9]  These represent Counts I, II, III, IV, V, VI, VII, VIII, X, XI, XII, and XIII.

8

opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("Its [Rule 702's] overarching subject is the scientific validity and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

In *Daubert*, the Supreme Court listed several factors federal judges may consider in determining whether to admit expert scientific testimony under Rule 702: whether an expert's theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally accepted in the scientific community.[10] 509 U.S. at 593-94 (declining to set forth a "definitive checklist or test").

The Supreme Court subsequently held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150 (internal citations and quotations omitted). Accordingly, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . [A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. The trial court has the same kind of latitude in deciding how to test an expert's reliability as it enjoys when it decides whether or not that expert's relevant

---

[10] In *Daubert*, the Supreme Court considered the federal judge's gatekeeping role in ensuring that all *scientific* expert testimony is not only relevant, but reliable. The Supreme Court later held that this basic gatekeeping obligation and *Daubert*'s general principles apply to *all* expert testimony, not just testimony that is classified as scientific. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999).

testimony is reliable. *Id.*

The Eleventh Circuit engages in a three part inquiry to determine the admissibility of expert testimony under Rule 702, considering whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (internal citations omitted). The Eleventh Circuit has noted that the primary purpose of a *Daubert* inquiry is to ensure that the expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (quoting *Kumho*, 526 U.S. at 152).

## ii.   Parties' Arguments

Plaintiffs proffer Dr. Carl J. Blond, M.D., Ph.D., as their specific causation[11] expert. The following information has been obtained from Dr. Blond's expert report ("Report"). Dr. Blond is a licensed medical practitioner in the state of Texas, who has practiced medicine in the San Antonio area for twenty-eight years. He graduated from medical school and completed his internal medicine residency at the University of Texas Health Science Center in San Antonio ("UTHSCSA"), and then

---

[11] Specific causation refers to the issue of whether the plaintiff has demonstrated that the substance actually caused the injury in his particular case. Specific causation is distinguishable from general causation, which refers to the general issue of whether a substance has the potential to cause the plaintiff's injury. *Guinn v. AstraZenaca Pharms.*, 602 F.3d 1245, 1249 (11th Cir. 2010) (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). General causation is not in dispute in the instant motion. The Court assumes, without deciding that general causation has been established.

10

completed a two-year fellowship in Nephrology, the first year of which was at the University of Colorado and the second year at UTHSCSA. Dr. Blond has been board-certified in Internal Medicine since 1979 and in Nephrology since 1984. In addition to his patient care, Dr. Blond is a clinical professor of Internal Medicine and Nephorology at UTHSCSA.

Dr. Blond has confined his practice to the areas of nephrology and internal medicine, and his practice primarily involves patient care. A routine part of his practice involves treating post-operative heart surgery patients who suffer renal problems. Specifically, this included patients who encounter renal problems after coronary artery bypass surgery (CABG), heart valve surgery, heart transplants and other cardiac surgeries. Because of his clinical experience, Dr. Blond is familiar with the etiologies of renal dysfunction and renal failure, as well as the mortality and morbidity associated with renal dysfunction and renal failure.

After setting forth his qualifications as an expert, Dr. Blond's report provides as follows:

BRIEF NARRATIVE OF EVENTS[12]

Mr. Javian was a 62-year-old white man when he underwent orthopedic cardiac transplantation on 05/22/2007. He had a history of an ischemic cardiomyopathy, and then suffered severe left ventricular dysfunction, with an injection fraction of approximately 10%. Prior medical history included non-insulin requiring diabetes mellitus, depression, hyperlipidemia, explosive personality, hypothyroidism (amiodarone-induced), and myocardial infarctions in 1991 and 2003, as well as multiple stent placements, AICD, and pacemaker. Mr, Javian was a retired businessman, with a 20-pack-year prior smoking history. Allergies included Benadryl. The patient had been admitted to Winthrop Hospital for non-STEM (on 04/10/2006, where cardiac catheterization showed multivessel coronary disease. The patient required an aortic balloon pump and pressors, and was transported to New York Presbyterian Hospital (NYPH) for high-risk surgery/heart transplant evaluation. At NYPH Mr. Javian underwent a three-vessel CAM, mitral valve ring repair, and

---

[12] I note that Dr. Blond's report contained many spelling and grammatical errors. To insert a "[sic]" after each one would be disruptive. Therefore, the errors contained herein were contained in the original. There were also several substantive errors some of which are underlined above and discussed *supra* note 3 and *infra* note 16.

Dor procedure on 04/24/2006, performed by Yoshifumi Naka, M.D. Mr. Javian had a complicated course postoperatively, including circulatory shock associated with respiratory failure, acute kidney injury requiring renal replacement therapy, and atrial fibrillation. Mr. Javian underwent placement of an emergency I3iVAD secondary to deteriorating hemodynamics. On 05/07/2006, he underwent placement of a HeartMate XVE internal LVAD and Abiomed RVAD implant. The patient received aprotinin as an antifibrinolytic agent during this procedure. The postoperative course was complicated by renal failure requiring CVVHD, rapid atrial fibrillation, and aspiration pneumonia. A tracheostomy had been placed for prolonged respiratory failure, which was decannulated on 06/29/2006. Renal function gradually improved, with a creatinine in the 1.6-1.8 mg/dL range. The right ventricular RVAI) was explanted on 05/19/2006. After a very long and complicated rehabilitation, with marked deconditioning and sacral decubitus, Mr. Javian was eventually discharged home on 11/07/2006. Medications at the time of discharge included arniodarone, Toprol, Norvasc, Prevacid, Lipitor, Synthyroid, Paxil, valproic acid, Inspra, and Coumadin.

Mr. Javian was hospitalized twice at NYPH for decubitus debridement, and then an episode of bleeding from his decubitus wound, requiring transfusions, He then was re-hospitalized on 04/06/2007 through 04/20/2007 for cellulitis of the lower abdomen originating at the LVAD drive site. This was treated successfully with vancomycin and Zosyn. Mr. Javian was re-hospitalized on 05/23/2007 for orthotopic heart transplantation. Surgery was again performed by Dr. Naka. The donor was a 26-year-old who suffered a gunshot wound to the head, with no prior cardiac history. Operative findings included dense adhesions with a dilated heart without thrombus. The HeartMate was disconnected, and the patient underwent cardiac transplantation. Moderate hypothermia (32°C) was used, Estimated blood loss was 300 cc, and the patient was noted coagulopathic. Organized rhythm occurred after over 60 minutes of bypass support, Vasoactive drips included dopamine, Pitressin, dobutamine, Levophed, and milrinone. A transthoracic intraaortic balloon pump was used, as well as nitrous oxide. Mr. Javian was weaned from cardiopulmonary bypass, time was one hour and 6 minutes. Aprotinin was used as an antifibrinolytic, and the chest was kept open. The postoperative course was again complicated with multisystem failure. LVAD placement was initiated postoperatively to augment hemodynarnics. The patient's blood pressure on postoperative day #1 was 95/60 mm Hg with APAP of 30 and CVP of 10. Pressors included epinephrine, dobutamine, Pitressin, and Levophed. The patient was placed on CYVII for acute renal failure, respiratory failure with pneumonia, and required prolonged ventilation. On postoperative day #2, the patient's pressor doses were weaned, the patient remained arturic. Cardiac output was 6 L per minute. Additional later problems included heparin-induced thrombocytopenia, with left internal jugular thrombus, and stage IV decubitus ulceration. The patient ultimately was weaned off pressors, and transferred out of ICU on 011/10/2007, A cardiac biopsy was performed on 06/05/2007, which revealed grade 2/3 rejection, which was treated with pulse steroids in higher doses of cyclosporine. Later biopsies

showed resolution of the rejection to grade 0 on 09/19/2007. The patient was continued on CVVHD until 06/07/2007. The patient was temporarily taken off hemodialysis, but this was reinstituted with the feeling that the prolonged acute kidney injury superimposed on stage 3/4 chronic kidney disease, resulting in end-stage renal disease. Persisting problems included critical care myopathy, profound malnutrition (I-tube feeding), emotional liability, depression, and end-stage renal failure. He was transferred to a nursing home facility with on-site hemodialysis. Mr, Javian was hospitalized at North Shore University Hospital when he passed away on 04/10/2008. The cause of death was cardiopulmonary arrest secondary to flash pulmonary edema, due to end-stage renal disease,

### MEDICAL OPINION REGARDING THE LATE MR. RONALD JAVIAN

Each of the opinions stated below are stated to a reasonable degree of medical certainty, Patients undergoing cardiopulmonary bypass surgery are at risk for developing acute renal failure. This is usually a transient phenomena associated with hypotension, hypoxia, oxidative stress and nephrotoxic agents. Nephrotoxic agents include IV contrast, nonsteroidal drugs and rarely anesthetic agents. Hypotension is frequently related to blood loss, hypovolemia, impaired cardiac function and occasionally sepsis, Cardiopulmonary bypass is associated with a transient drop in glomerular filtration. Additional risk factors for developing acute renal failure includes the presence of chronic kidney disease, prolonged and complex surgery, as well as underlying congestive heart failure.

The mechanism for renal dysfunction, in general, can be from factors associated with cardiopuhnonary bypass surgery including decreased renal perfusion and associated ischemic inflammatory mediators, The proinflammatory state of bypass surgery also can have an associated toxicity to renal tubular cells. Atheroembolic injury can occur in this setting also, as well as hypoxia or hemolysis to produce renal injury, In the postoperative period, causes of renal dysfunction can include infection, antibiotic toxicity, worsening cardiac dysfunction and volume depletion. The use of aprotinin also has been found to be associated with an increased risk of renal failure.

A large number of risk factors have been identified in the setting of cardiopulmonary bypass surgery for acute kidney injury. This is of particular importance, as the presence of acute kidney injury in the setting of cardiopulmonary bypass surgery will greatly increase acute and chronic mortality, Significant long-term risk for mortality may persist independent of recovery of kidney function, Many of these risk factors are interrelated, and have markedly variable degrees of severity. Some are extremely frequent in the population undergoing cardiopulmonary bypass surgery, such as hypertension. The presence of advanced age, and prior chronic kidney disease are prominent risks. Other risk factors identified are female sex, congestive heart failure, CODA, tobaccoism,

13

ASPVD, pulmonary hypertension, diabetes, and anemia. Recent contrast exposure, as well as urgent surgery are significant risk factors. Prolonged and complex surgery, and prolonged bypass times greater than 2 hours, as well as blood transfusions are additional risks. The Acute Kidney Injury Network has devised a simple classification system for staging acute kidney injury, ranging from stage I (mild, with an increase in serum creatinine of 0.3 mg/dL, or increase equal to 150-200%), stage II (200-300% baseline), and stage III, severe (requiring renal replacement therapy or 300%).

Mr. Ronald Javian sustained a severe (stage III, AKIN criteria) after cardiopulmonary bypass surgery for orthotopic heart transplantation, Unfortunately Mr. Javian developed end-stage renal disease from this injury, which ultimately resulted in his death. Major risk factors included Mr. Javian's underlying chronic kidney disease, as well as severe cardiomyopathy. Additional risk factors would include prior smoking history, diabetes mellitus, prior acute kidney injury and marked debilitation. Mr. Javian would be considered a high risk for acute kidney injury, as had occurred previously. In the case of Mr. Javian, surgery was complicated by poor transplant function, and continuous dialysis was initiated immediately. Mr, Javian also received aprotinin, as an antifibrinolytic agent during his surgery, which is now known as a nephrotoxin. The etiology of his acute kidney injury was in all medical certainty multifactorial in nature. Major contributing factors included cardiopulmonary bypass, congestive heart failure, hypotension, pressor agents, and the use of aprotinin, Later contributing factors to end-stage renal disease included his acute kidney injury, chronic inflammation, and possibly his antirejection drugs, including cyclosporine.

Aprotinin, a nonspecific serine protease inhibitor, was used to attenuate the inflammatory and fibrinolytic pathways that are up-regulated in patients undergoing cardiopulmonary bypass surgery. Aprotinin works by a number of mediators, including kallikren, plasmin, and prostaglandins. The expert report of F. Gary Toback, M.D., sets out in detail the general manner in which aprotinin effects renal function, as well as the mechanisms of injury. There is a large volume of medical and scientific literature regarding the association of acute kidney injury with aprotinin, as listed in my attachment. Aprotinin was thought to cause renal tubular injury by a number of mechanisms including microthrombosis, direct cellular toxicity, and inhibition of vasodilatory prostaglandins. Aprotinin has also been associated with increased mortality in cardiopulmonary bypass surgery, when compared to other antifibrinolytic agents, including aminocaproic acid. In all medical certainty, aprotinin tipped the scale, resulting in a severe kidney injury that Mr. Javian never recovered from. Mr. Javian ultimately died from complications related to his end-stage renal disease. in all certainty, the physicians caring for Mr, Javian would not have used this drug had they been aware of the association of mortality and acute kidney injury. The development of end-stage renal disease in Mr. Javian was directly related to this injury.

14

> I reserve the right to amend the medical opinions expressed in this report if additional information is provided to me. The opinions expressed in this report are based on reasonable medical certainty. Please feel free to contact me if you have any questions regarding this report.

(Blond Report - DEFEX B at 2- 6) (emphasis added).

In summary, Dr. Blond would opine that "in all medical certainty [RJ's renal injury was] multifactorial in nature. Major contributing factors included cardiopulmonary bypass, congestive heart failure, hypotension, pressor agents, and the use of aprotinin. Later contributing factors to end-stage renal disease included his acute kidney injury, chronic inflammation, and possibly his antirejection drugs, including cyclosporine." *Id.* at 5-6 (emphasis added). Dr. Blond also would opine that, "[i]n all medical certainty, aprotinin tipped the scale, resulting in a severe kidney injury that Mr. Javian never recovered from. Mr. Javian ultimately died from complications related to his end-stage renal disease." Additionally "in all certainty, the physicians caring for Mr, Javian would not have used this drug had they been aware of the association of mortality and acute kidney injury. The development of end-stage renal disease in Mr. Javian was directly related to this injury. *Id.*[13]    Bayer argues that Dr. Blond's opinions should be excluded as unreliable and unhelpful to the trier of fact because they result from a flawed methodology.

Plaintiff's response first focuses on Dr. Blond's qualifications to testify as an expert. As Dr. Blond's qualifications have not been challenged, no discussion is required. Plaintiff next asserts that Dr. Blond conducted a legally sufficient differential diagnosis because "[t]he temporal connection between Mr. Javian's acute renal failure and the injection of Trasylol,

---

[13] This type of speculative opinion by Dr. Blond and other proposed medical experts, as to what another doctor might or might not have done if provided particular information, has been repeatedly rejected by this Court. Accordingly, this opinion is inadmissible and requires no further discussion.

15

together with the fact that Trasylol is known to be a nephrotoxic agent, in part reasonably lead to Dr. Blond's expert opinion that Trasylol was a substantial contributing factor in causing Mr. Javian's injuries and his untimely death." (DE 64 at 2) (emphasis added).

Bayer, in its Reply asserts that Plaintiffs' Response is insufficient to establish the admissibility of Dr. Blond's opinions.

### iii.    Analysis

A differential diagnosis, properly performed, constitutes a reliable methodology for determining medical causation under *Daubert*. *See Guinn v. Astrazeneca Pharms. LP*, 602 F.3d 145, 153 (11th Cir. 2010). While a differential diagnosis can provide a valid basis for a medical causation opinion, "an expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient." *McClain*, 401 F.3d at 1253. Instead, a court must examine whether the expert correctly applied the differential diagnosis methodology. 602 F.3d at 1253. The reasonableness of applying this approach, along with the validity of the expert's particular methodology for analyzing the data and drawing conclusions from the data, will determine whether the differential diagnosis is reliable. *Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010).

A differential diagnosis is a "patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005). It requires an expert to "determin[e] the possible causes for the patient's symptoms and then eliminat[e] each of the potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Guinn*, 602 F.3d at 1253 (quoting

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).

At the first of the two steps, the "rule in" step, the expert must compile a comprehensive list of theories that could explain the patient's symptoms. *Hendrix*, 609 F.3d at 1195; *McClain*, 401 F.3d at 1253; *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003). "Expert testimony that rules in a potential cause [of a patient's symptoms or mortality] that is *not* so capable is unreliable." *McClain*, 401 F.3d at 1253 (quoting *Clausen*, 339 F.3d at 1158). This is because "a fundamental assumption underlying [differential diagnosis] is that the final, suspected 'cause' . . . must actually be capable of causing the injury." *Id.* (alteration in original). At the second step of a differential diagnosis, the "rule out" step, the expert must at least consider the other causes that could have solely given rise to plaintiff's injury. *Guinn*, 602 F.3d at 1253. However, the expert "need not rule out all possible alternative causes" for his differential diagnosis to be reliable. *Id.*; *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999); *In re Mentor Corp.*, 711 F. Supp. 2d 1348, 1372 (M.D.Ga. 2010). *But see Hendrix*, 609 F.3d at 1195 ("[T]he expert must eliminate all causes but one.").

"Although a reliable differential diagnosis need not rule out all possible alternative causes, it must at least consider other factors that could have been the sole cause of the plaintiff's injury. . . . [A] 'differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.'" *Guinn v. Astrazeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (internal citations omitted). "[A]n expert must provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause of the plaintiff's injury." *Id.*

17

(internal citations and quotations omitted).  The "'temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1254 (11th Cir. 2005) (internal citations omitted).  Temporal proximity is "especially unreliable" where conditions independent of exposure to the drug could have been the sole cause of the plaintiff's injury, and the expert fails to explain the relative contribution of the drug to the injury.  *Guinn*, 602 F.3d at 1254-55 (excluding differential diagnosis opinion where evidence "appeared to equally indicate that Guinn may have already developed diabetes before ever taking Seroquel," Guinn's numerous other risk factors for diabetes put her at high risk for diabetes, and opinion failed to explain Seroquel's relative contribution to her diabetes).

    An expert must engage in the same level of "intellectual rigor that characterizes the practice of an expert in the relevant field." *Guinn*, 602 F.3d at 1255 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  An expert engaging in a differential diagnosis must adhere to their standard diagnostic techniques to be considered reliable.  *Id.*  Any analytical gap in an expert's methodology can be a sufficient basis to exclude expert testimony under *Daubert*.  *See Trucks Ins. Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1212-13 (10th Cir. 2004); *Goebel v. Denver & Rio Grande Western R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).  Under *Daubert*, "'any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir.1999) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir.1994)).

The main flaw in Dr. Blond's methodology is his failure to account for numerous risk factors at both the rule in and rule out stage.  Factors which either alone or in combination could explain RJ's alleged renal injury.  These factors include: a history of post-operative circulatory shock; repeat incidents of cardiac surgery; repeat "emergency" surgeries; effect of both need for and extended use of an intra-aortic balloon pump and pressure stabilizing medications; extended surgical and post-operative hypotension; extremely prolonged bypass time; and prolonged cardiac deterioration with worsening cardiac function.  Even to those factors which Dr. Blond did rule in, he gives either gives them short shrift at the rule-out stage, or dismisses them without discussion.

In his report Dr. Blond states that many risk factors are "extremely frequent in the general population undergoing cardiopulmonary bypass surgery, such as hypertension. . . , advanced age, . . . , prior chronic kidney disease . . . , female sex, congestive heart failure, CODA, tobaccoism, ASPVD,[14] pulmonary hypertension, diabetes . . . , anemia . . . , recent contrast exposure, [and] urgent surgery."  "Prolonged and complex surgery, and prolonged bypass times greater than 2 hours, as well as blood transfusions are additional risks."  In explaining the mechanism for how these factors could result in renal injury, Dr. Blond's report stated that

> [t]he mechanism for renal dysfunction, in general, can be from factors associated with cardiopulmonary bypass surgery including decreased renal perfusion and associated ischemic inflammatory mediators, The proinflammatory state of bypass surgery also can have an associated toxicity to renal tubular cells. Atheroembolic injury can occur in this setting also, as well as hypoxia or hemolysis to produce renal injury, In the postoperative period, causes of renal dysfunction can include infection, antibiotic toxicity, worsening cardiac dysfunction and volume depletion. The

---

[14] ASPVD is an acronym for Atherosclerotic Peripheral Vascular Disease.  Dictionary of Medical Abbreviations.  Found at http://www.medicabbreviations.com/abbreviations/21402.html

19

use of aprotinin also has been found to be associated with an increased risk of renal failure.

As for RJ's individual specific risk factors, Dr Blond stated that

> major risk factors included Mr. Javian's underlying chronic kidney disease, as well as severe cardiomyopathy. Additional risk factors would include prior smoking history, diabetes mellitus, prior acute kidney injury and marked debilitation. Mr. Javian would be considered a high risk for acute kidney injury, as had occurred previously. In the case of Mr. Javian, surgery was complicated by poor transplant function, and continuous dialysis was initiated immediately. Mr, Javian also received aprotinin, as an antifibrinolytic agent during his surgery, which is now known as a nephrotoxin. The etiology of his acute kidney injury was in all medical certainty multifactorial in nature. Major contributing factors included cardiopulmonary bypass, congestive heart failure, hypotension, pressor agents, and the use of aprotinin, Later contributing factors to end-stage renal disease included his acute kidney injury, chronic inflammation, and possibly his antirejection drugs, including cyclosporine.

Dr. Blond in his neither his report nor deposition provides any explanation for why he concluded that RJ's various risk factors other than exposure to Trasylol were not the sole cause of his injuries and ultimate death. Moreover, he testified that many of RJ's pre-operative, operative, or post-operative events, either alone or in concert, could have, and in fact had previously caused RJ to suffer renal failure. (*See* DEFEX A at 19-23 (Dr. Blonde "would not have been surprised if Mr. Javian developed renal failure even without Trasylol")); (DEFEX A at 26- 41; Blond Dep. at 94: 2-15) ( The combined effect of extended bypass, poorly functioning transplant heart, significant administration of pressor medications and intra-aortic balloon pump, prolonged vasodilation during surgery, administration of multiple units of blood products, sustained intra-operative hypotension, and critical post-surgical cardiac failure "could fully explain Mr. Javian's acute renal failure without aprotinin."). He did not in his report or

20

deposition attempt to explain why he believed that Trasylol, after the heart transplant, somehow "tipped the scales" in favor of a renal injury. Nor did he explain why Trasylol tipped the scales after the heart transplant surgery when RJ's two previous open-heart surgeries each resulted in either new or worsening renal injuries without any Trasylol administration.[15]

After sorting through Dr. Blond's opinions and the Plaintiff's response to Defendants' Motion, I find that Dr. Blond improperly relies on temporal proximity. As stated previously, the "'temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation.'" *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1254 (11th Cir. 2005) (internal citations omitted). Temporal proximity is "especially unreliable" in circumstances such as this where a patients conditions independent of exposure to the drug could have been the sole cause of the plaintiff's injury, and the expert fails to explain the relative contribution of the drug to the injury. *See Guinn v. Astrazeneca Pharmaceuticals LP*, 602 F.3d 145, 153 (11th Cir. 2010). As with the expert in *Guinn*, I find exclusion is warranted because the evidence "appear[s] to equally indicate that [RJ] may have [developed renal injury either] before ever taking [Trasylol]," or would have developed it without ever taking the medication. *Id.* Also as with *Guinn*, RJ's numerous other risk factors for renal injury placed him at a high risk for renal failure, and Dr. Blond's opinion fails to explain Trasylol's relative

---

[15]   In fact, Dr. Blond in this as well as other reports in this MDL has indicated that "aprotinin has been associated with increased mortality in patients undergoing cardiopulmonary bypass surgery, when compared to other antifibrinolytic agents such as aminocaproic acid." *See, e.g.* Expert Report in *DAVID QUINONES, et al. V. BAYER CORPORATION, ET AL.*, Case No. 09-80682 (DE 54 at Ex. E). I note that RJ was administered aminocaproic acid during the May 2006 Surgery and suffered continued renal failure. Dr. Blond makes no effort to explain his conclusion as to why the original injury or risk of increased mortality didn't lie with either the April or May 2006 surgeries, or with the aminocaproic administration alone.

contribution to RJ's injury or death..[16]

Dr. Blond's reliance on temporal proximity in this Case is not a reliable methodology. He fails provide a reasonable explanation for why he concluded that RJ's various risk factors other than exposure to Trasylol were not the sole cause of his renal injury and death. For these reasons, I find that Dr. Blond's causation opinions will not assist the trier of fact. They are therefore inadmissible and Plaintiff's claims for "negligence, strict liability, breach of express warranty, breach of implied warranty, fraudulent misrepresentation,[17] fraudulent concealment,

---

[16] I also note that Dr. Blond, in his report, relied on information which was, simply stated, incorrect. For example, Dr. Blond stated that RJ was on bypass for only one hour and six minutes when in fact the bypass time was close to four hours. As extended bypass time places a patient at a higher risk of developing post-operative renal failure (Blond Dep. at 26:12-22), this error is material. Another error is the statement in the report that RJ had received aprotinin during the May 2006 Surgery. RJ did not receive Trasylol during that surgery, but if he had, Dr. Blond should have discussed receipt of Trasylol during that surgery and its link to RJ's renal injury. These are just examples of some of the errors contained in the report. These type of material errors do not reflect the level of intellectual rigor contemplated by *Daubert*.

[17] Bayer correctly asserts that Plaintiffs fraud claims are due to be dismissed for the additional reasons set forth in numerous previous summary judgment orders. Plaintiff's claim for fraud was dismissed pursuant to my previous Orders dated April 1, 2009 (Order to Show Cause, DE 916 in Case No. 08-md-01928) (dismissing any common law fraud claims in accordance with the March 5 Order, unless a plaintiff timely responded or amended the complaint), and March 5, 2009 (Order on Motions to Dismiss, DE 809 in Case No. 08-md-01928 (stating that "a broad claim that a plaintiff or a plaintiff's physician relied on fraudulent or misleading statements . . . absent some recitation of what oral or written statement a particular drug representative made to a specific physician at what particular point in time, is an insufficient basis for allowing plaintiffs to proceed with a claim for fraud," and giving plaintiffs thirty days within which to plead fraud with specificity).
Plaintiff did not respond to these Orders. Plaintiff's fraud and  misrepresentation claims were accordingly dismissed in part  allowing them thirty days to provide specific allegations of fraud and reliance. There is no record evidence that Plaintiff relied on specific misleading statements that caused the use of Trasylol in the decedent's case, nor does she support her broad claims of fraud with any evidence of reliance, an essential element of these claims. *See Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y. 2d 403, 407 (N.Y. 1958) (reliance is an essential element for fraud claims in New York). Accordingly, Plaintiff's misrepresentation and fraud claims are due to be dismissed in full for this additional reason.

violation of consumer protection statutes, wrongful death, and loss of c[onsortium], as well as her survival claim" must fail." *See Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 586 (S.D.N.Y. 2008).

### B.    Failure to Warn

Bayer next asserts that Plaintiff's failure to warn claim is precluded by New York's Learned Intermediary Doctrine.  Under New York law a plaintiff "bringing suit against a drug manufacturer based upon a failure to warn, "must demonstrate that the warning was inadequate and that the failure to adequately warn of the dangers of the drug was a proximate cause of his or her injuries." *Glucksman v. Halsey Drug Co., Inc.,* 160 A.D. 2d 305 (1st Dept. 1990); *Krasnopolsky v. Warner-Lambert Co.*, 799 F. Supp. 1342 (E.D.N.Y. 1992).   The Plaintiff "bears the burden of proving that a defect exists and that this defect is the proximate cause of [his or her] injury." *Glucksman,* 109 A.D. 2d 305; *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 92 (2nd Cir. 1980).

I find it unnecessary to decide the applicability of the Learned Intermediary Doctrine to Plaintiff's Failure to Warn claim because this claim is due to be dismissed  for the same reasons discussed relating to Plaintiff's other claims.[18]  Specifically, the Failure to Warn claim is due to be dismissed due to lack of any credible evidence that Trasylol caused RJ any injury.  It is only logical that if a drug can not be attributable to a specific injury, whether the drug warned about

---

[18] I additionally note that the evidence establishes that the doctor who made the decision to use Trasylol, Dr. Naka was aware of the *Mangano* article and used Trasylol anyway. (SEE DEFEX F at ).  The evidence also establishes that Dr. Naka does not recall who ordered the Trasylol, and so there is no record evidence that a different warning would have impacted the decision to use the drug. *Id.*

23

that specific injury is irrelevant.  Accordingly, Plaintiffs failure to warn claim is due to be dismissed.

### C.    Unjust Enrichment and Punitive Damages

Summary judgment is granted on Plaintiff's Unjust Enrichment, and Punitive Damages claims because they are derivative of their underlying substantive claims each of which have failed.  *See e.g., Grynberg v. BP, P.L.C.*, 2011 Wl 1161540 (S.D.N.Y. 2011).

### IV.    Conclusion

Accordingly, for the reasons set forth above, it is hereby **ORDERED AND ADJUDGED** that the Motion be **GRANTED.**  Bayer's Motion for Summary Judgment (DE 12393 in 08-1928 & DE 62 in 08-22119) as to each Count of the Complaint is GRANTED.

**DONE and ORDERED,** in Chambers, at West Palm Beach, Florida this 2nd day of April, 2013.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:      Counsel of Record